Marc P. Berger
Sanjay Wadhwa
Sheldon L. Pollock
Daniel Michael
Osman Nawaz
Lee A. Greenwood
Philip A. Fortino
Lindsay S. Moilanen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1014 (Fortino)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL INVESTMENT GROUP, LLC, <br><br> Defendant. | 19 Civ. \_\_\_\_ <br><br> Complaint |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant International Investment Group, LLC ("IIG" or "Defendant"), alleges as follows:

## SUMMARY

1.     This civil action concerns a string of frauds by Defendant to cover up tens of millions of dollars in losses on bad bets and keep its investment advisory business afloat.

2.     IIG is an investment adviser that specializes in trade finance lending—risky loans to small- and medium-sized companies in emerging markets.  IIG serves as the investment

adviser to several private investment funds—the Trade Opportunities Fund ("TOF"), the Global

Trade Finance Fund ("GTFF"), and the Structured Trade Finance Fund ("STFF") (collectively,

the "Private Funds")—and in that capacity, selects and manages the Private Funds' investments,

principally in trade finance loans.

3.      Beginning in or about 2007, IIG engaged in a practice of hiding losses in the TOF

portfolio by overvaluing troubled loans and replacing defaulted loans with fake "performing"

loan assets.  When it was necessary to create liquidity, including to meet redemption requests,

IIG would sell the overvalued and/or fictitious loans to new investors, including, ultimately, to

GTFF and STFF, and use the proceeds to generate the necessary liquidity required to pay off

earlier investors.

4.      In addition to the Private Funds, IIG also advised an open-end mutual fund

marketed to retail investors (the "Retail Fund") and selected trade finance loans for the Retail

Fund's portfolio.  In or about March 2017, one of the loans IIG had recommended had defaulted

on a $6 million payment.  Concerned that the default would lead the Retail Fund to end the

advisory relationship, IIG used funds from an account under its control to make the defaulted

payment, making it appear that the borrower was creditworthy and current in its payments.  To

plug the $6 million hole it had created in the other account, IIG sold the retail fund a new fake

$6 million loan and used those funds to reimburse the account it had raided to make the earlier

payment to the Retail Fund.

5.      Through the conduct alleged herein, IIG is liable for violating Sections 206(1) and

206(2) of the Investment Advisers Act of 1940 ("Advisers Act"); Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and Section 17(a) of the

Securities Act of 1933 ("Securities Act").

6.      The relief sought in this action, including an asset freeze, is necessary to, among other things, prevent further harm to Defendant's clients and to restrain and enjoin Defendant from violating the federal securities laws.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to authority conferred by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and seeks to restrain and permanently enjoin Defendant from engaging in the acts, practices, transactions, and courses of business alleged herein, and such other and further relief as the Court may deem just and appropriate.

8.      The Commission also seeks final judgments ordering Defendant to: (a) disgorge its ill-gotten gains, together with prejudgment interest thereon and (b) pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

9.      The Commission also seeks preliminary and permanent injunctions: (a) enjoining Defendant from future violations of Sections 206(1) and 206(2) of the Advisers Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Section 17(a) of the Securities Act; (b) freezing IIG's assets; and (c) enjoining the filing or continuation of litigation affecting IIG's assets or assets controlled by IIG for the benefit of investment advisory clients.

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)], Sections 20(b) and 22(a) of the Securities

Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue is proper in this District pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because many of the acts and transactions constituting violations of the Advisers Act occurred within the Southern District of New York and because IIG inhabits the District.  Venue also is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint occurred within the Southern District of New York.

12.     In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## DEFENDANT

13.     IIG, a New Jersey limited liability company based in New York City, has been registered with the Commission as an investment adviser since 1995.  IIG serves as an investment adviser for multiple funds and separate accounts.  According to its Form ADV filed in March 2018, IIG had $373 million in assets under management.

## FACTS

### Background on the Private Funds and Trade Finance Loans

14.     Since its inception in 1994, IIG has specialized in advising clients with respect to investments in emerging market economies.  In or about 1998, it launched TOF.  IIG launched GTFF and STFF in June and July 2017, respectively.  All three Private Funds had the stated strategy of investing in trade finance loans.

15.     Trade finance loans are loans made to small- to medium-sized businesses, usually commodities exporters located in emerging markets, such as Latin America.  The loans are typically risky investments because the borrower's ability to repay could be impacted by less stable regulatory and economic conditions in the borrower's home country.  In order to mitigate the risk of these investments, trade finance loans typically are secured by collateral, which may include one or more of receivables, inventories, and assets.

16.     All three of the Private Funds were focused on and marketed to qualified institutional investors, including pension funds, insurers, and hedge funds, as a way for these prospective investors to diversify their portfolios with exposure to trade finance loans in Latin America.

17.     In offering memoranda and other communications, IIG touted its risk control strategies, which included portfolio concentration limits at the borrower, country, and commodity level.  It also touted its robust credit review process for borrowers.

18.     The Private Funds were valued on a regular basis including through a determination of the funds' net asset values ("NAV"), and IIG received compensation based on NAV and performance calculations.  With the exception of one position, every trade finance loan in the Private Fund portfolios was valued by IIG at par plus accrued interest throughout the entire life of the funds.

## IIG Hides Losses in TOF

19.     Beginning in or about 2007, IIG engaged in various deceptive acts to misrepresent the performance of and conceal losses in TOF, including overvaluing portfolio assets and replacing non-performing assets with fictitious loans that were reported as if they were legitimate performing assets.

20.    In or about 2007, when TOF's gross asset value was approximately $300 million, IIG learned that a $30 million loan by TOF to a South American coffee producer (the "Coffee Loan") had defaulted.

21.    Fearing that existing investors would flee the fund and that ongoing fundraising efforts would suffer if the loss were disclosed, IIG's two co-owners, Executive-1 and Executive-2, decided to conceal the loss and knowingly erroneously valued the loan at par plus accrued interest on the TOF's books.

22.    The overvaluation of the Coffee Loan materially inflated the NAV reported to TOF investors.

23.    When it became untenable to continue to carry the Coffee Loan on TOF's books as a performing asset due to auditor scrutiny, Executive-1 and Executive-2 removed the Coffee Loan from the firm's books and replaced it with fake loans to different borrowers (each, a "Substitute Loan").  The purported borrowers were foreign companies operating in other industries that were controlled by a business associate of IIG.  Accordingly, the purported borrowers never received anything of value from TOF, and there was no expectation they ever would make any payments to TOF.

24.    Executive-1 and Executive-2 directed that documentation be created to evidence each Substitute Loan for audit purposes.  In addition, starting in about 2010, Executive-1 and Executive-2 arranged for the purported borrowers to provide confirmations of the fake debts to auditors.  In one case, Executive-2 arranged for TOF to pay a monthly fee to a purported borrower in exchange for receiving such false confirmations.

25.    In or about 2010, another sizeable TOF loan of approximately $30 million to a seafood producer (the "Seafood Loan") defaulted.  As in the case of the loss on the Coffee Loan,

Executive-1 and Executive-2 agreed to hide the new loss by first continuing to value the Seafood Loan at par plus accrued interest and, when that became untenable, then removing the Seafood Loan from the portfolio and replacing it with additional Substitute Loans.

26.     Over time, as new losses arose or as the fictitious loans matured, IIG would remove them from the TOF portfolio and replace them with additional Substitute Loans.

27.     IIG's practices of overvaluing loans, including valuing the worthless Substitute Loans in the tens of millions of dollars, artificially inflated TOF's NAV and resulted in IIG receiving management and performance fees to which it was not entitled.

**IIG Defrauds New Investors to Keep TOF's Losses Under Wraps**

28.     In or about November 2013, TOF continued to have liquidity problems due to investor redemption requests, as well as repayment obligations on loans the fund had taken from international development banks.

29.     In order to help meet these liquidity needs, and to continue to conceal TOF's losses, Executive-2 spearheaded an effort to securitize the TOF loan portfolio.

30.      Ultimately, as a result of Executive-2's efforts, IIG obtained bank financing of approximately $220 million to capitalize a collateralized loan obligation trust (the "CLO").

31.     IIG, which served as the investment adviser to the CLO, then caused the CLO to use some of its capital to acquire existing trade finance loans from TOF.  The CLO retained additional capital to make new trade finance loans.

32.     Once it had acquired these assets from TOF, the CLO issued bonds to investors, backed by the cash flows the CLO received from the trust's assets.

33.     The proceeds to TOF from the sale of these loans to the CLO were not sufficient to meet TOF's liquidity needs.

34.     Beginning in late 2014 and continuing through at least September 2016, in order to generate more liquidity, Executive-1 diverted some of the remaining cash from the CLO to TOF.

35.     To disguise the transactions, Executive-1 caused the CLO to make new loans to at least seven Panamanian shell companies (the "Panama Loans") secretly owned by IIG, but instead of directing the money to the supposed borrowers, Executive-1 directed that it be transferred to a TOF account and used to pay TOF's liabilities.

36.     Executive-1, with the assistance of a senior IIG employee ("Employee-1"), acquired the shell companies that were the nominal borrowers on the Panama Loans and by procuring fraudulent promissory notes memorializing the Panama Loans.

37.     The Panama Loans were worthless.  Nonetheless, IIG valued the fake assets in the tens of millions of dollars on the books of the CLO.

### IIG Offloads Fake and Troubled Loans to New Clients

38.     In or about 2017, TOF's liquidity needs persisted, and the notes issued by the CLO began to mature, without sufficient cash in the CLO from interest and principal payments to redeem all the noteholders.

39.     IIG explored various options to generate liquidity to meet the liabilities of TOF and the CLO, including raising a new fund to purchase assets from each.

40.     In or about 2017, IIG succeeded in generating interest in a new private fund, GTFF, on the part of a foreign investor ("Investor-1"), which agreed to invest $70 million as an anchor investor in the new fund.

41.     IIG used Investor-1's investment and subsequent smaller investments by two other foreign investors to purchase loan assets from TOF and the CLO for the GTFF portfolio.

The assets purchased included approximately $44 million in fake Substitute Loans and Panama Loans.

42.     In addition, Executive-1 caused GTFF to purchase approximately $28 million in loans (the "Argentina Loans") to an Argentine borrower (the "Argentine Borrower") from the CLO.  At the time of the transaction, Executive-1 knew that the Argentina Loans were disputed, with the borrower claiming that the loans had been fully satisfied and IIG claiming the Argentine Borrower was in default.  Executive-1 and IIG failed to disclose the dispute concerning the Argentina Loans to GTFF and caused the fund to purchase the loans at par plus accrued interest, a price materially higher than the actual value of the assets in light of the claimed payoff and default.

43.     Later that same year, Investor-1 asked IIG to create another fund, STFF, to facilitate an additional $130 million investment.

44.     IIG still was in need of fresh capital to fully redeem the CLO noteholders and bailout TOF and agreed to establish STFF to facilitate Investor-1's additional investment.

45.     Executive-1 then caused STFF to acquire approximately $10 million in fake Substitute Loans and Panama Loans from TOF and the CLO.

46.     In addition, Executive-1 caused STFF to acquire $25 million in disputed Argentina Loans from the CLO.  As in the case of the GTFF transactions, Executive-1 and IIG caused STFF to pay full price for the Argentina Loans and did not inform STFF or Investor-1 that the loans were disputed.

47.     The sale of the fake loans and over-valued Argentina Loans to GTFF and STFF operated as a fraud on the funds and resulted in substantial damages to those clients.

9

**IIG Defrauds the Retail Fund**

48.     In addition to serving as the investment adviser to the Private Funds, beginning in or about December 2012, IIG became an investment adviser to a portion of the assets of a retail mutual fund, the Retail Fund.

49.     In its capacity as an adviser to the Retail Fund, IIG recommended that it invest in participation interests in trade finance loans originated by IIG.  IIG was compensated for its recommendations with a percentage of the cash flows from the loans it recommended.

50.     Loans to the Argentine Borrower were among the loans the Retail Fund invested at IIG's recommendation.

51.     In or about February 2017, the Argentine Borrower was delinquent on a principal payment of approximately $6 million on a facility owned by the Retail Fund that was maturing.

52.     The Retail Fund informed IIG that it had an additional $6 million to invest and was interested in further lending to the Argentine Borrower, but only if the Argentine Borrower repaid the past-due loan in full.

53.     At the time, the Retail Fund was a crucial source of liquidity for IIG as a purchaser of participations in loans held by the Private Funds.  Executive-1 became concerned that a default on the Argentina Loan could result in the Retail Fund ending the relationship with IIG.

54.     On or about March 7, 2017, to make it appear as though the default on the Argentina Loan had been cured, Executive-1 instructed that approximately $6 million be transferred into a collection account of the Argentine Borrower from the collection account of a different borrower ("Borrower-1").  He further instructed that the funds be used to make the outstanding payment that the Argentine Borrower owed to the Retail Fund.

55.     That same day, Employee-1, acting on Executive-1's instructions, presented the

Retail Fund with the opportunity to invest a fresh $6 million in a new loan recently made to the

Argentine Borrower (the "New Argentina Loan").  Employee-1 furnished the Retail Fund with

documentation purportedly memorializing the New Argentina Loan, including a notarized

promissory note and credit agreement.

56.     The New Argentina Loan did not exist, and the documentation provided to the

Retail Fund was forged.  Employee-1 prepared the forged documentation by altering

documentation memorializing one of the earlier legitimate Argentina Loans, including

electronically copying signature blocks from older documents.

57.     None of the $6 million invested by the Retail Fund was loaned to the Argentine

Borrower.  Instead, Executive-1 directed that the proceeds be transferred to the account of

Borrower-1 to reimburse that account for the earlier withdrawal.

58.     The purchase of the New Argentina Loan resulted in a $6 million loss to the

Retail Fund.

## FIRST CLAIM FOR RELIEF

## Sections 206(1) and (2) of the Advisers Act

59.     The Commission realleges paragraphs 1 through 58, above.

60.     IIG, who had an adviser-client relationship with, and therefore owed a fiduciary

duty to, the Private Funds and the Retail Fund, violated Sections 206(1) and 206(2) of the

Advisers Act [15 U.S. Code § 80b-6(1), (2)].

61.     From at least 2007 to the present, while acting as an investment adviser,

Defendant, by use of the mails or any means or instrumentality of interstate commerce, directly

or indirectly, (a) employed a device, scheme, or artifice to defraud a client or prospective client;

and/or (b) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client.

## SECOND CLAIM FOR RELIEF

### Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder

62.     The Commission realleges paragraphs 1 through 58, above.

63.     IIG violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

64.     From at least 2007 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

## THIRD CLAIM FOR RELIEF

### Sections 17(a)(1), (2), and (3) of the Securities Act

65.     The Commission realleges paragraphs 1 through 58, above.

66.     IIG violated Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

67.     From at least 2007 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge,

recklessness, or negligence, (a) employed devices, schemes, or artifices to defraud; (b) obtained

money or property by means of untrue statements of material fact or by omitting to state material

facts necessary to make the statements made, in light of the circumstances under which they

were made, not misleading; and/or (2) engaged in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon the purchasers of the securities being offered

or sold.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the

following relief:

### I.

An order preliminarily, through final judgment, restraining and enjoining Defendant from

directly or indirectly committing future violations of Sections 206(1) and 206(2) of the Advisers

Act,  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

An order preliminarily, through final judgment, freezing Defendant's assets;

### III.

An order preliminarily, through final judgement, enjoining the filing or continuation of

litigation that would affect the assets subject to the asset freeze order;

### IV.

A final judgment permanently restraining and enjoining Defendant from directly or

indirectly committing future violations of Section 206 of the Advisers Act [15 U.S.C. § 80b-6],

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**V.**

A final judgment ordering Defendant to disgorge all ill-gotten gains or unjust enrichment,

plus prejudgment interest thereon;

**VI.**

A final judgment ordering Defendant to pay civil monetary penalty pursuant to Section

209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**VII.**

Granting such other and further relief as the Court deems just, equitable, or necessary in

connection with the enforcement of the federal securities laws and for the protection of investors.


Dated:  New York, New York
        November 21, 2019


                                   Respectfully submitted,


                           By: /s/ Daniel Michael
                               Marc P. Berger
                               Sanjay Wadhwa
                               Sheldon Pollock
                               Daniel Michael
                               Osman Nawaz
                               Philip A. Fortino
                               Lindsay S. Moilanen
                               Attorneys for the Plaintiff
                               SECURITIES AND EXCHANGE
                                 COMMISSION
                               New York Regional Office
                               200 Vesey Street, Suite 400
                               New York, NY 10281-1022
                               (212) 336-1014 (Fortino)

14