# EXHIBIT C

CONTRATO DE LÍNEA DE CRÉDITO CON AFECTACIÓN A PREFINANCIACIÓN DE EXPORTACIONES

**EXPORT PREFINANCING CREDIT FACILITY AGREEMENT**

Entre

This Agreement is made by and between:

COMPAÑÍA ARGENTINA DE GRANOS S.A., una sociedad constituida y registrada bajo las leyes de la República Argentina, representada en este acto por el Sr. CARLOS ADRIANO NAVILLI, DNI 12.657.137 en su carácter de Apoderado, domiciliada en Av. San Martín 691, de la Localidad de Adelia María, Provincia de Córdoba, República Argentina, por una parte, en adelante denominado "MUTUARIO".

COMPAÑÍA ARGENTINA DE GRANOS S.A. a Corporation organized and registered under the laws of the Republic of Argentina, represented herein by Mr. CARLOS ADRIANO NAVILLI, ID# 12.657.137 in his capacity as Attorney-in-fact, domiciled at Av. San Martín 691, Town of Adelia Maria, Province of Córdoba, Argentina (hereinafter the "BORROWER"); party of the first part, and

MOLINO CAÑUELAS S.A.C.I.F.I.A., una sociedad constituida y registrada bajo las leyes de la República Argentina, representada en este acto por el Sr. CARLOS ADRIANO NAVILLI, DNI 12.657.137 en su carácter de Apoderado, domiciliado en Calle Kennedy 160, Cañuelas, 1814, Buenos Aires, República Argentina, por otra parte, en adelante denominado "FIADOR", y

MOLINO CAÑUELAS S.A.C.I.F.I.A., , a Corporation organized and registered under the laws of the Republic of Argentina, represented herein by Mr. CARLOS ADRIANO NAVILLI, ID# 12.657.137 in his capacity as Attorney-in-fact, domiciled at Kennedy 160, Cañuelas, 1814, Buenos Aires, Argentina, (hereinafter the "SURETY") party of the second part; and

IIG TOF B.V., representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representada por _____, en su carácter de Apoderados, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, por la otra parte, en adelante denominado "MUTUANTE";

IIG TOF B.V., represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, represented herein by E. Hazelhorn & H. Klein, in their capacities as _____, domiciled at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands (hereinafter the "LENDER"), party of the third part; and

el MUTUARIO y el FIADOR conjuntamente denominados los "DEUDORES";
el MUTUARIO, el FIADOR y el MUTUANTE conjuntamente denominados las "Partes"; y

BORROWER and SURETY are jointly referred to as "DEBTORS"; BORROWER, LENDER and DEBTORS are jointly referred to as the "Parties"
and

CONSIDERANDO:

**RECITALS:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la prefinanciación de sus exportaciones; y en particular las exportaciones de aceite y/o harina y/o pellets de soja y/o trigo;

(a) Whereas BORROWER is interested in obtaining mid-term financing for its export operations particularly for its oil and/or flour and/or soya pellets and/or wheat pellets exports.

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndoles continuar con el desarrollo y ampliación de sus mercados externos;

(b) Whereas satisfaction of BORROWER'S current need of financing to prefinance its export operations shall allow BORROWER to continue developing and expanding its external markets.

(c) Que el FIADOR mantiene fuertes vínculos comerciales con el MUTUARIO por mantener accionistas en común , por lo cual está interesado en afianzar las obligaciones de éste último a fin de que pueda obtener la financiación antes referida, y de esta manera garantizarse la colocación internacional de una parte de sus productos como asimismo el capital de trabajo comercial-operativo necesario para mantener el giro normal de su capacidad productiva plena, redundando en un indudable beneficio para todas las partes.

(c) Whereas SURETY maintains strong business ties with BORROWER, as they have common stockholders and therefore SURETY is interested in securing the payment obligations of BORROWER so that BORROWER may obtain the above-mentioned pre-financing, thus ensuring the international placement of a portion of its products, as well as the commercial and operating working capital required to maintain BORROWER'S full productive capacity in the regular course of business, which shall undoubtedly be to the benefit of all parties hereto.

(d) Que por las razones indicadas en los Considerandos (b) y (c) anteriores, y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO y el FIADOR están dispuestos a afectar bienes para garantizar solidariamente el repago del crédito;

(d) For the reasons indicated in aforementioned items (b) and (c) of this chapter, and to ease the loan from a risk-analysis perspective, the BORROWER and the SURETY are willing to affect some of their goods to guarantee jointly the repayment of the credit"

(e) Que el MUTUANTE está dispuesto a otorgar una línea de crédito de hasta Dólares Estadounidenses DIECIOCHO MILLONES con 00/100 (US$ 18.000.000,00) para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato Marco, en la medida que y siempre y cuando: (i) el MUTUARIO y el FIADOR se obliguen solidariamente a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato Marco; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato Marco, y (iii) las Partes acuerden la

(e) Whereas LENDER is willing to grant a credit facility of up to EIGHTEEN MILLION **United States Dollars and 00/100 (US$18,000,000 )** to BORROWER, subject to the terms and conditions of this Master Agreement, to the extent and provided that: (i) BORROWER and SURETY become jointly and severally bound to repay the same and to comply with all the obligations undertaken under the Agreement; (ii) the Guarantees (as defined herein below) are maintained in full force and effect and are enforceable until termination of the Agreement; and (iii) the Parties agree on the applicable interest Rate.

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

By virtue of the aforesaid considerations, this Credit Facility Agreement is executed pursuant to the following terms and conditions:

**PRIMERA:      DEFINICIONES.**

**SECTION ONE; DEFINITIONS.**

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común de los DEUDORES.

"Affiliates" means the subsidiary corporations and/or holding corporations and/or companies commonly owned by DEBTORS.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole de los DEUDORES y/o sus Afiliadas y/o el MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que los DEUDORES no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Material Adverse Change" means any material unfavorable change in the economic, commercial, financial or operating or any other kind of condition or financial position of DEBTORS and/or their Affiliates and/or LENDER, or their projections, taken as a whole, or in the economic, financial and tax policy of the Republic of Argentina or the United States of America, or the occurrence of any event that, at LENDER 's reasonable discretion, materially changes prevailing market conditions as of the date of execution of this Master Agreement (including, without limitation, any suspension, release or limitation to the compliance with monetary obligations under financial facilities and/or foreign trade facilities and/or any other kind of facilities, any payment suspension declaration in the Republic of Argentina or in any other financial or exchange market, the commencement of war, armed assaults, or any other type of national or international crisis directly or indirectly related to the Republic of Argentina); or the occurrence of any event which in LENDER 's opinion provides reasonable grounds to assume DEBTORS will not be able to regularly fulfill or comply with their obligations hereunder; or any significant variation in the Argentine Peso /United States Dollar exchange rate, or any suspension in the foreign exchange markets of the Republic of Argentina and/or the United States of America giving rise to a Material Adverse Effect.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula Segunda.

"Conditions Precedent" means the conditions precedent for effectiveness of the Master Agreement, set forth in Section TWO.

"Contrato Marco" significa el presente contrato de línea de crédito suscripto entre las Partes.

"Master Agreement" means this Credit Facility Agreement executed between the Parties.

"Crédito Cedido Originario" significa todos los créditos pendientes de pago y derechos que posee el MUTUARIO descriptos en cada Solicitud de Desembolso, que le corresponden al MUTUARIO por la venta de mercadería que el MUTUARIO realice al Deudor Cedido en virtud de los contratos de compraventa y/u Ordenes de Compra, sus eventuales modificaciones y/o enmiendas, adjuntos a cada Solicitud de Desembolso, (incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con el Deudor Cedido); y que son cedidos por el MUTUARIO al MUTUANTE –a satisfacción de este último– mediante las Solicitudes de Desembolso, en los términos establecidos en la Cláusula CUARTA del presente Contrato Marco. En ningún caso el monto de los Créditos Cedidos será inferior al 120% (ciento veinte por ciento) de las Sumas Adeudadas.

"Original Assigned Receivable" means all outstanding claims and rights of BORROWER described on each Disbursement Request that BORROWER is entitled to under the sale of goods made by the Assigned Debtor as per the sales agreements and/or Purchase Orders (including all claims resulting from bills of lading, delivery notices, invoices and other documents issued under the sales transactions BORROWER may enter into with the Assigned Debtor) which are assigned by BORROWER to LENDER at LENDER's satisfaction- under the Disbursement Requests as set forth in Section FOUR of this Master Agreement. In no case shall Assigned Receivables be lower than 120 % (one hundred and twenty per cent) of the Sums Due.

"Crédito Cedido Derivado" significa el crédito que el MUTUARIO deberá ceder al MUTUANTE en reemplazo del Crédito Cedido Originario, de conformidad con lo establecido en las Secciones 4.9, 4.10 y 4.11 del presente Contrato Marco.

"Derived Assigned Receivable" means the receivable to be assigned by BORROWER to LENDER to replace the Original Assigned Receivable as set forth in Sections 4.9, 4.10 and 4.11 of this Master Agreement.

"Créditos Cedidos" significa el Crédito Cedido Originario y el Crédito Cedido Derivado.

"Assigned Receivables/s" means both the Original Assigned Receivable and the Derived Assigned Receivable.

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

"Lender's Account" means the following bank account of LENDER

Bank:      Deutsche Bank Trust Company Americas
60 Wall Street, New York, NY 10005

Bank:      Deutsche Bank Trust Company Americas
60 Wall Street, New York, NY 10005



| | |
|---|---|
| ABA #: | 021-001-033 |
| SWIFT Code: | BKTRUS33 |
| Account Name: | iIG TOF B.V. fbo COMPANIA ARGENTINA DE GRANOS |
| Account Number: | 04-886-486 |

| | |
|---|---|
| ABA #: | 021-001-033 |
| SWIFT Code: | BKTRUS33 |
| Account Name: | iIG TOF B.V. fbo COMPANIA ARGENTINA DE GRANOS |
| Account Number: | 04-886-486 |

"Cuenta/s del Mutuario" significa las cuentas bancarias de titularidad del MUTUARIO cuyos datos se detallarán en cada Solicitud de Desembolso remitida por el MUTUARIO, y en la que el MUTUANTE deberá realizar el depósito y/o acreditación de los fondos requeridos.

"BORROWER's Account/s" means the bank accounts of BORROWER whose data shall be specified on each Disbursement Request forwarded by BORROWER, where LENDER shall deposit and/or credit the requested funds.

"Deuda Financiera" significa, respecto del MUTUARIO y del FIADOR, la deuda no consolidada contraída con entidades financieras (tanto a corto como a largo plazo) que el MUTUARIO y/o el FIADOR informen trimestralmente al MUTUANTE y que será ajustada en forma trimestral de acuerdo con lo expuesto en los correspondientes estados contables.

"Financial Debt" means, with respect to BORROWER and SURETY, the non-consolidated debt taken from financial entities (including both short-term and long-term debt) as reported on a quarterly basis by BORROWER and/or SURETY to LENDER, and which shall be adjusted on a quarterly basis in accordance with the information disclosed on the pertinent financial statements.

"Deudor Cedido" o "Deudor Cedido Originario" significa MOLINO AMERICANO S.A., con domicilio en Gral. Pacheco 1070, Montevideo, Uruguay.

"Assigned Debtor" or "Original Assigned Debtor" means MOLINO AMERICANO S.A., domiciled at Gral. Pacheco 1070, Montevideo, Uruguay.

"Deudor Cedido Derivado" significa el importador obligado al pago del Crédito Cedido Derivado, que indefectiblemente deberá tener domicilio fuera de la República Argentina.

"Derived Assigned Debtor" means the importer bound to pay the Derived Assigned Receivable. Such importer shall have to be domiciled outside Argentina.

"Día/s Hábil/es" significa aquel en el cual se desarrolle actividad bancaria y/o cambiaria en la plaza de la Ciudad de Buenos Aires.

"Business Day/s" means the day/s on which bank and/or exchange activities are developed in the City of Buenos Aires.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo y los Pagarés.

"Transaction Documents" means this Master Agreement, the Disbursement Requests resulting therefrom, and the Promissory Notes.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Dollars" and "US$" means United States Dollars, in cash or through a bank transfer.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

"Material Adverse Effect" means a material adverse effect in (i) the business, assets, transactions or condition (financial or otherwise) of BORROWER and/or its Affiliates or any other parties to the Transaction Documents (including LENDER), or (ii) the validity or performance of Transaction Documents, or (iii) the rights and benefits granted to LENDER under the Transaction Documents.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula NOVENA, Sección 9.2 del Contrato; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco.

"Event of Default" means any event, condition or circumstance mentioned in 9.2, Section NINE of the Master Agreement; and/or any non-compliance of the obligations set forth in the Master Agreement.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Sumas Adeudadas deberán vencer indefectiblemente dentro del término de los doscientos setenta (270) días corridos contados desde la fecha en que se realizó cada desembolso y a su vez, las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Diciembre de 2015.

"Due Dates" means the due dates for payment of the Sums Due indicated on each of the Disbursement Requests. Sums Due shall always become payable within two hundred and seventy (270) running days from the date on which the disbursement was made. Furthermore, Due Dates shall always be before December 31, 2015.

"FIADOR" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"SURETY" has the meaning indicated in the heading of this Master Agreement.

"Garantías" significa los Pagarés y la cesión de los Créditos Cedidos.

"Guaranties" means the Promissory Notes and the assignment of the Assigned Receivables.

"Gastos Administrativos" significa la comisión a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE adicionará a cada desembolso de fondos que el MUTUARIO le solicite.

"Administrative Expenses" means the commission to be agreed upon by the Parties for each Disbursement Request, which LENDER shall add to each disbursement of funds requested by BORROWER.

"Línea de Crédito" significa la presente y única línea de crédito, *"revolving"* que, sujeto a los términos y condiciones establecidos en los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses dieciocho millones CON 00/100 (US$ 18,000,000) como monto neto máximo a desembolsar por el MUTUANTE.

"Línea de Crédito Adeudada" significa la sumatoria de todas las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme los Documentos de la Operación.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula NOVENA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios de los DEUDORES.

"Ordenes de Compra" significa las órdenes y/o pedidos firmes de compra de mercadería – incluso a través de correo electrónico-, sus eventuales modificaciones y/o enmiendas, pendientes de pago, comprendidos en los Créditos Cedidos y emitidos en forma escrita y rubricados por el Deudor Cedido a favor del MUTUARIO,

"Partes" significa conjuntamente el MUTUARIO, el FIADOR y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE y avalados por el FIADOR, de conformidad con el formato adjunto al Contrato Marco como **ANEXO I**, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2015 durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en **ANEXO II**, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Interés" significa la tasa de interés a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le

"Credit Facility" means this Revolving Credit Facility only which, subject to the terms and conditions of the Transaction Documents, LENDER may grant to BORROWER, up to a total maximum amount of EIGHTEEN MILLION United States Dollars and 00/100 (U$S18,000,000) as the net maximum amount to be disbursed by LENDER.

"Credit Facility Due" means all of the Sums Due by BORROWER under the Credit Facility including interest as applicable, pursuant to Transaction Documents.

"Default" means any event or condition constituting an Event of Default, having the effects set forth in Section NINE hereof.

"LENDER" has the meaning given in the heading hereof.

"BORROWER" has the meaning given in the heading hereof.

"Applicable Rules" means all present and/or future, national, provincial or municipal rules applicable to the activities and the business of DEBTORS.

"Purchase Orders" means the outstanding firm orders and/or requests for the purchase of goods- even by email-, as from time to time amended, comprised in the Assigned Receivables, issued in writing and signed by the Assigned Debtor for the benefit of BORROWER.

"Parties" means, collectively, BORROWER, SURETY, and LENDER.

"Promissory Note/s" means the promissory notes issued by BORROWER to the benefit of LENDER and secured by SURETY, as per the form attached hereto as **ANNEX I**, in an amount equal to the Sum Due under each Disbursement Request, as set forth in Section THREE of the Master Agreement.

"Pesos" means the legal tender in the Republic of Argentina.

"Crediting Term" means the term of three (3) Business Days as from the effective date of receipt of the Disbursement Request.

"Confirmation Term" means the term of five (5) Business Days as from the date the required funds are credited in BORROWER's Account pursuant to a Disbursement Request.

"Availability Term" is the term fixed exclusively to the benefit of LENDER, as from the date of the Master Agreement until December 31, 2015, during which period LENDER undertakes to make the Credit Facility available to BORROWER.

"Disbursement Request" is the form substantially identical to the one attached hereto as **ANNEX II**, having all required data, to be executed by BORROWER and bearing the signature of its attorneys-in-fact or legal representatives certified by a notary public.

"Sum/s Due" means the funds to be paid by BORROWER to LENDER under each Disbursement Request including any applicable interest, as per this Master Agreement.

"Interest Rate" means the interest rate to be agreed by the Parties in each Disbursement Request, applicable to each disbursement of funds requested by the BORROWER to the LENDER, that the

solicite para calcular el monto de las Sumas Adeudadas.

latter shall consider to calculate the amount of the Sums Due.

## SEGUNDA:   LA LINEA DE CREDITO.

### 2.1.   Disponibilidad de la Línea de Crédito.

**2.1.1 Disponibilidad Condicionada**. Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

**2.1.2 Vigencia**. Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna– el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

**2.1.3 Monto de los Desembolsos**. El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

### 2.2.   Condiciones Precedentes al otorgamiento de la Línea de Crédito.

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

**2.2.1 Aprobaciones Societarias**. Que los DEUDORES hayan suscripto válidamente los Documentos de la Operación, y que el Directorio del MUTUARIO y del FIADOR haya aceptado incondicionalmente todos los términos y condiciones de los mismos, entregándole al MUTUANTE, a plena satisfacción del mismo, (i) copia certificada del acta de directorio del MUTUARIO y del FIADOR, transcripta al libro pertinente, en la cual se evidencie tal aprobación, y en la cual asimismo se autorice a los apoderados del MUTUARIO y del FIADOR, para la suscripción de los Documentos de la Operación, y (ii) copia certificada por escribano público del poder general del MUTUARIO y del FIADOR de los cuales surja que las personas autorizadas por los Directorios para la suscripción de los Documentos de la Operación se encuentran suficientemente facultadas para dicho acto; y

## SECTION TWO: THE CREDIT FACILITY.

### 2.1 Availability of the Credit Facility.

**2.1.1 Conditional Availability**. Subject to the specific performance of all and each of the Conditions Precedent, or to a written waiver by LENDER of one or all of the Conditions Precedent, without being required to do so under any circumstance, LENDER undertakes to make the Credit Facility available to BORROWER during the Availability Term, which may only be used to pre-finance BORROWER's exports, to the extent of the Requests of Disbursement, pursuant to the conditions and procedure set forth in this Master Agreement.

**2.1.2 Effectiveness**. Once the Availability Term has expired, BORROWER's right to send to LENDER any Disbursement Requests will automatically and irrevocably cease, without any prior court or out-of-court notice being required therefore, unless the Availability Term is expressly extended in writing by LENDER, to its sole satisfaction, and such decision is sufficiently notified to BORROWER in a timely fashion.

**2.1.3 Amount of Disbursements**. BORROWER may require as many disbursements as it may deem appropriate according to its needs provided the aggregate of the amounts stated in the relevant Disbursement Requests stay below the amount of the Credit Facility; consequently, in no case and under no circumstance will LENDER be bound, or may be interpreted to be bound, to disburse an amount higher than or exceeding the Credit Facility.

### 2.2 Conditions Precedent to the Granting of the Credit Facility.

The validity and effectiveness of the Credit Facility granted by LENDER under the Master Agreement is subject to the fact that, at LENDER'S reasonable discretion, (i) all and each of the following Conditions Precedent, set forth for LENDER'S exclusive benefit, take place and remain fully effective as of the execution of this Master Agreement and until its termination, and/or (ii) LENDER expressly waives in writing one, any or all the Conditions Precedent:

**2.2.1 Corporate Approvals**. That DEBTORS have validly signed the Transaction Documents, and that the Boards of Directors of BORROWER and SURETY have unconditionally accepted all the terms and conditions thereof, furnishing to LENDER, to its full satisfaction, (i) a certified copy of the minutes of the board of directors' meeting of BORROWER and SURETY, transcribed to the relevant book, giving evidence of such approval and also authorizing BORROWER's and SURETY's attorneys-in-fact to execute the Transaction Documents, and (ii) a copy certified by a notary public of the general power of attorney granted by BORROWER and SURETY evidencing that the persons authorized by the Boards of Directors to sign the Transaction Documents are fully empowered therefor; and .

Case 1:09-cv-... Document 114-3 ...

**2.2.2 Vigencia de las Manifestaciones y Declaraciones de los DEUDORES.** Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por los DEUDORES en la Cláusula OCTAVA del Contrato Marco,

**2.2.3 Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Eventos de Incumplimiento.** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías.

## TERCERA: CONDICIONES PRECEDENTES PARA LOS DESEMBOLSOS.

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

**3.1.1** el original de la Solicitud de Desembolso debidamente completada y firmada por los representantes legales de los DEUDORES que cuenten con las facultades suficientes, con sus firmas certificadas por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo, las Sumas Adeudadas que el MUTUARIO deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento calculadas a la Tasa de Interés y el detalle de los Gastos Administrativos

**3.1.2** un Pagaré librado a favor del MUTUANTE y avalado por el FIADOR, pagadero a la vista y sin protesto, por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por los representantes legales de los DEUDORES que cuenten con las facultades suficientes, a plena satisfacción del MUTUANTE, con las firmas debidamente certificadas por un escribano público argentino;

**3.1.3** los originales de las Órdenes de Compra y el detalle de los Créditos Cedidos pendientes de pago, cedidos a favor del MUTUANTE con la correspondiente carta de notificación de la cesión de los Créditos Cedidos dirigida al Deudor Cedido

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO (incluyendo, sin limitación, el supuesto en que las Partes no logren acordar la Tasa de Interés aplicable a la Solicitud de Desembolso), y por consiguiente el MUTUARIO renuncia expresa e irrevocablemente a promover algún reclamo contra el MUTUANTE fundado en tal circunstancia o causa.

**3.3. Trámite posterior. Desembolso.**

**3.3.1** Una vez recibidos los Documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá a verificar, a su exclusiva discreción, que toda la información y documentación en ellos

**2.2.2 Effectiveness of the Representations and Statements made by DEBTORS.** That each of the representations and statements made by DEBTORS in Section EIGHT of the Master Agreement are fully effective, and continue to be accurate, correct and true;

**2.2.3 Non-existence of Material Adverse Changes, Material Adverse Effects, or Events of Default.** That no grounded events have either occurred and/or continue to exist or exist to foresee the occurrence of one or more Material Adverse Changes, Material Adverse Effects and/or Events of Default (whether the lapse and acceleration of terms have been declared or not), and no circumstance known by BORROWER and or SURETY has occurred that in any way may endanger, undermine or weaken the full effectiveness, validity, force and effect, scope, and enforceability vis-à-vis third parties of the Transaction Documents and Guarantees.

## SECTION THREE: CONDITIONS PRECEDENT FOR DISBURSEMENTS.

**3.1 Disbursement Request.** To request LENDER a disbursement under the Credit Facility, BORROWER must send by reliable means and to LENDER'S satisfaction:

**3.1.1** the original of the Disbursement Request duly filled out and signed by the legal representatives or attorneys-in-fact of DEBTORS duly empowered therefor, with their signatures certified by an Argentine notary public; each Disbursement Request shall always contain the requested disbursement amount, the Due Date/s thereof, the Sums Due payable by BORROWER on such Due Date/s calculated based on the Interest Rate, and a detail of the Administrative Expenses.

**3.1.2** a Promissory Note issued to the name of LENDER and co-signed by SURETY, payable at sight and with clause "sin protesto", in the amount of the Sums Due, duly signed by the legal representatives or attorneys-in-fact of DEBTORS duly empowered therefor, at the full satisfaction of LENDER, with their signatures duly certified by an Argentine notary public

3.1.3 the original Purchase Orders and a breakdown of the outstanding

**3.2. Lack of Liability for Making a Disbursement or Not.** Notwithstanding the provisions of this Section, LENDER shall not have any liability whatsoever to BORROWER for accepting or rejecting any Disbursement Requests received from BORROWER (including, without limitation, the Parties' failure to agree on the Interest Rate applicable to the Disbursement Request) and, therefore, BORROWER expressly and irrevocably waives to file any claim against LENDER based upon such circumstance or cause.

3.3 Subsequent Proceeding. Disbursement.

3.3.1 Once the Disbursement Request Documents have been received by LENDER, LENDER shall verify that all the information and documents contained therein are, at its own discretion, accurate and in accordance with the Master

contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los Documentos de la Solicitud de Desembolso, y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma.

**3.3.2** Sin perjuicio de ello, de estar el MUTUANTE de acuerdo, a su satisfacción, con los Documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar los fondos solicitados (netos de cualquier deducción que le fuere aplicable) en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquella.

**3.4. Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de diez (10) días corridos contados desde la finalización del Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5 Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, o las Partes no logren un acuerdo respecto de la Tasa de Interés; el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato Marco en tal supuesto, de conformidad con lo establecido en la cláusula NOVENA del presente Contrato Marco.

**CUARTA:    CESIÓN DE CRÉDITOS.**
**4.1** En garantía de las Sumas Adeudadas y como medio de pago de las mismas de la forma prevista en el presente Contrato Marco, mediante cada Solicitud de Desembolso el MUTUARIO deberá ceder al MUTUANTE los Créditos Cedidos Originarios. A cada una de tales cesiones de créditos serán aplicables los términos y condiciones establecidos en la presente Cláusula CUARTA, los cuales se tendrán por reproducidos en cada una de las Solicitudes de Desembolso. Los Créditos Cedidos Originarios se considerarán aceptados por el MUTUANTE si y sólo si este último efectúa el desembolso de acuerdo a lo establecido en la Sección 3.3 de este Contrato Marco, en cuyo caso la cesión quedará perfeccionada entre las Partes en los términos establecido en el presente Contrato Marco. La falta de aceptación de la cesión de créditos antedicha por parte del MUTUANTE acarreará automáticamente el rechazo de la Solicitud de Desembolso, sin que ello genere responsabilidad o incumplimiento de ningún tipo para el MUTUANTE. En caso de ser aceptada por el MUTUANTE, la cesión de los Créditos Cedidos Originarios comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos

Agreement. Notwithstanding the above, LENDER is not obliged to perform a legal audit or due diligence of the Disbursement Request Documents and, therefore, LENDER shall be not responsible for any misrepresentation, inaccuracy, omission and/or lack of genuineness thereof.

**3.3.2** Notwithstanding the aforesaid, if LENDER agrees, to its satisfaction, to the Disbursement Request documents, LENDER shall, at its own discretion and to its own satisfaction, and even without being bound thereto under the Transaction Documents, disburse the requested funds (net of any applicable deduction) in BORROWER's Account within the Crediting Term. LENDER'S acceptance of a Disbursement Request does not bind LENDER to accept any other Disbursement Requests that BORROWER may submit to LENDER simultaneously or thereafter.

**3.4 Confirmation.** Within the Confirmation Term, BORROWER shall send to LENDER a note confirming receipt of such funds by reliable means. Notwithstanding the aforesaid, even in the event that BORROWER fails to send the confirmation note mentioned above, BORROWER's failure to submit a claim by reliable means within a term of ten (10) calendar days as from completion of the Crediting Term shall imply BORROWER's acceptance of the disbursement deposited in BORROWER's Account.

**3.5 LENDER'S Exclusive Power.** Should, at LENDER'S exclusive discretion, any Material Adverse Change or Material Adverse Effect occur during the Availability Term, or if the Parties fail to agree on the applicable Interest Rate, LENDER may immediately interrupt the processing of any Disbursement Request submitted under the Master Agreement being reviewed and evaluated by LENDER, as well as any disbursement of funds corresponding to a Disbursement Request approved by LENDER but which funds have not been actually credited in BORROWER's Account, without giving rise to any responsibility for LENDER. Consequently, BORROWER waives the filing of any action for responsibility grounded thereon. The aforesaid notwithstanding LENDER's right to terminate the Master Agreement under the provisions of section NINE hereof.

**SECTION FOUR: ASSIGNMENT OF RECEIVABLES.**
**4.1** As security for payment of all Sums Due and as means of payment thereof as set forth in this Master Agreement, under each Disbursement Request BORROWER shall assign the Original Assigned Receivables to LENDER. The terms and conditions of this Section FOUR shall apply to each such assignment of receivables, which shall be deemed reproduced in each of the Disbursement Requests. The Original Assigned Receivables shall be deemed accepted by LENDER if and only if LENDER makes the disbursement in accordance with the provisions in Section 3.3 of this Master Agreement, in which case the assignment shall have been perfected under the terms of this Master Agreement. Lack of acceptance of such assignment of receivables by LENDER shall automatically cause the rejection of the Disbursement Request, without such a circumstance creating any liability or breach of any kind whatsoever for LENDER. In the event LENDER accepts the assignment of the Original Assigned Receivables, such assignment shall comprise all rights and actions of BORROWER with respect to the Assigned Receivables and the above-mentioned consequences, placing LENDER pari passu in priorities with the pertinent scope and to the relevant extent, LENDER being also subrogated to all rights for performance and/or collection actions likely to exist in connection with such receivables, notwithstanding any contractual obligations with

los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido de las cuales surjan los Créditos Cedidos Originarios, que quedarán a cargo exclusivo del MUTUARIO.

Borrower's Assigned Debtor resulting in the Original Assigned Receivables, which shall be exclusively borne by BORROWER.

**4.2** El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, copias autenticadas de los conocimientos de embarque respecto de la mercadería comprendida en las Órdenes de Compra. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.2** BORROWER shall deliver to LENDER, within five (5) days from shipment, authenticated copies of the bills of lading relating to the goods comprised in the Purchase Orders. BORROWER shall also deliver to LENDER the delivery notices and invoices issued by BORROWER as a result of The Original Assigned Receivables within five (5) days from their receipt by the Assigned Debtor.

**4.3** El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos Originarios serán depositadas por el Deudor Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUARIO mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas al MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

**4.3** BORROWER warrants that all sums corresponding to the Original Assigned Receivables shall be deposited by the Assigned Debtor in LENDER's Account. For such purpose, in addition to the notices indicated in Section 4.6 herein below in this Section FOUR, BORROWER shall include in all and each of the invoices issued pursuant to the Assigned Receivables and sent to Assigned Debtor, a legend expressly stating that such invoices shall be paid to LENDER through a transfer of the pertinent funds to LENDER's Account. In each of the invoices assigned to BORROWER, the following legend shall be included (both in Spanish and English):

*"El crédito representado y contenido en la presente factura, fue cedido a _____, por contrato de Cesión de Créditos de fecha __/__/__ Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____., ABA mediante _____, Beneficiario: _____, Cuenta N°: _____"*

*"The receivable represented and contained in this invoice, was assigned to _____ under the Assignment of Receivables Agreement dated __/__/__. You should pay the same on the due date through a deposit in Bank: _____, ABA _____; Beneficiary: _____; Account No _____".*

**4.4** Los fondos de los Créditos Cedidos Originarios depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Cláusula QUINTA del Contrato Marco.

**4.4** The funds pertaining to the Original Assigned Receivables deposited in LENDER's Account shall be applied to the payment of the Sums Due as provided for in Section Five of the Master Agreement.

**4.5** La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos Originarios no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.5** The assignment of the Assigned Receivables is made under BORROWER's liability to LENDER. Therefore, if for any reason whatsoever the amount of the Original Assigned Receivables is not paid to LENDER as per the terms stated in this Section Four and/or are not sufficient to cover payment of the Sums Due on the specified Due Dates, BORROWER shall pay LENDER the total amount or any balance due corresponding to each Sum Due before each pertaining Due Dates, under penalty of incurring in automatic Default.

**4.6** El MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido, las instrucciones de pago a favor del MUTUANTE de las sumas correspondientes a los Créditos Cedidos y a obtener la aprobación expresa del Deudor Cedido respecto de las mismas, mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **ANEXO III.** A tales fines dentro de las 48 hs. de suscripta cada Solicitud de Desembolso, y como condición previa al desembolso de las sumas solicitadas, el MUTUARIO comunicará al Deudor Cedido, por escrito y de manera fehaciente con intervención notarial, que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido —mediante su apoderado o representante legal- firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido en la forma antes indicada, conforme lo establecido y como condición previa al desembolso de las sumas solicitadas en la Cuenta del Mutuario. Todo ello, sin perjuicio de la leyenda que el MUTUARIO deberá incluir en cada una de las facturas emitidas en virtud de los Créditos Cedidos Originarios, según se indica en el punto 4.3 de la presente Cláusula CUARTA.

**4.6** BORROWER shall give true and reliable notice of this assignment to the Assigned Debtor, shall provide payment instructions for payment of the Assigned Receivables sums to be made to LENDER, and shall obtain the Assigned Debtor's express approval thereof, in the form of a notice substantially identical to the form attached hereto as **ANNEX III.** For such purposes, within 48 hours from execution of each Disbursement Request, and as a condition precedent to the disbursement of requested sums, BORROWER shall give notice to the Assigned Debtor in writing and through reliable means with the intervention of a notary, that the sums pertaining to the Assigned Receivables shall have to be deposited in Lender's Account, and the Assigned Debtor, shall —through its attorney-in-fact or legal representative- sign at the bottom thereof acknowledging its acceptance therewith. BORROWER shall deliver such notice to LENDER bearing Borrower's Assigned Debtor acceptance as hereinabove indicated and specified, and as a condition precedent to the disbursement of requested sums into BORROWER's account. All of the above notwithstanding the legend that BORROWER shall have included in each of the invoices issued under the Original Assigned Receivables, as indicated in 4.3 of this Section FOUR.

Asimismo, el MUTUARIO remitirá vía fax y/o e-mail, una comunicación al Deudor Cedido indicando que el pago de los Créditos Cedidos Originarios deberá realizarse en la referida cuenta, consignando que se remite por correo el original de la comunicación.

**4.7** El presente Contrato Marco no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos Originarios, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos, que causen los Créditos Cedidos Originarios, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos Originarios. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que –con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- el Deudor Cedido incumpla por cualquier causa (incluyendo sin que implique limitación alguna, por causa de fuerza mayor o caso fortuito) los contratos que causen los Créditos Cedidos Originarios o rescinda o termine dichos contratos por cualquier causa, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

**4.8** El MUTUARIO declara y garantiza al MUTUANTE:

**4.8.1** el cobro de los Créditos Cedidos Originarios, en Dólares y mediante depósito de los mismos en la Cuenta del Mutuante.

**4.8.2** la forma instrumental de los mismos.

**4.8.3** la legitimidad de los Créditos Cedidos Originarios y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

**4.8.4** que no se encuentra inhibido para disponer de sus bienes;

**4.8.5** que no adeuda suma alguna que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos Originarios;

**4.8.6** que no ha percibido suma alguna derivada de los Créditos Cedidos Originarios, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

**4.8.7** la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos Originarios.

**4.8.8** que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos Originarios, incluyendo –pero no limitado a- la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos Originarios.

**4.8.9** que el monto de los Créditos Cedidos Originarios depositado en la Cuenta del Mutuante será equivalente como mínimo al 120 % de las Sumas Adeudadas de la Solicitud de Desembolso.

**4.8.10** que la Línea de Crédito será destinada a la financiación de exportaciones.

Furthermore, BORROWER shall send by fax and/or e-mail, a communication to the Assigned Debtor indicating that payment of the Assigned Receivables shall be made into such account, specifying that the original communication is forwarded by postal mail.

**4.7** This Master Agreement does not imply in any manner whatsoever a transfer by BORROWER to LENDER of the obligations arising from agreements originating the Original Assigned Receivables, which shall continue to be obligations of BORROWER. BORROWER undertakes to comply with any and all of its obligations deriving from the agreements originating the Original Assigned Receivables so that LENDER's right to collect the Original Assigned Receivables shall not be affected. Non-compliance in due time and manner with the obligations mentioned above shall automatically give place by operation of law to BORROWER's Default. Default by operation of law shall also occur with the consequences stated above in the event that, irrespective of BORROWER's default, the Assigned Debtor does not comply for any reason (including but not limited to causes of force majeure or "act of god") with the agreements originating the Original Assigned Receivables, or rescinds or terminates such agreements for any reason, or in any other manner ceases or ends its business relationship with BORROWER, whether unilaterally or as agreed between BORROWER and the Assigned Debtor.

**4.8** BORROWER represents and warrants LENDER:

**4.8.1** Collection of the Original Assigned Receivables, in Dollars and through their deposit into LENDER's Account;

**44.8.2** the instrumental form thereof;

**4.8.3** the legitimacy of the Original Assigned Receivables and that Assigned Receivables are freely available to BORROWER, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

**4.8.4** that BORROWER is not subject to restraining orders to dispose of their property;

**4.8.5** that they do not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Original Assigned Receivables;

**4.8.6** that they have not received any sum resulting from the Original Assigned Receivables and that the same have not been previously assigned, either partially or totally, to any natural or artificial person;

**4.8.7** the authenticity of the signatures of any document evidencing the origin of the Original Assigned Receivables;

**4.8.8** that they shall comply with any and all of their obligations deriving from the Original Assigned Receivables, including, but not limited to, delivery in due time and manner to the Assigned Debtor of the goods stated in the Original Assigned Receivables.

**4.8.9** that the amount of the Original Assigned Receivables to be deposited into LENDER's Account shall be at least equal to 120 % of the Sums Due under the Disbursement Request .

**44.8.10** that obtaining the Credit Facility shall be applied to the financing of their export operations.

**4.9**  Sin perjuicio del recurso del MUTUARIO establecido en la Sección 4.5 del presente, por cada Solicitud de Desembolso aceptada por el MUTUANTE, el MUTUARIO se compromete a ceder gratuitamente al MUTUANTE durante la vigencia del presente Contrato Marco y hasta 30 días corridos anteriores a la Fecha de Vencimiento establecida en cada Solicitud de Desembolso, otro crédito que resulte satisfactorio para el MUTUANTE, -a criterio razonable de este último- en reemplazo del Crédito Cedido Originario (el "Crédito Cedido Derivado"). A tal efecto, el Crédito Cedido Derivado que el MUTUARIO pretenda ceder al MUTUANTE deberá reunir -entre otros- los siguientes requisitos mínimos:

4.9.1  Tener un monto cierto equivalente, como mínimo, al 120 % ( ciento veinte por ciento) de las Sumas Adeudadas de la Solicitud de Desembolso cuyo reemplazo del Crédito Cedido Originario se pretenda;

4.9.2  tener una fecha de pago anterior a la Fecha de Vencimiento;

4.9.3  el Deudor Cedido Derivado –adquirente de la mercadería del MUTUARIO- deberá ser alguno de los nombrados a continuación: **MOLINOS OVERSEAS S.A, GLENCORE INTERNATIONAL AG, CONCORDIA TRADING B.V., URUGRAIN S.A., ALFRED C. TOEPFER INTERNATIONAL, NETHGRAIN B.V., AGROGRAIN LTD., LOUIS DREYFUS, ARCHER DANIELS MIDLAND (ADM), GRUPO MOLINOS (PEREZ COMPANC), CARGILL INC., NOBLE GRAIN PTE. LTD., BUNGE Y BORN, CEVAL INTERNATIONAL, SOYA MILLS S/A o SHEMEN INDUSTRIES LTD, MOLINO AMERICANO S.A , CARGILL SACI SUCURSAL URUGUAY, BUNGE AGRITRADE S.A. , BUNGE GLOBAL MARKETS, INC. (LATIN DIVISION), GLENCORE GRAIN B.V., OLEAGINOSA MORENO HN NOBLE RESOURCES S.A. OS. S.A.C.I.F.I.A., CONCORDIA AGRITRADING PTE. LTD CORRECTA IND. E COM., NOBLE RESOURCES S.A.** El MUTUANTE se reserva, a su exclusivo criterio, la facultad de aceptar –siempre que lo haga por escrito- otros Deudores Cedidos Derivados de reconocida solvencia distintos de los antes nombrados.

4.9.4  Encontrarse instrumentado por escrito, mediante contratos de compraventa, órdenes de compra en firme suscriptas por el Deudor Cedido Derivado o facturas emitidas por el MUTUARIO y aceptadas por el Deudor Cedido Derivado.

El Crédito Cedido Derivado garantizará las Sumas Adeudadas y se aplicará al pago de las mismas del mismo modo que el Crédito Cedido Originario, resultando aplicable al mismo. La pretendida cesión del nuevo crédito en modo alguno reemplazará, modificará ni alterará la cesión del Crédito Cedido Originario instrumentada mediante la Solicitud de Desembolso en cuestión hasta tanto la misma no sea expresamente aceptada por el MUTUANTE y se haya suscripto el contrato de cesión y se haya notificado fehacientemente al Deudor Cedido Derivado, conforme se establece en la Sección 4.10 subsiguiente.

**4.10**  En el supuesto que el Crédito Cedido Derivado propuesto por el MUTUARIO sea aceptado por el MUTUANTE, el MUTUARIO deberá ceder el mismo en los mismos términos y condiciones previstos en la presente Cláusula CUARTA del Contrato Marco. A tal fin, el MUTUARIO deberá suscribir ante escribano público el contrato de cesión correspondiente y la notificación a los Deudor/es Cedido/s Derivado/s en los términos establecidos en la Sección 4.6 del presente Contrato Marco,

**4.9**  Without prejudice to BORROWER's remedy in Section 4.5 herein, for each Disbursement Request accepted by LENDER, BORROWER agrees to grant LENDER for no consideration during the life of this Agreement and within 30 calendar days prior to the Due Date established in each Disbursement Request, another receivable as may be satisfactory and reasonable to LENDER, to replace the Original Assigned Receivable (the "Derived Assigned Receivable"). To that effect, the Derived Assigned Receivable intended to be assigned by BORROWER to LENDER shall meet – among others- the following minimum requirements:

4.9.1  it shall be issued for an amount equal to, at least, 120% (one hundred and twenty per cent) of the Sums Due under the Disbursement Request relating to the Original Assigned Receivable sought to be replaced;

4.9.2  the payment date shall be prior to the Due Date;

4.9.3  the Derived Assigned Debtor –purchaser of BORROWER's goods- shall be one of the following companies: **MOLINOS OVERSEAS S.A, GLENCORE INTERNATIONAL AG, CONCORDIA TRADING B.V., URUGRAIN S.A., ALFRED C. TOEPFER INTERNATIONAL, NETHGRAIN B.V., AGROGRAIN LTD., LOUIS DREYFUS, ARCHER DANIELS MIDLAND (ADM), GRUPO MOLINOS (FEREZ COMPANC), CARGILL INC., NOBLE GRAIN PTE. LTD., BUNGE Y BORN, CEVAL INTERNATIONAL, SOYA MILLS S/A or SHEMEN INDUSTRIES LTD, MOLINO AMERICANO S.A , CARGILL SACI SUCURSAL URUGUAY, BUNGE AGRITRADE S.A. , BUNGE GLOBAL MARKETS, INC. (LATIN DIVISION), GLENCORE GRAIN B.V., OLEAGINOSA MORENO HN NOBLE RESOURCES S.A. OS. S.A.C.I.F.I.A., CONCORDIA AGRITRADING PTE. LTD CORRECTA IND. E COM., NOBLE RESOURCES S.A.** LENDER reserves the right to accept, at its own discretion, creditworthy Derived Assigned Debtors other than the ones listed above -- provided such election is made in writing.

4.9.4  it shall be in writing and evidenced by bills of sales, firm purchase orders executed by the Derived Assigned Debtor or invoices issued by BORROWER and accepted by the Derived Assigned Debtor.

The Derived Assigned Receivable shall secure the Sums Due and shall be applied to payment thereof in the same way as the Original Assigned Receivable, being applicable thereto. The intended assignment of the new receivable shall not in any manner whatsoever replace, modify or change the assignment of the Original Assigned Receivable implemented by the pertaining Disbursement Request until the latter has been expressly accepted by LENDER, the assignment agreement has been executed and due notice thereof has been given to the Derived Assigned Debtor, as per the provisions in Section 4.10 below.

**4.10**  In case the Derived Assigned Receivable indicated by BORROWER is accepted by LENDER, it shall be assigned by BORROWER under the terms and conditions set forth in this Section FOUR hereof. To that end, BORROWER shall, as provided for in Section 4.6 hereof. Execute the pertaining assignment agreement and the notice to the Derived Assigned Debtor/s before a notary public; it shall also instruct the Derived Assigned Debtor/s to deposit the sums corresponding to the Derived Assigned

instruyéndolo/s para que efectúen el depósito de las sumas correspondientes al Crédito Cedido Derivado en la Cuenta del Mutuante. Todo ello de acuerdo al modelo adjunto al presente como **ANEXO IV**, mediante el cual asimismo se dejará sin efecto la cesión del Crédito Cedido Originario.

Receivable into Lender's Account. All of the above shall conform to the sample attached as **ANNEX IV** hereto, which shall supersede the assignment of the Original Assigned Receivable.

**4.11** El reemplazo del Crédito Cedido Originario por el Crédito Cedido Derivado constituye una obligación y no una facultad del MUTUARIO. Dicho reemplazo constituye una condición indispensable tenida en cuenta por el MUTUANTE para la suscripción del presente. La falta de cesión del Crédito Cedido Derivado dentro del plazo establecido en la Sección 4.9 (primer párrafo), así como el incumplimiento de las demás obligaciones establecidas en la presente Cláusula ocasionará la Mora automática del MUTUARIO.

**4.11** Replacement of the Original Assigned Receivable by the Derived Assigned Receivable constitutes BORROWER's obligation, not a power. Such replacement is a material condition on which LENDER relies to execute this agreement. Failure to assign the Derived Assigned Receivable within the term set forth in Section 4.9 (first paragraph) and to comply with all other obligations herein shall result in BORROWER's automatic Default

**QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.**

**SECTION FIVE: PAYMENT OF SUMS DUE. APPLICATION OF ASSIGNED RECEIVABLES TO PAYMENT OF SUMS DUE. LENDER'S REMEDY.**

**5.1** El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes a cada una de ellas, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.1** BORROWER irrevocably and unconditionally undertakes to pay LENDER the Sums Due on the Due Dates corresponding to each of them through a deposit thereof into LENDER's Account.

**5.2.** A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

**5.2.** For the purposes mentioned in 5.1 above, Assigned Receivables funds deposited into LENDER's Account shall be applied to payment of the Sums Due as follows:

El MUTUANTE aplicará todos los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en cada Fecha de Vencimiento. En el caso de que los fondos de los Créditos Cedidos depositados excedan el monto de las Sumas Adeudadas, el excedente será transferido a la Cuenta del Mutuario dentro de las cuarenta y ocho (48) hs hábiles de acreditados los fondos de los Créditos Cedidos en la Cuenta del Mutuante y siempre que no exista un Evento de Incumplimiento y no resulte de aplicación la sección 5.3 siguiente. En el caso de que los fondos de los Créditos Cedidos depositados durante tales vencimientos no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

LENDER shall apply Assigned Receivables funds deposited into Lender's Account to the payment of each Sum Due payable on each Due Date. In the event Assigned Receivables funds so deposited exceed the amount of Sums Due, the exceeding amount shall be transferred to the BORROWER's Account within forty-eight (48) business hours of the funds being credited in the LENDER's Account and as long as no Event of Default is occurring and section 5.3 is not applicable. In the event Assigned Receivables funds deposited by the Due Dates are not sufficient to cover Sums Due, BORROWER shall have to make up for the difference to cover the total Sum Due, under warning of Default.

**5.3** En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y en el caso que exista un remanente luego de haber sido cancelada la totalidad de la Línea de Crédito Adeudada, dicho remanente será transferido por el MUTUANTE a la Cuenta del Mutuario dentro de las cuarenta y ocho (48) horas hábiles de cancelada la totalidad de la Línea de Crédito Adeudada.

**5.3** Upon Default, all the funds pertaining to the Assigned deposited in the LENDER's Account shall be applied to payment of the entire Credit Facility Due and in case after the cancellation of the totality of the Credit Facility Due a surplus amount exists, the said exceeding amount shall be transferred by the LENDER to the BORROWER's Account within forty-eight (48) business hours as from the cancellation of the totality of the Credit Facility Due.

**5.4** Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso de que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuese suficiente para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**5.4** Considering BORROWER's remedy in the assignment of Assigned Receivables to LENDER, if -for any reason whatsoever- the amount of the Assigned Receivables deposited in Lender's Account are not sufficient to cover Sums Due on the Due Dates relating to a certain month, BORROWER shall pay LENDER the total amount or the balance due on each Sum Due before each Due Date, under penalty of incurring in automatic Default.

**5.5** En caso de pago en tiempo y forma de los Créditos Cedidos al MUTUANTE, éste último reintegrará al MUTUARIO toda suma que exceda el monto de la Línea de Crédito Adeudada dentro de las cuarenta y ocho (48) horas hábiles contadas desde el pago de los Créditos Cedidos, mediante transferencia a la Cuenta del Mutuario indicada en la Cláusula PRIMERA.

**5.5** If the Assigned Receivables are paid to LENDER in a timely and accurate fashion, the latter shall reimburse BORROWER any sum exceeding the amount of the Credit Facility Due within forty-eight (48) business hours as from payment of Assigned Claims through a wire transfer to Borrower's Account as mentioned in Section ONE.

**5.6** En caso que el pago de los Créditos Cedidos se realizara

**5.6** If for any reason whatsoever payment of Assigned

al MUTUARIO, por cualquier causa que fuere, el MUTUARIO se compromete a depositar dentro de las 24 hs. en la cuenta del Mutuante indicada en la Cláusula Primera, a favor del MUTUANTE, la suma necesaria para saldar las Sumas Adeudadas más los intereses compensatorios que se devenguen desde el la Fecha de Vencimiento correspondiente.

**5.7** En caso de falta de cumplimiento de cualquiera de las obligaciones asumidas por el MUTUARIO en el Contrato Marco, el MUTUANTE quedará facultado para iniciar contra cualquiera de los DEUDORES la ejecución de los Pagarés, a exclusivo criterio del MUTUANTE. El MUTUANTE se compromete a devolver los Pagarés al MUTUARIO dentro de un plazo no mayor a diez (10) días desde que las Sumas Adeudadas derivadas de cada Solicitud de Desembolso hayan sido abonadas en tiempo y forma, con más los intereses adicionales que pudieren corresponder en caso de mora.

**5.8.** Independientemente de los Créditos Cedidos, el Mutuario deberá causar dentro del plazo de vigencia del Contrato Marco, que se acrediten en la cuenta del Mutuante un importe no inferior al trescientos por ciento (300%) del monto total de la Línea de Crédito. Siempre que no hubiera ocurrido un Evento de Incumplimiento, estos fondos -en exceso de los Créditos Cedidos- se considerarán de libre disponibilidad del Mutuario, por lo que el Mutuante liberará los mismos a favor del primero dentro de las cuarenta y ocho (48) horas de su acreditación en cuenta del Mutuante. En caso de Evento de Incumplimiento el Mutuante deberá liberar a favor del Mutuario en igual plazo, aquellos fondos que excedan las sumas que el Mutuario adeude al Mutuante al momento del Evento de Incumplimiento.

## SEXTA: FIANZA.

Por este acto, el FIADOR se constituye en fiador solidario, liso llano y principal pagador, co-deudor solidario de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene bajo ésta Línea de Crédito el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier acreedor con miras a un arreglo general de pagos, o se transformen en insolventes o quebrados, o se haya decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los 15 días de haber sido decretados. En dicho supuesto el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de

Receivables is made to BORROWER, BORROWER undertakes to deposit to the benefit of LENDER the Lender's Account mentioned in Section ONE, within twenty-four hours, an amount as may be necessary to discharge the Sums Due plus compensatory interest accrued as from the pertaining Due Date.

**5.7** Upon failure to comply with any of the obligations undertaken by BORROWER under the Master Agreement, LENDER shall be entitled to start enforcement proceedings against any of the DEBTORS for collection of the Promissory Notes at LENDER's sole discretion. LENDER binds itself to return the Promissory Notes to BORROWER within ten (10) days following due and timely payment of all Sums Due resulting from each Disbursement Request, plus any additional applicable interest that may be payable in the event of default, as applicable.

**5.8.** Independently of the Assigned Receivables, during the term of this Master Agreement, the Borrower shall cause the credit in the Lender's Account, of not less tan three hundred percent (300%) of the amount of the Credit Facility. Provided that no Event of Default has occurred, these funds –exceeding the Assigned Receivables-, shall be considered to be fully available by the Borrower, so the Lender shall free and dispose the funds in benefit of the Borrower within forty eight (48) hours as from their credit in the Lender's Account. In case of Event of Default the Lender shall free in benefit of the Borrower in the same term, the funds exceeding the amounts that Borrower owes to Lender at the moment of the Event of Default.

## SECTION SIX: SURETY.

SURETY hereby becomes a joint and several surety, main payor and co-debtor of the debts and liabilities undertaken by BORROWER under this Agreement, under the same terms and conditions set forth herein for BORROWER, expressly waiving the right to: (1) the benefits of division and excussion and other applicable related commercial and civil rules, (2) demand the previous court or out-of-court foreclosure of BORROWER or exercise any defense that may be available to BORROWER, and generally to file any defenses other than that of payment. The joint and several liability assumed by SURETY comprises, additionally, legal or conventional readjustment and accessory costs, such as currency updating, compensatory and penalty interest due by BORROWER. This surety shall be effective until full payment is made by BORROWER of all liabilities of BORROWER undertaken under this Credit Facility and covered by this guarantee. The following events shall be construed to be a breach of the provisions herein contemplated: if SURETY starts negotiations with any creditor for a general payment arrangement or changes their indebtedness schedule, becomes insolvent, or bankrupt, or bankruptcy proceedings are instituted, or petitions for a composition with creditors, or an Out of Court Reorganization Plan is filed, and the same are not withdrawn within 15 days from institution thereof. In such event, LENDER may, through notice served on SURETY, declare that BORROWER's obligations are due and demand payment of all amounts due by BORROWER as payable, plus all expenses incurred by LENDER. SURETY makes the following representations and warranties, all of which shall continue to be effective during the life of this Agreement: (a) This guaranty is a valid and binding obligation of Surety, enforceable according to its relevant terms; (b) There is no by-law, rule, regulation or contract provision binding upon Surety that may be breached by the execution, delivery or performance of this guaranty. For all legal purposes hereof, SURETY establishes its special domicile at 111 Eighth Avenue, New York, New York, 10011, and accepts that notices served through a certified telegram or other authentic means are valid. To all legal purposes hereof, SURETY irrevocably submits to the jurisdiction and applicable law set forth in Section FOURTEEN hereof, expressly waiving any other forum or jurisdiction.

la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO CUARTA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.

**SÉPTIMA:     MONEDA DE PAGO.**

7.1     El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada y de los Créditos Cedidos- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de las Líneas de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviniente en el pago.

7.2     En atención a lo dispuesto en la Cláusula 7.1., en caso que en cualquier Fecha de Vencimiento existiere cualquier restricción o prohibición de hecho o de derecho para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO deberá igualmente abonar la Línea de Crédito Adeudada y cualquier otra suma pagadera en virtud de los Documentos de la Operación en Dólares, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE:

7.2.1. Mediante la compra con Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

7.2.2. Mediante la entrega al MUTUANTE de cualquier título en Dólares, a satisfacción expresa del MUTUANTE y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

7.2.3. En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de América, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

7.2.4. Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en cualquier Fecha de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**SECTION SEVEN: PAYMENT CURRENCY.**

7.1 BORROWER undertakes that payment of the full amount or the balance that may become due under the Transaction Documents- including payment of the Credit Facility Due and of the Assigned Receivables- shall only be paid in Dollars and that no other currency shall be accepted. Consequently, BORROWER expressly acknowledges and states that it is a material condition to this Agreement that payment of the Credit Facility Due, as well as compensatory and penalty interest, costs, court fees and further sums payable to LENDER hereunder, be canceled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar theory to allege any increased burden for payment.

7.2 In accordance with the provisions set forth in Section 7.1., if on any Due Date there is any legal or in-fact restriction or prohibition to access the exchange market in the Republic of Argentina as the case may be, BORROWER shall nevertheless pay the Credit Facility Due and any other amount payable under the Transaction Documents in Dollars, and it shall obtain such Dollars through any of the following mechanisms, at LENDER's option.

7.2.1 Through the purchase with Pesos (or the then legal tender in the Republic of Argentina), of securities in Dollars and the transfer and sale of said instruments outside the Republic of Argentina for Dollars in an amount which, sold in a foreign market, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the amount of said currency due under the Transaction Documents; or

7.2.2 Through delivery to LENDER of any securities in Dollars, to LENDER's express satisfaction and with a Dollar quotation abroad, in an amount which, once sold by LENDER in a foreign market, at market prices and conditions, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the aggregate amount in such currency due under the Transaction Documents; or

7.2.3 If there is any express legal prohibition in the Republic of Argentina preventing BORROWER from making the transactions stated in the two foregoing paragraphs, through delivery to LENDER of Pesos (or the then legal tender in the Republic of Argentina), in an amount which, on the payment date, is sufficient, once applicable taxes, costs, commissions and expenses are deducted, to purchase the aggregate amount of Dollars payable by BORROWER under the Transaction Documents, as per the exchange rate reported by Citibank N.A., New York, United States of America, to make Dollar acquisitions with Pesos in the City of New York, at 12 (twelve) hours (New York City time) on the payment date; or

7.2.4 Through any other procedure existing in the Republic of Argentina or abroad, on any Due Date under the Master Agreement, for the purchase of Dollars.

**7.3** Queda expresamente establecido que en cualquiera de las alternativas detalladas en 7.2.1. a 7.2.4., las Sumas Adeudadas por el MUTUARIO sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante, la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**7.4** Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 7.2.1.. a 7.2.4. precedentes serán pagados por el MUTUARIO.

**7.5.** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO en una moneda distinta de Dólares, la obligación de pago del MUTUARIO de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE de esa pérdida.

**OCTAVA:   MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DE LOS DEUDORES.**

**8.1.   Manifestaciones y Declaraciones de los DEUDORES.**
A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la Línea de Crédito, los DEUDORES manifiestan y declaran a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**8.1.1.**   Que los DEUDORES son sociedades anónimas que se encuentra debidamente constituidas, inscriptas y existentes conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus operaciones y negocios en los que participan en la actualidad; y

**8.1.2.**   Que los DEUDORES no están obligados a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**8.1.3.**   Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que los DEUDORES están legalmente autorizados y capacitados para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias de los DEUDORES, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

**8.1.4.**   Que los DEUDORES y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte,

---

**7.3** It is hereby expressly stated that in any of the alternatives detailed in 7.2.1. through 7.2.4., the Sums Due by BORROWER shall only be deemed paid and such payment shall have discharging effects only once the amount of Dollars due under the Transaction Documents and this Master Agreement is actually credited into Lender's Account

**7.4** All charges, costs, commissions, fees and taxes payable in connection with the procedures set forth in 7.2.1. through 7.2.4. above shall be paid by BORROWER.

**7.5** If in order to obtain a judicial judgment the amounts in Dollars due hereunder should be translated into another currency, the Parties agree that the exchange rate to be used shall be such which, in accordance with normal banking procedures, LENDER shall be able to apply to such other currency to purchase Dollars in New York City, United States of America, on the Business Day prior to that day in which final judgment is rendered. Likewise, if a judgment is rendered against BORROWER for payment of a sum in a currency other than Dollars, BORROWER's payment obligation of any amount due under the Transaction Documents shall only be deemed paid if on the Business Day following the date in which LENDER has received any amount deemed to be due hereunder in such other currency, LENDER shall, under normal banking procedures, in the City of New York, United States of America, purchase Dollars with such other currency. If such amount of Dollars thus purchased is less than the amount due under the Transaction Documents, BORROWER agrees, as a different obligation and independently from such judgment, to compensate LENDER for such loss.

**SECTION EIGHT: REPRESENTATIONS, WARRANTIES AND COMMITMENTS OF DEBTORS.**

**8.1. Representations and Warranties of DEBTORS.**
In order to induce LENDER to enter into the Agreement, DEBTORS represent and warrant the following as of the date hereof and until termination of this Master Agreement:

**8.1.1.**   That DEBTORS are duly organized, registered and validly existing pursuant to the laws of the Republic of Argentina, with all necessary powers and authority to carry out the relevant operations and businesses currently developed by them; and

**8.1.2.**   That DEBTORS are not bound to apply for authorizations or approvals from any judicial or governmental authority or from any other public or private entity (including, without limitation, lessors, lenders, creditors, insurance companies, and financial institutions) as a result of this Master Agreement and/or the Guaranties;

**8.1.3.**   That the Agreement and the Guaranties (i) are legal acts or businesses that DEBTORS are legally authorized and qualified to perform pursuant to the relevant legal and statutory provisions governing their activity, and (ii) that they are executed pursuant to all the required internal approvals of DEBTORS, without infringing any legal, statutory, stockholders' meeting or contractual provision, and that no further authorization is necessary; and

**8.1.4.**   That DEBTORS and/or their Affiliates have not materially and significantly defaulted on: (i) any order, ruling, mandatory injunction, demand, decree or request from any court of justice or arbitral tribunal, or any government agency,

tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

**8.1.5.** Que los DEUDORES no tienen pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

**8.1.6.** Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable a los DEUDORES ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallaren sometidos los DEUDORES y/o disposición alguna emanada de los estatutos vigentes de los DEUDORES y/o de ninguna hipoteca, prenda, instrumento de deuda, contrato u otro compromiso en que los DEUDORES fueren parte o se encontraren obligados; y

**8.1.7.** Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos de los DEUDORES de suscribir y firmar la totalidad de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por los DEUDORES frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**8.1.8.** Que los DEUDORES cumplen con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que han obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**8.1.9.** Que han dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato, acuerdo u operación, hecho y/o circunstancia vinculada a los DEUDORES que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de los DEUDORES para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**8.1.10.** Que el balance del MUTUARIO al 30 de Septiembre de 2013 y del FIADOR al 30 de Noviembre de 2013, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí

whether national, provincial or municipal, in the Republic of Argentina, or abroad, and/or (ii) payment of any taxes, rates, liens, social security debts and/or levies, whether national, provincial or municipal, in the Republic of Argentina, or abroad; and

**8.1.5.** That DEBTORS have no pending lawsuit, investigation or judicial, administrative or arbitral proceeding before any court of justice, arbitral tribunal or administrative authority, whether national, provincial or municipal, in the Republic of Argentina, or abroad; or any arbitration proceeding, that may (i) adversely and materially affect their capacity to fulfill their payment obligations under the Transaction Documents; (ii) affect the validity, legality or enforceability of any of the Transaction Documents; and/or (iii) have a material adverse effect on the business, financial or any other condition, or the result of their operations; and

**8.1.6.** That the execution and delivery of, and/or compliance with the Transaction Documents do not infringe any provisions under the Applicable Rules and/or any law and/or decree and/or regulation and/or resolution applicable to DEBTORS and do not infringe any order issued by any court or relevant judicial, arbitral or administrative authority DEBTORS might be subject to, and/or any provision under the current by-laws of DEBTORS and/or under any mortgage, security interest, debt instrument, contract or other undertaking in which DEBTORS might be a party or be bound to; and

**8.1.7.** That there is no paramount title and/or lien and/or restriction and/or limitation and/or hindrance whatsoever that precludes and/or prohibits and/or limits and/or in any way restricts the powers and rights of DEBTORS to execute all Transaction Documents (both main documents and ancillary documents), as well as any other commitment assumed by DEBTORS to LENDER under any of the Transaction Documents; and

**8.1.8.** That DEBTORS are in compliance with the rules and regulations in force applicable to them in environmental, industrial safety and public health matters, and that they have secured all authorizations, permits and licenses required under such rules and regulations; and

**8.1.9.** That they have given and provided LENDER with all the information relating to or in connection with any other agreement, contract or transaction, fact and/or circumstance relating to DEBTORS that may in any way adversely and materially affect the capacity of any of them to comply with their payment obligations hereunder and under the Guarantees, and that all the information furnished to LENDER by DEBTORS relating to the preparation, negotiation and execution of the Transaction Documents is true and correct and does not contain any inaccurate information regarding any relevant fact, nor does it omit any relevant fact the mention of which might be necessary to prevent the stated facts from being inaccurate or misleading; and

**8.1.10.** That the annual balance sheet of BORROWER as of September 31, 2013and that of SURETY as of November 30, 2013, the relevant statements of income and financial position, annexes and further information therein contained

Case ...ials EP-MUTUARIO y/o FIADOR Document 114-3 Filed 04/23/... Page 17 of 69

contenida referente al MUTUARIO y/o al FIADOR de los cuales el MUTUARIO y/o FIADOR han entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 01 de Octubre de 2013 y 01 de Diciembre de 2013 -respectivamente- no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO y/o del FIADOR; y

8.1.11. Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda hipoteca, o mejor derecho alguno; y

8.1.12. Que los DEUDORES han contratado y mantienen vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrollan, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

8.1.13. Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus deudas.

8.1.14. Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales de los DEUDORES y tienen y tendrán en todo momento la misma prioridad que aquellas obligaciones asumidas con igual carácter.

8.1.15. Los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

8.1.16. Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

8.1.17. Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto de los DEUDORES que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

8.1.18. Que cumple y realiza todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**8.2 Compromisos y Obligaciones de los DEUDORES.**
Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, los

---

relating to BORROWER and/or SURETY, duly signed copies of which BORROWER and SURETY have delivered to LENDER through their pertinent authorities, accurately present the financial situation and result of operations of BORROWER as of such date, and that from October 1, 2013 and December 1, 2013, respectively, no adverse change or event that may cause an adverse change in the business, operations, prospects or financial condition of BORROWER and/or SURETY has occurred; and

8.1.11. That the property, rights, and assets of BORROWER on which the Guaranties have been created are not subject to any pledge, mortgage or paramount title; and

8.1.12. That DEBTORS have taken out and maintain in force and effect all required insurance pursuant to the standards current in the Republic of Argentina for the activities they develop with creditworthy insurance companies of national renown; and

8.1.13. That BORROWER is not currently aware of any insolvency, cessation of payment, reorganization or bankruptcy proceedings of Assigned Debtor, and that the Assigned Debtor currently pay all their debts to BORROWER as they become due.

8.1.14. That the Transaction Documents and the obligations included therein are and will be at all times direct and general obligations of DEBTORS and have and will have at all times pari passu priority with obligations of the same scope

8.1.15. That the Transaction Documents are, or when duly executed and delivered will be, in proper legal form and substance under the applicable law for purposes of performance thereof, pursuant to applicable law. All formalities required in the Republic of Argentina for the validity and performance of the Transaction Documents (including any notice, registration, filing, payment of fees or taxes, notarization, or submittal to any Government Authority) have been complied with;

8.1.16. That no Event of Default has occurred or will occur as a consequence of or in connection with the performance of the transactions contemplated in the Transaction Documents;

8.1.17. That no Material Adverse Change has occurred as regards DEBTORS that may reasonably cause a Material Adverse Effect in their capacity to comply their obligations under the Transaction Documents;

8.1.18. That every reasonable action is being followed and taken by them in order to remain compliant with all international laws, regulations and conventions relating to environmental, labor, health and social security issues as applicable thereto.

**8.2 Commitments and Obligations of DEBTORS**
Following the execution hereof and to the extent any amount due hereunder remains outstanding, on any account and/or due to any reason whatsoever, DEBTORS firmly, expressly, irrevocably and

DEUDORES se comprometen firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

unconditionally undertake to perform or abstain from performing all the acts and/or activities specified below:

8.2.1. A pagar debida y puntualmente las Sumas Adeudadas, así como los Gastos Administrativos, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

8.2.1 To pay as and when due the Sums Due and the Administrative Expenses, pursuant to the terms and conditions set forth herein; and

8.2.2. A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que los DEUDORES, según el caso, los disputare por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

8.2.2 To keep all payments of taxes, liens, rates, and/or social security obligations and/or levies, whether national, provincial or municipal, both in the Republic of Argentina, and abroad, up to date, except in such cases where DEBTORS may, as applicable, file well-grounded objections in good faith to such payments through the pertinent legal procedures, as soon as permitted by the applicable procedural legislation and based on their unconstitutionality, inapplicability and/or illegality; and

8.2.3. A (1) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (2) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato, seguros, poderes, prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (3) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (4) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

8.2.3 To (1) maintain their legal capacity in force as well as all registrations necessary to maintain the same; (2) take any reasonable steps to maintain all the rights, permits, authorizations, agreements, insurance, powers of attorney, privileges, franchises, registrations, licenses and the like in force, as are necessary or advisable for the regular conduct of their activity, businesses or operations and the performance of their obligations; (3) maintain all their property in good state and working conditions; and (4) abstain from performing any act that may adversely affect the validity and/or effect of the Agreement and the Guaranties; and

8.2.4. A no realizar, sin notificación previa y expresa al MUTUANTE, con una antelación mínima de diez (10) días hábiles, actos que constituyan o impliquen (1) una fusión, transformación, absorción, escisión o cualquier otro modo de reorganización societaria, (2) transferencia de fondo de comercio o cualquier otro acto de efectos similares o al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores de los DEUDORES, ó (3) la realización de actividades que estén fuera de su objeto social, ó (4) la reducción, distribución o reintegro del capital social de los DEUDORES a sus accionistas, y (5) a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

8.2.4 To abstain, unless prior ten (10) day express notice is given to LENDER, from performing any acts constituting or implying (1) a consolidation, merger, transformation, spin-off, or any other form of corporate restructuring, or (2) goodwill transfer or any other act having similar effects which, pursuant to any law or rule, may be enforced before the creditors of DEBTORS; or (3) the participation of DEBTORS in other companies or projects or businesses different from the ones currently developed by DEBTORS, or (4) the reduction, distribution or reimbursement of the corporate capital of DEBTORS to its shareholders, and (5) to conduct and make all acts necessary for conservation, maintenance, renewal and effectiveness of their legal existence and rights, licenses, concessions, permits, privileges and franchise materials for the conduction and management of its respective businesses; and

8.2.5. A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago de los DEUDORES de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

8.2.5 To maintain LENDER fully and thoroughly informed of any Material Adverse Change and/or any other fact that may cause a Material Adverse Effect and/or otherwise adversely and significantly affect the payment capacity of DEBTORS of the obligations hereunder and/or under the Guaranties; and/or (ii) that may adversely affect the validity and/or effect of any of the Guaranties, as well as of the actions taken to remedy the same; and

8.2.6. A poner a disposición del MUTUANTE, y además entregar inmediatamente, la siguiente documentación contable correspondiente a los DEUDORES: (1) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel, (2) estados contables semestrales no auditados, (3) estados contables trimestrales no auditados , y (4) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados

8.2.6 To make available to LENDER, and further deliver forthwith, the following accounting documentation of DEBTORS: (1) anual financial statements duly audited by a first-level auditing firm; (2) biannual non audited financial statements, (3) non audited quarterly financial statements and (4) any other information LENDER might reasonable request at any time. The financial statements mentioned in 8.2.6. (1) above must be submitted duly audited within one hundred and twenty (120) calendar days from the closing of the relevant

Case 1:19-cv-09236-DLC Document 114-3 Filed 04/16/20 Page 19 of 69

contables, referidos en 8.2.6.(1) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en 8.2.6.(2) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos semestres; los estados contables referidos en 8.2.6. (3) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos trimestres; y la documentación referida en 8.2.6.(4) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, siempre que los DEUDORES puedan cumplir con ella, y

8.2.7. A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas, la obligación de los DEUDORES de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

8.2.8. A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

8.2.9. A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y

8.2.10. A notificar al MUTUANTE, en forma inmediata, (1) el acaecimiento de cualquier Evento de Incumplimiento, y (2) cualquier incumplimiento en que los DEUDORES incurrieren en relación con cualquier acuerdo o Contrato Marco del que sean parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (3) las acciones tomadas para subsanar los incumplimientos referidos en 8.2.10 (1) y (2) precedentes, y

8.2.11. A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, en la medida que no interfiera sustancial y adversamente con las actividades habituales de los DEUDORES,

8.2.12. A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (1) cualquier pérdida o daño sufrido en los bienes de los DEUDORES por montos superiores a Dólares Estadounidenses UN MILLON con 00/00 (US$ 1.000.000,00) por todo y cualquier concepto, en forma individual o acumulada durante cada ejercicio anual, y (2) cualquier litigio, o reclamo en el cual el monto reclamado a los DEUDORES fuere igual o superior a Dólares Estadounidenses UN MILLON con 00/00 (US$ 1.000.000,00) por todo y cualquier concepto, en forma individual o acumulada durante cada ejercicio anual, y

8.2.13. A no recomprar, rescatar ni amortizar sus propias acciones y a no reducir su capital, y

fiscal year; the financial statements mentioned in 8.2.6.(2) shall be submitted within sixty (60) calendar days from the closing of the relevant semesters; the financial statements mentioned in 8.2.6.(3) above must be submitted within sixty (60) calendar days from the closing of the relevant quarter period; and the documentation mentioned in 8.2. (4) must be submitted within five (5) calendar days following LENDER's request, provided DEBTORS are able to meet such a request; and

8.2.7 Not to let in any manner whatsoever any third party creditor be subrogated to, and to preclude any third party creditor from becoming subrogated in any way to, any rights and/or actions granted to LENDER hereunder and under the Guaranties, which will entail, inter alia, the obligation of DEBTORS to demand the express waiver by any third party obligor of the power to become subrogated to such rights and/or actions to the extent any sum hereunder remains outstanding; and

8.2.8 To comply with Applicable Rules (including, without limitation, any law, rule, regulation, order, instruction or resolution applicable to them as regards environmental protection, toxic or hazardous wastes, pollution and health) and to maintain all authorizations, permits or licenses that are necessary under Applicable Rules; and

8.2.9 To comply in due time and manner with each and every of their obligations arising from the Transaction Documents; and

8.2.10 To immediately notify LENDER (1) of the occurrence of any Event of Default; and (2) of any default by DEBTORS in connection with any agreement they might be a party to, or of any of their obligations thereunder (irrespective of whether or not the lapsing and acceleration of terms has been declared); and (3) of any actions taken to cure the defaults mentioned in 8.2.10 (1) and (2) above; and

8.2.11 To keep accounting records and other records in proper form and allow LENDER's access to their offices, facilities, books, records and files, allowing the performance of any accounting, legal, and management audits, by themselves or by the ones appointed by the LENDER to the extent such action does not materially and adversely interfere with the regular activities of the DEBTORS; and

8.2.12 To inform LENDER within 5 (five) Business Days after occurrence (1) of any loss or damage according to general accepted accounting principles, suffered by DEBTORS' property in amounts higher than ONE MILLION United States Dollars and 00/100 (US$ 1,000,000.00) for any and all amounts due and payable, individually or cumulatively during each annual period, and (2) any action or claim where the amount claimed from BORROWER is equal to or higher than ONE MILLION United States Dollars and 00/100 (US$1,000,000.00) for any and all amounts due and payable, individually or cumulatively during each annual period, and

8.2.13 To abstain from repurchasing, redeeming or amortizing their own shares and from reducing their capital; and

**8.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de asociados o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias de cuotas sociales actuales de los DEUDORES en otras sociedades o cooperativas.

**8.2.15.** A mantener respecto de otros deudores quirografarios en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación de los DEUDORES, todos los importes adeudados bajo el presente Contrato Marco; y

**8.2.16.** A informar al MUTUANTE trimestralmente (1) la deuda consolidada de los DEUDORES y de todas las Afiliadas de los DEUDORES, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (2) el volumen de ventas de cada una de las Afiliadas y de los DEUDORES

**8.2.17.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, los Pagarés por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

**8.2.18.** A no adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave de los DEUDORES,

**8.2.19.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (1) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un mutuante del exterior y (2) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

**8.2.20.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**8.2.21.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**8.2.14** To abstain from transferring or otherwise reducing, for any cause or on any account, including by means of a shareholder s' agreement or stock syndication agreement with third parties, and from pledging, encumbering or granting, any kind of guaranty as regards the current shareholdings of DEBTORS in other companies.

**8.2.15** To maintain all amounts due hereunder as to guaranties and privileges in collection not below any other obligation of DEBTORS; and

**8.2.16** To inform LENDER on a quarterly basis (1) the consolidated debt of DEBTORS, and of all Affiliates of DEBTORS held by each of such companies and by each financial entity as creditor (2) the sales volume of each of the DEBTORS and DEBTORS' Affiliates;

**8.2.17** To replace, to LENDER's full satisfaction, within a term of five calendar days following request therefor, the Promissory Notes with another eligible instrument allowing to initiate collection proceedings if, due to any change in the legislation, the aforementioned instruments lose their effect for such an end; and

**8.2.18** To abstain from making any decision that could adversely affect the business and/or goodwill of DEBTORS.

**8.2.19** To comply with all the requirements and demands from the Banco Central de la República Argentina and other Applicable Rules, and immediately provide evidence of such compliance to LENDER, to LENDER's satisfaction, including, without limitation: (1) to enter in the exchange market of the Republic of Argentina all funds deposited in Borrower's Account as disbursed hereunder, through the corresponding exchange closing and crediting of the resulting Pesos in a bank account opened in the Argentine financial system from conversion of currency under this Master Agreement executed with a foreign lender and (2) to periodically inform the BCRA about (a) the existence of the Transaction Documents and (b) the balance of its foreign debt according to Communications "A" 3602 and 3609 of the BCRA as supplemented or amended.

**8.2.20** To provide all the information LENDER may request relating to the Assigned Receivables, and to comply with every obligation as applicable for the Assigned Receivables to be paid to LENDER, binding themselves to follow any necessary steps for LENDER to achieve full recognition of the Assigned Receivables; DEBTORS will bear all expenses and costs resulting from or inherent in said assignments, including reasonable attorney's fees or court costs LENDER may have to incur to collect the Assigned Receivables;

**8.2.21** To make their best efforts to cause the Assigned Debtor to deposit in LENDER's Account as and when due all amounts corresponding to the Assigned Receivables;

**9.1** La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco –incluyendo sin limitación, el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar de la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora el MUTUANTE tendrá derecho a percibir intereses compensatorios pactados a la Tasa de Interés, con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

**9.2** El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido al MUTUARIO el inmediato pago de todas las Sumas Adeudadas en los siguientes Eventos de Incumplimiento:

**9.2.1** si el MUTUARIO incumpliese con el pago en tiempo y forma de la Línea de Crédito Adeudada;

**9.2.2** si un tercero pidiere la quiebra de los DEUDORES, del Deudor Cedido y/o sus respectivas Afiliadas y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

**9.2.3** si los DEUDORES, el Deudor Cedido y/o sus respectivas Afiliadas pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

**9.2.4** si los DEUDORES y/o sus Afiliadas incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

**9.2.5** Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos de los DEUDORES y/o sus Afiliadas, o se decretare la inhibición general de bienes de los DEUDORES, por un monto en exceso de Dólares Estadounidenses TRESMILLONES con 00/100 (US$ 3.000.000,00) por todo y cualquier concepto, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los quince (15) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

**9.2.6** si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad, parcial o total, por parte de los DEUDORES, en las declaraciones contenidas en la Cláusula OCTAVA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

**9.2.7** si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

**9.1** BORROWER's default of the obligations agreed upon under this Master Agreement, including without limitation, payment in due time and manner of any Sum Due, shall occur automatically by operation of law and without any notice or order being required, upon the occurrence of any of the Events of Default. Upon BORROWER'S Default, the lapsing of all terms shall occur and LENDER shall be entitled to consider the aggregate amount of the Credit Facility Due as a past due debt, and to request and legally demand full payment thereof, plus accrued interest and other charges. As long as BORROWER continues to be in Default LENDER shall be entitled to receive compensatory interest at the Interest Rate plus default interest equal to fifty per cent (50%) of the compensatory interest rate.

**9.2** LENDER shall also be entitled to consider that BORROWER is automatically in Default, that the Credit Facility Due is past due, and to request from BORROWER the prompt payment of all Sums Due upon the occurrence of any of the following Events of Default:

**9.2.1** if BORROWER fails to make any of the Credit Facility Due payments in due time and manner;

**9.2.2** if a third party requests DEBTORS, the Assigned Debtor and/or their respective Affiliates to be declared bankrupt and such a request is not rejected by the court involved in the first procedural stage;

**9.2.3** if DEBTORS, the Assigned Debtor and/or their respective Affiliates file a voluntary petition in bankruptcy, file for their own reorganization, or initiate procedures for an out-of-court reorganization plan or any debt restructuring;

**9.2.4** if DEBTORS and/or its Affiliates become insolvent, even if the steps described above are not taken;

**9.2.5** in the event any attachment or any provisional remedy were granted over the property, assets or rights of DEBTORS and/or its Affiliates, or a legal prohibition from disposing of any of DEBTORS' property were ordered in an amount exceeding THREE MILLION United States Dollars and 00/100 (US$ 3,000,000.00) for any and all amounts due and payable, whether individually or jointly during the life of the Master Agreement, and such attachments and/or provisional remedies were not released or cancelled due to any reason whatsoever within fifteen (15) judicial days following the request to release the attachment and/or cancel the provisional remedy, which request must be made at the first procedural opportunity possible; or

**9.2.6** if at any time during the life of this Master Agreement, the lack of veracity, whether partial or total, by DEBTORS is found to exist in the statements included in Section EIGHT hereof and/or failure to comply with the undertakings assumed in such Section and/or lack of veracity in any of the applications of this Master Agreement;

**9.2.7** if there were any modification which, in LENDER's opinion, causes a material change in the basic conditions which have been considered for executing this Master Agreement;

**9.2.8** Si el MUTUARIO y/o sus Afiliadas modificasen de cualquier forma su composición accionaria, salvo cuando tales actos se realicen entre sociedades del grupo de los DEUDORES, de modo tal que la participación directa o indirecta del FIADOR en el patrimonio de las sociedades involucradas no varíe sustancial y negativamente, ni implique la pérdida del control accionario por parte de la familia Navilli de la voluntad social de los DEUDORES y/o de sus Afiliadas.

**9.2.8** if in any manner whatsoever BORROWER's and/or its Affiliates' capital stock structure is modified, unless such actions are carried out among companies within the DEBTORS' group to the extent that SURETY's direct or indirect interest in the assets of the companies involved is not substantially or adversely affected and no detriment is caused to the majority control held by the Navillis over corporate decisions of DEBTORS and/or their Affiliates.

**9.2.9** Si el FIADOR modificase de cualquier forma su actual composición accionaria, salvo que: (i) cuente con la previa autorización escrita del MUTUANTE, firmada en forma auténtica por un representante del MUTANTE con facultades suficientes; o (ii) luego de la modificación, los actuales accionistas continúen teniendo la mayoría accionaria –entendiéndose por tal a 51% o más de las acciones del FIADOR- y (iii) el Sr. Aldo Navilli continúe siendo Director Titular del Directorio. El FIADOR entiende y acepta que el mantenimiento de la actual composición accionaria del FIADOR es una condición fundamental tenida en mira por el MUTUANTE para suscribir el presente Contrato.

**9.2.9** if in any manner whatsoever SURETY modifies its current capital stock structure, unless: (i) LENDER's prior written consent bearing the signature of LENDER's representative duly and fully empowered therefor, has been given; or (ii) after consummation of a change thereof, the current shareholders continue to own a majority interest –i.e. 51% or more of SURETY's capital stock- and (iii) Mr. Aldo Navilli continues to be a Regular Director of the Board of Directors. SURETY acknowledges and accepts that maintenance of SURETY's current shareholding structure is a material condition on which LENDER relies to execute this Agreement

**9.2.10** si los DEUDORES incumplieren cualquiera de las obligaciones a su cargo establecidas en los Documentos de la Operación;

**9.2.10** if DEBTORS fail to comply with any of their obligations set forth under the Transaction Documents,

**9.2.11** si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido y/o con el Deudor Cedido Derivado;

**9.2.11** if BORROWER fails to comply with any of its contractual obligations undertaken with the Assigned Debtor and/or the Derived Assigned Debtor,

**9.2.12** si –con prescindencia de que hubiese o no incumplimiento por parte de los DEUDORES en el pago de las Sumas Adeudadas- el MUTUARIO y/o el Deudor Cedido y/o el Deudor Cedido Derivado terminan los contratos que causan los Créditos Cedidos;

**9.2.12** if –irrespective of DEBTORS' default in payment of the Sums Due - BORROWER and/or the Assigned Debtor and/or the Derived Assigned Debtor terminate the agreements originating the Assigned Receivables

**9.2.13** si por cualquier causa que fuere las Sumas Adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

**9.2.13** if for any reason whatsoever Sums Due hereunder are paid in a currency other than the Dollar.

**9.2.14** Si se dictaran una o más sentencias judiciales o laudos arbitrales firmes en contra los DEUDORES o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de los DEUDORES que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de los DEUDORES para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

**9.2.14** if one or more final court judgments or arbitration awards were issued against DEBTORS or measures were adopted to foreclose any mortgage, attachment or other lien over the property of DEBTORS which, at LENDER's discretion, may (i) adversely and materially affect the capacity of DEBTORS to afford payment of their obligations hereunder; or (ii) adversely and materially affect any of the Guaranties;

**9.2.15** Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

**9.2.15** if there occurs a Material Adverse Change and/or a Material Adverse Effect;

**9.2.16** Si de cualquier forma el MUTUARIO solicitare judicialmente o efectuare liberaciones parciales de cualquiera de las Garantías en violación a lo dispuesto en el Contrato Marco.

**9.2.16** if BORROWER files a court petition to have any of the Guarantees discharged or otherwise makes partial releases of the Guarantees in breach of the provisions in the Master Agreement;

**9.2.17** Si el MUTUARIO no instrumentase la cesión de los Créditos Cedidos Derivados en los plazos y términos establecidos en las Secciones 4.9, 4.10, y 4.11 de este Contrato Marco.

**9.2.17** if Borrower fails to consummate the assignment of the Derived Assigned Receivables within the timelines and under the terms and conditions set forth in Sections 4.9, 4.10, and 4.11 of this Master Agreement.

**9.3** El MUTUARIO asume el cumplimiento de todas y cada una de las obligaciones bajo los Documentos de la Operación, por lo cual

**9.3** BORROWER agrees to comply with each and every one of the obligations under the Transaction Documents, and, therefore, the

en caso de incurrir en un Evento de Incumplimiento, se producirá la Mora del MUTUARIO. Producida la Mora del MUTUARIO, el MUTUANTE podrá proceder sin más a la ejecución de las Garantías e imputar la totalidad de los Créditos Cedidos al pago de la Línea de Crédito Adeudada.

**9.4** En adición a lo dispuesto en la Sección 9.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUANTE y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática en el presente Contrato Marco -en los términos establecidos en la Sección 9.1 precedente- y de cualquier otra obligación contractual entre el MUTUANTE y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago por parte del Deudor Cedido o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUANTE y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUANTE y el MUTUARIO.

## DÉCIMA: GASTOS.

**10.1** El MUTUARIO abonará al MUTUANTE, los Gastos Administrativos, los que serán adicionados al monto de cada desembolso solicitado mediante las Solicitudes de Desembolso y cancelados conjuntamente con los intereses en las Fechas de Vencimiento.

**10.2** Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuentas del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

**10.3** Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberá obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago

**10.4** El MUTUARIO se obliga a cumplir en tiempo y forma -a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**10.5** El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones

occurrence of an Event of Default will give rise to BORROWER's Default. Upon BORROWER's Default, LENDER may forthwith enforce the Guarantees and apply all Assigned Receivables to payment of the Credit Facility Due.

**9.4** In addition to the provisions set forth in 9.1 above, BORROWER's Default due to non-fulfillment of any of the obligations agreed herein shall give place to the lapsing of all terms and the automatic default of BORROWER in all agreements executed between BORROWER and LENDER . Likewise, the default in any of such agreements shall give place to the automatic Default hereof – as per the terms set forth in 9.1 above – and of any other contractual obligation between BORROWER and LENDER. In such sense, upon BORROWER's Default either due to lack of payment by the Assigned Debtor or due to the occurrence of any of the Events of Default detailed hereinabove, LENDER, at its own discretion, shall be entitled to enforce the Guarantees and/or other guaranties granted in other agreements executed between BORROWER and LENDER . Likewise, in such event, LENDER shall be entitled to apply to payment of the Sums Due hereunder, any BORROWER's funds then deposited – or those to be deposited in the future – in LENDER's Account for any reason and/or contractual relationship between LENDER and BORROWER.

## SECTION TEN: EXPENSES.

**10.1** BORROWER shall pay LENDER the Administrative Expenses, which shall be added to each disbursement requested under the Disbursement Requests and shall be paid together with any interest due on the Due Dates.

**10.2** All commissions, bank fees (including, without limitation, bank fees and commissions resulting from the deposits and transfers made from and to Lender's Account and/or Borrower's Account), taxes and/or charges resulting from the transactions directly and/or indirectly derived from this Master Agreement, shall be borne by BORROWER. BORROWER undertakes to pay all commissions and/or expenses to be borne by BORROWER to LENDER promptly and upon the latter's sole request and not later than 48 hours following such request, which shall be duly evidenced.

**10.3** All payments hereunder shall be made by BORROWER free of any deductions, withholdings and other charges of any nature whatsoever. If BORROWER is requested by law or any competent authority to make any deduction, withholding or charge, BORROWER shall make such additional payments to LENDER as necessary so that, after such deductions, withholdings or charges, LENDER receives an amount equal to the amount due to LENDER hereunder as if such deductions, withholdings or charges have not been made. BORROWER shall pay in due time and manner to the pertinent tax authorities the amount withheld, and shall obtain and give to LENDER a certified copy of the pertaining receipts evidencing such payment.

**10.4** BORROWER shall comply in due time and manner, at their cost and expense, with the settlement of foreign currency and payment of all pertinent taxes directly or indirectly resulting from this Master Agreement and with any rules and regulations set forth by the Banco Central de la República Argentina, releasing LENDER from any obligation in connection therewith.

**10.5** BORROWER shall hold LENDER harmless, and to defend and prevent any damage being made to LENDER, its shareholders and employees in connection with any and all of the obligations resulting

emergentes de las operaciones relacionadas con los Créditos Cedidos; ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

## DÉCIMO PRIMERA:      CESIÓN DEL CONTRATO MARCO.

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último) por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este contrato. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también las nuevas instrucciones de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del contrato cualquier defensa que hubiera podido oponer al MUTUANTE cedente. El MUTUARIO no podrá bajo ningún concepto ceder el presente Contrato Marco sin previo y expreso consentimiento del MUTUANTE.

## DÉCIMO SEGUNDA:      VIGENCIA. INDEMNIDAD.

12.1 El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas DÉCIMA, DECIMO SEGUNDA y DECIMO CUARTA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

12.2    El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (1) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstos en ellos; (2) los Créditos Cedidos adeudados con más sus intereses o el uso de los fondos desembolsados o (3) cualquier demanda, litigio, sumario, o procedimiento extrajudicial o administrativo, relacionado con cualquiera de las circunstancias previstas en esta Cláusula 12.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

## DÉCIMO TERCERA:      AUTORIZACIÓN

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.
En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

## DÉCIMO CUARTA:      JURISDICCIÓN Y LEY APLICABLE.

14.1    El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva

from the transactions relating to the Assigned Receivables, entry and settlement of foreign exchange and any other taxable, exchange, banking, customs liability or of any other kind of obligations whatsoever resulting therefrom.

## SECTION ELEVEN: MASTER AGREEMENT ASSIGNMENT.

LENDER may assign the rights arising from the Master Agreement in full to any of its affiliates and/or subsidiaries (i.e. those holding or subsidiary corporations of LENDER or commonly owned by LENDER), by any of the means provided by Law, the assignee acquiring the same benefits and/or rights and/or actions to which LENDER is entitled under this Master Agreement  In such event, LENDER shall give notice by true means of the assignment to BORROWER, as well as of the new payment instructions, using true means of notice. In such event, BORROWER may file any defense against the assignee of the Master Agreement that BORROWER would have been entitled to file against the assigning LENDER. BORROWER shall not be authorized to assign this Master Agreement without the previous written consent of LENDER.

## SECTION TWELVE: EFFECT – INDEMNITY.

12.1 This Master Agreement as well as all the Guaranties resulting herefrom will remain in full force and effect until all rights and/or obligations of the Parties hereunder are fully exercised and complied with. Furthermore, even after the obligations arising from the Master Agreement have been fulfilled, Sections TEN, TWELVE and FOURTEEN will survive and will remain in full force and effect until the expiration of the limitations that might be applicable.

12.2 BORROWER will hold LENDER and its Affiliates, directors, managers, officers, employees and independent advisors (the "Indemnitee") harmless against any loss, claim, complaint, liability and every expense relating thereto (including reasonable attorney's and advisor's fees) incurred by the Indemnitee in connection with, relating to, arising from and as a consequence of: (1) execution or delivery of the Master Agreement and the Guaranties and performance of the obligations thereunder, or performance of the transactions contemplated therein; (2) the Assigned Receivables due plus any interest thereon or the use of the disbursed funds; or (3) any complaint, lawsuit, preliminary investigation proceeding or out-of-court or administrative procedure, relating to any of the circumstances contemplated in this Section 12.2, based on contractual or extra-contractual grounds, or as provided in the applicable law; to the extent the indemnity against such losses, complaints, liabilities or expenses does not result from the gross negligence or willful misconduct of the Indemnitee.

## SECTION THIRTEEN: AUTHORIZATION

BORROWER expressly authorizes LENDER to register this Master Agreement and all documents hereunder in all Registries deemed relevant by LENDER in order to secure BORROWER's obligations.

Therefore, BORROWER authorizes LENDER to submit any kind of financing statements in the registry offices of any jurisdiction of the United States of America, as per the provisions set forth in Section 5 Article 9 of the Uniform Commercial Code, including all BORROWER's goods delivered as security for fulfillment of the obligations undertaken hereunder.

## SECTION FOURTEEN: JURISDICTION AND APPLICABLE LAW

14.1 This Master Agreement is governed by and must be construed in accordance with the laws of the State of New York, United States

**14.2** El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

**14.3** Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés en la República Argentina.

**14.4** El MUTUARIO por el presente constituye en forma irrevocable domicilio en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

**14.5** Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America no estuviere presente, el MUTUARIO acepte y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 14.8 de la presente Cláusula.

**14.6** Las notificaciones efectuadas de la manera establecida en la Sección 14.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

**14.7** El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

**14.8** Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:

MUTUARIO:
1) Av. San Martin 691, de la Localidad de Adelia Maria, Provincia de Cordoba
2) CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America.

MUTUANTE:
1) Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE,

---

**14.2** BORROWER irrevocably submits to the non-exclusive jurisdiction of the United States Southern District Courts for the District of New York, for any actions, lawsuits or proceedings that may be brought by LENDER in connection with this Master Agreement. The rulings against BORROWER in any of such actions, lawsuits or proceedings, shall be final, and shall be enforceable in any other jurisdiction.

**14.3** Nothing of the aforesaid herein shall affect LENDER's right to bring legal actions or to otherwise sue BORROWER in any other jurisdiction deemed appropriate by LENDER, including LENDER'S right to initiate court or out-of-court collection proceedings of the Promissory Notes in Argentina. .

**14.4** BORROWER hereby irrevocably establishes its domicile at Corporation Service Company, domiciled at CT Corporation System, domiciled at 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, as its authorized agent for the sole purpose of receiving, in its name and stead, letters and/or notices addressed to BORROWER in any action, lawsuit or proceedings filed by LENDER in the State of New York, and BORROWER shall also inform LENDER of the identity and domicile of any new agent BORROWER may designate for such a purpose.

**14.5** If, for any reason, its authorized agent to receive notices at CT Corporation System, domiciled at 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, fails to be present, BORROWER agrees that notices to be served in any action, lawsuit or proceedings on BORROWER be delivered by US registered mail at BORROWER's domicile stated in 14.8 of this Section FOURTEEN.

**14.6** Notices served as stated in Section 14.4 hereof shall be considered personal, validly received, and mandatory for BORROWER.

**14.7** BORROWER irrevocably waives, to the maximum extent permitted by laws, the right to file an objection now or in the future against the jurisdiction of any of the courts mentioned in this Section hearing in any lawsuit, action or proceedings filed by LENDER, and, especially, BORROWER waives the right to file any defense or to allege lack of jurisdiction, or inconvenient forum regarding the court hearing in such action, lawsuit or proceedings. BORROWER also expressly waives its right to challenge without cause the one-judge court or the collegiate court hearing the case. BORROWER and SURETY may only file a defense for full payment evidenced in writing, on a document sent by LENDER directly relating to the Master Agreement being performed or the guaranteed obligation, expressly waiving any other defenses of any kind whatsoever.

**14.8** Any of the aforementioned notices to be made in respect of this Master Agreement shall be sent to the domiciles stated below:

BORROWER:
1) Av. San Martin 691, Adelia Maria, Provincia de Córdoba, Argentina
2) CT Corporation System, 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America.

LENDER:
1) Telestone 8 – Teleport, Naritaweg 165, P. O. Box 7241, 1007 JE,

Amsterdam, The Netherlands

Amsterdam, The Netherlands

**DECIMO QUINTA:FIRMAS Y RECEPCION DE INSTRUMENTOS.**

Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.

A los efectos de la interpretación del presente Contrato Marco la versión en inglés prevalecerá sobre la versión en español.

**DECIMO SEXTA:          LUGAR Y FECHA.**

Suscripto por los DEUDORES en la Ciudad de Buenos Aires, República Argentina, al día 18 del mes de julio de 2014, y por el MUTUANTE en Amsterdam, al día __ del mes de_____ de 20__.

**SECTION FIFTEEN: SIGNATURES AND RECEIPT OF DOCUMENTS.**

The parties hereto sign three (3) equal counterparts of the same tenor and to one sole purpose, being one (1) counterpart for LENDER, and one (1) counterpart for BORROWER. .

For purposes of interpretation hereof the English version of this Master Agreement shall prevail over the Spanish version.

**SECTION SIXTEEN: PLACE AND DATE.**

This Master Agreement is executed by DEBTORS in the City of Buenos Aires, Republic of Argentina, on July 18th, 2014, and by LENDER in the City of Amsterdam, on _July 21_, 20_14_



By: **COMPAÑIA ARGENTINA DE GRANOS S.A.**
Name: Carlos Adriano Navilli
Capacity: Attorney-in-fact

Compañía Argentina de Granos

Apoderado

By: **MOLINO CAÑUELAS S.A.C.I.F.I.A**
Name: Carlos Adriano Navilli
Capacity: Attorney-in-fact

Molino Cañuelas S/A.C.I.F.I.A.

Apoderado

By: **IIG TOF B.V.,**
Represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Name:   F. I. Hoogeboom    Hinna Nasim
Capacity: Attorneys-in-fact

CERTIFICACION EN SELLO N°._F0105817.22_

BUENOS AIRES, _18_ DE _Julio_ DEL 20_14_.-

PABLO BUFFONI ALMEIDA

MAT. 5028

ESCRIBANO



F 010581722

1   **Buenos Aires,** 18   de   julio   de   2014   **. En mi carácter de escribano**

2   **Titular del Registro de Contratos Públicos 625 de Capital Federal.- - - - - - -**

3   **CERTIFICO: Que la/s**   -Firma-   **que obra/n en el**

4   **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5   **formaliza simultáneamente por ACTA número**   -062-   **del LIBRO**

6   **número**   -7-   **, es/son puesta/s en mi presencia por la/s persona/s**

7   **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8   **la justificación de su identidad. Ricardo Alberto NAVILLI, con D.N.I. N°**

9   **13.420.134, quien se identifica con el documento de identidad relacionado,**

10  **cuyo original exhibe y en copia de sus partes pertinentes conservo en mis**

11  **archivos. Declara intervenir en nombre y representación y como Apoderado**

12  **de las siguientes sociedades: 1) "COMPAÑÍA ARGENTINA DE GRANOS S.A.",**

13  **lo que justifica con el poder general amplio según escritura 209 del**

14  **27/02/2008, folio 338, ante el Esc. Alejandro Miguel Bertomeu, Registro**

15  **Notarial 1951, a su cargo de ésta ciudad; y 2) "MOLINO CAÑUELAS**

16  **S.A.C.I.F.I.A.", lo que justifica con el poder general amplio según escritura**

17  **229 del 04/03/2008, folio 376, ante el Esc. Alejandro Miguel Bertomeu,**

18  **Registro Notarial 1951 a su cargo de ésta ciudad. La documentación**

19  **relacionada en sus originales tengo ante mí, con facultades suficientes. El**

20  **compareciente declara bajo juramento la plena vigencia de la personería**

21  **invocada y acreditada.**

22

ANEXO I/ ANNEX I

## MODELO DE PAGARE (sin protesto)

_____, ___ de _____ de 20 __

US$ _____

Por este Pagaré haré efectivo a la vista y sin protesto, por igual valor recibido, a la orden de _____ (en adelante el "Acreedor"), la suma de Dólares Estadounidenses _____ CON ___/100 (US$ _____), sin deducción alguna que pudiera corresponder en concepto de impuestos, tasas, contribuciones, comisiones, retenciones, cargos, aranceles y/o gastos de cualquier naturaleza, actuales o futuros. Domicilio de pago:_____, República Argentina,

El presente pagaré es pagadero exclusivamente en Dólares Estadounidenses de inmediata y libre disponibilidad (art. 44 del Dec. Ley 5965/63). El importe de este Pagaré devengará un interés compensatorio del nueve y medio por ciento (9,5%) nominal anual desde la fecha de libramiento. En caso de falta de pago a su presentación el importe consignado devengará, además del interés compensatorio, un interés moratorio del diez y medio por ciento (10,5%) anual. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados.

De conformidad con lo dispuesto por el artículo 36 del decreto 5965/63, el plazo para presentar el presente pagaré para su cobro se extiende a 36 meses contados desde la fecha de libramiento. El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor de igual rango. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) El presente no es un pagaré de consumo y por lo tanto no está sujeto a lo establecido en el artículo 36 de la ley 24.240. Será competente para la ejecución del presente pagaré o para cualquier conflicto relacionado con el mismo, a exclusiva opción del Acreedor, la Justicia Nacional en lo Comercial sita en la Ciudad Autónoma de Buenos Aires, o los Tribunales de la jurisdicción del domicilio del deudor.

b) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:
Suscriptor:
Avalista:
Acreedor:

c) Las notificaciones efectuadas de la manera establecida en el acápite "b" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el deudor.

d) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

Suscriptor:_____          **Por Aval**
Nombre:                              **Avalista:**_____
Carácter:                            Nombre:
                                     Carácter:

| | |
|---|---|
| **ANEXO II** | **ANNEX II** |

| | |
|---|---|
| **SOLICITUD DE DESEMBOLSO** | **DISBURSEMENT REQUEST** |

Buenos Aires, _____ de _____ de _____

Buenos Aires, _____ __, _____

Sres.
IIG TOF B.V., represented by
TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.
Telestone 8 – Teleport, Naritaweg 165. P.O. Box 7241, 1007 JE,
Amsterdam, The Netherlands

IIG TOF B.V., represented by
TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.
Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam,
The Netherlands

De nuestra consideración:
Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ____ de ____ de ___ (el "Contrato Marco"), cuyas definiciones, términos y condiciones, resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula _____ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

Dear Sirs:
Reference is hereby made to the Master Credit Line Agreement between you and _____ dated ____ , ____ (The "Master Agreement"), whose definitions, terms and conditions are applicable to this Disbursement Request. Pursuant to Section ____ of the Master Agreement we hereby request to you a disbursement pursuant to the following conditions:

I.   El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____).

I.   The amount requested to be disbursed herein is the aggregate principal amount of USD _____ (United States Dollars _____ WITH 00/100).

II.   La/s Fecha/s de Vencimiento del desembolso antes requerido será/n la/s siguiente/s:

II.   The Due Date/s of the requested disbursement is the following:

| Fecha Vto. | Moneda e Importe |
|---|---|
| ___/___/20 | US$ _____ |

| Due Date | Currency and Amount |
|---|---|
| ___/___/20 | USD _____ |

III.   La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses _____), comprensivo del monto del desembolso con más los intereses aplicables hasta la Fecha de Vencimiento antedicha, de conformidad con la Tasa de Interés pactada con Uds. para la presente con mas los Gastos Administrativos que ascienden a la suma de US$ _____ (Dólares Estadounidenses _____).

III.   The Sum Due corresponding to such disbursement amounts to a total of USD _____ (United States Dollars _____) which comprehends the disbursed amount plus the applicable interests as of the aforementioned Due Date, in accordance with the agreed interest rate, plus the Administrative Expenses which amounts to USD _____ (United States Dollars _____).

IV.   Adjuntamos a la presente un Pagare a vuestro favor, pagadero a la vista, por la suma total de US$ _____ (Dólares Estadounidenses _____)

IV.   We enclosed herein a Promissory Note at your favor, payable on demand for the total aggregate amount of USD _____ (United States Dollars _____)

| Fecha Emisión | Fecha Vto. | Moneda e Importe |
|---|---|---|
| ___/___/20 | A la vista | US$ _____ |

| Issue Date | Due Date | Currency and Amount |
|---|---|---|
| ___/___/20 | On demand | USD _____ |

V.   Adjuntamos a la presente original del contrato de venta de mercadería a _____ ("Deudor Cedido") por la suma de US$ _____ (Dólares Estadounidenses _____) correspondientes a las _____ toneladas métricas, detallado a continuación, cuyos derechos crediticios constituyen los Créditos Cedidos Originarios que cedemos con recurso a vuestro favor en los términos señalados en la Cláusula CUARTA del Contrato Marco, en pago de las Sumas Adeudadas:

V.   We enclosed herein the original of a goods purchase agreement to _____ ("Assigned Debtor") for the total aggregate amount of USD _____ (United States Dollars _____) detailed hereinafter, which credit rights constitute the Original Assigned Credits, which we assigned in your favor with resource, pursuant to the terms and conditions set forth in Section Four of the Master Agreement, in payment for the Sums Due:

VI.   Adjuntamos el original de la notificación de la cesión antes señalada dirigida al Deudor Cedido, con la firma de nuestro representante legal o apoderado, certificada ante Notario Público en los términos de la Sección 4.6 del Contrato Marco.

VI.   We enclosed herein the original notification of the aforementioned assignment addressed to the Assigned Debtor, with the signature of our legal representative or attorney-in-fact, duly certify by a Notary Public pursuant to the terms set forth in Section 4.6 of the Master Agreement.

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., le solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso a la Cuenta del Mutuario que se detalla a continuación:

Provided this Disbursement Request is accepted by you, we request that within the Crediting Term, you transfer the disbursement amount to the Borrower's Account detailed hereinafter:

BANK:
SWIFT:
ABA CHIP:
ABA FED:
For the credit of account nr:
Beneficiary:
Account NBR.:
REFERENCIA:

BANK:
SWIFT:
ABA CHIP:
ABA FED:
For the credit of account nr:
Beneficiary:
Account NBR.:
REFERENCIA:

A los efectos de la presente Solicitud de Desembolso la versión en inglés prevalecerá sobre la versión en español.

To the purposes set forth in this Disbursement Request the English version shall prevail over the Spanish version.

Sin otro particular, saludamos a Uds. atentamente.

Yours sincerely,

**Por COMPAÑÍA ARGENTINA DE GRANOS**
Nombre: _____
Carácter: _____

**By COMPAÑÍA ARGENTINA DE GRANOS**
Name: _____
Capacity: _____

**ANNEX III**

Buenos Aires, _____ ____, 20__

To:
Attention:
Tel:
Fax:

Dear Sirs,
We address you in order to give you notice of the Assignment Agreement _____, 20__, executed between IIG **TOF B.V., represented for TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** ("IIG TOF B.V") and **Compañia Argentina de Granos S.A.** , whereby **Compañia Argentina de Granos S.A.** has assigned and transferred to IIG TOF B.V, and IIG TOF B.V has accepted and received all the rights and credits derived from the collection of argentine wheat bran pollard pellets derived from the Contract following:

SELLER:        COMPAÑIA ARGENTINA DE GRANOS S.A. – BUENOS AIRES
BUYER:         MOLINO AMERICANO – GRAL. PACHECO 1070 MONTEVIDEO – URUGUAY
DATE:
COMMODITY:
QUANTITY:
PACKING:
PRICE:
DELIVERY:

Therefore, **Compañia Argentina de Granos S.A.** hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement all the sums and credits derived from the Contract hereinabove referred – including the credits derived from the invoices and other documentation that **Compañia Argentina de Granos S.A.** submit to you as a result of the said commercial transactions, are to be fully paid to IIG TOF B.V. by wire transfer of the corresponding funds to the following bank account:

Bank:              **Deutsche Bank Trust Company Americas**
                       **60 Wall Street, New York, NY 10005**
ABA #:            021-001-033
SWIFT Code:    BKTRUS33
Account Name:  IIG TOF B.V. fbo COMPANIA ARGENTINA DE GRANOS
Account Number:  04-886-486

The aforementioned Assignment Agreement and payment instructions are irrevocable and can only be modified by a new notice signed by representatives of IIG TOF B.V, duly authorized by the pertinent certifications.

The aforementioned Assignment Agreement shall not transfer and/or modify the liability of **Compañia Argentina de Granos S.A.** derived from the aforesaid commercial transactions and business operations. Thus, **Compañia Argentina de Granos S.A.** remains fully and exclusively responsible for any and all the obligations resulting thereof.

Please send us a confirmation of your reception and acceptance of this letter of notification as well as a notarial certificate or other relevant documentation to prove the authenticity of the signature and the capacity of the signatory.

Sincerely yours,

_____
**Compañia Argentina de Granos S.A.**
Name:
Capacity:

_____
**IIG TOF B.V., represented by**
**TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Name
Capacity

Acknowledged and accepted:
**MOLINO AMERICANO S.A.**

_____
Name:
Capacity:

## ANEXO IV

### MODELO DE CONTRATO DE CESION DE CRÉDITOS.
El presente constituye un modelo del contrato previsto en Cláusula CUARTA del presente Contrato Marco, careciendo de validez para cualquier otro efecto.

Entre
**COMPAÑIA ARGENTINA DE GRANOS S.A.**, una sociedad constituida y registrada bajo las leyes de la Republica Argentina, representada en este acto por el _____ en su carácter de Apoderado, domiciliada en Av. San Martin 691, de la Localidad de Adelia Maria, Provincia de Córdoba, República Argentina, por una parte, en adelante denominado "MUTUARIO",
**MOLINO CAÑUELAS S.A.C.I.F.I.A.**, una sociedad constituida y registrada bajo las leyes de la Republica Argentina, representada en este acto por el _____ en su carácter de Apoderado, domiciliada en Calle Kennedy 160, Cañuelas, 1814, Buenos Aires, República Argentina, por otra parte, en adelante denominado "FIADOR", y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representada por _____ en su carácter de Apoderados, domiciliada en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, por la otra parte, en adelante denominado "MUTUANTE";
el MUTUARIO y el FIADOR conjuntamente denominados los "DEUDORES";
el MUTUARIO, el FIADOR y el MUTUANTE conjuntamente denominados las "Partes"; y

CONSIDERANDO:

I. Que con fecha __ de _____ de _____, las Partes suscribieron un contrato Marco cuyas definiciones, términos y condiciones resultan aplicables a la presente;

II. Que con fecha __ de _____ de ____ los DEUDORES remitieron una Solicitud de Desembolso adjunta al presente como **Anexo A** (la "Solicitud de Desembolso"), la cual fue aceptada por el MUTUANTE. El MUTUARIO declara haber recibido de conformidad la suma solicitada en la Solicitud de Desembolso antes referida.

III. Que es intención de las Partes instrumentar el reemplazo de los Créditos Cedidos Originarios (cedidos mediante la solicitud de Desembolso antes aludida) por los Créditos Cedidos Derivados descriptos en el presente Contrato de Cesión, conforme lo establecido en las Secciones 4.9 y subsiguientes del Contrato Marco.;

En mérito a las consideraciones precedentemente establecidas, las cuales forman parte integrante de este Contrato, se celebra el presente Contrato de Cesión de Crédito, sujeto a las siguientes Cláusulas y condiciones:

### PRIMERA: CESIÓN
1.1. En garantía de pago de las Sumas Adeudadas en virtud de la Solicitud de Desembolso señalada en el apartado II de los considerandos (las "Sumas Adeudadas") y como medio de pago de las mismas de la forma prevista en el Contrato Marco, mediante el presente, el MUTUARIO cede al MUTUANTE todos los créditos que le corresponden al MUTUARIO en virtud del contrato suscripto entre el MUTUARIO y _____ (el "Deudor Cedido Derivado") cuya copia se adjunta al presente como **Anexo B** (la "Orden de Compra"), sus eventuales modificaciones y/o enmiendas, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud del contrato antes referido, por la suma mínima de _____ Dólares (US$ _____) (los "Créditos Cedidos Derivados"). La cesión de

## ANNEX IV

### SAMPLE RECEIVABLES ASSIGNMENT AGREEMENT
This is a sample of the agreement contemplated in Section FOUR of this Master Agreement.
Void - it is not a valid document – example only.

This Agreement is made by and between:
**COMPAÑIA ARGENTINA DE GRANOS S.A.**, a corporation organized and existing under the laws of Argentina, represented herein by _____ in his capacity as Attorney-in-fact, domiciled at Av. San Martin 691, Adelia Maria, Province of Córdoba, Argentina, party of the first part, hereinafter "BORROWER",
**MOLINO CAÑUELAS S.A.C.I.F.I.A.**, a corporation organized and existing under the laws of Argentina, represented herein by I _____ in his capacity as Attorney-in-fact, domiciled at Kennedy 160, Cañuelas, 1814, Buenos Aires, Argentina, party of the second part, hereinafter "SURETY", and

**IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, represented by _____, in their capacity as Attorneys-in-fact, domiciled at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, party of the third part, hereinafter "LENDER";

BORROWER and SURETY are jointly referred to as "DEBTORS";
BORROWER, SURETY and LENDER are jointly referred to as the "Parties"; and

RECITALS:

I. Whereas on __ , _____ , _____ , the Parties executed a Master Agreement; the definitions, terms and conditions of which are applicable hereto;

II. Whereas on __ , _____ , _____ DEBTORS sent a Disbursement Request, attached hereto as **Annex A** (the "Disbursement Request"), which was accepted by LENDER. BORROWER represents that it acknowledged and received the amount requested in the above-mentioned Disbursement Request.

III. Whereas the Parties desire to replace the Original Assigned Receivables (assigned through the above-mentioned disbursement request) with the Derived Assigned Receivables herein described, as per the provisions in Sections 4.9 and subsequent sections of the Master Agreement.;

By virtue of the aforesaid considerations, Assignment Agreement is executed under the following terms and conditions:

### FIRST: ASSIGNMENT
1.1.To secure payment of the Sums Due under the Disbursement Request mentioned in item II of recitals (the "Sums Due") and as a means of payment thereof as set forth in the Master Agreement, BORROWER hereby assigns to LENDER all the claims to which BORROWER is entitled under the Master Agreement executed between BORROWER and _____ (the "Derived Assigned Debtor"); a copy of which is hereto attached as **Annex B** (the "Purchase Order"), as amended from time to time, including all claims resulting from bills of lading, delivery notices, invoices and other documents issued under the above-mentioned agreement, in the minimum amount of _____ Dollars (US$ _____) (the "Derived Assigned Receivables"). The assignment of Derived Assigned Receivables comprises all the rights and actions of BORROWER on the Derived Assigned Receivables and of the

Case 1:19-cv-10796-DLC Document 124 Filed 04/16/20 Page 32 of 69

los Créditos Cedidos Derivados comprende todos los derechos y acciones que posee el MUTUARIO y/o corresponden respecto de los Créditos Cedidos Derivados y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido Derivado de las cuales surjan los Créditos Cedidos Derivados, que quedarán a cargo exclusivo del MUTUARIO.

**1.2** El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, copias autenticadas de los conocimientos de embarque respecto de la mercadería comprendida en la Orden de Compra. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**1.3** El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos Derivados serán depositadas por el Deudor Cedido Derivado en la Cuenta del Mutuante. A tal efecto, en adición a la notificación prevista en la Sección 1.6 de la presente Cláusula Primera, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos Derivados que sean remitidas al Deudor Cedido Derivado, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas al MUTUANTE se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

*"El crédito representado y contenido en la presente factura, fue cedido a _____, por contrato de Cesión de Créditos de fecha __/__/____. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____, ABA _____. Beneficiario: _____, Cuenta N°: _____."*

**1.4** Los fondos de los Créditos Cedidos Derivados depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Cláusula QUINTA del Contrato Marco.

**1.5** La cesión de los Créditos Cedidos Derivados se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe total de los Créditos Cedidos Derivados no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula Primera y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**1.6** El MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido Derivado, las instrucciones de pago a favor del MUTUANTE de las sumas correspondientes a los Créditos Cedidos Derivados y a obtener la aprobación expresa del Deudor Cedido Derivado respecto de las mismas, mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **Anexo C**. A tales fines, y como condición sine qua non para dejar sin efecto la cesión de los Créditos Cedidos Originarios, tal como se establece en la Cláusula Segunda del presente, el MUTUARIO comunicará al Deudor Cedido Derivado, por escrito y de manera fehaciente con intervención notarial, que el depósito de las sumas correspondientes a los Créditos Cedidos Derivados deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido Derivado –mediante su apoderado o representante legal- firmar al pie de dicha notificación con constancia de aceptación de la misma. MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido Derivado en la forma antes indicada. Todo ello, sin perjuicio de la leyenda que el MUTUARIO deberá incluir en cada una de las facturas emitidas en virtud de los Créditos Cedidos Derivados, según se indica en el punto 1.3 de la presente Cláusula Primera.

Empero, a fin de no entorpecer la operatoria comercial del

---

aforementioned consequences, placing LENDER pari passu in priority with LENDER being also subrogated to all rights or performance and/or collection actions likely to exist in the future in connection with such receivables, notwithstanding any obligations deriving from contractual obligations with the Derived Assigned Debtor originating from the Derived Assigned Receivables, which shall be exclusively borne by BORROWER.

**1.2** BORROWER undertakes to deliver to LENDER, no later than 5 (five) days from shipment thereof, authenticated copies of the bills of lading issued in respect of the goods mentioned in the Purchase Order. Furthermore, it undertakes to deliver to LENDER, no later than 5 (five) days after receipt by the Assigned Debtor, all the delivery notes and invoices issued by BORROWER in connection with the Assigned Receivables. .

**1.3** BORROWER warrants that all sums corresponding to the Derived Assigned Receivables shall be deposited by the Derived Assigned Debtor in Lender's Account. For such purpose, in addition to the notice indicated in Section 1.6 of this Section ONE, BORROWER shall include in each and every of the invoices issued pursuant to the Derived Assigned Receivables sent to the Derived Assigned Debtor, a legend expressly stating that such invoices shall be payable to LENDER through a transfer of the pertinent funds to Lender's Account. In each of the invoices assigned to BORROWER the following legend shall be included (both in Spanish and English):

*"The receivable represented and container in this invoice was assigned to _____, under the Assignment of Receivables Agreement dated __/__/___. You should pay the same on the due date through a deposit in Bank: _____, ABA _____. Beneficiary: _____, Account No.: _____"*

**1.4** The funds pertaining to the Derived Assigned Receivables deposited in Lender's Account shall be applied to the payment of the Sums Due as per Section FIVE of the Master Agreement.

**1.5** The assignment of Derived Assigned Receivables is made under BORROWER's liability to LENDER. Therefore, if for any reason whatsoever the amount of the Derived Assigned Receivables is not paid to LENDER as per the terms stated in this Section ONE and/or is not sufficient to secure payment of the Sums Due on the pertaining Due Date BORROWER shall pay LENDER the total amount or any balance due corresponding to each Sum Due, before each Due Date, under penalty of incurring in automatic Default.

**1.6** BORROWER agrees to give true notice of this assignment to the Derived Assigned Debtor, to provide payment instructions for payment of the sums relating to the Derived Assigned Receivables to LENDER and to obtain the express approval of the Derived Assigned Debtor, through delivery of a notice identical to the form attached hereto as **Annex C**. For such purposes, and as a condition precedent for Original Assigned Receivables to become void, as set forth in Section TWO hereof, BORROWER give notice to the Derived Assigned Debtor, in writing and through reliable means with the intervention of a notary, that the sums pertaining to the Derived Assigned Receivables shall have to be deposited in Lender's Account, and the Derived Assigned Debtor shall –through its Attorney-in-fact or legal representative- sign at the bottom thereof acknowledging its acceptance therewith. BORROWER shall deliver such notice to LENDER, bearing the Derived Assigned Debtor's acceptance as hereinabove indicated. All of the above notwithstanding the legend that BORROWER shall have included in the invoices issued under the Derived Assigned Receivables, as indicated in subsection 1.3 hereof.

However, so as not to hinder BORROWER's ordinary course of business,



MUTUARIO, y por razones operativas invocadas por este último, el instrumento formal de la notificación será retenido por el MUTUANTE, pudiendo el MUTUANTE remitir dicha notificación al Deudor Cedido Derivado ante el acaecimiento de cualquier Evento de Incumplimiento.

Asimismo, el MUTUARIO remitirá vía fax y/o e-mail, una comunicación al Deudor Cedido Derivado indicando que el pago de los Créditos Cedidos Derivados deberá realizarse en la referida cuenta, consignando que se remite por correo el original de la comunicación.

**1.7** El presente no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de la Orden de Compra, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de la Orden de Compra, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos Derivados. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que —con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- el Deudor Cedido Derivado incumpla por cualquier causa (incluyendo sin que implique limitación alguna, por causa de fuerza mayor o caso fortuito) la Orden de Compra o rescinda o termine la Orden de Compra por cualquier causa, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido Derivado.

**1.8** El MUTUARIO declara y garantiza al MUTUANTE:

    1.8.1    el cobro de los Créditos Cedidos Derivados, en Dólares y mediante depósito de los mismos en la Cuenta del Mutuante.

    1.8.2    la forma instrumental de los mismos.

    1.8.3    la legitimidad de los Créditos Cedidos Derivados y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

    1.8.4    que no se encuentra inhibido para disponer de sus bienes;

    1.8.5    que no adeuda suma alguna que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos Derivados;

    1.8.6    que no ha percibido suma alguna derivada de los Créditos Cedidos Derivados, y que los mismos no han sido cedido total ni parcialmente a persona física o jurídica alguna con anterioridad;

    1.8.7    la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos Derivados.

    1.8.8    que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de La Orden de Compra, incluyendo —pero no limitado a- la entrega en tiempo y forma al Deudor Cedido Derivado de la mercadería objeto de los Créditos Cedidos Derivados.

    1.8.9    que el monto de los Créditos Cedidos Derivados depositado en la Cuenta del Mutuante será equivalente como mínimo al 300% de las Sumas Adeudadas.

    1.8.10    que los Créditos Cedidos Derivados serán íntegramente pagados antes de la última Fecha de Vencimiento descripta en la Solicitud de Desembolso.

**SEGUNDA:** **CONTRAPRESTACIÓN.**
**2.1** Sujeto a la condición suspensiva establecida en la Sección 2.2 subsiguiente, como contraprestación por la cesión de los Créditos Cedidos Derivados, las Partes acuerdan dejar sin

and for operating reasons claimed by BORROWER, the document evidencing notice thereof shall be retained by LENDER, and LENDER may forward said notice to the Derived Assigned Debtor in case of occurrence of an Event of Default.

Furthermore, BORROWER shall send by fax and/or e-mail, a communication to the Derived Assigned Debtor indicating that payment of the Derived Assigned Receivables shall be made into such account, specifying that the original communication is forwarded by postal mail

**1.7** This agreement does not imply in any manner whatsoever a transfer by BORROWER to LENDER of the obligations arising from the Purchase Order, which shall continue to be borne by BORROWER. BORROWER undertakes to comply with any and all of its obligations deriving from the Purchase Order so that LENDER's right to collect the Derived Assigned Receivables shall not be affected. Non-compliance in due time and manner of the obligations mentioned above shall automatically give place by operation of law to BORROWER's Default. Default by operation of law shall also occur with the consequences stated above in the event that, irrespective of BORROWER's default, the Derived Assigned Debtor does not comply for any reason (including but not limited to causes of force majeure or "act of god") with the Purchase Order or rescinds or terminates the Purchase Order for any reason, or in any other manner ceases or ends its business relationship with BORROWER, whether unilaterally or as agreed between BORROWER and the Derived Assigned Debtor.

**1.8** BORROWER represents and warrants LENDER:

    1.8.1    collection of the Derived Assigned Receivables, in Dollars and through their deposit into LENDER's Account .

    1.8.2    the instrumental form thereof.

    1.8.3    the legitimacy of the Derived Assigned Receivables that they are freely available, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

    1.8.4    it is not subject to restraining orders to dispose of its property;

    1.8.5    that it does not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Derived Assigned Receivables;

    1.8.6    that it has not received any sum resulting from the Derived Assigned Receivables and that the same have not been previously assigned, either partially or totally, to any natural or artificial person;

    1.8.7    the authenticity of the signatures of any document evidencing the origin of the Derived Assigned Receivables.

    1.8.8    that it shall comply with any and all of its obligations deriving from the Purchase Order, including, but not limited to, delivery in due time and manner to the Derived Assigned Debtor of the goods stated in Derived Assigned Receivables.

    1.8.9    that the amount of the Derived Assigned Receivables to be deposited into LENDER's Account shall be at least equal to 300% of the Sums Due.

    1.8.10    that the Derived Assigned Receivables shall be fully repaid before the last Due Date detailed in the Disbursement Request.

**SECOND:** **CONSIDERATION.**
**2.1** Subject to the condition precedent set forth in Section 2.2 below, in consideration for the assignment of the Derived Assigned Receivables, the Parties agree to declare void the assignment of the Original Assigned

**2.2** Sin perjuicio de la validez a partir del día de la fecha de la cesión de los Créditos Cedidos Derivados instrumentada mediante el presente, la cesión de los Créditos Cedidos Originarios quedará sin efecto si –y sólo si- el MUTUARIO acredita fehacientemente al MUTUANTE haber notificado la presente cesión de los Créditos Cedidos Derivados por acto público al Deudor Cedido Derivado en los términos establecidos en la Sección 1.6 de la cláusula precedente. Cuando esto último ocurra, el MUTUANTE notificará a los Deudores Cedidos Originarios que la cesión de los Créditos Cedidos Originarios ha quedado sin efecto y que a partir de dicha fecha los mismos deben ser nuevamente pagados al MUTUARIO.

**2.2** Without prejudice to the fact that the assignment of the Derived Assigned Receivables herein comes into effect as of the day hereof, the assignment of the Original Assigned Receivables shall become void if –and only if- BORROWER gives faithful evidence to LENDER that this assignment of the Derived Assigned Receivables to the Derived Assigned Debtor has been effected with the intervention of a notary public under the provisions in Section 1.6 above. Thereupon, LENDER shall give notice to the Original Assigned Debtors informing that the assignment of Original Assigned Receivables has become void and that, as from the date thereof, such payment should be made again to BORROWER.

**TERCERA:    MISCELÁNEA.**
Salvo en la medida en que hayan sido objeto de expresa modificación mediante el presente, aplican al presente contrato de cesión de créditos y a los Créditos Cedidos Derivados todos los términos y condiciones contenidos en el Contrato Marco y en la Solicitud de Desembolso, las cuales permanecen plenamente vigentes.

**THIRD:    MISCELLANEOUS.**
Except as hereby expressly amended, all the terms and conditions contained in the Master Agreement and the Disbursement Request shall apply to this Agreement of Receivables Assignment and to the Derived Assigned Receivables; such terms and conditions shall continue to be in full force and effect.

**CUARTA:    FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.
**QUINTA: LUGAR Y FECHA.**
Suscripto por los DEUDORES en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en New York, a los _____ días del mes de _____ de 20___.

**FOURTH:    SIGNATURES AND RECEIPT OF DOCUMENTS**
The Parties hereto sign 3 (three) equal counterparts of the same tenor and to one sole purpose, being 1 (one) counterpart for LENDER and 1 (one) counterpart for BORROWER.
**FIFTH:    PLACE AND DATE.**
This agreement is executed by DEBTORS in the City of Buenos Aires, Republic of Argentina, and by LENDER in New York, on this _____ day of the month of _____, 20___.

Por: **COMPAÑIA ARGENTINA DE GRANOS S.A.**
Nombre:
Carácter: Apoderado

By: **COMPAÑIA ARGENTINA DE GRANOS S.A.**
Name:
Capacity: Attorney-in-fact

Por: **MOLINO CAÑUELAS S.A.C.I.F.I.A**
Nombre:
Carácter: Apoderado

By: **MOLINO CAÑUELAS S.A.C.I.F.I.A**
Name:
Capacity: Attorney-in-fact

Por: **IIG TOF B.V.,**
representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Nombre: _____
Carácter: Apoderados

By: **IIG TOF B.V.,**
represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Name: _____
Capacity: Attorneys-in-fact

**LISTADO DE ANEXOS:**

ANEXO A: SOLICITUD DE DESEMBOLSO
ANEXO B: CREDITOS CEDIDOS DERIVADOS
ANEXO C: MODELO DE NOTIFICACION

**LIST OF ANNEXES:**

ANNEX A: DISBURSEMENT REQUEST
ANNEX B: DERIVED ASSIGNED RECEIVABLES
ANNEX C: SAMPLE NOTICE



**ANNEX C (SAMPLE ASSIGNED DEBTOR NOTICE)**

Buenos Aires, _____, 20_

To:
Attention:
Tel:
Fax:

Dear Sirs,

This is to give you notice of the Assignment Agreement dated _____, 20 ___ executed between **COMPAÑIA ARGENTINA DE GRANOS S.A.** and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, whereby **COMPAÑIA ARGENTINA DE GRANOS S.A.** has assigned and transferred to **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** has accepted and received all the rights and credits derived from _____ derived from the _____ corresponding to the merchandise that you have requested to **COMPAÑIA ARGENTINA DE GRANOS S.A.**, which is attached hereto as Annex I.

Therefore, **COMPAÑIA ARGENTINA DE GRANOS S.A.** and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement all the sums and credits derived from the Contracts hereinabove referred to –including the credits derived from the invoices and other documentation that **COMPAÑIA ARGENTINA DE GRANOS S.A.** submitted or will submit to you as a consequence of said commercial transactions, are to be fully paid to **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** by wire transfer of the corresponding funds to the following bank account:

BANK:
ABA#:
SWIFT:
Credit:
Account#:
Further Credit:
Account#:

The aforementioned Assignment Agreements and payment instructions are irrevocable and may only be modified through a new notice signed by representatives from **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, duly authorized by the correspondent certifications.

The aforementioned Assignment Agreements shall not transfer and/or modify the liability of **COMPAÑIA ARGENTINA DE GRANOS S.A.** derived from the referred commercial transactions. Thus **COMPAÑIA ARGENTINA DE GRANOS S.A.** remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

_____                                    _____
**COMPAÑIA ARGENTINA DE GRANOS S.A.**                       **IIG TOF B.V.**,
Name:                                                        Name:
Capacity:                                                    Capacity:

Acknowledged and accepted:

_____

Name: _____
Capacity: _____

**CONTRATO DE LÍNEA DE CRÉDITO CON AFECTACIÓN A PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**COMPAÑIA ARGENTINA DE GRANOS S.A.**, una sociedad constituida y registrada bajo las leyes de la República Argentina, representada en este acto por el Sr. RICARDO ALBERTO NAVILLI, DNI 13.420.134 en su carácter de Apoderado, domiciliada en Av. San Martin 691, de la Localidad de Adelia Maria, Provincia de Cordoba, República Argentina, por una parte, en adelante denominado "MUTUARIO",

**MOLINO CAÑUELAS S.A.C.I.F.I.A.**, una sociedad constituida y registrada bajo las leyes de la República Argentina, representada en este acto por el Sr. RICARDO ALBERTO NAVILLI, DNI 13.420.134 en su carácter de Apoderado, domiciliada en Calle Kennedy 160, Cañuelas, 1814, Buenos Aires, República Argentina, por otra parte, en adelante denominado "FIADOR", y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representada por _____, en su carácter de Apoderados, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, por la otra parte, en adelante denominado "MUTUANTE";

el MUTUARIO y el FIADOR conjuntamente denominados los "DEUDORES";
el MUTUARIO, el FIADOR y el MUTUANTE conjuntamente denominadas las "Partes"; y

**CONSIDERANDO:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la prefinanciación de sus exportaciones; y en particular las exportaciones de aceite y/o harina y/o pellets de soja y/o trigo;

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndoles continuar con el desarrollo y ampliación de sus mercados externos;

(c) Que el FIADOR mantiene fuertes vínculos comerciales con el MUTUARIO por mantener accionistas en común , por lo cual está interesado en afianzar las obligaciones de éste último o a fin de que pueda obtener la financiación antes referida, y de esta manera garantizarse la colocación internacional de una parte de sus productos como asimismo el capital de trabajo comercial-operativo necesario para mantener el giro normal de su capacidad productiva plena, redundando en un indudable beneficio para todas las partes.

(d) Que por las razones indicadas en los Considerandos (b) y (c) anteriores, y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO y el FIADOR están dispuestos a afectar bienes para garantizar solidariamente el repago del crédito;

(e) Que el MUTUANTE está dispuesto a otorgar una línea de crédito de hasta **Dólares Estadounidenses DIEZ MILLONES con 00/100 (US\$ 10.000.000,00)** para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato Marco, en la medida que y siempre y cuando: (i) el MUTUARIO y el FIADOR se obliguen solidariamente a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato Marco; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato Marco, y (iii) las Partes acuerden la

---

**EXPORT PREFINANCING CREDIT FACILITY AGREEMENT**

This Agreement is made by and between:

**COMPAÑIA ARGENTINA DE GRANOS S.A.**, a Corporation organized and registered under the laws of the Republic of Argentina, represented herein by Mr. RICARDO ALBERTO NAVILLI, ID# 13.420.134 in his capacity as Attorney-in-fact, domiciled at Av. San Martín 691, Town of Adelia Maria, Province of Córdoba, Argentina (hereinafter the "BORROWER"); party of the first part, and

**MOLINO CAÑUELAS S.A.C.I.F.I.A.** , a Corporation organized and registered under the laws of the Republic of Argentina, represented herein by Mr. RICARDO ALBERTO NAVILLI, ID# 13.420.134 in his capacity as Attorney-in-fact, domiciled at Kennedy 160, Cañuelas, 1814, Buenos Aires, Argentina, (hereinafter the "SURETY") party of the second part; and

**IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, represented herein by _____, in their capacities as _____, domiciled at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands (hereinafter the "LENDER"), party of the third part; and

BORROWER and SURETY are jointly referred to as "DEBTORS";
BORROWER, LENDER and DEBTORS are jointly referred to as the "Parties"
and

**RECITALS:**

(a) Whereas BORROWER is interested in obtaining mid-term financing for its export operations, particularly for its oil and/or flour and/or soya pellets and/or wheat pellets exports.

(b) Whereas satisfaction of BORROWER'S current need of financing to prefinance its export operations shall allow BORROWER to continue developing and expanding its external markets.

(c) Whereas SURETY maintains strong business ties with BORROWER, as they have common stockholders, and therefore SURETY is interested in securing the payment obligations of BORROWER so that BORROWER may obtain the above-mentioned pre-financing, thus ensuring the international placement of a portion of its products, as well as the commercial and operating working capital required to maintain BORROWER'S full productive capacity in the regular course of business, which shall undoubtedly be to the benefit of all parties hereto.

(d) For the reasons indicated in aforementioned items (b) and (c) of this chapter, and to ease the loan from a risk-analysis perspective, the BORROWER and the SURETY are willing to affect some of their goods to guarantee jointly the repayment of the credit"

(e) Whereas LENDER is willing to grant a credit facility of up to **TEN MILLION United States Dollars and 00/100 (US\$10,000,000.00 )** to BORROWER, subject to the terms and conditions of this Master Agreement, to the extent and provided that: (i) BORROWER and SURETY become jointly and severally bound to repay the same and to comply with all the obligations undertaken under the Agreement; (ii) the Guarantees (as defined herein below) are maintained in full force and effect and are enforceable until termination of the Agreement; and (iii) the Parties agree on the applicable Interest Rate.

Tasa de Interés aplicable.

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

**PRIMERA:   DEFINICIONES.**

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común de los DEUDORES.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole de los DEUDORES y/o sus Afiliadas y/o el MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que los DEUDORES no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula Segunda.

"Contrato Marco" significa el presente contrato de línea de crédito suscripto entre las Partes.

"Crédito Cedido Originario" significa todos los créditos pendientes de pago y derechos que posee el MUTUARIO descriptos en cada Solicitud de Desembolso, que le corresponden al MUTUARIO por la venta de mercadería que el MUTUARIO realice al Deudor Cedido en virtud de los contratos de compraventa y/u Ordenes de Compra, sus eventuales modificaciones y/o enmiendas, adjuntos a cada Solicitud de Desembolso, (incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con el Deudor Cedido); y que son cedidos por el MUTUARIO al MUTUANTE –a satisfacción de este último- mediante las Solicitudes de Desembolso, en los términos establecidos en la Cláusula CUARTA del presente Contrato Marco. En ningún caso el monto de los Créditos Cedidos será inferior al 120% (ciento veinte por ciento) de las Sumas Adeudadas.

"Crédito Cedido Derivado" significa el crédito que el MUTUARIO deberá ceder al MUTUANTE en reemplazo del Crédito Cedido Originario, de conformidad con lo establecido en las Secciones 4.9, 4.10 y 4.11 del presente Contrato Marco.

"Créditos Cedidos" significa el Crédito Cedido Originario y el Crédito Cedido Derivado.

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

By virtue of the aforesaid considerations, this Credit Facility Agreement is executed pursuant to the following terms and conditions:

**SECTION ONE: DEFINITIONS.**

"Affiliates" means the subsidiary corporations and/or holding corporations and/or companies commonly owned by DEBTORS.

"Material Adverse Change" means any material unfavorable change in the economic, commercial, financial or operating or any other kind of condition or financial position of DEBTORS and/or their Affiliates and/or LENDER, or their projections, taken as a whole, or in the economic, financial and tax policy of the Republic of Argentina or the United States of America, or the occurrence of any event that, at LENDER 's reasonable discretion, materially changes prevailing market conditions as of the date of execution of this Master Agreement (including, without limitation, any suspension, release or limitation to the compliance with monetary obligations under financial facilities and/or foreign trade facilities and/or any other kind of facilities, any payment suspension declaration in the Republic of Argentina or in any other financial or exchange market, the commencement of war, armed assaults, or any other type of national or international crisis directly or indirectly related to the Republic of Argentina); or the occurrence of any event which in LENDER 's opinion provides reasonable grounds to assume DEBTORS will not be able to regularly fulfill or comply with their obligations hereunder; or any significant variation in the Argentine Peso /United States Dollar exchange rate, or any suspension in the foreign exchange markets of the Republic of Argentina and/or the United States of America giving rise to a Material Adverse Effect.

"Conditions Precedent" means the conditions precedent for effectiveness of the Master Agreement, set forth in Section TWO.

"Master Agreement" means this Credit Facility Agreement executed between the Parties.

"Original Assigned Receivable" means all outstanding claims and rights of BORROWER described on each Disbursement Request that BORROWER is entitled to under the sale of goods made by the Assigned Debtor as per the sales agreements and/or Purchase Orders (including all claims resulting from bills of lading, delivery notices, invoices and other documents issued under the sales transactions BORROWER may enter into with the Assigned Debtor) which are assigned by BORROWER to LENDER -at LENDER's satisfaction- under the Disbursement Requests as set forth in Section FOUR of this Master Agreement. In no case shall Assigned Receivables be lower than 120 % (one hundred and twenty per cent) of the Sums Due.

"Derived Assigned Receivable" means the receivable to be assigned by BORROWER to LENDER to replace the Original Assigned Receivable as set forth in Sections 4.9, 4.10 and 4.11 of this Master Agreement.

"Assigned Receivables/s" means both the Original Assigned Receivable and the Derived Assigned Receivable.

"Lender's Account" means the following bank account of LENDER

| Bank: | Deutsche Bank Trust Company Americas<br>60 Wall Street, New York, NY 10005 | Bank: | Deutsche Bank Trust Company Americas<br>60 Wall Street, New York, NY 10005 |
|---|---|---|---|
| ABA #: | 021-001-033 | ABA #: | 021-001-033 |
| SWIFT Code: | BKTRUS33 | SWIFT Code: | BKTRUS33 |
| Account Name: | IIG TOF B.V. fbo COMPANIA ARGENTINA<br>DE GRANOS (1) | Account Name: | IIG TOF B.V. fbo COMPANIA ARGENTINA<br>DE GRANOS (1) |
| Account Number: | 04-901-498 | Account Number: | 04-901-498 |

"Cuenta/s del Mutuario" significa las cuentas bancarias de titularidad del MUTUARIO cuyos datos se detallarán en cada Solicitud de Desembolso remitida por el MUTUARIO, y en la que el MUTUANTE deberá realizar el depósito y/o acreditación de los fondos requeridos.

"Deuda Financiera" significa, respecto del MUTUARIO y del FIADOR, la deuda no consolidada contraída con entidades financieras (tanto a corto como a largo plazo) que el MUTUARIO y/o el FIADOR informen trimestralmente al MUTUANTE y que será ajustada en forma trimestral de acuerdo con lo expuesto en los correspondientes estados contables.

"Deudor Cedido" o "Deudor Cedido Originario" significa **MOLINO AMERICANO S.A.**, con domicilio en Gral. Pacheco 1070, Montevideo, Uruguay.

"Deudor Cedido Derivado" significa el importador obligado al pago del Crédito Cedido Derivado, que indefectiblemente deberá tener domicilio fuera de la República Argentina.

"Día/s Hábil/es" significa aquel en el cual se desarrolle actividad bancaria y/o cambiaria en la plaza de la Ciudad de Buenos Aires.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo y los Pagarés.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula NOVENA, Sección 9.2 del Contrato; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Sumas Adeudadas deberán vencer indefectiblemente dentro del término de los doscientos setenta (270) días corridos contados desde la fecha en que se realizó cada desembolso y a su vez, las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Diciembre de 2015.

"FIADOR" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Garantías" significa los Pagarés y la cesión de los Créditos Cedidos.

"Gastos Administrativos" significa la comisión a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE adicionará a cada desembolso de fondos que el MUTUARIO le solicite.

"BORROWER's Account/s" means the bank accounts of BORROWER whose data shall be specified on each Disbursement Request forwarded by BORROWER, where LENDER shall deposit and/or credit the requested funds.

"Financial Debt" means, with respect to BORROWER and SURETY, the non-consolidated debt taken from financial entities (including both short-term and long-term debt) as reported on a quarterly basis by BORROWER and/or SURETY to LENDER, and which shall be adjusted on a quarterly basis in accordance with the information disclosed on the pertinent financial statements.

"Assigned Debtor" or "Original Assigned Debtor" means **MOLINO AMERICANO S.A.**, domiciled at Gral. Pacheco 1070, Montevideo, Uruguay.

"Derived Assigned Debtor" means the importer bound to pay the Derived Assigned Receivable. Such importer shall have to be domiciled outside Argentina.

"Business Day/s" means the day/s on which bank and/or exchange activities are developed in the City of Buenos Aires.

"Transaction Documents" means this Master Agreement, the Disbursement Requests resulting therefrom, and the Promissory Notes.

"Dollars" and "US$" means United States Dollars, in cash or through a bank transfer.

"Material Adverse Effect" means a material adverse effect in (i) the business, assets, transactions or condition (financial or otherwise) of BORROWER and/or its Affiliates or any other parties to the Transaction Documents (including LENDER), or (ii) the validity or performance of Transaction Documents, or (iii) the rights and benefits granted to LENDER under the Transaction Documents.

"Event of Default" means any event, condition or circumstance mentioned in 9.2, Section NINE of the Master Agreement; and/or any non-compliance of the obligations set forth in the Master Agreement.

"Due Dates" means the due dates for payment of the Sums Due indicated on each of the Disbursement Requests. Sums Due shall always become payable within two hundred and seventy (270) running days from the date on which the disbursement was made. Furthermore, Due Dates shall always be before December 31, 2015.

"SURETY" has the meaning indicated in the heading of this Master Agreement.

"Guaranties" means the Promissory Notes and the assignment of the Assigned Receivables.

"Administrative Expenses" means the commission to be agreed upon by the Parties for each Disbursement Request, which LENDER shall add to each disbursement of funds requested by BORROWER.

"Línea de Crédito" significa la presente y única línea de crédito *"revolving"* que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses DIEZ millones CON 00/100 (US$ 10.000.000,00) como monto neto máximo a desembolsar por el MUTUANTE.

"Línea de Crédito Adeudada" significa la sumatoria de todos las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme los Documentos de la Operación.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula NOVENA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios de los DEUDORES.

"Ordenes de Compra" significa las órdenes y/o pedidos firmes de compra de mercadería – incluso a través de correo electrónico- , sus eventuales modificaciones y/o enmiendas, pendientes de pago, comprendidos en los Créditos Cedidos y emitidos en forma escrita y rubricados por el Deudor Cedido a favor del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO, el FIADOR y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE y avalados por el FIADOR, de conformidad con el formato adjunto al Contrato Marco como **ANEXO I**, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2015 durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en **ANEXO II**, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Interés" significa la tasa de interés a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

"Credit Facility" means this Revolving Credit Facility only which, subject to the terms and conditions of the Transaction Documents, LENDER may grant to BORROWER, up to a total maximum amount of TEN MILLION United States Dollars and 00/100 (U$S10,000,000.00) as the net maximum amount to be disbursed by LENDER.

"Credit Facility Due" means all of the Sums Due by BORROWER under the Credit Facility including interest as applicable, pursuant to Transaction Documents.

"Default" means any event or condition constituting an Event of Default, having the effects set forth in Section NINE hereof.

"LENDER" has the meaning given in the heading hereof.

"BORROWER" has the meaning given in the heading hereof.

"Applicable Rules" means all present and/or future, national, provincial or municipal rules applicable to the activities and the business of DEBTORS.

"Purchase Orders" means the outstanding firm orders and/or requests for the purchase of goods- even by email-, as from time to time amended, comprised in the Assigned Receivables, issued in writing and signed by the Assigned Debtor for the benefit of BORROWER.

"Parties" means, collectively, BORROWER, SURETY, and LENDER.

"Promissory Note/s" means the promissory notes issued by BORROWER to the benefit of LENDER and secured by SURETY, as per the form attached hereto as **ANNEX I**, in an amount equal to the Sum Due under each Disbursement Request, as set forth in Section THREE of the Master Agreement.

"Pesos" means the legal tender in the Republic of Argentina.

"Crediting Term" means the term of three (3) Business Days as from the effective date of receipt of the Disbursement Request.

"Confirmation Term" means the term of five (5) Business Days as from the date the required funds are credited in BORROWER's Account pursuant to a Disbursement Request.

"Availability Term" is the term fixed exclusively to the benefit of LENDER, as from the date of the Master Agreement until December 31, 2015, during which period LENDER undertakes to make the Credit Facility available to BORROWER.

"Disbursement Request" is the form substantially identical to the one attached hereto as **ANNEX II**, having all required data, to be executed by BORROWER and bearing the signature of its attorneys-in-fact or legal representatives certified by a notary public.

"Sum/s Due" means the funds to be paid by BORROWER to LENDER under each Disbursement Request including any applicable interest, as per this Master Agreement.

"Interest Rate" means the interest rate to be agreed by the Parties in each Disbursement Request, applicable to each disbursement of funds requested by the BORROWER to the LENDER, that the latter shall consider to calculate the amount of the Sums Due.



**SEGUNDA:    LA LINEA DE CREDITO.**

**2.1.    Disponibilidad de la Línea de Crédito.**

**2.1.1 Disponibilidad Condicionada.** Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

**2.1.2 Vigencia.** Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

**2.1.3 Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

**2.2.    Condiciones Precedentes al otorgamiento de la Línea de Crédito.**
La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

**2.2.1 Aprobaciones Societarias.** Que los DEUDORES hayan suscripto válidamente los Documentos de la Operación, y que el Directorio del MUTUARIO y del FIADOR haya aceptado incondicionalmente todos los términos y condiciones de los mismos, entregándole al MUTUANTE, a plena satisfacción del mismo, (i) copia certificada del acta de directorio del MUTUARIO y del FIADOR, transcripta al libro pertinente, en la cual se evidencie tal aprobación, y en la cual asimismo se autorice a los apoderados del MUTUARIO y del FIADOR, para la suscripción de los Documentos de la Operación, y (ii) copia certificada por escribano público del poder general del MUTUARIO y del FIADOR de los cuales surja que las personas autorizadas por los Directorios para la suscripción de los Documentos de la Operación se encuentran suficientemente facultadas para dicho acto;

**2.2.2 Vigencia de las Manifestaciones y Declaraciones de**

**SECTION TWO: THE CREDIT FACILITY.**

**2.1 Availability of the Credit Facility.**

**2.1.1 Conditional Availability.** Subject to the specific performance of all and each of the Conditions Precedent, or to a written waiver by LENDER of one or all of the Conditions Precedent, without being required to do so under any circumstance, LENDER undertakes to make the Credit Facility available to BORROWER during the Availability Term, which may only be used to pre-finance BORROWER's exports, to the extent of the Requests of Disbursement, pursuant to the conditions and procedure set forth in this Master Agreement.

**2.1.2 Effectiveness.** Once the Availability Term has expired, BORROWER's right to send to LENDER any Disbursement Requests will automatically and irrevocably cease, without any prior court or out-of-court notice being required therefore, unless the Availability Term is expressly extended in writing by LENDER, to its sole satisfaction, and such decision is sufficiently notified to BORROWER in a timely fashion.

**2.1.3 Amount of Disbursements.** BORROWER may require as many disbursements as it may deem appropriate according to its needs provided the aggregate of the amounts stated in the relevant Disbursement Requests stay below the amount of the Credit Facility; consequently, in no case and under no circumstance will LENDER be bound, or may be interpreted to be bound, to disburse an amount higher than or exceeding the Credit Facility.

**2.2 Conditions Precedent to the Granting of the Credit Facility.**

The validity and effectiveness of the Credit Facility granted by LENDER under the Master Agreement is subject to the fact that, at LENDER'S reasonable discretion, (i) all and each of the following Conditions Precedent, set forth for LENDER'S exclusive benefit, take place and remain fully effective as of the execution of this Master Agreement and until its termination, and/or (ii) LENDER expressly waives in writing one, any or all the Conditions Precedent:

**2.2.1 Corporate Approvals.** That DEBTORS have validly signed the Transaction Documents, and that the Boards of Directors of BORROWER and SURETY have unconditionally accepted all the terms and conditions thereof, furnishing to LENDER, to its full satisfaction, (i) a certified copy of the minutes of the board of directors' meeting of BORROWER and SURETY, transcribed to the relevant book, giving evidence of such approval and also authorizing BORROWER's and SURETY's attorneys-in-fact to execute the Transaction Documents, and (ii) a copy certified by a notary public of the general power of attorney granted by BORROWER and SURETY evidencing that the persons authorized by the Boards of Directors to sign the Transaction Documents are fully empowered therefor; and .

**2.2.2 Effectiveness of the Representations and Statements**

los DEUDORES. Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por los DEUDORES en la Cláusula OCTAVA del Contrato Marco,

**2.2.3 Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Eventos de Incumplimiento.** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías.

**TERCERA: CONDICIONES PRECEDENTES PARA LOS DESEMBOLSOS.**

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

3.1.1 el original de la Solicitud de Desembolso debidamente completada y firmada por los representantes legales de los DEUDORES que cuenten con las facultades suficientes, con sus firmas certificadas por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo, las Sumas Adeudadas que el MUTUARIO deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento calculadas a la Tasa de Interés y el detalle de los Gastos Administrativos

3.1.2 un Pagaré librado a favor del MUTUANTE y avalado por el FIADOR, pagadero a la vista y sin protesto, por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por los representantes legales de los DEUDORES que cuenten con las facultades suficientes, a plena satisfacción del MUTUANTE, con las firmas debidamente certificadas por un escribano público argentino;

3.1.3 los originales de las Órdenes de Compra y el detalle de los Créditos Cedidos pendientes de pago, cedidos a favor del MUTUANTE con la correspondiente carta de notificación de la cesión de los Créditos Cedidos dirigida al Deudor Cedido

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO (incluyendo, sin limitación, el supuesto en que las Partes no logren acordar la Tasa de Interés aplicable a la Solicitud de Desembolso), y por consiguiente el MUTUARIO renuncia expresa e irrevocablemente a promover algún reclamo contra el MUTUANTE fundado en tal circunstancia o causa.

**3.3. Trámite posterior. Desembolso.**

3.3.1 Una vez recibidos los Documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco.

made by DEBTORS. That all and each of the representations and statements made by DEBTORS in Section EIGHT of the Master Agreement are fully effective, and continue to be accurate, correct and true;

**2.2.3 Non-existence of Material Adverse Changes, Material Adverse Effects, or Events of Default.** That no grounded events have either occurred and/or continue to exist or exist to foresee the occurrence of one or more Material Adverse Changes, Material Adverse Effects and/or Events of Default (whether the lapse and acceleration of terms have been declared or not), and no circumstance known by BORROWER and or SURETY has occurred that in any way may endanger, undermine or weaken the full effectiveness, validity, force and effect, scope, and enforceability vis-à-vis third parties of the Transaction Documents and Guarantees.

**SECTION THREE: CONDITIONS PRECEDENT DISBURSEMENTS.**

**3.1 Disbursement Request.** To request LENDER a disbursement under the Credit Facility, BORROWER must send by reliable means and to LENDER's satisfaction:

3.1.1 the original of the Disbursement Request duly filled out and signed by the legal representatives or attorneys-in-fact of DEBTORS duly empowered therefor, with their signatures certified by an Argentine notary public; each Disbursement Request shall always contain the requested disbursement amount, the Due Date/s thereof, the Sums Due payable by BORROWER on such Due Date/s calculated based on the Interest Rate, and a detail of the Administrative Expenses.

3.1.2 a Promissory Note issued to the name of LENDER and co-signed by SURETY, payable at sight and with clause "sin protesto", in the amount of the Sums Due, duly signed by the legal representatives or attorneys-in-fact of DEBTORS duly empowered therefor, at the full satisfaction of LENDER, with their signatures duly certified by an Argentine notary public

3.1.3 the original Purchase Orders and a breakdown of the outstanding

**3.2. Lack of Liability for Making a Disbursement or Not.** Notwithstanding the provisions of this Section, LENDER shall not have any liability whatsoever to BORROWER for accepting or rejecting any Disbursement Requests received from BORROWER (including, without limitation, the Parties' failure to agree on the Interest Rate applicable to the Disbursement Request) and, therefore, BORROWER expressly and irrevocably waives to file any claim against LENDER based upon such circumstance or cause.

**3.3 Subsequent Proceeding. Disbursement.**

3.3.1 Once the Disbursement Request Documents have been received by LENDER, LENDER shall verify that all the information and documents contained therein are, at its own discretion, accurate and in accordance with the Master Agreement. Notwithstanding the above, LENDER is not

Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los Documentos de la Solicitud de Desembolso, y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma.

**3.3.2** Sin perjuicio de ello, de estar el MUTUANTE de acuerdo, a su satisfacción, con los Documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar los fondos solicitados (netos de cualquier deducción que le fuere aplicable) en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquella.

**3.4 Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de diez (10) días corridos contados desde la finalización del Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5 Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, o las Partes no logren un acuerdo respecto de la Tasa de Interés; el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato Marco en tal supuesto, de conformidad con lo establecido en la cláusula NOVENA del presente Contrato Marco.

**CUARTA:     CESIÓN DE CRÉDITOS.**
**4.1**     En garantía de las Sumas Adeudadas y como medio de pago de las mismas en la forma prevista en el presente Contrato Marco, mediante cada Solicitud de Desembolso el MUTUARIO deberá ceder al MUTUANTE los Créditos Cedidos Originarios. A cada una de tales cesiones de créditos serán aplicables los términos y condiciones establecidas en la presente Cláusula CUARTA, los cuales se tendrán por reproducidos en cada una de las Solicitudes de Desembolso. Los Créditos Cedidos Originarios se considerarán aceptados por el MUTUANTE si y sólo si este último efectúa el desembolso de acuerdo a lo establecido en la Sección 3.3 de este Contrato Marco, en cuyo caso la cesión quedará perfeccionada entre las Partes en los términos establecido en el presente Contrato Marco. La falta de aceptación de la cesión de créditos antedicha por parte del MUTUANTE acarreará automáticamente el rechazo de la Solicitud de Desembolso, sin que ello genere responsabilidad o incumplimiento de ningún tipo para el MUTUANTE. En caso de ser aceptada por el MUTUANTE, la cesión de los Créditos Cedidos Originarios comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro

---

obliged to perform a legal audit or due diligence of the Disbursement Request Documents and, therefore, LENDER shall be not responsible for any misrepresentation, inaccuracy, omission and/or lack of genuineness thereof.

**3.3.2** Notwithstanding the aforesaid, if LENDER agrees, to its satisfaction, to the Disbursement Request documents, LENDER shall, at its own discretion and to its own satisfaction, and even without being bound thereto under the Transaction Documents, disburse the requested funds (net of any applicable deduction) in BORROWER's Account within the Crediting Term. LENDER'S acceptance of a Disbursement Request does not bind LENDER to accept any other Disbursement Requests that BORROWER may submit to LENDER simultaneously or thereafter.

**3.4 Confirmation.** Within the Confirmation Term, BORROWER shall send to LENDER a note confirming receipt of such funds by reliable means. Notwithstanding the aforesaid, even in the event that BORROWER fails to send the confirmation note mentioned above, BORROWER's failure to submit a claim by reliable means within a term of ten (10) calendar days as from completion of the Crediting Term shall imply BORROWER's acceptance of the disbursement deposited in BORROWER's Account.

**3.5 LENDER'S Exclusive Power.** Should, at LENDER'S exclusive discretion, any Material Adverse Change or Material Adverse Effect occur during the Availability Term, or if the Parties fail to agree on the applicable Interest Rate, LENDER may immediately interrupt the processing of any Disbursement Request submitted under the Master Agreement being reviewed and evaluated by LENDER, as well as any disbursement of funds corresponding to a Disbursement Request approved by LENDER but which funds have not been actually credited in BORROWER's Account, without giving rise to any responsibility for LENDER. Consequently, BORROWER waives the filing of any action for responsibility grounded thereon. The aforesaid notwithstanding LENDER's right to terminate the Master Agreement under the provisions of section NINE hereof.

**SECTION FOUR: ASSIGNMENT OF RECEIVABLES.**

**4.1** As security for payment of all Sums Due and as means of payment thereof as set forth in this Master Agreement, under each Disbursement Request BORROWER shall assign the Original Assigned Receivables to LENDER. The terms and conditions of this Section FOUR shall apply to each such assignment of receivables, which shall be deemed reproduced in each of the Disbursement Requests. The Original Assigned Receivables shall be deemed accepted by LENDER if and only if LENDER makes the disbursement in accordance with the provisions in Section 3.3 of this Master Agreement, in which case the assignment shall have been perfected under the terms of this Master Agreement. Lack of acceptance of such assignment of receivables by LENDER shall automatically cause the rejection of the Disbursement Request, without such a circumstance creating any liability or breach of any kind whatsoever for LENDER. In the event LENDER accepts the assignment of the Original Assigned Receivables, such assignment shall comprise all rights and actions of BORROWER with respect to the Assigned Receivables and the above-mentioned consequences, placing LENDER pari passu in priorities with the pertinent scope and to the relevant extent, LENDER being also subrogated to all rights or performance and/or collection actions likely to exist in connection with such receivables, notwithstanding any contractual obligations with Borrower's Assigned Debtor resulting in the Original Assigned

que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido de las cuales surjan los Créditos Cedidos Originarios, que quedarán a cargo exclusivo del MUTUARIO.

**4.2** El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, copias autenticadas de los conocimientos de embarque respecto de la mercadería comprendida en las Órdenes de Compra. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.3** El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos Originarios serán depositadas por el Deudor Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas al MUTUANTE se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

*"El crédito representado y contenido en la presente factura, fue cedido a _____, por contrato de Cesión de Créditos de fecha __/__/__ Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____, ABA _____, Beneficiario: _____, Cuenta N°: _____."*

**4.4** Los fondos de los Créditos Cedidos Originarios depositados en la Cuenta del Mutante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Cláusula QUINTA del Contrato Marco.

**4.5** La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos Originarios no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.6** El MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido, las instrucciones de pago a favor del MUTUANTE de las sumas correspondientes a los Créditos Cedidos y a obtener la aprobación expresa del Deudor Cedido respecto de las mismas, mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **ANEXO III**. A tales fines dentro de las 48 hs. de suscripta cada Solicitud de Desembolso, y como condición previa al desembolso de las sumas solicitadas, el MUTUARIO comunicará al Deudor Cedido, por escrito y de manera fehaciente con intervención notarial, que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido –mediante su apoderado o representante legal- firmar el pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido en la forma antes indicada, conforme lo establecido y como condición previa al desembolso de las sumas solicitadas en la Cuenta del Mutuario. Todo ello, sin perjuicio de la leyenda que el MUTUARIO deberá incluir en cada una de las facturas emitidas en virtud de los Créditos Cedidos Originarios, según se indica en el punto 4.3 de la presente Cláusula CUARTA.

Receivables, which shall be exclusively borne by BORROWER .

**4.2** BORROWER shall deliver to LENDER, within five (5) days from shipment, authenticated copies of the bills of lading relating to the goods comprised in the Purchase Orders. BORROWER shall also deliver to LENDER the delivery notices and invoices issued by BORROWER as a result of The Original Assigned Receivables within five (5) days from their receipt by the Assigned Debtor.

**4.3** BORROWER warrants that all sums corresponding to the Original Assigned Receivables shall be deposited by the Assigned Debtor in LENDER's Account. For such purpose, in addition to the notices indicated in Section 4.6 herein below in this Section FOUR, BORROWER shall include in all and each of the invoices issued pursuant to the Assigned Receivables and sent to Assigned Debtor, a legend expressly stating that such invoices shall be paid to LENDER through a transfer of the pertinent funds to LENDER's Account. In each of the invoices assigned to BORROWER, the following legend shall be included (both in Spanish and English):

*"The receivable represented and contained in this invoice, was assigned to _____ under the Assignment of Receivables Agreement dated __/__/__. You should pay the same on the due date through a deposit in Bank: _____, ABA _____; Beneficiary: _____; Account No _____".*

**4.4** The funds pertaining to the Original Assigned Receivables deposited in LENDER's Account shall be applied to the payment of the Sums Due as provided for in Section Five of the Master Agreement.

**4.5** The assignment of the Assigned Receivables is made under BORROWER's liability to LENDER. Therefore, if for any reason whatsoever the amount of the Original Assigned Receivables is not paid to LENDER as per the terms stated in this Section Four and/or are not sufficient to cover payment of the Sums Due on the specified Due Dates, BORROWER shall pay LENDER the total amount or any balance due corresponding to each Sum Due before each pertaining Due Dates, under penalty of incurring in automatic Default.

**4.6** BORROWER shall give true and reliable notice of this assignment to the Assigned Debtor, shall provide payment instructions for payment of the Assigned Receivables sums to be made to LENDER, and shall obtain the Assigned Debtor's express approval thereof, in the form of a notice substantially identical to the form attached hereto as **ANNEX III**. For such purposes, within 48 hours from execution of each Disbursement Request, and as a condition precedent to the disbursement of requested sums, BORROWER shall give notice to the Assigned Debtor in writing and through reliable means with the intervention of a notary, that the sums pertaining to the Assigned Receivables shall have to be deposited in Lender's Account, and the Assigned Debtor shall –through its attorney-in-fact or legal representative- sign at the bottom thereof acknowledging its acceptance therewith. BORROWER shall deliver such notice to LENDER bearing Borrower's Assigned Debtor acceptance as hereinabove indicated and specified, and as a condition precedent to the disbursement of requested sums into BORROWER's account. All of the above notwithstanding the legend that BORROWER shall have included in each of the invoices issued under the Original Assigned Receivables, as indicated in 4.3 of this Section FOUR.

Asimismo, el MUTUARIO remitirá vía fax y/o e-mail, una comunicación al Deudor Cedido indicando que el pago de los Créditos Cedidos Originarios deberá realizarse en la referida cuenta, consignando que se remite por correo el original de la comunicación.

**4.7** El presente Contrato Marco no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos Originarios, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos Originarios, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos Originarios. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que –con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- el Deudor Cedido incumpla por cualquier causa (incluyendo sin que implique limitación alguna, por causa de fuerza mayor o caso fortuito) los contratos que causen los Créditos Cedidos Originarios o rescinda o termine dichos contratos por cualquier causa, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

**4.8** El MUTUARIO declara y garantiza al MUTUANTE:



**4.8.1** el cobro de los Créditos Cedidos Originarios, en Dólares y mediante depósito de los mismos en la Cuenta del Mutuante.

**4.8.2** la forma instrumental de los mismos.

**4.8.3** la legitimidad de los Créditos Cedidos Originarios y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

**4.8.4** que no se encuentra inhibido para disponer de sus bienes;

**4.8.5** que no adeuda suma alguna que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos Originarios;

**4.8.6** que no ha percibido suma alguna derivada de los Créditos Cedidos Originarios, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

**4.8.7** la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos Originarios.

**4.8.8** que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos Originarios, incluyendo –pero no limitado a- la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos Originarios.

**4.8.9** que el monto de los Créditos Cedidos Originarios depositado en la Cuenta del Mutuante será equivalente como mínimo al 120 % de las Sumas Adeudadas de la Solicitud de Desembolso.

**4.8.10** que la Línea de Crédito será destinada a la financiación de exportaciones.

Furthermore, BORROWER shall send by fax and/or e-mail, a communication to the Assigned Debtor indicating that payment of the Assigned Receivables shall be made into such account, specifying that the original communication is forwarded by postal mail.

**4.7** This Master Agreement does not imply in any manner whatsoever a transfer by BORROWER to LENDER of the obligations arising from the agreements originating the Original Assigned Receivables, which shall continue to be obligations of BORROWER. BORROWER undertakes to comply with any and all of its obligations deriving from the agreements originating the Original Assigned Receivables so that LENDER's right to collect the Original Assigned Receivables shall not be affected. Non-compliance in due time and manner with the obligations mentioned above shall automatically give place by operation of law to BORROWER's Default. Default by operation of law shall also occur with the consequences stated above in the event that, irrespective of BORROWER's default, the Assigned Debtor does not comply for any reason (including but not limited to causes of force majeure or "act of god") with the agreements originating the Original Assigned Receivables, or rescinds or terminates such agreements for any reason, or in any other manner ceases or ends its business relationship with BORROWER, whether unilaterally or as agreed between BORROWER and the Assigned Debtor.

**4.8** BORROWER represents and warrants LENDER:

**4.8.1** Collection of the Original Assigned Receivables, in Dollars and through their deposit into LENDER's Account;

**4.8.2** the instrumental form thereof;

**4.8.3** the legitimacy of the Original Assigned Receivables and that Assigned Receivables are freely available to BORROWER, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

**4.8.4** that BORROWER is not subject to restraining orders to dispose of their property;

**4.8.5** that they do not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Original Assigned Receivables;

**4.8.6** that they have not received any sum resulting from the Original Assigned Receivables and that the same have not been previously assigned, either partially or totally, to any natural or artificial person;

**4.8.7** the authenticity of the signatures of any document evidencing the origin of the Original Assigned Receivables;

**4.8.8** that they shall comply with any and all of their obligations deriving from the Original Assigned Receivables, including, but not limited to, delivery in due time and manner to the Assigned Debtor of the goods stated in the Original Assigned Receivables.

**4.8.9** that the amount of the Original Assigned Receivables to be deposited into LENDER's Account shall be at least equal to 120 % of the Sums Due under the Disbursement Request .

**4.8.10** that obtaining the Credit Facility shall be applied to the financing of their export operations.

**4.9**  Sin perjuicio del recurso del MUTUARIO establecido en la Sección 4.5 del presente, por cada Solicitud de Desembolso aceptada por el MUTUANTE, el MUTUARIO se compromete a ceder gratuitamente al MUTUANTE durante la vigencia del presente Contrato Marco y hasta 30 días corridos anteriores a la Fecha de Vencimiento establecida en cada Solicitud de Desembolso, otro crédito que resulte satisfactorio para el MUTUANTE, -a criterio razonable de este último- en reemplazo del Crédito Cedido Originario (el "<u>Crédito Cedido Derivado</u>"). A tal efecto, el Crédito Cedido Derivado que el MUTUARIO pretenda ceder al MUTUANTE deberá reunir -entre otros- los siguientes requisitos mínimos:

4.9.1  Tener un monto cierto equivalente, como mínimo, al 120 % ( ciento veinte por ciento) de las Sumas Adeudadas de la Solicitud de Desembolso cuyo reemplazo del Crédito Cedido Originario se pretenda;

4.9.2  tener una fecha de pago anterior a la Fecha de Vencimiento;

4.9.3  el Deudor Cedido Derivado –adquirente de la mercadería del MUTUARIO- deberá ser alguno de los nombrados a continuación: **MOLINOS OVERSEAS S.A, GLENCORE INTERNATIONAL AG, CONCORDIA TRADING B.V., URUGRAIN S.A., ALFRED C. TOEPFER INTERNATIONAL, NETHGRAIN B.V., AGROGRAIN LTD., LOUIS DREYFUS, ARCHER DANIELS MIDLAND (ADM), GRUPO MOLINOS (PEREZ COMPANC), CARGILL INC., NOBLE GRAIN PTE. LTD., BUNGE Y BORN, CEVAL INTERNATIONAL, SOYA MILLS S/A o SHEMEN INDUSTRIES LTD, MOLINO AMERICANO S.A , CARGILL SACI SUCURSAL URUGUAY, BUNGE AGRITRADE S.A. , BUNGE GLOBAL MARKETS, INC. (LATIN DIVISION), GLENCORE GRAIN B.V., OLEAGINOSA MORENO HN NOBLE RESOURCES S.A. OS. S.A.C.I.F.I.A., CONCORDIA AGRITRADING PTE. LTD CORRECTA IND. E COM., NOBLE RESOURCES S.A.** El MUTUANTE se reserva, a su exclusivo criterio, la facultad de aceptar –siempre que lo haga por escrito- otros Deudores Cedidos Derivados de reconocida solvencia distintos de los antes nombrados.

4.9.4  Encontrarse instrumentado por escrito, mediante contratos de compraventa, órdenes de compra en firme suscriptas por el Deudor Cedido Derivado o facturas emitidas por el MUTUARIO y aceptadas por el Deudor Cedido Derivado.

El Crédito Cedido Derivado garantizará las Sumas Adeudadas y se aplicará al pago de las mismas del mismo modo que el Crédito Cedido Originario, resultando aplicable al mismo. La pretendida cesión del nuevo crédito en modo alguno reemplazará, modificará ni alterará la cesión del Crédito Cedido Originario instrumentada mediante la Solicitud de Desembolso en cuestión hasta tanto la misma no sea expresamente aceptada por el MUTUANTE y se haya suscripto el contrato de cesión y se haya notificado fehacientemente al Deudor Cedido Derivado, conforme se establece en la Sección 4.10 subsiguiente.

**4.10**  En el supuesto que el Crédito Cedido Derivado propuesto por el MUTUARIO sea aceptado por el MUTUANTE, el MUTUARIO deberá ceder el mismo en los mismos términos y condiciones previstos en la presente Cláusula CUARTA del Contrato Marco. A tal fin, el MUTUARIO deberá suscribir ante escribano público el contrato de cesión correspondiente y la notificación a los Deudor/es Cedido/s Derivado/s en los términos establecidos en la Sección 4.6 del presente Contrato Marco, instruyéndolo/s para que efectúen el depósito de las sumas

**4.9**  Without prejudice to BORROWER's remedy in Section 4.5 herein, for each Disbursement Request accepted by LENDER, BORROWER agrees to grant LENDER for no consideration during the life of this Agreement and within 30 calendar days prior to the Due Date established in each Disbursement Request, another receivable as may be satisfactory and reasonable to LENDER, to replace the Original Assigned Receivable (the "<u>Derived Assigned Receivable</u>"). To that effect, the Derived Assigned Receivable intended to be assigned by BORROWER to LENDER shall meet – among others- the following minimum requirements:

4.9.1  it shall be issued for an amount equal to, at least, 120% (one hundred and twenty per cent) of the Sums Due of the Disbursement Request relating to the Original Assigned Receivable sought to be replaced;

4.9.2  the payment date shall be prior to the Due Date;

4.9.3  the Derived Assigned Debtor –purchaser of BORROWER's goods- shall be one of the following companies: **MOLINOS OVERSEAS S.A, GLENCORE INTERNATIONAL AG, CONCORDIA TRADING B.V., URUGRAIN S.A., ALFRED C. TOEPFER INTERNATIONAL, NETHGRAIN B.V., AGROGRAN LTD., LOUIS DREYFUS, ARCHER DANIELS MIDLAND (ADM), GRUPO MOLINOS (PEREZ COMPANC), CARGILL INC., NOBLE GRAIN PTE. LTD., BUNGE Y BORN, CEVAL INTERNATIONAL, SOYA MILLS S/A or SHEMEN INDUSTRIES LTD, MOLINO AMERICANO S.A , CARGILL SACI SUCURSAL URUGUAY, BUNGE AGRITRADE S.A. , BUNGE GLOBAL MARKETS, INC. (LATIN DIVISION), GLENCORE GRAIN B.V., OLEAGINOSA MORENO HN NOBLE RESOURCES S.A. OS. S.A.C.I.F.I.A., CONCORDIA AGRITRADING PTE. LTD CORRECTA IND. E COM., NOBLE RESOURCES S.A.** LENDER reserves the right to accept, at its own discretion, creditworthy Derived Assigned Debtors other than the ones listed above – provided such election is made in writing.

4.9.4  it shall be in writing and evidenced by bills of sales, firm purchase orders executed by the Derived Assigned Debtor or invoices issued by BORROWER and accepted by the Derived Assigned Debtor.

The Derived Assigned Receivable shall secure the Sums Due and shall be applied to payment thereof in the same way as the Original Assigned Receivable, being applicable thereto. The intended assignment of the new receivable shall not in any manner whatsoever replace, modify or change the assignment of the Original Assigned Receivable implemented by the pertaining Disbursement Request until the latter has been expressly accepted by LENDER, the assignment agreement has been executed and due notice thereof has been given to the Derived Assigned Debtor, as per the provisions in Section 4.10 below.

**4.10**  In case the Derived Assigned Receivable indicated by BORROWER is accepted by LENDER, it shall be assigned by BORROWER under the terms and conditions set forth in this Section FOUR hereof. To that end, BORROWER shall, as provided for in Section 4.6 hereof, execute the pertaining assignment agreement and the notice to the Derived Assigned Debtor/s before a notary public; it shall also instruct the Derived Assigned Debtor/s to deposit the sums corresponding to the Derived Assigned Receivable into Lender's Account. All of the above shall conform to

correspondientes al Crédito Cedido Derivado en la Cuenta del Mutuante. Todo ello de acuerdo al modelo adjunto al presente como **ANEXO IV**, mediante el cual asimismo se dejará sin efecto la cesión del Crédito Cedido Originario.

**4.11**   El reemplazo del Crédito Cedido Originario por el Crédito Cedido Derivado constituye una obligación y no una facultad del MUTUARIO. Dicho reemplazo constituye una condición indispensable tenida en cuenta por el MUTUANTE para la suscripción del presente. La falta de cesión del Crédito Cedido Derivado dentro del plazo establecido en la Sección 4.9 (primer párrafo), así como el incumplimiento de las demás obligaciones establecidas en la presente Cláusula ocasionará la Mora automática del MUTUARIO.

**QUINTA:     CANCELACIÓN    DE    LAS    SUMAS ADEUDADAS. APLICACIÓN DE LOS CRÉDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.**

**5.1**     El     MUTUARIO  se  obliga  irrevocable  e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes a cada una de ellas, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.2.** A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

El MUTUANTE aplicará todos los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en cada Fecha de Vencimiento. En el caso de que los fondos de los Créditos Cedidos depositados excedan el monto de las Sumas Adeudadas, el excedente será transferido a la Cuenta del Mutuario dentro de las cuarenta y ocho (48) hs hábiles de acreditados los fondos de los Créditos Cedidos en la Cuenta del Mutuante y siempre que no exista un Evento de Incumplimiento y no resulte de aplicación la sección 5.3 siguiente. En el caso de que los fondos de los Créditos Cedidos depositados durante tales vencimientos no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

**5.3**     En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y en el caso que exista un remanente luego de haber sido cancelada la totalidad de la Línea de Crédito Adeudada, dicho remanente será transferido por el MUTUANTE a la Cuenta del Mutuario dentro de las cuarenta y ocho (48) horas hábiles de cancelada la totalidad de la Línea de Crédito Adeudada.

**5.4**     Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso de que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuese suficiente para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**5.5**     En caso de pago en tiempo y forma de los Créditos Cedidos al MUTUANTE, éste último reintegrará al MUTUARIO toda suma que exceda el monto de la Línea de Crédito Adeudada dentro de las cuarenta y ocho (48) horas hábiles contadas desde el pago de los Créditos Cedidos, mediante transferencia a la Cuenta del Mutuario indicada en la Cláusula PRIMERA.

**5.6**     En caso que el pago de los Créditos Cedidos se realizara al MUTUARIO, por cualquier causa que fuere, el MUTUARIO se

the sample attached as **ANNEX IV** hereto, which shall supersede the assignment of the Original Assigned Receivable.

**4.11** Replacement of the Original Assigned Receivable by the Derived Assigned Receivable constitutes BORROWER's obligation, not a power. Such replacement is a material condition on which LENDER relies to execute this agreement. Failure to assign the Derived Assigned Receivable within the term set forth in Section 4.9 (first paragraph) and to comply with all other obligations herein shall result in BORROWER's automatic Default.

**SECTION FIVE: PAYMENT OF SUMS DUE. APPLICATION OF ASSIGNED RECEIVABLES TO PAYMENT OF SUMS DUE. LENDER'S REMEDY.**

**5.1** BORROWER irrevocably and unconditionally undertakes to pay LENDER the Sums Due on the Due Dates corresponding to each of them through a deposit thereof into LENDER's Account.

**5.2.** For the purposes mentioned in 5.1 above, Assigned Receivables funds deposited into LENDER's Account shall be applied to payment of the Sums Due as follows:

LENDER shall apply Assigned Receivables funds deposited into Lender's Account to the payment of each Sum Due payable on each Due Date. In the event Assigned Receivables funds so deposited exceed the amount of Sums Due, the exceeding amount shall be transferred to the BORROWER's Account within forty-eight (48) business hours of the funds being credited in the LENDER's Account and as long as no Event of Default is occurring and section 5.3 is not applicable. In the event Assigned Receivables funds deposited by the Due Dates are not sufficient to cover Sums Due, BORROWER shall have to make up for the difference to cover the total Sum Due, under warning of Default.

**5.3** Upon Default, all the funds pertaining to the Assigned deposited in the LENDER's Account shall be applied to payment of the entire Credit Facility Due and in case after the cancellation of the totality of the Credit Facility Due a surplus amount exists, the said exceeding amount shall be transferred by the LENDER to the BORROWER's Account within forty-eight (48) business hours as from the cancellation of the totality of the Credit Facility Due.

**5.4**     Considering BORROWER's remedy in the assignment of Assigned Receivables to LENDER, if -for any reason whatsoever- the amount of the Assigned Receivables deposited in Lender's Account are not sufficient to cover Sums Due on the Due Dates relating to a certain month, BORROWER shall pay LENDER the total amount or the balance due on each Sum Due before each Due Date, under penalty of incurring in automatic Default.

**5.5**     If the Assigned Receivables are paid to LENDER in a timely and accurate fashion, the latter shall reimburse BORROWER any sum exceeding the amount of the Credit Facility Due within forty-eight (48) business hours as from payment of Assigned Claims through a wire transfer to Borrower's Account as mentioned in Section ONE.

**5.6**     If for any reason whatsoever payment of Assigned Receivables is made to BORROWER, BORROWER undertakes to

compromete a depositar dentro de las 24 hs. en la Cuenta del Mutuante indicada en la Cláusula Primera, a favor del MUTUANTE, la suma necesaria para saldar las Sumas Adeudadas más los intereses compensatorios que se devenguen desde el la Fecha de Vencimiento correspondiente.

**5.7**    En caso de falta de cumplimiento de cualquiera de las obligaciones asumidas por el MUTUARIO en el Contrato Marco, el MUTUANTE quedará facultado para iniciar contra cualquiera de los DEUDORES la ejecución de los Pagarés, a exclusivo criterio del MUTUANTE. El MUTUANTE se compromete a devolver los Pagarés al MUTUARIO dentro de un plazo no mayor a diez (10) días desde que las Sumas Adeudadas derivadas de cada Solicitud de Desembolso hayan sido abonadas en tiempo y forma, con más los intereses adicionales que pudieren corresponder en caso de mora.

**5.8.** Independientemente de los Créditos Cedidos, el Mutuario deberá causar dentro del plazo de vigencia del Contrato Marco, que se acrediten en la cuenta del Mutuante un importe no inferior al trescientos por ciento (300%) del monto total de la Línea de Crédito. Siempre que no hubiera ocurrido un Evento de Incumplimiento, estos fondos -en exceso de los Créditos Cedidos- se considerarán de libre disponibilidad del Mutuario, por lo que el Mutuante liberará los mismos a favor del primero dentro de las cuarenta y ocho (48) horas de su acreditación en cuenta del Mutuante. En caso de Evento de Incumplimiento el Mutuante deberá liberar a favor del Mutuario en igual plazo, aquellos fondos que excedan las sumas que el Mutuario adeude al Mutuante al momento del Evento de Incumplimiento.

## SEXTA:     FIANZA.

Por este acto, el FIADOR se constituye en fiador solidario, liso llano y principal pagador, co-deudor solidario de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene bajo ésta Línea de Crédito el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier acreedor con miras a un arreglo general de pagos, o se transformen en insolventes o quebrados, o les sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los 15 días de haber sido decretados. En dicho supuesto el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la

deposit to the benefit of LENDER into Lender's Account mentioned in Section ONE, within twenty-four hours, an amount as may be necessary to discharge the Sums Due plus compensatory interest accrued as from the pertaining Due Date.

**5.7** Upon failure to comply with any of the obligations undertaken by BORROWER under the Master Agreement, LENDER shall be entitled to start enforcement proceedings against any of the DEBTORS for collection of the Promissory Notes at LENDER's sole discretion. LENDER binds itself to return the Promissory Notes to BORROWER within ten (10) days following due and timely payment of all Sums Due resulting from each Disbursement Request, plus any additional applicable interest that may be payable in the event of default, as applicable.

**5.8.** Independently of the Assigned Receivables, during the term of this Master Agreement, the Borrower shall cause the credit in the Lender's Account, of not less tan three hundred percent (300%) of the amount of the Credit Facility. Provided that no Event of Default has occurred, these funds —exceeding the Assigned Receivables-, shall be considered to be fully available by the Borrower, so the Lender shall free and dispose the funds in benefit of the Borrower within forty eight (48) hours as from their credit in the Lender's Account. In case of Event of Default the Lender shall free in benefit of the Borrower in the same term, those funds exceeding the amounts that Borrower owes to Lender at the moment of the Event of Default.

## SECTION SIX: SURETY.

SURETY hereby becomes a joint and several surety, main payor, and co-debtor of the debts and liabilities undertaken by BORROWER under this Agreement, under the same terms and conditions set forth herein for BORROWER, expressly waiving the right to: (1) the benefits of division and excussion and other applicable related commercial and civil rules, (2) demand the previous court or out-of-court foreclosure of BORROWER or exercise any defense that may be available to BORROWER, and generally to file any defenses other than that of payment. The joint and several liability assumed by SURETY comprises, additionally, legal or conventional readjustment and accessory costs, such as currency updating, compensatory and penalty interest due by BORROWER. This surety shall be effective until full payment is made by BORROWER of all liabilities of BORROWER undertaken under this Credit Facility and covered by this guarantee. The following events shall be construed to be a breach of the provisions herein contemplated: if SURETY starts negotiations with any creditor for a general payment arrangement or changes their indebtedness schedule, becomes insolvent, or bankrupt, or bankruptcy proceedings are instituted, or petitions for a composition with creditors, or an Out of Court Reorganization Plan is filed, and the same are not withdrawn within 15 days from institution thereof. In such event, LENDER may, through notice served on SURETY, declare that BORROWER's obligations are due and demand payment of all amounts due by BORROWER as payable, plus all expenses incurred by LENDER. SURETY makes the following representations and warranties, all of which shall continue to be effective during the life of this Agreement: (a) This guaranty is a valid and binding obligation of Surety, enforceable according to its relevant terms; (b) There is no by-law, rule, regulation or contract provision binding upon Surety that may be breached by the execution, delivery or performance of this guaranty. For all legal purposes hereof, SURETY establishes its special domicile at 111 Eighth Avenue, New York, New York, 10011, and accepts that notices served through a certified telegram or other authentic means are valid. To all legal purposes hereof, SURETY irrevocably submits to the jurisdiction and applicable law set forth in Section FOURTEEN hereof, expressly waiving any other forum or jurisdiction.

jurisdicción y ley aplicable establecidos en la Cláusula DECIMO CUARTA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.

**SÉPTIMA:        MONEDA DE PAGO.**

**7.1**        El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada y de los Créditos Cedidos- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

**7.2**        En atención a lo dispuesto en la Cláusula 7.1., en caso que en cualquier Fecha de Vencimiento existiere cualquier restricción o prohibición de hecho o de derecho para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO deberá igualmente abonar la Línea de Crédito Adeudada y cualquier otra suma pagadera en virtud de los Documentos de la Operación en Dólares, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE:

7.2.1. Mediante la compra con Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

7.2.2. Mediante la entrega al MUTUANTE de cualquier título en Dólares, a satisfacción expresa del MUTUANTE y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

7.2.3. En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de América, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

7.2.4. Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en cualquier Fecha de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**SECTION SEVEN: PAYMENT CURRENCY.**

7.1 BORROWER undertakes that payment of the full amount or the balance that may become due under the Transaction Documents- including payment of the Credit Facility Due and of the Assigned Receivables- shall only be paid in Dollars and that no other currency shall be accepted. Consequently, BORROWER expressly acknowledges and states that it is a material condition to this Agreement that payment of the Credit Facility Due, as well as compensatory and penalty interest, costs, court fees and further sums payable to LENDER hereunder, be canceled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar theory to allege any increased burden for payment.

7.2 In accordance with the provisions set forth in Section 7.1., if on any Due Date there is any legal or in-fact restriction or prohibition to access the exchange market in the Republic of Argentina as the case may be, BORROWER shall nevertheless pay the Credit Facility Due and any other amount payable under the Transaction Documents in Dollars, and it shall obtain such Dollars through any of the following mechanisms, at LENDER's option.

7.2.1 Through the purchase with Pesos (or the then legal tender in the Republic of Argentina), of securities in Dollars and the transfer and sale of said instruments outside the Republic of Argentina for Dollars in an amount which, sold in a foreign market, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the amount of said currency due under the Transaction Documents; or

7.2.2 Through delivery to LENDER of any securities in Dollars, to LENDER's express satisfaction and with a Dollar quotation abroad, in an amount which, once sold by LENDER in a foreign market, at market prices and conditions, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the aggregate amount in such currency due under the Transaction Documents; or

7.2.3 If there is any express legal prohibition in the Republic of Argentina preventing BORROWER from making the transactions stated in the two foregoing paragraphs, through delivery to LENDER of Pesos (or the then legal tender in the Republic of Argentina), in an amount which, on the payment date, is sufficient, once applicable taxes, costs, commissions and expenses are deducted, to purchase the aggregate amount of Dollars payable by BORROWER under the Transaction Documents, as per the exchange rate reported by Citibank N.A., New York, United States of America, to make Dollar acquisitions with Pesos in the City of New York, at 12 (twelve) hours (New York City time) on the payment date; or

7.2.4 Through any other procedure existing in the Republic of Argentina or abroad, on any Due Date under the Master Agreement, for the purchase of Dollars.

**7.3**    Queda expresamente establecido que en cualquiera de las alternativas detalladas en 7.2.1. a 7.2.4., las Sumas Adeudadas por el MUTUARIO sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante, la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**7.4**    Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 7.2.1.. a 7.2.4. precedentes serán pagados por el MUTUARIO.

**7.5.**    Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO en una moneda distinta de Dólares, la obligación de pago del MUTUARIO de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTANTE de esa pérdida.

**OCTAVA:    MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DE LOS DEUDORES.**

**8.1.    Manifestaciones y Declaraciones de los DEUDORES.**
A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la Línea de Crédito, los DEUDORES manifiestan y declaran a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**8.1.1.**    Que los DEUDORES son sociedades anónimas que se encuentra debidamente constituidas, inscriptas y existentes conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus operaciones y negocios en los que participan en la actualidad; y

**8.1.2.**    Que los DEUDORES no están obligados a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**8.1.3.**    Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que los DEUDORES están legalmente autorizados y capacitados para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias de los DEUDORES, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

**8.1.4.**    Que los DEUDORES y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental

**7.3** It is hereby expressly stated that in any of the alternatives detailed in 7.2.1. through 7.2.4., the Sums Due by BORROWER shall only be deemed paid and such payment shall have discharging effects only once the amount of Dollars due under the Transaction Documents and this Master Agreement is actually credited into Lender's Account.

**7.4** All charges, costs, commissions, fees and taxes payable in connection with the procedures set forth in 7.2.1. through 7.2.4. above shall be paid by BORROWER.

**7.5** If in order to obtain a judicial judgment the amounts in Dollars due hereunder should be translated into another currency, the Parties agree that the exchange rate to be used shall be such which, in accordance with normal banking procedures, LENDER shall be able to apply to such other currency to purchase Dollars in New York City, United States of America, on the Business Day prior to that day in which final judgment is rendered. Likewise, if a judgment is rendered against BORROWER for payment of a sum in a currency other than Dollars, BORROWER's payment obligation of any amount due under the Transaction Documents shall only be deemed paid if on the Business Day following the date in which LENDER has received any amount deemed to be due hereunder in such other currency, LENDER shall, under normal banking procedures, in the City of New York, United States of America, purchase Dollars with such other currency. If such amount of Dollars thus purchased is less than the amount due under the Transaction Documents, BORROWER agrees, as a different obligation and independently from such judgment, to compensate LENDER for such loss.

**SECTION EIGHT: REPRESENTATIONS, WARRANTIES AND COMMITMENTS OF DEBTORS.**

**8.1. Representations and Warranties of DEBTORS.**
In order to induce LENDER to enter into the Agreement, DEBTORS represent and warrant the following as of the date hereof and until termination of this Master Agreement:

**8.1.1.** That DEBTORS are duly organized, registered and validly existing pursuant to the laws of the Republic of Argentina, with all necessary powers and authority to carry out the relevant operations and businesses currently developed by them; and

**8.1.2.** That DEBTORS are not bound to apply for authorizations or approvals from any judicial or governmental authority or from any other public or private entity (including, without limitation, lessors, lenders, creditors, insurance companies, and financial institutions) as a result of this Master Agreement and/or the Guaranties;

**8.1.3.** That the Agreement and the Guaranties (i) are legal acts or businesses that DEBTORS are legally authorized and qualified to perform pursuant to the relevant legal and statutory provisions governing their activity; and (ii) that they are executed pursuant to all the required internal approvals of DEBTORS, without infringing any legal, statutory, stockholders' meeting or contractual provision, and that no further authorization is necessary; and

**8.1.4.** That DEBTORS and/or their Affiliates have not materially and significantly defaulted on: (i) any order, ruling, mandatory injunction, demand, decree or request from any court of justice or arbitral tribunal, or any government agency, whether national, provincial or municipal, in the Republic of

nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

Argentina, or abroad, and/or (ii) payment of any taxes, rates, liens, social security debts and/or levies, whether national, provincial or municipal, in the Republic of Argentina, or abroad; and

**8.1.5.** Que los DEUDORES no tienen pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

**8.1.5.** That DEBTORS have no pending lawsuit, investigation or judicial, administrative or arbitral proceeding before any court of justice, arbitral tribunal or administrative authority, whether national, provincial or municipal, in the Republic of Argentina, or abroad; or any arbitration proceeding, that may (i) adversely and materially affect their capacity to fulfill their payment obligations under the Transaction Documents; (ii) affect the validity, legality or enforceability of any of the Transaction Documents; and/or (iii) have a material adverse effect on the business, financial or any other condition, or the result of their operations; and

**8.1.6.** Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable a los DEUDORES ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallaren sometidos los DEUDORES y/o disposición alguna emanada de los estatutos vigentes de los DEUDORES y/o de ninguna hipoteca, prenda, instrumento de deuda, contrato u otro compromiso en que los DEUDORES fueren parte o se encontraren obligados; y

**8.1.6.** That the execution and delivery of, and/or compliance with the Transaction Documents do not infringe any provisions under the Applicable Rules and/or any law and/or decree and/or regulation and/or resolution applicable to DEBTORS and do not infringe any order issued by any court or relevant judicial, arbitral or administrative authority DEBTORS might be subject to, and/or any provision under the current by-laws of DEBTORS and/or under any mortgage, security interest, debt instrument, contract or other undertaking in which DEBTORS might be a party or be bound to; and

**8.1.7.** Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos de los DEUDORES de suscribir y firmar la totalidad de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por los DEUDORES frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**8.1.7.** That there is no paramount title and/or lien and/or restriction and/or limitation and/or hindrance whatsoever that precludes and/or prohibits and/or limits and/or in any way restricts the powers and rights of DEBTORS to execute all Transaction Documents (both main documents and ancillary documents), as well as any other commitment assumed by DEBTORS to LENDER under any of the Transaction Documents; and

**8.1.8.** Que los DEUDORES cumplen con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que han obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**8.1.8.** That DEBTORS are in compliance with the rules and regulations in force applicable to them in environmental, industrial safety and public health matters, and that they have secured all authorizations, permits and licenses required under such rules and regulations; and

**8.1.9.** Que han dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato, acuerdo u operación, hecho y/o circunstancia vinculada a los DEUDORES que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de los DEUDORES para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**8.1.9.** That they have given and provided LENDER with all the information relating to or in connection with any other agreement, contract or transaction, fact and/or circumstance relating to DEBTORS that may in any way adversely and materially affect the capacity of any of them to comply with their payment obligations hereunder and under the Guarantees, and that all the information furnished to LENDER by DEBTORS relating to the preparation, negotiation and execution of the Transaction Documents is true and correct and does not contain any inaccurate information regarding any relevant fact, nor does it omit any relevant fact the mention of which might be necessary to prevent the stated facts from being inaccurate or misleading; and

**8.1.10.** Que el balance del MUTUARIO al 30 de Septiembre de 2013 y del FIADOR al 30 de Noviembre de 2013, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO y/o al FIADOR de

**8.1.10.** That the annual balance sheet of BORROWER as of September 31, 2013and that of SURETY as of November 30, 2013, the relevant statements of income and financial position, annexes and further information therein contained relating to BORROWER and/or SURETY, duly signed copies

los cuales el MUTUARIO y el FIADOR han entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 01 de Octubre de 2013 y 01 de Diciembre de 2013 -respectivamente- no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO y/o del FIADOR; y

of which BORROWER and SURETY have delivered to LENDER through their pertinent authorities, accurately present the financial situation and result of operations of BORROWER as of such date, and that from October 1, 2013and December 1, 2013, respectively, no adverse change or event that may cause an adverse change in the business, operations, prospects or financial condition of BORROWER and/or SURETY has occurred; and

**8.1.11.** Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda hipoteca, o mejor derecho alguno; y

**8.1.11.** That the property, rights, and assets of BORROWER on which the Guaranties have been created are not subject to any pledge, mortgage or paramount title; and

**8.1.12.** Que los DEUDORES han contratado y mantienen vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrollan, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**8.1.12.** That DEBTORS have taken out and maintain in force and effect all required insurance pursuant to the standards current in the Republic of Argentina for the activities they develop with creditworthy insurance companies of national renown; and

**8.1.13.** Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus deudas.

**8.1.13.** That BORROWER is not currently aware of any insolvency, cessation of payment, reorganization or bankruptcy proceedings of Assigned Debtor, and that the Assigned Debtor currently pay all their debts to BORROWER as they become due.

**8.1.14.** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales de los DEUDORES y tienen y tendrán en todo momento la misma prioridad que aquellas obligaciones asumidas con igual carácter.

**8.1.14.** That the Transaction Documents and the obligations included therein are and will be at all times direct and general obligations of DEBTORS and have and will have at all times pari passu priority with obligations of the same scope

**8.1.15.** Los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

**8.1.15.** That the Transaction Documents are, or when duly executed and delivered will be, in proper legal form and substance under the applicable law for purposes of performance thereof, pursuant to applicable law. All formalities required in the Republic of Argentina for the validity and performance of the Transaction Documents (including any notice, registration, filing, payment of fees or taxes, notarization, or submittal to any Government Authority) have been complied with;

**8.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

**8.1.16.** That no Event of Default has occurred or will occur as a consequence of or in connection with the performance of the transactions contemplated in the Transaction Documents;

**8.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto de los DEUDORES que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**8.1.17.** That no Material Adverse Change has occurred as regards DEBTORS that may reasonably cause a Material Adverse Effect in their capacity to comply their obligations under the Transaction Documents;

**8.1.18.** Que cumple y realiza todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**8.1.18.** That every reasonable action is being followed and taken by them in order to remain compliant with all international laws, regulations and conventions relating to environmental, labor, health and social security issues as applicable thereto.

**8.2    Compromisos y Obligaciones de los DEUDORES.**
Desde la firma del presente Contrato Marco y durante el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, los DEUDORES se comprometen firme, expresa, irrevocable e

**8.2 Commitments and Obligations of DEBTORS**
Following the execution hereof and to the extent any amount due hereunder remains outstanding, on any account and/or due to any reason whatsoever, DEBTORS firmly, expressly, irrevocably and unconditionally undertake to perform or abstain from performing all

incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

the acts and/or activities specified below:

8.2.1. A pagar debida y puntualmente las Sumas Adeudadas, así como los Gastos Administrativos, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

8.2.1 To pay as and when due the Sums Due and the Administrative Expenses, pursuant to the terms and conditions set forth herein; and

8.2.2. A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que los DEUDORES, según el caso, los disputase por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

8.2.2 To keep all payments of taxes, liens, rates, and/or social security obligations and/or levies, whether national, provincial or municipal, both in the Republic of Argentina, and abroad, up to date, except in such cases where DEBTORS may, as applicable, file well-grounded objections in good faith to such payments through the pertinent legal procedures, as soon as permitted by the applicable procedural legislation and based on their unconstitutionality, inapplicability and/or illegality; and

8.2.3. A (1) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (2) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato, seguros, poderes, prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (3) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (4) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

8.2.3 To (1) maintain their legal capacity in force as well as all registrations necessary to maintain the same; (2) take any reasonable steps to maintain all the rights, permits, authorizations, agreements, insurance, powers of attorney, privileges, franchises, registrations, licenses and the like in force, as are necessary or advisable for the regular conduct of their activity, businesses or operations and the performance of their obligations; (3) maintain all their property in good state and working conditions; and (4) abstain from performing any act that may adversely affect the validity and/or effect of the Agreement and the Guaranties; and

8.2.4. A no realizar, sin notificación previa y expresa al MUTUANTE, con una antelación mínima de diez (10) días hábiles, actos que constituyan o impliquen (1) una fusión, transformación, absorción, escisión o cualquier otro modo de reorganización societaria, (2) transferencia de fondo de comercio o cualquier otro acto de efectos similares o al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores de los DEUDORES, ó (3) la realización de actividades que estén fuera de su objeto social, ó (4) la reducción, distribución o reintegro del capital social de los DEUDORES a sus accionistas, y (5) a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

8.2.4 To abstain, unless prior ten (10) day express notice is given to LENDER, from performing any acts constituting or implying (1) a consolidation, merger, transformation, spin-off, or any other form of corporate restructuring, or (2) goodwill transfer or any other act having similar effects which, pursuant to any law or rule, may be enforced before the creditors of DEBTORS; or (3) the participation of DEBTORS in other companies or projects or businesses different from the ones currently developed by DEBTORS, or (4) the reduction, distribution or reimbursement of the corporate capital of DEBTORS to its shareholders, and (5) to conduct and make all acts necessary for conservation, maintenance, renewal and effectiveness of their legal existence and rights, licenses, concessions, permits, privileges and franchise materials for the conduction and management of its respective businesses; and

8.2.5. A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago de los DEUDORES de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

8.2.5 To maintain LENDER fully and thoroughly informed of any Material Adverse Change and/or any other fact that may cause a Material Adverse Effect and/or otherwise adversely and significantly affect the payment capacity of DEBTORS of the obligations hereunder and/or under the Guaranties; and/or (ii) that may adversely affect the validity and/or effect of any of the Guaranties, as well as of the actions taken to remedy the same; and

8.2.6. A poner a disposición del MUTUANTE, y además entregar inmediatamente, la siguiente documentación contable correspondiente a los DEUDORES: (1) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel, (2) estados contables semestrales no auditados, (3) estados contables trimestrales no auditados y, y (4) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en 8.2.6.(1) precedente deberán

8.2.6 To make available to LENDER, and further deliver forthwith, , the following accounting documentation of DEBTORS: (1) anual financial statements duly audited by a first-level auditing firm; (2) biannual non audited financial statements, (3) non audited quarterly financial statements and (4) any other information LENDER might reasonable request at any time. The financial statements mentioned in 8.2.6. (1) above must be submitted duly audited within one hundred and twenty (120) calendar days from the closing of the relevant fiscal year; the financial statements mentioned in 8.2.6.(2)

presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en 8.2.6.(2) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos semestres; los estados contables referidos en 8.2.6. (3) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos trimestres; y la documentación referida en 8.2.6.(4) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, siempre que los DEUDORES puedan cumplir con ella, y

**8.2.7.** A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas, la obligación de los DEUDORES de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

**8.2.8.** A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

**8.2.9.** A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y

**8.2.10.** A notificar al MUTUANTE, en forma inmediata, (1) el acaecimiento de cualquier Evento de Incumplimiento, y (2) cualquier incumplimiento en que los DEUDORES incurrieren en relación con cualquier acuerdo o Contrato Marco del que sean parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (3) las acciones tomadas para subsanar los incumplimientos referidos en 8.2.10 (1) y (2) precedentes, y

**8.2.11.** A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, en la medida que no interfiera sustancial y adversamente con las actividades habituales de los DEUDORES,

**8.2.12.** A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (1) cualquier pérdida o daño sufrido en los bienes de los DEUDORES por montos superiores a Dólares Estadounidenses UN MILLON con 00/00 (US$ 1.000.000,00) por todo y cualquier concepto, en forma individual o acumulada durante cada ejercicio anual, y (2) cualquier litigio, o reclamo en el cual el monto reclamado a los DEUDORES fuere igual o superior a Dólares Estadounidenses UN MILLON con 00/00 (US$ 1.000.000,00) por todo y cualquier concepto, en forma individual o acumulada durante cada ejercicio anual, y

**8.2.13.** A no recomprar, rescatar ni amortizar sus propias acciones y a no reducir su capital, y

shall be submitted within sixty (60) calendar days from the closing of the relevant semesters; the financial statements mentioned in 8.2.6.(3) above must be submitted within sixty (60) calendar days from the closing of the relevant quarter period; and the documentation mentioned in 8.2.6. (4) must be submitted within five (5) calendar days following LENDER's request, provided DEBTORS are able to meet such a request; and

**8.2.7** Not to let in any manner whatsoever any third party creditor be subrogated to, and to preclude any third party creditor from becoming subrogated in any way to, any rights and/or actions granted to LENDER hereunder and under the Guaranties, which will entail, inter alia, the obligation of DEBTORS to demand the express waiver by any third party obligor of the power to become subrogated to such rights and/or actions to the extent any sum hereunder remains outstanding; and

**8.2.8** To comply with Applicable Rules (including, without limitation, any law, rule, regulation, order, instruction or resolution applicable to them as regards environmental protection, toxic or hazardous wastes, pollution and health) and to maintain all authorizations, permits or licenses that are necessary under Applicable Rules; and

**8.2.9** To comply in due time and manner with each and every of their obligations arising from the Transaction Documents; and

**8.2.10** To immediately notify LENDER (1) of the occurrence of any Event of Default; and (2) of any default by DEBTORS in connection with any agreement they might be a party to, or of any of their obligations thereunder (irrespective of whether or not the lapsing and acceleration of terms has been declared); and (3) of any actions taken to cure the defaults mentioned in 8.2.10 (1) and (2) above; and

**8.2.11** To keep accounting records and other records in proper form and allow LENDER's access to their offices, facilities, books, records and files, allowing the performance of any accounting, legal, and management audits, by themselves or by the ones appointed by the LENDER to the extent such action does not materially and adversely interfere with the regular activities of the DEBTORS; and

**8.2.12** To inform LENDER within 5 (five) Business Days after occurrence (1) of any loss or damage according to general accepted accounting principles, suffered by DEBTORS' property in amounts higher than ONE MILLION United States Dollars and 00/100 (US$ 1,000,000.00) for any and all amounts due and payable, individually or cumulatively during each annual period, and (2) any action or claim where the amount claimed from BORROWER is equal to or higher than ONE MILLION United States Dollars and 00/100 (US$1,000,000.00) for any and all amounts due and payable, individually or cumulatively during each annual period, and

**8.2.13.** To abstain from repurchasing, redeeming or amortizing their own shares and from reducing their capital; and



**8.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de asociados o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias de cuotas sociales actuales de los DEUDORES en otras sociedades o cooperativas.

**8.2.14** To abstain from transferring or otherwise reducing, for any cause or on any account, including by means of a shareholder s' agreement or stock syndication agreement with third parties, and from pledging, encumbering or granting, any kind of guaranty as regards the current shareholdings of DEBTORS in other companies.

**8.2.15.** A mantener respecto de otros deudores quirografarios en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación de los DEUDORES, todos los importes adeudados bajo el presente Contrato Marco, y

**8.2.15** To maintain all amounts due hereunder as to guaranties and privileges in collection not below any other obligation of DEBTORS; and

**8.2.16.** A informar al MUTUANTE trimestralmente (1) la deuda consolidada de los DEUDORES y de todas las Afiliadas de los DEUDORES, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (2) el volumen de ventas de cada una de las Afiliadas y de los DEUDORES

**8.2.16** To inform LENDER on a quarterly basis (1) the consolidated debt of DEBTORS, and of all Affiliates of DEBTORS held by each of such companies and by each financial entity as creditor (2) the sales volume of each of the DEBTORS and DEBTORS' Affiliates;

**8.2.17.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, los Pagarés por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

**8.2.17** To replace, to LENDER's full satisfaction, within a term of five calendar days following request therefor, the Promissory Notes with another eligible instrument allowing to initiate collection proceedings if, due to any change in the legislation, the aforementioned instruments lose their effect for such an end; and

**8.2.18.** A no adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave de los DEUDORES.

**8.2.18** To abstain from making any decision that could adversely affect the business and/or goodwill of DEBTORS.

**8.2.19.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (1) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un mutuante del exterior y (2) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

**8.2.19** To comply with all the requirements and demands from the Banco Central de la República Argentina and other Applicable Rules, and immediately provide evidence of such compliance to LENDER, to LENDER's satisfaction, including, without limitation: (1) to enter in the exchange market of the Republic of Argentina all funds deposited in Borrower's Account as disbursed hereunder, through the corresponding exchange closing and crediting of the resulting Pesos in a bank account opened in the Argentine financial system from conversion of currency under this Master Agreement executed with a foreign lender and (2) to periodically inform the BCRA about (a) the existence of the Transaction Documents and (b) the balance of its foreign debt according to Communications "A" 3602 and 3609 of the BCRA as supplemented or amended.

**8.2.20.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**8.2.20** To provide all the information LENDER may request relating to the Assigned Receivables, and to comply with every obligation as applicable for the Assigned Receivables to be paid to LENDER, binding themselves to follow any necessary steps for LENDER to achieve full recognition of the Assigned Receivables; DEBTORS will bear all expenses and costs resulting from or inherent in said assignments, including reasonable attorney's fees or court costs LENDER may have to incur to collect the Assigned Receivables;

**8.2.21.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**8.2.21** To make their best efforts to cause the Assigned Debtor to deposit in LENDER's Account as and when due all amounts corresponding to the Assigned Receivables;

**NOVENA:     MORA.**

**9.1**   La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco –incluyendo sin limitación, el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora el MUTUANTE tendrá derecho a percibir intereses compensatorios pactados a la Tasa de Interés, con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

**9.2**   El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las Sumas Adeudadas en los siguientes Eventos de Incumplimiento:

**9.2.1** si el MUTUARIO incumpliese con el pago en tiempo y forma de la Línea de Crédito Adeudada;

**9.2.2** si un tercero pidiere la quiebra de los DEUDORES, del Deudor Cedido y/o sus respectivas Afiliadas y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

**9.2.3** si los DEUDORES, el Deudor Cedido y/o sus respectivas Afiliadas pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

**9.2.4** si los DEUDORES y/o sus Afiliadas incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

**9.2.5** Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos de los DEUDORES y/o sus Afiliadas, o se decretare la inhibición general de bienes de los DEUDORES, por un monto en exceso de Dólares Estadounidenses TRESMILLONES con 00/100 (US$ 3.000.000,00) por todo y cualquier concepto, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los quince (15) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

**9.2.6** si en cualquier momento durante la vigencia del presente Contrato Marco se comprobara la falta de veracidad, parcial o total, por parte de los DEUDORES, en las declaraciones contenidas en la Cláusula OCTAVA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

**9.2.7** si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

**SECTION NINE: DEFAULT.**

**9.1** BORROWER's default of the obligations agreed upon under this Master Agreement, including without limitation, payment in due time and manner of any Sum Due, shall occur automatically by operation of law and without any notice or order being required, upon the occurrence of any of the Events of Default. Upon BORROWER'S Default, the lapsing of all terms shall occur and LENDER shall be entitled to consider the aggregate amount of the Credit Facility Due as a past due debt, and to request and legally demand full payment thereof, plus accrued interest and other charges. As long as BORROWER continues to be in Default LENDER shall be entitled to receive compensatory interest at the Interest Rate plus default interest equal to fifty per cent (50%) of the compensatory interest rate.

**9.2** LENDER shall also be entitled to consider that BORROWER is automatically in Default, that the Credit Facility Due is past due, and to request from BORROWER the prompt payment of all Sums Due upon the occurrence of any of the following Events of Default:

**9.2.1** if BORROWER fails to make any of the Credit Facility Due payments in due time and manner;

**9.2.2** if a third party requests DEBTORS, the Assigned Debtor and/or their respective Affiliates to be declared bankrupt and such a request is not rejected by the court involved in the first procedural stage;

**9.2.3** if DEBTORS, the Assigned Debtor and/or their respective Affiliates file a voluntary petition in bankruptcy, file for their own reorganization, or initiate procedures for an out-of-court reorganization plan or any debt restructuring;

**9.2.4** if DEBTORS and/or its Affiliates become insolvent, even if the steps described above are not taken;

**9.2.5** in the event any attachment or any provisional remedy were granted over the property, assets or rights of DEBTORS and/or its Affiliates, or a legal prohibition from disposing of any of DEBTORS' property were ordered in an amount exceeding THREE MILLION United States Dollars and 00/100 (US$ 3,000,000.00) for any and all amounts due and payable, whether individually or jointly during the life of the Master Agreement, and such attachments and/or provisional remedies were not released or cancelled due to any reason whatsoever within fifteen (15) judicial days following the request to release the attachment and/or cancel the provisional remedy, which request must be made at the first procedural opportunity possible; or

**9.2.6** if at any time during the life of this Master Agreement, the lack of veracity, whether partial or total, by DEBTORS is found to exist in the statements included in Section EIGHT hereof and/or failure to comply with the undertakings assumed in such Section and/or lack of veracity in any of the applications of this Master Agreement;

**9.2.7** if there were any modification which, in LENDER's opinion, causes a material change in the basic conditions which have been considered for executing this Master Agreement;



**9.2.8** Si el MUTUARIO y/o sus Afiliadas modificasen de cualquier forma su composición accionaria, salvo cuando tales actos se realicen entre sociedades del grupo de los DEUDORES, de modo tal que la participación directa o indirecta del FIADOR en el patrimonio de las sociedades involucradas no varíe sustancial y negativamente, ni implique la pérdida del control accionario por parte de la familia Navilli de la voluntad social de los DEUDORES y/o de sus Afiliadas.

**9.2.9** Si el FIADOR modificase de cualquier forma su actual composición accionaria, salvo que: (i) cuente con la previa autorización escrita del MUTUANTE, firmada en forma auténtica por un representante del MUTANTE con facultades suficientes; o (ii) luego de la modificación, los actuales accionistas continúen teniendo la mayoría accionaria –entendiéndose por tal a 51% o más de las acciones del FIADOR- y (iii) el Sr. Aldo Navilli continúe siendo Director Titular del Directorio. El FIADOR entiende y acepta que el mantenimiento de la actual composición accionaria del FIADOR es una condición fundamental tenida en mira por el MUTUANTE para suscribir el presente Contrato.

**9.2.10** si los DEUDORES incumplieren cualquiera de las obligaciones a su cargo establecidas en los Documentos de la Operación;

**9.2.11** si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido y/o con el Deudor Cedido Derivado;

**9.2.12** si —con prescindencia de que hubiese o no incumplimiento por parte de los DEUDORES en el pago de las Sumas Adeudadas- el MUTUARIO y/o el Deudor Cedido y/o el Deudor Cedido Derivado terminan los contratos que causan los Créditos Cedidos;

**9.2.13** si por cualquier causa que fuere las Sumas Adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

**9.2.14** Si se dictaran una o más sentencias judiciales o laudos arbitrales firmes en contra los DEUDORES o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de los DEUDORES que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de los DEUDORES para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

**9.2.15** Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

**9.2.16** Si de cualquier forma el MUTUARIO solicitare judicialmente o efectuare liberaciones parciales de cualquiera de las Garantías en violación a lo dispuesto en el Contrato Marco.

**9.2.17** Si el MUTUARIO no instrumentase la cesión de los Créditos Cedidos Derivados en los plazos y términos establecidos en las Secciones 4.9, 4.10, y 4.11 de este Contrato Marco.

**9.3**      El MUTUARIO asume el cumplimiento de todas y cada una de las obligaciones bajo los Documentos de la Operación, por lo cual en caso de incurrir en un Evento de Incumplimiento, se producirá la

**9.2.8** if in any manner whatsoever BORROWER's and/or its Affiliates' capital stock structure is modified, unless such actions are carried out among companies within the DEBTORS' group to the extent that SURETY's direct or indirect interest in the assets of the companies involved is not substantially or adversely affected and no detriment is caused to the majority control held by the Navillis over corporate decisions of DEBTORS and/or their Affiliates.

**9.2.9** if in any manner whatsoever SURETY modifies its current capital stock structure, unless: (i) LENDER's prior written consent bearing the signature of LENDER's representative duly and fully empowered therefor, has been given; or (ii) after consummation of a change thereof, the current shareholders continue to own a majority interest –i.e. 51% or more of SURETY's capital stock- and (iii) Mr. Aldo Navilli continues to be a Regular Director of the Board of Directors. SURETY acknowledges and accepts that maintenance of SURETY's current shareholding structure is a material condition on which LENDER relies to execute this Agreement

**9.2.10** if DEBTORS fail to comply with any of their obligations set forth under the Transaction Documents,

**9.2.11** if BORROWER fails to comply with any of its contractual obligations undertaken with the Assigned Debtor and/or the Derived Assigned Debtor,

**9.2.12** if –irrespective of DEBTORS' default in payment of the Sums Due - BORROWER and/or the Assigned Debtor and/or the Derived Assigned Debtor terminate the agreements originating the Assigned Receivables

**9.2.13** if for any reason whatsoever Sums Due hereunder are paid in a currency other than the Dollar.

**9.2.14** if one or more final court judgments or arbitration awards were issued against DEBTORS or measures were adopted to foreclose any mortgage, attachment or other lien over the property of DEBTORS which, at LENDER's discretion, may (i) adversely and materially affect the capacity of DEBTORS to afford payment of their obligations hereunder; or (ii) adversely and materially affect any of the Guaranties;

**9.2.15** if there occurs a Material Adverse Change and/or a Material Adverse Effect;

**9.2.16** if BORROWER files a court petition to have any of the Guarantees discharged or otherwise makes partial releases of the Guarantees in breach of the provisions in the Master Agreement;

**9.2.17** if Borrower fails to consummate the assignment of the Derived Assigned Receivables within the timelines and under the terms and conditions set forth in Sections 4.9, 4.10, and 4.11 of this Master Agreement.

**9.3** BORROWER agrees to comply with each and every one of the obligations under the Transaction Documents, and, therefore, the occurrence of an Event of Default will give rise to BORROWER's

Mora del MUTUARIO. Producida la Mora del MUTUARIO, el MUTUANTE podrá proceder sin más a la ejecución de las Garantías e imputar la totalidad de los Créditos Cedidos al pago de la Línea de Crédito Adeudada.

**9.4** En adición a lo dispuesto en la Sección 9.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 9.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago por parte del Deudor Cedido o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUANTE y el MUTUARIO.

### DÉCIMA: GASTOS.

**10.1** El MUTUARIO abonará al MUTUANTE, los Gastos Administrativos, los que serán adicionados al monto de cada desembolso solicitado mediante las Solicitudes de Desembolso y cancelados conjuntamente con los intereses en las Fechas de Vencimiento.

**10.2** Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuentas del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieran generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

**10.3** Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberá obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago

**10.4** El MUTUARIO se obliga a cumplir en tiempo y forma –a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**10.5** El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos

Default. Upon BORROWER's Default, LENDER may forthwith enforce the Guarantees and apply all Assigned Receivables to payment of the Credit Facility Due.

**9.4** In addition to the provisions set forth in 9.1 above, BORROWER's Default due to non-fulfillment of any of the obligations agreed herein shall give place to the lapsing of all terms and the automatic default of BORROWER in all agreements executed between BORROWER and LENDER . Likewise, the default in any of such agreements shall give place to the automatic Default hereof – as per the terms set forth in 9.1 above – and of any other contractual obligation between BORROWER and LENDER. In such sense, upon BORROWER's Default either due to lack of payment by the Assigned Debtor or due to the occurrence of any of the Events of Default detailed hereinabove, LENDER, at its own discretion, shall be entitled to enforce the Guarantees and/or other guaranties granted in other agreements executed between BORROWER and LENDER . Likewise, in such event, LENDER shall be entitled to apply to payment of the Sums Due hereunder, any BORROWER's funds then deposited – or those to be deposited in the future – in LENDER's Account for any reason and/or contractual relationship between LENDER and BORROWER.

### SECTION TEN: EXPENSES.

**10.1** BORROWER shall pay LENDER the Administrative Expenses, which shall be added to each disbursement requested under the Disbursement Requests and shall be paid together with any interest due on the Due Dates.

**10.2** All commissions, bank fees (including, without limitation, bank fees and commissions resulting from the deposits and transfers made from and to Lender's Account and/or Borrower's Account), taxes and/or charges resulting from the transactions directly and/or indirectly derived from this Master Agreement, shall be borne by BORROWER. BORROWER undertakes to pay all commissions and/or expenses to be borne by BORROWER to LENDER promptly and upon the latter's sole request and not later than 48 hours following such request, which shall be duly evidenced.

**10.3** All payments hereunder shall be made by BORROWER free of any deductions, withholdings and other charges of any nature whatsoever. If BORROWER is requested by law or any competent authority to make any deduction, withholding or charge, BORROWER shall make such additional payments to LENDER as necessary so that, after such deductions, withholdings or charges, LENDER receives an amount equal to the amount due to LENDER hereunder as if such deductions, withholdings or charges have not been made. BORROWER shall pay in due time and manner to the pertinent tax authorities the amount withheld, and shall obtain and give to LENDER a certified copy of the pertaining receipts evidencing such payment.

**10.4** BORROWER shall comply in due time and manner, at their cost and expense, with the settlement of foreign currency and payment of all pertinent taxes directly or indirectly resulting from this Master Agreement and with any rules and regulations set forth by the Banco Central de la Republica Argentina, releasing LENDER from any obligation in connection therewith.

**10.5** BORROWER shall hold LENDER harmless, and to defend and prevent any damage being made to LENDER, its shareholders and employees in connection with any and all of the obligations resulting from the transactions relating to the Assigned Receivables, entry and

Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

**DÉCIMO PRIMERA:      CESIÓN DEL CONTRATO MARCO.**

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último) por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este contrato. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también las nuevas instrucciones de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del contrato cualquier defensa que hubiera podido oponer al MUTUANTE cedente. El MUTUARIO no podrá bajo ningún concepto ceder el presente Contrato Marco sin previo y expreso consentimiento del MUTUANTE.

**DÉCIMO SEGUNDA:      VIGENCIA. INDEMNIDAD.**

12.1 El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas DÉCIMA, DECIMO SEGUNDA y DECIMO CUARTA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

12.2      El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (1) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstas en ellos; (2) los Créditos Cedidos adeudados con más sus intereses o el uso de los fondos desembolsados o (3) cualquier demanda, litigio, sumario, o procedimiento extrajudicial o administrativo, relacionado con cualquiera de las circunstancias previstas en esta Cláusula 12.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

**DÉCIMO TERCERA:      AUTORIZACIÓN**

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.
En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

**DÉCIMO CUARTA:      JURISDICCIÓN Y LEY APLICABLE.**

14.1      El presente Contrato Marco es governado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

**SECTION ELEVEN: MASTER AGREEMENT ASSIGNMENT.**

LENDER may assign the rights arising from the Master Agreement in full to any of its affiliates and/or subsidiaries (i.e. those holding or subsidiary corporations of LENDER or commonly owned by LENDER), by any of the means provided by Law, the assignee acquiring the same benefits and/or rights and/or actions to which LENDER is entitled under this Master Agreement. In such event, LENDER shall give notice by true means of the assignment to BORROWER, as well as of the new payment instructions, using true means of notice. In such event, BORROWER may file any defense against the assignee of the Master Agreement that BORROWER would have been entitled to file against the assigning LENDER. BORROWER shall not be authorized to assign this Master Agreement without the previous written consent of LENDER.

**SECTION TWELVE: EFFECT – INDEMNITY.**

12.1 This Master Agreement as well as all the Guaranties resulting herefrom will remain in full force and effect until all rights and/or obligations of the Parties hereunder are fully exercised and complied with. Furthermore, even after the obligations arising from the Master Agreement have been fulfilled, Sections TEN, TWELVE and FOURTEEN will survive and will remain in full force and effect until the expiration of the limitations that might be applicable.

12.2 BORROWER will hold LENDER and its Affiliates, directors, managers, officers, employees and independent advisors (the "Indemnitee") harmless against any loss, claim, complaint, liability and every expense relating thereto (including reasonable attorney's and advisor's fees) incurred by the Indemnitee in connection with, relating to, arising from and as a consequence of: (1) execution or delivery of the Master Agreement and the Guaranties and performance of the obligations thereunder, or performance of the transactions contemplated therein; (2) the Assigned Receivables due plus any interest thereon or the use of the disbursed funds; or (3) any complaint, lawsuit, preliminary investigation proceeding or out-of-court or administrative procedure, relating to any of the circumstances contemplated in this Section 12.2, based on contractual or extra-contractual grounds, or as provided in the applicable law; to the extent the indemnity against such losses, complaints, liabilities or expenses does not result from the gross negligence or willful misconduct of the Indemnitee.

**SECTION THIRTEEN: AUTHORIZATION**

BORROWER expressly authorizes LENDER to register this Master Agreement and all documents hereunder in all Registries deemed relevant by LENDER in order to secure BORROWER's obligations.

Therefore, BORROWER authorizes LENDER to submit any kind of financing statements in the registry offices of any jurisdiction of the United States of America, as per the provisions set forth in Section 5 Article 9 of the Uniform Commercial Code, including all BORROWER's goods delivered as security for fulfillment of the obligations undertaken hereunder.

**SECTION FOURTEEN: JURISDICTION AND APPLICABLE LAW**

14.1 This Master Agreement is governed by and must be construed in accordance with the laws of the State of New York, United States of America.

**14.2** El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

**14.2** BORROWER irrevocably submits to the non-exclusive jurisdiction of the United States Southern District Courts for the District of New York, for any actions, lawsuits or proceedings that may be brought by LENDER in connection with this Master Agreement. The rulings against BORROWER in any of such actions, lawsuits or proceedings, shall be final, and shall be enforceable in any other jurisdiction.

**14.3** Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés en la República Argentina.

**14.3** Nothing of the aforesaid herein shall affect LENDER's right to bring legal actions or to otherwise sue BORROWER in any other jurisdiction deemed appropriate by LENDER, including LENDER'S right to initiate court or out-of-court collection proceedings of the Promissory Notes in Argentina. .

**14.4** El MUTUARIO por el presente constituye en forma irrevocable domicilio en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

**14.4** BORROWER hereby irrevocably establishes its domicile at Corporation Service Company, domiciled at CT Corporation System, domiciled at 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, as its authorized agent for the sole purpose of receiving, in its name and stead, letters and/or notices addressed to BORROWER in any action, lawsuit or proceedings filed by LENDER in the State of New York, and BORROWER shall also inform LENDER of the identity and domicile of any new agent BORROWER may designate for such a purpose.

**14.5** Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 14.8 de la presente Cláusula.

**14.5** If, for any reason, its authorized agent to receive notices at CT Corporation System, domiciled at 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America, fails to be present, BORROWER agrees that notices to be served in any action, lawsuit or proceedings on BORROWER shall be delivered by US registered mail at BORROWER's domicile stated in 14.8 of this Section FOURTEEN.

**14.6** Las notificaciones efectuadas de la manera establecida en la Sección 14.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

**14.6** Notices served as stated in Section 14.4 hereof shall be considered personal, validly received, and mandatory for BORROWER.

**14.7** El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

**14.7** BORROWER irrevocably waives, to the maximum extent permitted by laws, the right to file an objection now or in the future against the jurisdiction of any of the courts mentioned in this Section hearing in any lawsuit, action or proceedings filed by LENDER, and, especially, BORROWER waives the right to file any defense or to allege lack of jurisdiction, or inconvenient forum regarding the court hearing in such action, lawsuit or proceedings. BORROWER also expressly waives its right to challenge without cause the one-judge court or the collegiate court hearing the case. BORROWER and SURETY may only file a defense for full payment evidenced in writing, on a document sent by LENDER directly relating to the Master Agreement being performed or the guaranteed obligation, expressly waiving any other defenses of any kind whatsoever.

**14.8** Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:

**14.8** Any of the aforementioned notices to be made in respect of this Master Agreement shall be sent to the domiciles stated below:

MUTUARIO:
1) Av. San Martin 691, de la Localidad de Adelia Maria, Provincia de Cordoba
2) CT Corporation System, con domicilio en 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America.

BORROWER:
1) Av. San Martin 691, Adelia Maria, Provincia de Córdoba, Argentina
2) CT Corporation System, 111 Eight Avenue, 13th floor, New York, New York, 10011, United States of America.

MUTUANTE:
1) Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands

LENDER:
1) Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands



**DECIMO QUINTA: FIRMAS Y RECEPCION DE INSTRUMENTOS.**

Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.

A los efectos de la interpretación del presente Contrato Marco la versión en inglés prevalecerá sobre la versión en español.

**DECIMO SEXTA:        LUGAR Y FECHA.**

Suscripto por los DEUDORES en la Ciudad de Buenos Aires, República Argentina, al día 25 del mes de julio de 2014, y por el MUTUANTE en Amsterdam, al día _____ del mes de_____ de 20__.

**SECTION FIFTEEN: SIGNATURES AND RECEIPT OF DOCUMENTS.**

The parties hereto sign three (3) equal counterparts of the same tenor and to one sole purpose, being one (1) counterpart for LENDER, and one (1) counterpart for BORROWER. .

For purposes of interpretation hereof the English version of this Master Agreement shall prevail over the Spanish version.

**SECTION SIXTEEN: PLACE AND DATE.**

This Master Agreement is executed by DEBTORS in the City of Buenos Aires, Republic of Argentina, on July 25th, 2014, and by LENDER in the City of Amsterdam, on _____, 20__.

By: COMPAÑIA ARGENTINA DE GRANOS S.A.
Name: Ricardo Alberto Navilli
Capacity: Attorney-in-fact

By: MOLINO CAÑUELAS S.A.C.I.F.I.A
Name: Ricardo Alberto Navilli
Capacity: Attorney-in-fact

By: IIG TOF B.V.,
Represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.
Name: // J.O.J. van Rossum
Capacity: Attorneys-in-fact

CERTIFICACION EN SELLO N° F0605817297
BUENOS AIRES, 25 DE Julio DEL 20 14.-

PABLO BUFFONI ALMEIDA
MAT. 5028
ESCRIBANO



**ACTA DE CERTIFICACION DE FIRMAS**

F 010581727

1  **Buenos Aires,** 25 de julio de 2014 . **En mi carácter de escribano**

2  Titular del Registro de Contratos Públicos 625 de Capital Federal.- - - - - - - -

3  CERTIFICO: Que la/s                    -Firma-                    que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número        -067-        del LIBRO

6  número             -7-        , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación así como

8  la justificación de su identidad. **Ricardo Alberto NAVILLI**, con D.N.I. N°

9  13.420.134, quien se identifica con el documento de identidad relacionado,

10  cuyo original exhibe y en copia de sus partes pertinentes conservo en mis

11  archivos. Declara intervenir en nombre y representación y como Apoderado

12  de las siguientes sociedades: 1) "COMPAÑÍA ARGENTINA DE GRANOS S.A.",

13  lo que justifica con el poder general amplio según escritura 209 del

14  27/02/2008, folio 338, ante el Esc. Alejandro Miguel Bertomeu, Registro

15  Notarial 1951, a su cargo de ésta ciudad; y 2) "MOLINO CAÑUELAS

16  S.A.C.I.F.I.A.", lo que justifica con el poder general amplio según escritura

17  229 del 04/03/2008, folio 376, ante el Esc. Alejandro Miguel Bertomeu,

18  Registro Notarial 1951 a su cargo de ésta ciudad. La documentación

19  relacionada en sus originales tengo ante mí, con facultades suficientes. El

20  compareciente declara bajo juramento la plena vigencia de la personería

21  invocada y acreditada.

22

23

24

25



ANEXO I/ ANNEX I

## MODELO DE PAGARE (sin protesto)

_____, __ de _____ de 20 __

US$ _____

Por este Pagaré haré efectivo a la vista y sin protesto, por igual valor recibido, a la orden de _____ (en adelante el "Acreedor"), la suma de Dólares Estadounidenses _____ CON __/100 (US$ _____), sin deducción alguna que pudiera corresponder en concepto de impuestos, tasas, contribuciones, comisiones, retenciones, cargos, aranceles y/o gastos de cualquier naturaleza, actuales o futuros. Domicilio de pago:_____ República Argentina,

El presente pagaré es pagadero exclusivamente en Dólares Estadounidenses de inmediata y libre disponibilidad (art. 44 del Dec. Ley 5965/63). El importe de este Pagaré devengará un interés compensatorio del nueve y media por ciento (9,5%) nominal anual desde la fecha de libramiento. En caso de falta de pago a su presentación el importe consignado devengará, además del interés compensatorio, un interés moratorio del diez y medio por ciento (10,5%) anual. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados.

De conformidad con lo dispuesto por el artículo 36 del decreto 5965/63, el plazo para presentar el presente pagaré para su cobro se extiende a 36 meses contados desde la fecha de libramiento.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor de igual rango. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) El presente no es un pagaré de consumo y por lo tanto no está sujeto a lo establecido en el artículo 36 de la ley 24.240. Será competente para la ejecución del presente pagaré o para cualquier conflicto relacionado con el mismo, a exclusiva opción del Acreedor, la Justicia Nacional en lo Comercial sita en la Ciudad Autónoma de Buenos Aires, o los Tribunales de la jurisdicción del domicilio del deudor.

b) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:
Suscriptor:
Avalista:
Acreedor:

c) Las notificaciones efectuadas de la manera establecida en el acápite "b" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el deudor.

d) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

Suscriptor:_____          Por Aval
Nombre:                                Avalista:_____
Carácter:                              Nombre:
                                       Carácter:

| | |
|---|---|
| **ANEXO II** | **ANNEX II** |
| <u>SOLICITUD DE DESEMBOLSO</u> | <u>DISBURSEMENT REQUEST</u> |

Buenos Aires, _____ de _____ de ___

Sres.
**IIG TOF B.V., represented by**
**TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
**Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE,**
**Amsterdam, The Netherlands**

De nuestra consideración:
Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ____ de _____ de ___ (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula _____ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

I.    El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____).

II.    Adjuntamos a la presente un Pagaré a vuestro favor, pagadero a la vista, por la suma total de US$ _____ (Dólares Estadounidenses _____)

| Fecha Emisión | Fecha Vto. | Moneda e Importe |
|---|---|---|
| ___/___/20__ | A la vista | US$ _____ |

Vencimiento de intereses y capital: Los servicios de intereses se vencerán mensualmente. El capital nominal por la suma de US$ ____ (Dólares Estadounidenses ____ Millones). se vence el 24/4/2015.

IV.    Adjuntamos a la presente original del contrato de venta de mercadería a _____ ("Deudor Cedido") por la suma de US$ _____ (Dólares Estadounidenses _____) correspondientes a las _____ toneladas métricas, detallado a continuación, cuyos derechos crediticios constituyen los Créditos Cedidos Originarios que cedemos con recurso a vuestro favor en los términos señalados en la Cláusula CUARTA del Contrato Marco, en pago por las Sumas Adeudadas:

V.    Adjuntamos al original de la notificación de la cesión antes señalada dirigida al Deudor Cedido, con la firma de nuestro representante legal o apoderado, certificada ante Notario Público en los términos de la Sección 4.6 del Contrato Marco.

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso a la Cuenta del Mutuario que se detalla a continuación:

**BANK:**
**SWIFT:**
**ABA CHIP:**
**ABA FED:**
**For the credit of account nr:**
**Beneficiary:**
**Account NBR.:**
**REFERENCIA:**

A los efectos de la presente Solicitud de Desembolso la versión en inglés prevalecerá sobre la versión en español.

Sin otro particular, saludamos a Uds. atentamente.

_____
**Por COMPAÑIA ARGENTINA DE GRANOS**
Nombre: _____
Carácter: _____

---

Buenos Aires, _____ __, _____

Dear Sirs:
Reference is hereby made to the Master Credit Line Agreement between you and _____ dated _____, ____ (The "Master Agreement"), whose definitions, terms and conditions are applicable to this Disbursement Request. Pursuant to Section ____ of the Master Agreement we hereby request to you a disbursement pursuant to the following conditions:

I.    The amount requested to be disbursed herein is the aggregate principal amount of USD _____ (United States Dollars _____ WITH 00/100).

II.    We enclosed herein a Promissory Note at your favor, payable on demand for the total aggregate amount of USD _____ (United States Dollars _____)

| Issue Date | Due Date | Currency and Amount |
|---|---|---|
| ___/___/20__ | On demand | USD _____ |

III.    Due date for interests and capital: The interests services will be due on a monthly basis. The amount of capital USD ____ (United States Dollars ____ Million) will be due on 24/4/2015.

IV.    We enclosed herein the original of a goods purchase agreement to _____ ("Assigned Debtor") for the total aggregate amount of USD _____ (United States Dollars _____) detailed hereinafter, which credit rights constitute the Original Assigned Credits, which we assigned in your favor with resource, pursuant to the terms and conditions set forth in Section Four of the Master Agreement, in payment for the Sums Due:

V.    We enclosed herein the original notification of the aforementioned assignment addressed to the Assigned Debtor, with the signature of our legal representative or attorney-in-fact, duly certify by a Notary Public pursuant to the terms set forth in Section 4.6 of the Master Agreement.

Provided this Disbursement Request is accepted by you, we request that within the Crediting Term, you transfer the disbursement amount to the Borrower's Account detailed hereinafter:

**BANK:**
**SWIFT:**
**ABA CHIP:**
**ABA FED:**
**For the credit of account nr:**
**Beneficiary:**
**Account NBR.:**
**REFERENCIA:**

To the purposes set forth in this Disbursement Request the English version shall prevail over the Spanish version.

Yours sincerely,

_____
**By COMPAÑIA ARGENTINA DE GRANOS**
Name: _____
Capacity: _____

## ANEXO IV

MODELO DE CONTRATO DE CESION DE CRÉDITOS.
El presente constituye un modelo de contrato previsto en Cláusula CUARTA del presente Contrato Marco, careciendo de validez para cualquier otro efecto.

Entre
COMPAÑÍA ARGENTINA DE GRANOS S.A., una sociedad constituida y registrada bajo las leyes de la Republica Argentina, representada en este acto por el _____ en su carácter de Apoderado, domiciliada en Av. San Martin 691, de la Localidad de Adelia María, Provincia de Córdoba, República Argentina, por una parte, en adelante denominado "MUTUARIO",
MOLINO CAÑUELAS S.A.C.I.F.I.A., una sociedad constituida y registrada bajo las leyes de la Republica Argentina, representada en este acto por el _____ en su carácter de Apoderado, domiciliada en Calle Kennedy 160, Cañuelas, 1814, Buenos Aires, República Argentina, por otra parte, en adelante denominado "FIADOR", y

IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., representada por _____, en su carácter de Apoderados, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, por la otra parte, en adelante denominado "MUTUANTE";
el MUTUARIO y el FIADOR conjuntamente denominados los "DEUDORES";
el MUTUARIO, el FIADOR y el MUTUANTE, conjuntamente denominados las "Partes"; y

CONSIDERANDO:

I.  Que con fecha __ de _____ de _____, las Partes suscribieron un contrato Marco cuyas definiciones, términos y condiciones resultan aplicables a la presente;

II.  Que con fecha __ de _____ de _____ los DEUDORES remitieron una Solicitud de Desembolso adjunta al presente como **Anexo A** (la "Solicitud de Desembolso"), la cual fue aceptada por el MUTUANTE. El MUTUARIO declara haber recibido de conformidad la suma solicitada en la Solicitud de Desembolso antes referida.

III.  Que es intención de las Partes instrumentar el reemplazo de los Créditos Cedidos Originarios (cedidos mediante la solicitud de Desembolso antes aludida) por los Créditos Cedidos Derivados descriptos en el presente Contrato de Cesión, conforme lo establecido en las Secciones 4.9 y subsiguientes del Contrato Marco.;

En mérito a las consideraciones precedentemente establecidas, las cuales forman parte integrante de este Contrato, se celebra el presente Contrato de Cesión de Crédito, sujeto a las siguientes Cláusulas y condiciones:

## PRIMERA: CESIÓN
1.1.    En garantía de pago de las Sumas Adeudadas en virtud de la Solicitud de Desembolso señalada en el apartado II de los considerandos (las "Sumas Adeudadas") y como medio de pago de las mismas de la forma prevista en el Contrato Marco, mediante el presente, el MUTUARIO cede al MUTUANTE todos los créditos que le corresponden al MUTUARIO en virtud del contrato suscripto entre el MUTUARIO y _____ (el "Deudor Cedido Derivado") cuya copia se adjunta al presente como **Anexo B** (la "Orden de Compra"), sus eventuales modificaciones y/o enmiendas, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud del contrato antes referido, por la suma mínima de _____ Dólares (US$ _____) (los "Créditos Cedidos Derivados"). La cesión de

## ANNEX IV

SAMPLE RECEIVABLES ASSIGNMENT AGREEMENT
This is a sample of the agreement contemplated in Section FOUR of this Master Agreement.
Void - it is not a valid document – example only.

This Agreement is made by and between:
COMPAÑÍA ARGENTINA DE GRANOS S.A., a corporation organized and existing under the laws of Argentina, represented herein by _____ in his capacity as Attorney-in-fact, domiciled at Av. San Martin 691, Adelia María, Province of Córdoba, Argentina, party of the first part, hereinafter "BORROWER",

MOLINO CAÑUELAS S.A.C.I.F.I.A., a corporation organized and existing under the laws of Argentina, represented herein by I _____ in his capacity as Attorney-in-fact, domiciled at Kennedy 160, Cañuelas, 1814, Buenos Aires, Argentina, party of the second part, hereinafter "SURETY", and

IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., represented by _____, in their capacity as Attorneys-in-fact, domiciled at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, party of the third part, hereinafter "LENDER";

BORROWER and SURETY are jointly referred to as "DEBTORS";
BORROWER, SURETY and LENDER are jointly referred to as the "Parties"; and

RECITALS:

I.  Whereas on __, _____, _____, the Parties executed a Master Agreement; the definitions, terms and conditions of which are applicable hereto;

II.  Whereas on __, _____, _____, DEBTORS sent a Disbursement Request, attached hereto as **Annex A** (the "Disbursement Request"), which was accepted by LENDER. BORROWER represents that it acknowledged and received the amount requested in the above-mentioned Disbursement Request.

III.  Whereas the Parties desire to replace the Original Assigned Receivables (assigned through the above-mentioned disbursement request) with the Derived Assigned Receivables herein described, as per the provisions in Sections 4.9 and subsequent sections of the Master Agreement.;

By virtue of the aforesaid considerations, Assignment Agreement is executed under the following terms and conditions:

## FIRST: ASSIGNMENT
1.1.To secure payment of the Sums Due under the Disbursement Request mentioned in item II of recitals (the "Sums Due") and as a means of payment thereof as set forth in the Master Agreement, BORROWER hereby assigns to LENDER all the claims to which BORROWER is entitled under the Master Agreement executed between BORROWER and _____ (the "Derived Assigned Debtor"); a copy of which is hereto attached as **Annex B** (the "Purchase Order"), as amended from time to time, including all claims resulting from bills of lading, delivery notices, invoices and other documents issued under the above-mentioned agreement, in the minimum amount of _____ Dollars (US$ _____) (the "Derived Assigned Receivables"). The assignment of Derived Assigned Receivables comprises all the rights and actions of BORROWER on the Derived Assigned Receivables and of the

efecto la cesión de los Créditos Cedidos Originarios instrumentada mediante la Solicitud de Desembolso.

**2.2** Sin perjuicio de la validez a partir del día de la fecha de la cesión de los Créditos Cedidos Derivados instrumentada mediante el presente, la cesión de los Créditos Cedidos Originarios quedará sin efecto si –y sólo si- el MUTUARIO acredita fehacientemente al MUTUANTE haber notificado la presente cesión de los Créditos Cedidos Derivados por acto público al Deudor Cedido Derivado en los términos establecidos en la Sección 1.6 de la cláusula precedente. Cuando esto último ocurra, el MUTUANTE notificará a los Deudores Cedidos Originarios que la cesión de los Créditos Cedidos Originarios ha quedado sin efecto y que a partir de dicha fecha los mismos deben ser nuevamente pagados al MUTUARIO.

**TERCERA:        MISCELÁNEA.**
Salvo en la medida en que hayan sido objeto de expresa modificación mediante el presente, aplican al presente contrato de cesión de créditos y a los Créditos Cedidos Derivados todos los términos y condiciones contenidos en el Contrato Marco y en la Solicitud de Desembolso, las cuales permanecen plenamente vigentes.
**CUARTA:        FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.
**QUINTA: LUGAR Y FECHA.**
Suscripto por los DEUDORES en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en Amsterdam, a los _____ días del mes de _____de 20____.

---

**Por: COMPAÑIA ARGENTINA DE GRANOS S.A.**
Nombre:
Carácter: Apoderado

---

**Por: MOLINO CAÑUELAS S.A.C.I.F.I.A**
Nombre:
Carácter: Apoderado

---

**Por: IIG TOF B.V.,**
representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Nombre: _____
Carácter: Apoderados

---

**LISTADO DE ANEXOS:**

ANEXO A: SOLICITUD DE DESEMBOLSO
ANEXO B: CREDITOS CEDIDOS DERIVADOS
ANEXO C: MODELO DE NOTIFICACION

Receivables implemented by the Disbursement Request.

**2.2** Without prejudice to the fact that the assignment of the Derived Assigned Receivables herein comes into effect as of the day hereof, the assignment of the Original Assigned Receivables shall become void if –and only if- BORROWER gives faithful evidence to LENDER that this assignment of the Derived Assigned Receivables to the Derived Assigned Debtor has been effected with the intervention of a notary public under the provisions in Section 1.6 above. Thereupon, LENDER shall give notice to the Original Assigned Debtors informing that the assignment of Original Assigned Receivables has become void and that, as from the date thereof, such payment should be made again to BORROWER.

**THIRD:  MISCELLANEOUS.**
Except as hereby expressly amended, all the terms and conditions contained in the Master Agreement and the Disbursement Request shall apply to this Agreement of Receivables Assignment and to the Derived Assigned Receivables; such terms and conditions shall continue to be in full force and effect.

**FOURTH:        SIGNATURES AND RECEIPT OF DOCUMENTS.**
The Parties hereto sign 3 (three) equal counterparts of the same tenor and to one sole purpose, being 1 (one) counterpart for LENDER and 1 (one) counterpart for BORROWER.
**FIFTH:   PLACE AND DATE.**
This agreement is executed by DEBTORS in the City of Buenos Aires, Republic of Argentina, and by LENDER in Amsterdam, on the _____ day of the month of _____, 20____.

---

**By: COMPAÑIA ARGENTINA DE GRANOS S.A.**
Name:
Capacity: Attorney-in-fact

---

**By: MOLINO CAÑUELAS S.A.C.I.F.I.A**
Name:
Capacity: Attorney-in-fact

---

**By: IIG TOF B.V.,**
represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Name: _____
Capacity: Attorneys-in-fact

---

**LIST OF ANNEXES:**

ANNEX A: DISBURSEMENT REQUEST
ANNEX B: DERIVED ASSIGNED RECEIVABLES
ANNEX C: SAMPLE NOTICE

**ANNEX C (SAMPLE ASSIGNED DEBTOR NOTICE)**

Buenos Aires, _____, 20_

To:
Attention:
Tel:
Fax:

Dear Sirs,
This is to give you notice of the Assignment Agreement dated _____, 20 ___ executed between **COMPAÑIA ARGENTINA DE GRANOS S.A.** and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, whereby **COMPAÑIA ARGENTINA DE GRANOS S.A.** has assigned and transferred to **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** has accepted and received all the rights and credits derived from _____ derived from the _____ corresponding to the merchandise that you have requested to **COMPAÑIA ARGENTINA DE GRANOS S.A.**, which is attached hereto as Annex I.



Therefore, **COMPAÑIA ARGENTINA DE GRANOS S.A.** and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement all the sums and credits derived from the Contracts hereinabove referred to –including the credits derived from the invoices and other documentation that **COMPAÑIA ARGENTINA DE GRANOS S.A.** submitted or will submit to you as a consequence of said commercial transactions, are to be fully paid to **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** by wire transfer of the corresponding funds to the following bank account:

BANK:
ABA#:
SWIFT:
Credit:
Account#:
Further Credit:
Account#:

The aforementioned Assignment Agreements and payment instructions are irrevocable and may only be modified through a new notice signed by representatives from **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, duly authorized by the correspondent certifications.

The aforementioned Assignment Agreements shall not transfer and/or modify the liability of **COMPAÑIA ARGENTINA DE GRANOS S.A.** derived from the referred commercial transactions. Thus **COMPAÑIA ARGENTINA DE GRANOS S.A.** remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

_____                    _____
**COMPAÑIA ARGENTINA DE GRANOS S.A.**              **IIG TOF B.V.**,
Name:                                              Name:
Capacity:                                          Capacity:

Acknowledged and accepted:

_____

_____
Name: _____
Capacity: _____

ADENDA CONTRATOS DE LÍNEA DE CRÉDITO CON
AFECTACIÓN A
PREFINANCIACIÓN DE EXPORTACIONES

Este acuerdo se celebra entre:

COMPAÑIA ARGENTINA DE GRANOS S.A., una sociedad
constituida y registrada bajo las leyes de la República Argentina,
representada en este acto por el Sr. CARLOS ADRIANO
NAVILLI, DNI 12.657.137 en su carácter de Apoderado,
domiciliada en Av. San Martin 691, de la Localidad de Adelia
Maria, Provincia de Córdoba. República Argentina, por una parte,
en adelanto denominado "MUTUARIO", y

IIG TOF B.V., representado por TRUST INTERNATIONAL
MANAGEMENT (T.I.M.) B.V., representada por
_____, en su carácter de
Apoderado, domiciliado en Telestone 8 – Teleport, Naritaweg 165,
P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands, por la otra
parte, en adelanto denominado "MUTUANTE";

el MUTUARIO y el MUTUANTE conjuntamente denominados las
"Partes"; y

CONSIDERANDO:

(a) Que el 18 de julio de 2014 las Partes firmaron un Contrato
Marco que fuera modificado el 13 de marzo de 2015, el 17
de diciembre de 2015, el 18 de octubre de 2016, el 27 de
febrero de 2017, el 6 de junio de 2017, el 15 de junio de
2017 y el 30 de octubre de 2017, por el cual el
MUTUANTE otorgó al MUTUARIO una linea de crédito
para la prefinanciación de sus exportaciones por Dólares
Estadounidenses DIECIOCHO MILLONES QUINIENTOS
MIL (US$ 18.500.000) (ese Contrato Marco, la "Línea 1");

(b) Que el 25 de julio de 2014 las Partes firmaron un Contrato
Marco que fuera modificado el 13 de marzo de 2015, el 17
de diciembre de 2015, el 18 de octubre de 2016, el 27 de
febrero de 2017, el 6 de junio de 2017, el 15 de junio de
2017 y el 30 de octubre de 2017, por el cual el
MUTUANTE otorgó al MUTUARIO una línea de crédito
para la prefinanciación de sus exportaciones por Dólares
Estadounidenses QUINCE MILLONES con 00/100 (US$
15.000.000) (ese Contrato Marco, la "Línea 2"; y cuando
sea referido colectivamente con la Linea 1, ambas
conjuntamente, las "Líneas");

(c) Que las Partes desean modificar la definición de Plazo de
Disponibilidad" con respecto a ambas Líneas;

(d) Que las Partes desean modificar las respectivas
secciones 5.8. de cada una de las Líneas; y

En mérito a las consideraciones precedentes, se acuerda la
modificación de ambas Líneas sujeta a las siguientes cláusulas y
condiciones:

PRIMERA: Las Partes acuerdan modificar la definición de "Plazo
de Disponibilidad" con respecto a ambas Lineas, conforme al texto
que se refleja seguidamente:

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente
en beneficio del MUTUANTE, que transcurre desde la fecha del

Compañía Argentina de Granos S.A.

APODERADO

CARLOS A. NAVILLI
DNI: 12.657.137

---

ADDENDUM TO EXPORT PREFINANCING CREDIT
FACILITY AGREEMENTS

This agreement is made by and between:

COMPAÑIA ARGENTINA DE GRANOS S.A., a
Corporation organized and registered under the laws of the
Republic of Argentina, represented herein by Mr. CARLOS
ADRIANO NAVILLI, ID# 12.657.137 in his capacity as
Attorney-in-fact, domiciled at Av. San Martin 691, Town of
Adelia Maria, Province of Córdoba, Argentina (hereinafter
the "BORROWER"); party of the first part, and

IIG TOF B.V., represented by TRUST INTERNATIONAL
MANAGEMENT (T.I.M.) B.V., represented herein by
_____, in his capacity as
attorneys-in-fact, domiciled at Telestone 8 – Teleport,
Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The
Netherlands (hereinafter the "LENDER"),

BORROWER and LENDER are jointly referred to as the
"Parties"; and

RECITALS:

(a) Whereas, on July 18th, 2014, the Parties executed a
Master Agreement, that was amended on March 13,
2015, December 17, 2015, October 18, 2016, February
27, 2017, June 6, 2017, on June 15, 2017, and on
October 30, 2017, through which the LENDER granted
to the BORROWER a credit facility to prefinance its
exports for United States Dollars EIGHTEEN MILLION
FIVE HUNDRED THOUSAND (US$18,500,000) (that
Master Agreement, the "Line No. 1");

(b) Whereas, on July 25th, 2014, the Parties executed a
Master Agreement, that was amended on March 13,
2015, December 17, 2015, October 18, 2016, February
27, 2017, June 6, 2017, on June 15, 2017, and on
October 30, 2017, through which the LENDER granted
to the BORROWER a credit facility to prefinance its
exports for United States Dollars FIFTEEN MILLION
(US$15,000,000) (that Master Agreement, the "Line No.
2"; and when collectively referred to together with Line
No. 1, both of them jointly referred to as, the "Lines");

(c) Whereas, the Parties wish to amend the definition of
"Availability Term" regarding both Lines;

(d) Whereas, the Parties wish to amend the respective
Sections 5.8. of each of the Lines; and

By virtue of the aforesaid considerations, it is hereby agreed
to amend the two Lines, subject to the following terms and
conditions:

SECTION ONE: The Parties agree to amend the definition of
"Availability Term" regarding both Lines, as set forth below:

"Availability Term" is the term fixed exclusively to the benefit
of LENDER, as from the date of the Master Agreement until
June 30, 2018, during which period, LENDER undertakes to
make the Credit Facility available to the BORROWER.

Compañía Argentina de Granos S.A.

APODERADO

CARLOS A. NAVILLI
DNI: 12.657.137

Contrato Marco hasta el 30 de junio de 2018, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

Esta nueva definición del término "Plazo de Disponibilidad" reemplaza a cualquier otra definición de éste mismo término que las Partes hayan convenido en el pasado.

**SEGUNDA:** Las Partes acuerdan modificar la definición de "Fecha/s de Vencimiento" con respecto a ambas Líneas, conforme al texto que se refleja seguidamente:

"_Fecha/s de Vencimiento_" significa las fechas de vencimiento para el pago de las Sumas Adeudadas bajo cualquiera de las Líneas, todas las cuales deberán ser pagadas el 30 de junio de 2018.

Esta nueva definición del término "Fecha/s de Vencimiento" reemplaza a cualquier otra definición de éste mismo término que las Partes hayan convenido en el pasado.

**TERCERA:** Las Partes acuerdan modificar la redacción de las secciones 5.8. de ambas Líneas, que a partir de la firma del presente instrumento quedará redactada del siguiente modo:

"5.8. Independientemente de los Créditos Cedidos, el MUTUARIO deberá causar que se acrediten en la Cuenta del Mutuante no menos de dólares estadounidenses diez millones (US$ 10.000.000) antes del 20 de abril de 2018, otro importe no menor a dólares estadounidenses diez millones (US$ 10.000.000) antes del 20 de mayo de 2018, y otro importe no menor a dólares estadounidenses diez millones (US$ 10.000.000) antes del 20 de junio de 2018. Siempre que no hubiera ocurrido un Evento de Incumplimiento, cualquier monto parcial que el MUTUARIO acredite en la Cuenta del Mutuante dentro de cada uno de los períodos arriba indicados -en exceso de los Créditos Cedidos- se considerarán de libre disponibilidad del MUTUARIO, por lo que el MUTUANTE liberará los mismos a favor del primero dentro de las cuarenta y ocho (48) horas de su acreditación en Cuenta del Mutuante. En caso de Evento de Incumplimiento, el MUTUANTE deberá liberar a favor del MUTUARIO en igual plazo, aquellos fondos que excedan las sumas que el MUTUARIO adeude al MUTUANTE al momento de dicha liberación.

5.8.1. Cuando los fondos que el MUTUARIO acredite en cada uno de los períodos indicados en el punto precedente -en exceso de los Créditos Cedidos- , exceda el tope requerido para dicho período --dólares estadounidenses diez millones (US$ 10.000.000)--, se entenderá que el monto en exceso se depositó para el período siguiente, aplicando dicho excedente al umbral que corresponde al período que siga.

5.8.2. La falta de cumplimiento en tiempo y forma por parte del MUTUARIO de cualquiera de sus obligaciones emergentes de esta Sección 5.8. implicará automáticamente un Evento de Incumplimiento.

**CUARTA:** Se acuerda que la Tasa de Interés aplicable a todas las Sumas Adeudadas bajo ambas Líneas a partir del 31 de enero de 2018 y hasta el vencimiento del Plazo de Disponibilidad será del nueve por ciento (9%) anual.

**QUINTA:** Se deja establecido que todas las cláusulas y condiciones de ambas Líneas que no resulten expresamente modificadas por la presente Adenda, se mantendrán plenamente

Campaña Argentina de Granos S.A.

. APODERADO
**CARLOS A. NAVILLI**
**DNI: 12,657.137**

This new definition of "Availability Term" replaces any other definition of the same term that the Parties might have agreed in the past.

**SECTION TWO:** The Parties hereby agree to amend the definition of "Due Date" regarding both Lines, as set forth below:

"_Due Dates_" means the due dates for payment of the Sums Due under any of the Lines, all of which shall become payable on June 30, 2018.

This new definition of "Due Dates" replaces any other definition of the same term that the Parties may have agreed in the past.

**SECTION THREE:** The Parties hereby agree to amend Section 5.8. of both Lines, which as from the execution of this Addendum shall be in force as follows:

"5.8. Regardless, of the Assigned Receivables, the BORROWER shall cause the credit in the Lender's Account, of not less than Ten Million United States Dollars (US$ 10,000,000) prior to April 20, 2018, another Ten Million United States Dollars (US$ 10,000,000) prior to May 20, 2018, and another Ten Million United States Dollars (US$ 10,000,000) prior to June 20, 2018. Provided that no Event of Default has occurred, any partial amount that the BORROWER has credited in the Lender's Account within the above mentioned terms and exceeding the Assigned Receivables, shall be considered to be fully available to the BORROWER. In that hypothesis, the LENDER shall free and dispose the funds in benefit of the BORROWER within forty eight (48) hours as from their credit in the Lender's Account. In case of Event of Default, the LENDER shall release to the BORROWER in the same term, the funds exceeding the amounts that BORROWER owes to LENDER at the moment of that release.

5.8.1. Whenever the funds credited by BORROWER in Lender's Account within each of the periods referred to in the above paragraph --exceeding Assigned Receivables-, exceed the total amount to be credited for such period -- Ten Million United States Dollars (US$ 10,000,000)--, it shall be considered that such exceeding amount has been credited on the account of the following period, and thus such exceeding amount will be computed for calculating the threshold corresponding to the following period"

5.8.2. BORROWER's lack of timely and due compliance with any of its obligations contemplated under this Section 5.8. shall automatically trigger an automatic Event of Default.

**SECTION FOUR:** It is hereby agreed that the Interest Rate applicable to all Sums Due under both Lines as from January 31, 2018 and until the expiration of the Availability Term shall be of nine per cent (9%) per annum.

**SECTION FIVE:** It is agreed that all the terms and conditions of both Lines that are not expressly modified by this Addendum, shall remain in full force, effect and unmodified. All terms that in this Addendum include its initials in capitalized words whose definition are not found defined in

Campaña Argentina de Granos S.A.

. APODERADO
**CARLOS A. NAVILLI**
**DNI: 12,657.137**

válidas, vigentes o inalteradas. Todos los términos que en la presente Adenda figuran con sus palabras iniciales en mayúsculas y que no se encuentren definidos en la presente Adenda, tendrán el significado que al efecto se les otorga en cada una de las Líneas.

**SEXTA**: La presente Adenda a ambas Líneas se rige por las leyes del Estado de Nueva York, Estados Unidos de América, y debe ser interpretada de acuerdo con esas normas, conforme lo establecido en cada una de las Líneas.

Se firman 2 (dos) ejemplares iguales, de un mismo tenor y a un solo efecto. Esas firmas son efectuadas por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, el día [__] de enero de 2018, y por el MUTUANTE en Amsterdam, Reino de los Países Bajos, el día [__] de enero de 2018.

Compañía Argentina de Granos S.A.

Por: COMPAÑIA ARGENTINA DE GRANOS S.A.
Nombre:
Carácter: Apoderado

CARLOS A. NAVILLI
DNI: 12.657.137

Por: IIG TOF B.V.,
representado por TRUST INTERNATIONAL MANAGEMENT
(T.I.M.) B.V.
Nombre: _____
Carácter: Apoderado

this Addendum shall have the meanings that are given to them in each of the Lines.

**SECTION SIX**: This Addendum to both Lines is governed by, and must be construed in accordance with, the laws of the State of New York, United States of America, according to the provisions set forth in each of the Lines.

The parties hereto sign two (2) equal counterparts of the same tenor and to one sole purpose.  This Addendum is executed by BORROWER in the City of Buenos Aires, Republic of Argentina, on January [__], 2018, and by LENDER in the City of Amsterdam, the Netherlands, on January [__], 2018.

Compañía Argentina de Granos S.A.

By: COMPAÑIA ARGENTINA DE GRANOS S.A.
Name:
Capacity: Attorney-in-fact

CARLOS A. NAVILLI
DNI: 12.657.137

By: IIG TOF B.V.,
represented by TRUST INTERNATIONAL MANAGEMENT
(T.I.M.) B.V.
Name: J.O.J. van Rossum          Hinna Nasim
Capacity: Attorney-in-fact