# EXHIBIT F

**CONTRATO DE PRÉSTAMO**

**US$ 16'000,000.00**

**De fecha**

**30 de setiembre de 2013**

**entre**

**CONDUCTORES Y CABLES DEL PERÚ S.A.C.**
**como Prestatario**

**CABLES Y CONDUCTORES NACIONALES S.A.C.**
**como Fiador Solidario**

**e**

**IIG CAPITAL LLC AS AGENT**
**como Prestamista**



**CONTRATO DE PRÉSTAMO**

Conste por el presente documento, el Contrato de Préstamo (el "Contrato") que celebran las personas que se indican a continuación:

**I.      EN CALIDAD DE PRESTAMISTA:**

-      **IIG CAPITAL LLC AS AGENT,** una sociedad constituida y existente de conformidad con las leyes del Estado de Nueva York, con domicilio para estos efectos en 1500 Broadway, Piso 17, Nueva York, Estados Unidos de América, quien procede representada por su *Executive Director*, señor Daniel Rochmann, identificado con Pasaporte Norte Americano 096617940, a quien en adelante se le denominará "IIG", en su calidad de agente de TOF  Cayman SPV ("TOF SPV"); y de la otra parte,

**II.     EN CALIDAD DE PRESTATARIO:**

-      **CONDUCTORES Y CABLES DEL PERÚ S.A.C.,** *sociedad anónima cerrada constituida y* organizada bajo las leyes de la República del Perú, inscrita en la partida electrónica No. 12313866 del Registro de Personas Jurídicas de la Oficina Registral de Lima, con Registro Único de Contribuyentes ("RUC") No. 20511445389, *con domicilio para estos* efectos en Av. Los Frutales 334 Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, representada por su Gerente General, señor Fernando Barrón Villacorta, identificado con DNI No. 08248191, facultado según poderes otorgados por mediante Junta General de Accionistas de fecha 27 de setiembre de 2013, a quien en adelante se le denominará "CCP".

Con la intervención de:

-      **CABLES Y CONDUCTORES NACIONALES S.A.C.,** una sociedad anónima cerrada constituida y organizada bajo las leyes de la República del Perú, inscrita en la partida electrónica No. 12313866 del Registro de Personas Jurídicas de la Oficina Registral de Lima, con RUC No. 20521834138, con domicilio para estos efectos en Av. Los Frutales 334 Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, representada por su Gerente General, señor Fernando Barrón Villacorta, identificado con DNI No. 08248191, facultado según poderes otorgados por mediante Junta General de Accionistas de fecha 27 de setiembre de 2013, a quien en adelante se le denominará, indistintamente, "CCN" o el "Fiador Solidario".

El Contrato se rige por los términos y condiciones que aparecen en las cláusulas siguientes:

**PRIMERA: DEFINICIONES Y GENERALIDADES**

1.1      Para efectos del presente Contrato, todas las palabras que después de aparecer inicialmente entre comillas, sean de ahí en adelante utilizadas con su primera letra en mayúscula son términos definidos y tendrán el significado previsto para ellos en esta cláusula. Las definiciones acordadas por las Partes para los términos definidos contenidos en esta cláusula corresponden al significado que las Partes han asignado a dichos términos y dicho significado será el único aceptado para todos los efectos, a menos que las Partes lo acuerden de otra forma por escrito.

*Account Control Agreement*: es el contrato de control de cuenta a ser celebrado por CCP e IIG, en virtud del cual: (i) CCP reconocerá que IIG será la única persona facultada para disponer y transferir los fondos depositados por CCP, los Clientes Cedidos Extranjeros y/o cualquier tercero en la cuenta bancaria TOF Cayman SPV fbo Conductores y Cables del Peru No. 8901192481 , abierta por IIG en el The Bank of New York Mellon, ubicado en 1 Wall Street, New York, NY 10005, *sin que para ello resulte necesaria la intervención ni el consentimiento de CCP, de los Clientes Cedidos Extranjeros y/o de cualquier tercero; e, (ii) IIG se comprometerá a aplicar los referidos fondos únicamente para cubrir las sumas que CCP le adeude de conformidad con lo establecido en el Contrato y en el Contrato de Línea de Crédito Revolvente y luego de cubrir las mismas, IIG remitirá a CCP todo el excedente de tales fondos, salvo que se disponga lo contrario para *dicho excedente en el Contrato o en el Contrato de Línea de Crédito Revolvente o de común acuerdo por IIG y CCP que conste por escrito. El contenido del *Account Control Agreement* forma parte integrante del presente Contrato como Anexo V.

Acuerdo de Llenado de Pagaré: tiene el significado establecido en el numeral 8.1 de la Cláusula Octava del Contrato.

Accionistas: significa las personas que se identifican en el Anexo IV de este Contrato, quienes son las propietarias del cien por ciento (100%) de las acciones con derecho a voto del capital social de CCP y CCN.

Afiliada: con respecto a CCP y CCN, significará: (i) *sus Subsidiarias; (ii) cualquier persona jurídica que sea propietaria de acciones representativas del capital social o que de alguna otra manera participe en la propiedad de ésta, ya sea directamente o a través de Subsidiarias; (iii) las Subsidiarias de estas últimas; (iv) cualquier persona que ejerce un Control Efectivo sobre ésta y las otras personas sobre las cuales aquella ejerce también un Control Efectivo; y (v) las Subsidiarias de estas últimas.

Autoridad: es *cualquier entidad que ejerza funciones ejecutivas, legislativas, judiciales o arbitrales, regulatorias o administrativas, del gobierno nacional, regional o municipal, que correspondan a funciones de gobierno y ejerzan jurisdicción sobre CCP y/o CCN o materias en cuestión, sus bienes o actividades, y que sean competentes según la legislación peruana.

Contrato de Canalización de Fondos: significa el contrato de canalización de fondos que suscribirán CCP e IIG, conjuntamente con el presente Contrato y de acuerdo a los términos y condiciones contemplados en el Anexo VI del presente documento.

Contrato de Garantía Mobiliaria sobre Acciones CCP: significa el *contrato de garantía mobiliaria sobre acciones, en mérito del cual Alphahill Investments S.A. y Danehill Holdings Limited otorgarán en garantía mobiliaria a favor de IIG* todas y cada una de las acciones que ostenten en CCP.

Contrato de Garantía Mobiliaria sobre Acciones CCN: significa el *contrato de garantía mobiliaria sobre acciones, en mérito del cual CCP otorgará en garantía mobiliaria a favor de IIG* todas y cada una de las acciones que ostente en CCN.

Contrato de Garantía Mobiliaria sobre Acciones Cobrecon: significa el contrato de garantía mobiliaria sobre acciones, en mérito del cual CCN otorgará en garantía mobiliaria a favor de IIG todas y cada una de las acciones que ostenta en Cobrecon S.A.

<u>Contrato de Garantía Mobiliaria sobre Bienes y Marcas</u>: significa el contrato de garantía mobiliaria sobre bienes y marcas, en mérito del cual CCP otorgará en garantía mobiliaria a favor de IIG todos y cada uno de: (i) las máquinas y equipos de su propiedad; y, (ii) todas y cada una de las marcas "CEPER" de su titularidad, identificadas por los Certificados Nos. P00055871, S00055608, P00150115, P00150114, P00150116, S00055607 y P00151289 e inscritas en el Registro de Marcas de la Propiedad Industrial del Instituto Nacional de Defensa de la Competencia y de la Protección de la Propiedad Intelectual - INDECOPI.

Contrato de Garantía Mobiliaria sobre Flujos: significa el contrato de garantía mobiliaria sobre flujos, en mérito del cual CCP otorgará en garantía mobiliaria a favor de IIG todos y cada uno de los flujos provenientes de sus Derechos de Cobro.

<u>Contrato de Garantía Mobiliaria sobre Materia Prima y Productos Terminados</u>: significa el contrato de garantía mobiliaria sobre materia prima y productos terminados, en mérito del cual CCP otorgará en garantía mobiliaria a favor de IIG una cantidad determinada de materia prima y productos terminados.

<u>Contrato de Línea de Crédito Revolvente</u>: significa el Contrato de Línea de Crédito Revolvente suscrito conjuntamente con el presente Contrato por CCP como Prestatario e IIG como Prestamista, con la intervención de CCN, en calidad de Fiador Solidario, en virtud del cual IIG otorga a CCP una línea de crédito revolvente hasta por la suma de US$ 3'000,000.00 (tres millones y 00/100 Dólares) para la financiación de operaciones de venta que IIG apruebe previamente.

<u>Contrato</u>: tiene el significado que se le asigna en el encabezado del presente documento.

<u>Clientes Cedidos Extranjeros</u>: significa cualquier persona y/o entidad domiciliada fuera de la República del Perú que celebre con CCP, CCN y/o alguna Afiliada de las mismas uno o varios contratos, instrumentos y/u órdenes de pago que sean generadores de Derechos de Cobro y que hayan sido previamente aprobadas por IIG.

<u>Clientes Cedidos Locales</u>: significa cualquier persona y/o entidad domiciliada en la República del Perú que celebre con CCP, CCN y/o alguna Afiliada de las mismas uno o varios contratos, instrumentos y/o órdenes de pago que sean generadores de Derechos de Cobro y que hayan sido previamente aprobadas por IIG.

Control Efectivo: una persona (natural o jurídica) tiene Control Efectivo de una persona jurídica cuando (i) posee, de manera directa o indirecta, una representación en su Directorio u órgano social equivalente, superior al cincuenta por ciento (50%) de sus integrantes; o, (ii) por cualquier medio no previsto anteriormente (sea contractual o no) controla el poder de decisión al interior de la otra persona.

<u>Derechos de Cobro</u>: son todos los derechos de cobro bajo los contratos, instrumentos y/u órdenes de compra que CCP, CCN y/o cualquier Afiliada de las mismas celebren con sus Clientes Cedidos Extranjeros y/o con sus Clientes Cedidos Locales.

<u>Desembolsos</u>: significa uno o más desembolsos efectuados por IIG a CCP que acumulativamente equivalen al Préstamo.

<u>Día Hábil</u>: significa un día en el cual los bancos están abiertos al público en el domicilio de la jurisdicción de CCP y de IIG. Esta definición no incluye a los días sábados, domingos y los *feriados no laborables en la provincia* de Lima reconocidos por el Estado peruano, o en el Estado de Nueva York, Estados Unidos de América.

<u>Distribuciones</u>: significa: (i) todo dividendo u otra distribución sobre el capital de CCP y/o CCN (excepto por distribuciones hechas en forma de acciones representativas del capital social de CCP y/o CCN); (ii) cualquier pago respecto de una reducción de capital, redención, compra o adquisición de acciones del capital social de CCP y/o de CCN o el ejercicio de opciones u otros derechos a adquirir acciones del capital social de CCP y/o de CCN; (iii) todo pago realizado por cualquier concepto a accionistas que no esté *relacionado con una distribución* sobre el capital (tales como principal e intereses de préstamos, pago de remuneraciones, entre otros).

<u>Documentos del Préstamo</u>: son: (i) este Contrato de Préstamo; (ii) el Pagaré; (iii) los Contratos de Garantía Mobiliaria; (iv) el *Account Control Agreement*; y, (v) el Contrato de Canalización de Fondos.

<u>Dólares y/o (US$)</u>: significan, indistintamente, la moneda de curso legal de los Estados Unidos de América.

<u>Efecto Sustancialmente Adverso</u>: es aquél causado por un evento que afecta adversamente y de manera sustancial: (i) la condición financiera y/o económica, operaciones, negocios, propiedades, y/o perspectivas de CCP y/o CCN; (ii) los derechos o remedios de IIG bajo cualquiera de los Documentos del Préstamo; (iii) la capacidad de CCP y/o CCN de cumplir con las obligaciones establecidas en los Documentos del Préstamo; o, (iv) la legalidad, vigencia, validez o ejecutabilidad de las obligaciones generadas a partir de los Documentos del Préstamo.

*<u>Eventos de Incumplimiento</u>: son todos y cada uno de los eventos contenidos bajo esta* definición conforme a la Cláusula Sexta de este Contrato.

<u>Fechas de Pago de Intereses</u>: serán las fechas en las que se deban pagar los intereses de acuerdo con el Cronograma de Pagos que forma parte integrante de este Contrato como <u>Anexo I</u>.

<u>Fecha de Vencimiento</u>: será: (i) el 31 de marzo de 2015; o, (ii) cualquier fecha anterior al 31 de marzo de 2015, en la cual el Préstamo sea pagado en su totalidad, ya sea por pagos *anticipados o por cualquier otra razón conforme* a este Contrato o cualquiera de los otros Documentos del Préstamo, lo que ocurra primero.

<u>Garantías</u>: tiene el significado que se le atribuye en la Cláusula Octava de este Contrato.

<u>Impuesto General a las Ventas</u>: es el impuesto que grava, entre otros, la prestación o utilización del servicios en el Perú, de conformidad con lo establecido en el T.U.O de la Ley del Impuesto General a las Ventas e Impuesto Selectivo al Consumo, aprobado mediante Decreto Supremo 055-99-EF y en su Reglamento, aprobado mediante Decreto Supremo 29-94-EF.

<u>Monto de los Intereses Capitalizados</u>: tiene el significado que se le atribuye en la Cláusula Segunda de este Contrato.

<u>Pagaré</u>: es el pagaré emitido por CCP como consecuencia de la suscripción de este Contrato, de conformidad con el numeral 8.1 de la Cláusula Octava del Contrato.

<u>Prestamista</u>: tiene el significado que se le atribuye en el encabezado de este Contrato.

<u>Prestatario</u>: tiene el significado que se le atribuye en el encabezado de este Contrato.

<u>Préstamo</u>: significa el préstamo que IIG otorga a CCP hasta por US$ 16'000,000.00 (dieciséis millones y 00/100 Dólares), según los términos y condiciones que constan en los Documentos del Préstamo.

<u>Perú</u>: significa la República del Perú.

<u>Proceso Concursal</u>: significa un proceso por el que se busque llegar a un juicio, resolución, acuerdo o transacción para la insolvencia, concurso, quiebra, rehabilitación, reorganización, administración, disolución, liquidación u otra resolución similar con respecto a CCP y/o CCN o sus deudas o activos, el cual incluye el Procedimiento Concursal Ordinario, el Procedimiento Concursal Preventivo, así como cualquier otro proceso de naturaleza concursal regulado por la normativa concursal en el Perú, particularmente por la Ley General del Sistema Concursal, promulgada mediante Ley 27809 y publicada en el diario oficial "El Peruano" o por la norma que la sustituya en el futuro o por el que se busque la designación de un fiduciario, receptor, liquidador, conservador, administrador, síndico, junta de acreedores, comité de acreedores u otro sujeto similar de CCP y/o CCN o una parte sustancial de sus activos, bajo cualquier legislación en materia concursal, de reestructuración patrimonial, insolvencia, quiebra, cesión de pagos u otra similar que regule a CCP y/o CCN, particularmente por la referida Ley General del Sistema Concursal.

<u>Subsidiaria</u>: con respecto a CCP y/o CCN, es: (i) toda persona jurídica de cuyas acciones representativas del capital social o participaciones sociales es propietaria en todo o en un porcentaje mayor al cincuenta por ciento (50%) de su capital social, ya sea directamente o a través de otra Subsidiaria; y, (ii) toda persona jurídica sobre la cual ejerce un Control Efectivo, así como sus Subsidiarias.

<u>Tasa Mínima de Interés</u>: la tasa mínima de interés compensatoria que IIG cobrará a CCP será de cinco por ciento (5%) anual (tasa efectiva anual).

Tasa de Intereses Moratorios: tiene el significado que se le atribuye en el numeral 3.5 de la Cláusula Tercera este Contrato.

<u>Tributos</u>: es cualquier impuesto, tasa, contribución o retención o cualquier otro tributo existente o futuro que puede ser aplicable en cualquier jurisdicción y que esté vinculado a los Documentos del Préstamo, incluido cualquier interés, recargo, multa o sanción relativa a los mismos excluyendo, en el caso de IIG, cualesquiera tributos que grave su renta o utilidad. La definición de Tributos incluye la del Impuesto General a las Ventas tal como ha sido definido en la presente cláusula, cuando esta última definición no sea identificada en forma particular.

1.2     Salvo que expresamente se indique lo contrario o el contexto así lo requiera, en la interpretación de este Contrato deberán observarse las siguientes reglas:

(i)     El singular incluye al plural y viceversa.

(ii)    *La referencia a cualquier género incluye al otro género.*

(iii)   La referencia a cualquier contrato (incluyendo este Contrato y sus Anexos), documento o instrumento se entiende efectuada a tal contrato, documento o instrumento tal como pueda ser modificado o regulado de tiempo en tiempo de acuerdo con los términos contenidos en cada uno de ellos y, de ser aplicables, de acuerdo con los términos contenidos en este Contrato.

(iv)    Salvo que el contexto exija una interpretación en sentido contrario, la referencia a *cualquier Cláusula, Sección o Anexo* significa aquella Cláusula, Sección o Anexo de este Contrato.

(v)     "Incluyendo" (y, consiguientemente, "incluye", "incluido" o "incluso") significa que comprende aquello que a continuación se indica, sin limitar la generalidad de la descripción que precede al uso de dicho término.

(vi)    Cualquier referencia a "Parte" o "Partes" en este Contrato deberá entenderse efectuada a una parte o las partes de este Contrato, según sea el caso.

**SEGUNDA: OBJETO**

En vista de la solicitud efectuada por CCP, IIG ha consentido en otorgarle a aquella el Préstamo, el mismo que ambas Partes, de mutuo acuerdo, han decidido sujetar a las disposiciones estipuladas en este Contrato.

En virtud de lo anterior, con el objeto de quedar legalmente obligados en términos del Contrato IIG, CCP y CCN convienen en lo siguiente:

CCP utilizará el Préstamo para pagar a IIG parte de la suma que le adeuda a la fecha en mérito de la facilidad crediticia de US$ 9'000,000.00 (nueve millones y 00/100 Dólares) que IIG le otorgó de acuerdo con lo establecido en el contrato de crédito de fecha 4 de enero de 2007, así como sus addendas de fecha 3 de enero de 2008; 1 de febrero de 2008; 15 de abril de 2008; 12 de diciembre de 2008; 9 de marzo de 2009; 31 de julio de 2009; 18 de diciembre de 2009; 21 de junio de 2010; 13 de diciembre de 2010; 30 de diciembre de 2011; 30 de marzo de 2012; 28 de junio de 2012; 31 de diciembre de 2012; y, 28 de junio de 2013, incluyendo el capital y los intereses generados en virtud de dicha facilidad crediticia, hasta por la suma de US$ 16'000,000.00 (dieciséis millones y 00/100 Dólares).

Se deja constancia que a la fecha de suscripción del presente Contrato, CCP adeuda a IIG en mérito del contrato de crédito de fecha 4 de enero de 2007 antes mencionado, la suma de US$ 33'660,000.00 (treinta y tres millones seiscientos sesenta mil y 00/100 Dólares), de los cuales US$ 9'000,000.00 (nueve millones y 00/100 Dólares) corresponden a capital y US$ 24,660,000.00 (veinticuatro millones seiscientos sesenta mil y 00/100 Dólares) corresponden al Monto de los Intereses Capitalizados.

**TERCERA: TÉRMINOS Y CONDICIONES DEL PRÉSTAMO**

3.1     Desembolsos

IIG no efectuará desembolso adicional alguno a favor de CCP en virtud de la celebración del presente Contrato. Sin embargo, la suma de US$ 16'000,000.00 (dieciséis millones y 00/100 Dólares) que corresponde al Préstamo que CCP le adeuda a IIG en virtud del contrato de crédito de fecha 4 de enero de 2007 mencionado en la Cláusula Segunda anterior deberá constar representada en un Pagaré que se regirá por las condiciones establecidas en el numeral 8.1 de la Cláusula Octava del Contrato.

3.2     Destino del Préstamo

CCP se obliga a destinar el Préstamo única y exclusivamente para aquello indicado en la Cláusula Segunda anterior.

3.3     Plazo

El plazo del Préstamo acordado en la Cláusula Segunda es de dieciocho (18) meses, el cual empezará a regir el 30 de setiembre de 2013 y culminará el 31 de marzo de 2015.

IIG, a su sola discreción, podrá extender este plazo por un plazo idéntico en caso reciba una solicitud escrita de CCP con, por lo menos, 30 días de anticipación del vencimiento del plazo.

3.4     Amortización

CCP tendrá un plazo de gracia de nueve (9) meses para efectuar el pago del Préstamo. Por lo tanto, CCP amortizará el capital del Préstamo y los intereses compensatorios (según estos se definen en el numeral 3.6 siguiente) mediante el pago de nueve (9) cuotas, a partir del 31 de julio de 2014 y hasta el 31 de marzo de 2015, conforme consta en el Anexo I de este Contrato.

La amortización del Préstamo será considerada cancelada, en forma parcial o total, cuando IIG reciba el pago de las sumas adeudadas por CCP dentro del plazo señalado en el numeral 3.3 precedente.

CCP pagará las obligaciones derivadas del Contrato a través de las ventas y/o transferencias de propiedad de cualquier naturaleza que realice a los Clientes Cedidos Extranjeros y/o a los Clientes Cedidos Locales, cuyas contraprestaciones serán depositadas en las cuentas que serán administradas de conformidad con lo estipulado en el Account Control Agreement y en el Contrato de Canalización de Fondos, respectivamente.

Si el capital del Préstamo y/o los intereses compensatorios no fuesen pagados por CCP a IIG al final del décimo octavo (18) mes computado desde la fecha de suscripción de este Contrato, por cualquier causa que fuere, ello generará la obligación de CCP de abonar a IIG el importe total o el saldo adeudado correspondiente a dicho capital del Préstamo y/o a dichos intereses compensatorios, vencidos e impagos, dentro de los tres (3) Días Hábiles de ser requerido por escrito, por parte de IIG, abonando a su vez, los intereses moratorios que se devenguen a la tasa que se indica en el numeral 3.5 siguiente.

La mora de CCP se producirá automáticamente, sin necesidad de intimación por parte de IIG y de pleno derecho por el solo vencimiento del plazo indicado en el párrafo precedente, a partir del cual CCP deberá abonar los intereses moratorios antes mencionados, hasta la efectiva y total cancelación del monto adeudado, ya sea que éste corresponda al capital del *Préstamo*, a los intereses compensatorios y/o a ambos. Los intereses por mora serán calculados con relación al número de días calendario efectivamente transcurridos, sobre la base de trescientos sesenta (360) días por año.

3.5    Tasa de intereses moratorios

CCP pagará a IIG, en adición al interés establecido en el numeral 3.6 siguiente, intereses moratorios equivalentes a cinco por ciento (5%) anual del monto vencido y no pagado por *arriba de la Tasa Mínima de Interés.*

3.6    Intereses compensatorios

Los intereses diarios se calcularán multiplicando la Tasa Mínima de Interés por el saldo insoluto del principal del Préstamo y por el cociente obtenido al dividir el número de días por los que se calculen los intereses entre 360 (trescientos sesenta).

CCP deberá pagar a IIG todos los intereses compensatorios que se generen en mérito del Préstamo en nueve (9) cuotas, a partir del 31 de julio de 2014 y hasta el 31 de marzo de 2015.

3.7    Pagos

Todos los pagos que realicen CCP y/o CCN bajo este *Contrato* deberán hacerse mediante depósito de las cantidades adeudadas en las cuentas que IIG designe e instruya a CCP por escrito.

3.8    Aplicación de los Pagos

Todos los pagos que reciba IIG en virtud de lo establecido en este Contrato serán aplicados al pago del Préstamo y de los intereses compensatorios y/o de los intereses moratorios, *según corresponda, de acuerdo con lo* contemplado en el presente instrumento.

3.9    Lugar y hora para pagos

Los pagos que deba realizar CCP a favor de IIG conforme al Contrato serán efectuados con fondos de disponibilidad inmediata que provengan de los pagos efectuados por los Clientes Cedidos Extranjeros y/o por los Clientes Cedido Locales y que serán administrados de conformidad con lo estipulado en el Account Control Agreement y en el Contrato de Canalización de Fondos, respectivamente, a más tardar a las 12 horas, hora de Nueva York, Estados Unidos de América, en la cuenta y lugar que IIG designe e instruya a CCP por escrito.

3.10   Pago de Tributos y demás recargos

El pago de capital, intereses, gastos y otros cargos conforme con este Contrato se efectuará por CCP sin deducción alguna por concepto de Tributos u otros recargos

vigentes a la fecha de celebración del Contrato o que sean establecidos con posterioridad a esta fecha. Sin perjuicio de ello, en caso sea exigible a IIG algún pago por los conceptos antes mencionados, CCP deberá pagar a IIG cantidades que permitan que el monto neto resultante, luego de pagar, retener o de cualquier otra forma descontar la totalidad de los Tributos u otros recargos entonces vigentes, sea igual a la totalidad de las prestaciones pactadas que IIG tiene derecho a recibir conforme a lo estipulado en este Contrato.

3.11   Vigencia

Sin perjuicio de los plazos descritos en los numerales precedentes, las Partes acuerdan que las tasas de interés, penalidades y gastos se mantendrán vigentes de acuerdo con lo señalado en la Cláusula Undécima. CCP se compromete a abonar a IIG en forma inmediata y a su solo requerimiento, los intereses, penalidades, comisiones y gastos, a su cargo, los cuales deberán hacerse efectivos en un plazo no mayor a siete (7) Días Hábiles de recibido tal requerimiento.

3.12   Pagos Anticipados

CCP tiene la facultad de pagar, parcial o totalmente, con anticipación al plazo descrito en el numeral 3.3. anterior y sin penalidades de ninguna naturaleza, el monto adeudado derivado del Préstamo.

**CUARTA: DECLARACIONES Y GARANTÍAS DE CCP Y CCN**

CCP y CCN declaran y garantizan a IIG que:

4.1    Son sociedades anónimas cerradas constituidas, organizadas y válidamente existentes y en buena posición ante las leyes aplicables del Perú y que cuentan con todos los poderes y las autorizaciones requeridas para conducir sus negocios, para poseer sus propiedades y para cumplir con los derechos y obligaciones establecidos bajo este Contrato y los Documentos del Préstamo.

4.2    El Contrato y cualquier otro documento a ser celebrado o emitido con relación a este Contrato constituirán actos o negocios jurídicos válidos que están legal y estatutariamente autorizados para realizar en virtud de las leyes aplicables de Perú a su rubro de negocios. Además, el Contrato y cualquier Documento del Préstamo constituirán obligaciones legalmente vinculantes de CCP y CCN y exigibles contra la misma de acuerdo con las cláusulas contenidas en dichos documentos, sujeto a las leyes concursales aplicables y cualquier otra ley similar que afecte, en forma general, el derecho de los acreedores en cualquier proceso concursal de acuerdo con las reglas aplicables en vigencia.

4.3    La celebración, ejecución y cumplimiento de este Contrato y/o de cualquier otro Documento del Préstamo se encuentran dentro de su objeto societario, fueron debidamente autorizados por los órganos societarios pertinentes y no violan: (i) sus estatutos sociales; (ii) ninguna ley, decreto, reglamento o derecho que pueda ser aplicable; (iii) ninguna resolución o decisión expedida por cualquier corte u otra dependencia judicial o administrativa que pudiera ser aplicable; o, (iv) ningún contrato, hipoteca, prenda, garantía mobiliaria, instrumento o compromiso legalmente vinculante que pudiera ser aplicable.

4.4   No han incumplido la ejecución de acuerdo, contrato, deber, compromiso u obligación respecto del cual pudiera esperarse razonablemente que origine un Efecto Sustancialmente Adverso.

4.5   No existe mejor derecho, gravamen, restricción, limitación u obstáculo que evite, prohíba o limite, de cualquier manera, la facultad o derechos de ambas para celebrar y firmar cualquier documento que pueda ser necesario para el otorgamiento y perfeccionamiento del Contrato y de cualquier Documento del Préstamo.

4.6   El Préstamo será afectado y utilizado, exclusiva y excluyentemente, al cumplimiento de lo establecido en la Cláusula Segunda del Contrato, de conformidad con los términos y condiciones de este Contrato y los Documentos del Préstamo.

4.7   Es condición esencial de este Contrato que cualquier monto de capital, intereses compensatorios y moratorios, comisiones, y demás sumas a ser pagadas a IIG derivados del Préstamo o los Documentos del Préstamo, se cancelen en Dólares.

4.8   Las obligaciones en virtud de este Contrato tienen y tendrán por lo menos la misma preferencia para el pago (pari passu) y para cualquier otro asunto respecto de cualquier otra obligación no garantizada de CCP y/o CCN, a excepción de los créditos preferentes en virtud de cualquier norma general, laboral, tributaria, concursal, de reestructuración empresarial, insolvencia, compensación de capital, liquidación o similar.

4.9   No tienen endeudamiento significativo alguno ni pérdidas anticipadas y no han asumido compromisos inusuales o de largo plazo fuera de los previstos en sus proyecciones financieras que puedan generar un Efecto Sustancialmente Adverso.

4.10  No existe investigación, procedimiento o litigio alguno relacionado a CCP y/o CCN que puedan generar un Efecto Sustancialmente Adverso.

4.11  No existe cambio en el negocio, situación (financiera u otra), operaciones o bienes de CCP y/o CCN desde la fecha de sus últimos estados financieros que razonablemente pudiera causar un Efecto Sustancialmente Adverso.

4.12  En caso de incumplimiento de CCP y/o CCN, IIG tiene el derecho de compensar cualquier obligación que tenga a favor de CCP y/o CCN contra las obligaciones pendientes de pago a cargo de estas últimas.

4.13  Están sujetas a leyes civiles y comerciales del Perú y no cuentan con inmunidad ante corte alguna o en proceso judicial alguno.

CCP y/o CCN certifican que las declaraciones incluidas en esta cláusula son verdaderas y reconocen que inducen a IIG a celebrar el Contrato.

**QUINTA: OBLIGACIONES DE CCP**

5.1   <u>Obligaciones positivas o de hacer</u>

Mientras todos los montos adeudados a IIG bajo el Préstamo no hayan sido cancelados conforme a lo establecido en este Contrato, CCP se obliga a (salvo autorización en contrario de IIG en forma expresa y por escrito):



(i) Cumplir en todos los aspectos sustanciales con todas las leyes, ordenanzas, reglamentos, resoluciones, circulares, regulaciones y requerimientos de todas las autoridades gubernamentales (incluyendo, pero no limitándose a las licencias, certificados, permisos, y otras autorizaciones gubernamentales necesarias para la propiedad y posesión de sus activos o para la conducción de su negocio; normas del medio ambiente y leyes relacionadas a la seguridad social y a las obligaciones de fondos de pensiones).

(ii) Cumplir con los términos y condiciones del Contrato y los Documentos del Préstamo.

(iii) Contratar y/o mantener vigentes póliza(s) de seguro(s) cubriendo los activos de la empresa contra todo tipo de riesgo. Las pólizas antes mencionadas deberán cubrir el costo de reparación o de reemplazo de los activos en caso de cualquier siniestro y deberán ser endosadas a favor de IIG.

(iv) Preservar y mantener su existencia corporativa y los permisos, licencias y aprobaciones requeridas para el desarrollo de su negocio.

(v) Dar a representantes de IIG acceso a las instalaciones de CCP a fin que se efectúen las verificaciones e inspecciones que IIG estime necesarias. Asimismo, permitir que representantes de IIG obtengan información de los libros, registros y documentos que estuvieran relacionados con la operatividad de CCP y el cumplimiento de las obligaciones de CCP bajo este Contrato.

(vi) Informar inmediatamente a IIG y como máximo al siguiente Día Hábil de su conocimiento sobre cualquier Efecto Sustancialmente Adverso.

(vii) CCP deberá cumplir con el pago de Tributos de cualquier naturaleza ante la Superintendencia Nacional de Administración Tributaria del Perú, así como remitir a IIG: (a) la Declaración Jurada Anual del Impuesto a la Renta; y, (b) constancia de pago de Tributos emitida por el banco receptor del pago, legalizada por un Notario Público de Lima.

La documentación indicada en este numeral deberá ser enviada a IIG dentro de los tres (3) Días Hábiles de efectuado el pago de los Tributos.

(viii) Entregar a IIG, toda la información razonable que IIG pudiera requerirle relacionada con los Documentos del Préstamo.

(ix) Proveer a IIG: (i) sus estados financieros con una periodicidad trimestral, los cuales deben ser remitidos dentro de los diez (10) primeros días del mes siguiente; y, (ii) sus estados financieros auditados, los cuales deben ser remitidos dentro de los noventa (90) días siguientes al cierre del ejercicio anual.

Los estados financieros incluirán el Balance General, el Estado de Pérdidas y Ganancias, el Estado de Flujo de Efectivo, el Estado de Cambios en el Patrimonio Neto completos y la carta de opinión –incluyendo las notas- debidamente firmada por los auditores de CCP.

(x) Cuando corresponda, contratar una póliza de seguros contra todo riesgo sobre los bienes que financie IIG y/o bienes que se encuentren gravados en mérito de los Contratos de Garantía Mobiliaria, endosando la póliza de seguros a favor de IIG como único beneficiario, dentro de los tres (3) Días Hábiles de recibida la póliza.

(xi) CCP reconoce que IIG tiene la potestad de enviar auditores, contadores y a sus trabajadores y/o funcionarios a las oficinas y/o instalaciones de CCP, con la finalidad de revisar la información financiera, económica y contable, inventarios y/o cualquier otro tipo de información de CCP y sus Subsidiarias, en la oportunidad que IIG estime conveniente, obligándose CCP a brindar las facilidades necesarias y asumir los costos derivados de la auditoría. IIG deberá notificar a CCP con una anticipación de dos (2) Días Hábiles a efectos que CCP reúna adecuadamente la información solicitada por IIG.

(xii) Capitalizar todas y cada una de las utilidades que genere CCP durante la vigencia de los Documentos del Préstamo.

5.2 Obligaciones negativas o de no hacer

Mientras todos los montos adeudados a IIG bajo el Préstamo no hayan sido pagados conforme a lo establecido en el presente Contrato, CCP se obliga a (salvo autorización en contrario de IIG en forma expresa y por escrito):

(i) No efectuar Distribuciones de utilidades.

(ii) No transferir, delegar o ceder el Préstamo ni su posición contractual en el Contrato, bajo supuesto alguno ni modalidad alguna.

(iii) No realizar cambio significativo alguno en el giro principal y naturaleza de sus negocios, consistente en la producción de laminado y trefilado de alambres y productos similares, fabricación de conductores eléctricos y sus accesorios, comercializando dichos productos en el Perú y en el extranjero.

(iv) Salvo autorización expresa y por escrito de IIG, no fusionarse o adquirir empresas, cualquiera sea su actividad, de manera tal que pueda generarse un Efecto Sustancialmente Adverso y/o que pueda resultar en un Evento de Incumplimiento.

(v) No transferir o dar en arrendamiento financiero sus activos, salvo en los siguientes casos: (a) activos que conformen su inventario y que sean realizados en el curso ordinario de su negocio, y, (b) venta de activos en desuso u obsoletos con relación a la operación de la sociedad.

(vi) Ni directa o indirectamente, celebrar contratos, convenios, acuerdos, negocios o transacciones con terceros, que no sean en condiciones de mercado.

(vii) No otorgar préstamos, garantizar o constituirse como fiador respecto de obligaciones de terceros, incluyendo a sus accionistas, directores y empleados, excepto por los préstamos otorgados y/o las garantías constituidas dentro del curso normal del negocio.

(viii)  No subordinar el pago de las obligaciones contempladas en este Contrato a algún otro endeudamiento que CCP contraiga posteriormente.

(ix)   *Salvo autorización expresa y por escrito de IIG, no celebrar contratos de préstamo, mutuo, crédito, financiamiento ni cualquier otro acto y/o contrato en mérito del cual una empresa vinculada o una tercera persona le otorgue dinero y/u otros bienes consumibles, a cambio de que se le devuelvan otros de la misma especie, calidad o cantidad.*

## SEXTA: EVENTOS DE INCUMPLIMIENTO

IIG tendrá la facultad de considerar los montos adeudados como de plazo vencido y solicitar el pago de los mismos en los siguientes supuestos:

6.1    El incumplimiento de pago por parte de CCP y/o CCN de sus obligaciones dinerarias estipuladas en este Contrato, tales como el pago del capital, la tasa de interés acordada por las Partes, comisiones y/o reembolso de gastos y pago de Tributos, en cada oportunidad de pago a IIG.

6.2    La comprobación que las Declaraciones y Garantías señaladas en la Cláusula Cuarta o en cualquier Documento del Préstamo o información proporcionada por CCP y/o CCN a IIG dentro del marco del Préstamo, haya sido falsa o sustancialmente incorrecta al momento de haber sido hecha la declaración o proporcionada dicha información.

6.3    El incumplimiento por parte de CCP y/o CCN de cualquier obligación a su cargo estipulada en este Contrato o en cualesquiera de los Documentos del Préstamo.

6.4    Cambio en la estructura de propiedad y control de CCP y/o CCN, que signifique la pérdida por parte de sus Accionistas de la propiedad directa o indirecta de las acciones con derecho a voto o el Control Efectivo de CCP y/o CCN, salvo por el cambio en la participación accionarial de CCP que se produzca luego de que Alphahill Investments S.A. y Danehill Holdings Limited capitalicen sus créditos en CCP. Las transferencias de las acciones de CCP y/o CCN estarán permitidas en la medida que los Accionistas mantengan el Control Efectivo de la misma, directamente o a través de Subsidiarias y siempre que dichas transferencias sean informadas previamente a IIG.

6.5    El reconocimiento por escrito de CCP y/o CCN de la imposibilidad de pago de deudas o la cesión o abandono de bienes en beneficio de acreedores o el inicio del un Proceso Concursal.

6.6    La declaración de procedencia de un embargo o medida cautelar sobre CCP y/o CCN, la expropiación, nacionalización o alguna otra acción que tenga un efecto similar por parte de cualquiera de los poderes ejecutivo, judicial, legislativo u otra Autoridad, que generen un Efecto Sustancialmente Adverso.

6.7    La mora de CCP y/o CCN en el pago de sus obligaciones bajo cualquier operación de financiamiento o si cualquiera de estas obligaciones se volviese exigible *antes de su vencimiento* o fuese declarada vencida antes de la fecha prevista, a discreción de IIG.

6.8    La adopción en contra de CCP y/o CCN de cualquier fallo judicial, resolución administrativa o laudo arbitral en última instancia, a discreción de IIG.



6.9 La realización de algún tipo de reorganización societaria, sin autorización de IIG, cuando dicha reorganización genere un Efecto Sustancialmente Adverso.

6.10 Cualquier Efecto Sustancialmente Adverso en la situación de CCP y/o CCN.

6.11 El incumplimiento de cualquier obligación de CCP y/o CCN frente a IIG, en cualquier otro contrato que hayan suscrito las Partes, presentes o futuros.

6.12 En caso CCP utilice los recursos de este Préstamo para financiar operaciones fuera del curso normal de sus negocios.

6.13 Si cualquier Autoridad impusiera una moratoria que tenga un Efecto Sustancialmente Adverso en los pagos de las obligaciones de CCP y/o CCN derivadas de este Contrato o los Documentos del Préstamo.

6.14 En caso el Contrato y/o cualesquiera de los Documentos del Préstamo fuese declarado nulo o inválido o ineficaz o inexigible por una Autoridad.

## SÉTIMA: ACCIONES DERIVADAS DE EVENTOS DE INCUMPLIMIENTO

En caso de producirse cualesquiera de los Eventos de Incumplimiento descritos en la Cláusula Sexta precedente, IIG podrá acumulativamente y a su solo criterio:

7.1 Otorgar a CCP un plazo máximo de cinco (5) Días Hábiles para subsanar o corregir el Evento de Incumplimiento.

7.2 Declarar -mediante aviso escrito dirigido a CCP y/o CCN - todos los montos que CCP y/o CCN deban pagar en virtud del Contrato, que de otra forma sean exigibles con posterioridad a la fecha del aviso, como inmediatamente exigibles y pagaderos, para lo cual las Partes en este acto convienen en que, a partir de ese momento, tales montos serán exigibles y pagaderos, sin que medien diligencias, avisos, presentación para el pago, requerimiento judicial, protesto o cualesquiera otra formalidad, a todas las cuales CCP y/o CCN renuncian en forma expresa.

Para los efectos previstos en este numeral, CCP y/o CCN aceptan que el efecto de la declaratoria de plazo vencido antes indicada será el de permitir a IIG declarar de plazo vencido la totalidad de las obligaciones pendientes de pago y proceder al cobro inmediato de las sumas adeudadas, las cuales se consideraran, sin necesidad de notificación, protesto o requerimiento judicial de ninguna especie como líquidas, exigibles y pagaderas de inmediato.

7.3 Solicitar la promesa o entrega efectiva de una garantía adicional a favor de IIG por el monto de lo adeudado al momento del requerimiento de pago.

7.4 Ejecutar todos los derechos y remedios que tenga disponibles de acuerdo a lo dispuesto por este Contrato o al amparo de lo dispuesto por las leyes que resulten aplicables, incluyendo pero no limitándose a la ejecución del Pagaré y/o de cualquier otra garantía que se hubiera constituido a su favor.

7.5    Compensar cualquier obligación que tenga a favor de CCP y/o CCN y/o de garantes solidarios contra las obligaciones pendientes de pago a cargo de éstos, *aceptando CCP y/o CCN desde ya dichas compensaciones en forma expresa.*

**OCTAVA: GARANTÍAS**

8.1    <u>Emisión de Pagaré</u>

En forma simultánea a la suscripción del presente Contrato y con la finalidad de garantizar el fiel cumplimiento del Préstamo, CCP suscribirá el Pagaré que obra como Anexo II del Contrato.

El Pagaré se regirá por las condiciones siguientes:

(i)     CCP emitirá en favor de IIG un Pagaré incompleto, de acuerdo con el modelo contenido en el <u>Anexo II</u>. CCN, por su parte, intervendrá como fiador solidario en el mismo.

(ii)    El Pagaré incorporará, adicionalmente, la obligación de pago de intereses compensatorios e intereses moratorios a las tasas pactadas en los términos de este Contrato.

(iii)   La emisión del Pagaré en los términos de esta cláusula, de conformidad con lo dispuesto por el artículo 1279 del Código Civil, no implicará la novación ni la suspensión de las obligaciones contraídas por CCP frente a IIG conforme a este Contrato ni la modificación de los términos bajo los cuales fueron acordadas y, en consecuencia, las indicadas obligaciones de pago se entienden como exigibles en su integridad en cualquiera de los Eventos de Incumplimiento.

(iv)   Como consecuencia de haber sido emitido el Pagaré por CCP en forma incompleta, a efectos de cumplir con lo dispuesto por la Ley de Títulos Valores, CCP autoriza expresa e irrevocablemente a IIG a completar el Pagaré de acuerdo con lo dispuesto por el Acuerdo de Llenado de Pagaré detallado en el <u>Anexo III</u>.

(v)    Las Partes, en uso de la facultad que les confiere el artículo 1233 del Código Civil peruano, convienen expresamente en que la entrega o emisión del Pagaré o de *cualquier título valor que constituya orden o promesa de pago, en ningún caso extinguirá la obligación primitiva ni aun cuando éstos hubiesen sido perjudicados por cualquier caso, incluso por causa imputable a IIG.*

(vi)   *IIG tendrá derecho a reclamar el pago a cargo de CCP de la suma desembolsada bajo el presente Contrato, ya sea sobre la base del Pagaré o del presente Contrato, de manera excluyente; sin que haya lugar a reclamar por ambas vías simultáneamente.*

8.2    *Contratos de Garantía Mobiliaria*

Con el objeto de garantizar el Préstamo, CCP, CCN y Alphahill Investments S.A. y Danehill Holdings Limited celebrarán, según corresponda, los Contratos de Garantía Mobiliaria, en *mérito de los cuales otorgarán en garantía mobiliaria a favor de IIG determinados activos de su titularidad,* de acuerdo con lo establecido en el presente Contrato.

**NOVENA: MONEDA DE PAGO**

CCP asume la obligación de verificar que los montos a ser pagados a IIG en mérito de este Contrato sean en Dólares.

**DÉCIMA: AUTORIZACIÓN DE CESIÓN**

10.1    IIG podrá ceder en todo o en parte, a favor de una sociedad, la posición contractual que ocupa en este Contrato y/o ceder los derechos y/u obligaciones que le confiere el mismo, sin que como consecuencia de esta cesión se vean modificados los términos y condiciones de las obligaciones de CCP bajo este Contrato.

CCP y CCN autorizan y consienten en forma expresa e irrevocable la cesión que efectúe IIG.

10.2    En tal sentido, CCP y CCN se obligan a suscribir el contrato de cesión y cualquier otro documento que sea necesario con el fin que se pueda llevar a cabo la o las cesiones autorizadas conforme al párrafo anterior.

10.3    CCP y/o CCN no podrán ceder o transferir, total o parcialmente, su posición contractual ni cualquier derecho u obligación que les corresponda con arreglo a los términos del presente Contrato y/o los Documentos del Préstamo, sin la autorización previa y por escrito de IIG.

**UNDÉCIMA: VIGENCIA**

Este Contrato tendrá una vigencia de dieciocho (18) meses a partir de su suscripción. Sin perjuicio de lo anterior, las Partes acuerdan que el Contrato estará vigente mientras subsista alguna suma pendiente de pago y terminará con el pago total de toda suma adeudada bajo el Contrato y/o los Documentos del Préstamo.

**DUODÉCIMA: NOTIFICACIONES**

Todas las notificaciones y otras comunicaciones relacionadas con el Contrato y/o con los Documentos del Préstamo serán cursadas en principio por correo electrónico y en idioma castellano e inglés, y serán enviadas a las direcciones electrónicas detalladas al final de esta cláusula o a aquellas otras direcciones electrónicas que la Parte que desee modificarlas indique a la otra Parte mediante aviso escrito; dicha modificación será efectiva a partir de la fecha de entrega de la notificación. En el supuesto de fallas en la comunicación electrónica antes indicada, las Partes aceptan que las comunicaciones se efectúen vía facsímil a los números detallados a continuación o mediante entrega física a las direcciones indicadas posteriormente.

Las reglas anteriores rigen en forma primaria, salvo que de acuerdo al Contrato y/o a los Documentos del Préstamo se requiera de notificación por la vía notarial. Las notificaciones se considerarán eficaces: (i) en la fecha de acuse de recibo del envío del correo electrónico; (ii) al momento de la confirmación de acuse de recibo del facsímil de destino, si son enviadas por facsímil; (iii) en la fecha de entrega, si son entregadas en forma personal; o, (iv) a la fecha de recepción, si son enviadas por correo certificado con cargo de recepción o por vía notarial.

Para los fines dispuestos en esta cláusula, las direcciones y números de facsímil de las Partes son:

IIG Capital LLC As Agent
Atención: Daniel Rochmann
Dirección: 1500 Broadway, piso 17, Nueva York, Estados Unidos de América
Teléfono: +1 212 806-5100
Facsímil: +1 212 806-5199
E-mail: drochmann@iigcapital.com

Conductores y Cables del Perú S.A.C.
Atención: Fernando Barrón Villacorta
Dirección: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y
departamento de Lima.
Teléfono: + (511) 713 6000
Facsímil: + (511) 713 6002
E-mail: fernando.barron@ccp.com.pe

Cables y Conductores Nacionales S.A.C.
Atención: Fernando Barrón Villacorta
Dirección: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y
departamento de Lima.
Teléfono: + (511) 713 6000
Facsímil: + (511) 713 6002
E-mail: fernando.barron@ccp.com.pe

Para que surta efecto cualquier variación relacionada con las direcciones electrónicas, el domicilio
o el número de facsímil de las Partes, ésta deberá ser comunicada a la otra Parte mediante
comunicación escrita con una anticipación de por lo menos (5) cinco días calendario desde la
fecha en que la modificación entraría en vigencia. En dicha comunicación se deberá hacer expresa
referencia a que dicha variación se encuentra referida a las direcciones y/o al número de facsímil
señalado en la presente cláusula.

## DECIMO TERCERA: ILEGALIDAD

Independientemente de cualquier otra disposición contenida en este Contrato, si IIG informa a
CCP que la promulgación o un cambio en la interpretación de cualquier norma convierte en ilegal
el Préstamo o cualquier estipulación del Contrato y/o de los Documentos del Préstamo; o, si
cualquier Autoridad considera que es ilegal para IIG realizar uno o más Desembolsos o cualquier
estipulación del Contrato y/o con los Documentos del Préstamo, o proveerse de fondos o
mantener su compromiso de realizar Desembolso(s), el(los) Desembolso(s) se suspenderá(n)
hasta que CCP informe a IIG que las circunstancias que originaron dicha suspensión ya no existen.
Si IIG considera que será ilegal mantener, o proveerse de fondos para otorgar el Préstamo, CCP
deberá prepagar inmediatamente el total del monto adeudado a dicha fecha, conjuntamente con
el interés compensatorio devengado. La opinión de IIG será definitiva y concluyente en todos los
casos. Para efectos de lo señalado en esta cláusula, IIG deberá informar por escrito
inmediatamente a CCP respecto de la legalidad o ilegalidad de mantener el Préstamo. En cualquier
caso, CCP declara que IIG no asume responsabilidad por la suspensión de cualquier Desembolso.

## DECIMO CUARTA: GASTOS Y MAYORES COSTOS

14.1   CCP asume íntegramente el pago y reembolso a IIG de cualesquiera gastos razonables que
       se deriven de este Contrato y/o de los Documentos del Préstamo, incluso en razón de los

documentos que deban emitirse, los mismos que deberán ser cancelados a simple requerimiento de IIG.

14.2    En caso CCP demorase cualquier pago o reembolso, la suma que corresponda pagar estará afecta, además, al pago de intereses compensatorios y moratorios y de cualquier otro concepto adicional a las tasas establecidas en este Contrato.

14.3    IIG podrá, a su solo criterio y sin estar obligado a ello, financiar a CCP los gastos materia de la presente cláusula, en los términos y condiciones que IIG determine en su oportunidad.

14.4    Si, como consecuencia de: (i) la publicación de, o un cambio en la interpretación de cualquier norma legal que modifique el régimen tributario vigente; o, (ii) el cumplimiento de cualquier instrucción o solicitud del Banco Central de Reserva del Perú, la Superintendencia de Banca, Seguros y Administradoras Privadas de Fondos de Pensiones o cualquier otra Autoridad (sea que dicha instrucción o solicitud tenga o no fuerza de ley), se originase un incremento en el costo de IIG para acordar, otorgar, proveer de fondos o mantener su compromiso de desembolsar el Préstamo; CCP de tiempo en tiempo, de acuerdo a la solicitud de IIG, deberá pagar a ésta los montos adicionales que fuesen suficientes para compensar a IIG por dicho incremento en el costo. IIG deberá entregar a CCP un certificado en el que se indique la causa que originó ese mayor costo, así como el monto del incremento, el cual será definitivo y concluyente en todos los casos, salvo error manifiesto.

## DÉCIMO QUINTA: LEGISLACIÓN Y ARBITRAJE

15.1    En todo lo no previsto en este documento, el Contrato se rige por la legislación de la República del Perú. Cualquier referencia a la legislación o norma específica alguna contemplada en este documento debe entenderse referida a la legislación de la República del Perú.

15.2    Las Partes acuerdan que toda discrepancia o controversia que se suscite entre ellas en relación con la interpretación, ejecución, validez o eficacia del presente Contrato, procurará ser resuelta por las Partes de buena fe mediante trato directo.

De no llegar las Partes en disputa a un acuerdo en el plazo de quince (15) días calendario, la controversia podrá ser sometida por las Partes a un arbitraje de derecho ante al Centro de Arbitraje de la Cámara de Comercio de Lima (el "Centro"), conforme al Reglamento del Centro, el mismo que las Partes declaran aceptar y conocer, y bajo la administración del Centro. El arbitraje de derecho se tramitará conforme al siguiente procedimiento:

-   El arbitraje se llevará a cabo por un Tribunal Arbitral compuesto de tres (3) miembros.

-   El arbitraje se llevará a cabo conforme al Reglamento del Centro, a cuyas normas se someten las Partes en forma incondicional y las que declaran conocer y aceptar en su integridad.

-   El Tribunal Arbitral se constituirá de la siguiente forma: cada una de las Partes designará un árbitro y el tercero será designado de común acuerdo por los árbitros ya designados. El tercer árbitro presidirá el Tribunal Arbitral. Si las Partes en conflicto fueran más de dos (2), las Partes se pondrán de acuerdo para la designación de los árbitros. Los árbitros así designados se pondrán de acuerdo sobre quien se




desempeñará como presidente del Tribunal Arbitral. Si los tres (3) árbitros no llegasen a un acuerdo sobre el nombramiento del presidente del Tribunal Arbitral, dentro del plazo de diez (10) días calendario contado a partir de la fecha del nombramiento del tercer árbitro, el presidente será elegido por el Centro, a pedido de cualquiera de las Partes.

- En caso que una de las Partes no designe a su árbitro o las Partes no llegasen a un acuerdo sobre la designación de los tres (3) árbitros, dentro de un plazo de diez (10) días hábiles contado desde la fecha en que una de ellas manifieste por escrito su voluntad de acogerse a la presente cláusula, el árbitro o los árbitros que no haya(n) sido designado(s) será(n) nombrado(s) por el Centro.

- El Tribunal Arbitral tendrá un plazo de noventa (90) días hábiles desde su instalación para expedir el respectivo laudo arbitral, el cual será inapelable.

- El Tribunal Arbitral puede quedar encargado de determinar con precisión la controversia, así como otorgar una prórroga en caso fuera necesario para emitir el laudo.

- El lugar del arbitraje será en la ciudad de Lima, Perú y el idioma que se utilizará en el procedimiento arbitral será el castellano.

- Todos los gastos derivados del arbitraje, su desarrollo y posterior ejecución, incluyendo las tasas del Centro, los honorarios de los árbitros, los costos de funcionamiento del Tribunal Arbitral, los honorarios de los asesores legales y de cualquier otra índole, a los que razonablemente hayan tenido que recurrir las Partes, los costos y costas de los procesos judiciales que se inicien como consecuencia del laudo, incluyendo los de su ejecución y cualquier otro gasto que sea necesario, serán por cuenta de la Parte vencida en el arbitraje. De no existir una Parte totalmente vencida en el arbitraje, el Tribunal podrá, en equidad, disponer de manera distinta. Los gastos y costos correspondientes al arbitraje serán asumidos por la Parte que no se vea favorecida con la decisión del Tribunal Arbitral.

- El correspondiente laudo arbitral será definitivo e inapelable, a efectos de lo cual, las Partes renuncian expresamente a presentar cualquier acción y/o recurso de apelación ante una segunda instancia arbitral.

15.3   Sin perjuicio de lo establecido en el numeral 15.2 anterior, en caso se requiera efectuar cualquier tipo de cobranza en mérito de cualquiera de los Documentos del Préstamo, las Partes acuerdan que dicho proceso deberá ser resuelto ante los Jueces y Tribunales del Distrito Judicial de Lima –Cercado, renunciando las Partes a cualquier otra competencia, sin reserva ni limitación alguna.

## <u>DÉCIMO SEXTA</u>: INTERVENCIÓN DE CCN

CCN interviene en el presente Contrato, constituyéndose en fiador solidario frente a IIG en respaldo del cumplimiento de todas y cada una de las obligaciones asumidas por CCP frente a IIG de acuerdo con este Contrato y los demás Documentos del Préstamo, incluyendo pero sin limitarse al pago de toda y cualquier suma que CCP adeude a IIG por concepto de cuotas del principal y/o interés compensatorio y/o interés moratorio, indemnizaciones, penalidades, gastos, Tributos y/o en general toda y cualquier obligación asumida por CCP de acuerdo con el Contrato y los

demás *Documentos del Préstamo* y/o cualesquiera otros conceptos a que hubiere lugar derivados del *Contrato* y los demás *Documentos del Préstamo*.

La fianza otorgada por medio de este *Contrato* es de carácter solidario, incondicional, sin beneficio de excusión ni división e irrevocable (la "*Fianza*").

De acuerdo con lo anterior, en caso se produzca un *Evento de Incumplimiento* o *CCP* no reembolse a IIG, cuando corresponda según el *Contrato*, los montos desembolsados por IIG, ésta podrá exigir a *CCN*, sin necesidad de requerimiento previo a *CCP*, el cumplimiento inmediato de cualesquiera de las obligaciones objeto de este *Contrato*.

En ese sentido, la *Fianza* podrá ser ejecutada automáticamente por IIG en caso *CCP* no cumpla de manera íntegra, exacta y oportuna con el pago de cualesquiera de las obligaciones de pago objeto de este *Contrato*, de acuerdo con lo establecido en este *Contrato*.

Para la ejecución de la *Fianza* bastará que IIG requiera a *CCN* por carta notarial el cumplimiento íntegro, exacto u oportuno, según sea el caso, de cualesquiera de las obligaciones de pago de este *Contrato*, sin necesidad de tener que evidenciar o sustentar que el cumplimiento de las mismas no ha sido íntegro, exacto u oportuno.

La vigencia de la *Fianza*, incluyendo  sin limitación las condiciones que se regulan en este *Contrato*, se mantiene mientras existan obligaciones pendientes de cumplimiento de acuerdo a lo establecido en este instrumento.

De la misma manera, *CCN* acepta que la presente fianza garantiza el incumplimiento de cualquier obligación de *CCP* y/o *CCN* frente a IIG, en cualquier otro contrato que hayan suscrito las Partes, presentes o futuros.

Lima, 30 de setiembre de 2013.

Por "Conductores y Cables del Perú S.A.C."          Por "Conductores y Cables Nacionales S.A.C."

Nombre: Fernando Barrón Villacorta            Nombre: Fernando Barrón Villacorta
Cargo: Gerente General                        Cargo: Gerente General

Por "IIG Capital LLC As Agent":

Nombre: Daniel Rochmann
Cargo: Executive Director

### ANEXO I

### CRONOGRAMA DE PAGOS

| | Conductores y Cables del Peru S.A.C. | | |
|---|---|---|---|
| | Month | Principal Repayment | Prin. Balance |
| 0 | 30/09/2013 | - | 16,000,000.00 |
| 1 | 31/10/2013 | - | 16,000,000.00 |
| 2 | 30/11/2013 | - | 16,000,000.00 |
| 3 | 31/12/2013 | - | 16,000,000.00 |
| 4 | 31/01/2014 | - | 16,000,000.00 |
| 5 | 28/02/2014 | - | 16,000,000.00 |
| 6 | 31/03/2014 | - | 16,000,000.00 |
| 7 | 30/04/2014 | - | 16,000,000.00 |
| 8 | 31/05/2014 | - | 16,000,000.00 |
| 9 | 30/06/2014 | - | 16,000,000.00 |
| 10 | 31/07/2014 | 3,200,000.00 | 12,800,000.00 |
| 11 | 31/08/2014 | 3,200,000.00 | 9,600,000.00 |
| 12 | 30/09/2014 | 3,200,000.00 | 6,400,000.00 |
| 13 | 31/10/2014 | 1,066,666.66 | 5,333,333.34 |
| 14 | 30/11/2014 | 1,066,666.66 | 4,266,666.68 |
| 15 | 31/12/2014 | 1,066,666.66 | 3,200,000.02 |
| 16 | 31/01/2015 | 1,066,666.66 | 2,133,333.36 |
| 17 | 28/02/2015 | 1,066,666.66 | 1,066,666.70 |
| 18 | 31/03/2015 | 1,066,666.70 | 0.00 |

**ANEXO II**

**MODELO DE PAGARÉ**

Importe US $ _____

Vence el _____ de_____ de _____

Nosotros, Conductores y Cables del Perú S.A.C., una sociedad anónima cerrada constituida y organizada bajo las leyes de la República del Perú, con Registro Único de Contribuyentes No. 20511445389, con domicilio en Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, República del Perú, debemos y pagaremos en la fecha de vencimiento indicada, a la orden de IIG Capital LLC As Agent, una sociedad constituida y existente de conformidad con las leyes del Estado de Nueva York, Estados Unidos de América, (en adelante, "IIG"), en sus oficinas en 1500 Broadway, Piso 17, Nueva York, Estados Unidos de América, o en el lugar en que se nos presente a cobro, la cantidad de US$ _____
(_____ y _____/100 Dólares de los Estados Unidos de América), suma adeudada por nuestra parte a dicha sociedad por obligaciones contraídas a nuestra entera satisfacción, sin lugar a reclamo de ninguna especie, para cuyo fiel y exacto cumplimiento obligamos todos nuestros bienes habidos y por haber, en la mejor forma de derecho, en especial los que se encuentren en IIG.

En adición al principal del monto de este Pagaré, nos obligamos incondicionalmente a pagar intereses compensatorios a partir de la fecha de emisión del mismo y hasta la fecha de su pago íntegro a la tasa de interés prevista en el numeral 3.6 de la Cláusula Tercera del Contrato de Préstamo suscrito entre IIG en calidad de Prestamista y Conductores y Cables del Perú S.A.C. en calidad de Prestatario y Cables y Conductores Nacionales S.A.C., en calidad de Fiador Solidario, con fecha 30 de setiembre de 2013 (en adelante, el "Contrato de Préstamo").

En caso no cumplamos con pagar correcta y oportunamente el principal del Préstamo, los intereses devengados o cualquier monto adeudado a IIG en virtud del Contrato de Préstamo nos obligamos a pagar adicionalmente a los intereses compensatorios, los intereses moratorios a una tasa de interés determinada en el numeral 3.5 de la Cláusula Tercera del Contrato de Préstamo y de acuerdo con los términos y condiciones establecidos en dicho numeral. Durante el tiempo que se devenguen intereses moratorios se devengarán paralelamente los intereses compensatorios establecidos en la Cláusula Tercera del Contrato de Préstamo.

Asimismo, nos obligamos incondicionalmente a pagar a IIG los gastos notariales, costos y costas judiciales y extrajudiciales incurridos por IIG en razón de nuestro incumplimiento, obligándonos a pagar sobre dichos gastos el mismo interés moratorio pactado en este Pagaré y en el Contrato de Préstamo.

Declaramos conocer, las tasas de interés al momento de la suscripción del presente documento.

Este título no requerirá de protesto por falta de pago, procediendo su ejecución por el solo mérito de haber vencido su plazo y no haber sido prorrogado.

Los impuestos y derechos que se originen de la obligación representada por este Pagaré, salvo los que correspondan a IIG conforme a la legislación peruana, serán por nuestro cargo y cuenta.

Aceptamos de antemano las renovaciones y prórrogas de vencimiento de este Pagaré que IIG considere conveniente efectuar, ya sea por su importe total o parcial, aún cuando no hayan sido comunicadas a nosotros. Dichas modificaciones serán anotadas en este mismo documento o en hoja anexa, sin que sea necesaria nuestra suscripción de tal documento u hoja anexa.

Toda vez que la fecha de vencimiento de cualquier pago que deba efectuarse conforme a este Pagaré haya de ocurrir un día que no fuese un Día Hábil, ese pago se hará en el Día Hábil inmediato siguiente. Para tal efecto, se entenderá por Día Hábil cada uno de los cinco (5) días de la semana que comienzan el lunes y terminan el viernes, en que los bancos en la ciudad de Lima, Perú, se encuentran abiertos con atención al público en general en sus oficinas principales.

El presente pagaré es emitido de conformidad con el artículo 10 de la Ley de Títulos Valores promulgada mediante Ley 27287 y será completado conforme al acuerdo de llenado que hemos suscrito con IIG, de fecha 30 de setiembre de 2013.

Cualquier referencia en este Pagaré a IIG deberá entenderse efectuada a cualquier tenedor del mismo, sea que lo adquiera por endoso o de otro modo.

Este Pagaré se devolverá a su cancelación total. Queda expresamente establecido que nuestro domicilio es Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A", distrito de Ate, provincia y departamento de Lima, lugar a donde se dirigirán todas las comunicaciones y notificaciones derivadas de este Pagaré.

El presente Pagaré es de naturaleza mercantil y está sujeto a las disposiciones de la Ley de Títulos Valores y demás normas que le sean de aplicación.

Para efectos de ejecución de este Pagaré nos sometemos a la jurisdicción y competencia de los jueces y tribunales del Distrito Judicial del Cercado de Lima, a cuyo efecto renunciamos al fuero que por nuestro domicilio pudiese correspondernos.

Lima, 30 de setiembre de 2013.

Nombre: Fernando Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General

En todos los casos, el(los) apoderado(s) de la empresa actúa(n) facultado(s) según poder(es) que cuentan con las certificaciones necesarias de acuerdo con la legislación aplicable.



**FIANZA SOLIDARIA**

Cables y Conductores Nacionales S.A.C., debidamente representada por el señor *Fernando Barrón Villacorta*, identificado con DNI No. 08248191, por la presente nos constituimos en fiador solidario del obligado principal, renunciando expresamente al *beneficio de excusión a que se refiere el* artículo 1879 del Código Civil, por todas las obligaciones contraídas por el obligado principal frente a IIG Capital LLC As Agent, *incluyendo todas aquellas expresadas en este Pagaré.*

Dejamos *expresa constancia que esta fianza se constituye por plazo indeterminado y estará* vigente hasta que sean pagadas totalmente las obligaciones a las que sirve de garantía.

De conformidad con el artículo 49 de la Ley 27287 (Ley de Títulos Valores), aceptamos todas las prórrogas que sean efectuadas por el tenedor de este Pagaré por el plazo que ésta señale en este mismo documento, sin que sea necesaria intervención alguna de nuestra parte.

Fijamos nuestro domicilio en el lugar que se indica al pie de nuestra firma, donde se *dirigirán todas* las comunicaciones y/o notificaciones derivadas del Pagaré. Asimismo, para el caso de ejecución del preste título o de la fianza que otorgamos, *renunciamos a la competencia de los jueces de* nuestro domicilio y nos sometemos a la competencia de los jueces del lugar que indique IIG Capital LLC As Agent.

Nombre: Fernando Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General
Domicilio: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate



### ANEXO III

### ACUERDO DE LLENADO DE PAGARÉ

Conductores y Cables del Perú S.A.C. ("CCP") ha solicitado a IIG Capital LLC As Agent ("IIG") un préstamo hasta por US$ 16'000,000.00 (dieciséis millones y 00/100 Dólares), suscribiendo un (1) Pagaré incompleto, a favor de IIG, por lo que mediante la firma de CCP en el presente documento ésta autoriza de manera expresa e irrevocable para que IIG o a quien éste hubiera transferido el Pagaré incompleto proceda al llenado del mencionado Pagaré incompleto en los siguientes términos y condiciones:

**PRIMERO:** IIG podrá considerar vencidos todos los plazos y proceder al cobro del íntegro de lo adeudado ejecutando el Pagaré mencionado en uno cualquiera de los siguientes casos:

Si CCP dejase de pagar una o más cuotas de pago del Contrato de Préstamo, de fecha 30 de setiembre de 2013, celebrado entre CCP e IIG, entre otros  (el "Contrato de Préstamo") en los plazos establecidos en dicho Contrato de Préstamo; y/o;

Si, en virtud de lo dispuesto en el Contrato de Préstamo, se verifica la ocurrencia de algún Evento de Incumplimiento, tal como este término se define en el Contrato.

**SEGUNDO:** Las instrucciones del llenado del Pagaré incompleto son las siguientes:

La oportunidad a partir de la cual IIG podrá proceder a llenar el Pagaré será aquella en que se produzca cualquiera de los eventos señalados en la Cláusula Primera del presente documento.

La fecha de emisión o suscripción del Pagaré que IIG deberá estampar en el documento será el día que corresponda a la fecha de suscripción del Contrato.

La fecha de vencimiento del Pagaré que IIG deberá estampar será la del día de la fecha en que IIG dé por vencidos todos los plazos de acuerdo a lo señalado en la Cláusula Primera.

La cantidad adeudada que se pagará por CCP y que IIG deberá consignar en el documento será equivalente a todas aquellas sumas que según los términos del Contrato de Préstamo CCP adeuda a IIG, incluidos los intereses respectivos, a las tasas establecidas en el Contrato de Préstamo, incrementadas con el correspondiente Tributo si fuere el caso que grave el Pagaré antes referido.

Las partes establecen que cualquier Tributo que pueda gravar la emisión y pago del Pagaré descrito en el presente documento será de cargo de CCP.

El importe total del saldo deudor a cargo de CCP incluye, a criterio razonable de IIG, intereses, comisiones, penalidades, seguros y todos los demás conceptos aplicables y exigibles al momento de realizado el llenado del Pagaré.

CCP autoriza en forma irrevocable a IIG para que compense el saldo total pendiente de pago con los activos de titularidad de CCP que mantenga en su poder.

CCP acepta y da por válidas todas las renovaciones y/o prórrogas totales o parciales que se anoten en el Pagaré, aún cuando no estén suscritas por CCP.




El presente documento constituye el Acuerdo entre CCP e IIG, al amparo del Artículo 10 de la Ley 27287 –Ley de Títulos Valores ó normas que los sustituyan o modifiquen, y la Ley 29571-Código de Protección y Defensa del Consumidor.

**TERCERO:** CCP deja expresa constancia que ha recibido de IIG copia del Pagaré incompleto suscrito por éste en el momento en que IIG recibió el mencionado Pagaré incompleto.

**CUARTO:** CCP renuncia expresamente a la inclusión de una cláusula que impida o limite la libre negociación del Pagaré incompleto.

Lima, 30 de setiembre de 2013.

Por "Conductores y Cables del Perú S.A.C.":


Nombre: Fernando Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General


Por "IIG Capital LLC As Agent":


Nombre: Daniel Rochmann
Pasaporte Norte Americano 096617940
Cargo: Executive Director


Con intervención de "Cables y Conductores Nacionales S.A.C."


Nombre: Fernando Barrón Villacorta
DNI No. 08248191
Cargo: Gerente General

## ANEXO IV

## ACCIONISTAS DE CCP Y DE CCN

**Conductores y Cables del Perú S.A.C.:**

Accionistas:

a.      Borgeland Internacional SA: 7'374,322 acciones.

b.      Lami Trading Company: 4'641,845 acciones.

**Conductores y Cables Nacionales:**

Accionistas:

a.      Conductores y Cables del Perú S.A.C.: 1,499 acciones.

b.      Sergio Roberto Barboza Beraún: 1 acción.



## ANEXO V

## ACCOUNT CONTROL AGREEMENT

This Account Control Agreement ("Agreement") dated as of September 30, 2013 between IIG CAPITAL LLC, a limited liability company organized under the laws of New York (the "Secured Party"), as agent for one or more of its affiliate investment funds as principal ("Principal"), and Conductores y Cables del Peru S.A.C., a industrial company organized under the laws of Lima, Peru (the "Lien Grantor).

**WHEREAS,** on or about the date hereof, Lien Grantor and Secured Party are entering into a loan agreement and into a asset-based lending agreement (such agreements and all other agreements or instruments between Lien Grantor and Secured Party in connection therewith, as may be amended, supplemented or otherwise modified from time to time, "Loan Agreement") in connection with the amount(s) loaned by Secured Party to Lien Grantor pursuant to the Loan Agreement; and

**WHEREAS,** on or about the date hereof, Lien Grantor and Secured Party are entering into a security agreement (said security agreement, as may be amended, supplemented or otherwise modified from time to time, "Security Agreement") under which Lien Grantor has granted or will grant to Secured Party a security interest in collateral ("Collateral"), which includes, without limitation, all funds which are deposited by, or at the direction of, Lien Grantor from time to time in deposit accounts opened and exclusively controlled by Secured Party as the sole customer of the depositary banks of such accounts; and

**WHEREAS,** Secured Party has requested Lien Grantor to acknowledged certain relative rights of each party in connection with the aforesaid deposit accounts.

**NOW, THEREFORE,** in consideration of the mutual agreements hereinafter set forth, the parties hereby agree as follows:

1.   *Definitions.*  Unless otherwise defined herein, capitalized terms shall have the meanings given to them in the Security Agreement and the New York Uniform Commercial Code in effect from time to time ("UCC").

2.   *The Account.*  Secured Party, as the sole customer of Bank (as hereinafter defined) with respect to the Account TOF Cayman SPV fbo Conductores y Cables del Perú, has established account number 8901192481 (the "Account") at The Bank of New York Mellon ("Bank of New York Mellon"), located at 1 Wall Street, New York, NY 10005, (as that term is defined in Section 9-102(a)(8) of the UCC), and which Account will be maintained as a "deposit account" (within the meaning of Section 9-102(a)(29) of the UCC), to provide security for, and facilitate payment of all of Lien Grantor's obligations to Secured Party under and in connection with the Loan Agreement. Bank of New York Mellon is referred to herein as a "Bank".

3.   *Acknowledgment of Lien.*  Lien Grantor hereby acknowledges the security interest of Secured Party in the Accounts and that Secured Party shall be the sole signatory of the Account for all purposes, including, without limitation, sole and exclusive control and authority relating to the disposition or transfer of any and all funds in the Accounts without consent being required from Lien Grantor or any other third party. Secured Party will apply such funds only in respect of any amounts which are owed by Lien Grantor to Secured Party

under or in connection with the Loan Agreement and will remit to Lien Grantor any excess funds deposited in the Accounts except as may be otherwise provided for with respect to such excess funds under the Loan Agreement or any other written agreement between Lien Grantor and Secured Party.  Lien Grantor hereby acknowledges and agrees that Secured Party's security interest in the Accounts has been perfected by its "control" over the Accounts in accordance with Sections 9-314(a) and 9-104(a)(3) of the UCC.

4.   Withdrawals.  Lien Grantor acknowledges and agrees that neither Bank shall accept or comply with any instructions from Lien Grantor withdrawing or distributing any funds from either of the Accounts nor deliver any such funds to Lien Grantor unless instructed to do so by Secured Party.

5.   Statements, Confirmations and Notices of Adverse Claims.  Secured Party either has or will request the Banks to send copies of all statements, confirmations and other correspondence concerning the Accounts to Secured Party and Lien Grantor at the address set forth in Section 15.

6.   Relative Rights of Parties; Responsibility of the Banks.  This Agreement provides only for certain relative rights as between Secured Party and Lien Grantor in the Accounts as are more particularly set forth in the Loan Agreement and does not create any obligation or duty of either of the Banks to Secured Party or Lien Grantor.

7.   Indemnification.  Lien Grantor agrees to indemnify, reimburse and hold Secured Party and its affiliates, directors, officers, agents, representatives and employees ("Indemnitees") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorneys' fees, that may be imposed on, incurred by or asserted against any of the Indemnitees in any way relating to or arising out of this Agreement or any action taken or not taken by any of the Indemnitees or the transactions contemplated hereby ("Indemnified Obligations"); provided, that Lien Grantor shall not be liable to Secured Party for any portion of such Indemnified Obligations that results from the gross negligence or willful misconduct of Secured Party.  The foregoing indemnification shall survive any termination of this Agreement.

8.   Compliance with Legal Process and Judicial Orders.  Notwithstanding any other provision of this Agreement, if either of the Accounts is at any time attached or levied upon, or in case the transfer or delivery of any funds in either such Account shall be stayed or enjoined, or in the case of any other legal process or judicial order affecting either such Account, Lien Grantor acknowledges that Secured Party and each of the Banks is authorized to comply with any such order in any matter as any of them deems appropriate, regardless of whether any such order or process is subsequently modified, vacated or otherwise determined to have been without legal force or effect.

9.   Force Majeure.  Secured Party shall not be responsible for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war or terrorism, epidemics, nationalization, expropriation, currency restrictions, governmental regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

10.  Representations.  Each party hereto represents and warrants that (i) if it is a legal entity, it is duly incorporated or organized and is validly existing in good standing in its jurisdiction of

incorporation or organization, (ii) the execution, delivery and performance of this Agreement has been duly authorized, (iii) the person executing this Agreement on such party's behalf has been duly authorized to act on its behalf, (iv) this Agreement constitutes such party's legal, valid, binding and enforceable agreement, and (v) such party's entry into this Agreement will not violate any agreement, law, rule or regulation by which such party is bound or by which any of such party's assets are affected.

11.     Termination.  The rights and powers granted to Secured Party have been granted in order to perfect its security interest in the Account, are powers coupled with an interest and will not be affected by the bankruptcy of Lien Grantor.  Upon the payment in full to Secured Party of all obligations under or in connection with the Loan Agreement, Secured Party will pay the balance, if any, on deposit in the Accounts to Lien Grantor, except as may be otherwise provided for under any other written agreement between Lien Grantor and Secured Party.

12.     Amendments.  No amendment, modification or termination of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by the party to be charged.

13.     Severability.   If any term or provision set forth in this Agreement shall be invalid or unenforceable, the remainder of this Agreement, or the application of such terms or provisions to persons or circumstances, other than those to which it is held invalid or unenforceable, shall be construed in all respects as if such invalid or unenforceable term or provision were omitted.

14.     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Lien Grantor, Secured Party and their respective successors and assigns; provided, that Lien Grantor may not assign, delegate or transfer any of its rights or obligations under this Agreement without the prior written consent of Secured Party.  Secured Party shall have the right to assign any or all of its rights in the Agreement, including, without limitation, any assignment and pledge of its rights as security to any third party without the consent of Lien Grantor.  Any purported assignment, delegation or transfer by Lien Grantor in violation of this Section shall be void.

15.     Notices.  Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received, or after being sent by certified or registered United States mail, return receipt requested, postage prepaid:

If to Secured Party:
IIG Capital LLC As Agent
1500 Broadway, 17th Floor
New York, NY 10036
USA
Attention: Daniel Rochmann
Telecopy: +1 212 806-5199
E-mail: drochmann@iigcapital.com

<u>If to Lien Grantor at</u>:
Conductores y Cables del Peru S.A.C.
Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate, Lima, Peru
Attention: Fernando Barron
Telecopy: + 51 1 -713 6002
E-mail: fernando.barron@ccp.com.pe

16.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

17.    <u>Choice of Law</u>.  The validity, terms, performance and enforcement of this Agreement shall be governed by the laws of the State of New York.

18.    <u>Consent to Jurisdiction and Service</u>.  Lien Grantor hereby irrevocably consents and submits to the non-exclusive *in personam jurisdiction* of the courts of the State of New York and the United States for the Southern District of New York, sitting in the City of New York, in connection with any actions or proceedings brought against Lien Grantor in any way *relating to this Agreement*.  In any such action or proceeding, Lien Grantor hereby irrevocably waives personal service of any summons, complaint, declaration or other process and hereby irrevocably agrees that the service thereof may be made by certified or registered first-class mail directed to Lien Grantor at its address in accordance with the terms hereof.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date set forth above.

CONDUCTORES CABLES DEL PERÚ S.A.C., as Lien Grantor
Nombre: Fernando Barrón Villacorta
DNI No. 08248191
Title: Gerente General

IIG CAPITAL LLC, as agent for Principal, as Secured Party
Nombre: Daniel Rochmann
American Passport: 096617940
Title: Executive Director

**ANEXO VI**

**CONTRATO DE CANALIZACIÓN DE FONDOS**

Conste por el presente documento, el Contrato de Canalización de Fondos (el "Contrato") que celebran las personas que se indican a continuación:

- **IIG CAPITAL LLC AS AGENT**, una sociedad constituida y existente de conformidad con las leyes del Estado de Nueva York, con domicilio para estos efectos en 1500 Broadway, Piso 17, Nueva York, Estados Unidos de América, quien procede representada por su *Executive Director*, señor Daniel Rochmann, identificado con Pasaporte Norte Americano: 096617940, a quien en adelante se le denominará "IIG"; y de la otra parte,

- **CONDUCTORES Y CABLES DEL PERÚ S.A.C.**, sociedad anónima cerrada constituida y organizada bajo las leyes de la República del Perú, inscrita en la partida electrónica No. 12313866 del Registro de Personas Jurídicas de la Oficina Registral de Lima, con Registro Único de Contribuyentes ("RUC") No. 20511445389, con domicilio para estos efectos en Av. Los Frutales 334 Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, representada por su Gerente General, señor Fernando Barrón Villacorta, identificado con DNI No. 08248191, facultado según poderes otorgados por mediante Junta General de Accionistas de fecha 27 de setiembre de 2013, a quien en adelante se le denominará "CCP".

El Contrato se rige por los términos y condiciones que aparecen en las cláusulas siguientes:

**PRIMERA: DEFINICIONES**

1.1    Los términos utilizados en el texto del Contrato que se incluyen con letra mayúscula, tendrán el significado que se les asigna en el numeral 1.2 siguiente. Los términos que no estén expresamente definidos, se deberán entender en el sentido corriente y usual que ellos tienen en el lenguaje técnico correspondiente o en el natural y obvio según el uso general de los mismos.

1.2    Para efectos de la interpretación del Contrato se adoptan las siguientes definiciones:

BANCO:                         Es el Banco Scotiabank en el cual se abrirán las CUENTAS
                               relacionadas con el Contrato.

CLIENTES:                      Son todos y cada una de las personas naturales y/o jurídicas
                               domiciliadas en la República del Perú o en el extranjero con
                               quienes CCP haya celebrado una COMPRAVENTA.



| | |
|---|---|
| **COMPRAVENTA(S):** | Es el acto jurídico en virtud del cual CCP se obliga a transferir a los CLIENTES la propiedad de los PRODUCTOS, a cambio del pago del precio respectivo. |

En cada oportunidad en que se celebre una COMPRAVENTA, se originará un DERECHO DE COBRO y en mérito del ejercicio de dicho derecho, se generarán los FLUJOS DINERARIOS.

Se deja constancia que todas las COMPRAVENTAS deberán estar formalizadas en documentos escritos.

**CONTRATO DE CRÉDITO:** Es el Contrato de Crédito suscrito con fecha 30 de setiembre entre el IIG y CCP, por la suma del CRÉDITO, con la finalidad que dicho monto sea destinado exclusivamente para la reestructuración de parte de los pasivos que CCP mantiene a la fecha frente a IIG.

Dentro de la presente definición se incluye las modificaciones, ampliaciones, anexos y garantías correspondientes al referido CONTRATO DE CRÉDITO, así como cualquier modificación y/o ampliación y/o anexos de los documentos antes mencionados.

**CONTRATO DE CRÉDITO REVOLVENTE:** Es el Contrato de Línea de Crédito Revolvente suscrito con fecha 30 de setiembre de 2013 entre el IIG e CCP, con la finalidad que la línea de crédito revolvente otorgada por la primera a favor de la segunda ("Línea de Crédito Revolvente") sea destinada exclusivamente para adquirir materia prima y cubrir los gastos y costos que se generen en la elaboración de los PRODUCTOS.

Dentro de la presente definición se incluyen las modificaciones, ampliaciones, anexos y garantías correspondientes al referido CONTRATO DE CRÉDITO REVOLVENTE, así como cualquier modificación y/o ampliación y/o anexos de los documentos antes mencionados.

**CRÉDITO:** Es el financiamiento que ha otorgado IIG a CCP, en virtud del CONTRATO DE CRÉDITO.

Dicho financiamiento es por la cantidad de US$ 16'000,000.00 (dieciséis millones y 00/100 DÓLARES).

| | |
|---|---|
| CRONOGRAMA: | Es el cronograma de pagos contemplado en el CONTRATO DE CRÉDITO. |

Las CUOTAS contempladas en el CRONOGRAMA deberán ser pagadas con cargo a los FLUJOS DINERARIOS acreditados y disponibles en las CUENTAS, conforme a los términos establecidos en el CONTRATO.

| | |
|---|---|
| CUENTAS: | Son conjuntamente: |

a.    **CUENTA CRÉDITO REVOLVENTE**
Cta.Cte. M.E. 000-2768320

b.    **CUENTA RECAUDADORA**
Cta.Cte. M.N. 000-1528556
Cta.Cte. M.E. 000-2619155

c.    **CUENTA PROVISIONES**
Cta.Cte. M.E. 000-4319308

d.    **CUENTA EXCEDENTES**
Cta.Cte. M.N. 000-5216303
Cta.Cte. M.E.000-4325541

e.    **CUENTA CUOTAS**

**CUENTA CRÉDITO REVOLVENTE:** Es la cuenta en DÓLARES que abrirá CCP en el BANCO donde IIG abonará los recursos de la Línea de Crédito Revolvente y de donde efectuará los pagos para la compra de materia prima, insumos y carretes, de acuerdo a las explosiones elaboradas por el Área Industrial y valorizadas por el Área de Logística de CCP.

**CUENTAS RECAUDADORAS:** Serán las cuentas, tanto en NUEVOS SOLES como en DÓLARES, que abrirá CCP en el BANCO, las cuales servirán para depositar y administrar los FLUJOS DINERARIOS que sean pagados por los CLIENTES.

CCP transferirá los FLUJOS DINERARIOS a la CUENTA PROVISIONES y a la CUENTA EXCEDENTES, mediante transferencias bancarias según corresponda, de acuerdo a lo establecido en el presente CONTRATO.

**CUENTA PROVISIONES:** Será la cuenta en DÓLARES que CCP mantendrá en el BANCO, en donde depositará el costo de producción de cada operación de venta, según la explosión y valorización respectiva, una vez cobrada la factura correspondiente, debiendo transferirlo al cabo de 110 días calendario a la CUENTA CRÉDITO REVOLVENTE a fin de liberar línea de crédito.

CUENTA EXCEDENTES:     Son las cuentas en DÓLARES y NUEVOS SOLES que CCP mantendrá en el BANCO, en donde depositará el margen o excedente de cada operación de venta y que será de libre disponibilidad de CCP, a fin de cubrir sus costos fijos mensuales e intereses de la Línea de Crédito Revolvente en o en su oportunidad transferir a la CUENTA CUOTAS para cumplir con el CONTRATO DE CRÉDITO.

CUENTA CUOTAS:     Es la cuenta dineraria, denominada en DÓLARES, que abrirá CCP en el BANCO, la cual servirá para depositar los fondos dinerarios que servirán para el pago de las CUOTAS de acuerdo al CRONOGRAMA y a lo establecido en el CONTRATO DE CRÉDITO.

Esta cuenta será abierta vencido el plazo de nueve (9) meses calendarios que IIG ha otorgado de gracia.

CUOTA(S):     Se refiere a cada uno de los pagos del CRÉDITO, que incluye principal y/o intereses según el CRONOGRAMA, que serán pagadas de conformidad con lo establecido en el CONTRATO DE CRÉDITO y en este CONTRATO.

DERECHOS DE COBRO:     Son los derechos de cobro (cuentas por cobrar) que corresponden a CCP frente a los CLIENTES, en mérito de la celebración de una COMPRAVENTA.

DÓLARES Y/O (US$):     Significan, indistintamente, la moneda de curso legal de los Estados Unidos de América.

ESTADO   DE   CRÉDITO REVOLVENTE:     Es el documento en el cual IIG señalará los montos correspondientes a los desembolsos realizados con cargo a la   Línea   de   Crédito   Revolvente   y   los   montos correspondientes a los PAGOS y sus respectivas fechas, conforme a los términos y condiciones establecidos en el CONTRATO DE CRÉDITO REVOLVENTE.

Los PAGOS deberán realizarse primero con cargo a los recursos dinerarios acreditados y disponibles en la CUENTA PROVISIONES en lo que respecta al capital otorgado y con cargo   a la CUENTA EXCEDENTES en lo que respecta a intereses del capital otorgado, todo ello conforme a los términos establecidos en el CONTRATO DE CRÉDITO REVOLVENTE y en el presente CONTRATO.

| | |
|---|---|
| **EVENTO DE INCUMPLIMIENTO:** | Es cualquier: |

    a.    "Evento de Incumplimiento", conforme este término se encuentre definido en el CONTRATO DE CRÉDITO y en el CONTRATO DE CRÉDITO REVOLVENTE y/o sus respectivas garantías; o,

    b.    Incumplimiento de las obligaciones del CCP estipuladas en el presente CONTRATO.

**EXCEDENTE:**    Es el monto remanente de cada facturación que será depositada en la CUENTA EXCEDENTES, luego de haber determinado el porcentaje exacto del margen generado en cada venta (porción de libre disponibilidad de CCP para cubrir sus costos fijos).

**FECHAS DE PAGO:**    Son las fechas en las cuales se efectuarán:

    a.    Los PAGOS, de acuerdo al ESTADO DE CRÉDITO REVOLVENTE; y,

    b.    Las CUOTAS, de acuerdo al CRONOGRAMA.

**FLUJOS DINERARIOS:**    Son la totalidad de los flujos dinerarios derivados del ejercicio de los DERECHOS DE COBRO, generados en virtud de la celebración de las COMPRAVENTAS y que corresponden al pago de los precios de las mismas por parte de los CLIENTES.

Los FLUJOS DINERARIOS que sean pagados deberán ser depositados por los CLIENTES directamente en la CUENTA RECAUDADORA.

**NUEVOS SOLES o S/.**    Significan, indistintamente, la moneda de curso legal de la República del Perú.

**OPERACIONES CREDITICIAS:**    Son el CONTRATO DE CRÉDITO y el CONTRATO DE CRÉDITO REVOLVENTE y/o cualquier instrumento vinculado a ellos, incluyendo sus modificaciones, ampliaciones o precisiones, según sea el caso.

**PAGO(S):**    Se refiere a cada uno de los pagos de la Línea de Crédito Revolvente, que incluye principal y/o intereses, según los montos expuestos en el ESTADO DE CRÉDITO REVOLVENTE, que serán pagados de conformidad con lo establecido en este CONTRATO.

**PRODUCTOS:**    Son los productos que CCP elabora de acuerdo con su objeto social.

**SEGUNDA: ANTECEDENTES**

2.1   CCP es una sociedad anónima cerrada, cuyo objeto social es dedicarse a actividades industriales, en especial a la producción y comercialización de alambres, conductores eléctricos y de cualquier otro tipo, cables, productos similares y accesorios, a la prestación de todo tipo de servicios, así como cualquier actividad vinculada o conexa con las anteriores.

2.2   En virtud de las OPERACIONES CREDITICIAS, CCP se obligó frente a IIG a cancelar el CRÉDITO y la Línea de Crédito Revolvente mediante el pago de las CUOTAS y a la realización de los PAGOS respectivos.

2.3   Para efectos de cumplir y garantizar el pago de las CUOTAS y la realización de los PAGOS, CCP se comprometió a ceder los flujos dinerarios provenientes de su negocio para respaldar a IIG por las facilidades otorgadas.

**TERCERA: OBJETO**

El objeto del CONTRATO es establecer las condiciones para un adecuado control de los pagos de las OPERACIONES CREDITICIAS, así como del flujo dinerario que CCP genere a fin de lograr su reordenamiento económico y financiero, asegurando de esa forma la fuente de pago de tales operaciones.

**CUARTA: DE LOS DERECHOS DE COBRO Y FLUJOS DINERARIOS**

4.1   Los depósitos en la CUENTA RECAUDADORA DOLARES o SOLES podrán realizarse:

a.   Mediante transferencias o depósitos; o,

b.   Mediante cheques girados a la orden de CCP.

4.2   CCP se obliga a causar y causará, bajo responsabilidad y sin reserva, excepción o limitación alguna:

a.   Que los pagos que los CLIENTES abonen en otras entidades bancarias distintas a LAS CUENTAS RECAUDADORAS sean transferidos a estas como parte de los FLUJOS DINERARIOS afectados en respaldo de los créditos otorgados por IIG a CCP.

b.   A que cualquier modificación y/o cambio de condición a las COMPRAVENTAS y/o DERECHOS DE COBRO y/o las relaciones comerciales con los CLIENTES, sea informada a IIG.

**QUINTA: DE LA ADMINISTRACIÓN DE LAS CUENTAS**

5.1   En la CUENTA CRÉDITO REVOLVENTE IIG desembolsará los recursos dinerarios provenientes del uso de la Línea de Crédito Revolvente y desde dicha cuenta CCP cancelará a los proveedores de materias primas, insumos y carretes según las órdenes de compra emitidas de acuerdo a la explosión efectuada por su Área Industrial y valorizada por su Área de Logística, en los términos y condiciones pactados con cada uno de ellos.

Conductores y Cables del Perú S.A.C.
Atención: Fernando Barrón Villacorta
Dirección: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima.
Teléfono: + (511) 713 6000
Facsímil: + (511) 713 6002
E-mail: fernando.barron@ccp.com.pe

Para que surta efecto cualquier variación relacionada con las *direcciones electrónicas, el domicilio* o el número de facsímil de las partes, ésta deberá ser comunicada a la otra parte mediante comunicación escrita con una anticipación de por lo menos (5) cinco días calendario desde la fecha en que la modificación entraría en vigencia. En dicha comunicación se deberá hacer expresa referencia a que dicha variación se encuentra referida a las direcciones y/o al número de facsímil *señalado en la presente cláusula.*

**OCTAVA: GASTOS Y MAYORES COSTOS**

8.1    CCP asume íntegramente el pago y reembolso a IIG de cualesquiera gastos razonables que se deriven de este CONTRATO, incluso en razón de los documentos que deban emitirse, los mismos que deberán ser cancelados a simple requerimiento de IIG.

8.2    En caso CCP demorase cualquier pago o reembolso, la suma que corresponda pagar estará afecta, además, al pago de intereses compensatorios y moratorios y de cualquier otro concepto adicional a las tasas establecidas en el CONTRATO DE CRÉDITO.

8.3    IIG podrá, a su solo criterio y sin estar obligado a ello, financiar a CCP los gastos materia de la presente cláusula, en los términos y condiciones que IIG determine en su oportunidad.

**NOVENA: LEGISLACIÓN Y ARBITRAJE**

9.1    En todo lo no previsto en este documento, el CONTRATO se rige por la legislación de la República del Perú. Cualquier referencia a la legislación o norma específica alguna contemplada en este documento debe entenderse referida a la legislación de la República del Perú.

9.2    Las partes acuerdan que toda discrepancia o controversia que se suscite entre ellas en relación con la interpretación, ejecución, validez o eficacia del presente CONTRATO, procurará ser resuelta por las partes de buena fe mediante trato directo.

Las Partes acuerdan que toda discrepancia o controversia que se suscite entre ellas en relación con la interpretación, ejecución, validez o eficacia del presente Contrato, procurará ser resuelta por las Partes de buena fe mediante trato directo.

De no llegar las Partes en disputa a un acuerdo en el plazo de quince (15) días calendario, la controversia podrá ser sometida por las Partes a un arbitraje de derecho ante el Centro de Arbitraje de la Cámara de Comercio de Lima (el "Centro"), conforme al Reglamento del Centro, el mismo que las Partes declaran aceptar y conocer, y bajo la administración del Centro. El arbitraje de derecho se tramitará conforme al siguiente procedimiento:

-    El arbitraje se llevará a cabo por un Tribunal Arbitral compuesto de tres (3) miembros.



- El arbitraje se llevará a cabo conforme al Reglamento del Centro, a cuyas normas se someten las Partes en forma incondicional y las que declaran conocer y aceptar en su integridad.

- El Tribunal Arbitral se constituirá de la siguiente forma: cada una de las Partes designará un árbitro y el tercero será designado de común acuerdo por los árbitros ya designados. El tercer árbitro presidirá el Tribunal Arbitral. Si las Partes en conflicto fueran más de dos (2), las Partes se pondrán de acuerdo para la designación de los árbitros. Los árbitros así designados se pondrán de acuerdo sobre quien se desempeñará como presidente del Tribunal Arbitral. Si los tres (3) árbitros no llegasen a un acuerdo sobre el nombramiento del presidente del Tribunal Arbitral, dentro del plazo de diez (10) días calendario contado a partir de la fecha del nombramiento del tercer árbitro, el presidente será elegido por el Centro, a pedido de cualquiera de las Partes.

- En caso que una de las Partes no designe a su árbitro o las Partes no llegasen a un acuerdo sobre la designación de los tres (3) árbitros, dentro de un plazo de diez (10) días hábiles contado desde la fecha en que una de ellas manifieste por escrito su voluntad de acogerse a la presente cláusula, el árbitro o los árbitros que no haya(n) sido designado(s) será(n) nombrado(s) por el Centro.

- El Tribunal Arbitral tendrá un plazo de noventa (90) días hábiles desde su instalación para expedir el respectivo laudo arbitral, el cual será inapelable.

- El Tribunal Arbitral puede quedar encargado de determinar con precisión la controversia, así como otorgar una prórroga en caso fuera necesario para emitir el laudo.

- El lugar del arbitraje será en la ciudad de Lima, Perú y el idioma que se utilizará en el procedimiento arbitral será el castellano.

- Todos los gastos derivados del arbitraje, su desarrollo y posterior ejecución, incluyendo las tasas del Centro, los honorarios de los árbitros, los costos de funcionamiento del Tribunal Arbitral, los honorarios de los asesores legales y de cualquier otra índole, a los que razonablemente hayan tenido que recurrir las Partes, los costos y costas de los procesos judiciales que se inicien como consecuencia del laudo, incluyendo los de su ejecución y cualquier otro gasto que sea necesario, serán por cuenta de la Parte vencida en el arbitraje. De no existir una Parte totalmente vencida en el arbitraje, el Tribunal podrá, en equidad, disponer de manera distinta. Los gastos y costos correspondientes al arbitraje serán asumidos por la Parte que no se vea favorecida con la decisión del Tribunal Arbitral.

- El correspondiente laudo arbitral será definitivo e inapelable, a efectos de lo cual, las Partes renuncian expresamente a presentar cualquier acción y/o recurso de apelación ante una segunda instancia arbitral.

9.3   Sin perjuicio de lo establecido en el numeral 9.2 anterior, en caso se requiera efectuar cualquier tipo de cobranza en mérito de cualquiera de los Documentos del Préstamo, las Partes acuerdan que dicho proceso deberá ser resuelto ante los Jueces y Tribunales del Distrito Judicial de Lima –Cercado, renunciando las Partes a cualquier otra competencia,

sin reserva ni limitación alguna.

Suscrito por las partes en señal de conformidad en tres (3) ejemplares de un mismo tenor, en Lima, el 30 de setiembre de 2013.

Por "Conductores y Cables del Perú S.A.C."        Por "IIG Capital LLC As Agent"

Nombre: Fernando Barrón Villacorta          Nombre: Daniel Rochmann
Cargo: Gerente General                Cargo: Executive Director

**ADENDA AL CONTRATO DE PRÉSTAMO**

Conste por el presente documento, la Adenda al Contrato de Préstamo (la "Adenda") que celebran las personas que se indican a continuación:

**I.      EN CALIDAD DE PRESTAMISTA:**

-      **IIG CAPITAL LLC AS AGENT,** una sociedad constituida y existente de conformidad con las leyes del Estado de Nueva York, con domicilio para estos efectos en 1500 Broadway, Piso 17, Nueva York, Estados Unidos de América, quien procede representada por su *Executive Director*, señor Daniel Rochmann, identificado con Pasaporte Norte Americano 096617940, a quien en adelante se le denominará "IIG", en su calidad de agente de TOF  Cayman SPV ("TOF SPV"); y de la otra parte,

**II.     EN CALIDAD DE PRESTATARIO:**

-      **CONDUCTORES Y CABLES DEL PERÚ S.A.C.,** sociedad anónima cerrada constituida y organizada bajo las leyes de la República del Perú, inscrita en la partida electrónica No. 12313866 del Registro de Personas Jurídicas de la Oficina Registral de Lima, con Registro Único de Contribuyentes ("RUC") No. 20511445389, con domicilio para estos efectos en Av. Los Frutales 334 Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, representada por su Gerente General, señor Fernando Barrón Villacorta, identificado con DNI No. 08248191, facultado según poderes otorgados por mediante Junta General de Accionistas de fecha 27 de setiembre de 2013, a quien en adelante se le denominará "CCP".

Con la intervención de:

-      **CABLES Y CONDUCTORES NACIONALES S.A.C.,** una sociedad anónima cerrada constituida y organizada bajo las leyes de la República del Perú, inscrita en la partida electrónica No. 12313866 del Registro de Personas Jurídicas de la Oficina Registral de Lima, con RUC No. 20521834138, con domicilio para estos efectos en Av. Los Frutales 334 Fundo Monterrico Grande Oeste "A" distrito de Ate, provincia y departamento de Lima, representada por su Gerente General, señor Fernando Barrón Villacorta, identificado con DNI No. 08248191, facultado según poderes otorgados por mediante Junta General de Accionistas de fecha 27 de setiembre de 2013, a quien en adelante se le denominará, indistintamente, "CCN" o el "Fiador Solidario".

La presente Adenda se rige por los términos y condiciones que aparecen en las cláusulas siguientes:

**PRIMERA: ANTECEDENTES**

Con fecha 30 de setiembre de 2013, IIG y CCP, con intervención de CCN, suscribieron un contrato de préstamo en virtud del cual IIG le otorgó a CCP un préstamo hasta por US$ 16'000,000.00 (dieciséis millones y 00/100 Dólares) (el, "Préstamo"), según los términos y para los fines señalados en dicho documento (el, "Contrato").

**SEGUNDA: OBJETO**

2.1   Por medio de esta Adenda, las partes aquí intervinientes acuerdan ampliar el plazo de vigencia del Contrato hasta el 31 de marzo de 2018.

2.2   En ese sentido, las partes disponen que las nueve (9) cuotas para la amortización del capital e intereses compensatorios del Préstamo a las que se hace referencia en el Contrato, serán canceladas a partir del 31 de julio de 2017 y hasta el 31 de marzo de 2018.

2.3   En virtud de lo anterior, las partes acuerdan modificar el Anexo I del Contrato en el cual figura el Cronograma de Pagos del Préstamo, el cual quedará redactado como sigue:

### ANEXO I

### CRONOGRAMA DE PAGOS

| | Conductores y Cables del Peru S.A.C. | | |
|---|---|---|---|
| | Month | Principal Repayment | Prin. Balance |
| 0 | 30/09/2013 | - | **16,000,000.00** |
| 1 | 31/10/2013 | - | 16,000,000.00 |
| 2 | 30/11/2013 | - | 16,000,000.00 |
| 3 | 31/12/2013 | - | 16,000,000.00 |
| 4 | 31/01/2014 | - | 16,000,000.00 |
| 5 | 28/02/2014 | - | 16,000,000.00 |
| 6 | 31/03/2014 | - | 16,000,000.00 |
| 7 | 30/04/2014 | - | 16,000,000.00 |
| 8 | 31/05/2014 | - | 16,000,000.00 |
| 9 | 30/06/2014 | - | 16,000,000.00 |
| 10 | 31/07/2014 | - | 16,000,000.00 |
| 11 | 31/08/2014 | - | 16,000,000.00 |
| 12 | 30/09/2014 | - | 16,000,000.00 |
| 13 | 31/10/2014 | - | 16,000,000.00 |
| 14 | 30/11/2014 | - | 16,000,000.00 |
| 15 | 31/12/2014 | - | 16,000,000.00 |
| 16 | 31/01/2015 | - | 16,000,000.00 |
| 17 | 28/02/2015 | - | 16,000,000.00 |
| 18 | 31/03/2015 | - | 16,000,000.00 |
| 19 | 30/04/2015 | - | 16,000,000.00 |
| 20 | 31/05/2015 | - | 16,000,000.00 |
| 21 | 30/06/2015 | - | 16,000,000.00 |
| 22 | 31/07/2015 | - | 16,000,000.00 |
| 23 | 31/08/2015 | - | 16,000,000.00 |
| 24 | 30/09/2015 | - | 16,000,000.00 |
| 25 | 31/10/2015 | - | 16,000,000.00 |

| 26 | 30/11/2015 | - | 16,000,000.00 |
|---|---|---|---|
| 27 | 31/12/2015 | - | 16,000,000.00 |
| 28 | 31/01/2016 | - | 16,000,000.00 |
| 29 | 29/02/2016 | - | 16,000,000.00 |
| 30 | 31/03/2016 | - | 16,000,000.00 |
| 31 | 30/04/2016 | - | 16,000,000.00 |
| 32 | 31/05/2016 | - | 16,000,000.00 |
| 33 | 30/06/2016 | - | 16,000,000.00 |
| 34 | 31/07/2016 | - | 16,000,000.00 |
| 35 | 31/08/2016 | - | 16,000,000.00 |
| 36 | 30/09/2016 | - | 16,000,000.00 |
| 37 | 31/10/2016 | - | 16,000,000.00 |
| 38 | 30/11/2016 | - | 16,000,000.00 |
| 39 | 31/12/2016 | - | 16,000,000.00 |
| 40 | 31/01/2017 | - | 16,000,000.00 |
| 41 | 28/02/2017 | - | 16,000,000.00 |
| 42 | 31/03/2017 | - | 16,000,000.00 |
| 43 | 30/04/2017 | - | 16,000,000.00 |
| 44 | 31/05/2017 | - | 16,000,000.00 |
| 45 | 30/06/2017 | - | 16,000,000.00 |
| 46 | 31/07/2017 | 3,200,000.00 | 12,800,000.00 |
| 47 | 31/08/2017 | 3,200,000.00 | 9,600,000.00 |
| 48 | 30/09/2017 | 3,200,000.00 | 6,400,000.00 |
| 49 | 31/10/2017 | 1,066,666.66 | 5,333,333.34 |
| 50 | 30/11/2017 | 1,066,666.66 | 4,266,666.68 |
| 51 | 31/12/2017 | 1,066,666.66 | 3,200,000.02 |
| 52 | 31/01/2018 | 1,066,666.66 | 2,133,333.36 |
| 53 | 28/02/2018 | 1,066,666.66 | 1,066,666.70 |
| 54 | 31/03/2018 | 1,066,666.70 | 0.00 |

## TERCERA: INALTERABILIDAD

Todos los términos, condiciones y alcances del Contrato que no hayan sido modificados mediante la presente Adenda, se mantendrán inalterables y con pleno vigor.

## CUARTA: GASTOS

CCP asumirá íntegramente todo pago relacionado con la elaboración, suscripción y/o formalización de este documento.

Lima, 12 de mayo de 2015.

Por "Conductores y Cables del Perú S.A.C."     Por "Conductores y Cables Nacionales S.A.C."

Nombre: Fernando Barrón Villacorta          Nombre: Fernando Barrón Villacorta
Cargo: Gerente General                       Cargo: Gerente General


Por "IIG Capital LLC.":


Nombre: Daniel Rochmann
Cargo: *Executive Director*