# EXHIBIT I

US$ 5'000,000.00

# CONTRATO DE LÍNEA DE CRÉDITO REVOLVENTE

**De fecha**

**20 de diciembre del 2017**

**entre**

**CONSORCIO CEPER INTL**
**como Prestatario**

**y**

**TRADE FINANCE TRUST**
**como Prestamista**

## CONTRATO DE LÍNEA DE CRÉDITO REVOLVENTE

Conste por el presente documento, el Contrato de Línea de Crédito Revolvente (el "Contrato") que celebran las personas que se indican a continuación:

### I.   EN CALIDAD DE PRESTAMISTA:

- **TRADE FINANCE TRUST**, una sociedad constituida y existente de conformidad con las leyes del Estado de Delaware, con domicilio en 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, Estados Unidos de América, quien procede representada por IIG TRADE FINANCE LLC, en calidad de administrador, quién a su vez procede representada por [-Carlos Cano-], identificado con Pasaporte No. 424141529, a quien en adelante se le denominará "TFT"; y de la otra parte,

### II.   EN CALIDAD DE PRESTATARIO:

- **CONSORCIO CEPER INTL**, un consorcio formado por las empresas CABLES Y CONDUCTORES NACIONALES SAC y CONDUCTORES Y CABLES DEL PERÚ SAC, con domicilio en Av. Los Frutales 334, Ate, Lima, Perú, debidamente representado por el Fernando Segundo Jesús Barrón Villacorta, identificado con DNI No. 08248191, quienes, de acuerdo con el contrato de consorcio, se obligan solidariamente al cumplimiento de las obligaciones del Contrato, según poderes establecidos en el contrato de consorcio correspondiente, a quien en adelante se le denominará "CCI".

TFT y CCI serán denominados conjuntamente como las "Partes" e individualmente como "Parte". El Contrato se rige por los términos y condiciones que aparecen en las cláusulas siguientes:

### PRIMERA: DEFINICIONES Y GENERALIDADES

1.1   Para efectos del presente Contrato, todas las palabras que después de aparecer inicialmente entre comillas, sean de ahí en adelante utilizadas con su primera letra en mayúscula son términos definidos y tendrán el significado previsto para ellos en esta cláusula. Las definiciones acordadas por las Partes para los términos definidos contenidos en esta cláusula corresponden al significado que las Partes han asignado a dichos términos y dicho significado será el único aceptado para todos los efectos, a menos que las Partes lo acuerden de otra forma por escrito.

Acuerdo de Llenado de Pagaré: tiene el significado establecido en la Cláusula Octava del Contrato.

Autoridad: es cualquier entidad que ejerza funciones ejecutivas, legislativas, judiciales o arbitrales, regulatorias o administrativas, del gobierno nacional, regional o municipal, que correspondan a funciones de gobierno y ejerzan jurisdicción sobre CCI o materias en cuestión, sus bienes o actividades y que sean competentes según la legislación peruana.

Borrowing Base Certificate o Solicitud de Desembolso: significa el documento que prepara CCI en el cual CCI solicita el envío de Desembolsos en base a la totalidad de Garantías que tenga disponible y el monto de sumas adeudas de la Línea, de acuerdo al formato establecido en el Anexo III de este Contrato. Este documento es verificado y aprobado por TFT previo al envío de Desembolsos.

Centro: tiene el significado que se le atribuye en el numeral 9.3 del Contrato.

CCI: tiene el significado que se le atribuye en la introducción de este Contrato.

Clientes Cedidos: significa cualquier persona y/o entidad domiciliada o no en la República del Perú que celebre con CCI varios contratos, instrumentos y/o órdenes de pago que sean generadores de Derechos de Cobro..

Contrato: tiene el significado que se le asigna en el encabezado del presente documento.

Control Efectivo: una persona (natural o jurídica) tiene Control Efectivo del consorcio cuando: (i) posee, de manera directa o indirecta, una representación en su órgano administrativo equivalente, superior al cincuenta por ciento (50%) de sus integrantes; o, (ii) por cualquier medio no previsto anteriormente (sea contractual o no) controla el poder de decisión al interior de la otra persona.

Cuenta Escrow: es la cuenta escrow abierta y constituida por CCI y TFT en el Banco de Crédito del Perú - BCP, en virtud del cual: (i) los Clientes Cedidos pagarán los Derechos de Cobro a favor del CCI; (ii) el CCI se comprometerá a aplicar los referidos fondos para cubrir las sumas que adeude a TFT conforme al Contrato y demás pagos relacionados al negocio; y (iii) TFT supervisará el manejo del consorcio.

Derechos de Cobro: son todos los derechos de cobro bajo los contratos, instrumentos y órdenes de compra que CCI celebre con sus Clientes Cedidos y que tengan conexión con el uso del crédito establecido en el presente Contrato.

Desembolsos: significa uno o más desembolsos efectuados por TFT a CCI en mérito del Contrato, que acumulativamente equivalen a la Línea.

Día Hábil: significa un día en el cual los bancos están abiertos al público en el domicilio de la jurisdicción de CCI y de TFT. Esta definición no incluye a los días sábados, domingos y los feriados no laborables en la provincia de Lima reconocidos por el Estado peruano, o en el Estado de Nueva York, Estados Unidos de América.

Distribuciones: significa toda utilidad u otra distribución o liquidación de utilidad establecida en el contrato de consorcio que da origen a CCI.

Documentos de la Línea: son (i) este Contrato; (ii) el Pagaré; (iii) el Acuerdo de Llenado y (iv) la Solicitud de Desembolso o el *Borrowing Base Certificate*.

Dólares y/o (US$): significan, indistintamente, la moneda de curso legal de los Estados Unidos de América.

Efecto Sustancialmente Adverso: es aquél causado por un evento que afecta adversamente y de manera sustancial: (i) la condición financiera y/o económica, operaciones, negocios, propiedades y/o perspectivas de CCI; (ii) los derechos o remedios de TFT bajo cualquiera de los Documentos de la Línea; (iii) la capacidad de CCI de cumplir con las obligaciones establecidas en los Documentos de la Línea; o, (iv) la legalidad, vigencia, validez o ejecutabilidad de las obligaciones generadas a partir de los Documentos de la Línea.

Eventos de Incumplimiento: son todos y cada uno de los eventos contenidos bajo esta definición conforme a la Cláusula Sexta de este Contrato.

Fecha de Desembolso: significa la fecha en que se cumplan las Condiciones Precedentes al Desembolso que se encuentran fijadas en el numeral 3.1 de la Cláusula Tercera del presente Contrato u otra fecha fijada de común acuerdo por las Partes.

Fecha de Vencimiento: significa lo que ocurra primero de: (i) la fecha en que se cumpla el plazo del Contrato o (ii) cualquier fecha distinta a la fecha indicada anteriormente, en la cual la totalidad de los Desembolsos efectuados por el Prestamista en mérito de la Línea y los intereses compensatorios y moratorios aplicables a los mismos sean exigibles.

Garantías: tiene el significado que se le atribuye en la Cláusula Octava de este Contrato.

Impuesto General a las Ventas: es el impuesto que grava, entre otros, la prestación o utilización de servicios en el Perú, de conformidad con lo establecido en el T.U.O de la Ley del Impuesto General a las Ventas e Impuesto Selectivo al Consumo, aprobado mediante Decreto Supremo 055-99-EF y en su Reglamento, aprobado mediante Decreto Supremo 29-94-EF.

Línea: es la línea de crédito revolvente que por el presente Contrato TFT otorga a CCI, hasta por la suma de US$ 5'000,000.00 (cinco millones y 00/100 Dólares), según los términos y condiciones que constan en los Documentos de la Línea.

Órdenes de Compra Elegibles: serán las órdenes de compra que apruebe TFT respecto de los Clientes Cedidos.

Pagaré: es el pagaré emitido por CCI como consecuencia de la suscripción de este Contrato, de conformidad con la Cláusula Octava del Contrato.

Participantes: significa (i) CABLES Y CONDUCTORES NACIONALES SAC y (ii) CONDUCTORES Y CABLES DEL PERÚ SAC, quienes son miembros del contrato de consorcio denominado "CONSORCIO CEPER INTL".

Prestamista: tiene el significado que se le atribuye en el encabezado de este Contrato.

Prestatario: tiene el significado que se le atribuye en el encabezado de este Contrato.

Perú: significa la República del Perú.

Proceso Concursal: significa un proceso por el que se busque llegar a un juicio, resolución, acuerdo o transacción para la insolvencia, concurso, quiebra, rehabilitación, reorganización, administración, disolución, liquidación u otra resolución similar con respecto a CCI o sus deudas o activos, el cual incluye el Procedimiento Concursal Ordinario, el Procedimiento Concursal Preventivo, así como cualquier otro proceso de naturaleza concursal regulado por la normativa concursal en el Perú, particularmente por la Ley General del Sistema Concursal, promulgada mediante Ley 27809 y publicada en el diario oficial "El Peruano" o por la norma que la sustituya en el futuro, o por el que se busque la designación de un fiduciario, receptor, liquidador, conservador, administrador, síndico, junta de acreedores, comité de acreedores u otro sujeto similar de CCI, o una parte sustancial de sus activos, bajo cualquier legislación en materia concursal, de reestructuración patrimonial, insolvencia, quiebra, cesión de pagos u otra similar que regule a CCI, particularmente por la referida Ley General del Sistema Concursal.

Subsidiaria: con respecto a las personas jurídicas miembro de CCI, es: (i) toda persona jurídica de cuyas acciones representativas del capital social o participaciones sociales, los Participantes de CCI sean propietarias en todo o en un porcentaje mayor al cincuenta por ciento (50%) de su capital social, ya sea directamente o a través de otra Subsidiaria; y, (ii) toda persona jurídica sobre la cual los Participantes ejerzan un Control Efectivo.

Tasa Mínima de Interés: la tasa mínima de interés compensatoria que TFT cobrará a CCI será de 8.2% efectiva anual.

Tasa de Intereses Moratorios: tiene el significado que se le atribuye en el numeral 3.5 de la Cláusula Tercera este Contrato.

TFT: tiene el significado que se le atribuye en la introducción del Contrato.

Tributos: es cualquier impuesto, tasa, contribución o retención o cualquier otro tributo existente o futuro que puede ser aplicable en cualquier jurisdicción y que esté vinculado a los Documentos de la Línea, incluido cualquier interés, recargo, multa o sanción relativa a los mismos excluyendo, en el caso de TFT, cualesquiera tributos que grave su renta o utilidad. La definición de Tributos incluye la del Impuesto General a las Ventas tal como ha sido definido en la presente cláusula, cuando esta última definición no sea identificada en forma particular y el impuesto a la renta sobre los intereses compensatorios y moratorios a favor de TFT.

1.2     Salvo que expresamente se indique lo contrario o el contexto así lo requiera, en la interpretación de este Contrato deberán observarse las siguientes reglas:

(i)     El singular incluye al plural y viceversa.

(ii)    La referencia a cualquier género incluye al otro género.

(iii)   La referencia a cualquier contrato (incluyendo este Contrato y sus Anexos), documento o instrumento se entiende efectuada a tal contrato, documento o instrumento tal como pueda ser modificado o regulado de tiempo en tiempo de acuerdo con los términos contenidos en cada uno de ellos y, de ser aplicables, de acuerdo con los términos contenidos en este Contrato.

(iv)   Salvo que el contexto exija una interpretación en sentido contrario, la referencia a cualquier Cláusula, Sección o Anexo significa aquella Cláusula, Sección o Anexo de este Contrato.

(v)    "Incluyendo" (y, consiguientemente, "incluye", "incluido" o "incluso") significa que comprende aquello que a continuación se indica, sin limitar la generalidad de la descripción que precede al uso de dicho término.

(vi)   Cualquier referencia a "Parte" o "Partes" en este Contrato deberá entenderse efectuada a una parte o las partes de este Contrato, según sea el caso.

## SEGUNDA: OBJETO

En vista de la solicitud efectuada por CCI, TFT ha decidido concederle la Línea, la misma que ambas Partes, de mutuo acuerdo, han decidido sujetar a las disposiciones estipuladas en este Contrato.

En virtud de lo anterior, con el objeto de quedar legalmente obligados en términos del Contrato, TFT y CCI convienen en que CCI utilizará la Línea para la finalidad descrita en el numeral 3.2 siguiente.

## TERCERA: TÉRMINOS Y CONDICIONES DE LA LÍNEA

3.1    Condiciones Precedentes al Desembolso

La Línea se otorgará mediante uno o, acumulativamente, varios Desembolsos en el banco y la cuenta que CCI indique en la Solicitud de Desembolso, previa aprobación de TFT.

El(los) Desembolso(s) estarán sujetos a las condiciones siguientes:

- La existencia de Órdenes de Compra Elegibles..

- Que el representante legal de CCI certifique la existencia de los bienes que se comprarán con el uso del Desembolso, información que debe estar contenida en cada Solicitud de Desembolso.

- La suscripción de los Documentos de la Línea, incluyendo la Solicitud de Desembolso respectiva.

El 100% de los fondos depositados a través de los Desembolsos podrán utilizarse para (i) la adquisición de cobre o (ii) cualquier otro producto que genere Derechos de Cobro, siempre que sea aprobado por TFT.

CCI cederá y transferirá a favor de TFT todos los derechos que le corresponden respecto del cobro de todos los Derechos de Cobro que se originen de las ventas de los productos terminados efectuados a los Clientes Cedidos. En la nota de cesión que se incorpore en los comprobantes de pago que contemplen los Derechos de Cobro antes mencionados se deberá indicar que los mismos se ceden a favor de TFT y que éstos deben ser pagados mediante depósitos en la cuenta que TFT indique a CCI por escrito para tales efectos.

La referida cesión comprende todos los derechos que posee CCI que le corresponden respecto a los Derechos de Cobro que mantenga frente a los Clientes Cedidos, colocando a TFT en su mismo lugar y grado de privilegio, con toda la extensión y amplitud pertinente, subrogando además a TFT en todos los derechos o acciones que eventualmente existieran con respecto a los créditos derivados de dichos Derechos de Cobro. La cesión de los Derechos de Cobro antes mencionados no implica dación en pago de los préstamos adeudados por CCI a TFT; al contrario, al existir una cesión bajo responsabilidad de CCI, ésta queda obligada solidariamente con los Clientes Cedidos frente a TFT y no se extinguirá su responsabilidad deudora hasta que no pague todas las obligaciones que le adeude a TFT.

3.2    Destino de la Línea y Procedimiento

CCI se obliga a utilizar la Línea para financiar la compra de (i) cobre o (ii) cualquier otro producto que genere Derechos de Cobro, siempre que sea aprobado por TFT, conforme a las condiciones y el procedimiento que se establece en este Contrato.

CCI deberá remitir por cualquier medio escrito a TFT una Solicitud de Desembolso redactada según lo establecido en el <u>Anexo III</u> del presente Contrato, la cual deberá estar debidamente firmada por CCI.

Una vez que TFT hayan recibido la información necesaria y requerida, TFT procederá a transferir los fondos requeridos a la cuenta que CCI indique en la respectiva Solicitud de Desembolso.

3.3     <u>Plazo</u>

El plazo de cada Desembolso será de 90 días calendario computados desde que cada Desembolso se haya efectuado.

3.4     <u>Amortización</u>

CCI deberá amortizar el capital de cada Desembolso antes o dentro de los 90 días calendario luego de efectuado cada Desembolso o en la fecha de vencimiento de los comprobantes de pago que correspondan a los Derechos de Cobro, según corresponda.

La amortización de cada Desembolso será considerado devuelto o pagado en forma parcial o total cuando TFT reciba el pago de las sumas adeudadas por CCI dentro del plazo señalado en el numeral 3.3 precedente. Sin perjuicio de lo anterior, cada Desembolso deberá ser devuelto en un máximo de 90 días computados desde la fecha de desembolso. y contra la pre factura que emita el proveedor de los cátodos de Cobre.

Se deja constancia que CCI pagará las obligaciones derivadas del Contrato a través de las ventas que realice a los Clientes Cedidos, cuyas contraprestaciones serán depositadas en la Cuenta Escrow.

Si los Desembolsos y/o los intereses compensatorios (según estos se definen en el numeral 3.6 siguiente) no fuesen pagados por CCI a TFT según los plazos indicados en este Contrato y/o al vencimiento de este Contrato, por cualquier causa que fuere, ello generará la obligación de CCI de abonar a TFT el importe total o el saldo adeudado correspondiente a dichos Desembolsos y/o a dichos intereses compensatorios, vencidos e impagos, hasta dentro de un plazo máximo de quince (15) días hábiles de ser requerido por escrito por parte de TFT, abonando a su vez, los intereses moratorios que se devenguen a la tasa que se indica en el numeral 3.5 siguiente.

La mora de CCI se producirá automáticamente, sin necesidad de intimación por parte de TFT y de pleno derecho por el solo vencimiento del plazo indicado en el párrafo precedente, a partir del cual CCI deberá abonar los intereses moratorios antes mencionados, hasta la efectiva y total cancelación del monto adeudado, ya sea que éste corresponda a los Desembolsos, a los intereses compensatorios y/o a ambos.

3.5     <u>Tasa de intereses moratorios</u>

CCI pagará a TFT, en adición al interés establecido en el numeral 3.6 siguiente, intereses moratorios equivalentes a 5% anual del monto vencido y no pagado por arriba de la Tasa Mínima de Interés.

3.6.    <u>Intereses compensatorios</u>

Los intereses diarios se calcularán multiplicando la Tasa Mínima de Interés por el saldo insoluto de cada uno de los Desembolsos y por el cociente obtenido al dividir el número de días por los que se calculen los intereses entre 360 (trescientos sesenta).

CCI deberá pagar a TFT todos los intereses compensatorios que se generen en mérito de los Desembolsos, cada 90 días calendario, a partir de cada Desembolso. En caso que CCI pre-pague los Desembolsos, el cálculo de los intereses se deberá realizar acorde con la fecha del pre-pago correspondiente.

3.7     Pagos

Todos los pagos que realice CCI bajo este Contrato deberán hacerse mediante depósito de las cantidades adeudadas en la cuenta que TFT designe e instruya a CCI por escrito.

En todos los casos cada pago a cargo de CCI deberá considerar por lo menos tres (3) Días Hábiles para el procesamiento de dicho pago. Sin perjuicio de ello, se deja constancia que los intereses únicamente se devengarán hasta el pago efectivo de los mismos.

3.8     Aplicación de los Pagos

Todos los pagos que reciba TFT serán aplicados al pago de la Línea y de los intereses compensatorios y/o de los intereses moratorios, según corresponda, de acuerdo con lo contemplado en el presente instrumento.

3.9     Lugar y hora para pagos

Los pagos que deba realizar CCI a favor de TFT conforme al Contrato deberán estar disponibles para TFT, con fondos de disponibilidad inmediata que provengan de los pagos efectuados por los Clientes Cedidos a la Cuenta Escrow, a más tardar a las 12 horas, hora de Nueva York, Estados Unidos de América, en la cuenta y lugar que TFT designe e instruya por escrito.

3.10    Pago de Tributos y demás recargos

El pago de los Desembolsos, intereses, gastos y otros cargos y comisiones conforme con este Contrato se efectuará por CCI sin deducción alguna por concepto de Tributos u otros recargos vigentes en la Solicitud de Desembolso o que sean establecidos con posterioridad a estas fechas. Sin perjuicio de ello, en caso sea exigible a TFT algún pago por los conceptos antes mencionados, CCI deberá pagar a TFT cantidades que permitan que el monto neto resultante, luego de pagar, retener o de cualquier otra forma descontar la totalidad de los Tributos u otros recargos entonces vigentes, sea igual a la totalidad de las prestaciones pactadas que TFT tiene derecho a recibir conforme a lo estipulado en este Contrato.

3.11    Vigencia

Sin perjuicio de los plazos descritos en los numerales precedentes, las Partes acuerdan que las tasas de interés, penalidades y gastos se mantendrán vigentes de acuerdo con lo señalado en la Cláusula Undécima.

3.12    Pagos Anticipados

CCI tiene la facultad de pagar, parcial o totalmente cada Desembolso, con anticipación al plazo descrito en el numeral 3.3 anterior y sin penalidades de ninguna naturaleza, los montos que adeude en mérito de la Línea.

## CUARTA: DECLARACIONES Y GARANTÍAS DE CCI

CCI declara y garantiza a TFT que:

4.1    Es un consorcio constituido, organizado y válidamente existente y en buena posición ante las leyes aplicables del Perú y que cuentan con todos los poderes y las autorizaciones requeridas para conducir sus negocios y para cumplir con los derechos y obligaciones establecidos bajo este Contrato y los Documentos de la Línea.

4.2    El Contrato y cualquier otro documento a ser celebrado o emitido con relación a este Contrato constituirán actos o negocios jurídicos válidos que están legalmente autorizados para realizar en virtud de las leyes aplicables de Perú a su rubro de negocios. Además, el Contrato y cualquier Documento de la Línea constituirán obligaciones legalmente vinculantes de CCI, exigibles contra la misma de acuerdo con las cláusulas contenidas en dichos documentos, sujeto a las leyes concursales aplicables y cualquier otra ley similar que afecte, en forma general, el derecho de los acreedores en cualquier proceso concursal de acuerdo con las reglas aplicables en vigencia.

4.3    La celebración, ejecución y cumplimiento de este Contrato y/o de cualquier otro Documento de la Línea se encuentran dentro del giro de negocio de CCI, fueron debidamente autorizados por los órganos pertinentes; y no violan: (i) el contrato de consorcio correspondiente; (ii) ninguna ley, decreto, reglamento o derecho que pueda ser aplicable; (iii) ninguna resolución o decisión expedida por cualquier corte u otra dependencia judicial o administrativa que pudiera ser aplicable; o, (iv) ningún contrato, hipoteca, garantía mobiliaria, instrumento o compromiso legalmente vinculante que pudiera ser aplicable.

4.4    No han incumplido la ejecución de acuerdo, contrato, deber, compromiso u obligación respecto del cual pudiera esperarse razonablemente que origine un Efecto Sustancialmente Adverso.

4.5    No existe mejor derecho, gravamen, restricción, limitación u obstáculo que evite, prohíba o limite, de cualquier manera, la facultad o derechos de ambas para celebrar y firmar cualquier documento que pueda ser necesario para el otorgamiento y perfeccionamiento del Contrato y de cualquier Documento de la Línea.

4.6    Los Desembolsos efectuados por TFT en mérito de la Línea serán afectados y utilizados, exclusiva y excluyentemente, al cumplimiento de lo establecido en la Cláusula Segunda del Contrato, de conformidad con los términos y condiciones de este Contrato y los Documentos de la Línea.

4.7    Es condición esencial de este Contrato que cualquier monto de capital, intereses compensatorios y moratorios, comisiones, y demás sumas a ser pagadas a TFT derivados de la Línea o los Documentos de la Línea, se cancelen en Dólares.

4.8    Las obligaciones en virtud de este Contrato tienen y tendrán por lo menos la misma preferencia para el pago (*pari passu*) y para cualquier otro asunto respecto de cualquier otra obligación no garantizada de CCI, a excepción de los créditos preferentes en virtud

de cualquier norma general, laboral, tributaria, concursal, de reestructuración empresarial, insolvencia, compensación de capital, liquidación o similar.

4.9 No tiene endeudamiento significativo, pérdidas anticipadas y no han asumido compromisos inusuales o de largo plazo fuera de los previstos en sus proyecciones financieras que puedan generar un Efecto Sustancialmente Adverso.

4.10 No existe investigación, procedimiento o litigio alguno relacionado a CCI que puedan generar un Efecto Sustancialmente Adverso.

4.11 No existe cambio en el negocio, situación (financiera u otra), operaciones o bienes de CCI que razonablemente pudiera causar un Efecto Sustancialmente Adverso.

4.12 En caso de incumplimiento de CCI, TFT tiene el derecho de compensar cualquier obligación que tenga a favor de CCI contra las obligaciones pendientes de pago a cargo de estas últimas.

4.13 Están sujetas a leyes civiles y comerciales del Perú y no cuentan con inmunidad ante corte alguna o en proceso judicial alguno.

4.14 Los estados financieros serán preparados de acuerdo con los principios de contabilidad generalmente aceptados en el Perú y los mismos y toda la información que han entregado a TFT para la celebración de este Contrato son correctos, completos y ciertos.

CCI certifica que las declaraciones incluidas en esta cláusula son verdaderas y reconocen que inducen a TFT a celebrar el Contrato y que se mantendrán como verdaderas al momento de presentación de cada Solicitud de Desembolso.

## QUINTA: OBLIGACIONES DE CCI

5.1 Obligaciones positivas o de hacer

Mientras todos los montos adeudados a TFT bajo la Línea no hayan sido cancelados conforme a lo establecido en este Contrato, CCI se obliga a (salvo autorización en contrario de TFT, en forma expresa y por escrito):

(i) Cumplir en todos los aspectos sustanciales con todas las leyes, ordenanzas, reglamentos, resoluciones, circulares, regulaciones y requerimientos de todas las autoridades gubernamentales (incluyendo, pero no limitándose a las licencias, certificados, permisos, y otras autorizaciones gubernamentales necesarias para la propiedad y posesión de sus activos o para la conducción de su negocio; normas del medio ambiente y leyes relacionadas a la seguridad social y a las obligaciones de fondos de pensiones).

(ii) Cumplir con los términos y condiciones del Contrato y los Documentos de la Línea.

(iii) Contratar y/o mantener vigentes póliza(s) de seguro(s) cubriendo los activos de la empresa contra todo tipo de riesgo. Las pólizas antes mencionadas deberán cubrir el costo de reparación o de reemplazo de los activos en caso de cualquier siniestro.

(iv) Preservar y mantener su existencia y los permisos, licencias y aprobaciones requeridas para el desarrollo de su negocio.

(v) Dar a representantes de TFT acceso a las instalaciones de CCI a fin que se efectúen las verificaciones e inspecciones que TFT estime necesarias. Asimismo, permitir que representantes de TFT obtengan información de los libros, registros y documentos que estuvieran relacionados con la operatividad de CCI y el cumplimiento de las obligaciones de CCI bajo este Contrato.

(vi) Informar inmediatamente a TFT y como máximo dentro de los dos (2) Días Hábiles de su conocimiento sobre cualquier Efecto Sustancialmente Adverso.

(vii) CCI deberá cumplir con el pago de Tributos de cualquier naturaleza ante la Superintendencia Nacional de Administración Tributaria del Perú, así como remitir a TFT: (a) la Declaración Jurada Anual del Impuesto a la Renta; y, (b) constancia de pago de Tributos emitida por el banco receptor del pago.

La documentación indicada en este numeral deberá ser enviada a TFT dentro de los tres (3) Días Hábiles de efectuado el pago de los Tributos.

(viii) Entregar a TFT toda la información razonable que TFT pudiera requerirle relacionada con los Documentos de la Línea.

(ix) Proveer a TFT: (i) sus estados financieros con una periodicidad trimestral, los cuales deben ser remitidos dentro de los cuarenta y cinco (45) días siguientes al fin de cada trimestre; (ii) sus estados financieros auditados, los cuales deben ser remitidos dentro de los noventa (90) días siguientes al cierre del ejercicio anual.

Los estados financieros incluirán el Balance General, el Estado de Pérdidas y Ganancias, el Estado de Flujo de Efectivo el Estado de Cambios en el Patrimonio Neto completos y la carta de opinión –incluyendo las notas- debidamente firmada por los auditores de CCI.

(x) Cuando corresponda, contratar una póliza de seguros contra todo riesgo sobre los bienes que financie TFT, endosando la póliza de seguros a favor de TFT como único beneficiario, dentro de los tres (3) Días Hábiles de recibida la póliza.

(xi) CCI reconoce que TFT tiene la potestad de enviar auditores y contadores a las oficinas y/o instalaciones de CCI con la finalidad de revisar la información financiera, económica y contable, inventarios y/o cualquier otro tipo de información de CCI, los miembros del consorcio y sus Subsidiarias, en la oportunidad que TFT estime conveniente, obligándose CCI a brindar las facilidades necesarias y asumir los costos derivados de la auditoria. TFT deberá notificar a CCI con una anticipación de dos (2) Días Hábiles a efectos que CCI reúna adecuadamente la información solicitada por TFT.

5.2 Obligaciones negativas o de no hacer

Mientras todos los montos adeudados a TFT bajo la Línea no hayan sido pagados conforme a lo establecido en el presente Contrato, CCI se obliga a (salvo autorización en contrario de TFT en forma expresa y por escrito):

(i) No efectuar Distribuciones.

(ii)   No transferir, delegar o ceder la Línea ni su posición contractual en el Contrato, bajo supuesto alguno ni modalidad alguna.

(iii)  No realizar cambio significativo alguno en el giro principal y naturaleza de sus negocios, consistente en la producción de laminado y trefilado de alambres y productos similares, fabricación de conductores eléctricos y sus accesorios, comercializando dichos productos en el Perú y en el extranjero.

(iv)   No resolver el contrato de consorcio que crea a CCI o que CCI adquiera empresas, cualquiera sea su actividad, de manera tal que pueda generarse un Efecto Sustancialmente Adverso y/o que pueda resultar en un Evento de Incumplimiento.

(v)    No transferir o dar en arrendamiento financiero sus activos, salvo en los siguientes casos: (a) activos que conformen su inventario y que sean realizados en el curso ordinario de su negocio, y, (b) venta de activos en desuso u obsoletos con relación a la operación de CCI.

(vi)   Ni directa o indirectamente, celebrar contratos, convenios, acuerdos, negocios o transacciones con terceros, que no sean en condiciones de mercado.

(vii)  No otorgar préstamos, garantizar o constituirse como fiador respecto de obligaciones de terceros, incluyendo a sus accionistas, directores y empleados, excepto por los préstamos otorgados y/o las garantías constituidas dentro del curso normal del negocio.

(viii) No subordinar el pago de las obligaciones contempladas en este Contrato a algún otro endeudamiento que CCI contraiga posteriormente.

## SEXTA: EVENTOS DE INCUMPLIMIENTO

TFT tendrá la facultad de considerar los montos adeudados como de plazo vencido y solicitar el pago de los mismos en los siguientes supuestos:

6.1   El incumplimiento de pago por parte de CCI de sus obligaciones dinerarias estipuladas en este Contrato, tales como el pago de los Desembolsos, la tasa de interés acordada por las Partes, comisiones y/o reembolso de gastos y pago de Tributos, en cada oportunidad de pago a TFT.

6.2   La comprobación que las Declaraciones y Garantías señaladas en la Cláusula Cuarta o en cualquier Documento de la Línea o información proporcionada por CCI a TFT dentro del marco de la Línea, haya sido falsa o sustancialmente incorrecta al momento de haber sido hecha la declaración o proporcionada dicha información.

6.3   El incumplimiento por parte de CCI de cualquier obligación a su cargo estipulada en este Contrato o en cualesquiera de los Documentos de la Línea.

6.4   Cambio en la estructura del contrato de consorcio que crea el consorcio CCI que signifique la pérdida por parte de sus Participantes del Control Efectivo de CCI o sus miembros en la suscripción del Contrato. Las modificaciones a la estructura del consorcio CCI estarán permitidas en la medida que los Participantes mantengan el Control Efectivo de la misma, directamente o a través de Subsidiarias y siempre que dichas modificaciones sean informadas previamente a TFT. Asimismo, se deja constancia que el presente numeral no es aplicable a la cesión de posición contractual

que realizará CONDUCTORES Y CABLES NACIONALES SAC a favor de CHAKANA LLC, cesión que se encuentra expresamente aprobada por TFT.

6.5 El reconocimiento por escrito de CCI de la imposibilidad de pago de deudas, o la cesión o abandono de bienes en beneficio de acreedores; o el inicio de un Proceso Concursal por parte de cualquiera de los miembros de CCI.

6.6 La declaración de procedencia de un embargo o medida cautelar sobre CCI o sus miembros, la expropiación, nacionalización o alguna otra acción que tenga un efecto similar por parte de cualquiera de los poderes ejecutivo, judicial, legislativo u otra Autoridad que generen un Efecto Sustancialmente Adverso.

6.7 La mora de CCI en el pago de sus obligaciones bajo cualquier operación de financiamiento o si cualquiera de estas obligaciones se volviese exigible antes de su vencimiento o fuese declarada vencida antes de la fecha prevista, a discreción de TFT.

6.8 La adopción en contra de CCI de cualquier fallo judicial, resolución administrativa o laudo arbitral en última instancia, a discreción de TFT.

6.9 La realización de algún tipo de modificación del consorcio CCI sin autorización de TFT cuando dicha reorganización genere un Efecto Sustancialmente Adverso.

6.10 Cualquier Efecto Sustancialmente Adverso en la situación de CCI.

6.11 El incumplimiento de cualquier obligación de CCI frente a TFT, en cualquier otro contrato que hayan suscrito las Partes, presentes o futuros.

6.12 En caso CCI utilice los recursos desembolsados en mérito de la Línea para financiar operaciones fuera del curso normal de sus negocios.

6.13 Si cualquier Autoridad impusiera una moratoria que tenga un Efecto Sustancialmente Adverso en los pagos de las obligaciones de CCI derivadas de este Contrato o los Documentos de la Línea.

6.14 En caso el Contrato y/o cualesquiera de los Documentos de la Línea fuese declarado nulo o inválido o ineficaz o inexigible por una Autoridad.

## <u>SÉTIMA</u>: ACCIONES DERIVADAS DE EVENTOS DE INCUMPLIMIENTO

En caso de producirse cualesquiera de los Eventos de Incumplimiento descritos en la Cláusula Sexta precedente, TFT podrá acumulativamente y a su solo criterio:

7.1 Otorgar a CCI un plazo máximo de quince (15) Días Hábiles para subsanar o corregir el Evento de Incumplimiento.

7.2 Declarar, mediante aviso escrito dirigido a CCI, todos los montos que CCI deban pagar en virtud del Contrato, que de otra forma sean exigibles con posterioridad a la fecha del aviso, como inmediatamente exigibles y pagaderos, para lo cual las Partes en este acto convienen en que, a partir de ese momento, tales montos serán exigibles y pagaderos, sin que medie diligencias, avisos, presentación para el pago, requerimiento judicial, protesto o cualesquiera otra formalidad, a todas las cuales CCI renuncian en forma expresa.

Para los efectos previstos en este numeral, CCI acepta que el efecto de la declaratoria de plazo vencido antes indicada, será el de permitir a TFT declarar de plazo vencido la totalidad de las obligaciones pendientes de pago y proceder al cobro inmediato de las sumas adeudadas, las cuales se consideraran, sin necesidad de notificación, protesto o requerimiento judicial de ninguna especie como líquidas, exigibles y pagaderas de inmediato.

7.3     Ejecutar todos los derechos y remedios que tenga disponibles de acuerdo a lo dispuesto por este Contrato o al amparo de lo dispuesto por las leyes que resulten aplicables, incluyendo, pero no limitándose a la ejecución del Pagaré y de cualquier otra garantía que se hubiera constituido a su favor.

7.4     Compensar cualquier obligación que tenga a favor de CCI contra las obligaciones pendientes de pago a cargo de éstos, aceptando CCI desde ya dichas compensaciones en forma expresa.

## OCTAVA: GARANTÍAS

Emisión de Pagaré

En forma simultánea a la suscripción del presente Contrato y con la finalidad de garantizar el fiel cumplimiento de las obligaciones de pago que se generen en mérito del mismo, CCI, a través de los Participantes, suscribirá el Pagaré que obra como Anexo I del Contrato.

El Pagaré se regirá por las condiciones siguientes:

(i)     CCI, a través de los Participantes, emitirá en favor de TFT un Pagaré incompleto, de acuerdo con el modelo contenido en el Anexo I.

(ii)    Dicho Pagaré será afianzado de manera solidaria por CONDUCTORES Y CABLES DEL PERÚ SAC.

(iii)   El Pagaré incorporará, adicionalmente, la obligación de pago de intereses compensatorios e intereses moratorios a las tasas pactadas en los términos de este Contrato.

(iv)    La emisión del Pagaré en los términos de esta cláusula, de conformidad con lo dispuesto por el artículo 1279 del Código Civil, no implicará la novación ni la suspensión de las obligaciones contraídas por CCI frente a TFT conforme a este Contrato, ni la modificación de los términos bajo los cuales fueron acordadas y, en consecuencia, las indicadas obligaciones de pago se entienden como exigibles en su integridad en cualquiera de los Eventos de Incumplimiento.

(v)     Como consecuencia de haber sido emitido el Pagaré por CCI en forma incompleta, a efectos de cumplir con lo dispuesto por la Ley de Títulos Valores, CCI autoriza, expresa e irrevocablemente, a TFT a completar el Pagaré de acuerdo con lo dispuesto por el Acuerdo de Llenado de Pagaré detallado en el Anexo II.

(vi)    Las Partes, en uso de la facultad que les confiere el artículo 1233 del Código Civil peruano, convienen expresamente en que la entrega o emisión del Pagaré o de cualquier título valor que constituya orden o promesa de pago, en ningún caso extinguirá la obligación primitiva ni aun cuando éstos hubiesen sido perjudicados por cualquier caso, incluso por causa imputable a TFT.

(vii)   TFT tendrá derecho a reclamar el pago a cargo de CCI de la suma desembolsada bajo el presente Contrato, ya sea sobre la base del Pagaré o del presente Contrato, de manera excluyente; sin que haya lugar a reclamar por ambas vías simultáneamente. Asimismo, se deja constancia que TFT podrá reclamar el pago que se indique en el Pagaré a CONDUCTORES Y CABLES DEL PERÚ SAC, en su calidad de fiador solidario.

## NOVENA: MONEDA DE PAGO

En los casos en que CCI deba pagar a TFT y/o a quien ésta indique, el importe total o el saldo adeudado de eventuales derechos cedidos derivados de facturas, CCI asume la obligación de verificar que dichos montos sean reintegrados en Dólares.

## DÉCIMA: AUTORIZACIÓN DE CESIÓN

10.1   TFT podrá ceder en todo o en parte, a favor de una sociedad, la posición contractual que ocupa en este Contrato y/o ceder los derechos y/o obligaciones que le confiere el mismo, sin que como consecuencia de esta cesión se vean modificados los términos y condiciones de las obligaciones de CCI bajo este Contrato.

CCI autoriza y consiente en forma expresa e irrevocable la cesión que efectúe TFT.

10.2   En tal sentido, CCI acepta expresamente a la cesión de posición contractual o derechos y/u obligaciones, siendo efectiva ésta desde la comunicación hacia CCI. En ese contexto, CCI se obliga a suscribir la documentación correspondiente, en caso sea necesaria, para que el cesionario tenga los mismos derechos y/o obligaciones que TFT tiene en el presente Contrato.

10.3   CCI no podrá ceder o transferir, total o parcialmente, su posición contractual ni cualquier derecho u obligación que le corresponde con arreglo a los términos del presente Contrato y/o los Documentos de la Línea, sin la autorización previa y por escrito de TFT.

## UNDÉCIMA: VIGENCIA

Este Contrato tendrá una vigencia de 12 meses calendario a partir de su suscripción el cual se renovará automáticamente, sin impedimento de que las Partes puedan confirmar por escrito su aceptación a la renovación.  El Contrato no se renovará si una de las Partes comunica por escrito a la otra, con una anticipación no menor a treinta (30) días calendario a la fecha de su terminación, su intención de no renovar el mismo. Sin perjuicio de lo anterior, las Partes acuerdan que el Contrato estará vigente mientras subsista suma alguna pendiente de pago y terminará con el pago total de toda suma adeudada bajo el Contrato y/o los Documentos de la Línea.

## DUODÉCIMA: NOTIFICACIONES

Todas las notificaciones y otras comunicaciones relacionadas con el Contrato y/o con los Documentos de la Línea serán cursadas en principio por correo electrónico y en idioma castellano e inglés y serán enviadas a las direcciones electrónicas detalladas al final de esta cláusula o a aquellas otras direcciones electrónicas que la Parte que desee modificarlas indique a la otra Parte mediante aviso escrito; dicha modificación será efectiva a partir de la fecha de entrega de la notificación. En el supuesto de fallas en la comunicación electrónica antes indicada, las Partes aceptan que las comunicaciones se efectúen vía facsímil a los números detallados a continuación o mediante entrega física a las direcciones indicadas posteriormente.

Las reglas anteriores rigen en forma primaria, salvo que de acuerdo al Contrato y/o con los Documentos de la Línea se requiera de notificación por la vía notarial. Las notificaciones se considerarán eficaces: (i) en la fecha de acuse de recibo del envío del correo electrónico; (ii) al momento de la confirmación de acuse de recibo del facsímil de destino, si son enviadas por facsímil; (iii) en la fecha de entrega, si son entregadas en forma personal; o, (iv) a la fecha de recepción, si son enviadas por correo certificado con cargo de recepción o por vía notarial.

Para los fines dispuestos en esta cláusula, las direcciones y números de facsímil de las Partes son:

TRADE FINANCE TRUST
Atención: Carlos Cano
Dirección: 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, Estados Unidos de América.
Teléfono: +1(917)242-5710
E-mail: CRCano@iigh.com

CONSORCIO CEPER INTL
Atención: Fernando Segundo Jesús Barrón Villacorta
Dirección: Av. Los Frutales 334, Ate
Teléfono: 713-6000 anexo 201
E-mail: fernando.barron@ceper.com.pe

Para que surta efecto cualquier variación relacionada con las direcciones electrónicas o el domicilio de las Partes, ésta deberá ser comunicada a la otra Parte mediante comunicación escrita con una anticipación de por lo menos (5) cinco días calendario desde la fecha en que la modificación entraría en vigencia. En dicha comunicación se deberá hacer expresa referencia a que dicha variación se encuentra referida a las direcciones y/o al número de facsímil señalado en la presente cláusula.

## DECIMO TERCERA: ILEGALIDAD

Independientemente de cualquier otra disposición contenida en este Contrato, si TFT informa a CCI que la promulgación o un cambio en la interpretación de cualquier norma convierte en ilegal el otorgamiento de la Línea o cualquier estipulación del Contrato y/o de los Documentos de la Línea o si cualquier Autoridad considera que es ilegal para TFT realizar uno o más Desembolsos o cualquier estipulación del Contrato y/o con los Documentos de la Línea o proveerse de fondos o mantener su compromiso de realizar Desembolso(s), el(los) Desembolso(s) se suspenderá(n) hasta que CCI informe a TFT que las circunstancias que originaron dicha suspensión ya no existen. Si TFT considera que será ilegal mantener o proveerse de fondos para otorgar la Línea, CCI deberá pre-pagar inmediatamente el total del monto adeudado a dicha fecha, conjuntamente con el interés compensatorio devengado. La opinión de TFT será definitiva y concluyente en todos los casos. Para efectos de lo señalado en esta cláusula, TFT deberá informar por escrito inmediatamente a CCI respecto de la legalidad o ilegalidad de mantener la Línea. En cualquier caso, CCI declara que TFT no asume responsabilidad por la suspensión de cualquier Desembolso.

## DECIMO CUARTA: GASTOS Y MAYORES COSTOS

14.1   CCI asume íntegramente el pago y reembolso a TFT de cualesquiera gastos razonables que se deriven de este Contrato y/o de los Documentos de la Línea, incluso

en razón de los documentos que deban emitirse, los mismos que deberán ser cancelados a simple requerimiento de TFT.

14.2    En caso CCI demorase cualquier pago o reembolso, la suma que corresponda pagar estará afecta, además, al pago de intereses compensatorios y moratorios y de cualquier otro concepto adicional a las tasas establecidas en este Contrato.

14.3    TFT podrá, a su solo criterio y sin estar obligado a ello, financiar a CCI los gastos materia de la presente cláusula, en los términos y condiciones que TFT determine en su oportunidad.

14.4    Si, como consecuencia de: (i) la publicación de o un cambio en la interpretación de cualquier norma legal que modifique el régimen tributario vigente; o, (ii) el cumplimiento de cualquier instrucción o solicitud del Banco Central de Reserva del Perú, la Superintendencia de Banca, Seguros y Administradoras Privadas de Fondos de Pensiones (sea que dicha instrucción o solicitud tenga o no fuerza de ley), se originase un incremento en el costo de TFT para acordar, otorgar, proveer de fondos o mantener su compromiso de desembolsar la Línea; CCI de tiempo en tiempo, de acuerdo a la solicitud de TFT, deberá pagar a ésta los montos adicionales que fuesen suficientes para compensar a TFT por dicho incremento en el costo. TFT deberá entregar a CCI un certificado en el que se indique la causa que originó ese mayor costo, así como el monto del incremento, el cual será definitivo y concluyente en todos los casos, salvo error manifiesto.

## DÉCIMO QUINTA: LEGISLACIÓN Y JURISDICCIÓN

15.1    En todo lo no previsto en este documento, el Contrato se rige por la legislación de la República del Perú. Cualquier referencia a la legislación o norma específica alguna contemplada en este documento, debe entenderse referida a la legislación de la República del Perú.

15.2    Las Partes acuerdan que toda discrepancia o controversia que se suscite entre ellas en relación con la interpretación, ejecución, validez o eficacia del presente Contrato, procurará ser resuelta por las Partes de buena fe mediante trato directo.

De no llegar las Partes en disputa a un acuerdo en el plazo de quince (15) días calendario, la controversia podrá ser sometida por las Partes a un arbitraje de derecho ante el Centro de Arbitraje de la Cámara de Comercio de Lima (el "Centro"), conforme al Reglamento del Centro, el mismo que las Partes declaran aceptar y conocer, y bajo la administración del Centro. El arbitraje de derecho se tramitará conforme al siguiente procedimiento:

-    El arbitraje se llevará a cabo por un Tribunal Arbitral compuesto de tres (3) miembros.

-    El arbitraje se llevará a cabo conforme al Reglamento del Centro, a cuyas normas se someten las Partes en forma incondicional y las que declaran conocer y aceptar en su integridad.

-    El Tribunal Arbitral se constituirá de la siguiente forma: cada una de las Partes designará un árbitro y el tercero será designado de común acuerdo por los árbitros ya designados. El tercer árbitro presidirá el Tribunal Arbitral. Si las Partes en conflicto fueran más de dos (2), las Partes se pondrán de acuerdo para la designación de los árbitros. Los árbitros así designados se pondrán de acuerdo

sobre quien se desempeñará como presidente del Tribunal Arbitral. Si los tres (3) árbitros no llegasen a un acuerdo sobre el nombramiento del presidente del Tribunal Arbitral, dentro del plazo de diez (10) días calendario contado a partir de la fecha del nombramiento del tercer árbitro, el presidente será elegido por el Centro, a pedido de cualquiera de las Partes.

- En caso que una de las Partes no designe a su árbitro o las Partes no llegasen a un acuerdo sobre la designación de los tres (3) árbitros, dentro de un plazo de diez (10) días hábiles contado desde la fecha en que una de ellas manifieste por escrito su voluntad de acogerse a la presente cláusula, el árbitro o los árbitros que no haya(n) sido designado(s) será(n) nombrado(s) por el Centro.

- El Tribunal Arbitral tendrá un plazo de noventa (90) días hábiles desde su instalación para expedir el respectivo laudo arbitral, el cual será inapelable.

- El Tribunal Arbitral puede quedar encargado de determinar con precisión la controversia, así como otorgar una prórroga en caso fuera necesario para emitir el laudo.

- El lugar del arbitraje será en la ciudad de Lima, Perú y el idioma que se utilizará en el procedimiento arbitral será el castellano.

- Todos los gastos derivados del arbitraje, su desarrollo y posterior ejecución, incluyendo las tasas del Centro, los honorarios de los árbitros, los costos de funcionamiento del Tribunal Arbitral, los honorarios de los asesores legales y de cualquier otra índole, a los que razonablemente hayan tenido que recurrir las Partes, los costos y costas de los procesos judiciales que se inicien como consecuencia del laudo, incluyendo los de su ejecución y cualquier otro gasto que sea necesario, serán por cuenta de la Parte vencida en el arbitraje. De no existir una Parte totalmente vencida en el arbitraje, el Tribunal podrá, en equidad, disponer de manera distinta. Los gastos y costos correspondientes al arbitraje serán asumidos por la Parte que no se vea favorecida con la decisión del Tribunal Arbitral.

- El correspondiente laudo arbitral será definitivo e inapelable, a efectos de lo cual, las Partes renuncian expresamente a presentar cualquier acción y/o recurso de apelación ante una segunda instancia arbitral.

15.3  Sin perjuicio de lo establecido en el numeral 15.2 anterior, en caso se requiera efectuar cualquier tipo de cobranza en mérito de cualquiera de los Documentos del Préstamo, las Partes acuerdan que dicho proceso deberá ser resuelto ante los Jueces y Tribunales del Distrito Judicial de Lima – Cercado, renunciando las Partes a cualquier otra competencia, sin reserva ni limitación alguna.

## DÉCIMO SEXTA: RESPONSABILIDAD DE LOS MIEMBROS DEL CONSORCIO

Se deja constancia que, de acuerdo a lo establecido en el contrato de consorcio que crea CCI, los Participantes asumen de manera solidaria la responsabilidad frente a TFT respecto de todas y cada una de las obligaciones asumidas por CCI frente a TFT de acuerdo con este Contrato y los demás Documentos de la Línea, incluyendo pero sin limitarse al pago de toda y cualquier suma que CCI adeude a TFT por concepto de cuotas del principal y/o interés compensatorio y/o interés moratorio, indemnizaciones, penalidades, gastos, Tributos y/o en general toda y cualquier obligación asumida por CCI de acuerdo con el Contrato y los demás

Documentos de la Línea y/o cualesquiera otros conceptos a que hubiere lugar derivados del Contrato y los demás Documentos de la Línea.

De acuerdo con lo anterior, en caso se produzca un Evento de Incumplimiento o CCI no reembolse a TFT, cuando corresponda según el Contrato, los montos desembolsados por TFT, ésta podrá exigir a cualquiera de los miembros del consorcio, sin necesidad de requerimiento previo a CCI, el cumplimiento inmediato de cualesquiera de las obligaciones objeto de este Contrato.

Lima 20 de diciembre de 2017

Por TRADE FINANCE TRUST:

Nombre: IIG Trade Finance LLC en su calidad de Administrador, representada por Carlos Cano
Cargo: Administrador

Por CONSORCIO CEPER INTL:

Nombre: Fernando Segundo Jesús Barrón Villacorta
Cargo: Gerente General

**ANEXO I**

**MODELO DE PAGARÉ**

Importe US $ _____
Vence el _____ de_____ de _____

Nosotros, Consorcio Ceper INTL, un consorcio formado por las empresas Cables y Conductores Nacionales S.A.C. y Conductores y Cables del Perú S.A.C. y organizado bajo las leyes de la República del Perú, con Registro Único de Contribuyentes No. 20602692834, con domicilio para estos efectos en Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A", distrito de Ate, provincia y departamento de Lima, República del Perú,  debemos y pagaremos en la fecha de vencimiento indicada, a la orden de Trade Finance Trust, administrada por IIG TRADE FINANCE LLC, una sociedad constituida y existente de conformidad con las leyes del Estado de Delaware, Estados Unidos de América, ("TFT"), en sus oficinas en 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, Estados Unidos de América, o en el lugar en que se nos presente a cobro, la cantidad de US$ _____ (_____ y _____/100 Dólares de los Estados Unidos de América), suma adeudada por nuestra parte a dicha sociedad por obligaciones contraídas a nuestra entera satisfacción, sin lugar a reclamo de ninguna especie, para cuyo fiel y exacto cumplimiento obligamos todos nuestros bienes habidos y por haber, en la mejor forma de derecho, en especial los que se encuentren en TFT.

En adición al principal del monto de este Pagaré, nos obligamos incondicionalmente a pagar intereses compensatorios a partir de la fecha de emisión del mismo y hasta la fecha de su pago íntegro a la tasa de interés prevista en el numeral 3.6 de la Cláusula Tercera del Contrato de Línea de Crédito Revolvente suscrito entre TFT en calidad de Prestamista y Consorcio Ceper INTL en calidad de Prestatario, con fecha 20 de diciembre de 2017 (el "Contrato").

En caso no cumplamos con pagar correcta y oportunamente los Desembolsos efectuados por TFT en mérito del Contrato, los intereses devengados o cualquier monto adeudado a TFT en virtud del Contrato nos obligamos a pagar adicionalmente a los intereses compensatorios, los intereses moratorios a una tasa de interés determinada en el numeral 3.5 de la Cláusula Tercera del Contrato y de acuerdo con los términos y condiciones establecidos en dicho numeral. Durante el tiempo que se devenguen intereses moratorios se devengarán paralelamente los intereses compensatorios establecidos en la Cláusula Tercera del Contrato.

Asimismo, nos obligamos incondicionalmente a pagar a TFT los gastos notariales, costos y costas judiciales y extrajudiciales incurridos por TFT en razón de nuestro incumplimiento, obligándonos a pagar sobre dichos gastos el mismo interés moratorio pactado en este Pagaré y en el Contrato.

Declaramos conocer, las tasas de interés al momento de la suscripción del presente documento.

Este título no requerirá de protesto por falta de pago, procediendo su ejecución por el solo mérito de haber vencido su plazo y no haber sido prorrogado.

Los impuestos y derechos que se originen de la obligación representada por este Pagaré, salvo los que correspondan a TFT conforme a la legislación peruana, serán por nuestro cargo y cuenta.

Aceptamos de antemano las renovaciones y prórrogas de vencimiento de este Pagaré que TFT considere conveniente efectuar, ya sea por su importe total o parcial, aun cuando no hayan sido comunicadas a nosotros. Dichas modificaciones serán anotadas en este mismo documento o en hoja anexa, sin que sea necesaria nuestra suscripción de tal documento u hoja anexa.

En caso que la fecha de vencimiento de cualquier pago que deba efectuarse conforme a este Pagaré haya de ocurrir un día que no fuese un Día Hábil, ese pago se hará en el Día Hábil inmediato siguiente. Para tal efecto, se entenderá por Día Hábil cada uno de los cinco (5) días de la semana que comienzan el lunes y terminan el viernes, en que los bancos en la ciudad de Lima, Perú, se encuentran abiertos con atención al público en general en sus oficinas principales.

El presente pagaré es emitido de conformidad con el artículo 10 de la Ley de Títulos Valores promulgada mediante Ley 27287 y será completado conforme al acuerdo de llenado que hemos suscrito con TFT, de fecha 20 de diciembre de 2017.

Cualquier referencia en este Pagaré a TFT deberá entenderse efectuada a cualquier tenedor del mismo, sea que lo adquiera por endoso o de otro modo.

Este Pagaré se devolverá a su cancelación total. Queda expresamente establecido que nuestro domicilio es Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A", distrito de Ate, provincia y departamento de Lima, lugar a donde se dirigirán todas las comunicaciones y notificaciones derivadas de este Pagaré.

El presente Pagaré es de naturaleza mercantil y está sujeto a las disposiciones de la Ley de Títulos Valores y demás normas que le sean de aplicación.

Para efectos de ejecución de este Pagaré nos sometemos a la jurisdicción y competencia de los jueces y tribunales del Distrito Judicial del Cercado de Lima, a cuyo efecto renunciamos al fuero que por nuestro domicilio pudiese correspondernos.

Lima, 20 de diciembre de 2017.

Nombre: Fernando Segundo Jesús Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General

En todos los casos, el(los) apoderado(s) de la empresa actúa(n) facultado(s) según poder(es) que cuentan con las certificaciones necesarias de acuerdo con la legislación aplicable.

**FIANZA SOLIDARIA**

Conductores y Cables del Perú S.A.C. debidamente representadas por el señor Fernando Segundo Jesús Barrón Villacorta, identificado con DNI No. 08248191 y por el señor Carlos Frank Baigorria Polo, identificado con DNI No. 08218930 por la presente se constituye en fiador solidarios del obligado principal, renunciando expresamente al beneficio de excusión a que se refiere el artículo 1879 del Código Civil, por todas las obligaciones contraídas por el obligado principal frente a Trade Finance Trust, incluyendo todas aquellas expresadas en este Pagaré.

Dejamos expresa constancia que esta fianza se constituye por plazo indeterminado y estará vigente hasta que sean pagadas totalmente las obligaciones a las que sirve de garantía.

De conformidad con el artículo 49 de la Ley 27287 (Ley de Títulos Valores), aceptamos todas las prórrogas que sean efectuadas por el tenedor de este Pagaré por el plazo que ésta señale en este mismo documento, sin que sea necesaria intervención alguna de nuestra parte.

Fijamos nuestro domicilio en el lugar que se indica al pie de nuestra firma, donde se dirigirán todas las comunicaciones y/o notificaciones derivadas del Pagaré. Asimismo, para el caso de ejecución del preste título o de la fianza que otorgamos, renunciamos a la competencia de los jueces de nuestro domicilio y nos sometemos a la competencia de los jueces del lugar que indique Trade Finance Trust.

Nombre: Fernando Segundo Jesús Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General
Domicilio: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate
CONDUCTORES Y CABLES DEL PERU S.A.C.

Nombre: Carlos Frank Baigorria Polo
DNI No.: 08218930
Cargo: Gerente
Domicilio: Av. Los Frutales 334, Fundo Monterrico Grande Oeste "A" distrito de Ate
CONDUCTORES Y CABLES DEL PERU S.A.C.

## ANEXO II

### ACUERDO DE LLENADO DE PAGARÉ

Consorcio Ceper INTL ("CCI") ha solicitado a Trade Finance Trust ("TFT") el otorgamiento de una línea de crédito revolvente hasta por US$ 5'000,000.00 (cinco millones y 00/100 Dólares), suscribiendo un (1) Pagaré incompleto, a favor de TFT, por lo que mediante la firma de CCI en el presente documento autoriza de manera expresa e irrevocable para que TFT o a quien éste hubiera transferido el Pagaré incompleto proceda al llenado del mencionado Pagaré incompleto en los siguientes términos y condiciones:

**PRIMERO:** TFT podrá considerar vencidos todos los plazos y proceder al cobro del íntegro de lo adeudado ejecutando el Pagaré mencionado en uno cualquiera de los siguientes casos:

Si CCI dejase de pagar uno o más Desembolsos que TFT hubiese efectuado a su favor en virtud del Contrato de Línea de Crédito Revolvente, de fecha 20 de diciembre de 2017, celebrado entre CCI e TFT, entre otros  (el "Contrato") en los plazos establecidos en dicho Contrato; y/o,

Si, en virtud de lo dispuesto en el Contrato, se verifica la ocurrencia de algún Evento de Incumplimiento, tal como este término se define en el Contrato.

**SEGUNDO:** Las instrucciones del llenado del Pagaré incompleto son las siguientes:

La oportunidad a partir de la cual TFT podrá proceder a llenar el Pagaré será aquella en que se produzca cualquiera de los eventos señalados en la Cláusula Primera del presente documento.

La fecha de emisión o suscripción del Pagaré que TFT deberá estampar en el documento será el día que corresponda a la fecha de suscripción del Contrato.

La fecha de vencimiento del Pagaré que TFT deberá estampar será la del día de la fecha en que TFT dé por vencidos todos los plazos de acuerdo a lo señalado en la Cláusula Primera.

La cantidad adeudada que se pagará por CCI y que TFT deberá consignar en el documento será equivalente a todas aquellas sumas que según los términos del Contrato CCI adeuda a TFT, incluidos los intereses respectivos, a las tasas establecidas en el Contrato, incrementadas con el correspondiente Tributo si fuere el caso que grave el Pagaré antes referido.

Las partes establecen que cualquier Tributo que pueda gravar la emisión y pago del Pagaré descrito en el presente documento será de cargo de CCI.

El importe total del saldo deudor a cargo de CCI incluye, a criterio razonable de TFT, intereses, comisiones, penalidades, seguros y todos los demás conceptos aplicables y exigibles al momento de realizado el llenado del Pagaré.

CCI autoriza en forma irrevocable a TFT para que compense el saldo total pendiente de pago con los activos de titularidad de CCI que mantenga en su poder.

CCI acepta y da por válidas todas las renovaciones y/o prórrogas totales o parciales que se anoten en el Pagaré, aun cuando no estén suscritas por CCI.

El presente documento constituye el Acuerdo entre CCI y TFT, al amparo del Artículo 10 de la Ley 27287 –Ley de Títulos Valores o normas que los sustituyan o modifiquen.

**TERCERO:** CCI deja expresa constancia que ha recibido de TFT copia del Pagaré incompleto suscrito por éste en el momento en que TFT recibió el mencionado Pagaré incompleto.

**CUARTO:** CCI renuncia expresamente a la inclusión de una cláusula que impida o limite la libre negociación del Pagaré incompleto.

Lima, 20 de diciembre de 2017.

Por "Consorcio Ceper INTL":

_____
Nombre: Fernando Segundo Jesús Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General

Por "Trade Finance Trust" representado por IIG Trade Finance LLC:

_____
Nombre: Carlos Cano
Pasaporte: 424141529
Cargo: Representante

Con intervención de "Conductores y Cables del Perú S.A.C.":

_____
Nombre: Fernando Segundo Jesús Barrón Villacorta
DNI No.: 08248191
Cargo: Gerente General

_____
Nombre: Carlos Frank Baigorria Polo
DNI No.: 08218930
Cargo: Gerente

## ANEXO III

## SOLICITUD DE DESEMBOLSO

### Consorcio Ceper INTL - Revolving Line of Credit

BORROWING BASE CERTIFICATE NO.

BBC- XXX
CCI XXX

*DATE:*                                                                                                  XXX

*ACCOUNTS RECEIVABLES*

1  *AR as of date of prior Certificate*

2  *New Accounts Receivable (See attached)*                                    -
3  *Minus Credits Issued after above Certificate*
   **TOTAL ACCOUNTS RECEIVABLE**                                             $[--]
   *Advance Rate*                                                             [--]%
   **NET AVAILABILITY AGAINST ACCOUNTS RECEIVABLES**                          $[--]

4  *Inelegible Invoices*
   *Minus collections to be applied to inelegible invoices*
                                                                              $
4a  **TOTAL INELEGIBLE INVOICES**                                            -
5  *Advance Rate*                                                            [--]%
6  *NET INELEGIBLE INVOICE VALUE*                                           $[--]
9  **NET AVAILABILITY AGAINST ACCOUNTS RECEIVABLES**

20  **COPPER**
                                                                              $
   *Minus Credits Issued after above Certificate*
                                                                              $
22  **INVENTORY PREVIOUS TO NEW REQUEST**                                     -
   **NEW ADVANCE**
                                                                              $
26  **TOTAL INVENTORY [COPPER], if applicable**                              -
27  *Advance Rate*                                                           [--]%
                                                                              $
28  **NET AVAILABILITY AGAINST COPPER**                                       -

29  **NON-COPPER, if applicable**
                                                                              $
   *INVENTORY*                                                                -
   *New Advance*
   *Minus Liquidating Inventory - Based on current Funding WIP*
33  *Minus Collections after above Certificate*
                                                                              $
35  **TOTAL INVENTORY [NON-COPPER], if applicable**                          -
36  *Advance Rate*                                                           [--]%
                                                                              $
37  **NET AVAILABILITY AGAINST NON-COPPER**                                   -

| | | |
|---|---|---|
| 38 | **MAXIMUM AVAILABILITY AGAINST EXISTING INVENTORY** | $ - |
| 45 | **OTHER LOANS (if applicable)** | |
| | | $ |
| | | $ |
| | **NEW ADVANCE** | - |
| | | $ |
| | | - |
| | | $ |
| 46 | **TOTAL MAXIMUM COLLATERAL** | - |

### Loan Balance / Net Availability

| | | |
|---|---|---|
| | | $ |
| 56 | LOAN BALANCE AS OF PREVIOUS CERTIFICATE | - |
| 57 | Minus Collections after above Certificate | |
| 57A | APPLICATION AGAINST current funding  (SWAP) WIP 63546 | |
| 58 | Advance Dated | |

**Capitialized Fees:**
| | | |
|---|---|---|
| 59 | Special Credit Accommodation Fee | |
| 60 | Loan Origination Fee | |
| 61 | Collateral Management Fee | |
| 62 | Eligible Inventory Fee | |
| 63 | Monthly Facility Fee | |
| 64 | Minimum Monthly Fee | |
| 65 | **New Loan Balance before requested new advance (EXISTING LOANS)** | $ - |
| | | $ |
| 66 | **EXISTING AVAILABILITY BASED ON NEW COLLATERAL** | - |
| | | $ |
| 67 | **NEW ADVANCE** | - |
| | | $ |
| 68 | **ENDING LOAN BALANCE - NOT TO EXCEED 3,000,000.00** | - |
| | | $ |
| 69 | **[Over/under Advance}** | - |

The undersigned represents and warrants that the foregoing is true, complete and correct, and that the information
in this Borrowing Base Certificate complies with the representations and warranties in the Loan and Security
Agreement between the undersigned and Lender.

**ACCOUNT NAME**