# EXHIBIT X

## SENIOR SECURED CREDIT AGREEMENT

**THIS SENIOR SECURED CREDIT AGREEMENT** (this *Agreement*), dated as of July 13, 2018, is made by and between PROSESAMO HOLDING LTD., an exempted company with limited liability incorporated under the laws of the Cayman Islands, as borrower (the *Borrower*), and TRADE FINANCE TRUST, a statutory trust organized under the laws of the State of Delaware, as lender (the *Lender*). Each of the Borrower and the Lender are referred to individually as a *Party*, and collectively as the *Parties*, to this Agreement.

### W I T N E S S E T H:

**WHEREAS**, the Borrower seeks to acquire Prosesamo, S.A., a *sociedad anónima* organized under the laws of Guatemala (*Prosesamo*);

**WHEREAS**, in order to consummate the acquisition of Prosesamo, the Borrower now requires a loan in the amount of US$2,000,000 (two million United States dollars) to finance such acquisition; and

**WHEREAS**, the Lender has agreed to provide such a loan, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

### ARTICLE I – DEFINITIONS

**Defined Terms**

1.1     The following terms, as used herein, have the following meanings:

*Advance* shall mean an advance by the Lender made to the Borrower pursuant to Article II made during the Term of this Agreement.

*Agreement* shall mean this Senior Secured Credit Agreement.

*Borrower* shall have the meaning set forth in the introductory paragraph to this Agreement.

*Business Day* shall mean any day of the year on which banks are not required or authorized by law to close in New York City.

*Commitment* shall have the meaning set forth in Section 2.1.

*Collateral* shall mean the property specified as such in the Pledge Agreement.

*Debt* of any Person shall mean, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 60 days incurred in the ordinary course of such Person's business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with generally

accepted accounting principles, recorded as capital leases; (f) all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit or similar extensions of credit; (g) all obligations of such Person in respect of any interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements; (h) all Debt of others referred to in clauses (a) through (g) above or clause (*i*) below guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss; and (*i*) all Debt referred to in clauses (a) through (h) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

*Default* shall mean any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

*Effective Date* shall have the meaning set forth in Section 3.1.

*Event of Default* shall have the meaning set forth in Section 6.1.

*Indemnified Party* shall have the meaning set forth in Section 7.2(b).

*Lender* shall have the meaning set forth in the introductory paragraph to this Agreement.

*Lien* shall mean any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

*Material Adverse Effect* means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower, (b) the rights and remedies of the Lender under this Agreement or (c) the ability of the Borrower to perform its obligations under this Agreement.

*Other Taxes* shall have the meaning set forth in Section 2.6(b).

*Party* and *Parties* shall have the meaning set forth in the introductory paragraph to this Agreement.

*Permitted Lien* shall mean such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) Lender's security interest in the Collateral under the Pledge Agreement; (b) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.1(b) hereof; (c) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 30 days; (d) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (e) easements, rights of way and other encumbrances on title to real property that do not affect the use of such property for its present purpose; and (f) any Liens created as the result of any other agreement between the Borrower (or any of its affiliates) and the Lender.

*Permitted Use* shall have the meaning set forth in Section 2.7.

*Person* shall mean any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agent thereof.

*Pledge Agreement* shall have the meaning set forth in Section 4.1(*i*).

*Process Agent* shall have the meaning set forth in Section 7.9(d).

*Prosesamo* shall have the meaning set forth in the recitals to this Agreement.

*Subordinated Agreement* shall have the meaning set forth in Section 2.8.

*Taxes* shall have the meaning set forth in 2.6(a).

*Termination Date* shall mean July 13, 2021.

*Voting Stock* shall mean capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the occurrence of such contingency.

**References; Rules of Construction**

1.2     In this Agreement:

(a)     References to any gender include a reference to all other genders;

(b)     References to the singular include the plural, and vice versa;

(c)     Reference to any Article or Section means an Article or Section of this Agreement;

(d)     Reference to any Attachment or Schedule means an Attachment or Schedule to this Agreement, all of which are incorporated into and made an integral part of this Agreement;

(e)     Unless expressly provided to the contrary, "hereunder," "hereof," "herein," and words of similar import are references to this Agreement as a whole and not any particular Section or other provision of this Agreement;

(f)     "Include" and "including" shall mean include or including without limiting the generality of the description preceding such term; and

(g)     in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

## ARTICLE II – AMOUNTS AND TERMS OF THE ADVANCES

**The Advances**

2.1     The Lender agrees, on the terms and conditions set forth in this Agreement, to make Advances to the Borrower from time to time on any Business Day during the period from the Effective Date until the Termination Date in an aggregate principal amount not to exceed at any time outstanding the amount of US$2,000,000 (two million United States dollars), as such amount may be reduced pursuant to Section 2.4 (the Lender's ***Commitment***).  Each Advance shall be in an aggregate amount of US$50,000 (fifty thousand United States dollars) or an integral multiple of US$5,000 (five thousand United States dollars) in excess thereof.  The Parties agree that as of the date that is 90 (ninety) calendar days after the Advance has been made the Borrower may not borrow further amounts under this Agreement.  Repayment by the Borrower of the principal amount of the Advance shall be due in full upon the Termination Date.

**Making the Advances**

2.2     Each Advance shall be made on notice, given not later than 11:00 a.m. (New York City time) on the first Business Day prior to the date of the proposed Advance, by the Borrower to the Lender, specifying therein the requested date of such Advance and aggregate amount of such Advance.  The Lender shall, before 11:00 a.m. (New York City time) on the date of such Advance, make such funds available to the Borrower by wire transfer to the Borrower's bank account at Deutsche Bank Trust Company Americas, ABA Number 021-001-033, SWIFT Code BKTRUS33, Account Number 04-902-757.

**Interest**

2.3(a)     The Borrower shall pay interest on the unpaid principal amount of each Advance owing to the Lender from the date of such Advance until such principal amount shall be paid in full, at a rate per annum equal to 8% (eight percent) per annum, payable in arrears monthly on the first day of each month and on the date such Advance shall be paid in full.  In the event that the first day of any calendar month shall occur on a day that is not a Business Day, the payment of interest that would otherwise be due on such day must be paid on the immediately preceding Business Day.

(b)     Upon the occurrence and during the continuance of an Event of Default (as set forth in Section 6.1(a)), the Borrower shall pay interest on (i) the unpaid principal amount of each Advance, payable in arrears on the dates referred to in clause (a), above, at a rate per annum equal at all times to 5% (five percent) per annum above the rate per annum required to be paid on such Advance pursuant to clause (a), above, and (ii) the amount of any interest, fee or other amount payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal at all times to 5% (five percent) per annum above the rate per annum required to be paid on Advances pursuant to clause (a), above.

**Optional Prepayments**

2.4     The Borrower may prepay, upon at least three Business Days' notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Borrower shall prepay, outstanding principal of the Advances in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; **provided, however**, that each partial prepayment shall be in an aggregate principal amount of US$50,000 (fifty thousand United States dollars) or an integral multiple of US$5,000 (five thousand United States dollars) in excess thereof.

**Payments and Computations**

2.5(a)   The Borrower shall make each payment hereunder not later than 11:00 a.m. (New York City time) on the day when due in United States dollars to the Lender's account in New York in same day funds.

 (b)   All computations of interest shall be made by the Lender on the basis of a year of 365 or 366 days, as the case may be.  Each determination by the Lender of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Taxes**

2.6(a)   Any and all payments by the Borrower hereunder shall be made, in accordance with Section 2.5, free and clear of and without deduction for any and all present and future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (*Taxes*).  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.6) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)   In addition, the Borrower also agrees to pay any present or future stamp or documentary taxes, or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other document provided for herein (hereinafter referred to as *Other Taxes*).

(c)   The Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.6) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date the Lender makes written demand therefor.

**Use of Proceeds**

2.7   The proceeds of the Advances shall be available (and the Borrower agrees that it shall use such proceeds) solely for payment of the purchase price of the acquisition of Prosesamo, as well as the payment of any reasonable costs associated therewith, including expenses related to securing and maintaining operations in the initial phase after the said purchase (the *Permitted Use*).

**Rank and Collateral**

2.8   The Advances shall constitute senior indebtedness of the Borrower.  Without the prior written consent of the Lender, which may be withheld or provided at Lender's sole and absolute discretion, the Borrower shall not incur or suffer to exist any indebtedness other than Permitted Liens.  Notwithstanding any of the foregoing, the Parties are entering into a subordinated secured credit agreement, dated as of the date hereof (the *Subordinated Agreement*), which shall constitute indebtedness subordinated to the indebtedness created pursuant to this Agreement.  The Advances shall be secured by the Collateral on the terms and conditions set forth in the Pledge Agreement **provided, however**, that the Lender acknowledges and agrees that the Collateral is being pledged pursuant to the Pledge Agreement to secure repayment both of this Agreement and of the Subordinated Agreement.

## ARTICLE III – CONDITIONS TO EFFECTIVENESS

**Conditions Precedent to Effectiveness of Section 2.1**

3.1     Section 2.1 of this Agreement shall become effective on and as of the first date (the *Effective Date*) on which the following conditions precedent have been satisfied:

(a)     there shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower pending or threatened before any court, governmental agency or arbitrator that (i) could be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated hereby;

(b)     All governmental and third Person consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not acceptable to the Lender) and shall remain in effect, and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby;

(c)     The Borrower shall have notified the Lender in writing as to the proposed Effective Date;

(d)     On the Effective Date, the following statements shall be true and the Lender shall have received a certificate signed by a duly authorized officer of the Borrower, dated the Effective Date, stating that:

(i)     the representations and warranties contained in Section 4.1 are correct on and as of the Effective Date; and

(ii)    no event has occurred and is continuing that constitutes a Default;

(e)     The Lender shall have received on or before the Effective Date the following, each dated such day, in form and substance satisfactory to the Lender:

(i)     Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement; and

(ii)    A certificate of an officer of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign this Agreement and the other documents to be delivered hereunder;

(f)     to the extent that the aggregate amount to be provided to the Borrower under the initial Advance exceeds US$1,250,001.00 (One million two hundred fifty thousand one United States dollars), all documents necessary to transfer ownership of Prosesamo to the Borrower shall have been duly executed and delivered by all parties to such documents and no condition to the closing of title of the same shall exist other than a requirement that the purchase price therefor be paid in full; and

(g)     the Borrower shall have provided all other documents the Lender may reasonably request relating to the corporate authority for and the validity of this Agreement and any other matters relevant hereto, all in form and substance satisfactory to the Lender.

**Conditions Precedent to Each Advance**

3.2   The obligation of the Lender to make an Advance shall be subject to the conditions precedent that the Effective Date shall have occurred and on the date of such Advance:

(a)   the following statements shall be true (and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)   the representations and warranties contained in Section 4.1 are correct on and as of the date of such Advance, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date; and

(ii)   no event has occurred and is continuing, or would result from such Advance or from the application of the proceeds therefrom, that constitutes a Default;

(b)   to the extent that the aggregate amount to be provided to the Borrower under all the Advances (including the requested Advance to which these conditions apply, which shall be deemed to have been made for purposes of the calculations set forth in this Section 3.2(b)) does not exceed US$2,000,000.00 (Two million United States dollars) in the aggregate, all documents necessary to transfer ownership of Prosesamo to the Borrower shall have been duly executed and delivered by all parties to such documents and no condition to the closing of title of the same shall exist other than a requirement that the purchase price therefor be paid in full; and

(c)   the Lender shall have received such other documents as it may reasonably request.

**Determinations Under Section 3.1**

3.3   For purposes of determining compliance with the conditions specified in Section 3.1, the Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless the Borrower shall have received notice from the Lender prior to the proposed Effective Date specifying its objection thereto.

### ARTICLE IV – REPRESENTATIONS AND WARRANTIES

**Representations and Warranties of the Borrower**

4.1   The Borrower represents and warrants as follows:

(a)   The Borrower is an exempted company incorporated with limited liability under the laws of the Cayman Islands and is duly incorporated, validly existing and in good standing under the laws of the Cayman Islands.

(b)   The execution, delivery and performance by the Borrower of this Agreement, and the consummation of the transactions contemplated hereby, are within the Borrower's company powers, have been duly authorized by all necessary company action, and do not contravene (i) the Borrower's memorandum and articles of association or (ii) any law or contractual restriction binding on or affecting the Borrower.

(c)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by the Borrower of this Agreement.

(d)     This Agreement has been duly executed and delivered by the Borrower.  This Agreement is the legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms.

(e)     There is no pending or threatened action, suit, investigation, litigation or proceeding affecting the Borrower before any court, governmental agency or arbitrator that (i) could be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated hereby.

(f)     No proceeds of any Advance will be used to acquire any equity security of a class that is registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended.

(g)     The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(h)     Following application of the proceeds of each Advance, not more than 25 percent of the value of the assets subject to any restriction contained in any agreement or instrument between the Borrower and the Lender relating to Debt will be margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System).

(*i*)     In order to induce the Lender to agree to make the Advances described in this Agreement, the Borrower has agreed to pledge to the Lender all of its right, title or interest in, to or under the Collateral, pursuant to the pledge agreement in form and substance substantially similar to the draft pledge agreement attached as Schedule B hereto (the ***Pledge Agreement***).  The Collateral to be pledged under the Pledge Agreement has not been pledged to any Person located in any jurisdiction whatsoever.  Notwithstanding any of the foregoing, the Parties acknowledge and agree that the Collateral is being pledged pursuant to the Pledge Agreement to secure the Borrower's obligations pursuant to this Agreement and pursuant to the Subordinated Agreement.

## ARTICLE V – COVENANTS

**Affirmative Covenants of the Borrower**

5.1     So long as any Advance shall remain unpaid in full, the Borrower will:

(a)     Comply in all material respects will all applicable laws, rules, regulations and orders applicable to the Borrower in any jurisdiction where it has operations or assets.

(b)     Pay and discharge before the same shall become delinquent, (i) all taxes, assessments, and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; **provided, however**, that the Borrower shall not be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

(c) Preserve and maintain its company existence, rights and franchises.

(d) Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time on the territory of the Cayman Islands.

(e) At any reasonable time and from time to time, permit the Lender or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any of the Lender's officers or directors and with its certified public accountants.

(f) Duly execute and deliver to Lender, no later than thirty (30) calendar days after the date upon which the first Advance is made pursuant to Section 2.1 hereto, the Pledge Agreement as specified in Section 4.1(*i*) hereto, and to represent as of such date that the Pledge Agreement has been duly executed and delivered to the Lender and that the Collateral pledged under the Pledge Agreement has been pledged solely to the Lender and not to any other Person located in any jurisdiction whatsoever.

**Negative Covenants of the Borrower**

5.2 So long as any Advance shall remain unpaid in full, without the Lender's prior approval the Borrower will not:

(a) Create or suffer to exist, or permit any of its subsidiaries to create or suffer to exist, any Lien on or with respect to any of its properties, whether now owned or hereafter acquired, or assign, or permit any of its subsidiaries to assign, any right to receive income, other than Permitted Liens.

(b) Create or suffer to exist, or permit any of its subsidiaries to create or suffer to exist, any Debt, other than Debt incurred in accordance with this Agreement or other Debt provided by the Lender.

(c) Create, incur, assume or suffer to exist, or permit any of its subsidiaries to create, incur, assume or suffer to exist, any obligations as lessee for the rental or hire of real or personal property of any kind.

(d) Sell, lease, transfer or otherwise dispose of, or permit any of its subsidiaries to sell, lease, transfer or otherwise dispose of, any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except (i) sales of inventory in the ordinary course of its business or (ii) in a transaction authorized by the Lender.

(e) Make any material change in the nature of its business as carried on at the date hereof.

**ARTICLE VI – EVENTS OF DEFAULT**

**Events of Default**

6.1 If any of the following events (each an *Event of Default*) shall occur and be continuing:

(a) The Borrower shall fail to pay any principal of any Advance when the same becomes due and payable or the Borrower shall fail to pay any interest on any Advance or make any other payment under this Agreement within three Business Days after the same becomes due and payable; or

(b) Any representation or warranty made by the Borrower herein shall prove to have been incorrect in any material respect when made or the Borrower shall fail to perform or observe the covenant contained in Section 5.1(f); or

(c) The Borrower shall fail to perform or observe any covenant contained in Section 5.1 (other than the covenant contained in Section 5.1(f)) or Section 5.2 and such failure shall remain unremedied for thirty (30) days after written notice thereof shall have been given to the Borrower by the Lender; or

(d) Any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or compensation of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 45 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or similar official for, it or for any substantial part of its property) shall occur; or the Borrower shall take any company action to authorize any of the actions set forth above in this subsection (d); or

(e) Any judgment or order shall be rendered against the Borrower that could be reasonably expected to have a Material Adverse Effect, and there shall be any period of ninety (90) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(f) Any event of default shall occur under the Pledge Agreement or the Pledge Agreement shall cease to be a valid and binding obligation of the Borrower; or

(g) (i) Any Person or two or more Persons acting in concert shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934), directly or indirectly, of Voting Stock of the Borrower (or other securities convertible into such Voting Stock) representing 20% or more of the combined voting power of all Voting Stock of the Borrower; or (ii) during any period of up to 24 consecutive months, commencing after the date of this Agreement, individuals who at the beginning of such 24-month period were directors in the Borrower shall cease for any reason (other than due to death or disability) to constitute a majority of the board of directors of the Borrower; or (iii) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower;

then the Lender, by notice to the Borrower, may declare the Advances, all interest thereon and all other amounts payable under this Agreement, to be forthwith due and payable, whereupon the Advances, all interest thereon and all other amounts payable under this Agreement shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE VII - MISCELLANEOUS

**Notices**

7.1 All notices, requests, demands and other communications to any party hereunder (each, a *Notice*) shall be in writing and shall be delivered in person or sent via internationally recognized overnight courier,

if to the Borrower, to it at PO Box 1093, Queensgate House, Grand Cayman, KY1-1102, Cayman Islands; or if to the Lender, to it at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, United States of America, with a copy to International Investment Group, 1500 Broadway, 26th Floor, New York, New York 10036, United States of America, ATTN: David Hu; or to such other address as any Party may by Notice given as herein provided.  The giving of any Notice required hereunder may be waived in writing by the Party entitled to receive such Notice.  Every Notice hereunder shall be deemed to have been duly given or served on the date on which personally delivered and the next Business Day after deposit with an internationally recognized overnight courier service.

**Costs and Expenses**

7.2(a)   Subject to the terms hereof, the Borrower shall pay any and all transactional expenses of Lender incurred in connection with the negotiation, execution, delivery or enforcement of this Agreement.

(b)   Subject to the terms hereof, the Borrower agrees to indemnify and hold harmless the Lender and each of its affiliates and their respective directors, officers, members, managers, employees, agents, representatives, assignees and controlling persons (each, an *Indemnified Party*) from and against any and all losses, claims, damages, expenses and liabilities (including the cost of any investigation, litigation, or other proceedings, regardless of whether any Indemnified Party is a party thereto), and fees, disbursements and other charges of counsel, joint or several, to which such Indemnified Party may become subject under any applicable law and related to or arising out of (i) any transaction contemplated by this Agreement or the Pledge Agreement or the execution, delivery and performance of such documents or any other document in any way relating to this Agreement or the Pledge Agreement, or (ii) any breach of a representation, warranty or covenant contained in this Agreement or the Pledge Agreement.  The Borrower will not be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any loss, claim, damage, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence, or knowing violation of law.  The Borrower also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Borrower, or any security holders or creditors thereof, related to or arising out of the execution, delivery and performance of any document in any way relating to any of the Loan or the other transactions contemplated by this Agreement or the Pledge Agreement, except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court to have resulted from such Indemnified Party's bad faith or gross negligence or any breach of this Agreement.

(c)   Subject to the terms hereof, if the indemnification of an Indemnified Party provided for in Section 7.2(b) is for any reason held unenforceable, the Borrower agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable (i) in such proportion as is appropriate to reflect the relative benefits to the Borrower, on the one hand, and such Indemnified Party, on the other hand, of the transactions contemplated by this Agreement and the Pledge Agreement or (ii) if (but only if) the allocation provided for in clause (i) is for any reason held unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Borrower, on the one hand, and such Indemnified Party, on the other hand, as well as any other relevant equitable considerations; **provided, however**, that, to the extent permitted by applicable law, in no event shall any Indemnified Party be required to contribute an aggregate amount in excess of the aggregate interest and costs and expenses actually paid to such Indemnified Party in connection with the Advances.

**Limited Recourse**

7.3(a)   The Lender shall have recourse only to the proceeds of the realization of the Collateral once the proceeds have been applied in accordance with the terms of the Pledge Agreement (the *Net Proceeds*).  If

the Net Proceeds are insufficient to discharge all payments which, but for the effect of this Section 7.3, would then be due (the *Amounts Due*), the obligation of the Borrower shall be limited to the amounts available from the Net Proceeds and no debt shall be owed to the Lender by the Borrower for any further sum. The Lender shall not take any action or commence any proceedings against the Borrower to recover any amounts due and payable by the Borrower under this Agreement except as expressly permitted by the provisions of this Agreement.  The Lender shall not take any action or commence any proceedings or petition a court for the liquidation of the Borrower, nor enter into any arrangement, reorganization or insolvency proceedings in relation to the Borrower whether under the laws of the Cayman Islands or other applicable bankruptcy laws until one year and one day after the later to occur of the payment of all of the Amounts Due or the application of all of the Net Proceeds.

(b) The Lender hereby acknowledges and agrees that the Borrower's obligations under this Agreement are solely the corporate obligations of the Borrower, and that the Lender shall not have any recourse against any of the directors, officers or employees of the Borrower for any claims, losses, damages, liabilities, indemnities or other obligations whatsoever in connection with any transactions contemplated by this Agreement.

**Entire Agreement**

7.4 This Agreement (including the Schedules hereto), the Pledge Agreement, and any documents executed in connection with this Agreement and/or the Pledge Agreement, embody the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements and understandings between the Parties.  Notwithstanding any of the foregoing, the Parties acknowledge and agree that the Subordinated Agreement is being executed by and between the Parties hereto and also subject to the Pledge Agreement, and a default under the Subordinated Agreement may lead to a default under the Pledge Agreement and, by extension, under this Agreement.

**Waivers and Amendments**

7.5 This Agreement may be amended, superseded or canceled only by a written instrument signed by Lender.  Any of the terms or conditions hereof may be waived only by a written instrument signed by the Party or Parties to be bound thereby.  No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

**Binding Effect; Assignment**

7.6 This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  This Agreement shall not be assignable by the Borrower except with the prior written consent of the Lender.  The Lender may assign its rights hereunder and/or under the Pledge Agreement in its sole and absolute discretion.  Any assignment of, attempt to assign, this Agreement in violation of this Section 7.6 by either Party shall be deemed void *ab initio* and of no legal force or effect whatsoever.

**Counterparts**

7.7 This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement electronically by PDF shall be effective as

delivery of a manually executed counterpart of this Agreement.  No counterpart shall be effective until each Party has executed at least one counterpart.

**Construction**

7.8	The language used in this Agreement will be deemed the language chosen by the Parties to express their mutual intent, and no rules of strict construction will be applied against either Party.

**Governing Law; Consent to Jurisdiction; Waiver of Jury Trial**

7.9(a)	This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this Agreement shall be governed by, the law of the State of New York.

(b)	The Parties hereby irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in the City of New York in any action or proceeding arising out of or relating to this Agreement, and the Parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court.  The Parties hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

(c)	**EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**  Each Party hereby (i) certifies that no representative, agent or attorney of the other has represented, expressly or otherwise, that the other would not, in the event of a proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 7.9(c).

(d)	Borrower hereby irrevocably appoints IIG Trade Finance LLC, with an office located at 1500 Broadway, 26th Floor, New York, New York 10036, United States of America, as its process agent (the ***Process Agent***), to receive, for it and on its behalf, service of process in any proceedings.  If for any reason the Process Agent is unable to act as such, the Borrower will promptly notify the Lender and within 30 days appoint a substitute process agent acceptable to the Lender.  The Borrower irrevocably consents to service of process given in the manner provided for notices in Section 7.1.  Nothing in this Agreement will affect the right of the Lender to serve process in any other manner permitted by law.

**Severability**

7.10	Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**Headings**

7.11	The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**Further Assurances**

7.12    Each Party will, and will use all reasonable efforts to, take or cause to be taken all actions, and do or cause to be done all other things, necessary, proper or advisable in order to give full effect to this Agreement.  Each Party shall negotiate, execute and deliver all reasonably required documents and do all other acts which may be reasonably requested by any other Party hereto to implement and carry out the terms and conditions of this Agreement.  Each Party shall use its commercially reasonable efforts not to take any action or fail to take any action which would reasonably be expected to frustrate the intent and purposes of this Agreement.

**No Third Party Beneficiaries**

7.13    This Agreement is solely for the benefit of the Parties, and each Party hereby agrees that nothing in this Agreement shall entitle any Person other than the Parties to any claim, cause of action or right of any kind.

(*signature page follows*)

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PROSESAMO HOLDING LTD.**, as Borrower

By: _____
    Name:    Enrico Scalvini
    Title:     Authorized Signatory

**TRADE FINANCE TRUST**, as Lender
BY: IIG TRADE FINANCE LLC, its Administrator

By: _____
    Name:    David Hu
    Title:     Managing Partner

15