# EXHIBIT DD

Execution Version

# US$ 10,000,000.00

## UNCOMMITTED LOAN AGREEMENT

**Dated as of March 10, 2014**

among

**VALLE ENERGY INC.**

and

**LAKEVIEW GREEN CORP.**

as Borrowers

and

**IIG CAPITAL LLC, as agent**

as Lender

Execution Version

**UNCOMMITTED LOAN AGREEMENT** dated as of March 10, 2014 (the "**Execution Date**") and executed by and among Valle Energy Inc., a corporation organized under the laws of the British Virgin Islands, with its registered office at P.O. Box 662, Road Town, Tortolla, British Virgin Islands ("**Valle**"); Lakeview Green Corp., a corporation organized under the laws of the British Virgin Islands, with its registered office at P.O. Box 662, Road Town, Tortolla, British Virgin Islands ("**Lakeview**" and together with Valle, each a "**Borrower**" and collectively, the "**Borrowers**"); and IIG Capital LLC, as agent, a New York limited liability company with offices at 1500 Broadway, 17th Floor, New York, NY 10036 (the "**Lender**").

**WHEREAS:**

A.   The Borrowers desire to obtain Loans (as defined below) in the aggregate principal amount of up to US$10,000,000.00 (ten million U.S. Dollars);

B.   The Borrowers agree that all of the Obligations (as defined below) will be secured by the Collateral; and

C.   On the basis of the terms and conditions specified in this Agreement, the Lender is willing to enter into this uncommitted facility with the terms set forth below.

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

## 1.   DEFINITIONS.

1.1   **CERTAIN DEFINITIONS.** Unless otherwise defined above, capitalized terms used in this Agreement shall have the following meanings assigned to them:

*Account Control Agreement* means the Account Control Agreement of even date herewith between Valle and the Lender in form and substance acceptable to the Lender, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

*Adjusted Outstanding Amount* means, at any time, the aggregate outstanding principal amount of the Loans minus the amount of cash then held in the Collection Account.

*Affiliate* means any Person directly or indirectly controlling, controlled by, or under common control with, any other Person. For this purpose, "control" of any Person means ownership of 10% or more of the issued and outstanding voting Capital Stock of the Person or the ability, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

*Agreement* means this Uncommitted Loan Agreement, its Annexes, Exhibits and Schedules, as such may be amended, varied, novated or supplemented from time to time.

*Applicable Margin* means 8.50% per annum.



2

Execution Version

*Assets* mean, for any Person, all assets of such Person that have been or should be recorded as such in accordance with GAAP.

*Assignment and Security Agreements* mean any and/or all of the Cloister Blue Security Agreement, the Green Acres Security Agreement, the Lakeview Security Agreement and the Mid Summer Security Agreement.

*Availability Period* means the period from the Execution Date to and including the date that is thirty (30) days after the Execution Date.

*Borrower* and *Borrowers* each has the meaning ascribed to it in the preamble.

*Business Day* means a day, other than a Saturday or Sunday, on which financial institutions are not required or authorized to close in (a) London, England, (b) New York, New York, United States of America, and/or (c) Bogota, Colombia.

*Capital Stock* means any and all shares, quotas, interests, participations or other equivalents (however designated) of capital stock of a legal entity, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

*Change in Law* means the occurrence, after the Execution Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

*Change of Control* means that (a) the Ordóñez-Masering Group shall cease to (i) own beneficially and control (either directly or indirectly) at least 50.1% of Valle's issued and outstanding Capital Stock having the right to vote or other equity interests (or securities convertible into equity interests) in Valle having the right to vote, and/or (ii) have the power (whether by ownership of Capital Stock, contract or otherwise) to control the management or policies of Valle, and/or (b) Valle shall cease to (i) own beneficially and control (either directly or indirectly) at least 50.1% of Lakeview's issued and outstanding Capital Stock having the right to vote or other equity interests (or securities convertible into equity interests) in Lakeview having the right to vote, and/or (ii) have the power (whether by ownership of Capital Stock, contract or otherwise) to control the

3

Execution Version

management or policies of Lakeview and/or (iii) own beneficially and control (either directly or indirectly) at least 50.1% of any one of the Guarantors' issued and outstanding Capital Stock having the right to vote or other equity interests (or securities convertible into equity interests) in such Guarantor having the right to vote, and/or (iv) have the power (whether by ownership of Capital Stock, contract or otherwise) to control the management or policies of any one of the Guarantors (meaning if such events set forth in items (iii) or (iv) hereof occur with respect to any one of the Guarantors even though it does not occur with respect to any of the other Guarantors it shall be a "Change of Control"). For purposes of clarification, Sections (b)(iii) and (iv) shall be applicable in respect of Las Quinchas only from and after such time as Las Quinchas first becomes controlled, directly or indirectly, by Valle and those Sections shall apply to Cloister Blue, Green Acres and Mid Summer only while the Guaranty remains in force.

***Cloister Blue*** means Cloister Blue Ltd., a British Virgin Islands company.

***Cloister Blue Security Agreement*** means the Assignment and Security Agreement dated as of the Execution Date between Cloister Blue and the Lender pursuant to which Cloister Blue grants to the Lender a first priority security interest in all of its right, title and interest in and to the Conditional Assignment to which it is a party.

***Collateral*** means the collateral pledged or purported to be pledged to the Lender pursuant to the Security Agreements.

***Collection Account*** means the account of IIG TOF fbo Valle Energy Inc. with The Bank of New York Mellon, ABA#: 021-000-018, Swift IRVTUS3N, Acct# 8901213144.

***Colombia*** means the Republic of Colombia.

***Conditional Assignments*** means any and/or all of the following: (a) the Conditional Assignment Agreement executed on May 12, 2012 between Pacific, as assignor, and Cloister Blue as assignee, as amended; (b) the Conditional Assignment Agreement executed on May 12, 2012 between Pacific, as assignor, and Lakeview as assignee, as amended; (c) the Conditional Assignment Agreement executed on May 12, 2012 between Pacific, as assignor, and Mid Summer as assignee, as amended; and (d) the Conditional Assignment Agreement executed on May 12, 2012 between Pacific, as assignor, and Green Acres as assignee, as amended.

***Conditional Guaranty*** means the guaranty of even date herewith from Las Quinchas in favor of the Lender and guaranteeing the Obligations, but that will only become effective once Las Quinchas is controlled, directly or indirectly, by Valle.

***Credit Documents*** means this Agreement, the Note, the Guarantees, the Masering Guaranty, the Security Agreements and any other documents and/or agreements delivered or entered into in connection with the foregoing.

4

Execution Version

***Default*** means an Event of Default or event or condition that, but for the requirement that time elapse, notice be given or a determination be made hereunder, or any combination thereof, would constitute an Event of Default.

***Default Interest Rate*** has the meaning ascribed to it in Section 2.6.

***Dollars, U.S. Dollars*** and the designation ***US$*** each means the lawful currency of the United States of America.

***Drawdown*** means, for each Loan, the crediting by the Lender of the principal amount of such Loan in accordance with the instructions in the relevant Notice of Drawdown.

***Drawdown Date*** means, for any Loan, the date of the relevant Drawdown.

***Economic and Trade Sanctions and Anti-Terrorism Laws*** means any laws relating to economic or trade sanctions, terrorism or money laundering, including without limitation Executive Order 13224, the Patriot Act, the regulations administered by OFAC, the Trading with the Enemy Act (12 U.S.C. §95), and the International Emergency Economic Powers Act (50 U.S.C. §1701-1707).

***Environmental Laws*** means any and all national, state, provincial or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning pollution or protection of human health or the environment, as now or may at any time hereafter be in effect.

***Event of Default*** has the meaning ascribed to it in Section 7.

***Execution Date*** – See Preamble.

***Expenses*** means the fees (including any reasonable attorneys' fees and any other general legal fees), expenses and disbursements incurred by the Lender in connection with its due diligence in respect of the transactions contemplated hereby, the preparation and negotiation of this Agreement and the other documents prepared in connection herewith or pursuant hereto, and all reasonable fees, legal fees, expenses and disbursements incurred by the Lender in connection with any amendments, modifications, approvals, consents or waivers pursuant hereto or thereto.

***Facility Amount*** means US$10,000,000.00.

***Facility Maturity Date*** means September 15, 2015, provided that if such date is not a Business Day then the Facility Maturity Date shall be the next preceding Business Day.

***Financial Statements*** has the meaning ascribed to it in Section 3(i).

Execution Version

*GAAP* means generally accepted accounting principles and applicable legal requirements with respect to accounting matters in the relevant jurisdiction, consistently applied during a relevant period.

*Goods* means crude oil.

*Governing Documents* of any Person means the charter and by-laws, articles of incorporation or other organizational or governing documents of such Person.

*Governmental Approval* means any consent, license, approval, order, authorization, exemption, registration, filing, opinion or declaration from or with, notice to, or any other action by or in respect of, as the case may be, any Governmental Authority.

*Governmental Authority* means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) and any entity exercising executive, legislative, judicial, regulatory or administrative authority of or pertaining to government (whether such authority is recognized as a *de jure* government or is a *de facto* government).

*Green Acres* means Green Acres Development Ltd., a British Virgin Islands company.

*Green Acres Security Agreement* means the Assignment and Security Agreement dated as of the Execution Date between Green Acres and the Lender pursuant to which Green Acres grants to the Lender a first priority security interest in all of its right, title and interest in and to the Conditional Assignment to which it is a party.

*Guarantees* means the Guaranty and the Conditional Guaranty.

*Guarantors* means any and/or all of Cloister Blue, Green Acres, Mid Summer and Las Quinchas (but in the case of Las Quinchas, only as of such time as it becomes controlled, directly or indirectly, by Valle).

*Guaranty* means the Guaranty of even date herewith from the Guarantors (other than Las Quinchas) in favor of the Lender and guaranteeing the Obligations.

*Hazardous Materials* means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

*Holdings* means Las Quinchas Holdings, Corp., a Panamanian company.

*Holdings Pledge* means the Pledge Agreement to be entered into promptly upon Holdings being owned, directly or indirectly, by Valle, granted by Valle to the Lender over 50.1% of the Capital Stock of Holdings, governed by the laws of Panama.

Execution Version

*Indebtedness* means, as to any Person, without duplication, (a) all indebtedness of such Person in respect of (i) borrowed money or advances including, but not limited to, obligations in connection with acceptance facilities and letter of credit facilities, whether or not drawn and (ii) the deferred purchase price of Property or services, (b) all payment obligations, contingent or otherwise, of such Person evidenced by bonds, debentures, notes, or other similar securities, (c) all direct or indirect guarantees of such Person in respect of, and all obligations (contingent or otherwise) of such Person to any other Person for, borrowed money or for the deferred purchase price of Property or services, (d) all obligations of such Person as lessee under leases which shall have been or ought to be, in accordance with GAAP, recorded as capital leases, (e) all indebtedness of another Person secured by a Lien on any Property owned by such Person, whether or not such Person has assumed or otherwise become liable for the payment thereof, and (f) net liabilities arising under derivative transactions, repurchase agreements or hedging transactions. The Indebtedness of any Person shall include the Indebtedness of any other Person to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

*Indemnified Parties* has the meaning ascribed to it in Section 10.14(a).

*Interest Payment Date* means the last day of each Interest Period.

*Interest Period* means, for each Loan, (a) initially, the period commencing on the Drawdown Date thereof and ending on (but not including) the last day of that calendar month, and (b) then, each period commencing on the last day of the immediately preceding Interest Period and ending on (but not including) the last day of the next calendar month; provided, however, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall end on the next preceding Business Day and (ii) no Interest Period may end after the Final Maturity Date.

*Interest Rate* means, for any Loan at any time, the LIBO Rate plus the Applicable Margin, subject, however, to Section 2.4(a) below.

*Interest Rate Determination Date* means, for any Interest Period in respect of any Loan, the day two London Banking Days prior to the first day of the relevant Interest Period.

*Judgment Currency* has the meaning ascribed to it in Section 10.13.

*Judgment Currency Conversion Date* has the meaning ascribed to it in Section 10.13.

*Lakeview Security Agreement* means the Assignment and Security Agreement dated as of the Execution Date between Lakeview and the Lender pursuant to which Lakeview grants to the Lender a first priority security interest in all of its right, title and interest in and to the Conditional Assignment to which it is a party.

Execution Version

***Las Quinchas*** means Las Quinchas Resource Corp., currently a Barbados company.

***Las Quinchas Pledge*** means the Share Pledge Agreement to be entered into promptly upon Las Quinchas being controlled, directly or indirectly, by Valle, granted by Holdings to the Lender over at least 50.1% of the Capital Stock of Las Quinchas, governed by the laws of Panama.

***Lender*** has the meaning ascribed to it in the preamble.

***Liabilities*** have the meaning ascribed to it in Section 10.14(a).

***LIBO Rate*** means, for any Interest Period in respect of any Loan, the rate per annum (rounded upward to the nearest one eighth of a percentage point), as determined on the basis of the offered rates for deposits in Dollars, for a period of three months as shown on the display page designated as Reuters01 (or such other page as may replace that page) as of 11:00 a.m. London time on the relevant Interest Rate Determination Date (or if such period is not shown then the interpolated rate for the two closest periods that are shown); provided, however, if the rate described above does not appear on the Reuters page on the relevant Interest Rate Determination Date, the LIBO Rate shall be the rate for deposits in Dollars for a period of three months on the display page of Bloomberg designated as BBAM (or such other page as may replace the BBAM Page on Bloomberg for the purpose of displaying such rates) as of 11:00 a.m. (London time) on the relevant Interest Rate Determination Date (or if such period is not shown then the interpolated rate for the two closest periods that are shown). If both the Reuters and Bloomberg services are unavailable, then the rate for that date will be determined on the basis of the offered rates for deposits in Dollars for a period of three months which are offered by four major banks in the London interbank market at approximately 11:00 a.m. London time on the relevant Interest Rate Determination Date as selected by the Lender. In the event that the Lender is unable to obtain any such quotation as provided above, it will be deemed that the LIBO Rate for such Interest Period cannot be determined and Section 2.5 shall be applicable.

***Lien*** means any lien, mortgage, assignment, pledge, hypothecation, fiduciary lien, deposit arrangement, title retention, trust, encumbrance, security interest or other charge, or any other type of preferential arrangement, priority or other security agreement having the practical effect of constituting a security interest, upon or with respect to any Property or other Asset, including, without limitation, any agreement to give any of the foregoing.

***Loan*** or ***Loans*** has the meaning ascribed to it in Section 2.1(a).

***Margin Stock*** means "margin stock" within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

***Masering*** means Masering Holding S.A.S., a Colombian company.

Execution Version

*Masering Guaranty* means the guaranty dated as of the Execution Date and issued by Masering in favor of the Lender, governed by Colombian law.

*Material Adverse Effect* means, in each case as determined by the Lender in its sole discretion, (a) a material adverse effect on the business condition, operations, performance, property or prospects of any Borrower, any of their Affiliates or any Guarantor, (b) a material adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder, or (c) a material adverse effect on the ability of any Borrower or Guarantor or Holdings to perform its respective obligations under any Credit Document to which it is a party.

*Mid Summer* means Mid Summer Capital Corp., a British Virgin Islands company.

*Mid Summer Security Agreement* means the Assignment and Security Agreement dated as of the Execution Date between Mid Summer and the Lender pursuant to which Mid Summer grants to the Lender a first priority security interest in all of its right, title and interest in and to the Conditional Assignment to which it is a party.

*Note* means the promissory note in connection with the Loans, to be issued in the form of Annex A hereto, duly executed by the Borrowers.

*Notice of Drawdown* has the meaning ascribed to it in Section 2.2(a).

*Obligation Currency* has the meaning ascribed to it in Section 10.13.

*Obligations* mean any and all obligations of any of the Borrowers under this Agreement and the other Credit Documents.

*OFAC* means the Office of Foreign Assets Control of the United States Department of the Treasury.

*OFAC Lists* has the meaning ascribed to it in Section 3(w).

*OFAC Violation* has the meaning ascribed to it in Section 5(p).

*Off-take Contract* means the contract between Las Quinchas and Pacific dated February 19, 2014 providing for the sale by Las Quinchas to Pacific of the oil produced from the Chípalo, Moriche, Guásimo y las Quinchas blocks in Colombia.

*Off-take Pledge* means the *Contrato de Cesión de Créditos en Garantía*, dated as of the Execution Date, granted by Las Quinchas to the Lender over the Off-take Contract as security for the payment of the Obligations, governed by Colombian law.

*Ordóñez-Masering Group* means any of Oscar Alberto Ordóñez Muñóz, Luz Angela Beltrán Donoso, Sergio Andres Ordóñez Beltrán and/or Nicolás Ordóñez Beltrán.

9

Execution Version

*Other Taxes* has the meaning ascribed to it in Section 8.2.

*Pacific* means Pacific Stratus Energy Colombia Corp., a Panamanian corporation.

*Patriot Act* means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, United States Public Law 107-56.

*Person* means any individual, corporation, partnership, trust, unincorporated organization, joint stock company or other legal entity or organization and any Governmental Authority.

*Principal Repayment Date* means each Interest Payment Date starting with the eighth Interest Payment Date from the date of the first Drawdown.

*Process Agent* has the meaning ascribed to it in Section 10.8(b).

*Property* means any right of interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

*Reserve Amount* means (a) during the first seven months from and after the first Drawdown Date, the amount equal to the interest payable on the next Interest Payment Date and (b) at all times thereafter the amount equal to the principal and interest payable on the next Principal Repayment Date.

*Responsible Officer* of any Person means the Chairman, Chief Executive Officer, Chief Financial Officer, President, any Executive Director, Director, Vice President, Treasurer or Assistant Treasurer of that Person, or any other Person who is duly authorized by the board of directors or other governing body of that Person.

*Restricted Payment* means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other Property) with respect to any equity interests in such Person or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity interests, or any option, warrant or other right to acquire any such equity interests.

*Security Agreements* means the Las Quinchas Pledge, the Holdings Pledge, the Valle Pledge, the Assignment and Security Agreements, the Off-take Pledge and the Account Control Agreement.

*Senior Indebtedness* has the meaning ascribed to it in Section 9.6.

*Subsidiary* means, as to any Person, a corporation, partnership or other entity of which Capital Stock having ordinary voting power (other than Capital Stock having such power

Execution Version

only by reason of the happening of a contingency) to elect a majority of the board of directors (or similar governing body) or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.

***Taxes*** has the meaning ascribed to it in Section 8.1(a).

***Valle Pledge*** means the Equitable Mortgage, dated as of the Execution Date, granted by Valle to the Lender over all of the Capital Stock of Lakeview, governed by the laws of the British Virgin Islands.

## 1.2   OTHER DEFINITIONAL PROVISIONS.

(a)   The term "including" is not limiting and means "including without limitation".

(b)   The words "hereof", "herein" and "hereunder" and words of similar import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)   References to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute to which reference is made.

(d)   References to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such agreements and instruments, but only to the extent that such amendments and other modifications are permitted by, or not prohibited by, the terms of this Agreement.

(e)   The meaning given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)   In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly presented.

(g)   All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement or any other Credit Document shall be prepared in English and in conformity with, applicable GAAP

11

Execution Version

(including principles of consolidation where appropriate) applied on a consistent basis, as in effect from time to time.

## 2. THE FACILITY.

2.1  **THE LOANS.** (a) The Lender agrees, subject to the terms and conditions and relying upon the representations and warranties hereinafter set forth in this Agreement, to grant to the Borrowers a credit facility to be disbursed at Lender's sole discretion in one loan or in several loans during the Availability Period (each a "**Loan**" and together, the "**Loans**"), provided that the aggregate principal amount of all Loans outstanding hereunder at any one time shall not exceed the Facility Amount.

(b) Amounts paid, repaid or prepaid in respect of the Loans may not be reborrowed. THIS AGREEMENT DOES NOT CONSTITUTE A COMMITMENT ON THE PART OF THE LENDER TO MAKE ANY LOANS HEREUNDER.

2.2  **NOTICE OF DRAWDOWN; FUNDING BY THE LENDER.**

(a)  A Borrower shall draw a Loan by giving a notice in the form of Annex B hereto (the "**Notice of Drawdown**") to the Lender, which notice must contain a proposed Drawdown Date of three Business Days thereafter and during the Availability Period. If a Notice of Drawdown is received by the Lender after 12:00 p.m. (New York time) on any day it shall be deemed as having been received on the next Business Day. The receipt of the Notice of Drawdown by the Lender shall obligate such Borrower to borrow the aggregate principal amount of such Loan on the date set forth therein if the Lender decides in its sole discretion to make the relevant Loan.

(b)  Upon receipt of the Notice of Drawdown, and provided that all the applicable conditions set forth in Section 4, as the case may be, shall have been satisfied and the Lender has decided to make the requested Loan, the Lender shall make the relevant Loan available on the proposed Drawdown Date by wire transfer to such account of the relevant Borrower as it has indicated in the Notice of Drawdown.  In no event does the Lender have any obligation to make a Loan that has been requested by a Borrower, even if the Borrowers have satisfied all of the conditions of Section 4 hereof.

2.3  **NOTE; LENDER'S RECORDS.** The Loans shall be evidenced by a single Note duly executed on behalf of the Borrowers, dated the first Drawdown Date, with the blanks appropriately filled, and payable to the order of the Lender.  The Lender shall maintain in accordance with its usual practice records evidencing the indebtedness of the Borrowers to the Lender resulting from each Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder, and such records shall be conclusive and binding on the Borrowers absent manifest error, but the failure to record, or any error in so recording, any such amount in the Lender's records shall not affect the obligations of the Borrowers hereunder or under the Note held by the Lender to make payments of principal of and interest on such Note when due.

12

Execution Version

2.4 **INTEREST ON THE LOANS.**

(a) The Borrowers shall pay to the Bank interest on the unpaid principal amount of each Loan, at a rate per annum equal to the Interest Rate provided, however, that in no event shall the Interest Rate ever be less than 12.50% *per annum*. Each determination of an Interest Rate by the Bank pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers in the absence of clearly demonstrable error.

(b) Interest for each Loan shall be computed on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed, counted from the relevant Drawdown Date, and shall be payable in arrears on each Interest Payment Date.

2.5 **ALTERNATIVE INTEREST RATE FOR LIBO RATE.** If, prior to the first day of any Interest Period, the Lender shall have determined (which determination shall be conclusive and binding upon the Borrowers) that (a) this Section is applicable pursuant to the definition of LIBO Rate, or (b) the LIBO Rate as determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to the Lender of making or maintaining the relevant Loan during such Interest Period, the Lender shall give notice thereof to the Borrowers as soon as practicable thereafter. Upon the giving of such notice by the Lender the LIBO Rate portion of the Interest Rate to be applicable to the relevant Loan for such Interest Period shall be the per annum rate reflecting the cost to the Lender of funding the relevant Loan from whatever source the Lender may reasonably select. Each determination by the Lender shall be conclusive absent manifest error.

2.6 **DEFAULT INTEREST RATE.** If any amount due hereunder on or in respect of the Loans or under the Note, including principal, interest, fees, premiums, expenses or any other amount, is not paid when due (whether at maturity, by acceleration or otherwise), then interest shall accrue on such overdue amount at a rate per annum equal to the Interest Rate plus five percent (5%) per annum or, if less, the highest default interest rate permitted by applicable law, for each day counted from the due date thereof until full and effective payment (after as well as before judgment). Interest accruing on overdue amounts pursuant to this Section shall be payable monthly.

2.7 **REPAYMENT MECHANISM. COLLECTION ACCOUNT.**

(a)   The principal of the Loans will be repaid in equal installments, with one installment being paid on each Principal Repayment Date.

(b)   The primary mechanism for the repayment of the Loans shall be through the payments due under the Conditional Assignments and/or under the Off-take Contract, which shall be paid directly into the Collection Account.

(c)   The proceeds of all payments made to the Collection Account shall be held by the Lender in the Collection Account until it contains an amount equal to the Reserve Amount, and provided no Event of Default has occurred and is continuing (if an Event of

Execution Version

Default has occurred and is continuing the Lender shall follow the procedure set forth in clause (d) below) and that the Borrowers are in compliance with their obligations under Section 5(k) hereof both before and after such release, any excess amounts received shall be released to the Borrowers by transfer to an account designated in writing by the Borrowers to the Lender.

(d)      Upon the occurrence of (i) any Principal Repayment Date, (ii) any other date on which any amount is payable hereunder or (iii) any Event of Default (unless such Event of Default has been waived or cured in accordance with the provisions hereof) the Lender shall debit (or in the case of clause (iii) hereof, at any time thereafter as the Lender shall determine in its sole discretion the Lender shall debit) the Collection Account and apply such funds in accordance with Section 2.8 hereof.

(f)      In the event that any installment of principal or any other amount in respect of any Loan is not paid when due, or if any such principal or other amount remains outstanding on the Final Maturity Date, the Borrowers shall immediately pay such amount to the Lender and the Lender may demand payment thereof under the Note.

(g)      As collateral security for the Obligations, Valle hereby assigns, pledges, grants, transfers and conveys to the Lender a continuing first priority lien and security interest in all of its right, title and interest in and to the Collection Account and the funds therein, whether now owned or hereafter acquired and whether now existing or hereafter arising. In no event is the foregoing intended to imply (or to be an acknowledgement by the Lender) that Valle actually has any rights to the Collection Account, but merely to serve as a pledge and assignment of any such rights to the extent Valle is determined to have any such rights.

2.8    **METHOD OF PAYMENT.** All payments of principal and all payments of interest, fees and other amounts payable hereunder shall be made by means of the Lender's debiting the Collection Account in accordance with the terms hereof, or, in the absence of sufficient funds available in the Collection Account on the relevant payment date, by means of payments by the Borrowers or Pacific to the Collection Account (for immediate debit by the Lender as provided in Section 2.7 above) or such other account as the Lender shall so instruct, with each such payment (whether by debit from the Collection Account or transfer from a Borrower or Pacific) to be made in immediately available Dollars, on or before 11:00 a.m. (New York time) on the due date thereof, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any Taxes or other payments (except for Taxes required to be deducted by law and for which such payment is grossed up as provided in Section 8.1 hereof). Payments received after this time shall be deemed to have been received by the Lender on the following Business Day. For purposes of clarification, if funds are blocked or frozen upon receipt at such account pursuant to any Economic and Trade Sanctions and Anti-Terrorism Laws, then such funds will not constitute payment hereunder. Until the Borrowers have discharged the Obligations in full, all amounts received by the Lender from the Borrowers or for their account shall be applied by the Lender in the following way: (a) first, in discharge

Execution Version

of any right of indemnification (with respect to increased costs, taxes or otherwise) of the Lender due and payable under any Credit Document; (b) second, in discharge of any fees, costs or expenses then due and payable under this Agreement; (c) third, in discharge of any interest (including capitalized interest) accrued, due and unpaid; (d) fourth, in repayment of the principal amount of the Loans then due; (e) fifth, in discharge of any other Obligations then due; and (f) sixth, any surplus shall be paid as the Borrowers may direct in writing, or to the Person otherwise entitled, provided that in case of a Default or Event of Default, the Lender shall retain any such surplus until further disposition in accordance with the terms hereof.

2.9 **ILLEGALITY.** Notwithstanding any other provisions herein, if at any time the Lender shall have determined in good faith (which determination shall be final and conclusive) that compliance by the Lender with any applicable law or governmental regulation, guideline or order or interpretation thereof or change therein by any Governmental Authority charged with the interpretation or administration thereof or with any request or directive of any such Governmental Authority shall make it unlawful for the Lender to make or maintain any Loan hereunder, then, and in any such event, the Lender shall immediately so notify the Borrowers thereof. If such change in circumstances occurs prior to the disbursement of any Loan hereunder by the Lender, then such Loan will not be made and all the Lender's other obligations hereunder shall terminate without any indemnification in favor of the Borrowers. If such change in circumstances occurs while any Loan is outstanding, the Borrowers shall prepay the outstanding principal amount of the relevant Loans, together with accrued interest thereon and all other amounts payable under this Agreement immediately or, if it is permitted by the relevant law, at the end of the then current Interest Period, in any case subject to the indemnification obligations set forth in Section 2.11.

2.10   **INCREASED COSTS.**

(a) If any Change in Law (i) subjects the Lender to any tax, duty, mandatory contribution or other charge or payment of any kind whatsoever with respect to this Agreement or the Note, or to any extraordinary tax, or changes the basis of taxation of any payments to the Lender hereunder or under the Note (except any change in the rate of tax on the overall income of the Lender imposed by the jurisdiction in which the principal office of the Lender is located), or (ii) imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Lender, or shall impose on the Lender any other condition affecting this Agreement or the Note, and the result of any of the foregoing is to increase the cost to the Lender of making or maintaining any Loan, or to reduce the amount of any payment received or receivable by the Lender, or to impose on the Lender an obligation to make any payment to any fiscal, monetary, regulatory or other authority calculated on or by reference to any amount received or receivable by it under this Agreement or the Note, by an amount deemed by the Lender to be material, then the Borrowers shall pay to the Lender, promptly upon demand, such additional

15

amount or amounts as will compensate the Lender for such increased cost or reduction in the amount received or receivable.

(b) The Lender shall notify the Borrowers of any event that will entitle the Lender to such additional amount or amounts pursuant to this Section 2.10 (and in respect of which the Lender intends to claim compensation pursuant to this Section 2.10) as promptly as practicable after becoming aware of such event, provided, however, that failure to give any such notice shall not impair the Lender's rights under this Section 2.10. A certificate of the Lender setting forth the basis for the determination of such additional amount or amounts necessary to compensate the Lender as provided herein shall be conclusive and binding, absent manifest error.

2.11 **INDEMNITY.** The Borrowers shall indemnify the Lender against any loss or reasonable expense which the Lender may sustain or incur as a consequence of (a) any failure by the Borrowers to fulfill on the date set forth in the relevant Notice of Drawdown the applicable conditions set forth in Section 4 hereof, (b) any failure by the Borrowers to borrow a Loan hereunder after irrevocable notice of such borrowing has been given pursuant to Section 2.2, provided that the Lender had agreed to make the requested Loan, or (c) any payment of a Loan on other than the scheduled payment date therefore, including, in each such case, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain the relevant Loan or any part thereof. A certificate of the Lender setting forth in reasonable detail (including the method of computation) any amount or amounts which the Lender is entitled to receive pursuant to this Section and evidencing a loss suffered by the Lender of such amount or amounts shall be delivered to the Borrowers and shall be conclusive absent manifest error.

2.12 **OPTIONAL PREPAYMENT.** The Borrowers shall be entitled to prepay, in whole or in part, the principal amount of any outstanding Loan, *provided* that all of the following conditions shall have been satisfied: (a) the principal amount prepaid shall be paid together with (i) accrued interest on the relevant amounts of the Loan then being prepaid to the date of such prepayment, and (ii) any amounts due pursuant to Section 2.11 above; (b) the relevant Borrower shall have received all necessary approvals for such prepayment from all relevant Governmental Authorities, if any are required; and (c) the Borrowers shall have given the Lender not less than five (5) Business Days' prior written notice of its intention to prepay the Loans, which notice shall be irrevocable and shall specify the amount being prepaid and the prepayment date. All principal amounts prepaid hereunder shall be applied against installments due in the inverse order of maturity.

3.   **REPRESENTATIONS AND WARRANTIES.** As of the Execution Date and each Drawdown Date, the Borrowers, jointly and severally, represent and warrant to the Lender that:

(a) **CORPORATE EXISTENCE.** It is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite

Execution Version

corporate power and authority and all necessary material licenses, authorizations, consents, approvals and permits to own its Properties and Assets and to conduct the business in which it is currently engaged, without conflict with the rights of any other Person, and is duly qualified and licensed as a foreign corporation in good standing in each jurisdiction where such qualification is required. Its shareholders have not taken any steps to authorize or institute its liquidation or dissolution.

(b) **NO BREACH.** The execution, delivery and performance of the Credit Documents do not and will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents (other than consents which have been obtained prior to the Execution Date, are in full force and effect and with respect to which all conditions to be complied with have been fulfilled), (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its Properties are bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its Properties or Assets, other than pursuant to the Credit Documents. It is in compliance with all applicable laws and regulations (including labor laws and regulations) and the terms of all material licenses held by it or applicable to it or its Property, and all indentures, agreements and other instruments binding upon it or its Property.

(c) **AUTHORITY; BINDING EFFECT.** It has all necessary corporate power, authority and legal right to execute, deliver and perform its obligations under the Credit Documents to which it is a party; the execution, delivery and performance by it of the Credit Documents to which it is a party, and the borrowings hereunder, have been duly authorized by all necessary action on its part; and this Agreement and the other Credit Documents to which it is a party have been duly executed and delivered by it and constitute, together with the Note, when executed and delivered, its legal, valid and binding obligations, enforceable against each of them in accordance with their respective terms.

(d) **USE OF PROCEEDS.** The proceeds of the Loans shall be used by the Borrowers solely to finance the amounts due by Lakeview and the Guarantors under the Conditional Assignment Agreements and for certain capital expenditures.

(e) **TAX RETURNS AND PAYMENTS.** All income and other tax returns of the Borrowers and the Guarantors required by law to be filed have been duly filed, and all taxes, assessments and other governmental charges (other than those which can be paid without penalty) upon the Borrowers, the Guarantors or any of their respective Properties shown thereon have been paid to the extent that such taxes, assessments and other governmental charges have become due and payable and are not being contested in good faith, except where the failure to make such filings or pay such taxes, assessments and other governmental charges would not have a Material Adverse Effect. The charges, accruals and reserves on the books of the Borrowers and the Guarantors in respect of taxes are adequate in all material respects and no additional assessments exist for any year, which

Execution Version

materially exceed such reserves. There are no tax Liens filed against any of the Properties of the Borrowers or the Guarantors.

(f) **LITIGATION.** There are no legal or arbitral proceedings, or any proceedings by or before any Governmental Authority or agency, now pending or (to its knowledge) threatened against or affecting any Borrower or any Guarantor either (i) with respect to or arising out of this Agreement, the other Credit Documents or the transactions relating hereto or thereto, or (ii) which, if adversely determined, could have a Material Adverse Effect.

(g) **ABSENCE OF DEFAULTS.** No Default has occurred and is continuing.

(h) **GOVERNMENTAL APPROVALS.** No Governmental Approval (except for those that have already been obtained, are in full force and effect and with respect to which all conditions to be complied with have been fulfilled) or other act by or in respect of, any Governmental Authority, or consent or authorization of, approval by or notice to any other Person is required or is necessary (i) in connection with the execution, delivery and performance of the Credit Documents, (ii) for the validity and enforceability against any of the Borrowers or Guarantors, as the case may be, of the Credit Documents to which they are party, or (iii) for the availability and transfer of Dollars required to make payments under the Credit Documents.

(i) **FINANCIAL CONDITION.** The consolidated annual audited financial statements dated as of December 31, 2012 of Valle (the "**Financial Statements**"), including the related schedules and notes, fairly present the financial condition of Valle on a consolidated basis as of the date and the results of its operations for the period stated therein and have been prepared in accordance with GAAP, consistently applied throughout the periods involved. On the date on which such Financial Statements were prepared, neither any Borrower or Guarantor had any liabilities (contingent or otherwise) which were not disclosed thereby (or by the notes thereto) or reserved against therein nor any unrealized or anticipated losses arising from commitments entered into by it which were not so disclosed or reserved against. Since December 31, 2012, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect. Neither any Borrower nor any Guarantor has any contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including, without limitation, any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, which are not reflected in the Financial Statements, including the related notes thereto, or which have not been disclosed in writing to the Lender prior to the date hereof.

(j) **RANKING.** The obligations evidenced by each of the Credit Documents are its direct, unconditional and unsubordinated senior obligations, and rank and will continue to rank, upon its bankruptcy or insolvency, in right of (i) payment, at least *pari passu* with all its other obligations or Indebtedness, except obligations or Indebtedness mandatorily

18

Execution Version

preferred by operation of applicable law, and (ii) collateral security, senior, to the extent of the Collateral pledged by it, to all other its other obligations or Indebtedness.

(k) CHOICE OF LAW. In any action or proceeding involving it that arises out of or is related to this Agreement or the other Credit Documents in any court of the British Virgin Islands or Colombia, as the case may be, the Lender would be entitled to the recognition and enforcement of the choice of law provisions contained herein and therein.

(l) CIVIL LAW; NO IMMUNITY. It is subject to civil and commercial law with respect to its obligations under the Credit Documents and the execution, delivery and performance of the Credit Documents to which it is a party, constitute private and commercial activities rather than public or governmental acts. Neither it nor any of its Property has any immunity (sovereign or otherwise) from the jurisdiction of any court or from setoff or any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of any jurisdiction.

(m) SOLVENCY. After giving effect to the execution and delivery of this Agreement and the making of the Loans under this Agreement: (i) it will not (A) be "insolvent," as defined or used in any "Applicable Law" (as such term is defined below), (B) be unable to pay its debts generally as such debts become due or (C) have an unreasonably small capital to engage in any business or transaction, whether current or contemplated; (ii) its obligations under this Agreement and with respect to the Loans will not be rendered avoidable under any Applicable Law, and (iii) the sum of its Indebtedness (including its obligations under this Agreement and the other Credit Documents) is less than the value of its Property (calculated at the lesser of the cost of the Property and its fair market value). "Applicable Law" means the bankruptcy law of the British Virgin Islands, and any other applicable law pertaining to fraudulent transfers or acts voidable by creditors, in each case as such law may be amended from time to time.

(n) COMPLETENESS AND ACCURACY OF INFORMATION. There is nothing that would, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect which has not been disclosed to the Lender in writing in connection with or pursuant to the terms of this Agreement. All information supplied by it to the Lender relating to it was true and accurate in all material respects as of the date supplied, and did not as of such date, and does not as of the Execution Date, in each case viewed individually or in the aggregate, omit to state any material information necessary to make the information therein contained, in light of the circumstances under which such information was supplied, not misleading.

(o) MARGIN STOCK. No Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no part of the proceeds of any Loan has been, or will be, used to buy or carry any Margin Stock.

19

(p) **PROPER FORM.** The Credit Documents are in proper legal form under the laws of the British Virgin Islands, Colombia, Panama and Barbados for the enforcement thereof in each of the British Virgin Islands, Colombia, Panama and Barbados, as the case may be; provided that for Colombian purposes the Credit Documents that are signed outside of Colombia should be signed before a notary public and then an apostille should be obtained.

(q) **SECURITY INTERESTS.** On and after the date of execution and delivery thereof, the Security Agreements create (or will create, as the case may be), as security for the obligations purported to be secured thereby, subject to the provisions hereof and thereof, valid and enforceable first priority perfected security interests in and Liens on all of the Collateral subject to such agreement, in favor of the Lender. Each Borrower and each Guarantor has good title to all of its Collateral free and clear of all Liens, except as created under the Security Agreements. No filings or recordings are required in order to perfect the security interests created under the Security Agreements except for filings or recordings listed in such agreements, all of which shall have been (or will be) made on or prior to each Drawdown Date, except as otherwise expressly provided in such agreements or herein.

(r) **ENVIRONMENTAL MATTERS.** Neither any Borrower's nor any Guarantor's Properties contain, nor have they previously contained, Hazardous Materials in amounts or concentrations that constitute or constituted any violation of, or reasonably could give rise to any liability under, Environmental Laws, and each Borrower, each Guarantor, their respective Properties and all operations at such Properties are in compliance and at all times have been in compliance in all respects with all Environmental Laws, and there is no contamination at, under or about the Properties which could interfere with the continued operation of such Properties or impair the fair market value thereof. Neither any Borrower nor any Guarantor has, or has assumed of any Person, any liability under any Environmental Laws.

(s) **ASSETS.** Each Borrower and Guarantor has good title to, or valid leasehold interests in, all its real and personal Property related to its business, except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such Property for its intended purposes. Each Borrower and Guarantor owns or is licensed or otherwise has the right to use all of the patents, contractual franchises, licenses, authorizations and other rights that are reasonably necessary for the operation of its business, without conflict with the rights of any other Person.

(t) **INVESTMENT COMPANY ACT; REGULATORY LIMITATIONS.** No Borrower is (i) an "investment company," as defined in the Investment Company Act of 1940, as amended, or (ii) subject to any statute or regulation that prohibits or restricts the incurrence of obligations under this Agreement,.

(u) **INSURANCE.** It has in full force and effect insurance coverage with financially sound and reputable insurance companies and in such amounts and covering such risks as are

usually carried by companies engaged in similar businesses and owning and/or operating Properties similar to those owned and/or operated by it.

(v) **WITHHOLDING TAXES.** There is no income, stamp or other tax, duty, impost, deduction or other charge imposed (whether by withholding or otherwise) by the British Virgin Islands, Barbados, Panama or Colombia (including any political subdivision of any thereof) or any Governmental Authority of the British Virgin Islands, Barbados, Panama or Colombia on or by virtue of the execution or delivery of this Agreement, any other Credit Document or any other document required to be delivered hereunder or thereunder.

(w)    **ANTI-TERRORISM LAWS.** None of any Borrower, any Guarantor, nor, to the best of their knowledge, any *Persons holding any legal or beneficial interest whatsoever in any Borrower or any Guarantor* (whether directly or indirectly) (i) are named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC or any list of Persons issued by OFAC pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as in effect on the date hereof, or any similar list issued by OFAC (collectively, the **"OFAC Lists"**); (ii) are Persons determined by the Secretary of the Treasury of the United States pursuant to Executive Order 13224 to be owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in the OFAC Lists; or (iii) have conducted business with or engaged in any transaction with any Person identified in (i) or (ii) above.

## 4. CONDITIONS PRECEDENT OF THE LOANS.

4.1    **DOCUMENTS.** The decision of the Lender to make the first Loan hereunder is subject to the receipt by the Lender (unless waived by the Lender in writing) of each of the following documents, each of which shall be satisfactory to the Lender in form and substance:

(a)    **CREDIT DOCUMENTS.** Each of the Credit Documents (except for the Holdings Pledge and the Las Quinchas Pledge) and each of the documents to be executed and delivered under each of the Credit Documents, duly executed and delivered by all parties thereto;

(b)    **CORPORATE DOCUMENTS AND AUTHORIZATIONS.** Copies of (i) the Governing Documents of each Borrower and each Guarantor certified as of the Execution Date as a complete and correct copy thereof by a Responsible Officer thereof, and (ii) the resolutions of the directors meeting or other equivalent corporate act (if required by its Governing Documents) for each Borrower and each Guarantor, authorizing the execution, delivery and performance of the Credit Documents to which it is party and the transactions contemplated thereunder;

21

(c) **OFFICER'S CERTIFICATE.** A certificate of each Borrower and each Guarantor, substantially in the form of <u>Annex C</u> or <u>Annex D</u>, as the case may be, each dated the Execution Date, and executed by a Responsible Officer thereof;

(d) **GOVERNMENTAL AND THIRD PARTY APPROVALS.** Copies of all Governmental Approvals required for the making and/or maintenance of the Loans and the performance of all obligations and transactions contemplated by the Credit Documents, and copies of all registrations, filings, approvals and consents of all other Persons necessary for the making or maintenance of the Loans, if any, including all approvals required pursuant to the terms of each Borrower's existing Indebtedness;

(e) **APPOINTMENT OF PROCESS AGENT.** Satisfactory written evidence that the Process Agent has accepted its appointment as the agent for the receipt of any and all legal process for each Borrower pursuant to Section 10.8(b), for each Guarantor pursuant to the Guarantees and for each of Cloister Blue, Green Acres, Lakeview and Mid Summer pursuant to the Assignment and Security Agreement to which it is a party;

(f) **OPINION OF COUNSEL.** Legal opinions dated as of the Execution Date, addressed to the Lender, from (i) Landay Leblang Stern, New York counsel to the Lender; (ii) Harridyal Sodha Associates, Barbados counsel to the Lender and (iii) Lewin & Wills, Colombian counsel to the Lender;

(g) **FINANCIAL STATEMENTS.** Copies of the Financial Statements; and

(h) **OTHER DOCUMENTS.** Such other documents as the Lender requests.

4.2 **OTHER CONDITIONS.** The decision of the Lender to make each Loan hereunder is also subject to the satisfaction (as determined by the Lender in its sole discretion) of the following conditions precedent, and the disbursement by the Lender of the relevant Loan shall constitute a representation by the Borrowers that each of the following conditions (other than Sections 4.2(c) and (g) below) shall have been satisfied on and as of the relevant Drawdown Date:

(a) **REPRESENTATIONS AND WARRANTIES.** The representations and warranties contained in Section 3 of this Agreement or otherwise made by the Borrowers in connection with the transactions contemplated by this Agreement shall be correct as of the relevant Drawdown Date (both immediately before and after giving effect to the relevant Loan) with the same effect as if made at and as of such time;

(b) **NO PROHIBITION.** No applicable law, regulation, directive, communication or action has been imposed, issued or taken by any Person (including but not limited to any Governmental Authority) that would have a Material Adverse Effect or that prohibits or prevents the usage of the relevant Loan as set forth in Section 3(d) hereof;

Execution Version

(c) **NO MATERIAL ADVERSE EFFECT.** There has been no Material Adverse Effect, nor in the judgment of the Lender has there been any material adverse change or development involving a prospective material adverse change in (i) United States, British Virgin Islands, Colombian, Barbados, Latin American or international financial, banking, political or economic conditions, (ii) the political, social, economic or financial condition of the British Virgin Islands, Barbados or Colombia, (iii) the currency exchange rates or controls imposed by any Governmental Authority of the British Virgin Islands, Barbados or Colombia applicable to Dollars or lawful local currency of such jurisdiction, (iv) any legislation, rules or regulations affecting financial transactions of the same nature as the one reflected by the Credit Documents, or (v) the loan syndication or capital markets with respect to British Virgin Islands, Colombian, Barbados and/or Latin American issuers;

(d) **NO DEFAULT.** The Borrowers and the Guarantors shall have performed and complied with all terms and conditions required to be performed or complied with by them pursuant to the Credit Documents prior to or on the relevant Drawdown Date, and on the relevant Drawdown Date, both immediately before and after giving effect to such Loan, there shall exist no Default;

(e) **REQUIRED FEES.** The Borrowers shall have paid all fees and expenses then due and payable to the Lender;

(f) **SECURITY INTEREST; COLLECTION ACCOUNT.** The Lender shall have a first priority perfected security interest in all of the Collateral (and UCC-1 filings listing each of Valle, Cloister Blue, Green Acres, Lakeview and Mid Summer as debtors have been filed in Washington D.C.) other than the collateral to be provided under the Holdings Pledge and the Las Quinchas Pledge, and the Collection Account has been opened and is fully operational;

(g) **PROCEEDINGS AND DOCUMENTS.** All proceedings in connection with the transactions contemplated by this Agreement and all documents incident thereto shall be satisfactory in form and substance to the Lender, and the Lender shall have received all information and such original documents or certified or other copies thereof as the Lender may reasonably request; and

(h) **ADDITIONAL MATTERS.** The Borrowers shall have delivered to the Lender such other additional information, materials, opinions, authorizations, assurances, or documents as the Lender may request.

**5      AFFIRMATIVE COVENANTS.** The Borrowers, jointly and severally, covenant and agree that so long as any Obligation is outstanding:

(a) FINANCIAL STATEMENTS. The Borrowers will deliver to the Lender:

(i) As soon as available, and in any event no later than ninety (90) days after the end of each fiscal year, Valle's consolidated and, if available, consolidating balance sheet, as of the end of its fiscal year, and the related statement of

23

earnings, shareholders' equity and changes in financial condition prepared in accordance with GAAP, in each case setting forth in comparative form the figures for the previous fiscal year, and accompanied by a report thereon of independent certified public accountants of recognized standing selected by Valle, and reasonably satisfactory to the Lender, which report shall be unqualified and shall state that such consolidated financial statements present fairly its financial position as at the dates indicated and the results of its operations and its changes in financial condition for the periods indicated in conformity with GAAP, applied on a basis consistent with prior years (except for inconsistencies required by changes in GAAP) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(ii) As soon as available, and in any event not later than sixty (60) days after the end of each fiscal quarter Valle's consolidated and, if available, consolidating balance sheet as of the end of such fiscal quarter, and the related statement of earnings, shareholders equity and changes in financial condition prepared in accordance with GAAP, duly certified by its chief financial officer as having been prepared in accordance with GAAP; and

(iii) To the extent applicable, promptly upon their becoming available, any financial statements, reports, notices and proxy statements sent or made available generally by any Borrower or any Guarantor to their respective security holders, any regular and periodic reports and all registration statements and prospectuses filed by them with any securities exchange, or any comparable foreign bodies, and any press releases and other statements made available generally by them to the public concerning material developments in their business.

(b) **ADDITIONAL INFORMATION**. Each Borrower and Guarantor will (i) promptly after it knows or has reason to know that any Event of Default has occurred and is continuing, deliver to the Lender a certificate from a Responsible Officer thereof notifying the Lender as to the occurrence of such Event of Default, describing the same in reasonable detail and describing the actions that it proposes to take with respect thereto, (ii) immediately after the commencement thereof, deliver to the Lender notice in writing of (A) all actions, suits and proceedings before any court or Governmental Authority and (B) all arbitral proceedings in which it becomes involved (and in relation to which it shall obtain the necessary approvals, if any, to disclose the existence of such arbitral proceedings to the Lender), which, if determined adversely to it, would have a Material Adverse Effect, (iii) provide such other information respecting its business, Properties, condition or operations, financial or otherwise, as the Lender may reasonably request, and (iv) promptly upon the re-domiciliation of Las Quinchas in Panama, provide to the Lender copies of all documents evidencing the same, together with a legal opinion from Panamanian counsel stating that such re-domiciliation is effective and confirming

Execution Version

the continued validity of the Credit Documents to which Las Quinchas is at that time a party.

(c) **INSPECTION.** Each Borrower and Guarantor will permit any officers or employees of the Lender or any third party designated by the Lender to visit and inspect any of its Properties and to discuss matters pertinent to an evaluation of its credit or relating to compliance with this Agreement with its principal officers, and to the fullest extent permitted by law and appropriate regulatory authority, to review all books of record and account and any available reports or statements relevant thereto, all as often as they may reasonably request and during regular business hours, after due notice, except at any time at which an Event of Default shall have occurred and be continuing, due notice shall not be required.

(d) **CORPORATE EXISTENCE, TAXES AND MAINTENANCE OF PROPERTIES.** Each Borrower and Guarantor will:

(i) do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights, franchises, permits and licenses, except where the failure to preserve such rights, franchises, permits or licenses could not reasonably, individually or in the aggregate, have a Material Adverse Effect;

(ii) promptly pay, discharge, or cause to be paid and discharged, all taxes, assessments and governmental charges lawfully levied or imposed upon its Property or any part thereof before the same shall become in default, as well as all lawful claims for labor, materials and supplies which, if unpaid, might become a Lien or charge upon such Property or any part thereof. It may in good faith contest any such taxes, assessments, charges or claims, and in the event of such contest may permit the same to remain unpaid, so long as enforcement of such contested item is effectively stayed during the period of such contest and it has established adequate reserves therefor in accordance with GAAP; and

(iii) maintain, preserve and keep its Properties which are necessary to it for the conduct of its business in good repair and working order (ordinary wear and tear excepted) and from time to time will make all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained.

(e) **COMPLIANCE WITH LAWS; MAINTENANCE OF APPROVALS.** Each Borrower and Guarantor will comply with any and all regulations, rules, laws and orders applicable to it, including, without limitation, any and all regulations, rules, laws and orders pertaining to social security, retirement and pension matters, and it will maintain all Governmental Approvals required for the making and/or maintenance of the Loans and the performance of all obligations and transactions contemplated by the Credit Documents.

Execution Version

(f) **BOOKS AND RECORDS.** Each Borrower and Guarantor will keep proper books of record and account in which full, true and correct entries in conformity with GAAP and the requirements of applicable law shall be made of all dealings and transactions in relation to its business.

(g) **INSURANCE.** Each Borrower and Guarantor will maintain insurance coverage by financially sound and reputable insurers that are acceptable to the Lender and in such forms and amounts, with such deductibles and against such risks, as are customary for business entities of established reputation engaged in the same or a similar business and owning and operating similar Properties.

(h) **RANKING.** It will ensure that the obligations evidenced by each of the Credit Documents are its direct and unconditional obligations and rank upon its bankruptcy or insolvency, in right of (i) payment, at least *pari passu* with all its other obligations or Indebtedness, except obligations or Indebtedness mandatorily preferred by operation of applicable law, and (ii) collateral security, senior, to the extent of the Collateral pledged by it, to all its other obligations or Indebtedness.

(i) **MATERIAL CONTRACTS.** Each Borrower and Guarantor will fully perform its obligations under, and maintain in full force and effect during its stated term, each existing and future agreement or instrument to which it is a party or by which it is bound, except where the failure to so perform or so maintain in full force and effect would not have, individually or in the aggregate, a Material Adverse Effect.

(j) **SECURITY INTEREST.**     It shall (i) perform any and all acts and execute any and all documents (including the execution, amendment or supplementation of any financing statement and continuation statement or other statement) for filing under the provisions of the Uniform Commercial Code and the rules and regulations thereunder, or any other statute, rule or regulation of any applicable foreign, federal, state or local jurisdictions, from time to time, in order to grant and maintain in favor of the Lender first priority security interests in each item of the Collateral perfected to the extent contemplated by the Security Agreements; (ii) deliver or cause to be delivered to the Lender from time to time such other documentation, consents, authorizations, approvals and orders in form and substance satisfactory to the Lender as the Lender shall deem reasonably necessary or advisable to perfect or maintain the Liens for the benefit of the Lender pursuant to the Security Agreements; and (iii) provide copies of the acknowledgements from Pacific that all payments due under the Conditional Assignments and under the Off-take Contract will be made directly to the Collection Account.

(k)     **COLLATERAL.**  (i) It will ensure that at all times the value of the Goods remaining to be paid for under the terms of Conditional Assignments and under the Off-take Contract prior to the Final Maturity Date is equal to or greater than 120% of the Adjusted Outstanding Amount.

Execution Version

(ii) Unless it has obtained the prior written consent of the Lender, which among other things may be conditioned on providing additional collateral of a type and in an amount acceptable to the Lender, it will ensure that the transfers of the rights to the relevant exploration, development and production contract to be made by Pacific pursuant to each of the Conditional Assignments will only be made by transferring those rights to Las Quinchas and then transferring control of Las Quinchas to Valle.

(iii) It will ensure that the following actions will be taken promptly (and in any event within five (5) Business Days) after the date when Valle first gains control, directly or indirectly, of Las Quinchas: (A) each of the Holdings Pledge and the Las Quinchas Pledge shall be executed and delivered by all parties thereto; (B) all actions shall be taken to ensure that the Lender has a first priority security interest in the Collateral that is subject to the Holdings Pledge and the Las Quinchas Pledge, including, without limitation, all filings and registrations, required or recommended by Lender's counsel, in Panama and the British Virgin Islands; and (C) Lender's counsel in Panama is able to issue (and then does issue) a favorable legal opinion to the Lender in respect of the security interests under the Las Quinchas Pledge and the Holdings Pledge, which opinion shall be in form and substance acceptable to the Lender.

(l)    **FURTHER ASSURANCES.** The Borrowers will cooperate with the Lender and execute and deliver such further instruments, documents, authorizations, consents, approvals and orders in form and substance satisfactory to the Lender as the Lender shall reasonably request to carry out the transactions contemplated by this Agreement.

(m)    **ENVIRONMENTAL LAWS.** Each Borrower and Guarantor will comply in all respects with all applicable Environmental Laws and obtain and comply in all respects with and maintain, any and all licenses, approvals, registrations or permits required by applicable Environmental Laws, except where such noncompliance with Environmental Laws, or failure to obtain and so comply with and maintain such licenses, approvals, registrations or permits would not, individually or in the aggregate, have a Material Adverse Effect.

(n)    **USE OF PROCEEDS.** The proceeds of the Loans shall be used by the Borrowers solely to finance the payments due by the Guarantors under the Conditional Assignments and for certain capital expenditures.

(o)    **COMPLIANCE WITH ANTI-TERRORISM LAWS.** (i) Neither any Borrower, Holdings (once controlled directly or indirectly by Valle) nor any Guarantor will knowingly conduct business with or engage in any transaction with any Person named on any of the OFAC Lists or any Persons determined by the Secretary of the Treasury of the United States pursuant to Executive Order 13224 to be owned

27

Execution Version

by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in the OFAC Lists; (ii) if any Borrower, Holdings (once controlled directly or indirectly by Valle) or any Guarantor obtains actual knowledge or receives any written notice that it or any Person holding any legal or beneficial interest whatsoever therein (whether directly or indirectly), is named on any of the OFAC Lists (such occurrence, an **"OFAC Violation"**), such Borrower, Holdings or such Guarantor, as the case may be, will immediately (A) give written notice to the Lender of such OFAC Violation, and (B) comply with all applicable laws with respect to such OFAC Violation (regardless of whether the party included on any of the OFAC Lists is located within the jurisdiction of the United States of America), including, without limitation, the Economic and Trade Sanctions and Anti-Terrorism Laws. Each Borrower hereby authorizes and consents to the Lender taking any and all steps it deems necessary, in its sole discretion, to comply with all applicable laws with respect to any such OFAC Violation, including, without limitation, the requirements of the Economic and Trade Sanctions and Anti-Terrorism Laws (including the rejection of funds or "freezing" and/or "blocking" of assets); and (iii) the Borrowers, Holdings (once controlled directly or indirectly by Valle) and the Guarantors will comply at all times with the requirements of all Economic and Trade Sanctions and Anti-Terrorism Laws, and the Borrowers will, upon the Lender's request from time to time during the term of this Agreement, deliver a certification confirming compliance with the covenants set forth in this Section 5(o).

6. **NEGATIVE COVENANTS**. Each Borrower, jointly and severally, agrees that, so long as any Obligations are outstanding, it will not and will ensure that each Guarantor will not:

(a) TRANSACTIONS WITH AFFILIATES. Enter into any transaction or series of related transactions with any Affiliate thereof, other than in the ordinary course of its business and on terms and conditions substantially as favorable to it as would reasonably be obtained at that time in a comparable arm's length transaction with a Person other than such Affiliate.

(b) MERGERS ETC. Enter into any merger, consolidation, or amalgamation (except for any merger, consolidation or amalgamation in which it is the surviving party), or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any reorganization or corporate restructuring, or in a single transaction or in a series of transactions and whether related or not, sell, transfer, assign or dispose, in any way, of all or any part of its Property or Assets other than (i) disposition of worn out or replaced Assets and (ii) sales of Goods in the ordinary course of its business.

(c) CHANGE IN NATURE OF BUSINESS; GOVERNING DOCUMENTS ETC. (i) Make any material change in the nature of its business as carried on at the date hereof,

Execution Version

or (ii) amend, modify or change any of its Governing Documents, or any agreement entered into by it with respect to its Capital Stock, or enter into any new agreement with respect to its Capital Stock, in each case in any manner materially adverse to the Lender.

(d) LIMIT ON ACCOUNTING CHANGES. Make any change in accounting treatment or reporting practices, change its fiscal year or promote any revaluation of its Assets, except as permitted by GAAP.

(e) LIENS. Create, incur, assume or permit to exist any Liens on or with respect to its Property or Assets, except (i) Liens pertaining to judgments under appeal in good faith by appropriate proceedings, (ii) Liens for taxes not required to be paid but properly reserved against, (iii) mechanics and similar Liens securing sums not past due and Liens of a like nature, (iv) Liens existing on the date hereof and listed on Schedule 1 hereto, and (v) Liens in favor of the Lender.

(f) RESTRICTED PAYMENTS. Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, unless otherwise approved in writing by the Lender.

## 7   EVENTS OF DEFAULT.

If:

(a) Any Borrower or any Guarantor shall (i) fail to pay the principal of any Loan when due or (ii) fail to pay any interest thereon or any other obligation payable by it hereunder or under any other Credit Document, or any fees, when due; or

(b) Any Borrower or any Guarantor shall fail to duly observe or perform any covenants, agreements or obligations contained in Sections 5 or 6 of this Agreement or any Guarantee; or

(c) Any Borrower or any Guarantor or Holdings shall fail to duly observe or perform any other covenants, agreements or obligations contained in this Agreement (other than as provided in subsections 7(a) and 7(b)), any other Credit Document to which it is a party, or any other instrument or document delivered in connection herewith or therewith and such failure continues for a period of 5 (five) days after the earlier of (i) the date on which a Borrower or any other Person, as the case may be, gives notice to the Lender of such failure and (ii) the date on which written notice of such failure shall have been given to the Borrowers by the Lender; or

(d) Any Borrower or any Guarantor, or any of their respective officers, has made any representation or warranty herein or in any other writing furnished pursuant to or in connection with this Agreement or any of the other Credit Documents which shall prove to have been incorrect in any material respect on the date when made or deemed made; or

29

Execution Version

(e) Any Borrower or any Guarantor shall have defaulted in the payment of the principal of or the interest on any of its Indebtedness, when due, whether by scheduled maturity, required prepayment, acceleration, demand or otherwise, or any other default shall have occurred under the terms of any instrument or agreement evidencing or setting forth terms and conditions applicable to any of its Indebtedness, or any other event shall occur or condition exist, if the effect of such default, condition or event is to cause or permit the holder or holders of such Indebtedness (or anyone acting on behalf of such holder or holders) to cause such Indebtedness to become due prior to its date of maturity; or

(f) One or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of US$250,000 (Two Hundred and Fifty Thousand U.S. Dollars) (or its equivalent in another currency) shall be rendered against any Borrower or any Guarantor and such judgment or order shall continue unsatisfied and in effect for a period of 30 (thirty) calendar days; or

(g) Any Borrower or any Guarantor or Pacific shall: (i) generally not, or be unable to, or shall admit in writing its inability to, pay its debts (except for amounts due under this Agreement) as such debts become due; (ii) make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, trustee or other similar official for it or any substantial part of its Assets; (iii) commence any proceeding under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, winding-up or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; (iv) have had any such petition or application (as described in (ii) above) filed or any such proceeding (as described in (iii) above) shall have been commenced, against it, in which an adjudication or appointment is made or order for relief is entered, or which petition, application or proceeding is not dismissed within 30 days of such filing or commencement; (v) have proposed to any creditor or any group of creditors of the same nature and subject to the same payment conditions, an out-of-court reorganization plan, regardless of its confirmation by the relevant court; (vi) have filed for court reorganization, whether such request shall or shall not have been granted by court; or (vii) by any act or omission indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or order for relief or the appointment of a custodian, receiver or trustee for all or any substantial part of its Property; or

(h) Any attachment, execution or legal process shall be enforced against any Assets or Property of any Borrower or any Guarantor which has or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and such attachment, execution or legal process shall remain unstayed and in effect for a period of fifteen (15) days; or

Execution Version

(i) Any material provision of any of the Credit Documents shall cease, for any reason other than the agreement of the Lender or satisfaction in full of all the Obligations, to be in full force and effect, or any Borrower, any Guarantor, Holdings or Masering shall so assert; or any Borrower, any Guarantor, Holdings or Masering shall assert that it does not have any liability under any one or more of the Credit Documents to which it is a party; or this Agreement or any other Credit Document shall not give or shall cease in any material respect to give the Lender the Liens, rights, powers and privileges purported to be created thereby (including a first priority perfected security interest in, and Lien on, all of the Collateral subject thereto) or the validity or enforceability of the Liens granted, to be granted, or purported to be granted, by this Agreement or any other Credit Document shall be contested by any Borrower or any Guarantor or Holdings; or

(j) Pacific fails to make any payment due under a Conditional Assignment or the Off-take Contract to the Collection Account and continuance of such failure or non-payment for a period of five (5) Business Days (whatever the reasons for such failure or non-payment and whether it shall be voluntary or involuntary or be effected by operation of law, pursuant to any judgment, decree or order of any court or any order, rule or regulation of any Governmental Authority);

(k) Las Quinchas (once it is controlled, directly or indirectly by Valle), makes any sale of Goods other than to Pacific, unless it has obtained the prior written consent of the Lender; or

(l) All or any substantial part of the undertaking, Assets or revenues of any Borrower or any Guarantor, or Holdings once it is owned, directly or indirectly, by Valle, is condemned, seized or otherwise appropriated by any Person acting under the authority of any Governmental Authority, or any Borrower or any Guarantor or Holdings once it is owned, directly or indirectly, by Valle, is prevented by any such Person from exercising normal control over all or any substantial part of its undertakings, Assets or revenues; or

(m) (i) A Governmental Authority of the British Virgin Islands, Barbados, Panama or Colombia shall (A) declare a general suspension of payment or a moratorium on the payment of debt or other obligations of any Borrower or any Guarantor, as the case may be (which does not expressly exclude this Agreement) or (B) fail to exchange, or to approve or permit the exchange of, lawful local currency into Dollars, or take any other action including the promulgation, operation or enforcement of any law, act, decree, regulation, ordinance, order, policy, or determination, or any modification of, or change in the interpretation of, any of the foregoing that has the effect of restricting or preventing such exchange or the transfer of any funds outside the British Virgin Islands, Barbados or Colombia as the case may be, beyond the extent to which such restrictions exist on the date first set forth above, or (ii) the unavailability of United States Dollars in any legal exchange market therefor in such jurisdiction in accordance with normal commercial practice; or

31

Execution Version

(n) A Change of Control shall have occurred; or

(o) A Material Adverse Effect shall have occurred,

thereupon and at any time thereafter and in every such event (each an "**Event of Default**"), (i) if such event is an Event of Default specified in Section 7(g) with respect to any Borrower, then if any Loan is then outstanding, the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and/or the Note shall immediately become due and payable without presentment, demand, protest, or other notices or formalities of any kind, all of which are hereby expressly waived by the Borrowers, and (ii) if such event is any other Event of Default the Lender may, by notice to the Borrowers, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and/or the Note to be due and payable forthwith, whereupon the same shall immediately become due and payable without presentment, demand, protest, or other notices or formalities of any kind, all of which are hereby expressly waived by the Borrowers. The foregoing shall not limit the Lender's right to exercise any of its remedies under any of the other Credit Documents.

# 8   TAXES

## 8.1   Taxes

(a) All payments due hereunder or under the Note to or for the account of the Lender shall be made without deduction for or on account of any present or future income, stamp, value-added, registration, transfer and other taxes, levies, imposts, duties, fees, withholdings, assessments or other charges of whatever nature, or any interest, penalty, or similar liability with respect thereto, now or hereafter imposed by any taxing authorities in any jurisdiction (other than such taxes as may be measured by the overall net income of the Lender and imposed in the jurisdiction in which the Lender's principal office or lending office is located) and any and all extraordinary taxes which may be imposed on this transaction or payments contemplated hereunder or under the Note ("**Taxes**").

(b) If Taxes are required to be withheld or deducted from any such payment, the Borrowers shall pay to the Lender such additional amount as may be necessary to ensure that the net amount actually received by the Lender in respect of such payment free and clear of Taxes, is equal to the amount which the Lender would have received if Taxes had not been withheld or deducted from such payment. Without limiting the foregoing sentence, the Borrowers shall pay all Taxes due in respect of any such payment (including all Taxes payable on account of any such payment of Taxes) on or before the respective due dates thereof and, upon making any such deduction, withholding or payment of Taxes, the Borrowers shall furnish to the Lender, within thirty (30) days thereafter, an original or certified copy of a receipt from the relevant taxing authority evidencing such deduction, withholding or payment.

Execution Version

(c) If any Taxes are paid directly by the Lender or if the Borrowers fail to comply with the provisions of this Section 8.1, the Borrowers shall, within thirty (30) calendar days after written demand of the Lender, reimburse the Lender for all such payments, and indemnify the Lender for any related interest, penalty or similar liability.

8.2    **Other Taxes**. Without limiting Section 8.1, the Borrowers shall pay, and indemnify the Lender against, any and all stamp, excise, registration, transfer, capital, net worth and similar taxes including, without limitation, taxes on financial outstandings, court taxes and any extraordinary tax ("**Other Taxes**") which may be payable or determined to be payable on or in connection with the execution, delivery, performance or enforcement of the Credit Documents or the lending or borrowing hereunder. The Borrowers shall further pay, and indemnify the Lender against, any and all penalties and liabilities with respect to or resulting from delay or omission to pay such Other Taxes.

## 9    PROVISIONS REGARDING CO-BORROWERS.

9.1    **Joint and Several Liability**.  Each Borrower is accepting joint and several liability with the other Borrower hereunder and under the other Credit Documents in consideration of the financial accommodations to be provided to the Borrowers by the Lender under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Obligations. Each Borrower, jointly and severally with the other Borrower, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all the other Obligations, it being the intention of the parties hereto that all Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

9.2    **Failure to Pay**. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligations.

9.3    **Full Recourse**. The Obligations specific to each Borrower under this Section 9 constitute the full recourse Obligations of each Borrower enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

9.4    **Agreement to Action or Delay by Lender**.  Each Borrower assents to any other action or delay in acting or failure to act on the part of the Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 9, afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this

Section 9 or otherwise, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrower under this Agreement, including, without limitation, this Section 9 shall not be discharged except by performance and then only to the extent of such performance.

9.5    **Enforcement; Reinstatement**. The provisions of this Section 9 are made for the benefit of the Lender and its respective successors and assigns, and may be enforced by it or them from time to time against any and all of the Borrowers as often as occasion therefor may arise and without requirements on the part of the Lender first to marshall any of its claims or to exercise any of its rights against any other Borrower or to exhaust any remedies available to it against any other Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.    The provisions of this Section 9 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy or incapacity of any of the Borrowers, or otherwise, the provisions of this Section 9 will forthwith be reinstated in effect, as though such payment had not been made.

9.6    **Senior Indebtedness**. Each Borrower hereby agrees that it will not exercise any of its rights of contribution or subrogation against the other Borrower or any affiliate of the Borrowers with respect to any liability incurred by it hereunder or under any of the other Credit Documents, any payments made by it to the Lender with respect to any of the Obligations or any collateral security therefor until such time as all indebtedness of the Borrowers owing to the Lender under the Credit Documents (the "**Senior Indebtedness**") has been paid in full in immediately available funds denominated in Dollars.  Any claim which any Borrower may have against any other Borrower with respect to any payment to the Lender hereunder or under any other Credit Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full of the Senior Indebtedness and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Senior Indebtedness shall be paid in full in immediately available funds denominated in Dollars before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

9.7    **Subordination**.  Each Borrower hereby agrees that the payment of any amounts due with respect to the indebtedness owing by either Borrower to the other Borrower or any affiliate is hereby subordinated to the prior payment in full in immediate available funds denominated in Dollars of the Senior Indebtedness.  Each Borrower hereby agrees that after the occurrence and during the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of the other Borrower owing to such Borrower until the Senior Indebtedness shall have been

34

*Execution Version*

paid in full in immediately available funds denominated in Dollars. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Lender and be paid over to the Lender to be applied to repay the Senior Indebtedness.

## 10  MISCELLANEOUS

### 10.1  ASSIGNMENTS/PARTICIPATIONS BY LENDER.

(a) The Lender may, at any time, assign or transfer all or part of its rights or obligations under this Agreement (including all or any portion of the Note) to one or more Persons. In this case, the Borrowers shall, at the request of the Lender, execute one or more replacement Notes in connection with any such assignment or transfer.

(b) The Lender may sell participations to one or more Persons in all or a portion of its rights and obligations under this Agreement and the other Credit Documents.

### 10.2  PARTIES-IN-INTEREST; BORROWERS' ASSIGNMENT. 
This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto; provided, that neither Borrower may assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lender.

### 10.3  FEES AND EXPENSES. 
The Borrowers will pay to the Lender:

(a) on the first Drawdown Date, a structuring fee equal to zero point five (0.5%) percent of the Facility Amount;

(b) the Expenses, at such times as is requested by the Lender;

(c) the applicable and relevant expenses related to any Default and/or any enforcement or collection proceedings resulting therefrom; and

(d) all duties (including stamp taxes), fees or other charges payable on or in connection with any Credit Document or document related thereto.

Amounts due and payable under this Section 10.3 on a Drawdown Date may, in the Lender's sole discretion, be deducted from the proceeds of the relevant Loan.

### 10.4  RIGHT OF SET-OFF. 
Valle hereby grants to the Lender a continuing Lien, security interest, and right of setoff as security for all liabilities and obligations to the Lender (including the Obligations), whether now existing or hereafter arising, upon and against any and all amounts deposited in the Collection Account. At any time after an Event of Default has occurred and is continuing, without demand or notice (any such notice being expressly waived by Valle), the Lender may setoff the same or any part thereof and apply the same to any liability or obligation of any Borrower (including without limitation the Obligations) even though unmatured and

35

Execution Version

regardless of the adequacy of any collateral for the Obligations. ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY COLLATERAL FOR SUCH OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF ANY BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

10.5   **SURVIVAL OF COVENANTS.** All covenants, agreements, representations and warranties made herein and in any certificates or other papers delivered by or on behalf of any Borrower pursuant hereto are material and shall be deemed to have been relied upon by the Lender, notwithstanding any investigation heretofore or hereafter made by it, and shall survive the making by the Lender of the Loans as herein contemplated, and shall continue in full force and effect so long as any Obligation remains outstanding and the Lender shall not be deemed to have waived, by reason of making the Loans, any Event of Default which may arise by reason of such representation or warranty proving to have been false or misleading on the date made or reaffirmed, as the case may be, notwithstanding that the Lender may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time any Loan was made. All statements contained in any certificate or other paper delivered by any Borrower pursuant hereto or in connection with the transactions contemplated hereby constitute representations and warranties by the Borrowers hereunder.

10.6   **NOTICES.** All notices and other communications made or required to be given pursuant to this Agreement shall be in writing and shall be mailed, transmitted by fax or delivered as follows:

> (a) if to Valle:
>
> **Valle Energy Inc.**
> Cra 7 # 74 – 36 Of 502
> Bogotá DC, Colombia, SA
> Telephone: +57 1 345 6684
> Email: Sergio.abauat@valleenergy.com
>
> or at such other address for notice as Valle shall last have furnished in writing to the Lender, or
>
> (b) if to Lakeview:
>
> **Lakeview Green Corp.**
> Cra 7 # 74 – 36 Of 502
> Bogotá DC, Colombia, SA
> Telephone: +57 1 345 6684
> Email: Sergio.abauat@valleenergy.com

Execution Version

or at such other address for notice as Lakeview shall last have furnished in writing to the Lender, or

(c) if to the Lender:

**IIG CAPITAL LLC, AS AGENT**
1500 Broadway, 17th Floor
New York, NY 10036
Attention: Jorge Correa – Executive Director
          Daniel Rochmann – Executive Director
Telephone Number: + 1 212 806 5158
Fax Number: + 1 212 806 5199
Email: jcorrea@iigh.com/ drochmann@iigh.com

or at such other address for notice as the Lender shall last have furnished in writing to the Borrowers.

All such notices and communications shall, when mailed, transmitted by fax or sent by overnight courier, be effective when deposited in the mails, delivered to any internationally recognized overnight courier, or transmitted by fax (confirmed by fax transmission confirmation), except that all notices to the Lender shall not be effective until received if receipt occurs during business hours on a Business Day, and, otherwise, upon the opening of business for the Lender on the first Business Day after receipt. The Lender shall be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify each Indemnified Party from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Borrower.

10.7  **NEW YORK LAW CONTRACT.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction.

10.8  **CONSENT TO JURISDICTION.**

(a)    Each Borrower agrees that any action or proceeding relating in any way to this Agreement and/or the Note may be brought and enforced in the state courts sitting in the City of New York, New York, United States of America, in the United States District Court for the Southern District of New York or in the courts in the British Virgin Islands, in the sole discretion of the Lender. Each Borrower further irrevocably submits to the non-exclusive *in personam* jurisdiction of each such court and the appellate courts thereof. Each Borrower further irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any action or proceeding relating in any way to this

Execution Version

Agreement or the Note in any such court, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum and agrees not to claim or plead the same. Each Borrower agrees that nothing herein shall affect the right to bring suit in any other jurisdiction.

(b)     Each Borrower hereby irrevocable appoints Devonshire Services LLC, located at 80 Broad Street, 5th Floor #25, New York, New York, 10004, United States of America (the "Process Agent") as its agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summonses, notices and documents which may be served in any action or proceeding in the state courts sitting in the City of New York, New York, United States of America or the United States District Court for the Southern District of New York in respect of this Agreement and agrees that service in such manner shall, to the fullest extent permitted by law, be deemed effective service of process upon it in any such suit, action or proceeding. If for any reason such Process Agent shall cease to be available to act as such, each Borrower agrees to designate a new Process Agent in the City of New York (and notify the Lender of such designation), on the terms and for the purposes of this provision, provided that the new Process Agent shall have accepted such designation in writing before the termination of the appointment of the prior Process Agent. Each Borrower further consents to the service of process or summons by certified or registered mail, postage prepaid, return receipt requested, directed to it at its address specified in Section 10.6 hereof. Nothing herein shall in any way be deemed to limit the ability of the Lender to serve legal process in any other manner permitted by applicable law.

(c)     Each Borrower agrees that a final judgment (a certified copy of which shall be conclusive evidence of the amount of any of its indebtedness or obligations arising out of, or relating in any way to, this Agreement or the Note, as the case may be) against it in any action, proceeding or claim arising out of, or relating in any way to, this Agreement or the Note, shall be conclusive and may be enforced by suit on the judgment in any court lawfully entitled to entertain such suit.

(d)     Each Borrower recognizes that the remedies of the Lender specified in this Section are not exclusive and that the exercise of any such remedy shall not preclude the Lender from pursuing other remedies available to it in any competent court.

(e)     Each Borrower hereby irrevocably waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment and execution, both before and after judgment, to which it might otherwise be entitled in any action or proceeding in the courts of the British Virgin Islands, the courts of the State of New York, the United States District Court for the Southern District of New York, or the courts of any other jurisdiction, relating in any way to this Agreement or the Note, and each agrees that it will neither raise nor claim any such immunity at or in respect of any such action or proceeding.

(f)     Each Borrower irrevocably waives, to the fullest extent permitted by applicable law, any claim that any action or proceeding commenced by the Lender relating in any way to this Agreement or the Note should be dismissed or stayed by reason, or pending the resolution, of

Execution Version

any action or proceeding commenced by any Borrower relating in any way to this Agreement or the Note, whether or not commenced earlier. To the fullest extent permitted by applicable law, each Borrower shall take all measures necessary for any such action or proceeding commenced by the Lender to proceed to judgment prior to the entry of judgment in any such action or proceeding commenced by any Borrower.

(g)     Each Borrower acknowledges that it has no right to require the Lender to arbitrate any dispute, action or proceeding relating to or arising from or out of any Credit Document. Each Borrower agrees that to the extent it has or in the future will have any such right it hereby irrevocably waives such right. Furthermore each Borrower acknowledges that the acknowledgements and agreements contained in this paragraph are a material inducement for the Lender to enter into this Agreement and the other Credit Documents.

10.9.   **CAPTIONS.** Captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

10.10. **SEPARATE COUNTERPARTS.** This Agreement or any amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

10.11. **SEVERABILITY.** If any provision of this Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.12. **CONSENTS, AMENDMENTS AND WAIVERS.** Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by, or approved in writing by, the parties hereto. No waiver shall extend to or affect any obligation not expressly waived or impair any right consequent thereon. No course of dealing or delay or omission on the part of the Lender in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto. No notice to or demand upon any Borrower shall entitle any Borrower to other or further notice or demand in similar or other circumstances.

10.13. **US DOLLAR LOAN CURRENCY.** This is an international loan transaction in which the specification of payment in Dollars is of the essence. Dollars shall be the currency of account and of payment in all events. The obligation of the Borrowers hereunder to make payments in Dollars (the **"Obligation Currency"**) shall not be discharged or satisfied by any tender of (or recovery pursuant to any judgment expressed in or converted into) any currency other than the Obligation Currency, except to the extent that such tender (or recovery) results in the effective receipt by the Lender of the full amount of the Obligation Currency expressed to be payable to

39

Execution Version

the Lender under this Agreement and/or the Note, and, accordingly, the amount (if any) by which such tender or recovery shall fall short of such full amount of the Obligation Currency shall be and remain due as a separate obligation. If, for the purpose of obtaining or enforcing judgment against any Borrower in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "**Judgment Currency**") an amount due in the Obligation Currency the parties agree, to the fullest extent permitted for the parties to do so, that the conversion shall be made at the rate of exchange (as quoted by the Lender or if the Lender does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Lender) determined, in each case, as of the date immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "**Judgment Currency Conversion Date**"). If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Borrowers covenant and agree to pay, or cause to be paid, such amounts, if any, as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate of exchange prevailing on the Judgment Currency Conversion Date. For purposes of determining the rate of exchange for this Section, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

10.14. **INDEMNIFICATION.**

    (a)    The Borrowers agree to indemnify and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (together, the "**Indemnified Parties**") from and against any and all liabilities, losses, damages, penalties, actions, judgments, suits, costs, expenses (including the reasonable fees and expenses of counsel) and disbursements of any kind whatsoever (together, "**Liabilities**") arising out of or by reason of any investigation or litigation or other proceedings (including any threatened investigation or litigation or other proceedings) related to the entering into and/or performance of this Agreement or any other Credit Document or the use of proceeds of the Loans or the consummation of any of the transactions contemplated hereby or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such investigation or litigation or other proceedings (but excluding any such Liabilities to the extent determined by the final and nonappealable judgment of a court of competent jurisdiction to specifically have been proximately caused by the gross negligence or willful misconduct of the Person to be indemnified). To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentences may be unenforceable, each Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Liabilities incurred by the Indemnified Parties or any of them.

Execution Version

(b)     Without limiting the foregoing, the Borrowers will defend, indemnify and hold harmless the Indemnified Parties from and against any Liabilities of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way relating to any violation or noncompliance with or liability under any Environmental Laws or any orders, requirements or demands of any Governmental Authorities related thereto (including without limitation, attorney's fees, court costs and litigation expenses), but excluding any Liabilities to the extent determined by the final and nonappealable judgment of a court of competent jurisdiction to specifically have been proximately caused by the gross negligence or willful misconduct of the Person to be indemnified.

(c)     No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

**10.15. WAIVER OF JURY TRIAL. EACH BORROWER AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EACH BORROWER AND THE LENDER. EACH BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH SUCH OTHER DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THIS AGREEMENT AND EACH SUCH OTHER DOCUMENT. EXCEPT AS PROHIBITED BY LAW, EACH BORROWER HEREBY WAIVES ANY RIGHTS IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.**

**10.16. SURVIVAL.** The obligations of the Borrowers under Sections 2.10, 2.11, 8, 10.3, 10.13 and 10.14 shall survive the repayment of the Loans and the termination of this Agreement.

**10.17. NEUTRAL INTERPRETATION.** In the interpretation of the Credit Documents, no party shall be deemed the drafting party and each provision hereof and thereof shall be interpreted neutrally with no presumption arising in favor of one party or the other based upon which party prepared the drafts or the final version hereof or thereof.

**10.18. USURY.** Anything herein to the contrary notwithstanding, the obligations of the Borrowers under this Agreement and the Note shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of

41

Execution Version

law applicable to the Lender limiting rates of interest which may be charged or collected by the Lender.

10.19.  **ACKNOWLEDGEMENTS.** Each of the Borrowers hereby acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents and (b) the Lender does not have a fiduciary relationship to any Borrower, and the relationship between the Lender, on the one hand, and the Borrowers, on the other hand, is solely that of debtor and creditor.

10.20  **ENGLISH LANGUAGE.**  In the construction and interpretation of this Agreement, the English language version thereof shall be the official version, and any version that has been translated into any other language shall have no force or effect except for purposes of enforcing this Agreement in a court of law that requires that this Agreement be presented thereto in another language.  All notices and documents to be furnished under this Agreement shall be in the English language.

10.21  **CONFIDENTIALITY/ US PATRIOT ACT NOTICE.**

(a) Each Borrower hereby authorizes the Lender to disclose information relating to any Borrower and/or its Affiliates to any of the Lender's affiliates, any regulatory, tax, customs or judicial authority, any rating agency, auditor, insurance or reinsurance broker, professional advisor, insurer, reinsurer and, as the case may be, in connection with any securitization or other risk transfer or hedging transaction or any other transaction under which payments are to be made by reference to any Credit Document or to any Borrower, including without limitation any actual or potential participants or assignees, if the Lender deems such disclosure to be necessary or advisable in carrying out its duties, obligations, commitments or activities, or for the purpose of its asset, liability or risk management policies, or as may be required by law, regulation or judicial process.

(b)  The Lender hereby notifies each Borrower that, pursuant to the requirements of the Patriot Act, it may be required to obtain, verify and record information that identifies each Borrower, including the name and address of each thereof and other information that allows the Lender to identify each Borrower in accordance with the Patriot Act.  Each Borrower shall provide such information and take such actions as are requested by the Lender to comply with the Patriot Act.

10.22  **RELEASE OF GUARANTY AND CERTAIN COLLATERAL.**  The Lender agrees that at such time as all of the property and assets that are to be transferred by Pacific under the Conditional Assignments have been properly transferred to Las Quinchas, Las Quinchas is at least 50.1% owned and controlled (directly or indirectly) by Valle, and all of the terms of Section 5(k)(iii) above have been fully complied with, then upon the written request of Valle, the Lender will promptly take all steps necessary to terminate the Guaranty (but not the Conditional Guaranty), each of the Assignment and Security Agreements and the Valle Pledge.  The Borrowers shall pay all such costs and expenses incurred by the Lender in carrying out such termination and release of collateral.

Execution Version

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*Borrower*

By: _____
Name: SERGIO ABAUA
Title: DIRECTOR

**LAKEVIEW GREEN CORP.**
*Borrower*

By: _____
Name: SERGIO ABAUA
Title: DIRECTOR

**IIG CAPITAL LLC, as agent**

By: _____
Name: Daniel Rochmann
Title: Executive Director

44



Execution Version

10.23 ENTIRE AGREEMENT.   THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

(REST OF PAGE INTENTIONALLY LEFT BLANK)







COMO NOTARIO SEXTO DEL CIRCULO DE SANTAFE DE
BOGOTA, HAGO CONSTAR QUE LA(S) ANTERIOR(ES) FIR-
MA(S) PUESTA(S) POR

IDENTIFICADO(S) CON S.C. No (s)

ES(SON) AUTENTICA(S)

SANTAFE DE BOGOTA   1 3 MAR 2014



Execution Version

## SCHEDULE 1

### LIENS EXISTING AS OF THE EXECUTION DATE

**NONE**



Execution Version

## ANNEX A

### FORM OF PROMISSORY NOTE

New York, New York
[DATE]

For value received, each of Valle Energy Inc., a British Virgin Islands company and Lakeview Green Corp., a British Virgin Islands company (each a "Borrower" and together, the "Borrowers"), jointly and severally, promises to pay to the order of IIG Capital LLC, as agent (the "Lender"), the unpaid principal amount of the Loans made by the Lender to the Borrowers pursuant to the Loan Agreement referred to below on the Principal Repayment Dates provided for in the Loan Agreement. The Borrowers, jointly and severally, promise to pay interest on the unpaid principal amount of the Loans on the dates and at the rate or rates provided for in the Loan Agreement. All such payments of principal and interest shall be made in the manner and at the place provided for in the Loan Agreement.

This Note is the Note referred to in the Uncommitted Loan Agreement dated as of March 10, 2014 among the Borrowers and the Lender (as the same may be amended, varied, novated, supplemented or otherwise modified from time to time, the "Loan Agreement"). Terms defined in the Loan Agreement are used herein with the same meanings.

As provided in the Loan Agreement, this Note is subject to voluntary prepayment, in whole or in part. Reference is made to the Loan Agreement for provisions for the acceleration of the maturity hereof.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive, to the fullest extent permitted by applicable law, presentment, demand, protest and all other notices of any kind.

This Note shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction.

**VALLE ENERGY INC.**

By: _____     By: _____
Name:                                Name:
Title:                               Title:

46

Execution Version

**LAKEVIEW GREEN CORP.**

By: _____     By: _____
Name:                             Name:
Title:                            Title:



Execution Version

## ANNEX B

## FORM OF NOTICE OF DRAWDOWN

_____, 201_

To
IIG Capital LLC, as Agent
1500 Broadway, 17th Floor
New York, NY 10036
Att:

**Re:    Uncommitted Loan Agreement dated as of March 10, 2014**

Ladies and Gentlemen:

We refer to the Uncommitted Loan Agreement (as from time to time amended, varied, novated or supplemented, the "Loan Agreement") dated as of March 10, 2014 among Valle Energy Inc. and Lakeview Green Corp. (each a "Borrower") and IIG Capital LLC, as Agent (the "Lender"). Terms defined in the Loan Agreement shall have the same meaning in this Notice of Drawdown.

We hereby give you notice that, pursuant to the Loan Agreement, [Valle Energy Corp.][Lakeview Green Corp.] wishes to borrow a Loan in the total amount of _____ (_____**U.S. Dollars),** upon the terms and subject to the conditions contained therein, for payment according to the following payment instructions:

Bank:
Swift Code:
ABA#:
Chips:
For further credit to:
Swift Code:
Account #
Ultimate Beneficiary:
Ag:
Account #

We confirm that, on the date hereof, the representations set out in Section 3 thereof are true and correct, we are in compliance with all the covenants set out in Sections 5 and 6 thereof, that the conditions to the Loan set out in Section 4 thereof have been satisfied and that no Default has occurred and is continuing.

**[VALLE ENERGY INC.][LAKEVIEW GREEN CORP.]**

By: _____          By: _____
Name:                            Name:
Title:                           Title:

48

Execution Version

## ANNEX C

## FORM OF CERTIFICATE OF OFFICER

[Date]

To:
IIG Capital LLC, as Agent
1500 Broadway, 17th Floor
New York, NY 10036
Att:

Ladies and Gentlemen:

I refer to the Uncommitted Loan Agreement (as from time to time amended, varied, novated or supplemented, the "Loan Agreement") dated as of March 10, 2014 among Valle Energy Inc. and Lakeview Green Corp. as borrowers and IIG Capital LLC, as Agent (the "Lender"). Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

I am a [title] of the [Valle Energy Inc.][Lakeview Green Corp.] (the "Borrower") and, pursuant to Section 4.1(c) of the Export Prepayment Finance Agreement, hereby certify in this certificate (this "Certificate") as follows:

(1)        I am duly authorized to give this Certificate.

(2)        Powers: Attached as Exhibit A to this Certificate are true, complete and up-to-date certified copies of the Governing Documents of the Borrower as in effect on the date hereof and on the date of the Borrower's execution and delivery of the Credit Documents to which it is a party. The Borrower is carrying on a business authorized under its Governing Documents.  Neither the entry into the Credit Documents to which it is a party, the execution and delivery of the Note by the Borrower, nor the exercise of its rights and/or performance of or compliance with its obligations under the Credit Documents to which it is a party does or will violate, or exceed any borrowing or other power or restriction granted or imposed by, its Governing Documents.

(3)        Due Authorization: [Use this bracketed alternative if the Governing Documents require approval of the Board of Directors/shareholders and delete the other alternative: Attached as Exhibit B to this Certificate is a true and complete certified copy of the minutes (including, if the same is not in the English language, an accurate English translation thereof) of a duly convened meeting of its {board of directors, shareholders, members etc}[1] duly held on _____ __, 2014, at which a duly constituted quorum was present and voting throughout and at which the resolutions set out in the minutes were duly passed and adopted (the

---

[1] Insert the relevant corporate body (Board of Directors, Executive Committee) or other group (such as shareholders), as appropriate, if this bracketed clause is applicable

Execution Version

"Resolutions"). Each of the Resolutions remains in full force and effect and has not been amended, modified, revoked or rescinded. The Resolutions constitute all action necessary on the part of the Borrower to approve the execution and delivery by the Borrower of the Credit Documents to which it is a party, the borrowings thereunder and the performance by the Borrower of its obligations thereunder.] [Use this bracketed alternative if the Governing Documents do not require approval of the Board of Directors/shareholders and delete the other alternative:  The  Governing  Documents  of  the  Borrower  provide  all authorizations necessary for the Borrower to execute, deliver and perform the Credit Documents to which it is a party, and no further action is necessary for the Borrower to execute, deliver and perform the Credit Documents to which it is a party.]

(4)     Due Execution: The following persons have been duly elected or appointed to the offices of the Borrower set forth opposite their respective names and are fully elected or appointed incumbents of such offices, or duly appointed attorneys-in-fact of the Borrower, and are authorized (either individually or with others, as provided in the Resolutions), on behalf of the Borrower, to sign the Credit Documents to which it is a party and are authorized to give all communications and take any other action required under or in connection with the Credit Documents to which it is a party on behalf of the Borrower, and the signature set forth opposite of each of their respective names is a true and genuine specimen of the signature of such person:

Name                          Title                          Signature

(5)     Default: No Default has occurred and is continuing as of the date of this Certificate.

(6)     Covenants and Representations and Warranties: As of the date hereof the Borrower is in full compliance with all covenants under the Credit Documents that are applicable to it and all representations and warranties of the Borrower contained in the Credit Documents and any certificates, statements or other documents delivered pursuant thereto are true and correct as of this date.

Name: _____

Execution Version

## ANNEX D

## FORM OF CERTIFICATE OF OFFICER

[Date]

To:
IIG Capital LLC, as Agent
1500 Broadway, 17th Floor
New York, NY 10036
Att:

Ladies and Gentlemen:

I refer to the Uncommitted Loan Agreement (as from time to time amended, varied, novated or supplemented, the "Loan Agreement") dated as of March 10, 2014 among Valle Energy Inc. and Lakeview Green Corp. (each a "Borrower") and IIG Capital LLC, as Agent (the "Lender"). Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

I am a [title] of [Cloister Blue Ltd.][Green Acres Development Ltd.][Mid Summer Capital Corp.][Las Quinchas Resource, Corp.] (the "Guarantor") and, pursuant to Section 4.1(c) of the Export Prepayment Finance Agreement, hereby certify in this certificate (this "Certificate") as follows:

(1)         I am duly authorized to give this Certificate.

(2)         Powers: Attached as Exhibit A to this Certificate are true, complete and up-to-date certified copies of the Governing Documents of the Guarantor as in effect on the date hereof and on the date of the Guarantor's execution and delivery of the Credit Documents to which it is a party. The Guarantor is carrying on a business authorized under its Governing Documents.  Neither the entry into the Credit Documents to which it is a party nor the exercise of its rights and/or performance of or compliance with its obligations under the Credit Documents to which it is a party does or will violate, or exceed any borrowing or other power or restriction granted or imposed by, its Governing Documents.

(3)         Due Authorization: [Use this bracketed alternative if the Governing Documents require approval of the Board of Directors/shareholders and delete the other alternative: Attached as Exhibit B to this Certificate is a true and complete certified copy of the minutes (including, if the same is not in the English language, an accurate English translation thereof) of a duly convened meeting of its {board of directors, shareholders, members etc}[2] duly held on _____ __, 2014, at which a duly constituted quorum was present and voting throughout and at which the resolutions set out in the minutes were duly passed and adopted (the "Resolutions").  Each of the Resolutions remains in full force and effect and has

_____

[2] Insert the relevant corporate body (Board of Directors, Executive Committee) or other group (such as shareholders), as appropriate, if this bracketed clause is applicable

Execution Version

not been amended, modified, revoked or rescinded.  The Resolutions constitute all action necessary on the part of the Guarantor to approve the execution and delivery by the Guarantor of the Credit Documents to which it is a party, the borrowings thereunder and the performance by the Guarantor of its obligations thereunder.] [Use this bracketed alternative if the Governing Documents do not require approval of the Board of Directors/shareholders and delete the other alternative:  The Governing Documents of the Guarantor provide all authorizations necessary for the Guarantor to execute, deliver and perform the Credit Documents to which it is a party, and no further action is necessary for the Guarantor to execute, deliver and perform the Credit Documents to which it is a party.]

(4)     Due Execution: The following persons have been duly elected or appointed to the offices of the Guarantor set forth opposite their respective names and are fully elected or appointed incumbents of such offices, or duly appointed attorneys-in-fact of the Guarantor, and are authorized (either individually or with others, as provided in the Resolutions), on behalf of the Guarantor, to sign the Credit Documents to which it is a party and are authorized to give all communications and take any other action required under or in connection with the Credit Documents to which it is a party on behalf of the Guarantor, and the signature set forth opposite of each of their respective names is a true and genuine specimen of the signature of such person:

| Name | Title | Signature |
|------|-------|-----------|
|      |       |           |

(5)     Default: No Default has occurred and is continuing as of the date of this Certificate.

(6)     Covenants and Representations and Warranties: As of the date hereof the Guarantor is in full compliance with all covenants under the Credit Documents that are applicable to it and all representations and warranties of the Guarantor contained in the Credit Documents and any certificates, statements or other documents delivered pursuant thereto are true and correct as of this date.

_____
Name:

# FIRST AMENDMENT
# TO UNCOMMITTED LOAN AGREEMENT

**FIRST AMENDMENT**, dated as of July 25, 2014 (the "First Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Valle"), Lakeview Green Corp., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Lakeview"), and IIG Capital LLC, as agent, a New York limited liability company with offices at 1500 Broadway, 17th Floor, New York, NY 10036 (the "Lender"). Terms not otherwise defined herein are used as defined in the Loan Agreement.

WHEREAS, the Borrowers and the Lender have agreed, on the terms and conditions stated below, to amend the Loan Agreement as hereinafter set forth,

NOW, THEREFORE, in consideration of the premises set forth herein, the parties hereto hereby agree as follows:

1. Whereas Clause A of the Loan Agreement is revised to read as follows:

   The Borrowers desire to obtain Loans (as defined below) in the aggregate principal amount of up to US$16,500,000.00 (sixteen million five hundred thousand U.S. Dollars);

2. The definition of "Availability Period" in Section 1.1 of the Loan Agreement is revised to read as follows:

   ***Availability Period*** means the period from the Execution Date to and including August 2, 2014.

3. The definition of "Facility Amount" in Section 1.1 of the Loan Agreement is revised to read as follows:

   ***Facility Amount*** means US$16,500,000.00.

4. In Section 2.7(f) of the Loan Agreement the reference to "Final Maturity Date" is revised to read "Facility Maturity Date".

5. Each Borrower represents and warrants to the Lender that: (a) it has full power and authority, and has taken all action necessary, to execute and deliver this First Amendment and all documents related hereto to which it is a party, and to perform its obligations hereunder and thereunder; (b) this First Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; (c) no Default will occur or be continuing after giving effect to this First Amendment; (d) after giving effect to this First Amendment, all representations and warranties made by it in the Loan Agreement are true on and as of the date hereof as though made on such date (except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013"); (e) the

1



execution and delivery of this First Amendment and each document related hereto to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents, (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its properties or assets, other than Liens in favor of the Lender; (f) no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by it of this First Amendment or any other document related hereto to which it is a party; and (g) it is not in breach of or in default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected that may cause an adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder.

6.   The Borrowers shall pay to the Lender all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Lender in connection with this First Amendment (collectively, the "Fees and Expenses"). The Lender shall notify the Borrower of such total Fees and Expenses to be paid to the Lender.

     This First Amendment shall become effective as of the date hereof when the following conditions precedent shall have been satisfied in form and substance satisfactory to the Lender and the Lender has so notified the Borrowers in writing:

     (a)  The Administrative Agent shall have received originals of this First Amendment, duly executed by all parties hereto;

     (b)  The representations and warranties of the Borrowers contained in Section 3 of the Loan Agreement shall be true on and as of the date of the execution and delivery of this First Amendment as if they had been made on such date except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013";

     (c)  Each Borrower shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex A hereto certifying as to the matters set forth therein;

     (d)  Each Guarantor and Las Quinchas shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex B hereto certifying as to the matters set forth therein;

     (e)  No Default shall have occurred and be continuing;

     (f)  Each Guarantor, Las Quinchas and each Borrower shall have executed and delivered the Reaffirmation of Credit Documents dated of even date herewith;

(g) Masering shall have executed and delivered to the Lender the first amendment to the Masering Guaranty;

(h) Las Quinchas shall have executed and delivered to the Lender the first amendment to the Off-take Pledge (*Otro Sí No. 1 al Contrato de Cesión de Créditos en Garantía*);

(i) The security particulars registration in the British Virgin Islands for the Valle Pledge has been updated to reference this First Amendment; and

(j) Masering shall have delivered to the Lender board and shareholder votes approving the amendment to the Masering Guaranty.

8. Each Borrower agrees that as of the date hereof it owes the Loans and accrued interest thereon to the Lender in the amounts set forth on Schedule I hereto, without defense, offset, deduction, credit, claim or counterclaim of any kind or nature whatsoever, whether matured or contingent, related or unrelated. Each Borrower hereby acknowledges and agrees that it has no present claims or defenses of any sort whatsoever against the Lender with respect to the Loans or such aforementioned accrued interest and, for the benefit of the Lender, hereby irrevocably waives any such claims or defenses, whether matured or contingent, known or unknown, to which it might otherwise be entitled.

9. Upon the effectiveness of this First Amendment (a) this First Amendment shall be deemed to be an amendment to the Loan Agreement, and the Loan Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect, and (b) all references to the Loan Agreement in any other document, instrument, agreement or writing, including without limitation the other Credit Documents, shall hereafter be deemed to refer to the Loan Agreement as amended hereby. The parties hereto agree it is their intention that nothing in this First Amendment shall be construed to extinguish, release or discharge or constitute, create or effect a novation of, or an agreement to extinguish, release or impair any of the existing liabilities or obligations of any Borrower under the provisions of the Credit Documents.

10. This First Amendment shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. The parties agree that the provisions of Section 10.8 of the Loan Agreement shall apply to this First Amendment, including, without limitation, the submission by the Borrowers to the jurisdiction of the state courts sitting in the City of New York, New York, United States of America, the United States District Court for the Southern District of New York and the courts of the British Virgin Islands. THE BORROWERS AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS FIRST AMENDMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS FIRST AMENDMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE BORROWERS OR THE LENDER.



11. This First Amendment may be executed by the parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*as a Borrower*

By: _____
Name: SERGIO ABNAA?
Title: DIRECTOR

**LAKEVIEW GREEN CORP.**
*as a Borrower*

By: _____
Name: SERGIO ABNAT
Title: DIRECTOR

**MG CAPITAL LLC, as agent**
*the Lender*

By: _____
Name: Daniel Rochmann
Title: Executive Director





4









COMO NOTARIO SEXTO DEL CIRCULO DE SANTAFE DE
BOGOTA, HAGO CONSTAR QUE LA(S) ANTERIOR(ES) FIR-
MA(S) PUESTA(S) POR _____ Sergio
_____ Asavat _____ Calderon _____

_____ IDENTIFICADOS CON C.C. No.(s)
_____ 12 128 472 Neiva
_____ ES(SON) AUTENTICA(S)
SANTAFE DE BOGOTA _____ 29 Julio 2014

SCHEDULE I

LOAN PRINCIPAL OUTSTANDING

US$10,000,000

ACCRUED INTEREST

US$86,805.56







ANNEX A

CERTIFICATE OF OFFICER

July __, 2014

To:   IIG Capital LLC, as Agent
      1500 Broadway, 17th Floor
      New York, NY 10036

I refer to the First Amendment, dated as of July 25, 2014 (the "First Amendment") to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

I am a [title] of [Valle Energy Inc.][Lakeview Green Corp.](the "Borrower") and, pursuant to Section 7(c) of the First Amendment, hereby certify in this certificate (this "Certificate") as follows:



(1)   I am duly authorized to give this Certificate.

(2)   Powers: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the First Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the First Amendment and any documents related thereto. A copy of each such authorization is attached hereto.

(3)   Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, on behalf of the Borrower, to sign the First Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the First Amendment and all documents related thereto on behalf of the Borrower.

Name: _____

Exhibit A

| <u>Name</u> | <u>Title</u> | <u>Signature</u> | <u>Individually or with others</u>[1] |
| --- | --- | --- | --- |







_____

[1] Please specify

ANNEX B

CERTIFICATE OF OFFICER

July __, 2014

To:   IIG Capital LLC, as Agent
      1500 Broadway, 17th Floor
      New York, NY 10036

I refer to the Reaffirmation of Credit Documents, dated as of July 25, 2014 (the "Reaffirmation") from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation organized and existing under the laws of Barbados. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a [title] of [Cloister Blue Ltd.][Green Acres Development Ltd.][Mid Summer Capital Corp.][Las Quinchas Resource Corp.] (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)   I am duly authorized to give this Certificate.

(2)   <u>Powers</u>: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)   <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

Name: _____ 

Exhibit A

| Name | Title | Signature | Individually or with others[2] |
|------|-------|-----------|-------------------------------|





---

[2] Please specify

# SECOND AMENDMENT
# TO UNCOMMITTED LOAN AGREEMENT

**SECOND AMENDMENT**, dated as of October 20, 2014 (the "Second Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Valle"), Lakeview Green Corp., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Lakeview"), and IIG Capital LLC, as agent, a New York limited liability company with offices at 1500 Broadway, 17th Floor, New York, NY 10036 (the "Lender"). Terms not otherwise defined herein are used as defined in the Loan Agreement.

WHEREAS, the Borrowers and the Lender have agreed, on the terms and conditions stated below, to amend the Loan Agreement as hereinafter set forth;

NOW, THEREFORE, in consideration of the premises set forth herein, the parties hereto hereby agree as follows:

1. The definition of "Facility Maturity Date" in Section 1.1 of the Loan Agreement is revised to read as follows:

   *Facility Maturity Date* means September 29, 2015, provided that if such date is not a Business Day then the Facility Maturity Date shall be the next preceding Business Day.

2. The definition of "Interest Period" in Section 1.1 of the Loan Agreement is revised to read as follows:

   *Interest Period* means, for each Loan, (a) initially, the period commencing on the Drawdown Date thereof and ending on (but not including) the last day of that calendar month except that in the case of the first Loan hereunder it shall be the last day of the next calendar month then, each period commencing on the last day of the immediately preceding Interest Period and ending on (but not including) the last day of the next calendar month; provided, however, (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall end on the next preceding Business Day and (ii) no Interest Period may end after the Facility Maturity Date.

3. The definition of "Principal Repayment Date" in Section 1.1 of the Loan Agreement is revised to read as follows:

   *Principal Repayment Date* means each Interest Payment Date starting with the ninth Interest Payment Date from the date of the first Drawdown.

4. Each Borrower represents and warrants to the Lender that: (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Second Amendment and all documents related hereto to which it is a party, and to perform its obligations hereunder and thereunder; (b) this Second Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid and binding

1

obligation, enforceable in accordance with its terms; (c) no Default will occur or be continuing after giving effect to this Second Amendment; (d) after giving effect to this Second Amendment, all representations and warranties made by it in the Loan Agreement are true on and as of the date hereof as though made on such date (except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013"); (e) the execution and delivery of this Second Amendment and each document related hereto to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents, (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its properties or assets, other than Liens in favor of the Lender; (f) no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by it of this Second Amendment or any other document related hereto to which it is a party; and (g) it is not in breach of or in default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected that may cause an adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder.

5. The Borrowers shall pay to the Lender all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Lender in connection with this Second Amendment (collectively, the "Fees and Expenses"). The Lender shall notify the Borrowers of such total Fees and Expenses to be paid to the Lender.

6. This Second Amendment shall become effective as of the date hereof when the following conditions precedent shall have been satisfied in form and substance satisfactory to the Lender and the Lender has so notified the Borrowers in writing:

(a) The Lender shall have received originals of this Second Amendment, duly executed by the parties hereto;

(b) The representations and warranties of the Borrowers contained in Section 3 of the Loan Agreement shall be true on and as of the date of the execution and delivery of this Second Amendment as if they had been made on such date except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013";

(c) Each Borrower shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex A hereto certifying as to the matters set forth therein;

(d) Each Guarantor and Las Quinchas shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex B hereto certifying as to the matters set forth therein;

2

(e) No Default shall have occurred and be continuing;

(f) Each Guarantor, Las Quinchas and each Borrower shall have executed and delivered the Reaffirmation of Credit Documents dated of even date herewith;

(g) Masering shall have executed and delivered to the Lender an agreement to the extension of the maturity date of the Loans;

(h) Las Quinchas shall have executed and delivered to the Lender an agreement to the extension of the maturity date of the Loans; and

(i) The Lender has received from the Borrowers a certificate of legal existence and good standing for Las Quinchas from the proper Governmental Authority in Panama.

7.  Each Borrower agrees that as of the date hereof it owes the Loans and accrued interest thereon to the Lender in the amounts set forth on Schedule I hereto, without defense, offset, deduction, credit, claim or counterclaim of any kind or nature whatsoever, whether matured or contingent, related or unrelated.  Each Borrower hereby acknowledges and agrees that it has no present claims or defenses of any sort whatsoever against the Lender with respect to the Loans or such aforementioned accrued interest and, for the benefit of the Lender, hereby irrevocably waives any such claims or defenses, whether matured or contingent, known or unknown, to which it might otherwise be entitled.

8.  Upon the effectiveness of this Second Amendment (a) this Second Amendment shall be deemed to be an amendment to the Loan Agreement, and the Loan Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect, and (b) all references to the Loan Agreement in any other document, instrument, agreement or writing, including without limitation the other Credit Documents, shall hereafter be deemed to refer to the Loan Agreement as amended hereby.  The parties hereto agree it is their intention that nothing in this Second Amendment shall be construed to extinguish, release or discharge or constitute, create or effect a novation of, or an agreement to extinguish, release or impair any of the existing liabilities or obligations of any Borrower under the provisions of the Credit Documents.

9.  This Second Amendment shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-140 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. The parties agree that the provisions of Section 10.8 of the Loan Agreement shall apply to this Second Amendment, including, without limitation, the submission by the Borrowers to the jurisdiction of the state courts sitting in the City of New York, New York, United States of America, the United States District Court for the Southern District of New York and the courts of the British Virgin Islands.  THE BORROWERS AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS SECOND AMENDMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS SECOND AMENDMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING,

3



STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE BORROWERS OR THE LENDER.

10. This Second Amendment may be executed by the parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*as a Borrower*

By: _____
Name: Sergio Abadia
Title: Director

**LAKEVIEW GREEN CORP.**
*as a Borrower*

By: _____
Name: Sergio Abadia
Title: Director

**IIG CAPITAL LLC, as agent**
*as the Lender*

By: _____
Name: Daniel Rochmann
Title: Executive Director



4







COMO NOTARIO SEXTO DEL CIRCULO DE SANTAFE DE
BOGOTA, HAGO CONSTAR QUE LA(S) ANTERIOR(ES) FIR-
MA(S) PUESTA(S) POR ___Sergio

___Abauat   Calderon___

IDENTIFICADOS CON C.C. No.(s)
___12 128 472   Neiva___

ES(SON) AUTENTICA(S)

SANTAFE DE BOGOTA  '12 DIC 2014





SCHEDULE I

<u>LOAN PRINCIPAL OUTSTANDING</u>                    <u>ACCRUED INTEREST</u>

US$16,500,000                                            US$ 114,583.33









ANNEX A

CERTIFICATE OF OFFICER

October ___, 2014

To:     IIG Capital LLC, as Agent
        1500 Broadway, 17th Floor
        New York, NY 10036

      I refer to the Second Amendment, dated as of October 20, 2014 (the "Second Amendment")  to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

      I am a [title] of [Valle Energy Inc.][Lakeview Green Corp.](the "Borrower") and, pursuant to Section 6(c) of the Second Amendment, hereby certify in this certificate (this "Certificate") as follows:

(1)     I am duly authorized to give this Certificate.

(2)     Powers: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the Second Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the Second Amendment and any documents related thereto.  A copy of each such authorization is attached hereto.

(3)     Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, to sign on behalf of the Borrower, the Second Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Second Amendment and all documents related thereto on behalf of the Borrower.

_____

Name:

Exhibit A

| Name | Title | Signature | Individually or with others[1] |
|------|-------|-----------|-------------------------------|



---

[1] Please specify



ANNEX B

CERTIFICATE OF OFFICER

October 2014

To:   IIG Capital LLC, as Agent
      1500 Broadway, 17th Floor
      New York, NY 10036

     I refer to the Reaffirmation of Credit Documents, dated as of October 20, 2014 (the "Reaffirmation") from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation organized and existing under the laws of Barbados. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

     I am a [title] of [Cloister Blue Ltd.][Green Acres Development Ltd.][Mid Summer Capital Corp.][Las Quinchas Resource Corp.] (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

    (1)    I am duly authorized to give this Certificate.

    (2)    <u>Powers</u>: All authorizations necessary for the Guarantor to execute, deliver, perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

    (3)    <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.



Name: _____

Exhibit A

| Name | Title | Signature | Individually or with others[2] |
|------|-------|-----------|-------------------------------|






---

[2] Please specify

## THIRD AMENDMENT
## TO UNCOMMITTED LOAN AGREEMENT

**THIRD AMENDMENT**, dated as of December 23, 2014 (the "Third Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Valle"), Lakeview Green Corp., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Lakeview"), and IIG Capital LLC, as agent, a New York limited liability company with offices at 1500 Broadway, 17th Floor, New York, NY 10036 (the "Lender").   Terms not otherwise defined herein are used as defined in the Loan Agreement.

WHEREAS, the Borrowers and the Lender have agreed, on the terms and conditions stated below, to amend the Loan Agreement as hereinafter set forth,

NOW, THEREFORE, in consideration of the premises set forth herein, the parties hereto hereby agree as follows:

1.  The definition of "Availability Period" in Section 1.1 of the Loan Agreement is revised to read as follows:

    *Availability Period* means the Original Availability Period and each Subsequent Availability Period.

2.  The definition of "Credit Documents" in Section 1.1 of the Loan Agreement is revised to read as follows:

    *Credit Documents* means this Agreement, the Note, the Guarantees, the Masering Guaranty, the Security Agreements, the Fee Letter and any other documents and/or agreements delivered or entered into in connection with the foregoing.

3.  The definition of "Interest Period" in Section 1.1 of the Loan Agreement is revised to read as follows:

    *Interest Period* means, for each Loan, (a) initially, the period commencing on the Drawdown Date thereof and ending on (but not including) the last day of that calendar month except that in the case of the first Loan hereunder it shall be the last day of the next calendar month, and (b) then, each period commencing on the last day of the immediately preceding Interest Period and ending on (but not including) the last day of the next calendar month; provided, however, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall end on the next preceding Business Day and (ii) no Interest Period may end after the final date on which the Loans are due.

4.  The definition of "Facility Maturity Date" in Section 1.1 of the Loan Agreement is deleted.

5.  The following new definitions are inserted in Section 1.1 of the Loan Agreement in their proper alphabetical location:

1

***Borrowing Base Certificate*** means a certificate in the form of <u>Annex E</u> hereto.

***Fee Letter*** means the letter dated December 23, 2014 between Valle and IIG Trade Finance LLC pursuant to which Valle agrees to pay certain fees to IIG Trade Finance LLC.

***Original Availability Period*** means the period from the Execution Date to and including August 20, 2014.

***Subsequent Availability Period*** means each period of five (5) Business Days following the occurrence of the first ten (10) Principal Repayment Dates.

6.   Section 2.1 of the Loan Agreement is revised to read as follows:

2.1   THE LOANS.   (a) The Lender agrees, subject to the terms and conditions and relying upon the representations and warranties hereinafter set forth in this Agreement, to grant to the Borrowers a credit facility to be disbursed at Lender's sole discretion in one loan or in several loans during the relevant Availability Period (each a "**Loan**" and together, the "**Loans**"), provided that the aggregate principal amount of all Loans outstanding hereunder at any one time shall not exceed the Facility Amount.

(b) The amount of the principal installment of the Loans paid on each of the first ten (10) Principal Repayment Dates (meaning the Principal Repayment Dates from and including December 31, 2014 through and including September 30, 2015) may be re-borrowed, subject to the terms and conditions in this Agreement and at the Lender's sole discretion, during the relevant Availability Period.

(c) Amounts paid, repaid or prepaid in respect of the Loans may be re-borrowed only on the terms and conditions set forth herein.   THIS AGREEMENT DOES NOT CONSTITUTE A COMMITMENT ON THE PART OF THE LENDER TO MAKE ANY LOANS HEREUNDER.

7.   Section 2.7(a) of the Loan Agreement is revised to read as follows:

(a)      The principal of the Loans made during the Original Availability Period will be repaid in ten (10) equal installments, with one installment being paid on each of the first ten (10) Principal Repayment Dates.  Each Loan made during a Subsequent Availability Period will be repaid in full on the tenth Principal Repayment Date following its Drawdown, except for the Loan made during the Subsequent Availability Period that is a re-borrowing of the principal installment due on September 30, 2015, which Loan shall be repaid in full on the ninth Principal Repayment Date following its Drawdown.

(b)      The primary mechanism for the repayment of the Loans shall be through the payments due under the Conditional Assignments and/or under the Off-take Contract, which shall be paid directly into the Collection Account.

(c)      The proceeds of all payments made to the Collection Account shall be held by the Lender in the Collection Account until it contains an amount equal to the Reserve Amount, and



2

provided no Event of Default has occurred and is continuing (if an Event of Default has occurred and is continuing the Lender shall follow the procedure set forth in clause (d) below) and that the Borrowers are in compliance with their obligations under Section 5(k) hereof both before and after such release, any excess amounts received shall be released to the Borrowers by transfer to an account designated in writing by the Borrowers to the Lender.

(d)     Upon the occurrence of (i) any Principal Repayment Date, (ii) any other date on which any amount is payable hereunder or (iii) any Event of Default (unless such Event of Default has been waived or cured in accordance with the provisions hereof) the Lender shall debit (or in the case of clause (iii) hereof, at any time thereafter as the Lender shall determine in its sole discretion the Lender shall debit) the Collection Account and apply such funds in accordance with Section 2.8 hereof.

(e)     In the event that any installment of principal or any other amount in respect of any Loan is not paid when due, the Borrowers shall immediately pay such amount to the Lender and the Lender may demand payment thereof under the Note.

(f)     As collateral security for the Obligations, Valle hereby assigns, pledges, grants, transfers and conveys to the Lender a continuing first priority lien and security interest in all of its right, title and interest in and to the Collection Account and the funds therein, whether now owned or hereafter acquired and whether now existing or hereafter arising. In no event is the foregoing intended to imply (or to be an acknowledgement by the Lender) that Valle actually has any rights to the Collection Account, but merely to serve as a pledge and assignment of any such rights to the extent Valle is determined to have any such rights.

8. Section 4.2(f) of the Loan Agreement is revised to read as follows:

(a)   SECURITY INTEREST; COLLECTION ACCOUNT; BORROWER BASE CERTIFICATE. The Lender shall have a first priority perfected security interest in all of the Collateral (and UCC-1 filings listing each of Valle, Cloister Blue, Green Acres, Lakeview and Mid Summer as debtors have been filed in Washington D.C.) other than the collateral to be provided under the Holdings Pledge and the Las Quinchas Pledge, the Collection Account has been opened and is fully operational and the Lender shall have received a Borrowing Base Certificate duly executed by a Responsible Officer of Valle and showing compliance with Section 5(k)(i) both before and after giving effect to the requested Loan;

9. Section 5(k)(i) of the Loan Agreement is revised to read as follows:

(i) It will ensure that at all times the value of the Goods remaining to be paid for under the terms of Conditional Assignments and under the Off-take Contract prior to the final Principal Repayment Date (determined based on the Loans then outstanding) is equal to or greater than 120% of the Adjusted Outstanding Amount.

10. Annex C hereto is added to the Loan Agreement as Annex E thereto.

11. Each Borrower represents and warrants to the Lender that: (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Third Amendment and all documents related hereto to which it is a party, and to perform its obligations hereunder and



3

thereunder; (b) this Third Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; (c) no Default will occur or be continuing after giving effect to this Third Amendment; (d) after giving effect to this Third Amendment, all representations and warranties made by it in the Loan Agreement are true on and as of the date hereof as though made on such date (except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013"); (e) the execution and delivery of this Third Amendment and each document related hereto to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents, (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its properties or assets, other than Liens in favor of the Lender; (f) no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by it of this Third Amendment or any other document related hereto to which it is a party; and (g) it is not in breach of or in default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected that may cause an adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder.

12. The Borrowers shall pay to the Lender all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Lender in connection with this Third Amendment (collectively, the "Fees and Expenses"). The Lender shall notify the Borrowers of such total Fees and Expenses to be paid to the Lender.

13. This Third Amendment shall become effective as of the date hereof when the following conditions precedent shall have been satisfied in form and substance satisfactory to the Lender and the Lender has so notified the Borrowers in writing:

   (a) The Lender shall have received originals of this Third Amendment, duly executed by all parties hereto;

   (b) The representations and warranties of the Borrowers contained in Section 3 of the Loan Agreement shall be true on and as of the date of the execution and delivery of this Third Amendment as if they had been made on such date except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2013";

   (c) Each Borrower shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex A hereto certifying as to the matters set forth therein;

4

(d) Each Guarantor and Las Quinchas shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex B hereto certifying as to the matters set forth therein;

(e) No Default shall have occurred and be continuing;

(f) Each Guarantor, Las Quinchas and each Borrower shall have executed and delivered the Reaffirmation of Credit Documents dated of even date herewith;

(g) Masering shall have executed and delivered to the Lender an agreement to Third Amendment;

(h) Las Quinchas shall have executed and delivered to the Lender an agreement to Third Amendment; and

(i) The Lender has received evidence that the appointment of the Process Agent has been extended to at least six months past the last date when any of the Loans may be due.

The Lender shall notify the Borrowers in writing once the conditions precedent set forth herein have been satisfied (or waived by the Lender).

14. Each Borrower agrees that as of the date hereof it owes the Loans and accrued interest thereon to the Lender in the amounts set forth on Schedule I hereto, without defense, offset, deduction, credit, claim or counterclaim of any kind or nature whatsoever, whether matured or contingent, related or unrelated. Each Borrower hereby acknowledges and agrees that it has no present claims or defenses of any sort whatsoever against the Lender with respect to the Loans or such aforementioned accrued interest and, for the benefit of the Lender, hereby irrevocably waives any such claims or defenses, whether matured or contingent, known or unknown, to which it might otherwise be entitled.

15. Upon the effectiveness of this Third Amendment (a) this Third Amendment shall be deemed to be an amendment to the Loan Agreement, and the Loan Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect, and (b) all references to the Loan Agreement in any other document, instrument, agreement or writing, including without limitation the other Credit Documents, shall hereafter be deemed to refer to the Loan Agreement as amended hereby. The parties hereto agree it is their intention that nothing in this Third Amendment shall be construed to extinguish, release or discharge or constitute, create or effect a novation of, or an agreement to extinguish, release or impair any of the existing liabilities or obligations of any Borrower under the provisions of the Credit Documents.

16. This Third Amendment shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. The parties agree that the provisions of Section 10.8 of the Loan Agreement shall apply to this Third Amendment, including, without limitation, the submission by the Borrowers to the jurisdiction of the state courts sitting in the City of New York, New York, United States of America, the United States District Court for the Southern District of New York and the courts of the British Virgin

Islands. THE BORROWERS AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS THIRD AMENDMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS THIRD AMENDMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE BORROWERS OR THE LENDER.

17. This Third Amendment may be executed by the parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Third Amendment to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*as a Borrower*

By: _____
Name: SERGIO ABANAT
Title: DIRECTOR

**LAKEVIEW GREEN CORP.**
*as a Borrower*

By: _____
Name: SERGIO ABANAT
Title: DIRECTOR

**IIG CAPITAL LLC, as agent**
*as the Lender*

By: _____
Name: Daniel Rochmann
Title: Executive Director





6



COMO NOTARIO SEXTO DEL CIRCULO DE SANTAFE DE
BOGOTA, HAGO CONSTAR QUE LA(S) ANTERIOR(ES) FIR-
MA(S) PUESTA(S) POR _Sergio Abarca_
_Calderon_

IDENTIFICADOS CON C.C. No.(s)
_CC # 12.128.472_     _Neiva_

SON AUTENTICA(S)

SANTAFE DE BOGOTA ........     10 6 ENE 2015

SCHEDULE I



LOAN PRINCIPAL OUTSTANDING

US$16,500,000

ACCRUED INTEREST

US$131,770.91





ANNEX A

CERTIFICATE OF OFFICER

December ___, 2014

To:    IIG Capital LLC, as Agent
       1500 Broadway, 17th Floor
       New York, NY 10036

    I refer to the Third Amendment, dated as of December 23, 2014 (the "Third Amendment"),  to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

    I am a [title] of [Valle Energy Inc.][Lakeview Green Corp.](the "Borrower") and, pursuant to Section 13(c) of the Third Amendment, hereby certify in this certificate (this "Certificate") as follows:

(1)    I am duly authorized to give this Certificate.

(2)    <u>Powers</u>: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and any documents related thereto.  A copy of each such authorization is attached hereto.

(3)    <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, on behalf of the Borrower, to sign the Third Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Third Amendment and all documents related thereto on behalf of the Borrower.

_____
Name:

Exhibit A

<u>Name</u>                    <u>Title</u>                              <u>Signature</u>                    <u>Individually or with others</u>[1]





---
[1] Please specify



ANNEX B

CERTIFICATE OF OFFICER

December ___, 2014

To:  IIG Capital LLC, as Agent
     1500 Broadway, 17th Floor
     New York, NY 10036

I refer to the Reaffirmation of Credit Documents, dated as of December 23, 2014 (the "Reaffirmation"), from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a [title] of [Cloister Blue Ltd.][Green Acres Development Ltd.][Mid Summer Capital Corp.][Las Quinchas Resource Corp.] (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)  I am duly authorized to give this Certificate.

(2)  <u>Powers</u>: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)  <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

_____
Name:

Exhibit A



<u>Name</u>                <u>Title</u>                        <u>Signature</u>                        <u>Individually or with others</u>[2]



---

[2] Please specify

ANNEX C

BORROWING BASE CERTIFICATE

To:
IIG Capital LLC, as Agent
1500 Broadway, 17th Floor
New York, NY 10036
Att:

Ladies and Gentlemen:

I refer to the Uncommitted Loan Agreement (as from time to time amended, varied, novated or supplemented, the "Loan Agreement") dated as of March 10, 2014 among Valle Energy Inc. and Lakeview Green Corp. as borrowers and IIG Capital LLC, as Agent (the "Lender"). Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

I am a [title] of Valle Energy Inc. (the "Borrower") and, pursuant to Section 4.2(f) of the Loan Agreement, hereby certify in this certificate (this "Certificate") as follows:

(1)     I am duly authorized to give this Certificate.

(2)     As of the date hereof, the Borrowers are in compliance with Section 5(k)(i) of the Loan Agreement. In particular, the value of the Goods remaining to be paid for under the terms of Conditional Assignments and under the Off-take Contract prior to the final Principal Repayment Date (determined based on the Loans then outstanding and any Loan to be made in connection with the presentation of this Certificate) exceeds US$_____ [3].

Name: _____



---

[3] This amount should be 120% of the result of (i) the sum of the then outstanding Loans plus any Loan being requested in connection with the presentation of this Certificate minus (ii) the amount of cash in the Collection Account.

## REAFFIRMATION OF CREDIT DOCUMENTS

THIS REAFFIRMATION OF CREDIT DOCUMENTS ("Reaffirmation") is delivered as of this 23rd day of December, 2014, by each of Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama (each an "Obligor" and collectively, the "Obligors") in favor of IIG Capital LLC, as agent, a New York limited liability company (the "Lender") with respect to that certain (i) Guaranty Agreement dated as of March 10, 2014 among Cloister Blue Ltd., Green Acres Development Ltd., and Mid Summer Capital Corp., and the Lender, (ii) Guaranty Agreement dated as of March 10, 2014 between Las Quinchas Resource Corp. and the Lender, (iii) Assignment and Security Agreement, dated as of March 10, 2014, by and between Cloister Blue Ltd. and the Lender, (iv) Assignment and Security Agreement, dated as of March 10, 2014, by and between Green Acres Development Ltd. and the Lender, (v) Assignment and Security Agreement, dated as of March 10, 2014, by and between Lakeview Green Corp. and the Lender, (vi) Assignment and Security Agreement, dated as of March 10, 2014, by and between Mid Summer Capital Corp. and the Lender, (vii) Account Control Agreement, dated as of March 10, 2014, by and between Valle Energy Inc. and the Lender, and (viii) the Equitable Mortgage Over Shares in Lakeview Green Corp., dated March 10, 2014, among Valle Energy Inc., Lakeview Green Corp. and the Lender. Capitalized terms used herein shall have the meanings given to them in the Uncommitted Loan Agreement dated as of March 10, 2014 among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent, as amended to date (the "Loan Agreement").

### W I T N E S S E T H:

WHEREAS, the Lender, at the request of the Borrowers, is prepared to make certain changes to the Loan Agreement, subject to, among other conditions, the Obligors providing this Reaffirmation,

NOW THEREFORE, the Obligors agree as follows:

1. Each Obligor acknowledges that it is fully aware of the terms of the Third Amendment dated as of December 23, 2014 (the "Third Amendment") to the Uncommitted Loan Agreement dated as of March 10, 2014 among Valle Energy, Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Each Obligor consents to the modifications set forth in the Third Amendment, including, without limitation, the permitted re-borrowing of amounts repaid such that final repayment of the Loans may not occur until June 30, 2016. Each Obligor acknowledges and agrees that its liability under the Credit Documents to which it is a party relates to loans in the principal amount of up to US$16,500,000 and that for purposes of the guarantees referred to in items (i) and (ii) above the references therein to the making of loans in an aggregate principal amount of up to US$10,000,000 shall instead refer to the amount of US$16,500,000 and those documents are amended accordingly.



2. No Obligor is in default under (a) any Credit Document to which it is a party or (b) any other documents, instruments or agreements that evidence, secure or guarantee any indebtedness or other obligations of any Obligor to the Lender (collectively, the "Obligor Documents").

3. Each Obligor reaffirms that it is unconditionally liable to the Lender pursuant to the terms of each of the Obligor Documents to which it is a party, as reaffirmed, amended and confirmed herein, without set-off, demand, counterclaim or any defense whatsoever and that such obligations of each Obligor include new Loans resulting from the re-borrowing of amounts repaid through September 30, 2015, such that final repayment of the Loans may not occur until June 30, 2016.

4. Each Obligor agrees that each of the Obligor Documents to which it is a party shall remain in full force and effect as reaffirmed, amended and confirmed herein. With respect to Las Quinchas Resource Corp., it is expressly understood and reaffirmed that its Guarantee will not be enforceable during such times as Las Quinchas Resource Corp. is directly or indirectly controlled by Pacific Rubiales Energy Corp.

IN WITNESS WHEREOF, each of the undersigned has caused this instrument to be duly executed as of the first date written above.

Cloister Blue Ltd.

By: _____
Name: SERGIO ABDANAT
Title: DIRECTOR

Green Acres Development Ltd.

By: _____
Name: SERGIO ABDANAT
Title: DIRECTOR

Mid Summer Capital Corp.

By: _____
Name: SERGIO ABDANAT
Title: DIRECTOR

Las Quinchas Resource Corp.

By: _____
Name:
Title:



2

Lakeview Green Corp.

By: _____
Name: SERGIO ABAUAT
Title: DIRECTOR

Valle Energy Inc.

By: _____
Name: SERGIO ABAUAT
Title: DIRECTOR

Accepted and Agreed:

IIG Capital LLC, as agent
*as Lender*

By: _____
Name:
Title:





3





COMO NOTARIO SEXTO DEL CIRCULO DE SANTAFE DE
BOGOTA, HAGO CONSTAR QUE LA(S) ANTERIOR(ES) FIR-
MA(S) PUESTA(S) POR _Sergio Abaua_
_Calderon_
_____
IDENTIFICADOS CON C.C. No.(s)
_cc# 12.128.472. Neiva_
FUERON AUTENTICA(S)
SANTAFE DE BOGOTA     06 ENE 2015

CERTIFICATE OF OFFICER

December 23, 2014

To:    IIG Capital LLC, as Agent
        1500 Broadway, 17th Floor
        New York, NY 10036

       I refer to the Third Amendment, dated as of December 23, 2014 (the "Third Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

       I am a Director of Valle Energy Inc. (the "Borrower") and, pursuant to Section 13(c) of the Third Amendment, hereby certify in this certificate (this "Certificate") as follows:

        (1)    I am duly authorized to give this Certificate.

        (2)    <u>Powers</u>: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and any documents related thereto. A copy of each such authorization is attached hereto.

        (3)    <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, on behalf of the Borrower, to sign the Third Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Third Amendment and all documents related thereto on behalf of the Borrower.

                                                                  Name:  SERGIO ABANAM

Exhibit A

| Name | Title | Signature | Individually or with others |
|------|-------|-----------|----------------------------|
| Sergio Abauat | Director | | Individually |

CERTIFICATE OF OFFICER

December 23, 2014

To:    IIG Capital LLC, as Agent
       1500 Broadway, 17th Floor
       New York, NY 10036

       I refer to the Third Amendment, dated as of December 23, 2014 (the "Third Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

       I am a Director of Lakeview Green Corp. (the "Borrower") and, pursuant to Section 13(c) of the Third Amendment, hereby certify in this certificate (this "Certificate") as follows:

(1)    I am duly authorized to give this Certificate.

(2)    Powers: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the Third Amendment and any documents related thereto. A copy of each such authorization is attached hereto.

(3)    Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, on behalf of the Borrower, to sign the Third Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Third Amendment and all documents related thereto on behalf of the Borrower.

Name: SERGIO AZAUAT

Exhibit A

| <u>Name</u> | <u>Title</u> | <u>Signature</u> | <u>Individually or with others</u> |
|---|---|---|---|
| Sergio Abauat | Director | | Individually |

## CERTIFICATE OF OFFICER

December 23 2014

To:    IIG Capital LLC, as Agent
       1500 Broadway, 17th Floor
       New York, NY 10036

I refer to the Reaffirmation of Credit Documents, dated as of December 23, 2014 (the "Reaffirmation"), from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a Director of Mid Summer Capital Corp. (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)    I am duly authorized to give this Certificate.

(2)    Powers: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)    Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

Name:    Sergio Abnat

Exhibit A

| Name | Title | Signature | Individually or with others |
|------|-------|-----------|------------------------------|
| Sergio Abauat | Director |  | Individually |

CERTIFICATE OF OFFICER

December 23 2014

To:    IIG Capital LLC, as Agent
       1500 Broadway, 17th Floor
       New York, NY 10036


I refer to the Reaffirmation of Credit Documents, dated as of December 23, 2014 (the "Reaffirmation"), from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a Director of Cloister Blue Ltd. (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)    I am duly authorized to give this Certificate.

(2)    Powers: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)    Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

Name: _____

Exhibit A

| Name | Title | Signature | Individually or with others |
|------|-------|-----------|-----------------------------|
| Sergio Abauat | Director | | Individually |

CERTIFICATE OF OFFICER

December 23 2014

To:     IIG Capital LLC, as Agent
        1500 Broadway, 17th Floor
        New York, NY 10036


I refer to the Reaffirmation of Credit Documents, dated as of December 23, 2014 (the "Reaffirmation"), from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a Director of Green Acres Development Ltd. (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)     I am duly authorized to give this Certificate.

(2)     Powers: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)     Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

Name: _____

Exhibit A

| Name | Title | Signature | Individually or with others |
|------|-------|-----------|------------------------------|
| Sergio Abauat | Director | | Individually |

December 23, 2014

Valle Energy Inc.
Cra 7 # 74 – 36 Of 502
Bogotá DC, Colombia, SA
Attention: Sergio Abauat

   Re: US$16.5 million loan facility

Dear Sirs:

This letter (the "Letter") sets forth the understanding between IIG Trade Finance LLC ("IIG") and you regarding payment of the structuring fee with respect to the Third Amendment, dated as of December 23, 2014 (the "Third Amendment") to the Uncommitted Loan Agreement dated as of March 10, 2014 among yourselves and Lakeview Green Corp. as Borrowers and IIG Capital LLC, as agent (the "Loan Agreement"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement, as amended to date.

   1. In consideration for the services provided in structuring the Third Amendment, you agree to pay to IIG a structuring fee in U.S. Dollars in the amount of US$82,500 (the "Structuring Fee"). The Structuring Fee shall be paid in ten equal installments of US$8,250 starting in January 2015 and continuing through October 2015, with one installment due by the tenth day of each such calendar month, provided that if a Loan is made prior to the tenth day of the relevant calendar month then the installment of the Structuring Fee for that month shall be paid on the Drawdown Date for that Loan. Once any portion of the Structuring Fee is paid, it shall not be refundable under any circumstances. Furthermore, the unpaid portion of the Structuring Fee may not be cancelled by you under any circumstances.

   2. The Structuring Fee shall be paid to IIG, to account no. 004977175988 of IIG at Citibank N.A., New York, ABA No. 021000089, or such other account as IIG shall notify to you in writing.

   3. Except as required by applicable law and reporting requirements, you agree not to disclose publicly or make available to any third party any information regarding the Structuring Fee or the other terms of this Letter.

   4. All payments hereunder will be made in immediately available and freely transferable U.S. Dollars, without deduction, set-off or counterclaim, and will be grossed up for all Taxes.

This Letter may not be amended or modified except in a writing signed by both of the parties, and shall be governed by and construed and enforced in accordance with the law of the State of New York, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. You hereby irrevocably and unconditionally (a) submit, for yourself and your property, to the nonexclusive jurisdiction of the courts of the State of New York sitting in the City of New

Valle Energy Inc.
December 23, 2014
Page 2

York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Letter, (b) agree that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such Federal court, (c) waive, to the fullest extent you may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, (d) consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to you, or in any other manner permitted by applicable law, and (e) agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Letter will affect IIG's right to bring any action or proceeding relating to this Letter or the transactions contemplated hereby against you or your property in the courts of any jurisdiction. Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Letter or the transactions contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.

This Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

If the foregoing correctly sets forth the understanding and agreement between you and us, please so indicate in the space provided for that purpose below, whereupon this letter shall constitute a binding agreement as of the date hereof.

IIG TRADE FINANCE LLC

By: _____
Name:  Daniel Rochmann
Title: Executive Director

**ACCEPTED AND AGREED**:

VALLE ENERGY INC.

By: _____
Name: SERGIO MERLATI
Title: DIRECTOR

Execution Version

## FOURTH AMENDMENT
## TO UNCOMMITTED LOAN AGREEMENT

**FOURTH AMENDMENT**, dated as of October 30, 2015 (the "Fourth Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Valle"), Lakeview Green Corp., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Lakeview"), and IIG Capital LLC, as agent, a New York limited liability company with offices at 1500 Broadway, 17th Floor, New York, NY 10036 (the "Lender"). Terms not otherwise defined herein are used as defined in the Loan Agreement.

WHEREAS, the Borrowers and the Lender have agreed, on the terms and conditions stated below, to amend the Loan Agreement as hereinafter set forth,

NOW, THEREFORE, in consideration of the premises set forth herein, the parties hereto hereby agree as follows:

1. The definition of "Collection Account" in Section 1.1 of the Loan Agreement is revised to read as follows:

   "*Collection Account*" means the account of TFF fbo Valle Energy Inc. with Deutsche Bank Trust Company Americas, ABA#: 021-001-033, Swift: BKTRUS33, Acct# 04-922-192.

2. The definition of "Fee Letter" in Section 1.1 of the Loan Agreement is revised to read as follows:

   *Fee Letter* means (a) the letter dated December 23, 2014 between Valle and IIG Trade Finance LLC pursuant to which Valle agrees to pay certain fees to IIG Trade Finance LLC and (b) the letter dated October 30, 2015 between Valle and IIG Trade Finance LLC pursuant to which Valle agrees to pay certain fees to IIG Trade Finance LLC.

3. The definition of "Security Agreements" in Section 1.1 of the Loan Agreement is revised to read as follows:

   *Security Agreements* means the Las Quinchas Pledge, the Holdings Pledge, the Valle Pledge, the Assignment and Security Agreements, the Off-take Pledge, the New Off-take Pledge, the Account Control Agreement and any document entered into pursuant to Section 5(k)(i) hereof that creates a security interest in favor of the Lender in a contract for the sale of Goods.

4. The following new definitions are inserted in Section 1.1 of the Loan Agreement in their proper alphabetical location:

   *New Off-take Contract* means the contract among Las Quinchas, Pacific and Petrominerales dated November 20, 2015 providing for the sale by Las Quinchas to Pacific and Petrominerales of the oil produced (up to two thousand barrels of oil per day (2,000 BOPD)) from the Chipalo, Moriche, Guasimo and Las Quinchas blocks in Colombia.

1

Execution Version

**New Off-take Pledge** means the *Contrato de Cesión de Créditos en Garantía*, dated December 3, 2015 and with an effective date of December 30, 2015, granted by Las Quinchas to the Lender over the New Off-take Contract as security for the payment of the Obligations, governed by Colombian law.

**Petrominerales** means Petrominerales Colombia Corp., Sucursal Colombia.

5. Sections 2.7(a) through (c) of the Loan Agreement are revised to read as follows:

(a) The principal of the Loans shall be repaid in installments on the Principal Repayment Dates, with the relevant installments being in the amounts as set forth on Schedule 2 hereto.

 (b) The primary mechanism for the repayment of the Loans shall be through the payments due under the Conditional Assignments, the Off-take Contract, the New Off-take Contract and any replacement thereof pursuant to Section 5(k)(i) below, which shall be paid directly into the Collection Account.

(c) The proceeds of all payments made to the Collection Account shall be held by the Lender in the Collection Account until it contains an amount equal to the Reserve Amount, and provided no Event of Default has occurred and is continuing (if an Event of Default has occurred and is continuing the Lender shall follow the procedure set forth in clause (d) below) and that the Borrowers are in compliance with their obligations under Section 5(k) hereof both before and after such release, any excess amounts received shall be released by transfer to an account or accounts designated in writing by the Borrowers to the Lender (or by Las Quinchas to the extent set forth in the New Off-take Pledge), which may include an account of Pacific (or one of its Affiliates) if so instructed by the Borrowers (or by Las Quinchas to the extent set forth in the New Off-take Pledge).

6. The first sentence of Section 2.8 of the Loan Agreement is revised to read as follows:

All payments of principal and all payments of interest, fees and other amounts payable hereunder shall be made by means of the Lender's debiting the Collection Account in accordance with the terms hereof, or, in the absence of sufficient funds available in the Collection Account on the relevant payment date, by means of payments by the Borrowers or Pacific or Petrominerales to the Collection Account (for immediate debit by the Lender as provided in Section 2.7 above) or such other account as the Lender shall so instruct, with each such payment (whether by debit from the Collection Account or transfer from a Borrower or Pacific or Petrominerales) to be made in immediately available Dollars, on or before 11:00 a.m. (New York time) on the due date thereof, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any Taxes or other payments (except for Taxes required to be deducted by law and for which such payment is grossed up as provided in Section 8.1 hereof).

7. Section 5(j)(iii) of the Loan Agreement is revised to read as follows and new Section 5(j)(iv) is inserted as follows:

(iii) provide copies of the acknowledgements from Pacific that all payments due under the Conditional Assignments and under the Off-take Contract and the New Off-take Contract will



2

Execution Version

be made directly to the Collection Account; and (iv) provide copies of the acknowledgement from Petrominerales that all payments due under the new Off-take Contract will be made directly to the Collection Account.

8.  Section 5(k)(i) of the Loan Agreement is revised to read as follows:

(i) It will ensure that at all times the value of the Goods remaining to be paid for under the terms of Conditional Assignments, under the Off-take Contract and under the New Off-take Contract prior to the final Principal Repayment Date is equal to or greater than 120% of the Adjusted Outstanding Amount. If at any time the New Off-take Contract is canceled, terminated or otherwise fails to remain in full force and effect, the Borrowers will within five (5) Business Days thereafter pledge (or arrange for the pledge by one of their Affiliates of) a new contract or contracts for the purchase of Goods by purchasers of Goods acceptable to the Lender and providing a first priority security interest in such contracts in favor of the Lender pursuant to security interest documentation acceptable to the Lender which contracts will be sufficient to ensure that at all times the value of the Goods remaining to be paid for under such new contracts for the purchase of Goods prior to the Final Maturity Date is equal to or greater than 120% of the Adjusted Outstanding Amount.

9.  Section 5(k)(iii) of the Loan Agreement is revised to read as follows:

(iii) It will ensure that the following actions will be taken promptly (and in any event by February 29, 2016) after the date when Valle first gains control, directly or indirectly, of Las Quinchas: (A) each of the Holdings Pledge and the Las Quinchas Pledge shall be executed and delivered by all parties thereto; (B) all actions shall be taken to ensure that the Lender has a first priority security interest in the Collateral that is subject to the Holdings Pledge and the Las Quinchas Pledge, including, without limitation, all filings and registrations, required or recommended by Lender's counsel, in Panama and the British Virgin Islands; and (C) Lender's counsel in Panama is able to issue (and then does issue) a favorable legal opinion to the Lender in respect of the security interests under the Las Quinchas Pledge and the Holdings Pledge, which opinion shall be in form and substance acceptable to the Lender.

10. Sections 7(g), (j) & (k) of the Loan Agreement are revised to read as follows:

(g) Any Borrower or any Guarantor or Pacific or Petrominerales shall: (i) generally not, or be unable to, or shall admit in writing its inability to, pay its debts (except for amounts due under this Agreement) as such debts become due; (ii) make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, trustee or other similar official for it or any substantial part of its Assets; (iii) commence any proceeding under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, winding-up or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; (iv) have had any such petition or application (as described in (ii) above) filed or any such proceeding (as described in (iii) above) shall have been commenced, against it, in which an adjudication or appointment is made or order for relief is entered, or which petition, application or proceeding is not dismissed within 30 days of such filing or commencement; (v) have proposed to any creditor or any group of creditors of the same nature and subject to the same payment conditions, an out-of-court reorganization plan, regardless of its confirmation by the relevant court; (vi) have filed for court reorganization, whether such request shall or shall not

3

have been granted by court; or (vii) by any act or omission indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or order for relief or the appointment of a custodian, receiver or trustee for all or any substantial part of its Property; or

(j) Pacific fails to make any payment due under a Conditional Assignment, the Off-take Contract or the New Off-take Contract to the Collection Account, or Petrominerales fails to make any payment due under the New Off-take Contract to the Collection Account, and continuance of such respective failure or non-payment for a period of five (5) Business Days (whatever the reasons for such failure or non-payment and whether it shall be voluntary or involuntary or be effected by operation of law, pursuant to any judgment, decree or order of any court or any order, rule or regulation of any Governmental Authority); or

(k) Las Quinchas makes any sale of Goods other than under the Off-take Contract or the New Off-take Contract or makes any sale of Goods to any Person other than Pacific or Petrominerales, unless it has obtained the prior written consent of the Lender; or

11. For purposes of Section 7 of the Loan Agreement, all references therein to "Guarantor" shall include Las Quinchas at all times, even when Las Quinchas is not controlled by Valle.

12. Section 10.22 of the Loan Agreement is revised to read as follows:

**RELEASE OF GUARANTY AND CERTAIN COLLATERAL.** The Lender agrees that at such time as all of the property and assets that are to be transferred by Pacific under the Conditional Assignments have been properly transferred to Las Quinchas, Las Quinchas is at least 50.1% owned and controlled (directly or indirectly) by Valle, and all of the terms of Section 5(k)(iii) above have been fully complied with, then upon the written request of Valle, and provided no Event of Default has occurred and is continuing at such time, the Lender will promptly take all steps necessary to terminate the Guaranty (but not the Conditional Guaranty), each of the Assignment and Security Agreements and the Valle Pledge. The Borrowers shall pay all such costs and expenses incurred by the Lender in carrying out such termination and release of collateral.

13. The Borrowers agree to provide the Lender with a written update to the existing oil reserve reports for the Moriche, Las Quinchas, Guasimo and Chipalo blocks, within ninety (90) days from the date hereof. Such report must be from an independent third party acceptable to the Lender, provided that if the reserves per block are below one million barrels, the Borrower will provide an internal reserves report The Borrowers agree that their failure to comply with the foregoing requirement shall constitute an Event of Default under Section 7(b) of the Loan Agreement.

14. The Borrowers agree that by February 29, 2016 they will deliver to the Lender written evidence that the registered agent in the British Virgin Islands for each of Cloister Blue, Green Acres, Lakeview and Mid Summer has updated the (private) register of charges for each of such companies to reflect the changes being made to the term for which the collateral is being provided and the other changes resulting from the Assignment Amendments (as such term is defined below). The Borrowers agree that their failure to comply with the foregoing requirement shall constitute an Event of Default under Section 7(b) of the Loan Agreement.

Execution Version

15. Schedule I hereto is added to the Loan Agreement as Schedule 2 thereto.

16. Each Borrower represents and warrants to the Lender that: (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Fourth Amendment and all documents related hereto to which it is a party, and to perform its obligations hereunder and thereunder; (b) this Fourth Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; (c) no Default will occur or be continuing after giving effect to this Fourth Amendment; (d) after giving effect to this Fourth Amendment, all representations and warranties made by it in the Loan Agreement are true on and as of the date hereof as though made on such date (except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2014"); (e) the execution and delivery of this Fourth Amendment and each document related hereto to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents, (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its properties or assets, other than Liens in favor of the Lender; (f) no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by it of this Fourth Amendment or any other document related hereto to which it is a party; and (g) it is not in breach of or in default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected that may cause an adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder.

17. The Borrowers shall pay to the Lender all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Parties in connection with this Fourth Amendment (collectively, the "Fees and Expenses"). The Lender shall notify the Borrowers of such total Fees and Expenses to be paid to the Lender. Legal fees will be promptly paid by the Borrowers directly to the providers of these services.

18. This Fourth Amendment shall become effective as of the date hereof when the following conditions precedent shall have been satisfied in form and substance satisfactory to the Lender and the Lender has so notified the Borrowers in writing:

    (a) The Lender shall have received originals of this Fourth Amendment, duly executed by all parties hereto;

    (b) The representations and warranties of the Borrowers contained in Section 3 of the Loan Agreement shall be true on and as of the date of the execution and delivery of this Fourth Amendment as if they had been made on such date except to the extent that such representations and warranties expressly relate to an earlier date and except that for

Execution Version

purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2014";

(c) Each Borrower shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex A hereto certifying as to the matters set forth therein;

(d) Each Guarantor and Las Quinchas shall have delivered to the Lender a certificate from a Responsible Officer thereof in the form of Annex B hereto certifying as to the matters set forth therein;

(e) No Default shall have occurred and be continuing;

(f) Each Guarantor, Las Quinchas and each Borrower shall have executed and delivered the Reaffirmation of Credit Documents dated of even date herewith;

(g) Each of the First Amendments to each of the Assignment and Security Agreements (the "Assignment Amendments") and the First Amendment to Account Control Agreement shall have been executed and delivered by the parties thereto;

(h) A UCC-3 financing statement shall have been filed in Washington DC amending the definition of "Collateral Account" in the UCC-1 financing statement (file #2014023986) that was original filed with the Recorder of Deeds listing Valle as debtor to reflect the definition that will apply upon the effectiveness of this Fourth Amendment;

(i) The notice of change of Collection Account required to be executed by Pacific pursuant to each of the Assignment Amendments shall have been obtained and delivered to the Lender;

(j) Masering shall have executed and delivered to the Lender an agreement to Fourth Amendment;

(k) Las Quinchas shall have executed and delivered to the Lender an agreement to Fourth Amendment;

(l) The Lender has received evidence that the appointment of the Process Agent has been extended to at least six months past the date the final installment for repayment of the Loans is due (after giving effect to the terms of this Fourth Amendment);

(m)A certified copy of the New Off-take Contract (as defined after giving effect to this Fourth Amendment) has been delivered to the Lender;

(n) The New Off-take Pledge (as defined after giving effect to this Fourth Amendment) has been executed and delivered by all parties thereto and all filings and other actions in respect thereof necessary so as to provide a first priority security interest to the Lender in respect of the New Off-take Contract have been made or taken, as the case may be;

(o) The amendment to the Off-take Pledge changing the collection account (to match the change therein carried out by this Fourth Amendment) has been executed and delivered by the parties thereto; and

(p) Valle shall have paid all fees due pursuant to the Fee Letter.

The Lender shall notify the Borrowers in writing once the conditions precedent set forth herein have been satisfied (or waived by the Lender).

19. Each Borrower agrees that as of the date hereof it owes the Loans and accrued interest thereon to the Lender in the amounts set forth on Schedule II hereto, without defense, offset, deduction, credit, claim or counterclaim of any kind or nature whatsoever, whether matured or contingent, related or unrelated. Each Borrower hereby acknowledges and agrees that it has no present claims or defenses of any sort whatsoever against the Lender with respect to the Loans or such aforementioned accrued interest and, for the benefit of the Lender, hereby irrevocably waives any such claims or defenses, whether matured or contingent, known or unknown, to which it might otherwise be entitled.

20. The Lender agrees that upon receipt by it of a letter from Pacific and Petrominerales certifying that: (a) the Off-take Contract has been terminated by the parties thereto, is no longer in force and effect and there are not any pending obligations between the parties pursuant to the Off-take Contract except for amounts that may be due in respect of shipments that were made prior to the termination of the Off-take Contract; (b) the New Off-take Contract (as defined after giving effect to this Fourth Amendment) has become effective in accordance with its terms, sales of crude are being made under it and payments for such sales are being made into the Collection Account; and (c) except for the contract among Las Quinchas, Pacific and Petrominerales dated November 20, 2015 providing for the sale by Las Quinchas to Pacific and Petrominerales of the oil produced (up to five hundred barrels of oil per day (500 BOPD)) from the Chípalo, Moriche, Guásimo and Las Quinchas blocks in Colombia, there is no other contract or agreement (besides the New Off-take Contract) among Pacific and/or Petrominerales and any other Person regarding the sale of oil produced from the Chípalo, Moriche, Guásimo and/or Las Quinchas blocks in Colombia, then all references to the Off-take Contract and the Off-take Pledge in the Agreement will no longer have any effect and shall be considered as deleted from the Agreement, and the Lender will also take such actions as are necessary to terminate the Off-take Pledge, including any registrations in Colombia of the Lien evidenced by the Off-take Pledge.

21. Upon the effectiveness of this Fourth Amendment (a) this Fourth Amendment shall be deemed to be an amendment to the Loan Agreement, and the Loan Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect, and (b) all references to the Loan Agreement in any other document, instrument, agreement or writing, including without limitation the other Credit Documents, shall hereafter be deemed to refer to the Loan Agreement as amended hereby. The parties hereto agree it is their intention that nothing in this Fourth Amendment shall be construed to extinguish, release or discharge or constitute, create or effect a novation of, or an agreement to extinguish, release or impair any of the existing liabilities or obligations of any Borrower under the provisions of the Credit Documents.

22. This Fourth Amendment shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. The parties agree that the



7

Execution Version

provisions of Section 10.8 of the Loan Agreement shall apply to this Fourth Amendment, including, without limitation, the submission by the Borrowers to the jurisdiction of the state courts sitting in the City of New York, New York, United States of America, the United States District Court for the Southern District of New York and the courts of the British Virgin Islands. THE BORROWERS AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS FOURTH AMENDMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS FOURTH AMENDMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE BORROWERS OR THE LENDER.

23. This Fourth Amendment may be executed by the parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same agreement.

[SIGNATURE PAGE FOLLOWS]





8

Execution Version

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Amendment to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*as a Borrower*

By:
Name: SERGIO ABALAT
Title: DIRECTOR

**LAKEVIEW GREEN CORP.**
*as a Borrower*

By:
Name: SERGIO ABALAT
Title: DIRECTOR

**IIG CAPITAL LLC, as agent**
*as the Lender*

By:
Name: Daniel Rochmann
Title:   Executive Director



DILIGENCIA DE AUTENTICACION
Ante LA NOTARIA 21 DEL CIRCULO DE BOGOTA, D.C.
COMPARECIO Sergio Abaunt Calderon
quien exhibió la C.C. 12128472
de Nueva y declaró que la firma que
aparece en el presente documento es la suya.
El Declarante
Autorizó la anterior autenticación
Fecha:   23 FEB 2016
LA NOTARIA 21
ADRIANA CUELLAR ARANGO



9

Execution Version

SCHEDULE I

PRINCIPAL REPAYMENT DATE                    PRINCIPAL AMOUNT DUE

October 30, 2015                            US$250,000
November 30, 2015                           US$250,000
December 31, 2015                           US$250,000
January 29, 2016                            US$400,000
February 29, 2016                           US$500,000
March 31, 2016                              US$700,000
April 29, 2016                              US$800,000
May 31, 2016                                US$800,000
June 30 2016                                US$800,000
July 29, 2016                               US$1,000,000
August 31, 2016                             US$1,000,000
September 30, 2016                          US$1,000,000
October 31, 2016                            US$8,750,000



Execution Version

## SCHEDULE II

LOAN PRINCIPAL OUTSTANDING

US$16,500,000

ACCRUED INTEREST

US$ 175,885.42



Execution Version

### ANNEX A

### CERTIFICATE OF OFFICER

_____ __, 201_

To:     IIG Capital LLC, as Agent
        1500 Broadway, 17th Floor
        New York, NY 10036

I refer to the Fourth Amendment, dated as of October 30, 2015 (the "Fourth Amendment"), to the Uncommitted Loan Agreement dated as of March 10, 2014 (as may be amended, supplemented or otherwise modified from time to time, the "Loan Agreement") among Valle Energy Inc. and Lakeview Green Corp., as borrowers, and IIG Capital LLC, as agent. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

I am a [title] of [Valle Energy Inc.][Lakeview Green Corp.](the "Borrower") and, pursuant to Section 18(c) of the Fourth Amendment, hereby certify in this certificate (this "Certificate") as follows:

     (1)    I am duly authorized to give this Certificate.

     (2)    <u>Powers</u>: All authorizations necessary for the Borrower to execute, deliver and perform its obligations under the Fourth Amendment and each document related thereto to which it is a party, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Borrower to execute, deliver and perform its obligations under the Fourth Amendment and any documents related thereto.  A copy of each such authorization is attached hereto.

     (3)    <u>Due Execution</u>: Attached as <u>Exhibit A</u> to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Borrower or attorneys-in-fact of the Borrower and who (either individually or with others) are authorized, on behalf of the Borrower, to sign the Fourth Amendment and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Fourth Amendment and all documents related thereto on behalf of the Borrower.

                                       _____

                                       Name:

Execution Version

## Exhibit A

| Name | Title | Signature | Individually or with others[1] |
|------|-------|-----------|-------------------------------|

---

Execution Version

## ANNEX B

## CERTIFICATE OF OFFICER

\_\_\_\_ \_\_ \_\_, 201\_

To:   IIG Capital LLC, as Agent
      1500 Broadway, 17th Floor
      New York, NY 10036

I refer to the Reaffirmation of Credit Documents, dated as of October 30, 2015 (the "Reaffirmation"), from Valle Energy Inc., Cloister Blue Ltd., Green Acres Development Ltd., Lakeview Green Corp., and Mid Summer Capital Corp., each of which is a British Virgin Islands business company, and Las Quinchas Resource Corp., a corporation originally organized under the laws of Barbados but currently existing under the laws of the Republic of Panama. Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Reaffirmation.

I am a [title] of [Cloister Blue Ltd.][Green Acres Development Ltd.][Mid Summer Capital Corp.][Las Quinchas Resource Corp.] (the "Guarantor") and hereby certify in this certificate (this "Certificate") as follows:

(1)   I am duly authorized to give this Certificate.

(2)   Powers: All authorizations necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any document related thereto, if any are required, have been obtained and remain in full force and effect, and no further action is necessary for the Guarantor to execute, deliver and perform its obligations under the Reaffirmation and any documents related thereto. A copy of each such authorization is attached hereto.

(3)   Due Execution: Attached as Exhibit A to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Guarantor or attorneys-in-fact of the Guarantor and who (either individually or with others) are authorized, on behalf of the Guarantor, to sign the Reaffirmation and all documents related thereto and are authorized to give all communications and take any other action required under or in connection with the Reaffirmation and all documents related thereto on behalf of the Guarantor.

Name: _____

Execution Version

## Exhibit A

| Name | Title | Signature | Individually or with others[2] |
|------|-------|-----------|-------------------------------|

---

[2] Please specify

## AMENDMENTS TO AGREEMENTS

**THIS AMENDMENT**, dated as of November 19th, 2019 (the "Fifth Amendment") is:

    (a) the Fifth Amendment to the Uncommitted Loan Agreement dated as of March 10, 2014, as amended to date (and as may be amended, supplemented or otherwise modified from time to time, the "2014 Loan Agreement" or the "Loan Agreement") among Valle Energy Inc., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Valle"), Lakeview Green Corp., a British Virgin Islands business company, with its registered office at P.O. Box 662, Road Town, Tortola, British Virgin Islands ("Lakeview"), and Trade Finance Trust (the "Trust"), a statutory trust duly organized and existing under the laws of the State of Delaware, and having its registered office at Deutsche Bank Trust Company Delaware, 1101 Centre Road, Suite 200, Wilmington, Delaware 19805, United States of America (the "2014 Lender");

    (b) the Second Amendment to the Uncommitted Loan Agreement dated as of December 3, 2015, as amended to date (and as may be amended, supplemented or otherwise modified from time to time, the "2015 Loan Agreement" and together with the 2014 Loan Agreement, the "Loan Agreements) between Valle and the Trust (the "2015 Lender" and together with the 2014 Lender, the "Lender");

    (c) the First Amendment to the Account Control Agreement dated as of December 3, 2015 between Valle and the Lender (the "2015 Account Control Agreement"); and

    (d) the Second Amendment to the Account Control Agreement dated as of March 10, 2014 between Valle and the Lender (the "2014 Account Control Agreement, and together with the 2015 Account Control Agreement, the "Account Control Agreements").

Terms not otherwise defined herein are used as defined in the 2014 Loan Agreement.

WHEREAS, the Trust is (a) the 2014 Lender under the 2014 Loan Agreement by assignment from IIG Capital LLC, as Agent to the Lender, and (b) the 2015 Lender under the 2015 Loan Agreement by assignment from IIG TOF B.V., as Agent to the Lender;

WHEREAS, the name of Las Quinchas Resource Corp. has been changed to San Agustin Energy Corp. through public deed 9.123 dated November 16th, 2018 (the "Name Change"); and

WHEREAS, Valle, Lakeview, and the Lender have agreed, on the terms and conditions stated below, to amend the Loan Agreements as hereinafter set forth, and the other parties hereto have agreed to the terms and conditions of this Fifth Amendment.

NOW, THEREFORE, in consideration of the premises set forth herein, the parties hereto hereby agree as follows:

1.   The 2015 Loan Agreement shall be amended and restated in its entirety as set forth in the 2014 Loan Agreement as amended hereby. The Borrower and the Lender under the 2015 Loan Agreement agree that (a) as of the date hereof, the Loans outstanding under the 2015 Loan Agreement ("2015 Loans") shall be deemed to be amended and restated as Loans under the



1

2014 Loan Agreement, (b) the 2015 Loans will not be terminated, extinguished or novated but will be continued on the terms set forth in the 2014 Loan Agreement, as amended hereby, and (c) the other Credit Documents (including the Notes) as defined in the 2015 Loan Agreement will not be terminated or extinguished but will be amended and restated as set forth in the Credit Documents as defined in the 2014 Loan Agreement.

2. The Account Control Agreements are hereby amended as follows: (a) the 2014 Account Control Agreement shall be amended and restated in its entirety as set forth in the 2015 Account Control Agreement as amended hereby (for purposes of clarity, referred to in the Credit Documents as the Account Control Agreement); (b) San Agustin shall replace Valle as a Lien Grantor therein, and San Agustin agrees that from and after the date hereof, it is and shall be subject to and bound by the terms of the Account Control Agreement as a Lien Grantor, and all references in the Account Control Agreement to the "Lien Grantor" shall be deemed to refer to San Agustin; (c) all references to the "Secured Party" shall be deemed to refer to the Lender; and the definition of "Account" in Section 2 of the Account Control Agreement shall be amended and restated to refer to Account Name: Trade Finance Trust – San Agustin Energy Corp., Account Number: 7352583901 therein. 

3. As a result of the Name Change, all references in the Loan Agreements and the other Credit Documents and any documents or instruments relating thereto, to "Las Quinchas Resource Corp." or "Las Quinchas" shall be deemed references to "San Agustin Energy Corp." or "San Agustin" therein.

4. As of the date hereof, each of Valle and Lakeview hereby assigns to San Agustin Energy Corp. (formerly Las Quinchas Resource Corp.), a corporation organized under the laws of the Republic of Panama, having its domicile in the IGRS Building at 8 Aquilino de la Guardia Street, P.O. Box 0823-02435, Panama City, Panama ("San Agustin"), and San Agustin hereby assumes from each of Valle and Lakeview, only from the date of signature of the Fifth Amendment, all of the rights and obligations of Valle and Lakeview under the Loan Agreements and the other Credit Documents to which each of Valle and Lakeview is a party, including, without limitation those duties, obligations and liabilities incurred, accrued, or otherwise occurring or arising prior to the date hereof. San Agustin confirms and agrees (a) to pay, perform, observe and maintain in full force and effect, all of the covenants, agreements, obligations, and liabilities of each of Valle and Lakeview under the Loan Agreements and the Credit Documents to which each of Valle and Lakeview is a party, and (b) that from and after the date hereof, it is and shall be subject to and bound by the Credit Documents to which each of Valle and Lakeview is a party as the "Borrower", and all references in the Credit Documents to the "Borrower" shall be deemed to refer to San Agustin. By its signature below, the Lender hereby agrees to the foregoing assumption.

5. The Borrower agrees that as of the date hereof it owes the Loan in the amount of US $15,450,000 and accrued interest thereon to the Lender.

6. The following definitions in Section 1.1 of the Loan Agreement are revised in their entirety to read as follows:



*Collection Account* means the account of the Trust as follows: Bank: Bank Leumi USA, 350 Madison Ave, New York, NY 10017 ABA #: 026002794, SWIFT Code: LUMIUS3N, Account Name: Trade Finance Trust – San Agustin Energy Corp., Account Number:7352583901.

*Change of Control* means that (a) Oscar Ordoñez shall cease to (i) own beneficially and control (either directly or indirectly) at least 50.1% of Holdings' issued and outstanding Capital Stock having the right to vote or other equity interests (or securities convertible into equity interests) in Holding having the right to vote, and/or (ii) have the power (whether by ownership of Capital Stock, contract or otherwise) to control the management or policies of Holdings, and/or (b) Holdings shall cease to (i) own beneficially and control (either directly or indirectly) at least 50.1% of San Agustin' issued and outstanding Capital Stock having the right to vote or other equity interests (or securities convertible into equity interests) in San Agustin having the right to vote, and/or (ii) have the power (whether by ownership of Capital Stock, contract or otherwise) to control the management or policies of San Agustin.

*Credit Documents* means this Agreement, the Note, the Security Agreements, and the Fifth Amendment.

*Facility Amount* means US$15,450,000.00.

*Holdings* means San Agustin Holding Corp. (formerly Las Quinchas Holdings Corp.), a Panamanian company.

*Interest Rate* means 11.50% per annum.

*San Agustin* or *Borrower* means San Agustin Energy Corp (formerly Las Quinchas Resource Corp.), a corporation organized under the laws of the Republic of Panama, having its domicile in the IGRS Building at 8 Aquilino de la Guardia Street, P.O. Box 0823-02435, Panama City, Panama.

*San Agustin Pledge* means the Share Pledge Agreement granted by Holdings to the Lender over 20% of the Capital Stock of San Agustin.

*Loan* means, collectively, the Loans made under the 2014 Loan Agreement and the Loans made under the 2015 Loan Agreement.

*Material Adverse Effect* mean, in each case as determined by the Lender, a material adverse effect on (a) the business condition, operations, performance, property or prospects of the Borrower, any of its Affiliates, or Holdings, (b) the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder, or (c) the ability of the Borrower or Holdings to perform its respective obligations under any Credit Document to which it is a party. Notwithstanding the above the Lender determination will not be required in the event of force majeure refer to in section 2.7 (g) (see paragraph 9. Below).

*Off-take Contract* means the contracts to be executed (a) between Las Quinchas Resource Corp., Sucursal Colombia, and the Off-taker providing for the sale by Las Quinchas Resource Corp., Sucursal Colombia to the Off-taker of the oil produced from the Moriche blocks in



3

Colombia, and (b) between Las Quinchas Resource Corp., Sucursal Colombia and any other Off-taker.

*Off-take Pledge* means the *Contrato de Cesión de Créditos en Garantia*, granted by San Agustin to the Lender over the Off-take Contract as security for the payment of the Obligations, governed by Colombian law.

*Principal Repayment Date* means November 30, 2019 and the last Business Day of each month thereafter until the Final Maturity Date.

*Security Agreements* means the San Agustin Pledge, the Off-take Pledge, the Account Control Agreement and any document entered into pursuant to Section 5(k)(i) hereof that creates a security interest in favor of the Lender in a contract for the sale of Goods.

7. The definitions of Applicable Margin, Assignment and Security Agreements, Availability Period, Cloister Blue, Cloister Blue Security Agreement, Conditional Guaranty, Green Acres, Green Acres Security Agreement, Guarantees, Guarantors, Holdings Pledge, Lakeview Security Agreement, LIBO Rate, San Agustin Guaranty, Masering, Masering Guaranty, Mid Summer, Mid Summer Security Agreement, New Off-take Contract, New Off-take Pledge, Valle Pledge, and Reserve Amount, are deleted from Section 1.1 of the Loan Agreement and all those terms are deleted from each place in the Loan Agreement where they occur, and all of these Companies and/or persons are exempt from fulfilling any obligation under the Loan Agreement; and they are declared in good standing by the Lender .



8. The following definitions are inserted in Section 1.1 of the Loan Agreement in their proper alphabetical location:

*Asset Sale* means the sale, transfer, assignment or disposal, in any way, of all or part of the following, whether in a single transaction or in a series of transactions and whether related or not, by Las Quinchas (or a branch thereof): (a) the two Exploration and Production Contracts (*Contratos de Exploracion y Explotacion*) "Guasimo" and "Moriche" between Las Quinchas (or a branch thereof) and the Agencia Nacional de Hidrocarburos de Colombia - ANH, and (b) the two Association Contracts (*Contratos de Asociación*) "Las Quinchas" and "Chipalo" between Las Quinchas (or a branch thereof) and Empresa Colombiana de Petroleos - Ecopetrol, in each case (i) as may be described from time to time in the external auditor's Notes to the Financial Statements of the Borrower, and (ii) true and correct copies of which, and any amendments thereto, have been provided to the Lender.

*Final Maturity Date* means April 30, 2020, provided that if such date is not a Business Day then the Final Maturity Date shall be the next preceding Business Day.

*Fifth Amendment* means the Fifth Amendment dated as of November 19th, 2019 to, among others, this Agreement.

*Off-taker* means Gunvor and any other off-taker with similar conditions and similar financial capabilities to Gunvor, which is not in violation of any United States laws or regulations applicable to such off-taker, as determined by the Lender.

4

9. Section 2.4(a) of the Loan Agreement is revised to read as follows:

(a) The Borrower shall pay to the Lender interest on the unpaid principal amount of the Loan, at a rate per annum equal to the Interest Rate.

10. Section 2.7 of the Loan Agreement is revised in its entirety to read as follows:

(a)     The principal of the Loan will be repaid in such amounts and on such dates as follows: (i) on each Principal Repayment Date, an installment of US$300,000 each, and (ii) on the Final Maturity Date, the unpaid principal of the Loan outstanding on such date (for purposes of clarity, together with accrued interest).

(b)     The primary mechanism for the repayment of the Loan shall be through the payments due under the Off-take Contract and any replacement thereof pursuant to Section 5(k) below, which shall be paid directly into the Collection Account.

(c)     The proceeds of all payments made to the Collection Account shall be held by the Lender in the Collection Account until it contains an amount equal to the principal installment plus accrued interest due for the relevant calendar month.  Any amount received in the Collection Account during the relevant calendar month in excess of such principal installment and accrued interest shall be released to the Borrower by transfer to an account of the Borrower notified by the Borrower in writing to the Lender prior to such release, provided (i) no Event of Default has occurred and is continuing at such time (if an Event of Default has occurred and is continuing the Lender shall follow the procedure set forth in clause (d) below), and (ii) that the Borrower is in compliance with its obligations under Section 5(k) hereof both before and after such release.

(d)     Upon the occurrence of (i) any Principal Repayment Date, (ii) any other date on which any amount is payable hereunder or (iii) any Event of Default (unless such Event of Default has been waived or cured in accordance with the provisions hereof) the Lender shall debit (or in the case of clause (iii) hereof, at any time thereafter as the Lender shall determine in its sole discretion the Lender shall debit) the Collection Account and apply such funds in accordance with Section 2.8 hereof.

(e)     In the event that any installment of principal or any other amount in respect of the Loan is not paid when due, or if any such principal or other amount remains outstanding on the Final Maturity Date, the Borrower shall immediately pay such amount to the Lender and the Lender may demand payment thereof under the Note.

(f)     As collateral security for the Obligations, San Agustin hereby assigns, pledges, grants, transfers and conveys to the Lender a continuing first priority lien and security interest in all of its right, title and interest in and to the Collection Account and the funds therein, whether now owned or hereafter acquired and whether now existing or hereafter arising. In no event is the foregoing intended to imply (or to be an acknowledgement by the Lender) that San Agustin actually has any rights to the Collection Account, but merely to serve as a pledge and assignment of any such rights to the extent that San Agustin is determined to have any such rights.



5

(g)     In the event of a *force majeure* event causing the failure of production in the main producing wells of the Moriche Mauritia North field, the Borrower shall so notify the Lender within five (5) days thereof. Upon receipt of such notice, the Lender will proceed to postpone any principal payments then due and payable by the Borrower for a period of up to three months beginning on the first day of such event (the "Postponement"). Once the Postponement is notified to by the Borrower in writing, then (i) any failure of the Borrower to pay such principal payments during the period of Postponement shall not be deemed an Event of Default, (ii) the provisions of Section 2.6 in respect of default interest shall not apply to any unpaid principal amounts during such period, and (iii) regardless of such Postponement, interest shall continue to accrue at the Interest Rate on any unpaid principal amounts during such period and the Borrower shall continue to pay such interest when and as due hereunder.

11. The first sentence of Section 2.8 of the Loan Agreement is revised to read as follows: "All payments of principal and all payments of interest, fees and other amounts payable hereunder shall be made by means of the Lender's debiting the Collection Account in accordance with the terms hereof, or, in the absence of sufficient funds available in the Collection Account on the relevant payment date, by means of payments by the Borrower or Off-taker to the Collection Account (for immediate debit by the Lender as provided in Section 2.7 above) or such other account as the Lender shall so instruct, with each such payment (whether by debit from the Collection Account or transfer from the Borrower or Off-taker) to be made in immediately available Dollars, on or before 11:00 a.m. (New York time) on the due date thereof, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any Taxes or other payments (except for Taxes required to be deducted by law and for which such payment is grossed up as provided in Section 8.1 hereof; provided that, unless an Event of Default has occurred and is continuing, legal fees and expenses payable by the Borrower as provided herein may only be debited from the Collection Account with the prior written consent of the Borrower".

12. Section 2.12 of the Loan Agreement is revised to read as follows:

**OPTIONAL AND MANDATORY PREPAYMENT.** (a) Optional Prepayment: Subject to the provisions of clause (b), the Borrower shall be entitled to prepay, in whole or in part, the outstanding principal amount of the Loan, *provided* that all of the following conditions shall have been satisfied: (i) the principal amount prepaid shall be paid together with accrued interest on the relevant amounts of the Loan then being prepaid to the date of such prepayment; (ii) the Borrower shall have received all necessary approvals for such prepayment from all relevant Governmental Authorities, if any are required; and (iii) the Borrower shall have given the Lender not less than five (5) Business Days' prior written notice of its intention to prepay the Loan in whole or in part, which notice shall be irrevocable and shall specify the amount being prepaid and the prepayment date.

(b) Mandatory Prepayment: The Borrower shall prepay in whole the outstanding principal amount of the Loan together with accrued interest immediately upon the occurrence of (i) a Change of Control, or (ii) an Asset Sale. In the event of a partial Asset Sale, whose sale price is less than the loan balance, the borrower shall proceed to prepay the net sale amount received and the loan amount will be adjusted accordingly.



6

(c) All principal amounts prepaid hereunder shall be applied against installments due in the inverse order of maturity.

13. Section 3(q) of the Loan Agreement is revised to read as follows:

(q) **SECURITY INTERESTS**. On and after the date of execution and delivery thereof, this Agreement and the Security Agreements create (or will create, as the case may be), as security for the obligations purported to be secured thereby, subject to the provisions hereof and thereof, valid and enforceable perfected security interests in and Liens on all of the Collateral subject to such agreement, in favor of the Lender, with the priority of such Lien being as set forth in each of such agreements. Each of San Agustin and Holdings has good title to all of its Collateral free and clear of all Liens, except as created under this Agreement and the Security Agreements. No filings or recordings are required in order to perfect the security interests created hereunder and under the Security Agreements except for filings or recordings listed in such agreements, all of which shall have been made, except as otherwise expressly provided in such agreements or herein.

14. Section 5(a) of the Loan Agreement is amended as follows: (a) clauses (i) and (ii) are revised to replace all references to "Valle" with references to "the Borrower" therein, and (b) clause (ii) is revised to replace all references to "fiscal quarter" with references to "fiscal semester" therein.

15. Section 5(g) of the Loan Agreement is deleted in its entirety.

16. Section 5(j)(iii) of the Loan Agreement is amended and restated in its entirety as follows:

(iii) The Borrower will be granted sixty (60) days after the effective date of the Fifth Amendment to provide copies of the Annex C duly delivered to the Off-Taker providing that, once the acknowledgment of the Notification Letter has been confirmed by the Off-Taker, all payments due under the Off-take Contract will be made directly to the Collection Account;

17. Section 5(k)(i) of the Loan Agreement is revised to read as follows (and for purposes of clarification, Sections 5(k)(ii) & (iii) are deleted in their entirety):

**COLLATERAL.** (i) It will ensure at all times that the value of the Goods remaining to be paid for under the Off-take Contract prior to the Final Maturity Date is equal to or greater than 120% of the Adjusted Outstanding Amount. If at any time the Off-take Contract is canceled, terminated, or otherwise fails to remain in full force and effect, or the value of such Goods remaining to be paid is less than 120% of the Adjusted Outstanding Amount, the Borrower will within thirty (30) Business Days thereafter pledge a new contract or contracts for the purchase of Goods by purchasers of Goods acceptable to the Lender and providing a first priority security interest in such contracts in favor of the Lender pursuant to security interest documentation acceptable to the Lender, which contracts will be sufficient to ensure that at all times the value of the Goods remaining to be paid for under such new contracts for the purchase of Goods prior to the Final Maturity Date is equal to or greater than 120% of the Adjusted Outstanding Amount. The Borrower will be granted sixty (60) days after the effective date of the Fifth Amendment to deliver to the Lender a certified copy of the Off-take Contract complying with the requirements hereof.



18. New Sections 5(p) and (q) are inserted in the Loan Agreement as follows:

(p) **RESOURCE REPORT.** The Borrower will provide the Lender yearly with a written update to the existing oil reserve reports for the Moriche, Las Quinchas, Guasimo and Chipalo blocks, by March 31, 2019, with each such report being from an independent third party acceptable to the Lender. If the reserves per block are below one million barrels, the Borrower will provide an internal reserves report in place of each such third-party report.

(q) **OFF-TAKER SALES REPORTS.** The Borrower will provide the Lender (i) by no later than the tenth (10th) Business Day of the annual renewal date of each Off-take Contract, a written forecast of San Agustin projected sales to the Off-taker under such Off-take Contract during the next following twelve (12) months; and (ii) within ten (10) Business Days of the last day of each fiscal quarter, the year-to-date actual sales made to the Off-taker under each Off-take Contract, as renewed, and the amounts received by San Agustin in connection with such sales.

19. The references to "Pacific" or "Petrominerales" in Section 2.8 and Section 7(k) of the Loan Agreement shall be replaced with references to "Off-taker".

20. Sections 7(d), (g), (j), (m) and (n) of the Loan Agreement are revised to read as follows:

(d) The Borrower or Holdings, or any of their respective officers, has made any representation or warranty herein or in any other writing furnished pursuant to or in connection with this Agreement or any of the other Credit Documents including a borrower notification to the lender of a force majeure as provided in section 9 (g) of the Fifth Amendment, which shall prove to have been incorrect in any material respect on the date when made or deemed made; or

(g) The Borrower or Holdings shall: (i) generally not, or be unable to, or shall admit in writing its inability to, pay its debts (except for amounts due under this Agreement) as such debts become due; (ii) make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, trustee or other similar official for it or any substantial part of its Assets; (iii) commence any proceeding under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, winding-up or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; (iv) have had any such petition or application (as described in (ii) above) filed or any such proceeding (as described in (iii) above) shall have been commenced, against it, in which an adjudication or appointment is made or order for relief is entered, or which petition, application or proceeding is not dismissed within 30 days of such filing or commencement; (v) have proposed to any creditor or any group of creditors of the same nature and subject to the same payment conditions, an out-of-court reorganization plan, regardless of its confirmation by the relevant court; (vi) have filed for court reorganization, whether such request shall or shall not have been granted by court; or (vii) by any act or omission indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or order for relief or the appointment of a custodian, receiver or trustee for all or any substantial part of its Property; or



8

(j) The Off-taker fails to make any payment due under the Off-take Contract to the Collection Account, and continuance of such failure or non-payment for a period of ten (10) Business Days (whatever the reasons for such failure or non-payment and whether it shall be voluntary or involuntary or be effected by operation of law, pursuant to any judgment, decree or order of any court or any order, rule or regulation of any Governmental Authority); or

(m) (i) A Governmental Authority of Panama or Colombia shall (A) declare a gener l suspension of payment or a moratorium on the payment of debt or other obligations of ne Borrower or Holdings, as the case may be (which does not expressly exclude this Agreement) or (B) fail to exchange, or to approve or permit the exchange of, lawful local currency into Dollars, or take any other action including the promulgation, operation or enforcement of any law, act, decree, regulation, ordinance, order, policy, or determination, or any modification of, or change in the interpretation of, any of the foregoing that has the effect of restricting or preventing such exchange or the transfer of any funds outside Panama or Colombia as the case may be, beyond the extent to which such restrictions exist on the date first set forth above, or (ii) the unavailability of United States Dollars in any legal exchange market therefor in such jurisdiction in accordance with normal commercial practice; or

(n) It have been proved that the event of force majeure notified in writing by the Borrower to the Lender as provided in section 2.7 (g) of the Loan Agreement was not real; or

21. Section 9 of the Loan Agreement (Provisions regarding Co-Borrowers) is replaced with the phrase "[Reserved]".

22. Section 10.3(b) of the Loan Agreement is amended and restated in its entirety as follows:

"(b) the Expenses, as such times as is requested by the Lender, provided that, unless an Event of Default has occurred and is continuing, any such Expenses shall have been previously approved in writing by the Borrower, which approval shall not be unreasonably withheld or delayed."

23. Section 10.22 of the Loan Agreement is deleted in its entirety.

24. Schedule 2 to the Loan Agreement (for purposes of clarity, which listed the principal repayment schedule and was added to the Loan Agreement pursuant to the Fourth Amendment to the 2014 Loan Agreement) is deleted.

25. The Borrower represents and warrants to the Lender that: (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Fifth Amendment and all documents related hereto to which it is a party, and to perform its obligations hereunder and thereunder, including without limitation the assumption of the Loan in the amount of US$15,450,000 plus accrued interest thereon and the repayment; (b) this Fifth Amendment and each document related hereto to which it is a party has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; (c) no Default will occur or be continuing after giving effect to this Fifth Amendment; (d) after giving effect to this Fifth Amendment, all representations and warranties made by it in the Loan Agreement are true on and as of the date hereof as though made on such date (except to the



9

extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2018"); (e) the execution and delivery of this Fifth Amendment and each document related hereto to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) conflict with or result in a breach of, or require any consent under, its Governing Documents, (ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and applicable to it, (iii) result in a breach of or constitute a default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien upon or with respect to any of its properties or assets, other than Liens in favor of the Lender; (f) no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by it of this Fifth Amendment or any other document related hereto to which it is a party; and (g) it is not in breach of or in default under any indenture or financing or credit agreement or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected that may cause an adverse effect on the validity or enforceability of any Credit Document, or the rights or remedies of the Lender thereunder.

26. The Borrower shall pay to the Lender all costs and expenses (including reasonable attorneys' fees and expenses that shall not exceed the amount of twenty thousand dollars US$20.000) incurred by the Lender in connection with this Fifth Amendment (collectively, the "Fees and Expenses"), provided that the Lender shall notify the Borrower of such total Fees and Expenses to be paid to the Lender and the Borrower shall approve such Fees and Expenses in writing, which approval shall not be unreasonably withheld or delayed. Legal fees will be promptly paid by the Borrower directly to the providers of these services.

27. This Fifth Amendment shall become effective as of the date of its signature.

   (a) The Borrower will deliver to the Lender (i) originals of this Fifth Amendment, duly executed by all parties hereto and (ii) a new Note duly executed by San Agustin, substantially in the form of Annex A hereto;

   (b) The representations and warranties of the Borrower contained in Section 3 of the Loan Agreement shall be true on and as of the date of the execution and delivery of this Fifth Amendment as if they had been made on such date except to the extent that such representations and warranties expressly relate to an earlier date and except that for purposes of Section 3(i) the references to "December 31, 2012" shall instead be read as "December 31, 2018;

   (c) Each of the Borrower and Holdings shall deliver to the Lender a certificate from a Responsible Officer thereof in the form of Annex B hereto certifying as to the matters set forth therein;

   (d) After giving effect to this Fifth Amendment, no Default shall have occurred and be continuing;

10

(e) Holdings shall execute and deliver to the Lender the San Agustin Pledge (as defined after giving effect to this Fifth Amendment) and the pledge over the Collateral provided thereunder has been perfected and is in full force and effect;

(f) Each of San Agustin and Holdings shall deliver to the Lender (i) board and/or shareholder votes, as required by the Lender, approving its execution, delivery and performance of each of the Credit Documents to which it is a party, including without limitation the assumption by San Agustin of the Assumed Obligations, and (ii) evidence of the incumbency for each Person signing any of the Credit Documents on its behalf;

(g) The Borrower shall deliver evidence that the Borrower's appointment of the Process Agent has been put into effect for at least six months past the Final Maturity Date (as defined after giving effect to the terms of this Fifth Amendment); and

(h) The Lender shall file in Washington DC UCC-1 and UCC-3 financing statements reflecting the amended definition of "Collateral Account", and listing San Agustin as debtor and the Trust as lender.

Once a new Off-take Contract is executed with the Off-taker as defined above, San Agustin within the next ten (10) business days will proceed to execute and deliver to The Lender the Off-take Pledge Agreement along with the irrevocable payment instruction letter in the form provided in Annex B of said agreement.

28. Upon the effectiveness of this Fifth Amendment (a) this Fifth Amendment shall be deemed to be an amendment to the Loan Agreement, and the Loan Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect, (b) this Fifth Amendment shall be deemed to effect an amendment and restatement of the 2015 Loan Agreement on the terms set forth in the 2014 Loan Agreement, as amended hereby, and (c) all references to the Loan Agreement or the 2015 Loan Agreement in any other document, instrument, agreement or writing, including without limitation the other Credit Documents, as defined in the Loan Agreements, shall hereafter be deemed to refer to the Loan Agreement as amended hereby. The parties hereto agree it is their intention that nothing in this Fifth Amendment shall be construed to extinguish, release or discharge or constitute, create or effect a novation of, or an agreement to extinguish, release or impair any of the existing liabilities or obligations of the Borrower (for purposes of clarity, which have been assumed hereunder) under the provisions of the Credit Documents as defined in the Loan Agreements.

29. This Fifth Amendment shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction. The parties agree that the provisions of Section 10.8 of the Loan Agreement shall apply to this Fifth Amendment, including, without limitation, the submission by the Borrower to the jurisdiction of the state courts sitting in the City of New York, New York, United States of America, the United States District Court for the Southern District of New York and the courts of Panama. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION



11

WITH, THIS FIFTH AMENDMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION WITH THIS FIFTH AMENDMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE PARTIES HTEREO.

30. This Fifth Amendment may be executed by the parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Fifth Amendment to be duly executed and delivered, by their respective duly authorized representatives, as of the date first above written.

**VALLE ENERGY INC.**
*as a Borrower*

By:
Name: S. ABNAT
Title: Director

**LAKEVIEW GREEN CORP.**
*as a Borrower*

By:
Name: S. ABAOAT
Title: Attorney.

**SAN AGUSTIN ENERGY CORP.**
*as a Borrower*

By:
Name: S. ABALAT
Title: Attorney

**TRADE FINANCE TRUST**
*as the Lender*

By: IIG Trade Finance LLC, as Administrator

Name:
Title:



12

**DILIGENCIA DE AUTENTICACIÓN**

Ante LA NOTARIA 21 DEL CIRCULO DE BOGOTA D.C.

COMPARECIO Sergio Abouat Calderon

quien exhibió la C.C. 12128472

de Neiva y declaro que la firma que

aparece en el presente documento es la suya.

El Declarante

Autorizó la anterior autenticación 2 U NOV 2019

Fecha:

LA NOTARIA 21

ADRIANA CUELLAR ARANGO

ANNEX A

FORM OF PROMISSORY NOTE

New York, New York
November 19th, 2019

For value received, San Agustin Energy Corp. (formerly Las Quinchas Resource Corp.), a Panamanian company (the "Borrower"), promises to pay to the order of Trade Finance Trust (the "Trust"), a statutory trust duly organized and existing under the laws of the State of Delaware (the "Lender"), the unpaid principal amount of the Loan made by the Lender to the Borrower pursuant to the Loan Agreement referred to below on the Principal Repayment Dates provided for in the Loan Agreement.  The Borrower promises to pay interest on the unpaid principal amount of the Loan on the dates and at the rate provided for in the Loan Agreement.  All such payments of principal and interest shall be made in the manner and at the place provided for in the Loan Agreement.

This Note is a Note referred to in the Uncommitted Loan Agreement dated as of March 10, 2014 between the Borrower and the Lender (as the same may be amended, varied, novated, supplemented or otherwise modified from time to time, including without limitation by the Fifth Amendment dated as of November 19th, 2019, the "Loan Agreement").  Terms defined in the Loan Agreement are used herein with the same meanings.

As provided in the Loan Agreement, this Note is subject to voluntary prepayment, in whole or in part.  Reference is made to the Loan Agreement for provisions for the acceleration of the maturity hereof.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive, to the fullest extent permitted by applicable law, presentment, demand, protest and all other notices of any kind.

This Note shall be governed by and construed in accordance with the laws of the State of New York, United States of America, including, without limitation, Section 5-1401 of the New York General Obligations Law, but excluding any conflicts of law principles that would lead to the application of the laws of another jurisdiction.

**SAN AGUSTIN ENERGY CORP. (formerly LAS QUINCHAS RESOURCE CORP.)**


By:   _____
Name:
Title:

ANNEX B

CERTIFICATE OF OFFICER

November 19th, 2019

To:     Trade Finance Trust
        1101 Centre Road, Suite 200
        Wilmington, Delaware 19805

I refer to the Fifth Amendment, dated as of November 19th, 2019 (the "Fifth Amendment") to (a) the 2014 Loan Agreement among Valle Energy Inc. ("Valle"), Lakeview Green Corp. and Trade Finance Trust (the "Lender"); (b) the 2015 Loan Agreement between Valle and the Lender; (c) the First Amendment to the Account Control Agreement dated as of December 3, 2015 between Valle and the Lender; and (d) the Second Amendment to the Account Control Agreement dated as of March 10, 2014 between Valle and the Lender.

Capitalized terms used herein unless otherwise defined herein shall have the meanings assigned to them in the Fifth Amendment.

Sergio Abauat, legal representative of Las Quinchas Resource Corp. Sucursal Colombia, and duly authorized by the meeting of San Agustin Energy Corp (formerly Las Quinchas Resource Corp.) board of directors duly held on September 17th, 2019, a Panamanian company (the "Company") and, pursuant to Section 20(c) of the Fifth Amendment, hereby certify in this certificate (this "Certificate") as follows:

(1)     I am duly authorized to give this Certificate.

(2)     Powers: Attached as Exhibit A to this Certificate are true, complete and up-to-date certified copies of the Governing Documents of the Company as in effect on the date hereof and on the date of the Company execution and delivery of the Fifth Amendment and/or the related documents to be executed and delivered thereunder (the "Fifth Amendment Documents"). The Company is carrying on a business authorized under its Governing Documents.  Neither the entry into the Fifth Amendment Documents to which it is a party nor the exercise of its rights and/or performance of or compliance with its obligations under the Fifth Amendment Documents to which it is a party does [including without limitation, the Assumed Obligations] or will violate, or exceed any borrowing or other power or restriction granted or imposed by, its Governing Documents.

(3)     Due Authorization: Attached as Exhibit B to this Certificate is a true and complete certified copy of the minutes (including, if the same is not in the English language, an accurate English translation thereof) of a duly convened meeting of its board of directors duly held on September 17th, 2019, at which a duly constituted quorum was present and voting throughout and at which the resolutions set out in the minutes were duly passed and adopted (the "Resolutions").  Each of the Resolutions remains in full force and effect and has

not been amended, modified, revoked or rescinded.  The Resolutions constitute all action necessary on the part of the Company to approve the execution and delivery by the Company of the Fifth Amendment Documents to which it is a party, and the performance by the Company of its obligations thereunder [including without limitation the Assumed Obligations].

(4)     <u>Due Execution</u>: Attached as Exhibit C to this Certificate and signed or initialed by me for the purpose of identification is a list of the names and titles, and specimen of the signatures, of the persons who are at the date of this Certificate officers of the Company or attorneys-in-fact of the Company and who (either individually or with others) are authorized, on behalf of the Company, to sign the Fifth Amendment Documents and are authorized to give all communications and take any other action required under or in connection with the Fifth Amendment Documents on behalf of the Company.

_____

Name:

Exhibit C

| Name | Title | Signature | Individually or with others |
|------|-------|-----------|------------------------------|
| Sergio Abauat | Attorney-in-fact | | Individually |

ANNEX C

NOTIFICATION LETTER AND ACKNOWEDGMENT

To:     The Off Taker
        _____
        _____
        Attn: _____

Date:   _____ __, 2019

The undersigned hereby gives you irrevocable notice that we have assigned to Trade Finance Trust (the "Lender") all our right, title and interest in and to (but not our obligations under) the [Names of Contracts] between the undersigned and you, as the same may be supplemented, amended or modified from time to time (the "Contract").

Once and after the Acknowledgement of this Notification Letter has been confirmed by you, all payments in relation to the Contract shall be made to the following account:

Bank Name:              Bank Leumi USA
Bank SWIFT:             LUMIUS3N
Bank ABA/Routing #:     026-002-794
Account Name:           Trade Finance Trust – Las Quinchas Resource Corp.
Account Number          7352583901

Bank Name:              Bank Leumi USA
Bank SWIFT:             LUMIUS3N
Bank ABA/Routing #:     026-002-794
Account Name:           Trade Finance Trust – Las Quinchas Resource Corp.
Account Number          7352583901

We hereby inform you that we will not, without the Lender's prior written consent, agree to any modification or amendment to, termination of, or waiver of any of our or your rights and/or obligations under the Contract.

This Notice may not be revoked, waived or changed without the prior written consent of the Lender.

**SAN AGUSTIN ENERGY CORP. (formerly LAS QUINCHAS RESOURCE CORP.)**

By:     _____
        Name:
        Title:

**THE OFF-TAKER**

By: _____
      Name:
      Title:

ACKNOWLEDGMENT OF NOTIFICATION LETTER

To:     Trade Finance Trust
        1101 Centre Road, Suite 200
        Wilmington, Delaware 19805

Date:   November __, 2018

The undersigned hereby acknowledges receipt of the Notification Letter dated as of _____ __, 2019 from San Agustin Energy Corp. (formerly Las Quinchas Resource Corp.) ("San Agustin"), regarding its assignment to you of all of its right, title and interest in and to (but not its obligations under) the [Names of Contracts] between the undersigned and you, as the same may be supplemented, amended or modified from time to time (the "Contract").

We hereby agree to the assignment to you by San Agustin of all of its right, title and interest in and to (but not its obligations under) the Contract. We confirm that we have not been notified by any other person or entity that it has received an assignment of San Agustin' rights under the Contract. We hereby irrevocably agree that all payments by us under the Contract shall be made directly to the following account:

| | |
|---|---|
| Bank Name: | Bank Leumi USA |
| Bank SWIFT: | LUMIUS3N |
| Bank ABA/Routing #: | 026-002-794 |
| Account Name: | Trade Finance Trust – Las Quinchas Resource Corp. |
| Account Number | 7352583901 |

We hereby irrevocably agree that we will not, without your prior written consent, agree to any modification or amendment to, termination of, or waiver of any of San Agustin' or our rights and/or obligations under the Contract.

We confirm that this Acknowledgment may not be revoked, waived or changed without your prior written consent.

**THE OFF-TAKER**


By:     _____
Name:
Title:


**SAN AGUSTIN ENERGY CORP. (formerly LAS QUINCHAS RESOURCE CORP.)**


By:     _____
Name:
Title: