<u>ANEXO IV</u>

<u>MODELO DE NOTIFICACIÓN</u>



## CONTRATO DE MUTUO CON CESION DE CREDITOS

ENTRE:

SANCOR COOPERATIVAS UNIDAS LTDA., una cooperativa constituida bajo las leyes de la República Argentina, representada en este acto por el Sr. Mario Cesar Magdalena, en su carácter de Apoderado, domiciliada en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, por una parte, en adelante el "MUTUARIO o SANCOR", y

IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., una sociedad constituida bajo las leyes de Holanda, representada por los Sres._____ en su carácter de Apoderados, domiciliada en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, por la otra parte, en adelante el "MUTUANTE", ambos denominados conjuntamente las PARTES y

CONSIDERANDO:

I.     Que SANCOR es una cooperativa argentina dedicada a la producción y exportación de derivados de productos lácteos.

II.    Que el MUTUANTE es una compañía dedicada a la financiación de actividades de empresas de primera línea de diversos países.

III.   Que es intención del MUTUARIO obtener un préstamo del MUTUANTE a fin de prefinanciar las exportaciones de producción de sus productos ("Pre-financiacion").

IV.    Que el MUTUANTE está dispuesto a otorgar el préstamo solicitado, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (ii) se otorgue y perfeccione la cesión de los Créditos Cedidos (tal como se los define más adelante).

En mérito a las consideraciones precedentemente establecidas, las cuales forman parte integrante de este Contrato, se celebra el presente contrato de mutuo con cesión de créditos, sujeto a las siguientes cláusulas y condiciones:

PRIMERA:     DEFINICIONES.

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o sus Afiliadas y/o el MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Contrato" significa el presente contrato de mutuo suscripto entre las Partes.

"Crédito/s Cedido/s" significa todos los derechos crediticios que le correspondan al MUTUARIO sobre las transacciones comerciales de cualquier tipo que pudiera celebrar con el Deudor Cedido, a partir del día de la fecha y hasta la cancelación total de todas las sumas adeudadas por el MUTUARIO al MUTUANTE en virtud del presente Contrato, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con el Deudor Cedido.

1



ETCHEPARE
...ANA
r 4578

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| BANK: | STATE STREET CORP. |
| ABA#: | 011-001-438 |
| SWIFT: | INVBUS33 |
| Credit: | Client Funds |
| Account#: | 569-530-395 |
| Further Credit: | IIG TOF B.V– Sancor CUL |
| Account#: | 02030-8420148 |

"Cuenta del MUTUARIO" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación:

| | |
|---|---|
| BANCO: | Wachovia Bank N.A. |
| DIRECCIÓN: | New York, U.S.A. |
| SWIFT: | PNBPUS3NNYC |
| A NOMBRE DE: | Banco Itau Buen Ayre S.A., Buenos Aires, Argentina |
| SWIFT CODE: | ITAUARBA |
| Cuenta Nro.: | 2000192261739 |
| ROUTING N°: | FW026005092 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada |
| CUENTA Nro.: | 01185361001 |
| REFERENCIA: | Prefinanciación de Exportación |

"Cuota/s" significa las Cuotas que el MUTUARIO se obliga a pagar al MUTUANTE en devolución del Présta-mo, comprensivas de capital e intereses, pagaderas de acuerdo a los montos en US$ y Fechas de Venci-miento establecidas en el **ANEXO II** del presente Contrato.

"Deuda Financiera" significa, respecto del MUTUARIO, la deuda no consolidada contraída con las entidades financieras (tanto a corto como a largo plazo) que el MUTUARIO informe trimestralmente al MUTUANTE y que será ajustada en forma trimestral de acuerdo con lo expuesto en los correspondientes estados contables.

"Deudor/es Cedido/s" significa **ARTHUR SCHUMAN, INC.**, domiciliado en 40 New Dutch Lane, Fairfield, NJ 07004 USA

"Documentos de la Operación" significa el presente Contrato, los Créditos Cedidos, el Pagaré y los Warrants

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUARIO), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Opera-ción.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula NOVENA, Sección 9.2 del Contrato; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato.

"Fecha/s de Vencimiento" significa las Fechas de Vencimiento para el pago de las Cuotas indicadas en el **ANEXO II** del presente Contrato.

"Garantías" significa la cesión de los Créditos Cedidos, los Warrants y el Pagaré.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula NOVENA del presente Contrato.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Pagarés" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE de conformidad con el formato adjunto al Contrato como **ANEXO III**, por la suma total de US\$ 2.799.000,00 (Dólares Estadounidenses DOS MILLONES SETECIENTOS NOVENTA Y NUEVE MIL CON 00/100), conforme lo establecido en la Cláusula QUINTA del Contrato.

"Partes" significa conjuntamente el MUTUARIO y el MUTUANTE.

"Préstamo" significa el préstamo de US\$ 2.572.928,92 (Dólares Estadounidenses DOS MILLONES QUINIENTOS SETENTA Y DOS MIL NOVECIENTOS VEINTIOCHO CON 92/100) que el MUTUANTE otorga al MUTUARIO y que será abonado de acuerdo a lo establecido en el presente Contrato.

"Pesos" Moneda de Curso legal de la República Argentina

"Warrant/s" significa los Warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO, endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidas en la Cláusula SEXTA del presente Contrato en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato.

SEGUNDA:   PRÉSTAMO.
2.1     El MUTUARIO solicita el Préstamo al MUTUANTE; y el MUTUANTE se compromete a otorgar el Préstamo al MUTUARIO en los términos y condiciones establecidos en el presente Contrato.

2.2     El MUTUANTE procederá a abonar el Préstamo al MUTUARIO en un solo desembolso, mediante acreditación y/o depósito bancario del Préstamo en la Cuenta del Mutuario dentro de los cinco (5) días corridos contados desde la firma del presente.

2.3     Dentro del plazo de cinco (5) días hábiles contados desde la recepción de tales fondos en la Cuenta del Mutuario, el MUTUARIO deberán remitir al MUTUANTE un recibo confirmando la recepción de dichos fondos firmado por un representante legal o apoderado con facultades suficientes de cada uno de ellos. En el supuesto de que el MUTUARIO no remitiese el recibo de confirmación antes referido, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de diez (10) días corridos contados desde la fecha pactada para el desembolso implicará la conformidad del MUTUARIO con el desembolso del Préstamo depositado por el MUTUANTE en la Cuenta del Mutuario.

TERCERA:   DEVOLUCIÓN DEL PRÉSTAMO.
3.1     El MUTUARIO se obliga a devolver al MUTUANTE el monto del Préstamo con más los intereses aplicables en las Fechas de Vencimiento, mediante el depósito de cada una de las 3 (TRES) Cuotas mensuales y consecutivas en la Cuenta del Mutuante.

3.2     Sin perjuicio de ello, transcurridos ciento ochenta (180) días contados a partir de la firma del presente Contrato, el MUTUARIO se reserva la facultad de cancelar anticipadamente la totalidad del Préstamo – con fondos propios o mediante pagos del Deudor Cedido-, en cuyo caso se le reintegraran los intereses proporcionales correspondientes.

CUARTA: MONEDA DE PAGO.
4.1     El MUTUARIO asume que el pago de las Cuotas o el saldo que eventualmente adeude en virtud del Contrato deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato que la devolución del Préstamo, incluyendo el pago de las Cuotas así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviniente en el pago.

4.2     En atención a lo dispuesto en la Cláusula 4.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO deberá igualmente abonar las Cuotas y cualquier otra suma pagadera en virtud del Contrato en Dólares, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE:

4.2.(a). Mediante la compra con Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo el Contrato; o bien

3

4.2.(b). Mediante la entrega al MUTUANTE de cualquier título en Dólares, a satisfacción expresa del MUTUANTE y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo el Contrato; o bien

4.2.(c). En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO bajo el Contrato, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

4.2.(d). Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en cualquier Fecha de Vencimiento bajo el Contrato, para la adquisición de Dólares.

4.3    Queda expresamente establecido que en cualquiera de las alternativas detalladas en 4.2.(a). a 4.2.(d)., las sumas adeudadas por el MUTUARIO sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante, la cantidad de Dólares adeudada bajo el Contrato y, en su caso, más los intereses compensatorios que se devenguen desde el vencimiento del crédito impago a una tasa de descuento del 11% anual.

4.4    Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 4.2.(a). a 4.2.(d) precedentes serán pagados por el MUTUARIO.

4.5. Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO en una moneda distinta de Dólares, la obligación de pago del MUTUARIO de cualquier suma adeudada bajo el Contrato sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTUANTE haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo el Contrato, el MUTUARIO acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE de esa pérdida.

## QUINTA:    PAGARÉ.

5.1    Como garantía de pago de las obligaciones contraídas en el presente Contrato y del pago en tiempo y forma de las Cuotas, y sin que ello importe duplicación de las obligaciones del MUTUARIO, éste suscribe a favor del MUTUANTE 3 (TRES) Pagarés, por la suma total de US$ 2.799.000,00 (Dólares Estadounidenses DOS MILLONES SETECIENTOS NOVENTA Y NUEVE MIL CON 00/100) – monto equivalente a la suma total del monto de cada Cuota- pagaderos en las Fechas de Vencimiento, los cuales son entregados en este acto al MUTUANTE.

5.2    Ante el primer incumplimiento de cualquiera de las obligaciones asumidas por el MUTUARIO en el Contrato, el MUTUANTE quedará facultado para iniciar contra el MUTUARIO la ejecución de los Pagarés, a exclusivo criterio del MUTUANTE. El MUTUANTE se compromete a devolver los Pagarés al MUTUARIO a medida que vayan siendo pagadas las Cuotas, debiendo reintegrar cada Pagaré en un plazo no mayor a diez (10) días desde que haya sido abonada en tiempo y forma la Cuota correspondiente a dicho pagaré.

## SEXTA: WARRANTS

6.1    Sin perjuicio de las obligaciones asumidas en el presente Contrato, en garantía de su total cumplimiento el MUTUARIO afecta los warrants endosados a favor del MUTUANTE en virtud del ASSIGNMENT OF CREDITS suscripto con fecha 25 de Abril de 2006, por el cual el MUTUANTE se constituyo en titular de todos los derechos y créditos derivados de los contratos de préstamo celebrados entre el MUTUARIO y IIG CAPITAL LLC AS AGENT suscriptos con fecha 18 de Agosto de 2004, modificado mediante Enmienda de fecha 29 de Marzo de 2005; contrato mutuo de fecha 22 de Noviembre de 2004, modificado por Enmienda de fecha 29 de Marzo de 2005; contrato de préstamo de fecha 26 de Noviembre de 2004, modificado por Enmienda de fecha 29 de marzo de 2005; contrato de préstamo de fecha 29 de Marzo de 2005, modificado mediante Enmienda de fecha 30 de Julio de 2007; contrato de préstamo de fecha 12 de Septiembre de 2005, modificado

4

por Enmienda de fecha 30 de Julio de 2007; contrato de préstamo de fecha 27 de Septiembre de 2005, contrato de préstamo de fecha 22 de marzo de 2006, modificado mediante Enmienda de fecha 31 de Mayo de 2007; contrato de préstamo de fecha 20 de Julio de 2006, modificado mediante Enmienda de fecha 30 de Julio de 2007; contrato de préstamo de fecha 8 de Septiembre de 2006, modificado mediante Enmienda de fecha 30 de Julio de 2007; contrato de préstamo de fecha 20 de Octubre de 2006, modificado mediante Enmienda de fecha 29 de Junio de 2007; contrato de préstamo de fecha 27 de Diciembre de 2006, modificado mediante Enmienda de fecha 30 de Julio de 2007; contrato de préstamo de fecha 14 de Febrero de 2007; contrato de préstamo de fecha 27 de Septiembre de 2007, 14 de Diciembre de 2007, todos ellos adjuntos al presente como **ANEXO I**.

De tal manera, entre los Warrants que tenga en su poder el MUTUANTE con motivo de todos los contratos adjuntos al presente como **ANEXO I**, el MUTUANTE deberá contar en todo momento con warrants (endosados a su favor) por un monto total equivalente o superior al 33,45% del monto resultante de la suma de los Préstamos otorgados mediante contratos de fecha 18 de Agosto de 2004, 22 de Noviembre de 2004, 26 de Noviembre de 2004, 29 de Marzo de 2005, 12 de Septiembre de 2005, 27 de Septiembre de 2005, 22 de Marzo de 2006, 20 de Julio de 2006, 8 de Septiembre de 2006, 20 de Octubre de 2006, 27 de Diciembre de 2006, 14 de Febrero de 2007, 27 de Septiembre de 2007, 14 de Diciembre de 2007 y el presente, <u>menos las cuotas canceladas en los mismos trece (15)</u> contratos de mutuo (el **presente contrato y los catorce contratos cedidos por el ASSIGNMENT OF CREDITS adjunto como ANEXO I**)

6.2     El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. El incumplimiento de dicha comunicación provocará la mora automática del MUTUARIO, con los efectos pactados en la cláusula NOVENA. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

6.3     En caso de mora del MUTUARIO por cualquier causa que fuere – incluido pero no limitado a la falta de pago de cualquiera de las Cuotas del presente Contrato y/o de cualquier otro contrato suscripto entre las mismas Partes (con mas los intereses y gastos que eventualmente pudieran corresponder)- el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de designar martillero al efecto.

SEPTIMA:     CESIÓN DE CRÉDITOS.
7.1     En garantía de pago de las Cuotas y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO en el presente Contrato, y en adición a las garantías establecidas en las Cláusulas QUINTA y SEXTA, el MUTUARIO cede al MUTUANTE los Créditos Cedidos. Si bien los Créditos Cedidos garantizan todas las obligaciones pactadas en los contratos de Mutuo cedidos en virtud del ASSIGNMENT OF CREDITS adjunto como **ANEXO I**, el MUTUARIO estima –por tratarse de créditos futuros y eventuales- que el monto de dichos Créditos Cedidos resultan suficientes para garantizar el pago de todas las sumas adeudadas al MUTUANTE. Consecuentemente, los Créditos Cedidos quedarán afectados como garantía de cumplimiento de los quince contratos.

7.2     La presente cesión implica también la cesión y transferencia a favor del MUTUANTE de todos los derechos y acciones que le corresponden o puedan corresponder al MUTUARIO sobre los conocimientos de embarque que acrediten el despacho de la mercadería comprendida en los Créditos Cedidos, como así también los remitos/facturas y/o facturas que el mismo emita en un futuro respecto a los productos que se entreguen al Deudor Cedido en virtud o a consecuencia de los Créditos Cedidos. La referida cesión o cesiones comprenden todos los derechos y acciones que posee el MUTUARIO y le correspondan respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en los derechos o acciones de cumplimiento de contrato y/o cobro, etc. que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

7.3     El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que emita como consecuencia de los Créditos Cedidos.

7.4     Asimismo, el MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por el Deudor Cedido en la Cuenta del Mutuante indicada en la Cláusula PRIMERA del presente Contrato. A tal efecto, en adición a las notificaciones previstas en la Sección 7.7 de la presente Cláu-



ula SÉPTIMA, el MUTUANTE se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los ditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tal factura deberá ser pagada al MUTUANTE mediante transferencia de los fondos correspondientes a la cuenta bancaria antes señalada.

7.5     Los fondos del Crédito Cedido depositados en la Cuenta del Mutuante serán aplicados al pago de las Cuotas.

(i)     Durante los meses en que NO exista Fecha de Vencimiento de alguna de las Cuotas (entendiéndose por tales aquellos meses que no se encuentren mencionados en las Fechas de Vencimiento indicadas en el **ANEXO II** del presente Contrato), y siempre que el MUTUARIO no registre en ese momento ninguna deuda vencida impaga contra el MUTUANTE, que tenga origen en este u otro contrato suscripto entre las mismas Partes, el MUTUANTE transferirá los fondos de los Créditos Cedidos que el Deudor Cedido deposite en su cuenta, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario indicada en la Cláusula PRIMERA.

(ii)    Durante los meses en que exista una Fecha de Vencimiento de alguna Cuota (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento indicadas en el **ANEXO II** del presente Contrato), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en su cuenta a precancelar el monto de la Cuota a pagar en la Fecha de Vencimiento correspondiente a dicho mes.

(iii)   En el caso de que los fondos de los Créditos Cedidos depositados por el Deudor Cedido durante tales meses excedan el monto de la Cuota, el excedente será transferido al MUTUARIO de la forma indicada en el acápite (i) de la presente Sección. En el caso de que los fondos de los Créditos Cedidos depositados por el Deudor Cedido durante tales meses no fuesen suficientes para cubrir el importe de la Cuota, el MUTUARIO será responsable de aportar la diferencia, hasta completar la diferencia y abonar así el importe total de la Cuota en la Fecha de Vencimiento, bajo apercibimiento de mora.

7.6     La presente cesión se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula SÉPTIMA para cubrir el pago de las Cuotas en las Fechas de Vencimiento, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Cuota, en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en mora automática, en los términos de la Cláusula NOVENA del presente Contrato.

7.7     Las Partes acuerdan que, en virtud de la notificación de Cesión de derechos crediticios efectuada oportunamente por el MUTUARIO al Deudor Cedido con motivo del Contrato de Mutuo suscripto con fecha 18 de Agosto de 2004 y modificado mediante Enmienda de fecha 29 de Marzo de 2005 adjunto como parte integrante del ANEXO I del presente Contrato y la notificación efectuada con motivo del ASSIGNMENT OF CREDITS– por la cual el MUTUARIO notifica las nuevas instrucciones de pago a favor del MUTUANTE- y la ratificación efectuada el 27 de Septiembre de 2007, el MUTUARIO no deberá notificar al Deudor Cedido la Cesión de derechos crediticios pactada por las partes en el presente Contrato.

7.8     El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones de los Créditos Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete irrevocablemente a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. Asimismo, el MUTUARIO se obliga a remitir mercadería al Deudor Cedido con una frecuencia mínima de una vez por mes, durante toda la vigencia del presente Contrato, debiendo informar al MUTUANTE los detalles (volumen, precio, etc.) de la mercadería remitida en los términos indicados en la Sección 7.10 de la presente Cláusula SÉPTIMA. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la mora del MUTUARIO, con los efectos estipulados en la Cláusula NOVENA. De igual manera se producirá la mora de pleno derecho con los efectos antes citados en el caso de que –con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO– el Deudor Cedido rescinda o resuelva los contratos de compraventa de mercadería que integren los Créditos Cedidos, o de cualquier forma discontinúe o termine su relación comercial con el Deudor Cedido, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

7.9     El MUTUARIO garantiza al MUTUANTE:
(a)     el cobro de los Créditos Cedidos, en Dólares y mediante transferencia de los mismos a la Cuenta del Mutuante en cada Fecha de Vencimiento para satisfacer el monto de cada Cuota.
(b)     la forma instrumental del mismo.





la legitimidad de los Créditos Cedidos y que el mismo es de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d) que no se encuentra inhibido para disponer de sus bienes;

(e) que no adeuda suma alguna que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos;

(f) que no ha percibido suma alguna derivada de los Créditos Cedidos, y que el mismo no ha sido cedido total ni parcialmente a persona física o jurídica alguna con anterioridad; excepto el Acreedor Cedente de acuerdo al ASSIGNMENT OF CREDITS.

(g) la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h) Que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a- la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos.

(i) que el monto de los Warrants será equivalente como mínimo al 33,45% de la sumatoria de la totalidad de los Préstamos otorgados.

7.10    Durante la vigencia del presente Contrato, el MUTUARIO se compromete a notificar mensualmente (entre el 1 y el 5 de cada mes) y por medio fehaciente al MUTUANTE, el estado de deuda del Deudor Cedido con el MUTUARIO, remitiendo a tal efecto un informe firmado por un Contador Público matriculado en la República Argentina, en el que se indiquen las sumas facturadas y las sumas impagas por el Deudor Cedido a la fecha de dicho informe (incluyendo un detalle de cada una de las facturas, con su número, fecha de emisión, fecha de recepción y monto de cada una de ellas), así como un detalle de las órdenes de compra emitidas por el Deudor Cedido y recibidas por el MUTUARIO a la fecha de dicho informe. Asimismo se compromete a mantener durante la vigencia del presente préstamo facturas, BL, órdenes de compra y/o notas de pedidos y órdenes de compra y/o notas de pedidos futuras y/o eventuales del Deudor Cedido por el 66,55 % del saldo de dicho préstamo. Todos los gastos del informe antes señalado correrán por exclusiva cuenta del MUTUARIO. La falta de remisión en debido tiempo y forma de la información y documentación prevista en la presente Sección 7.9, producirá automáticamente de pleno derecho la mora del MUTUARIO, con los efectos estipulados en la Cláusula NOVENA.

## OCTAVA: MANIFESTACIONES, DECLARACIONES y COMPROMISOS DEL MUTUARIO
### 8.1.    Manifestaciones y Declaraciones del MUTUARIO.

A fin de inducir al MUTUANTE a celebrar el Contrato, el MUTUARIO manifiesta y declara, a la fecha del presente Contrato y hasta que el mismo se extinga, lo siguiente:

8.1.1.    Que el MUTUARIO es una Cooperativa en primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad;

8.1.2.    Que el MUTUARIO no está obligado a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato y/o de las Garantías; y

8.1.3.    Que el Contrato y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

8.1.4    Que el MUTUARIO y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

8.1.5.    Que el MUTUARIO no tiene pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en los Documentos de la Operación, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

8.1.6.    Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o





resolución aplicable al MUTUARIO, ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido  y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, contrato u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

8.1.7.  Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o límite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad de la documentación (principal y accesoria) que resulte necesaria para el otorgamiento y perfeccionamiento de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

8.1.8.  Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

8.1.9.  Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato, acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

8.1.10.  Que el balance del MUTUARIO al 30 de Junio de 2007, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2007 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

8.1.11.  Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda hipoteca, o mejor derecho alguno; y

8.1.12.  Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

8.1.13   Que conforme al conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registran con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

8.1.14   Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tienen y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

8.1.15.  Que los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

8.1.16.  Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

8.1.17.  Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación..

8.1.18   Que cumple y realiza todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulte aplicables.



8.1.19 que el monto de los Warrants endosados a favor del MUTUANTE será en todo momento equivalente como mínimo al 35,50% de la sumatoria de la totalidad de las cuotas adeudadas.

8.2    **Compromisos y Obligaciones del MUTUARIO**

Desde la firma del presente Contrato y durante todo el tiempo en que cualquier suma debida bajo el Contrato se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO se compromete firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

8.2.1.    A pagar debida y puntualmente las Cuotas en caso de falta de pago del Deudor Cedido, y los intereses aplicables, en su caso correspondientes, así como los gastos referidos en la Cláusula Décima, de conformidad con los términos y condiciones que se establecen en el presente Contrato, y

8.2.2.    A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que, según el caso, los disputasen por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

8.2.3.    A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contratos, seguros, poderes, prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato y las Garantías, y

8.2.4.    A no realizar actos que constituyan o impliquen (i) una fusión, transformación, absorción, escisión o cualquier otro modo de reorganización societaria, transferencia de fondo de comercio o cualquier otro acto de efectos similares o al que, conforme a cualquier ley o norma, pudieran oponerse sus acreedores, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, ó (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

8.2.5.    A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

8.2.6.    A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente del MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel y prestigio internacional, (ii) estados contables semestrales, (iii) estados contables trimestrales, y (iv) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos semestres; los estados contables referidos en (iii) deberán ser presentados dentro de los sesenta (60) días corridos del cierre de los respectivos trimestres; y la documentación referida en (iv) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

8.2.7.    A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato y las Garantías, lo que implicará, entre otras cosas, la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato, y

8.2.8.    A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

8.2.9.    A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y



9

**8.2.10.** A notificar al MUTUANTE, en forma inmediata, (i) el acaecimiento de cualquier Evento de Incumplimiento, y (II) cualquier incumplimiento en que el MUTUARIO incurriere en relación con cualquier acuerdo o contrato del que sea parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (iii) las acciones tomadas para subsanar los incumplimientos referidos en (i) y (ii) precedentes, y

**8.2.11.** A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, permitiéndole la realización de auditorías contables, legales y de gestión, por sí mismo o por quien el MUTUANTE designe a tal efecto, en la medida que no interfiera sustancial y adversamente con las actividades habituales del MUTUARIO, y

**8.2.12.** A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (I) cualquier pérdida o daño sufrido en los bienes del MUTUARIO por montos superiores a Dólares Estadounidenses DOS MILLONES con 00/100 (US$ 2.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y (ii) cualquier litigio, o reclamo en el cual el monto reclamado al MUTUARIO fuere igual o superior a Dólares Estadounidenses DOS MILLONES con 00/100 (US$ 2.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y

**8.2.13.** A no recomprar, rescatar ni amortizar sus propias acciones y a no reducir su capital, y

**8.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**8.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato, y

**8.2.16.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

**8.2.17.** A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

**8.2.18.** A no adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

**8.2.19.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta Bancaria del MUTUARIO desembolsados bajo el presente Contrato, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

**8.2.20.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dichas cesiones, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**8.2.21.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del MUTUANTE en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**NOVENA: MORA.**
**9.1** La falta de cumplimiento de cualquiera de las obligaciones asumidas en virtud del presente Préstamo (incluyendo sin limitación, la falta de pago de las Cuotas en las Fechas de Vencimiento correspondientes) por cualquier causa que fuere, producirá la mora automática del MUTUARIO y la caducidad de todos los





plazos, sin necesidad de interpelación previa. En tal supuesto, además de las sumas adeudadas y del interés que dichas sumas devenguen hasta el efectivo pago de acuerdo a la tasa calculada para la determinación del valor de las Cuotas, el MUTUARIO deberá abonar al MUTUANTE intereses compensatorios acumulativos que las Partes acuerdan a razón de una tasa de interés anual equivalente a la tasa implícita del presente contrato con mas un interés punitorio equivalente al 50% (cincuenta por ciento) de la tasa de los intereses compensatorios. Todo ello sin perjuicio de las acciones que podrá ejercer el MUTUANTE respecto del Deudor Cedido en virtud de su incumplimiento.

9.2     El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar el Préstamo como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todo lo adeudado en cualquiera de los siguientes Eventos de Incumplimiento:

(a)     si el MUTUARIO incumpliese con el pago en tiempo y forma de cualquiera de las Cuotas.

(b)     si un tercero pidiere la quiebra del MUTUARIO y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

(c)     si el MUTUARIO pidiera su propia quiebra, promoviese su concurso de acreedores, o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial;

(d)     si el MUTUARIO incurriere en cesación de pagos, aún sin efectuarse los trámites antedichos;

(e)     si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO o se decretare la inhibición general de bienes del MUTUARIO por un monto en exceso de Dólares Estadounidenses DOS MILLONES con 00/100 (US$ 2.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato, y dichos embargos y/o medidas cautelares no fuesen levantados por cualquier causa que fuere, dentro de los treinta (30) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible;

(f)     si en cualquier momento durante la vigencia del presente Contrato se comprobare la falta de veracidad, parcial o total, por parte del MUTUARIO en las declaraciones contenidas en la Cláusula OCTAVA del presente y/o el incumplimiento de los Compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del préstamo objeto del presente Contrato;

(g)     si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el otorgamiento del préstamo objeto del presente Contrato;

(h)     si el MUTUARIO incumpliere cualquiera de las demás obligaciones a su cargo establecidas en el presente Contrato;

(i)     si el MUTUARIO incumpliere con cualquiera de sus obligaciones asumidas en los contratos que causan los Créditos Cedidos;

(j)     si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato fueren abonadas en una moneda distinta del Dólar Estadounidense; con excepción a lo dispuesto en las alternativas detalladas en 4.2(a) a 4.2(d);

(k)     si se dictaran una o mas sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaren medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes del MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad del MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

(l)     Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso.

9.3     En adición a lo dispuesto en la Sección 9.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato -en los términos establecidos en la Sección 9.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de cualquiera de las



11

ICHEPARE
SAMA
4674

Cuotas o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las sumas adeudadas bajo este Contrato los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE, incluidos, pero no limitados a los fondos que tengan origen en cesiones de derechos crediticios que le correspondan al MUTUARIO, por las transacciones abonadas o que se devenguen, derivadas del Contrato denominado "Agency Marketing Sales Agreement" (y sus eventuales enmiendas, modificaciones y renovaciones) suscripto entre el MUTUARIO y FONTERRA CO-OPERATIVE GROUP LIMITED, con domicilio en Fonterra Centre, 9 Princes Street, Auckland, New Zealand, con fecha 7 de Diciembre de 2004.

DECIMA: COMISIONES Y GASTOS.
10.1     Toda comisión y/o aranceles bancarios, tributos, tasas y/o gastos (incluyendo sin limitación los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario) que las operaciones derivadas directa y/o indirectamente de este Contrato pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones, tributos y/o gastos, a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

10.2     Todos los pagos bajo el Contrato deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido del mismo bajo los términos de este Contrato como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago

10.3     Asimismo, el MUTUARIO se obliga a cumplir en tiempo y forma –a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del Préstamo objeto del presente Contrato, de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

10.4     El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de la operación de exportación de mercaderías relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

DÉCIMO PRIMERA: CESIÓN DEL CONTRATO.
El MUTUANTE podrá ceder el presente Contrato en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este contrato. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también las nuevas instrucciones de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al MUTUANTE del contrato cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

DÉCIMO SEGUNDA: VIGENCIA – INDEMNIDAD
12.1     El presente Contrato así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato, las Cláusulas Décima y Décimo Cuarta sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

12.2     El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y/o todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstos en ellos; (ii) los Créditos Cedidos adeudado con más sus



12



intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial, relacionado con cualquiera de las circunstancias previstas en esta Cláusula 12.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

### DÉCIMO TERCERA: AUTORIZACIÓN

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO. En tal sentido, el MUTUARIO autorizan al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato.

### DÉCIMO CUARTA: JURISDICCIÓN Y LEY APLICABLE.

14.1    El presente Contrato es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

14.2    El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

14.3    Nada de lo dispuesto precedentemente en el presente Contrato afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada. En particular, en caso de Mora, el MUTUANTE tendrá la facultad de iniciar la ejecución de los Pagarés y/o los Warrants contra el MUTUARIO ante los Tribunales de la Ciudad de Buenos Aires, Republica Argentina.

14.4    El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

14.5    Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en Sancor Dairy Corporation, con domicilio en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en el último párrafo de la presente Cláusula.

14.6    Las notificaciones efectuadas de la manera establecida en la Sección 14.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

14.7    El MUTUARIO irrevocablemente renuncian, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en el especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho de recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al contrato en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole.

14.8    Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato deberán ser remitidas a los domicilios indicados a continuación:

MUTUARIO: 1) 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003 - USA

2) Tacuarí 202 - 3° Piso - Capital Federal, República Argentina

MUTUANTE: Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands



13



Se firman 2 ejemplares iguales de un mismo tenor y a un solo efecto, quedando un ejemplar en poder del DEUDOR y un ejemplar en poder del ACREEDOR.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina y por el MUTUANTE en la Ciudad de Amsterdam, The Netherlands, a los 08 días del mes de Febrero de 2008.-

Por: SANCOR COOPERATIVAS UNIDAS LIMITADA.
Nombre: Mario Cesar Magdalena
Carácter: Apoderado

Por: IG TOF B.V.
representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.
Nombre: Sih Strijbosch y Eduard Hendriks
Carácter: Apoderados!

CLAUDINA ETCHEPARE
ESCRIBANA
MAT. 4678

Trust International Management (T.I.M.) B.V.

14



## ANEXO

F 000951104



1  Buenos Aires,  8 de   Febrero   de  2008  . En mi carácter de Escribano

2  Interinamente a cargo del Registro Notarial N° 841

3  CERTIFICO: Que la/s   firma/s                              que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5  firma/s que se formaliza simultáneamente por ACTA número      22       del

6  LIBRO número       90       , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8  cuyo conocimiento doy fe.   Mario César MAGDALENA L.E. 8.106.144.- Mani-

9  fiesta actuar en su carácter de apoderado de la sociedad SANCOR COO-

10  PERATIVAS UNIDAS LIMITADAS, de acuerdo a la documentación que me

11  exhibe y le confiere facultades suficientes para suscribir el documento ad-

12  junto.-

13

14

15

16

17

18

19

20

21

22

23

24

25





**ANEXO II**
**(Detalle de las cuotas)**

| ENDOSANTE | FECHA DE VENCIMIENTO | MONEDA | IMPORTE |
|---|---|---|---|
| SANCOR COOP. UNIDAS LTD. | 01-Octubre-2008 | U$S | 933.000,00 |
| SANCOR COOP. UNIDAS LTD. | 03-Noviembre-2008 | U$S | 933.000,00 |
| SANCOR COOP. UNIDAS LTD. | 01-Diciembre-2008 | U$S | 933.000,00 |
| | | U$S | 2.799.000,00 |





**ANEXO III**
**PAGARE (sin protesto)**

Buenos Aires, _____ de _____ de 2008.                                    0/0

US$ _____

El _____ de _____ de 2008 (en adelante la "Fecha de Vencimiento"), por igual valor recibido, _____., una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en_____, República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en _____, Argentina, la suma neta de Dólares Estadounidenses _____ (US$ _____), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagares que el deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor –además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del _____% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:

Deudor: _____

Acreedor: _____

d) Las notificaciones efectuadas de la manera establecida en el acápite "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

Deudor

_____

Firma
Nombres: _____
Carácter: _____



16

**PAGARE (sin protesto)**

1/3

Buenos Aires, 08 de Febrero de 2008.

US$ 933.000,00.-

El 01 de Octubre de 2008 (en adelante la "Fecha de Vencimiento"), por igual valor recibido, SANCOR COOPERATIVAS UNIDAS LTDA., una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en Tacuari 202 - 3° Piso - Capital Federal, República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en Av. Leandro N. Alem  1050, piso 13 - (C1001AAS) Buenos Aires, Argentina, la suma neta de Dólares Estadounidenses NOVECIENTOS TREINTA Y TRES MIL CON 00/100 (US$ 933.000,00), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente Pagaré se pagarán en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagares que el deudor tuviera pendientes con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor –además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del 11,00% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente Pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:

Deudor: Tacuari 202 - 3° Piso - Capital Federal, República Argentina
        SanCor Dairy Corporation - 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003

Acreedor: Av. Leandro N. Alem 1050, piso 13 - (C1001AAS) Buenos Aires, Argentina,
         con copia: Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam

d) Las notificaciones efectuadas de la manera establecida en la acápite "c" del presente Pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este Pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o "inconvenient forum" respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

Deudor

Por SANCOR COOPERATIVAS UNIDAS LTDA.
Nombres: Mario Magdalena
Carácter: Apoderado

CLAUDINA ETCHEPARE
ESCRIBANA
MAT. 4871





F 004032433

1  Buenos Aires,  8 de  Febrero  de  2008 - En mi carácter de Escribano

2  Interinamente a cargo del Registro Notarial Nº 841

3  CERTIFICO: Que la/s  firma/s  que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5  firma/s que se formaliza simultáneamente por ACTA número  23  del

6  LIBRO número  90  , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8  cuyo conocimiento doy fe.  Mario César MAGDALENA L.E. 8.106.144.- Mani-

9  fiesta actuar en su carácter de apoderado de la sociedad SANCOR COO-

10  PERATIVAS UNIDAS LIMITADAS, de acuerdo a la documentación que me

11  exhibe y le confiere facultades suficientes para suscribir el documento ad-

12  junto.-

13

14

15

16

17

18

19

20

21

22

23

24

25



**Cotecna Inspección Argentina S.A.**
Avda. Paseo Colón 728, 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

| | | |
|---|---|---|
| **WARRANT** | **N°** | **6335** |
| LEY 9.643 - Decreto 165/95 | **Serie:** | **A** |
| Autorizada por S.I.C. Resol. N° 1207/04 | | |
| Exp. N° 292098/04. Publicado en B.O. 29/11/04 | | CERTIFICA QUE: |

| | | |
|---|---|---|
| Nombre o Denominación: | **SANCOR COOPERATIVAS UNIDAS LTDA.** | **C.U.I.T.** 30-50167764-3 |
| Domicilio Especial: | **TENIENTE GRAL. RICHIERI 15 , SUNCHALES** | |
| Ha depositado en el Almacén N° | **SANCOR - BALNEARIA** | |
| Ubicado en: | **RUTA PROV. 17 Y RUTA PROV 3. , BALNEARIA,  , CORDOBA** | |

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.334,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

| | |
|---|---|
| Precio FOB Balnearia | |

| | | |
|---|---|---|
| EL VALOR APROXIMADO de las mercaderias al emitir este CERTIFICADO es de: | | **U$S 505.469,64** |
| (en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y NUEVE CON SESENTA Y CUATRO CENTAVOS | | |
| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por        **180 Dias** | VENCIMIENTO        **28/09/2008** |

CARGOS:                     La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspeccion Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspeccion Argentina S.A. a su reclamo, y por su pago Cotecna Inspeccion Argentina S.A.gozara de privilegio sobre lo producido de la mercadería.

| | | | |
|---|---|---|---|
| Almacenaje desde: | **01/04/2008** | a razon de: | por |
| Emisión de Documentos: | | Administración: | |
| Seguros: | | Otros Gastos: | |
| Movimientos: | | Observaciones: | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

| | |
|---|---|
| SEGUROS: | Estas mercaderias están cubiertas contra incendio y/u otros. |
| Compañía: | **SANCOR SEGUROS** |
| Domicilio: | **AV. INDEPENDENCIA 333** |
| Póliza número: | **3837**                 Vencimiento:        **31/07/2008** |
| | Robo:                 Daño por agua:                 Glos Limpieza: |
| | **EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE** |

ENTREGA DE LOS EFECTOS:  No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

CONDICIONES :                     Este documento se sujeta a  las condiciones especificas que enuncia el mismo (frente y dorso) y  a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar  y  Fecha : Buenos Aires        **01/04/2008**

Por: COTECNA INSPECCION ARGENTINA S.A.                EDUARDO MOLINA CAMPOS        ROBERTO ZUCCO
                                                APODERADO                APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspeccion Argentina S.A., entidad autorizada a emitir Certificados de Depositos y Warrant (ley 9643), segun resolucion N° 1207, de fecha 29/11/04, de la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Publicos. La autorizacion no implica responsabilidad del Estado.

DECLARACION  JURADA: El  DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercaderia depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercaderia se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercaderia se estipula de acuerdo con los estandares de mercados, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento asi como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado

Lugar  y  Fecha : Buenos Aires        **01/04/2008**

| | |
|---|---|
| Firma del Depositante | Aclaración de firma: |
| | SanCor Cooperativas Unidas Ltda. |
| Calidad que reviste | C. P. N. MARIO C. MAGDALENA        Tipo y número de documento: |
| | Gerente Dpto. de Finanzas |

**K   0891603**

El/los tenedores del presente WARRANT  SANCOR COOPERATIVAS UNIDAS LTDA.

domiciliado en TENIENTE GRAL. RICHIERI 15  SUNCHALES  SANTA FE                                                     transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de     IIG TOF B.V.

domiciliado en TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS

en garantía de la suma de        1001186,67        (Son  Dolares Estadounidenses un millon un mil ciento ochenta  y seis con sesenta  y siete centavos ).-

con mas un interés de      U$S 69813,33                lo que hace un total de     U$S 101'1000,00

(Son Dolares Estadounidenses un millón setenta  y un mil ).-

Pagadero en (lugar)    AMSTERDAM                                                              el día _____ 28 Septiembre 2008

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Registro del endoso en:

Fecha

Nr.

Acreedor _____          Tenedor _____

## SEGUNDO ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en _____                                                     transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en _____

en garantía de la suma de _____

con mas un interés de _____        lo que hace un total de _____

Pagadero en (lugar) _____                                         el día _____

Registro del endoso en:

Fecha

Nr.

Acreedor _____          Tenedor _____

## TERCER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en _____                                                     transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en _____

en garantía de la suma de _____

con mas un interés de _____        lo que hace un total de _____

Pagadero en (lugar) _____                                         el día _____

Registro del endoso en:

Fecha

Nr.

Acreedor _____          Tenedor _____

## CANCELACION DEL CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRATNS, CONSTE.

En (lugar) _____          el (fecha) _____

Acreedor _____

(aclaración) _____

## CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con mas sus intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentara antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de este documento mas los diversos cargos consignados al frente  de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor.REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: Si dentro de los los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderias, o si presentandose mantuviera deuda con Cotecna Inspeccion Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercaderia a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los terminos del articulo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercaderías, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspeccion Argentina S.A. de consignar o rematar la mercaderia luego de 60 días de vencimiento del certificado es un derecho y no un deber de Cotecna Inspeccion Argentina S.A., pudiendo Cotecna Inspeccion Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercaderia hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspeccion Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exeda al originariamente pactado, Cotecna Inspección Argentina S.A. tendra derecho a cobrar la tarifa que originariamente se pacto.

RESPONSABILIDAD – COTECNA INSPECCION ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averias ocasionadas a los productos depositados hasta la concurrencia del importe as mercaderias, como reparación de daños por todo concepto.

80a1980



**Cotecna Inspección Argentina S.A.**
Avda. Paseo Colón 728 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

## CERTIFICADO DE DEPOSITO

| | |
|---|---|
| N° | 6335 |
| Serie: | A |

LEY 9.643 - Decreto 165/95

Autorizada por S.I.C. Resol. N° 1207/04

Exp. N° 292098/04  Publicado en B.O. 29/11/04

CERTIFICA QUE:

| | | |
|---|---|---|
| Nombre o Denominación: | SANCOR COOPERATIVAS UNIDAS LTDA. | C.U.I.T. 30-50167764-3 |
| Domicilio Especial: | TENIENTE GRAL. RICHIERI 15 , SUNCHALES | |
| Ha depositado en el Almacén N° | SANCOR - BALNEARIA | |
| Ubicado en: | RUTA PROV. 17 Y RUTA PROV 3 , BALNEARIA , CORDOBA | |

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.334,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

Precio FOB Balnearia

| | |
|---|---|
| EL VALOR APROXIMADO de las mercaderías al emitir este CERTIFICADO es de: | U$S 505.469,64 |

(en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y NUEVE CON SESENTA Y CUATRO CENTAVOS

| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por | 180 Días | VENCIMIENTO | 28/09/2008 |
|---|---|---|---|---|

CARGOS:  La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspeccion Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar al mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspeccion Argentina S.A. a su reclamo, y por su pago Cotecna Inspeccion Argentina S.A.gozara de privilegio sobre el producido de la mercadería.

| | | | |
|---|---|---|---|
| Almacenaje desde: | 01/04/2008 | a razon de: | por |
| Emisión de Documentos: | | Administración: | |
| Seguros: | | Otros Gastos: | |
| Movimientos: | | Observaciones: | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

| | |
|---|---|
| SEGUROS: | Estas mercaderías están cubiertas contra incendio y/u otros. |
| Compañía: | SANCOR SEGUROS |
| Domicilio: | AV. INDEPENDENCIA 333 |
| Póliza número: | 3837 |

Vencimiento: 31/07/2008

Robo:          Daño por agua:          Gtos. Limpieza:

**EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE**

ENTREGA DE LOS EFECTOS:  No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO de DEPOSITO, sin estar acompañados del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

CONDICIONES :          Este documento se sujeta a las condiciones especificas que enuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha: Buenos Aires          01/04/2008

Por: COTECNA INSPECCION ARGENTINA S.A   EDUARDO MOLINA CAMPOS   ROBERTO ZUCCHI
APODERADO          APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspeccion Argentina S.A., entidad autorizada a emitir Certificados de Depositos y Warrant (ley 9643), según resolucion N° 1207, de fecha 29/11/04, de la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economia y Obras y Servicios Publicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: El DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercadería depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercadería se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercadería se estipula de acuerdo con los estandares del mercado, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento así como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado.

Lugar y Fecha : Buenos Aires          01/04/2008

| | |
|---|---|
| Firma del Depositante | Aclaración de firma: |
| | SanCor Cooperativas Unidas Ltda. |
| Calidad que reviste | C.P.N. MARIO C. MAGDALENA     Tipo y número de documento: |
| | Gerente Dpto. de Finanzas |

K 0891604

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## SEGUNDO ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## TERCER ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## PRIMER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT   SANCOR COOPERATIVAS UNIDAS LTDA.

domiciliado en  TENIENTE GRAL. RICHIERI 15   SUNCHALES  SANTA FE                              transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de   IIG TOF B.V.

domiciliado en  TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS

en garantía de la suma de     1001186,67                                                    Dolares Estadounidenses un millón

con mas un interés de    U$S 69813,33          lo que hace un total de     U$S 1071000,00

    Dolares Estadounidenses un millón setenta  y un mil  .-

Pagadero en (lugar)   AMSTERDAM                                                    el dia        28 Septiembre 2008

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Registro del endoso en:
Fecha
Nr.

Acreedor _____ Tenedor _____

## CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de deposito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con mas sus intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentara antes a su cobro. PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de ese documento mas los diversos cargos consignados al frente  de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor.REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderías, o si presentandose mantuviera deuda con Cotecna Inspecion Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar  judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los términos del artículo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercaderías, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspeccion Argentina S.A. de consignar o rematar la mercadería luego de 60 días de vencimiento del certificado es un derecho y no un deber de Cotecna Inspeccion Argentina S.A., pudiendo Cotecna Inspeccion Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspeccion Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exeda al originalmente pactado, Cotecna Inspeccion Argentina S.A. tendrá derecho a cobrar la tarifa que originalmente se pactó.

RESPONSABILIDAD - COTECNA INSPECCION ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.

**Cotecna Inspección Argentina S.A.**
Avda. Paseo Colón 728 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

## WARRANT

N° **6336**

Serie: **A**

LEY 9.643 - Decreto 165/95

Autorizada por S.I.C. Resol. N° 1207/04

Exp. N° 292098/04  Publicado en B.O. 29/11/04

CERTIFICA QUE:

| | | |
|---|---|---|
| Nombre o Denominación: | SANCOR COOPERATIVAS UNIDAS LTDA. | C.U.I.T. 30-50167764-3 |
| Domicilio Especial: | TENIENTE GRAL. RICHIERI 15 , SUNCHALES | |
| Ha depositado en el Almacén N° | SANCOR - BALNEARIA | |
| Ubicado en: | RUTA PROV. 17 Y RUTA PROV 3 , , BALNEARIA, , CORDOBA | |

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.333,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

**Precio FOB Balnearia**

EL VALOR APROXIMADO de las mercaderías al emitir este CERTIFICADO es de: **U$S 505.465,18**
(en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y CINCO CON DIECIOCHO CENTAVOS -

| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por | **180 Días** | VENCIMIENTO | **28/09/2008** |
|---|---|---|---|---|

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspeccion Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar al mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspeccion Argentina S.A. a su reclamo, y por su pago Cotecna Inspeccion Argentina S.A.gozara de privilegio sobre el producido de la mercadería.

| Almacenaje desde: | **01/04/2008** | a razon de: | por |
|---|---|---|---|
| Emisión de Documentos: | | Administración: | |
| Seguros: | | Otros Gastos: | |
| Movimientos: | | Observaciones: | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

| SEGUROS: | Estas mercaderías están cubiertas contra incendio y/u otros. |
|---|---|
| Compañía: | SANCOR SEGUROS |
| Domicilio: | AV. INDEPENDENCIA 333 |
| Póliza número: | 3837 | Vencimiento: | 31/07/2008 |
| Robo: | Daño por agua: | Gtos. Limpieza: |

**EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE**

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañados del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

CONDICIONES : Este documento se sujeta a las condiciones específicas que enuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha : Buenos Aires    **01/04/2008**

Por: COTECNA INSPECCION ARGENTINA S.A. EDUARDO MOLINA CAMPOS APODERADO

ROBERTO ZUCCHI APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspeccion Argentina S.A., entidad autorizada a emitir Certificados de Depositos y Warrant (ley 9643), según resolucion N° 1207, de fecha 29/11/04, de la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economia y Obras y Servicios Publicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: El DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercadería depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercadería se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercadería se estipula de acuerdo con los estandares del mercados, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento así como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado

Lugar y Fecha : Buenos Aires    **01/04/2008**

Firma del Depositante    Sancor Cooperativas Unidas Ltda.    Aclaración de firma:
C. P. N. MARIO C. MAGDALENA
Calidad que reviste    Gerente Dpto. de Finanzas    Tipo y número de documento:

K 0891605

## PRIMER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT  **SANCOR COOPERATIVAS UNIDAS LTDA.**

domiciliado en  **TENIENTE GRAL. RICHIERI 15  SUNCHALES  SANTA FE**                                                                                                transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de      **IIG TOF B.V.**

domiciliado en  **TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS**

en garantía de la suma de        1001186,67        (Son  Dolares Estadounidenses un millón un mil ciento ochenta  y siete con sesenta  y siete centavos ).-

con mas un interés de    U$S 69813,33            lo que hace un total de        U$S 1071000,00

(Son Dolares Estadounidenses un millón setenta  y un mil ).-

Pagadero en (lugar)   AMSTERDAM                                                                       el día            28 Septiembre 2008

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto  de Finanzas

Registro del endoso en:
Fecha
Nr.

Acreedor  _____                    Tenedor  _____

## SEGUNDO ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en  _____                transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en  _____

en garantía de la suma de _____

con mas un interés de_____ lo que hace un total de  _____

Pagadero en (lugar)  _____        el día  _____

Registro del endoso en:
Fecha
Nr.

Acreedor  _____                    Tenedor  _____

## TERCER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en  _____                transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en  _____

en garantía de la suma de _____

con mas un interés de_____ lo que hace un total de  _____

Pagadero en (lugar)  _____        el día  _____

Registro del endoso en:
Fecha
Nr.

Acreedor  _____                    Tenedor  _____

## CANCELACION DEL CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRATNS, CONSTE,

En (lugar)  _____    el (fecha)  _____

Acreedor  _____

(aclaración)  _____

## CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de deposito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con sus más intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentara antes a su cobro. PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de ese documento mas los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor.REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderías, o si presentandose mantuviera deuda con Cotecna Inspección Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar  judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los terminos del artículo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercadería, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspección Argentina S.A. de consignar o rematar la mercadería luego de 60 días de vencimiento del certificado es un derecho y no un deber de Cotecna Inspección Argentina S.A., pudiendo Cotecna Inspección Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspección Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originariamente pactado, Cotecna Inspección Argentina S.A. tendra derecho a cobrar la tarifa que originariamente se pactó.

RESPONSABILIDAD - COTECNA INSPECCION ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.

0a0ca61f



**Cotecna Inspección Argentina S.A.**
Avda. Paseo Colón 728 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

## CERTIFICADO DE DEPOSITO

**N°** 6336
**Serie:** A

LEY 9.643 - Decreto 165/95

Autorizada por S.I.C. Resol. N° 1207/04

Exp. N° 292098/04 Publicado en B.O. 29/11/04

CERTIFICA QUE:

| | | | |
|---|---|---|---|
| **Nombre o Denominación:** | SANCOR COOPERATIVAS UNIDAS LTDA. | | C.U.I.T. 30-50167764-3 |
| **Domicilio Especial:** | TENIENTE GRAL. RICHIERI 15 , SUNCHALES | | |
| **Ha depositado en el Almacén N°** | SANCOR - BALNEARIA | | |
| **Ubicado en:** | RUTA PROV. 17 Y RUTA PROV 3. , BALNEARIA , , CORDOBA | | |

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.333,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

Precio FOB Balnearia

| | | |
|---|---|---|
| EL VALOR APROXIMADO de las mercaderías al emitir este CERTIFICADO es de: | | **U$S 505.465,18** |
| (en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y CINCO CON DIECIOCHO CENTAVOS | | |

| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por | **180 Días** | VENCIMIENTO | 28/09/2008 |
|---|---|---|---|---|

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspeccion Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspeccion Argentina S.A. a su reclamo, y por su pago Cotecna Inspeccion Argentina S.A.gozara de privilegio sobre el producido de la mercadería.

| | | | | |
|---|---|---|---|---|
| Almacenaje desde: | **01/04/2008** | a razon de: | | por |
| Emisión de Documentos: | | Administración: | | |
| Seguros: | | Otros Gastos: | | |
| Movimientos: | | Observaciones: | | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

| SEGUROS: | Estas mercaderías están cubiertas contra incendio y/u otros. | |
|---|---|---|
| Compañía: | SANCOR SEGUROS | |
| Domicilio: | AV. INDEPENDENCIA 333 | |
| Póliza número: | 3837 | Vencimiento: 31/07/2008 |
| | Robo: | Daño por agua: | Glos. Limpieza: |

EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE

**ENTREGA DE LOS EFECTOS:** No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

**CONDICIONES :** Este documento se sujeta a las condiciones específicas que enuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha : Buenos Aires    **01/04/2008**

Por: COTECNA INSPECCION ARGENTINA S.A. EDUARDO MOLINA CAMPOS     ROBERTO ZUCCHI
APODERADO     APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspeccion Argentina S.A., entidad autorizada a emitir Certificados de Depositos y Warrant (ley 9643), según resolucion N° 1207, de fecha 29/11/04, de la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Publicos. La autorización no implica responsabilidad del Estado.

**DECLARACION JURADA:** El DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercadería depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercadería se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercadería se estipule de acuerdo con los estandares del mercado, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento asi como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado

Lugar y Fecha : Buenos Aires    **01/04/2008**

| | |
|---|---|
| Firma del Depositante | Aclaración de firma: |
| SanCor Cooperativas Unidas Ltda. | |
| C. P. N. MARIO C. MAGDALENA | |
| Calidad que reviste    Gerente Dpto. de Finanzas | Tipo y número de documento: |

K 0891606

PRIMER ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## SEGUNDO ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## TERCER ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____ el dia _____

Registro del endoso en:
Fecha
Nr.

Endosante _____ Endosatario _____

## PRIMER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT  SANCOR COOPERATIVAS UNIDAS LTDA.

domiciliado en  TENIENTE GRAL. RICHIERI 15  SUNCHALES  SANTA FE                          transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de   IIG TOF B.V.

domiciliado en  TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS

en garantia de la suma de        1001186,67                                          Dolares Estadounidenses un millón

con mas un interés de   U$S 69813,33        lo que hace un total de    U$S 1071000,00

    Dolares Estadounidenses un millón setenta  y un mil .-

Pagadero en (lugar)   AMSTERDAM                                     el dia        28 Septiembre 2008

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Registro del endoso en:
Fecha
Nr.

Acreedor _____ Tenedor _____

## CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de deposito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con mas sus intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentaran antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de ese documento mas los diversos cargos consignados al frente  de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor. REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a traves de la normativa establecida en el Art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 dias corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderías, o si presentandose mantuviera deuda con Cotecna Inspeccion Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar  judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los terminos del articulo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercadería, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspeccion Argentina S.A. de consignar o rematar la mercadería luego de 60 dias de vencimiento del certificado es un derecho y no un deber de Cotecna Inspeccion Argentina S.A., pudiendo Cotecna Inspeccion Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspeccion Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originariamente pactado, Cotecna Inspección Argentina S.A. tendra derecho a cobrar la tarifa que originariamente se pacto.

RESPONSABILIDAD - COTECNA INSPECCION ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



### Cotecna Inspección Argentina S.A.
Avda. Paseo Colón 728 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

**WARRANT**  N° **6337**  Serie: **A**

LEY 9.643 - Decreto 165/95

Autorizada por S.I.C. Resol. N° 1207/04

Exp. N° 292098/04 Publicado en B.O. 29/11/04   CERTIFICA QUE:

| Nombre o Denominación: | SANCOR COOPERATIVAS UNIDAS LTDA. | C.U.I.T. 30-50167764-3 |
|---|---|---|

Domicilio Especial:   **TENIENTE GRAL. RICHIERI 15 , SUNCHALES**

Ha depositado en el Almacén N°   **SANCOR - BALNEARIA**

Ubicado en:   **RUTA PROV. 17 Y RUTA PROV 3 , , BALNEARIA, , CORDOBA**

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.333,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

**Precio FOB Balnearia**

EL VALOR APROXIMADO de las mercaderías al emitir este CERTIFICADO es de:   **U$S 505.465,18**

(en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y CINCO CON DIECIOCHO CENTAVOS

| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por | **180 Días** | VENCIMIENTO | **28/09/2008** |
|---|---|---|---|---|

CARGOS:   La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspección Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar al mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspección Argentina S.A. a su reclamo, y por su pago Cotecna Inspección Argentina S.A.gozara de privilegio sobre el producido de la mercadería.

| Almacenaje desde: | **01/04/2008** | a razón de: | por |
|---|---|---|---|
| Emisión de Documentos: | | Administración: | |
| Seguros: | | Otros Gastos: | |
| Movimientos: | | Observaciones: | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

SEGUROS:   Estas mercaderías están cubiertas contra incendio y/u otros.

Compañía:   **SANCOR SEGUROS**

Domicilio:   **AV. INDEPENDENCIA 333**

| Póliza número: | **3837** | Vencimiento: | **31/07/2008** |
|---|---|---|---|

Robo:   Daño por agua:   Glos. Limpieza:

**EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE**

ENTREGA DE LOS EFECTOS:  No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañados del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

CONDICIONES :   Este documento se sujeta a las condiciones específicas que enuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha : Buenos Aires   **01/04/2008**

Por: COTECNA INSPECCION ARGENTINA S.A.   EDUARDO MOLINA CAMPOS APODERADO   ROBERTO ZUCCHI APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspección Argentina S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolucion N° 1207, de fecha 29/11/04, de la Secretaría de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Publicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: El DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercadería depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercadería se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercadería se estipula de acuerdo con los estandares del mercados, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento así como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado

Lugar y Fecha : Buenos Aires   **01/04/2008**

Firma del Depositante   SanCor Cooperativas Unidas Ltda.   Aclaración de firma: _____

C. P. N/ MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Calidad que reviste   Tipo y/o número de documento: _____

K  0891607

El/los tenedores del presente WARRANT __SANCOR COOPERATIVAS UNIDAS LTDA.__

domiciliado en __TENIENTE GRAL. RICHIERI 15   SUNCHALES  SANTA FE__ _____ transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de ___IIG TOF B.V.__

domiciliado en __TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS__

en garantía de la suma de _____1001186,67_____ (Son  Dolares Estadounidenses un millón un mil ciento ochenta  y siete con sesenta  y siete centavos ).-

con mas un interés de_____ U$S 69813,33_____ lo que hace un total de ____U$S 1071000,00___

(Son Dolares Estadounidenses un millón setenta  y un mil ).-

Pagadero en (lugar)    AMSTERDAM _____ el día _____28 Septiembre 2008___

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Registro del endoso en:
Fecha
Nr.

Acreedor _____          Tenedor _____

---

## SEGUNDO ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en _____ transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en _____

en garantía de la suma de _____

con mas un interés de_____ lo que hace un total de _____

Pagadero en (lugar) _____ el día _____

Registro del endoso en:
Fecha
Nr.

Acreedor _____          Tenedor _____

---

## TERCER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT_____

domiciliado en _____ transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _____

domiciliado en _____

en garantía de la suma de _____

con mas un interés de_____ lo que hace un total de _____

Pagadero en (lugar) _____ el día _____

Registro del endoso en:
Fecha
Nr.

Acreedor _____          Tenedor _____

---

## CANCELACION DEL CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRATNS, CONSTE,

En (lugar) _____ el (fecha) _____

Acreedor _____

(aclaración) _____

---

## CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de deposito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con mas sus intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentara antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de ese documento mas los diversos cargos consignados al frente  de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor.REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a traves de la normativa establecida en el Art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: SI dentro de los los 80 días corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderías, o si presentandose mantuviera deuda con Cotecna Inspeccion Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los terminos del articulo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercaderías, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspeccion Argentina S.A. de consignar o rematar la mercadería luego de 60 días de vencimiento del certificado es un derecho y no un deber de Cotecna Inspeccion Argentina S.A., pudiendo Cotecna Inspeccion Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspeccion Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originariamente pactado, Cotecna Inspeccion Argentina S.A. tendra derecho a cobrar la tarifa que originariamente se pacto.

RESPONSABILIDAD - COTECNA INSPECCIÓN ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.

**Cotecna Inspección Argentina S.A.**
Avda. Paseo Colón 728 8vo. Piso - Buenos Aires - Argentina
Tel. 54-11-5239-8888 (líneas rotativas) e-mail cma@cotecna.com.ar

## CERTIFICADO DE DEPOSITO

**N°** 6337
**Serie:** A

LEY 9.643 - Decreto 165/95

Autorizada por S.I.C. Resol. N° 1207/04

Exp. N° 292098/04  Publicado en B.O. 29/11/04

CERTIFICA QUE:

| | | |
|---|---|---|
| Nombre o Denominación: | **SANCOR COOPERATIVAS UNIDAS LTDA.** | C.U.I.T. 30-50167764-3 |
| Domicilio Especial: | **TENIENTE GRAL. RICHIERI 15 , SUNCHALES** | |
| Ha depositado en el Almacén N° | **SANCOR - BALNEARIA** | |
| Ubicado en: | **RUTA PROV. 17 Y RUTA PROV 3. , BALNEARIA , , CORDOBA** | |

| Clase de Producto | Cantidad | Unidad | Kgs. Por unidad | Peso total tons | Calidad / Tipo | Marca | Envase | Estado |
|---|---|---|---|---|---|---|---|---|
| QUESO | 113.333,00 | KILOS | - | 0,00 | SEMI DURO | - | HORMAS | BUENO |

Otras características

**Precio FOB Balnearia**

EL VALOR APROXIMADO de las mercaderías al emitir este CERTIFICADO es de: **U$S 505.465,18**

(en letras) SON: DOLARES ESTADOUNIDENSES QUINIENTOS CINCO MIL CUATROCIENTOS SESENTA Y CINCO CON DIECIOCHO CENTAVOS -

| PERIODO DEL DEPOSITO: | A partir del día de la fecha será por | **180 Días** | VENCIMIENTO | **28/09/2008** |
|---|---|---|---|---|

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:

Todos los intervinientes en este certificado autorizan a Cotecna Inspeccion Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar al mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande seran reembolsados a Cotecna Inspeccion Argentina S.A. a su reclamo, y por su pago Cotecna Inspeccion Argentina S.A.gozara de privilegio sobre el producido de la mercadería.

| | | | |
|---|---|---|---|
| Almacenaje desde: | **01/04/2008** | a razon de: | por |
| Emisión de Documentos: | | Administración: | |
| Seguros: | | Otros Gastos: | |
| Movimientos: | | Observaciones: | |

Antes de realizar algún endoso, consultar en COTECNA Inspección Argentina S.A. el monto total adeudado.

| SEGUROS: | Estas mercaderías están cubiertas contra incendio y/u otros. | |
|---|---|---|
| Compañía: | **SANCOR SEGUROS** | |
| Domicilio: | **AV. INDEPENDENCIA 333** | |
| Póliza número: | **3837** | Vencimiento: **31/07/2008** |
| | Robo: | Daño por agua: | Gtos. Limpieza: |

**EL SEGURO DE LA MERCADERIA ES CONTRATADO POR CUENTA Y RIESGO DEL DEPOSITANTE**

ENTREGA DE LOS EFECTOS:  No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO de DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma si se hubiesen negociado.

CONDICIONES :  Este documento se sujeta a  las condiciones específicas que enuncia el mismo (frente y dorso) y a  aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar  y  Fecha : Buenos Aires      **01/04/2008**

Por: COTECNA INSPECCION ARGENTINA S.A.

EDUARDO MOLINA CAMPOS
APODERADO

ROBERTO ZUCCHI
APODERADO

Administrador (firma y sello)

Emisor Cotecna Inspeccion Argentina S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolucion N° 1207, de fecha 29/11/04, de la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economia y Obras y Servicios Publicos. La autorización no implica responsabilidad del Estado.

DECLARACION  JURADA: El  DEPOSITANTE declara BAJO JURAMENTO que:

a) La mercadería depositada correspondiente a este Certificado es de su propiedad y no se encuentra afectada a gravámenes, prohibiciones ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes.

b) La mercadería se encuentra en condiciones de comercializarse conforme con las normas vigentes.

c) El valor de la mercadería se estipuló de acuerdo con los estándares de mercados, facturas de ventas y otras fuentes que determinen precios referentes aproximados.

d) Constituye domicilio especial a los fines del ejercicio de los derechos derivados de este documento así como de las obligaciones que emergen del mismo conforme lo arriba asignado. En caso de desinteligencia de las partes respecto de cualquier asunto relacionado con este documento, la cuestión será sometida a los Tribunales Ordinarios de la Capital Federal con exclusión de cualquier otro fuero y/o jurisdicción.

e) Conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente enunciadas y a las que se detallan al dorso de este certificado

Lugar  y  Fecha : Buenos Aires      **01/04/2008**

| | | |
|---|---|---|
| Firma del Depositante | Sancor Cooperativas Unidas Ltda. | Aclaración de firma: .......................... |
| Calidad que reviste | C. P. N. MARIO C. MAGDALENA<br>Gerente Dpto. de Finanzas | Tipo y número de documento: .......................... |

K  0891608

PRIMER ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____                                          el día _____

|  | Registro del endoso en: |
|  | Fecha |
|  | Nr. |

Endosante _____        Endosatario _____

### SEGUNDO ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____                                          el día _____

|  | Registro del endoso en: |
|  | Fecha |
|  | Nr. |

Endosante _____        Endosatario _____

### TERCER ENDOSO DEL CERTIFICADO DE DEPOSITO

Endoso este Certificado de Deposito en sus derechos y obligaciones a favor de _____

domiciliado en _____

o a su orden en (lugar) _____                                          el día _____

|  | Registro del endoso en: |
|  | Fecha |
|  | Nr. |

Endosante _____        Endosatario _____

### PRIMER ENDOSO DEL WARRANT

El/los tenedores del presente WARRANT   SANCOR COOPERATIVAS UNIDAS LTDA.

domiciliado en  TENIENTE GRAL. RICHIERI 15   SUNCHALES  SANTA FE                              transfieren este WARRANT

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de     IIG TOF B.V.

domiciliado en  TELESTONE 8 – TELEPORT, NARITAWEG 165, P.O. BOX 7241, 1007 JE AMSTERDAM, THE NETHERLANDS

en garantia de la suma de         1001186,67                                                      Dolares Estadounidenses un millón

con mas un interés de      U$S 69813,33            lo que hace un total de       U$S 1071000,00

Dolares Estadounidenses un millón setenta  y un mil .

Pagadero en (lugar)   AMSTERDAM                                          el día          28 Septiembre 2008

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

|  | Registro del endoso en: |
|  | Fecha |
|  | Nr. |

Acreedor _____        Tenedor _____

### CONDICIONES DE ESTE WARRANT

Sin perjuicio de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del certificado de deposito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Deposito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con mas sus intereses calculados hasta la fecha de vencimiento, a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio. El administrador de COTECNA INSPECCION ARGENTINA S.A., se encontrara facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, sino se presentara antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Deposito podrá consignar el importe de ese documento mas los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. LA consignación se deberá hacer a la orden de COTECNA INSPECCION ARGENTINA S.A. y en su domicilio quedando esta facultada para entregar el importe del WARRANT a quien resulte su tenedor.REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 dias corridos siguientes a la fecha de vencimiento de vigencia del presente deposito no se presenta el titular del Certificado de Deposito a retirar los productos o mercaderías, o si presentandose mantuviera deuda con Cotecna Inspeccion Argentina S.A. originada en este Certificado de Deposito o su Warrant y dicha deuda no fuera cancelada, COTECNA INSPECCION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Deposito o bien a vender la misma en público subasta en los terminos del artículo 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de créditos que afecten a la mercaderías, será consignado judicialmente a la orden de quien resulte titular del Certificado de Deposito. Esta facultad de Cotecna Inspeccion Argentina S.A. de consignar o rematar la mercadería luego de 60 dias de vencimiento del certificado es un derecho y no un deber de Cotecna Inspeccion Argentina S.A., pudiendo Cotecna Inspeccion Argentina S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que Cotecna Inspeccion Argentina S.A. continue custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exeda el originariamente pactado, Cotecna Inspeccion Argentina S.A. tendra derecho a cobrar la tarifa que originariamente se pacto.

RESPONSABILIDAD - COTECNA INSPECCION ARGENTINA S.A. responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.

## PRIMERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

**IIG TOF B.V.**, representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., representado en este acto por los Sres. S.S. tryhosch y H. Browns en su carácter de *apoderado*, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, que en copia se adjunta como Anexo A, cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Primera Enmienda.

(b) Que el MUTUARIO ha solicitado al MUTUANTE aumentar en Dólares Estadounidenses Veinticinco Millones con 00/100 (US$ 25.000.000,00) el monto de la Línea de Crédito.

(c) Que el MUTUANTE está dispuesto a aceptar el aumento de la Línea de Crédito requerido siempre que el MUTUARIO otorgue garantías adicionales de pago, a cuyo fin el MUTUARIO está dispuesto a ceder nuevos créditos a favor del MUTUANTE; y constituir y endosar warrants a favor del MUTUANTE.

En mérito a las consideraciones precedentemente establecidas, las Partes acuerdan suscribir la presente Primera Enmienda al Contrato Marco (la "Primera Enmienda"), de conformidad con los términos y condiciones incluidos en las siguientes cláusulas:

1. Incorpóranse a la Cláusula PRIMERA del Contrato Marco las siguientes definiciones:

   "*Arthur Schuman*": significa **ARTHUR SCHUMAN, INC.**, una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica, con domicilio en 40 New Dutch Lane, Fairfield, NJ 07004 USA

   "*Fonterra*": significa **FONTERRA LIMITED,** una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

   "*BARIVEN c/o PDVSA*": significa **Bariven S.A., c/o PDVSA Services, Inc.,** una firma organizada bajo las leyes del Estado de Texas, Estados Unidos de Norteamérica, con domicilio en 1293 Eldrige Parkway, Houston, Texas (77077), Estados Unidos de Norteamérica.

   *Warrants*: significa los Warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE, endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidos en la Cláusula SEXTA BIS del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco.

2. Modifícanse las definiciones de "Créditos Cedidos", y "Deudores Cedidos" de la Cláusula PRIMERA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

   "*Crédito/s Cedido/s*" significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

   (i) todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a Fonterra derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como **Anexo I** (y las enmiendas, contratos complementarios y/o

1

NA (h)

reemplazantes de dicho contrato adjunto como Anexo I, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo). Se adjunta asimismo como **Anexo II** una Declaración Jurada del MUTUARIO con el Pronóstico de Ventas mínimas que el MUTUARIO estima realizar a Fonterra durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.

(ii)  todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a BARIVEN S.A c/o PDVSA derivada de la Orden de Compra (Purchase Order) N° 5100062284 de fecha 26 de Marzo de 2008, emitida por BARIVEN c/o PDVSA y aceptada por el MUTUARIO, cuya fotocopia se adjunta al presente Contrato como **Anexo B** (y las enmiendas, contratos complementarios y/o reemplazantes de dicha orden de compra adjunta como Anexo B, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo).

(iii)  todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realicen a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 31 de Mayo de 2008 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Arthur Schuman.

*"Deudor/es Cedido/s"* significa Arthur Schuman y/o Fonterra y/o BARIVEN c/o PDVSA.

*"Línea de Crédito"* significa la única línea de crédito que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100  (US$ 50.000.000,00).

3.  Las modificaciones antes referidas importan la cesión a favor del MUTUANTE de los créditos del MUTUARIO contra Arthur Schuman y BARIVEN c/o PDVSA precedentemente descriptos, en los términos de la Cláusula CUARTA del Contrato Marco. Consecuentemente, dentro de las 48 hs de suscripto el presente y como condición para cualquier nuevo desembolso bajo el Contrato Marco, el MUTUARIO se obliga a notificar dicha cesión a Arthur Schuman y Bariven S.A., c/o PDVSA Services, Inc.  en los términos establecidos en la Cláusula 4.6 del Contrato Marco.

4.  Antes del 31 de Agosto de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants por una suma equivalente al diez por ciento (10%) de la Línea de Crédito Adeudada. Transcurrido un mes más de la fecha antes referida, dicho porcentaje deberá haber aumentado al quince por ciento (15%), de modo tal que antes del 30 de Septiembre de 2008 el MUTUARIO deberá haber entregado y endosado a favor del MUTUANTE Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Concordantemente con ello, incorpórase como Cláusula SEXTA BIS del Contrato Marco la siguiente:

*"CLÁUSULA SEXTA BIS: WARRANTS*

*6BIS.1  Antes del 30 de Septiembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants endosados a favor de este último por un monto equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada a dicha fecha, obligándose a mantener los mismos – reemplazándolos de ser necesario, conforme se establece en la siguiente Sección 6.2- por dicho monto durante toda la vigencia del presente Contrato Marco.*

*6BIS.2  El MUTUARIO se obliga a que antes del 31 de Agosto de 2008, el MUTUANTE cuente en su poder con Warrants por un monto no inferior al  diez por ciento (10%) de la Línea de Crédito Adeudada y que a partir del 30 de Septiembre de 2008 y durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.*

*6BIS.3  A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería, vigente al momento de dicho depósito. El*

2

ANA (h)
o
o

*mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial para el mantenimiento de la presente enmienda. Consecuentemente, la falta de acuerdo –por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula NOVENA del presente Contrato.*

***6BIS.4*** *El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.*

***6BIS.5*** *En Caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.*

***6BIS.6*** *Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria (Warrantera) de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora."*

**5.**    Incorpóranse a la Cláusula SÉPTIMA, Sección 7.1, las siguientes declaraciones y garantías del MUTUARIO:

*"**7.1.19**  Que el Crédito Cedido contra PDVSA ascenderá a la suma de US$ 46.408.615,56 (Dólares Estadounidenses CUARENTA Y SEIS MILLONES CUATROCIENTOS OCHO MIL SEISCIENTOS QUINCE CON 56/100).*

***7.1.20***  *Que el Crédito Cedido contra Fonterra ascenderá como mínimo a una suma equivalente al cincuenta por ciento (50%) de la Línea de Crédito.*

***7.1.21***  *Que el Crédito Cedido contra Arthur Schuman ascenderá como mínimo a una suma equivalente al treinta por ciento (30%) de la Línea de Crédito.*

***7.1.22***  *Que a partir del 30 de Septiembre de 2008 y en todo momento durante la vigencia del presente Contrato el MUTUANTE contará con Warrants por una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada."*

**6.**    Con excepción de aquellos términos expresamente modificados por la presente Primera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, a los 11 días del mes de Junio de 2008; y por el MUTUANTE en la Ciudad de Amsterdam, a los 13 días del mes de Junio de 2008.

Firma/s certificada/s en Foja
Nº E 00431944 U
Bs. As. 17 6 2008

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

Por: TICTOP B.V.
Nombre: S. Strubeg g. H. Braamskamp
Carácter: Apoderado    Managing Director
Trust International Management (T.I.M.) B.V.
Trust International Management (T.I.M.) B.V.
Managing Director

3



**ACTA DE CERTIFICACION DE FIRMAS**
LEY 404



F 004319444

1    **Buenos Aires,** 11 **de** Junio **de** 2008 . **En mi carácter de Escribano**

2    Titular del Registro Notarial Nº 841

3    **CERTIFICO: Que la/s** firma/s      **que obra/n en el**

4    **documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s**

5    **firma/s que se formaliza simultáneamente por ACTA número** 144 **del**

6    **LIBRO número** 96 **, es/son puesta/s en mi presencia por la/s persona/s**

7    **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación y de**

8    **cuyo conocimiento doy fe.** Mario César MAGDALENA L.E. 8.106.144.- Mani-

9    fiesta actuar en su carácter de apoderado de la sociedad "SANCOR CO-

10    OPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Provincia

11    de Santa Fe, e inscripta en la Matrícula 772 del Registro Nacional de Coo-

12    perativas, de la Provincia de Santa Fe, Departamento Castellanos, con-

13    forme lo acredita con el poder de fecha 23 de junio de 1993, pasado al folio

14    638 del Registro 200 de la ciudad de Sunchales, Provincia de Santa Fe, a

15    cargo del escribano Horacio Remondino, la documentación relacionada

16    tengo a la vista y le confiere facultades suficientes para suscribir el docu-

17    mento adjunto.-

18

19

20

21

22



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

23

24

25

**MODELO NOTIFICACION A BARIVEN**

Buenos Aires, June___<sup>th</sup> 2008

Messrs.:
**Bariven S.A., c/o PDVSA Services, Inc.**
Purchasing Agent (BU00),
1293 Eldridge Parkway
Houston, Texas 77077, USA.
At.: _____
Phone: _____
E-mail: _____

Dear Sirs:

We address to you in order to give you notice of the Assignment Agreement June ___<sup>th</sup>, 2008, executed between **SANCOR COOPERATIVAS UNIDAS LTDA ("SANCOR")** and **IIG TOF B.V.,** represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., ("IIG"),** whereby **SANCOR** has assigned and transferred to **IIG** and **IIG,** has accepted and received all the rights and credits derived from the **PURCHASE ORDER N° 5100062284** dated March 26th, 2008, corresponding to the merchandise that you have requested to **SANCOR,** which is attached hereto as <u>Annex I</u>.

Therefore, **SANCOR** and **IIG** hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement all the sums and credits derived from the purchase order hereinabove referred –including the credits derived from the invoices and other documentation that **SANCOR** submit to you as a consequence of said commercial transactions-, are to be fully paid to **IIG** by wire transfer of the corresponding funds to the following bank account:

| | |
|---|---|
| **BANK:** | STATE STREET BANK AND TRUST BOSTON MA. |
| **ABA#:** | 011-000-028 |
| **SWIFT:** | SBOSUS33 |
| **Credit:** | WMS Cash DDA |
| **Account#:** | 17039843 |
| **Further Credit:** | IIG TOF B.V– Sancor CUL |
| **Account#:** | 02030-8420148 |

The aforementioned Assignment Agreements and payment instructions are irrevocable and could only be modified through a new notice signed by representatives from **IIG** duly authorized by the correspondent certifications.

The aforementioned Assignment Agreements shall not transfer and/or modify the liability of **SANCOR** derived from the referred commercial transactions and business operations. Thus **SANCOR** remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

_____
Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

_____
**Por: IIG TOF B.V.**
Nombre: _____
Carácter: _____

Acknowledged and accepted:

**BARIVEN S.A., C/O PDVSA SERVICES, INC.**
Name: _____
Capacity: _____

5

# ANEXO

## CONTRATO DE LÍNEA DE CRÉDITO PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _H. Draaisma y S. Smit_ en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la pre-financiación de sus exportaciones

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndole continuar con el desarrollo y ampliación de sus mercados externos;

(c) Que por las razones indicadas en el Considerando (b) anterior, y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO está dispuesto a afectar bienes para garantizar el repago del crédito para prefinanciar sus exportaciones;

(d) Que el MUTUANTE está dispuesto a otorgar una línea de crédito de hasta Dólares Estadounidenses veinticinco millones con 00/100 (US$ 25.000.000,00) para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) el MUTUARIO se obligue a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (iii) se otorgue y perfeccione la cesión de los Créditos Cedidos (tal como se los define más adelante).

1

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

**PRIMERA:   DEFINICIONES.**

"<u>Afiliadas</u>" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO.

"<u>Cambio Material Adverso</u>" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO no podrá cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"<u>Condiciones Precedentes</u>" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula SEGUNDA.

"<u>Contrato Marco</u>" significa el presente contrato de línea de crédito suscripto entre las Partes.

"<u>Crédito/s Cedido/s</u>" significa todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice al Deudor Cedido derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como **Anexo I** (y las enmiendas, contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo). Se adjunta asimismo como **Anexo II** una Declaración Jurada del MUTUARIO con el Pronóstico de Ventas mínimas que el MUTUARIO estima realizar al Deudor Cedido durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.

2

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| BANK: | Satet Street Corp f/k/a Investors Bank & Trust Company |
| ABA#: | 011-001-438 |
| SWIFT: | INVBUS33 |
| Credit: | Client Funds |
| Account#: | 569-530-395 |
| Further Credit: | IIG TOF – Sancor CUL |
| Account#: | 02030-8420148 |

"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTUANTE en forma fehaciente:

| | |
|---|---|
| BANCO: | Citibank N.A. |
| DIRECCIÓN: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 |
| A NOMBRE DE: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada |
| CUENTA N°: | 000-0-129785 |
| REFERENCIA: | Prefinanciación de Exportación |

"Deudor Cedido" significa **FONTERRA LIMITED** una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagarés y el contrato adjunto como Anexo I que causa los Créditos Cedidos.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

3

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula OCTAVA, Sección 8.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Mayo de 2009.

"Garantías" significa los Pagarés y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses veinticinco millones con 00/100 (US$ 25.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todos las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula OCTAVA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como **ANEXO III**, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

4

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Mayo de 2009, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en **ANEXO IV**, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interés anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO.

### 2.1.   Disponibilidad de la Línea de Crédito.

**(a) Disponibilidad Condicionada.** Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

**(b) Vigencia.** Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

5

**(c) Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

## 2.2.    Condiciones Precedentes al otorgamiento de la Línea de Crédito.

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

**(a) Aprobaciones Societarias.** (i) copia certificada por escribano público del poder general del MUTUARIO del cual surja que el/ los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto; y

**(b) Vigencia de las Manifestaciones y Declaraciones del MUTUARIO.** Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por el MUTUARIO en la Cláusula SEPTIMA del Contrato Marco, y

**(c) Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Supuestos de Incumplimiento.** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO   ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías, y

**(d) Notificación al Deudor Cedido.** Que el MUTUARIO haya notificado al Deudor Cedido la cesión del Crédito Cedido en los términos establecidos en la Sección 4.6 del presente Contrato Marco; a cuyo efecto el MUTUARIO deberá entregar al MUTUANTE el original de tal notificación recibida y aceptada por el Deudor Cedido.

**CLAUSULA TERCERA: CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.**





6

**3.1. <u>Solicitud de Desembolso</u>.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

(i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento; y

(ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes, a plena satisfacción del MUTUANTE, con la firma debidamente certificada por un escribano público argentino.

**3.2. <u>Falta de Responsabilidad por Desembolsar o No Desembolsar</u>.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa- y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal circunstancia o causa.

**3.3. <u>Trámite posterior. Desembolso</u>.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá, a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso, y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar éste de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso –siempre que el rechazo sea con causa- que al MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquella.

**3.4. <u>Confirmación</u>.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos contados desde la finalización del

7

Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5   Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto, de conformidad con lo establecido en la cláusula OCTAVA del presente Contrato.

**3.6 Devolución al Mutuario de los Créditos Cedidos. Notificación al Deudor Cedido.** En cualquiera de los supuestos enumerados en la presente cláusula TERCERA y una vez cancelada en su totalidad la Línea de Crédito Adeudada por el MUTUARIO y dentro de las 48 hs. de sucedido ello, el MUTUANTE se obliga a notificar al Deudor Cedido que ha quedado sin efecto la Cesión del Crédito Cedido por lo que a partir de la recepcion de dicha notificación, el Deudor Cedido deberá abonar al MUTUARIO el monto de los Créditos Cedidos.

## CLÁUSULA CUARTA: CESIÓN DE CRÉDITOS.

**4.1**   En garantía de pago de la Línea de Crédito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operación, y como medio de pago de las Sumas Adeudadas -conforme lo establecido en la Cláusula 5.2 del Contrato Marco- el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesión comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido de las cuales surjan los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

**4.2**   El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE,

8

dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.3**     El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por el Deudor Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha __/__/2007. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____., ABA _____, Beneficiario: IIG TOF B.V., Cuenta N°: _____"*

**4.4**     Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

**4.5**     La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.6**     Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido y a obtener la aprobación expresa de este último respecto de la presente cesión mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **ANEXO V**. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará al Deudor Cedido, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido –mediante su apoderado o representante legal- firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido en la forma antes

9

indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación al Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario, domicilio y su despacho mediante correo internacional por un servicio que brinde constancia de su entrega y recepción.

4.7    El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que –con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- el Deudor Cedido rescinda o resuelva los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

4.8    El MUTUARIO declara y garantiza al MUTUANTE:

(a)    el cobro de los Créditos Cedidos.

(b)    la forma instrumental de los mismos.

(c)    la legitimidad de los Créditos Cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d)    que no se encuentra inhibido para disponer de sus bienes;

(e)    que no adeuda suma alguna al Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos;

(f)    que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;



10

(g)  la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h)  que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a- la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos.

(i)  que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito.

(j)  que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente al Deudor Cedido, debiéndose abstener de vender o facturar los productos comprendidos en el contrato adjunto como Anexo I a terceros distintos del Deudor Cedido, aún cuando contase con el consentimiento de este último.

## CLAUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.

**5.1**  El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.2**  A los efectos mencionados en la Sección 5.1 antes referida, los fondos del Crédito Cedido depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

(a)  Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.



(b)  Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso de que los fondos del Crédito Cedido depositados durante tales meses excedan el monto de la Suma Adeudada, el



11

excedente será transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso de que los fondos del Crédito Cedido depositados durante tales meses no fuesen suficientes para cubrir el importe de la Suma Adeudada, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

(c)   Todos los fondos correspondientes al Crédito Cedido que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

**5.3**    En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

**5.4**    Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso de que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de la Suma Adeudada en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**CLAUSULA SEXTA: MONEDA DE PAGO.**

**6.1**    El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de l a Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se

12

cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

**6.2**    En atención a lo dispuesto en la Cláusula 6.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometidas (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

**6.2.(a).** Mediante la compra con Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(b).** Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(c).** En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

13

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**6.3**    Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**6.4**    Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a). a 6.2.(d) precedentes serán pagados por el MUTUARIO (o por el MUTANTE en su caso).

**6.5.** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE (o al MUTUARIO en su caso) de esa pérdida.

## CLAUSULA SEPTIMA:    MANIFESTACIONES,    DECLARACIONES    Y COMPROMISOS DEL MUTUARIO.

**7.1.    Manifestaciones y Declaraciones del MUTUARIO.**

A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la  Línea de Crédito, el MUTUARIO manifiesta y declara, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**7.1.1.**   Que el MUTUARIO  es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades

14

necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

**7.1.2.** Que el MUTUARIO no está obligado a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**7.1.3.** Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

**7.1.4.** Que el MUTUARIO y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

**7.1.5.** Que el MUTUARIO no tiene pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

**7.1.6.** Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

**7.1.7.** Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad




15

de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**7.1.8.** Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**7.1.9.** Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco, acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**7.1.10.** Que el balance del MUTUARIO al 30 de Junio de 2007, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2007 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

**7.1.11.** Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

**7.1.12.** Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**7.1.13** Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

**7.1.14** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tiene y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

16

**7.1.15.** Los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

**7.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

**7.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**7.1.18** Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**7.2      Compromisos y Obligaciones del MUTUARIO.**

Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO se compromete firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

**7.2.1.** A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula NOVENA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

**7.2.2.** A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que el MUTUARIO, según el caso, los disputase por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

**7.2.3.** A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes,

17

prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

**7.2.4.** A no realizar actos que constituyan o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, ó (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

**7.2.5.** A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

**7.2.6.** A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoria de primer nivel y prestigio internacional, (ii) estados contables semestrales, (iii) estados contables trimestrales, y (iv) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos semestres; los estados contables (iii) deberán ser presentados dentro del los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iv) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

**7.2.7.** A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas, la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

18

**7.2.8.** A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

**7.2.9.** A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y

**7.2.10.** A notificar al MUTUANTE, en forma inmediata, (i) el acaecimiento de cualquier Evento de Incumplimiento, y (ii) cualquier incumplimiento en que el MUTUARIO incurriere en relación con cualquier acuerdo o Contrato Marco del que sea parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (iii) las acciones tomadas para subsanar los incumplimientos referidos en (i) y (ii) precedentes, y

**7.2.11.** A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, permitiéndole la realización de auditorías contables, legales y de gestión, por sí mismo o por quien el MUTUANTE designe a tal efecto, en la medida que no interfiera sustancial y adversamente con las actividades habituales del MUTUARIO, y

**7.2.12.** A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (i) cualquier pérdida o daño sufrido en los bienes de el MUTUARIO por montos superiores a Dolares Estadounidenses DOS MILLONES con 00/100 (US$ 2..000.000,00) en forma individual o acumulada durante cada ejercicio anual, y (ii) cualquier litigio, o reclamo en el cual el monto reclamado al MUTUARIO fuere igual o superior a Dolares Estadounidenses DOS MILLONES con 00/100 (US$ 2.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y

**7.2.13.** A no reducir su capital, y

**7.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**7.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco, y

19

**7.2.16.** A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

**7.2.17.** A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

**7.2.18.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

**7.2.19.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**7.2.20.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**7.2.21.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

**7.2.22** A remitir mensualmente al MUTUANTE, antes del 5° día hábil de cada mes de vigencia del presente Contrato Marco, un informe con el pronóstico escrito de venta de sus productos al Deudor Cedido durante los dieciocho (18) meses subsiguientes a la fecha de entrega del informe antes referido.



20

**7.2.23** A remitir al MUTUANTE –además del señalado en la Sección 7.2.22 precedente- copia de todo informe, documento, reporte, orden de compra, factura, y/o pronóstico de ventas que remita al Deudor Cedido y/o que reciba del Deudor Cedido.

## OCTAVA:   MORA.

**8.1**   La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco –incluyendo sin limitación, el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora,  el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

**8.2**   El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las sumas adeudadas en los siguientes Eventos de Incumplimiento:

(a)   si el MUTUARIO incumpliese con el pago en tiempo y forma de la Línea de Crédito Adeudada;

(b)   si un tercero pidiere la quiebra del MUTUARIO, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

(c)   si el MUTUARIO, el Deudor Cedido y/o pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

(d)   si el MUTUARIO y/o sus incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

(e)   Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares Estadounidenses DOS MILLONES (US$





21

2.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los treinta (30) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

(f)    si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad, parcial o total, por parte del MUTUARIO, en las declaraciones contenidas en la Cláusula SEPTIMA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(g)    si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(h)    si el MUTUARIO y/o sus modificasen de cualquier forma su composición accionaria;

(i)    si el MUTUARIO incumpliere cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(j)    si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido;

(k)    si –con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas- el MUTUARIO y/o el Deudor Cedido terminan el contrato que causa los Créditos Cedidos ;

(l)    si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(m)    Si se dictaren una o más sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;





22

(n)     Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

**8.3**     En adición a lo dispuesto en la Sección 8.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 8.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de las Sumas Adeudadas por parte del MUTUARIO o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE.

**NOVENA: GASTOS.**

**9.1**     Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieran generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

**9.2**     Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago.

23

**9.3**    El MUTUARIO se obliga a cumplir en tiempo y forma –a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**9.4**    El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

## DÉCIMA: CESIÓN DEL CONTRATO MARCO.

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

## DÉCIMO PRIMERA:       VIGENCIA. INDEMNIDAD.

**11.1**    El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas NOVENA, DECIMO PRIMERA y DECIMO TERCERA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

**11.2**    El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstos en ellos; (ii) el Crédito Cedido adeudado con más sus intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial,

24

relacionado con cualquiera de las circunstancias previstas en esta Cláusula 11.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

## DÉCIMO SEGUNDA: AUTORIZACION

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.

En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

## DÉCIMO TERCERA: JURISDICCIÓN Y LEY APLICABLE.

**13.1** El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

**13.2** El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

**13.3** Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés en la República Argentina.

**13.4** El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

25

**13.5**   Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 13.8 de la presente Cláusula.

**13.6**   Las notificaciones efectuadas de la manera establecida en la Sección 13.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

**13.7**   El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total y/o parcial comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

**13.8**   Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:

MUTUARIO: 1) 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003 - USA

2) Tacuarí 202 - 3° Piso - Capital Federal, República Argentina

MUTUANTE:   Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands

**DECIMO CUARTA: FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 2 (dos) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.

**DECIMO QUINTA: LUGAR Y FECHA.**

26

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina y por el MUTUANTE en Amsterdam, a los 30 días del mes de Noviembre de 2007.

_____

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**

Nombre: Mario Magdalena

Carácter: Apoderado

Firma/s certificada/s en Foja
N°.......................................
Bs. As. ................................

_____

Por: **IIG TOF B.V.**

Nombre: _____

Carácter: _____

Trust International Management (T.I.M.) B.V.
Managing Director

27



**ACTA DE CERTIFICACION DE FIRMAS**
LEY 404

F  003850242

1. Buenos Aires,   30 de    Noviembre   de   2007 . En mi carácter de Escribano

2. Titular del Registro Notarial Nº 841

3. **CERTIFICO:** Que la/s   firma/s                                que obra/n en el

4. documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5. firma/s que se formaliza simultáneamente por ACTA número        42         del

6. **LIBRO número**        86        , es/son puesta/s en mi presencia por la/s persona/s

7. cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8. cuyo conocimiento doy fe.   Mario César MAGDALENA L.E. 8.106.144.- Mani-

9. fiesta actuar en su carácter de apoderado de la sociedad SANCOR COO-

10. PERATIVAS UNIDAS LIMITADAS, de acuerdo a la documentación que me

11. exhibe y le confiere facultades suficientes para suscribir el documento ad-

12. junto.-

13.

14.



15.

16.

17.

18.   

19.

20.

21.

22.

23.                                                          

24.

25.

ANEXO I:
COPIA "Exclusive Purchase Agreement"

ANEXO II
Declaración Jurada con Pronóstico de ventas Mínimas del MUTUARIO

ANEXO III

## Modelo de Pagaré (sin protesto)

Buenos Aires, __ de _____ de 200_.

US$ _____

A la vista, por igual valor recibido, _____ una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en _____ República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a _____, (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en _____, República Argentina, la suma neta de Dólares Estadounidenses _____ CON __/100 (US$ _____), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagares que el deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor – además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del ___% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:

Deudor:
Acreedor:

d) Las notificaciones efectuadas de la manera establecida en la acápite "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.



Deudor

_____

30

Por _____
Nombre: _____
Carácter: _____

ANEXO IV

**MODELO DE SOLICITUD DE DESEMBOLSO**

Buenos Aires, _____de _____ de 2007

Sres.
**IIG TOF B.V.**
_____

De nuestra consideración:

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha _____ de _____ de 2007 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula _____ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

(i)    El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____).

(ii)   La/s Fecha/s de Vencimiento del desembolso antes requerido será/n la/s siguiente/s:
       **Fecha Vto.            Moneda e Importe**
       __/_____/____          U$S  _____
       __/_____/____          U$S  _____

(ii)   La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses _____), comprensivo del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas.

(iii)  Adjuntamos a la presente un Pagare a vuestro favor, pagadero a la vista, por la suma total de US$ _____ (Dólares Estadounidenses _____).

       **Fecha Emisión        Fecha Vto.            Moneda e Importe**
       ___/_____/_____     A la vista           U$S_____

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso requerido a la Cuenta del Mutuario indicada en el Contrato Marco.

Sin otro particular, saludamos a Uds. atentamente.

_____
Nombre: _____
Carácter: _____

31

ANEXO V
MODELO DE NOTIFICACION AL DEUDOR CEDIDO

Buenos Aires, _____ __' 2007

Messrs.:
**FONTERRA CO-OPERATIVE GROUP LIMITED ("FONTERRA")**

Dear Sirs:
We address to you in order to give you notice of the Loan and Assignment Agreement dated _____ __th, 200_, executed between **SANCOR COOPERATIVAS UNIDAS LTDA.** ("SANCOR") and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** ("IIG TOF BV"), whereby **SANCOR** has assigned and transferred to **IIG TOF BV**, and **IIG TOF BV** has accepted and received all the rights and credits (both credits existing at present or credits that may exist in the future) derived from all the proceeds derived from the EXCLUSIVE PURCHASE AGREEMENT executed between **FONTERRA** and **SANCOR** on October 01st, 2007, the amendments and renewals thereof. Save for the assignment of proceeds hereinbefore mentioned, **IIG TOF BV** shall have no right or lien over the Products referred to in said EXCLUSIVE PURCHASE AGREEMENT, which shall remain the property of SANCOR or FONTERRA.

Therefore, **SANCOR** and **IIG TOF BV** hereby confirm that pursuant to the terms and conditions of the aforementioned Loan and Assignment Agreement all the sums and credits hereinabove referred –including, without limitation, the credits derived from the invoices and other documentation that **SANCOR** submit to you as a consequence of said commercial transactions-, are to be fully paid to **IIG TOF BV** by wire transfer of the corresponding funds to the following bank account:

_____

The aforementioned Assignment Agreement shall not transfer and/or modify the liability of **SANCOR** derived from the referred commercial transactions and business operations. Thus, **SANCOR** remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

_____
By: **SANCOR COOPERATIVAS UNIDAS LIMITADA**
Nombre: Mario Magdalena
Carácter: Apoderado

_____
By: **IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Nombre:
Carácter:

Acknowledged and accepted:

_____
**FONTERRA CO-OPERATIVE GROUP LIMITED**
Name: _____
Capacity: _____

32

ANEXO II - DECLARACION JURADA CON PRONOSTICO DE VENTAS MINIMAS
Pronóstico de Ventas. (en miles)

| Productos | Nov-07 Volumen | P.U. US$ | Facturac. US$ | Dic-07 Volumen | P.U. US$ | Facturac. US$ | Ene-08 Volumen | P.U. US$ | Facturac. US$ | Feb-08 Volumen | P.U. US$ | Facturac. US$ | Mar-08 Volumen | P.U. US$ | Facturac. US$ | Abr-08 Volumen | P.U. US$ | Facturac. US$ | Nov-07 / Abr-08 Volumen | Facturac. US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1932 Mozzarella | 400 | 4.50 | 1,800 | 400 | 4.50 | 1,800 | 400 | 4.50 | 1,800 | 400 | 4.50 | 1,800 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | | |
| 1053 Manteca | 250 | 3.50 | 875 | 250 | 3.50 | 875 | 100 | 3.50 | 350 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | | |
| 4335 L P E Bolsa 25 Kgs Sancor | 1000 | 4.50 | 4,500 | 1000 | 4.00 | 4,000 | 200 | 4.50 | 900 | 200 | 4.50 | 900 | 200 | 4.50 | 900 | 500 | 4.50 | 2,250 | | |
| 4404 L P D 25 Kgs Sancor | 1100 | 4.00 | 4,400 | 200 | 4.50 | 900 | 300 | 4.00 | 1,200 | 300 | 4.00 | 1,200 | 300 | 4.00 | 1,200 | 300 | 4.00 | 1,200 | | |
| 1755 Gouda/Edam | | | | | | | 200 | 4.50 | 900 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | | |
| Total Fonterra | 2,100 | | 8,900 | 1,850 | | 7,575 | 1,200 | | 5,150 | 1,050 | | 4,525 | 900 | | 3,850 | 1,200 | | 5,200 | 8,300 | 35,200 |

| Productos | May-08 Volumen | P.U. US$ | Facturac. US$ | Jun-08 Volumen | P.U. US$ | Facturac. US$ | Jul-08 Volumen | P.U. US$ | Facturac. US$ | Ago-08 Volumen | P.U. US$ | Facturac. US$ | Sep-08 Volumen | P.U. US$ | Facturac. US$ | Oct-08 Volumen | P.U. US$ | Facturac. US$ | Mar-08 / Ago-08 Volumen | Facturac. US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1932 Mozzarella | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | | |
| 1053 Manteca | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | | |
| 4335 L P E Bolsa 25 Kgs Sancor | 600 | 4.50 | 2,700 | 720 | 4.50 | 3,240 | 864 | 4.50 | 3,888 | 1037 | 4.50 | 4,666 | 1244 | 4.50 | 5,599 | 1799 | 4.50 | 8,097 | | |
| 4404 L P D 25 Kgs Sancor | 360 | 4.00 | 1,440 | 432 | 4.00 | 1,728 | 500 | 4.00 | 2,000 | 600 | 4.00 | 2,400 | 850 | 4.00 | 3,400 | 1,000 | 4.00 | 4,000 | | |
| 1755 Gouda/Edam | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | | |
| Total Fonterra | 1,360 | | 5,890 | 1,552 | | 6,718 | 1,764 | | 7,638 | 2,037 | | 8,816 | 2,494 | | 10,749 | 3,199 | | 13,847 | 12,406 | 53,658 |

| Productos | Nov-08 Volumen | P.U. US$ | Facturac. US$ | Dic-08 Volumen | P.U. US$ | Facturac. US$ | Ene-09 Volumen | P.U. US$ | Facturac. US$ | Feb-09 Volumen | P.U. US$ | Facturac. US$ | Mar-09 Volumen | P.U. US$ | Facturac. US$ | Abr-09 Volumen | P.U. US$ | Facturac. US$ | Nov-08 / Abr-09 Volumen | Facturac. US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1932 Mozzarella | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.50 | 1,125 | 250 | 4.500 | 1,125 | 250 | 4.500 | 1,125 | | |
| 1053 Manteca | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.50 | 175 | 50 | 3.500 | 175 | 50 | 3.500 | 175 | | |
| 4335 L P E Bolsa 25 Kgs Sancor | 1659.4 | 4.50 | 7,467 | 1393.5 | 4.50 | 6,271 | 1184.4 | 4.50 | 5,330 | 947.55 | 4.50 | 4,264 | 758.04 | 4.500 | 3,411 | 530.63 | 4.500 | 2,388 | | |
| 4404 L P D 25 Kgs Sancor | 1000 | 4.00 | 4,000 | 1000 | 4.00 | 4,000 | 850 | 4.00 | 3,400 | 680 | 4.00 | 2,720 | 544 | 4.000 | 2,176 | 380.8 | 4.000 | 1,523 | | |
| 1755 Gouda/Edam | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.50 | 450 | 100 | 4.500 | 450 | 100 | 4.500 | 450 | | |
| Total Fonterra | 3,059 | | 13,217 | 2,794 | | 12,021 | 2,434 | | 10,480 | 2,028 | | 8,734 | 1,702 | | 7,337 | 1,311 | | 5,661 | 13,326 | 57,450 |

34,035    146,308



**Dairy for life**

**Fonterra Co-operative Group Limited**

## Solicitor's Certificate – Internal

**TO:**   **Emma Parsons**

**RE:**   **Purchase Agreement – Fonterra Limited and SanCor Cooperativas Unidas Limitada** ("the Document")

I confirm that I have reviewed the Document from a legal perspective and that:

(a)   The Document reflects the instructions of **Emma Parsons** on the commercial content of the Document;

(b)   No legal risks of an important or unusual nature have been identified;

(c)   I am not aware of any legal enquiry in the circumstances of this transaction which should have been made, which has not been made;

(d)   The transaction that relates to the Document is authorised by the exercise of a delegation under Fonterra's Delegated Authorities by **Mark Robins** and **Brian Willis** is entitled to execute the Document;

(e)   To the best of my knowledge the Document does not breach any legal obligations of **Fonterra Limited** and complies with all relevant New Zealand laws.

The Document is therefore acceptable for execution by **Fonterra Limited**

Jason Sandford
Corporate Counsel
Fonterra Co-operative Group Limited

Date: 28 September 2007

FONTERRA LIMITED

SANCOR COOPERATIVAS UNIDAS LIMITADA

---

EXCLUSIVE PURCHASE AGREEMENT

---

PARTIES:

(1)   **FONTERRA LIMITED** of Fonterra Centre, 9 Princes Street, Auckland, New Zealand ("**Fonterra**"); and

(2)   **SANCOR COOPERATIVAS UNIDAS LIMITADA** of Tte. Gral. Richieri 15, 52322FYA, Sunchales, Santa Fe, Argentina ("SanCor").

BACKGROUND

1.   Fonterra manufactures dairy products and has an international marketing network and experience in the sale of dairy products.

2.   SanCor wishes to utilise the experience and services of Fonterra for sale in the international market of certain dairy products produced by SanCor.

3.   SanCor has agreed to sell to Fonterra on an exclusive basis and Fonterra has agreed to purchase the Products for on-sale by Fonterra to Customers in the Territory.

THE PARTIES AGREE as follows:

1   Interpretation

In this Agreement, unless the context otherwise requires, the following words and expressions shall have the following meanings:

"**Agreement**" means this agreement including all schedules and appendices hereto;

"**Associate**" means any person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control of, the other person.  For this purpose, a person is deemed to control another person if the first such person possesses, directly or indirectly, the power to appoint a majority of the directors of the second person, or to otherwise direct or cause the direction of the management or policies of the second person, whether through the ownership of voting securities, by contract or otherwise;

"**Base Price**" means the weekly prices set by S&OP in New Zealand for Commodity Groups;

"**Business Day**" means, for the purpose of clause 16.7 (Notices) any day other than a Saturday, Sunday or Public Holiday in the country in which the notice is being served, and in all other cases means any day other than a Saturday, Sunday or Public Holiday in New Zealand or Argentina;

05/03/2007                                                                                    2

"**Commission**" means a commission of 1% of the FOB value of an Order, to a maximum value of USD40 per metric tonne and a minimum value of USD25 per metric tonne for payment terms of 30 days or less, payable by SanCor to Fonterra on all Products sold by Fonterra to Customers under this Agreement;

"**Customer**" means the customer to whom Fonterra sells the Products in response to an Order;

"**Forecast**" has the meaning set out in Schedule 1;

"**Grading**" means, in respect of Product, the time at which SanCor, acting in good faith, issues a "Certificate of Analysis" through SanCor's Quality Laboratory attesting to the Product meeting Specification (such SanCor Quality Laboratory being registered to issue these Certificates by the Argentine Ministry of Agriculture);

"**Graded**" has a corresponding meaning;

"**Order**" means a purchase order placed by Fonterra with SanCor for the supply of Products in accordance with clause 3;

"**Products**" means the products described in Schedule 1 manufactured by SanCor at its manufacturing facility and meeting a Specification acceptable to Fonterra (acting reasonably);

"**Purchase Price**" means the price agreed between SanCor and Fonterra in respect of a sale of the Products pursuant to an Order;

"**Relationship Managers**" means a relationship manager described in Schedule 1, or such other relationship managers as notified to the other party from time to time;

"**Specification(s)**" means the manufacturing and packaging specifications for each of the Products set out in Schedule 1 or such other specifications acceptable to Fonterra (acting reasonably), to be supplied by SanCor and as may be amended by agreement in writing from time to time;

"**Term**" shall have the meaning referred to in clause 2.4;

"**Territory**" means the Territory described in more detail in Schedule 1; and

"**WACC**" means weighted average cost of capital.

1.1   In this Agreement:

a.     references to clauses are to clauses of this Agreement;



b.   references to statutes shall include any statutory modification or re-enactment of the statute concerned;

c.   words and expressions in the singular shall include the plural and vice versa;

d.   the headings are for convenience only and shall be ignored in construing this Agreement;

e.   references in this Agreement to Fonterra shall include reference to its successors and permitted assigns; and

f.   all references to EXW, FOB, CFR, CIF and other delivery terms are references to those terms as defined in Incoterms 2000.



## 2   Appointment and Term

2.1   **Appointment:** SanCor hereby agrees to sell the Products to Fonterra exclusively in the Territory on the terms and subject to the conditions of this Agreement, and Fonterra agrees to purchase the Products on the terms and subject to the conditions of this Agreement.

2.2   **Effect of Territory:**   The effect of the appointment of Fonterra as the exclusive purchaser of the Products in the Territory is that:

    a.    Fonterra is entitled to sell or facilitate the sale and may engage any other person to sell or facilitate the sale of the Products in the Territory to any channel;

    b.    SanCor shall not itself sell or facilitate the sale and shall not engage any other person to directly or indirectly sell or facilitate the sale of the Products to Customers in the Territory unless this has first been agreed with Fonterra in writing on a case by case basis; and

    c.    SanCor shall not sell the Products to any person outside of the Territory if SanCor knows, or should have known by reasonable enquiry, or had reasonable cause to believe, that the Products would be subsequently imported or distributed or sold in the Territory.

2.3   **Enquiries from Territory:** SanCor may not sell or otherwise dispose of the Products in the Territory other than as provided in clause 2.2.b.   If SanCor receives any enquiries from any potential customers in the Territory relating to the Products, SanCor shall promptly inform Fonterra of such enquiries and shall not seek to deal directly or indirectly with those potential customers with respect to the Products.

2.4   **Terms:** Fonterra's appointment shall commence on 1 September 2007 and shall continue for an initial term of three years ("Term") unless earlier terminated in accordance with the terms of this Agreement.   This Agreement shall thereafter continue in full force and effect until a party gives to the other not less than six months' written notice of termination.

2.5   **Simple Termination:** After the first year of the Agreement, one party ("**Terminating Party**") may give to the other ("**Other Party**") a minimum of six months written notice of termination of the Agreement, without the Other Party having any claim, right, title, property or other interest of any kind or nature.   Before the Terminating Party can give notice of termination, the Terminating Party must offer, no later than six months prior to the date of termination, the right to discuss with the Other Party the reasons for the proposed non-renewal to give both parties the opportunity to discuss the

possibility of continuing this Agreement on agreed terms.

2.6 **Fonterra may sell competing products:** Nothing in this Agreement prevents or limits the right of Fonterra to be concerned or interested either directly or indirectly in the supply to Customers or any third party of any goods in the Territory which are the same as, similar to or competitive with the Products.

2.7 **Exception to Agreement:** The terms of this Agreement shall not apply to the sale or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A"). or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities..

3 **Forecasting, Orders and Sales**

3.1 **Forecasting procedure:** The forecasting regime set out in Schedule 1 shall apply.

3.2 **Sales:** In accepting orders from Customers, Fonterra shall take into account the Forecast of volume of Products provided by SanCor under this Agreement.

3.3 **Quantity:** Fonterra agrees to sell the entire Manufactured Volumes of Product that is available for export to the extent that such Manufactured Volumes of Product meets the Specifications for each Product

3.4 **Delivery:** SanCor agrees to deliver the Products subject of an Order within the timeframes and by the delivery method agreed between Fonterra and the Customer, subject to SanCor reasonably being able to comply with the requirements of an Order. Where Fonterra requires delivery dates or shipping arrangements that vary from the normal practice adopted between SanCor and Fonterra, Fonterra agrees to provide sufficient advance notice to SanCor to enable SanCor to meet the requirements of the relevant Order.

3.5 **Currency:** All sales of Products under this Agreement and all payments made under this Agreement are to be made in United States Dollars unless otherwise agreed.

3.6 **Terms and conditions of sale:** SanCor acknowledges that Fonterra is not making or providing to the Customer any representation or warranty, express or implied, that the Product meets the Specification, is fit for the intended purpose or is otherwise of merchantable quality. SanCor accepts full responsibility and liability for, and agrees to fully indemnify Fonterra in respect of, any claim by a Customer or any third party that the Products sold by

05/10/2007                                                                                          6

Fonterra to the Customer are in breach of any statutory or contractual warranty, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this agreement is the direct cause of such claim, loss or damage.

3.7 **Fonterra to sell at market price:** Fonterra shall endeavour to achieve the best market price for the Products at the time of sale to the Customer having regard to, amongst other factors, Specification, quality, volume, delivery date, delivery terms, international market price ranges and other market factors in so far as the availability of the Product is advised to Fonterra with sufficient lead time. Fonterra shall keep SanCor informed of any non-standard terms of sale or unusual conditions, pricing or volumes.

3.8 **Costs:** SanCor shall be responsible for (i) liability for any additional taxes imposed by the Argentinean Government over and above those considered by this Agreement and (ii) payment of all freight, financing costs, customs and other charges, costs and expenses related to supply and delivery of the Products to a Customer pursuant to the Incoterms of an Order.

## 4    Commission

4.1 **Commission Amount:** SanCor agrees that Fonterra is entitled to the Commission on all Products sold by Fonterra to a Customer. The Commission will be calculated depending on the payment terms with the end customer. For payment terms of 30 days or less, Commission will be 1% of the FOB value of the Order, up to a maximum of USD40 per metric tonne, and a minimum of USD25 per metric tonne.

4.2 Notwithstanding clause 4.1, for each subsequent 30 days of payment terms on the Order, SanCor will pay Fonterra an additional 0.5% monthly on the Purchase Price.

Example – in the case of an order with a purchase price of USD3000 / MT CFR with 90 day payment terms, the total commission due to Fonterra would be:

- base commission of 1% plus

- variable commission for two 30-day periods at 0.5% per 30 days

In this example, the total commission amount would be equal to USD60 / MT ((USD3000 x (1% base +1% variable)).

4.3 In the case that the average lapsed time from grading date to bill of lading date is less than 30 days, Fonterra and SanCor will share the capital saving generated on a 50:50 basis. The capital saving will be calculated using SanCor's weighted average capital cost, and will be calculated on the average number of days from grading date to BOL date for all the orders

shipped within a calendar month.

Example – if a total of 2500 MT was shipped within a given calendar month, within an average of 15 days from grading date to BOL date, with a weighted average price of USD3000 / MT CFR and a SanCor WACC rate of 12%, the total additional payment due would be:

= ((15/365)*0.12*3000)/2

= USD7.39 / MT additional payment due per MT.

4.4   **Payment of Commission:**  On receipt by Fonterra of the Purchase Price paid by a Customer, Fonterra is entitled to deduct from that Purchase Price the Commission prior to Fonterra remitting the balance of the Purchase Price to SanCor.

5   Payment to SanCor

5.1   **Standard Payment Terms:**  Payment will be made by Fonterra to SanCor for the Products Fonterra has purchased from SanCor pursuant to this Agreement within 30 days from bill of lading date.

5.2   **Pre-payment:** Notwithstanding the payment provisions under clause 5.1, the Parties have agreed that, as an alternative, SanCor may request a Pre-payment for the Products as soon as the Products have been Graded (the "Grading Date"), in accordance with the following provisions:

5.3   The amount of any Pre-payment shall be an amount equal to the amount of an Order or a group of Orders.

5.4   The amount of all Pre-payments made by Fonterra shall not  at any one time exceed an  aggregate value as agreed between both parties, or in the absence of such an agreed value, a total of USD10,000,000.00.

5.5   Interest of Fonterra WACC + 2% will be charged on each Pre-payment from the date of the Pre-payment until the due date of the relevant order in accordance with the standard payment terms.

5.6   SanCor must give Fonterra not less than fourteen days notice that a Pre-payment is requested.  Pre-payment requests may only be made in respect of Product which has already been manufactured at the time notice is given and that is allocated to an existing Order.

5.7   The purpose of the pre payment provision of clause 5.2 is to provide cashflow security to SanCor in the event that, due to market conditions, stock is not rotating at the same speed of manufacturing.  It would be expected that this clause would not be exercised unless a Product was held in stock for one reason or another for a period of more than 45 days from grading date.

05/10/2007                                                                                              8

6   Invoicing and Documentation:

6.1   The issuing of invoices to Customers shall be the responsibility of Fonterra.

6.2   SanCor will have responsibility to ensure that all export documentation, in compliance with the Country of Destination and Customer requirements as advised on each and every Order, is supplied to Fonterra within 15 days of the date of the relevant bill of lading.

6.3   SanCor has the right, at all times during the term of this Agreement, to request details of all final customer invoices from Fonterra.

6.4   **SanCor Default:** If SanCor, without the prior written consent of Fonterra, sells or otherwise disposes of Products in the Territory other than via the direct sale of those Products to Fonterra under this Agreement then, without prejudice to Fonterra's other rights and remedies, SanCor must immediately pay to Fonterra an amount equal to the Commission that would otherwise be payable if the Products had been sold or disposed of in accordance with the terms of this Agreement.

6.5   **Storage and Insurance:** In accordance with Schedule 1, Clause 2, "Supply and Forecasting Regime", last paragraph; SanCor will be responsible for attending to all storage, and handling of the Products to be sold under this Agreement up to and including delivery to the Customer regardless of whether or not any payment has been paid to SanCor, following the Incoterms agreed on an Order. Risk of loss, damage or deterioration of the Products will be with SanCor until delivery to a Customer on the terms of the relevant Order.

7   Fonterra's Obligations

7.1   Fonterra will:

   a.   at all times during this Agreement work diligently to promote the sale of the Products;

   b.   not describe itself as agent or representative of SanCor except to the extent authorised by this Agreement;

   c.   not sell or facilitate the sale of any Product without SanCor's consent if Fonterra knows, or should have known by reasonable enquiry, or had reasonable cause to believe, that the Product would be subsequently distributed or sold in countries that are outside of the Territory allocated to Fonterra under this Agreement. Where Fonterra receives any enquiries from any Customers or potential Customers for the purchase of the Product outside of the Territory, Fonterra shall promptly inform SanCor of such enquiries. If a commission is to be paid on any business resulting from the



9

enquiry, this must be negotiated on a case by case basis.

d.    conduct the business of selling the Products to Customers in an orderly and businesslike manner and in accordance with all applicable laws, regulations and requirements of any governmental or regulatory authority;

e.    sell the Products in the Territory only under the brand names and trademarks of SanCor and/or any of its Associates; and

f.    be responsible for and will pay for all of its own administrative costs and expenses associated with its marketing of the Products as sales agent in accordance with this Agreement;

g.    provide to SanCor together with the Order the following information:

    (i)    terms and conditions of sale of Products;

    (ii)    quantity and specification of Products;

    (iii)    term and condition of delivery and shipment of Products, including country of destination; and

    (iv)    SanCor shall inform Fonterra within 4 (four) working days as from reception of the Order whether SanCor is precluded by the laws of Argentina from selling to that country of destination and/or any other legal impediment that may arise.

7.2    Fonterra will provide reasonable advice and technical assistance required to manufacture and supply the Products in accordance with the Specification. All such assistance will be at a cost to SanCor at an agreed rate on a case by case basis.

## 8    SanCor's Obligations

8.1    **Information to facilitate sales:** SanCor shall provide Fonterra with all necessary written information relevant to the sale of the Products including details of, Specification, health, legal and regulatory information and approvals and such other information as Fonterra may reasonably require to carry out its obligations under this Agreement. SanCor shall ensure that all information provided to Fonterra is accurate, current and kept up to date.

8.2    **No Agency:** SanCor shall not describe itself as Fonterra's agent or representative for the sale of the Products in the Territory, notwithstanding that if SanCor initiates a sourcing opportunity in the Territory on behalf of Fonterra, SanCor will be entitled to a commission on such Products equivalent to the Commission.

8.3 **Compliance:** It shall be the sole responsibility of SanCor to ensure that:

    a.    the Products comply with the Specifications, and with all the Product descriptions and information provided by SanCor to Fonterra or to a Customer;

    b.    all documentation, labelling and other requirements to ensure the Products are properly and promptly delivered to Customers are completed;

    c.    the Products comply with all relevant health, agricultural, legal and regulatory requirements in the country of manufacture and in the Territory;

    d.    the Products comply with the requirements of a Customer's country of import where specified (including without limitation any product registrations with relevant authorities that may be required but excluding any obligations such as customs clearance where customs clearance is the responsibility of the Customer under the terms of sale);

    e.    all Products are fit for their intended purpose (which, unless otherwise expressly agreed by both parties, shall be fit for human consumption); and

    f.    all Products can be traced as to source and batch in the event of any recall issues arising and adequate Product samples (to the reasonable satisfaction of Fonterra) are kept and properly stored.

8.4 **Access to Facilities:** SanCor will allow Fonterra access to the SanCor manufacturing facilities as necessary, during the Term of the agreement to inspect those facilities to ensure that the Products are being produced in accordance with the Specifications.

8.5 **Recovery of Customer Payments:** If SanCor receives all or part payment from a Customer in respect of an invoice issued by Fonterra in accordance with clause 3.2, SanCor shall immediately notify Fonterra and remit such payment to Fonterra provided however that SanCor will be able to set-off such payment with any amount owed by Fonterra to SanCor in relation to the same transaction. Failure of SanCor to comply with these obligations shall entitle Fonterra to recover any amount paid by Fonterra to SanCor in respect of such sale.

8.6 **Freight:** As required SanCor will act on behalf of Fonterra in negotiating freight for product exported from Brasil, Argentina and Uruguay.

9 **Reporting, communication**

9.1 **Reporting and communication procedure:** The parties shall agree on reasonable reports, meeting and other communication processes for the purpose of discussing sales activities, obtaining market feedback and generally reviewing performance of both parties. Each party shall participate in good faith in all such meetings.

9.2 **Quarterly meetings:** Without limiting clause 7.1, the parties will meet on a quarterly basis to discuss general performance and other such issues as may arise.

9.3 **Reports:** Fonterra will provide to SanCor quarterly reports containing such marketing and sales information as may be appropriate. These reports shall include pricing information for shipments of comparable dairy products from New Zealand.

10 Intellectual Property

10.1 **SanCor Trademarks:** Where the Products bear the name, logo and/or other proprietary marks of SanCor and/or any of its Associates or parent companies ("SanCor Trademarks"), Fonterra is authorised to promote and sell the Products in the SanCor packaging and by reference to the SanCor Trademarks. Fonterra will use or refer to the SanCor Trademarks only for the purpose of sale of the Products in accordance with this Agreement and acknowledges that the SanCor Trademarks remain the property of SanCor and that Fonterra's use of the SanCor Trademarks does not create any separate rights of Fonterra in the SanCor Trademarks. Fonterra will not contest the ownership of the SanCor Trademarks and not use or attempt to register the SanCor Trademarks in any country.

10.2 **Indemnity:** SanCor will indemnify Fonterra and keep Fonterra indemnified from and against any and all claims, demands, actions and proceedings ("Claims") which are made or brought against Fonterra by any third party, that the use of the SanCor Trademarks or the sale, promotion or use of the Products bearing the SanCor Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

10.3 Fonterra will indemnify SanCor and keep SanCor indemnified from and against any and all Claims which are made or brought against SanCor by any third party that the use of the Fonterra Trademarks or the sale, promotion or use of the Products bearing the Fonterra Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such

claim, loss or damage.

10.4 **Fonterra Trademarks:** Use by Fonterra of its sales network for the purposes of this Agreement does not give SanCor any rights whatsoever in Fonterra's sales network or in any of the names, logos and/or other proprietary marks of Fonterra or its Associates ("Fonterra Trademarks"). SanCor is not authorised to use the Fonterra Trademarks in relation to any sale or promotion of the Products or any other products except with the express written agreement of Fonterra on a case by case basis. SanCor will not contest the ownership of any Fonterra Trademarks and not use or attempt to register the Fonterra Trademarks in any country.

## 11  Liability

11.1 **General indemnity:** Each party (the "indemnifying party") will indemnify and keep indemnified the other party from and against any direct loss, damage or liability (including legal fees and costs on a solicitor/client basis) suffered or incurred by that other party resulting from breach of this Agreement by the indemnifying party including any act, neglect or default of the indemnifying party's agents and employees.

11.2 **Excluded:** Neither party shall be liable to the other for any loss of profits or loss of income or savings or for any indirect or consequential loss or damage.

11.3 **SanCor indemnity:** SanCor shall indemnify and hold Fonterra harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by Fonterra arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of SanCor, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

11.4 **Fonterra indemnity:** Fonterra shall indemnify and hold SanCor harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by SanCor arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the

Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of Fonterra, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

## 12  Confidentiality

12.1  **Hold confidential:** The parties acknowledge and agree that:

    a.  the provision or disclosure by one party ("Disclosing party") to the other party ("Receiving party") intentionally or otherwise of marketing plans, manufacturing and technical information, pricing information and other matters arising from or relating to the supply of the Products or the business affairs of a party for the purposes or in connection with this Agreement in whatever form (the "Confidential Information") is confidential and of substantial value to and the property of the Disclosing party;

    b.  the Receiving party does not have any claim, right, title, property or other interest of any kind or nature in the Confidential Information; and

    c.  the Receiving party shall hold and maintain the Confidential Information in strictest confidence and in trust for the sole and exclusive benefit of the Disclosing party.

12.2  **Specific Information:** Fonterra has been engaged by SanCor due to Fonterra's international marketing network and experience in the sale of dairy products. Fonterra will be using that experience and it customer lists and contacts in marketing the Products to its existing and new customers. It is acknowledged by SanCor that all such customer lists are Fonterra's Confidential Information.

12.3  **Excluded:** For the purposes of this Agreement "Confidential Information" shall not include any information which:

    a.  is published or otherwise becomes generally available to the public other than as a result of disclosure by the Receiving party; and

    b.  becomes available to the Receiving party on a non-confidential basis from a source other than the Disclosing party provided that such source is not itself in breach of any obligation of confidentiality.

12.4  **Survival:** The obligations created under this Agreement to preserve the confidentiality of information disclosed by each party to the other shall not be

extinguished by and shall expressly survive termination of this Agreement during the period of three (3) years after the Date of Termination.

## 13 Force Majeure

13.1 **Force majeure:** Neither party shall be liable to the other for any failure to fulfil or perform any of its obligations under this Agreement, other than an obligation to pay money, if fulfilment has been delayed, hindered or interfered with, curtailed or prevented by any circumstance whatsoever which is beyond that party's reasonable control including without limitation where such failure is caused by war, civil commotion, hostility, Act of God, outbreak of disease, or governmental regulation or direction.

13.2 **Notice:** A party seeking relief from its obligations under this Agreement shall forthwith give notice to the other party of such impediment and its effects on the party's ability to perform. Notice shall also be given when the ground of relief ceases. Failure to give notice makes the failing party liable in damages for loss which otherwise could have been avoided.

13.3 **May terminate:** No curtailment or cessation of delivery of the Products pursuant to this clause 13 shall operate to extend this Agreement. If the curtailment or cessation of the delivery of the Products continues for more than 60 days either party may terminate this Agreement by written notice.

## 14 Dispute Resolution

14.1 Before commencing any legal or administrative proceedings in respect of any dispute arising in respect of, or in connection with, this Agreement (including the validity, breach or termination of it) ("Dispute"), a party must give the other party notice of the Dispute.

14.2 Following receipt of a notice under clause 14.1, each of the parties' Relationship Managers must meet to discuss the Dispute within ten Business Days of receipt of notice of the Dispute, with a view to achieving a resolution of the Dispute within 20 Business Days of receipt of that notice, or such longer period as the Relationship Managers agree in writing.

14.3 If the Relationship Managers fail to resolve the Dispute within 20 Business Days of notice of the Dispute, either party may take such legal action, including the commencement of legal proceedings, as is deemed appropriate or necessary by it to resolve or determine the Dispute in accordance with this Agreement or at law.

14.4 A party is not bound by clause 14.2 if the other party does not comply with that clause.

14.5 Nothing in clause 14.1 limits the rights of either party to seek interlocutory relief in respect of this Agreement or the other party's obligations under it.

## 15  Termination

15.1  **Acts of default:** Either party may terminate this Agreement immediately, if the other party:

   a.  breaches a provision of this Agreement and fails to remedy that breach within 30 days of written notice being given;

   b.  is, becomes, continues to be, or is deemed to be, insolvent or bankrupt; in spite of this, neither party does not have any other claim, right, title, property or other interest of any kind or nature

   c.  makes an assignment for the benefit of, or enters into or makes any arrangement or composition with, its creditors; in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature;

   d.  goes into receivership or has a receiver, trustee and/or manager (including a statutory manager) appointed in respect of all or any of its property;

   e.  is the subject of any resolution passed, or any proceeding commenced, for its winding up or liquidation (other than for the purpose of a solvent reconstruction); in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature; or

   f.  assigns the benefits of this Agreement without consent of the other party except as otherwise provided herein.

## 16  Miscellaneous

16.1  **Interest:** Where any amount due from SanCor to Fonterra or its Associates is not paid by the due date, or where Fonterra is requested by SanCor to pay in advance against Product, then Fonterra may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

16.2  Where any amount due from Fonterra to SanCor or its Associates is not paid by the due date, SanCor may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

16.3  **Waiver:** No failure on the part of either party to exercise, and no delay by

either party in exercising, any right under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.

16.4 **Compliance With Applicable Laws:** Each party shall comply with all applicable laws or regulations relating to the performance of its obligations under this Agreement and any transaction related to it, including without limitation, obtaining all necessary licences, permits, authorisations, and approvals required from any Governmental, provincial, or local department or agency applicable to the performance of its duties in this Agreement.

16.5 **Severable Agreement:** If any provision in this Agreement is held invalid or unenforceable in whole or in part then such invalidity or unenforceability shall affect only such provision or part thereof. To the extent legally permissible, an arrangement which reflects the original intent of the parties shall be substituted for such invalid or unenforceable provision.

16.6 **Counterparts:** This Agreement may be executed in two or more counterparts and may be executed on the basis of an exchange of facsimile copies.

16.7 **Amendments:** This Agreement may only be altered in writing signed by all the parties.

16.8 **Notices:** Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed duly given if given by personal service or sent by letter, email or facsimile addressed to the party to whom it is to be delivered at their address set out below or to such other address as that party shall have most recently notified in writing. Any notice served in accordance with this clause shall be deemed to have been duly served:

a. in the case of personal delivery, upon actual delivery to the correct address during the hours 8.30 am to 5.00 pm on a Business Day;

b. in the case of service by post 15 days after posting the same in a correctly addressed envelope;

c. in the case of transmission by fax or email on the next Business Day at the place of receipt of the fax or email.

Address for Fonterra:    Fonterra Limited
                         Fonterra Centre
                         9 Princes Street
                         Private Bag 92032
                         Auckland
                         New Zealand
                         Attn: General Counsel and Company Secretary

05/10/2007

17

Phone:  64 9 374 9049
Fax :    64 9 379 8281

Address for SanCor:     SanCor Cooperativas Unidas Limitada
                        Teniente General Richieri 15
                        S2322FYA Sunchales
                        Santa Fe
                        Argentina.]
                        Attn:
                        Phone:
                        Fax:

16.9 **Entire Agreement:**  This Agreement constitutes the entire agreement between the Parties in relation to its subject matter and supersedes and cancels any previous agreements and arrangements in respect of the services. The Parties have signed an Exclusive Sales and Marketing Agreement in December 2004 ("2004 Agreement"), which they agree, is cancelled as of 1 August 2007. The parties acknowledge and agree that neither party has any claim, right or title emerging from the 2004 Agreement.

16.10 **Sub-Agency:**  Fonterra may appoint a sub-agent with the prior written approval of SanCor but Fonterra shall remain fully responsible for meeting its obligations under this Agreement notwithstanding such appointment.

16.11 **Assignment:** Except as provided for in this clause, no party may assign this Agreement without the prior written consent of the other party.

16.12 **Relationship between the Parties:** Neither party shall have the authority to create or assume any obligations of any kind (whether express or implied) for or on behalf of the other party except as permitted by this Agreement. Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties for any purpose whatsoever.

16.13 **Governing Law:** The formation, validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of New Zealand. The parties irrevocably agree that the Courts of New Zealand shall have the non-exclusive jurisdiction to hear and determine all disputes under or in connection with this Agreement.   The parties irrevocably waive any objections to New Zealand as the forum for proceedings on the grounds of forum non-conveniens or any similar grounds.

SIGNED for and on behalf of

**FONTERRA LIMITED**

_____
Signature

_KALVIN WICKHAM_
Name

_1ST OCTOBER 2007_
Date

SIGNED for and on behalf of

_____
**SANCOR COOPERATIVAS UNIDAS LIMITADA**
Signature

_Claudio H. Ciprolotti_
Name

_22 Octobre 2007_
Date

## SCHEDULE 1

1.   PRODUCTS AND TERRITORIES

**Territory:**
All countries of the world except Argentina and sales or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A"). or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities.

**Products:**

Whole Milk Powder in 25 Kgs. Bags
Whole Milk blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
Skimmed Milk Powder in 25 Kgs. Bags
Skimmed Milk Powder blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
Butter in 25 Kgs. Blocks
Brine Salted cheese including Gouda by agreement
Mozzarella
Non gas-flushed regular whole milk powder in 25kg bags

SanCor agress that no Product that has failed to meet the original Specification, or such other specification as may have been agreed in writing between the parties, shall be re-processed by SanCor as product to be sold to Fonterra pursuant to his Agreement.

Products in consumer formats are specifically excluded from this Agreement, including 3.6kg loaves of gouda and mozzarella for sale via SanCor's existing distributors within Latin America.

2.   SUPPLY AND FORECASTING REGIME

On or before the 5th Business Day of the month, Fonterra shall provide SanCor with a rolling 18 month forecast of customer demand, by customer, by month. This forecast will include customer D1 (unconstrained demand), D1 contracted, previous AD (dedicated availability) and previous AU (unconfirmed availability).

Transparent customer payment term information will also be provided.

When this information is available from SAP APO Fonterra and SanCor will open the monthly process with a demand review meeting to capture variances from previous months and to set a baseline planning demand.

Once baseline planning demand is agreed SanCor will have 5 Business Days to use this demand signal to make product mix decisions and will propose a customer level supply plan (availability plan).

SanCor and Fonterra will meet on 10th Business Day of the month to sign off this availability plan.

Key outcomes of SanCor-Fonterra S&OP meeting:
- Formal milk supply and market update include forecast base price information.
- KPI review and corrective actions.
- Sign off of availability plan for release to NZ S&OP and market.
- Sales plan
- Inventory targets
- Agreed base pricing for SanCor products
- Marginal pricing for unforecasted production

In the case that during the monthly meeting an agreement cannot be reached between the parties on optimal placement opportunities for Product, SanCor may, on an exceptional basis, put forward for discussion proposals of business from Third Parties. If no suitable alternative business can be found through the Fonterra network, Fonterra will provide written approval for SanCor to execute these sales directly. No such sales may proceed without prior written approval.

3.    RELATIONSHIP MANAGERS

Fonterra:    Emma Parsons

SanCor:    Santiago Aon

4.    PRODUCT SPECIFICATIONS

[To be completed]

05/10/2007                                                                21

 **PDVSA**

BARIVEN, S.A.
c/o PDVSA Services, Inc.
Purchasing Agent (BU00)
1293 Eldridge Parkway
Houston, Texas 77077
United States of America

| Purchase order |
| :---: |
| **5100062284** |

**DATE** :March,26 2008
**CONTACT PERSON** :Jose Camacho
**TELEPHONE USA** : (281)5886478
**E-MAIL ADDRESS**:2815827511

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25

DON TORCUATO
ARGENTINA
POSTAL CODE: 00000 PO BOX: 0000000000      YOUR REF.  AGREEMENT
SALESPERSON / PHONE: Santiago Aon/11 54 4748
5300
FAX: 1147485390
**PDVSA SUPPLIER CODE:** 350014878

**INSTRUCTIONS FOR SUPPLIERS :**      **DELIVERY DATE** : December,30 2008
FOR SHIPPING INSTRUCTIONS CALL:

CFR -PUERTO CABELLO/LA GUAIRA, VENEZUELA
VENEZUELA

**INSTRUCTIONS FOR FREIGHT FORWARDER:**
**PLEASE CONTACT SUPPLIER FOR INLAND SHIPPING DETAILS**

**TERMS OF DELIVERY** : CFR PUERTO CABELLO/LA GUAIRA, VE
**PAYMENT TERMS.**   : Payable immediately Due net                **CURRENCY** : USD

**P.O. General Comments**

    PURPOSE OF CHANGE
    ==================
CHANGE ORDER NO. 03 IS ISSUED ON 26MAR08 BY JOSE CAMACHO
TO REPLACE THE P.O. 5100061354/XG6400004605 AND CREATED A NEW P.O. IN SAP IN ORDER TO
PROCESS THIS PURCHASE ORDER AS SAP SYSTEM REQUIRE, IN THIS MANNER WE SOLVED THE
TECHNICAL PROBLEM WITH THE ORIGINAL PURCHASE ORDER FOR THIS SUPPLIER.

PO VALUE DOES NOT CHANGE

PURPOSE OF CHANGE
==================
CHANGE ORDER NO. 02 IS ISSUED ON 20MAR08 BY JOSE CAMACHO
TO MODIFY THE PAYMENT ACCORDING THE AGREEMENT BETWEEN SUPPLIER AND PSI FINANCE. THE
PAYMENT TERMS ARE:

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PO VALUE DOES NOT CHANGE




**PDVSA**

Page: 2 of 1

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
| --- |
| **5100062284** |

PURPOSE OF CHANGE
=================
CHANGE ORDER NO. 01 IS ISSUED ON 12MAR08 BY JOSE CAMACHO
.* TO MODIFY THE DELIVERY TERMS FROM CFR - PUERTO CABELLO TO CFR - PUERTO CABELLO AND
LA GUAIRA PORT AT VENEZUELA.
.* TO MODIFY THE SHIPPING INSTRUCTIONS NOTE FOR THE SUPPLIER.

P.O. VALUE DOES NOT CHANGE
*******************************************
PRODUCT MUST BE PALLETIZED AND SECURELY BANDED FOR OCEAN TRANSPORT.
PRICES & TERMS PER AGREEMENT SIGNED 2.11.08 BETWEEN ARGENTINA & VENEZUELA.
DELIVERY: 10 MONTHS ARO WITH THE FOLLOWING SCHEDULE:
7,000 TM FROM MARCH TO JUNE 2008
11,000 TM FROM JULY TO DEC. 2008

*****************************************************************
-. "MANDATORY" WE NEED THE TECHNICAL AND NUTRITIONAL SPECIFICATIONS,
COPY OF THE FITOSANITARY, CERTIFCATE OF ORIGIN FROM YOUR PRODUCTS,
QUALITY CERTIFICATE FROM THE PRODUCTS PLANTS.

-. "MANDATORY" SUPPLIER MUST SEND THE DELIVERY SCHEDULE AND PLANT LOCATIONS BY EMAIL
IN ORDER KNOW THE LOGISTICS AND COORDINATE THE INSPECTIONS BY PSI TO:
JUAN JOSE BASTARDO, EMAIL: BASTARDOJJ@PSI.PDV.COM.
MARIA ROBLES, EMAIL: ROBLESM@PDVSA.COM
PABLO RODRIGUEZ, EMAIL: PRODRIGUEZ@PSI.PDV.COM

*****************************************************************

***********************************************************************
IF SUPPPLIER FAILS TO PROVIDE A P.O. ACKNOWLEDGMENT WITHIN THE
SPECIFIED PERIOD (48 HOURS), THEN SUCH P.O. SHALL BE DEEMED
ACCEPETED BY SUPPLIER.
***********************************************************************

**Shipping Marks**
BARIVEN, S.A./PDVSA PETROLEO/MYM PUERTO
5100062284/XG64004713

VAL-VALENCIA
via :PUERTO CABELLO, VENEZUELA
PRIORITY LEVEL: 3
FIELD EXPEDITING: N
INSPECTION FLAG: Y

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
| --- | --- | --- | --- | --- | --- | --- |

 **PDVSA**

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
|---|
| **5100062284** |

---

00001    **18.000   Metric Ton**, ENRICHED POWDER    5.000,00    90.000.000,00

---

Harmonized Tariff Code   : 0402211900

**Material purchasing text**
ENRICHED POWDERED MILK WITH VITAMINS A AND D

IT IS THE PRODUCT OBTAINED BY ELIMINATING ALMOST ALL OF THE WATER THAT CONSTITUTES
MILK.

1. REQUISITES:

" MUST BE FREE OF PRESERVATIVES, NEUTRALIZERS, TOXIC SUBSTANCES OR ANY STRANGE MATTER.

" MUST BE OF WHITE YELLOWISH COLORING AND HOMOGENEOUS THROUGHOUT,CHARACTERISTIC OF
SIMILAR PRODUCTS.

" MUST BE EXEMPT OF STRANGE ODORS AND TASTE SIMILAR TO ITS NATURE.
" MUST BE A HOMOGENEOUS POWDER, CONGLOMERATED, EXEMPT OF ANY
NON-INCLUSIVE MATTER, FREE OF ANY BURNED PARTICLES AND STRANGE MATTER.


2. PHYSIOCHEMICAL REQUIREMENTS:

CHARACTERISTICS LIMITS (%)
HUMIDITY MAX. 3,5
FAT MIN. 26,0  MAX. 27,0
PROTEÍNS MIN. 24,5
CHLORIDES MIN. 0,07  MAX. 0,11
ASH MAX. 5,9
ACIDITY (G AC.LACTIC/100G) MAX. 1,35
FAT FREE MAX. 2,0
LACTOSE MIN. 34,0
INSOLUBILITY INDEZ (ML) MAX. 0,5
BURNEO PARTICLES MAX. B-15N

VITAMIN A MIN. 960 (UG/100G)   MIN. 3200 (UI/100G)
VITAMIN D3 MIN. 8 (UG/100G)    MIN.320 (UI/100G)


3. MICROBIOLOGIC REQUISITES:

CHARACTERISTICS (UFC/G) LIMITS

AEROBIOS MESÓFILOS  MIN. 5,0 X 103   MAX. 1,0 X 104
MOLD  MIN. 1,0 X 102   MAX. 1,0 X 103
SALMONELLA IN 25G 0
COLIFORM (NMP/G) MIN. 3   MAX. 7



**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
| :---: |
| **5100062284** |

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
| --- | --- | --- | --- | --- | --- | --- |

S.AUREUS MIN. 10 MAX. 1,0 X 102
LISTERIA MONOCYTOGENES EN 25G 0
ESPORA TERMOFILE MIN. 1,0 X 102   MAX. 1,0 X 103


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
LECHE EN POLVO ENTERA CON VITAMINAS A Y D.
NORMA CONSULTADA COVENIN 1481:2001.

REQUISITOS:

" DEBE ESTAR LIBRE DE PRESERVATIVOS, NEUTRALIZANTES, SUSTANCIAS TOXICAS Y MATERIAS
EXTRAÑAS.

" DEBE SER DE COLOR BLANCO AMARILLENTO HOMOGÉNEO, CARACTERÍSTICO DEL PRODUCTO.

" DEBE ESTAR EXENTO DE OLORES Y SABORES EXTRAÑOS A LA NATURALEZA DEL MISMO.

" DEBE SER UN POLVO HOMOGÉNEO, AGLOMERADO, EXENTO DE GRUMOS COMPACTOS, LIBRE DE
PARTÍCULAS QUEMADAS Y DE MATERIA EXTRAÑA.
ENRICHED POWDERED MILK WITH VITAMINS A AND D


**Additional technical specs.**

ENRICHED POWDERED MIL WITH VITAMINS A AND D

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*
LECHE EN POLVO.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
LECHE EN POLVO MODIFICADA ENRIQUECIDA CON VITAMINAS & MINERALES
APTA PARA CONSUMO INFANTIL

ROTULADO: SEGUN ARTE GRAFICO SUMINISTRADO POR PDVAL
PRESENTACION:  EN BOLSAS TRILAMINADAS DE 1 KG.

ENTREGAS: MARZO – ABRIL 2008

CARGA: APPROX. 17 TM POR CONTENEDOR DE 40" DRY HIGH CUBE, PALETIZADO

 **PDVSA**

Page: 5 of 1

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

**Purchase order**

**5100062284**

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|
| | | Gross Price | | | | 90,000,000.00 |
| | | Net value | | | | 90,000,000.00 |

**Purchase order total value**          **90,000,000.00** USD

**P.O. General terms**

\*\*\* DOC. B0021, REV. E (06.13.2007) \*\*\*

DELIVERY
========
10 MONTHS ARO WITH THE FOLLOWING SCHEDULE:
7,000 TM FROM APRIL TO JULY 2008
11,000 TM FROM JULY TO DEC. 2008

LINE ITEMS MUST SHIP COMPLETE.
PARTIALS ARE ALLOWED PER SCHEDULE ABOVE

ESTIMATED WEIGHT:  SELLER TO ADVISE

NEW MATERIAL
============
MATERIAL MUST BE IN NEW CONDITION, FREE FROM DEFECTS AND SUITABLE FOR ANY SERVICE SPECIFIED, UNLESS OTHERWISE STATED.

ORDER ACKNOWLEDGEMENT
=====================
SELLER MUST ACKNOWLEDGE RECEIPT OF THIS FAX/EDI PURCHASE ORDER WITHIN 48 HOURS A.R.O. VIA E-MAIL, AND ADVISE AND CONFIRM SHIPPING DATE, BY PROVIDING THE FOLLOWING INFORMATION:

    - OUR REFERENCE (PO) NUMBER _____
    - CONFIRMED DELIVERY DATE    _____
    - YOUR REFERENCE NUMBER      _____
    - YOUR EXPEDITING CONTACT    _____
    - TELEPHONE NUMBER           _____
    - FACSIMILE NUMBER           _____
    - DRAWINGS SUBMITTAL DATE    _____ (as applicable)

ORDER ACKNOWLEDGEMENT MUST BE E-MAILED WITH OUR P.O. NUMBER IN THE SUBJECT LINE, TO PDVSA SERVICES EXPEDITING DEPARTMENT AT OAINBOX@PSI.PDV.COM
---------------------------------------------------

 **PDVSA**

**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
|---|
| **5100062284** |

**Terms of delivery**

GENERAL INSTRUCTIONS:

AIR FREIGHT VIA MAIQUETIA:
1. Consign Master AWB to: Forwarder's office in Maiquetía.
2. Consign House AWB to:  First line of shipping marks.

Notify Party :
Clover Internacional C.A.

Address:
Aduana Aérea de Maiquetía Detrás del Almacén de Avensa y  al lado de Alitalia Carga. Maiquetía, Estado Vargas.
Venezuela. / Fax: 01158(212)331-3786
Attn: (Operations Manager)
Telephone: 01158(212)331-3301
Email:amarilis.galdona@clovergroup.com.ve/ciganal@pdvsa.com

Contacts:
Yubelis Munoz - yubelis.munoz@clovergroup.com.ve / 58(212)331-1103
Onelia Torres - onelia.torres @clovergroup.com.ve / 58 212 - 331-3304
Liliana Cigana - Ciganal@pdvsa.com / 0212-958- 04.90/ 0416- 980.99.04
Grazia Fiore  Graziaf@pdvsa.com / 0212-958-04.900 / 0414-235.98.37

OCEAN FREIGHT VIA LA GUAIRA:
Consign B/L as shown on the first line of the purchase order shipping marks.

Notify Party :
Clover Internacional C.A.

Address:
Aduana Aérea de Maiquetía detrás del Almacén de Avensa y  al lado de Alitalia Carga.Maiquetía, Estado Vargas.
Venezuela. / Fax: 01158(212)331-3786
Attn: (Operations Manager)
Phone: 01158(212)331-3301
Email: amarilis.galdona@clovergroup.com.ve/ciganal@pdvsa.com

Contacts:
Yubelis Munoz - yubelis.munoz@clovergroup.com.ve / 01158(212)331-1103
Onelia Torres onelia.torres@clovergroup.com.ve / 01158(212)331-3304
Liliana Cigana Ciganal@pdvsa.com / 0212-958-04.90/0416-980.99.04
Grazia Fiore Fioreg@pdvsa.com  / 0212-958-04.900414-235.98.37

OCEAN FREIGHT VÍA PUERTO CABELLO:
Consign B/L as shown on the first line of the purchase order shipping marks.

Notify Party:
Clover Internacional C.A.

Address:
Calle Mariño con Calle Guevara,
Edificio Centro Profesional Gaba, Oficina 3.
Puerto Cabello, Estado Carabobo
Venezuela. / Fax: 01158(242)362-0210
Attn: Luis Vera (Customs Coordinator) / ciganal@pdvsa.com
Telephone: 01158(242)367-5010/361-4244

Contacts:
Luis Vera - luis.vera@clovergroup.com.ve / 01158 (242)367-5010/361-4244
Iliana Vasquez - iliana.vasquez@clovergroup.com.ve / 01158(241)8741157
Vanessa Diaz vanessa.diaz@clovergroup.com.ve / 01158(241)8741157
Miroska Goitia Goitiams@pdvsa.com / 0414-235.92.60
Liliana Cigana Ciganal@pdvsa.com /  0212-958- 04.90/ 0416- 980.99.04
Grazia Fiore - Graziaf@pdvsa.com / 0212-958-04.900 / 0414-235.98.37

EXPORT DOCUMENTS:
The following shipping documents are required by the Venezuelan Government for customs clearance. All shipments must be sent on freight
prepaid basis and should be consigned in all shipping documents, AWB, B/L as follows:

1. B/L or AWB: Consigned as shown on the first line of the purchase order shipping marks.



**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

**Purchase order**

**5100062284**

2. COMMERCIAL INVOICE
  a. Prepare one invoice per shipment per Order.
  b. The invoice should be consigned as shown on the first    line of the purchase order shipping marks.
  c. All shipper's invoices must specify the following    information:
    i. Invoice date and number.
    ii. PDVSA SERVICES INC. Purchase Order Number and    Requisition Number.
    iii. Delivery terms. / Payment terms.
    iv. Purchase Order Item Numbers as shown in Purchase    Order.
    v. Number and description of goods.
    vi. Tariff Number and Spanish Description, if given, for    Purchase order. If more than one is given indicate    each one with the corresponding item.
    vii. Gross & Net weight of commodity.
    viii. Value & Dimensions of commodity.
    ix. County of origin.

3. INSPECTION CERTIFICATES: Agriculture exporters are frequently  required to provide a certificate attesting to the condition  of the goods shipped.
4. PHYTOSANITARY CERTIFICATE: This certificate must be  issued by a certifying official (Federal, State or Local).
5. CERTIFICATE OF ORIGIN: This certificate must be issued by a  certifying official.

Original Export documentation:
Documents for all ocean shipments are required to be in possession of Bariven-Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuela Port of unlading. Att: Liliana Cigana / Grazia Fiore.

Send the required originals to:
BARIVEN - ADUANAS PDVSA AGRICOLA
CENTRO EMPRESARIAL EUROBUILDING
PISO 10 - OFIC. 22
Phone: 58212-958-04.90 - Fax: 58212-958-00.20

Perishable Shipments:
- All documents associated with perishable goods must specify  the temperature that the goods must be kept at in both  Celsius and  Fahrenheit scales.
- The documents should indicate directly whether the goods  should  be REFRIGERATED or FROZEN. (Preferred temperature  should be clearly marked on the cargo)
- Perishable and non perishable cargo must not be shipped  together on the same bill of lading or in the same  consolidation. Each  category of material must be shipped  and documented separately.

REQUIRED EXPORT DOCUMENTS AND DISTRIBUTION:

(OCEAN)
DOCUMENT    CUSTOMS BROKER / PSI
Original Bill of Lading    4/1
Copies of B/L    2/1
Commercial Invoice Original    4/1
Commercial Invoice copies  2/1
Export packing list 4/1
Certificates (if any)    2/1

(AIR)
DOCUMENT    CUSTOMS BROKER / PSI
Original Airway Bill    4/1
Copies of AWB 2/1
Commercial Invoice Original    4/1
Commercial Invoice copies  2/1
Export packing list 4/1
Certificates (if any)    2/1

Note: SHOW PURCHASE ORDER SHIPPING MARKS ON ALL DOCUMENTS.

PACKAGING AND LABELING:

AS OF APRIL 2006 WOODEN PACKING TO VENEZUELA MUST SHOW A MARKING THAT THE WOOD WAS EITHER TREATED WITH METHYL BROMIDE OR HAS BEEN HEAT TREATED AND DOES NOT PRESENT/DISPLAY EVIDENCE OF QUARANTINE PESTS. ALL WOOD USED IN THE BOXING/CRATING, PALLETIZING, SKIDDING, OR BLOCKING AND BRACING OF THE MATERIAL ON THIS PURCHASE ORDER MUST HAVE UNDERGONE SUFFICIENT PROCESSING OR TREATMENT IN COMPLIANCE WITH ISPM 15 OF THE INTERNATIONAL PLANT PROTECTION CONVENTION (IPPC) ENTITLED "GUIDELINES FOR REGULATING WOOD PACKAGING MATERIAL IN INTERNATIONAL TRADE". ALL WOOD SUBJECT TO THIS REGULATION SHALL BE MARKED AS SPECIFIED IN ANNEX II OF THE REGULATION. NON-CONFORMANCE WILL RESULT IN CONFISCATION OF THE ENTIRE SHIPMENT BY VENEZUELAN PORT/AIRPORT AUTHORITIES. FOR SPECIFIC DETAILS, PLEASE REFER TO THE IPPC WEBSITE: WWW.IPPC.INT.


# PDVSA

**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
| :---: |
| **5100062284** |

ALL CARGO DESTINED TO VENEZUELA MUST BE SUFFICIENTLY PACKED TO WITHSTAND THE RIGORS OF INTERNATIONAL TRANSPORT. PACKAGING MUST RESIST: THE ROUGH HANDLING DURING LOADING AND UNLOADING; COMPRESSION FROM THE OVERHEAD WEIGHT OF OTHER CONTAINERS; IMPACT AND VIBRATION DURING TRANSPORTATION; AND HIGH HUMIDITY DURING PRECOOLING, TRANSIT, AND STORAGE.

A. PACK MATERIALS IN ONE OF THE FOLLOWING WAYS:
- SHIPPING UNITS: EACH UNIT OF FREIGHT, TENDERED TO A CARRIER AS LISTED AND DEFINED ON BILL OF LADING. DO NOT COMBINE DIFFERENT ORDERS IN ONE SHIPPING UNIT.
- INTERIOR PACKAGES: EACH UNIT PACKAGE COMBINED WITH OTHER PACKAGES TO MAKE-UP A SHIPPING UNIT. THEY MUST CONSIST OF ONLY ONE ORDER ITEM (ANY QUANTITY).

B. PACKING LIST: ATTACHED TO EXTERIOR OF AT LEAST ONE SHIPPING U NIT.ADDITIONAL PACKING LISTS MUST BE INSIDE OF ENCLOSED S HIPPING UNITS.

MARKING: (MUST BE PERMANENT/WATERPROOF)
A. INTERIOR PACKAGES: MARK OR TAG WITH ORDER NUMBER.
- ITEM NUMBER.
B. SHIPPING UNITS: MARK ON TWO ADJACENT SIDES OR TAG:
- "SHIPPING MARKS" AS SPECIFIED IN THE PURCHASE ORDER /ORDER AND ITEM NUMBER (IF A ONE-ITEM SHIPPING UNIT) /OVERALL DIMENSIONS IN CENTIMETERS / GROSS WEIGHT IN KILOGRAMS
C. SHIPPING UNIT NUMBERS: NUMBER EACH SHIPPING UNIT BEGINNING WITH NUMBER 1 IN MULTIPLE SHIPMENTS, NUMBER UNITS CONSECUTIVELY INDICATING TOTAL UNITS IN THE LOT (I.E. 1 OF 4, 2OF 4, ETC.). ENCLOSED ATTACH PACKING LIST TO SHIPPING UNIT NUMBER 1.
D. PACK ING LIST: SHOW FOR EACH ORDER ITEM LISTED:
- PURCHASER'S STOCK NUMBER (IF GIVEN IN ORDER) / GOOD'S DESCRIPTION.
E. NUMBER:
- SHIPPING UNIT NUMBER (IF MORE THAN ONE). / "SHIPPING MARKS" AS SPECIFIED IN THE PURCHASE ORDER.

F. FOR PERISHABLE AND NON-PERISHABLE FOOD PRODUCTS:

 PLEASE INDICATE THE FOLLOWING:

STORAGE TEMPERATURE_____ (INDICATE º F OR º C).

REFRIGERATED OR FROZEN OR DRY (CHOOSE ONE)

PLEASE USE COLORED LABELS TO CATEGORIZE EACH CASE/CRATE:

GREEN: REFRIGERATED
BLUE: FROZEN
RED: DRY/NON PERISHABLE

PRE-SHIPMENT ADVICE:
PRE-ALERT MUST SHOW DEPARTURE DATE AND PORT CITY, PORT OF DESTINATION AND ETA, VESSEL NAME AND VOYAGE NUMBER, BILL OF LADING NUMBER AND DATE, NAME OF SHIPPING LINE, PURCHASE ORDER NUMBER AND REQUISITION NUMBER (SECOND LINE OF P.O. SHIPPING MARKS).

THE FOLLOWING ATTACHMENTS MUST BE INCLUDED AS WELL:
1. EXECUTED BILL OF LADING,
2. EXPORT PACKING LIST AND COMMERCIAL INVOICE.
4. PHYTOSANITARY CERTIFICATES
5. CERTIFICATE OF ORIGIN
6. OTHER CERTIFICATES REQUIRED.

PRE-SHIPMENT ADVICE AND COPY OF EXPORT DOCUMENTS TO:
PDVSA (TRAFFIC & CUSTOMS) - VENEZUELA
Nº NAME    EMAIL
1. LILIANA CIGANA  CIGANAL@PDVSA.COM
2. FERNANDO VELASQUEZ  VELASQUEZFN@PDVSA.COM
3. MARIA ROBLES   ROBLESMS@PDVSA.COM
4. JUAN CARLOS RIVAS  ELBOTIJAJC@CANTV.NET
5. KARIN RODRIGUEZ  RODRIGUEZKK@PDVSA.COM
6. DONNATY DURAN  DURANDS@PDVSA.COM
7. ASDRUBAL DIAZ  DIAZAAL@PDVSA.COM
8. GRAZIA FIORE   FIOREG@PDVSA.COM
9. DUBRASKA RODRIGUEZ  DUBRASKAAR@GMAIL.COM
10. IRANOR ANDRADE  ANDRADEIR@PDVSA.COM
11. JOSE ROMERO  JOSEROMERO@ANDROMEDA.COM.VE
12. YOANNA SALAZAR  YOANNASALAZAR@ANDROMEDA.COM.VE
13. ANGEL RODRIGUEZ  ANGELRODRIGUEZ@ANDROMEDA.COM.VE
14. OSMAR NIETO  OSMARYNIETO@GMAIL.COM

Case 1:19-cv-10796-DLC   Document 114-35   Filed 04/16/20   Page 102 of 140

 **PDVSA**

| | Purchase order |
|---|---|
| **SUPPLIER:** | **5100062284** |

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

15. JUAN CARLOS RIVAS  ELBOTIJAJC@CANTV.NET ONLY SHIPMENTS       VIA LA GUAIRA
16. MIROSKA GOITIA   GOITIAMS@PDVSA.COM ONLY SHIPMENTS VIA       PUERTO CABELLO.
17. IRANOR ANDRADE   ANDRADEIR@PDVSA.COM

PSI (LOGISTICS DEPARTMENT) - HOUSTON
Nº NAME   EMAIL   PHONE
1. JUAN JOSE BASTARDO BASTARDOJJ@PSI.PDV.COM  (281) 5886474
2. PSI DATA BASE  DOCUMENT@PSI.PDV.COM

**Terms of payment**

PROGRESS/ADVANCE PAYMENT INVOICES
=================================

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PROGRESSIVE PAYMENTS SHALL BE BASED ON THE ORIGINAL PURCHASE ORDER VALUE.  ANY ADDITIONS TO THE PURCHASE
ORDER VALUE SHALL BE INCLUDED IN THE SUPPLIER'S FINAL INVOICE.

**Requir docs/Inspec/Field Exped**

FIELD INSPECTION REQUIREMENT
(DOC. TR050, REV.F, 05-Feb-08 )
-----------------------------------------------------
1. THIS PURCHASE ORDER OR RFQ (WHEN APPLICABLE) HAS BEEN CODED FOR FIELD TECHNICAL INSPECTION PRIOR TO
SHIPMENT. THIS MEANS A QUALIFIED INSPECTOR WILL INSPECT THE EQUIPMENT FOR COMPLIANCE TO QUOTE, PURCHASE
ORDER, AND ANY OTHER APPLICABLE INDUSTRY STANDARD OR SPECIFICATION.
2. PRODUCT, EQUIPMENT, OR MATERIAL INSPECTION MUST BE PERFORMED BEFORE PACKAGING FOR SHIPMENT. THE
PURCHASER'S INSPECTION DOES NOT RELIEVE THE MANUFACTURER OR THE SELLER FROM COMPLIANCE TO ALL PURCHASE
ORDER REQUIREMENTS.
3. PRODUCT, EQUIPMENT OR MATERIAL MUST NOT LEAVE YOUR FACILITIES UNTIL THE ASSIGNED INSPECTOR OR DESIGNATED
INSPECTION AGENCY HAS ISSUED A RELEASE AUTHORIZING SHIPPING OF THE PRODUCT OR EQUIPMENT.
4. THE VENDOR IS REQUIRED TO PROVIDE THE FOLLOWING INFORMATION:
4.1 LOCATION OF WHERE INSPECTION CAN BE PERFORMED.
4.2 CONTACT NAME, PHONE NUMBER, & EMAIL ADDRESS OF THE PROJECT MGR.
5. DOCUMENTATION REQUIREMENTS
( THIS NOTE APPLIES TO TECHNICAL DOCUMENTS NOT INCLUDING INVOICES OR SHIPPING DOCUMENTS)
5.1. ONE COPY OF ALL THE REQUIRED DOCUMENTS MUST SHIP WITH THE EQUIPMENT. THIS INCLUDES TECHNICAL DOCUMENTS
SUCH AS MATERIAL TEST REPORTS, NONDESTRUCTIVE TEST REPORTS, QA CERTIFICATES/CONFORMANCE, PRINTS, MECHANICAL
OR PERFORMANCE TEST RESULTS, AND OTHER APPLICABLE DOCUMENTS.
5.2 TWO HARD COPIES (DATABOOKS) AND TWO ELECTRONIC COPIES (CD'S OR VIA EMAIL (AS APPLICABLE)) MUST BE SHIP TO:
PDVSA SERVICES, INC. // CITGO BLDG
ATTN: PETER BERNSTEIN N2061
1293 ELDRIDGE PKWY
HOUSTON, TX. 77077
5.3 FOR DELIVERY OF DOCUMENTS ELECTRONICALLY, SEND THEM TO: TECHDOCS@PSI.PDV.COM
5.4 THE PDVSA SERVICES PURCHASE ORDER NUMBER MUST BE LISTED ON THE SUBJECT LINE OF THE EMAIL. IF PARTIAL
DOCUMENTATION IS SUBMITTED, THE EMAIL MUST CLEARLY IDENTIFY TO WHICH LINE ITEM(S) THE DOCUMENTS BELONG TO.
5.5 THE PO NUMBER AND THE PO ITEMS MUST BE CLEARLY IDENTIFIED IN EACH DOCUMENT.

5.6 FOR PURCHASE ORDERS PLACED IN EUROPE OR WHERE THE MATERIAL IS COMING FROM EUROPE, ELECTRONIC DOCUMENTS
CAN BE SUBMITTED TO: INSPECTION@PDVSA.NL
5.7 Send hard copies to:
PDVSA SERVICES BV
ATTN. TECHNICAL SERVICES DEPARTMENT
PRESIDENT KENNEDYLAAN 19
2517 JK THE HAGUE
THE NETHERLANDS
*************************************
6. ANY QUESTIONS REGARDING THIS INSPECTION REQUIREMENT, FORWARD EMAIL TO prodriguez@psi.pdv.com or
bernsteinp@psi.pdv.com or iguedez@psi.pdv.com. For purchase orders placed in Europe, please contact: inspection@pdvsa.nl
-----------------------------------------------------

 **PDVSA**

**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
|---|
| **5100062284** |

IMPORTANT INSTRUCTIONS TO SELLER
(Doc. Z_ME_PO_GEN_BU00, rev.7, 11-14-2005)

If this Document is issued from BARIVEN, S.A. c/o PDVSA Services, Inc., follow instruction:

INSTRUCTION

Unless covered by a Blanket Purchase Agreement, this purchase order is subject to the present standard BARIVEN, S.A. c/o PDVSA Services, Inc. Terms and Conditions which are already in your possession. In the event that you do not have the above mentioned Terms and Conditions, please advise us. Otherwise, acceptance of this purchase order signifies your     acknowledgement, understanding, and acceptance of said Terms and Conditions.

If this order is covered by an Outline Agreement, the Terms and Conditions of the Outline Agreement number mentioned on the item(s) of this purchase order apply to this document.

Seller must acknowledge receipt of this purchase order within five days A.R.O. and must advise, or confirm, seller's shipping date. This acknowledgement is to be sent to PDVSA Services Inc., Expediting Department Attn. Mrs Gloria Robinson

Assignment of Credit Facility:
This purchase order may be selected for financing through a credit facility. Seller may be required to provide additional information or documentation required by the financial institution. If this is the case, our Finance Department will send further instructions.

Packing, Marking, Invoicing and Shipping Instructions:

As of April 2006 wooden packing to Venezuela must show a marking that the wood was either treated with methyl bromide or has been heat treated and does not present/display evidence of quarantine pests. All wood used in the boxing/crating, palletizing, skidding, or blocking and bracing of the material on this Purchase Order must have undergone sufficient processing or treatment in compliance with ISPM 15 of the International Plant Protection Convention (IPPC) entitled "Guidelines for Regulating Wood Packaging Material in International Trade". All wood subject to this regulation shall be marked as specified in Anex II of the regulation. Non-conformance will result in confiscation of the entire shipment by Venezuelan port/airport authorities. For specific details, please refer to the IPPC website: www.ippc.int.

Do not dispatch until you have read and understood our packing, marking, invoicing, and shipping instructions for sellers, as follows:
1. For domestic deliveries FOB/FCA to our USA forwarders, FOB Seller's Plant, Exworks, from North America and Mexico, please use instructions on standard note B0010, attached to our purchase order.
2. For International Ocean Freight deliveries to Venezuela by the Seller, use instructions on the applicable standard notes B0030-B0041, B0056-B0059, attached to our purchase order.
3. For International Air and Ocean Freight deliveries to Curacao by the Seller, use instructions on note B0042, attached to our purchase order.
4. For International Air Freight deliveries by the seller to Venezuela via Maiquetia, use instructions on the applicable standard notes B0043-B0055, attached to our purchase order.

These forms, an integral part of this document, are already in your possession, extra copies available on request, from Juan Jose Bastardo at: email: bastardojj@psi.pdv.com, or ph. 281.588.6474

General Invoicing Instructions

Follow each of the applicable instructions attached to the respective purchase order, because they will change according to the agreed-to delivery terms.

Your Bank Account and Routing Information must be included on your invoice. All payments are processed via "ACH" (Automatic Clearing House) electronic funds transfer.

Seller will send Invoices to:

BARIVEN, S.A.
c/o PDVSA Services, Inc.
P.O. Box 4403
Houston, Texas 77210 USA
Attn: Accounts Payable
Contact Person: Tim Marshman.
Phone: (281) 588-6253; Fax: (281) 582-7578

If using courier services, please use the street address:

BARIVEN, S.A.
c/o PDVSA Services, Inc.
1293 Eldridge Parkway,
Houston, Texas 77077 USA
Attn: Accounts Payable
Contact Person: Tim Marshman.
Phone: (281) 588-6253; Fax: (281) 582-7578

We require one original invoice with attached copies of your packing list and all supporting documents when charges other than material costs



**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
| --- |
| **5100062284** |

have been required by the Buyer and quoted by the Seller, such as Inland Freights, Over Time, Export Packing, Special Handling, etc.

Please show our Purchase Order (PO) number and shipping marks on all invoices. Our standard invoice processing is, upon delivery in accordance with PO delivery terms, 100% net 30 days after receipt and approval of your invoice, unless otherwise specified in this Purchase Order.

DESTINATION CONTROL STATEMENT:

According to U.S. Export Administration Regulations, Chapter 758.6,
"These commodities, technology or software will be exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited." Ultimate destination as per shipping marks in the Purchase Order.

The DCS is required for all exports from the United States of items on the Commerce Control List that are not classified as EAR99. The person responsible for preparation of, the invoice and on the bill of lading, air waybill, or other export control document that accompanies the shipment from its point of origin in the United States to the ultimate consignee or end-user abroad is responsible for entry of the DCS.

NOTE TO SUPPLIERS:

Invoices will not be processed unless all export or quality documents are provided.

Regards,
Bariven, S.A.- C/O. PDVSA Services, INC.
Purchasing Agent

**SOLICITUD DE DESEMBOLSO**

Buenos Aires, 24 de Septiembre de 2008

Sres.
**IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Domicilio: Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE
Amsterdam, The Netherlands
At.:

De nuestra consideración:

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y **SANCOR COOPERATIVAS UNIDAS LIMITADA** con fecha 30 de Noviembre de 2007, modificado mediante Enmiendas de fecha 11 de Junio de 2008 y 24 de Septiembre de 2008 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula TERCERA del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

(i)      El monto del desembolso solicitado mediante la presente es de US$ 1.452.408,89 (Dólares Estadounidenses UN MILLON CUATROCIENTOS CINCUENTA Y DOS MIL CUATROCIENTOS OCHO CON 89/100).

(ii)     La/s Fecha/s de Vencimiento del desembolso antes requerido será/n la/s siguiente/s:

| VTO. | MONEDA | V/N |
|------|--------|-----|
| 01 de Julio de 2009 | US$ | 800.000,00 |
| 03 de Agosto de 2009 | US$ | 800.000,00 |
| | US$ | 1.600.000,00 |

(iii)    La Suma Adeudada por dicho desembolso asciende a un total de US$ 1.600.000,00 (Dólares Estadounidenses UN MILLON SEISCIENTOS MIL con 00/100), comprensivo del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas.

(iv)     Adjuntamos a la presente un Pagare a vuestro favor, pagadero a la vista, por la suma total de US$ 1.600.000,00 (Dólares Estadounidenses UN MILLON SEISCIENTOS MIL con 00/100)

| Fecha Emisión | Fecha Vto. | Moneda e Importe |
|---------------|------------|------------------|
| 24/Septiembre/2008 | A la vista | US$ 1.600.000,00 |

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso requerido a la cuenta del mutuario que a continuación se indica:

| | |
|---|---|
| BANCO: | STANDARD CHARTERED BANK  – NEW YORK – USA |
| DIRECCIÓN: | One Madison Ave, New York, NY 10010-3603, USA |
| ABA: | 026002561 |
| CHIPS UID: | 011575, 404782 |
| CODIGO SWIFT: | SCBLUS33XXX |
| CUENTA Nro.: | 3544034620001 |
| A NOMBRE DE: | BANCO SANTANDER RIO |
| CÓDIGO SWIFT: | BSCHARBA |
| A FAVOR DE: (Campo 59) | SANCOR COOPERATIVAS UNIDAS LIMITADA |
| CUENTA CORRIENTE N°: | 9761/1 |
| CONCEPTO: | PREFINANCIACION DE EXPORTACIÓN |

Sin otro particular, saludamos a Uds. atentamente.

Por: *SANCOR COOPERATIVAS UNIDAS LTDA.*
Nombre: Mario Magdalena
Carácter: Apoderado

Por: *IIG TOF B.V.*
Nombre:
Carácter: Trust International Management (T.I.M.) B.V.
Managing Director

Firma/s certificada/s en Foja
N°...F.00.U.G.008.01
Bs. As.....24-9-2008

MARTIN R. ARANA
ESCRIBANO
MAT. 4376

MARTIN R. AF
ESCOBAI
MAT. 13



**ACTA DE CERTIFICACION DE FIRMAS**
**LEY 404**






F 004606671

1   **Buenos Aires,**   24 de   Septiembre   de   2008   . En mi carácter de escribano

2   Titular del Registro Notarial Nº 841

3   **CERTIFICO: Que la/s**   firma/s   que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número   131 del LIBRO

6   número   102   , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144.-

9   Manifiesta actuar en su carácter de apoderado de la sociedad "SANCOR

10  COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Pro-

11  vincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Nacional de

12  Cooperativas, de la Provincia de Santa Fe, Departamento Castellanos,

13  conforme lo acredita con el poder de fecha 23 de junio de 1993, pasado al

14  folio 638 del Registro 200 de la ciudad de Sunchales, Provincia de Santa

15  Fe, a cargo del escribano Horacio Remondino, la documentación relacio-

16  nada tengo a la vista y le confiere facultades suficientes para suscribir el

17  documento adjunto, doy fe.-

18

19

20

21

22

23   

24

25





F 004606671

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50

## PAGARE (sin protesto)

Buenos Aires, 28 de Noviembre de 2008.

**US$ 2.350.000,00.-**

A la vista, por igual valor recibido, *SANCOR COOPERATIVAS UNIDAS LTDA.* una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3ª Piso - Capital Federal, República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a **IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en Av. Leandro N. Alem 1050, piso 13 - (C1001AAS) Buenos Aires, República Argentina, la suma neta de Dólares Estadounidenses **DOS MILLONES TRESCIENTOS CINCUENTA MIL CON 00/100 (US$ 2.350.000,00)**, en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagares que el deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor –además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del 13,00% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en éste Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:

Deudor: Tacuarí 202 - 3ª Piso - Capital Federal, República Argentina
     SanCor Dairy Corporation - 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003

Acreedor: Av. Leandro N. Alem 1050, piso 13 - (C1001AAS) Buenos Aires, Argentina,
     con copia: Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam

d) Las notificaciones efectuadas de la manera establecida en la acápite "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

**Deudor**

Por: *SANCOR COOPERATIVAS UNIDAS LTDA.*
Nombre: Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
Nº F 00 4 7 5 4 8 2 2
Bs. As. 2 8 / 11 / 0 8

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

ESCRIBANO
MAT. 4370

24



F 004754822

1   **Buenos Aires,** 28 de Noviembre de 2008 . **En mi carácter de escribano**

2   Titular del Registro Notarial Nº 841

3   **CERTIFICO: Que la/s** firma/s                       **que obra/n en el**

4   **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5   **formaliza simultáneamente por ACTA número** 132          **del LIBRO**

6   **número** 106           , **es/son puesta/s en mi presencia por la/s persona/s**

7   **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8   **la justificación de su identidad.** Mario César MAGDALENA, L.E. 8.106.144.-

9   quien justifica su identidad de acuerdo al inciso a del articulo 1002 del

10   Código Civil y actúa en su carácter de apoderado de la sociedad "SAN-

11   COR COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales,

12   Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

13   cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

14   tellanos, conforme lo acredita con el poder de fecha 23 de junio de 1993,

15   pasado al folio 638 del Registro 200 de la ciudad de Sunchales, Provincia

16   de Santa Fe, a cargo del escribano Horacio Remondino, la documenta-

17   ción relacionada tengo a la vista y le confiere facultades suficientes para

18   suscribir el documento adjunto, doy fe.-

19

20

21

22

23

24

25



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

## TERCERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

**IIG TOF B.V.,** representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "<u>MUTUANTE</u>"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA,** una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "<u>MUTUARIO</u>"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "<u>Partes</u>"; y

**CONSIDERANDO:**

(a)  Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, enmendado con fecha 11 de Junio de 2008 y 24 de Septiembre de 2008, que en copia se adjunta como **Anexo A** (el "<u>Contrato Marco</u>"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Tercera Enmienda.

(b)  Que sobre la base del Contrato Marco, es intención del MUTUARIO requerir al MUTUANTE una línea de crédito tipo 'revolving' a fin de poder requerirle –en los términos y condiciones establecidos en el Contrato Marco- los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(c)  Que el mecanismo antes descripto permitiría al MUTUARIO requerir periódicamente el flujo de fondos requeridos para financiar sus exportaciones, pudiendo cancelar las Sumas Adeudadas, solicitar nuevos desembolsos y así sucesivamente, siempre que el monto acumulado de toda la Línea de Crédito –incluyendo la requerida en la última Solicitud de Desembolso remitida al MUTUANTE- resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(d)  Que en atención a que gran parte de los Créditos Cedidos han sido aplicados al pago de las Sumas Adeudadas a la fecha; y a efectos de poder remitir nuevas Solicitudes de Desembolso al MUTUANTE y garantizar debidamente las futuras Sumas Adeudadas en virtud de las mismas, es intención del MUTUARIO ceder al MUTUANTE nuevos créditos, los cuales serán eventualmente aplicados al pago de tales Sumas Adeudadas en los términos de la Cláusula QUINTA del Contrato Marco.

En mérito a las consideraciones precedentemente establecidas, las cuales forman parte integrante de la presente, las Partes acuerdan suscribir la presente Tercera Enmienda al Contrato Marco (la "<u>Tercera Enmienda</u>"), de conformidad con los términos y condiciones incluidos en las siguientes cláusulas:

1.  Modifícanse las definiciones de "Créditos Cedidos", y "Línea de Crédito" de la Cláusula PRIMERA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

"<u>Crédito/s Cedido/s</u>" significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

(i)  *todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a Fonterra derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como **Anexo I** (y las enmiendas, contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo). Se adjunta asimismo como **Anexo II** una Declaración Jurada del MUTUARIO con el Pronóstico de Ventas mínimas que el MUTUARIO estima realizar a Fonterra durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.*

(ii)  *todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a BARIVEN S.A c/o PDVSA derivada de la Orden de Compra (Purchase Order) N° 5100062284 de fecha 26 de Marzo de 2008, emitida por BARIVEN c/o PDVSA y aceptada por el MUTUARIO, cuya fotocopia se adjunta al presente Contrato como **Anexo B** (y las enmiendas, contratos complementarios y/o reemplazantes de dicha orden de compra adjunta como Anexo B, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo).*

(iii)  *todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realicen a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 31 de Mayo de 2008 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo*



MARTIN R. ARAN
ESCRIBANO
MAT. 4370

todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Arthur Schuman.

(iv)     todos los créditos actuales y futuros que le correspondan al  MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a BARIVEN S.A c/o PDVSA y/o sus Afiliadas y/o subsidiarias, hasta el 31 de Marzo de 2010 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo, sin limitación, todos los créditos y derechos que correspondan al MUTUARIO derivados del "Acuerdo Preliminar" suscripto entre el MUTUARIO y BARIVEN S.A. con fecha 14 de Noviembre de 2008, y las enmiendas, contratos complementarios y/o reemplazantes de dicho Acuerdo Preliminar, así como los conocimientos de embarque, factura y/o remitos emitidos en virtud del mismo. Respecto del "Acuerdo Preliminar" antedicho, en caso de que los créditos derivados directamente del mismo prevean pagos anticipados por parte del Deudor Cedido de hasta un porcentaje máximo de 35% (treinta y cinco por ciento) del crédito en cuestión, dicho pago anticipado quedará excluido de los Créditos Cedidos, debiendo ser abonada dicha porción directamente al MUTUARIO. En este último caso, quedará incluido dentro de los "Créditos Cedidos" el porcentaje restante del anticipo (65% del monto del crédito como mínimo) el cual deberá ser pagado directamente al MUTUANTE.

"Línea de Crédito" significa la única línea de crédito modalidad 'revolving' que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100   (US$ 50.000.000,00).

2.     Modifícase la Sección 2.1.(c) de la Cláusula SEGUNDA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

"(c) Monto de los Desembolsos. El MUTUARIO podrá requerir los desembolsos que  estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100  (US$ 50.000.000,00); en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito."

3.     Las modificaciones antes referidas importan la cesión a favor del MUTUANTE de los créditos del MUTUARIO contra BARIVEN c/o PDVSA precedentemente descriptos, en los términos de la Cláusula CUARTA del Contrato Marco. Consecuentemente, dentro de las 48 hs de suscripto el presente y como condición para cualquier nuevo desembolso bajo el Contrato Marco, el MUTUARIO se obliga a notificar dicha cesión a Bariven S.A., c/o PDVSA Services, Inc. en los términos establecidos en la Cláusula 4.6 del Contrato Marco.

4.     Antes del 2 DE Diciembre de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants por una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada a dicha fecha (incluyéndose en el calculo de dicho porcentaje los Warrants que el MUTUARIO ya ha entregado y endosado a favor del MUTUANTE); obligándose el MUTUARIO a mantener la ratio antes referida (25 % de la Línea de Crédito Adeudada) en todo momento durante la vigencia del Contrato Marco, bajo apercibimiento de Mora. Concordantemente con ello, modifícase la Cláusula SEXTA BIS del Contrato Marco, la cual quedara redactada del siguiente modo:

"CLÁUSULA SEXTA BIS: WARRANTS

6BIS.1     Antes del 2 de Diciembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants endosados a favor de este último por un monto equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada a dicha fecha, obligándose a mantener los mismos –reemplazándolos de ser necesario, conforme se establece en la siguiente Sección 6bis.2- por dicho monto durante toda la vigencia del presente Contrato Marco.

6BIS.2     El MUTUARIO se obliga a que durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.

6BIS.3     A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería, vigente al momento de dicho depósito. El mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial para el mantenimiento de la presente enmienda. Consecuentemente, la falta de acuerdo –por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula NOVENA del presente Contrato.

MARTIN R. AR/
ESCRIBANC
MAT. 437(

**6BIS.4**   *El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.*

**6BIS.5**   *En Caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.*

**6BIS.6**   *Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria (Warrantera) de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora."*

5.   Modifícase la Sección 7.1.22 de la Cláusula SEPTIMA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

*"7.1.22   Que a partir del 2 de Diciembre de 2008 y en todo momento durante la vigencia del presente Contrato el MUTUANTE contará con Warrants por una suma equivalente al veinticinco  por ciento (25 %) de la Línea de Crédito Adeudada."*

6.   Con excepción de aquellos términos expresamente modificados por la presente Tercera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, a los 28 días del mes de Noviembre de 2008; y por el MUTUANTE en la Ciudad de Amsterdam, a los 28 días del mes de Noviembre de 2008.

Firma/s certificada/s en Foja
Nº F.0.0.4.7.5.4.2.7.
Bs. As. 28/11/08

_____
Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

_____
Por: IIG TOF B.V.
Nombre: _____
Carácter: _____

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370







F 004754827

1. **Buenos Aires,** 28 **de** Noviembre **de** 2008 . **En mi carácter de escribano**

2. Titular del Registro Notarial Nº 841

3. **CERTIFICO: Que la/s** firma/s que obra/n en el

4. **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5. **formaliza simultáneamente por ACTA número** 137 **del LIBRO**

6. **número** 106 **, es/son puesta/s en mi presencia por la/s persona/s**

7. **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8. la justificación de su identidad. Mario César MAGDALENA,

9. L.E. 8.106.144.- quien justifica su i-

10. dentidad de acuerdo al inciso a del ar-

11. ticulo 1002 del Código Civil y actúa en

12. su carácter de apoderado de la sociedad

13. "SANCOR COOPERATIVAS UNIDAS LIMITADAS"

14. con domicilio en Sunchales, Provincia de

15. Santa Fe, e inscripta en la Matrícula 772

16. del Registro Nacional de Cooperativas, de

17. la Provincia de Santa Fe, Departamento

18. Castellanos, conforme lo acredita con el

19. poder de fecha 23 de junio de 1993, pa-

20. sado al folio 638 del Registro 200 de la

21. ciudad de Sunchales, Provincia de Santa

22. Fe, a cargo del escribano Horacio Remon-

23. dino, la documentación relacionada tengo

24. a la vista y le confiere facultades sufi-

25. cientes para suscribir el documento ad-




F 004754827

junto, doy fe.-



26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50

## SEGUNDA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representada en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO") por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominadas las "Partes" y

**CONSIDERANDO:**

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 11 de Junio de 2008, que en copia se adjunta como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Segunda Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán extenderse las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente segunda enmienda al Contrato Marco (la "Segunda Enmienda"), de conformidad con las presentes Cláusulas:

1.    Modifícase de la **Cláusula PRIMERA** del Contrato Marco las siguientes definiciones:

"*Fecha/s de Vencimiento*" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Diciembre de 2009.

"*Plazo de Disponibilidad*" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2009, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

2.    Con excepción de aquellos términos expresamente modificados por la presente Segunda Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 24 días del mes de Septiembre de 2008.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: IIG TOF B.V.
Nombre: Trust International Management (T.I.M.) B.V.
Carácter: Managing Director



**ACTA DE CERTIFICACION DE FIRMAS**
LEY 404

# ANEXO

F 001088971

1   Buenos Aires, 24 de Septiembre de 2008 . En mi caracter de escribano

2   Titular del Registro Notarial Nº 841

3   CERTIFICO: Que la/s firma/s que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número 133 del LIBRO

6   número 102 , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario Cesar MAGDALENA. L.E. 8.106.144.-

9   Manifiesta actuar en su carácter de apoderado de la sociedad "SANCOR

10  COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Pro-

11  vincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Nacional de

12  Cooperativas, de la Provincia de Santa Fe. Departamento Castellanos,

13  conforme lo acredita con el poder de fecha 23 de junio de 1993, pasado al

14  folio 638 del Registro 200 de la ciudad de Sunchales, Provincia de Santa

15  Fe, a cargo del escribano Horacio Remondino, la documentación relacio-

16  nada tengo a la vista y le confiere facultades suficientes para suscribir el

17  documento adjunto, doy fe -

18





19
20
21
22
23
24
25

dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.3**     El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por el Deudor Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha ___/___/200? Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco. _____, ABA _____, Beneficiario: IIG TOF B.V., Cuenta N°. _____"*

**4.4**     Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

**4.5**     La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.6**     Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido y a obtener la aprobación expresa de este último respecto de la presente cesión mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **ANEXO V**. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará al Deudor Cedido, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido —mediante su apoderado o representante legal– firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido en la forma antes

9

indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación al Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario, domicilio y su despacho mediante correo internacional por un servicio que brinde constancia de su entrega y recepción.

4.7    El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que —con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- el Deudor Cedido rescinda o resuelva los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

4.8    El MUTUARIO declara y garantiza al MUTUANTE:

(a)    el cobro de los Créditos Cedidos.

(b)    la forma instrumental de los mismos.

(c)    la legitimidad de los Créditos Cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d)    que no se encuentra inhibido para disponer de sus bienes;

(e)    que no adeuda suma alguna al Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos;

(f)    que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

10

(g)   la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h)   que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a· la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos.

(i)   que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito.

(j)   que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente al Deudor Cedido, debiéndose abstener de vender o facturar los productos comprendidos en el contrato adjunto como Anexo I a terceros distintos del Deudor Cedido, aun cuando contase con el consentimiento de este último.

## CLAUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.

5.1   El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.

5.2   A los efectos mencionados en la Sección 5.1 antes referida, los fondos del Crédito Cedido depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

(a)   Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.

(b)   Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el periodo comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso de que los fondos del Crédito Cedido depositados durante tales meses excedan el monto de la Suma Adeudada, el

11

excedente sera transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso de que los fondos del Crédito Cedido depositados durante tales meses no fuesen suficientes para cubrir el importe de la Suma Adeudada, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes al Crédito Cedido que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

5.3    En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

5.4    Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso de que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de la Suma Adeudada en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

## CLÁUSULA SEXTA: MONEDA DE PAGO.

6.1    El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación -incluyendo el pago de la Línea de Crédito Adeudada- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se

12

cancelen en Dólares, renunciando expresamente a invocar la teoria de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

6.2    En atención a lo dispuesto en la Cláusula 6.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometidas (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

6.2.(a). Mediante la compra con Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

6.2.(b). Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

6.2.(c). En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

13

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

6.3     Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

6.4     Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a). a 6.2.(d) precedentes serán pagados por el MUTUARIO (o por el MUTANTE en su caso).

6.5. Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUARIO (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerara cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE (o al MUTUARIO en su caso) de esa pérdida.

## CLAUSULA SEPTIMA:    MANIFESTACIONES,        DECLARACIONES        Y COMPROMISOS DEL MUTUARIO.

7.1.     **Manifestaciones y Declaraciones del MUTUARIO.**

A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la  Línea de Crédito, el MUTUARIO manifiesta y declara, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

7.1.1.   Que el MUTUARIO  es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades

14

necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

7.1.2. Que el MUTUARIO no está obligado a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

7.1.3. Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

7.1.4. Que el MUTUARIO y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

7.1.5. Que el MUTUARIO no tiene pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

7.1.6. Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

7.1.7. Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad

15

de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

7.1.8.  Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

7.1.9.  Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco, acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

7.1.10. Que el balance del MUTUARIO al 30 de Junio de 2007, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivas autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2007 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

7.1.11. Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

7.1.12. Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

7.1.13  Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

7.1.14  Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tiene y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

16

7.1.15. Los Documentos de la Operación están; o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

7.1.16. Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

7.1.17. Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

7.1.18 Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

7.2    **Compromisos y Obligaciones del MUTUARIO.**

Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO se compromete firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

7.2.1. A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula NOVENA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

7.2.2. A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que el MUTUARIO, según el caso, los disputase por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

7.2.3. A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes,

17

prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

7.2.4. A no realizar actos que constituyan o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, ó (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

7.2.5. A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

7.2.6. A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel y prestigio internacional, (ii) estados contables semestrales, (iii) estados contables trimestrales, y (iv) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos semestres; los estados contables (iii) deberán ser presentados dentro del los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iv) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

7.2.7. A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas, la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

18

**7.2.13.** A no reducir su capital, y

**7.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**7.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco, y

7.2.16. A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

7.2.17. A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

7.2.18. A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

7.2.19. A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

7.2.20. A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

7.2.21. A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

7.2.22 A remitir mensualmente al MUTUANTE, antes del 5° día hábil de cada mes de vigencia del presente Contrato Marco, un informe con el pronóstico escrito de venta de sus productos al Deudor Cedido durante los dieciocho (18) meses subsiguientes a la fecha de entrega del informe antes referido.

20

7.2.23  A remitir al MUTUANTE -además del señalado en la Sección 7.2.22 precedente- copia de todo informe, documento, reporte, orden de compra, factura, y/o pronóstico de ventas que remita al Deudor Cedido y/o que reciba del Deudor Cedido.

## OCTAVA:   MORA.

8.1  La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco –incluyendo sin limitación, el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora,  el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

8.2  El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las sumas adeudadas en los siguientes Eventos de Incumplimiento:

(a)  si el MUTUARIO incumpliese con el pago en tiempo y forma de la Línea de Crédito Adeudada;

(b)  si un tercero pidiere la quiebra del MUTUARIO, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

(c)  si el MUTUARIO, el Deudor Cedido y/o pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

(d)  si el MUTUARIO y/o sus incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

(e)  Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares Estadounidenses DOS MILLONES (US$



21

2.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los treinta (30) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

(f)   si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad, parcial o total, por parte del MUTUARIO, en las declaraciones contenidas en la Cláusula SEPTIMA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(g)   si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(h)   si el MUTUARIO y/o sus modificasen de cualquier forma su composición accionaria;

(i)   si el MUTUARIO incumpliere cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(j)   si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido;

(k)   si –con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas- el MUTUARIO y/o el Deudor Cedido terminan el contrato que causa los Créditos Cedidos ;

(l)   si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(m)   Si se dictaren una o mas sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;





22



(n)    Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

8.3    En adición a lo dispuesto en la Sección 8.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 8.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de las Sumas Adeudadas por parte del MUTUARIO o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE.

## NOVENA: GASTOS.

9.1    Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

9.2    Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago.

23

**9.3** El MUTUARIO se obliga a cumplir en tiempo y forma –a su exclusivo costo y cargo– con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**9.4** El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

## DÉCIMA: CESIÓN DEL CONTRATO MARCO.

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

## DÉCIMO PRIMERA:     VIGENCIA, INDEMNIDAD.

**11.1** El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas NOVENA, DÉCIMO PRIMERA y DÉCIMO TERCERA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso

**11.2** El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstos en ellos; (ii) el Crédito Cedido adeudado con más sus intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial,

24

relacionado con cualquiera de las circunstancias previstas en esta Cláusula 11.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

## DÉCIMO SEGUNDA: AUTORIZACIÓN

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.

En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

## DÉCIMO TERCERA: JURISDICCIÓN Y LEY APLICABLE.

13.1   El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

13.2   El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

13.3   Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés en la República Argentina.

13.4   El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

25

13.5   Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 13.8 de la presente Cláusula.

13.6   Las notificaciones efectuadas de la manera establecida en la Sección 13.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

13.7   El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total y/o parcial comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

13.8   Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:

MUTUARIO: 1) 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003 - USA

2) Tacuarí 202 - 3° Piso - Capital Federal, República Argentina

MUTUANTE:   Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands

**DECIMO CUARTA: FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 2 (dos) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.

**DECIMO QUINTA: LUGAR Y FECHA.**

26

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina y por el
MUTUANTE en Amsterdam, a los 30 días del mes de Noviembre de 2007.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
N°
Bs. As.

Por: IIG TOF B.V.
Nombre: _____ Trust International Management (T.I.M.) B.V.
Carácter _____ Managing Director

27



ACTA DE CERTIFICACION DE FIRMAS

F 003850242

1  Buenos Aires,   30 de   Noviembre  de   2007 . En mi carácter de Escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s   firma/s                          que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5  firma/s que se formaliza simultáneamente por ACTA número        42        del

6  LIBRO número        86      , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8  cuyo conocimiento doy fe.   Mario Cesar MAGDALENA L.E. 8.106.144.- Mani-

9  fiesta actuar en su caracter de apoderado de la sociedad SANCOR COO-

10  PERATIVAS UNIDAS LIMITADAS, de acuerdo a la documentación que me

11  exhibe y le confiere facultades suficientes para suscribir el documento ad-

12  junto.-

13

14

15

16

17

18

19

20

21

22

23

24

25



