ANEXO I:
COPIA "Exclusive Purchase Agreement"

28

ANEXO II
Declaración Jurada con Pronóstico de ventas Mínimas del MUTUARIO

29

**ANEXO III**

**Modelo de Pagaré (sin protesto)**

Buenos Aires, __ de _____ de 200_.

US$ _____

A la vista, por igual valor recibido, _____ _____ una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en ___ _____ República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a _____, (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en _____, República Argentina, la suma neta de Dólares Estadounidenses _____, CON ___/100 (US$ _____), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagarés que el deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor – además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del ___% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en este Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación:

Deudor:
Acreedor:

d) Las notificaciones efectuadas de la manera establecida en la acápite "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier juicio, acción o procedimiento iniciado por el Acreedor; y en el especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento; y en general a oponer cualquier defensa que no sea la de pago documentado.

Deudor _____

30

Por _____
Nombre: _____
Carácter: _____

ANEXO IV

<u>MODELO DE SOLICITUD DE DESEMBOLSO</u>

Buenos Aires, ____ __de _____ de 2007

Sres.
**IIG TOF B.V.**
_____

De nuestra consideración:

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ____ de _____ de 2007 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula _____ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

(i)   El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____ _____ ).

(ii)   La/s Fecha/s de Vencimiento del desembolso antes requerido será/n la/s siguiente/s:

| <u>Fecha Vto.</u> | <u>Moneda e Importe</u> |
|---|---|
| __/____/___ | U$S _____ |
| __/____/___ | U$S _____ |

(ii)   La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses ___ _____), comprensivo del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas.

(iii)   Adjuntamos a la presente un Pagaré a vuestro favor, pagadero a la vista, por la suma total de US$ __ _____ (Dólares Estadounidenses ___ _____).

| <u>Fecha Emisión</u> | <u>Fecha Vto.</u> | <u>Moneda e Importe</u> |
|---|---|---|
| __/____/___ | A la vista | U$S_____ |

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso requerido a la Cuenta del Mutuario indicada en el Contrato Marco.

Sin otro particular, saludamos a Uds. atentamente.

Nombre: _____
Carácter: _____

31

ANEXO V
MODELO DE NOTIFICACION AL DEUDOR CEDIDO

Buenos Aires, _____ 2007

Messrs.:
**FONTERRA CO-OPERATIVE GROUP LIMITED ("FONTERRA")**
_____

Dear Sirs:
We address to you in order to give you notice of the Loan and Assignment Agreement dated _____ __, 200_, executed between **SANCOR COOPERATIVAS UNIDAS LTDA** ("**SANCOR**") and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** ("**IIG TOF BV**"), whereby **SANCOR** has assigned and transferred to IIG TOF BV, and IIG TOF BV has accepted and received all the rights and credits (both credits existing at present or credits that may exist in the future) derived from all the proceeds derived from the EXCLUSIVE PURCHASE AGREEMENT executed between **FONTERRA** and **SANCOR** on October 01st, 2007, the amendments and renewals thereof. Save for the assignment of proceeds hereinabove mentioned, **IIG TOF BV** shall have no right or lien over the Products referred to in said EXCLUSIVE PURCHASE AGREEMENT, which shall remain the property of SANCOR or FONTERRA.

Therefore, **SANCOR** and **IIG TOF BV** hereby confirm that pursuant to the terms and conditions of the aforementioned Loan and Assignment Agreement all the sums and credits hereinabove referred –including, without limitation, the credits derived from the invoices and other documentation that **SANCOR** submit to you as a consequence of said commercial transactions-, are to be fully paid to **IIG TOF BV** by wire transfer of the corresponding funds to the following bank account:

_____

The aforementioned Assignment Agreement shall not transfer and/or modify the liability of **SANCOR** derived from the referred commercial transactions and business operations. Thus, **SANCOR** remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,


By: **SANCOR COOPERATIVAS UNIDAS LIMITADA**
Nombre: Mano Magdalena
Carácter: Apoderado


By: **IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Nombre:
Carácter:

Acknowledged and accepted:

**FONTERRA CO-OPERATIVE GROUP LIMITED**
Name: _____
Capacity: _____

32

**ANEXO II - DECLARACION JURADA CON PRONOSTICO DE VENTAS MINIMAS**
Pronóstico de Ventas (en miles)



Dairy for life

**Fonterra Co-operative Group Limited**

## Solicitor's Certificate – Internal

**TO:    Emma Parsons**

**RE:    Purchase Agreement – Fonterra Limited and SanCor Cooperativas Unidas Limitada ("the Document")**

I confirm that I have reviewed the Document from a legal perspective and that:

(a)    The Document reflects the instructions of Emma Parsons on the commercial content of the Document;

(b)    No legal risks of an important or unusual nature have been identified;

(c)    I am not aware of any legal enquiry in the circumstances of this transaction which should have been made, which has not been made;

(d)    The transaction that relates to the Document is authorised by the exercise of a delegation under Fonterra's Delegated Authorities by **Mark Robins** and **Brian Willis** is entitled to execute the Document;

(e)    To the best of my knowledge the Document does not breach any legal obligations of Fonterra Limited and complies with all relevant New Zealand laws.

The Document is therefore acceptable for execution by Fonterra Limited

Jason Sandford
Corporate Counsel
Fonterra Co-operative Group Limited

Date: 28 September 2007

FONTERRA LIMITED

SANCOR COOPERATIVAS UNIDAS LIMITADA

EXCLUSIVE PURCHASE AGREEMENT

<u>PRIMERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO</u>
<u>PARA LA PREFINANCIACIÓN DE EXPORTACIONES</u>

Entre

IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., representado en este acto por los Sres S. Strijbosch, H.H. Burgers, en su carácter de _Apoderados_, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "<u>MUTUANTE</u>"), por una parte; y

SANCOR COOPERATIVAS UNIDAS LIMITADA, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "<u>MUTUARIO</u>"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominadas las "<u>Partes</u>", y

CONSIDERANDO:

(a)   Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, que en copia se adjunta como Anexo A, cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Primera Enmienda

(b)   Que el MUTUARIO ha solicitado al MUTUANTE aumentar en Dólares Estadounidenses Veinticinco Millones con 00/100 (US$ 25.000.000,00) el monto de la Línea de Crédito.

(c)   Que el MUTUANTE está dispuesto a aceptar el aumento de la Línea de Crédito requerido siempre que el MUTUARIO otorgue garantías adicionales de pago, a cuyo fin el MUTUARIO está dispuesto a ceder nuevos créditos a favor del MUTUANTE; y constituir y endosar warrants a favor del MUTUANTE

En mérito a las consideraciones precedentemente establecidas, las Partes acuerdan suscribir la presente Primera Enmienda al Contrato Marco (la "Primera Enmienda"), de conformidad con los términos y condiciones incluidos en las siguientes cláusulas:

1.   Incorpóranse a la Cláusula PRIMERA del Contrato Marco las siguientes definiciones:

"<u>Arthur Schuman</u>": significa ARTHUR SCHUMAN, INC., una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica, con domicilio en 40 New Dutch Lane, Fairfield, NJ 07004 USA.

"<u>Fonterra</u>": significa FONTERRA LIMITED, una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"<u>BARIVEN c/o PDVSA</u>": significa Bariven S.A., c/o PDVSA Services, Inc., una firma organizada bajo las leyes del Estado de Texas, Estados Unidos de Norteamérica, con domicilio en 1293 Eldrige Parkway, Houston Texas (77077), Estados Unidos de Norteamérica.

<u>Warrants</u>: significa los Warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidos en la Cláusula SEXTA BIS del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco

2.   Modifícanse las definiciones de "Créditos Cedidos", y "Deudores Cedidos" de la Cláusula PRIMERA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

"<u>Créditos Cedidos</u>": significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

(i)   todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a Fonterra derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como Anexo I (y las enmiendas, contratos complementarios y/o

1

reemplazantes de dicho contrato adjunto como Anexo I, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo. Se adjunta asimismo como Anexo II una Declaración Jurada del MUTUARIO con el Pronóstico de Ventas mínimas que el MUTUARIO estima realizar a Fonterra durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.

(ii) todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a BARIVEN S.A c/o PDVSA derivada de la Orden de Compra (Purchase Order) N° 5100062284 de fecha 26 de Marzo de 2008, emitida por BARIVEN c/o PDVSA y aceptada por el MUTUARIO, cuya fotocopia se adjunta al presente Contrato como Anexo B (y las enmiendas, contratos complementarios y/o reemplazantes de dicha orden de compra adjunta como Anexo B, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo).

(iii) todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 31 de Mayo de 2008 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebra con Arthur Schuman.

"Deudor/es Cedido/s" significa Arthur Schuman y/o Fonterra y/o BARIVEN c/o PDVSA.

"Línea de Crédito" significa la única línea de crédito que, sujeto a los términos y condiciones de los Documentos de la Operación, al MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

3. Las modificaciones antes referidas importan la cesión a favor del MUTUANTE de los créditos del MUTUARIO contra Arthur Schuman y BARIVEN c/o PDVSA precedentemente descriptos, en los términos de la Cláusula CUARTA del Contrato Marco. Consecuentemente, dentro de las 48 hs de suscripto el presente y como condición para cualquier nuevo desembolso bajo el Contrato Marco, el MUTUARIO se obliga a notificar dicha cesión a Arthur Schuman y Bariven S.A. c/o PDVSA Services, Inc. en los términos establecidos en la Cláusula 4.6 del Contrato Marco.

4. Antes del 31 de Agosto de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants por una suma equivalente al diez por ciento (10%) de la Línea de Crédito Adeudada. Transcurrido un mes más de la fecha antes referida, dicho porcentaje deberá haber aumentado al quince por ciento (15%), de modo tal que antes del 30 de Septiembre de 2008 el MUTUARIO deberá haber entregado y endosado a favor del MUTUANTE Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Concordantemente con ello, incorpórase como Cláusula SEXTA BIS del Contrato Marco la siguiente:

"CLÁUSULA SEXTA BIS: WARRANTS

6BIS.1 Antes del 30 de Septiembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants endosados a favor de este último por un monto equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada a dicha fecha, obligándose a mantener los mismos – reemplazándolos de ser necesario, conforme se establece en la siguiente Sección 6.2- por dicho monto durante toda la vigencia del presente Contrato Marco.

6BIS.2 El MUTUARIO se obliga a que antes del 31 de Agosto de 2008, el MUTUANTE cuente en su poder con Warrants por un monto no inferior al  diez por ciento (10%) de la Línea de Crédito Adeudada y que a partir del 30 de Septiembre de 2008 y durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.

6BIS.3 A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería, vigente al momento de dicho depósito. El



2

ANA (h)

mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial para el mantenimiento de la presente enmienda. Consecuentemente, la falta de acuerdo -por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula NOVENA del presente Contrato.

**6BIS.4** El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

**6BIS.5** En Caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le corresponden. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.

**6BIS.6** Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria (Warrantera) de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que corresponden a dicha empresa almacenadora.

5.   Incorpóranse a la Cláusula SÉPTIMA, Sección 7.1, las siguientes declaraciones y garantías del MUTUARIO:

**7.1.19** Que el Crédito Cedido contra PDVSA ascenderá a la suma de US$ 46.408.615,56 (Dólares Estadounidenses CUARENTA Y SEIS MILLONES CUATROCIENTOS OCHO MIL SEISCIENTOS QUINCE CON 56/100).

**7.1.20** Que el Crédito Cedido contra Fonterra ascenderá como mínimo a una suma equivalente al cincuenta por ciento (50%) de la Línea de Crédito.

**7.1.21** Que el Crédito Cedido contra Arthur Schuman ascenderá como mínimo a una suma equivalente al treinta por ciento (30%) de la Línea de Crédito.

**7.1.22** Que a partir del 30 de Septiembre de 2008 y en todo momento durante la vigencia del presente Contrato el MUTUANTE contará con Warrants por una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada."

6.   Con excepción de aquellos términos expresamente modificados por la presente Primera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, a los 11 días del mes de Junio de 2008; y por el MUTUANTE en la Ciudad de Amsterdam, a los 13 días del mes de Junio de 2008.

Firma/s certificada/s en Foja
N! E 004194444
Bs. As. 11 G 2008

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

Por: TCF B.V.
Nombre: S Struyck (J y H. Braamskamp)
Carácter: Apoderado
Trust International Management (T.I.M.) B.V.
Trust International Management (T.I.M.) B.V.
Managing Director

3



F 004319444

1   Buenos Aires, 11 de    Junio    de 2008   . En mi carácter de Escribano

2   Titular del Registro Notarial Nº 841

3   CERTIFICO: Que la/s firma/s                              que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5   firma/s que se formaliza simultáneamente por ACTA número      144      del

6   LIBRO número      96      , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8   cuyo conocimiento doy fe. Mario César MAGDALENA L.E. 8.106.144.- Mani-

9   fiesta actuar en su carácter de apoderado de la sociedad "SANCOR CO-

10  OPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Provincia

11  de Santa Fe, e inscripta en la Matrícula 772 del Registro Nacional de Coo-

12  perativas, de la Provincia de Santa Fe, Departamento Castellanos, con-

13  forme lo acredita con el poder de fecha 23 de junio de 1993, pasado al folio

14  638 del Registro 200 de la ciudad de Sunchales, Provincia de Santa Fe, a

15  cargo del escribano Horacio Remondino, la documentación relacionada

16  tengo a la vista y le confiere facultades suficientes para suscribir el docu-

17  mento adjunto.-

18

19

20

21

22

23

24

25

MARTIN R. AHANA (h)
ESCRIBANO
MAT. 4370

**MODELO NOTIFICACION A BARIVEN**

Buenos Aires, June __ᵗʰ 2008

Messrs.:
Bariven S.A., c/o PDVSA Services, Inc.
Purchasing Agent (BU00),
1293 Eldridge Parkway
Houston, Texas 77077, USA.
Att.: _____
Phone: _____
E-mail _____

Dear Sirs

We address to you in order to give you notice of the Assignment Agreement June __ᵗʰ, 2008, executed between **SANCOR COOPERATIVAS UNIDAS LTDA ("SANCOR")** and **IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, **("IIG")**, whereby SANCOR has assigned and transferred to IIG and IIG, has accepted and received all the rights and credits derived from the **PURCHASE ORDER N° 5100082284** dated March 26ᵗʰ, 2008, corresponding to the merchandise that you have requested to SANCOR, which is attached hereto as Annex I.

Therefore, SANCOR and IIG hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement all the sums and credits derived from the purchase order hereinabove referred –including the credits derived from the invoices and other documentation that SANCOR submit to you as a consequence of said commercial transactions-, are to be fully paid to IIG by wire transfer of the corresponding funds to the following bank account:

| | |
|---|---|
| **BANK:** | STATE STREET BANK AND TRUST |
| | BOSTON MA |
| **ABA#:** | 011-000-028 |
| **SWIFT:** | SBOSUS33 |
| **Credit:** | WMS Cash DDA |
| **Account#:** | 17039843 |
| **Further Credit:** | IIG TOF B.V.- Sancor CUL |
| **Account#:** | 02030-842-148 |

The aforementioned Assignment Agreements and payment instructions are irrevocable and could only be modified through a new notice signed by representatives from IIG duly authorized by the correspondent certifications.

The aforementioned Assignment Agreements shall not transfer and/or modify the liability of SANCOR derived from the referred commercial transactions and business operations. Thus SANCOR remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

_____
Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

_____
Por: IIG TOF B.V.
Nombre: _____
Carácter: _____

Acknowledged and accepted

BARIVEN S.A., C/O PDVSA SERVICES, INC.
Name: _____
Capacity: _____

5

# ANEXO

## CONTRATO DE LÍNEA DE CRÉDITO PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

**IIG TOF B.V.,** representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** representado en este acto por los Sres. _____ _____ en su carácter de _____ , domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la pre-financiación de sus exportaciones

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndole continuar con el desarrollo y ampliación de sus mercados externos;

(c) Que por las razones indicadas en el Considerando (b) anterior, y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO está dispuesto a afectar bienes para garantizar el repago del crédito para prefinanciar sus exportaciones,

(d) Que el MUTUANTE está dispuesto a otorgar una línea de crédito de hasta Dólares Estadounidenses veinticinco millones con 00/100 (US$ 25.000.000,00) para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) el MUTUARIO se obligue a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato, (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (iii) se otorgue y perfeccione la cesión de los Créditos Cedidos (tal como se los define más adelante).

1

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

**PRIMERA:   DEFINICIONES.**

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO no podrá cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula SEGUNDA.

"Contrato Marco" significa el presente contrato de línea de crédito suscripto entre las Partes.

"Crédito/s Cedido/s" significa todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice al Deudor Cedido derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como Anexo I (y las enmiendas, contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo). Se adjunta asimismo como Anexo II una Declaración Jurada del MUTUARIO con el Pronóstico de Ventas mínimas que el MUTUARIO estima realizar al Deudor Cedido durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.

2

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| BANK: | Satet Street Corp f/k/a Investors Bank & Trust Company |
| ABA#: | 011-001-438 |
| SWIFT: | INVBUS33 |
| Credit: | Client Funds |
| Account#: | 569-530-395 |
| Further Credit: | IIG TOF – Sancor CUL |
| Account#: | 02030-8420148 |

"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTUANTE en forma fehaciente:

| | |
|---|---|
| BANCO: | Citibank N.A. |
| DIRECCIÓN: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 |
| A NOMBRE DE: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada |
| CUENTA N°: | 000-0-129785 |
| REFERENCIA: | Prefinanciación de Exportación |

"Deudor Cedido" significa FONTERRA LIMITED una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagarés y el contrato adjunto como Anexo I que causa los Créditos Cedidos.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

3

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula OCTAVA, Sección 8.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Mayo de 2009.

"Garantías" significa los Pagarés y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses veinticinco millones con 00/100 (US$ 25.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todas las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula OCTAVA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como ANEXO III, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

4

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Mayo de 2009, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta en el presente en ANEXO IV, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interés anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO.

### 2.1.  Disponibilidad de la Línea de Crédito.

(a) Disponibilidad Condicionada. Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

(b) Vigencia. Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

5

(c) **Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

2.2.    **Condiciones Precedentes al otorgamiento de la Línea de Crédito.**

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

(a) **Aprobaciones Societarias.** (i) copia certificada por escribano público del poder general del MUTUARIO del cual surja que el/ los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto; y

(b) **Vigencia de las Manifestaciones y Declaraciones del MUTUARIO.** Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por el MUTUARIO en la Cláusula SEPTIMA del Contrato Marco, y

(c) **Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Supuestos de Incumplimiento.** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO   ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías, y

(d) **Notificación al Deudor Cedido.** Que el MUTUARIO haya notificado al Deudor Cedido la cesión del Crédito Cedido en los términos establecidos en la Sección 4.6 del presente Contrato Marco; a cuyo efecto el MUTUARIO deberá entregar al MUTUANTE el original de tal notificación recibida y aceptada por el Deudor Cedido.

**CLAUSULA TERCERA: CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.**

6

3.1. **Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

    (i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento; y

    (ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes, a plena satisfacción del MUTUANTE, con la firma debidamente certificada por un escribano público argentino.

3.2. **Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa- y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal circunstancia o causa.

3.3. **Trámite posterior. Desembolso.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá, a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso, y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar este de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aun sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso -siempre que el rechazo sea con causa- que al MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquella.

3.4. **Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos contados desde la finalización del

7

Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

3.5 **Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquel, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto, de conformidad con lo establecido en la cláusula OCTAVA del presente Contrato.

3.6 **Devolución al Mutuario de los Créditos Cedidos. Notificación al Deudor Cedido.** En cualquiera de los supuestos enumerados en la presente cláusula TERCERA y una vez cancelada en su totalidad la Línea de Crédito Adeudada por el MUTUARIO y dentro de las 48 hs. de sucedido ello, el MUTUANTE se obliga a notificar al Deudor Cedido que ha quedado sin efecto la Cesión del Crédito Cedido por lo que a partir de la recepción de dicha notificación, el Deudor Cedido deberá abonar al MUTUARIO el monto de los Créditos Cedidos.

## CLÁUSULA CUARTA: CESIÓN DE CRÉDITOS.

4.1    En garantía de pago de la Línea de Crédito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operación, y como medio de pago de las Sumas Adeudadas, conforme lo establecido en la Cláusula 5.2 del Contrato Marco, el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesión comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido de las cuales surjan los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

4.2    El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE,

8

**PARTIES:**

(1)  **FONTERRA LIMITED** of Fonterra Centre, 9 Princes Street, Auckland, New Zealand ("Fonterra"); and

(2)  **SANCOR COOPERATIVAS UNIDAS LIMITADA** of Tte. Gral. Richieri 15, 52322FYA, Sunchales, Santa Fe, Argentina ("SanCor")

**BACKGROUND**

1.  Fonterra manufactures dairy products and has an international marketing network and experience in the sale of dairy products

2.  SanCor wishes to utilise the experience and services of Fonterra for sale in the international market of certain dairy products produced by SanCor.

3.  SanCor has agreed to sell to Fonterra on an exclusive basis and Fonterra has agreed to purchase the Products for on-sale by Fonterra to Customers in the Territory

**THE PARTIES AGREE as follows:**

**1   Interpretation**

In this Agreement, unless the context otherwise requires, the following words and expressions shall have the following meanings:

"**Agreement**" means this agreement including all schedules and appendices hereto.

"**Associate**" means any person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control of, the other person.  For this purpose, a person is deemed to control another person if the first such person possesses, directly or indirectly, the power to appoint a majority of the directors of the second person, or to otherwise direct or cause the direction of the management or policies of the second person, whether through the ownership of voting securities, by contract or otherwise;

"**Base Price**" means the weekly prices set by S&OP in New Zealand for Commodity Groups.

"**Business Day**" means, for the purpose of clause 16.7 (Notices) any day other than a Saturday, Sunday or Public Holiday in the country in which the notice is being served, and in all other cases means any day other than a Saturday, Sunday or Public Holiday in New Zealand or Argentina;

2

"Commission" means a commission of 1% of the FOB value of an Order, to a maximum value of USD40 per metric tonne and a minimum value of USD25 per metric tonne for payment terms of 30 days or less, payable by SanCor to Fonterra on all Products sold by Fonterra to Customers under this Agreement;

"Customer" means the customer to whom Fonterra sells the Products in response to an Order;

"Forecast" has the meaning set out in Schedule 1;

"Grading" means, in respect of Product, the time at which SanCor, acting in good faith, issues a "Certificate of Analysis" through SanCor's Quality Laboratory attesting to the Product meeting Specification (such SanCor Quality Laboratory being registered to issue these Certificates by the Argentine Ministry of Agriculture);

"Graded" has a corresponding meaning;

"Order" means a purchase order placed by Fonterra with SanCor for the supply of Products in accordance with clause 3;

"Products" means the products described in Schedule 1 manufactured by SanCor at its manufacturing facility and meeting a Specification acceptable to Fonterra (acting reasonably);

"Purchase Price" means the price agreed between SanCor and Fonterra in respect of a sale of the Products pursuant to an Order.

"Relationship Managers" means a relationship manager described in Schedule 1, or such other relationship managers as notified to the other party from time to time.

"Specification(s)" means the manufacturing and packaging specifications for each of the Products set out in Schedule 1 or such other specifications acceptable to Fonterra (acting reasonably), to be supplied by SanCor and as may be amended by agreement in writing from time to time;

"Term" shall have the meaning referred to in clause 2.4;

"Territory" means the Territory described in more detail in Schedule 1; and

"WACC" means weighted average cost of capital.

1.1   In this Agreement:

a.   references to clauses are to clauses of this Agreement;

b.  references to statutes shall include any statutory modification or re-enactment of the statute concerned;

c.  words and expressions in the singular shall include the plural and vice versa;

d.  the headings are for convenience only and shall be ignored in construing this Agreement;

e.  references in this Agreement to Fonterra shall include reference to its successors and permitted assigns; and

f.  all references to EXW, FOB, CFR, CIF and other delivery terms are references to those terms as defined in Incoterms 2000.

## 2   Appointment and Term

2.1   **Appointment:** SanCor hereby agrees to sell the Products to Fonterra exclusively in the Territory on the terms and subject to the conditions of this Agreement, and Fonterra agrees to purchase the Products on the terms and subject to the conditions of this Agreement.

2.2   **Effect of Territory:**   The effect of the appointment of Fonterra as the exclusive purchaser of the Products in the Territory is that:

    a.    Fonterra is entitled to sell or facilitate the sale and may engage any other person to sell or facilitate the sale of the Products in the Territory to any channel;

    b.    SanCor shall not itself sell or facilitate the sale and shall not engage any other person to directly or indirectly sell or facilitate the sale of the Products to Customers in the Territory unless this has first been agreed with Fonterra in writing on a case by case basis; and

    c.    SanCor shall not sell the Products to any person outside of the Territory if SanCor knows, or should have known by reasonable enquiry, or had reasonable cause to believe, that the Products would be subsequently imported or distributed or sold in the Territory.

2.3   **Enquiries from Territory:** SanCor may not sell or otherwise dispose of the Products in the Territory other than as provided in clause 2.2.b.   If SanCor receives any enquiries from any potential customers in the Territory relating to the Products, SanCor shall promptly inform Fonterra of such enquiries and shall not seek to deal directly or indirectly with those potential customers with respect to the Products.

2.4   **Terms:** Fonterra's appointment shall commence on 1 September 2007 and shall continue for an initial term of three years ("Term") unless earlier terminated in accordance with the terms of this Agreement.   This Agreement shall thereafter continue in full force and effect until a party gives to the other not less than six months' written notice of termination.

2.5   **Simple Termination:** After the first year of the Agreement, one party ("Terminating Party") may give to the other ("Other Party") a minimum of six months written notice of termination of the Agreement, without the Other Party having any claim, right, title, property or other interest of any kind or nature.   Before the Terminating Party can give notice of termination, the Terminating Party must offer, no later than six months prior to the date of termination, the right to discuss with the Other Party the reasons for the proposed non-renewal to give both parties the opportunity to discuss the

5

possibility of continuing this Agreement on agreed terms.

2.6 **Fonterra may sell competing products:** Nothing in this Agreement prevents or limits the right of Fonterra to be concerned or interested either directly or indirectly in the supply to Customers or any third party of any goods in the Territory which are the same as, similar to or competitive with the Products.

2.7 **Exception to Agreement:** The terms of this Agreement shall not apply to the sale or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A") or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities.

3 **Forecasting, Orders and Sales**

3.1 **Forecasting procedure:** The forecasting regime set out in Schedule 1 shall apply.

3.2 **Sales:** In accepting orders from Customers, Fonterra shall take into account the Forecast of volume of Products provided by SanCor under this Agreement.

3.3 **Quantity:** Fonterra agrees to sell the entire Manufactured Volumes of Product that is available for export to the extent that such Manufactured Volumes of Product meets the Specifications for each Product.

3.4 **Delivery:** SanCor agrees to deliver the Products subject of an Order within the timeframes and by the delivery method agreed between Fonterra and the Customer, subject to SanCor reasonably being able to comply with the requirements of an Order. Where Fonterra requires delivery dates or shipping arrangements that vary from the normal practice adopted between SanCor and Fonterra, Fonterra agrees to provide sufficient advance notice to SanCor to enable SanCor to meet the requirements of the relevant Order.

3.5 **Currency:** All sales of Products under this Agreement and all payments made under this Agreement are to be made in United States Dollars unless otherwise agreed.

3.6 **Terms and conditions of sale:** SanCor acknowledges that Fonterra is not making or providing to the Customer any representation or warranty, express or implied, that the Product meets the Specification, is fit for the intended purpose or is otherwise of merchantable quality. SanCor accepts full responsibility and liability for, and agrees to fully indemnify Fonterra in respect of, any claim by a Customer or any third party that the Products sold by

6

Fonterra to the Customer are in breach of any statutory or contractual warranty, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this agreement is the direct cause of such claim, loss or damage.

3.7 **Fonterra to sell at market price:** Fonterra shall endeavour to achieve the best market price for the Products at the time of sale to the Customer having regard to, amongst other factors, Specification, quality, volume, delivery date, delivery terms, international market price ranges and other market factors in so far as the availability of the Product is advised to Fonterra with sufficient lead time. Fonterra shall keep SanCor informed of any non-standard terms of sale or unusual conditions, pricing or volumes.

3.8 **Costs:** SanCor shall be responsible for (i) liability for any additional taxes imposed by the Argentinean Government over and above those considered by this Agreement and (ii) payment of all freight, financing costs, customs and other charges, costs and expenses related to supply and delivery of the Products to a Customer pursuant to the incoterms of an Order.

4 **Commission**

4.1 **Commission Amount** SanCor agrees that Fonterra is entitled to the Commission on all Products sold by Fonterra to a Customer. The Commission will be calculated depending on the payment terms with the end customer. For payment terms of 30 days or less, Commission will be 1% of the FOB value of the Order, up to a maximum of USD40 per metric tonne, and a minimum of USD25 per metric tonne.

4.2 Notwithstanding clause 4.1, for each subsequent 30 days of payment terms on the Order, SanCor will pay Fonterra an additional 0.5% monthly on the Purchase Price.

Example – in the case of an order with a purchase price of USD3000 / MT CFR with 90 day payment terms, the total commission due to Fonterra would be:

- base commission of 1% plus

- variable commission for two 30-day periods at 0.5% per 30 days

In this example, the total commission amount would be equal to USD60 / MT ((USD3000 x (1% base +1% variable)).

4.3 In the case that the average lapsed time from grading date to bill of lading date is less than 30 days, Fonterra and SanCor will share the capital saving generated on a 50:50 basis. The capital saving will be calculated using SanCor's weighted average capital cost, and will be calculated on the average number of days from grading date to BOL date for all the orders

shipped within a calendar month.

Example – if a total of 2500 MT was shipped within a given calendar month, within an average of 15 days from grading date to BOL date, with a weighted average price of USD3000 / MT CFR and a SanCor WACC rate of 12%, the total additional payment due would be:

= ((15/365)*0.12*3000)/2

= USD7.39 / MT additional payment due per MT

4.4   **Payment of Commission:**   On receipt by Fonterra of the Purchase Price paid by a Customer, Fonterra is entitled to deduct from that Purchase Price the Commission prior to Fonterra remitting the balance of the Purchase Price to SanCor.

5   **Payment to SanCor**

5.1   **Standard Payment Terms.**   Payment will be made by Fonterra to SanCor for the Products Fonterra has purchased from SanCor pursuant to this Agreement within 30 days from bill of lading date.

5.2   **Pre-payment:** Notwithstanding the payment provisions under clause 5.1, the Parties have agreed that, as an alternative, SanCor may request a Pre-payment for the Products as soon as the Products have been Graded (the "Grading Date"), in accordance with the following provisions.

5.3   The amount of any Pre-payment shall be an amount equal to the amount of an Order or a group of Orders.

5.4   The amount of all Pre-payments made by Fonterra shall not, at any one time exceed an aggregate value as agreed between both parties, or in the absence of such an agreed value, a total of USD10,000,000.00

5.5   Interest of Fonterra WACC + 2% will be charged on each Pre-payment from the date of the Pre-payment until the due date of the relevant order in accordance with the standard payment terms.

5.6   SanCor must give Fonterra not less than fourteen days notice that a Pre-payment is requested.  Pre-payment requests may only be made in respect of Product which has already been manufactured at the time notice is given and that is allocated to an existing Order.

5.7   The purpose of the pre payment provision of clause 5.2 is to provide cash-flow security to SanCor in the event that, due to market conditions, stock is not rotating at the same speed of manufacturing.  It would be expected that this clause would not be exercised unless a Product was held in stock for one reason or another for a period of more than 45 days from grading date.

6    Invoicing and Documentation:

6.1   The issuing of invoices to Customers shall be the responsibility of Fonterra.

6.2   SanCor will have responsibility to ensure that all export documentation, in compliance with the Country of Destination and Customer requirements as advised on each and every Order, is supplied to Fonterra within 15 days of the date of the relevant bill of lading.

6.3   SanCor has the right, at all times during the term of this Agreement, to request details of all final customer invoices from Fonterra.

6.4   **SanCor Default:** If SanCor, without the prior written consent of Fonterra, sells or otherwise disposes of Products in the Territory other than via the direct sale of those Products to Fonterra under this Agreement then, without prejudice to Fonterra's other rights and remedies, SanCor must immediately pay to Fonterra an amount equal to the Commission that would otherwise be payable if the Products had been sold or disposed of in accordance with the terms of this Agreement.

6.5   **Storage and Insurance:** In accordance with Schedule 1, Clause 2, "Supply and Forecasting Regime", last paragraph; SanCor will be responsible for attending to all storage, and handling of the Products to be sold under this Agreement up to and including delivery to the Customer regardless of whether or not any payment has been paid to SanCor, following the Incoterms agreed on an Order. Risk of loss, damage or deterioration of the Products will be with SanCor until delivery to a Customer on the terms of the relevant Order.

7    Fonterra's Obligations

7.1   Fonterra will:

   a.   at all times during this Agreement work diligently to promote the sale of the Products.

   b.   not describe itself as agent or representative of SanCor except to the extent authorised by this Agreement.

   c.   not sell or facilitate the sale of any Product without SanCor's consent if Fonterra knows, or should have known by reasonable enquiry, or had reasonable cause to believe, that the Product would be subsequently distributed or sold in countries that are outside of the Territory allocated to Fonterra under this Agreement. Where Fonterra receives any enquiries from any Customers or potential Customers for the purchase of the Product outside of the Territory. Fonterra shall promptly inform SanCor of such enquiries.  If a commission is to be paid on any business resulting from the

9

enquiry, this must be negotiated on a case by case basis.

d    conduct the business of selling the Products to Customers in an orderly and businesslike manner and in accordance with all applicable laws, regulations and requirements of any governmental or regulatory authority.

e.    sell the Products in the Territory only under the brand names and trademarks of SanCor and/or any of its Associates, and

f.    be responsible for and will pay for all of its own administrative costs and expenses associated with its marketing of the Products as sales agent in accordance with this Agreement.

g.    provide to SanCor together with the Order the following information:

    (i)    terms and conditions of sale of Products,

    (ii)    quantity and specification of Products

    (iii)    term and condition of delivery and shipment of Products, including country of destination; and

    (iv)    SanCor shall inform Fonterra within 4 (four) working days as from reception of the Order whether SanCor is precluded by the laws of Argentina from selling to that country of destination and/or any other legal impediment that may arise.

7.2    Fonterra will provide reasonable advice and technical assistance required to manufacture and supply the Products in accordance with the Specification. All such assistance will be at a cost to SanCor at an agreed rate on a case by case basis.

## 8    SanCor's Obligations

8.1    **Information to facilitate sales:** SanCor shall provide Fonterra with all necessary written information relevant to the sale of the Products including details of, Specification, health, legal and regulatory information and approvals and such other information as Fonterra may reasonably require to carry out its obligations under this Agreement. SanCor shall ensure that all information provided to Fonterra is accurate, current and kept up to date.

8.2    **No Agency.** SanCor shall not describe itself as Fonterra's agent or representative for the sale of the Products in the Territory, notwithstanding that if SanCor initiates a sourcing opportunity in the Territory on behalf of Fonterra, SanCor will be entitled to a commission on such Products equivalent to the Commission.

8.3 **Compliance:** It shall be the sole responsibility of SanCor to ensure that:

a. the Products comply with the Specifications, and with all the Product descriptions and information provided by SanCor to Fonterra or to a Customer;

b. all documentation, labelling and other requirements to ensure the Products are properly and promptly delivered to Customers are completed.

c. the Products comply with all relevant health, agricultural, legal and regulatory requirements in the country of manufacture and in the Territory;

d. the Products comply with the requirements of a Customer's country of import where specified (including without limitation any product registrations with relevant authorities that may be required but excluding any obligations such as customs clearance where customs clearance is the responsibility of the Customer under the terms of sale).

e. all Products are fit for their intended purpose (which, unless otherwise expressly agreed by both parties, shall be fit for human consumption), and

f. all Products can be traced as to source and batch in the event of any recall issues arising and adequate Product samples (to the reasonable satisfaction of Fonterra) are kept and properly stored.

8.4 **Access to Facilities:** SanCor will allow Fonterra access to the SanCor manufacturing facilities as necessary, during the Term of the agreement to inspect those facilities to ensure that the Products are being produced in accordance with the Specifications

8.5 **Recovery of Customer Payments:** If SanCor receives all or part payment from a Customer in respect of an invoice issued by Fonterra in accordance with clause 3.2, SanCor shall immediately notify Fonterra and remit such payment to Fonterra provided however that SanCor will be able to set-off such payment with any amount owed by Fonterra to SanCor in relation to the same transaction. Failure of SanCor to comply with these obligations shall entitle Fonterra to recover any amount paid by Fonterra to SanCor in respect of such sale.

8.6 **Freight:** As required SanCor will act on behalf of Fonterra in negotiating freight for product exported from Brasil, Argentina and Uruguay.

9 **Reporting, communication**

11

9.1 **Reporting and communication procedure:** The parties shall agree on reasonable reports, meeting and other communication processes for the purpose of discussing sales activities, obtaining market feedback and generally reviewing performance of both parties. Each party shall participate in good faith in all such meetings.

9.2 **Quarterly meetings:** Without limiting clause 7.1, the parties will meet on a quarterly basis to discuss general performance and other such issues as may arise.

9.3 **Reports:** Fonterra will provide to SanCor quarterly reports containing such marketing and sales information as may be appropriate. These reports shall include pricing information for shipments of comparable dairy products from New Zealand.

## 10 Intellectual Property

10.1 **SanCor Trademarks:** Where the Products bear the name, logo and/or other proprietary marks of SanCor and/or any of its Associates or parent companies ("SanCor Trademarks"), Fonterra is authorised to promote and sell the Products in the SanCor packaging and by reference to the SanCor Trademarks. Fonterra will use or refer to the SanCor Trademarks only for the purpose of sale of the Products in accordance with this Agreement and acknowledges that the SanCor Trademarks remain the property of SanCor and that Fonterra's use of the SanCor Trademarks does not create any separate rights of Fonterra in the SanCor Trademarks. Fonterra will not contest the ownership of the SanCor Trademarks and not use or attempt to register the SanCor Trademarks in any country.

10.2 **Indemnity:** SanCor will indemnify Fonterra and keep Fonterra indemnified from and against any and all claims, demands, actions and proceedings ("Claims") which are made or brought against Fonterra by any third party, that the use of the SanCor Trademarks or the sale, promotion or use of the Products bearing the SanCor Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

10.3 Fonterra will indemnify SanCor and keep SanCor indemnified from and against any and all Claims which are made or brought against SanCor by any third party that the use of the Fonterra Trademarks or the sale, promotion or use of the Products bearing the Fonterra Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such

05/10/2007

12

claim, loss or damage.

10.4 **Fonterra Trademarks:** Use by Fonterra of its sales network for the purposes of this Agreement does not give SanCor any rights whatsoever in Fonterra's sales network or in any of the names, logos and/or other proprietary marks of Fonterra or its Associates ("Fonterra Trademarks"). SanCor is not authorised to use the Fonterra Trademarks in relation to any sale or promotion of the Products or any other products except with the express written agreement of Fonterra on a case by case basis. SanCor will not contest the ownership of any Fonterra Trademarks and not use or attempt to register the Fonterra Trademarks in any country.

## 11   Liability

11.1 **General indemnity:** Each party (the "indemnifying party") will indemnify and keep indemnified the other party from and against any direct loss, damage or liability (including legal fees and costs on a solicitor/client basis) suffered or incurred by that other party resulting from breach of this Agreement by the indemnifying party including any act, neglect or default of the indemnifying party's agents and employees.

11.2 **Excluded:** Neither party shall be liable to the other for any loss of profits or loss of income or savings or for any indirect or consequential loss or damage.

11.3 **SanCor indemnity:** SanCor shall indemnify and hold Fonterra harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by Fonterra arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of SanCor, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

11.4 **Fonterra indemnity:** Fonterra shall indemnify and hold SanCor harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by SanCor arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the

13

Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of Fonterra, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

## 12  Confidentiality

12.1  **Hold confidential:** The parties acknowledge and agree that:

    a.  the provision or disclosure by one party ("Disclosing party") to the other party ("Receiving party") intentionally or otherwise of marketing plans, manufacturing and technical information, pricing information and other matters arising from or relating to the supply of the Products or the business affairs of a party for the purposes or in connection with this Agreement in whatever form (the "Confidential Information") is confidential and of substantial value to and the property of the Disclosing party;

    b.  the Receiving party does not have any claim, right, title, property or other interest of any kind or nature in the Confidential Information; and

    c.  the Receiving party shall hold and maintain the Confidential Information in strictest confidence and in trust for the sole and exclusive benefit of the Disclosing party

12.2  **Specific Information:** Fonterra has been engaged by SanCor due to Fonterra's international marketing network and experience in the sale of dairy products. Fonterra will be using that experience and it customer lists and contacts in marketing the Products to its existing and new customers. It is acknowledged by SanCor that all such customer lists are Fonterra's Confidential Information

12.3  **Excluded:** For the purposes of this Agreement, "Confidential Information" shall not include any information which:

    a.  is published or otherwise becomes generally available to the public other than as a result of disclosure by the Receiving party; and

    b.  becomes available to the Receiving party on a non-confidential basis from a source other than the Disclosing party provided that such source is not itself in breach of any obligation of confidentiality.

12.4  **Survival:** The obligations created under this Agreement to preserve the confidentiality of information disclosed by each party to the other shall not be

13/10/2007

14

extinguished by and shall expressly survive termination of this Agreement during the period of three (3) years after the Date of Termination.

## 13  Force Majeure

13.1  **Force majeure:** Neither party shall be liable to the other for any failure to fulfil or perform any of its obligations under this Agreement, other than an obligation to pay money, if fulfilment has been delayed, hindered or interfered with, curtailed or prevented by any circumstance whatsoever which is beyond that party's reasonable control including without limitation where such failure is caused by war, civil commotion, hostility, Act of God, outbreak of disease, or governmental regulation or direction.

13.2  **Notice:** A party seeking relief from its obligations under this Agreement shall forthwith give notice to the other party of such impediment and its effects on the party's ability to perform. Notice shall also be given when the ground of relief ceases. Failure to give notice makes the failing party liable in damages for loss which otherwise could have been avoided.

13.3  **May terminate:** No curtailment or cessation of delivery of the Products pursuant to this clause 13 shall operate to extend this Agreement. If the curtailment or cessation of the delivery of the Products continues for more than 60 days either party may terminate this Agreement by written notice.

## 14  Dispute Resolution

14.1  Before commencing any legal or administrative proceedings in respect of any dispute arising in respect of, or in connection with, this Agreement (including the validity, breach or termination of it) ("Dispute"), a party must give the other party notice of the Dispute.

14.2  Following receipt of a notice under clause 14.1, each of the parties' Relationship Managers must meet to discuss the Dispute within ten Business Days of receipt of notice of the Dispute, with a view to achieving a resolution of the Dispute within 20 Business Days of receipt of that notice, or such longer period as the Relationship Managers agree in writing.

14.3  If the Relationship Managers fail to resolve the Dispute within 20 Business Days of notice of the Dispute, either party may take such legal action, including the commencement of legal proceedings, as is deemed appropriate or necessary by it to resolve or determine the Dispute in accordance with this Agreement or at law.

14.4  A party is not bound by clause 14.2 if the other party does not comply with that clause.

14.5  Nothing in clause 14.1 limits the rights of either party to seek interlocutory relief in respect of this Agreement or the other party's obligations under it.

15

## 15  Termination

**15.1  Acts of default.** Either party may terminate this Agreement immediately, if the other party:

a.  breaches a provision of this Agreement and fails to remedy that breach within 30 days of written notice being given;

b.  is, becomes, continues to be, or is deemed to be  insolvent or bankrupt; in spite of this, neither party does not have any other claim, right, title, property or other interest of any kind or nature

c.  makes an assignment for the benefit of, or enters into or makes any arrangement or composition with, its creditors; in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature.

d.  goes into receivership or has a receiver, trustee and/or manager (including a statutory manager) appointed in respect of all or any of its property;

e.  is the subject of any resolution passed, or any proceeding commenced, for its winding up or liquidation (other than for the purpose of a solvent reconstruction); in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature; or

f.  assigns the benefits of this Agreement without consent of the other party except as otherwise provided herein.

## 16  Miscellaneous

**16.1  Interest:** Where any amount due from SanCor to Fonterra or its Associates is not paid by the due date, or where Fonterra is requested by SanCor to pay in advance against Product, then Fonterra may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

**16.2** Where any amount due from Fonterra to SanCor or its Associates is not paid by the due date, SanCor may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

**16.3  Waiver:** No failure on the part of either party to exercise, and no delay by

either party in exercising, any right under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.

16.4 **Compliance With Applicable Laws**: Each party shall comply with all applicable laws or regulations relating to the performance of its obligations under this Agreement and any transaction related to it, including without limitation, obtaining all necessary licences, permits, authorisations, and approvals required from any Governmental, provincial or local department or agency applicable to the performance of its duties in this Agreement.

16.5 **Severable Agreement**: If any provision in this Agreement is held invalid or unenforceable in whole or in part then such invalidity or unenforceability shall affect only such provision or part thereof. To the extent legally permissible, an arrangement which reflects the original intent of the parties shall be substituted for such invalid or unenforceable provision.

16.6 **Counterparts**: This Agreement may be executed in two or more counterparts and may be executed on the basis of an exchange of facsimile copies.

16.7 **Amendments**: This Agreement may only be altered in writing signed by all the parties.

16.8 **Notices**: Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed duly given if given by personal service or sent by letter, email or facsimile addressed to the party to whom it is to be delivered at their address set out below or to such other address as that party shall have most recently notified in writing. Any notice served in accordance with this clause shall be deemed to have been duly served:

a. in the case of personal delivery, upon actual delivery to the correct address during the hours 8.30 am to 5.00 pm on a Business Day;

b. in the case of service by post 15 days after posting the same in a correctly addressed envelope;

c. in the case of transmission by fax or email on the next Business Day at the place of receipt of the fax or email.

Address for Fonterra:  Fonterra Limited
                        Fonterra Centre
                        9 Princes Street
                        Private Bag 92032
                        Auckland
                        New Zealand
                        Attn: General Counsel and Company Secretary

17

Phone:  64 9 374 9049
Fax:      64 9 379 8281

Address for SanCor:    SanCor Cooperativas Unidas Limitada
                       Teniente General Richieri 15
                       S2322FYA Sunchales
                       Santa Fe
                       Argentine.)
                       Attn:
                       Phone:
                       Fax.

16.9 **Entire Agreement**:  This Agreement constitutes the entire agreement between the Parties in relation to its subject matter and supersedes and cancels any previous agreements and arrangements in respect of the services. The Parties have signed an Exclusive Sales and Marketing Agreement in December 2004 ("2004 Agreement"), which they agree, is cancelled as of 1 August 2007. The parties acknowledge and agree that neither party has any claim, right or title emerging from the 2004 Agreement.

16.10 **Sub-Agency**:  Fonterra may appoint a sub-agent with the prior written approval of SanCor but Fonterra shall remain fully responsible for meeting its obligations under the Agreement notwithstanding such appointment.

16.11 **Assignment**: Except as provided for in this clause, no party may assign this Agreement without the prior written consent of the other party.

16.12 **Relationship between the Parties**: Neither party shall have the authority to create or assume any obligations of any kind (whether express or implied) for or on behalf of the other party except as permitted by this Agreement. Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties for any purpose whatsoever.

16.13 **Governing Law**: The formation, validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of New Zealand. The parties irrevocably agree that the Courts of New Zealand shall have the non-exclusive jurisdiction to hear and determine all disputes under or in connection with this Agreement.   The parties irrevocably waive any objections to New Zealand as the forum for proceedings on the grounds of forum non-conveniens or any similar grounds.

18

SIGNED for and on behalf of

FONTERRA LIMITED

Signature

Name _KALVIN WICKHAM_

Date _1ST OCTOBER 2007_

SIGNED for and on behalf of

SANCOR COOPERATIVAS UNIDAS LIMITADA

Signature

Name _Claudio A Giraudi_

Date _23 Octobre 2007_

19

SCHEDULE 1

1.   PRODUCTS AND TERRITORIES

Territory:
All countries of the world except Argentina and sales or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S A") or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities.

Products.

Whole Milk Powder in 25 Kgs. Bags
Whole Milk blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
Skimmed Milk Powder in 25 Kgs. Bags
Skimmed Milk Powder blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
Butter in 25 Kgs. Blocks
Brine Salted cheese including Gouda by agreement
Mozzarella
Non gas-flushed regular whole milk powder in 25kg bags

SanCor agrees that no Product that has failed to meet the original Specification, or such other specification as may have been agreed in writing between the parties, shall be re-processed by SanCor as product to be sold to Fonterra pursuant to this Agreement

Products in consumer formats are specifically excluded from this Agreement, including 3.6kg loaves of gouda and mozzarella for sale via SanCor's existing distributors within Latin America.

2.   SUPPLY AND FORECASTING REGIME

On or before the 5th Business Day of the month, Fonterra shall provide SanCor with a rolling 18 month forecast of customer demand, by customer, by month. This forecast will include customer D1 (unconstrained demand), D1 contracted, previous AD (dedicated availability) and previous AU (unconfirmed availability).

Transparent customer payment term information will also be provided.

20

00103097

When this information is available from SAP APO Fonterra and SanCor will open the monthly process with a demand review meeting to capture variances from previous months and to set a baseline planning demand.

Once baseline planning demand is agreed SanCor will have 5 Business Days to use this demand signal to make product mix decisions and will propose a customer level supply plan (availability plan).

SanCor and Fonterra will meet on 10th Business Day of the month to sign off this availability plan.

Key outcomes of SanCor-Fonterra S&OP meeting:
- Formal milk supply and market update include forecast base price information.
- KPI review and corrective actions.
- Sign off of availability plan for release to NZ S&OP and market.
- Sales plan
- Inventory targets
- Agreed base pricing for SanCor products
- Marginal pricing for unforecasted production

In the case that during the monthly meeting an agreement cannot be reached between the parties on optimal placement opportunities for Product, SanCor may, on an exceptional basis, put forward for discussion proposals of business from Third Parties. If no suitable alternative business can be found through the Fonterra network, Fonterra will provide written approval for SanCor to execute these sales directly. No such sales may proceed without prior written approval.

3   **RELATIONSHIP MANAGERS**

   Fonterra:    Emma Parsons

   SanCor:    Santiago Aon

4.   **PRODUCT SPECIFICATIONS**

[To be completed]

## ❋ PDVSA

BARIVEN, S.A.
c/o PDVSA Services, Inc.
Purchasing Agent (RUCO)
1293 Eldridge Parkway
Houston, Texas 77077
United States of America

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km .5

DON TORCUATO
ARGENTINA
POSTAL CODE: 00000 PO BOX: 0000000000
SALESPERSON / PHONE: Santiago Aon (11) 54 4748
5300
FAX: 1147485390
**PDVSA SUPPLIER CODE:** J50014838

**Purchase order**

**5100062284**

**DATE**              :March,26 2008
**CONTACT PERSON**    :Jose Camacho
**TELEPHONE USA**     :(281)5886478
**E-MAIL ADDRESS**:2815827511

YOUR REF.   AGREEMENT

**INSTRUCTIONS FOR SUPPLIERS :**          **DELIVERY DATE** : December,30 2008
FOR SHIPPING INSTRUCTIONS CALL:

CFR -PUERTO CABELLO/LA GUAIRA, VENEZUELA
VENEZUELA

**INSTRUCTIONS FOR FREIGHT FORWARDER:**
**PLEASE CONTACT SUPPLIER FOR INLAND SHIPPING DETAILS**

**TERMS OF DELIVERY** : CFR PUERTO CABELLO/LA GUAIRA, VE          **CURRENCY** : USD
**PAYMENT TERMS**     : Payable immediately due net

**P.O. General Comments**

   PURPOSE OF CHANGE
   ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
CHANGE ORDER NO. 03 IS ISSUED ON 26MARCH BY JOSE CAMACHO
TO REPLACE THE P.O. 5100061354 (XC5100061605) AND CREATED A NEW P.O. IN SAP IN ORDER TO
PROCESS THIS PURCHASE ORDER AS SAP SYSTEM REQUIRE, IN THIS MANNER WE SOLVED THE
TECHNICAL PROBLEM WITH THE ORIGINAL PURCHASE ORDER FOR THIS SUPPLIER.

PO VALUE DOES NOT CHANGE

PURPOSE OF CHANGE
   ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
CHANGE ORDER NO. 02 IS ISSUED ON 26MAR08 BY JOSE CAMACHO
TO MODIFY THE PAYMENT ACCORDING THE AGREEMENT BETWEEN SUPPLIER AND PSI FINANCE. THE
PAYMENT TERMS ARE:

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PO VALUE DOES NOT CHANGE

## ❈ PDVSA

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase order |
| --- |
| 5100062284 |

PURPOSE OF CHANGE
-------------------
CHANGE ORDER NO. 01 IS ISSUED ON 12MAR08 BY JOSE CAMACHO
.* TO MODIFY THE DELIVERY TERMS FROM CFR - PUERTO CABELLO TO CFR - PUERTO CABELLO AND
LA GUAIRA PORT AT VENEZUELA.
.* TO MODIFY THE SHIPPING INSTRUCTIONS NOTE FOR THE SUPPLIER.

P.O. VALUE DOES NOT CHANGE
............................................

PRODUCT MUST BE PALLETIZED AND SECURELY BANDED FOR OCEAN TRANSPORT.
PRICES & TERMS PER AGREEMENT SIGNED 2.11.06 BETWEEN ARGENTINA & VENEZUELA.
DELIVERY: 10 MONTHS ARO WITH THE FOLLOWING SCHEDULE
7,000 TM FROM MARCH TO JUNE 2008
11,000 TM FROM JULY TO DEC. 2008
............................................................
-. "MANDATORY" WE NEED THE TECHNICAL AND NUTRITIONAL SPECIFICATIONS,
COPY OF THE FITOSANITARY, CERTIFICATE OF ORIGIN FROM YOUR PRODUCTS,
QUALITY CERTIFICATE FROM THE PRODUCTS PLANTS.

-. "MANDATORY" SUPPLIER MUST SEND THE DELIVERY SCHEDULE AND PLANT LOCATIONS BY EMAIL
IN ORDER KNOW THE LOGISTICS AND COORDINATE THE INSPECTIONS BY PSI TO:
JUAN JOSE BASTARDO, EMAIL: BASTARDOJJ@PDVSA.COM.
MARIA ROBLES, EMAIL: ROBLESM@PDVSA.COM
PABLO RODRIGUEZ, EMAIL: PRODRIGUEZ@PSI.TTV.COM

............................................................

............................................................
IF SUPPLIER FAILS TO PROVIDE A P.O. ACKNOWLEDGMENT WITHIN THE
SPECIFIED PERIOD (48 HOURS), THEN 50TH P.O. SHALL BE DEEMED
ACCEPTED BY SUPPLIER.
............................................................

Shipping Marks
BARIVEN, S.A./PDVSA PETROLEO MYM PUERTO
5100062284/XG64004713

VAL-VALENCIA
VIA :PUERTO CABELLO, VENEZUELA
PRIORITY LEVEL: 3
FIELD EXPEDITING: N
INSPECTION FLAG: Y

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
| --- | --- | --- | --- | --- | --- | --- |

❋ **PDVSA**

Purchase order
**5100062284**

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| 00001 | **18.000 Metric Ton**, ENRICHED POWDER | 5,000,00 | 90.000.000,00 |

Harmonized Tariff Code : 0402211900

**Material purchasing text**
ENRICHED POWDERED MILK WITH VITAMINS A AND D

IT IS THE PRODUCT OBTAINED BY ELIMINATING ALMOST ALL OF THE WATER THAT CONSTITUTES MILK.

1. REQUISITES:

* MUST BE FREE OF PRESERVATIVES, NEUTRALIZERS, TOXIC SUBSTANCES OR ANY STRANGE MATTER.

* MUST BE OF WHITE YELLOWISH COLORING AND HOMOGENEOUS THROUGHOUT, CHARACTERISTIC OF SIMILAR PRODUCTS

* MUST BE EXEMPT OF STRANGE ODORS AND TASTE SIMILAR TO ITS NATURE.
* MUST BE A HOMOGENEOUS POWDER, CONGLOMERATED, EXEMPT OF ANY
NON INCLUSIVE MATTER, FREE OF ANY BURNED PARTICLES AND STRANGE MATTER.

2. PHYSIOCHEMICAL REQUIREMENTS:

CHARACTERISTICS LIMITS (%)
HUMIDITY MAX. 3,5
FAT MIN. 26,0   MAX. 27,0
PROTEINS MIN. 24,5
CHLORIDES MIN. 0,07   MAX. 0,11
ASH MAX. 5,9
ACIDITY (G AC.LACTIC/100G) MAX. 1,35
FAT FREE MAX. 2,0
LACTOSE MIN. 34,0
INSOLUBILITY INDEX (ML) MAX. 0,5
BURNED PARTICLES MAX. B-15N

VITAMIN A MIN. 960 (UG/100G)   MIN. 3200 (UI/100G)
VITAMIN D MIN. 8 (UG/100G)   MIN. 320 (UI/100G)

3. MICROBIOLOGIC REQUISITES:

CHARACTERISTICS (UFC/G) LIMITS

AEROBIOS MESOFILOS MIN. 5,0 X 103   MAX. 1,0 X 104
MOLD  MIN. 1,0 X 102   MAX. 1,0 X 103
SALMONELLA IN 25G 0
COLIFORM (NMP/G) MIN. 3   MAX. 9

## ✳ PDVSA

| Purchase order |
|---|
| 5100062284 |

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| ITEM | MATERIAL | QUANTITY UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|

S.AUREUS MIN. 10 MAX. 1,0 X 10²
LISTERIA MONOCYTOGENES EN 25G 0
ESPORA TERMOFILE MIN. 1,0 X 10²   MAX. 1,0 X 10³

....................................................
LECHE EN POLVO ENTERA CON VITAMINAS A Y D.
NORMA CONSULTADA COVENIN 1481:2001.

REQUISITOS:

* DEBE ESTAR LIBRE DE PRESERVATIVOS, NEUTRALIZANTES, SUSTANCIAS TOXICAS Y MATERIAS
EXTRAÑAS.

* DEBE SER DE COLOR BLANCO AMARILLENTO HOMOGENEO, CARACTERISTICO DEL PRODUCTO.

* DEBE ESTAR EXENTO DE GLOBES Y SABORES EXTRAÑOS A LA NATURALEZA DEL MISMO.

* DEBE SER UN POLVO HOMOGENEO, AGLOMERADO, EXENTO DE GRUMOS COMPACTOS, LIBRE DE
PARTICULAS QUEMADAS Y DE MATERIA EXTRAÑA
ENRICHED POWDERED MILK WITH VITAMINS A AND D

        Additional technical specs.

ENRICHED POWDERED MIL WITH VITAMINS A AND D

....................................................
..........
LECHE EN POLVO.

....................................................
LECHE EN POLVO MODIFICADA ENRIQUECIDA CON VITAMINAS & MINERALES
APTA PARA CONSUMO INFANTIL

ROTULADO: SEGUN ARTE GRAFICO SUMINISTRADO POR PDVAL
PRESENTACION:  EN BOLSAS TRILAMINADAS DE 1 KG.

ENTREGAS: MARZO - ABRIL 2008

CARGA: APROX. 17 TM POR CONTENEDOR DE 40' DRY HIGH CUBE, PALETIZADO

**�֎ PDVSA**

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

**Purchase order**
**5100062284**

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|
| | | | | Gross Price | | 90,000,000.00 |
| | | | | Net value | | 90,000,000.00 |

**Purchase order total value**       **90,000,000.00** USD

**P.O. General terms**

··· DOC. B0021, REV. E (08 13 2007) ···

DELIVERY

10 MONTHS AHO WITH THE FOLLOWING SCHEDULE
7,000 TM FROM APRIL TO JULY 2008
11,000 TM FROM JULY TO DEC. 2008

LINE ITEMS MUST SHIP COMPLETE
PARTIALS ARE ALLOWED PER SCHEDULE ABOVE

ESTIMATED WEIGHT   SELLER TO ADVISE

NEW MATERIAL

MATERIAL MUST BE IN NEW CONDITION, FREE FROM DEFECTS AND SUITABLE FOR ANY SERVICE SPECIFIED, UNLESS OTHERWISE
STATED

ORDER ACKNOWLEDGEMENT

SELLER MUST ACKNOWLEDGE RECEIPT OF THIS FAXED PURCHASE ORDER WITHIN 48 HOURS A P.O. VIA E-MAIL, AND ADVISE AND
CONFIRM SHIPPING DATE, BY PROVIDING THE FOLLOWING INFORMATION

· OUR REFERENCE (PO) NUMBER
· CONFIRMED DELIVERY DATE
· YOUR REFERENCE NUMBER
· YOUR EXPEDITING CONTACT
· TELEPHONE NUMBER
· FACSIMILE NUMBER
· DRAWINGS SUBMITTAL DATE                    (as applicable)

ORDER ACKNOWLEDGEMENT MUST BE E MAILED WITH OUR P.O. NUMBER IN THE SUBJECT LINE, TO PDVSA SERVICES EXPEDITING
DEPARTMENT AT OAINBOX@PSI PDV.COM

**✳ PDVSA**

```
Purchase order
5100062284
```

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

### Terms of delivery

GENERAL INSTRUCTIONS

AIR FREIGHT VIA MAIQUETIA
1 Consign Master AWB to Forwarder's office in Maiquetia
2 Consign House AWB to first line of shipping marks

Notify Party
Clover Internacional C A.

Address
Aduana Aérea de Maiquetia Detras del Almacén de Avensa y al lado de Aitaka Carga Maiquetia, Estado Vargas
Venezuela / Fax 01158(212)331-3786
Attn (Operatons Manager)
Telephone 01158(212)331-3301
Email amanis.galdona@clovergroup.com.ve ciganak@pdvsa.com

Contacts
Yubeis Munoz - yubeks.munoz@clovergroup.com.ve / 58(212)331-1103
Onelia Torres - onelia.torres@clovergroup.com.ve / 58-212 - 331-3304
Liliana Cigana - Ciganak@pdvsa.com / 0212-958-04-900/0415-980-09-04
Grazia Fiore - Grazialf@pdvsa.com / 0212-958-04-900 - 0414-235-98-37

OCEAN FREIGHT VIA LA GUAIRA
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C A.

Address
Aduana Aérea de Maiquetia detrás del Almacen de Avensa y al lado de Aitaka Carga Maiquetia, Estado Vargas
Venezuela / Fax 01158(212)331-3786
Attn (Operatons Manager)
Phone 01158(212)331-3301
Email. amanis.galdona@clovergroup.com.ve ciganak@pdvsa.com.

Contacts
Yubeis Munoz - yubeks.munoz@clovergroup.com.ve / 01158(212)331-1103
Onelia Torres onelia.torres@clovergroup.com.ve / 01158(212)331-3304
Liliana Cigana Ciganak@pdvsa.com / 0212-958-04-90/0415-980-09-04
Grazia Fiore Fioreg@pdvsa.com / 0212-958-04-920414-235-98-37

OCEAN FREIGHT VIA PUERTO CABELLO
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C.A.

Address
Calle Mariño con Calle Guevara,
Edificio Centro Profesional Gaba, Oficina 3
Puerto Cabelio, Estado Carabobo-
Venezuela / Fax 01158(242)382-0210
Attn Luis Vera (Customs Coordinator) / ciganak@pdvsa.com
Telephone 01158(242)387-5010/381-4244

Contacts
Luis Vera - luis.vera@clovergroup.com.ve / 01158(242)387-5010/361-4244
Iliana Vasquez - iliana.vasquez@clovergroup.com.ve / 01158(241)381-1157
Vanessa Diaz vanessa.diaz@clovergroup.com.ve / 01158(241)381157
Mirsma Goxa Goinams@pdvsa.com / 0414-235-92-80
Liliana Cigana - Ciganak@pdvsa.com / 0212-958-04-90/0415-980-09-04
Grazia Fiore - Grazialf@pdvsa.com / 0212-958-04-900 / 0414-235-68-37

EXPORT DOCUMENTS
The following shipping documents are required by the Venezuelan Government for customs clearance. All shipments must be sent on freight prepaid basis and should be consigned in all shipping documents, AWB, B/L as follows

1 B/L or AWB Consigned as shown on the first line of the purchase order shipping marks

# ❈ PDVSA

| | |
|---|---|
| **SUPPLIER:** | **Purchase order** |
| SANCOR COOPERATIVAS UNIDAS LIMITADA | **5100062284** |
| Ruta Panamericana km 25 | |
| DON TORCUATO | |

**2 COMMERCIAL INVOICE**
a Prepare one invoice per shipment per Order
b The invoice should be consigned as shown on the first   line of the purchase order shipping marks
c All shipper's invoices must specify the following   information
i Invoice date and number
ii PDVSA SERVICES INC  Purchase Order Number and   Requisition Number
iii Delivery terms / Payment terms
iv Purchase Order Item Numbers as shown in Purchase   Order
v Number and description of goods
vi Tariff Number and Spanish Description, if given, for   Purchase order  If more than one is given indicate   each one with the corresponding
item
vii Gross & Net weight of commodity
viii Value & Dimensions of commodity
ix County of origin

**3 INSPECTION CERTIFICATES**  Agriculture exporters are frequently required to provide a certificate attesting to the condition  of the goods shipped
**4 PHYTOSANITARY CERTIFICATE**  This certificate must be  issued by a certifying official (Federal, State or Local)
**5 CERTIFICATE OF ORIGIN**  This certificate must be issued by a  certifying official

Original Export documentation
Documents for all ocean shipments are required to be in possession of Banven  Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuela Port of unlading  Att  Liliana Cigana / Grazia Fiore

Send the required originals to
BAR-VEN  ADUANAS PDVSA AGRICOLA
CENTRO EMPRESARIAL EUROBUILDING
PISO 10  OFIC  22
Phone  58212-958-04 90 - Fax  58212-958-00 20

Perishable Shipments
- All documents associated with perishable goods must specify  the  temperature that the goods must be kept at in both  Celsius and  Fahrenheit scales
- The documents should indicate directly whether the goods  should  be REFRIGERATED or FROZEN  (Preferred temperature  should be clearly marked on the cargo)
- Perishable and non perishable cargo must not be shipped  together on the same bill of lading or in the same  consolidation  Each  category of material must be shipped  and documented separately

**REQUIRED EXPORT DOCUMENTS AND DISTRIBUTION**

**(OCEAN)**
DOCUMENT      CUSTOMS BROKER / PSI
Original Bill of Lading        4/1
Copies of B/L        2/1
Commercial Invoice Original       4/1
Commercial Invoice copies   2/1
Export packing list 4/1
Certificates (if any)      2/1

**(AIR)**
DOCUMENT      CUSTOMS BROKER / PSI
Original Airway Bill        4/1
Copies of AWB 2/1
Commercial Invoice Original   4/1
Commercial Invoice copies  2/1
Export packing list 4/1
Certificates (if any)       2/1

Note  SHOW PURCHASE ORDER SHIPPING MARKS ON ALL DOCUMENTS

**PACKAGING AND LABELING**

AS OF APRIL 2006 WOODEN PACKING TO VENEZUELA MUST SHOW A MARKING THAT THE WOOD WAS EITHER TREATED WITH METHYL BROMIDE OR HAS BEEN HEAT TREATED AND DOES NOT PRESENT/DISPLAY EVIDENCE OF QUARANTINE PESTS  ALL WOOD USED IN THE BOXING/CRATING  PALLETIZING  SKIDDING  OR BLOCKING  AND BRACING OF THE MATERIAL ON THIS PURCHASE ORDER MUST HAVE UNDERGONE SUFFICIENT PROCESSING OR TREATMENT IN COMPLIANCE WITH ISPM 15 OF THE INTERNATIONAL PLANT PROTECTION CONVENTION (IPPC) ENTITLED "GUIDELINES FOR REGULATING WOOD PACKAGING MATERIAL IN INTERNATIONAL TRADE"  ALL WOOD SUBJECT TO THIS REGULATION SHALL BE MARKED AS SPECIFIED IN ANNEX II OF THE REGULATION  NON-CONFORMANCE WILL RESULT IN CONFISCATION OF THE ENTIRE SHIPMENT BY VENEZUELAN PORT/AIRPORT AUTHORITIES  FOR SPECIFIC DETAILS, PLEASE REFER TO THE IPPC WEBSITE  WWW.IPPC.INT

## PDVSA

| Purchase order |
| --- |
| 5100062284 |

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana Km 21
DON TORCUATO

ALL CARGO DESTINED TO VENEZUELA MUST BE SUFFICIENTLY PACKED TO WITHSTAND THE RIGORS OF INTERNATIONAL TRANSPORT. PACKAGING MUST RESIST THE ROUGH HANDLING DURING LOADING AND UNLOADING, COMPRESSION FROM THE OVERHEAD WEIGHT OF OTHER CONTAINERS, IMPACT AND VIBRATION DURING TRANSPORTATION, AND HIGH HUMIDITY DURING PRECOOLING, TRANSIT, AND STORAGE

A  PACK MATERIALS IN ONE OF THE FOLLOWING WAYS
 - SHIPPING UNITS EACH UNIT OF FREIGHT  TENDERED TO A CARRIER  AS LISTED AND DEFINED ON BILL OF LADING  DO NOT COMBINE  DIFFERENT ORDERS IN ONE SHIPPING UNIT
 - INTERIOR PACKAGES  EACH UNIT PACKAGE COMBINED WITH OTHER  PACKAGES TO MAKE UP A SHIPPING UNIT  THEY MUST CONSIST OF  ONLY ONE ORDER ITEM (ANY QUANTITY)

B  PACKING LIST  ATTACHED TO EXTERIOR OF AT LEAST ONE SHIPPING UNIT  ADDITIONAL PACKING LISTS MUST BE INSIDE OF ENCLOSED SHIPPING UNITS

MARKING  (MUST BE PERMANENT/WATERPROOF)
A  INTERIOR PACKAGES  MARK OR TAG WITH ORDER NUMBER
 - ITEM NUMBER
B  SHIPPING UNITS  MARK ON TWO ADJACENT SIDES OR TAG
 - SHIPPING MARKS  AS SPECIFIED IN THE PURCHASE ORDER   ORDER) AND  ITEM NUMBER (IF A ONE-ITEM SHIPPING UNIT)
 (OVERALL DIMENSIONS IN CENTIMETERS - GROSS WEIGHT  IN  KILOGRAMS
C  SHIPPING UNIT NUMBERS  NUMBER EACH SHIPPING UNIT BEGINNING  WITH NUMBER 1 IN MULTIPLE SHIPMENTS, NUMBER UNITS CONSECUTIVELY INDICATING TOTAL UNITS IN THE LOT (I.E. 1 OF 4, 2OF 4, ETC.) ENCLOSED ATTACH PACKING LIST TO SHIPPING UNIT NUMBER 1
D  PACKING LIST   SHOW FOR EACH ORDER ITEM LISTED
 - PURCHASER'S STOCK NUMBER (IF GIVEN IN ORDER)/ GOODS  DESCRIPTION
E  NUMBER
 - SHIPPING UNIT NUMBER (IF MORE THAN ONE)  / SHIPPING   MARKS  AS SPECIFIED IN THE PURCHASE ORDER

F  FOR PERISHABLE AND NON-PERISHABLE FOOD PRODUCTS

 PLEASE INDICATE THE FOLLOWING

STORAGE TEMPERATURE_____ (INDICATE º F OR º C)

REFRIGERATED OR FROZEN OR DRY (CHOOSE ONE)

PLEASE USE COLORED LABELS TO CATEGORIZE EACH CASE/CRATE

GREEN  REFRIGERATED
BLUE  FROZEN
RED  DRY/NON PERISHABLE

PRE-SHIPMENT ADVICE
PRE-ALERT MUST SHOW DEPARTURE DATE AND PORT CITY, PORT OF DESTINATION AND ETA, VESSEL NAME AND VOYAGE NUMBER, BILL OF LADING NUMBER AND DATE, NAME OF SHIPPING LINE, PURCHASE ORDER NUMBER AND REQUISITION NUMBER (SECOND LINE OF P.O. SHIPPING MARKS)

THE FOLLOWING ATTACHMENTS MUST BE INCLUDED AS WELL
1 EXECUTED BILL OF LADING.
2 EXPORT PACKING LIST AND COMMERCIAL INVOICE
4 PHYTOSANITARY CERTIFICATES
5 CERTIFICATE OF ORIGIN
6 OTHER CERTIFICATES REQUIRED

PRE-SHIPMENT ADVICE AND COPY OF EXPORT DOCUMENTS TO
PDVSA (TRAFFIC & CUSTOMS) - VENEZUELA
Nº NAME   EMAIL
1  LILIANA CIGANA   CIGANAL@PDVSA.COM
2  FERNANDO VELASQUEZ  VELLASQUEZFN@PDVSA.COM
3  MARIA ROBLES   ROBLESMS@PDVSA.COM
4  JUAN CARLOS RIVAS  ELJBOTIJAJC@CANTV.NET
5  KARIN RODRIGUEZ  RODRIGUEZKK@PDVSA.COM
6  DONNATY DURAN   DURANDS@PDVSA.COM
7  ASDRUBAL DIAZ  DIAZAAL@PDVSA.COM
8  GRAZIA FIORE   FIOREG@PDVSA.COM
9  DUBRASKA RODRIGUEZ  DUBRASKAAR@GMAIL.COM
10  IRANOR ANDRADE   ANDRADEFIR@PDVSA.COM
11  JOSE ROMERO   JOSEROMERO@ANDROMEDA.COM.VE
12  YOANNA SALAZAR   YOANNASALAZAR@ANDROMEDA.COM.VE
13  ANGEL RODRIGUEZ  ANGEL.RODRIGUEZ@ANDHCOMEDA.COM.VE
14  OSMAR NIETO   OSMARYNIETO@GMAIL.COM

 **PDVSA**

Purchase order
5100062284

**SUPPLIER:**

SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

15 JUAN CARLOS RIVAS  ELBOTIJAJC@CANTV NET ONLY SHIPMENTS
16 MIROSKA GOITIA  GOITIAMS@PDVSA COM ONLY SHIPMENTS VIA
17 IRANORI ANDRADE  ANDRADEIR@PDVSA COM

VIA LA GUAIRA
PUERTO CABELLO

PSI (LOGISTICS DEPARTMENT)  HOUSTON
Nº NAME  EMAIL  PHONE
1 JUAN JOSE BASTARDO BASTARDOJJ@PSI PDV COM (281) 5806474
2 PSI DATA BASE  DOCUMENT@PSI PCV COM

**Terms of payment**

PROGRESS/ADVANCE PAYMENT INVOICES
----------------------------------

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PROGRESSIVE PAYMENTS SHALL BE BASED ON THE ORIGINAL PURCHASE ORDER VALUE  ANY ADDITIONS TO THE PURCHASE
ORDER VALUE SHALL BE INCLUDED IN THE SUPPLIERS FINAL INVOICE

**Requir docs/Inspec/Field Exped**

FIELD INSPECTION REQUIREMENT
(DOC TR050, REV F, 05 Feb 08 )

1 THIS PURCHASE ORDER OR RFQ (WHEN APPLICABLE) HAS BEEN CODED FOR FIELD TECHNICAL INSPECTION PRIOR TO
SHIPMENT THIS MEANS A QUALIFIED INSPECTOR WILL INSPECT THE EQUIPMENT FOR COMPLIANCE TO QUOTE, PURCHASE
ORDER, AND ANY OTHER APPLICABLE INDUSTRY STANDARD OR SPECIFICATION
2 PRODUCT, EQUIPMENT OR MATERIAL INSPECTION MUST BE PERFORMED BEFORE PACKAGING FOR SHIPMENT. THE
PURCHASERS INSPECTION DOES NOT RELIEVE THE MANUFACTURER OR THE SELLER FROM COMPLIANCE TO ALL PURCHASE
ORDER REQUIREMENTS
3 PRODUCT, EQUIPMENT OR MATERIAL MUST NOT LEAVE YOUR FACILITIES UNTIL THE ASSIGNED INSPECTOR OR DESIGNATED
INSPECTION AGENCY HAS ISSUED A RELEASE AUTHORIZING SHIPPING OF THE PRODUCT OR EQUIPMENT
4 THE VENDOR IS REQUIRED TO PROVIDE THE FOLLOWING INFORMATION
4 1 LOCATION OF WHERE INSPECTION CAN BE PERFORMED
4 2 CONTACT NAME, PHONE NUMBER & EMAIL ADDRESS OF THE PROJECT MGR
5 DOCUMENTATION REQUIREMENTS
( THIS NOTE APPLIES TO TECHNICAL DOCUMENTS NOT INCLUDING INVOICES OR SHIPPING DOCUMENTS)
5 1 ONE COPY OF ALL THE REQUIRED DOCUMENTS MUST SHIP WITH THE EQUIPMENT THIS INCLUDES TECHNICAL DOCUMENTS
SUCH AS MATERIAL TEST REPORTS, NONDESTRUCTIVE TEST REPORTS, QA CERTIFICATES/CONFORMANCE, PRINTS, MECHANICAL
OR PERFORMANCE TEST RESULTS, AND OTHER APPLICABLE DOCUMENTS
5 2 TWO HARD COPIES (DATABOOKS) AND TWO ELECTRONIC COPIES (CD S OR VIA EMAIL (AS APPLICABLE)) MUST BE SHIP TO
PDVSA SERVICES, INC // CITGO BLDG
ATTN PETER BERNSTEIN N2081
1293 FLORIDGE PKWY
HOUSTON, TX 77077
5 3 FOR DELIVERY OF DOCUMENTS ELECTRONICALLY, SEND THEM TO  TECHDOCS@PSI PDV COM
5 4 THE PDVSA SERVICES PURCHASE ORDER NUMBER MUST BE LISTED ON THE SUBJECT LINE OF THE EMAIL IF PARTIAL
DOCUMENTATION IS SUBMITTED THE EMAIL MUST CLEARLY IDENTIFY TO WHICH LINE ITEM(S) THE DOCUMENTS BELONG TO
5 5 THE PO NUMBER AND THE PO ITEMS MUST BE CLEARLY IDENTIFIED IN EACH DOCUMENT

5 6 FOR PURCHASE ORDERS PLACED IN EUROPE OR WHERE THE MATERIAL IS COMING FROM EUROPE, ELECTRONIC DOCUMENTS
CAN BE SUBMITTED TO INSPECTION@PDVSA NL
5 7 Send hard copies to
PDVSA SERVICES BV
ATTN TECHNICAL SERVICES DEPARTMENT
PRESIDENT KENNEDYLAAN 19
2517 JK THE HAGUE
THE NETHERLANDS

6 ANY QUESTIONS REGARDING THIS INSPECTION REQUIREMENT FORWARD EMAIL TO prodngusr@psi pdv com or
bernstenp@psi pdv com or iguedez@psi pdv com For purchase orders placed in Europe, please contact  inspection@pdvsa nl

## PDVSA

SUPPLIER:
BANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

**Purchase order**
**5100062284**

IMPORTANT INSTRUCTIONS TO SELLER
(Doc. Z_ME_PO_GEN_BU00, rev.7, 11-14-2005)

If this Document is issued from BARIVEN, S A. c/o PDVSA Services, Inc., follow instruction

INSTRUCTION

Unless covered by a Blanket Purchase Agreement, this purchase order is subject to the present standard BARIVEN, S.A. c/o PDVSA Services, Inc. Terms and Conditions which are already in your possession. In the event that you do not have the above mentioned Terms and Conditions, please advise us. Otherwise, acceptance of this purchase order signifies your   acknowledgement, understanding, and acceptance of said Terms and Conditions

If this order is covered by an Outline Agreement, the Terms and Conditions of the Outline Agreement number mentioned on the item(s) of this purchase order apply to this document.

Seller must acknowledge receipt of this purchase order within five days A.R.O. and must advise or confirm, seller's shipping date. This acknowledgement is to be sent to PDVSA Services Inc. Expediting Department Attn. Mrs Gloria Robinson

Assignment of Credit Facility
This purchase order may be selected for financing through a credit facility. Seller may be required to provide additional information or documentation required by the financial institution. If this is the case, our Finance Department will send further instructions.

Packing, Marking, Invoicing and Shipping Instructions

As of April 2006 wooden packing to Venezuela must show a marking that the wood was either treated with methyl bromide or has been heat treated and does not present/display evidence of quarantine pests. All wood used in the boxing/crating, palletizing, skidding, or blocking and bracing of the material on this Purchase Order must have undergone sufficient processing or treatment in compliance with ISPM 15 of the International Plant Protection Convention (IPPC) entitled "Guidelines for Regulating Wood Packaging Material in International Trade". All wood shipment by Venezuela port/airport authorities. For specific details, please refer to the IPPC website  www.ippc.int

Do not dispatch until you have read and understood our packing, marking, invoicing and shipping instructions for sellers, as follows:
1. For domestic deliveries FOB/FCA to our USA forwarders, FOB Seller's Plant, Exworks, from North America and Mexico, please use instructions on standard note B0010, attached to our purchase order
2. For International Ocean Freight deliveries to Venezuela by the Seller, use instructions on the applicable standard notes B0030-B0041, B0056-B0059, attached to our purchase order
3. For International Air and Ocean Freight deliveries to Curazao by the Seller, use instructions on note B0042, attached to our purchase order
4. For International Air Freight deliveries by the seller to Venezuela via Maiquetia, use instructions on the applicable standard notes B0043-B0055, attached to our purchase order

These forms, an integral part of this document, are already in your possession, extra copies available on request, from Juan Jose Bastardo at email bastardoj@pdvsa pdv com, or ph. 281-588-6474

General Invoicing Instructions

Follow each of the applicable instructions attached to the respective purchase order, because they will change according to the agreed-to delivery terms

Your Bank Account and Routing Information must be included on your invoice. All payments are processed via "ACH" (Automatic Clearing House) electronic funds transfer

Seller will send invoices to

BARIVEN, S A
c/o PDVSA Services, Inc
P.O. Box 4403
Houston, Texas 77210 USA
Attn. Accounts Payable
Contact Person: Tim Marshman
Phone  (281) 588-6253, Fax. (281) 582-7578

If using courier services, please use the street address

BARIVEN, S A
c/o PDVSA Services, Inc
1293 Eldridge Parkway
Houston, Texas 77077 USA
Attn. Accounts Payable
Contact Person: Tim Marshman
Phone (281) 588-6253, Fax. (281) 582-7578

We require one original invoice with attached copies of your packing list and all supporting documents when charges other than material costs



 **PDVSA**

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

| Purchase Order |
| :---: |
| 5100062284 |

have been required by the Buyer and quoted by the Seller, such as Inland Freights, Over Time, Export Packing, Special Handling, etc.

Please show our Purchase Order (PO) number and shipping marks on all invoices. Our standard invoice processing is, upon delivery in accordance with PO delivery terms. 100% net 30 days after receipt and approval of your invoice, unless otherwise specified in this Purchase Order.

DESTINATION CONTROL STATEMENT

According to U.S. Export Administration Regulations, Chapter 758.6.
"These commodities, technology or software will be exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited." Ultimate destination as per shipping marks in the Purchase Order.

The DCS is required for all exports from the United States of items on the Commerce Control List that are not classified as EAR99. The person responsible for preparation of the invoice and on the bill of lading, air waybill, or other export control document that accompanies the shipment from its point of origin in the United States to the ultimate consignee or end user abroad is responsible for entry of the DCS.

NOTE TO SUPPLIERS

Invoices will not be processed unless all export or quality documents are provided.

Regards,
Bariven, S.A. - C/O. PDVSA Services, INC.
Purchasing Agent

**QUINTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO**
**PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. S. Strybosd & S. Niele _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominadas las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 11 de Junio de 2008, Segunda Enmienda del 24 de Septiembre de 2008 y Tercera y Cuarta Enmienda del 28 de Noviembre de 2008, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Quinta Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán extenderse las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente segunda enmienda al Contrato Marco (la "Segunda Enmienda"), de conformidad con las presentes Cláusulas:

1.   Modifícase de la **Cláusula PRIMERA** del Contrato Marco las siguientes definiciones:

"*Fecha/s de Vencimiento*" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Diciembre de 2010.

"*Plazo de Disponibilidad*" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2010, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

2.   Oportunamente, el Mutuario se compromete a notificar en el marco de la presente Quinta Enmienda, a los Deudores Cedidos, la ampliación de plazo según la Cláusula 1 y de conformidad con la Cláusula 4.6 del Contrato Marco.

A los efectos de su certificación suscribe/n
Buenos Aires, a 13.1.2009

3.   Con excepción de aquellos términos expresamente modificados por la presente Quinta Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 30 días del mes de Abril de 2009.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: SANCOR DO BRASIL Produtos Alimenticios Ltda.
Nombre: Mario Magdalena – Gabriel Gustavo Martinuzzi
Carácter: Apoderado - Administrador

Firma/s certificada/s en Foja
N°. F098-2880046
Bs. As. 12 - 1 - 2008

Firma/s certificada/s en Foja
N°. 00509356?
Bs. As. 30/4/09

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

Por: IIG TOF B.V.
Nombre: S. Strybosd   S. Niele
Carácter: Apodados

Trust International Management (T.I.M.) B.V.
Managing Director

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

MARTIN R. A
ESCRIB
MAT. 4



ACTA DE CERTIFICACION DE FIRMAS
LEY 404

F  005093562

1  **Buenos Aires,** 30 **de** Abril **de** 2009 . **En mi carácter de escribano**

2  Titular del Registro Notarial Nº 841

3  **CERTIFICO: Que la/s** firma/s **que obra/n en el**

4  **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5  **formaliza simultáneamente por ACTA número** 152 **del LIBRO**

6  **número** 113 **, es/son puesta/s en mi presencia por la/s persona/s**

7  **cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación así como**

8  **la justificación de su identidad.** Mario César MAGDALENA, L.E. 8.106.144.-

9  quien justifica su identidad de acuerdo al inciso a del artículo 1002 del

10  Código Civil y actúa en su carácter de apoderado de la sociedad "SAN-

11  COR COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales,

12  Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

13  cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

14  tellanos, conforme lo acredita con el poder de fecha 23 de junio de 1993,

15  pasado al folio 638 del Registro 200 de la ciudad de Sunchales, Provincia

16  de Santa Fe, a cargo del escribano Horacio Remondino, y en su carácter

17  de Apoderado Gerencia Financiera de la sociedad "SANCOR DO BRASIL

18  Productos Alimenticios LTDA." lo que acredita con el Contrato Social de

19  fecha 4 de agosto de 2008, con facultades suficientes siempre que actúe

20  en forma conjunta con el Sr. Gabriel Gustavo MARTINUZZI la documen-

21  tación relacionada tengo a la vista y le confiere facultades suficientes pa-

22  ra suscribir el documento ad junto, doy fe.-

23

24  MARTIN R. ARANA (h)
   ESCRIBANO
25  MAT. 1070





F 005093562

MARTIN R. /
ESCRIE
MAT. ·

26

27

28

29

30

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50



**ACTA DE CERTIFICACION DE FIRMAS**
**LEY 404**

F 005265046

A (h)

1. **Buenos Aires,** 13 **de** Julio **de** 2009 **. En mi carácter de escribano**

2. Titular del Registro Notarial Nº 841

3. **CERTIFICO: Que la/s firma/s** que obra/n en el

4. **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5. **formaliza simultáneamente por ACTA número**156 **del LIBRO**

6. **número**117 **, es/son puesta/s en mi presencia por la/s persona/s**

7. **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8. **la justificación de su identidad.**Gabriel Gustavo MARTINUZZI, DNI

9. 18.264.987, quien justifica su identidad de acuerdo al inciso a del articulo

10. 1002 del Código Civil y actúa en su carácter de Administrador de la so-

11. ciedad "SANCOR DO BRASIL Productos Alimenticios LTDA." lo que a-

12. credita con el Contrato Social de fecha 4 de agosto de 2008 debidamente

13. Legalizado y Apostillado, la documentación relacionada tengo a la vista y

14. le confiere facultades suficientes para suscribir el documento ad junto,

15. doy fe.-

16.

17.

18.

19.

20.

21. MARTIN R. ARANA (h)
    ESCRIBANO
    MAT. 4370

22.

23.

24.

25.





F 005265046

26

27

28

29

30

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50

**CUARTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres ~~S. Siribush e I. Getiljein~~ , en su carácter de *Attorney-in-fact A or B* domiciliado en Telestone 8 - Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE") por una parte, y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

CONSIDERANDO:

    (a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 13 de Junio de 2008, Segunda Enmienda de fecha 24 de Septiembre de 2008 y Tercera Enmienda de fecha 28 de noviembre de 2008, que en copia se adjunta como Anexo A, cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Cuarta Enmienda

    (b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de incorporar la cláusula de Fianza

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente Cuarta enmienda al Contrato Marco (la "Cuarta Enmienda"), de conformidad con las presentes Cláusulas:

1.    Incorpórase la Cláusula SEXTA BIS del C___, la cual quedará redactada del siguiente modo:

> **SEXTA BIS:   FIADOR.**
> *Por este acto **SANCOR DO BRASIL Productos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la Republica del Brasil, representada en este acto por los Sres Mario Magdalena y Gabriel Gustavo Martinuzzi, en su carácter de Apoderado Gerencia Financiera y Administrador (Art.11) respectivamente, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro 933, Sala 91/92, Alphaville – CEP 06455-000, Republica del Brasil, (el "FIADOR") se constituye en fiador solidario, codeudor solidario, liso llano y principal pagador de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier acreedor con miras a un arreglo general de pagos o cambiar el cronograma de endeudamiento, o se transformen en insolventes o quebrados, o les sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los 15 días de haber sido decretados. En dicho supuesto, en un plazo de treinta (30) días, el MUTUARIO deberá designar un nuevo garante a satisfacción del MUTUANTE. Vencido el plazo de treinta (30) días sin que el MUTUARIO haya designado un nuevo garante, el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las*

cuales deberan mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos, (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO TERCERA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción

2.      El FIADOR declara que el presente afianzamiento (i) constituye un acto o negocio jurídico que está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebra contando con todas las aprobaciones internas necesarias, sin violación de disposición legal, estatutaria, asamblea ria ni contractual alguna, no siendo necesaria ninguna autorización adicional En prueba de conformidad firma al pie de la presente.

3.      Con excepción de aquellos términos expresamente modificados por la presente Cuarta Enmienda, los cuales tendrán efecto a partir del día de la fecha, todos los demás términos, condiciones y cláusulas del Contrato Marco, así como los actos ya cumplidos por las Partes en virtud de los mismos, permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, por el FIADOR en la Ciudad de San Pablo, República del Brasil, y por el MUTUANTE en la Ciudad de Amsterdan, The Netherland, a los 28 días del mes de Noviembre de 2008.


Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
N°_____
Bs. As._____

Por SANCOR DO BRASIL Produtos Alimenticios LTDA.
Nombre Mario Magdalena y Gabriel Gustavo Martinuzzi
Carácter (Apoderado Gerencia Financiera y Administrador (Art 11)

MARTIN R. ARANA (h)
ESCRIBANO
MAT 4370

Por: IIG TOF B.V.
Nombre Trust International Management (T.I.M.) B.V.
Carácter  Managing Director

1° Tabelião de Notas e Protesto
de Letras e Titulos de Barueri
Comarca de Barueri Estado de São Paulo
Ubiratan Pereira Guimarães - Tabelião
RECONHEÇO por semelhança 1 firma(s) de
GABRIEL GUSTAVO MARTINUZZI
BARUERI, 05/12/2008  Em test.        da Verdade
Escrevente Autorizado
Emolumentos: R$ 4,50 - COM VALOR   Impresso:
VALIDO SOMENTE COM SELO DE AUTENTICIDADE
Selo(s): 418366-AA
Cod. Segurança: 19266917001552
Marcos Roberto Merula
Escrevente Auto

Para produzir efeito no Brasil e valer contra terceiros este documento deverá ser vertido em vernáculo, registrando-se a tradução pública (artigo 224/CCB e 148 da Lei 6.015/73).

 **ACTA DE CERTIFICACION DE FIRMAS** LEY 404 

F 004754828

1   Buenos Aires, 28 de   Noviembre   de   2008 . En mi carácter de escribano

2   Titular del Registro Notarial Nº 841

3   CERTIFICO: Que la/s   firma/s                                   que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número 138                del LIBRO

6   número 106                   , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario   César   MAGDALENA,   L.E.

9   8.106.144.- quien justifica su identidad de acuerdo al inci-

10  so a del artículo 1002 del Código Civil y actúa en su ca-

11  rácter de apoderado de la sociedad "SANCOR COOPE-

12  RATIVAS UNIDAS LIMITADAS" con domicilio en Suncha-

13  les, Provincia de Santa Fe, e inscripta en la Matrícula 772

14  del Registro Nacional de Cooperativas, de la Provincia de

15  Santa Fe, Departamento Castellanos, conforme lo acredita

16  con el poder de fecha 23 de junio de 1993, pasado al folio

17  638 del Registro 200 de la ciudad de Sunchales, Provincia

18  de Santa Fe, a cargo del escribano Horacio Remondino, y

19  manifiesta actuar en su carácter de Apoderado Gerencia

20  Financiera de la sociedad "SANCOR DO BRASIL Produc-

21  tos Alimenticios LTDA." lo que acredita con el Contrato

22  Social de fecha 4 de agosto de 2008, con facultades sufi-

23  cientes siempre que actúe en forma conjunta con el Sr.

24  Gabriel Gustavo MARTINUZZI la documentación relacio-

25  nada tengo a la vista y le confiere facultades suficientes







F 004754828

26

para suscribir el documento ad junto, doy fe.-

27

28

29

30

31



32

33

34



35



36

37

38

39

40

41

42

43

44

45

46

47

48

49

50

# ANEXO

### TERCERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
### PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

BIG TOE B.V. representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., representado en este acto por los Sres. _____ en su carácter de _____ domiciliado en Teleston B Telepart Nantaweg 165 1 P.O. Box 7241 1007 JE Amsterdam The Netherlands (en adelante el "MUTUANTE") por una parte y

SANCOR COOPERATIVAS UNIDAS LIMITADA una cooperativa de primer grado constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuari 202 3° Piso Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes", y

CONSIDERANDO

(a) Que con fecha 30 de Noviembre de 2007 las Partes suscribieron un Contrato Marco de línea de crédito para prefinanciación de exportaciones enmendado con fecha 11 de Junio de 2008 y 24 de Septiembre de 2008, que en copia se adjunta como Anexo A (el "Contrato Marco") cuyas definiciones, términos y condiciones se mantienen vigentes resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Tercera Enmienda.

(b) Que sobre la base del Contrato Marco es intención del MUTUARIO requerir al MUTUANTE una línea de crédito tipo revolving a fin de poder requerirle, en los términos y condiciones establecidos en el Contrato Marco, los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(c) Que el mecanismo antes descripto permitirá al MUTUARIO requerir periódicamente el flujo de fondos requeridos para financiar sus exportaciones, pudiendo cancelar las Sumas Adeudadas, solicitar nuevos desembolsos y así sucesivamente siempre que el monto acumulado de toda la Línea de Crédito incluyendo la requerida en la última Solicitud de Desembolso remitida al MUTUANTE resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00)

(d) Que en atención a que una parte de los Créditos Cedidos han sido aplicados al pago de las Sumas Adeudadas a la fecha y a efectos de poder remitir nuevas Solicitudes de Desembolso al MUTUANTE y garantizar debidamente las futuras Sumas Adeudadas en virtud de las mismas, es intención del MUTUARIO ceder al MUTUANTE nuevos créditos, los cuales serán eventualmente aplicados al pago de tales Sumas Adeudadas en los términos de la Cláusula QUINTA del Contrato Marco

En mérito a las consideraciones precedentemente establecidas las cuales forman parte integrante de la presente las Partes acuerdan suscribir la presente Tercera Enmienda al Contrato Marco (la "Tercera Enmienda") de conformidad con los términos y condiciones incluidos en las siguientes cláusulas

1.  Modifícanse las definiciones de "Créditos Cedidos" y "Línea de Crédito" de la Cláusula PRIMERA del Contrato Marco las cuales quedarán redactadas del siguiente modo:

    *Créditos Cedidos* significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos

    (a) todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a Fonterra derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como Anexo I (y las sucesivas, contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I) y las enmiendas contratos complementarios y/o facturas y/o ventas emitidas en virtud del mismo) Se adjunta asimismo como Anexo II una Declaración Jurada del MUTUARIO con el Pronóstico de ventas mínimas que el MUTUARIO estima realizar a Fonterra durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco

    (b) todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a BARIVEN S.A. o PDVSA derivada de la Orden de Compra (Purchase Order) N° 5100062384 de fecha 26 de Marzo de 2008 emitida por BARIVEN c/o PDVSA y aceptada por MUTUARIO cuya fotocopia se adjunta al presente Contrato como Anexo B (y las enmiendas contratos complementarios y/o reemplazantes de dicha orden de compra adjunta como Anexo B) así como los conocimientos de embarque facturas y/o ventas emitidas en virtud del mismo)

    (c) todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realicen a Arthur Schuman y/o sus Afiliadas y/o subsidiarias entre el 31 de Mayo de 2008 y hasta la cancelación total de la Línea de Crédito Adeudada incluyendo





**Línea de Crédito** significa la única línea de crédito modalidad revolvente, que sujeto a los términos y condiciones de los Documentos de la Operación el MUTUANTE pondrá a disposición del MUTUARIO por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

2.     ...

*(c) Monto de los Desembolsos.* El MUTUARIO podrá realizar los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que el monto de crédito en su conjunto no los exceda en Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00) ...

3.     ...

4.     Antes del 2 de Diciembre de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants, ...

**CLÁUSULA SEXTA BIS  WARRANTS**

6BIS.1    Antes del 2 de Diciembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants endosados a favor de este último por un monto equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada ...

6BIS.2    ...

6BIS.3    ...

**6BIS 4**   El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs de declarada la misma. El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos  el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiera ocasionar al MUTUANTE

**6BIS 5**   En Caso de Mora del MUTUARIO por cualquier causa que fuere  el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 964J, sin perjuicio de las otras remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants  el MUTUANTE se reserva expresamente la facultad de desinsacular ...

**6BIS 6**   Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria (Warrantera) de la mercadería indicada en por los mismos como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora

5        Modifícase la Sección 7.1.22 de la Cláusula SEPTIMA del Contrato Marco  las cuales quedarán redactadas del siguiente modo

"7.1.22   Que a partir del 2 de Diciembre de 2008 y en todo momento durante la vigencia del presente Contrato el MUTUANTE contará con Warrants por una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada

6.        Con excepción de aquellos términos expresamente modificados por la presente Tercera Enmienda  todos los demás términos, condiciones y cláusulas del Contrato Marco permanecen inalterables  manteniendo los mismos plena vigencia

Suscripto por el MUTUARIO  en la Ciudad de Buenos Aires  República Argentina  a los 28 días del mes de Noviembre de 2008  y por el MUTUANTE  en la Ciudad de Amsterdam  a los 24 días del mes de Noviembre de 2008

Por SANCOR COOPERATIVAS UNIDAS LTDA
Nombre  María Magdalena
Carácter  Apoderado

Por IIG TOF B V
Nombre
Carácter

Firma/s certificada/s en Foja
N°.P.Q.Q.4.7.5.4.8.2.7
Bs. As.  28/11/08



MARTIN R. ARANA (h)
ESCRIBANO
MAT 4370







ACTA DE CERTIFICACION DE FIRMAS

F 004754827



Buenos Aires, 28 de Noviembre de 2008. En mi caracter de escribano

Titular del Registro Notarial Nº 841

CERTIFICO: Que la/s firma/s que obra/n en el

documento que adjunto a esta foja, cuyo requerimiento de certificación se

formaliza simultaneamente por ACTA numero 137 del LIBRO

numero 106 es/son puesta/s en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

la justificación de su identidad. Mario César MAGDALENA,
L.E. 8.106.144.- quien justifica su i-
dentidad de acuerdo al inciso a del ar-
tículo 1002 del Código Civil y actúa en
su caracter de apoderado de la sociedad
"SANCOR COOPERATIVAS UNIDAS LIMITADAS"
con domicilio en Sunchales, Provincia de
Santa Fe, e inscripta en la Matrícula 772
del Registro Nacional de Cooperativas, de
la Provincia de Santa Fe, Departamento
Castellanos, conforme lo acredita con el
poder de fecha 23 de junio de 1993, pa-
sado al folio 638 del Registro 200 de la
ciudad de Sunchales, Provincia de Santa
Fe, a cargo del escribano Horacio Remon-
dino, la documentación relacionada tengo
a la vista y le confiere facultades sufi-
cientes para suscribir el documento ad-





F 004754827

junto, doy fe.-





SEGUNDA ENMIENDA AL CONTRATO DE LINEA DE CREDITO
PARA LA PREFINANCIACION DE EXPORTACIONES

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los señores [...] en su carácter de [...] domiciliado en Telestone 8 - Teleport [...] N° 154 Piso 8/L 1043 1007 JL Amsterdam, The Netherlands, (en adelante el MUTUANTE), por una parte, y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una sociedad de primer grado constituida y registrada bajo las leyes de la Republica Argentina, con domicilio en [...] Buenos Aires 7, 3 Piso - Capital Federal, Republica Argentina, representada [...] en su carácter de apoderado (en adelante el MUTUARIO), por la otra parte,

El MUTUANTE y el MUTUARIO [...]

**CONSIDERANDO**

(a) Que con fecha 10 de Noviembre de 2006, las partes suscribieron un Contrato Marco de linea de credito para prefinanciacion de exportaciones (en adelante, junto con la Primera Enmienda de fecha 11 de Junio de 2008 que por este acto se celebra, Anexo A y la citada Marco) y cuyas definiciones, terminos y condiciones [...] que se tienen por reproducidas en la presente [...] las cuales se modifican por la presente Segunda Enmienda.

(b) Que es intencion de las Partes [...] celebrar el presente contrato de extender el Plazo de Disponibilidad, el plazo [...] las Fechas de Vencimiento previsto en la Clausula Primera [...]

En merito a las consideraciones precedentes, que forman parte integrante de la presente, las Partes, suscriben la presente Segunda Enmienda al Contrato Marco del Segunda Enmienda 1 de conformidad con las siguientes Clausulas:

1.    Modificase la Clausula PRIMERA del Contrato Marco [...] siguientes definiciones:

*Fechas de Vencimiento*: significa las fechas [...] mente para el pago de las Sumas Adeudadas indicadas en la solicitud de desembolso [...] pertinentes. Las Fechas de Vencimiento deberan operar a [...] antes del [...] 31 de octubre de 2009.

*Plazo de Disponibilidad*: significa [...] a favor de[l] MUTUANTE, que transcurre desde la fecha [...] hasta el 31 de octubre de 2009. Durante el cual el MUTUANTE se compromete [...] a otorgar la Linea de Credito a favor del MUTUARIO.

2.    Con excepcion de aquellas [...] expresamente modificadas por la presente Segunda Enmienda, todos los demas terminos y condiciones establecidos en el Contrato Marco y las Solicitudes de Desembolso, tramitadas y aceptadas [...] mantenidan los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, Republica Argentina y por el MUTUANTE en la Ciudad de Amsterdam a los 2 dias del mes de Septiembre de 2008.

Por **SANCOR COOPERATIVAS UNIDAS LTDA**
Nombre: M. Magdalena
Caracter: Apoderado

Por **IIG TOF B.V.**
Nombre: Trust International Management (T.I.M.) B.V.
Caracter: Managing Director



ACTA DE CERTIFICACION DE FIRMAS

# ANEXO

001088971

Buenos Aires, 24 de    Septiembre   de 2008    En mi carácter de escribano

Titular del Registro Notarial N° 644

CERTIFICO: Que la/s   firma/s                    que obra/n en el

documento que  adjunto  a  esta  foja, cuyo  requerimiento  de  certificación  se

formaliza simultáneamente por N° 14 número        133 del LIBRO

número          102       es/son puesta/s en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se mencionan a continuación así como

la justificación de su identidad  Mario  Cesar  MAGDALENA   L.E   8 106 144 -

Manifiesta actuar en su carácter de apoderado de la sociedad "SANCOR

COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Pro-

vincia de Santa Fe  e inscripta en la Matrícula 772 del Registro Nacional de

Cooperativas, de la Provincia de Santa Fe  Departamento Castellanos,

conforme lo acredita con el poder de fecha 23 de junio de 1993, pasado al

folio 638 del Registro 500 de la ciudad de Sunchales, Provincia de Santa

Fe, a cargo del escribano Horacio Remondino  la documentación relacio-

nada tengo a la vista y le confiere facultades suficientes para suscribir el

documento adjunto  doy fe -

dentro de los 5 (cinco) días de recibidas por el Deudor Cedido los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

4.3    El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositados por el respectivo Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que se vienen emitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés)

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha _____ 2008. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en la cuenta _____ ARA _____ Beneficiario IIG TOF B.V. Cuenta N _____*

4.4    Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco

4.5    La cesión de los créditos cedidos se efectúa sin responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA, o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

4.6    Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido y a obtener la aprobación expresa de este último respecto de la presente cesión mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como ANEXO V. A tales fines, dentro de las 48 hs de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará al Deudor Cedido, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos, deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido mediante su apoderado o representante legal firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE con la aceptación del Deudor Cedido en la forma antes

9

indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación al Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario domicilio y su despacho mediante correo internacional por un servicio que brinde constancia de su entrega y recepción.

4.7   El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos, las que permanecerán en cabeza de el MUTUARIO. El MUTUARIO se compromete a cumplir con toda y cada una de las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antes dichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados, en el caso de que, con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO, el Deudor Cedido rescinda o resuelva los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

4.8   El MUTUARIO declara y garantiza al MUTUANTE:

(a)   el cobro de los créditos cedidos;

(b)   la forma instrumental de los mismos;

(c)   la legitimidad de los créditos cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectados por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente.

(d)   que no se encuentra inhabilitado para disponer de sus bienes.

(e)   que no adeuda suma alguna al Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos;

(f)   que no ha percibido suma alguna a cuenta de los Créditos Cedidos, y que los mismos no han sido cedidos, total ni parcialmente, a persona física o jurídica alguna con anterioridad.

10

(g) la autenticidad de la firma de todo documento que acredite la causa de los Créditos Cedidos

(h) que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo, pero no limitado a, la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos

(i) que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito

(j) que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente al Deudor Cedido, debiendose abstener de vender o facturar los productos comprendidos en el contrato adjunto como Anexo I a terceros distintos del Deudor Cedido, aun cuando contare con el consentimiento de este último.

CLAUSULA QUINTA. CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CRÉDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.

5.1   El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante

5.2   A los efectos mencionados en la Sección 5.1 antes referida, los fondos del Crédito Cedido depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo

(a) Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos del Crédito Cedido por el Deudor Cedido deposite en la Cuenta del Mutuante dentro de las 48 hs de enviados a la Cuenta del Mutuario

(b) Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso de que los fondos del Crédito Cedido depositados durante tales meses excedan el monto de la Suma Adeudada, el

11

excedente sera transfiriendo al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso de que los fondos del Credito Cedido depositados durante dicos meses no fueran suficientes para cubrir el importe de la Suma Adeudada, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes al Credito Cedido que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Credito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

**5.3** En caso de Mora, la totalidad de los fondos de los Creditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Credito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operacion.

**5.4** Habida cuenta del recurso del MUTUARIO en la cesion de los Creditos Cedidos al MUTUANTE, en caso de que, por cualquier causa, el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de la Suma Adeudada en las Fecha de Vencimiento, correspondiente a un mes determinado, el MUTUARIO debera abonar al MUTUANTE, el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automatica.

## CLAUSULA SEXTA. MONEDA DE PAGO.

**6.1** El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operacion, incluyendo el pago de la Línea de Credito Adeudada debera ser necesariamente abonado en Dolares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condicion esencial de este Contrato Marco que la devolucion de la Linea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevision o cualquier otra similar para alegar una mayor onerosidad sobreviniente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos del Credito Cedido que el Deudor cedido deposite en la cuenta del Mutuante conforme a lo previsto en la clausula QUINTA acápite 5.2 a) y c) debera ser necesariamente abonado en Dolares y no en otra moneda. En consecuencia el MUTUANTE expresamente reconoce y acepta que constituye condicion esencial de este Contrato Marco que la devolucion de los fondos del Credito Cedido que el Deudor cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2 a) y c) así como los intereses punitorios y demas sumas a ser transferidos al MUTUARIO en virtud del presente, se

12

cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviniente en el pago.

6.2    En atención a lo dispuesto en la Cláusula 6.1, en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas aquí remetidas (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuario conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

6.2.(a). Mediante la compra con Pesos u otra moneda que sea en ese momento de curso legal en la República Argentina, de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

6.2.(b). Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO) en su caso en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

6.2.(c). En el caso que existiere cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUANTE (o al MUTUARIO en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieran para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

13

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**6.3** Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2 (a) a 6.2 (d), las sumas adeudadas por el MUTUARIO (o el MUTUANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la cuenta del Mutuante (o en la cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**6.4** Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2 (a) a 6.2 (d) precedentes serán pagados por el MUTUARIO (o por el MUTUANTE en su caso).

**6.5** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquel al cual de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUANTE (o el MUTUARIO en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTUANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados, fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independiente de tal sentencia, indemnizar al MUTUANTE (o al MUTUARIO en su caso) de esa pérdida.

## CLAUSULA SEPTIMA. MANIFESTACIONES DECLARACIONES Y COMPROMISOS DEL MUTUARIO.

**7.1.** Manifestaciones y Declaraciones del MUTUARIO.

A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la Línea de Crédito, el MUTUARIO manifiesta y declara a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**7.1.1.** Que el MUTUARIO es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades

14

necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad. y

7.1.2. Que el MUTUARIO no está obligado a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a accionistas, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías. y

7.1.3. Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO sin violación de disposición legal, estatutaria, asamblearia o contractual alguna, no siendo necesaria ninguna autorización adicional y

7.1.4. Que el MUTUARIO y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

7.1.5. Que el MUTUARIO no tiene pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere resultar adverso y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso sustancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones. y

7.1.6. Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrara obligado. y

7.1.7. Que no existe ningún derecho y/o prohibición y/o restricción y/o limitación y/o impedimento de cualquier naturaleza que imponga y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y deberes del MUTUARIO de suscribir y firmar la totalidad

15

de la documentacion de los Documentos de la Operacion, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**7.1.8.** Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud publica, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**7.1.9.** Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco o acuerdo u operacion, hecho y/o circunstancia vinculada al MUTUARIO que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningun hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos, y

**7.1.10.** Que el balance del MUTUARIO al 30 de Junio de 2007, los correspondientes estados de resultados y situación patrimonial a esos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivas autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2007 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

**7.1.11.** Que las Garantias otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

**7.1.12.** Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**7.1.13.** Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas;

**7.1.14.** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y vigentes del MUTUARIO y tiene y tendrán en todo momento el rango más preferente del endeudamiento del MUTUARIO

16

**7.1.15.** Los Documentos de la Operación estarán o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal aceptada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos protocolización o presentación ante cualquier Autoridad Gubernamental) han sido cumplimentadas.

**7.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a el cumplimiento de las operaciones previstas en los Documentos de la Operación;

**7.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**7.1.18** Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales de salubridad y seguridad social que le resulten aplicables.

**7.2    Compromisos y Obligaciones del MUTUARIO**

Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encuentre pendiente de pago por cualquier concepto y/o causa que fuere, el MUTUARIO se compromete firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar según es caso la totalidad de los actos y/o actividades que a continuación se específican:

**7.2.1.** A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula NOVENA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

**7.2.2.** A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero salvo para aquellos casos en que el MUTUARIO, según el caso, los disputase por las vías legales correspondientes de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

**7.2.3.** A (i) mantener en vigencia su personería jurídica y todas las inscripciones necesarias para mantener dichas personerías, (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes,

17

prerrogativas, franquicias, inversiones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones, (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiere afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías; y

**7.2.4.** A no realizar actos que constituyan, o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, o (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente o (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas; y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de su respectivos negocios; y

**7.2.5.** A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo; y

**7.2.6.** A poner a disposición del MUTUANTE y además entregar inmediatamente cuando este lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel y prestigio internacional, (ii) estados contables semestrales, (iii) estados contables trimestrales, y (iv) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio, los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos semestres, los estados contables (iii) deberán ser presentados dentro del los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iv) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE; y

**7.2.7.** A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE, bajo el presente Contrato Marco y las Garantías, lo que implicará entre otras cosas, la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco; y

18

**7.2.13.** A no reducir su capital. y

**7.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**7.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco. y



19

**7.2.16.** A informar al MUTUANTE, semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

**7.2.17.** A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO

**7.2.18.** A cumplir con todos los requisitos o exigencias que imponga el Banco Central de la República Argentina, y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de este, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambios y a redituar de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco sea apto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3647 del BCRA y sus complementarias y modificatorias.

**7.2.19.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Créditos Cedidos.

**7.2.20.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos.

**7.2.21.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales, y

**7.2.22.** A remitir mensualmente al MUTUANTE, antes del 5° día hábil de cada mes de vigencia del presente Contrato Marco, un informe con el pronóstico escrito de venta de sus productos al Deudor Cedido durante los doce ocho (8) meses subsiguientes a la fecha de entrega del informe antes referido.

20

**7.2.23** A remitir al MUTUANTE, además de lo señalado en la Sección 7.2.22 precedente, copia de todo informe, documento, reporte, orden de compra, factura, y/o pronóstico de ventas que remita al Deudor Cedido y/o que reciba del Deudor Cedido.

## OCTAVA:   MORA

**8.1**   La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco -incluyendo sin limitación el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago integro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora,  el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con mas un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

**8.2**   El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las sumas adeudadas en los siguientes **Eventos de Incumplimiento**

   (a)   si el **MUTUARIO** incumpliese con el pago en tiempo y forma de la Línea de Crédito Adeudada;

   (b)   si un tercero pidiere la quiebra del MUTUARIO, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

   (c)   si el MUTUARIO, el Deudor Cedido y/o pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

   (d)   si el MUTUARIO y/o sus incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

   (e)   Si se trabase embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares, Estadounidenses DOS MILLONES (US$

21

2.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fueren levantados, por cualquier causa que fuere, dentro de los treinta (30) días hábiles judiciales, de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible; o

(f)  si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad parcial o total, por parte del MUTUARIO en las declaraciones contenida en la Cláusula SEPTIMA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(g)  si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(h)  si el MUTUARIO y/o sus modificaren de cualquier forma su composición accionaria;

(i)  si el MUTUARIO incumpliere cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(j)  si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido;

(k)  si con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas, el MUTUARIO y/o el Deudor Cedido terminare el contrato que causa los Créditos Cedidos ;

(l)  si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(m)  Si se dictaren una o más sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se trataran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco o (ii) afectar adversa y sustancialmente cualquiera de las Garantías.



22

(n)    Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

8.3    En adición a lo dispuesto en la Sección 8.1 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 8.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de las Sumas Adeudadas por parte del MUTUARIO o por el acaecimiento de cualquiera de los eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin mas a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE.

## NOVENA: GASTOS

9.1    Toda comisión, arancel, o bancario, (incluyendo -sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o cuenta del Mutuario), y todos y/o gastos, que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento, todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

9.2    Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda el monto retenido, y deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago.

23

9.3    El MUTUARIO se obliga a cumplir en tiempo y forma, a su exclusivo costo y cargo, con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

9.4    El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

## DÉCIMA: CESIÓN DEL CONTRATO MARCO

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE, o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiere podido oponer al MUTUANTE cedente.

## DÉCIMO PRIMERA        VIGENCIA. INDEMNIDAD

11.1    El presente Contrato Marco así como toda las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas NOVENA, DÉCIMO PRIMERA y DÉCIMO TERCERA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

11.2    El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos o de los celebrados y/u operaciones previstos en ellos, (ii) el Crédito Cedido adeudado con más sus intereses y/o el de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, reclamo y procedimiento, real o potencial,

24

relacionado con cualquiera de las circunstancias previstas en esta Cláusula 11.2, fundada en razones contractuales como contractuale o o previstas en el derecho que resulte aplicable, en la medida que la extensidad de tales perdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada

## DECIMO SEGUNDA: AUTORIZACION

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de alianzar las obligaciones del MUTUARIO.
En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de America, de acuerdo a lo previsto en la sección 6 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco

## DECIMO TERCERA: JURISDICCION Y LEY APLICABLE

13.1   El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

13.2   El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción

13.3   Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagares en la República Argentina

13.4   El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation con domicilio en 80 SW 8th Street, Suite 2000, Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representacion, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos

25

**13.5** Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street , Suite 2000 - Miami, FL 41130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de America, en el domicilio del MUTUARIO indicado en la Sección 13.8 de la presente Clausula

**13.6** Las notificaciones efectuadas de la manera establecida en la Sección 13.4 de la presente Clausula seran consideradas personales, validas, recibidas y obligatorias para el MUTUARIO

**13.7** El MUTUARIO irrevocablemente renuncia, en la maxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Clausula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE, y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o inconvenient forum respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresion de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO solo podra oponer excepción de pago total y/o parcial comprobado por escrito en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier indole

**13.8** Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberan ser remitidas a los domicilios indicados a continuación

MUTUARIO: 1) 80 SW 8th Street - Suite 2000 - Miami, FL 33130-3003 - USA

2) Tacuari 202 - 3° Piso - Capital Federal, Republica Argentina

MUTUANTE: Telestone 8 - Teleport, Naritaweg, 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands

**DECIMO CUARTA. FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 2 (dos) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO

**DECIMO QUINTA. LUGAR Y FECHA.**

26

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina y por el MUTUANTE en Amsterdam, a los 30 días del mes de Noviembre de 2007.

Por SANCOR COOPERATIVAS UNIDAS LTDA
Nombre Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
N°
De fs

Por: IIG TOF B.V.
Nombre
Carácter

27



ACTA DE CERTIFICACION DE FIRMAS

F 003850242

Buenos Aires, 30 de Noviembre de 2007. En mi carácter de Escribano

Titular del Registro Notarial N° 603

CERTIFICO Que la firma que obra/n en el

documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

firma/s que se formaliza simultáneamente por ACTA número   42   del

LIBRO número   66   , presan puestas en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación y de

cuya constancia doy fe. María Cesar MAGDALENA L E 8 106.144.- Mani-

fiesta actuar en su carácter de apoderado de la sociedad SANCOR COO-

PERATIVAS UNIDAS LIMITADA , de acuerdo a la documentación que me

exhibe y que tiene facultades suficientes para suscribir el documento ad-

junto

ANEXO I.
COPIA "Exclusive Purchase Agreement"

28

ANEXO II
Declaración Jurada con Pronóstico de ventas Mínimas del MUTUARIO

29

ANEXO III

Modelo de Pagaré (sin protesto)

Buenos Aires, __ de _____ de 20() .

US$ _____

A la vista, por igual valor recibido ___ _____ una sociedad constituida de conformidad con las leyes de la Republica Argentina con domicilio en _____ República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a _____ (en adelante el "Acreedor"), sus sucesores o cesionarios, con domicilio sito en _____ República Argentina, la suma neta de Dolares Estadounidenses _____ CON _/100 (US$ _____) en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran dictar las autoridades gubernamentales y/o impositivas de la Republica Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dolares Estadounidenses (y no en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales) incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera integramente abonado a la fecha de Vencimiento, producida la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagarés que el Deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor – además del capital adeudado, los intereses correspondientes calculados a razón de una tasa del ___ % anual, calculados desde la fecha de vencimiento hasta el dia del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación valida, legal y exigible de su parte, exigible contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en este Pagaré tiene caracter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con este serán resueltas definitivamente ante los Tribunales ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación.

Deudor
Acreedor

d) Las notificaciones efectuadas de la manera establecida en el inciple "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la maxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora ón el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este Pagaré que intervenga en cualquier pleito, acción o procedimiento iniciado por el Acreedor y en especial a él, así renuncia a oponer cualquier defensa o alegación de incompetencia, o inconvenient forum, respecto del tribunal que intervenga en tal acción, juicio o procedimiento, y en general a oponer cualquier defensa que no sea la de pago documentado.

Deudor

30

Por _____ ___ __ _____
Nombre _____ __ ___ _____
Caracter ___ __ _____

ANEXO IV

MODELO DE SOLICITUD DE DESEMBOLSO

Buenos Aires ___   de _____ de 2007

Sres
IIG TOF B.V
___ _____ _____

De nuestra consideración

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ___ de _____ de 2007 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula ___ ___ __ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

(i)   El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses ___ ___ ___ __ )

(ii)  La/s fecha/s de Vencimiento del desembolso antes requerido serán la/s siguiente/s:
Fecha Vto ___ _____ __ Moneda e Importe
___/___/_____              US$ ___
___/___/_____              US$ ___

(ii)  La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses ___ ___ __ ) compuesta del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas

(iii) Adjuntamos a la presente un Pagaré a vuestro favor pagadero a la vista, por la suma total de US$ ___ (Dólares Estadounidenses ___ ___ ___ )

Fecha Emisión ___  __  Fecha Vto _____   Moneda e Importe
___/___/_____        A la vista          US$

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación transfieran los fondos del desembolso requerido a la Cuenta del Mutuario indicada en el Contrato Marco

Sin otro particular, saludamos a Uds. atentamente

Nombre
Carácter

31

ANEXO V
MODELO DE NOTIFICACION AL DEUDOR CEDIDO

Buenos Aires, _____ __ 2007

Messrs
FONTERRA CO-OPERATIVE GROUP LIMITED ("FONTERRA")

Dear Sirs
We address to you in order to give you notice of the Loan and Assignment Agreement dated _____,
200_ executed between SANCOR COOPERATIVAS UNIDAS LTDA. ("SANCOR") and IIG TOF B.V.,
represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V ("IIG TOF BV"), whereby SANCOR
has assigned and transferred to IIG TOF BV and IIG TOF BV has accepted and received all the rights and
credits (both credits existing at present or credits that may exist in the future) derived from all the proceeds
derived from the EXCLUSIVE PURCHASE AGREEMENT executed between FONTERRA and SANCOR on
October 01st, 2007, the amendments and renewals thereof. Save for the assignment of proceeds hereinbefore
mentioned, IIG TOF BV shall have no right or lien over the Products referred to in said EXCLUSIVE
PURCHASE AGREEMENT which shall remain the property of SANCOR or FONTERRA.

Therefore, SANCOR and IIG TOF BV hereby confirm that pursuant to the terms and conditions of the
aforementioned Loan and Assignment Agreement all the sums and credits hereinabove referred -including,
without limitation, the credits derived from the invoices and other documentation that SANCOR submit to you
as a consequence of said commercial transactions- are to be fully paid to IIG TOF BV by wire transfer of the
corresponding funds to the following bank account

_____

The aforementioned Assignment Agreement shall not transfer and/or novate the liability of SANCOR derived
from the referred commercial transactions and business operations. Thus, SANCOR remains being fully and
exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

By SANCOR COOPERATIVAS UNIDAS LIMITADA
Nombre  Mario Magdalena
Caracter  Apoderado

By. IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.
Nombre
Caracter

Acknowledged and accepted

FONTERRA CO-OPERATIVE GROUP LIMITED
Name
Capacity

32

ANEXO II - DECLARACION JURADA CON PRONOSTICO DE VENTAS MAY-MAS
Pronostico de ventas (en miles)



Fonterra Co-operative Group Limited

## Solicitor's Certificate – Internal

**TO:**  **Emma Parsons**

**RE:**  **Purchase Agreement - Fonterra Limited and SanCor Cooperativas Unidas Limitada ("the Document")**

I confirm that I have reviewed the Document from a legal perspective and that:

(a)  The Document reflects the instructions of Emma Parsons on the commercial content of the Document.

(b)  No legal risks of an important or unusual nature have been identified.

(c)  I am not aware of any legal enquiry in the circumstances of this transaction which should have been made, which has not been made.

(d)  The transaction that results in the Document is authorised by the exercise of a delegation under Fonterra's Delegated Authorities by **Mark Robins and Brian Willis** is entitled to execute the Document.

(e)  To the best of my knowledge this Document does not breach any legal obligations of Fonterra Limited and complies with all relevant New Zealand laws.

The Document is therefore acceptable for execution by Fonterra Limited

Jason Sandford
Corporate Counsel
Fonterra Co-operative Group Limited

Date: 28 September 2007





FONTERRA LIMITED

SANCOR COOPERATIVAS UNIDAS LIMITADA

EXCLUSIVE PURCHASE AGREEMENT

PRIMERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

IIG TOF B.V. representando a TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V., representado en este acto por los Sres. _____ en su carácter de ___Apoderado__ , domiciliado en Telestone 8 _____ Hoofddorp, N.O. box 7241, 1007 JE Amsterdam, The Netherlands (en adelante el "MUTUANTE") por una parte y

SANCOR COOPERATIVAS UNIDAS LIMITADA (una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina con domicilio en Tacuarí 202, 3° Piso - Capital Federal, República Argentina) representados en este acto por el Sr. Mario Magdalena en su carácter de apoderado (en adelante el "MUTUARIO") por la otra parte.

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"

CONSIDERANDO

(a) Que con fecha 30 de Noviembre de 2007 las Partes suscribieron un Contrato Marco de línea de crédito para uso financiero, la copia del cual que en copia se adjunta como Anexo A, cuyas definiciones, términos y condiciones se encuentran vigentes nos son aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Primera Enmienda.

(b) Que el MUTUARIO ha solicitado al MUTUANTE la apertura de Créditos Extraordinarios Veinticinco Millones con (US$ 25.000.-) (una) bajo la modalidad de Línea de Crédito.

(c) Que el MUTUANTE está dispuesto a aceptar el pedido de apertura de la línea de Crédito requerido siempre que el MUTUARIO entregue girar a los adelantos de pago a cargo en el MUTUARIO está dispuesto a ceder nuevos créditos a favor del MUTUARIO y celebrar y endosar warrants a favor del MUTUANTE

En mérito a las consideraciones precedentemente establecidas, las Partes acuerdan suscribir la presente Primera Enmienda al Contrato Marco a la "Primera Enmienda" de conformidad con los términos y condiciones incluidos en las siguientes cláusulas.

1. Incorpórense a la Cláusula PRIMERA del Contrato Marco las siguientes las definiciones

"Arthur Schuman" significa ARTHUR SCHUMAN INC. una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica con domicilio en 40 New Dutch Lane, Fairfield NJ 07004 USA.

"Fonterra" significa FONTERRA LIMITED, una firma organizada bajo las leyes de Nueva Zelandia con domicilio en Fonterra Centre, 9 Princess Street Auckland, New Zealand.

"HARIVEN co PDVSA" significa Hariven S.A., con PDVSA Services Inc., una firma organizada bajo las leyes de los Estados Unidos, Estados Unidos de Norteamérica con domicilio en 1293 Eldridge Parkway Houston, Texas 77077 Estados Unidos de Norteamérica

Warrants significa los Warrants emitidos conforme la Ley 9644 de la República Argentina, correspondiente a certificado de mercadería en instrumentos de seguridad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE endosados por el MUTUARIO a favor del MUTUANTE en todos los casos a fin de las obligaciones asumidas en la Cláusula SEXTA BIS del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco

2. Modifíquense las definiciones de "Créditos Cedidos" y "Deudores Cedidos" de la Cláusula PRIMERA del Contrato Marco las cuales quedarán redactadas del siguiente modo

"Créditos Cedidos significa los apertura créditos del MUTUARIO contra los Deudores Cedidos

Deudores Cedidos significa los créditos a favor del MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a favor de los deudores del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya copia se adjunta al presente Contrato como Anexo ___ de los presentes contratos complementarios y/o

reemplazantes de ... así como los conocimientos de embarque, las ... emitidos en virtud del mismo) Se adjunta asimismo como Anexo B una Descripción ... del MUTUARIO con el Pronóstico de Ventas ... que el MUTUARIO estima realizar a ... durante los primeros 18 ... meses ... el presente Contrato Marco

(ii) todas las cuentas ... deberán ... que le corresponden al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realizó a BARIVEN S.A c/o PDVSA derivada de la Orden de Compra Purchase Order N° 5100482264 de fecha 26 de Marzo de 2008, ... por el MUTUARIO cuya fotocopia se adjunta ... Anexo B, ... Anexo B, las enmiendas, contratos ... de la orden de compra adjunta como Anexo B, así como los conocimientos de embarque, las ... emitidos en virtud del mismo

(iii) todas las cuentas ... que le correspondan al MUTUARIO en virtud de las ventas de ... por el MUTUARIO realizó a Arthur Schuman y/o sus ... hasta la concesión total de la ... Arthur Schuman ... facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO realizó con Arthur Schuman

"Deudores ... Arthur Schuman c/o Bariven y/o BARIVEN c/o PDVSA

"Línea de Crédito" ... según los términos y condiciones de los Documentos ... MUTUANTE ... a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00)

3       Las modificaciones antes referidas ... crédito a favor del MUTUANTE de los créditos del MUTUARIO contra Arthur Schuman y BARIVEN c/o PDVSA, precedentemente descriptos, en los términos de la Cláusula CUARTA del Contrato Marco. Consecuentemente, dentro de las 48 hs de suscripto el presente, y como condición para ... del Contrato Marco, el MUTUARIO se obliga a notificar dicha ... a Arthur Schuman y Bariven S.A c/o PDVSA Services, Inc, en los términos establecidos en la Cláusula ... del Contrato Marco.

4       Antes del 31 de Agosto de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants por ... equivalente al diez por ciento (10%) de la Línea de Crédito Aduanera. Transcurrido ese ... las ... de la fecha antes ... dicho porcentaje deberá haber MUTUARIO aumentado al quince por ciento (15%) de modo tal que antes del 30 de Septiembre de 2008 el MUTUANTE Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Aduanera. Concurrentemente con dicha ... como Cláusula SEXTA BIS del Contrato Marco la siguiente

"CLAUSULA SEXTA BIS WARRANTS

6BIS 1   Antes del 31 de Septiembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants endosados a favor ... por un monto equivalente al quince por ciento (15%) de la Línea de Crédito ... obligándose a mantener los mismos ... reemplazándolos a ... vigencia se establece en la siguiente Sección 6.2 por dicho monto durante la ... del Contrato Marco

6BIS 2   El MUTUARIO ... entregar antes del 31 de Agosto de 2008, al MUTUANTE cuenta en su poder con Warrants ... equivalente al diez por ciento (10%) de la Línea de Crédito Aduanera y con ... antes del 30 de Septiembre de 2008 durante toda la vigencia del Contrato Marco el MUTUARIO ... cuenta en su poder con Warrants por un monto no inferior a una suma equivalente al ... quince (15%) de la ... de la Línea de Crédito Aduanada. Teniendo en cuenta lo dispuesto en el art 26 de la Ley 9643, el ... a plazo mayor al vigente de los Warrants utilizados, en el art 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar los Warrants antes del vencimiento de los mismos. Habiendo entregar al MUTUANTE nuevos Warrants por un monto equivalente o superior, en su caso, al los Warrants respectivos

6BIS 3   A fin de ... cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los ... de dichos warrants correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería vigente al momento de dicho depósito. El

2

ANA (h)

mantenimiento [...] circulando por los Warrants, por los montos y en la forma precedentemente [...] de cláusulas [...] es esencial para el mantenimiento de la presente [...] conforme la indica [...] por cualquier motivo que fuere, en la calidad por cantidad [...] a su capacidad por [...] a su más la Mora automática del MUTUARIO sin necesidad de interpelación alguna provocando la caducidad de todos los plazos con los efectos establecidos en la Cláusula NOVENA del presente Contrato.

**6BIS 4** El MUTUARIO [...] ni se opondrá la constitución de todos los datos consignados en los Warrants y que a dicho [...] no recaen gravamen ni restricción alguna [...] de la entrega depositada (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de un día. En mutatis la norma. El incumplimiento de dicha comunicación por [...] del MUTUANTE. En todos los casos, el MUTUARIO deberá responder [...] y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

**6BIS 5** En caso de [...] del MUTUARIO [...] cualquier sea el que fuere el MUTUANTE quedará automáticamente facultado para accionar la ejecución de los Warrants en los términos de la Ley 958 [...] sus pagos y demás [...] remedios [...] acciones legales que le correspondan. En el supuesto de subasta de [...] más adelante descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de accionar a una resolución de uno u otro.

**6BIS 6** Será responsabilidad [...] manda y mantenimiento del MUTUARIO la inscripción del endoso de los Warrants [...] (Warrantera) de la mercadería indicada en por las mismas como [...] del Estado del y los los gastos y honorarios que correspondan a dicha empresa almacenadora.

5      Incorpórase a las [...] de la PRIMERA Sección 7 las siguientes declaraciones y garantías del MUTUARIO.

    7.1.19   Que el [...] PIVESA ascenderá a la suma de US$ 46.608.615,56 (Dólares Estadounidenses CUARENTA Y SEIS MILLONES SEISCIENTOS OCHO MIL SEISCIENTOS QUINCE CON [...])

    7.1.20   Que el [...] ascenderá como mínimo a una suma equivalente al cincuenta por ciento [...] de la [...]

    7.1.21   Que el Capital [...] sobre Artículos [...] ascenderá como mínimo a una suma equivalente al treinta por ciento [...] de la [...] del Capital.

    7.1.22   Que a partir del 15 de septiembre de [...] y en todo momento durante la vigencia del presente Contrato, el MUTUANTE contará con Warrants por una suma equivalente al quince por ciento [...] del [...]

6      Con excepción de aquellas expresamente modificadas por la presente Primera Enmienda todas las demás [...] términos, condiciones y cláusulas del Contrato Marco permanecen inalteradas manteniendo su [...] y Agencia.

Suscripto por el MUTUARIO en la ciudad de Buenos Aires, República Argentina, a los 11 días del mes de Junio de 2008 y por el MUTUANTE en la ciudad de Amsterdam a los 13 días del mes de Junio de 2008

                                          Firma/s certificada/s en Foja
                                          N° [...]
                                          De As [...]

**Por SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre Mario Magdalena
Carácter Apoderado

**Por [...] B.V.**
Nombre [...]
Carácter [...]

MARTIN R. AHANA (h)
( SCRIBANO )
MAT. 4370

3



F 004319444

Buenos Aires, 11 de Junio de 2008. En mi carácter de Escribano

Titular del Registro Notarial Nº 941

CERTIFICO: Que la/s firma/s que obra/n en el

documento que adjunto a esta hoja, cuyo requerimiento de certificación de su/s

firma/s que se formaliza simultáneamente por ACTA número 144 del

LIBRO número 96, es/son puesta/s en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación y de

cuyo conocimiento doy fe Marco Cesar MAGDALENA L.E. 8.106.144.- Mani-

fiesta actuar en su carácter de apoderado de la sociedad "SANCOR CO-

OPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Provincia

de Santa Fe, e inscripta en la Matrícula 272 del Registro Nacional de Coo-

perativas de la Provincia de Santa Fe, Departamento Castellanos, con-

forme lo acredita con el poder de fecha 23 de junio de 1993, pasado al folio

638 del Registro 290 de la ciudad de Sunchales, Provincia de Santa Fe, a

cargo del escribano Horacio Remondino. la documentación relacionada

tengo a la vista y le confiere facultades suficientes para suscribir el docu-

mento adjunto.



MARTIN R. AHANA (h)
ESCRIBANO
MAT. 110

MODELO NOTIFICACION A BARIVEN

Buenos Aires, June__,ᵗʰ 2008

Messrs
Bariven S.A., c/o PDVSA Services Inc
Purchasing Agent (PUUU)
1293 Eldridge Parkway
Houston Texas 77077 USA
At :
Phone :
E-mail :

Dear Sirs

We address to you in order to give you notice of the Assignment Agreement June __ᵗʰ 2008, executed between SANCOR COOPERATIVAS UNIDAS LTDA ("SANCOR") and IIG TOF B V represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V. ("IIG") whereby SANCOR has assigned and transferred to IIG and IIG has accepted and received all the rights and credits derived from the PURCHASE ORDER Nº 5100062284 dated March 26ᵗʰ 2008 corresponding to the merchandise that you have requested to SANCOR which is attached hereto as Annex I

Therefore SANCOR and IIG hereby confirm that pursuant to the terms and conditions of the aforementioned Assignment Agreement as the sum of any credits derived from the purchase order hereinabove referred -including the credits derived from the invoices and other documentation that SANCOR submit to you as a consequence of said commercial transactions- are to be fully paid by the wire transfer of the corresponding funds to the following bank account

| | |
|---|---|
| BANK | STATE STREET BANK AND TRUST, BOSTON MA |
| ABA# | 011000028 |
| SWIFT | SBOSUS3X |
| Credit | IIG TOF BV |
| Account# | 12456 |
| Further Credit | IIG TOF bv SANCOR Ltd |
| Account# | 020 0 542.149 |

The aforementioned Assignment Agreement and its payment instructions are irrevocable and could only be modified through a new notice signed by representatives that duly authorized to the correspondent certifications

The aforementioned Assignment Agreement shall not transfer and/or modify the liability of SANCOR derived from the referred commercial transactions and subsidiary operations. Thus SANCOR remains being fully and exclusively responsible for any and all the obligations derived thereof.

Sincerely yours

Por SANCOR COOPERATIVAS UNIDAS LTDA
Nombre Mario Magdalena
Caracter Apoderado

Por IIG TOF B V
Nombre _____
Caracter _____

Acknowledged and accepted

BARIVEN S.A. C/O PDVSA SERVICES INC
Name
Capacity



# ANEXO

CONTRATO DE LINEA DE CREDITO PARA LA PREFINANCIACIÓN DE
EXPORTACIONES

Entre

HG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M.)
B.V., representado en este acto por los Sres. _____ en su
carácter de _____, domiciliado en Telestone 8  Teleport, Naritaweg 165, P.O.
Box 7241, 1007 JE Amsterdam  Da  Netherlands, (en adelante el "MUTUANTE"), por una
parte, y

SANCOR COOPERATIVAS UNIDAS LIMITADA  una cooperativa de primer grado,
constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí
202 - 3º Piso - Capital Federal  República Argentina  representado en este acto por el Sr.
Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra
parte, y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

CONSIDERANDO

(a) Que el MUTUARIO esta interesado en obtener financiamiento de mediano plazo para
destinarlo a la pre-financiación de sus exportaciones

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las
exportaciones que el MUTUARIO tiene en la actualidad  redundara en su beneficio,
permitiéndole continuar con el desarrollo y ampliación de sus mercados externos,

(c) Que por las razones indicadas en el Considerando (b) anterior, y además, para
facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el
MUTUARIO esta dispuesto a afectar bienes  para garantizar el repago del crédito para
prefinanciar sus exportaciones.

(d) Que el MUTUANTE esta dispuesto a otorgar una linea de crédito de hasta Dólares
Estadounidenses  veinticinco  millones  con (0/100)  (U.S$  25.000.000,00)  para el
MUTUARIO sujeto a los términos y condiciones del presente Contrato, en la medida
que y siempre y cuando  (i) el MUTUARIO se obligue a su repago y al cumplimiento
de todas las obligaciones asumidas bajo el Contrato  (ii) que las Garantías (conforme
se las define mas adelante)  se mantengan plenamente vigentes y exigibles hasta la
expiración del Contrato  (iii) se otorgue y perfeccione  la cesion de los Créditos
Cedidos (tal como se los define mas adelante)

En merito a las consideraciones precedentemente establecidas, se celebra el presente contrato de linea de credito sujeto a las siguientes clausulas y condiciones.

## PRIMERA:   DEFINICIONES

"Afiliadas" significa las compañias controladas por y/o controlantes de y/o de propiedad comun del MUTUARIO.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situacion economica, comercial, financiera, operativa, patrimonial o de cualquier otra indole del MUTUARIO y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, consideradas en conjunto o en la politica economica, monetaria y tributaria de la Republica Argentina o de los Estados Unidos de America, o que se refiera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebracion del presente Contrato Marco (incluyendo sin limitacion cualquier suspension, condonacion o limitacion al cumplimiento de las obligaciones dinerarias bajo vaciada las financieras y/o de comercio exterior y/o de otro tipo, cualquier declaracion de cesacion de pagos en la Republica Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional e internacional directa o indirectamente relacionada con la Republica Argentina) o que exista con un acontecimiento que en opinion del MUTUANTE diera motivo razonable para suponer que el MUTUARIO no podra cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco, o cualquier variacion en el tipo de cambio Peso Argentino/Dolar Estadounidense o cualquier suspension en los mercados de cambio de la Republica Argentina y/o Estados Unidos de America.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco previstas en la Clausula SEGUNDA.

"Contrato Marco" significa el presente contrato de linea de credito suscripto entre las Partes.

"Creditos Cedidos" significa todos los creditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercaderia que el MUTUARIO realice al Deudor Cedido derivada del contrato denominado "MASTER PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como Anexo I (y las enmiendas, contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I, asi como los conocimientos de embarque, facturas y/o remitos emitido en virtud del mismo). Se adjunta asimismo como Anexo II una Declaracion Jurada del MUTUARIO con el Pronostico de Ventas minimas que el MUTUARIO planea realizar al Deudor Cedido durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco.

2

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación

| | |
|---|---|
| BANK: | State Street Corp f/k/a Investors Bank & Trust Company |
| ABA#: | 011-001-438 |
| SWIFT: | INVBUS33 |
| Credit: | Client Funds |
| Account#: | 569-536-395 |
| Further Credit: | IIG TOF – Sancor CPT |
| Account# | 02030-8420148 |

"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTUANTE en forma fehaciente

| | |
|---|---|
| BANCO: | Citibank N A |
| DIRECCIÓN: | New York, E S A |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 |
| A NOMBRE DE: | Banco Comafi S A  Buenos Aires Argentina |
| SWIFT | QUILARBA |
| CHIPS: | UID 120011 |
| A FAVOR DE: | SanCor Cooperativas Pmi a  Limitada |
| CUENTA N° | 000-0 129785 |
| REFERENCIA: | Prefinanciacion de Exportacion |

"Deudor Cedido" significa FONTERRA LIMITED una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre 9 Princess Street, Auckland, New Zealand

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagares, y el contrato adjunto como Anexo I que causa los Creditos Cedidos

"Dolares" y "US$" significa Dolares Estadounidenses billete o transferencia

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condicion (financiera o de cualquier otro tipo) del MUTUARIO y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación

3

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la Cláusula OCTAVA, Sección 8.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Mayo de 2009.

"Garantías" significa los Pagarés y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses veinticinco millones con 00/100 (US$ 25.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todas las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la Cláusula OCTAVA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO y el MUTUANTE.

"Pagarés" significa los pagarés librados por el MUTUARIO a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como ANEXO III, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

4

"Plazo de Confirmacion" significa el plazo de cinco (5) dias habiles contados a partir de la fecha de acreditacion de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Mayo de 2009, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Credito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente identico al que se adjunta al presente en ANEXO IV, completo con todos los datos debidamente consignados, que el MUTUARIO debera suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano publico.

"Sumas Adeudadas" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interes anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso que el MUTUANTE aplicara a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO

2.1.    Disponibilidad de la Línea de Credito.

(a) Disponibilidad Condicionada. Sujeto al cumplimiento especifico de cada una y todas las condiciones Precedentes, y a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Credito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la financiacion de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

(b) Vigencia. Una vez expirado el Plazo de Disponibilidad, cesara automática e irrevocablemente sin necesidad de notificacion judicial o extrajudicial alguna, el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfaccion, y tal decision sea fehacientemente notificada al MUTUARIO en tiempo hábil.

5

(c) Monto de los Desembolsos. EL MUTUARIO  solo podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades, hasta que la sumatoria total de los montos consignado en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito, en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

2.2    Condiciones Precedentes al otorgamiento de la Línea de Crédito.

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco esta condicionada a que a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE  dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

(a) Aprobaciones Societarias que prevea mediante por escritura publica del poder general del MUTUARIO del cual conste que los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto, y

(b) Vigencia de las Manifestaciones y Declaraciones del MUTUARIO. Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de las manifestaciones y declaraciones establecidas por el MUTUARIO en la Cláusula SEPTIMA del Contrato Marco, y

(c) Inexistencia de Cambios Materiales Adversos o Hechos Materiales Adversos o Supuestos de Incumplimiento. Que no hubiere ocurrido ni se encontrare vigente, ni hubiere elementos fundados para prever los acaecimientos unos Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de  Incumplimiento (hubiere o no sido declarada la caducidad y/o el vencimiento de plazos), y que se hubiere ocurrido en conocimiento del MUTUARIO    ninguna  circunstancia  que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de Los Documentos de la Operación o de las Garantías, y

(d) Notificación al Deudor Cedido. Que el MUTUARIO  haya notificado al Deudor Cedido la cesion del Crédito Cedido en los términos establecidos en la Sección 4.6 del presente Contrato Marco, a cuyo efecto el MUTUARIO debera entregar al MUTUANTE el original de tal notificación recibida y aceptada por el Deudor Cedido.

CLAUSULA TERCERA  CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE

(i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento; y

(ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes, a plena satisfacción del MUTUANTE, con la firma debidamente certificada por un escribano público argentino

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa- y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal circunstancia o causa

**3.3. Trámite posterior. Desembolso.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá, a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso, y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar este de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso -siempre que el rechazo sea con causa- que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquella

**3.4. Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aún en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos, contados desde la finalización del

Plazo de Acreditacion implicara la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

3.5 **Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podra suspender inmediatamente la tramitacion de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que este siendo verificada y evaluada por aquel asi como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier accion por responsabilidad fundada en tal causa. Ello, sin perjucio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto de conformidad con lo establecido en la clausula OCTAVA del presente Contrato

3.6 **Devolución al Mutuario de los Créditos Cedidos. Notificación al Deudor Cedido.** En cualquiera de los supuestos enumerados en la presente clausula TERCERA y una vez cancelada en su totalidad la Linea de Credito Adeudada por el MUTUARIO y dentro de las 48 hs de sucedido ello, el MUTUANTE se obliga a notificar al Deudor Cedido que ha quedado sin efecto la Cesion del Credito Cedido por lo que a partir de la recepcion de dicha notificación, el Deudor Cedido debera abonar al MUTUARIO el monto de los Créditos Cedidos.

## CLAUSULA CUARTA. CESIÓN DE CRÉDITOS.

4.1   En garantia de pago de la Linea de Credito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operacion, y como medio de pago de las Sumas Adeudadas conforme lo establecido en la Clausula 5.2 del Contrato Marco el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesion comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Creditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extension y amplitud pertinente, subrogandolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos creditos, sin perjucio de las obligaciones emergentes de las obligaciones contractuales con el Deudor Cedido de las cuales surjan los Créditos Cedidos, que quedaran a cargo exclusivo del MUTUARIO

4.2   El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) dias de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE,

8

**PARTIES:**

(1)    **FONTERRA LIMITED** of Fonterra Centre, 9 Princes Street, Auckland, New Zealand ("Fonterra"), and

(2)    **SANCOR COOPERATIVAS UNIDAS LIMITADA** of Tte. Gral. Richieri 15, 52322FYA, Sunchales, Santa Fe, Argentina ("SanCor")

**BACKGROUND**

1.    Fonterra manufactures dairy products and has an international marketing network and experience in the sale of dairy products

2.    SanCor wishes to utilise the experience and services of Fonterra for sale in the international market of certain dairy products produced by SanCor.

3    SanCor has agreed to sell to Fonterra on an exclusive basis and Fonterra has agreed to purchase the Products for on-sale by Fonterra to Customers in the Territory

**THE PARTIES AGREE as follows:**

**1    Interpretation**

In this Agreement, unless the context otherwise requires, the following words and expressions shall have the following meanings:

"**Agreement**" means this agreement including all schedules and appendices hereto.

"**Associate**" means any person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control of, the other person. For this purpose, a person is deemed to control another person if the first such person possesses, directly or indirectly, the power to appoint a majority of the directors of the second person, or to otherwise direct or cause the direction of the management or policies of the second person, whether through the ownership of voting securities, by contract or otherwise.

"**Base Price**" means the weekly prices set by SCOP in New Zealand for Commodity Groups

"**Business Day**" means, for the purpose of clause 16.7 (Notices) any day other than a Saturday, Sunday or Public Holiday in the country in which the notice is being served, and in all other cases means any day other than a Saturday, Sunday or Public Holiday in New Zealand or Argentina;

"Commission" means a commission of 1% of the FOB value of an Order, to a maximum value of USD40 per metric tonne and a minimum value of USD25 per metric tonne for payment terms of 30 days or less, payable by SanCor to Fonterra on all Products sold by Fonterra to Customers under this Agreement,

"Customer" means the customer to whom Fonterra sells the Products in response to an Order,

"Forecast" has the meaning set out in Schedule 1,

"Grading" means in respect of Product, the time at which SanCor, acting in good faith, issued a "Certificate of Analysis" through SanCor's Quality Laboratory attesting to the Product meeting Specification (such SanCor Quality Laboratory being registered to issue these Certificates by the Argentine Ministry of Agriculture),

"Graded" has a corresponding meaning,

"Order" means a purchase order placed by Fonterra with SanCor for the supply of Products in accordance with clause 3,

"Products" means the products described in Schedule 1 manufactured by SanCor at its manufacturing facility and meeting a Specification acceptable to Fonterra (acting reasonably)

"Purchase Price" means the price agreed between SanCor and Fonterra in respect of a sale of the Products pursuant to an Order

"Relationship Managers" means a relationship manager described in Schedule 1, or such other relationship managers as notified to the other party from time to time

"Specification(s)" means the manufacturing and packaging specifications for each of the Products set out in Schedule 1 or such other specifications acceptable to Fonterra (acting reasonably) to be supplied by SanCor and as may be amended by agreement in writing from time to time;

"Term" shall have the meaning referred to in clause 2.4,

"Territory" means the Territory described in more detail in Schedule 1, and

"WACC" means weighted average cost of capital

1.1    In this Agreement.

a        references to clauses are to clauses of this Agreement;



b.    references to statutes shall include any statutory modification or
      re-enactment of the statute concerned;

c.    words and expressions in the singular shall include the plural and vice
      versa.

d.    the headings are for convenience only and shall be ignored in
      construing this Agreement;

e.    references in this Agreement to Fonterra shall include reference to
      its successors and permitted assigns; and

f.    all references to EXW, FOB, CFR, CIF and other delivery terms are
      references to those terms as defined in Incoterms 2000

2   **Appointment and Term**

2.1   **Appointment:** SanCor hereby agrees to sell the Products to Fonterra exclusively in the Territory on the terms and subject to the conditions of this Agreement, and Fonterra agrees to purchase the Products on the terms and subject to the conditions of this Agreement.

2.2   **Effect of Territory.** The effect of the appointment of Fonterra as the exclusive purchaser of the Products in the Territory is that:

    **a.** Fonterra is entitled to sell or facilitate the sale and may engage any other person to sell or facilitate the sale of the Products in the Territory to any channel.

    **b** SanCor shall not itself sell or facilitate the sale and shall not engage any other person to directly or indirectly sell or facilitate the sale of the Products to Customers in the Territory unless this has first been agreed with Fonterra in writing on a case by case basis; and

    **c.** SanCor shall not sell the Products to any person outside of the Territory if SanCor knows, or should have known by reasonable enquiry, or has reasonable cause to believe, that the Products would be subsequently imported or distributed or sold in the Territory

2.3   **Enquiries from Territory** SanCor may not sell or otherwise dispose of the Products in the Territory other than as provided in clause 2.2.b   If SanCor receives any enquiries from any potential customers in the Territory relating to the Products, SanCor shall promptly inform Fonterra of such enquiries and shall not seek to deal directly or indirectly with those potential customers with respect to the Products

2.4   **Terms:** Fonterra's appointment shall commence on 1 September 2007 and shall continue for an initial term of three years ("Term") unless earlier terminated in accordance with the terms of this Agreement   This Agreement shall thereafter continue in full force and effect until a party gives to the other not less than six months written notice of termination.

2.5   **Simple Termination.** After the first year of the Agreement, one party ("Terminating Party") may give to the other ("Other Party") a minimum of six months written notice of termination of the Agreement, without the Other Party having any claim, right, title, property or other interest of any kind or nature.   Before the Terminating Party can give notice of termination, the Terminating Party must offer no later than six months prior to the date of termination, the right to discuss with the Other Party the reasons for the proposed non-renewal to give both parties the opportunity to discuss the

5

possibility of continuing this Agreement on agreed terms.

2.6 **Fonterra may sell competing products:** Nothing in this Agreement prevents or limits the right of Fonterra to be concerned or interested either directly or indirectly in the supply to Customers or any third party of any goods in the Territory which are the same as, similar to or competitive with the Products

2.7 **Exception to Agreement** The terms of this Agreement shall not apply to the sale or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A") or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities.

3 **Forecasting, Orders and Sales**

3.1 **Forecasting procedure:** The forecasting regime set out in Schedule 1 shall apply

3.2 **Sales:** In accepting orders from Customers, Fonterra shall take into account the Forecast of volume of Products provided by SanCor under this Agreement

3.3 **Quantity:** Fonterra agrees to sell the entire Manufactured Volumes of Product that is available for export to the extent that such Manufactured Volumes of Product meets the Specifications for each Product

3.4 **Delivery.** SanCor agrees to deliver the Products subject of an Order within the timeframes and by the delivery method agreed between Fonterra and the Customer, subject to SanCor reasonably being able to comply with the requirements of an Order. Where Fonterra requires delivery dates or shipping arrangements that vary from the normal practice adopted between SanCor and Fonterra, Fonterra agrees to provide sufficient advance notice to SanCor to enable SanCor to meet the requirements of the relevant Order.

3.5 **Currency** All sales of Products under this Agreement and all payments made under this Agreement are to be made in United States Dollars unless otherwise agreed

3.6 **Terms and conditions of sale:** SanCor acknowledges that Fonterra is not making or providing to the Customer any representation or warranty, express or implied, that the Product meets the Specification, s fit for the intended purpose or is otherwise of merchantable quality. SanCor accepts full responsibility and liability for, and agrees to fully indemnify Fonterra in respect of, any claim by a Customer or any third party that the Products sold by

6

Fonterra to the Customer are in breach of any statutory or contractual warranty; provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this agreement is the direct cause of such claim, loss or damage

3.7   **Fonterra to sell at market price:** Fonterra shall endeavour to achieve the best market price for the Products at the time of sale to the Customer having regard to amongst other factors, Specification, quality, volume, delivery date, delivery terms, international market price ranges and other market factors in so far as the availability of the Product is advised to Fonterra with sufficient lead time. Fonterra shall keep SanCor informed of any non-standard terms of sale or unusual conditions, pricing or volumes.

3.8   **Costs.** SanCor shall be responsible for (i) liability for any additional taxes imposed by the Argentinean Government over and above those considered by this Agreement and (ii) payment of all freight, financing costs, customs and other charges, costs and expenses related to supply and delivery of the Products to a Customer pursuant to the Incoterms of an Order

4     **Commission**

4.1   **Commission Amount**   SanCor agrees that Fonterra is entitled to the Commission on all Products sold by Fonterra to a Customer.    The Commission will be calculated depending on the payment terms with the end customer. For payment terms of 30 days or less, Commission will be 1% of the FOB value of the Order, up to a maximum of USD40 per metric tonne, and a minimum of USD25 per metric tonne

4.2   Notwithstanding clause 4.1, for each subsequent 30 days of payment terms on the Order, SanCor will pay Fonterra an additional 0.5% monthly on the Purchase Price

Example – in the case of an order with a purchase price of USD3000 / MT CFR with 90 day payment terms, the total commission due to Fonterra would be:

- base commission of 1% plus

- variable commission for two 30-day periods at 0.5% per 30 days

In this example, the total commission amount would be equal to USD60 / MT ((USD3000 x (1% base + 1% variable))

4.3   In the case that the average lapsed time from grading date to bill of lading date is less than 30 days, Fonterra and SanCor will share the capital saving generated on a 50:50 basis.  The capital saving will be calculated using SanCor's weighted average capital cost and will be calculated on the average number of days from grading date to BOL date for all the orders

shipped within a calendar month

Example – if a total of 2500 MT was shipped within a given calendar month, within an average of 15 days from grading date to BOL date, with a weighted average price of USD3000 / MT CFR and a SanCor WACC rate of 12%, the total additional payment due would be:

= ((15/365)*0.12*300util2

= USD7 39 / MT additional payment due per M T

4.4 **Payment of Commission**   On receipt by Fonterra of the Purchase Price paid by a Customer, Fonterra is entitled to deduct from that Purchase Price the Commission prior to Fonterra remitting the balance of the Purchase Price to SanCor

5 **Payment to SanCor**

5.1 **Standard Payment Terms**   Payment will be made by Fonterra to SanCor for the Products Fonterra has purchased from SanCor pursuant to this Agreement within 30 days from date of lading date

5.2 **Pre-payment.** Notwithstanding the payment provisions under clause 5.1, the Parties have agreed that, as an alternative, SanCor may request a Pre-payment for the Products as soon as the Products have been Graded (the "Grading Date"), in accordance with the following provisions

5 3 The amount of any Pre-payment shall be an amount equal to the amount of an Order or a group of Orders

5 4 The amount of all Pre-payments made by Fonterra shall not  at any one time exceed an  aggregate value as agreed between both parties, or in the absence of such an agreed value  a total of USD10 000,000 00

5 5 Interest of Fonterra WACC + 2% will be charged on each Pre-payment from the date of the Pre-payment until the due date of the relevant order in accordance with the standard payment terms

5 6 SanCor must give Fonterra not less than fourteen days notice that a Pre-payment is requested   Pre-payment requests may only be made in respect of Product which has already been manufactured at the time notice is given and that is allocated to an existing Order.

5 7 The purpose of the pre payment provision of clause 5 2 is to provide cash-flow security to SanCor in the event that, due to market conditions, stock is not rotating at the same speed of manufacturing.  It would be expected that this clause would not be exercised unless a Product was held in stock for one reason or another for a period of more than 15 days from grading date.

6   Invoicing and Documentation:

6.1   The issuing of invoices to Customers shall be the responsibility of Fonterra.

6.2   SanCor will have responsibility to ensure that all export documentation, in compliance with the Country of Destination and Customer requirements as advised on each and every Order is supplied to Fonterra within 15 days of the date of the relevant bill of lading.

6.3   SanCor has the right, at all times during the term of this Agreement, to request details of all final customer invoices from Fonterra.

6.4   **SanCor Default**   If SanCor, without the prior written consent of Fonterra, sells or otherwise disposes of Products in the Territory other than via the direct sale of those Products to Fonterra under this Agreement then, without prejudice to Fonterra's other rights and remedies, SanCor must immediately pay to Fonterra an amount equal to the Commission that would otherwise be payable if the Products had been sold or disposed of in accordance with the terms of this Agreement.

6.5   **Storage and Insurance**   In accordance with Schedule 1, Clause 2, "Supply and Forecasting Regime", last paragraph, SanCor will be responsible for attending to all storage, and handling of the Products to be sold under this Agreement up to and including delivery to the Customer regardless of whether or not any payment has been paid to SanCor, following the Incoterms agreed on an Order. Risk of loss, damage or deterioration of the Products will be with SanCor until delivery to a Customer on the terms of the relevant Order.

7   Fonterra's Obligations

7.1   Fonterra will:

a.   at all times during this Agreement work diligently to promote the sale of the Products;

b.   not describe itself as agent or representative of SanCor except to the extent authorised by this Agreement;

c.   not sell or facilitate the sale of any Product without SanCor's consent if Fonterra knows or should have known by reasonable enquiry, or had reasonable cause to believe that the Product would be subsequently distributed or sold in countries that are outside of the Territory allocated to Fonterra under this Agreement. Where Fonterra receives any enquiries from any Customers or potential Customers for the purchase of the Product outside of the Territory, Fonterra shall promptly inform SanCor of such enquiries.  If a commission is to be paid on any business resulting from the

9

enquiry this must be negotiated on a case by case basis.

d    conduct the business of selling the Products to Customers in an orderly and businesslike manner and in accordance with all applicable laws, regulations and requirements of any governmental or regulatory authority;

e.    sell the Products in the Territory only under the brand names and trademarks of SanCor and/or any of its Associates; and

f    be responsible for and will pay for all of its own administrative costs and expenses associated with its marketing of the Products as sales agent in accordance with this Agreement

g.    provide to SanCor together with the Order the following information:

(i)    terms and conditions of sale of Products;

(ii)    quantity and specification of Products

(iii)    term and condition of delivery and shipment of Products, including country of destination; and

(iv)    SanCor shall inform Fonterra within 4 (four) working days as from reception of the Order whether SanCor is precluded by the Laws of Argentina from selling to that country of destination and/or any other legal impediment that may arise.

7.2    Fonterra will provide reasonable advice and technical assistance required to manufacture and supply the Products in accordance with the Specification. All such assistance will be at a cost to SanCor at an agreed rate on a case by case basis

**8    SanCor's Obligations**

8.1    **Information to facilitate sales**  SanCor shall provide Fonterra with all necessary written information relevant to the sale of the Products including details of Specification, health, legal and regulatory information and approvals and such other information as Fonterra may reasonably require to carry out its obligations under this Agreement. SanCor shall ensure that all information provided to Fonterra is accurate, current and kept up to date.

8.2    **No Agency**  SanCor shall not describe itself as Fonterra's agent or representative for the sale of the Products in the Territory, notwithstanding that if SanCor initiates a sourcing opportunity in the Territory on behalf of Fonterra, SanCor will be entitled to a commission on such Products equivalent to the Commission.

8.3   **Compliance**  It shall be the sole responsibility of SanCor to ensure that:

   a.   the Products comply with the Specifications, and with all the Product descriptions and information provided by SanCor to Fonterra or the Customer;

   b.   all documentation, labelling and other requirements to ensure the Products are properly and promptly delivered to Customers are completed;

   c.   the Products comply with all relevant health, agricultural, legal and regulatory requirements in the country of manufacture and in the Territory;

   d.   the Products comply with the requirements of a Customer's country of import where specified (including without limitation any product registrations with relevant authorities that may be required but excluding any obligations such as customs clearance where customs clearance is the responsibility of the Customer under the terms of sale);

   e.   all Products are fit for their intended purpose (which, unless otherwise expressly agreed by both parties, shall be fit for human consumption); and

   f.   all Products can be traced as to source and batch in the event of any recall issues arising and adequate Product samples (to the reasonable satisfaction of Fonterra) are kept and properly stored

8.4   **Access to Facilities**  SanCor will allow Fonterra access to the SanCor manufacturing facilities as necessary, during the Term of the agreement to inspect those facilities to ensure that the Products are being produced in accordance with the Specifications

8.5   **Recovery of Customer Payments.**  If SanCor receives all or part payment from a Customer in respect of an invoice issued by Fonterra in accordance with clause 3.2, SanCor shall immediately notify Fonterra and remit such payment to Fonterra provided however that SanCor will be able to set-off such payment with any amount owed by Fonterra to SanCor in relation to the same transaction.  Failure of SanCor to comply with these obligations shall entitle Fonterra to recover any amount paid by Fonterra to SanCor in respect of such sale

8.6   **Freight.**  As required SanCor will act on behalf of Fonterra in negotiating freight for product exported from Brasil, Argentina and Uruguay.

9   **Reporting, communication**



11

9.1 **Reporting and communication procedure:** The parties shall agree on reasonable reports, meeting and other communication processes for the purpose of discussing sales activities, obtaining market feedback and generally reviewing performance of both parties. Each party shall participate in good faith in all such meetings.

9.2 **Quarterly meetings:** Without limiting clause 7.1, the parties will meet on a quarterly basis to discuss general performance and other such issues as may arise.

9.3 **Reports.** Fonterra will provide to SanCor quarterly reports containing such marketing and sales information as may be appropriate. These reports shall include pricing information for shipments of comparable dairy products from New Zealand.

10 **Intellectual Property**

10.1 **SanCor Trademarks.** Where the Products bear the name, logo and/or other proprietary marks of SanCor and/or any of its Associates or parent companies ("SanCor Trademarks"), Fonterra is authorised to promote and sell the Products in the SanCor packaging and by reference to the SanCor Trademarks. Fonterra will use or refer to the SanCor Trademarks only for the purpose of sale of the Products in accordance with this Agreement and acknowledges that the SanCor Trademarks remain the property of SanCor and that Fonterra's use of the SanCor Trademarks does not create any separate rights of Fonterra in the SanCor Trademarks. Fonterra will not contest the ownership of the SanCor Trademarks and not use or attempt to register the SanCor Trademarks in any country.

10.2 **Indemnity:** SanCor will indemnify Fonterra and keep Fonterra indemnified from and against any and all claims, demands, actions and proceedings ("Claims") which are made or brought against Fonterra by any third party, that the use of the SanCor Trademarks or the sale, promotion or use of the Products bearing the SanCor Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

10.3 Fonterra will indemnify SanCor and keep SanCor indemnified from and against any and all Claims which are made or brought against SanCor by any third party that the use of the Fonterra Trademarks or the sale, promotion or use of the Products bearing the Fonterra Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such

12

claim, loss or damage

10.4 **Fonterra Trademarks:** Use by Fonterra of its sales network for the purposes of this Agreement does not give SanCor any rights whatsoever in Fonterra's sales network or in any of the names, logos and/or other proprietary marks of Fonterra or its Associates ("Fonterra Trademarks"). SanCor is not authorised to use the Fonterra Trademarks in relation to any sale or promotion of the Products or any other products except with the express written agreement of Fonterra on a case by case basis. SanCor will not contest the ownership of any Fonterra Trademarks and not use or attempt to register the Fonterra Trademarks in any country

## 11 Liability

11.1 **General indemnity:** Each party (the "indemnifying party") will indemnify and keep indemnified the other party from and against any direct loss, damage or liability (including legal fees and costs on a solicitor/client basis) suffered or incurred by that other party resulting from breach of this Agreement by the indemnifying party including any act, neglect or default of the indemnifying party's agents and employees

11.2 **Excluded.** Neither party shall be liable to the other for any loss of profits or loss of income or savings or for any indirect or consequential loss or damage.

11.3 **SanCor indemnity.** SanCor shall indemnify and hold Fonterra harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by Fonterra arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the Products (including without limitation whether the Product meets or does not meet the Specification has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of SanCor, the intended use of the Products and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage

11.4 **Fonterra indemnity.** Fonterra shall indemnify and hold SanCor harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by SanCor arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the

13

Products (including without limitation whether the Product meets or does not meet the Specification has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of Fonterra, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

## 12  Confidentiality

**12.1 Hold confidential:** The parties acknowledge and agree that

a. the provision or disclosure by one party ("Disclosing party") to the other party ("Receiving party") intentionally or otherwise of marketing plans, manufacturing and technical information, pricing information and other matters arising from or relating to the supply of the Products or the business affairs of a party for the purposes or in connection with this Agreement in whatever form (the "Confidential Information") is confidential and of substantial value to and the property of the Disclosing party

b. the Receiving party does not have any claim, right, title, property or other interest of any kind or nature in the Confidential information, and

c. the Receiving party shall hold and maintain the Confidential Information in strictest confidence and in trust for the sole and exclusive benefit of the Disclosing party

**12.2 Specific Information:** Fonterra has been engaged by SanCor due to Fonterra's international marketing network and experience in the sale of dairy products. Fonterra will be using that experience and it customer lists and contacts in marketing the Products to its existing and new customers. It is acknowledged by SanCor that all such customer lists are Fonterra's Confidential Information

**12.3 Excluded:** For the purposes of this Agreement "Confidential Information" shall not include any information which

a. is published or otherwise becomes generally available to the public other than as a result of disclosure by the Receiving party  and

b. becomes available to the Receiving party on a non-confidential basis from a source other than the Disclosing party provided that such source is not itself in breach of any obligation of confidentiality

**12.4 Survival:** The obligations created under this Agreement to preserve the confidentiality of information disc...... by each party to the other shall not be

extinguished by and shall expressly survive termination of this Agreement during the period of those (3) years after the Date of Termination

### 13   Force Majeure

13.1   **Force majeure**: Neither party shall be liable to the other for any failure to fulfil or perform any of its obligations under this Agreement, other than an obligation to pay money, if fulfilment has been delayed, hindered or interfered with, curtailed or prevented by any circumstance whatsoever which is beyond that party's reasonable control including without limitation where such failure is caused by war, civil commotion, hostility, Act of God, outbreak of disease or governmental regulation or direction

13.2   **Notice**. A party seeking relief from its obligations under this Agreement shall forthwith give notice to the other party of such impediment and its effects on the party's ability to perform. Notice shall also be given when the ground of relief ceases. Failure to give notice makes the failing party liable in damages for loss which otherwise could have been avoided

13.3   **May terminate**. No curtailment or cessation of delivery of the Products pursuant to this clause 13 shall operate to extend this Agreement. If the curtailment or cessation of the delivery of the Products continues for more than 60 days either party may terminate this Agreement by written notice.

### 14   Dispute Resolution

14.1   Before commencing any legal or administrative proceedings in respect of any dispute arising in respect of, or in connection with, this Agreement (including the validity, breach or termination of it) ("Dispute") a party must give the other party notice of the Dispute

14.2   Following receipt of a notice under clause 14.1, each of the parties' Relationship Managers must meet to discuss the Dispute within ten Business Days of receipt of notice of the Dispute, with a view to achieving a resolution of the Dispute within 20 Business Days of receipt of that notice or such longer period as the Relationship Managers agree in writing

14.3   If the Relationship Managers fail to resolve the Dispute within 20 Business Days of notice of the Dispute, either party may take such legal action, including the commencement of legal proceedings, as is deemed appropriate or necessary by it to resolve or determine the Dispute in accordance with this Agreement or at law

14.4   A party is not bound by clause 14.2 if the other party does not comply with that clause

14.5   Nothing in clause 14.1 limits the rights of either party to seek interlocutory relief in respect of this Agreement or the other party's obligations under it.

15

## 15  Termination

15 1  **Acts of default.** Either party may terminate this Agreement immediately, if the other party

    a  breaches a provision of this Agreement and fails to remedy that breach within 30 days of written notice being given;

    b  is, becomes, continues to be or is deemed to be insolvent or bankrupt; in spite of this, neither party does not have any other claim, right, title, property or other interest of any kind or nature;

    c  makes an assignment for the benefit of, or enters into or makes any arrangement or composition with, its creditors, in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature.

    d  goes into receivership or has a receiver, trustee and/or manager (including a statutory manager) appointed in respect of all or any of its property;

    e  is the subject of any resolution passed, or any proceeding commenced, for its winding up or liquidation (other than for the purpose of a solvent reconstruction); in spite of this, neither party has any other claim, right, title property or other interest of any kind or nature; or

    f  assigns the benefits of this Agreement without consent of the other party except as otherwise provided herein

## 16  Miscellaneous

16 1  **Interest:** Where any amount due from SanCor to Fonterra or its Associates is not paid by the due date, or where Fonterra is requested by SanCor to pay in advance against Product, then Fonterra may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made

16 2  Where any amount due from Fonterra to SanCor or its Associates is not paid by the due date, SanCor may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

16 3  **Waiver.** No failure on the part of either party to exercise, and no delay by

either party in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.

16.4 **Compliance With Applicable Laws.** Each party shall comply with all applicable laws or regulations relating to the performance of its obligations under this Agreement and any transaction related to it, including without limitation, obtaining all necessary licences, permits, authorisations, and approvals required from any Governmental, provincial or local department or agency applicable to the performance of its duties in this Agreement.

16.5 **Severable Agreement.** If any provision in this Agreement is held invalid or unenforceable in whole or in part then such invalidity or unenforceability shall affect only such provision or part thereof. To the extent legally permissible, an arrangement which reflects the original intent of the parties shall be substituted for such invalid or unenforceable provision.

16.6 **Counterparts:** This Agreement may be executed in two or more counterparts and may be executed on the basis of an exchange of facsimile copies.

16.7 **Amendments:** This Agreement may only be altered in writing signed by all the parties.

16.8 **Notices:** Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed duly given if given by personal service or sent by letter, email or facsimile addressed to the party to whom it is to be delivered at their address set out below or to such other address as that party shall have most recently notified in writing. Any notice served in accordance with this clause shall be deemed to have been duly served.

a   in the case of personal delivery, upon actual delivery to the correct address during the hours 8.30 am to 5.00 pm on a Business Day.

b   in the case of service by post 15 days after posting the same in a correctly addressed envelope.

c   in the case of transmission by fax or email on the next Business Day at the place of receipt of the fax or email.

Address for Fonterra   Fonterra Limited
Fonterra Centre
9 Princes Street
Private Bag 92032
Auckland
New Zealand
Attn: General Counsel and Company Secretary

17

Phone. 64 9 379 0049
Fax     64 9 379 8281

Address for SanCor:    SanCor Cooperativas Unidas Limitada
Tenie te General Richien 15
S2322FYA Sunchales
Santa Fe
Argentine )
Atln
Phone
Fax.

16.9 **Entire Agreement**   This Agreement constitutes the entire agreement between the Parties in relation to its subject matter and supersedes and cancels any previous agreements and arrangements in respect of the services  The Parties have signed an Exclusive Sales and Marketing Agrrement in December 2004 ("2004 Agreement"), which they agree, is cancelled as of 1 August 2007  The parties acknowledge and agree that neither party has any claim, right or title emerging from the 2004 Agreement

16.10 **Sub-Agency.**   Fonterra may appoint a sub-agent with the prior written approval of SanCor but Fonterra shall remain fully responsible for meeting its obligations under the Agreement notwithstanding such appointment.

16.11 **Assignment**  Except as provided for in this clause  no party may assign this Agreement without the prior written consent of the other party

16.12 **Relationship between the Parties**  Neither party shall have the authority to create or assume any obligations of any kind (whether express or implied) for or on behalf of the other party except as permitted by this Agreement. Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties for any purpose whatsoever.

16.13 **Governing Law**  The formation, validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of New Zealand  The parties irrevocably agree that the Courts of New Zealand shall have the non exclusive jurisdiction to hear and determine all disputes  under  or in  connection with this Agreement    The parties irrevocably waive any objection to New Zealand as the forum for proceedings on the grounds of forum non-convenience or any similar grounds

18

SIGNED for and on behalf of

FONTERRA LIMITED

Signature

KALVIN WILLIAM
Name

1ST OCTOBER 2004
Date

SIGNED for and on behalf of

SANCOR COOPERATIVAS UNIDAS LIMITADA
Signature

Claudio A Gonzalez
Name

22 October 2004
Date

## SCHEDULE 1

1.  PRODUCTS AND TERRITORIES

**Territory**
All countries of the world except Argentina and sales or distribution of
Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS
AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A") or any another
Venezuelan entity to be supplied by SanCor under the Financial
Agreement signed between SanCor and BANCO DE DESARROLLO
ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or
any other Agreement subscribed by SanCor with the Government of
Venezuela through any of its entities.

**Products**

Whole Milk Powder in 25 Kgs. Bags
Whole Milk blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
Skimmed Milk Powder in 25 Kgs. Bags
Skimmed Milk Powder blended with Maltodextrine or vegetable fat in 25
Kgs. Bags
Butter in 25 Kgs. Blocks
Brine Salted cheese including Gouda by agreement
Mozzarella
Non gas-flushed regular whole milk powder in 25kg bags

SanCor agrees that no Product that has failed to meet the original
Specification, or such other specification as may have been agreed in
writing between the parties, shall be re-processed by SanCor as product to
be sold to Fonterra pursuant to his Agreement

Products in consumer formats are specifically excluded from this
Agreement, including 3.6kg loaves of gouda and mozzarella for sale via
SanCor's existing distributors within Latin America

2   SUPPLY AND FORECASTING REGIME

On or before the 5th Business Day of the month, Fonterra shall provide SanCor
with a rolling 18 month forecast of customer demand, by customer, by month.
This forecast will include customer D1 (unconstrained demand), D1 contracted,
previous AD (dedicated availability) and previous AU (sancor firmed availability).

Transparent customer payment term information will also be provided

20

When this information is available from SAP APO Fonterra and SanCor will open the monthly process with a demand review meeting to capture variances from previous months and to set a baseline planning demand

Once baseline planning demand is agreed SanCor will have 5 Business Days to use this demand signal to make product mix decisions and will propose a customer level supply plan (availability plan)

SanCor and Fonterra will meet on 10th Business Day of the month to sign off this availability plan

Key outcomes of SanCor Fonterra S&OP meeting
- Formal milk supply and market update include forecast base price information
- KPI review and corrective actions
- Sign off of availability plan for release to NZ S&OP and market
- Sales plan
- Inventory targets
- Agreed base pricing for SanCor products
- Marginal pricing for unforecasted production

In the case that during the monthly meeting an agreement cannot be reached between the parties on optimal placement opportunities for Product, SanCor may, on an exceptional basis, put forward for discussion proposals of business from Third Parties. If no suitable alternative business can be found through the Fonterra network, Fonterra will provide written approval for SanCor to execute these sales directly. No such sales may proceed without prior written approval.

3   **RELATIONSHIP MANAGERS**

Fonterra    Emma Parsons

SanCor     Santiago Aon

4.   **PRODUCT SPECIFICATIONS**

[To be completed]





**PDVSA**

BARIVEN, S.A
c/o PDVSA Servi... Inc
Purchasing Agent ...
1293 Eldridge Parkway
Houston, Texas 77...
United States of America

**SUPPLIER:**
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km ...

DON TORCUATO
ARGENTINA
POSTAL CODE: 00000 PO BOX ...
SALESPERSON / PHONE ... Age 11 31 1748
5700
FAX  1147485390
**PDVSA SUPPLIER CODE:** 35.0024878

**Purchase order**

**5100062284**

| | |
|---|---|
| **DATE** | :March, 26 2008 |
| **CONTACT PERSON** | :Jose Camacho |
| **TELEPHONE USA** | :(281)5886478 |
| **E-MAIL ADDRESS:** | 2815827511 |

...      AGREEMENT

**DELIVERY DATE** : December,30 2008

**INSTRUCTIONS FOR SUPPLIERS**
FOR SHIPPING INSTRUCTIONS SEA

CFR -PUERTO CABELLO/LA GUAIRA, VENEZUELA
VENEZUELA

**INSTRUCTIONS FOR FREIGHT FORWARDER**
**PLEASE CONTACT SUPPLIER FOR INLAND SHIPPING DETAILS**

**TERMS OF DELIVERY** ... PUERTO CABELLO/LA GUAIRA, VE     **CURRENCY :** USD
**PAYMENT TERMS** ... Payment according to ...

**P O. General Comments**

PURPOSE OF CHANGE
----------------------
CHANGE ORDER NO  03 IS ISSUED ON MARCH BY JOSE CAMACHO
TO REPLACE THE P O  5100062287&5100062303 AND CREATED A NEW P.O  IN SAP IN ORDER TO
PROCESS THIS PURCHASE ORDER AS SAP SYSTEM REQUIRE, IN THIS MANNER WE SOLVED THE
TECHNICAL PROBLEM WITH THE ORIGINAL PURCHASE ORDER FOR THIS SUPPLIER.

PO VALUE DOES NOT CHANGE

PURPOSE OF CHANGE
----------------------
CHANGE ORDER NO  02 IS ISSUED ON 26MAR08 BY JOSE CAMACHO
TO MODIFY THE PAYMENT ACCORDING THE AGREEMENT BETWEEN SUPPLIER AND PSI FINANCE. THE
PAYMENT TERMS ARE

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF PRODUCT SHIPPED

PO VALUE DOES NOT CHANGE

**❈ PDVSA**

Purchase order
5100062284

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana Km 25
DON TORCUATO

PURPOSE OF CHANGE
-------------------
CHANGE ORDER NO. 01 IS ISSUED OR CREATED BY JOSE AMARO
.* TO MODIFY THE DELIVERY TERMS FROM FOB - PUERTO CABELLO TO CFR - PUERTO CABELLO AND
LA GUAIRA PORT AT VENEZUELA
.* TO MODIFY THE SHIPPING INSTRUCTIONS NEED FOR THE SUPPLIER

P.O. VALUE DOES NOT CHANGE
*******************************************

PRODUCT MUST BE PALLETIZED AND SECURELY BANDED FOR OCEAN TRANSPORT.
PRICES & TERMS PER AGREEMENT SIGNED 2017 BETWEEN ARGENTINA & VENEZUELA.
DELIVERY. 10 MONTHS ARE WITH THE FOLLOWING CONDITII
7,000 TM FROM MARCH TO JUNE 2018
11,000 TM FROM JULY TO DECEMBER 2018

******************************************************
.* "MANDATORY" WE NEED THE PHYSICAL AND CHEMICAL SPECIFICATIONS,
COPY OF THE FITOSANITARIO, CERTIFICATE OF ORIGEN FROM YOUR PRODUCTS,
QUALITY CERTIFICATE FROM THE PRODUCTS PLANTS

.* "MANDATORY" SUPPLIER MUST SEND THE DELIVERY SCHEDULE AND PLANT LOCATIONS BY EMAIL
IN ORDER KNOW THE LOGISTIC AND COORDINATE THE INSPECTIONS BY PSI TO:
JUAN JOSE BASTARDO, EMAIL: BASTARDOJOG@PDVSA.COM
MARIA ROBLES, EMAIL: ROBLESMC@PDVSA.COM
PABLO RODRIGUEZ, EMAIL: RODRIGUEZPJ@PDVSA.COM

*********************************************
IF SUPPLIER FAILS TO PROVIDE A GOOD ACKNOWLEDGMENT WITHIN THE
SPECIFIED PERIOD (48 HOURS), THEN SUCH P.O. SHALL BE DEEMED
ACCEPTED BY SUPPLIER
*********************************************

**Shipping Marks**
BARIVEN, S A./PDVSA PEDIDO HYM FOB EU
S100006.2284/XG640C4713

VAL-VALENCIA
VIA :PUERTO CABELLO, VENEZUELA
PRIORITY LEVEL: 9
SELLER EXPEDITING   N
INSPECTION FLAG   C

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|

**❋ PDVSA**

Purchase order
5100062284

SUPPLIER.
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 7.5
DON TORCUATO

00001    18.000   Metric Ton.ENRICHED POWDER   5 000,00    90 000 000,00

Harmonized Tariff Code    0402211900

**Material purchasing text**

ENRICHED POWDERED MILK WITH VITAMINS A AND D

IT IS THE PRODUCT OBTAINED BY ELIMINATING ALMOST ALL OF THE WATER THAT CONSTITUTES
MILK

1 REQUISITES:

* MUST BE FREE OF PRESERVATIVES, NEUTRALIZERS, TOXIC SUBSTANCES OR ANY STRANGE MATTER.

* MUST BE OF WHITE YELLOWISH COLORING AND HOMOGENEOUS THROUGHOUT, CHARACTERISTIC OF
SIMILAR PRODUCTS

* MUST BE EXEMPT OF STRANGE ODOR AND TASTE SIMILAR TO ITS NATURE.
* MUST BE A HOMOGENEOUS POWDER, CONGLOMERATION, EXEMPT OF ANY
NON INCLUSIVE MATTER, FREE OF ANY BURNED PARTICLES AND STRANGE MATTER.

2 PHYSIOCHEMICAL REQUIREMENT.

CHARACTERISTICS LIMITS (%)
HUMIDITY MAX  3,5
FAT MIN  26,0  MAX  27,0
PROTEINS MIN  24,5
CHLORIDES MIN  0,60  MAX  2,11
ASH MAX  5,9
ACIDITY (G. ACTLACTIC) 1000G MAX  1,45
FAT FREE MAX  2,0
LACTOSE MIN  34,0
INSOLUBILITY INDEX (ML) MAX  2,0
BURNED PARTICLES MAX  B 15.0

VITAMIN A MIN  960 (UG/100 G       MIN  1200 (UG/100 G
VITAMIN D MIN  8 (UG/100 G         MIN  12 (UG/100 G

3 MICROBIOLOGIC REQUISITES.

CHARACTERISTICS (UFC/G) LIMITS

AEROBIOS MESOFILOS MIN  5,0 X 104  MAX  2,0 X 105
MOLD MIN  1,0 X 102  MAX  1,0 X 103
SALMONELLA IN 25G G
COLIFORM (NMP/G) MIN  3  MAX

**❖ PDVSA**

**Purchase order**
5100062284

**SUPPLIER**
SANCOR COOPERATIVAS UNIDA LIMITADA
Ruta Panamericana 10 ??
DON TORCUATO

| ITEM | MATERIAL | QUANTITY UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|---------------|-------------|------------|-------------|

S. AUREUS MIN  10 MAX  1. x 10?
LISTERIA MONOCYTOGENES IN .50 G
ESPORA TERMOFILE MIN  1. x 10?   MAX. 1. x 10?

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
LECHE EN POLVO ENTERA CON VITAMINAS A Y D
NORMA CONSULTADA COVENIN 140. 200?

REQUISITOS

* DEBE ESTAR LIBRE DE PRESERVATIVOS, NEUTRALIZANTES, SUSTANCIAS TOXICAS Y MATERIAS
EXTRAÑAS

* DEBE SER DE COLOR BLANCO AMARILLENTO HOMOGENEO,  CARACTERISTICO DEL PRODUCTO.

* DEBE ESTAR EXENTO DE OLORES Y SABORES EXTRAÑOS A  A NATURALEZA DEL MISMO.

* DEBE SER UN POLVO HOMOGENEO, AGLOMERADO, EXENTO DE GRUMOS COMPACTOS, LIBRE DE
PARTICULAS QUEMADAS Y DE MATERIA EXTRAÑA
ENRICHED POWDERED MILK WITH VITAMINS A AND D


**Additional technical specs**

ENRICHED POWDERED MILK WITH VITAMINS A AND D

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . .
LECHE EN POLVO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
LECHE EN POLVO MODIFICADA ENRIQUECIDA CON VITAMINAS & MINERALES
APTA PARA CONSUMO INFANTIL

ROTULADO  SEGUN ARTE GRAFICO SUMINISTRADO POR PDVSA
PRESENTACION.  EN BOLSAS TRILAMINADAS DE 1 KG

ENTREGA  MARZO - ABRIL 200?

CARGA  APPROX  1? TM POR CONTENEDOR DE 40? DRY HIGH CUBE, PALETIZADO

Page: 5 of 1

**PDVSA**

SUPPLIER
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana KM
DON TORCUATO

| ITEM | MATERIAL | QUANTITY UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|---------------|-------------|------------|-------------|
| | | | | | 90,000,000.00 |
| | | Gross Price | | | |
| | | Net Value | | | 90,000,000.00 |

Purchase order total value           **90,000,000.00** USD

P O General terms

··· DOC B0021, REV E (08 13 2(07) ···

DELIVERY
10 MONTHS AHO WITH THE FOLLOWING SCHEDULE
7,000 TM FROM APRIL TO JULY ,008
11,000 TM FROM JULY TO DEC ,008

LINE ITEMS MUST SHIP COMPLETE
PARTIALS ARE ALLOWED PER SCHEDULE ABOVE

ESTIMATED WEIGHT   SELLER TO ADVISE

NEW MATERIAL
MATERIAL MUST BE IN NEW CONDITION FREE FROM DEFECTS AND SUITABLE FOR ANY SERVICE SPECIFIED, UNLESS OTHERWISE
STATED

ORDER ACKNOWLEDGEMENT
SELLER MUST ACKNOWLEDGE RECEIPT OF THIS FAXED PURCHASE ORDER WITHIN 48 HOURS A R O VIA E MAIL, AND ADVISE AND
CONFIRM SHIPPING DATE BY PROVIDING THE FOLLOWING INFORMATION

    OUR REFERENCE (PO) NUMBER
    · CONFIRMED DELIVERY DATE
    YOUR REFERENCE NUMBER
    · YOUR EXPEDITING CONTACT
    · TELEPHONE NUMBER
    · FACSIMILE NUMBER
    · DRAWINGS SUBMITTAL DATE                (as applicable)

ORDER ACKNOWLEDGEMENT MUST BE E MAILED WITH OUR PO NUMBER IN THE SUBJECT LINE, TO PDVSA SERVICES EXPEDITING
DEPARTMENT AT OAINBOX@PSI PDV COM







 **PDVSA**

Purchase order
5100062284

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

**Terms of delivery**

GENERAL INSTRUCTIONS

AIR FREIGHT VIA MAIQUETIA
1 Consign Master AWB to Forwarders office in Marquetia
2 Consign House AWB to first line of shipping marks

Notify Party
Clover Internacional C A

Address
Aduana Aerea de Maiqueta detras del Almacen de Arensa y al lado de Airsasa Carga Marquetia, Estado Vargas
Venezuela / Fax 01158(212)331 3786
Attn (Operasions Manager)
Telephone 01158(212)331 3301
Email amanda galdona@clovergroup com ve cguana@pdvsa com

Contacts
Yubeis Munoz  yubeis munoz@clovergroup com ve / 58(212)331 3143
Oneila Torres - oneila torres@clovergroup com ve / 58-212  331 3364
Lihana Cigana  Cigana@pdvsa com / 0212 v58 04 viv 0415 viv0 viv 04
Grazia Fiore  Grazia@pdvsa com / 0212 v58 04 900  0414 235 98 37

OCEAN FREIGHT VIA LA GUAIRA
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C A

Address
Aduana Aerea de Maiqueta detras del Almacen de Arensa y al lado de Airsasa Carga Marquetia, Estado Vargas
Venezuela / Fax 01158(212)331 3786
Attn (Operasions Manager)
Phone 01158(212)331 3301
Email amanda galdona@clovergroup com ve cguana@pdvsa com

Contacts
Yubeis Munoz - yubeis munoz@clovergroup com ve / 01158(212)331 3143
Oneila Torres oneila torres@clovergroup com ve 01158(212)331 3364
Lihana Cigana Cigana@pdvsa com / 0212 v58 04 900 04 04
Grazia Fiore Fiore@pdvsa com . 0212 v58 04 90/414 235 98 37

OCEAN FREIGHT VIA PUERTO CABELLO
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C A

Address
Calle Marino con Calle Guevara
Edificio Centro Profesional Caba, Oficina 3
Puerto Cabello  Estado Carabobo
Venezuela / Fax 01158(242)36C 0210
Attn Luis Vera (Customs Coordinator) / cuyanak@pdvsa com
Telephone 01158(242)387-5010/381 4244

Contacts
Luis Vera  luis vera@clovergroup com ve  0 1158(242)387 5010/381 4244
Ilana Vasquez  ilana vasquez@clovergroup com ve / 01158(241)8741157
Vanessa Diaz vanessa diaz@clovergroup com ve  01158(241)8741157
Mirotka Goita Gorrams@pdvsa com / 0414 197 82 80
Lihana Cigana  Cigana@pdvsa com / 0212 v58- 04 v0/ v0415 v8v0 04
Grazia Fiore  Grazia@pdvsa com / 0212 v58-04 v0/ v414 235 v8 37

EXPORT DOCUMENTS
The following shipping documents are required by the Venezuelan Government to customs clearance All shipments must be sent on freight
prepaid basis and should be consigned in all shipping documents, AWB B/L as follows

1 B/L or AWB Consigned as shown on the first line of the purchase order shipping marks

# ❋ PDVSA

SUPPLIER:
SANCOR COOPERATIVAS UNIDA LIMITADA
Ruta Panamericana km 4
DON TORCUATO

2 COMMERCIAL INVOICE
a Prepare one invoice per shipment per Order
b The invoice should be consigned as shown on the first line of the purchase order shipping marks
c All shipper's invoices must specify the following information
i Invoice date and number
ii PDVSA SERVICES INC Purchase Order Number and Requisition Number
iii Delivery terms / Payment terms
iv Purchase Order Item Numbers as shown on Purchase Order
v Number and description of goods
vi Tariff Number and Spanish Description if given for Purchase order. If more than one is given indicate each one with the corresponding item
vii Gross & Net weight of commodity
viii Value & Dimensions of commodity
ix Country of origin

3 INSPECTION CERTIFICATES Agriculture exporters are frequently required to provide a certificate attesting to the condition of the goods shipped
4 PHYTOSANITARY CERTIFICATE This certificate must be issued by a certifying official (Federal, State or Local)
5 CERTIFICATE OF ORIGIN This certificate must be issued by a certifying office

Original Export documentation
Documents for all ocean shipments are required to be in possession of Barrven Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuelan Port of unlading AR Laana Oqana / Grazia Fiore

Send the required originals to
BAR-VEN ADUANAS PDVSA AGRICOLA
CENTRO EMPRESARIAL EUROBUILDING
PISO 10 OFIC 22
Phone 58212 958 04 00 Fax 58212 958 00 20

Perishable Shipments
All documents associated with perishable goods must specify the temperature that the goods must be kept at in both Celsius and Fahrenheit scales
The documents should indicate directly whether the goods should be REFRIGERATED or FROZEN (Preferred temperature should be clearly marked on the cargo)
Perishable and non perishable cargo must not be shipped together on the same bill of lading or in the same consolidation Each category of material must be shipped and documented separately

REQUIRED EXPORT DOCUMENTS AND DISTRIBUTION

(OCEAN)
DOCUMENT     CUSTOMS BROKER  PSI
Original Bill of Lading      4/1
Copies of B/L     2/1
Commercial Invoice Original     4/1
Commercial Invoice copies     2/1
Export packing list 4/1
Certificates (if any)     2/1

(AIR)
DOCUMENT     CUSTOMS BROKER / PSI
Original Airway Bill     4/1
Copies of AWB 2/1
Commercial Invoice Original     4/1
Commercial Invoice copies     2/1
Export packing list 4/1
Certificates (if any)     2/1

Note SHOW PURCHASE ORDER SHIPPING MARKS ON ALL DOCUMENTS

PACKAGING AND LABELING

AS OF APRIL 2006 WOODEN PACKING TO VENEZUELA MUST SHOW A MARKING THAT THE WOOD WAS EITHER TREATED WITH METHYL BROMIDE OR HAS BEEN HEAT TREATED AND DOES NOT PRESENT DISPLAY EVIDENCE OF QUARANTINE PESTS. ALL WOOD USED IN THE BOX INCL CRATING, PALLETIZING, PADDING, DUNNAGING AND BRACING OF THE MATERIAL ON THIS PURCHASE ORDER MUST HAVE UNDERGONE SUFFICIENT PROCESSING OR TREATMENT IN COMPLIANCE WITH ISPM 15 OF THE INTERNATIONAL PLANT PROTECTION CONVENTION (IPPC). IPPC DEFINES RULES FOR REGULATING WOOD PACKAGING MATERIAL IN INTERNATIONAL TRADE. ALL WOOD SUBJECT TO THE REGULATION SHALL BE MARKED AS SPECIFIED IN ANNEX II OF THE REGULATION. NON-CONFORMANCE WILL RESULT IN CONFISCATION OF THE ENTIRE SHIPMENT BY VENEZUELAN PORT/AIRPORT AUTHORITIES. FOR SPECIFIC DETAILS, PLEASE REFER TO THE IPPC WEBSITE WWW.IPPC.INT

# ❄ PDVSA

Purchase order
5100062284

SUPPLIER
SANGUR COOPERATIVE UNIT, A.G. GTS, TADA
Ruta Panamericana, Km 17
D.N. TS RDUATO

ALL CARGO DESTINED TO VENEZUELA MUST BE SUFFICIENTLY PACKED TO WITHSTAND THE RIGORS OF INTERNATIONAL TRANSPORT. PACKAGING MUST RESIST THE ROUGH HANDLING DURING LOADING AND UNLOADING, COMPRESSION FROM THE OVERHEAD WEIGHT OF OTHER CONTAINERS, IMPACT AND VIBRATION DURING TRANSPORTATION, AND HIGH HUMIDITY DURING PRECOOLING, TRANSIT AND STORAGE.

A. PACK MATERIALS IN ONE OF THE FOLLOWING WAYS:
. SHIPPING UNITS. EACH UNIT OF FREIGHT IS NOT TO BE TO A COMMER CLASSIFIED AND DEFINED ON BILL OF LADING. DO NOT COMBINE DIFFERENT ORDERS IN ONE SHIPPING UNIT.
  INTERIOR PACKAGES EACH UNIT PACKAGE COMBINED WITH OTHER PACKAGES TO MAKE UP A SHIPPING UNIT. THEY MUST CONSIST OF ONLY ONE ORDER ITEM (AND QUANTITY).

B. PACKING LIST ATTACHED TO EXTERIOR OF AT LEAST ONE SHIPPING UNIT. ADDITIONAL PACKING LISTS MUST BE INSIDE OF ENCLOSED SHIPPING UNITS

MARKING (MUST BE PERMANENT WATERPROOF):
A. INTERIOR PACKAGES. MARK EACH TAG WITH ORDER NUMBER
  ITEM NUMBER
B. SHIPPING UNITS  MARK ON TWO ADJACENT SIDES ON TAG
  "SHIPPING MARKS" AS SPECIFIED IN THE PURCHASE ORDER    ORDER AND ITEM NUMBER (IF A ONE ITEM SHIPPING UNIT)
  (OVERALL DIMENSIONS IN CENTIMETERS   CARGO'S WEIGHT IN KG) (GRAM)
C. SHIPPING UNIT NUMBERS. NUMBER EACH SHIPPING UNIT CONSECUTIVELY WITH NUMBER 1 IN MULTIPLE SHIPMENTS. NUMBER UNITS CONSECUTIVELY INDICATING TOTAL UNITS IN THE LOT (E.G. 1 OF 4 2 OF 4 3 OF 4) ENCLOSED ATTACH PACKING LIST TO SHIPPING UNIT NUMBER 1
D. PACKING LIST: SHOW FOR EACH ORDER ITEM LISTED
  PURCHASER'S STOCK NUMBER (IF GIVEN IN ORDER) PO GOODS DESCRIPTION
E. NUMBER
  SHIPPING UNIT NUMBER (IF MORE THAN ONE) SHIPPING  MARKS AS SPECIFIED IN THE PURCHASE ORDER

F. FOR PERISHABLE AND NON PERISHABLE FOOD PRODUCTS

  PLEASE INDICATE THE FOLLOWING

STORAGE TEMPERATURE ___ ___ (INDICATE F OR C)

REFRIGERATED OR FROZEN OR DRY (CHOOSE ONE)

PLEASE USE COLORED LABELS TO CATEGORIZE EACH CASE PALLATE

GREEN  REFRIGERATED
BLUE  FROZEN
RED  DRY/NON PERISHABLE

PRE-SHIPMENT ADVICE
PRE-ALERT MUST SHOW DEPARTURE DATE AND PORT CITY, PORT OF DESTINATION AND ETA. VESSEL NAME AND VOYAGE NUMBER. BILL OF LADING NUMBER AND DATE. NAME OF SHIPPING UNIT. PURCHASE ORDER NUMBER AND REQUISITION NUMBER (SECOND LINE OF P.O. SHIPPING MARKS)

THE FOLLOWING ATTACHMENTS MUST BE INCLUDED AS WELL:
1 EXECUTED BILL OF LADING
2 EXPORT PACKING LIST AND COMMERCIAL INVOICE
4 PHYTOSANITARY CERTIFICATES
5 CERTIFICATE OF ORIGIN
6 OTHER CERTIFICATES REQUIRED

PRE-SHIPMENT ADVICE AND COPY OF EXPORT DOCUMENTS TO
PDVSA (TRAFFIC & CUSTOMS)  VENEZUELA
Nº NAME   EMAIL
1 LILIANA CIGANA  CIGANAL@PDVSA.COM
2 FERNANDO VELASQUEZ  VELASQUEZFFN@PDVSA.COM
3 MARIA ROBLES   ROBLESMS@PDVSA.COM
4 JUAN CARLOS RIVAS  ELBOTUAJC@CANTV.NET
5 KARIN RODRIGUEZ  RODRIGUEZKR@PDVSA.COM
6 DONNATY DURAN  DURANDS@PDVSA.COM
7 ASDRUBAL DIAZ  DIAZAAL@PDVSA.COM
8 GRAZIA FIORE   FIOREG@PDVSA.COM
9 DUBRASKA RODRIGUEZ  DUBRASKAAH@GMAIL.COM
10 IRANOR ANDRADE  ANDRADITIR@PDVSA.COM
11 JOSE ROMERO   JOSLROMERO@ANDR-MEDIA.COM VE
12 YOANNA SALAZAR  YOANNASALAZAR@ANDRIMR.DIT.COM VE
13 ANGEL RODRIGUEZ  ANGELRODRGUEZ@ANDROMEDA.COM VE
14 OSMAR NIETO  OSMARYNIETO@GMAIL.COM

# ✳ PDVSA

**Purchase order**

5100062284

**SUPPLIER.**
BANCON COOPERATI AS DIETAS  DIRITALA
Hera  Panamericana Vra 25
DON  TORCUATO

15 JUAN CARLOS RIVAS  ELBOTIJAJC@CANTV NET ONLY SHIPMENTS         VIA LA GUAIRA
16 MIROSKA GOITIA   GOTIAMS@PDVSA COM ONLY SHIPMENTS VIA          PUERTO CABELLO
17 IRANOR ANDRADE  ANDIADEIR@PDVSA COM

PSI LOGISTICS DEPARTMENT)  HOUSTON
N° NAME   EMAIL   PHONE
1 JUAN JOSE BASTARDO BASTARDOJJ@PSI PDV COM (281) 646474
2 PSI DATA BASE  DOCUMENT@PSI PDV COM

**Terms of payment**

PROGRESSIVE/ADVANCE PAYMENT INVOICES
---------------------------------

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PROGRESSIVE PAYMENTS SHALL BE BASED ON THE ORIGINAL PURCHASE ORDER VALUE  ANY ADDITIONS TO THE PURCHASE
ORDER VALUE SHALL BE INCLUDED IN THE SUPPLIER'S FINAL INVOICE

**Requir docs/Inspec/Field Exped**

FIELD INSPECTION REQUIREMENT
(DOC 1R050 REV F 05 Feb 98 )

1 THIS PURCHASE ORDER OR RFQ WHEN APPLICABLE) HAS BEEN CODED FOR FIELD TECHNICAL INSPECTION PRIOR TO
SHIPMENT  THIS MEANS A QUALIFIED INSPECTION WILL INSPECT THE EQUIPMENT FOR COMPLIANCE TO QUOTE, PURCHASE
ORDER AND ANY OTHER APPLICABLE INDUSTRY STANDARD OR SPECIFICATION
2 PRODUCT EQUIPMENT OR MATERIAL INSPECTION MUST BE PERFORMED  BEFORE PACKAGING FOR SHIPMENT  THE
PURCHASER'S INSPECTION DOES NOT RELIEVE THE MANUFACTURER OR THE SELLER FROM COMPLIANCE TO ALL PURCHASE
ORDER REQUIREMENTS
3 PRODUCT, EQUIPMENT OR MATERIAL MUST NOT HAVE LEFT FACILITY UNTIL THE ASSIGNED INSPECTOR OR DESIGNATED
INSPECTION AGENCY HAS ISSUED A RELEASE OR STRONG NON SHIPMENT OF THE PRODUCT OR EQUIPMENT
4 THE VENDOR IS REQUIRED TO PROVIDE THE FOLLOWING INFORMATION
1 LOCATION OF WHERE INSPECTION CAN BE PERFORMED
4 2 CONTACT NAME, PHONE NUMBER  & EMAIL ADDRESS OF THE PROJECT MGR
4 2 CONTACT NAME, PHONE NUMBER  & EMAIL ADDRESS OF THE PROJECT MGR (FOR SHIPPING DOCUMENTS)
(THIS NOT APPLIED TO TECHNICAL DOCUMENT NOT INCLUDING INVOICE FOR SHIPPING DOCUMENTS)
5 1 ONE COPY OF ALL THE REQUIRED DOCUMENTS MUST  SHIP WITH THE EQUIPMENT THIS INCLUDES TECHNICAL DOCUMENTS
SUCH AS MATERIAL TEST REPORTS  NDE TEST REPORTS, QA CERTIFICATES CONFORMANCE, PRINTS MECHANICAL
OR PERFORMANCE TEST RESULTS AND OTHER APPLICABLE DOCUMENTS
5 2 TWO HARD COPIES (DATABOOK S) AND TWO ELECTRONIC COPIES (CDS OR VIA EMAIL (AS APPLICABLE)) MUST BE SHIP TO
PDVSA SERVICES INC @ CITGO BLDG
ATTN  PETER BERNSTEIN N2081
1293 ELDRIDGE PKWY
HOUSTON TX 77377
5 3 FOR DELIVERY OF DOCUMENTS ELECTRONICALLY  SEND THEM TO  TECHDOCS@PSI PDV COM
5 4 THE PDVSA SERVICES PURCHASE ORDER NUMBER MUST BE LISTED ON THE  SUBJECT LINE OF THE EMAIL  IF PARTIAL
DOCUMENTATION IS SUBMITTED  THE EMAIL MUST CLEARLY IDENTIFY TO WHICH LINE ITEM(S) THE DOCUMENTS BELONG TO
5 5 THE PO NUMBER AND THE POI ITEMS MUST BE CLEARLY IDENTIFIED IN EACH DOCUMENT

5 6 FOR PURCHASE ORDERS PLACED IN EUROPE OR WHERE THE MATERIAL IS COMING FROM EUROPE, ELECTRONIC DOCUMENTS
CAN BE SUBMITTED TO INSPECTION@PDVSA NL
5 7 Send hard copies to
PDVSA SERVICES BV
ATTN  TECHNICAL SERVICES DEPARTMENT
PRESIDENT KENNEDYLAAN 19
2517 JK THE HAGUE
THE NETHERLANDS
-----------------------
6 ANY QUESTIONS REGARDING THIS INSPECTION REQUIREMENT  FORWARD EMAIL TO projaguar@psi pdv com or
bernstenp@psi pdv com or nguedez@psi pdv com  For purchase orders placed in Europe, please contact :inspection@pdvsa.nl

Page: 10 of 1

## ✳ PDVSA

Purchase order
5100062284

SUPPLIER:
SANCON COOPERATIVA DE UNIDAD LIMITADA
Ruta Panamericana Km 25
DON TORCUATO

IMPORTANT INSTRUCTIONS TO SELLER
(Doc. Z_ML_PO_GEN_BU00, rev 7 11.14.2005)

If this Document is issued from BARIVEN S.A. c/o PDVSA Services Inc., follow instruction

INSTRUCTION

Unless covered by a Blanket Purchase Agreement this purchase order is subject to the present standard BARIVEN, S.A. c/o PDVSA Services, Inc. Terms and Conditions which are already in your possession. In the event that you do not have the above mentioned Terms and Conditions, please advise us. Otherwise acceptance of this purchase order implies your acknowledgement understanding, and acceptance of said Terms and Conditions

If this order is covered by an Outline Agreement the Terms and Conditions of the Outline Agreement number mentioned on the item(s) of this purchase order apply to this document

Seller must acknowledge receipt of this purchase order within five days after PO and must advise or confirm, sellers shipping date. This acknowledgement is to be sent to PDVSA Services Inc. Expediting Engineer Ana Marisiona Robinson

Assignment of Credit Facility
This purchase order may be selected for financing through a Credit Facility. Seller may be required to provide additional information or documentation required by the financial institution. If this is the case our Finance Department will send further instructions

Packing, Marking, Invoicing and Shipping Instructions

As of April 2004 wooden packing to Venezuela must show a marking that the wood was either treated with methyl bromide or has been heat treated and does not present display evidence of quarantine pests. All wood used in the boxing/crating/palletizing, skidding or blocking and bracing of the material on this Purchase Order must have undergone an heat treatment in compliance with ISPM 15 of the International Plant Protection Convention (IPPC) standard - guidelines for regulating Wood Packaging Material in International Trade. All wood subject to this regulation shall be marked as such. Seller's Area's of the regulation. Non-conformance will result in confiscation of the entire shipment by Venezuelan port/airport authorities. For specific details, please refer to the IPPC website: www.ippc.int

Do not dispatch until you have read and understood our packing, marking and shipping instructions for sellers as follows
1 For domestic deliveries (FOB/FCA to our USA boundaries) follow seller use instructions from North America and Mexico, please use instructions on standard note B0010 attached to our purchase order
2 For International Ocean Freight deliveries to venezuela by the Seller use instructions on the applicable standard notes B0030-B0041, B0056-B0059 attached to our purchase order
3 For International Air and Ocean Freight deliveries to Curazao by the seller use instructions on the applicable standard notes B0043-B0056, attached to our purchase order
4 For International Air Freight deliveries by the seller to Venezuela via Maiquetia use instructions on the applicable standard notes B0043-B0056, attached to our purchase order

These forms, an integral part of this document are already in your possession or are always available on request from Juan Jose Bastardo at email bastardoj@pdv.pdv.com, or ph 281 588 6474

General Invoicing Instructions

Follow each of the applicable instructions attached to the respective purchase order because they will change according to the agreed-to delivery terms

Your Bank Account and Routing Information must be included on your invoice. All payments are processed via 'ACH' (Automatic Clearing House) electronic funds transfer

Seller will send invoices to

BARIVEN S.A
c/o PDVSA Services Inc.
P.O. Box 4403
Houston, Texas 77210 USA
Attn Accounts Payable
Contact Person Tim Marshman
Phone (281) 588-6250 Fax (281) 582 7578

If using courier services please use the street address

BARIVEN S.A
c/o PDVSA Services Inc.
1293 Eldridge Parkway
Houston, Texas 77077 USA
Attn Accounts Payable
Contact Person Tim Marshman
Phone (281) 588-6250 Fax (281) 582 7578

We require one original invoice with attached copies of your packing list and all supporting documents when charges other than material costs

 **PDVSA**

Page: 11 of 11

Purchase order
5100062284

SUPPLIER:

SANCOR COOPERATIVAS UNITA.   LIMITADA

Ruta Panamericana km 25

DON TORCUATO

have been required by the Buyer and quoted by the Seller such as Inland Freights, Over Time, Export Packing, Special Handling, etc

Please show our Purchase Order (PO) number and shipping marks on all invoices. Our standard invoice processing is, upon delivery in accordance with PO delivery terms  100% net 30 days after receipt and approval of your invoice, unless otherwise specified in this Purchase Order

**DESTINATION CONTROL STATEMENT**

According to U.S. Export Administration Regulations  Chapter 758.6
"These commodities, technology or software will be exported from the United States in accordance with the Export Administration Regulations Diversion contrary to U.S. law is prohibited." Ultimate destination as per shipping marks in the Purchase Order

The DCS is required for all exports from the United States, of items on the Commerce Control List that are not classified as EAR99. The person responsible for preparation of the invoice and on the bill of lading, air waybill or other export control document that accompanies the shipment from its point of origin in the United States to the ultimate consignee or end user abroad is responsible for entry of the DCS

**NOTE TO SUPPLIERS**

Invoices will not be processed unless all export or quality documents are provided

Regards
Dariven    S.A.  C/O  PDVSA Serv. Inc., Inc
Purchasing Agent

**SEXTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 11 de Junio de 2008, Segunda Enmienda del 24 de Septiembre de 2008, Tercera y Cuarta Enmienda del 28 de Noviembre de 2008 y Quinta Enmienda del 30 de Abril de 2009 cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Sexta Enmienda.

(b) Que en cumplimiento de la Cláusula Sexta Bis, introducida al Contrato Marco por la Tercer Enmienda suscripta entre las Partes con fecha 28 de Noviembre de 2008, el MUTUARIO entrego al MUTUANTE Warrants endosados a favor de este último por un monto equivalente al veinticinco por ciento (25 %) como mínimo, de la Línea de Crédito Adeudada.

(c) Que es intención del MUTUARIO disponer de la mercadería representada por algunos –no todos- de los warrants antes mencionados, por lo cual solicita al MUTUANTE el reemplazo de los mismos por otros Warrants.

(d) Que el MUTUANTE estaría dispuesto a aceptar el reemplazo de parte de los mencionados warrants, siempre y cuando los "Nuevos Warrants" entregados por el MUTUARIO, sean por igual valor y mercadería de iguales características a los que se reemplazan y que los mismos sean entregados a los mismos fines y efectos que los anteriores.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente sexta enmienda al Contrato Marco (la "Sexta Enmienda"), de conformidad con las presentes Cláusulas:

1. El MUTUANTE devolverá al MUTUARIO, dentro de los 10 días de firmada la presente, los Warrants indicados a continuación – que habían sido entregados por el MUTUARIO en los términos detallados en el Considerando b)- por un valor de US$ 1.564.500,00 (Dólares Estadounidenses UN MILLON QUINIENTOS SESENTA Y CUATRO MIL QUINIENTOS CON 00/100).

| N° WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2025 | LECHE EN POLVO | SUNCHALES | 249 | Tons | 05-OCT-2009 | 522.900,00 |
| 2026 | LECHE EN POLVO | SUNCHALES | 248 | Tons | 05-OCT-2009 | 520.800,00 |
| 2027 | LECHE EN POLVO | SUNCHALES | 248 | Tons | 05-OCT-2009 | 520.800,00 |
| Total | | | | | | 1.564.500,00 |

2. En reemplazo de los Warrants reintegrados al MUTUARIO, conforme lo indicado en la Cláusula 1 precedente, y a los mismos fines y efectos que tales Warrants reintegrados, el MUTUARIO, en este acto entrega y endosa a favor del MUTUANTE los Warrants indicados a continuación por un valor total de US$ 1.564.500,00 (Dólares Estadounidenses UN MILLON QUINIENTOS SESENTA Y CUATRO MIL QUINIENTOS CON 00/100) los cuales son recibidos de conformidad por el MUTUANTE:

| N° WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 4019 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 149.400 | Kgs | 05-OCT-2009 | 522.900,00 |
| 4020 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 148.800 | Kgs | 05-OCT-2009 | 520.800,00 |
| 4021 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 148.800 | Kgs | 05-OCT-2009 | 520.800,00 |
| Total | | | | | | 1.564.500,00 |

3.   Como consecuencia del reemplazo de los Warrants, a partir del día de la fecha, la garantía de Warrants del Contrato Marco queda conformada de la siguiente forma:

| N° WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2015 | QUESO PASTA DURA | LA CARLOTA | 187.500 | Kgs | 05-OCT-2009 | 1.312.500,00 |
| 2016 | QUESO PASTA DURA | LA CARLOTA | 187.500 | Kgs | 05-OCT-2009 | 1.312.500,00 |
| 2017 | QUESO PASTA DURA | LA CARLOTA | 187.500 | Kgs | 05-OCT-2009 | 1.312.500,00 |
| 2018 | QUESO PASTA DURA | LA CARLOTA | 87.500 | Kgs | 05-OCT-2009 | 612.500,00 |
| 2019 | QUESO SEMI DURO | BALNEARIA | 148.937 | Kgs | 05-OCT-2009 | 700.003,90 |
| 2020 | QUESO SEMI DURO | BALNEARIA | 102.412 | Kgs | 05-OCT-2009 | 481.336,40 |
| 2021 | QUESO PASTA DURA | BRIKMANN | 101.250 | Kgs | 05-OCT-2009 | 633.825,00 |
| 2022 | QUESO PASTA DURA | BRIKMANN | 101.250 | Kgs | 05-OCT-2009 | 633.825,00 |
| 2023 | QUESO PASTA DURA | BRIKMANN | 101.250 | Kgs | 05-OCT-2009 | 633.825,00 |
| 2024 | QUESO PASTA DURA | BRIKMANN | 101.250 | Kgs | 05-OCT-2009 | 633.825,00 |
| 2028 | LECHE UAT | SUNCHALES | 515.750 | Lt | 05-OCT-2009 | 866.460,00 |
| 2029 | LECHE UAT | SUNCHALES | 515.750 | Lt | 05-OCT-2009 | 866.460,00 |
| 2030 | LECHE UAT | SUNCHALES | 169.643 | Lt | 05-OCT-2009 | 285.000,24 |
| 2031 | LECHE UAT | CHIVILCOY | 500.000 | Lt | 05-OCT-2009 | 285.000,00 |
| 2032 | LECHE UAT | CHIVILCOY | 500.000 | Lt | 05-OCT-2009 | 285.000,00 |
| 2033 | LECHE UAT | CHIVILCOY | 500.000 | Lt | 05-OCT-2009 | 285.000,00 |
| 4019 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 149.400 | Kgs | 05-OCT-2009 | 522.900,00 |
| 4020 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 148.800 | Kgs | 05-OCT-2009 | 520.800,00 |
| 4021 | LECHE EN POLVO FRACCIONADA | SUNCHALES | 148.800 | Kgs | 05-OCT-2009 | 520.800,00 |
| Total | | | | | | 12.704.060,54 |

4.   Con excepción de aquellos términos expresamente modificados por la presente Sexta Enmienda al Contrato Marco, todos los demás términos, condiciones y cláusulas del Contrato Marco y de las Solicitudes de Desembolso remitidas y aceptadas permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 24 días del mes de Agosto de 2009.

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Por: **SANCOR DO BRASIL Produtos Alimenticios Ltda.**
Nombre: Mario Magdalena – Gabriel Gustavo Martinuzzi
Carácter: Apoderado - Administrador

Por: IIG TOF B.V.
Nombre: J. Ramos / Goeymann
Carácter: apoderados

A los efectos de su certificación suscribe/n nuevamente en Bs. As. a ..... .8.2009.

Firma/s certificada/s en Foja
N°. ...............
Bs. As. ...........

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

Firma/s certificada/s en Foja
N°. ...............
Bs. As. ...........

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

MARTIN F
ESC
MA

  

**ACTA DE CERTIFICACION DE FIRMAS**
**LEY 404**



F 005376323

1   Buenos Aires, 24 de     Agosto     de 2009 . En mi carácter de escribano

2   Titular del Registro Notarial Nº 841

3   CERTIFICO: Que la/s  firma/s                        que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número 13             del LIBRO

6   número 120                  , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144.-

9   quien justifica su identidad de acuerdo al inciso a del articulo 1002 del

10  Código Civil y actúa en su carácter de apoderado de la sociedad "SAN-

11  COR COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales,

12  Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

13  cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

14  tellanos, conforme lo acredita con el poder de fecha 23 de junio de 1993,

15  pasado al folio 638 del Registro 200 de la ciudad de Sunchales, Provincia

16  de Santa Fe, a cargo del escribano Horacio Remondino, y en su carácter

17  de Apoderado Gerencia Financiera de la sociedad "SANCOR DO BRASIL

18  Productos Alimenticios LTDA." lo que acredita con el Contrato Social de

19  fecha 4 de agosto de 2008, con facultades suficientes siempre que actue

20  en forma conjunta con el Sr. Gabriel Gustavo MARTINUZZI la documen-

21  tación relacionada tengo a la vista y le confiere facultades suficientes pa-

22  ra suscribir el documento ad junto, doy fe.-

23

24

25

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370





F 005376323

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50





**ACTA DE CERTIFICACION DE FIRMAS**
**LEY 404**

F 005400850

1    **Buenos Aires,** 1 de Septiembre de 2009 . **En mi carácter de escribano**

2    **Titular del Registro Notarial Nº 841**

3    **CERTIFICO: Que la/s** firma/s **que obra/n en el**

4    **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5    **formaliza simultáneamente por ACTA número** 140 **del LIBRO**

6    **número** 120 **, es/son puesta/s en mi presencia por la/s persona/s**

7    **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8    **la justificación de su identidad.** Gabriel Gustavo MARTINUZZI, DNI

9    18.264.987, quien justifica su identidad de acuerdo al inciso a del articulo

10    1002 del Código Civil y actúa en su carácter de Administrador de la so-

11    ciedad "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que acre-

12    dita con el Contrato Social de fecha 4 de agosto de 2008 debidamente

13    Legalizado y Apostillado, la documentación relacionada tengo a la vista y

14    le confiere facultades suficientes para suscribir el documento ad junto,

15    doy fe.-

16

17

18

19

20

21

22

23

24

25



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



F 005400850

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50



# CONTROL UNION ARGENTINA S.A.
## MEMBER OF CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABO • BUENOS AIRES
**T** 4510-6600 (LINEAS ROTATIVAS) **F** (54-11) 4510-6723



ISO 9001:2000 CERTIFIED

## WARRANT

Leche en polvo     (LEY 9643)

N°     4019
Serie:     H

Autorizada por S.I.C.
Resol. N° 106/Exp. N° 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

Nombre o Denominación:   Sancor Coop. Unidas Ltda.     C.U.I.T.:   30-50167764-3
Constituye Dom. Especial en:   Tacuari 202 3°, Capital Federal

HA DEPOSITADO en nuestro "ALMACEN" N°     Sancor 1 - Sunchales
Ubicado en:   Tte.Gral.Richieri 15, Sunchales, Sta Fé     los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|---|---|---|---|---|
| 149,400.00 | Kgs | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | | Envase | Estado |
|---|---|---|---|---|
| 1.00 | 149400.00 kgrs. | | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2025

EL VALOR aproximado de las mercaderías al emitir este CERTIFICADO es de:     U$S   522,900.00

SEGUROS: Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada

domiciliada en:   Avenida Independencia  333, Sunchales, Sta Fé
bajo Póliza N°:  2134

vencimiento     31/07/2009     por     U$S   19,363,760.00

Otros Seguros:
Todo Riesgo Operativo

PERIODO DE DEPOSITO: El depósito se efectúa por:   46   días   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A., a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande serán reembolsados a Control Union Argentina S.A., la que se reclamo, y por su pago Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

| Almacenaje desde:   20/08/2009 | a razón de   : U$S   por |
|---|---|
| Emisión de Documentos: U$S 1,082.40 | Gtos. Adm.   : U$S  0.00 |
| Seguro:   U$S 166.90 | Otros gastos   : U$S836.80 |
| Estibaje y Desestibaje:   U$S 0.00 | Observaciones: Vigilancia: 4 S/h |

CONDICIONES: Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha:   Buenos Aires, 20/08/2009

Por: CONTROL UNION ARGENTINA S.A.

Administrador (firma y sello)

IGNACIO MONTES DE OCA
APODERADO

CARLOS RICHARDS
APODERADO

Emisor CONTROL UNION ARGENTINA S.A. entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolución N° 106, de fecha 22-03-93, la Secretaria de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: EL DEPOSITANTE declara BAJO JURAMENTO, que: a) Las mercaderías detalladas en este CERTIFICADO DE DEPOSITO son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado interno conforme a las normas vigentes; c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento así como de las obligaciones que emergen del mismo, conforme lo arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito preferentemente anunciadas y las que se detallan de este certificado.

Lugar y Fecha:

Buenos Aires, 20/08/2009

SanCor Cooperativas Unidas Ltda
C. P. N. MARIO E. MAGDALENA
Gerente Dpto. de Finanzas

Firma del Depositante:     Aclaración de firma:

Documento de Identidad:     Calidad que reviste:

## PRIMER ENDOSO DEL "WARRANT"

El/los tenedores del presente WARRANT ...... Sancor Coop Unidas Ltda ......
domiciliado en: ...... Tacuari 202 3° Capital Federal ...... transfiere/n este WARRANT,
que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de ...... BGS.... representada por TRUST INTERNATIONAL
MANAGEMENT (T.I.M.)BV .... domiciliado en ...... Johsbove 8. Telepert Naardweg 165,CO Box 7241, 1007 JE, Amsterdam, The Netherlands ......
en garantía de la suma de ...... US$.43.971.966.08 ......... (Son dolares estadounidenses cuarenta y tres millones novecientos
setenta y un mil setenta y seis 08/00 ......)
con más un interés de ........................... lo que hace un total de ...... Nb 43.971.966.08 (dolares treinta y tres dolares tres mil .....
(Son dolares estadounidenses cuarenta y tres millones novecientos setenta y un mil setenta y seis/ los intereses devengados
a la fecha de su efectiva cancelacion ......). Pagadero en (lugar) ..... Amsterdam, The Netherlands ......
.................. el día ...... 05 ...... de ...... Octubre ...... de 200 5

<br>

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

| Registro del Endoso en: |
| Fecha: |
| N° |

ACREEDOR: .................................................. TENEDOR: o

## SEGUNDO ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de ..................................................
..................................................
.................................................. domiciliado en ..................................................
.................................................. o a su orden en (lugar): ..................................................
.................................................. el día .................. de .................. de 200

| Registro del Endoso en: |
| Fecha: |
| N° |

ACREEDOR: .................................................. TENEDOR: ..................................................

## TERCER ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de ..................................................
.................................................. domiciliado en ..................................................
.................................................. o a su orden en (lugar): ..................................................
.................................................. el día .................. de .................. de 200

| Registro del Endoso en: |
| Fecha: |
| N° |

ENDOSANTE: .................................................. ENDOSATARIO: ..................................................

## CANCELACION DE CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRANT, CONSTE,

En (lugar) .................. el día .................. de .................. de 200 ..................

ACREEDOR: ..................................................

## CONDICIONES DE ESTE WARRANT

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más sus intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A.", se encontrará facultado para entregar el importe del WARRANT a quien resulte ser tenedor a la fecha de vencimiento, si no se preserva antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de ese documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta, facultada para entregar el importe del WARRANT a quién resulte su tenedor.

REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643.

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del préstamo, el titular del Certificado de Depósito no se presentara a retirar la mercadería afectada al mismo, o si presentándose mantuviera deuda con CONTROL UNION ARGENTINA S.A. originada en este Certificado de Depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quién resulte titular del Certificado de Depósito, o bien a vender la misma en pública subasta en los términos del Art. 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de los créditos que afecten a la mercadería, será consignado judicialmente a la orden de quién resulte titular del Certificado de Depósito. Esta facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado es un derecho y no un deber de CONTROL UNION ARGENTINA S.A., pudiendo CONTROL UNION ARGENTINA S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originariamente pactado, CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originariamente se pactó.

RESPONSABILIDAD: "CONTROL UNION ARGENTINA S.A." responderá por su culpa, o la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



# CONTROL UNION ARGENTINA S.A.
MEMBER OF CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABO • BUENOS AIRES
T 4510-6600 (LINEAS ROTATIVAS) F (54-11) 4510-6723


**ISO**
9001:2000
CERTIFIED

## CERTIFICADO DE DEPOSITO

| Leche en polvo | (LEY 9643) |
|---|---|

Nº     4019
Serie:   H

Autorizada por S.I.C.
Resol. N° 106/Exp. N° 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

**Nombre o Denominación:**   Sancor Coop. Unidas Ltda.          **C.U.I.T.:**   30-50167764-3

**Constituye Dom. Especial en:**   Tacuari 202 3°, Capital Federal

**HA DEPOSITADO en nuestro "ALMACEN" N°**   Sancor 1 - Sunchales

**Ubicado en:**   Tte.Gral.Richieri 15, Sunchales, Sta Fé          los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|---|---|---|---|---|
| 149,400.00 | Kgs. | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | Envase | Estado |
|---|---|---|---|
| 1.00 | 149400.00 kgrs. | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2025

**EL VALOR aproximado de las mercaderías al emitir este CERTIFICADO es de:**     U$S   522,900.00

**SEGUROS:** Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada

**domiciliada en:** Avenida Independencia 333, Sunchales, Sta Fé

**bajo Póliza N°:** 2134

vencimiento   31/07/2009   por:     U$S   19,363,760.00

**Otros Seguros:**
Todo Riesgo Operativo

**PERIODO DE DEPOSITO:** El depósito se efectúa por:   46   días   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A., a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande serán reembolsados a Control Union Argentina S.A. a su reclamo, y por su pago. Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

| | | |
|---|---|---|
| Almacenaje desde: 20/08/2009 | a razón de : U$S | por |
| Emisión de Documentos: U$S 1,082.40 | Gtos. Adm. : U$S 0.00 | |
| Seguro: U$S 106.90 | Otros gastos : U$S836.80 | |
| Estibaje y Desestibaje: U$S 0.00 | Observaciones: Vigilancia: 4 $/h | |

CONDICIONES: Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha:   Buenos Aires, 20/08/2009

Por: CONTROL UNION ARGENTINA S.A.

Administrador (firma y sello) .........................
GNACIO MONTES DE OCA
APODERADO

CARLOS RICHARDS
APODERADO

En esta CONTROL UNION ARGENTINA S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643) según resolución N° 106, de fecha 22-03-93, de la Secretaría de Comercio e Inversiones Dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: EL DEPOSITANTE declara BAJO JURAMENTO, que: a) Las mercaderías detalladas en este CERTIFICADO DE DEPOSITO son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado Interno conforme a las normas vigentes; c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento así como de las obligaciones que emergen del mismo, conforme lo arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito preferentemente enunciadas y las que se detallan de este certificado.

Lugar y Fecha:

Buenos Aires, 20/08/2009

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Firma del Depositante:

Aclaración de firma:

Documento de Identidad:                    Calidad que reviste:

## PRIMER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ......................................................

.......................................... domiciliado en: ......................................................

.......................................... o a su orden en (lugar): ......................................................

.......................................... el día .......................... de .......................... de 200....

| | Registro del Endoso en:<br>Fecha:<br>Nº |
|---|---|
| ENDOSANTE: .......................... ENDOSATARIO: .......................... | |

## SEGUNDO ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ......................................................

.......................................... domiciliado en: ......................................................

.......................................... o a su orden en (lugar): ......................................................

.......................................... el día .......................... de .......................... de 200....

| | Registro del Endoso en:<br>Fecha:<br>Nº |
|---|---|
| ENDOSANTE: .......................... ENDOSATARIO: .......................... | |

## TERCER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ......................................................

.......................................... domiciliado en: ......................................................

.......................................... o a su orden en (lugar): ......................................................

.......................................... el día .......................... de .......................... de 200....

| | Registro del Endoso en:<br>Fecha:<br>Nº |
|---|---|
| ENDOSANTE: .......................... ENDOSATARIO: .......................... | |

## PRIMER ENDOSO DEL "WARRANT"

CONSTANCIA DEL PRIMER ENDOSO DEL WARRANT

En (lugar) .......................... con fecha .......................... de *Agosto* .......................... de 200..*9*..

al WARRANT correspondiente a este CERTIFICADO DE DEPOSITO, se ha transferido a favor de *Incombank per Pcl International*.......... domiciliado en *Telefone 8 Telegraf Manterag 165 85 002 3201* *Amsterdam The Netherlands*..............

o a su orden en garantía de la suma de *VAS 53.121.666,8* .......... (Son *cincuenta estados unidos veinte y tres*....

*millones ... setenta y un ... seiscientos sesenta*........................................................)

con más un interes de .......................... lo que hace un total de *dos millones veinte y tres* ..........

(Son ......................................................................................................)

Pagadero en *Amsterdam The Netherland* el día ....*25*.... de .... *Octubre* .......................... de 200..*7*..

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

| | Registro del Endoso en:<br>Fecha:<br>Nº |
|---|---|
| ACREEDOR: .......................... TENEDOR: X .......................... | |

## CONDICIONES DE ESTE CERTIFICADO DE DEPOSITO

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

**PAGO ANTICIPADO:** El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más los intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A.", se encontrará facultado para entregar el importe del WARRANT a quien resulte su tenedor a la fecha de vencimiento, si no se presenta antes a su cobro.

**PAGO EN TERMINO:** Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de ese documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta facultada para entregar el importe del WARRANT a quien resulte su tenedor.

**REMATE:** En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643.

**RETIRO DE LAS MERCADERIAS:** Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente depósito, el titular del certificado de depósito no se presentara a retirar la mercadería afectada al mismo, o al presentándose mantuviera deuda con CONTROL UNION ARGENTINA S.A. originada en este certificado de depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quién resulte titular del certificado de depósito, o bien a vender la misma en pública subasta en los términos del art. 17 de la ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de los créditos que afectan a la mercadería, será consignado judicialmente a la orden de quién resulte titular del certificado de depósito. Esta facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado o un derecho y no un deber de CONTROL UNION ARGENTINA S.A., pudiendo CONTROL UNION ARGENTINA S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se la abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que excede al originariamente pactado, CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originariamente se pactó.

**RESPONSABILIDAD "CONTROL UNION ARGENTINA S.A."** responderá por su culpa, o la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



# CONTROL UNION ARGENTINA S.A.
## MEMBER OF CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABQ • BUENOS AIRES
**T** 4510-6600 (LINEAS ROTATIVAS) **F** (54-11) 4510-6723



## WARRANT

| Leche en polvo | **(LEY 9643)** |
|---|---|

N°    4020
Serie:   H

Autorizada por S.I.C.
Resol. N° 106/Exp. N° 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

**Nombre o Denominación:**  Sancor Coop. Unidas Ltda.          **C.U.I.T.:**  30-50167764-3
**Constituye Dom. Especial en:**  Tacuari 202 3°, Capital Federal

**HA DEPOSITADO** en nuestro "ALMACEN" N°      Sancor 1 - Sunchales
Ubicado en:   Tte.Gral.Richieri 15, Sunchales, Sta Fé          los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|---|---|---|---|---|
| 148,800.00 | Kgs. | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | Envase | Estado |
|---|---|---|---|
| 1.00 | 148800.00 kgrs. | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2026

**EL VALOR** aproximado de las mercaderías al emitir este CERTIFICADO es de:       U$S   520,800.00

**SEGUROS:** Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada

domiciliada en: Avenida Independencia 333, Sunchales, Sta Fé
bajo Póliza N°: 2134

vencimiento      31/07/2009     por:      U$S   19,363,760.00

Otros Seguros:
Todo Riesgo Operativo

**PERIODO DE DEPOSITO:** El depósito se efectúa por:   46   dias   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañada del WARRANT correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos.
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos por ello demande serán reembolsados a Control Union Argentina S.A. a su reclamo, y por su pago Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

| Almacenaje desde: 20/08/2009 | a razón de : U$S por |
|---|---|
| Emisión de Documentos: U$S 1.078.06 | Gtos. Adm. : U$S 0.00 |
| Seguro: U$S 106.47 | Otros gastos : U$S836.80 |
| Estibaje y Desestibaje: U$S 0.00 | Observaciones: Vigilancia: 4 $/h |

CONDICIONES: Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha:    Buenos Aires, 20/08/2009

**Por: CONTROL UNION ARGENTINA S.A.**

IGNACIO MONTES DE OCA
APODERADO

CARLOS RICHARDS
APODERADO

Administrador (firma y sello) ...........................

Emisor CONTROL UNION ARGENTINA S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolución N° 106, de fecha 22-03-93, de la Secretaría de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

**DECLARACION JURADA: EL DEPOSITANTE** declara **BAJO JURAMENTO, que: a)** Las mercaderías detalladas en este **CERTIFICADO DE DEPOSITO** son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargos de ninguna naturaleza y que él mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado interno conforme a las normas vigentes. c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento así como de las obligaciones que emergen del mismo, conforme lo arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito preferentemente enunciadas y las que se detallan al dorso de este certificado.

Lugar y Fecha:
Buenos Aires, 20/08/2009

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Firma del Depositante:                          Aclaración de firma:

Documento de Identidad: ...........................          Calidad que reviste: ...........................

## PRIMER ENDOSO DEL "WARRANT"

El/los tenedores del presente WARRANT _Sancor Coop. Unidas Ltda_
domiciliado en: _Tacural 202  3°  Capital Federal_ transfiere/n este WARRANT,
que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de _este Señor, representado, pr TRUST INTERNATIONAL_
_MANAGEMENT (T.I.M.) BV_ domiciliado en _Prinsen v/Teljep J, Neuburg, 165, 16, the 2211, ave 106, Amsterdam, The Netherlands_
en garantía de la suma de _u$s5.43.971.06 c,p.n_ (Son dolares estadounidenses cuarenta y tres millones, novecientos
_setenta y un mil sesenta con 06/100_)
con más un interés de _..................._ lo que hace un total de _u$s43.971.06c,p,n(interes devengados a la fecha de efectiva cancelación_
(Son dolares estadounidenses cuarenta y tres millones novecientos setenta y un mil sesenta con valores + intereses devengados
_a la fecha de efectiva cancelación_ )- Pagadero en (lugar) _Amsterdam, The Netherlands_
_..............._ el día _05_ de _octubre_ de 200 _9_

SanCor Cooperativas Unidas Ltda
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

Registro del Endoso en:
Fecha:
N°

ACREEDOR: _..............._                    TENEDOR: _X_

## SEGUNDO ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de: _..............._
_..............._
_..............._ domiciliado en: _..............._
_..............._ o a su orden en (lugar): _..............._
_..............._ el día _..............._ de _..............._ de 200 _.._

Registro del Endoso en:
Fecha:
N°

ACREEDOR: _..............._                    TENEDOR: _..............._

## TERCER ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de: _..............._
_..............._ domiciliado en: _..............._
_..............._ o a su orden en (lugar): _..............._
_..............._ el día _..............._ de _..............._ de 200 _.._

Registro del Endoso en:
Fecha:
N°

ENDOSANTE: _..............._              ENDOSATARIO: _..............._

## CANCELACION DE CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRANT. CONSTE.

En (lugar) _..............._ el día _..............._ de _..............._ de 200 _..............._

ACREEDOR: _..............._

## CONDICIONES DE ESTE WARRANT

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más sus intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A.", en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A.", se encontrará facultado para entregar el importe del WARRANT a quién resulte su tenedor a la fecha de vencimiento, si no su presenta antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de este documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta, facultada para entregar el importe del WARRANT a quién resulte su tenedor.

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente depósito, el titular del Certificado de Depósito no se presentara a retirar la mercadería afectada al mismo, o si presentándose mantuviera deuda con CONTROL UNION ARGENTINA S.A. originada en este Certificado de Depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quien resulte titular del Certificado de Depósito o bien a ejecutar la misma en pública subasta en los términos del Art. 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuarse la distribución de los créditos que afecten a la mercadería, será consignado judicialmente a la orden de quien resulte titular del Certificado de Depósito. Esta facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado es un derecho y no un deber de CONTROL UNION ARGENTINA S.A. pudiendo CONTROL UNION ARGENTINA S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y mientras la espera. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que excede al originariamente pactado, CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originariamente se pactó.

RESPONSABILIDAD: CONTROL UNION ARGENTINA S.A. responderá por su culpa, o la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



# CONTROL UNION ARGENTINA S.A.
## MEMBER Of CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABO • BUENOS AIRES
T 4510-6600 (LINEAS ROTATIVAS) F (54-11) 4510-6723



ISO 9001:2000
CERTIFIED

---

## CERTIFICADO DE DEPOSITO

( Leche en polvo )     (LEY 9643)

Nº      4020
Serie:  H

Autorizada por S.I.C.
Resol. Nº 106/Exp. Nº 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

**Nombre o Denominación:**   Sancor Coop. Unidas Ltda.          **C.U.I.T.:**   30-50167764-3
**Constituye Dom. Especial en:**   Tacuari 202 3º, Capital Federal

**HA DEPOSITADO** en nuestro "ALMACEN" Nº   Sancor 1 - Sunchales
   **Ubicado en:**  Tte.Gral.Richieri 15, Sunchales, Sta Fé                    los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|---|---|---|---|---|
| 148,800.00 | Kgs. | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | Envase | Estado |
|---|---|---|---|
| 1.00 | 148800.00 kgrs. | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2026

**EL VALOR** aproximado de las mercaderías al emitir este **CERTIFICADO** es de:     [ U$S   520.800.00 ]

**SEGUROS:** Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada
domiciliada en: Avenida Independencia  333, Sunchales, Sta Fé
bajo Póliza Nº: 2134

                              vencimiento      31/07/2009      por:      [ U$S  19.363.760.00 ]

Otros Seguros:
Todo Riesgo Operativo

**PERIODO DE DEPOSITO:** El depósito se efectúa por:   46   dias   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

CARGOS: La mercadería depositada podría adeudar los siguientes conceptos:
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande serán reembolsados a Control Union Argentina S.A. a su reclamo, y por su pago Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

Almacenaje desde:  20/08/2009          a razón de    : US$              por
Emisión de Documentos: U$S 1,078.06     Gtos. Adm. :  U$S 0.00
Seguro:            U$S 106.47           Otros gastos : US$836.80
Estibaje y Desestibaje:  U$S 0.00       Observaciones: Vigilancia: 4 $/h

CONDICIONES: Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha:      Buenos Aires, 20/08/2009

        **Por: CONTROL UNION ARGENTINA S.A.**

        Administrador (firma y sello) ................................. IGNACIO MONTES DE OCA          CARLOS RICHARDS
                                                                      APODERADO

Emisor CONTROL UNION ARGENTINA S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolución Nº 106, de fecha 22-03-93, de la Secretaría de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

**DECLARACION JURADA: EL DEPOSITANTE declara BAJO JURAMENTO, que:** a) Las mercaderías detalladas en este **CERTIFICADO DE DEPOSITO** son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargo de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado interno conforme a las normas vigentes; c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento así como de las obligaciones que emergen del mismo, conforme el arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito preferentemente enunciadas y las que se detallan de este certificado.
Lugar y Fecha:

        Buenos Aires, 20/08/2009

        SanCor Cooperativas Unidas Ltda.
        C. P. N. MARIO C. MAGDALENA
        Gerente Opto. de Finanzaa

Firma del Depositante: ..p....          Aclaración de firma:

Documento de Identidad:                 Calidad que reviste:

## PRIMER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ...............................................
........................................................................................................... domiciliado en: ...................................................................
.................................................................................... o a su orden en (lugar): ..........................................................................
............................................... el día ............... de ................................................. de 200 ...........

|  | Registro del Endoso en:<br>Fecha:<br>N° |
| --- | --- |
| ENDOSANTE: ...........................................  ENDOSATARIO: .......................................... |  |

## SEGUNDO ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ...............................................
........................................................................................................... domiciliado en: ...................................................................
.................................................................................... o a su orden en (lugar): ..........................................................................
............................................... el día ............... de ................................................. de 200 ...........

|  | Registro del Endoso en:<br>Fecha:<br>N° |
| --- | --- |
| ENDOSANTE: ...........................................  ENDOSATARIO: .......................................... |  |

## TERCER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ...............................................
........................................................................................................... domiciliado en: ...................................................................
.................................................................................... o a su orden en (lugar): ..........................................................................
............................................... el día ............... de ................................................. de 200 ...........

|  | Registro del Endoso en:<br>Fecha:<br>N° |
| --- | --- |
| ENDOSANTE: ...........................................  ENDOSATARIO: .......................................... |  |

## PRIMER ENDOSO DEL "WARRANT"

CONSTANCIA DEL PRIMER ENDOSO DEL WARRANT

En (lugar) ....................... con fecha ................. de ...Agosto............................. de 200..7..................
al WARRANT correspondiente a este CERTIFICADO DE DEPOSITO, se ha transferido a favor de Rabobank International (Cooperative...)
domiciliado en Telstra & Intertel Nachberg 165, Postus PR41 Aea 3 AE Amsterdam, The Netherlands.
o a su orden en garantía de la suma de u$s.13.791.06.013..........................(Son .trece .estadounidenses con..tres....
.millones .....................setenta .y .uno .mil .sesenta con c/100...................................)
con más un interés de .................................... lo que hace un total de u$s.......................................................
(Son .............................................................................................................................................)
Pagadero en Amsterdam, The Netherlands el día ...05... de ...Octubre................... de 200..7..

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

|  | Registro del Endoso en:<br>Fecha:<br>N° |
| --- | --- |
| ACREEDOR: ...........................................  TENEDOR: ... |  |

## CONDICIONES DE ESTE CERTIFICADO DE DEPOSITO

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más sus intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A.", se encontrará facultado para entregar el importe del WARRANT a quién resulte su tenedor a la fecha de vencimiento, si no se presenta antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de ese documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta facultada para entregar el importe del WARRANT a quién resulte su tenedor.

REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643.

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente depósito, el titular del certificado de depósito no se presentara a retirar la mercadería afectada al mismo, o si presentándose mantuviera deuda con CONTROL UNION ARGENTINA S.A. originada en este certificado de depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quien resulte titular del certificado de depósito, o bien a vender la misma en pública subasta en los términos del art. 17 de la ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de los créditos que afecten a la mercadería, será consignado judicialmente a la orden de quién resulte titular del certificado de depósito. Será facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado es un derecho y no un deber de CONTROL UNION ARGENTINA S.A. pudiendo CONTROL UNION ARGENTINA S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se la abone todo lo adeudado y se retire la misma. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originariamente pactado, CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originariamente se pactó.

RESPONSABILIDAD "CONTROL UNION ARGENTINA S.A." responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



# CONTROL UNION ARGENTINA S.A.
MEMBER OF CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABO • BUENOS AIRES
T 4510-6600 (LINEAS ROTATIVAS) F (54-11) 4510-6723


**ISO**
**9001:2000**
CERTIFIED

## WARRANT

| Leche en polvo | (LEY 9643) | Nº 4021 |
| | | Serie: H |

Autorizada por S.I.C.
Resol. Nº 106/Exp. Nº 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

**Nombre o Denominación:**  Sancor Coop. Unidas Ltda.       **C.U.I.T.:**  30-50167764-3
**Constituye Dom. Especial en:**  Tacuari 202 3º, Capital Federal

**HA DEPOSITADO** en nuestro "ALMACEN" Nº    Sancor 1 - Sunchales
**Ubicado en:** Tte.Gral.Richieri 15, Sunchales, Sta Fé                     los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|----------|--------|-------------------|--------------|-------|
| 148.800,00 | Kgs. | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | Envase | Estado |
|-----------------|------------|--------|--------|
| 1.00 | 148800.00 kgrs. | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2027

**EL VALOR** aproximado de las mercaderías al emitir este CERTIFICADO es de:    |  U$S  520.800,00  |

**SEGUROS:** Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada

domiciliada en: Avenida Independencia  333, Sunchales, Sta Fé

bajo Póliza Nº: 2134

                                    vencimiento   31/07/2009   por:    |  U$S   19.363.760,00  |

**Otros Seguros:**
Todo Riesgo Operativo

**PERIODO DE DEPOSITO:** El depósito se efectúa por:  46   dias   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

ENTREGA DE LOS EFECTOS: No se entregarán los efectos depositados a la presentación del respectivo CERTIFICADO DE DEPOSITO, sin estar acompañado del WARRANT correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

CARGOS: La mercadería depositada podrá adeudar los siguientes conceptos:
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A. a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande serán reembolsados a Control Union Argentina S.A. a su reclamo, y por su pago Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

**Almacenaje desde:** 20/08/2009               a razón de   : U$S         por
**Emisión de Documentos:** U$S 1.078.06        Gtos. Adm.   : U$S 0.00
**Seguro:**              U$S 106.47            Otros gastos : U$S836.80
**Estibaje y Desestibaje:** U$S 0.00           Observaciones: Vigilancia: 4 $/h

CONDICIONES: Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

Lugar y Fecha:   Buenos Aires,  20/08/2009

**Por: CONTROL UNION ARGENTINA S.A.**

Administrador (firma y sello)              IGNACIO MONTES DE OCA        CARLOS RICHARDS
                                              APODERADO                    APODERADO

Emisor CONTROL UNION ARGENTINA S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolución Nº 106, de fecha 22-03-93, de la Secretaría de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

DECLARACION JURADA: EL DEPOSITANTE declara BAJO JURAMENTO, que: a) Las mercaderías detalladas en este CERTIFICADO DE DEPOSITO son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado interno conforme a las normas vigentes; c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento así como de las obligaciones que emergen del mismo, conforme lo arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito preferentemente enunciadas y las que se detallan de este certificado.

Lugar y Fecha:    Buenos Aires, 20/08/2009

SanCor Cooperativas Unidas Ltda.
C.P. N. MARIO C/ MAGDALENA
Gerente Dpto. de Finanzas

**Firma del Depositante:**                       Aclaración de firma:

**Documento de Identidad:**                       Calidad que reviste:

## PRIMER ENDOSO DEL "WARRANT"

El/los tenedores del presente WARRANT ..... *Sancor Coop Unidas Ltda* ...........

domiciliado en: ..... *Tacuari 202 3° Capital Federal* ..................... transfiere/n este WARRANT,

que corresponde al CERTIFICADO DE DEPOSITO de la misma fecha de emisión, número y serie, a favor de *IFG IPE BV, representado por IFG6T INTERNATIONAL MANAGEMENT (I.M)B.V.* domiciliado en *Teatro P. Telegel, Mariboug 165, fm iers 3241, 1001 JG, Amsterdam, The Netherlands.*

en garantía de la suma de *V$S.43.971.060,00* ...........(Son *dólares estadounidenses cuarenta y tres millones novecientos setenta y un mil sesenta con 0/100* ...........................................)

con más un interés de ........................................., lo que hace un total de ..... *$43.971.060, más los intereses a la fecha de su efectiva cancelación* .........(Son *dólares estadounidenses cuarenta y tres millones novecientos setenta y un mil sesenta más los intereses devengados a la fecha de su efectiva cancelación* ...........................) - Pagadero en (lugar) ..... *Amsterdam, The Netherlands* ...........

.......................... el día ..... *05* ..... de ..... *Octubre* .......... de 200 *7*

ACREEDOR: ...........................................  TENEDOR: ...........

> SanCor Cooperativas Unidas Ltda
> C. P. N. MARIO C. MAGDALENA
> Gerente Dpto. de Finanzas

Registro del Endoso en:
Fecha:
N°

## SEGUNDO ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de: ....................................

...................................................................................................

............................................................... o a su orden en (lugar): ....................................

.......................... el día .......... de .......... de 200 ..

ACREEDOR: ...........................................  TENEDOR: ...........

Registro del Endoso en:
Fecha:
N°

## TERCER ENDOSO DEL "WARRANT"

ENDOSO este "WARRANT" en sus derechos y obligaciones a favor de: ....................................

............................................................... domiciliado en: ....................................

............................................................... o a su orden en (lugar): ....................................

.......................... el día .......... de .......... de 200 ..

Registro del Endoso en:
Fecha:
N°

ENDOSANTE: ...........................................  ENDOSATARIO: ...........

## CANCELACION DE CREDITO

CANCELADO el crédito por el cual se efectuó la transferencia de este WARRANT, CONSTE.

En (lugar) .......................... el día .......... de .......... de 200 ..

ACREEDOR: ...........................................

## CONDICIONES DE ESTE WARRANT

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes.

PAGO ANTICIPADO: El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más los intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A." se encontrará facultado para entregar el importe del WARRANT a quién resulte su tenedor a la fecha de vencimiento, si no se presenta antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de ese documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta, facultada para entregar el importe del WARRANT a quién resulte su tenedor.

REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el Art. 17 de la Ley 9643.

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente depósito, el titular del Certificado de Depósito no se presentara a retirar la mercadería afectada al mismo, o al presentándose mantuviere deuda con CONTROL UNION ARGENTINA S.A. originada en este Certificado de Depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quién resulte titular del Certificado de Depósito, o bien a vender la misma en pública subasta en los términos del Art. 17 de la Ley 9643. El saldo que resultare de esa subasta, luego de efectuada la distribución de los créditos que afecten a la mercadería, será consignado judicialmente a la orden de quién resulte titular del Certificado de Depósito. Esta facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado es un derecho y no un deber de CONTROL UNION ARGENTINA S.A. pudiendo CONTROL UNION ARGENTINA S.A. decidir, por las razones que ella estime, continuar custodiando la mercadería hasta tanto se le abone todo lo adeudado y se releve la misma. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda el originariamente pactado. CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originariamente se pactó.

RESPONSABILIDAD: "CONTROL UNION ARGENTINA S.A." responderá por su culpa, y la culpa o dolo de sus dependientes en la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe a las mercaderías, como reparación de daños por todo concepto.



# CONTROL UNION ARGENTINA S.A.
### MEMBER OF CONTROL UNION WORLD GROUP

RECONQUISTA 723 • C.P. C1003ABO • BUENOS AIRES
**T** 4510-6600 (LINEAS ROTATIVAS) **F** (54-11) 4510-6723


ISO 9001:2000 CERTIFIED

## CERTIFICADO DE DEPOSITO

| | |
|---|---|
| Leche en polvo | **(LEY 9643)** |

Nº 4021
Serie: H

Autorizada por S.I.C.
Resol. Nº 106/Exp. Nº 617.094-93
Publicado en B.O. 29-04-93

CERTIFICA QUE:

**Nombre o Denominación:** Sancor Coop. Unidas Ltda.        **C.U.I.T.:** 30-50167764-3
**Constituye Dom. Especial en:** Tacuari 202 3º, Capital Federal

**HA DEPOSITADO** en nuestro "ALMACEN" Nº   Sancor 1 - Sunchales
**Ubicado en:** Tte.Gral.Richieri 15, Sunchales, Sta Fé        los siguientes efectos:

| Cantidad | Unidad | Clase de Producto | Calidad/Tipo | Marca |
|---|---|---|---|---|
| 148,800.00 | Kgs. | Leche en polvo | Leche en Polvo | |

| Peso por Unidad | Peso Total | Envase | Estado |
|---|---|---|---|
| 1.00 | 148800.00 kgrs. | Varios | Bueno |

Otras características

La valuación de la mercadería es FOB Bs. As. a tipo cbio. cdor. Banco Nación al 20/08/2009. Anula y reemplaza WT/CD U-2027

**EL VALOR** aproximado de las mercaderías al emitir este **CERTIFICADO** es de:        U$S   520,800.00

**SEGUROS:** Estas mercaderías están cubiertas contra incendio y/u otros
en la Cía. Sancor Cooperativa de seguros Limitada

**domiciliada en:** Avenida Independencia  333, Sunchales, Sta Fé
**bajo Póliza Nº:** 2134

vencimiento   31/07/2009   por:        U$S   19,363,760.00

**Otros Seguros:**
Todo Riesgo Operativo

**PERIODO DE DEPOSITO:** El depósito se efectúa por:   46   días   a contar desde la fecha de emisión de este documento. Vto.: 05/10/2009

**ENTREGA DE LOS EFECTOS:** No se entregarán los efectos depositados a la presentación del respectivo *CERTIFICADO DE DEPOSITO*, sin estar acompañado del *WARRANT* correspondiente y ambos con endoso en forma, si se hubiese negociado, y los cargos abajo enunciados totalmente cancelados.

**CARGOS:** La mercadería depositada podría adeudar los siguientes conceptos:
Todos los intervinientes en este certificado autorizan a Control Union Argentina S.A., a realizar todos los actos e incurrir en todos los gastos que fueran necesarios para asegurar el mantenimiento de la calidad y cantidad de la mercadería. Todos los gastos que ello demande serán reembolsados a Control Union Argentina S.A. a su reclamo, y por su pago Control Union Argentina S.A. gozará de privilegio sobre el producido de la mercadería.

| | | | | |
|---|---|---|---|---|
| Almacenaje desde: 20/08/2009 | | a razón de : U$S | por | |
| Emisión de Documentos: U$S 1,078.06 | | Gtos. Adm. : U$S 0.00 | | |
| Seguro: U$S 106.47 | | Otros gastos : U$S836.80 | | |
| Estibaje y Desestibaje: U$S 0.00 | | Observaciones : Vigilancia: 4 $/h | | |

**CONDICIONES:** Este documento se sujeta a las condiciones específicas que anuncia el mismo (frente y dorso) y a aquellas que resulten de la Ley 9643 y su Decreto Reglamentario en cuanto sean compatibles.

**Lugar y Fecha:**   Buenos Aires, 20/08/2009

**Por: CONTROL UNION ARGENTINA S.A.**

IGNACIO MONTES DE OCA
APODERADO

CARLOS RICHARDS
APODERADO

Administrador (firma y sello) ..................................................................

Emite CONTROL UNION ARGENTINA S.A., entidad autorizada a emitir Certificados de Depósitos y Warrant (ley 9643), según resolución Nº 106, de fecha 22-03-93, la Secretaría de Comercio e Inversiones dependiente del Ministerio de Economía y Obras y Servicios Públicos. La autorización no implica responsabilidad del Estado.

**DECLARACION JURADA:** EL DEPOSITANTE declara BAJO JURAMENTO, que: a) Las mercaderías detalladas en este *CERTIFICADO DE DEPOSITO* son de su propiedad y que no se encuentran afectadas por gravámenes, prohibiciones, ni embargos de ninguna naturaleza y que el mismo no se encuentra inhibido para disponer de sus bienes; b) Que dichas mercaderías se encuentran en condiciones de ser comercializadas en el mercado interno conforme a las normas vigentes; c) Que constituye domicilio especial a los fines del ejercicio de derechos derivados de este documento al como de las obligaciones que emergen del mismo, conforme lo arriba consignado; d) Que conoce y acepta, sin reserva de ninguna naturaleza, todas las condiciones de este depósito precedentemente anunciadas y las que se detallan de este certificado.
Lugar y Fecha:

Buenos Aires, 20/08/2009

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Opto. de Finanzas

**Firma del Depositante:** ...........................   Aclaración de firma: ....................................

**Documento de Identidad:** ...........................................   Calidad que reviste: ....................................

## PRIMER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ..............................................

.......................................... domiciliado en: ..............................................

.......................................... o a su orden en (lugar): ..............................................

.......................................... el día .................. de .................. de 200....

| | Registro del Endoso en:<br>Fecha:<br>N° |
|---|---|
| ENDOSANTE: .......................................... ENDOSATARIO: .......................................... | |

## SEGUNDO ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ..............................................

.......................................... domiciliado en: ..............................................

.......................................... o a su orden en (lugar): ..............................................

al WARRANT correspondiente a este CERTIFICADO DE DEPOSITO, se ha transferido a favor de .......................................... el día .................. de .................. de 200....

| | Registro del Endoso en:<br>Fecha:<br>N° |
|---|---|
| ENDOSANTE: .......................................... ENDOSATARIO: .......................................... | |

## TERCER ENDOSO DEL "CERTIFICADO DE DEPOSITO"

ENDOSO este "CERTIFICADO DE DEPOSITO" en sus derechos y obligaciones a favor de: ..............................................

.......................................... domiciliado en: ..............................................

.......................................... o a su orden en (lugar): ..............................................

.......................................... el día .................. de .................. de 200....

| | Registro del Endoso en:<br>Fecha:<br>N° |
|---|---|
| ENDOSANTE: .......................................... ENDOSATARIO: .......................................... | |

## PRIMER ENDOSO DEL "WARRANT"

CONSTANCIA DEL PRIMER ENDOSO DEL WARRANT

En (lugar) .......................................... con fecha .................. de *Agosto* .................................................. de 200...7

al WARRANT correspondiente a este CERTIFICADO DE DEPOSITO, se ha transferido a favor de *Rabobank Curaçao N.V. como Agente de los prestamistas*

domiciliado en *Telestone 8 Teleport, Naritaweg 165, 1043 BW Amsterdam, Ins Netherlands*

o a su orden en garantía de la suma de *U$S 53.371.059,00* .............. (Son *dólares estadounidenses cincuenta y tres*

*millones trescientos setenta y un mil cincuenta y nueve 00/100*)

con más un interés de .......................................................... lo que hace un total de *U$S ...........................................................*

(Son *dólares estadounidenses cincuenta y tres millones trescientos setenta y un mil cincuenta y nueve 00/100*)

Pagadero en *un solo pago* el día *25* de *Octubre* .................................................. de 200...9

SanCor Cooperativas Unidas Ltda.
C. P. N. MARIO C. MAGDALENA
Gerente Dpto. de Finanzas

| | Registro del Endoso en:<br>Fecha:<br>N° |
|---|---|
| ACREEDOR: .......................................... TENEDOR: .......................................... | |

## CONDICIONES DE ESTE CERTIFICADO DE DEPOSITO

Sin perjuicio, de las condiciones establecidas en el reverso de este documento, se establecen las siguientes:

PAGO ANTICIPADO: El portador del Certificado de Depósito separado del WARRANT, podrá antes del vencimiento del préstamo pagar el importe del WARRANT. Si el portador del WARRANT no fuese conocido, o si siéndolo, no estuviese de acuerdo con el deudor sobre las condiciones en que tendrá lugar la anticipación del pago, el portador del Certificado de Depósito podrá cancelar anticipadamente el WARRANT, consignando el importe del préstamo con más sus intereses calculados hasta la fecha de vencimiento, a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio. El administrador de "CONTROL UNION ARGENTINA S.A.", se encontrará facultado para entregar el importe del WARRANT a quién resulte su tenedor a la fecha de vencimiento, si no se presenta antes a su cobro.

PAGO EN TERMINO: Si el tenedor del WARRANT no se presenta a su cobro a la fecha de su vencimiento, el portador del Certificado de Depósito podrá consignar el importe de ese documento más los diversos cargos consignados al frente de este documento para retirar la mercadería depositada. La consignación se deberá hacer a la orden de "CONTROL UNION ARGENTINA S.A." y en su domicilio quedando ésta facultada para entregar el importe del WARRANT a quién resulte su tenedor.

REMATE: En los supuestos de remate de las mercaderías, ello se llevará a cabo a través de la normativa establecida en el art. 17 de la Ley 9643.

RETIRO DE LAS MERCADERIAS: Si dentro de los 60 días corridos siguientes a la fecha de vencimiento de vigencia del presente depósito, el titular del certificado de depósito no se presentara a retirar la mercadería afectada al mismo, o si presentándose mantuviera adeudo con CONTROL UNION ARGENTINA S.A. originada en este certificado de depósito o su Warrant y dicha deuda no fuera cancelada, CONTROL UNION ARGENTINA S.A. estará facultada a consignar judicialmente dicha mercadería a nombre de quien resulte titular del certificado de depósito, o bien a vencer la misma en pública subasta en los términos del art. 17 de la Ley 9643. El saldo que resultara de ese subasta, luego de efectuada la distribución de los créditos que afecten a la mercadería, será consignado judicialmente a la orden de quien resulte titular del certificado de depósito. Esta facultad de CONTROL UNION ARGENTINA S.A. de consignar o rematar la mercadería luego de los 60 días de vencimiento del certificado es un derecho y no un deber de CONTROL UNION ARGENTINA S.A. pudiendo CONTROL UNION ARGENTINA S.A. por las razones que ella estime, continuar custodiando la mercadería tanto se el abona todo lo adeudado y se retira la misma. En todos los casos, durante todo el tiempo que CONTROL UNION ARGENTINA S.A. continúe custodiando la mercadería, sea durante el plazo pactado de vigencia del presente, sea durante el plazo que exceda al originalmente pactado, CONTROL UNION ARGENTINA S.A. tendrá derecho a cobrar la tarifa que originaran ante se pactó.

RESPONSABILIDAD "CONTROL UNION ARGENTINA S.A." responderá por su culpa, o la culpa o dolo de sus dependientes de la pérdida o averías ocasionadas a los productos depositados hasta la concurrencia del importe de las mercaderías, como reparación de daños por todo concepto.



**QUINTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 11 de Junio de 2008, Segunda Enmienda del 24 de Septiembre de 2008 y Tercera y Cuarta Enmienda del 28 de Noviembre de 2008, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Quinta Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán extenderse las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente segunda enmienda al Contrato Marco (la "Segunda Enmienda"), de conformidad con las presentes Cláusulas:

1. Modificase de la **Cláusula PRIMERA** del Contrato Marco las siguientes definiciones:

   "_Fecha/s de Vencimiento_" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores al 31 de Diciembre de 2010.

   "_Plazo de Disponibilidad_" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2010, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

2. Oportunamente, el Mutuario se compromete a notificar en el marco de la presente Quinta Enmienda, a los Deudores Cedidos, la ampliación de plazo según la Cláusula 1 y de conformidad con la Cláusula 4.6 del Contrato Marco.

   _A los efectos de su certificación suscribe/n_

3. Con excepción de aquellos términos expresamente modificados por la presente Quinta Enmienda, todas las _Buenos Aires, a 13.7.200_ demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 30 días del mes de Abril de 2009.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: SANCOR DO BRASIL Productos Alimenticios Ltda.
Nombre: Mario Magdalena – Gabriel Gustavo Martinuzzi
Carácter: Apoderado - Administrador

Firma/s certificada/s en Foja
N° F.066.326.206.2
Bs. As. 13.7.2009

Por: IIG TOF B.V.
Nombre:
Carácter:

Firma/s certificada/s en Foja
N° 005093567.
Bs. As. 30/7/09

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

MARTIN R. ARANA (h)
ESCR.
MAT. 170

24

25

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



ACTA DE CERTIFICACION DE FIRMAS
LEY 404



F 005093562

1  Buenos Aires, 30 de Abril de 2009 . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 152 del LIBRO

6  número 113 , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144.-

9  quien justifica su identidad de acuerdo al inciso a del artículo 1002 del

10 Código Civil y actúa en su carácter de apoderado de la sociedad "SAN-

11 COR COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales,

12 Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

13 cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

14 tellanos, conforme lo acredita con el poder de fecha 23 de junio de 1993,

15 pasado al folio 638 del Registro 200 de la ciudad de Sunchales, Provincia

16 de Santa Fe, a cargo del escribano Horacio Remondino, y en su carácter

17 de Apoderado Gerencia Financiera de la sociedad "SANCOR DO BRASIL

18 Productos Alimenticios LTDA." lo que acredita con el Contrato Social de

19 fecha 4 de agosto de 2008, con facultades suficientes siempre que actúe

20 en forma conjunta con el Sr. Gabriel Gustavo MARTINUZZI la documen-

21 tación relacionada tengo a la vista y le confiere facultades suficientes pa-

22 ra suscribir el documento ad junto, doy fe.-

23

24

25

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 1070



**ACTA DE CERTIFICACION DE FIRMAS**
LEY 404

F 005265046

1  Buenos Aires, 13 de Julio de 2009 . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 156 del LIBRO

6  número 117 , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Gabriel Gustavo MARTINUZZI, DNI

9  18.264.987, quien justifica su identidad de acuerdo al inciso a del articulo

10  1002 del Código Civil y actúa en su carácter de Administrador de la so-

11  ciedad "SANCOR DO BRASIL Productos Alimenticios LTDA." lo que a-

12  credita con el Contrato Social de fecha 4 de agosto de 2008 debidamente

13  Legalizado y Apostillado, la documentación relacionada tengo a la vista y

14  le confiere facultades suficientes para suscribir el documento ad junto,

15  doy fe.-

16

17

18

19

20

21  MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

22

23

24

25



**CUARTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. S. Siebesh et G. Hyrnien _____, en su carácter de Actorany-in-fact A er B domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

CONSIDERANDO:

(a) Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 13 de Junio de 2008, Segunda Enmienda de fecha 24 de Septiembre de 2008 y Tercera Enmienda de fecha 28 de noviembre de 2008, que en copia se adjunta como Anexo A, cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Cuarta Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de incorporar la cláusula de Fianza.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente Cuarta enmienda al Contrato Marco (la "Cuarta Enmienda"), de conformidad con las presentes Cláusulas:

1.    Incorpórase la Cláusula SEXTA BIS del Contrato, la cual quedará redactada del siguiente modo:

*SEXTA BIS: FIADOR.*
*Por este acto, **SANCOR DO BRASIL Productos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Gabriel Gustavo Martinuzzi, en su carácter de Apoderado Gerencia Financiera y Administrador (Art.11) respectivamente, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, (el "FIADOR"); se constituye en fiador solidario, codeudor solidario, liso llano y principal pagador de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUANTE o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier acreedor con miras a un arreglo general de pagos o cambiar el cronograma de endeudamiento, o les sea transformen en insolventes o quebrados, o les sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los 15 días de haber sido decretados. En dicho supuesto, en un plazo de treinta (30) días, el MUTUARIO deberá designar un nuevo garante a satisfacción del MUTUANTE. Vencido el plazo de treinta (30) días sin que el MUTUARIO haya designado un nuevo garante, el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las*






*cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mi, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mi que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO TERCERA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.*

2.      El FIADOR declara que el presente afianzamiento (i) constituye un acto o negocio jurídico que está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebra contando con todas las aprobaciones internas necesarias, sin violación de disposición legal, estatutaria, asamblea ria ni contractual alguna, no siendo necesaria ninguna autorización adicional. En prueba de conformidad firma al pie de la presente.

3.      Con excepción de aquellos términos expresamente modificados por la presente Cuarta Enmienda, los cuales tendrán efecto a partir del día de la fecha, todos los demás términos, condiciones y cláusulas del Contrato Marco, así como los actos ya cumplidos por las Partes en virtud de los mismos, permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, Republica Argentina, por el FIADOR en la Ciudad de San Pablo, República del Brasil, y por el MUTUANTE en la Ciudad de Amsterdan, The Netherland, a los 28 días del mes de Noviembre de 2008.


Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
Nº 7  *Cal 99 83.2.2*
Bs. As. *29-11-2008*


Por: **SANCOR DO BRASIL Productos Alimenticios LTDA.**
Nombre: Mario Magdalena y Gabriel Gustavo Martinuzzi
Carácter: Apoderado Gerencia Financiera y Administrador (Art.11)


Por: **IIG TOF B.V.**
Nombre: Trust International Management (T.I.M.) B.V.
Carácter:      Managing Director

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

1º Tabelião de Notas e Protesto
de Letras e Títulos de Barueri
Comarca de Barueri – Estado de São Paulo
Ubiratan Pereira Guimarães – Tabelião
RECONHEÇO por semelhança 1 firma(s) de(s)
GABRIEL GUSTAVO MARTINUZZI
BARUERI, 05/12/2008                  Em tes...      Da Verdade.

Escrevente Autorizado
Emolumentos:R$ 4,50 - COM VALOR - Impressao:273/731
        ***VALIDO SOMENTE COM SELO DE AUTENTICIDADE***
Selo(s): 418366-AA
Cod. Segurança: 19266617081552

Marcos Roberto Moreira
Escrevente Autor...

Para producir efecto no Brasil
e valer contra terceiros este
documento deverá ser vertido em
vernáculo, registrando-se a tradução
publica (artigo 224/CCB e 148
da Lei 6.015/73).




ACTA DE CERTIFICACION DE FIRMAS
LEY 404

F 004754828

1  Buenos Aires, 28 de Noviembre de 2008 . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 138 del LIBRO

6  número 106 . es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E.

9  8.106.144.- quien justifica su identidad de acuerdo al inci-

10  so a del articulo 1002 del Código Civil y actúa en su ca-

11  rácter de apoderado de la sociedad "SANCOR COOPE-

12  RATIVAS UNIDAS LIMITADAS" con domicilio en Suncha-

13  les, Provincia de Santa Fe, e inscripta en la Matrícula 772

14  del Registro Nacional de Cooperativas, de la Provincia de

15  Santa Fe, Departamento Castellanos, conforme lo acredita

16  con el poder de fecha 23 de junio de 1993, pasado al folio

17  638 del Registro 200 de la ciudad de Sunchales, Provincia

18  de Santa Fe, a cargo del escribano Horacio Remondino, y

19  manifiesta actuar en su carácter de Apoderado Gerencia

20  Financiera de la sociedad "SANCOR DO BRASIL Produc-

21  tos Alimenticios LTDA." lo que acredita con el Contrato

22  Social de fecha 4 de agosto de 2008, con facultades sufi-

23  cientes siempre que actue en forma conjunta con el Sr.

24  Gabriel Gustavo MARTINUZZI la documentación relacio-

25  nada tengo a la vista y le confiere facultades suficientes



 

F 004754828

26

para suscribir el documento ad junto, doy fe.-

27

28

29

30

 

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50

# ANEXO

## TERCERA ENMIENDA AL CONTRATO DE LINEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre

IIG TOF B.V., representado por TRUST INTERNATIONAL MANAGEMENT (T.I.M) B.V., representado en este acto por los Sres. _____, _____, en su caracter de _____, domiciliado en Teleslone 8 - Teleport, Nantaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte, y

SANCOR COOPERATIVAS UNIDAS LIMITADA, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominados las "Partes"; y

CONSIDERANDO

(a)   Que con fecha 30 de Noviembre de 2007, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, enmendado con fecha 11 de Junio de 2008 y 24 de Septiembre de 2008, que en copia se adjunta como Anexo A (el "Contrato Marco") cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Tercera Enmienda.

(b)   Que sobre la base del Contrato Marco, es intención del MUTUARIO requerir al MUTUANTE una línea de crédito tipo revolving a fin de poder requerirle en los términos y condiciones establecidos en el Contrato Marco los desembolsos que estime conveniente de acuerdo a sus necesidades, hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(c)   Que el mecanismo antes descripto permitiría al MUTUARIO requerir periódicamente el flujo de fondos requeridos para financiar sus exportaciones, pudiendo cancelar las Sumas Adeudadas, solicitar nuevos desembolsos y así sucesivamente, siempre que el monto acumulado de toda la Línea de Crédito –incluyendo la requerida en la última Solicitud de Desembolso remitida al MUTUANTE– resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

d.   Que en atención a que gran parte de los Créditos Cedidos han sido aplicados al pago de las Sumas Adeudadas a la fecha, y a efectos de poder remitir nuevas Solicitudes de Desembolso al MUTUANTE y garantizar debidamente las futuras Sumas Adeudadas en virtud de las mismas, es intención del MUTUARIO ceder al MUTUANTE nuevos créditos, los cuales serán eventualmente aplicados al pago de tales Sumas Adeudadas en los términos de la Cláusula QUINTA del Contrato Marco.

En mérito a las consideraciones precedentemente establecidas, las cuales forman parte integrante de la presente, las Partes acuerdan suscribir la presente Tercera Enmienda al Contrato Marco (la "Tercera Enmienda"), de conformidad con los términos y condiciones incluidos en las siguientes cláusulas

1.   Modifícanse las definiciones de "Créditos Cedidos" y "Línea de Crédito" de la Cláusula PRIMERA del Contrato Marco, las cuales quedarán redactadas del siguiente modo

*Créditos Cedidos* significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos

(i)   todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a Fonterra derivada del contrato denominado "EXCLUSIVE PURCHASE AGREEMENT" cuya fotocopia se adjunta al presente Contrato como Anexo I (y las eventuales contratos complementarios y/o reemplazantes de dicho contrato adjunto como Anexo I así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo). Se adjunta asimismo como Anexo II una Declaración Jurada del MUTUARIO con el Pronóstico de ventas mínimas que el MUTUARIO estima realizar a Fonterra durante los primeros 18 (dieciocho) meses de la vigencia del presente Contrato Marco

(ii)   todos los créditos y derechos que le correspondan al MUTUARIO en virtud de la venta de mercadería que el MUTUARIO realice a BARIVEN S.A. c/o PDVSA derivada de la Orden de Compra (Purchase Order) N° 5100062284 de fecha 26 de Marzo de 2008 emitida por BARIVEN c/o PDVSA y aceptada por el MUTUARIO cuya fotocopia se adjunta al presente Contrato como Anexo B (y las eventuales contratos complementarios y/o reemplazantes de dicha orden de compra adjunta como Anexo B así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo)

(iii)   todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realicen a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 31 de Mayo de 2008 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo





todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con BARIVEN S.A. hasta ...

(ii)     todos los créditos actuales y futuros que le son otorgados al MUTUARIO en virtud de las ventas de mercaderías que el MUTUARIO realiza a BARIVEN S.A. con PDVSA y/o sus Afiliadas y/o Subsidiarias, hasta el 31 de Marzo de 2011 y hasta la contractual total de la Línea de Crédito Adeudada, incluyendo, sin limitación, todos los créditos y derechos que corresponden al MUTUARIO derivados del "Acuerdo Preliminar" suscripto entre el MUTUARIO y BARIVEN S.A. con fecha 14 de Noviembre de 2008 y las eventuales contratos complementarios y/o reemplazantes de dicho Acuerdo Preliminar, así como los conocimientos de embarque, facturas y/o remitos emitidos en virtud del mismo. Respecto del Acuerdo Preliminar antedicho en caso de que los créditos derivados excedi-eran del monto, procuren pagos anticipados por parte del Deudor ... o hasta un porcentaje máximo del 25% ... o sobre por reducción del crédito en cuestión ... o pagos anticipados gráfica a percibir de los créditos (pagos debiendo ser abonados dicha ... directamente al MUTUARIO. En este último caso, quedará incluido dentro de los Créditos ... el porcentaje restante del anticipo (25% del monto del crédito como mínimo) el cual deberá ser pagado directamente al MUTUANTE.

**Línea de Crédito** significa la única línea de crédito modalidad revolving, que sujeto a los términos y condiciones de los Documentos de la Operación el MUTUANTE pondrá a disposición del MUTUARIO por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

2     Modifícase la Sección 2.1 (c) de la Cláusula SEGUNDA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

"(c) Monto de los Desembolsos. El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00), en cuyo caso y bajo ninguna situación el MUTUANTE estará obligado ni se verá obligado a entregar sumas ... consumida una suma mayor o igual en razón de la Línea de Crédito.

3     Las modificaciones antes referidas implican la cesión a favor del MUTUANTE de los créditos del MUTUARIO contra BARIVEN N.2 o PDVSA precedentemente descriptos, en los términos de la Cláusula CUARTA del Contrato Marco. Consecuentemente dentro de las 48 hs de suscripto el presente y como condición para cualquier nuevo desembolso bajo el Contrato Marco, el MUTUARIO se obliga a notificar dicha cesión a Bariven S.A. con PDVSA Services Inc. en los términos establecidos en la Cláusula 4.6 del Contrato Marco.

4     Antes del 2 DE Diciembre de 2008, el MUTUARIO se compromete a entregar y endosar a favor del MUTUANTE Warrants por una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada a dicha fecha incluyendo se en el cálculo de dicho porcentaje los Warrants que el MUTUARIO ya ha entregado y endosado a favor del MUTUANTE. Adicionalmente el MUTUARIO a mantener la ratio antes referida (25 % de la Línea de Crédito Adeudada) en todo momento durante la vigencia del Contrato Marco bajo apercibimiento de Mora. Consecuentemente con ello, modifícase la Cláusula SEXTA BIS del Contrato Marco, la cual quedará redactada del siguiente modo:

"CLÁUSULA SEXTA BIS WARRANTS

6BIS 1     Antes del 2 de Diciembre de 2008, el MUTUARIO se obliga a entregar al MUTUANTE Warrants inmobolizados a favor de este último por un monto equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada a dicha fecha, obligándose a mantener los mismos, reemplazándolos de ser necesario conforme se establece en la Siguiente Sección bais 2, por dicho monto durante toda la vigencia del presente contrato Marco.

6BIS 2     El MUTUARIO se obliga a que durante toda la vigencia del Contrato Marco el MUTUANTE cuente con Warrants por un monto no inferior a una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecidos en el art. 2o de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento o ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior en su caso, al de los Warrants anteriores.

6BIS 3     A los de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los conocimientos de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de la mercadería vigente al momento de dicho depósito. El mantenimiento de la cantidad consolidada por los warrants, por los montos y en la forma precedentemente establecida constituye una condición esencial para el mantenimiento de la presente enmienda. Consecuentemente la falta de acuerdo --por cualquier motivo que fuere-- en la calidad y/o cantidad de mercadería a ser depositada producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula NOVENA del presente Contrato.

6BIS 4   El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs de decretada la misma. El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiera ocasionar al MUTUANTE.

6BIS 5   En Caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.

6BIS 6   Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria (Warrantera) de la mercadería indicada en por los mismos como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora."

5.   Modifícase la Sección 7.1.22 de la Cláusula SEPTIMA del Contrato Marco, las cuales quedarán redactadas del siguiente modo:

"7.1.22   Que a partir del 2 de Diciembre de 2008 y en todo momento durante la vigencia del presente Contrato el MUTUANTE contará con Warrants por una suma equivalente al veinticinco por ciento (25 %) de la Línea de Crédito Adeudada."

6.   Con excepción de aquellos términos expresamente modificados por la presente Tercera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, a los 28 días del mes de Noviembre de 2008, y por el MUTUANTE en la Ciudad de Amsterdam, a los 25 días del mes de Noviembre de 2008.



Por SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: María Magdalena
Caracter: Apoderado

Por IIG TOF B.V.
Nombre: _____
Caracter: _____  Managing Director

Firma/s certificada/s en Foja
N°. P.O.04.75 K8.27
Bs. As. 28/11/08

MARTIN R. ARANA (h)
ESCRIBANO
MAT 4370

9



ACTA DE CERTIFICACION DE FIRMAS

F 004754827

1    Buenos Aires, 28 de   Noviembre   de  2008 . En mi carácter de escribano

2    Titular del Registro Notarial Nº 841

3    CERTIFICO: Que la/s  firma/s                              que obra/n en el

4    documento que adjunto a esta foja, cuyo requerimiento de certificación se

5    formaliza simultáneamente por ACTA número 137                del LIBRO

6    número 106                    , es/son puesta/s en mi presencia por la/s persona/s

7    cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8    la justificación de su identidad. Mario   César   MAGDALENA,

9    L.E.  8.106.144.- quien justifica su i-

10   dentidad de acuerdo al inciso a del ar-

11   tículo 1002 del Código Civil y actúa en

12   su carácter de apoderado de la sociedad

13   "SANCOR  COOPERATIVAS  UNIDAS  LIMITADAS"

14   con domicilio en Sunchales, Provincia de

15   Santa Fe, e inscripta en la Matrícula 772

16   del Registro Nacional de Cooperativas, de

17   la Provincia de Santa Fe, Departamento

18   Castellanos, conforme lo acredita con el

19   poder de fecha 23 de junio de 1993, pa-

20   sado al folio 638 del Registro 200 de la

21   ciudad de Sunchales, Provincia de Santa

22   Fe, a cargo del escribano Horacio Remon-

23   dino, la documentación relacionada tengo

24   a la vista y le confiere facultades sufi-

25   cientes para suscribir el documento ad-




F 004754827

junto, doy fe.-





26

27

28

29

30

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50



SEGUNDA ENMIENDA AL CONTRATO DE LINEA DE CREDITO
PARA LA PREFINANCIACION DE EXPORTACIONES

Entre

**IIG TOF B.V.**, representada por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. [...] en su carácter de [...] domiciliada en Telestone 8 - Teleport (Naritaweg) 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por una parte; y

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado constituida y registrada bajo las leyes de la República Argentina con domicilio en Tucumán 362 - 3 Piso - Capital Federal, República Argentina, representada en este acto la por la Sra. M. [...] Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"; que por otra parte; y

El MUTUANTE y el MUTUARIO conjuntamente denominadas las "Partes"; y

CONSIDERANDO:

(a) Que con fecha 30 de Noviembre de 2007 las Partes suscribieron un Contrato Marco de línea de crédito para la prefinanciación de exportaciones (modificado a su vez por una Primera Enmienda de fecha 11 de Junio de 2008 que en conjunto se designarán con "Anexo A" o el "Contrato Marco"), cuyas definiciones, términos y condiciones se incorporan y consideran en su totalidad a la presente y se tienen por reproducidas en la presente y no estará que estos términos quedan modificadas por la presente Segunda Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco a los efectos de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán estar vencidas las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentes en las exposiciones las cuales forman parte integrante de la presente, las Partes suscriben la presente Segunda enmienda al Contrato Marco (la "Segunda Enmienda") de conformidad con las presentes Cláusulas.

1. Modifícase la Cláusula **PRIMERA** del Contrato Marco las siguientes definiciones:

*Fechas de Vencimiento*: significa las fechas en que deberá para el pago de las Sumas Adeudadas indicadas en cada caso de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente antes del 31 de Diciembre de 2009.

*Plazo de Disponibilidad*: significa el plazo a ser fijado a opción en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2009, durante el cual el MUTUANTE se compromete a mantener disponible la presente Línea de Crédito a favor del MUTUARIO.

2. Con excepción de aquellos términos expresamente establecidos por la presente Segunda Enmienda, todos los demás términos condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta la fecha de la fecha permanecen inalterados, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina; y por el MUTUANTE en la Ciudad de Amsterdam, a los 24 días del mes de Septiembre de 2008.

Por SANCOR COOPERATIVAS UNIDAS LTDA
Nombre: M.[...] Magdalena
Caracter: Apoderado

Por: IIG TOF B.V.
Nombre: Trust International Management (T.I.M.) B.V.
Caracter: Managing Director

Firma certificada con fecha
F 201088271
24-9-2008

9

 ACTA DE CERTIFICACION DE FIRMAS 

# ANEXO

⊦ 001088971

Buenos Aires, 24 de Septiembre de 2008  En mi caracter de escribano

Titular del Registro Notarial Nº 841

CERTIFICO: Que la/s firma/s                    que obra/n en el

documento que adjunto a esta hoja, cuyo requerimiento de certificacion se

formaliza simultaneamente por ACTA numero         133 del LIBRO

numero           102     es/son puesta/s en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se mencionan/n a continuacion, asi como

la justificacion de su identidad: Mario Cesar MAGDALENA L.E. 8.106.144.-

Manifiesta actuar en su caracter de apoderado de la sociedad "SANCOR

COOPERATIVAS UNIDAS LIMITADAS" con domicilio en Sunchales, Pro-

vincia de Santa Fe, e inscripta en la Matricula 772 del Registro Nacional de

Cooperativas, de la Provincia de Santa Fe, Departamento Castellanos,

conforme lo acredita con el poder de fecha 23 de junio de 1993, pasado al

folio 638 del Registro 200 de la ciudad de Sunchales, Provincia de Santa

Fe, a cargo del escribano Horacio Remondino, la documentación relacio-

nada tengo a la vista y le confiere facultades suficientes para suscribir el

documento adjunto, doy fe.-

dentro de los 5 (cinco) días de recibidas por el Deudor Cedido, los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.3**    El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por el Deudor Cedido en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas al Deudor Cedido, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE **mediante** transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés)

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a HG TOF B.V., por contrato de Cesión de Créditos de fecha [...]/2001. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el banco _____ ABA _____ Beneficiario HG TOF B.V., Cuenta N° ___*

**4.4**    Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

**4.5**    La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, y por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.6**    Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión al Deudor Cedido y a obtener la aprobación expresa de este último respecto de la presente cesión mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **ANEXO V**. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará al Deudor Cedido, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante, debiendo el Deudor Cedido (mediante su apoderado o representante legal) firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación del Deudor Cedido en la forma antes

9

indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación al Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario domicilio y su despacho mediante correo internacional  por un servicio que brinde constancia de su entrega y recepción.

4.7      El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que, con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO, el Deudor Cedido rescinda o resuelva los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y el Deudor Cedido.

4.8      El MUTUARIO declara y garantiza al MUTUANTE:

(a)      el cobro de los Créditos Cedidos;

(b)      la forma instrumental de los mismos

(c)      la legitimidad de los Créditos Cedidos, y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d)      que no se encuentra inhibido para disponer de sus bienes;

(e)      que no adeuda suma alguna al Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos;

(f)      que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad.

10

(g)    la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h)    que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo -pero no limitado a- la entrega en tiempo y forma al Deudor Cedido de la mercadería objeto de los Créditos Cedidos.

(i)    que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito

(j)    que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente al Deudor Cedido, debiéndose abstener de vender o facturar los productos comprendidos en el contrato adjunto como Anexo I a terceros distintos del Deudor Cedido, aún cuando contare con el consentimiento de este último.

## CLÁUSULA QUINTA. CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CRÉDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS, RECURSO DEL MUTUARIO.

5.1    El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante

5.2    A los efectos mencionados en la Sección 5.1 antes referida, los fondos del Crédito Cedido depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo

(a)    Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante, dentro de las 48 hs de recibidos a la Cuenta del Mutuario.

(b)    Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar la Suma Adeudada a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso de que los fondos del Crédito Cedido depositados durante tales meses excedan el monto de la Suma Adeudada, el

11

excedente será transferido al MUTUARIO de la forma indicada en el acapite (a) de la presente Sección 5.2. En el caso de que los fondos del Credito Cedido depositados durante tales meses no fueran suficientes para cubrir el importe de la Suma Adeudada, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de la Suma Adeudada, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes al Credito Cedido que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Credito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acapite (a) de la presente Sección 5.2.

5.3    En caso de Mora, la totalidad de los fondos de los Creditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Linea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

5.4    Habida cuenta del recurso del MUTUARIO en la cesión de los Creditos Cedidos al MUTUANTE, en caso de que  por cualquier causa  el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de la Suma Adeudada en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

## CLAUSULA SEXTA: MONEDA DE PAGO.

6.1    El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación  incluyendo el pago de la Linea de Credito Adeudada  deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Linea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviniente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos del Credito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la clausula QUINTA acapite 5.2 a) y c) debera ser necesariamente abonado en Dolares y no en otra moneda. En consecuencia  el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos del Credito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la clausule QUINTA acapite 5.2 a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se

12

cancelen en Dolares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

**6.2** En atención a lo dispuesto en la Cláusula 6.1, en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometida (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dolares para el caso del MUTUARIO y la transferencia de los fondos del Crédito Cedido que el Deudor Cedido deposite en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2 a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

**6.2.(a).** Mediante la compra sea Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), de cualquier título en Dolares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dolares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación, o bien

**6.2.(b).** Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dolares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dolares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dolares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación, o bien

**6.2.(c).** En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago, o bien

13

6.2.(d). Mediante cualquier otro procedimiento existente en la República **Argentina** o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

6.3   Queda expresamente establecido que en cualquiera de las alternativas **detalladas en** 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTUANTE en su caso) sólo se consideraran pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

6.4   Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a)   a 6.2.(d) precedentes serán **pagados** por el MUTUARIO (o por el MUTUANTE en su caso)

6.5. Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquel al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, **la obligación de pago** del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación solo se considerara cancelada si en el Día Hábil siguiente a aquél en que el MUTUANTE (o el MUTUARIO en su caso) hubiese recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el **MUTUARIO** en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados, fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independiente de tal sentencia, indemnizar al **MUTUANTE** (o al MUTUARIO en su caso) de esa perdida.

## CLAUSULA SEPTIMA:   MANIFESTACIONES   DECLARACIONES   Y COMPROMISOS DEL MUTUARIO.

7.1.   Manifestaciones y Declaraciones del MUTUARIO.

A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la  Línea de Crédito, el MUTUARIO manifiesta y declara, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente

7.1.1.   Que el MUTUARIO  es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades

14

necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

7.1.2. Que el MUTUARIO no está obligado a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a, socios, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

7.1.3. Que el Contrato Marco y las Garantías n) constituyen actos o negocios jurídicos que el MUTUARIO está legalmente autorizado y capacitado para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

7.1.4. Que el MUTUARIO y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

7.1.5. Que el MUTUARIO no tiene pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

7.1.6. Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

7.1.7. Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza que impida y/o prohiba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad

15

de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**7.1.8.** Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**7.1.9.** Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco, acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que ha proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**7.1.10.** Que el balance del MUTUARIO al 30 de Junio de 2007, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2007 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

**7.1.11.** Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

**7.1.12.** Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**7.1.13** Que conforme el conocimiento actual del MUTUARIO, el Deudor Cedido no se encuentra en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

**7.1.14.** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tiene y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

16

**7.1.15.** Los Documentos de la Operación estan, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas;

**7.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el cumplimiento de las operaciones previstas en los Documentos de la Operación;

**7.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**7.1.18** Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**7.2     Compromisos y Obligaciones del MUTUARIO.**

Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO se compromete firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

**7.2.1.** A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula NOVENA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

**7.2.2.** A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que el MUTUARIO, según el caso, los dispute por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

**7.2.3.** A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías, (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes,

17

prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías; y

7.2.4. A no realizar actos que constituyan o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, o (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

7.2.5. A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

7.2.6. A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoría de primer nivel y prestigio internacional, (ii) estados contables semestrales, (iii) estados contables trimestrales, y (iv) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos semestres; los estados contables (iii) deberán ser presentados dentro del los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iv) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

7.2.7. A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implica, entre otras cosas, la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

18

**7.2.13.** A no reducir su capital, y

**7.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**7.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco, y

19

**7.2.16.** A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

**7.2.17.** A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

**7.2.18.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3499 del BCRA y/o sus complementarias y modificatorias.

**7.2.19.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**7.2.20.** A realizar sus mejores esfuerzos para causar que el Deudor Cedido deposite en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**7.2.21.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales, y

**7.2.22.** A remitir mensualmente al MUTUANTE, antes del 5° día hábil de cada mes de vigencia del presente Contrato Marco un informe con el pronóstico escrito de venta de sus productos al Deudor Cedido durante los dieciocho (18) meses subsiguientes a la fecha de entrega del informe antes referido.

20

**7.2.23** A remitir al MUTUANTE, además del señalado en la Sección 7.2.22 **precedente**, copia de todo informe, documento, reporte, orden de compra, factura, y/o **pronóstico de ventas** que remita al Deudor Cedido y/o que reciba del Deudor Cedido.

## OCTAVA:   MORA.

**8.1**   La Mora del MUTUARIO en el cumplimiento de las obligaciones pactadas en el presente Contrato Marco -incluyendo sin limitación el pago en tiempo y forma cualquier Suma Adeudada- se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna, por el acaecimiento de cualquiera de los Eventos de Incumplimiento. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora,  el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios.

**8.2**   El MUTUANTE también tendrá la facultad de considerar la Mora automática del MUTUARIO, considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las sumas adeudadas en los siguientes **Eventos de Incumplimiento**:

  (a) si el MUTUARIO incumpliese con el pago en tiempo y forma de la **Línea de Crédito Adeudada**,

  (b) si un tercero pidiere la quiebra del MUTUARIO, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente,

  (c) si el MUTUARIO, el Deudor Cedido y/o pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos,

  (d) si el MUTUARIO y/o sus incurrieren en cesación de **pagos**, aún sin efectuarse los trámites antedichos,

  (e) Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares Estadounidenses DOS MILLONES (US$

21

2.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los treinta (30) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible; o

(f)   si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad parcial o total, por parte del MUTUARIO, en las declaraciones contenidas en la Cláusula SEPTIMA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(g)   si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(h)   si el MUTUARIO y/o sus modificasen de cualquier forma su composición accionaria;

(i)   si el MUTUARIO incumpliere cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(j)   si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con el Deudor Cedido;

(k)   si —con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas- el MUTUARIO y/o el Deudor Cedido terminan el contrato que causa los Créditos Cedidos ;

(l)   si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(m)   Si se dictaren una o más sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

22

(n)   Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

8.3   En adición a lo dispuesto en la Sección 8.1 precedente, la Mora del **MUTUARIO** por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el **MUTUARIO** y el **MUTUANTE**. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 8.1 precedente- y de cualquier otra obligación contractual entre el **MUTUARIO** y el **MUTUANTE**. En tal sentido, producida la Mora del **MUTUARIO**, ya sea por falta de pago de las Sumas Adeudadas por parte del **MUTUARIO** o por el acaecimiento de cualquiera de los eventos de Incumplimiento detallados con anterioridad, el **MUTUANTE** a su exclusivo criterio, podrá proceder sin mas a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el **MUTUARIO** y el **MUTUANTE**. Asimismo, en tal supuesto el **MUTUANTE** quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del **MUTUARIO** depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el **MUTUARIO** y el **MUTUANTE**.

## NOVENA: GASTOS.

9.1   Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario), relación y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del **MUTUARIO**. El **MUTUARIO** se compromete a abonar al **MUTUANTE** en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

9.2   Todos los pagos bajo el Contrato Marco deberán ser hechos por el **MUTUARIO** libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el **MUTUARIO** sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el **MUTUARIO** deberá realizar tantos pagos adicionales al **MUTUANTE** como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el **MUTUANTE** reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El **MUTUARIO** deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y deberán obtener y suministrar al **MUTUANTE** copia certificada de los comprobantes que correspondan respecto de dicho pago.

23

9.3    El MUTUARIO se obliga a cumplir en tiempo y forma a su exclusivo costo y cargo con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

9.4    El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

### DÉCIMA: CESIÓN DEL CONTRATO MARCO.

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE, o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

### DÉCIMO PRIMERA:      VIGENCIA. INDEMNIDAD.

11.1    El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplimenten en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas NOVENA, DÉCIMO PRIMERA y DÉCIMO TERCERA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

11.2    El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento de las obligaciones previstas en ellos, o de la celebración de las operaciones previstas en ellos; (ii) el Crédito Cedido adeudado con más sus intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial,

24

relacionado con cualquiera de las circunstancias previstas en esta Cláusula 11.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

DÉCIMO SEGUNDA: AUTORIZACIÓN

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.

En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 9 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

DÉCIMO TERCERA: JURISDICCIÓN Y LEY APLICABLE

13.1    El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

13.2    El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

13.3    Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés en la República Argentina.

13.4    El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

25

**13.5**   Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 13.8 de la presente Cláusula.

**13.6**   Las notificaciones efectuadas de la manera establecida en la Sección 13.4 de la presente Cláusula serán consideradas personales, válidas recibidas y obligatorias para el MUTUARIO

**13.7**   El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE, y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total y/o parcial comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole.

**13.8**   Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación

MUTUARIO: 1) 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003 - USA

2) Tacuari 202 - 3º Piso - Capital Federal, República Argentina

MUTUANTE:   Telestone 8    Teleport, Naritaweg, 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands

**DECIMO CUARTA: FIRMAS Y RECEPCION DE INSTRUMENTOS.**
Se firman 2 (dos) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE y 1 (un) juego en poder del MUTUARIO.

**DECIMO QUINTA: LUGAR Y FECHA.**

26

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina y por el
MUTUANTE en Amsterdam, a los 30 días del mes de Noviembre de 2007.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Firma/s certificada/s en Foja
Nº ..............................................
Bs. As. ..........................................

Por: IIG TOF B.V.
Nombre: _____ Trust International Management (T.I.M.) B.V.
Carácter _____ Managing Director

27



ACTA DE CERTIFICACIÓN DE FIRMAS

F 003850242

1  Buenos Aires,  30 de   Noviembre  de  2007 . En mi carácter de Escribano

2  Titular del Registro Notarial N° 643

3  CERTIFICO. Que la/s  firma/s                         que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación de su/s

5  firma/s que se formaliza simultáneamente por ACTA número        42       del

6  LIBRO número        86         , e/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s  de identidad se menciona/n a continuación y de

8  cuyo conocimiento doy fe.  Mario Cesar MAGDALENA  L.E  8.106.144.- Mani-

9  fiesta actuar en su carácter de apoderado de la sociedad SANCOR COO-

10  PERATIVAS UNIDAS LIMITADAS  de acuerdo a la documentación que me

11  exhibe y lo confiere facultades suficientes para suscribir el documento ad-

12  junto



ANEXO I.
COPIA "Exclusive Purchase Agreement"

28

ANEXO II
**Declaración Jurada con Pronóstico de ventas Ministas del MUTUARIO**

29

ANEXO III

Modelo de Pagaré (sin protesto)

Buenos Aires, __ de _____ __ de 200_

US$ _____

A la vista, por igual valor recibido, _____ una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en _____ República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a _____ (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en _____, República Argentina, la suma neta de Dólares Estadounidenses _____ CON __/100 (US$ _____ ), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales) incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la fecha de su Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagarés que el Deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor – además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del __ % anual, calculados desde la fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

El Deudor declara y garantiza que la deuda asumida mediante el presente Pagaré constituye una obligación válida, legal y exigible de su parte, ejecutable contra el Deudor de conformidad con los términos aquí contenidos, y dicha obligación se encuentra pari passu a la altura de todas las demás obligaciones asumidas por el Deudor. La obligación documentada en este Pagaré tiene carácter indivisible y se pacta la solidaridad en caso de pluralidad de deudores.

a) Todas las desavenencias que deriven de este Pagaré o que guarden relación con éste serán resueltas definitivamente ante los Tribunales Ordinarios de la Ciudad de Buenos Aires. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

b) Nada de lo dispuesto precedentemente en el presente pagaré afectará el derecho del Acreedor a iniciar procedimientos legales o de cualquier otra forma demandar al Deudor en cualquier otra jurisdicción que el Acreedor considere apropiada.

c) Todas las notificaciones judiciales y/o extrajudiciales relacionadas con el presente Pagaré deberán ser remitidas a los domicilios indicados a continuación.

Deudor:
Acreedor:

d) Las notificaciones efectuadas de la manera establecida en el acápite "c" del presente pagaré serán consideradas personales, válidas, recibidas y obligatorias para el Deudor.

e) El Deudor irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en este pagaré que intervenga en cualquier pleito, acción o procedimiento iniciado por el Acreedor, y en especial, el Deudor renuncia a oponer cualquier defensa o alegación de incompetencia o inconveniente foro, respecto del tribunal que intervenga en tal acción, juicio o procedimiento, y en general a oponer cualquier defensa que no sea la de pago documentado.

Deudor

30

Por _____
Nombre: _____
Carácter: _____

## ANEXO IV

### MODELO DE SOLICITUD DE DESEMBOLSO

Buenos Aires, ___ de _____ de 2007

Sres.
IIG TOF B.V.
_____

De nuestra consideración:

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ___ de _____ de 2007 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula _____ del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos.

(i)  El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____ )

(ii) La/s Fecha/s de Vencimiento del desembolso antes requerido serán la/s siguiente/s:

**Fecha Vto** _____ **Moneda e Importe**

___/___/___                 U$S ____
___/___/___                 U$S ____

(iii) La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses _____ ), comprensiva del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas

(iv) Adjuntamos a la presente un Pagaré a vuestro favor pagadero a la vista, por la suma total de US$ ____ (Dólares Estadounidenses _____ )

**Fecha Emisión** _____  **Fecha Vto** _____  **Moneda e Importe**

___/___/___     A la vista     U$S

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso requerido a la Cuenta del Mutuario indicada en el Contrato Marco.

Sin otro particular, saludamos a Uds. atentamente.

Nombre:
Carácter:

31

ANEXO V
MODELO DE NOTIFICACION AL DEUDOR CEDIDO

Buenos Aires, _____ , __ 2007

Messrs.:
**FONTERRA CO-OPERATIVE GROUP LIMITED ("FONTERRA")**

Dear Sirs:
We address to you in order to give you notice of the Loan and Assignment Agreement dated _____ __ ,
200_, executed between **SANCOR COOPERATIVAS UNIDAS LTDA.** ("**SANCOR**") and **IIG TOF B.V.,**
**represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.** ("**IIG TOF BV**"), whereby **SANCOR**
has assigned and transferred to IIG TOF BV, and IIG TOF BV has accepted and received all the rights and
credits (both credits existing at present or credits that may exist in the future) derived from all the proceeds
derived from the EXCLUSIVE PURCHASE AGREEMENT executed between **FONTERRA** and **SANCOR** on
October 01st, 2007, the amendments and renewals thereof. Save for the assignment of proceeds hereinbefore
mentioned, IIG TOF BV shall have no right or lien over the Products referred to in said EXCLUSIVE
PURCHASE AGREEMENT, which shall remain the property of SANCOR or FONTERRA.

Therefore, SANCOR and IIG TOF BV hereby confirm that pursuant to the terms and conditions of the
aforementioned Loan and Assignment Agreement all the sums and credits hereinabove referred –including,
without limitation, the credits derived from the invoices and other documentation that **SANCOR** submit to you
as a consequence of said commercial transactions-, are to be fully paid to IIG TOF BV by wire transfer of the
corresponding funds to the following bank account

The aforementioned Assignment Agreement shall not transfer and/or modify the liability of **SANCOR** derived
from the referred commercial transactions and business operations. Thus, SANCOR remains being fully and
exclusively responsible for any and all the obligations derived thereof.

Sincerely yours,

By: SANCOR COOPERATIVAS UNIDAS LIMITADA
Nombre: Mario Magdalena
Caracter: Apoderado

By: IIG TOF B.V., **represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**
Nombre:
Caracter:

Acknowledged and accepted:

FONTERRA CO-OPERATIVE GROUP LIMITED
Name:
Capacity:

32

ANEXO II - DECLARACIÓN JURADA CON PRONÓSTICO DE VENTAS MIN-MAS
Pronóstico de ventas (en miles)