enquiry, this must be negotiated on a case by case basis.

d    conduct the business of selling the Products to Customers in an orderly and businesslike manner and in accordance with all applicable laws, regulations and requirements of any governmental or regulatory authority;

e.   sell the Products in the Territory only under the brand names and trademarks of SanCor and/or any of its Associates; and

f.   be responsible for and will pay for all of its own administrative costs and expenses associated with its marketing of the Products as sales agent in accordance with this Agreement.

g.   provide to SanCor together with the Order the following information:

(i)    terms and conditions of sale of Products;

(ii)   quantity and specification of Products;

(iii)  term and condition of delivery and shipment of Products, including country of destination; and

(iv)   SanCor shall inform Fonterra within 4 (four) working days as from reception of the Order whether SanCor is precluded by the laws of Argentina from selling to that country of destination and/or any other legal impediment that may arise.

7.2  Fonterra will provide reasonable advice and technical assistance required to manufacture and supply the Products in accordance with the Specification. All such assistance will be at a cost to SanCor at an agreed rate on a case by case basis.

8    SanCor's Obligations

8.1  Information to facilitate sales: SanCor shall provide Fonterra with all necessary written information relevant to the sale of the Products including details of, Specification, health, legal and regulatory information and approvals and such other information as Fonterra may reasonably require to carry out its obligations under this Agreement. SanCor shall ensure that all information provided to Fonterra is accurate, current and kept up to date.

8.2  No Agency:  SanCor shall not describe itself as Fonterra's agent or representative for the sale of the Products in the Territory, notwithstanding that if SanCor initiates a sourcing opportunity in the Territory on behalf of Fonterra, SanCor will be entitled to a commission on such Products equivalent to the Commission.

10

8.3 **Compliance:** It shall be the sole responsibility of SanCor to ensure that:

a. the Products comply with the Specifications, and with all the Product descriptions and information provided by SanCor to Fonterra or to a Customer;

b. all documentation, labeling and other requirements to ensure the Products are properly and promptly delivered to Customers are complied;

c. the Products comply with all relevant health, agricultural, legal and regulatory requirements in the country of manufacture and in the Territory;

d. the Products comply with the requirements of a Customer's country of import where specified (including without limitation any product registrations with relevant authorities that may be required but excluding any obligations such as customs clearance where customs clearance is the responsibility of the Customer under the terms of sale);

e. all Products are fit for their intended purpose (which, unless otherwise expressly agreed by both parties, shall be fit for human consumption); and

f. all Products can be traced as to source and batch in the event of any recall issues arising and adequate Product samples (to the reasonable satisfaction of Fonterra) are kept and properly stored.

8.4 **Access to Facilities:** SanCor will allow Fonterra access to the SanCor manufacturing facilities as necessary, during the Term of the agreement to inspect those facilities to ensure that the Products are being produced in accordance with the Specifications.

8.5 **Recovery of Customer Payments:** If SanCor receives all or part payment from a Customer in respect of an invoice issued by Fonterra in accordance with clause 3.2, SanCor shall immediately notify Fonterra and remit such payment to Fonterra provided however that SanCor will be able to set-off such payment with any amount owed by Fonterra to SanCor in relation to the same transaction. Failure of SanCor to comply with these obligations shall entitle Fonterra to recover any amount paid by Fonterra to SanCor in respect of such sale.

8.6 **Freight:** As required SanCor will act on behalf of Fonterra in negotiating freight for product exported from Brasil, Argentina and Uruguay.

9 **Reporting, communication**

9.1 **Reporting and communication procedure:** The parties shall agree on reasonable reports, meeting and other communication processes for the purpose of discussing sales activities, obtaining market feedback and generally reviewing performance of both parties. Each party shall participate in good faith in all such meetings.

9.2 **Quarterly meetings:** Without limiting clause 7.1, the parties will meet on a quarterly basis to discuss general performance and other such issues as may arise.

9.3 **Reports:** Fonterra will provide to SanCor quarterly reports containing such marketing and sales information as may be appropriate. These reports shall include pricing information for shipments of comparable dairy products from New Zealand.

10 **Intellectual Property**

10.1 **SanCor Trademarks:** Where the Products bear the name, logo and/or other proprietary marks of SanCor and/or any of its Associates or parent companies ("SanCor Trademarks"), Fonterra is authorised to promote and sell the Products in the SanCor packaging and by reference to the SanCor Trademarks. Fonterra will use or refer to the SanCor Trademarks only for the purpose of sale of the Products in accordance with this Agreement and acknowledges that the SanCor Trademarks remain the property of SanCor and that Fonterra's use of the SanCor Trademarks does not create any separate rights of Fonterra in the SanCor Trademarks. Fonterra will not contest the ownership of the SanCor Trademarks and not use or attempt to register the SanCor Trademarks in any country.

10.2 **Indemnity:** SanCor will indemnify Fonterra and keep Fonterra indemnified from and against any and all claims, demands, actions and proceedings ("Claims") which are made or brought against Fonterra by any third party, that the use of the SanCor Trademarks or the sale, promotion or use of the Products bearing the SanCor Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

10.3 Fonterra will indemnify SanCor and keep SanCor indemnified from and against any and all Claims which are made or brought against SanCor by any third party that the use of the Fonterra Trademarks or the sale, promotion or use of the Products bearing the Fonterra Trademarks infringes upon the rights of that or any other third party, provided that such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such

12



claim, loss or damage.

10.4 **Fonterra Trademarks:** Use by Fonterra of its sales network for the purposes of this Agreement does not give SanCor any rights whatsoever in Fonterra's sales network or in any of the names logos and/or other proprietary marks of Fonterra or its Associates ('Fonterra Trademarks'). SanCor is not authorised to use the Fonterra Trademarks in relation to any sale or promotion of the Products or any other products except with the express written agreement of Fonterra on a case by case basis. SanCor will not contest the ownership of any Fonterra Trademarks and not use or attempt to register the Fonterra Trademarks in any country.

## 11 Liability

11.1 **General Indemnity:** Each party (the 'indemnifying party') will indemnify and keep indemnified the other party from and against any direct loss, damage or liability (including legal fees and costs on a solicitor/client basis) suffered or incurred by that other party resulting from breach of this Agreement by the indemnifying party including any act, neglect or default of the indemnifying party's agents and employees.

11.2 **Excluded:** Neither party shall be liable to the other for any loss of profits or loss of income or savings or for any indirect or consequential loss or damage.

11.3 **SanCor indemnity:** SanCor shall indemnify and hold Fonterra harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by Fonterra arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects, or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of SanCor, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that Fonterra's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

11.4 **Fonterra Indemnity:** Fonterra shall indemnify and hold SanCor harmless against all claims, liabilities, damages and expenses (including legal expenses incurred in defending and/or resisting any such claim) howsoever suffered or incurred by SanCor arising from claims from third parties relating to delivery or non delivery of the Products, the quality of the

13

Products (including without limitation whether the Product meets or does not meet the Specification, has latent defects or is fit for purpose), the storage, handling, packaging or shipment of the Products by or on behalf of Fonterra, the intended use of the Products, and any compliance with or failure to comply with the terms and conditions of the contract of sale or this Agreement, whether such claims are made during or after termination of this Agreement. Such indemnity shall not apply to the extent that SanCor's own negligence or breach in performing its obligations under this Agreement is the direct cause of such claim, loss or damage.

12   Confidentiality

12.1   Hold confidential: The parties acknowledge and agree that:

a.   the provision or disclosure by one party ("Disclosing party") to the other party ("Receiving party") intentionally or otherwise of marketing plans, manufacturing and technical information, pricing information and other matters arising from or relating to the supply of the Products or the business affairs of a party for the purposes or in connection with this Agreement in whatever form (the "Confidential Information") is confidential and of substantial value to and the property of the Disclosing party;

b.   the Receiving party does not have any claim, right, title, property or other interest of any kind or nature in the Confidential Information; and

c.   the Receiving party shall hold and maintain the Confidential Information in strictest confidence and in trust for the sole and exclusive benefit of the Disclosing party

12.2   Specific Information: Fonterra has been engaged by SanCor due to Fonterra's international marketing network and experience in the sale of dairy products. Fonterra will be using that experience and it customer lists and contacts in marketing the Products to its existing and new customers. It is acknowledged by SanCor that all such customer lists are Fonterra's Confidential Information

12.3   Excluded: For the purposes of this Agreement. "Confidential Information" shall not include any information which:

a.   is published or otherwise becomes generally available to the public other than as a result of disclosure by the Receiving party; and

b.   becomes available to the Receiving party on a non-confidential basis from a source other than the Disclosing party provided that such source is not itself in breach of any obligation of confidentiality.

12.4   Survival: The obligations created under this Agreement to preserve the confidentiality of information disclosed by each party to the other shall not be

extinguished by and shall expressly survive termination of this Agreement during the period of those (3) years after the Date of Termination.

### 13  Force Majeure

13.1  **Force majeure:** Neither party shall be liable to the other for any failure to fulfil or perform any of its obligations under this Agreement, other than an obligation to pay money, if fulfilment has been delayed, hindered or interfered with, curtailed or prevented by any circumstance whatsoever which is beyond that party's reasonable control including without limitation where such failure is caused by war, civil commotion, hostility, Act of God, outbreak of disease, or governmental regulation or direction.

13.2  **Notice:** A party seeking relief from its obligations under this Agreement shall forthwith; give notice to the other party of such impediment and its effects on the party's ability to perform. Notice shall also be given when the ground of relief ceases. Failure to give notice makes the failing party liable in damages for loss which otherwise could have been avoided.

13.3  **May terminate:** No curtailment or cessation of delivery of the Products pursuant to this clause 13 shall operate to extend this Agreement. If the curtailment or cessation of the delivery of the Products continues for more than 60 days either party may terminate this Agreement by written notice.

### 14  Dispute Resolution

14.1  Before commencing any legal or administrative proceedings in respect of any dispute arising in respect of, or in connection with, this Agreement (including the validity, breach or termination of it) ("Dispute"), a party must give the other party notice of the Dispute.

14.2  Following receipt of a notice under clause 14.1, each of the parties' Relationship Managers must meet to discuss the Dispute within ten Business Days of receipt of notice of the Dispute, with a view to achieving, a resolution of the Dispute within 20 Business Days of receipt of that notice or such longer period as the Relationship Managers agree in writing

14.3  If the Relationship Managers fail to resolve the Dispute within 20 Business Days of notice of the Dispute, either party may take such legal action, including the commencement of legal proceedings, as is deemed appropriate or necessary by it to resolve or determine the Dispute in accordance with this Agreement or at law

14.4  A party is not bound by clause 14.2 if the other party does not comply with that clause.

14.5  Nothing in clause 14.1 limits the rights of either party to seek interlocutory relief in respect of this Agreement or the other party's obligations under it.

15



**15   Termination**

**15.1   Acts of default.** Either party may terminate this Agreement immediately, if the other party:

   a.   breaches a provision of this Agreement and fails to remedy that breach within 30 days of written notice being given.

   b.   is, becomes, continues to be, or is deemed to be, insolvent or bankrupt; in spite of this, neither party does not have any other claim, right, title, property or other interest of any kind or nature.

   c.   makes an assignment for the benefit of, or enters into or makes any arrangement or composition with, its creditors; in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature.

   d.   goes into receivership or has a receiver, trustee and/or manager (including a statutory manager) appointed in respect of all or any of its property;

   e.   is the subject of any resolution passed, or any proceeding commenced, for its winding up or liquidation (other than for the purpose of a solvent reconstruction); in spite of this, neither party has any other claim, right, title, property or other interest of any kind or nature; or

   f.   assigns the benefits of this Agreement without consent of the other party except as otherwise provided herein.

**16   Miscellaneous**

**16.1   Interest:** Where any amount due from SanCor to Fonterra or its Associates is not paid by the due date, or where Fonterra is requested by SanCor to pay in advance against Product, then Fonterra may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

**16.2   Where** any amount due from Fonterra to SanCor or its Associates is not paid by the due date, SanCor may charge interest thereon from the due date of payment until payment in full or from the date of the prepayment to the date payment would ordinarily be due (as the case may be). The interest rate will be calculated according to weighted average cost of capital of Fonterra's ingredients business plus 2% at the time the payment is due or the prepayment is made.

**16.3   Waiver:** No failure on the part of either party to exercise, and no delay by

either party in exercising, any right under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.

16.4 **Compliance With Applicable Laws:** Each party shall comply with all applicable laws or regulations relating to the performance of its obligations under this Agreement and any transaction related to it, including without limitation, obtaining all necessary licences, permits, authorisations, and approvals required from any Governmental, provincial, or local department or agency applicable to the performance of its duties in this Agreement.

16.5 **Severable Agreement:** If any provision in this Agreement is held invalid or unenforceable in whole or in part then such invalidity or unenforceability shall affect only such provision or part thereof. To the extent legally permissible, an arrangement which reflects the original intent of the parties shall be substituted for such invalid or unenforceable provision.

16.6 **Counterparts:** This Agreement may be executed in two or more counterparts and may be executed on the basis of an exchange of facsimile copies.

16.7 **Amendments:** This Agreement may only be altered in writing signed by all the parties.

16.8 **Notices:** Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed duly given if given by personal service or sent by letter, email or facsimile addressed to the party to whom it is to be delivered at their address set out below or to such other address as that party shall have most recently notified in writing. Any notice served in accordance with this clause shall be deemed to have been duly served:

a. in the case of personal delivery, upon actual delivery to the correct address during the hours 8.30 am to 5.00 pm on a Business Day;

b. in the case of service by post 15 days after posting the same in a correctly addressed envelope;

c. in the case of transmission by fax or email on the next Business Day at the place of receipt of the fax or email.

Address for Fonterra:   Fonterra Limited
Fonterra Centre
9 Princes Street
Private Bag 92032
Auckland
New Zealand
Attn: General Counsel and Company Secretary

17

Phone:  64 9 374 9036
Fax:    64 9 379 8281

Address for SanCor:     SanCor Cooperativas Unidas Limitada
                        Tenente General Richieri 15
                        S2322FYA Sunchales
                        Santa Fe
                        Argentine.]
                        Attn:
                        Phone:
                        Fax:

16.9 **Entire Agreement**:  This Agreement constitutes the entire agreement between the Parties in relation to its subject matter and supersedes and cancels any previous agreements and arrangements in respect of the services. The Parties have signed an Exclusive Sales and Marketing Agreement in December 2004 ("2004 Agreement"), which they agree, is cancelled as of 1 August 2007. The parties acknowledge and agree that neither party has any claim, right or title emerging from the 2004 Agreement.

16.10 **Sub-Agency**:  Fonterra may appoint a sub-agent with the prior written approval of SanCor but Fonterra shall remain fully responsible for meeting its obligations under the Agreement notwithstanding such appointment.

16.11 **Assignment**: Except as provided for in this clause, no party may assign this Agreement without the prior written consent of the other party.

16.12 **Relationship between the Parties**: Neither party shall have the authority to create or assume any obligations of any kind (whether express or implied) for or on behalf of the other party except as permitted by this Agreement. Nothing in this Agreement shall constitute or be deemed to constitute a partnership between the Parties for any purpose whatsoever.

16.13 **Governing Law**: The formation, validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of New Zealand. The parties irrevocably agree that the Courts of New Zealand shall have the non-exclusive jurisdiction to hear and determine all disputes under or in connection with this Agreement. The parties irrevocably waive any objections to New Zealand as the forum for proceedings on the grounds of forum non-conveniens or any similar grounds

SIGNED for and on behalf of

FONTERRA LIMITED

Signature

KALVIN WICKHAM
Name

1st OCTOBER 2007
Date

SIGNED for and on behalf of

SANCOR COOPERATIVAS UNIDAS LIMITADA
Signature

Claudio H. Grodnitz
Name

23 October 2007
Date

**SCHEDULE 1**

1. **PRODUCTS AND TERRITORIES**

   **Territory:**
   All countries of the world except Argentina and sales or distribution of Products to LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS SOCIEDAD ANONIMA ("LA CASA S.A") or any another Venezuelan entity to be supplied by SanCor under the Financial Agreement signed between SanCor and BANCO DE DESARROLLO ECONOMICO Y SOCIAL DE VENEZUELA (BANDES) in February 2007 or any other Agreement subscribed by SanCor with the Government of Venezuela through any of its entities.

   **Products:**

   Whole Milk Powder in 25 Kgs. Bags
   Whole Milk blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
   Skimmed Milk Powder in 25 Kgs. Bags
   Skimmed Milk Powder blended with Maltodextrine or vegetable fat in 25 Kgs. Bags
   Butter in 25 Kgs. Blocks.
   Brine Salted cheese including Gouda by agreement
   Mozzarella
   Non gas flushed regular whole milk powder in 25kg bags

   SanCor agrees that no Product that has failed to meet the original Specification, or such other specification as may have been agreed in writing between the parties, shall be re-processed by SanCor as product to be sold to Fonterra pursuant to his Agreement.

   Products in consumer formats are specifically excluded from this Agreement, including 3.6kg loaves of gouda and mozzarella for sale via SanCor's existing distributors within Latin America.

2. **SUPPLY AND FORECASTING REGIME**

   On or before the 5th Business Day of the month, Fonterra shall provide SanCor with a rolling 18 month forecast of customer demand, by customer, by month. This forecast will include customer D1 (uncunstrained demand), D1 contracted, previous AD (deduced availability) and previous AU (unconfirmed availability).

   Transparent customer payment term information will also be provided.



20

When this information is available from SAP APO Fonterra and SanCor will open the monthly process with a demand review meeting to capture variances from previous months and to set a baseline planning demand

Once baseline planning demand is agreed SanCor will have 5 Business Days to use this demand signal to make product mix decisions and will propose a customer level supply plan (availability plan)

SanCor and Fonterra will meet on 10th Business Day of the month to sign off this availability plan.

Key outcomes of SanCor-Fonterra S&OP meeting.
- Formal milk supply and market update include forecast base price information.
- KPI review and corrective actions.
- Sign off of availability plan for release to NZ S&OP and market.
- Sales plan
- Inventory targets
- Agreed base pricing for SanCor products
- Marginal pricing for unforecasted production

In the case that during the monthly meeting an agreement cannot be reached between the parties on optimal placement opportunities for Product, SanCor may, on an exceptional basis, put forward for discussion proposals of business from Third Parties. If no suitable alternative business can be found through the Fonterra network, Fonterra will provide written approval for SanCor to execute these sales directly. No such sales may proceed without prior written approval.

3   RELATIONSHIP MANAGERS

Fonterra:     Emma Parsons

SanCor:     Santiago Aon

4.   PRODUCT SPECIFICATIONS

[To be completed]



**✳ PDVSA**

BARIVEN, S.A.
c/o PDVSA Servicios, Inc.
Purchasing Agent (PROC)
1293 Eldridge Parkway
Houston, Texas 77.17
United States of America

**Purchase order**

**5100062284**

DATE            :March, 26 2008
CONTACT PERSON  :Jose Camacho
TELEPHONE USA   :(281)5886478
E-MAIL ADDRESS:2815827511

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km .5

DON TORCUATO
ARGENTINA
POSTAL CODE: 00000 PO BOX: 00000000          YOUR REF:   AGREEMENT
SALESPERSON / PHONE: Santiago Angulli Dí 4248
5300
FAX: 1147485390
PDVSA SUPPLIER CODE: J5001487R

INSTRUCTIONS FOR SUPPLIERS :                 DELIVERY DATE : December,30 2008
FOR SHIPPING INSTRUCTIONS CALL:

CFR -PUERTO CABELLO/LA GUAIRA, VENEZUELA
VENEZUELA

INSTRUCTIONS FOR FREIGHT FORWARDER:
PLEASE CONTACT SUPPLIER FOR INLAND SHIPPING DETAILS

TERMS OF DELIVERY : -CFR PUERTO CABELLO/LA GUAIRA, VI
PAYMENT TERMS.    : Payable immediately Due net                CURRENCY : USD

P.O. General Comments

   PURPOSE OF CHANGE
   -----------------
CHANGE ORDER NO. 01 IS ISSUED ON JAMARCH BY JOSE CAMACHO
TO REPLACE THE P.O. 5100062842835100062840 AND CREATED A NEW P.O. IN SAP IN ORDER TO
PROCESS THIS PURCHASE ORDER AS SAP SYSTEM REQUIRE, IN THIS MANNER WE SOLVED THE
TECHNICAL PROBLEM WITH THE ORIGINAL PURCHASE ORDER FOR THIS SUPPLIER.

PO VALUE DOES NOT CHANGE.

   PURPOSE OF CHANGE
   -----------------
CHANGE ORDER NO. 02 IS ISSUED ON JAMARCH BY JOSE CAMACHO
TO MODIFY THE PAYMENT ACCORDING THE AGREEMENT BETWEEN SUPPLIER AND PSI FINANCE, THE
PAYMENT TERMS ARE:

45% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS ON EACH LOT SHIPPED

PO VALUE DOES NOT CHANGE



**PDVSA**

Page: 2 of 1

Purchase Order
5100062284

SUPPLIER:
SAMOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana Km 2N
DON TORCUATO

PURPOSE OF CHANGE
*****************
CHANGE ORDER NO. 01 IS ISSUED ON 12MAR08 BY JOSE CAMACHO
.* TO MODIFY THE DELIVERY TERMS FROM CFR - PUERTO CABELLO TO CFP - PUERTO CABELLO AND
LA GUAIRA PORT AT VENEZUELA.
.* TO MODIFY THE SHIPPING INSTRUCTIONS BLOCK FOR THE SUPPLIER.

P.O. VALUE DOES NOT CHANGE
***************************************

PRODUCT MUST BE PALLETIZED AND SECURELY BANDED FOR OCEAN TRANSPORT.
PRICES & TERMS PER AGREEMENT SIGNED 2008 BETWEEN ARGENTINA & VENEZUELA.
DELIVERY: 10 MONTHS AND WITH THE FOLLOWING SCHEDULE
7,000 TM FROM MARCH TO JUNE 2008
11,000 TM FROM JULY TO DEC. 2008

************************************
-. "MANDATORY" MEANING THE TECHNICAL AND BOTANICAL SPECIFICATIONS,
COPY OF THE FITOSANITARY, CERTIFICATE OF ORIGIN FROM EACH PRODUCTS,
QUALITY CERTIFICATE FROM EACH PRODUCTS PLANTS.

-. "MANDATORY" SUPPLIER MUST SEND THE DELIVERY SCHEDULE AND PLANT LOCATIONS BY EMAIL
IN ORDER KNOW THE LOGISTICS AND COORDINATE THE INDICATIONS BY PSI TO:
JUAN JOSE BASTARDO, EMAIL: BASTARDOJJ@PDVSA.COM
MARIA ROBLES, EMAIL: ROBLESM@PDVSA.COM
PABLO RODRIGUEZ, EMAIL: PRODRIGUEZ@PSI.NEV.COM

************************************************
IF SUPPLIER FAILS TO PROVIDE A P.O. ACKNOWLEDGMENT WITHIN THE
SPECIFIED PERIOD (10 DAYS), THEN SUCH P.O. SHALL BE DEEMED
ACCEPTED BY SUPPLIER.
************************************************

Shipping Marks
BARIVEN, S.A./PDVSA PETROLEO/MVM PORTS
5100062284/XG64004713

VAL-VALENCIA
VIA :PUERTO CABELLO, VENEZUELA
PRIORITY LEVEL: 3
FIELD EXPEDITING: N
INSPECTION FLAG: Y

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|

**PDVSA**

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

Purchase order
5100062284

| 00001 | 18.000 | Metric Ton, ENRICHED POWDER | 5.000,00 | 90.000.000,00 |
|---|---|---|---|---|

Harmonized Tariff Code : 0402211900

**Material purchasing text**
ENRICHED POWDERED MILK WITH VITAMINS A AND D

IT IS THE PRODUCT OBTAINED BY ELIMINATING ALMOST ALL OF THE WATCH THAT CONSTITUTES
MILK.

1. REQUISITES:

* MUST BE FREE OF PRESERVATIVES, NEUTRALISERS, TOXIC SUBSTANCES OR ANY STRANGE MATTER.

* MUST BE OF WHITE YELLOWISH COLORING AND HOMOGENEOUS THROUGHOUT, CHARACTERISTIC OF
SIMILAR PRODUCTS.

* MUST BE EXEMPT OF STRANGE ODORS AND TASTE SIMILAR TO ITS NATURE.
* MUST BE A HOMOGENEOUS POWDER, FREE-FLOWING, EXEMPT OF ANY
NON-INCLUSIVE MATTER, FREE OF ANY BURNED PARTICLES AND STRANGE MATTER.

2. PHYSICOCHEMICAL REQUIREMENTS.

CHARACTERISTICS LIMITS (%)
HUMIDITY MAX. 3,5
FAT MIN. 26,0  MAX. 27,0
PROTEINS MIN. 34,5
CHLORIDES MIN. 0,47  MAX. 0,71
ASH MAX. 5,9
ACIDITY (G AC.LACTIC/100G  MAX. 1,45
FAT FREE MAX. 2,0
LACTOSE MIN. 34,0
INSOLUBILITY INDEX (ML) MAX. 1,5
BURNED PARTICLES MAX. B 15G

VITAMIN A MIN. 960 (UI/100G)   MIN. 3200 (UI/100G)
VITAMIN D MIN. 8 (UI/100G)    MIN. 320 (UI/100G)

3. MICROBIOLOGIC REQUISITES:

CHARACTERISTICS (UFC/G) LIMITS

AEROBIOS MESOFILOS  MIN. 5,1 x 103   MAX. 1,0 X 104
MOLD MIN. 1,0 x 102   MAX. 1,0 x 103
SALMONELLA IN 25G O
COLIFORM (NMP/G) MIN. 3  MAX. 3

**PDVSA**

Page: 4 of 1

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana Km 25
SAN TORCUATO

Purchase Order
5100062284

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|

S.AUREUS MIN. 10 MAX. 1.0 X 10²
LISTERIA MONOCYTOGENES EN /25 G
ESPORA TERMOFILE MIN. 1.0 X 10² MAX. 1.0 X 10³

................................................................

LECHE EN POLVO ENTERA CON VITAMINAS A Y D.
NORMA CONSULTADA COVENIN 146:2001.

REQUISITOS:

* DEBE ESTAR LIBRE DE PRESERVATIVOS, NEUCRALIZANTES, SUSTANCIAS TOXICAS Y MATERIAS
EXTRAÑAS.

* DEBE SER DE COLOR BLANCO AMARILLENTO HOMOGENEO, CARACTERISTICO DEL PRODUCTO.

* DEBE ESTAR EXENTO DE OLORES Y SABORES EXTRAÑOS A LA NATURALEZA DEL MISMO.

* DEBE SER UN POLVO HOMOGENEO, AGLOMERADO, EXENTO DE GRUMOS COMPACTOS, LIBRE DE
PARTICULAS QUEMADAS Y DE MATERIA EXTRAÑA.
ENRICHED POWDERED MILK WITH VITAMINS A AND D

        Additional technical spece.

ENRICHED POWDERED MILK WITH VITAMINS A AND D
................................................................
........
LECHE EN POLVO.
................................................................
LECHE EN POLVO MODIFICADA ENRIQUECIDA CON VITAMINAS & MINERALES
APTA PARA CONSUMO INFANTIL

ROTULADO: SEGUN ARTE GRAFICO SUMINISTRADO POR PDVSA
PRESENTACION:  EN BOLSAS TRILAMINADAS DE 1 KG.

ENTREGAR: MARZO - ABRIL 2008

CARGA: APPROX 17 TM POR CONTENEDOR DE 40' DRY HIGH CUBE, PALETIZADO





**❈ PDVSA**

Page: 5 of 1

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana Km 25
DON TURCUATO

**Purchase order**

**5100062284**

| ITEM | MATERIAL | QUANTITY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|------|----------|----------|------|-------------|------------|-------------|
| | | | Gross Price | | | 90,000,000.00 |
| | | | Net value | | | 90,000,000.00 |

Purchase order total value     90,000,000.00 USD

P.O. General terms

*** DOC 00021, REV E (00 13 X07) ***

DELIVERY
10 MONTHS AND WITH THE FOLLOWING SCHEDULE
7,000 TM FROM APRIL TO JULY 2008
11,000 TM FROM JULY TO DEC 2008

LINE ITEMS MUST SHIP COMPLETE
PARTIALS ARE ALLOWED PER SCHEDULE ABOVE

ESTIMATED WEIGHT, SELLER TO ADVISE

NEW MATERIAL
MATERIAL MUST BE IN NEW CONDITION, FREE FROM DEFECTS AND SUITABLE FOR ANY SERVICE SPECIFIED, UNLESS OTHERWISE
STATED

ORDER ACKNOWLEDGEMENT
SELLER MUST ACKNOWLEDGE RECEIPT OF THIS FAXED PURCHASE ORDER WITHIN 48 HOURS A R O VIA E-MAIL, AND ADVISE AND
CONFIRM SHIPPING DATE, BY PROVIDING THE FOLLOWING INFORMATION

- OUR REFERENCE (PO) NUMBER
- CONFIRMED DELIVERY DATE
- YOUR REFERENCE NUMBER
- YOUR EXPEDITING CONTACT
- TELEPHONE NUMBER
- FACSIMILE NUMBER
- DRAWINGS SUBMITTAL DATE      (as applicable)

ORDER ACKNOWLEDGEMENT MUST BE FAXED WITH OUR P.O. NUMBER IN THE SUBJECT LINE, TO PDVSA SERVICES EXPEDITING
DEPARTMENT AT ORDMBO@PDVPDV CCM



**PDVSA**

Page: 6 of 1

| | Purchase order |
| 5100062284 |

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

Terms of delivery

GENERAL INSTRUCTIONS

AIR FREIGHT VIA MAIQUETIA
1 Consign Master AWB to Forwarder's office in Maiquetia
2. Consign House AWB to ... on line of shipping marks

Notify Party
Clover Internacional C.A

Address
Aduana Aérea de Maiquetia Detras del Alma 8° de Avensa y al lado de Alitalia Cargo Maiquetia, Estado Vargas
Venezuela / Fax 0115(212)331-3786
Attn (Operations Manager) :
Telephone 0115(212)331-2301
Email amaais.galdana@clovergroup com venegamal@pdvsa com

Contacts
Yubelis Munoz - yubelis munoz@clovergroup com ve / 58(212)331-1102
Oneka Torres - oneka torres @clovergroup com ve / 58 212   331-3204
Liliana Cigana - Cigana@pdvsa com / 0212 956 04 169 0415  990 90 04
Grana Feire  GranaI@pdvsa com / 0212-958 04 900  0414-229 88 37

OCEAN FREIGHT VIA LA GUAIRA
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C A

Address
Aduana Aérea de Maiquetia detras del Almacen de Avensa y  al lado de Aduana Carga Maiquetia, Estado Vargas
Venezuela / Fax  0115(212)331-3786
Attn (Operations Manager)
Phone 0115(212)331-2301
Email  amanis galdana@clovergroup com venigamal@pdvsa com

Contacts
Yubelis Munoz - yubelis munoz@clovergroup com ve / 0115(212)331-1103
Oneka Torres oneka torres@clovergroup com ve / 0115(212)331-3204
Liliana Cigana Cigana@pdvsa com / 0212 958 04 90/0415 986 90 04
Grana Feire Flarejg@pdvsa com / 0212 958 04 9/0414 229 88 37

OCEAN FREIGHT VIA PUERTO CABELLO
Consign B/L as shown on the first line of the purchase order shipping marks

Notify Party
Clover Internacional C A

Address
Calle Manito con Calle Guevara,
Edificio Centro Profesional Cabia, Oficina 3
Puerto Cabello, Estado Carabobo
Venezuela / Fax  0115(242)3067-0210
Attn: Luis Vera (Customs Coordinator) / cigana3@prima com
Telephone 0115(242)3067-5010/241-4244

Contacts
Luis Vera - luis vera@clovergroup com ve / 0.158(242)367 5010/241 4214
Ilana Vazquez - ilana vazquez@clovergroup com ve / 0115(242)3067257
Vanessa Diaz vanessa.diaz@clovergroup com ve / 0115(242)3167/741157
Moreda Galda Galcorro@pdvsd com / 0414 226 92 08
Liliana Cigana - Cigana@pdvsa com / 0212 958-04 60/0419 99568 04
Grana Feire - GranaI@pdvsa com / 0212 90804 60/0414 229 68 37

EXPORT DOCUMENTS
The following shipping documents are required by the Venezuelan Government for customs clearance. All shipments must be sent on freight
prepaid basis and should be consigned as all shipping documents, AWB, B/L as follows

1 B/L or AWB Consigned as shown on the first line of the purchase order shipping marks

Case 1:19-cv-10796-DLC   Document 114-39   Filed 04/16/20   Page 19 of 175



**❀ PDVSA**

Page: 7 of 1

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

Purchase Order
5100062284

**2 COMMERCIAL INVOICE**
a. Prepare one invoice per shipment per Order
b. The invoice should be consigned as shown in the last line of the purchase order shipment marks
c. All shipper's invoices must specify the following information
i. Invoice date and number
ii. PDVSA SERVICES INC. Purchase Order number and Requisition Number
iii. Delivery terms / Payment terms
iv. Purchase Order Item Numbers as shown in Purchase Order
v. Number and description of goods
vi. Tariff Number and Spanish Description, if given, for Purchase order. If more than one is given indicate each one with the corresponding item
vii. Gross & Net weight of commodity
viii. Value & Dimensions of commodity
ix. Country of origin

**3 INSPECTION CERTIFICATES** Agriculture exporters are frequently required to provide a certificate attesting to the condition of the goods shipped
4 PHYTOSANITARY CERTIFICATE This certificate must be issued by a country official (Federal, State or Local)
5 CERTIFICATE OF ORIGIN This certificate must be issued by a certifying official

Original Export documentation
Documents for all ocean shipments are required to be in possession of Aduanas seven (7) working days prior to the arrival of the freight at the first Venezuela Port of Unloading Air, Lanai Cepeda / Grace Frias

Send the required originals to
BAR.VEN. ADUANAS PDVSA AGRICOLA
CENTRO EMPRESARIAL EUROBUILDING
PISO 10 - OFIC. 22
Phone 58212-958-04 90 - Fax 58212-958-00 70

Perishable Shipments
- All documents associated with perishable goods must specify the temperature that the goods must be kept in both Celsius and Fahrenheit scales
- The documents should indicate directly whether the goods should be REFRIGERATED or FROZEN (Preferred temperature should be clearly marked on the cargo)
- Perishable and non perishable cargo must not be shipped together on the same bill of lading or in the same consolidation. Each category of material must be shipped and documented separately

**REQUIRED EXPORT DOCUMENTS AND DISTRIBUTION**

(OCEAN)
DOCUMENT    CUSTOMS BROKER: PSI
Original Bill of Lading      4/1
Copies of B/L    2/1
Commercial Invoice Original     4/1
Commercial Invoice copies    2/1
Export packing list 4/1
Certificates (if any)    2/1

(AIR)
DOCUMENT    CUSTOMS BROKER / PSI
Original Airway Bill    4/1
Copies of AWB 2/1
Commercial Invoice Original    4/1
Commercial Invoice copies    2/1
Export packing list 4/1
Certificates (if any)    2/1

Note  SHOW PURCHASE ORDER SHIPPING MARKS ON ALL DOCUMENTS

**PACKAGING AND LABELING**

AS OF APRIL 2006 WOODEN PACKING TO VENEZUELA MUST SHOW A MARKING THAT THE WOOD WAS EITHER TREATED WITH METHYL BROMIDE OR HAS BEEN HEAT TREATED AND DOES NOT PRESENT/DISPLAY EVIDENCE OF QUARANTINE PESTS. ALL WOOD USED IN THE BRACING/CRATING, PALLETIZING, SKIDDING, DUNNAGING, AND SPACING OF THE MATERIAL ON THIS PURCHASE ORDER MUST HAVE UNDERGONE SUFFICIENT PROCESSING OR TREATMENT IN COMPLIANCE WITH ISPM 15 OF THE INTERNATIONAL PLANT PROTECTION CONVENTION (IPPC) ENTITLED "GUIDELINES FOR REGULATING WOOD PACKAGING MATERIAL IN INTERNATIONAL TRADE". ALL WOOD SUBJECT TO THIS REGULATION SHALL BE MARKED AS SPECIFIED IN ANNEX II OF THE REGULATION. NON-COMPLIANCE WILL RESULT IN CONFISCATION OF THE ENTIRE SHIPMENT BY VENEZUELAN PORT/AIRPORT AUTHORITIES. FOR SPECIFIC DETAILS, PLEASE REFER TO THE IPPC WEBSITE WWW.IPPC.INT



**PDVSA**

Page: P of 1

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

Purchase Order
5100062284

ALL CARGO DESTINED TO VENEZUELA MUST BE SUFFICIENTLY PACKED TO WITHSTAND THE RIGORS OF INTERNATIONAL TRANSPORT, PACKAGING MUST RESIST THE ROUGH HANDLING, LOADING AND UNLOADING, COMPRESSION FROM THE OVERHEAD WEIGHT OF OTHER CONTAINERS, IMPACT AND VIBRATION DURING TRANSPORTATION, AND HIGH HUMIDITY DURING PRECOOLING, TRANSIT, AND STORAGE.

A PACK MATERIALS IN ONE OF THE FOLLOWING WAYS:
- SHIPPING UNITS EACH UNIT OF FREIGHT TENDERED TO A CARRIER AS SIGNED AND DEFINED ON BILL OF LADING. DO NOT COMBINE DIFFERENT ORDERS IN ONE SHIPPING UNIT
- INTENTION PACKAGES EACH UNIT PACKAGE COMBINED WITH OTHER PACKAGES TO MAKE UP A SHIPPING UNIT THEY MUST CONSIST OF ONLY ONE ORDER ITEM (ANY QUANTITY)

B PACKING LIST ATTACHED TO EXTERIOR OF AT LEAST ONE SHIPPING ITEM ADDITIONAL PACKING LISTS MUST BE INSIDE OF ENCLOSED SHIPPING UNITS

MARKING (MUST BE PERMANENT/WATERPROOF)
A INTERIOR PACKAGES MARK ON TAG WITH ORDER NUMBER
ITEM NUMBER
B SHIPPING UNITS MARK ON TWO ADJACENT SIDES ON TAG
- SHIPPING MARKS AS SPECIFIED IN THE PURCHASE ORDER - ORDER AND ITEM NUMBER (IF A ONE-ITEM SHIPPING UNIT)
OVERALL DIMENSIONS IN CENTIMETERS - GROSS WEIGHT A - KILOGRAMS
C SHIPPING UNIT NUMBERS NUMBER EACH SHIPPING UNIT BEGINNING. WITH NUMBER 1 IN MULTIPLE SHIPMENTS, NUMBER UNITS CONSECUTIVELY INDICATING TOTAL UNITS IN THE LOT (IE 1 OF 4, 2 OF 4, ETC.) ENCLOSED ATTACH PACKING LIST TO SHIPPING UNIT NUMBER 1
D PACKING LIST SHOW FOR EACH ORDER ITEM LISTED
- PURCHASERS STOCK NUMBER IF GIVEN IN ORDER/GOODS DESCRIPTION
E NUMBER
- SHIPPING UNIT NUMBER IF MORE THAN ONE - SHIPPING MARKS AS SPECIFIED IN THE PURCHASE ORDER

F FOR PERISHABLE AND NON PERISHABLE FOOD PRODUCTS

PLEASE INDICATE THE FOLLOWING

STORAGE TEMPERATURE _____ (INDICATE °F ON °C)

REFRIGERATED OR FROZEN ON ONLY (CHOOSE ONE)

PLEASE USE COLORED LABELS TO CATEGORIZE EACH CASE/CRATE

GREEN REFRIGERATED
BLUE FROZEN
RED DRY NON PERISHABLE

PRE-SHIPMENT ADVICE
PRE-ALERT MUST SHOW DEPARTURE DATE AND PORT CITY, PORT OF DESTINATION AND ETA, VESSEL NAME AND VOYAGE NUMBER, BILL OF LADING NUMBER AND DATE, NAME OF SHIPPING LINE, PURCHASE ORDER NUMBER AND REQUISITION NUMBER (SECOND LINE OF P O SHIPPING MARKS)

THE FOLLOWING ATTACHMENT MUST BE INCLUDED AS WELL
1 EXECUTED BILL OF LADING
2 EXPORT PACKING LIST AND COMMERCIAL INVOICE
3 PHYTOSANITARY CERTIFICATES
4 CERTIFICATE OF ORIGIN
5 OTHER CERTIFICATES REQUIRED

PRE-SHIPMENT ADVICE AND COPY OF EXPORT DOCUMENTS TO
PDVSA (TRAFFIC & CUSTOMS) - VENEZUELA
Nº NAME      EMAIL
1 LILIANA CASANA    CCIANAL@PDVSA.COM
2 FERNANDO VELASQUEZ VELASQUEZFN@PDVSA.COM
3 MARIA ROBLLIC     ROBLESMS@PDVSA.COM
4 JUAN CARLOS RIVAS  EUBOTIJAJC@CANTV.NET
5 KARIN RODRIGUEZ   RODRIGUEZKR@PDVSA.COM
6 DONNATY DURAN     DURANDS@PDVSA.COM
7 ASDRUBAL DIAZ     DIAZAAL@PDVSA.COM
8 GRAZIA FIORE      FIOREG@PDVSA.COM
9 DUBRANKA RODRIGUEZ DUBRANKAAR1@GMAIL.COM
10 IRANOR ANDRADE   ANDRADFIN@PDVSA.COM
11 JOSE ROMERO      JOSE.ROMERO@BANDHOMIEDA.COM.VE
12 YOANNA SALAZAR   YOANNASALAZAR@BANDHOMIEDA.COM.VE
13 ANGEL RODRIGUEZ  ANGEL.RODRIGUEZ@BANDHOMIEDA.COM.VE
14 OSMAR NIETO      OSMARYNIETO@GMAIL.COM



**PDVSA**

Page: 9 of 1

SUPPLIER:

SANKUR COOPERATIVAS DE JAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

18 JUAN CARLOS RIVAS ELBOTJAJC@CANTV NET ONLY SHIPMENTS          VIA LA GUAIRA
18 MIROSKA GOTTA   GOJTAMS@PDVSA COM ONLY SHIPMENTS VIA          FUERTO CABELLO
17 IRANOR ANDRADE  ANDRADER@PDVSA COM

PSI LOGISTICS DEPARTMENT   HOUSTON
NP NAME   EMAIL   PHONE
1 JUAN JOSE BASTARDO BASTARDOJJ@PSI PDV COM (281) 588174
2 PSI DATA BASE DOCUMENT@PSI PDV COM

Terms of payment

PROGRESS/ADVANCE PAYMENT INVOICES

35% ADVANCE PAYMENT
65% AGAINST SHIPPING DOCUMENTS OF EACH LOT SHIPPED

PROGRESSIVE PAYMENTS SHALL BE BASED ON THE ORIGINAL PURCHASE ORDER VALUE  ANY ADDITIONS TO THE PURCHASE
ORDER VALUE SHALL BE INCLUDED IN THE SUPPLIERS FINAL INVOICE

Requis docs/Inspec/Field Exped

FIELD INSPECTION REQUIREMENT
(DOC TR090, REV F, 05 Feb 08)

1 THIS PURCHASE ORDER OR REQ (WHEN APPLICABLE) HAS BEEN CODED FOR FIELD TECHNICAL INSPECTION PRIOR TO
SHIPMENT  THIS MEANS A QUALIFIED INSPECTOR WILL INSPECT THE EQUIPMENT FOR COMPLIANCE TO QUOTE, PURCHASE
ORDER, AND ANY OTHER APPLICABLE INDUSTRY STANDARD OR SPECIFICATION
2 PRODUCT, EQUIPMENT OR MATERIAL INSPECTION MUST BE PERFORMED BEFORE PACKAGING FOR SHIPMENT, THE
PURCHASER'S INSPECTOR DOES NOT RELIEVE THE MANUFACTURER OR THE SELLER FROM COMPLIANCE TO ALL PURCHASE
ORDER REQUIREMENTS
3 PRODUCT, EQUIPMENT OR MATERIAL MUST NOT LEAVE YOUR FACILITIES UNTIL THE ASSIGNED INSPECTOR OR DESIGNATED
INSPECTION AGENCY HAS ISSUED A RELEASE AUTHORIZING SHIPPING OF THE PRODUCT OR EQUIPMENT
4 THE VENDOR IS REQUIRED TO PROVIDE THE FOLLOWING INFORMATION
4 1 LOCATION OF WHERE INSPECTION CAN BE PERFORMED
4 2 CONTACT NAME, PHONE NUMBER & E MAIL ADDRESS OF THE PROJECT MGR
5 DOCUMENTATION REQUIREMENTS
THIS NOTE APPLIES TO TECHNICAL DOCUMENTS (NOT INCLUDING INVOICES OR SHIPPING DOCUMENTS)
5 1 ONE COPY OF ALL THE REQUIRED DOCUMENTS MUST SHIP WITH THE EQUIPMENT  THIS INCLUDES TECHNICAL DOCUMENTS
SUCH AS MATERIAL TEST REPORTS, NONDESTRUCTIVE TEST REPORTS  LA CERTIFICATES/CONFORMANCE, PRINTS, MECHANICAL
OR PERFORMANCE TEST RESULTS, AND OTHER APPLICABLE DOCUMENTS
5 2 TWO HARD COPIES (DATABOOKS) AND TWO ELECTRONIC COPIES (CDS OR VIA EMAIL (AS APPLICABLE)) MUST BE SHIP TO
PDVSA SERVICES, INC  c CITGO BLDG
ATTN PETER BERNSTEIN M2001
1293 ELDRIDGE PKWY
HOUSTON, TX 77077
5 3 FOR DELIVERY OF DOCUMENTS ELECTRONICALLY, SEND THEM TO TECHDOC@PSI PDV COM
5 4 THE PDVSA SERVICES PURCHASE ORDER NUMBER MUST BE LISTED ON THE SUBJECT LINE OF THE EMAIL  IF PARTIAL
DOCUMENTATION IS SUBMITTED  THE EMAIL MUST CLEARLY IDENTIFY WHICH LINE ITEM(S) THE DOCUMENTS BELONG TO
5 5 THE PO NUMBER AND THE PO ITEM NOS MUST BE CLEARLY IDENTIFIED IN EACH DOCUMENT

5 6 FOR PURCHASE ORDERS PLACED IN EUROPE OR WHERE THE MATERIAL IS COMING FROM EUROPE, ELECTRONIC DOCUMENTS
CAN BE SUBMITTED TO INSPECTION@PDVSA NL
5 7 Send hard copies to
PDVSA SERVICES BV
ATTN TECHNICAL SERVICES DEPARTMENT
PRESIDENT KENNEDYLAAN 19
2517 JK THE HAGUE
THE NETHERLANDS

8 ANY QUESTIONS REGARDING THIS INSPECTION REQUIREMENT, FORWARD EMAIL TO inspection@us pdv com  n
bernstein@psi pdv com  For questions psi pdv com  For purchase orders placed in Europe, please contact  inspection@pdvsa nl



**PDVSA**

SUPPLIER:

SAMCON COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 25
DON TORCUATO

Purchase Order
5100062284

IMPORTANT INSTRUCTIONS TO SELLER
(Doc. 2_NE_PO_GEN_BU08, rev.7, 11-14-2003)

**INSTRUCTION**

Unless covered by a Blanket Purchase Agreement this purchase order is subject to the present standard BARIVEN, S A. c/o PDVSA Services, Inc. Terms and Conditions which are already in your possession. In the event that you do not have the above mentioned Terms and Conditions, please advise us. Otherwise, acceptance of this purchase order signifies your acknowledgement, understanding, and acceptance of said Terms and Conditions

If this order is covered by an Outline Agreement the Terms and Conditions of the Outline Agreement number mentioned on the item(s) of this purchase order apply to this document

Seller must acknowledge receipt of this purchase order within two days of NFC and must advise, or confirm, seller's shipping date. This acknowledgement is to be sent to PDVSA Services Inc. Expediting Department Attn. Mrs Gloria Robinson

Assignment of Credit Facility
This purchase order may be selected for financing through a credit facility. Seller may be required to provide additional information or documentation required by the financial institution if this is the case and Finance Department will send further instructions.

Packing, Marking, Invoicing and Shipping Instructions

As of April 2006 wooden packing to Venezuela must show a marking that the wood was either treated with methyl bromide or has been heat treated and does not present during evidence of disease and pests. All wood used in the stowing/crating, palletizing, sledding, or stacking and bracing of the material on this Purchase Order must have undergone a phyto-sanitary treatment in compliance with ISPM 15 of the International Plant Protection Convention (IPPC) related "Guidelines for Regulating Wood Packaging Material in International Trade". All wood subject to this regulation shall be marked as specified in Annex II of the regulation. For contamination will result in rejection of the entire shipment by Venezuelan plant/port authorities. For specific details, please refer to the IPPC website: www.ippc.int

Do not dispatch until you have legal and understand our purchase, marking, invoicing and shipping instructions for sellers, as follows:
1 For domestic deliveries (USA) or in our USA forwarders, F/O/B Seller's Plant, El Marite, North America and Mexico, please use instructions on standard note B0010, attached to our purchase order.
- For International Ocean Freight deliveries to Venezuela by the Seller, use instructions on the applicable standard notes B0030-B0041, B0056-B0058, attached to our purchase order.
3 For International Air and Ocean Freight deliveries to Curazao by the Seller, use instructions on note B0042 attached to our purchase order
4 For International Air Freight deliveries by the seller to Venezuela via Maiquetia use instructions on the applicable standard notes B0043-B0056, attached to our purchase order

These terms, an integral part of this document, are already in your possession, extra copies available on request, from Juan Jose Bastardo at email bastardojj@bariven.pdv.com, or ph (281) 588-6414

General Invoicing Instructions

Follow each of the applicable instructions attached to the respective purchase order, because they will change according to the agreeable delivery terms.

Your Bank Account and Routing Information must be included on your invoice. All payments are processed via 'ACH' (Automatic Clearing House) electronic funds transfer.

Seller will send invoices to

BARIVEN, S A
c/o PDVSA Services, Inc
P.O. Box 4463
Houston, Texas 77210 USA
Attn: Accounts Payable
Contact Person: Tim Marshman
Phone: (281) 588-6233, Fax: (281) 582-7378

If using courier services, please use the street address

BARIVEN, S A
c/o PDVSA Services, Inc
1293 Eldridge Parkway
Houston, Texas 77077 USA
Attn: Accounts Payable
Contact Person: Tim Marshman
Phone: (281) 588-6233, Fax: (281) 582-7378

We require any original invoice with attached copies of your packing list and all supporting documents when charges other than material costs



**PDVSA**

Page 11 of 11

SUPPLIER:
SANCOR COOPERATIVAS UNIDAS LIMITADA
Ruta Panamericana km 24
DON TORCUATO

Purchase Order
5100062284

have been required by the Buyer and quoted by the Seller, such as Inland Freight, Over Time, Export Packing, Special Handling, etc.

Please show our Purchase Order (PO) number and shipping marks on all invoices. Our standard invoice processing is, upon delivery in accordance with PO delivery terms, 100% net 30 days after receipt and approval of your invoice, unless otherwise specified in the Purchase Order.

DESTINATION CONTROL STATEMENT

According to U.S. Export Administration Regulations, Chapter 736.2, "These commodities, technology or software will be exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited." U.S. law (destination) as per shipping marks in the Purchase Order.

The DCS is required for all exports from the United States on the Commerce Control List that are not classified as EAR99. The person responsible for preparation of, the invoice and/or the bill of lading, air waybill, or other export control document that accompanies the shipment from its point of origin in the United States to the ultimate consignee or end-user abroad is responsible for entry of the DCS

NOTE TO SUPPLIERS

Invoices will not be processed unless all export or quality documents are provided.

Nugación
Bariven, S.A. - C/O PDVSA Services, Inc.
Purchasing Agent



## TERCERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificada mediante Primera Enmienda de fecha 15 de Marzo de 2010, y Segunda Enmienda del 13 de Abril de 2010, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Tercera Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de modificar la cláusula Décimo Segunda.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente tercera enmienda al Contrato Marco (la "Tercera Enmienda"), de conformidad con las presentes Cláusulas:

1. Modifícase la Cláusula DECIMO SEGUNDA del Contrato Marco, la cual quedará redactada del siguiente modo:

**CLÁUSULA DÉCIMO SEGUNDA: CESIÓN DEL CONTRATO MARCO.**

El MUTUANTE podrá ceder o transferir los derechos derivados el presente Contrato Marco a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común o relacionadas a este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente. Asimismo, el MUTUANTE podrá suscribir con cualquiera de sus afiliadas y/o subsidiarias, convenios de participación relacionados a los créditos derivados de este Contrato Marco.

**SECTION TWELVE: MASTER AGREEMENT ASSIGNMENT.**

The LENDER may assign or otherwise transfer the rights arising from the Master Agreement to any of its affiliates and/or subsidiaries (i.e. those holding, subsidiary corporations of the LENDER or other corporations related to them or property thereof), by any of the means provided by Law, an assignee acquiring the assigned benefits and/or rights and/or actions to which the LENDER is entitled under the above-mentioned Master Agreement. In such event, the LENDER shall give notice by true means of any new payment terms and conditions, using therefore any true means of notice. In such event, the BORROWER may file any defense against an assignee of the Master Agreement which it would have been entitled to file against the assigning LENDER. In addition to the aforementioned assignment rights, the LENDER may execute with any of its affiliates and/or subsidiaries, participation agreements related to the credits and receivables derived from this Master Agreement.



2.   Las Partes acuerdan otorgar a esta Tercera Enmienda efectos retroactivos al 21 de Diciembre de 2009. Con excepción de aquellos términos expresamente modificados por la presente Tercera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los  29 días del mes de Noviembre de 2010.

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Por: **SANCOR DO BRASIL Produtos Alimenticios Ltda.**
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderados

Por: **IIG TOF B.V.**
Nombre: J. Haners / G Becher
Carácter: apoderados.

Firma/s certificada/s en Foja
N°...F22.19.1696c...
Bs. As. 29-11-2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370





ACTA DE CERTIFICACION DE FIRMAS
LEY 404

# ANEXO

F 001516965

1 Buenos Aires, 29 de Noviembre de 2010 . En mi carácter de escribano

2 Titular del Registro Notarial Nº 841

3 CERTIFICO: Que la/s firma/s que obra/n en el

4 documento que adjunto a esta foja, cuyo requerimiento de certificación se

5 formaliza simultáneamente por ACTA número 184 del LIBRO

6 número 147 , es/son puesta/s en mi presencia por la/s persona/s

7 cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8 la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9 Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10 dades de acuerdo al inciso a) del artículo 1002 del Código Civil y actúan:

11 el señor Magdalena en su carácter de Apoderado de la sociedad "SAN-

12 COR COOPERATIVAS UNIDAS LIMITADA", con domicilio en Sunchales,

13 Provincia de Santa Fe, inscripta en la Matrícula 772 del Registro Nacional

14 de Cooperativas, de la Provincia de Santa Fe, Departamento Castellanos,

15 conforme lo acredita con el poder de fecha 15 de diciembre de 2009, pa-

16 sado al folio 1400 del Registro 640 de la ciudad de Sunchales, Provincia

17 de Santa Fe, a cargo de la escribana Analía Roch, y el señor Valicente en

18 su carácter de Apoderado de la sociedad "SANCOR DO BRASIL Produtos

19 Alimenticios LTDA." lo que acredita con el Poder Especial de fecha 17 de

20 diciembre de 2009, debidamente certificado con fecha 17 de diciembre de

21 2009 y debidamente Autorizado por el Ministerio de Relaciones Exteriores

22 con fecha 7 de enero de 2010 y traducido con fecha 18 de enero de 2010

23 y legalizado bajo el número 948 de fecha 19 de enero de 2010, toda la

24 documentación relacionada tengo a la vista y les confiere facultades sufi-

25 cientes para suscribir el documento adjunto, doy fe.- El documento se




F 001516965

encuentra parcialmente escrito en idioma extranjero.-

26

27

28

29

30

31

32

33



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50



| | |
|---|---|
| **CONTRATO DE LÍNEA DE CRÉDITO PARA LA PREFINANCIACIÓN DE EXPORTACIONES** | **PRE EXPORT FINANCE CREDIT FACILITY AGREEMENT** |

<table>
<tr>
<td>

Entre

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Gabriel Gustavo Martinuzzi, en su carácter de Apoderado Gerencia Financiera y Administrador (Artículo 11°) respectivamente, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

  (a)  Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la pre-financiación de sus exportaciones

  (b)  Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndole continuar con el desarrollo y ampliación de sus mercados externos;

  (c)  Que el FIADOR mantiene fuertes relaciones comerciales con el MUTUARIO por lo cual está interesado en afianzar las obligaciones de éste último a fin de que pueda obtener la financiación antes referida.

  (d)  Que por las razones indicadas en el Considerando (b), y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO está dispuesto a afectar bienes para garantizar el repago del crédito para prefinanciar sus exportaciones;

  (e)  Que el MUTUANTE está dispuesto a otorgar una línea de

</td>
<td>

Entered into by and between:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, a company store of first degree, constituted and registered under the laws of the Argentine Republic, with domicile at Tacuarí 202, 3° floor, Capital Federal, República Argentina, represented herein by Mr. Mario Magdalena, as representative (hereinafter referred to as the "BORROWER"), and

**SANCOR DO BRASIL Productos Alimenticios Ltda.**, a corporation registered under the laws of the Brazilian Republic, represented herein by Mr. Mario Magdalena and Gabriel Gustavo Martinuzzi, as Attorney-in-Fact, Financial Manager and Administrator (section 11°) respectively, with domicile at Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República de Brasil, (hereinafter referred to as the "SURETY"), and

**IIG TOF B.V.**, represented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, represented herein by Mr. _____ and _____, as _____, with domicile at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (hereinafter referred to as the "LENDER"), and

The BORROWER, the LENDER and the SURETY jointly named as the "Parties"; and

**WHEREAS:**

  (a)  That the BORROWER is interested in obtaining mid term financing in order to appoint it to pre-finance its exportations.

  (b)  That the satisfaction and the need to obtain a financing to pre-finance the export that the BORROWER currently has, will benefit him, granting him to continue with the development and extension of its external markets;

  (c)  That the SURETY maintains strong commercial relationships with the BORROWER, reason why is interested to guarantee the obligations of the last mentioned in order for it to obtain the financing previously referred to;

  (d)  That for the reasons indicated in (b) above, and algo, to facilitate the granting of the loan from the perspective of the credit risk, the BORROWER is willing to affect some assets/goods to warranty the repayment of the credit to pre-finance its exports;

  (e)  That The LENDER is willing to grant a credit facility

</td>
</tr>
</table>



crédito de hasta Dólares Estadounidenses cincuenta millones con 00/100 (US$ 50.000.000,00) . para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) el MUTUARIO y el FIADOR se obliguen solidariamente a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato Marco; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (iii) se otorgue y perfeccione el Fideicomiso y la cesión de los Créditos Cedidos (tal como se los define más adelante).

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

## PRIMERA:    DEFINICIONES.

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO y/o del FIADOR.

"Arthur Schuman": significa ARTHUR SCHUMAN, INC., una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica, con domicilio en 40 New Dutch Lane, Fairfield, NJ 07004 USA

"BARIVEN c/o PDVSA": significa Bariven S.A., c/o PDVSA Services, Inc., una firma organizada bajo las leyes del Estado de Texas, Estados Unidos de Norteamérica, con domicilio en 1293 Eldrige Parkway, Houston, Texas (77077), Estados Unidos de Norteamérica.

"Bien/es Fideicomitido/s" significa los "Créditos Cedidos" conforme este término está definido en el Fideicomiso.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o del FIADOR y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO y/o el

of up to  Fifty Million United States Dollars and 00/100 (US$ 50,000,000.00) to the BORROWER, subject to the terms and conditions of this Master Agreement, to the extent and provided that: (i) the BORROWER and the SURETY become jointly and severally bound to repay the same and to comply with all the obligations undertaken under the Agreement; (ii) the Guarantees (as defined hereinbelow) are maintained in full force and effect and enforceable up to the termination of the Agreement; and (iii) the Parties grant and perfect the assignment of the Assigned Credits (as they are defined hereinafter).

By virtue of the aforesaid considerations, this credit facility agreement is executed pursuant to the following terms and conditions:

## SECTION ONE: DEFINITIONS.

"Affiliates" means the subsidiary corporations and/or holding corporations and/or companies commonly owned by the BORROWER and/or the SURETY.

"Artur Schuman" means ARTHUR SCHUMAN, INC., a corporation organized and registered under the laws of the Estate of New Jersey, United States, with domicile at 40 New Dutch Lane, Fairfield, NJ 07004 USA.

"BARIVEN c/o PDVSA" means Bariven S.A., c/o PDVSA Services Inc., a corporation organized and registered under the laws of the Estate of Texas, United States of America, with domicile at 1293 Eldrige Parkway, Huston, Texas (77077), United States of America.

"Trusted Asset/s" means the "Assigned Credits" as the term is defied in the Trust.

"Material Adverse Change" means any material unfavorable change in the economic, commercial, financial or operating situation or financial position or of any other kind of the BORROWER and/or the SURETY and/or their Affiliates and/or the LENDER, or their projections, taken as a whole, or in the economic, financial and tax policy of the Republic of Argentina or the United States of America, or the occurrence of any event that, at the LENDER 's reasonable criterion, materially changes the prevailing market conditions as of the date of execution hereof (including, without limitation, any suspension, release or limitation to the compliance with monetary obligations under financial facilities and/or foreign trade and/or of any other kind, any payment suspension declaration in the Republic of Argentina or in any other financial or exchange market, the commencement of war, armed assaults, or any other type of national or international crisis directly or indirectly related to the Argentine Republic); or the occurrence of any event which in the LENDER 's opinion gives reasonable grounds to presume that the BORROWER and/or the SURETY will not be able to regularly fulfill or comply with their obligations hereunder; or

FIADOR no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula SEGUNDA.

"Contrato Marco" significa el presente contrato de línea de crédito suscripto entre las Partes.

"Crédito/s Cedido/s" significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

(i)       todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Fonterra y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Fonterra.

(ii)      todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a BARIVEN c/o PDVSA y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con BARIVEN c/o PDVSA.

(iii)     todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Arthur Schuman.

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |

any significant variation in the Peso Argentino/United States Dollar exchange rate, or any suspension in the foreign exchange markets of the Republic of Argentina and/or the United States of America that produce a Material Adverse Effect.

"Conditions Precedent" means the conditions precedent for the effectiveness of the Master Agreement, set forth in Section TWO.

"Master Agreement" means this credit facility agreement executed between the Parties.

"Assigned Credit/s" means the following credits of the BORROWER against the Assigned Debtors:

(i)       means all the actual and future credit rights corresponding to the BORROWER over the commercial transactions of sales of goods that the BORROWER executes to Fonterra and/or their Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Fonterra.

(ii)      means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to BARIVEN c/o PDVSA and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with BARIVEN c/o PDVSA.

(iii)     means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to Arthur Schuman and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Arthur Schuman.

"Lender's Account" means the LENDER's bank account, the data of which is detailed hereinafter:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |

"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTUANTE en forma fehaciente:

| | |
|---|---|
| BANCO: | Citibank N.A. |
| DIRECCIÓN: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 |
| A NOMBRE DE: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada |
| CUENTA N°: | 000-0-129785 |
| REFERENCIA: | Prefinanciación de Exportación |

"Deudor/es Cedido/s" significa Arthur Schuman y/o Fonterra y/o BARIVEN c/o PDVSA.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagarés, el Fideicomiso, los Warrants y los contratos u órdenes de compra que causan los Créditos Cedidos.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o del FIADOR y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula DECIMA, Sección 10.1 y 10.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco; y/o cualquier Evento de Incumplimiento conforme se define en el Fideicomiso.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores a los 24 (veinticuatro) meses calculadas desde la fecha de cada Solicitud de Desembolso.

"FIADOR" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

---

"Borrower's Account" means the BORROWER's bank account, the data of which is detailed below or that that may be informed by the BORROWER in an evidencing way:

| | |
|---|---|
| BANK: | Citibank N.A. |
| ADDRESS: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Account #: | 36976697 |
| ON BEHALF OF: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| IN FAVOR OF: | SanCor Cooperativas Unidas Limitada |
| ACCOUNT #.: | 000-0-129785 |
| REFERENCE: | Prefinanciación de Exportación |

"Assigned Debtors" means Arthur Schuman and/or Fonterra and/or BARIVEN c/o PDVSA.

"Transaction Documents" means this Master Agreement, the Requests for Disbursement resulting therefrom, the Promissory Notes; the Trust, the Warrants and the agreements or purchase orders that cause the Assigned Credits.

"Dollars" and "USD" means United States Dollars, in cash or through a bank transfer.

"Material Adverse Effect" means a material adverse effect in (i) the business, assets, transactions or condition (financial or of any other nature) of the BORROWER and/or the SURETY and/or its Affiliates or the other parties of the Transaction Documents (including the LENDER), or (ii) the validity or performance of the Transaction Documents, or (iii) the rights and benefits granted to the LENDER in the Transaction Documents.

"Event of Default" means any event, condition or circumstance mentioned in, Section Ten, 10.1 and 10.2 of the Master Agreement; and/or any non-compliance of the obligations set forth in the Master Agreement; and/or any Event of Default in agreement with what is foreseen in the Trust.

"Due Date/s" means the due date for the payment of the Due Sums indicated in each of the Requests for Disbursement. The Due Dates shall be previous to 24 (twenty four) months of the date of each Disbursement Request.

"SURETY" has the meaning indicated in the introduction of this Master Agreement.

"Fideicomiso" es la propuesta de cesión fiduciaria y fideicomiso con fines de garantía suscripta en el día de la fecha por el MUTUARIO en carácter de potencial fiduciante, a efectos de ser remitida al Banco de Servicios y Transacciones S.A. como potencial fiduciario y al MUTUANTE como potencial beneficiario, en virtud de la cual, el MUTUARIO –a efectos de garantizar el cumplimiento de las obligaciones del presente Contrato Marco- transfiere los Bienes Fideicomitidos para que el potencial fiduciario, una vez aceptada la propuesta, los administre de conformidad con lo allí dispuesto, cuyo modelo se adjunta como Anexo I al presente Contrato Marco.

"Fonterra": significa FONTERRA LIMITED, una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Garantías" significa los Pagarés, el Fideicomiso, los Warrants y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito, que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA millones con 00/100 (US$ 50.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todos las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula DECIMA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO, el FIADOR y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO y avalados por el FIADOR, a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como Anexo II, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días

"Trust" is the proposal for the fiduciary assignment and trust with a guaranty purpose executed on the date hereof by the BORROWER in its capacity of potential Trustor, so as to be sent to the Banco de Servicio y Transacciones S.A. as potential Trustee, and the LENDER as potential beneficiary, by virtue of which, the BORROWER – in order to grant the compliance with the obligations of this Master Agreement – shall transfer the Trust Assets so that the potential Trustee once the proposal is accepted can administer them in agreement with what is therein established, which model is attached herein as Annex I to this Master Agreement.

"Fonterra" means FONTERRA LIMITED, a company existing under the laws of New Zealand, with domicile at Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Guarantees" means the Promissory Notes, the Trust, the Warrants and the assignment of the Assigned Credits.

"Credit Facility" means the unique Credit Facility, that, subject to the terms and conditions of the Transaction Documents, the LENDER shall make its best efforts so as to grant it to the BORROWER, for up to the total maximum amount of Fifty Million United States Dollars and 00/100 (U$S 50,000,000.00).

"Indebted Credit Facility" means the sum up of all the Sums Due by the BORROWER under the Credit Facility including all interests applicable in accordance with this Master Agreement.

"Default" means the any event or condition that constitute an Event of Default, causing the effects set forth in Section TEN hereof.

"LENDER" has the meaning given in the first paragraph hereof.

"BORROWER" has the meaning given in the first paragraph hereof.

"Applicable Rules" means all present and/or future, national, provincial or municipal rules applicable to the activities and the business of the BORROWER.

"Parties" means jointly the BORROWER, the SURETY and the LENDER.

"Promissory Note/s" means the promissory notes delivered by the BORROWER and guaranteed by the SURETY, in favor od the LENDER, in agreement with the format attached to this Master Agreement as Annex II, for an amount equivalent to the Due Amount in each Disbursement Request, in agreement with what is established in Section THIRD of the Master Agreement.

"Pesos" means the legal currency in the Argentine Republic.

"Crediting Term" means the term of three (3) Business Days as



Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2010, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en Anexo III, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interés anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

Warrants: significa los warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE, endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidos en la Cláusula SEPTIMA del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO.

### 2.1.    Disponibilidad de la Línea de Crédito.

(a) Disponibilidad Condicionada. Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

from the effective date of receipt of the Request for Disbursement.

"Confirmation Term" means the term of five (5) Business Days as from the date the required funds are credited in BORROWER's Account, pursuant to a Request for Disbursement.

"Availability Term" is the term fixed exclusively to the benefit of the LENDER, as from the date of the Master Agreement until December 31, 2010, during which period the LENDER undertakes to make their best efforts to maintain the Credit Facility available in favor of the BORROWER.

"Request for Disbursement /Disbursement Request" is the form substantially identical to the one attached hereto as Annex III, complete with all data duly stated, to be executed by the BORROWER with the signature of its attorneys-in-fact or legal representatives certified by a notary public.

"Sum/s Due" means the funds to be given by the BORROWER as payment to the LENDER under each Request for Disbursement including any applicable interest until the capital repayment, as per this Master Agreement.

"Discount Interest Rate" means the annual discount interest rate to be agreed between the Parties under each Request for Disbursement, that the LENDER will apply to each funds disbursement that the BORROWER requires to calculate the amount of the Sums Due.

"Warrants" means the warrants issued in agreement with Section 9643 of the Argentine Republic, corresponding to certificates of the deposit of merchandise property of the BORROWER or other merchandise at LENDER's satisfaction, endorsed by the BORROWER in favor of the LENDER for the amounts and in the conditions established n Section SEVEN of this Master Agreement in warranty of the fulfillment of obligations undertaken by the BORROWER under this Master Agreement.

## SECTION TWO: THE CREDIT FACILITY.

### 2.1 Availability of the Credit Facility.

(a) Conditional Availability. Subject to the punctual fulfillment of each and every of the Precedent Conditions, or to the fact that the LENDER expressly releases in writing the compliance with all and each of the Conditions Precedent, without being required to do so under no circumstance, the LENDER undertakes to make the Credit Facility available to the BORROWER during the Availability Term, which may be used to finance the BORROWER's exports, pursuant to the conditions and procedure set forth in this Master Agreement.

**(b) Vigencia.** Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

**(c) Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

**2.2.** <u>Condiciones Precedentes al otorgamiento de la Línea de Crédito.</u>

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

**(a) <u>Aprobaciones Societarias.</u>** copia certificada por escribano público del poder general del MUTUARIO del cual surja que el/ los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto; y

**(b) <u>Vigencia de las Manifestaciones y Declaraciones del MUTUARIO.</u>** Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por el MUTUARIO en la Cláusula NOVENA del Contrato Marco, y

**(c) <u>Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Supuestos de Incumplimiento.</u>** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías, y

**(d) <u>Notificación a los Deudores Cedidos.</u>** Que el MUTUARIO

**(b) Effectiveness.** Once the Availability Term has expired, the BORROWER's right to send to the LENDER any Request for Disbursement will automatically and irrevocably cease – without any prior judicial or extrajudicial notice - unless the Availability Term is expressly extended in writing by the LENDER, to its sole satisfaction, and such decision is sufficiently notified to the BORROWER in due time.

**(c) Amount of Disbursements.** The BORROWER may require the disbursements it deems appropriate according to its needs until the aggregate of the amounts stated in the relevant Requests for Disbursement reach the amount of the Credit Facility; consequently, in no case and event will the LENDER be bound, or may be interpreted to be bound, to disburse an amount higher than or exceeding the Credit Facility.

**2.2 <u>Conditions Precedent to the Granting of the Credit Facility.</u>**

The validity and effectiveness of the Credit Facility granted by the LENDER under the Master Agreement is subject to the fact that, at the LENDER'S reasonable discretion, (i) all and each of the following Conditions Precedent, set forth for LENDER'S exclusive benefit, take place and remain fully effective as of the execution of this Master Agreement and until its termination, and/or (ii) the LENDER expressly excludes in writing one, any or all the Conditions Precedent:

**(a) <u>Corporate Approvals.</u>** a copy certified by a notary public of the general power of attorney of the BORROWER , evidencing that the persons authorized to sign the Transaction Documents are fully empowered therefore.

**(b) <u>Effectiveness of the Representations and Statements by the BORROWER and the SURETY.</u>** That all and each of the representations and statements made by the BORROWER and/or the SURETY in Section NINE of the Master Agreement are fully effective, remain being accurate, correct and true;

**(c) <u>Non-existence of Material Adverse Changes, Material Adverse Effects or Events of Default.</u>** That no grounded elements have neither occurred and/or continue, or exist to foresee the occurrence of one or more Material Adverse Changes, Material Adverse Effects and/or Events of Default (should the lapse and acceleration of terms have been declared or not), and no circumstance known by the BORROWER has occurred that in any way may endanger, undermine or weaken the full effectiveness, validity, full force and effect, scope, enforcement and/or opposition against third parties of the Transaction Documents and Guarantees,

**(d) <u>Notification to the Assigned Debtors:</u>** That the BORROWER

haya notificado a los Deudores Cedidos las cesiones de los Créditos Cedidos en los términos establecidos en la Sección 4.6 del presente Contrato Marco; a cuyo efecto el MUTUARIO deberá entregar al MUTUANTE el original de tales notificaciones recibidas y aceptadas por los Deudores Cedidos.

(e) **Constitución del Fideicomiso.** Como condición previa e ineludible al otorgamiento de la Línea de Crédito, el MUTUARIO deberá haber constituido en legal forma el Fideicomiso de cesión de cobranzas, conforme lo establecido en el Fideicomiso, a favor del MUTUANTE.

### CLAUSULA TERCERA: CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

    (i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO y del FIADOR o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento;

    (ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes y avalado por el FIADOR, a plena satisfacción del MUTUANTE, con las firmas debidamente certificadas por un escribano público argentino; y

    (iii) los Warrants debidamente endosados por el MUTUARIO, de conformidad con lo establecido en la Cláusula SEPTIMA del presente Contrato Marco, con fecha de vencimiento anterior a la última Fecha de Vencimiento de las consignadas en la Solicitud de Desembolso, con firma certificada por escribano público argentino, a satisfacción del MUTUANTE, representativos de mercaderías a satisfacción del MUTUANTE y por un valor también a satisfacción del MUTUANTE;

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa- y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal

has notified to the Assigned Debtors all the assignments of the Assigned Credits in the terms established in section 4.6 of this Master Agreement, to which effect the BORROWER shall deliver to the LENDER the original of such received and accepted notifications by the Assigned Debtors.

(e) **Trust Constitution:** As a previous and unavoidable condition for the granting of the Credit Line, the BORROWER must have constituted in legal war the Trust of assigns recover, in agreement with what is established in the Trust, in favor of the LENDER.

### SECTION THREE: CONDITIONS PRECEDENT FOR DISBURSEMENTS.

**3.1 Request for Disbursement.** In order to request the LENDER a disbursement under the Credit Facility, the BORROWER must send by self-probatory means and to LENDER'S satisfaction:

    (i) the original of the Request for Disbursement duly filled out and signed by the legal representatives or attorney's in fact of the BORROWER and the SURETY duly empowered therefore, with their signatures certified by an Argentine notary public; each Request for Disbursement shall invariable contain the requested disbursement amount, the Due Dates, and the Sums Due that the it will have to pay to the LENDER in such Due Dates;

    (ii) a Promissory Note for the Sums Due, duly signed by the legal representatives or attorney–in-fact of the BORROWER and or representatives duly empowered therefore and by the SURETY, at LENDER's entire satisfaction, with the signatures duly certified by an Argentine notary public;

    (iii) the Warrants duly endorsed by the BORROWER, in agreement with what is established in Section SEVEN of this Master Agreement, with due date previous to the last Due Date of the ones established in the Request for Disbursement, with their signatures certified by an Argentine notary public, at satisfaction of the LENDER, representative of merchandise at satisfaction of the LENDER and also for an amount at satisfaction of the LENDER.

**3.2 Lack of Liability for Making a Disbursement or Not.** Notwithstanding the provisions of this Section, the LENDER shall not have any liability whatsoever to the BORROWER for accepting or rejecting any Request for Disbursement effectively received from the BORROWER – always that the rejection in with cause- and, therefore, the BORROWER expressly and irrevocably waives to file any claim against the LENDER based upon such circumstance or cause.

circunstancia o causa.

**3.3. Trámite posterior. Desembolso.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar éste de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso –siempre que el rechazo sea con causa- que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquélla.

**3.4. Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUANTE no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos contados desde la finalización del Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5. Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto, de conformidad con lo establecido en la cláusula DECIMA del presente Contrato.

**3.6. Devolución al MUTUARIO de los Créditos Cedidos. Notificación a los Deudores Cedidos.** Una vez cancelada en su totalidad la Línea de Crédito Adeudada por el MUTUARIO y dentro de las 48 hs. de sucedido ello, el MUTUANTE se obliga a notificar a cada Deudor Cedido que ha quedado sin efecto la cesión del Crédito Cedido por lo que a partir de la recepción de

**3.3 Subsequent Proceeding. Disbursement.** Once the documents of the Request for Disbursement have been received by the LENDER, it will proceed to verify, that all the information and documents contained therein are, at its own criterion, accurate and in accordance with the Master Agreement. Notwithstanding that, the LENDER is not obliged to perform a legal audit or due diligence of the Documents of the Request for Disbursement and, therefore, it will be not responsible for any misrepresentation, inaccuracy, omission and/or lack of genuineness thereof. Notwithstanding the aforesaid, if the LENDER agrees, to its satisfaction, with the Documents of the Request for Disbursement, the LENDER shall, at its own discretion and to its own satisfaction, and even without being bound thereto under the Transaction Documents, to disburse the requested funds in the BORROWER's Account within the Crediting Term. The LENDER'S acceptance of a Request for Disbursement does not bind it to accept any other Request for Disbursement that the BORROWER may submit to it simultaneously or thereafter – always that the rejection is with cause.

**3.4 Confirmation.** Within the Confirmation Term, the BORROWER must necessarily send to the LENDER a note confirming the receipt of such funds by self-probatory means. Notwithstanding the aforesaid, even in the event that the BORROWER fails to send the confirmation note mentioned above, the lack of claim by the BORROWER by self-probatory means within a term of five (5) calendar days as from the completion of the Crediting Term shall imply the conformity of the BORROWER to the disbursement deposited in the BORROWER's Account.

**3.5 LENDER'S Exclusive Power.** Should, at the LENDER'S exclusive discretion, during the Availability Term any Material Adverse Change or Material Adverse Effect occur, the LENDER may immediately interrupt the proceedings of any Request for Disbursement filed according to the Master Agreement, which is being reviewed and evaluated by such LENDER, as well as any disbursement of funds corresponding to a Request for Disbursement approved by the LENDER but which funds have not been actually credited in BORROWER's Account, without giving rise to any responsibility for the LENDER. Consequently, the BORROWER waives to file any action for responsibility grounded on such reason. The aforesaid notwithstanding the authority of the LENDER to render the Master Agreement terminated, pursuant to the provisions of section TEN hereof.

**3.6 Refund to the BORROWER of the Assigned Credits. Notification to the Assigned Debtors:** Once the Credit Line Facility owed is completely canceled by the BORROWER and in within the 48 hs. From its occurrence, the LENDER compels to notify to each of the Assigned Debtors that the assignment of the Assigned Credit has no effect, reason why from the reception of

dicha notificación, cada Deudor Cedido deberá abonar al MUTUARIO el monto de los respectivos Créditos Cedidos.

such notification, each Assigned Debtor shall pay to the BORROWER the amount of the respective Assigned Credits.

## CLÁUSULA CUARTA:   CESIÓN DE CRÉDITOS.

## SECTION FOUR: CREDIT ASSIGNMENT.

**4.1.**   En garantía de pago de la Línea de Crédito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operación, y como medio de pago de las Sumas Adeudadas - conforme lo establecido en la Cláusula 5.2 del Contrato Marco- el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesión comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con los Deudores Cedidos de las cuales surjan los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

**4.1**   As security for the payment of all the obligaitons and the compliance of all the obligations assumed by the BORROWER under the Transaction Documents, and as means of payment of the Sums Due, - in agreement with what is established in Section 5.2 of the Master Agreement – the BORROWER assign to the LENDER the Assigned Credits. The assignment or assignments undertaken comprises all the rights and actions that the BORROWER has with regard to the Assigend Credits and of the consequences previously stated, placing the LENDER pari passu in priorities with the pertinent scope and to the relevant extent, the latter being also subrogated to all rights or agreement performance and/or collection actions likely to exist in the future in connection with such credits, notwithstanding the obligations deriving from the contractual obligations with the Assigned Debtor originating from the Assigned Credits, which shall be exclusively borne by the BORROWER.

**4.2.**   El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por los Deudores Cedidos, copias o fotocopias de los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.2**   The BORROWER undertakes to deliver to the LENDER, within 5 (FIVE) days from dispatch thereof, certified copies of the bills of lading regarding the merchandise included in the Assigned Credits. In such sense, it undertakes to deliber to the LENDER, in within 5 (FIVE) days from the reception by the Assigned Debtors, the delivery notices and the invoices issued by the BORROWER as a consequence of the Assigned Credits.

**4.3.**   El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por los Deudores Cedidos en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas a los Deudores Cedidos, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

**4.3**   The BORROWER guarantees that all sums corresponding to the Assigned Credits shall be deposited by the Assigned Debtor in the LENDER's Account. For such purpose, in addition to the notices indicated in 4.6, the BORROWER and/or the SURETY undertakes to include in all and each of the invoices issued under the Assigned Credits to be sent to the Assigned Debtor, a legend expressly stating that such invoices shall be paid to the LENDER through a transfer of the pertinent funds to the LENDER's Account. In each of the assigned invoices assigned to the BORROWER and/or the SURETY, undertake to include the following legend:

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha __/__/200__. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____, ABA _____, Beneficiario: IIG TOF B.V., Cuenta Nº: _____."*

*"The credit represented and included in this invoice, was assigned as security to IIG TOF B.V., through the Credit Assignment Agreement dated __/200__. You should pay the same on the due date through a deposit in the Bank: __ ABA___; Beneficiary: IIG TOF B.V.; Account No. ___)"*

**4.4.**   Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

**4.4**   The funds of the Assigned Credits deposited in the LENDER's Account shall be applied to the payment of the Sums Due as per Section FIVE, 5.2 of the Master Agreement.



4.5.     La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos. Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total saldo adeudado correspondiente a cada Suma Adeudada, antes de en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

4.5   This assignment of the Assigned Credits is made under the BORROWER's liability to the LENDER. Therefore, if for any reason whatsoever the amount of the Assigned Credits is not paid to the LENDER as per the terms stated in this Section and/or are not enough to cover the payment of the Due Amounts in the correspondent Due Dates, the BORROWER shall pay the LENDER the total amount or the balance due corresponding to each Sum Due, previously of or in each Due Date, under penalty of incurring in automatic Default.

4.6.     Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión a los Deudores Cedidos mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como Anexo IV con lo cual la misma quedará perfeccionada frente a terceros, sin necesidad de aceptación alguna del Deudor Cedido para tales efectos. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará a todos los Deudores Cedidos, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante. Asimismo, y sin perjuicio del perfeccionamiento de la cesión del modo antes indicado, el MUTUARIO se obliga a obtener la aprobación expresa de los Deudores Cedidos respecto de la presente cesión, debiendo los Deudores Cedidos –mediante su apoderado o representante legal- firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, como una de las Condiciones Precedentes.

4.6   As an essential condition for the validity of this Master Agreement, the BORROWER and the SURETY binds themselves to give notice of this assignment by a self-probatory means to the Assigned Debtors, through the remittance of a notice substantially identical to the form attached hereto as Annex IV with which it must be understood as effective towards third parties, without the need of any acceptance of the Assigned Debtor to such effects. For purposes thereof, within 48 hours after the execution of this Master Agreement, as as one of the Precedent Condition, the BORROWER shall notify the Assigned Debtor in writing· and through self-probatory means with the intervention of a notary, that the credits have been assigned to the LENDER and that the deposit of the sums pertinent to the Assigned Credits shall be made to the LENDER's Account. In such sense, and without prejudice of the assignment perfection in the means previously mentioned, the BORROWER compels to obtain the express approval of the Assigned Debtors regarding this assignment, and the Assigned Debtors will have to sig – by means of a representative or a person empowered to – at the bottom of each notification with acceptance proof of it. The BORROWER shall deliver such notices to the LENDER, with the acceptance of the Assigned Debtors is the way previously outlined, as a Condition Precedent.

El MUTUARIO deberá entregar dichas notificaciones al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

The BORROWER shall deliver such notifications to de LENDER, with the acceptance of the Assigned Debtors in the way that was previously indicated, in agreement with what is established in the previous condition to the starting date of this Master Agreement.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación a cada Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

In such sense, the BORROWER will remit vía fax a communication to each of the Assigned Debtors, notifying the assignment of the Assigned Credits, indicating that the payment of the Assigned Credtis must be done in th LENDER's Account, establishing that the original of the communication is remitted by postage mail.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario, domicilio y su despacho mediante correo internacional  por un servicio que brinde constancia de su entrega y recepción.

Fulfilled that,·the LENDER will require to a notary public the certification of the text of it, its addressee, domicile and it deliver by means of international postage mail by a service that gives prove of its deliver and reception.

4.7.     El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos .

4.7   This Agreement does not imply in any manner whatsoever a transfer by the BORROWER to the LENDER of the obligations arising from the agreements originating the Assigned Credits,

Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que – con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- los Deudores Cedidos rescindan o resuelvan los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y los Deudores Cedidos.

which shall be borne by the BORROWER. The BORROWER undertakes to comply with any and all of its obligations deriving from the agreements of the Assigned Credits so that the LENDER's right to collect the Assigned Credits shall not be affected. Non-compliance in due time and manner of the obligations mentioned above shall automatically give place by operation of law to the BORROWER's Default. The Default by operation of law shall occur all the same with the consequences already mentioned in the event that, irrespective of the BORROWER's default, the Assigned Debtor rescinds or terminates the merchandise purchase agreements originating the Assigned Credits, or ceases or ends its business relationship with the BORROWER, whether unilaterally or as agreed between the BORROWER and the Assigned Debtor.

**4.8.** El MUTUARIO declara y garantiza al MUTUANTE:

(a) el cobro de los Créditos Cedidos.

(b) la forma instrumental de los mismos.

(c) la legitimidad de los Créditos Cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d) que no se encuentra inhibido para disponer de sus bienes;

(e) que no adeuda suma alguna a ningún Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos, y que de darse tal supuesto abonará la diferencia conforme lo estipulado en la cláusula 5.4;

(f) que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

(g) la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h) que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a- la entrega en tiempo y forma a los Deudores Cedidos de la mercadería objeto de los Créditos Cedidos.

(i) que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito.

(j) que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente a cada Deudor Cedido.

4.8 ¹ The BORROWER states and guarantees the LENDER as follows:

(a) the collection of the Assigned Credits;

(b) the instrumental form thereof;

(c) the legitimacy of the Assigned Credits and that the Assigned Credits are freely available to it, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

(d) that it is not subject to restraining orders to dispose of its property;

(e) that it does not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Assigned Credits; and that if such events take place it will pay the difference in agreement with what is established in section 5.4;

(f) that it has not received any sum resulting from the Assigned Credits and that the same have not been assigned, either partially or totally, to any natural or artificial person before;

(g) the authenticity of the signatures of any document evidencing the reason for the Assigned Credits;

(h) that it shall comply with any and all of the obligations under its charge deriving from the Assigned Credits, including, but not limited to, delivery in due time and manner to the Assigned Debtors of the goods stated in the Assigned Credits;

(i) that the amount of the Assigned Credits to be deposited at the LENDER's Account during the Availability Term shall be at least equal at a minimum to 110,00% of the amount of the Credit Facility;

(j) that all the Assigned Credits will be invoices by the BORROWER directly and exclusively to each Assigned Debtor.

**CLAUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.**

**SECTION FIVE: PAYMENT OF SUMS DUE. APPLICATION OF ASSIGNED CREDITS TO PAYMENT OF SUMS DUE. BORROWER'S REMEDY.**

**5.1.** El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.2.** A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

(a) Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.

(b) Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar las Sumas Adeudadas a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses excedan el monto de las Sumas Adeudadas, el excedente será transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de las Sumas Adeudadas, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes a los Créditos Cedidos que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

**5.3.** En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

---

**5.1.** The BORROWER irrevocably and unconditionally undertakes to pay the LENDER the Sums Due and the Performance Fee on the Due Dates corresponding to each of them through a deposit thereof in the LENDER's Account.

**5.2.** For purposes mentioned in Section 5.1 above, the funds of the Assigned Credits deposited at the LENDER's Account shall be applied to payment of the Sums Due as follows:

(a) During the months in which there are NO Due Dates (being understand by such the months between the effective disbursement after a Disbursement Request and the following calendar month before the Due Date), the LENDER shall transfer the funds corresponding to the Assigned Credit that the Assigned Debtors deposit at the Lender's Account, during the 48 hours period since its reception, to the Borrower's Account.

(b) During the months corresponding to the Due Dates (being understand by such the period between the 1st and the 30th of each month corresponding to the Due Dates), the LENDER shall apply the amounts of the Assigned Credits deposited at the Lender's Account to cancel the Sums Due to be paid in the Due Dates corresponding to each month. In the event that the amount of the Assigned Credits deposited during said month exceeds the amount of the Sums Due, the exceeding amount shall be transfer, to the Borrower's Account as stated in Section 5.2 (a) If the sums deposited during said months were not enough to fulfill the amounts of the Sums Due, the BORROWER shall deposit the amount needed in order to comply with the total amounts of the Sums Due, under penalty of incurring in automatic Default.

(c) All the funds corresponding to the Assigned Credits that were deposited at the Lender's Account, after the total cancellation of the Credit Facility, and in excess of it, shall be re-delivered to the BORROWER and/or the SURETY as set forth in (a) herein of this Section 5.2.

**5.3** Upon Default, all the funds of the Assigned Credits deposited in the LENDER's Account shall be applied to pay the entire Credit Facility and any other amount due under the Transaction Documents.

5.4.    Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

## CLAUSULA SEXTA:    MONEDA DE PAGO.

6.1.    El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) deberán ser necesariamente abonados en Dólares y no en otra moneda. En consecuencia, el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

6.2.    En atención a lo dispuesto en la Cláusula 6.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometidas (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO según el caso:

6.2.(a) Mediante la compra con Pesos (o la moneda que sea

5.4    Taking into account the resource of the BORROWER in the assignment of the Assigned Credits to the LENDER, in case that – for any reason whatsoever - the amount of the Assigned Credits deposited in the LENDER's Account are not sufficient to pay the Sums Due in the correspondent Due Date in a determined month, the BORROWER shall pat the LENDER the total amount or the adequate balance correspondent to each Sum Due, before of or in each Due Date, under penalty of incurring in automatic Default.

## SECTION SIX: PAYMENT CURRENCY.

6.1    The BORROWER undertakes that payment of the full amount or the balance eventually due under the Transaction Documents- including payment of the Indebted Credit Facility - shall be paid in Dollars and not in another currency. Consequently, the BORROWER expressly acknowledges and states that it is a material condition to this Master Agreement, that the payment of the Indebted Credit Facility, as well as compensatory and penalty interest, costs, court fees and further sums payable to the LENDER hereunder, be canceled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment. In addition to this the LENDER understands that the transfer to be made in favor of the BORROWER of the funds of the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c) shall be payable in Dollars and not in any other currency. As a consequence of the foregoing the LENDER acknowledges that it is an essential condition of this Master Agreement that the devolution of the funds corresponding to the Assigned Credits that the Assign Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), as well as punitive interests and other sums to be transferred to the BORROWER under this Agreement, are cancelled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment.

6.2    In accordance with the provisions set forth in Section 6.1., if on any Maturity Date there is any restriction or prohibition to access the exchange market in the Argentine Republic, the BORROWER and the LENDER shall nevertheless pay the indebted amounts (the Indebted Credit Facility and any other amount payable under the Transaction Documents) in Dollars, in the case of the BORROWER, and transfer of the sums corresponding to the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), obtaining the same though any of the following mechanisms, to the LENDER's or BORROWER s' option depending on the case:

6.2(a) Through the purchase with Pesos (or the then legal tender

en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

in the Argentine Republic), of any security in Dollars and the transfer and sale of said instruments outside the Argentine Republic for Dollars in an amount which, sold in a foreign market, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the amount of said currency due under the Transaction Documents; or

**6.2.(b).** Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2(b)** Through delivery to the LENDER (or the BORROWER as the case may be) of any security in Dollars, to the LENDER's express satisfaction (or the BORROWER's as the case may be) and with Dollar quotation abroad, in an amount which, once sold by the LENDER (or the BORROWER) in a foreign market, at market prices and conditions, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the aggregate amount in such currency due under the Transaction Documents; or

**6.2.(c).** En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

**6.2(c)** If there is any express legal prohibition in the Argentine Republic, which would impede the BORROWER (or the LENDER) from making the transactions stated in the two foregoing paragraphs, through the delivery to the LENDER (or BORROWER) of Pesos (or the then legal tender in the Argentine Republic), in an amount which, on the payment date, such Pesos are enough, once applicable taxes, costs, commissions and expenses are deducted, to acquire the aggregate amount of Dollars due by the BORROWER (or the LENDER) under the Transaction Documents, as per the exchange rate informed by Citibank N.A., New York, United States of America, to make Dollar acquisitions with Pesos in the City of New York, at 12 (twelve) hours (New York City time) on the payment date; or

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**6.2(d)** Through any other procedure existing in the Argentine Republic or abroad, on any Maturity Date under the Master Agreement, for the purchase of Dollars.

**6.3.** Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTUANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**6.3** It is hereby expressly stated that in any of the alternatives detailed in 6.2. (a) through 6.2.(d), the Sums Due by the BORROWER (or the LENDER) shall only be deemed paid and such payment shall have discharging effects only, once the amount of Dollars due under the Transaction Documents and this Master Agreement is actually credited at the Lender's Account (or at the Borrowers' Account as the case may be).

**6.4.** Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a). a 6.2.(d) precedentes serán pagados por el MUTUARIO

**6.4** All charges, costs, commissions, fees and taxes payable in connection with the procedures set forth in 6.2.(a) through 6.2.(d) above shall be paid by the BORROWER (or the LENDER as the

(o por el MUTUANTE en su caso).

case may be).

**6.5.** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTANTE (o al MUTUARIO en su caso) de esa pérdida.

6.5 If in order to obtain a judicial judgment it would be necessary to change the amounts in Dollars owed hereunder to another currency, the Parties agree that the exchange rate to be used shall be such which, in accordance with normal banking procedures, the LENDER (or the BORROWER) shall be able to purchase with such other currency Dollars in New York City, United States of America, on the Business Day prior to that day in which final judgment is pronounced. Likewise, if a judgment is pronounced against the BORROWER (or the LENDER) in a currency other than Dollars, the BORROWER's payment obligation (or the LENDER's) of any amount due under the Transaction Documents shall only be deemed paid if on the Business Day following the date in which the LENDER (or BORROWER) has received any amount judged as due hereunder in such other currency, the LENDER (or the BORROWER) shall, under normal banking procedures, in the City of New York, United States of America, purchase Dollars with such other currency. If such amount of Dollars thus purchased is less than the amount due under the Transaction Documents, the BORROWER (or LENDER) agrees, as a different obligation and independently from such judgment, to compensate the LENDER (or BORROWER) for such loss.

## CLÁUSULA SEPTIMA: WARRANTS

**7.1** En adición a toda otra garantía, junto con cada Solicitud de Desembolso, el MUTUARIO deberá suscribir y entregar al MUTUANTE, como garantía adicional de pago, Warrants de productos lácteos o sus derivados –debidamente endosados a favor del MUTUANTE- por una suma equivalente como mínimo al 15% (quince por ciento) de la Suma Adeudada correspondiente, expresada en Dólares Estadounidenses, con exclusión de toda otra moneda.

**7.2.** El MUTUARIO se obliga a que durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.

**7.3.** A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería vigente al momento de dicho depósito. El mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial

## SECTION SEVEN: WARRANTS

**7.1.** In addition to any other warranty, together with each Request for Disbursement, the BORROWER shall subscribe and deliver to the LENDER, as an additional warranty of payment, Warrants of milk products or its derivates – dully endorsed in favor of the LENDER – for an amount equivalent as minimum to 15% (fifteen per cent) of the correspondent Amount Due, determined in American Dollars, with exclusion of all other currency.

**7.2.** The BORROWER compels that during the term of the Master Agreement the LENDER has in its power the Warrants for an amount not inferior to the amount equivalent to 15% (fifteen per cent) of the Credit Line Due. Taking into account the maximum in force term of the warrants as established in section 26 on Section 9643, the BORROWER undertakes to periodically replace the Warrants before the expiration of 180 (one hundred and eighty) days counted from the date in which they were issued, and must deliver to the LENDER new Warrants for an amount equal or superior, in its case, to that of the original Warrants.

**7.3.** In order to determine the quantity of the merchandise that the BORROWER shall deposit for the issuance of the correspondent deposit certificates to the Warrants, it will be taken into account the market price of such merchandise, in force at the moment of such deposit. The maintenance of the warranties constituted for the Warrants, for the amounts and in the way that was previously mentioned, constitutes an essential

para el mantenimiento del presente Contrato Marco. Consecuentemente, la falta de acuerdo –por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada, que no fuere subsanada dentro de los 5 (cinco) días contados de la intimación que al efecto curse el MUTUANTE, producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula DECIMA del presente Contrato.

**7.4.** El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. . El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

**7.5.** En caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.

**7.6.** Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora.

## CLÁUSULA OCTAVA: FIADOR.

Por este acto el FIADOR se constituye en fiador solidario, codeudor solidario, liso llano y principal pagador de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier

condition for the maintenance of this Master Agreement. Consequently, the lack of agreement – for any reason whatsoever – in the quality and/or quantity of merchandise to be deposited, that is not heeled in within the 5 (five) days from the notification that to such effect delivers the LENDER, will produce the automatic Default of the BORROWER without the need to interpretation, causing the expiration of all the terms with the effects stipulated in Section TEN of this Master Agreement.

**7.4.** The BORROWER declares and warrants the truth of all the data contained in the Warrants, and that the merchandise indicated in them does not recognize nor will recognize any encumbrance nor restriction. In case of bankruptcy of the depositing company (Warrantera) of the merchandise described in the Warrants, the BORROWER compels to communicate such circumstance to the LENDER in within the 48 hs. from its order. The un-fulfillment of such communication will cause the automatic Default of the BORROWER. In all the cases, the BORROWER must answer for the damages and harms that it un-fulfillment could cause to the LENDER.

**7.5.** In case of Default of the BORROWER for any cause whatsoever, the LENDER will be automatically entitled with the faculty to initiate the execution of the Warrants in the terms of Lay 9643, without prejudice of all the other remedies and/or legal actions that correspond. In case of auction of the merchandise described in the Warrants, the LENDER expressly reserves the faculty to designate the auctioneer to such effect.

**7.6.** It will be exclusive and excluding responsibility of the BORROWER the inscription of the endorsement of the Warrants in the books of the depositing company of the merchandise indicated in them, as well as the payment of all the expenses and fees that correspond to such storage company.

## SECTION EIGHT: SURETY.

The SURETY hereat becomes the joint and several surety, main payor and co-debtor of the debts and liabilities undertaken by the BORROWER in this Master Agreement, under the same terms and conditions set forth herein for the BORROWER, expressly waiving the right to: (1) the benefits of division and excussion and other applicable related commercial and civil rules, (2) demand the previous judicial or extra judicial foreclosure of the BORROWER or exercise any defense to be enforced by the BORROWER and in general to file any defense other than that of payment. The joint and several liability assumed by the SURETY comprises, additionally, the legal or conventional readjustment and accessory costs, such as currency updating, compensatory and penalty interest, due by the BORROWER. This surety shall be effective until full payment by the BORROWER of all liabilities of the BORROWER, covered by this guarantee. It will be considered as a non compliance with the rules of the present the case in which the SURETY starts negotiations with any creditor for a general payment arrangement or changes the its indebtedness schedule, becomes

acreedor con miras a un arreglo general de pagos o cambiar el cronograma de endeudamiento, o se transformen en insolventes o quebrados, o les sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los (60) días hábiles de haber sido decretados. En dicho supuesto, en un plazo de treinta (60) días hábiles, el MUTUARIO deberá designar un nuevo garante a satisfacción del MUTUANTE. Vencido el plazo de treinta (30) días sin que el MUTUARIO haya designado un nuevo garante, el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3303, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO QUINTA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.

### CLAUSULA NOVENA:  MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DEL MUTUARIO Y DEL FIADOR.

**9.1.      Manifestaciones y Declaraciones del MUTUARIO.**
A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la  Línea de Crédito, el MUTUARIO  y el FIADOR manifiestan y declaran, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**9.1.1.**      Que el MUTUARIO es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

**9.1.2.**      Que el MUTUARIO y el FIADOR no están obligados a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**9.1.3.**      Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO y el FIADOR están

insolvent, or bankrupt, or bankruptcy proceedings are instituted, or petitions for a composition with creditors, or an Out of Court Reorganization Plan, and the same are not withdrawn within 60 days from initiation thereof. In such event, the LENDER shall designate a new surety at satisfaction of the LENDER. At the expiration of the terms of thirty (30) days in the case that the BORROWER has not designated a new surety, the LENDER may, declare that the BORROWER's obligations are due and demand payment of all amounts due by the BORROWER as payable, plus all expenses incurred by the LENDER. The SURETY declares and warrants all the following, which will be maintaing during the term of this Master Agreement: (a) This warranty constitutes a valid and bonding obligation for me, executable in agreement with its respective terms; (b) There is not existence of statute, rule, regulation or contractual obligation that is bonding to me and that could be violated by the celebration, delivery or execution of this warranty. For purposes hereof, the SURETY establishes special domicile at  80 SW 8th Street, Suite 2000 – Miami, FL 33130-3303, United States of America, and accepts that notices served through a certified telegram or other authentic means are valid. For all legal purposes hereof, the SURETY irrevocably submits to the jurisdiction and applicable law set forth in section FIFTEEN hereof, expressly waiving any other forum or jurisdiction.

### SECTION NINE: REPRESENTATIONS, WARRANTIES AND COMMITMENTS OF THE BORROWER AND OF THE SURETY

**9.1 Representations and Warranties of the BORROWER.**
In order to persuade the LENDER to enter into the Master Agreement and grant the Credit Facility, the BORROWER and the SURETY represent and warrant the following as of the date hereof and until this Master Agreement is terminated the following:

**9.1.1** That the BORROWER is a cooperative association of first degree duly organized, registered and validly existing pursuant to the laws of the Argentine Republic, with all the necessary powers and authority to carry out the relevant operations and businesses currently developed; and

**9.1.2** That the BORROWER and the SURETY are not bound to apply for authorizations or approvals from any judicial or governmental authority or from any other public or private entity (including, without limitation, lessors, lenders, creditors, insurance companies and financial institutions) as a result from this Master Agreement and/or the Guaranties.

**9.1.3** That the Master Agreement and the Guaranties (i) are legal acts or businesses that the BORROWER and/or the SURETY are



legalmente autorizados y capacitados para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

**9.1.4.** Que el MUTUARIO y/o el FIADOR y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

**9.1.5.** Que el MUTUARIO y el FIADOR no tienen pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

**9.1.6.** Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

**9.1.7.** Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**9.1.8.** Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**9.1.9.** Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco,

legally authorized and qualified to perform pursuant to the relevant legal and statutory provisions governing their activity; and (ii) that they are executed pursuant to all the required internal approvals of the BORROWER, without infringing any legal, statutory, stockholders' meeting or contractual provision, and that no further authorization is necessary; and

**9.1.4** That the BORROWER and/or the SURETY and/or their Affiliates have not materially and significantly defaulted on: (i) any order, ruling, mandatory injunction, demand, decree or request from any court of justice or arbitral tribunal, or any government agency, whether national, provincial or municipal, of the country or foreign, and/or (ii) the payment of taxes, rates, liens, social security debts and/or levies, whether national, provincial or municipal, both within the country or abroad; and

**9.1.5** That the BORROWER and/or the SURETY have no pending lawsuit, investigation or judicial, administrative or arbitral proceeding before any court of justice, arbitral tribunal or administrative authority, whether national, provincial or municipal, in the country or abroad; or any arbitration proceeding, that may (i) adversely and materially affect their capacity to fulfill their payment obligations under the Master Agreement; (ii) affect the validity, legality or enforceability of any of the Transaction Documents; and/or (iii) have a material adverse effect on the business, financial or any other condition, or the result of their operations; and

**9.1.6** That the execution and delivery of, and/or compliance with the Transaction Documents do not infringe any provisions under the Applicable Rules and/or any law and/or decree and/or regulation and/or resolution applicable to the BORROWER and do not infringe any order issued by any court or relevant judicial, arbitral or administrative authority the BORROWER might be subject to, and/or any provision under the current by-laws of the BORROWER and/or under any mortgage, pledge, debt instrument, master agreement or other undertaking in which the BORROWER might be a party to or be bound to; and

**9.1.7** That there is no paramount title and/or lien and/or restriction and/or limitation and/or hindrance whatsoever that precludes and/or prohibits and/or limits and/or in any way restricts the powers and rights of the BORROWER to execute all the documentation of the Transaction Documents, as well as any other commitment assumed by the BORROWER to the LENDER under any of the Transaction Documents; and

**9.1.8** That they are in compliance with the rules and regulations in force applicable to them in environmental, industrial safety and public health matters, and that they have secured all authorizations, permits and licenses required under such legislation; and

**9.1.9** That they have given and provided the LENDER with all the information relating to or in connection with any other

acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO y al FIADOR que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que han proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**9.1.10.** Que el balance del MUTUARIO al 30 de Junio de 2009, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2009 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

**9.1.11.** Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

**9.1.12.** Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**9.1.13** Que conforme el conocimiento actual del MUTUARIO, los Deudores Cedidos no se encuentran en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

**9.1.14** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tiene y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

**9.1.15.** Los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

**9.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el

master agreement, contract or transaction, fact and/or circumstance relating to the BORROWER and/or the SURETY that may in any way adversely and materially affect the capacity of any of them to comply with their payment obligations hereunder and under the Guarantees, and that all the information furnished to the LENDER relating to the preparation, negotiation and execution of the Transaction Documents is true and correct and does not contain any inaccurate information regarding any relevant fact, nor does it omit any relevant fact the mention of which might be necessary to prevent the stated facts from being inaccurate or misleading; and

**9.1.10** The annual balance sheet of the BORROWER as of June 30, 2009, the relevant statements of income and financial position, annexes and further information therein contained relating to the BORROWER, copies of which the BORROWER has delivered to the LENDER duly signed by their pertinent authorities, accurately represent the financial situation and result of operations of the BORROWER as of that date, and that from June 30, 2009 – no adverse change or event that may cause an adverse change in the business, operations, prospects or financial condition of the BORROWER has occurred; and

**9.1.11** That the Guaranties granted by the BORROWER are not subject to any pledge, or paramount title; and

**9.1.12** That the BORROWER has taken out and maintain duly in force all required insurance pursuant to the standards current in the Argentine Republic, and for the activities they develop with creditworthy insurance companies of national renown; and

**9.1.13** That pursuant to the BORROWER's present knowledge, the Assigned Debtors have not suspended payments, are not insolvent, are not subject to reorganization proceedings or bankrupt, and have not defaulted on any payment of its relevant debts.

**9.1.14.** That the Transaction Documents and the obligations included therein are and will be at all times direct and general obligations of the BORROWER and have and will have at all times the highest preferential rank of the BORROWER s' debt.

**9.1.15.** The Transaction Documents are, or when duly executed and delivered will be, in proper legal form and substance under the applicable law for purposes of performance thereof, pursuant to applicable law. All formalities required in Argentina for the validity and performance of the Transaction Documents (including any notice, registration, filing, payment of fees or taxes, notarization, or submittal to any Government Authority) have been complied with.

**9.1.16** That no Event of Default has occurred or will occur as a consequence of or in connection with the performance of the

cumplimiento de las operaciones previstas en los Documentos de la Operación;

**9.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO y/o del FIADOR que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**9.1.18.** Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**9.1.19.** Que los Bienes Fideicomitidos no reconocen gravamen ni restricción alguna a la fecha;

**9.1.20.** Que el Crédito Cedido contra PDVSA ascenderá como mínimo a una suma equivalente al veinte por ciento (20%) de la Línea de Crédito.

**9.1.21.** Que el Crédito Cedido contra Fonterra ascenderá como mínimo a una suma equivalente al cincuenta por ciento (50%) de la Línea de Crédito.

**9.1.21** Que el Crédito Cedido contra Arthur Schuman ascenderá como mínimo a una suma equivalente al treinta por ciento (30%) de la Línea de Crédito.

**9.1.22.** Que en todo momento durante la vigencia del presente Contrato Marco el MUTUANTE contará con Warrants por una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada.

**9.2** Compromisos y Obligaciones del MUTUARIO y del FIADOR.
Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO y el FIADOR se comprometen firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

**9.2.1.** A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula DECIMO PRIMERA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

**9.2.2.** A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que el MUTUARIO y/o el FIADOR, según el caso, los disputase por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la

transactions contemplated in the Transaction Documents;

**9.1.17.** That no Material Adverse Change has occurred or will occur as regards the BORROWER and/or the SURETY that may reasonably cause a Material Adverse Effect in their capacity to comply with their obligations under the Transaction Documents;

**9.1.18.** That the comply with and every reasonable action is being followed and taken by them in order to remain compliant with all international laws, regulations and conventions relating to environmental, labor, health and social security issues applicable thereto.

**9.1.19.** That the Trusted Assets to not recognize lien and or restriction of any kind as of the date hereof,

**9.1.20** That the Assigned Credit against PDVSA shall amount as a minimum to an amount equivalent to twenty per cent (20%) of the Credit Facility.

**9.1.21.** That the Assigned Credit against Fonterra shall amount as a minimum to an amount equivalent to fifty__ per cent (50%) of the Credit Facility.

**9.1.22.** That the Assigned Credit against Arthur Schuman shall amount as a minimum to an amount equivalent to thirty per cent (30%) of the Credit Facility.

**9.1.23.** That at all time during the validity period of this Master Agreement the LENDER shall be provided with Warrants for an amount equivalent to fifteen per cent (15%) of the Indebted Credit Facility.

**9.2 Commitments and Obligations of the BORROWER and of the SURETY.**
Following the execution hereof and to the extent any amount due hereunder remains outstanding, on any account and/or due to any reason whatsoever, the BORROWER and the SURETY firmly, expressly, irrevocably and unconditionally undertake to perform or abstain from performing, as applicable, all the acts and/or activities specified below:

**9.2.1** To pay as and when due the Sums Due, as well as the expenses of Section ELEVEN, pursuant to the terms and conditions set forth herein; and

**9.2.2** To keep all payments of taxes, liens, rates, and/or social security obligations and/or levies, whether national, provincial or municipal, both in the country or abroad, up to date, except in such cases where the BORROWER and the SURETY may, as applicable, object in good faith to such payments through the relevant legal resources for good reasons, as hastily as permitted by the applicable procedural legislation and based on their

base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

9.2.3. A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes, prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

9.2.4. A no realizar actos que constituyan o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, ó (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

9.2.5. A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

9.2.6. A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoria de primer nivel y prestigio internacional, (ii) estados contables trimestrales, y (iii) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iii) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

9.2.7. A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas,

unconstitutionality, inapplicability and/or illegality; and

9.2.3 To (i) maintain their legal capacity in force as well as all registrations necessary to maintain the same; (ii) take any reasonable steps to maintain all the rights, permits, authorizations, agreements, insurance, powers of attorney, privileges, franchises, registrations, licenses and the like in force, as are necessary or advisable for the regular conduct of their activity, businesses or operations and the performance of their obligations; (iii) maintain all their property in good state and working conditions; and (iv) abstain from performing any act that may adversely affect the validity and/or effect of the Master Agreement and the Guaranties; and

9.2.4 To abstain from performing any acts implying (i) a consolidation, merger, demerger or any other act which, pursuant to any law or rule, may be opposed by the BORROWER's creditors; or (ii) the participation of the BORROWER in other companies or projects or businesses different to the ones currently performed by them, or (iii) the reduction, distribution or reimbursement of corporate capital of the BORROWER or its associates, and to conduct and make all acts necessary for the conservation, maintenance, renewal and effectiveness of their legal existence and rights, licenses, concessions, permits, privileges and franchise materials for the conduction and management of its respective businesses; and

9.2.5 To maintain the LENDER fully and thoroughly informed of any Material Adverse Change and/or any other fact that may cause a Material Adverse Effect and/or otherwise adversely and significantly affect the payment capacity of the BORROWER of the obligations hereunder and/or under the Guaranties; and/or (ii) that may adversely affect the validity and/or effect of any of the Guaranties, as well as of the actions taken to remedy the same; and

9.2.6 To make available to the LENDER, and further deliver forthwith - at the latter's request - the following accounting documentation corresponding to the BORROWER: (i) annual financial statements duly audited by a first-level auditing firm of international prestige; (ii) quarterly financial statements, (iii) any other information the LENDER might reasonable request at any time. The financial statements mentioned in (i) above must be submitted duly audited within one hundred and twenty (120) calendar days from the closing of the relevant fiscal year; the financial statements mentioned in (ii) shall be submitted within sixty (60) calendar days from the closing of the relevant quarters; the documentation mentioned in (iii) above must be submitted within five (5) calendar days following LENDER 's request; and

9.2.7 Not to let in any manner whatsoever any third party creditor be subrogated to, and to preclude any third party creditor from becoming subrogated in any way to, any rights and/or actions granted to the LENDER hereunder and under the Guaranties, which will entail, inter alia, the obligation of the

la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

**9.2.8.** A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

**9.2.9.** A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y

**9.2.10.** A notificar al MUTUANTE, en forma inmediata, (i) el acaecimiento de cualquier Evento de Incumplimiento, y (ii) cualquier incumplimiento en que el MUTUARIO y/o el FIADOR incurriere en relación con cualquier acuerdo o Contrato Marco del que sea parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (iii) las acciones tomadas para subsanar los incumplimientos referidos en (i) y (ii) precedentes, y

**9.2.11.** A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, permitiéndole la realización de auditorías contables, legales y de gestión, por sí mismo o por quien el MUTUANTE designe a tal efecto, en la medida que no interfiera sustancial y adversamente con las actividades habituales del MUTUARIO, y

**9.2.12.** A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (i) cualquier pérdida o daño sufrido en los bienes de el MUTUARIO por montos superiores a Dólares Estadounidenses DOS MILLONES con 00/100 (US$ 2.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y (ii) cualquier litigio, o reclamo en el cual el monto reclamado al MUTUARIO fuere igual o superior a Dólares Estadounidenses TRES MILLONES con 00/100 (US$ 3.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y

**9.2.13.** A no reducir su capital, y

**9.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**9.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco, y

BORROWER to demand the express waiver by any third party obligor of the power to become subrogated to such rights and/or actions to the extent any sum hereunder remains outstanding; and

**9.2.8** To comply with the Applicable Rules (including, without limitation, any law, rule, regulation, order, instruction or resolution applicable to them as regards environmental protection, toxic or hazardous wastes, pollution and hygiene) and to maintain all authorizations, permits or licenses that are necessary under the Applicable Rules; and

**9.2.9** To comply in due time and manner each and every of their obligations arising from the Transaction Documents; and

**9.2.10** To forthwith immediately notify the LENDER (i) of the occurrence of any Event of Default; and (ii) of any default by the BORROWER and/or the SURETY in connection with any agreement or master agreement they might be a party to, or of any of their obligations thereunder (irrespective of whether or not the lapsing and acceleration of the terms has been declared); and (iii) of any actions taken to cure the defaults mentioned in (i) and (ii) above; and

**9.2.11** To keep the accounting records and other records in proper form and allow LENDER's access to their offices, facilities, books, records and files, allowing the performance of any accounting, legal, and management audits, by themselves or by the ones appointed by the LENDER to the extent such action does not materially and adversely interfere with the regular activities of the BORROWER, and

**9.2.12** To inform the LENDER within 5 (five) Business Days after occurrence thereof (i) of any loss or damage suffered by the BORROWER s' property in amounts higher than TWO MILLION United States Dollars and 00/100 (USD 2,000,000.00), individually or cumulatively during each fiscal year, and (ii) any action or claim where the amount claimed from the BORROWER is equal to or higher than THREE MILLION United States Dollars and 00/100 (USD 3,000,000.00) individually or cumulatively during each fiscal year, and

**9.2.13** To abstain from reducing its capital stock; and

**9.2.14** To abstain from transferring or otherwise reducing, for any cause or on any account, including by means of a shareholder s' agreement or voting trust with third parties, and from pledging, encumbering or granting, any kind of guaranty as regards the current shareholdings of the BORROWER in other companies, and

**9.2.15** To maintain all amounts due hereunder as to guaranties and privileges in collection not below any other obligation of the BORROWER;

9.2.16. A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

9.2.17. A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

9.2.18. A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

9.2.19. A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

9.2.20. A realizar sus mejores esfuerzos para causar que los Deudores Cedidos depositen en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

9.2.21. A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

9.2.22. A remitir al MUTUANTE copia de todo informe, documento, reporte, orden de compra, factura, y/o pronóstico de ventas que remita a cada Deudor Cedido y/o que reciba de cada Deudor Cedido.

9.2.16 To inform the LENDER on a semiannual basis (i) the consolidated debt of the BORROWER's Affiliates, by each of the companies and per each of the financial entities as creditors, and (ii) the sales volume of each of the Affiliates,

9.2.17 To abstain from making any decision that may affect the business and/or goodwill of the BORROWER;

9.2.18 To comply with all the requirements and demands imposed by Banco Central de la República Argentina and other Applicable Rules, and evidence such compliance to the LENDER, to the latter's satisfaction, including without any restriction whatsoever: (i) to enter in the exchange market of the Republic of Argentina all the funds deposited in the BORROWER's Account disbursed hereunder, through the corresponding exchange closing and crediting of the resulting Pesos in a bank account opened in the Argentine financial system as conversion of currency caused under this Master Agreement executed with a foreign lender, and (ii) to periodically inform Banco Central de la República de Argentina about: (a) the existence of the Transactions Documents and (b) the balance of its foreign debt according to Comunicaciones "A". 3602 and 3609 of the Banco Central de la República Argentina and/or its complementary rules and amendments.

9.2.19 To provide all the information the LENDER may request from them relating to the Assigned Credits, and to comply with every obligation applicable to them for the Assigned Credits to be paid to the LENDER, binding themselves to follow any necessary steps for the LENDER to achieve full recognition of the Assigned Credits; the BORROWER will bear all the expenses and costs resulting from or inherent in said assignments, including the reasonable attorney's fees or court costs the LENDER might eventually incur to collect the Assigned Credits;

9.2.20 To make their best efforts to cause the Assigned Debtors to deposit in the LENDER's Account as and when due all the amounts corresponding to the Assigned Credits;

9.2.21 To replace, to the LENDER's full satisfaction, within a term of five calendar days following request therefore, the relevant Promissory Notes with another eligible instruments allowing for the enforced collection proceeding if, due to any change in the legislation, the aforementioned instruments lose their effect as such; and

9.2.22. To send to the LENDER a copy of all reports, documents, purchase orders, invoices and/or sale forecasts that were send to each Assigned Debtor and/or were received from each Assigned Debtor.

**CLÁUSULA DECIMA:   MORA.**

**10.1**     La Mora del MUTUARIO en el cumplimiento de las obligaciones de pago en tiempo y forma de cualquier Suma Adeudada se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora, el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios..

**10.2**     También se considerará la mora del MUTUARIO, si transcurridos quince (15) días contados a partir de que el MUTUANTE los haya intimado a subsanar los siguientes Eventos de Incumplimiento, los mismos no hubieran sido subsanados, en cuyo caso el MUTUANTE tendrá la facultad de considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las Sumas Adeudadas en los siguientes Eventos de Incumplimiento:

(a)     si un tercero pidiere la quiebra del MUTUARIO, del FIADOR, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

(b)     si el MUTUARIO, el FIADOR y/o cada Deudor Cedido pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

(c)     si el MUTUARIO y/o el FIADOR incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

(d)     Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares Estadounidenses TRES MILLONES (US$ 3.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los sesenta (60) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

**SECTION TEN: DEFAULT**

**10.1** The BORROWER's default to comply with the obligations agreed upon in this Master Agreement - including without limitation, payment in due time and manner of any Sum Due - shall occur automatically by law and without any judicial order. Upon the Default, the lapsing of all terms shall occur and the LENDER shall be entitled to consider the aggregate amount of the Indebted Credit Facility as past due debt and to request and legally demand full payment of the Indebted Credit Facility, interest accrued and other charges. During the time of the Default the LENDER shall be entitled to receive compensatory interest agreed equivalent to the interest rate implicit in each funds request, plus and interest for default equivalent to 50% (fifty per cent) of such interest rate.

**10.2** The LENDER shall also be entitled to consider the automatic Default of the BORROWER, if after fifteen (15) calendar days as of the date in which the LENDER request the mitigation of the Event of Default, the same were not resolved, in which event the LENDER shall be entitled to consider the Indebted Credit Facility as past due, and request from the BORROWER the prompt payment of all the Sums Due, being the Events of Default the following:

(a)     if a third party requests the BORROWER, the SURETY, and/or the Assigned Debtors to be declared bankrupt and such request is not rejected by the court intervening in the pertinent first procedural step;

(b)     if the BORROWER, the SURETY, and/or the Assigned Debtor file for their own bankruptcy proceedings, file for their own reorganization, or initiate procedures for an out-of-court reorganization plan or any debt restructuring;

(c)     if the BORROWER, the SURETY incur suspension of payments, without such steps being taken;

(d)     in the event any attachment or any provisional remedy were granted over the property, assets or rights of the BORROWER, or a legal disqualification from disposing of any of the BORROWERs' property were ordered in an amount exceeding THREE Million United States Dollars and 00/100 (USD 3,000,000.00), or its equivalent in Pesos, whether individually or jointly throughout the effect of the Master Agreement, and such attachments and/or provisional remedies were not released or cancelled due to any reason whatsoever within sixty (60) judicial days following the request to release the attachment and/or cancel the provisional remedy, which request must be made at the first procedural opportunity possible; or

(e) si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad, parcial o total, por parte del MUTUARIO, en las declaraciones contenidas en la Cláusula NOVENA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(f) si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(g) si el MUTUARIO y/o el FIADOR modificasen de cualquier forma su composición accionaria;

(h) si el MUTUARIO y/o el FIADOR incumplieren cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(i) si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con cada Deudor Cedido;

(j) si –con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas- el MUTUARIO y/o cada Deudor Cedido terminan el contrato que causa los Créditos Cedidos ;

(k) si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(l) Si se dictaren una o más sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

(m) Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

(n) si el MUTUARIO incumpliere cualquiera de sus obligaciones establecidas en el Fideicomiso y/o realizare cualquier acto que afecte negativamente o implique una disminución en el valor de los Bienes Fideicomitidos;

10.3   El MUTUARIO asume el cumplimiento de todas y cada una de las obligaciones bajo los Documentos de la Operación, por lo cual en caso de incurrir en un Evento de Incumplimiento, se

(e) if at any time during the term hereof the lack of veracity, whether partial or total, by the BORROWER is proven in the statements included in Section NINE hereof and/or the failure to comply with the undertakings assumed in such Section and/or the lack of veracity in any of the applications of this Master Agreement;

(f) if there were any change that in the LENDER's opinion, would cause a material change in the basic conditions which have been considered for this Master Agreement.

(g) if in any manner whatsoever the BORROWER and/or the SURETY's shareholdings changes,

(h) if the BORROWER and/or the SURETY fails to comply with any of their obligations set forth herein and/or in the Transaction Documents.

(i) if the BORROWER fails to comply with any of their contractual obligations with the Assigned Debtors,

(j) if – irrespective of the BORROWER' compliance or noncompliance with the payment of the Sums Due –, the BORROWER and/or the Assigned Debtor terminate the agreements originating the Assigned Credits;

(k) if for any reason whatsoever the Sums Due hereunder are paid in other currency than the Dollar.

(l) if one or more final judicial judgments or arbitration awards were issued against the BORROWER or measures were adopted to foreclose any mortgage, attachment or other lien over the property of the BORROWER which, at LENDER's criterion, may (i) adversely and materially affect the capacity of the BORROWER to afford payment of their obligations hereunder; or (ii) adversely and materially affect any of the Guaranties;

(m) if there occurs a Material Adverse Change and/or a Material Adverse Effect.

(n) If the BORROWER does not comply with any of the obligations set forth in the Trust and/or perform any act that have a negative effect or implies a reduction in the value of the Trust Assets.

10.3 The BORROWER binds itself to the performance of each and every one of the obligations under the Transaction Documents, and, therefore, the occurrence of an Event of Default by it will



producirá la Mora del MUTUARIO. Producida la Mora del MUTUARIO, el MUTUANTE podrá proceder sin más a la ejecución de las Garantías (entendiéndose que en el caso del Fideicomiso podrá instruir al Fiduciario a tal efecto) e imputar la totalidad de los Créditos Cedidos al pago de la Línea de Crédito Adeudada.

10.4    En adición a lo dispuesto en la Sección 10.3 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 10.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de las Sumas Adeudadas por parte del MUTUARIO o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE.

### CLÁUSULA DECIMO PRIMERA:        GASTOS.

11.1    Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

11.2    Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y

give rise to BORROWER 's Default. Upon the BORROWER's Default, the LENDER may forthwith proceed to enforce the Guarantees (being understood that in the case of the Trust it may instruct the trustee to proceed to that end) and allocate all the Assigned Credits to the payment of the Indebted Credit Facility.

10.4 In addition to the provisions set forth in 10.3 above, the BORROWER 's Default due to the non-fulfillment of any of the obligations agreed herein shall give place to the lapsing of all terms and the automatic default of all the agreements executed between the BORROWER and the LENDER. Likewise, the default in any of such agreements shall give place to the automatic Default hereof – as per the terms set forth in 10.1 above – and of any other contractual obligation between the BORROWER and the LENDER. In such sense, upon the BORROWER 's, either due to the lack of payment by the Assigned Debtors or due to the occurrence of any of the Events of Default detailed hereinabove, the LENDER, at its own discretion, shall proceed to the execution of the Guarantees and/or other guaranties granted in other agreements executed between the BORROWER and the LENDER. Likewise, in such event, the LENDER shall be entitled to apply to the payment of the Sums Due, the BORROWER's funds deposited at such time – or those to be deposited in the future – in the LENDER's Account for any reason and/or contractual relationship between the LENDER and the BORROWER.

### SECTION ELEVEN: EXPENSES.

11.1 All commissions, bank fees (including, without any restriction whatsoever, the bank fees and commissions resulting from the deposits and transfers made from and to LENDER's Account and/or BORROWER's Account) taxes and/or charges resulting from the transactions directly and/or indirectly derived from this Master Agreement, shall be borne by the BORROWER. The BORROWER undertakes to pay all commissions and/or expenses to be borne by it to the LENDER promptly and upon the latter's sole request and not later than 48 hours following such request, which shall be duly evidenced.

11.2 All payments hereunder shall be made by the BORROWER free of any deduction, withholding and other charges of any nature whatsoever. If the BORROWER is requested by law or any other competent authority to make any deduction, withholding or charge, the BORROWER shall make such additional payments to the LENDER as necessary so that, after such deductions, withholdings or charges, the LENDER receives an amount equal to the amount due to it hereunder as if such deductions, withholdings or charges have not been made. The BORROWER shall pay in due time and manner to the pertinent tax authority, the amount withheld, and shall obtain and give to the LENDER a certified copy of the corresponding receipts in

deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago

connection with such payment.

**11.3** El MUTUARIO se obliga a cumplir en tiempo y forma – a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**11.3** The BORROWER undertakes to comply in due time and manner, on its own account, with settlement of foreign currency and payment of all pertinent taxes directly or indirectly resulting from this Master Agreement and with other rules in accordance with the rules set forth by Banco Central de la República Argentina, releasing the LENDER from any obligation therefore.

**11.4** El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

**11.4** The BORROWER undertakes to hold the LENDER harmless, and to defend and prevent any damage to the LENDER, its shareholders and employees in connection with all obligations resulting from the transactions relating to the Assigned Credits, entry and liquidation of foreign exchange and any other taxable, exchange, banking, customs liability or of any other kind whatsoever resulting therefrom.

**CLÁUSULA DÉCIMO SEGUNDA:      CESIÓN      DEL CONTRATO MARCO.**

**SECTION TWELVE: MASTER AGREEMENT ASSIGNMENT.**

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

The LENDER may assign the rights arising from the Master Agreement in full to any of its affiliates and/or subsidiaries (i.e. those holding or subsidiary corporations of the LENDER or property thereof), by any of the means provided by Law, the assignee acquiring the same benefits and/or rights and/or actions to which the LENDER is entitled under the above-mentioned Master Agreement. In such event, the LENDER shall give notice by true means of the assignment to the BORROWER, as well as of the new payment terms and conditions, using therefore any true means of notice. In such event, the BORROWER may file any defense against the assignee of the Master Agreement which it would have been entitled to file against the assigning LENDER.

**CLÁUSULA DÉCIMO TERCERA: VIGENCIA. INDEMNIDAD**

**SECTION THIRTEEN: EFFECT – INDEMNITY.**

**13.1** El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplan en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas DECIMO PRIMERA, DECIMO TERCERA y DECIMO QUINTA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

**13.1** This Master Agreement as well as all the Guaranties resulting herefrom will remain in full force and effect until performance in full of the rights and/or obligations of the Parties hereunder. Furthermore, even after the obligations arising from the Master Agreement have been fulfilled, Sections ELEVEN, THIRTEEN and FIFTEEN will survive and will remain in full force and effect until the expiration of the limitations that might be applicable.

**13.2** El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento

**13.2** The BORROWER will hold the LENDER and its Affiliates, directors, managers, officers, employees and independent advisors (the "Indemnitee") harmless against any loss, claim, complaint, liability and every expense relating thereto (including reasonable attorney's and advisor's fees) incurred by the Indemnitee in connection with, relating to, arising from and as a consequence of: (i) the execution or delivery of the Master Agreement and the Guaranties and the performance of the

de las obligaciones previstas en ellos, o de la celebración de las operaciones previstas en ellos; (ii) el Crédito Cédido adeudado con más sus intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial, relacionado con cualquiera de las circunstancias previstas en esta Cláusula 13.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

## CLÁUSULA DÉCIMO CUARTA: AUTORIZACION

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.

En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

## CLÁUSULA DÉCIMO QUINTA: JURISDICCIÓN Y LEY APLICABLE.

**15.1** El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

**15.2** El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

**15.3** Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés y/o los Warrants y/o del Fideicomiso en la República Argentina.

**15.4** El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado

obligations thereunder, or the performance of the transactions contemplated therein; (ii) the Assigned Credits due plus any interest thereon or the use of the disbursed funds; or (iii) any actual complaint, lawsuit, preliminary investigation proceeding or procedure, current or potential, relating to any of the circumstances contemplated in this Section 13.2, based on contractual or extra-contractual reasons, or as provided in the applicable law; to the extent the indemnity against such losses, complaints, liabilities or expenses is not due to the gross negligence or willful misconduct of the Indemnitee.

## SECTION FOURTEEN: AUTHORIZATION

The BORROWER expressly authorizes the LENDER to register this Master Agreement and all documents thereunder in all Registries deemed relevant by the LENDER in order to secure the BORROWER's obligations.

Therefore, the BORROWER authorizes the LENDER to submit any kind of financing statements in the registry offices of any jurisdiction of the United States of America, as per the provisions set forth in Section 5 Article 9 of the Uniform Commercial Code, including all the BORROWER's goods delivered as security for the compliance with the obligations undertaken hereunder.

## SECTION FIFTEEN: JURISDICTION AND APPLICABLE LAW

**15.1** This Master Agreement is governed by and must be construed in accordance with the laws of the State of New York, United States of America.

**15.2** The BORROWER irrevocably accepts the non-exclusive jurisdiction of the United States Courts located at the South District of New York for any claim, trial or proceeding that might be initiated by the LENDER, and in connection with this Master Agreement. The ruling issued against the BORROWER at such trials, claims or proceeding, shall be considered final and may be executed in any other jurisdiction.

**15.3** Nothing of the aforesaid herein shall affect the LENDER's right to bring legal actions or to otherwise sue the BORROWER in any other jurisdiction deemed appropriate by the LENDER, including the LENDER's right to initiate the judicial and/or extrajudicial execution of the Promissory Notes and/or Warrants and/or the Trust in the Argentine Republic.

**15.4** The BORROWER hereby irrevocably appoints and authorized Sancor Dairy Corporation, with domicile at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA, as its authorized agent for the sole purpose of receiving, in its name and stead, letters and/or notices addressed to the BORROWER in any action, lawsuit or proceedings filed by the LENDER in the estate of New York, being the BORROWER obliged to inform the

de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

LENDER as of the identity and address of any new agent appointed to that end.

**15.5** Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 15.8 de la presente Cláusula.

**15.5** If, for any reason, its authorized agent to receive notices at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA, fails to be present, the BORROWER agrees and consents to the notices to be served in any action, lawsuit or proceedings being served on it by US registered mail at the BORROWER's domicile stated in 15.8 hereof.

**15.6** Las notificaciones efectuadas de la manera establecida en la Sección 15.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

**15.6** Notices served as stated in 15.4 shall be considered personal, valid, received and mandatory for the BORROWER.

**15.7** El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total y/o parcial comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

**15.7** The BORROWER irrevocably waives, to the maximum extent permitted by the laws, the right to file an objection now or in the future against the jurisdiction of any of the courts mentioned in this Section hearing in any lawsuit, action or proceedings filed by the LENDER, and, especially, the BORROWER waives the right to file any defense or to allege lack of jurisdiction, or inconvenient forum regarding the court hearing in such action, lawsuit or proceedings. The BORROWER also expressly waives its right to challenge the one-judge or more judges of the court hearing the case. The BORROWER may only file a defense for full and/or partial payment evidenced in writing, on a document sent by the LENDER directly related to the Master Agreement being executed or the guaranteed obligation, expressly waiving any other defenses of any kind whatsoever.

**15.8** Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:
MUTUARIO: 1) 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003 - USA
2) Tacuarí 202 - 3° Piso - Capital Federal, República Argentina
MUTUANTE: Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands

**15.8** Any of the aforementioned notices to be made in respect of this Master Agreement shall be sent to the domiciles stated below:
BORROWER:
1) 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA.
2) Tacuarí 202 – 3rd Floor – City of Buenos Aires, Argentine Republic
LENDER:
Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands.

## CLÁUSULA DECIMO SEXTA: FIRMAS Y RECEPCION DE INSTRUMENTOS.

Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE, 1 (un) juego en poder del MUTUARIO y 1 (un) juego en poder del FIADOR.

## SECTION SIXTEEN: SIGNATURES AND RECEIPT OF DOCUMENTS.

The parties hereto sign 3 (three) equal counterparts of the same tenor and to one sole purpose, 1 (one) counterpart for the LENDER, and 1 (one) counterpart for the BORROWER, and one counterpart for the SURETY.





**CLÁUSULA DECIMO SEPTIMA: LUGAR Y FECHA.**

Suscripto por el MUTUARIO  y el FIADOR en la Ciudad de Buenos Aires, República Argentina y por el MUTUANTE en Amsterdam, a los 21 días del mes de Diciembre de 2009.

**SECTION SEVENTEEN: PLACE AND DATE.**

Executed by the BORROWER and the SURETY in the City of Buenos Aires, Argentine Republic, and by the LENDER in Amsterdam, on December 21; 2009.

_____
By: SANCOR COOPERATIVAS UNIDAS LTDA.
Name: Mario Magdalena
Capacity: Attorney-in-fact

_____
By: SANCOR DO BRASIL Productos Alimenticios Ltda.
Name: Mario Magdalena – Gabriel Martinuzzi
Capacity: Attorney-in-fact

_____
By: IIG TOF B.V.
Name:
Capacity:

Firma/s certificada/s en Foja
Nº E 00 / 3 2 2 8 6 3
Bs. As. 21 / 12 / 09

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



**ANEXO**

F 001322863



ARANA (h)
BANO
4370

1  Buenos Aires, 21 de Diciembre de 2009 . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s                              que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 24                del LIBRO

6  número 128                    , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9  Gabriel Gustavo MARTINUZZI, DNI 18.264.987, quienes justifican sus i-

10 dentidades de acuerdo al inciso a del artículo 1002 del Código Civil y ac-

11 túan: el señor Magdalena en su carácter de apoderado de la sociedad

12 "SANCOR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sun-

13 chales, Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro

14 Nacional de Cooperativas, de la Provincia de Santa Fe, Departamento

15 Castellanos, conforme lo acredita con el poder de fecha 15 de diciembre

16 de 2009, pasado al folio 1400 del Registro 640 de la ciudad de Suncha-

17 les, Provincia de Santa Fe, a cargo de la escribana Analía Roch, asimis-

18 mo actúan: el señor Magdalena en su carácter de Apoderado Gerencia

19 Financiera y el señor Martinuzzi en su carácter de Administrador de la

20 sociedad "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que a-

21 creditan con el Contrato Social de fecha 4 de agosto de 2008 debidamen-

22 te Legalizado y Apostillado, la documentación relacionada tengo a la vista

23 y les confieren facultades suficientes para suscribir el documento adjunto,

24 doy fe.- El documento se encuentra parcialmente escrito en idioma ex-

25 tranjero.-

MARTIN R. ARANA (h)

**ANEXO I: / ANNEX I**
**PROPUESTA FIDEICOMISO Y ACEPTACIONES / TRUST PROPOSAL AND ACCEPTENCE**

Buenos Aires, 21 de Diciembre de 2009.

Sres.
**IIG TOF B.V.**
**representada por Trust Management Corp. B.V**
**Telestone 8 – Teleport, Naritaweg 165,**
**P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands**

**BANCO DE SERVICIOS Y TRANSACCIONES S.A**
**Av. Corrientes 1174, Piso 3º**
**Ciudad Autónoma de Buenos Aires**
**At.: Juan Manuel Lladó**
Presente

> Ref. : Propuesta de Cesión Fiduciaria y
> Fideicomiso con Fines de Garantía Sancor-
> IIG TOF BV (Propuesta Nº 1101)

De nuestra consideración:

Conforme las conversaciones mantenidas, nos dirigimos a Uds. a fin de formular con carácter irrevocable la presente oferta (la "Oferta de Fideicomiso" o "Propuesta" indistintamente) para la constitución de un Fideicomiso de Garantía y Cesión Fiduciaria (según dicho término se define más adelante) que se regirá por los términos y condiciones que resultan del **Adjunto A**.

A los efectos de la presente Oferta de Fideicomiso, (i) **SANCOR COOPERATIVAS UNIDAS LTDA**, (el "Potencial Fiduciante"), con domicilio en Tacuari 212 Piso 3º, Ciudad A. de Buenos Aires; **IIG TOF B.V.** -representada en este acto por Trust Management Corp. B.V., con domicilio en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands (Países Bajos)- (el "Potencial Benefciario") y **BANCO DE SERVICIOS Y TRANSACCIONES S.A.** con domicilio en Av. Corrientes 1174 piso 3º Ciudad A. de Buenos Aires (el Potencial "Fiduciario") serán denominados en forma conjunta las "Partes".

**PRIMERO:** El Potencial Fiduciante por la presente ofrece irrevocablemente a Banco de Servicios y Transacciones S.A. y por el término previsto en el Artículo Cuarto, la constitución de un fideicomiso de garantía y celebración de un contrato de cesión fiduciaria (el "Fideicomiso de Garantía y Cesión Fiduciaria Propuesta") bajo el cual el Potencial Fiduciario actuará como fiduciario, el Potencial Beneficiario actuará como beneficiario y el Potencial Fiduciante actuará como fiduciante cediendo en propiedad fiduciaria los Créditos Cedidos -tal como se define dicho término en el **Adjunto A** de la presente Oferta de Fideicomiso-. Los términos y condiciones que regirán el Fideicomiso de Garantía y Cesión Fiduciaria Propuesta, incluyendo todos sus Anexos, se incluyen como **Adjunto A** a la presente Oferta de Fideicomiso.

**SEGUNDO:** En caso que decidan aceptar la presente Oferta de Fideicomiso, las obligaciones y derechos de las Partes serán estrictamente los que resultan del **Adjunto A** a la presente Oferta de Fideicomiso. En caso de discrepancia entre los Artículos Primero a Cuarto de la presente Oferta de Fideicomiso y los términos del **Adjunto A** de la misma, prevalecerá lo establecido en el **Adjunto A**.

**TERCERO:** La presente Oferta de Fideicomiso se considerará aceptada si en, o antes de, transcurridos diez (10) Días Hábiles desde el día de emisión de la presente Oferta de Fideicomiso: (i) el Potencial Fiduciario remite al Potencial Fiduciante la factura correspondiente a la comisión inicial por incorporación y comunica dicho extremo en forma fehaciente al Potencial Beneficiario mediante nota con certificación notarial de firmas y facultades de los firmantes –de conformidad con los términos del **Anexo VI**- y (ii) el Potencial Beneficiario remite al Potencial Fiduciante y al Potencial Fiduciario una nota – de conformidad con los terminos del **Anexo VII**- con certificación notarial de firmas de los firmantes mediante la cual ratifique el domicilio indicado en el Artículo 14.01 del **Adjunto A.**

**CUARTO:** La presente Oferta de Fideicomiso es irrevocable por parte del Potencial Fiduciante y tiene vigencia por el plazo de diez (10) Días Hábiles contados a partir del día de la fecha inclusive.

Atentamente,

**SANCOR COOPERATIVAS UNIDAS LTDA**

Nombre: Mario Cesar Magdalena
Cargo: Apoderado

**ADJUNTO A**

**FIDEICOMISO DE GARANTIA SANCOR –IIG TOF BV**

En caso de haber sido aceptada la Oferta de Fideicomiso (según dicho término se define más adelante), en los términos y condiciones allí previstos, de la cual el presente forma parte integrante como **Adjunto A**, se entenderá que se ha perfeccionado el siguiente Contrato de Fideicomiso en Garantía y la Cesión Fiduciaria de los Créditos Cedidos (el "Contrato de Fideicomiso en Garantía y Cesión Fiduciaria", el "Contrato de Fideicomiso" o el "Contrato") en el lugar y fecha en que dicha Oferta de Fideicomiso haya sido aceptada y se regirá por los términos y condiciones que se describen a continuación, teniendo como partes a:

(1) **SANCOR COOPERATIVAS UNIDAS LTDA**, (el "Fiduciante"), con domicilio en Tacuari 212 Piso 3°, Ciudad Autonóma de Buenos Aires, Argentina, representado por el Sr. Mario Magdalena (LE 8.106.144) en su carácter de apoderado,

(2) **BANCO DE SERVICIOS Y TRANSACCIONES S.A**, actuando exclusivamente en su carácter de fiduciario y no a título personal (el "Fiduciario"), con domicilio en Corrientes 1174, 3° Piso, Ciudad A. de Buenos Aires, Argentina, representado por los Sres. Juan Manuel Lladó (DNI 27.535.040) y Carlos E. Ravenna (DNI 14.929.563) en su calidad de apoderados, y

(3) **IIG TOF B.V.** ("el Beneficiario" o "IIG TOF BV" indistintamente), representada en este acto por Trust Management Corp. B.V., con domicilio en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands (Países Bajos), representado por los Sres. _____ y en su calidad de _____; y

CONSIDERANDO:

1 - Que al día de la fecha el Fiduciante ha suscripto un Contrato de Línea de Crédito con IIG TOF BV, cuya copia se adjunta al presente como **Anexo I**, mediante el cual IIG TOF BV ha concedido al Fiduciante una línea de crédito, por hasta un monto máximo, único y definitivo de US$ 50.000.000,00, (Dólares Estadounidenses Cincuenta millones con 00/100), (en adelante, el "Contrato de Préstamo").

2- Que a fin de garantizar al Beneficiario el fiel y puntual cumplimiento de todas y cualesquiera de las obligaciones asumidas por el Fiduciante bajo el Contrato de Préstamo y sin perjuicio de la plena responsabilidad del Fiduciante ante el Beneficiario por todas y cada una de dichas obligaciones, el Fiduciante cede y transmite al Fiduciario, en los términos y con el alcance del presente Contrato de Fideicomiso y del Título I de la Ley 24441 y el Artículo 2662 y concordantes del Código Civil de la República Argentina, los Créditos Cedidos (según se los define mas adelante), los cuales pasarán al Fiduciario en propiedad fiduciaria con fines de garantía y con efecto y operatividad simultáneos con la aceptación de la Oferta de Fideicomiso, incluyendo, en cada caso, el derecho de efectuar toda clase de reclamos e interponer todas las acciones judiciales o extrajudiciales que fueran necesarias para ejercitar, mantener y/o proteger la integridad y alcance de los Créditos Cedidos conforme a los términos del presente Contrato de Fideicomiso, para lo cual el Fiduciante, otorgará, al Fiduciario -una vez aceptada la Oferta de Fideicomiso- un poder especial irrevocable a dicho efecto.

3 - Que a los efectos de la constitución y perfeccionamiento de la cesión fiduciaria y fideicomiso con fines de garantía y de su eventual ejecución en favor del Beneficiario, es interés del Fiduciante

designar al Fiduciario para que actúe como fiduciario a los fines del presente de conformidad con los términos del Título 1 de la ley 24.441 y los términos y condiciones del presente Contrato de Fideicomiso.

POR TODO ELLO, las Partes acuerdan lo siguiente:

## CAPITULO 1
### DEFINICIONES

**1.01.** Todos los términos cuya primera letra figura en mayúscula (excepto en los casos en que se deba a que inician una oración o constituyan un nombre propio) en el presente Contrato de Fideicomiso tendrán, según el caso, el significado que se les otorga en el presente.

**1.02.**   (A) A efectos del presente Contrato de Fideicomiso, a menos que se especifique lo contrario o el contexto lo requiera, los términos definidos comprenderán el plural y el singular; los términos "en el presente", "del presente" y "en virtud del presente" y términos similares se referirán al presente Contrato de Fideicomiso en su totalidad y no a un artículo u otra subdivisión en particular; y las referencias a un artículo en particular son al artículo pertinente del Contrato de Fideicomiso.

   (B) Todos los términos definidos en el presente tendrán el significado que se les asigna en el presente apartado y/o en el cuerpo del presente Contrato de Fideicomiso, cuando se los utilice en cualquier documento entregado conforme con el presente a menos que se defina lo contrario, a saber:

<u>Autoridades Fiscales</u>: son aquellas indicadas en el Artículo 10.02.
<u>Beneficiario</u>: es IIG TOF B.V
<u>Bienes Fideicomitidos</u>: son los Créditos Cedidos conforme se definen bajo el presente Contrato de Fideicomiso.
<u>Comisiones</u>: son las Comisiones, conforme se definen en el Artículo 11.01 del presente Contrato de Fideicomiso.
<u>Cambio Material Adverso</u>: significa cualquier Cambio Material Adverso, conforme se define en el Contrato de Préstamo.
<u>Contrato de Fideicomiso</u>: es el presente Contrato de Fideicomiso en Garantía y Cesión Fiduciaria.
<u>Contrato de Préstamo</u>: es el Contrato de Línea de Crédito indicado en el Considerando 1 y cuyo modelo se adjunta como **Anexo I**.
<u>Créditos Cedidos</u>: son los créditos y derechos de cobro cedidos definidos en el Artículo 2.02. del presente Contrato de Fideicomiso, que constituyen los Bienes Fideicomitidos.
<u>Cuenta del Beneficiario</u>: es la cuenta de titularidad del Beneficiario que oportunamente éste informe al Fiduciario, abierta en una Entidad Financiera con asiento en la República Argentina.
<u>Cuentas Fiduciarias</u>: son las cuentas recaudadoras/cuentas corrientes en Pesos, cuya apertura procurará obtener el Fiduciario aplicando sus mejores esfuerzos dentro de los diez (10) Días de obtenida la Clave Única de Identificación Tributaria. Dichas cuentas deberán ser abiertas, a su nombre y en su carácter de fiduciario, bajo la denominación " Fideicomiso en Garantía SanCor – IIG TOF BV" en los bancos Banco Santander Río S.A y Banco de Galicia y Buenos Aires S.A.
<u>Cuenta Fiduciaria de Gastos</u>: es la cuenta fiduciaria en Pesos que el Fiduciario abrirá dentro de los cinco (5) Días de obtenida la Clave Única de Identificación Tributaria en Banco de Servicios y Transacciones S.A. a nombre del Fideicomiso y a la orden del Fiduciario en la que se depositarán las sumas que el Fiduciario afectará al pago de los Gastos del Fideicomiso. En todo momento los montos depositados en la Cuenta de Gastos no podrán ser inferiores a la suma de $ 50.000,00 (pesos cincuenta mil).

Cuentas del Fiduciante: es indistintamente las cuentas corrientes en pesos abiertas en los bancos Banco Santander Río S.A Cuenta N° 000-00009761-1 CBU 07200007-20000000976118 – Filial 000 Casa Central y Banco de Galicia y Buenos Aires S.A. Cuenta N° 0004782-1-999-2 CBU 0070999020000004782126 Filial 000 Casa Matriz, ambas de titularidad del Fiduciante.

Deudor/es Cedido/s del Fideicomiso: significan los concesionarios y distribuidores de productos lácteos, cuyas denominaciones sociales y domicilios se detallan en el **Anexo II**. Los Deudores Cedidos del Fideicomiso serán quienes depositarán los Fondos correspondientes a los Créditos Cedidos en las Cuentas Fiduciarias, de conformidad con lo establecido en el presente Contrato de Fideicomiso.

Día: es cualquier día hábil, entendiéndose por tal cualquier día en el que no se exige ni autoriza a los bancos comerciales a cerrar en la Ciudad Autónoma de Buenos Aires.

Dólares: es la moneda de curso legal de los Estados Unidos de América.

Evento de Incumplimiento: significa el incumplimiento de cualquiera de las Obligaciones Garantizadas, incluyendo sin limitación (i) cualquiera de los eventos, condiciones o circunstancias enumeradas en el Capítulo 8 del presente Contrato de Fideicomiso y/o cualquier incumplimiento de las declaraciones y garantías del Fiduciante establecidas en el Capítulo 6 del presente Contrato de Fideicomiso y/o cualquier otro incumplimiento de las obligaciones establecidas en el presente Contrato de Fideicomiso; y/o (ii) cualquier Evento de Incumplimiento, conforme se define en el Contrato de Préstamo.

Fechas de Vencimiento: son las Fechas de Vencimiento conforme se las define en el Contrato de Préstamo.

Fiduciante: es SanCor Cooperativas Unidas Ltda.

Fiduciario: es el Banco de Servicios y Transacciones S.A.

Fondos: son las cantidades en efectivo en Pesos que deban ser depositados por los Deudores Cedidos del Fideicomiso en virtud de los Créditos Cedidos en las Cuentas Fiduciarias de acuerdo a lo previsto en el Artículo 2.01. del presente Contrato de Fideicomiso.

Fondos de Reserva Impositivos: son los Fondos de Reserva Impositivos, conforme se define en el Artículo 10.06 del presente Contrato de Fideicomiso.

Impuestos: son los referidos en el Capítulo 10 del presente Contrato de Fideicomiso.

Información Confidencial: tiene el significado asignado en el Artículo 7.08.

Mes: es el plazo que transcurre entre el primero y el último día (inclusive) de cada mes calendario.

Mora: significa la Mora, conforme se define en el Contrato de Préstamo.

Monto Mínimo: es la suma mensual mínima de $ 16.000.000,00 (Pesos dieciséis millones con 00/100) o la cantidad de Pesos equivalente como mínimo a US$ 4.000.000,00 (Dólares Estadounidenses cuatro millones), según el tipo de cambio informado por el Banco Nación de la República Argentina para efectuar adquisiciones de Dólares con Pesos en el último Día del Mes correspondiente – la que resulte mayor-, que los Deudores Cedidos del Fideicomiso deberán depositar cada Mes en las Cuentas Fiduciarias, previa deducción de todos los gastos bancarios generados por los correspondientes depósitos.

Obligaciones Garantizadas: son aquellas indicadas en el Artículo 2.01 del presente Contrato de Fideicomiso.

Partes: significa conjuntamente el Fiduciario, el Fiduciante y el Beneficiario.

Parte Indemnizada: es cada uno de los indicados en el Artículo 9.01 del presente Contrato de Fideicomiso.

Pesos: es la moneda de curso legal de la República Argentina.

Solicitud/es de Desembolso: tiene el significado asignado en el Contrato de Préstamo.

Los términos escritos en mayúscula en el presente Contrato de Fideicomiso y no definidos precedentemente tendrán el significado asignado en el Contrato de Préstamo.

(C) A los fines del presente y de cualquier otro documento relacionado con el presente, a menos que se especifique lo contrario o el contexto lo requiera: (i) el término "inclusive" significará incluyendo sin limitación; (ii) las referencias a cualquier ley o reglamentación se referirán a dicha ley o reglamentación con sus modificatorias periódicas e incluirán cualquier ley o reglamentación sucesora; (iii) las referencias a cualquier acuerdo serán a dicho acuerdo con sus modificaciones periódicas de conformidad con los términos de dicho acuerdo; (iv) las referencias a cualquier persona incluirán a los sucesores y cesionarios permitidos de dicha persona y (v) los encabezamientos serán a modo de referencia únicamente y no afectarán de modo alguno el significado o interpretación de cualquier disposición del presente.

## CAPITULO 2
### OBJETO

**2.01.** El objeto del presente es la cesión fiduciaria de los Creditos Cedidos al Fiduciario por el Fiduciante, en los términos de la ley 24.441 y del presente Contrato de Fideicomiso, en beneficio del Beneficiario. La cesión fiduciaria que efectúa el Fiduciante por el presente tiene por finalidad garantizar el cumplimiento de las obligaciones asumidas por el Fiduciante emergentes de: (i) todos los desembolsos y/o prórrogas a efectuarse a partir del día de la fecha bajo el Contrato de Préstamo, sea por capital, intereses moratorios y/o punitorios, comisiones, honorarios, gastos y/o demás cargos y/o compromisos de cualquier otra índole derivados del Contrato de Préstamo, incluyendo sin limitación el pago de la Línea de Crédito Adeudada, conforme dicho término se define en el Contrato de Préstamo; y (ii) el presente Contrato de Fideicomiso, incluyendo las comisiones, honorarios, gastos y/o demás cargos y/o compromisos de cualquier otra índole derivados del presente Contrato de Fideicomiso; (todas las obligaciones precedentemente enunciadas, en adelante denominadas las "Obligaciones Garantizadas");

**2.02.** El Fiduciante cede y trasmite al Fiduciario, quien acepta, en garantía de las Obligaciones Garantizadas y en los términos de la Ley N° 24.441, la propiedad fiduciaria del cien por ciento (100%) de todos los créditos y derechos de cobro que le correspondan al Fiduciante en forma directa o indirectamente a través de terceros que facturen a nombre propio pero por cuenta y orden del Fiduciante por las operaciones comerciales de cualquier tipo que realice con los Deudores Cedidos del Fideicomiso a partir de la fecha de aceptación de la Propuesta por parte del Fiduciario y hasta la cancelación total de las Obligaciones Garantizadas (los "Créditos Cedidos"). Entre los Créditos Cedidos se incluyen sin ser el siguiente detalle de carácter taxativo: (i) todas las cantidades devengadas y/o a devengarse que resulten pagaderas en virtud de los derechos y obligaciones previstos en los Créditos Cedidos, y/o cualquier prestación de servicios y/o cualquier otro concepto derivado de los Créditos Cedidos pagaderas dentro de las fechas precedentemente comprendidas, sin limitación alguna, como ser: (a) todos los derechos y acciones que le corresponden o puedan corresponder al Fiduciante sobre las facturas, remitos y cualquier otra documentación que acredite el cumplimiento por parte del Fiduciante de prestaciones comprendidas en los Créditos Cedidos, como así también los remitos/facturas y/o facturas que el Fiduciante emita en un futuro por créditos contra los Deudores Cedidos del Fideicomiso en virtud o vinculado o como a consecuencia de los Creditos Cedidos; y/o (b) evidencias de cualquier título valor, instrumento bancario o documento de obligación de pago, o en la forma de cualquier otro bien o derecho de cualquier naturaleza o especie, como dación en pago, previa conformidad del Beneficiario y siempre derivados de los Creditos Cedidos y/o vinculado a éstos y/o originados como consecuencia de los mismos; y/o (c) cualquier derecho resarcitorio, indemnizatorio y/o cualquier otro concepto al cuál pudiere tener derecho el Fiduciante respecto de los Deudores Cedidos del Fideicomiso como consecuencia de la terminación de la

relacion comercial entre el Fiduciante y los Deudores Cedidos del Fideicomiso; y (ii) el derecho de efectuar toda clase de reclamos e interponer todas las acciones judiciales o extrajudiciales que fueran necesarias para ejercitar, mantener y/o proteger la integridad y alcance de los derechos cedidos conforme a los términos del presente Artículo, dejándose aclarado que la presente cesión no alcanza las obligaciones asumidas por el Fiduciante en los Creditos Cedidos, las que permanecerán en cabeza del mismo y deberán ser debidamente cumplidas en tiempo y forma en un todo de acuerdo a lo previsto por los Creditos Cedidos, reformas y adecuaciones y/o cualquier otro documento que sea suscripto por el Fiduciante con los Deudores Cedidos del Fideicomiso o vinculado o a consecuencia de los Creditos Cedidos.

**2.03.** El Fiduciante se obliga a notificar la cesión de los Créditos Cedidos con intervención notarial y por acto público a los Deudores Cedidos del Fideicomiso mediante la entrega de una nota en los términos previstos en el **Anexo III,** dentro de los treinta (30) Días de aceptada la Propuesta. Asimismo, y sin perjuicio del perfeccionamiento de esta cesión fiduciaria del modo antes indicado, el Fiduciante se obliga a obtener la aceptación de las notas de conformidad con las manifestaciones contenidas en el **Anexo III** emitida por medio fehaciente, lo que deberá ser acreditado al Fiduciario mediante entrega de las actuaciones notariales. La falta de cumplimiento en tiempo y forma de alguna/s o todas las obligaciones asumidas por el Fiduciante en la presente cláusula 2.03 producirá automáticamente de pleno derecho la Mora del Fiduciante.

Asimismo, el Fiduciante se obliga a otorgar dentro de los diez (10) Días de perfeccionado el presente un poder especial a favor del Fiduciario para que éste en su nombre notifique a los Deudores Cedidos en caso que así no lo hiciere el Fiduciante.

**2.04.** Por el presente, el Fiduciario se obliga exclusivamente a ejercer los derechos emergentes de la propiedad fiduciaria transferida de acuerdo con los términos y condiciones del presente Contrato de Fideicomiso. Una vez extinguidas las Obligaciones Garantizadas, los Créditos Cedidos serán automáticamente transmitidos al Fiduciante, luego de que se abonaran la totalidad de los gastos y/o impuestos a cargo del Fideicomiso.

### CAPITULO 3
### BIENES FIDEICOMITIDOS

Los Fondos correspondientes a los Créditos Cedidos y/o los que eventualmente correspondan ser ingresados por los Deudores Cedidos del Fideicomiso a las Cuentas Fiduciarias serán retenidos y/o liberados por el Fiduciario conforme los términos y condiciones que se detallan seguidamente:

**3.01** En cumplimiento de lo dispuesto en las notificaciones notariales previstas en el artículo 2.03. precedente, los Deudores Cedidos del Fideicomiso acreditarán los Fondos en las Cuentas Fiduciarias. Mientras el Fiduciario no reciba notificación alguna, emitida por el Beneficiario en los términos del modelo que se adjunta como **Anexo IV,** indicando que el Fiduciante ha incumplido alguna de las Obligaciones Garantizadas, el Fiduciario procederá, el mismo Día en que los Fondos hayan sido depositados por los Deudores Cedidos del Fideicomiso en la Cuentas Fiduciarias, a ordenar la transferencia de la totalidad de los mismos a las Cuentas del Fiduciante, salvo que el Fiduciario reciba instrucciones escritas en contrario emitidas por el Beneficiario o resulte de aplicación el procedimiento dispuesto en la Sección 3.06 a 3.08 del presente Contrato de Fideicomiso. El Fiduciario realizara las transferencias diarias a primera hora del Dia siguiente a la recepcion de los Fondos.

**3.02** El Fiduciante garantiza que mensualmente los Deudores Cedidos del Fideicomiso depositarán Créditos Cedidos por una suma equivalente al Monto Mínimo en las Cuentas Fiduciarias en la forma indicada en la Sección 3.04 del presente Contrato de Fideicomiso. A los fines de determinar el cumplimiento del Monto Mínimo, se tendrá en cuenta el total resultante de la sumatoria de los depósitos efectuados por los Deudores Cedidos del Fideicomiso en las Cuentas Fiduciarias conforme la cláusula 3.01 precedente durante el Mes en cuestión.

**3.03** En caso de incumplimiento del depósito de los Montos Mínimos –extremo que será verificado y notificado por el Beneficiario al Fiduciario- se procederá según lo establecido a continuación:

(i) si durante tres (3) Meses consecutivos los Deudores Cedidos del Fideicomiso sólo hubieren acreditado una suma igual o menor al 40% (cuarenta por ciento) de los Montos Mínimos correspondientes a cada uno o a la mayoría de los Meses comprendidos en dicho plazo, el Beneficiario intimará en forma fehaciente al Fiduciante a que en el plazo de quince (15) días corridos proponga y efectivamente incorpore un nuevo Deudor Cedido del Fideicomiso bajo las condiciones establecidas en la Sección 3.05 del presente Contrato de Fideicomiso;

(ii) si durante cinco (5) Meses consecutivos los Deudores Cedidos del Fideicomiso sólo hubieren acreditado una suma menor al 100% (cien por ciento) pero mayor al 40% (cuarenta por ciento) de los Montos Mínimos correspondientes a cada uno o a la mayoría de los Meses comprendidos en dicho plazo, el Beneficiario intimará en forma fehaciente al Fiduciante a que en el plazo de quince (15) días corridos proponga y efectivamente incorpore un nuevo Deudor Cedido del Fideicomiso bajo las condiciones establecidas en la Sección 3.05 del presente Contrato de Fideicomiso;

(iii) Si en cualquier momento después de la incorporación de el/los nuevo/s Deudor/es Cedido/s se incumpliera con el depósito del Monto Mínimo, se procederá siempre de acuerdo a lo indicado en el acápite (i) precedente.

**3.04** Sin perjuicio de la efectiva acreditación en las Cuentas Fiduciarias por parte de los Deudores Cedidos del Fideicomiso de los Montos Mínimos conforme lo establecido en la Sección 3.02 del presente Contrato de Fideicomiso, el Fiduciante garantiza que cada uno de los Deudores Cedidos del Fideicomiso depositará mensualmente como mínimo un porcentaje equivalente al 1,80% (uno coma ochenta por ciento) del Monto Mínimo a depositar. En el supuesto de incumplimiento por parte de alguno de los Deudores Cedidos del Fideicomiso del depósito del porcentaje establecido durante el plazo de tres (3) Meses consecutivos o de acreditarse alguno de los Deudores Cedidos del Fideicomiso no hubiere depositado suma alguna, supuestos que serán verificados por el Beneficiario y notificados –mediante medio fehaciente- al Fiduciario, el Beneficiario intimará al Fiduciante a que en el plazo de quince (15) días corridos proponga y efectivamente incorpore un nuevo Deudor Cedido del Fideicomiso o bien reemplace al Deudor Cedido del Fideicomiso en incumplimiento por otro - según corresponda-, todo ello bajo las condiciones establecidas en la Sección 3.05 del presente Contrato de Fideicomiso.

**3.05** Sin perjuicio de la facultad del Beneficiario de aceptar o rechazar a su exclusivo criterio el Deudor Cedido del Fideicomiso propuesto por el Fiduciante, será condición imprescindible para la aceptación de un nuevo Deudor Cedido del Fideicomiso que (i) sea de reconocida solvencia y antigüedad en el negocio de distribución y comercialización de lácteos; (ii) acrediten en forma fehaciente que han adquirido mercadería del Fiduciante en los últimos seis (6) meses, contados a

partir de que hayan sido propuestos por el Fiduciante como nuevos Deudores Cedidos del Fideicomiso y (iii) que le sean aplicables todos los términos y condiciones del presente Contrato de Fideicomiso, particularmente aquellos contenidos en las Secciones 3.02, 3.03 y 3.04 precedentes. En el supuesto que el Beneficiario acepte -a su exclusivo criterio- al nuevo Deudor Cedido del Fideicomiso propuesto por el Fiduciante, las Partes deberán firmar la correspondiente Addenda al presente contrato de Fideicomiso o bien bastará con que el Beneficiario acepte en forma expresa y a través de medio fehaciente el Deudor Cedido del Fideicomiso propuesto por el Fiduciante y notifique tal extremo al Fiduciario mediante medio fehaciente. Una vez aceptado el Deudor Cedido propuesto por el Fiduciante, el Fiduciante deberá cumplir con la correspondiente notificación notarial conforme lo establecido en la Sección 2.03 del presente Contrato de Fideicomiso dentro de los cinco (5) Días siguientes. La falta de cumplimiento en tiempo y forma de alguna/s o todas las obligaciones asumidas por el Fiduciante en la presente cláusula será considerado un Evento de Incumplimiento.

**3.06.** Si, y sólo si, el Beneficiario hubiere declarado al Fiduciario mediante una notificación emitida en los términos del modelo que se adjunta como **Anexo IV** el acaecimiento de algún Evento de Incumplimiento del Contrato de Préstamo y/o del presente Contrato de Fideicomiso, y el Fiduciario hubiese sido notificado de tal circunstancia por el Beneficiario, entonces el Fiduciario deberá, previa deducción de todos los conceptos mencionados en el Artículo Décimo y de los honorarios mencionados en el Artículo Undécimo y en su caso efectuadas las retenciones asociadas al fondeo del Fondo de Reserva Impositivo:

(i)   Retener por Mes -y hasta el plazo indicado por el Beneficiario- de los Fondos que hubiere disponibles en las Cuentas Fiduciarias la suma en Pesos equivalente a US$ 2.500.000,0 (Dólares dos millones quinientos mil con 00/100) según el tipo de cambio informado por el Banco Nación de la República Argentina para efectuar adquisiciones de Dólares con Pesos en el Día en que el Fiduciario haya sido notificado del acaecimiento de algún Evento de incumplimiento.

(ii)  En el supuesto que los Fondos acreditados en el período de un Mes en las Cuentas Fiduciarias no sean suficientes y no alcancen a cubrir la suma indicada en el punto (i) anterior, la diferencia faltante se acumulará a los Fondos que deban ser retenidos en el próximo Mes.

(iii) Transferir a las Cuentas del Fiduciante los Fondos acreditados en las Cuentas Fiduciarias por Mes que excedan los US$ 2.500.000,0 mencionados en el punto (i) anterior y que no deban ser retenidos por saldos pendientes de pago conforme lo establecido en el punto (ii) anterior.

(iv)  Inmediatamente, y siguiendo instrucciones impartidas por el Beneficiario –en los términos del modelo que se adjunta como **Anexo IV-**, aplicar los Fondos que sean retenidos al pago de las Obligaciones Garantizadas conforme lo establecido en el Contrato de Préstamo, mediante el procedimiento indicado en 3.08.

El monto a retener en caso de producirse un Evento de Incumplimiento será el establecido en el punto (i) anterior salvo que el Beneficiario establezca –al momento de notificar al Fiduciario el acaecimiento de un Evento de Incumplimiento- un monto menor.

**3.07.** En el caso que los Fondos existentes en las Cuentas Fiduciarias no alcanzaren a cubrir las Obligaciones Garantizadas, el pago de las Obligaciones Garantizadas quedará igualmente a cargo del Fiduciante habida cuenta de la naturaleza de garantía de la presente cesión fiduciaria.

**3.8.** El Beneficiario en oportunidad de notificar al Fiduciario el incumplimiento de alguna Obligación Garantizada, o en su caso de declarar la aceleración y caducidad de plazos del Contrato de Préstamo, de conformidad con las disposiciones allí establecidas, y en miras a la aplicación de los Fondos al pago de las Obligaciones Garantizadas solicitará:

(i) La transferencia de las sumas –que en virtud del acaecimiento de algunos de los dos supuestos detallados precedentemente el Beneficiario instruya al Fiduciario a transferir- a una cuenta en pesos de titularidad del Beneficiario, abierta en una entidad financiera de la República Argentina, o la aplicación de la sumas necesarias para la compra de cualquier título en Dólares en una cantidad tal que, liquidado en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo el Contrato de Préstamo y/o a la suma instruida por el Beneficiario a transferir, y depositar los mismos en una cuenta custodia de titularidad del Beneficiario abierta en la República Argentina, conforme las instrucciones del Beneficiario; y

(ii) Cualquier otro mecanismo de pago que cumpla con la normativa cambiaria vigente a esa fecha, de acuerdo con el dictamen del asesor legal que designe el Fiduciario, que permita la cancelación de las Obligaciones Garantizadas dentro o fuera de la República Argentina, mediante la acreditación de fondos en una cuenta del Beneficiario.

**3.09.** El Fiduciante tendrá la obligación de informar al Beneficiario con copia al Fiduciario, mediante soportes magnéticos cada factura que emita contra alguno de los Deudores Cedidos del Fideicomiso, de la cual se genere la obligación de pagar cualquier suma que constituya Crédito Cedido. Dicha notificación mediante soportes magnéticos deberá ser entregada contra constancia de recibo los días 15 y 30 de cada Mes o Día siguiente. En el supuesto que el Beneficiario lo considere necesario y ante su requerimiento, el Fiduciante deberá remitir la información contenida en los soportes magnéticos en soporte papel. El incumplimiento de dichas obligaciones será considerado como un Evento de Incumplimiento.

**3.10.** En caso que los Deudores Cedidos del Fideicomiso no transfieran al Fiduciario los importes correspondientes a los Créditos Cedidos en tiempo y forma, la gestión judicial y/o extrajudicial de cobro de todos los Créditos Cedidos, estará a cargo del Fiduciante, o de un tercero designado por éste a costa del Fiduciante. En caso que se registrara falta de pago de alguno de los Deudores Cedidos del Fideicomiso –extremo que será comunicado por el Beneficiario al Fiduciario- el Fiduciario procederá en dicho momento a otorgar un poder especial al Fiduciante (con facultades de sustitución) para que éste o la persona que éste designe, realice las gestiones aquí contempladas, aclarando siempre que la titularidad del Crédito Cedido impago corresponde al fideicomiso y que el mismo debe ser pagado en la Cuenta Fiduciaria. Las Partes dejan expresamente establecido que el Fiduciario no será responsable de manera alguna por el accionar de los apoderados designados en el poder en cuestión (o por quiénes dichos apoderados sustituyeran facultades), ni por los daños y perjuicios que éstos pudieran ocasionar. El Fiduciario no podrá revocar el poder otorgado, salvo que recibiera una instrucción expresa del Beneficiario en tal sentido.

**3.11.** En ningún caso, el Fiduciario revertirá total o parcialmente la cesión de los Créditos Cedidos, sino hasta que el Beneficiario comunique que el Fiduciante ha dado total cancelación de las



Obligaciones Garantizadas, y se hayan abonado la totalidad de los gastos e impuestos a cargo del Fiduciante conforme lo establecido en el presente Contrato de Fideicomiso.

## CAPITULO 4
## TRANSMISION FIDUCIARIA

**4.01.** No obstante cualquier disposición en contrario contenida en el presente Contrato de Fideicomiso, queda expresamente establecido que la cesión fiduciaria de los Créditos Cedidos:

(a) No transferirá, afectará, cancelará, novará, extinguirá o modificará las responsabilidades y/u obligaciones correspondientes al Fiduciante en virtud de cualquiera de los documentos mediante los que se instrumenta cualquiera de los Créditos Cedidos y/o cualquier otra disposición, contrato, norma y/o reglamentación que resultare aplicable, ni limitará su plena responsabilidad en tal sentido,

(b) No sujetará al Fiduciario, ni al Beneficiario a ninguna responsabilidad y/u obligación correspondiente al Fiduciante en virtud de cualquiera de los documentos mediante los que se instrumenta cualquiera de los Créditos Cedidos y/o cualquier otra disposición, contrato, norma y/o reglamentación que resultare aplicable,

(c) No implicará cancelación, novación o modificación alguna de las Obligaciones Garantizadas ni limitará de modo alguno la plena responsabilidad del Fiduciante frente al Beneficiario ni configurará dación en pago de las Obligaciones Garantizadas ni las extingue. Por el contrario, todas y cada una de las Obligaciones Garantizadas subsisten con plena vigencia y validez teniendo este Contrato de Fideicomiso carácter accesorio y en garantía respecto de aquellas.

(d) Los derechos que el presente Contrato de Fideicomiso acuerda al Beneficiario son adicionales a los que le otorga el Contrato de Préstamo, según corresponda. La cesión fiduciaria de los Créditos Cedidos no limitará la responsabilidad del Fiduciante frente al Beneficiario con todos sus bienes presentes y/o futuros ni los derechos que pudieran corresponder al Beneficiario en virtud del  Contrato de Préstamo, pudiendo el Beneficiario ejercer tales derechos en la forma y en el momento que consideren más conveniente. La cesión fiduciaria de los Créditos Cedidos se mantendrá vigente mientras cualquiera de las Obligaciones Garantizadas se encuentren pendientes de cumplimiento, incluyendo, sin limitación, Obligaciones Garantizadas pendientes de pago por razón de cualquier renovación o prórroga de las mismas acordada entre el Fiduciante y el Beneficiario.

**4.02.** El Fiduciario acepta la cesión fiduciaria de los Créditos Cedidos efectuada a su favor conforme al presente Contrato de Fideicomiso, con el fin de garantía mencionado. Todos los gastos, costas, honorarios, retenciones, impuestos y costos de cualquier naturaleza que pudieran corresponder, relacionados y/o derivados de la suscripción, cumplimiento y/o ejecución del presente Contrato de Fideicomiso, correrán por cuenta y orden exclusivamente del Fiduciante.

## CAPITULO 5
## DECLARACIONES Y GARANTIAS DEL FIDUCIANTE

**5.01.** El Fiduciante declara y manifiesta a la fecha del perfeccionamiento del presente Contrato de Fideicomiso, y a la respectiva fecha de perfeccionamiento frente a terceros de la cesión fiduciaria de los Créditos Cedidos:

(a) Que es una cooperativa de segundo grado legalmente constituida y que opera bajo las leyes de la República Argentina.

(b) Que es el único y exclusivo titular de los Créditos Cedidos.

(c) Que está legalmente capacitado para formular la Propuesta, constituir el Fideicomiso y ceder los Créditos Cedidos en propiedad fiduciaria y asumir las demás obligaciones que surgen del mismo, de conformidad con disposiciones legales y estatutarias que rigen sus actividades; habiendo tomado en legal forma todas las decisiones societarias que resultan necesarias para asumir las obligaciones que surgen del presente, particularmente la aprobación de la operación por el Consejo de Administración del Fiduciante, conforme consta en Acta de Consejo de Administración N° 2743 del 03 de Diciembre de 2009, cuya copia certificada se entregará al Fiduciario dentro de los cinco (5) Días de perfeccionado el presente.

(d) Que las obligaciones y compromisos que surgen del presente Contrato de Fideicomiso son obligaciones y compromisos válidos, vinculantes y ejecutables del Fiduciante y no contravienen: (i) ninguno de los documentos mediante los que se instrumentan los Créditos Cedidos ni ninguna disposición legal, contractual o estatutaria que les resulte aplicable, ni (ii) ningún acuerdo del cual el Fiduciante sea parte ni ninguna disposición legal, contractual o estatutaria que resulte aplicable al Fiduciante.

(e) Que los Créditos Cedidos se encuentran libres de cualquier gravamen, afectación, opción o restricción legal o contractual de cualquier origen o naturaleza que impida, limite o restrinja su cesión en propiedad fiduciaria, en todo o en parte, conforme los términos del presente o que de cualquier manera afecte, limite o restrinja los derechos otorgados al Fiduciario o al Beneficiario bajo el presente Contrato de Fideicomiso.

(f) Que no se encuentra en situación de incumplimiento de sus obligaciones bajo (i) ninguno de los documentos mediante los que se instrumentan los Créditos Cedidos, o (ii) ningún acuerdo, contrato, obligación, orden, norma, resolución o requerimiento administrativo, extrajudicial o judicial, que pueda afectar sus posibilidades de cumplir con sus obligaciones según lo previsto en el presente Contrato de Fideicomiso.

(g) Que no tiene pendiente litigio o procedimiento administrativo alguno ante ningún tribunal o autoridad administrativa, arbitral o judicial, en el país o en el extranjero, que afecten o puedan afectar sustancialmente sus posibilidades de cumplir con sus obligaciones bajo el presente Contrato de Fideicomiso o la validez y vigencia de cualquiera de los Créditos Cedidos.

(h) Que conforme los documentos mediante los que se instrumentan los Créditos Cedidos y cualesquiera otros contratos que el Fiduciante haya celebrado con terceros con relación a los Créditos Cedidos, la cesión fiduciaria de los Créditos Cedidos es una obligación válida, vinculante y ejecutable del Fiduciante sin que exista ningún tercero que pueda válida o legalmente cuestionarla total o parcialmente y que sometida la misma a un tribunal argentino, aún en el supuesto de quiebra, concurso o liquidación del Fiduciante, debiera ser reconocida por dicho tribunal como tal.

(i) Que no hay razones para suponer que cualquiera de los documentos mediante los que se instrumentan los Créditos Cedidos, por cualquier causa que fuere, pueda en el futuro perder su plena vigencia y alcance o existan circunstancias que puedan provocar la suspensión,

revocación o extinción de cualquiera de los mismos (con excepción de las causales contenidas en los documentos que instrumentan los Créditos Cedidos).

(j)     Que, con excepción de la notificación a los Deudores Cedidos del Fideicomiso y sus expresas conformidades, señaladas en el artículo 2.03 precedente, ningún consentimiento, autorización, aprobación, notificación, presentación y/o cualquier otra acción de cualquier persona de derecho privado o público es requerida a los fines de la constitución y perfeccionamiento de la cesión fiduciaria en garantía de los Créditos Cedidos y a los fines del ejercicio por parte del Fiduciario de todos sus derechos contemplados bajo el presente.

(k)     Que, más allá de lo establecido en el presente, no existe ninguna otra condición que sea necesaria cumplir a los fines de la constitución y perfeccionamiento de la transmisión fiduciaria de los Créditos Cedidos al Fiduciario en el marco del Contrato de Fideicomiso.

(l)     Que durante la vigencia del presente Contrato de Fideicomiso realizará sus mejores esfuerzos para que en tiempo propio los Deudores Cedidos del Fideicomiso depositen en las Cuentas Fiduciarias las sumas correspondientes al cumplimiento de las obligaciones por ellos asumidas respecto de los Créditos Cedidos y cumplan con las demás instrucciones de pago notificadas en virtud del presente, las cuales únicamente podrán ser modificadas mediante notificación fehaciente del Fiduciario o del Beneficiario. La presente constituye una obligación de resultado a cargo del Fiduciante, con lo cual la falta de cumplimiento de los Deudores Cedidos del Fideicomiso por cualquier causa que fuere, ocasionará automáticamente la mora del Fiduciante, sin perjuicio de la responsabilidad que eventualmente le pueda caber a los Deudores Cedidos del Fideicomiso.

(m)     Que los Créditos Cedidos son legítimos y vinculantes para sus respectivas partes y que se encuentran actualmente vigentes.

(n)     Que durante la vigencia del presente Contrato de Fideicomiso no rescindirá (con o sin causa) ninguno de los documentos por los que estén instrumentados y de los cuales surjan los Créditos Cedidos. La terminación anticipada de alguno de los mencionados documentos será considerada un Evento de Incumplimiento.

(ñ)     Que todas las facturas que se deriven del cumplimiento de las obligaciones a cargo de los Deudores Cedidos del Fideicomiso emergentes de los Créditos Cedidos serán emitidas por los Deudores Cedidos del Fideicomiso a nombre propio pero por cuenta y orden del Fiduciante.

## CAPITULO 6
### COMPROMISOS Y OBLIGACIONES DEL FIDUCIANTE

**6.01.** Desde el perfeccionamiento del Contrato de Fideicomiso el Fiduciante debe abstenerse de recibir cualquier pago y/o documento de obligación de pago y/o derecho como dación en pago correspondiente a los Créditos Cedidos, salvo que medie instrucción expresa del Fiduciario de acuerdo a lo indicado expresamente por el Beneficiario al efecto, en cuyo caso recibirá los mismos como mandatario del Fiduciario y entregará tales pagos, derechos y/o documentos de inmediato al Fiduciario, mediante su acreditación en las Cuentas Fiduciarias dentro de las 24 hs. de su percepción. Si no obstante, el Fiduciante recibiera cualquier pago y/o documento de obligación de pago y/o cualquier bien o derecho como dación en pago correspondiente a los Créditos Cedidos, el Fiduciante

recibirá los mismos como mandatario del Fiduciario y entregará tales pagos, bienes, derechos y/o documentos de inmediato al Fiduciario, mediante su acreditación en las Cuentas Fiduciarias dentro de las 24 hs. de su percepción.

**6.02.** Cumplir, en tiempo y forma, con todas y cada una de las obligaciones a su cargo emergentes del Contrato de Préstamo; de los Créditos Cedidos; de la normativa aplicable; del presente Contrato de Fideicomiso; y de las demás disposiciones, contratos y reglamentaciones que resulten aplicables al Fiduciante, y que fueren razonablemente necesarias a efectos de proteger la existencia y ejercicio de los derechos del Fiduciario bajo el presente Contrato de Fideicomiso.

**6.03.** Tomar y adoptar, pronta y diligentemente, todas las medidas razonables, y efectuar todos los actos, reclamos y/o acciones que resultaren necesarias, para que se perfeccione y cumpla debidamente con los términos y condiciones de la cesión de los Créditos Cedidos aquí operada; para que los Deudores Cedidos del Fideicomiso cumplan con el pago del Monto Mínimo en los términos establecidos en el Capítulo 3 del presente Contrato de Fideicomiso; y/o para evitar que el Fiduciario y/o el Beneficiario puedan sufrir algún perjuicio patrimonial y/o económico como consecuencia del presente Contrato de Fideicomiso. Estas medidas deberán ser tomadas previa comunicación al Beneficiario y Fiduciante. Sin perjuicio del compromiso asumido por el Fiduciante, el Fiduciario tendrá el derecho de solicitar al Fiduciante, que adopte las acciones, medidas y realice los reclamos que resultaren necesarios para el caso que todos o cualquiera de los Bienes Fideicomitidos no estén siendo adecuadamente protegidos por el Fiduciante. La negativa a cumplir con dicha solicitud será considerada un Evento de Incumplimiento.

**6.04.** Abonar los gastos, costos, expensas, honorarios del Fiduciario y demás asesores del Fideicomiso e impuestos de cualquier tipo que se generaren como consecuencia de la ejecución y cumplimiento del presente Contrato de Fideicomiso, incluyendo, sin limitación, los impuestos de sellos que resultaren aplicables.

**6.05.** Informar de inmediato al Fiduciario sobre la existencia u ocurrencia de cualquier Cambio Material Adverso o situación que pudiera afectar el cobro de los Fondos provenientes de los Créditos Cedidos.

**6.06.** A no modificar las condiciones instrumentadas respecto de los Créditos Cedidos, salvo que dicha modificación importe un beneficio económico para el Fiduciante (entendiéndose por "beneficio económico" un monto de facturación mensual que incremente el monto mensual de los Créditos Cedidos) y de ningún modo reduzca los importes a percibir por el Fiduciante y en consecuencia una mayor o igual garantía para el Beneficiario. En tal supuesto, deberá previamente notificar al Fiduciario y al Beneficiario explicando concretamente en qué consiste el beneficio económico derivado de la modificación de las condiciones instrumentadas respecto de los Créditos Cedidos, quienes —en caso de que se cumpla el requisito antes indicado- no podrán oponerse a dicha modificación.

**6.07.** A cumplir con todas y cada una de sus compromisos y obligaciones pactadas con los Deudores Cedidos; y a no rescindir, resolver, o, de cualquier modo, dar término o causar el término de ninguno de los contratos y/u obligaciones que generen, hayan generado o vayan a generar los Créditos Cedidos, sin el previo consentimiento escrito del Beneficiario, el que sólo será otorgado en caso de que el Fiduciante ofrezca previamente, en reemplazo, una garantía que, a juicio exclusivo y discrecional del Beneficiario, resulte suficiente para garantizar las Obligaciones Garantizadas.



**6.08.** A cumplir con todas las normas vigentes y/o futuras dictadas por las autoridades regulatorias de las actividades vinculadas a los Créditos Cedidos.

**6.09.** Colaborar y proveer la información que el Fiduciario le requiera para el cumplimiento de las obligaciones tributarias a su cargo (vgr. facturación emitida pendiente de pago sobre los Créditos Cedidos).

## CAPITULO 7
## COMPROMISOS Y OBLIGACIONES DEL FIDUCIARIO

**7.01.** El Fiduciario se obliga por el presente Contrato de Fideicomiso a emplear la misma diligencia que emplea un buen hombre de negocios, cumpliendo acabadamente con los compromisos que asumen bajo el presente Contrato de Fideicomiso y lo establecido en la Ley 24.441.

**7.02.** El Fiduciario deberá someter cualquier acción u omisión a llevar a cabo en ejercicio de sus facultades a la previa conformidad del Beneficiario. El silencio del Beneficiario transcurridos 15 (quince) Días de solicitada su intervención mediante notificación fehaciente, será interpretado por el Fiduciario como aceptación por parte del Beneficiario.

**7.03.** El Fiduciario se compromete a cumplir única y exclusivamente aquellas obligaciones que se encuentran expresamente determinadas en el presente Contrato de Fideicomiso y que le impone la Ley 24.441, no pudiendo leerse en el mismo ningún deber u obligación implícitos a cargo del Fiduciario, salvo los que surgen del punto 7.01 precedente, ni imponerle al Fiduciario ninguna otra función, responsabilidad u obligación que no sean las expresamente estipuladas en el mismo. El Fiduciante y el Beneficiario reconocen que ni el Fiduciario, ni ninguno de sus directores, funcionarios, empleados o mandatarios serán responsables por cualquier acción u omisión adoptada por él bajo el presente Contrato de Fideicomiso, o con relación al mismo, que no resulte de su culpa o dolo, calificada como tal por una sentencia firme dictada por tribunal competente. El Fiduciario manifiesta que no es parte del Contrato de Préstamo ni le recaerá ninguna responsabilidad derivada del mismo.

**7.04.** El Fiduciario no será responsable de haber actuado basándose en instrucciones recibidas de y/o en resoluciones adoptadas por el Beneficiario, siempre que dicha actuación haya sido en el marco de la Ley 24.441, aún en el caso de silencio contemplado en 7.02 precedente.

**7.05.** Respecto de aquellas cuestiones no expresamente previstas en el presente Contrato de Fideicomiso o no enunciadas expresamente en el mismo como una obligación del Fiduciario éste no estará obligado a ejercer ninguna facultad discrecional o adoptar medida alguna. No obstante cualquier disposición en contrario bajo el presente Contrato de Fideicomiso, queda expresamente entendido entre las Partes del presente que el Fiduciario en ningún caso podrá ser obligado a entablar o proseguir cualquier juicio, acción o procedimiento judicial o administrativo o adoptar cualquier medida para implementar, desarrollar y/o concretar el objeto del presente Contrato de Fideicomiso que, a su exclusivo juicio, lo exponga a responsabilidad personal o a gastos cuyo reembolso en un tiempo razonable no esté asegurado o bien sea contraria al presente Contrato de Fideicomiso o a la ley.

**7.06.** El Fiduciario no incurrirá en responsabilidad alguna por o en relación con cualquier acción u omisión adoptada por él bajo el presente Contrato de Fideicomiso sobre la base de cualquier título, certificado, aviso, instrucción, consentimiento, declaración jurada, aseveración u otro papel o instrumento que el Fiduciario razonablemente considere como genuino y como presentado y suscripto

por el Fiduciante y/o el Beneficiario, y con respecto a toda cuestión legal, el Fiduciario tendrá derecho pero no estará obligado, a basarse en el asesoramiento de los asesores legales que el Fiduciario haya elegido con respecto a todos los temas relacionados con el presente Contrato de Fideicomiso y sus funciones emergentes del mismo y de los documentos antes indicados, a su propio costo.

**7.07.** Mientras se encuentre en vigencia el presente Contrato de Fideicomiso, y sin perjuicio de las demás obligaciones a su cargo establecidas en el mismo, el Fiduciante, el Beneficiario y el Fiduciario se comprometen a tomar y realizar por sí o, según corresponda, hacer que las personas nominadas por ellos en el Directorio, o en su órgano ejecutivo según corresponda, tomen y realicen, todas las medidas y todos los actos necesarios o convenientes para que se puedan concretar los objetivos del presente Contrato de Fideicomiso.

**7.08.** Este Contrato de Fideicomiso, las operaciones contempladas en el mismo y toda la información que el Fiduciario obtenga en el cumplimiento de sus funciones tienen carácter estrictamente de información confidencial (la "Información Confidencial"), y sólo podrán ser utilizados por el Fiduciario y sus directores, funcionarios, empleados, mandatarios y asesores para los fines precedentemente indicados. Las Partes en el presente Contrato de Fideicomiso se obligan a proteger la Información Confidencial de la otra parte del mismo modo que protegen la información confidencial propia de naturaleza similar, pero bajo ningún aspecto podrán actuar por debajo de los niveles de debida diligencia.

**7.09.** Se establece que el Fiduciario deberá rendir cuentas de su actuación mensualmente al Beneficiario y al Fiduciante en los términos del artículo 7 de la ley 24.441, obligación que será satisfecha con la entrega al Fiduciante y al Beneficiario, del resumen de movimientos de las Cuentas Fiduciarias y de la Cuenta de Gastos, considerándose aprobada dicha rendición de cuentas, si el Fiduciante y/o el Beneficiario no impugnaran la misma, cada uno dentro de los treinta (30) días corridos de la respectiva recepción por medio fehaciente del resumen mencionado.

**7.10.** El Fiduciario no será responsable de manera alguna por el accionar de los apoderados designados en el poder mencionado en el Artículo 3.10. ni por los daños y perjuicios que éstos pudieran ocasionar. Asimismo, el Fiduciario tampoco será responsable del accionar de las personas a cuyo favor sustituyeran sus facultares los apoderados designados en el poder mencionado en el Artículo 3.10., ni por los daños y perjuicios que éstas pudieran ocasionar.

## CAPITULO 8
## INCUMPLIMIENTO DE LAS OBLIGACIONES GARANTIZADAS

**8.01.** Si el Beneficiario notificase al Fiduciario de conformidad con el **Anexo IV** del presente que:

(i)      se ha verificado cualquier Evento de Incumplimiento;

(ii)     se ha verificado un incumplimiento por parte del Fiduciante de cualquiera de sus obligaciones, declaraciones y/o garantías bajo el presente Contrato de Fideicomiso (incluyendo, sin limitación, el pago mensual del Monto Mínimo en los términos establecidos en el Capítulo 3 del presente Contrato de Fideicomiso) sin que el mismo haya sido subsanado dentro de los 15 (quince) días corridos de intimado el mismo por el Fiduciario;

(iii)  se ha verificado el incumplimiento de cualquiera de las obligaciones que le corresponden a los Deudores Cedidos del Fideicomiso, sin que el mismo haya sido subsanado por el Fiduciante dentro de los 15 (quince) días corridos de intimado en tal sentido por el Fiduciario y/o el Beneficiario;

(iv)  se ha trabado embargo o se ha dictado cualquier otra medida cautelar sobre o respecto de cualquiera de los Créditos Cedidos, y/o se ha iniciado cualquier procedimiento judicial o administrativo o fiscal o penal cambiario, de ejecución respecto de cualquiera de los Créditos Cedidos por cualquier tercero sin que cualesquiera de dichos eventos haya sido revertido dentro de los 30 (treinta) Días de haber tomado conocimiento del mismo

Y asimismo, el Beneficiario instruya al Fiduciario conforme el procedimiento previsto en dicho **Anexo IV**

ENTONCES, el Fiduciario dispondrá de los Créditos Cedidos (incluyendo los Fondos disponibles en ese momento), conforme lo dispuesto en el Artículo 3.07 del presente Contrato de Fideicomiso y las instrucciones recibidas del Beneficiario, a fin de aplicar los Créditos Cedidos a cancelar las Obligaciones Garantizadas en Mora, previa cancelación de los gastos e impuestos a cargo del Fideicomiso.

## CAPITULO 9
## INDEMNIDADES

**9.01.** El Fiduciante mantendrá al Fiduciario y al Beneficiario, así como a sus respectivos oficiales, ejecutivos, directores, empleados, agentes, asesores y representantes, indemnes, (cada uno de ellos en adelante una "Parte Indemnizada") de y contra cualquier reclamo, daño, pérdida, responsabilidad y gastos (incluyendo, sin limitación, honorarios razonables de asesores legales y de cualquier otro tipo) (un "Daño Indemnizable"), que cualquier Parte Indemnizada pueda sufrir o incurrir o puedan serle impuestos en relación directa con cualquier investigación, litigio o procedimiento relativo al Contrato de Préstamo y/o a la cesión en garantía de los Créditos Cedidos. A los fines de permitir el cumplimiento por parte del Fiduciante de las obligaciones aquí impuestas, la Parte Indemnizada deberá notificar fehacientemente al Fiduciante respecto de la existencia del supuesto hecho indemnizable (un "Reclamo Indemnizable"). La obligación de indemnizar aquí contemplada cesará en sus efectos en caso que una sentencia dictada por un tribunal competente y pasada en autoridad de cosa juzgada declare que el referido reclamo, daño, pérdida, responsabilidad o gasto se ha producido u originado como consecuencia directa, de la negligencia, culpa o dolo de dicha Parte Indemnizada.

**9.02.** Ninguna Parte Indemnizada será directa o indirectamente responsable ante el Fiduciante (ya sea que se trate de responsabilidad contractual, extra-contractual o de cualquier otro tipo), como consecuencia directa o indirecta de la celebración o cumplimiento del presente Contrato de Fideicomiso o la cesión fiduciaria de los Créditos Cedidos, o de cualquier operación contemplada bajo el mismo, a menos que una sentencia dictada por un tribunal competente y basada en autoridad de cosa juzgada declare que dicha responsabilidad se ha producido u originado como consecuencia directa de la negligencia, culpa o dolo de la Parte Indemnizada en cuestión.

**9.03.** Las obligaciones asumidas por el Fiduciante en el presente Capítulo Noveno seguirán vigentes aún después de la extinción de la cesión fiduciaria de los Créditos Cedidos y hasta la prescripción de las acciones que correspondan. Se acuerda expresamente que la obligación de indemnidad prevista en el presente apartado es, respecto del Fiduciario y a sus respectivos oficiales, ejecutivos, directores,

empleados, agentes, asesores y representantes, asumida asimismo por el Beneficiario, en forma subsidiaria al Fiduciante, a primera demanda del Fiduciario según sea el caso. Sin perjuicio de lo anterior, el Fiduciante renuncia, en forma total y definitiva, a reclamar al Fiduciario indemnización o compensación alguna como consecuencia de cualquier pérdida o reclamo relacionado con (i) el ejercicio por el Fiduciario de sus derechos bajo el presente Contrato de Fideicomiso, o (ii) los actos, procedimientos u operaciones contemplados o relacionados con el presente Contrato de Fideicomiso, salvo negligencia, culpa o dolo del Fiduciario, en cualquier caso habiendo sido dicha conducta calificada como tal por una sentencia firme dictada por tribunal competente.

9.04. El Fiduciante conviene en indemnizar y mantener indemne al Fiduciario por y contra cualesquiera responsabilidades, gastos, daños y perjuicios y otros costos de cualquier clase o naturaleza impuestos a, incurridos por, o reclamados contra, el Fiduciario con relación con cualquier aseveración, garantía o manifestación hecha por el Fiduciante en el presente o en cualquier aviso u otro documento, certificado o declaración entregado por el Fiduciante que resulte haber sido incorrecta.

9.05 El Fiduciante también conviene en indemnizar y mantener indemne al Fiduciario y a sus directores, funcionarios, empleados y mandatarios por y contra cualesquiera responsabilidades, impuestos, gastos, daños y perjuicios y otros costos de cualquier clase o naturaleza impuestos a, incurridos por, o reclamados contra, los mismos con relación a su actuación como tales respecto al presente o a cualquier otra cuestión relacionada, directa o indirectamente, al mismo o a la operación que se origine del mismo y que no sean consecuencia de su culpa o dolo calificada como tales por una sentencia dictada por tribunal competente y pasada a autoridad de cosa juzgada. A los fines de permitir el cumplimiento por parte del Fiduciante de las obligaciones aquí impuestas, la Parte Indemnizada deberá notificar fehacientemente al Fiduciante respecto de la existencia del supuesto hecho indemnizable (un "Reclamo Indemnizable"). La obligación de indemnizar aquí contemplada cesará en sus efectos en caso que una sentencia dictada por un tribunal competente y pasada en autoridad de cosa juzgada declare que el referido reclamo, daño, pérdida, responsabilidad o gasto se ha producido u originado como consecuencia directa, de la negligencia, culpa o dolo de dicha Parte Indemnizada.

9.06. En el caso que el Fiduciante no cumpliera con la obligación de indemnidad aquí prevista dentro de los cinco (5) Días o el plazo menor legal exigido, de haberse vuelto exigible de forma definitiva e inapelable el Reclamo Indemnizable por el Fiduciario, el Fiduciario podrá, -previa rendición de cuenta al Fiduciante y al Beneficiario, la cual se entenderá aceptada si en el plazo de 72hs contados a partir de su recepción el Fiduciante y/o el Beneficiario no impugnaran la misma por medio fehaciente-cobrarse los importes en cuestión de los Fondos.

## CAPITULO 10
## IMPUESTOS Y GASTOS

10.01. El Fiduciante toma a su exclusivo cargo la obligación de pagar en un plazo razonablemente breve al solo requerimiento del Fiduciario - requerimiento que deberá ser formulado con antelación razonable al vencimiento de la obligación de pago, la totalidad de los impuestos tanto nacionales provinciales o municipales y/o tasas y/o gravámenes y/o cualquier otro tributo, presente y/o futuro (en adelante los "Impuestos"), incluido pero no limitado al impuesto de sellos, que pudiere corresponder ser abonado con motivo o en ocasión del otorgamiento, instrumentación cumplimiento o ejecución del presente Contrato de Fideicomiso. Sin perjuicio de ello, el Fiduciante podrá autorizar al Fiduciario a deducir dichas sumas de las Cuentas Fiduciarias.

**10.02.** El Fiduciante toma a su cargo el pago de todos los Impuestos y/o el cumplimiento de todas las obligaciones formales y/o regímenes de información establecidos por las autoridades fiscales argentinas ya sea nacionales provinciales municipales o de cualquier índole o cualquier división o subdivisión política de las mismas (en adelante las "Autoridades Fiscales") en relación con los Fondos recibidos por el Fiduciario y/o sobre las transferencias que pudieren corresponder conforme el presente Contrato de Fideicomiso. Sin perjuicio de ello, el Fiduciante podrá autorizar al Fiduciario a deducir dichas sumas de las Cuentas Fiduciarias.

**10.03.** El Fiduciario cumplirá con las obligaciones tributarias asociadas al Impuesto a la Ganancia Mínima Presunta y a los Bienes Personales y demás Impuestos que correspondiere tributar a cuyos efectos designará al Estudio Leonardo H. Hansen como Asesor Impositivo, quién realizará todas las funciones que les solicite el Fiduciario incluyendo, sin limitación, obtención de números de identificación tributaria; emisión de un informe impositivo inicial y sus respectivas actualizaciones, cálculos de los Impuestos a pagar o adeudados; preparación de declaraciones juradas y retenciones y, en general, toda la auditoría impositiva del fideicomiso creado por el presente. En tales supuestos, el Fiduciario deberá basarse en las determinaciones, interpretación de las leyes, decretos, reglamentos, regulaciones y demás normas y criterios en materia de determinación de Impuestos y cumplimiento de las demás obligaciones sustanciales y formales de los Contadores y del Asesor Impositivo.

**10.04.** Sin perjuicio de lo establecido en el apartado precedente el Fiduciario estará facultado en todo momento a cumplir con sus obligaciones tributarias (si las hubiere) en lo relativo al pago de cualquier Impuesto adeudado a las Autoridades Fiscales, y al cumplimiento de todas las obligaciones formales, respecto de las transferencias o desembolsos de los Fondos, o sobre los Fondos recibidos por el Fiduciario, en cuyo caso dichos montos adeudados serán deducidos de los Fondos que se encuentren en poder del Fiduciario, a exclusivo criterio del Fiduciario.

**10.05.** Si con motivo de cualquier cambio en las normas impositivas vigentes y/o en la interpretación que de ellas efectúe cualquiera de las Autoridades Fiscales resultare obligatorio para el Fiduciario efectuar cualquier pago relativo al presente contrato o algún contrato relacionado con el presente Fideicomiso y respecto del cual la Autoridad Fiscal entendiere que el Fiduciario resulta responsable de manera directa o solidaria, incluso los de carácter retroactivo, el Fiduciante se compromete a indemnizar y mantener indemne al Fiduciario, a su primer requerimiento, por todas las sumas exigidas sobre la base de lo que antecede, con sus intereses, multas y accesorios, si correspondieren.

**10.06.** En caso de haberse configurado una contingencia impositiva asociada a una nueva normativa fiscal, a una nueva interpretación respecto de la normativa fiscal, o a un reclamo de alguna Autoridad Gubernamental con competencia en la materia que, según el leal saber y entender del Asesor Impositivo pudiera resultar exigible, el Fiduciario constituirá el Fondo de Reserva Impositivo por el monto que el Asesor Impositivo estime (en adelante, el "Fondo de Reserva Impositivo"). El Fondo de Reserva Impositivo se mantendrá como tal hasta que (a) se resuelva la integración del tributo, en cuyo caso el mismo deberá ser abonado de los montos disponibles en el Fondo de Reserva Impositivo; (b) se desestime la contingencia, en cuyo caso los montos disponibles en el Fondo de Reserva Impositivo serán transferidos a la Cuenta Fiduciaria; o (c) prescriba la contingencia impositiva en cuestión, en cuyo caso los montos disponibles en el Fondo de Reserva Impositivo serán transferidos a la Cuenta Fiduciaria.

**10.07.** El Fiduciante deberá indemnizar y mantener indemne al Fiduciario dentro de un plazo razonablemente breve contado desde el momento de serle requerido, de toda responsabilidad, costo,

garantía, multa, pérdida, perjuicio y daño sufrido por el Fiduciario, como consecuencia del otorgamiento, instrumentación, cumplimiento o ejecución judicial o extrajudicial del presente Contrato de Fideicomiso o que se le reclamen al Fiduciario en relación con cualquier Impuesto y/o responsabilidad emergente de la obligación de presentar información ante las Autoridades Fiscales y/o con los montos de los Impuestos que esté obligado a pagar, calculados sobre los Fondos recibidos o que se encuentren en poder del Fiduciario en virtud del presente Contrato de Fideicomiso.

**10.08.** Todos los gastos y costos que se generen en relación con el presente Contrato de Fideicomiso, en particular, pero no únicamente, los gastos y costos legales incurridos en relación con la protección y mantenimiento judicial y/o extrajudicial de la cesión fiduciaria de los Créditos Cedidos, estarán a cargo del Fiduciante, y serán abonados al Fiduciario por el Fiduciante dentro de los cinco (5) Días de requerido dicho pago por el Fiduciario. Sin perjuicio de ello, el Fiduciario podrá autorizar al Fiduciario a deducir dichas sumas de las Cuentas Fiduciarias. Si el Fiduciante no los abonara, el Fiduciario queda autorizado a retener de los Fondos recibidos en virtud del presente Contrato de Fideicomiso el importe necesario para cubrir cualquiera de tales conceptos así como los honorarios que en su caso se le adeuden al Fiduciario. Las obligaciones asumidas por el Fiduciante en el apartado 10.08 seguirán vigentes aún después de la extinción de la cesión fiduciaria de los Créditos Cedidos. En caso de no existir Fondos disponibles y no haber cumplido el Fiduciante con el pago de los gastos y costos transcurrido el plazo previsto más arriba, el Fiduciario podrá solicitar el pago en forma directa al Beneficiario, quien como responsable subsidiario deberá efectuarlo dentro del plazo de cinco (5) Días contados a partir del requerimiento formulado por el Fiduciario (sin perjuicio de las obligaciones del Fiduciante en tal sentido); ante la falta de dicho pago, el Fiduciario no tendrá obligación alguna de llevar a cabo los actos respecto de los cuales el pago fue requerido, no siendo responsable por las consecuencias que se generen con motivo del incumplimiento de sus obligaciones bajo el presente Contrato de Fideicomiso, cuando dichos incumplimientos estuvieran originados en la falta de pago en cuestión; en consecuencia, el Fiduciario no tendrá obligación alguna de adelantar fondos propios a los fines de afrontar los gastos, costos y/u otras erogaciones que demande el cumplimiento de los actos que se le hubieren encomendado bajo el presente; el Beneficiario acepta expresamente esta exención de responsabilidad, renunciando a efectuar cualquier tipo de reclamo por incumplimiento de los deberes del Fiduciario que pudieran derivarse de la falta de pago antedicha (sin perjuicio de las responsabilidades que pudieran corresponder al Fiduciante).

## CAPITULO 11
## COMISIONES DEL FIDUCIARIO

**11.01.** Por sus servicios como Fiduciario bajo el Contrato de Fideicomiso, el Banco de Servicios y Transacciones S.A. tendrá derecho a percibir del Fiduciante:

(a) una Comisión inicial de incorporación de $ 25.000,00 (Pesos veinticinco mil con 00/100) mas IVA,

(b) una comisión mensual de administración de $ 15.000,00 (Pesos quince mil con 00/100) más IVA, y

(c) una comisión extraordinaria de $ 15.000,00 (Pesos quince mil con 00/100) mensuales más IVA en caso de declararse un Evento de Incumplimiento en los términos del Contrato de Préstamo o del Contrato de Fideicomiso, o incumplimiento de las obligaciones de pago de los

Deudores Cedidos, sin perjuicio de las restricciones de gestión planteadas en el Contrato de Fideicomiso ("las "Comisiones").

Las Comisiones serán abonadas por el Fiduciante dentro de los 5 (cinco) Días de que el Fiduciario le remita la correspondiente factura. Sin perjuicio de ello el Fiduciante podrá autorizar al Fiduciario a deducir dichas sumas de las Cuentas Fiduciarias o de la Cuenta de Gastos. En caso de falta de pago por el Fiduciante, el Fiduciario podrá deducir las Comisiones de los Fondos acreditados en las Cuenta Fiduciarias o de la Cuenta de Gastos. En el caso que no existan fondos en las Cuentas Fiduciarias o en la Cuenta de Gastos, se estará a lo previsto en el Artículo 11.03.

**11.02.** Los montos indicados en el apartado 11.01 precedente, deberán ser abonados al Fiduciario, sin sufrir merma alguna, por lo que si en cualquier momento la aprobación, promulgación o derogación de cualquier ley, decreto, resolución o reglamento, o un cambio de interpretación o aplicación de los mismos por cualquier organismo gubernamental encargado de ello, así como el cumplimiento por el Fiduciario de cualquier requerimiento o directiva de organismos gubernamentales (tengan o no la validez de una ley), cuyo efecto implique que el Fiduciario quede sujeto a cualquier impuesto, derecho u otro cargo respecto de este Contrato de Fideicomiso, o se cambie la base imponible de los pagos, o las tasas a ellos aplicables y el resultado directo de cualquiera de estas circunstancias sea reducir sus derechos sobre la suma pactada en el apartado 11.01, entonces el Fiduciante deberá pagar al Fiduciario, tal monto adicional o montos adicionales para compensar al mismo después de dicho costo incrementado o reducción en el monto recibido o a ser recibido.

**11.03.** El Fiduciante toma a su exclusivo cargo y, consecuentemente, se compromete a pagar, la totalidad de los costos, gastos, honorarios (incluyendo honorarios legales), impuestos, gravámenes, tributos y/o cualesquiera otra erogación que pudiera corresponder ser abonada con motivo y/o en ocasión del otorgamiento y/o instrumentación y/o cumplimiento y/o ejecución del presente Contrato de Fideicomiso, los que podrán ser deducidos de los Fondos que integren las Cuentas Fiduciarias o de la Cuenta de Gastos, dentro de los cinco (5) Días de requerido, en caso de incumplimiento del Fiduciante.

**11.04.** La mora en el pago de las comisiones y gastos al Fiduciario se producirá, previa interpelación en el plazo de cinco (5)  días al Fiduciante y Beneficiario, por el solo vencimiento de los plazos establecidos, y en cuyo caso el Fiduciario podrá cobrarse los fondos en cuestión de las Cuentas Fiduciarias o de la Cuenta de Gastos. El Beneficiario podrá, a su exclusiva discrecionalidad, proceder al pago de las comisiones y gastos al Fiduciario.

## CAPITULO 12
## EXTINCION DEL FIDEICOMISO - LIQUIDACION

**12.01.** La cesión Fiduciaria de los Créditos Cedidos se mantendrá vigente hasta la total cancelación de las Obligaciones Garantizadas y previa instrucción en tal sentido del Fiduciante y el Beneficiario de manera conjunta. En ningún caso los Créditos Cedidos podrán ser liberados o reemplazados sin el consentimiento previo y por escrito del Beneficiario. Una vez cancelados todos los importes adeudados bajo las Obligaciones Garantizadas, conforme la notificación que en tal sentido enviará el Beneficiario al Fiduciario –en términos similares a los del modelo que se adjunta como **Anexo V**-, el Fiduciario procederá a dejar sin efecto la cesión fiduciaria de los Créditos Cedidos, entregando los Fondos remanentes, en su caso, al Fiduciante, previa deducción de los gastos e impuestos aplicables y una vez cubierto el Fondo de Reserva Impositivo, si correspondiere o de cualquier monto que el

Fiduciario pudiese estimar para afrontar contingencias relacionadas con, o derivadas del presente Fideicomiso, en función de reclamos de terceros. Los gastos derivados de todos los actos más arriba mencionados estarán a cargo del Fiduciante.

A tal efecto, el Fiduciario remitirá a los Deudores Cedidos del Fideicomiso una notificación suscripta por sus representantes legales o apoderados con facultades suficientes, informando que las Obligaciones Garantizadas han sido satisfechas y se deja sin efecto la cesión fiduciaria de los Créditos Cedidos, reintegrándose los mismos al Fiduciante.

**12.02.** No obstante, el Contrato de Fideicomiso podrá terminar anticipadamente -previa notificación a todas las Partes- si por cambios en la legislación se tornare ilegal el cumplimiento del objeto del presente Contrato de Fideicomiso o si por cualquier otra causa, ajena a la voluntad de las Partes, el cumplimiento del mismo deviniera en imposible, en cuyo caso ninguna de las Partes podrá reclamar indemnización alguna.

**12.03** Asimismo, el Contrato de Fideicomiso, podrá concluir por simple acuerdo de Partes.

**CAPITULO 13**
**SUSTITUCION DEL FIDUCIARIO**

**13.01.**

a)   El Fiduciario podrá renunciar a sus funciones bajo el presente Contrato de Fideicomiso con o sin justa causa, dando un previo aviso al Beneficiario y al Fiduciante con una anticipación no menor a sesenta (60) Días. Se considerará "justa causa" de renuncia por parte del Fiduciario cualquiera de las siguientes situaciones: (i) cualquier incumplimiento de los deberes, compromisos, responsabilidades y/u obligaciones asumidas por el Fiduciante emergentes del, relacionadas con el, y/o vinculadas al presente Contrato de Fideicomiso, que no fuera subsanado dentro de los treinta (30) Días de recibida una intimación escrita por parte del Fiduciario y que tampoco sea subsanado por el Beneficiario en su caso en los plazos previstos al efecto en el presente, de corresponder.

b)   En el supuesto de quiebra o liquidación del Fiduciario, éste cesará en sus funciones en forma automática.

c)   En la fecha en que se haga efectiva la renuncia o remoción del Fiduciario, éste transferirá al fiduciario sustituto, previa aprobación del Beneficiario, los Créditos Cedidos así como cualquier otro bien fideicomitido al Fiduciario bajo el presente Contrato de Fideicomiso, y depositará en la cuenta que indique el fiduciario sustituto a tal efecto la totalidad de los Fondos que a dicha fecha obraren en poder del Fiduciario. En caso de que en la fecha en que se haga efectiva la renuncia del Fiduciario de acuerdo con el aviso dado por el Fiduciario a tales efectos no se hubiese designado aún un fiduciario sustituto, entonces el Fiduciario deberá solicitar instrucciones al Beneficiario respecto de dónde transferir los Fondos depositados en las Cuentas Fiduciarias. La renuncia a sus funciones bajo el presente Contrato de Fideicomiso, por cualquier causa que fuere, no generará ningún tipo de responsabilidad u obligación para el Fiduciario ni hacia el Fiduciante ni hacia el Beneficiario, sin perjuicio de los derechos y obligaciones que subsisten al presente Contrato de Fideicomiso. Todos los costos, gastos e impuestos que de ello se deriven serán soportados por el Fiduciante, excepto renuncia sin causa del Fiduciario, en cuyo caso estarán a cargo del Fiduciario. En ningún caso el Fiduciario podrá retirarse de sus funciones mientras se reciban o mantengan Fondos en alguna de las Cuentas Fiduciaria.

En los supuestos previstos precedentemente, así como en aquellos en los que por cualquier otro motivo o razón el Fiduciario cesara en sus funciones, el nuevo fiduciario será una entidad designada por el Beneficiario.

**13.02.** En este acto el Fiduciante renuncia al derecho conferido por el Inciso a) del Artículo 9 y concordantes de la Ley 24.441, no estando el Fiduciante facultado, en consecuencia, para remover al Fiduciario de su calidad de fiduciario bajo el presente, excepto que el Fiduciario haya procedido respecto de los Bienes Fideicomitidos y/o sus obligaciones bajo el presente con negligencia, culpa o dolo. El Beneficiario podrá remover al Fiduciario sin expresión de causa a partir de los noventa (90) días corridos desde el perfeccionamiento del presente Contrato de Fideicomiso, remoción que se hará efectiva a las veinticuatro (24) horas de notificada.

**13.03.** Las Partes acuerdan y aceptan que, previa aceptación expresa del Beneficiario, el Fiduciario podrá ser sustituido en su carácter de tal, reputándose al fiduciario sustituto como continuador de todos los derechos y obligaciones de titularidad del Fiduciario que le serán transferidos automáticamente. Sin perjuicio que las indemnidades otorgadas a favor del Fiduciario sean también transferidas al Fiduciario sustituto en tal oportunidad, también continuarán subsistiendo para el Fiduciario sustituido para aquellos actos ejecutados hasta el Día en que tuviere lugar la cesión fiduciaria.

**13.04.** La transferencia será notificada fehacientemente al Fiduciante y/o al Beneficiario dentro del plazo de tres (3) Días de efectuada, procediéndose a efectuar las inscripciones correspondientes en los registros pertinentes y/o las notificaciones que pudieren corresponder.

## CAPITULO 14
## DOMICILIOS, JURISDICCION Y DERECHO APLICABLE

**14.01.** A todos los efectos legales derivados del presente Contrato de Fideicomiso, el Fiduciario, el Beneficiario y el Fiduciante constituyen como domicilios los que se indican a continuación, donde serán válidas todas las notificaciones judiciales y/o extrajudiciales que les sean cursadas, pudiendo dichos domicilios sólo ser modificados previa notificación en forma fehaciente con cinco (5) Días de anticipación a las otras Partes, por otros domicilios dentro de la Ciudad Autónoma de Buenos Aires.

Fiduciario
BANCO DE SERVICIOS Y TRANSACCIONES S.A
Av. Corrientes 1174 3°
Ciudad A. de Buenos Aires
At.: Juan Manuel Lladó / Paula de la Serna

Fiduciante
SANCOR COOPERATIVAS UNIDAS LTDA
Tacuarí 212 Piso 3°
Ciudad A. de Buenos Aires
At.: Maria Magdalena

Beneficiario
IIG TOF B.V
Av. Leandro N. Alem 1050, Piso 13
Ciudad A de Buenos Aires
At.: Lisandro Frene

**14.02.** Dichos domicilios subsistirán hasta tanto sean reemplazados por otro domicilio y tal reemplazo notificado a las restantes Partes por medio escrito y fehaciente.

**14.03.** Todas las notificaciones, pedidos, reclamos y otras comunicaciones exigidas o permitidas en virtud del presente se harán por escrito y se considerarán debidamente efectuadas una vez entregadas en persona, o recibidas en el caso de cartas, documentos o telegramas colacionados y dirigidas a los domicilios antes indicados.

**14.04.** La celebración, interpretación y cumplimiento del Contrato de Fideicomiso se regirá íntegramente por las leyes de la República Argentina (incluyendo pero no limitando a los artículos 1434, 1444, 1446 y concordantes del Código Civil y al Título I de la Ley N° 24.441).

**14.05.** Para cualquier controversia que se suscite con relación al presente, las Partes se someten a la jurisdicción y competencia de los Tribunales Ordinarios de la Ciudad Autónoma de Buenos Aires, con renuncia a cualquier otro fuero o jurisdicción que pudiera corresponderles.

**SANCOR COOPERATIVAS UNIDAS LTDA**

Nombre: Mario Cesar Magdalena
Cargo: Apoderado





**ANEXO I**
**(Modelo del *"Contrato de Préstamo"*)**



## ANEXO II
### *(Listado de Deudores Cedidos)*

| Razon Social | CUIT | IIBB | Dirección | Ubicación | Código Postal |
|---|---|---|---|---|---|
| Ron Marcos David | 20250063122 | 20250063122 | ENTRE RIOS 2735 | Quilmes | 1879 |
| Bagnato Hnos Suc Haedo S H | 30708374993 | 30708374993 | ATAHUALPA 1876 | Haedo | 1706 |
| Depetris Graciela | 27139299219 | 881811-08 | CARACAS 2087 | Capital | 1416 |
| Candia Y Freda S H | 30707977341 | 901-058789-5 | SAN JOSE 445 | Capital | 1076 |
| Giujusa Gustavo Adrián | 20225086452 | BRM 225086450 | MORENO N° 35 | Pilar | 1629 |
| R O Berra Y E A Morlacchi S H | 30621514381 | 513423-04 | GANDARA 3319 | Capital | 1431 |
| Etchebehere Raul Angel | 20102091982 | 20102091982 | AVDA 2 NRO. 3454 | Mercedes | 6600 |
| Ron Miguel Ángel | 23140035629 | 23140035629 | BAIZAN 631 | Claypole | 1849 |
| Silva Armando Ricardo | 20177528529 | 901-193405-1 | B.DE IRIGOYEN 518 | Boulogne | 1609 |
| Vignatti Oscar F Y Carlos Hug | 30645770389 | 902-112458-9 | PARAGUAY 852 | Avellaneda | 1870 |
| Pena Jorge Néstor | 20149221434 | 20149221434 | VERACRUZ 1679 | Lanus Oeste | 1824 |
| Caldara O Y Amaya C S De H | 30710165579 | 30710165579 | LUJAN 415 | Paso del Rey | 1742 |
| Gatto Alberto Antonio | 20074713441 | 424005-07 | C.DE LOS POZOS 946 | Capital | 1222 |
| Ribaudo Natalio Omar | 20110045140 | 20-11004514-0 | LAS LOMAS 920 | Escobar | 1625 |
| Figueroa Norberto Ceferino | 20251086924 | 20251086924 | SICILIANO 1736 | Luis Guillon | 1838 |
| Roso Fernando | 20082969811 | 20-08296981-1 | VENEZUELA 613 | Gral. Pacheco | 1617 |
| Bueno Guillermo Ariel | 20214413788 | 2021441388 | BLAS PARERA 2212 | Quilmes | 1878 |
| Gagino Gladys Emilce | 27134363903 | 27134363903 | RESISTENCIA 1446 | Lanus | 1824 |
| Ochoa Víctor Hugo | 20169845310 | 20BPP16984531 | CALLE 13 BIS ESQ 529 | La Plata | 1900 |
| Lopez Gustavo Adrian | 23144296869 | 745652-02 | YRIGOYEN Y GUIDO SPANO | Benvidez | 1621 |
| Barragan Horacio Fabio | 20174673706 | BRM-174673708 | ISAAC BELSKY 636 | Merlo | 1722 |
| Padilla Adrián Miguel | 20229945174 | 20-22994517-4 | CERETTI 3117 | Capital | 1421 |
| Iparraguirre Mariano Cesar | 20228454681 | 902-094761-1 | QUINTANA 13 | San Martin | 1650 |
| Bergero Saul Y Bergero Carlos | 30686021382 | 902-142099-0 | GAONA 2425 | Ramos Mejia | 1704 |
| Volpe Gabriel Antonio | 20281703847 | 20281703847 | CONDARCO 1738 | Quilmes | 1878 |
| Vignatti C Suc Y Di Marco A | 30644968568 | 902-112457-1 | PARAGUAY 852 | Avellaneda | 1870 |
| Marsico Rosses S A | 30707792635 | 901-055111-6 | JOSE MOLDES 2598 | Capital | 1428 |
| Wilhelm Gustavo Daniel | 20227027275 | 20227027275 | PIZARRO 416 | Merlo | 1722 |
| Guerra Gaston Y Guerra Mario | 30708746327 | 30708746327 | TIERRA DEL FUEGO 546 | Gral. Pacheco | 1617 |
| PeÑa Tomas Valentín | 20122422012 | 20100850738 | MAGNOLIA 730 | Villa Tesei | 1708 |
| Saraceno Guillermo Adrián | 20140972984 | 20140972984 | LAS HERAS 974 | Lujan | 6700 |



**ANEXO III**

**(_Modelo de Notificación a los Deudores Cedidos del Fideicomiso adecuado al formato de notificación notarial_)**

Buenos Aires, __ de _____ de 200_.

Folio [__]. Primer Copia, Escritura Número [___]-

En la Ciudad de _____, Capital de la República Argentina, a los [__] días del mes de _____ del año dos mil nueve, ante mí, Escribano Autorizante, comparece/n el/los señor/es _____, titular/es del Documento Nacional de Identidad _____ y _____respectivamente, con domicilio en _____ Cuidad de _____ y los señores _____ y _____, titular/es del Documento Nacional de Identidad _____ y _____respectivamente, con domicilio en _____ de la Ciudad de Buenos Aires, todos ellos mayores de edad, hábiles y de mi conocimiento, doy fe, como que concurren en este acto en nombre y representación y en su carácter de apoderados de la cooperativa que gira en esta plaza bajo la denominación de SANCOR COOPERATIVAS UNIDAS LTDA. inscripta en [_____], acreditando el carácter invocado y las facultades suficientes para este acto con el Poder [_____] otorgado con fecha [__] ante [___] al folio [___] del Registro Notarial [___] a cargo de [__], cuya primera copia tengo a la vista y en fotocopia debidamente autenticada se encuentra agregada al folio [__] de este mismo Registro Notarial Protocolo del año [___], manifestando los comparecientes su plena vigencia. Los comparecientes, en nombre de SANCOR COOPERATIVAS UNIDAS LTDA. dicen: que solicitan de mí, el autorizante, que en el plazo de cinco días hábiles contados a partir del día de la fecha notifique a [NOMBRE CONCESIONARIO] con domicilio en_____ Ciudad de _____, la cesión fiduciaria en garantía operada en el contrato de fideicomiso instrumentado conforme a la propuesta de fecha ___ de _____ de 2009 formulada por SANCOR COOPERATIVAS UNIDAS LTDA ("SanCor") en carácter de potencial fiduciante y aceptada por IIG TOF B.V. ("IIG") en carácter de beneficiario y por Banco de Servicios y Transacciones S.A. ("BST") en carácter fiduciario; mediante el cual SanCor ha transmitido a BST la propiedad fiduciaria del 100% de todos los créditos y derechos de cobro, cualquiera fuere su naturaleza, que le correspondan a SanCor en forma directa o indirectamente a través de terceros que facturen a nombre propio pero por cuenta y orden de Sancor sobre las transacciones comerciales de cualquier tipo que pudiera celebrar con [NOMBRE CONCESIONARIO] a partir del día del perfeccionamiento del Contrato de Fideicomiso (los "Creditos Cedidos").

Consecuentemente, a partir de la fecha de la presente notificación y salvo instrucción fehaciente en contrario de BST y de IIG TOF BV, se instruye a Uds a proceder al pago de los Créditos Cedidos conforme las siguientes instrucciones de pago:

BANCO:

CTA.CTE RECAUDADORA.:   NRO.

CBU:

Atentamente

(CONCLUIR NOTARIALMENTE LA NOTIFICACIÓN)

Recibimos de conformidad vuestra notificación y nos comprometemos a cumplir con las instrucciones de pago arriba mencionadas o las que en el futuro nos indique en forma fehaciente el Banco de Servicios y Transacciones S.A. y IIG TOF B.V. de conformidad a los derechos y obligaciones establecidos y/o consecuencia de los Créditos Cedidos. Por otra parte, confirmamos a Uds. que no tenemos conocimiento de ningún gravamen ni restricción de ningún tipo sobre la propiedad de los Créditos Cedidos antes señalados y que afecten a los mismos.

[NOMBRE CONCESIONARIO]
(Nombre del firmante)
(Carácter del firmante)

**ANEXO IV**

*Modelo de nota de notificación declarando la aceleración y caducidad de plazos del Contrato de Préstamo*

[Ciudad], __de _____ de 200__.

Sres.:
**BANCO DE SERVICIOS Y TRANSACCIONES S.A.**
Corrientes 1174, 3° Piso
Buenos Aires, Argentina
At: Sr. Juan Manuel Lladó

Ref: Fideicomiso de Garantía Sancor – IIG TOF BV

Nos dirigimos a Uds. con relación al Contrato de Cesión Fiduciaria y Fideicomiso de Garantía relativo al Fideicomiso de referencia [_____] de 2009, cuyas definiciones, términos y condiciones resultan aplicables a la presente. En tal sentido, informamos a Uds. que SANCOR COOPERATIVAS UNIDAS LTDA ha incumplido con sus Obligaciones Garantizadas –específicamente _____(INDICAR), Habiendo acaecido un Evento de Incumplimiento y habiendo incurrido en Mora, produciéndose la aceleración y caducidad de todos los plazos bajo el Contrato de Préstamo, conforme lo dispuesto en los Artículos 3.06. a 3.08 y 8 del Contrato de Fideicomiso y Cláusula_____ del Contrato de Préstamo. Consecuentemente, al día de la fecha nos adeuda la suma de [_____] Dólares (US$ [_____] ), conforme la siguiente liquidación:

(EL BENEFICIARIO PRACTICARÁ LIQUIDACIÓN SEGÚN MONTOS ADEUDADOS EN EL MARCO DEL CONTRATO DE PRESTAMO)

Consecuentemente, conforme lo establecido en los Artículos del Contrato de Fideicomiso antes referidos, solicitamos a Uds. que:

(EL BENEFICIARIO INDICARÁ AL FIDUCIARIO: INSTRUCCIONES PARA APLICAR LOS FONDOS DEPOSITADOS EN LA CUENTA FIDUCIARIA AL PAGO DE LAS OBLIGACIONES GARANTIZADAS INCUMPLIDAS.

Sin otro particular, saludamos a Uds. atentamente,

**IIG TOF B.V**
(nombre)
(cargo)



**ANEXO V**

*Modelo de nota de notificación informando que se dan por satisfechas la totalidad de las acreencias contra el Fiduciante e instruyendo la liquidación del fideicomiso*

[Ciudad], __ de _____ de 200__.

Sres.:
**BANCO DE SERVICIOS Y TRANSACCIONES S.A.**
**Corrientes 1174, 3º Piso**
**Buenos Aires, Argentina**
**At: Sr. Juan Manuel Lladó**

Ref: Fideicomiso de Garantía Sancor – IIG TOF BV

Nos dirigimos a Uds. con relación al Contrato de Cesión Fiduciaria y Fideicomiso de Garantía relativo al Fideicomiso de referencia[_____] de 2009, cuyas definiciones, términos y condiciones resultan aplicables a la presente. Mediante la presente informamos a Uds. que SANCOR COOPERATIVAS UNIDAS LTDA ha cancelado todas y cada una de las Obligaciones Garantizadas, no adeudándonos suma alguna bajo el Contrato de Préstamo. Consecuentemente, a partir de la efectiva recepción de la presente podrán Uds. proceder a la liquidación del Fideicomiso y a disponer de los Créditos Cedidos de acuerdo con las instrucciones que reciban Uds. del Fiduciante, previa cancelación de la totalidad de gastos e impuestos a cargo del Fideicomiso.

Sin otro particular, saludamos a Uds. atentamente,

———————————————
**IIG TOF B.V**
**(nombre)**
**(cargo)**



**ANEXO VI**

_**Modelo de nota de notificación a remitir por el Fiduciario al Beneficiario**_

[Ciudad], __ de _____ de 200__.

Sres.
**IIG TOF B.V.**
**representada por Trust Management Corp. B.V**
**Telestone 8 – Teleport, Naritaweg 165,**
**P.O. Box 7241, 1007 JE, Amsterdam, The Netherlands**

**Ref. : Propuesta de Cesión Fiduciaria y Fideicomiso**
**con Fines de Garantía. Sancor-IIG TOF BV**
**(Propuesta N° 1101)**

Por medio de la presente le informamos fehacientemente que con fecha _____ se ha emitido y hecho entrega el pasado _____ a SANCOR COOPERATIVAS UNIDAS LTDA. de la Factura N° _____ (que en copia se adjunta) en concepto de la comisión inicial por incorporación señalada en el Artículo 11.01 (a) de la Propuesta de la referencia.

Sin otro particular, saludamos a Uds. atentamente,

_____
**BANCO DE SERVICIOS Y TRANSACCIONES SA**
(nombre)
(cargo)

**ANEXO VII**

*Modelo de nota de notificación a remitir por el Beneficiario con destino al Fiduciante y al Fiduciario*

[Ciudad], ___ de _____ de 200__.

Sres.
**SANCOR COOPERATIVAS UNIDAS LTDA**
**Tacuari 212, 3° Piso,**
**Buenos Aires, Argentina**
**At.: Mario Cesar Magdalena**

Sres.
**BANCO DE SERVICIOS Y TRANSACCIONES S.A.**
**Corrientes 1174, 3° Piso**
**Buenos Aires, Argentina**
**At.: Sr. Juan Manuel Lladó**

**Ref. :** Propuesta de Cesión Fiduciaria y Fideicomiso con Fines de Garantía. Sancor-IIG TOF BV (Propuesta N° 1101)

Por medio de la presente le informamos fehacientemente que nuestro domicilio legal es el de Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE, Amsterdam, The Netherland y ratificamos el domicilio de Av. Leandro N. Alem 1050, Piso 13, Ciudad A de Buenos Aires, Republica Argentina, indicado en la Propuesta de la referencia a los fines de recibir notificaciones.

Sin otro particular, saludamos a Uds. atentamente,

_____
**IIG TOF B.V**
(nombre)
(cargo)

**ANEXO II / ANNEX II**

Modelo de Pagaré (sin protesto)

Buenos Aires, __ de _____ de 200_.

US$ _____

A la vista, por igual valor recibido, _____ una sociedad constituida de conformidad con las leyes de la República Argentina, con domicilio en _____ República Argentina (en adelante el "Deudor") se obliga en forma irrevocable e incondicional a abonar a _____, (en adelante el "Acreedor"), sus sucesores o cesionarios, en el domicilio sito en _____, República Argentina, la suma neta de Dólares Estadounidenses _____ CON __/100 (US$ _____), en fondos de disponibilidad inmediata, libres de cualquier tipo de deducción que pudiera corresponder en concepto de impuestos, tasas, contribuciones, cargos y/o aranceles de todo tipo, actuales o futuros, que pudieran efectuar las autoridades gubernamentales y/o impositivas de la República Argentina y/o de cualquier otra jurisdicción.

El presente pagaré es pagadero en Dólares Estadounidenses (y NO en otra moneda) contra la sola presentación del mismo. Si los montos debidos en virtud del mismo no fueran abonados en tiempo y forma, el Deudor se obliga a abonar al Acreedor todos los costos y cargos que demandare su cobro (judiciales y/o extrajudiciales), incluyendo honorarios razonables de abogados. Si el presente Pagaré no fuera íntegramente abonado a la Fecha de Vencimiento, producirá la mora sin necesidad de interpelación alguna, hará exigible el saldo de otros pagares que el deudor tuviera pendiente con el acreedor, operándose la caducidad de los plazos. El Deudor se obliga asimismo a pagar al Acreedor –además del capital adeudado- los intereses correspondientes calculados a razón de una tasa del ___% anual, calculados desde la Fecha de Vencimiento hasta el día del efectivo pago total del presente Pagaré.

En caso de ejecución de este Pagaré, los tribunales competentes serán los Tribunales Ordinarios de la Ciudad de Buenos Aires, República Argentina. La sentencia que se dicte contra el Deudor en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

A todos los efectos del presente Pagaré, se constituyen los siguientes domicilios:

Deudor: _____ – Argentina
Fiador: _____ - Argentina
Acreedor: Av. Leandro N. Alem 1050, piso 13 - (C1001AAS) Buenos Aires, Argentina, con copia:

Deudor

_____

Por
Nombre:
Carácter:

| ANEXO III | ANNEX III: |
|---|---|
| **MODELO DE SOLICITUD DE DESEMBOLSO** | **REQUEST FOR DISBURSEMENT** |

Buenos Aires, _____ de _____ de 200_

Buenos Aires, _____, 200__.-

Sres.
**IIG TOF B.V.**

_____

Sirs
**IIG TOF B.V.**

_____

De nuestra consideración:

Dear Sirs:

Nos dirigimos a Uds. con relación al Contrato Marco de Línea de Crédito suscripto entre Uds. y _____ con fecha ____ de _____ de 2009 (el "Contrato Marco"), cuyas definiciones, términos y condiciones resultan aplicables a la presente Solicitud de Desembolso. De conformidad con lo establecido en la Cláusula TERCERA del Contrato Marco, solicitamos a Uds. un desembolso de acuerdo a los siguientes términos:

Reference is hereby made to the Credit Facility Agreement executed with you, dated _____, 2009 (the "Master Agreement"), whose definitions, terms and conditions are applicable to this Request for Disbursement. Pursuant to Section Third of the Master Agreement we hereby request to you a disbursement pursuant to the following conditions:

(i) El monto del desembolso solicitado mediante la presente es de US$ _____ (Dólares Estadounidenses _____).

(i) The amount requested to be disbursed herein is the aggregate principal amount of USD _____ (United States Dollars _____).

(ii) La/s Fecha/s de Vencimiento del desembolso antes requerido será/n la/s siguiente/s:

(ii) The Due Date/s for the repayment of the requested disbursement shall be the following:

| Fecha Vto. | Moneda e Importe |
|---|---|
| __/__/__ | U$S _____ |
| __/__/__ | U$S _____ |

| Due Dates | Amount and Currency |
|---|---|
| __/__/__ | USD |
| __/__/__ | USD |

(ii) La Suma Adeudada por dicho desembolso asciende a un total de US$ _____ (Dólares Estadounidenses _____), comprensivo del monto del desembolso con más los intereses aplicables hasta la/s Fecha/s de Vencimiento antedichas.

(iii) The Sums Due as a consequence of the mentioned disbursement amounts to the total aggregate amount of USD _____ (United States Dollars _____), which comprehends the disbursed amount plus the interests applicable as of the aforementioned Due Dates.

(iii) Adjuntamos a la presente un Pagare a vuestro favor, pagadero a la vista, por la suma total de US$ _____ (Dólares Estadounidenses _____).

(iv) We enclosed herein a Promissory Note at your favor, payable on demand for the total aggregate amount of USD _____ (United States Dollars _____).

| Fecha Emisión | Fecha Vto. | Moneda e Importe |
|---|---|---|
| __/__/__ | A la vista | U$S_____ |

| Issue Date | Due Date | Amount and Currency |
|---|---|---|
| __/__/__ | On Demand | USD |

(iv) Adjuntamos a la presente los Warrants N° _____, por la suma total de US$ ____ (Dólares Estadounidenses _____), debidamente endosados a vuestro favor de acuerdo al siguiente detalle:

(v) We enclosed herein the Warrants N° _____, for the total aggregate amount of USD ____ (United States Dollars _____), duly endorsed in your favor according to the following detail:

En caso de que la presente Solicitud de Desembolso sea aceptada por Uds., les solicitamos que, dentro del Plazo de Acreditación, transfieran los fondos del desembolso requerido a la Cuenta del Mutuario indicada en el Contrato Marco.

Provided this Request for Disbursement is accepted by you, we request that within the Crediting Term, you transfer the requested amount to the Borrower's Account identified at the Master Agreement.

Sin otro particular, saludamos a Uds. atentamente.

Yours sincerely,

Nombre: _____
Carácter: _____

By: _____
Name: _____

**ANEXO IV / ANNEX IV**
**MODELO DE NOTIFICACION AL DEUDOR CEDIDO / MODEL OF NOTIFICATION TO THE**
**ASSIGNED DEBTOR**

Buenos Aires, _____ __· 200_

Messrs.:
At.:
Tel:
Fax:

Dear Sirs:
We address to you in order to give you notice of the Assignments Agreements dated November 30th 2007 and_____, executed between SANCOR COOPERATIVAS UNIDAS LTDA. ("SANCOR"), SANCOR DO BRASIL Produtos Alimenticios Ltda. ("SANCOR DO BRASIL") and IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V. ("IIG TOF BV"), and whereby SANCOR has assigned and transferred to IIG TOF BV, and IIG TOF BV has accepted and received all credits, rights, and interests arising and/or deriving from all and any commercial transactions that SANCOR execute and/or may execute with _____until _____ (the "Assigned Credits").

As a consequence thereof, we inform you that all the sums and credits hereinabove referred –including, without limitation, the credits derived from the invoices and other documentation that SANCOR submit to you as a consequence of said commercial transactions, as well as the letters of credit that you may open in order to pay those invoices are to be fully paid to IIG TOF BV by wire transfer to the following account:

BANK:
ABA#:
SWIFT:
Credit:
Account#:
Further Credit:
Account#:

The aforementioned Assignment Agreements shall not transfer and/or modify the liability of SANCOR derived from the referred commercial transactions and business operations (the "Agreements"). Thus, SANCOR remains being fully and exclusively responsible for any and all the obligations derived thereof.
Sincerely yours,

_____

**SANCOR COOPERATIVAS UNIDAS LTDA.**
Name:
Capacity:

_____

**IIG TOF B.V., represented by TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V**
Name:
Capacity:

Acknowledged and accepted:

_____

Name: _____
Capacity: _____



**PRIMERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO**
**PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representada en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, cuyas copias se adjuntan a la presente como Anexo A (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Primera Enmienda.

(b) Que sobre la base del Contrato Marco, es intención del MUTUARIO requerir al MUTUANTE una línea de crédito tipo 'revolving' a fin de poder requerirle –en los términos y condiciones establecidos en el Contrato Marco- los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(c) Que el mecanismo antes descripto permitiría al MUTUARIO requerir periódicamente el flujo de fondos requeridos para financiar sus exportaciones, pudiendo cancelar las Sumas Adeudadas, solicitar nuevos desembolsos y así sucesivamente, siempre que el monto acumulado de toda la Línea de Crédito resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(d) Que es intención de las Partes modificar el Contrato Marco al solo efecto de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán extenderse las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente primera enmienda al Contrato Marco (la "Primera Enmienda"), de conformidad con las presentes Cláusulas:

1. Modifícase de la Cláusula PRIMERA del Contrato Marco las siguientes definiciones:

"*Fecha/s de Vencimiento*" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán ser anteriores a los 24 (veinticuatro) meses calculadas desde la fecha de cada Solicitud de Desembolso e indefectiblemente anteriores al 31 de Diciembre de 2012 .

"*Línea de Crédito*" significa la única línea de crédito, modalidad "revolving" que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00)

"*Plazo de Disponibilidad*" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2012, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO"



2.      Con excepción de aquellos términos expresamente modificados por la presente Primera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 15 días del mes de Marzo de 2010.

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Por: **SANCOR DO BRASIL Produtos Alimenticios Ltda.**
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderado - Administrador

Por: **IIG TOF B.V.**
Nombre:
Carácter:      Trust International Management (T.I.M.) B.V,
                     Managing Director

Firma/s certificada/s en Foja
N° F001N6206.9
Bs. As. 12-3-2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



  

# ANEXO

F 001362069

1  Buenos Aires, 15 de Marzo de 2010 . En mi carácter de escribano

2  Titular del Registro Notarial N° 841

3  CERTIFICO: Que la/s firma/s que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 48 del LIBRO

6  número 132 , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9  Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10 dades de acuerdo al inciso a del artículo 1002 del Código Civil y actúan:

11 el señor Magdalena en su carácter de apoderado de la sociedad "SAN-

12 COR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sunchales,

13 Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

14 cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

15 tellanos, conforme lo acredita con el poder de fecha 15 de diciembre de

16 2009, pasado al folio 1400 del Registro 640 de la ciudad de Sunchales,

17 Provincia de Santa Fe, a cargo de la escribana Analía Roch, asimismo

18 actúan: el señor Magdalena en su carácter de Apoderado Gerencia Fi-

19 nanciera y el señor Valicente en su carácter de Apoderado de la sociedad

20 "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que acreditan con

21 el Poder Especial de fecha 17 de diciembre de 2009, debidamente certi-

22 ficado con fecha 17 de diciembre de 2009 y debidamente Autorizado por

23 el Ministerio de Relaciones Exteriores con fecha 7 de enro de 2010 y tra-

24 ducido con fecha 18 de enero de 2010 y legalizado bajo el número 948 de

25 fecha 19 de enero de 2010, la documentación relacionada tengo a la vista,



y les confieren facultades suficientes para suscribir el documento adjunto,

doy fe.-



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50

## SEGUNDA A ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificada mediante Primera Enmienda de fecha 15 de Marzo de 2010, cuyas copias se adjuntan a la presente como Anexo A (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Segunda Enmienda.

(b) Que, en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO frente al MUTUANTE bajo el Contrato Marco, el MUTUARIO se obligó a mantener durante toda la vigencia del Contrato Marco y hasta que el mismo se extinga, Warrants endosados a favor del MUTUANTE por un monto no inferior a una suma equivalente al 15% (quince por ciento) de la Línea de Crédito Adeudada (Sección 7.2 de la Cláusula SEPTIMA).

(c) Al momento de la presente, el MUTUANTE declara de conformidad, que la Línea de Crédito Adeudada, asciende a un total de US$ 14.910.992,92 (Dólares Estadounidenses CATORCE MILLONES NOVECIENTOS DIEZ MIL NOVECIENTOS NOVENTA Y DOS CON 92/100) y que el MUTUARIO entregó y endosó Warrants a su favor por la suma total de US$ 3.869.640,30 (Dólares Estadounidenses TRES MILLONES OCHOCIENTOS SESENTA Y NUEVE MIL SEISCIENTOS CUARENTA CON 30/100).

(d) Que el MUTUARIO ha requerido al MUTUANTE y el MUTUANTE –pese a no tener obligación alguna a ello- ha aceptado liberar algunos – no todos- de los Warrants endosados a su favor, siempre que no se vea afectada la ratio exigida por la Sección 7.2 de la Cláusula SEPTIMA y sin que ello implique novación alguna de la deuda instrumentada en el Contrato Marco ni en las Solicitudes de Desembolso.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente segunda enmienda al Contrato Marco (la "Segunda Enmienda"), de conformidad con las presentes Cláusulas:

**1.** Reintégrense al MUTUARIO los Warrants que se detallan a continuación dentro de las 48 hs de que el MUTUARIO haya suscripto la presente Segunda Enmienda:

| Nº WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2685 | Leche en Polvo | Sunchales | 148.800 | kgs | 03/Jun/2010 | 520.800,00 |

**2.** Conforme lo anteriormente detallado, como consecuencia de la liberación de los Warrants, a partir del día de la fecha, la garantía de Warrants del Contrato Marco queda conformada de la siguiente forma:

| Nº WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2675 V | Queso Semi Duro | Balnearia | 148.937,00 | Kg | 03/Jun/2010 | 700.003,90 |
| 2676 V | Queso Semi Duro | Balnearia | 102.412,00 | Kg | 03/Jun/2010 | 481.336,40 |
| 2677 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |



| 2678 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |
|--------|-----------|-----------|------------|-----|-------------|------------|
| 2679 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |
| 2682 V | Queso Pasta Dura | La Carlota | 187.500,00 | Kg | 03/Jun/2010 | 1.312.500,00 |
| Total | | | | | | 3.348.840,30 |

3. Con excepción de aquellos términos expresamente modificados por la presente Segunda Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 13 días del mes de Abril de 2010.

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Por: **SANCOR DO BRASIL Produtos Alimenticios Ltda.**
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderados

Por: **IIG TOF B.V.**
Nombre: J. Smytosch / y Meymans
Carácter: Apoderados

Firma/s certificada/s en Foja
Nº E007402230
Bs. As. 13-4-2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370






F   005962330

1   **Buenos Aires,** 13  **de**      Abril       **de** 2010  . **En mi carácter de escribano**

2   **Titular del Registro Notarial Nº 841**

3   **CERTIFICO: Que la/s firma/s**                                **que obra/n en el**

4   **documento que adjunto a esta foja, cuyo requerimiento de certificación se**

5   **formaliza simultáneamente por ACTA número** 190                         **del LIBRO**

6   **número** 133                    **, es/son puesta/s en mi presencia por la/s persona/s**

7   **cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como**

8   **la justificación de su identidad.** Mario César MAGDALENA, L.E. 8.106.144 y

9   Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10  dades de acuerdo al inciso a del artículo 1002 del Código Civil y actúan:

11  el señor Magdalena en su carácter de apoderado de la sociedad "SAN-

12  COR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sunchales,

13  Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

14  cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

15  tellanos, conforme lo acredita con el poder de fecha 15 de diciembre de

16  2009, pasado al folio 1400 del Registro 640 de la ciudad de Sunchales,

17  Provincia de Santa Fe, a cargo de la escribana Analia Roch, asimismo

18  actúan: el señor Magdalena en su carácter de Apoderado Gerencia Fi-

19  nanciera y el señor Valicente en su carácter de Apoderado de la sociedad

20  "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que acreditan con

21  el Poder Especial de fecha 17 de diciembre de 2009, debidamente certi-

22  ficado con fecha 17 de diciembre de 2009 y debidamente Autorizado por

23  el Ministerio de Relaciones Exteriores con fecha 7 de enro de 2010 y tra-

24  ducido con fecha 18 de enero de 2010 y legalizado bajo el número 948 de

25  fecha 19 de enero de 2010, la documentación relacionada tengo a la vista






F 005962330

y les confieren facultades suficientes para suscribir el documento adjunto,

doy fe.-




MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50



**CUARTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Productos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificada mediante Primera Enmienda de fecha 15 de Marzo de 2010, Segunda Enmienda de fecha 13 de Abril de 2010 y Tercera Enmienda de fecha 29 de Noviembre de 2010, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Cuarta Enmienda.

(b) Que, en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO frente al MUTUANTE bajo el Contrato Marco, el MUTUARIO se obligó a mantener durante toda la vigencia del Contrato Marco y hasta que el mismo se extinga, Warrants endosados a favor del MUTUANTE por un monto no inferior a una suma equivalente al 15% (quince por ciento) de la Línea de Crédito Adeudada (Sección 7.2 de la Cláusula SEPTIMA).

(c) Al momento de la presente, el MUTUANTE declara de conformidad, que la Línea de Crédito Adeudada, asciende a un total de US$ 53.312.477,86 (Dólares Estadounidenses CINCUENTA Y TRES MILLONES TRESCIENTOS DOCE MIL CUATROCIENTOS SETENTA Y SIETE CON 86/100) y que el MUTUARIO entregó y endosó Warrants a su favor por la suma total de US$ 13.397.274,44 (Dólares Estadounidenses TRECE MILLONES TRESCIENTOS NOVENTA Y SIETE MIL DOSCIENTOS SETENTA Y CUATRO CON 44/100).

(d) Que el MUTUARIO ha requerido al MUTUANTE y el MUTUANTE –pese a no tener obligación alguna a ello- ha aceptado liberar algunos – no todos- de los Warrants endosados a su favor, siempre que no se vea afectada la ratio exigida por la Sección 7.2 de la Cláusula SEPTIMA y sin que ello implique novación alguna de la deuda instrumentada en el Contrato Marco ni en las Solicitudes de Desembolso.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente Cuarta enmienda al Contrato Marco (la "Cuarta Enmienda"), de conformidad con las presentes Cláusulas:

1.   Reintégrense al MUTUARIO los Warrants que se detallan a continuación dentro de las 48 hs de que el MUTUARIO haya suscripto la presente Cuarta Enmienda:

| N° WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 3106U | QUESO PASTA DURA EN MADURACION | POZO DEL MOLLE | 10.000,00 | Kg | 08/09/2011 | 70.000,00 |
| 3107U | QUESO PASTA DURA EN MADURACION | LA CARLOTA | 400.000,00 | Kg | 08/09/2011 | 2.800.000,00 |

2.   Conforme lo anteriormente detallado, como consecuencia de la liberación de los Warrants, a partir del día de la fecha, la garantía de Warrants del Contrato Marco queda conformada de la siguiente forma:

 

| Nº WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 3075U | LECHE UAT | CHIVILCOY | 500.000,00 | Kg | 08/09/2011 | 285.000,00 |
| 3076U | LECHE UAT | CHIVILCOY | 500.000,00 | Kg | 08/09/2011 | 285.000,00 |
| 3077U | LECHE UAT | CHIVILCOY | 500.000,00 | Kg | 08/09/2011 | 285.000,00 |
| 3078U | QUESOS SEMIDUROS EN PROCESO | BALNEARIA | 148.937,00 | Kg | 08/09/2011 | 700.003,90 |
| 3079U | QUESOS SEMIDUROS EN PROCESO | BALNEARIA | 148.937,00 | Kg | 08/09/2011 | 700.003,90 |
| 3080U | QUESOS SEMIDUROS EN PROCESO | BALNEARIA | 102.412,00 | Kg | 08/09/2011 | 481.336,40 |
| 3081U | QUESO PASTA DURA EN MADURACION | LA CARLOTA | 187.500,00 | Kg | 08/09/2011 | 1.312.500,00 |
| 3082U | QUESO PASTA DURA EN MADURACION | LA CARLOTA | 87.500,00 | Kg | 08/09/2011 | 612.500,00 |
| 3083U | QUESO PASTA DURA EN MADURACION | POZO DEL MOLLE | 187.500,00 | Kg | 08/09/2011 | 1.312.500,00 |
| 3084U | LECHE UAT | SUNCHALES | 515.750,00 | Kg | 08/09/2011 | 866.460,00 |
| 3085U | LECHE UAT | SUNCHALES | 515.750,00 | Kg | 08/09/2011 | 866.460,00 |
| 3086U | LECHE UAT | SUNCHALES | 169.643,00 | Kg | 08/09/2011 | 285.000,24 |
| 3087U | QUESO PASTA DURA EN MADURACION | BRIKMANN | 101.250,00 | Kg | 08/09/2011 | 633.825,00 |
| 3088U | QUESO PASTA DURA EN MADURACION | BRIKMANN | 101.250,00 | Kg | 08/09/2011 | 633.825,00 |
| 3089U | QUESO PASTA DURA EN MADURACION | BRIKMANN | 101.250,00 | Kg | 08/09/2011 | 633.825,00 |
| 3090U | QUESO PASTA DURA EN MADURACION | BRIKMANN | 46.250,00 | Kg | 08/09/2011 | 289.525,00 |
| 3091U | QUESOS SEMIDUROS EN PROCESO | BRIKMANN | 73.300,00 | Kg | 08/09/2011 | 344.510,00 |
| 3133U | LECHE EN POLVO | MORTEROS | 200.000,00 | Kg | 08/09/2011 | 720.000,00 |
| 3134U | LECHE EN POLVO | SUNCHALES | 398.000,00 | Kg | 08/09/2011 | 1.432.800,00 |
| 3135U | LECHE EN POLVO | DEVOTO | 200.000,00 | Kg | 08/09/2011 | 720.000,00 |
| Total | | | | | | 13.400.074.44 |

3. Con excepción de aquellos términos expresamente modificados por la presente Cuarta Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, el día 1 de Agosto de 2011.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: SANCOR DO BRASIL Productos Alimenticios Ltda.
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderados

Firma/s certificada/s en Foja
Nº F 00103 U 160
Vto. 03 1 8 2011

Por: IIG TOF B.V.
Nombre:
Carácter: Trust International Management (T.I.M.) B.V.
Managing Director

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



**ACTA DE CERTIFICACION DE FIRMAS**
**LEY 404**

# ANEXO

F 001684188

1   **Buenos Aires,** 01   de   **Agosto**   de 2011   . En mi carácter de escribano

2   **Titular del Registro Notarial N° 841**

3   **CERTIFICO: Que la/s firma/s**                              que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número 154                del LIBRO

6   número 164              , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y Da-

9   niel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identidades de

10  acuerdo al inciso a) del artículo 1002 del Código Civil y actúan: el señor Magda-

11  lena en su carácter de Apoderado de la sociedad "SANCOR COOPERATIVAS

12  UNIDAS LIMITADA", con domicilio en Sunchales, Provincia de Santa Fe, ins-

13  cripta en la Matrícula 772 del Registro Nacional de Cooperativas, de la Provincia

14  de Santa Fe, Departamento Castellanos, conforme lo acredita con el poder de

15  fecha 15 de diciembre de 2009, pasado al folio 1400 del Registro 640 de la ciu-

16  dad de Sunchales, Provincia de Santa Fe, a cargo de la escribana Analia Roch,

17  y el señor Valicente en su carácter de Apoderado de la sociedad "SANCOR DO

18  BRASIL Produtos Alimenticios LTDA." lo que acredita con el Poder Especial de

19  fecha 17 de diciembre de 2009, debidamente certificado con fecha 17 de di-

20  ciembre de 2009 y debidamente Autorizado por el Ministerio de Relaciones Ex-

21  teriores con fecha 7 de enero de 2010 y traducido con fecha 18 de enero de

22  2010 y legalizado bajo el número 948 de fecha 19 de enero de 2010, toda la

23  documentación relacionada tengo a la vista y les confiere facultades suficientes

24  para suscribir el documento adjunto, doy fe.-

25

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

| | |
|---|---|
| **CONTRATO DE LÍNEA DE CRÉDITO PARA LA PREFINANCIACIÓN DE EXPORTACIONES** | **PRE EXPORT FINANCE CREDIT FACILITY AGREEMENT** |

Entre
**SANCOR COOPERATIVAS UNIDAS LIMITADA,** una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.,** una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Gabriel Gustavo Martinuzzi, en su carácter de Apoderado Gerencia Financiera y Administrador (Articulo 11°) respectivamente, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.,** representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "**Partes**"; y

**CONSIDERANDO:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la pre-financiación de sus exportaciones

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndole continuar con el desarrollo y ampliación de sus mercados externos;

(c) Que el FIADOR mantiene fuertes relaciones comerciales con el MUTUARIO por lo cual está interesado en afianzar las obligaciones de éste último a fin de que pueda obtener la financiación antes referida,

(d) Que por las razones indicadas en el Considerando (b), y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO está dispuesto a afectar bienes para garantizar el repago del crédito para prefinanciar sus exportaciones;

(e) Que el MUTUANTE está dispuesto a otorgar una línea de

Entered into by and between:
**SANCOR COOPERATIVAS UNIDAS LIMITADA,** a company store of first degree, constituted and registered under the laws of the Argentine Republic, with domicile at Tacuarí 202, 3° floor, Capital Federal, República Argentina, represented herein by Mr. Mario Magdalena, as representative (hereinafter referred to as the "BORROWER"), and

**SANCOR DO BRASIL Productos Alimenticios Ltda.,** a corporation registered under the laws of the Brazilian Republic, represented herein by Mr. Mario Magdalena and Gabriel Gustavo Martinuzzi, as Attorney-in-Fact, Financial Manager and Administrator (section 11°) respectively, with domicile at Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República de Brasil, (hereinafter referred to as the "SURETY"), and

**IIG TOF B.V.,** respresented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** respresented herein by Mr. _____ and _____, as _____, with domicile at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (hereinafter referred to as the "LENDER"), and

The BORROWER, the LENDER and the SURETY jointly named as the "**Parties**"; and

**WHEREAS:**

(a) That the BORROWER is interested in obtaining mid term financing in order to appoint it to pre-finance its exportations.

(b) That the satisfaction and the need to obtain a financing to pre-finance the export that the BORROWER currently has, will benefit him, granting him to continue with the development and extension of its external markets;

(c) That the SURETY maintains strong commercial relationships with the BORROWER, reason why is interested to guarantee the obligations of the last mentioned in order for it to obtain the financing previously referred to;

(d) That for the reasons indicated in (b) above, and algo, to facilitate the granting of the loan from the perspective of the credit risk, the BORROWER is willing to affect some assets/goods to warranty the repayment of the credit to pre-finance its exports;

(e) That The LENDER is willing to grant a credit facility



crédito de hasta Dólares Estadounidenses cincuenta millones con 00/100 (US$ 50.000.000,00) para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) el MUTUARIO y el FIADOR se obliguen solidariamente a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato Marco; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (iii) se otorgue y perfeccione el Fideicomiso y la cesión de los Créditos Cedidos (tal como se los define más adelante).

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

PRIMERA:      DEFINICIONES.

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO y/o del FIADOR.

"Arthur Schuman": significa ARTHUR SCHUMAN, INC., una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica, con domicilio en 40 New Dutch Lane, Fairfield, NJ 07004 USA

"BARIVEN c/o PDVSA": significa Bariven S.A., c/o PDVSA Services, Inc., una firma organizada bajo las leyes del Estado de Texas, Estados Unidos de Norteamérica, con domicilio en 1293 Eldrige Parkway, Houston, Texas (77077), Estados Unidos de Norteamérica.

"Bien/es Fideicomitido/s" significa los "Créditos Cedidos" conforme este término está definido en el Fideicomiso.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o del FIADOR y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis/nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO y/o el

of up to Fifty Million United States Dollars and 00/100 (US$ 50,000,000.00) to the BORROWER, subject to the terms and conditions of this Master Agreement, to the extent and provided that: (i) the BORROWER and the SURETY become jointly and severally bound to repay the same and to comply with all the obligations undertaken under the Agreement; (ii) the Guarantees (as defined hereinbelow) are maintained in full force and effect and enforceable up to the termination of the Agreement; and (iii) the Parties grant and perfect the assignment of the Assigned Credits (as they are defined hereinafter).

By virtue of the aforesaid considerations, this credit facility agreement is executed pursuant to the following terms and conditions:

SECTION ONE: DEFINITIONS.

"Affiliates" means the subsidiary corporations and/or holding corporations and/or companies commonly owned by the BORROWER and/or the SURETY.

"Artur Schuman" means ARTHUR SCHUMAN, INC., a corporation organized and registered under the laws of the Estate of New Jersey, United States, with domicile at 40 New Dutch Lane, Fairfield, NJ 07004 USA.

"BARIVEN c/o PDVSA" means Bariven S.A., c/o PDVSA Services Inc., a corporation organized and registered under the laws of the Estate of Texas, United States of America, with domicile at 1293 Eldrige Parkway, Huston, Texas (77077), United States of America.

"Trusted Asset/s" means the "Assigned Credits" as the term is defied in the Trust.

"Material Adverse Change" means any material unfavorable change in the economic, commercial, financial or operating situation or financial position or of any other kind of the BORROWER and/or the SURETY and/or their Affiliates and/or the LENDER, or their projections, taken as a whole, or in the economic, financial and tax policy of the Republic of Argentina or the United States of America, or the occurrence of any event that, at the LENDER 's reasonable criterion, materially changes the prevailing market conditions as of the date of execution hereof (including, without limitation, any suspension, release or limitation to the compliance with monetary obligations under financial facilities and/or foreign trade and/or of any other kind, any payment suspension declaration in the Republic of Argentina or in any other financial or exchange market, the commencement of war, armed assaults, or any other type of national or international crisis directly or indirectly related to the Argentine Republic); or the occurrence of any event which in the LENDER 's opinion gives reasonable grounds to presume that the BORROWER and/or the SURETY will not be able to regularly fulfill or comply with their obligations hereunder; or

FIADOR no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula SEGUNDA.

"Contrato Marco" significa el presente contrato de linea de crédito suscripto entre las Partes.

"Crédito/s Cedido/s" significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

(i)      todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Fonterra y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Fonterra.

(ii)      todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a BARIVEN c/o PDVSA y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con BARIVEN c/o PDVSA.

(iii)      todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Arthur Schuman.

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |

any significant variation in the Peso Argentino/United States Dollar exchange rate, or any suspension in the foreign exchange markets of the Republic of Argentina and/or the United States of America that produce a Material Adverse Effect.

"Conditions Precedent" means the conditions precedent for the effectiveness of the Master Agreement, set forth in Section TWO.

"Master Agreement" means this credit facility agreement executed between the Parties.

"Assigned Credit/s" means the following credits of the BORROWER against the Assigned Debtors:

(i)      means all the actual and future credit rights corresponding to the BORROWER over the commercial transactions of sales of goods that the BORROWER executes to Fonterra and/or their Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Fonterra.

(ii)      means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to BARIVEN c/o PDVSA and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with BARIVEN c/o PDVSA.

(iii)      means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to Arthur Schuman and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Arthur Schuman.

"Lender's Account" means the LENDER's bank account, the data of which is detailed hereinafter:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |



"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTANTE en forma fehaciente:

| | |
|---|---|
| BANCO: | Citibank N.A. |
| DIRECCIÓN: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 |
| A NOMBRE DE: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada |
| CUENTA N°: | 000-0-129785 |
| REFERENCIA: | Prefinanciación de Exportación |

"Deudor/es Cedido/s" significa Arthur Schuman y/o Fonterra y/o BARIVEN c/o PDVSA.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagarés, el Fideicomiso, los Warrants y los contratos u órdenes de compra que causan los Créditos Cedidos.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o del FIADOR y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTANTE en los Documentos de la Operación.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula DECIMA, Sección 10.1 y 10.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco; y/o cualquier Evento de Incumplimiento conforme se define en el Fideicomiso.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores a los 24 (veinticuatro) meses calculados desde la fecha de cada Solicitud de Desembolso.

"FIADOR" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Borrower's Account" means the BORROWER's bank account, the data of which is detailed below or that that may be informed by the BORROWER in an evidencing way:

| | |
|---|---|
| BANK: | Citibank N.A. |
| ADDRESS: | New York, U.S.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Account #: | 36976697 |
| ON BEHALF OF: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA |
| CHIPS: | UID 320011 |
| IN FAVOR OF: | SanCor Cooperativas Unidas Limitada |
| ACCOUNT #.: | 000-0-129785 |
| REFERENCE: | Prefinanciación de Exportación |

"Assigned Debtors" means Arthur Schuman and/or Fonterra and/or BARIVEN c/o PDVSA.

"Transaction Documents" means this Master Agreement, the Requests for Disbursement resulting therefrom, the Promissory Notes; the Trust, the Warrants and the agreements or purchase orders that cause the Assigned Credits.

"Dollars" and "USD" means United States Dollars, in cash or through a bank transfer.

"Material Adverse Effect" means a material adverse effect in (i) the business, assets, transactions or condition (financial or of any other nature) of the BORROWER and/or the SURETY and/or its Affiliates or the other parties of the Transaction Documents (including the LENDER), or (ii) the validity or performance of the Transaction Documents, or (iii) the rights and benefits granted to the LENDER in the Transaction Documents.

"Event of Default" means any event, condition or circumstance mentioned in, Section Ten, 10.1 and 10.2 of the Master Agreement; and/or any non-compliance of the obligations set forth in the Master Agreement; and/or any Event of Default in agreement with what is foreseen in the Trust.

"Due Date/s" means the due date for the payment of the Due Sums indicated in each of the Requests for Disbursement. The Due Dates shall be previous to 24 (twenty four) months of the date of each Disbursement Request.

"SURETY" has the meaning indicated in the introduction of this Master Agreement.

"Fideicomiso" es la propuesta de cesión fiduciaria y fideicomiso con fines de garantía suscripta en el día de la fecha por el MUTUARIO en carácter de potencial fiduciante, a efectos de ser remitida al Banco de Servicios y Transacciones S.A. como potencial fiduciario y al MUTUANTE como potencial beneficiario, en virtud de la cual, el MUTUARIO –a efectos de garantizar el cumplimiento de las obligaciones del presente Contrato Marco- transfiere los Bienes Fideicomitidos para que el potencial fiduciario, una vez aceptada la propuesta, los administre de conformidad con lo allí dispuesto, cuyo modelo se adjunta como Anexo I al presente Contrato Marco.

"Fonterra": significa FONTERRA LIMITED, una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Garantías" significa los Pagarés, el Fideicomiso, los Warrants y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito, que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA millones con 00/100 (US$ 50.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todas las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula DECIMA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO, el FIADOR y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO y avalados por el FIADOR, a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como Anexo II, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días

"Trust" is the proposal for the fiduciary assignment and trust with a guaranty purpose executed on the date hereof by the BORROWER in its capacity of potential Trustor, so as to be sent to the Banco de Servicio y Transacciones S.A. as potential Trustee, and the LENDER as potential beneficiary, by virtue of which, the BORROWER – in order to grant the compliance with the obligations of this Master Agreement – shall transfer the Trust Assets so that the potential Trustee once the proposal is accepted can administer them in agreement with what is therein established, which model is attached herein as Annex I to this Master Agreement.

"Fonterra" means FONTERRA LIMITED, a company existing under the laws of New Zealand, with domicile at Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Guarantees" means the Promissory Notes, the Trust, the Warrants and the assignment of the Assigned Credits.

"Credit Facility" means the unique Credit Facility, that, subject to the terms and conditions of the Transaction Documents, the LENDER shall make its best efforts so as to grant it to the BORROWER, for up to the total maximum amount of Fifty Million United States Dollars and 00/100 (US$ 50,000,000.00).

"Indebted Credit Facility" means the sum up of all the Sums Due by the BORROWER under the Credit Facility including all interests applicable in accordance with this Master Agreement.

"Default" means the any event or condition that constitute an Event of Default, causing the effects set forth in Section TEN hereof.

"LENDER" has the meaning given in the first paragraph hereof.

"BORROWER" has the meaning given in the first paragraph hereof.

"Applicable Rules" means all present and/or future, national, provincial or municipal rules applicable to the activities and the business of the BORROWER.

"Parties" means jointly the BORROWER, the SURETY and the LENDER.

"Promissory Note/s" means the promissory notes delivered by the BORROWER and guaranteed by the SURETY, in favor od the LENDER, in agreement with the format attached to this Master Agreement as Annex II, for an amount equivalent to the Due Amount in each Disbursement Request, in agreement with what is established in Section THIRD of the Master Agreement.

"Pesos" means the legal currency in the Argentine Republic.

"Crediting Term" means the term of three (3) Business Days as

Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2010, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en Anexo III, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interés anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

Warrants: significa los warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE, endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidos en la Cláusula SEPTIMA del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO.

### 2.1.   Disponibilidad de la Línea de Crédito.

(a) Disponibilidad Condicionada. Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

from the effective date of receipt of the Request for Disbursement.

"Confirmation Term" means the term of five (5) Business Days as from the date the required funds are credited in BORROWER's Account, pursuant to a Request for Disbursement.

"Availability Term" is the term fixed exclusively to the benefit of the LENDER, as from the date of the Master Agreement until December 31, 2010, during which period the LENDER undertakes to make their best efforts to maintain the Credit Facility available in favor of the BORROWER.

"Request for Disbursement /Disbursement Request" is the form substantially identical to the one attached hereto as Annex III, complete with all data duly stated, to be executed by the BORROWER with the signature of its attorneys-in-fact or legal representatives certified by a notary public.

"Sum/s Due" means the funds to be given by the BORROWER as payment to the LENDER under each Request for Disbursement including any applicable interest until the capital repayment, as per this Master Agreement.

"Discount Interest Rate" means the annual discount interest rate to be agreed between the Parties under each Request for Disbursement, that the LENDER will apply to each funds disbursement that the BORROWER requires to calculate the amount of the Sums Due.

"Warrants" means the warrants issued in agreement with Section 9643 of the Argentine Republic, corresponding to certificates of the deposit of merchandise property of the BORROWER or other merchandise at LENDER's satisfaction, endorsed by the BORROWER in favor of the LENDER for the amounts and in the conditions established n Section SEVEN of this Master Agreement in warranty of the fulfillment of obligations undertaken by the BORROWER under this Master Agreement.

## SECTION TWO:  THE CREDIT FACILITY.

### 2.1 Availability of the Credit Facility.

(a) Conditional Availability. Subject to the punctual fulfillment of each and every of the Precedent Conditions, or to the fact that the LENDER expressly releases in writing the compliance with all and each of the Conditions Precedent, without being required to do so under no circumstance, the LENDER undertakes to make the Credit Facility available to the BORROWER during the Availability Term, which may be used to finance the BORROWER's exports, pursuant to the conditions and procedure set forth in this Master Agreement.



**(b) Vigencia.** Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUANTE de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

**(c) Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

### 2.2. Condiciones Precedentes al otorgamiento de la Línea de Crédito.

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

**(a) Aprobaciones Societarias.** copia certificada por escribano público del poder general del MUTUARIO del cual surja que el/ los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto; y

**(b) Vigencia de las Manifestaciones y Declaraciones del MUTUARIO.** Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por el MUTUARIO en la Cláusula NOVENA del Contrato Marco, y

**(c) Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Supuestos de Incumplimiento.** Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías, y

**(d) Notificación a los Deudores Cedidos.** Que el MUTUARIO

**(b) Effectiveness.** Once the Availability Term has expired, the BORROWER's right to send to the LENDER any Request for Disbursement will automatically and irrevocably cease – without any prior judicial or extrajudicial notice - unless the Availability Term is expressly extended in writing by the LENDER, to its sole satisfaction, and such decision is sufficiently notified to the BORROWER in due time.

**(c) Amount of Disbursements.** The BORROWER may require the disbursements it deems appropriate according to its needs until the aggregate of the amounts stated in the relevant Requests for Disbursement reach the amount of the Credit Facility; consequently, in no case and event will the LENDER be bound, or may be interpreted to be bound, to disburse an amount higher than or exceeding the Credit Facility.

### 2.2 Conditions Precedent to the Granting of the Credit Facility.

The validity and effectiveness of the Credit Facility granted by the LENDER under the Master Agreement is subject to the fact that, at the LENDER'S reasonable discretion, (i) all and each of the following Conditions Precedent, set forth for LENDER'S exclusive benefit, take place and remain fully effective as of the execution of this Master Agreement and until its termination, and/or (ii) the LENDER expressly excludes in writing one, any or all the Conditions Precedent:

**(a) Corporate Approvals.** a copy certified by a notary public of the general power of attorney of the BORROWER , evidencing that the persons authorized to sign the Transaction Documents are fully empowered therefore.

**(b) Effectiveness of the Representations and Statements by the BORROWER and the SURETY.** That all and each of the representations and statements made by the BORROWER and/or the SURETY in Section NINE of the Master Agreement are fully effective, remain being accurate, correct and true;

**(c) Non-existence of Material Adverse Changes, Material Adverse Effects or Events of Default.** That no grounded elements have neither occurred and/or continue, or exist to foresee the occurrence of one or more Material Adverse Changes, Material Adverse Effects and/or Events of Default (should the lapse and acceleration of terms have been declared or not), and no circumstance known by the BORROWER has occurred that in any way may endanger, undermine or weaken the full effectiveness, validity, full force and effect, scope, enforcement and/or opposition against third parties of the Transaction Documents and Guarantees,

**(d) Notification to the Assigned Debtors:** That the BORROWER



haya notificado a los Deudores Cedidos las cesiones de los Créditos Cedidos en los términos establecidos en la Sección 4.6 del presente Contrato Marco; a cuyo efecto el MUTUARIO deberá entregar al MUTUANTE el original de tales notificaciones recibidas y aceptadas por los Deudores Cedidos.

(e) **Constitución del Fideicomiso.** Como condición previa e ineludible al otorgamiento de la Línea de Crédito, el MUTUARIO deberá haber constituido en legal forma el Fideicomiso de cesión de cobranzas, conforme lo establecido en el Fideicomiso, a favor del MUTUANTE.

## CLAUSULA TERCERA: CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

    (i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO y del FIADOR o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento;

    (ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes y avalado por el FIADOR, a plena satisfacción del MUTUANTE, con las firmas debidamente certificadas por un escribano público argentino; y

    (iii) los Warrants debidamente endosados por el MUTUARIO, de conformidad con lo establecido en la Cláusula SEPTIMA del presente Contrato Marco, con fecha de vencimiento anterior a la última Fecha de Vencimiento de las consignadas en la Solicitud de Desembolso, con firma certificada por escribano público argentino, a satisfacción del MUTUANTE, representativos de mercaderías a satisfacción del MUTUANTE y por un valor también a satisfacción del MUTUANTE;

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa- y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal

has notified to the Assigned Debtors all the assignments of the Assigned Credits in the terms established in section 4.6 of this Master Agreement, to which effect the BORROWER shall deliver to the LENDER the original of such received and accepted notifications by the Assigned Debtors.

(e) **Trust Constitution**: As a previous and unavoidable condition for the granting of the Credit Line, the BORROWER must have constituted in legal war the Trust of assigns recover, in agreement with what is established in the Trust, in favor of the LENDER.

## SECTION THREE: CONDITIONS PRECEDENT FOR DISBURSEMENTS.

**3.1 Request for Disbursement.** In order to request the LENDER a disbursement under the Credit Facility, the BORROWER must send by self-probatory means and to LENDER'S satisfaction:

    (i) the original of the Request for Disbursement duly filled out and signed by the legal representatives or attorney's in fact of the BORROWER and the SURETY duly empowered therefore, with their signatures certified by an Argentine notary public; each Request for Disbursement shall invariable contain the requested disbursement amount, the Due Dates, and the Sums Due that the it will have to pay to the LENDER in such Due Dates;

    (ii) a Promissory Note for the Sums Due, duly signed by the legal representatives or attorney-in-fact of the BORROWER and or representatives duly empowered therefore and by the SURETY, at LENDER's entire satisfaction, with the signatures duly certified by an Argentine notary public;

    (iii) the Warrants duly endorsed by the BORROWER, in agreement with what is established in Section SEVEN of this Master Agreement, with due date previous to the last Due Date of the ones established in the Request for Disbursement, with their signatures certified by an Argentine notary public, at satisfaction of the LENDER, representative of merchandise at satisfaction of the LENDER and also for an amount at satisfaction of the LENDER.

**3.2 Lack of Liability for Making a Disbursement or Not.** Notwithstanding the provisions of this Section, the LENDER shall not have any liability whatsoever to the BORROWER for accepting or rejecting any Request for Disbursement effectively received from the BORROWER – always that the rejection in with cause- and, therefore, the BORROWER expressly and irrevocably waives to file any claim against the LENDER based upon such circumstance or cause.

circunstancia o causa.

**3.3. Trámite posterior. Desembolso.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar éste de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso –siempre que el rechazo sea con causa– que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquélla.

**3.4. Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUARIO no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos contados desde la finalización del Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5. Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto, de conformidad con lo establecido en la cláusula DECIMA del presente Contrato.

**3.6. Devolución al MUTUARIO de los Créditos Cedidos. Notificación a los Deudores Cedidos.** Una vez cancelada en su totalidad la Línea de Crédito Adeudada por el MUTUARIO y dentro de las 48 hs. de sucedido ello, el MUTUANTE se obliga a notificar a cada Deudor Cedido que ha quedado sin efecto la cesión del Crédito Cedido por lo que a partir de la recepción de

**3.3 Subsequent Proceeding. Disbursement.** Once the documents of the Request for Disbursement have been received by the LENDER, it will proceed to verify, that all the information and documents contained therein are, at its own criterion, accurate and in accordance with the Master Agreement. Notwithstanding that, the LENDER is not obliged to perform a legal audit or due diligence of the Documents of the Request for Disbursement and, therefore, it will be not responsible for any misrepresentation, inaccuracy, omission and/or lack of genuineness thereof. Notwithstanding the aforesaid, if the LENDER agrees, to its satisfaction, with the Documents of the Request for Disbursement, the LENDER shall, at its own discretion and to its own satisfaction, and even without being bound thereto under the Transaction Documents, to disburse the requested funds in the BORROWER's Account within the Crediting Term. The LENDER'S acceptance of a Request for Disbursement does not bind it to accept any other Request for Disbursement that the BORROWER may submit to it simultaneously or thereafter – always that the rejection is with cause.

**3.4 Confirmation.** Within the Confirmation Term, the BORROWER must necessarily send to the LENDER a note confirming the receipt of such funds by self-probatory means. Notwithstanding the aforesaid, even in the event that the BORROWER fails to send the confirmation note mentioned above, the lack of claim by the BORROWER by self-probatory means within a term of five (5) calendar days as from the completion of the Crediting Term shall imply the conformity of the BORROWER to the disbursement deposited in the BORROWER's Account.

**3.5 LENDER'S Exclusive Power.** Should, at the LENDER'S exclusive discretion, during the Availability Term any Material Adverse Change or Material Adverse Effect occur, the LENDER may immediately interrupt the proceedings of any Request for Disbursement filed according to the Master Agreement, which is being reviewed and evaluated by such LENDER, as well as any disbursement of funds corresponding to a Request for Disbursement approved by the LENDER but which funds have not been actually credited in BORROWER's Account, without giving rise to any responsibility for the LENDER. Consequently, the BORROWER waives to file any action for responsibility grounded on such reason. The aforesaid notwithstanding the authority of the LENDER to render the Master Agreement terminated, pursuant to the provisions of section TEN hereof.

**3.6 Refund to the BORROWER of the Assigned Credits. Notification to the Assigned Debtors:** Once the Credit Line Facility owed is completely canceled by the BORROWER and in within the 48 hs. From its occurrence, the LENDER compels to notify to each of the Assigned Debtors that the assignment of the Assigned Credit has no effect, reason why from the reception of

dicha notificación, cada Deudor Cedido deberá abonar al MUTUARIO el monto de los respectivos Créditos Cedidos.

such notification, each Assigned Debtor shall pay to the BORROWER the amount of the respective Assigned Credits.

### CLÁUSULA CUARTA:  CESIÓN DE CRÉDITOS.

**4.1.** En garantía de pago de la Línea de Crédito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operación, y como medio de pago de las Sumas Adeudadas - conforme lo establecido en la Cláusula 5.2 del Contrato Marco- el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesión comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con los Deudores Cedidos de las cuales surjan los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

**4.2.** El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por los Deudores Cedidos, copias o fotocopias de los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.3.** El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por los Deudores Cedidos en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas a los Deudores Cedidos, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha __/__/200_. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____., ABA _____, Beneficiario: IIG TOF B.V., Cuenta N°:*_____"

**4.4.** Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

### SECTION FOUR: CREDIT ASSIGNMENT.

**4.1** As security for the payment of all the obligaitons and the compliance of all the obligations assumed by the BORROWER under the Transaction Documents, and as means of payment of the Sums Due, - in agreement with what is established in Section 5.2 of the Master Agreement – the BORROWER assign to LENDER the Assigned Credits. The assignment or assignments undertaken comprises all the rights and actions that the BORROWER has with regard to the Assigend Credits and of the consequences previously stated, placing the LENDER pari passu in priorities with the pertinent scope and to the relevant extent, the latter being also subrogated to all rights or agreement performance and/or collection actions likely to exist in the future in connection with such credits, notwithstanding the obligations deriving from the contractual obligations with the Assigned Debtor originating from the Assigned Credits, which shall be exclusively borne by the BORROWER.

**4.2** The BORROWER undertakes to deliver to the LENDER, within 5 (FIVE) days from dispatch thereof, certified copies of the bills of lading regarding the merchandise included in the Assigned Credits. In such sense, it undertakes to deliber to the LENDER, in within 5 (FIVE) days from the reception by the Assigned Debtors, the delivery notices and the invoices issued by the BORROWER as a consecuence of the Assigned Credits.

**4.3** The BORROWER guarantees that all sums corresponding to the Assigned Credits shall be deposited by the Assigned Debtor in the LENDER's Account. For such purpose, in addition to the notices indicated in 4.6, the BORROWER and/or the SURETY undertakes to include in all and each of the invoices issued under the Assigned Credits to be sent to the Assigned Debtor, a legend expressly stating that such invoices shall be paid to the LENDER through a transfer of the pertinent funds to the LENDER's Account. In each of the assigned invoices assigned to the BORROWER and/or the SURETY, undertake to include the following legend:

*"The credit represented and included in this invoice, was assigned as security to IIG TOF B.V., through the Credit Assignment Agreement dated __/200_. You should pay the same on the due date through a deposit in the Bank: __ ABA___; Beneficiary: IIG TOF B.V.; Account No. ___)"*

**4.4** The funds of the Assigned Credits deposited in the LENDER's Account shall be applied to the payment of the Sums Due as per Section FIVE, 5.2 of the Master Agreement.



**4.5.**    La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**4.6.**    Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión a los Deudores Cedidos mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **Anexo IV** con lo cual la misma quedará perfeccionada frente a terceros, sin necesidad de aceptación alguna del Deudor Cedido para tales efectos. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará a todos los Deudores Cedidos, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante. Asimismo, y sin perjuicio del perfeccionamiento de la cesión del modo antes indicado, el MUTUARIO se obliga a obtener la aprobación expresa de los Deudores Cedidos respecto de la presente cesión, debiendo los Deudores Cedidos –mediante su apoderado o representante legal- firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, como una de las Condiciones Precedentes.

El MUTUARIO deberá entregar dichas notificaciones al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación a cada Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario, domicilio y su despacho mediante correo internacional por un servicio que brinde constancia de su entrega y recepción.

**4.7.**    El presente Contrato no implica de forma alguna transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos

**4.5**    This assignment of the Assigned Credits is made under the BORROWER's liability to the LENDER. Therefore, if for any reason whatsoever the amount of the Assigned Credits is not paid to the LENDER as per the terms stated in this Section and/ or are not enough to cover the payment of the Due Amounts in the correspondent Due Dates, the BORROWER shall pay the LENDER the total amount or the balance due corresponding to each Sum Due, previously of or in each Due Date, under penalty of incurring in automatic Default.

**4.6**    As an essential condition for the validity of this Master Agreement, the BORROWER and the SURETY binds themselves to give notice of this assignment by a self-probatory means to the Assigned Debtors, through the remittance of a notice substantially identical to the form attached hereto as **Annex IV** with which it must be understood as effective towards third parties, without the need of any acceptance of the Assigned Debtor to such effects. For purposes thereof, within 48 hours after the execution of this Master Agreement, as as one of the Precedent Condition, the BORROWER shall notify the Assigned Debtor in writing and through self-probatory means with the intervention of a notary, that the credits have been assigned to the LENDER and that the deposit of the sums pertinent to the Assigned Credits shall be made to the LENDER's Account. In such sense, and without prejudice of the assignment perfection in the means previously mentioned, the BORROWER compels to obtain the express approval of the Assigned Debtors regarding this assignment, and the Assigned Debtors will have to sig – by means of a representative or a person empowered to – at the bottom of each notification with acceptance proof of it. The BORROWER shall deliver such notices to the LENDER, with the acceptance of the Assigned Debtors is the way previously outlined, as a Condition Precedent.

The BORROWER shall deliver such notifications to de LENDER, with the acceptance of the Assigned Debtors in the way that was previously indicated, in agreement with what is established in the previous condition to the starting date of this Master Agreement.

In such sense, the BORROWER will remit vía fax a communication to each of the Assigned Debtors, notifying the assignment of the Assigned Credits, indicating that the payment of the Assigned Credtis must be done in th LENDER's Account, establishing that the original of the communication is remitted by postage mail.

Fulfilled that, the LENDER will require to a notary public the certification of the text of it, its addressee, domicile and it deliver by means of international postage mail by a service that gives prove of its deliver and reception.

**4.7**    This Agreement does not imply in any manner whatsoever a transfer by the BORROWER to the LENDER of the obligations arising from the agreements originating the Assigned Credits,

Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que – con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- los Deudores Cedidos rescindan o resuelvan los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y los Deudores Cedidos.

which shall be borne by the BORROWER. The BORROWER undertakes to comply with any and all of its obligations deriving from the agreements of the Assigned Credits so that the LENDER's right to collect the Assigned Credits shall not be affected. Non-compliance in due time and manner of the obligations mentioned above shall automatically give place by operation of law to the BORROWER's Default. The Default by operation of law shall occur all the same with the consequences already mentioned in the event that, irrespective of the BORROWER's default, the Assigned Debtor rescinds or terminates the merchandise purchase agreements originating the Assigned Credits, or ceases or ends its business relationship with the BORROWER, whether unilaterally or as agreed between the BORROWER and the Assigned Debtor.

**4.8.**   El MUTUARIO declara y garantiza al MUTUANTE:

(a)   el cobro de los Créditos Cedidos.

(b)   la forma instrumental de los mismos.

(c)   la legitimidad de los Créditos Cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d)   que no se encuentra inhibido para disponer de sus bienes;

(e)   que no adeuda suma alguna a ningún Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos, y que de darse tal supuesto abonará la diferencia conforme lo estipulado en la cláusula 5.4;

(f)   que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

(g)   la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h)   que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a- la entrega en tiempo y forma a los Deudores Cedidos de la mercadería objeto de los Créditos Cedidos.

(i)   que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito.

(j)   que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente a cada Deudor Cedido.

**4.8** [^i] The BORROWER states and guarantees the LENDER as follows:

(a)   the collection of the Assigned Credits;

(b)   the instrumental form thereof;

(c)   the legitimacy of the Assigned Credits and that the Assigned Credits are freely available to it, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

(d)   that it is not subject to restraining orders to dispose of its property;

(e)   that it does not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Assigned Credits; and that if such events take place it will pay the difference in agreement with what is established in section 5.4;

(f)   that it has not received any sum resulting from the Assigned Credits and that the same have not been assigned, either partially or totally, to any natural or artificial person before;

(g)   the authenticity of the signatures of any document evidencing the reason for the Assigned Credits;

(h)   that it shall comply with any and all of the obligations under its charge deriving from the Assigned Credits, including, but not limited to, delivery in due time and manner to the Assigned Debtors of the goods stated in the Assigned Credits.

(i)   that the amount of the Assigned Credits to be deposited at the LENDER's Account during the Availability Term shall be at least equal at a minimum to 110,00% of the amount of the Credit Facility.

(j)   that all the Assigned Credits will be invoices by the BORROWER directly and exclusively to each Assigned Debtor.

**CLAUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.**

**SECTION FIVE: PAYMENT OF SUMS DUE. APPLICATION OF ASSIGNED CREDITS TO PAYMENT OF SUMS DUE. BORROWER'S REMEDY.**

**5.1.** El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.2.** A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

(a) Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.

(b) Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar las Sumas Adeudadas a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses excedan el monto de las Sumas Adeudadas, el excedente será transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de las Sumas Adeudadas, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes a los Créditos Cedidos que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

**5.3.** En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

**5.1.** The BORROWER irrevocably and unconditionally undertakes to pay the LENDER the Sums Due and the Performance Fee on the Due Dates corresponding to each of them through a deposit thereof in the LENDER's Account.

**5.2.** For purposes mentioned in Section 5.1 above, the funds of the Assigned Credits deposited at the LENDER's Account shall be applied to payment of the Sums Due as follows:

(a) During the months in which there are NO Due Dates (being understand by such the months between the effective disbursement after a Disbursement Request and the following calendar month before the Due Date), the LENDER shall transfer the funds corresponding to the Assigned Credit that the Assigned Debtors deposit at the Lender's Account, during the 48 hours period since its reception, to the Borrower's Account.

(b) During the months corresponding to the Due Dates (being understand by such the period between the 1st and the 30th of each month corresponding to the Due Dates), the LENDER shall apply the amounts of the Assigned Credits deposited at the Lender's Account to cancel the Sums Due to be paid in the Due Dates corresponding to each month. In the event that the amount of the Assigned Credits deposited during said month exceeds the amount of the Sums Due, the exceeding amount shall be transfer, to the Borrower's Account as stated in Section 5.2 (a) If the sums deposited during said months were not enough to fulfill the amounts of the Sums Due, the BORROWER shall deposit the amount needed in order to comply with the total amounts of the Sums Due, under penalty of incurring in automatic Default.

(c) All the funds corresponding to the Assigned Credits that were deposited at the Lender's Account, after the total cancellation of the Credit Facility, and in excess of it, shall be re-delivered to the BORROWER and/or the SURETY as set forth in (a) herein of this Section 5.2.

**5.3** Upon Default, all the funds of the Assigned Credits deposited in the LENDER's Account shall be applied to pay the entire Credit Facility and any other amount due under the Transaction Documents.



**5.4.** Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en la Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

**5.4** Taking into account the resource of the BORROWER in the assignment of the Assigned Credits to the LENDER, in case that – for any reason whatsoever - the amount of the Assigned Credits deposited in the LENDER's Account are not sufficient to pay the Sums Due in the correspondent Due Date in a determined month, the BORROWER shall pat the LENDER the total amount or the adequate balance correspondent to each Sum Due, before of or in each Due Date, under penalty of incurring in automatic Default.

<u>CLAUSULA SEXTA:</u>   <u>MONEDA DE PAGO.</u>

<u>SECTION SIX: PAYMENT CURRENCY.</u>

**6.1.** El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) deberán ser necesariamente abonados en Dólares y no en otra moneda. En consecuencia, el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

**6.1** The BORROWER undertakes that payment of the full amount or the balance eventually due under the Transaction Documents- including payment of the Indebted Credit Facility - shall be paid in Dollars and not in another currency. Consequently, the BORROWER expressly acknowledges and states that it is a material condition to this Master Agreement, that the payment of the Indebted Credit Facility, as well as compensatory and penalty interest, costs, court fees and further sums payable to the LENDER hereunder, be canceled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment. In addition to this the LENDER understands that the transfer to be made in favor of the BORROWER of the funds of the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c) shall be payable in Dollars and not in any other currency. As a consequence of the foregoing the LENDER acknowledges that it is an essential condition of this Master Agreement that the devolution of the funds corresponding to the Assigned Credits that the Assign Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), as well as punitive interests and other sums to be transferred to the BORROWER under this Agreement, are cancelled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment.

**6.2.** En atención a lo dispuesto en la Cláusula 6.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometidas (la Línea de Crédito Adeudada y cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

**6.2** In accordance with the provisions set forth in Section 6.1., if on any Maturity Date there is any restriction or prohibition to access the exchange market in the Argentine Republic, the BORROWER and the LENDER shall nevertheless pay the indebted amounts (the Indebted Credit Facility and any other amount payable under the Transaction Documents) in Dollars, in the case of the BORROWER, and transfer of the sums corresponding to the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), obtaining the same though any of the following mechanisms, to the LENDER's or BORROWER s' option depending on the case:

**6.2.(a)** Mediante la compra con Pesos (o la moneda que sea

**6.2(a)** Through the purchase with Pesos (or the then legal tender

en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(b).** Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(c).** En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**6.3.** Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTUANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**6.4.** Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a). a 6.2.(d) precedentes serán pagados por el MUTUARIO

in the Argentine Republic), of any security in Dollars and the transfer and sale of said instruments outside the Argentine Republic for Dollars in an amount which, sold in a foreign market, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the amount of said currency due under the Transaction Documents; or

**6.2(b)** Through delivery to the LENDER (or the BORROWER as the case may be) of any security in Dollars, to the LENDER's express satisfaction (or the BORROWER's as the case may be) and with Dollar quotation abroad, in an amount which, once sold by the LENDER (or the BORROWER) in a foreign market, at market prices and conditions, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the aggregate amount in such currency due under the Transaction Documents; or

**6.2(c)** If there is any express legal prohibition in the Argentine Republic, which would impede the BORROWER (or the LENDER) from making the transactions stated in the two foregoing paragraphs, through the delivery to the LENDER (or BORROWER) of Pesos (or the then legal tender in the Argentine Republic), in an amount which, on the payment date, such Pesos are enough, once applicable taxes, costs, commissions and expenses are deducted, to acquire the aggregate amount of Dollars due by the BORROWER (or the LENDER) under the Transaction Documents, as per the exchange rate informed by Citibank N.A., New York, United States of America, to make Dollar acquisitions with Pesos in the City of New York, at 12 (twelve) hours (New York City time) on the payment date; or

**6.2(d)** Through any other procedure existing in the Argentine Republic or abroad, on any Maturity Date under the Master Agreement, for the purchase of Dollars.

**6.3** It is hereby expressly stated that in any of the alternatives detailed in 6.2. (a) through 6.2.(d), the Sums Due by the BORROWER (or the LENDER) shall only be deemed paid and such payment shall have discharging effects only, once the amount of Dollars due under the Transaction Documents and this Master Agreement is actually credited at the Lender's Account (or at the Borrowers' Account as the case may be).

**6.4** All charges, costs, commissions, fees and taxes payable in connection with the procedures set forth in 6.2.(a) through 6.2.(d) above shall be paid by the BORROWER (or the LENDER as the

(o por el MUTUANTE en su caso).

case may be).

**6.5.** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE (o al MUTUARIO en su caso) de esa pérdida.

6.5 If in order to obtain a judicial judgment it would be necessary to change the amounts in Dollars due hereunder to another currency, the Parties agree that the exchange rate to be used shall be such which, in accordance with normal banking procedures, the LENDER (or the BORROWER) shall be able to purchase with such other currency Dollars in New York City, United States of America, on the Business Day prior to that day in which final judgment is pronounced. Likewise, if a judgment is pronounced against the BORROWER (or the LENDER) in a currency other than Dollars, the BORROWER's payment obligation (or the LENDER's) of any amount due under the Transaction Documents shall only be deemed paid if on the Business Day following the date in which the LENDER (or BORROWER) has received any amount judged as due hereunder in such other currency, the LENDER (or the BORROWER) shall, under normal banking procedures, in the City of New York, United States of America, purchase Dollars with such other currency. If such amount of Dollars thus purchased is less than the amount due under the Transaction Documents, the BORROWER (or LENDER) agrees, as a different obligation and independently from such judgment, to compensate the LENDER (or BORROWER) for such loss.

## CLÁUSULA SEPTIMA: WARRANTS

## SECTION SEVEN: WARRANTS

**7.1** En adición a toda otra garantía, junto con cada Solicitud de Desembolso, el MUTUARIO deberá suscribir y entregar al MUTUANTE, cómo garantía adicional de pago, Warrants de productos lácteos o sus derivados –debidamente endosados a favor del MUTUANTE- por una suma equivalente como mínimo al 15% (quince por ciento) de la Suma Adeudada correspondiente, expresada en Dólares Estadounidenses, con exclusión de toda otra moneda.

**7.1.** In addition to any other warranty, together with each Request for Disbursement, the BORROWER shall subscribe and deliver to the LENDER, as an additional warranty of payment, Warrants of milk products or its derivates – dully endorsed in favor of the LENDER – for an amount equivalent as minimum to 15% (fifteen per cent) of the correspondent Amount Due, determined in American Dollars, with exclusion of all other currency.

**7.2.** El MUTUARIO se obliga a que durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.

**7.2.** The BORROWER compels that during the term of the Master Agreement the LENDER has in its power the Warrants for an amount not inferior to the amount equivalent to 15% (fifteen per cent) of the Credit Line Due. Taking into account the maximum in force term of the warrants as established in section 26 on Section 9643, the BORROWER undertakes to periodically replace the Warrants before the expiration of 180 (one hundred and eighty) days counted from the date in which they were issued, and must deliver to the LENDER new Warrants for an amount equal or superior, in its case, to that of the original Warrants.

**7.3.** A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería, vigente al momento de dicho depósito. El mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial

**7.3.** In order to determine the quantity of the merchandise that the BORROWER shall deposit for the issuance of the correspondent deposit certificates to the Warrants, it will be taken into account the market price of such merchandise, in force at the moment of such deposit. The maintenance of the warranties constituted for the Warrants, for the amounts and in the way that was previously mentioned, constitutes an essential



para el mantenimiento del presente Contrato Marco. Consecuentemente, la falta de acuerdo –por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada, que no fuere subsanada dentro de los 5 (cinco) días contados de la intimación que al efecto curse el MUTUANTE, producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula DECIMA del presente Contrato.

**7.4.** El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. . El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

**7.5.** En caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.

**7.6.** Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora.

## CLÁUSULA OCTAVA: FIADOR.

Por este acto el FIADOR se constituye en fiador solidario, codeudor solidario, liso llano y principal pagador de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier

condition for the maintenance of this Master Agreement. Consequently, the lack of agreement – for any reason whatsoever – in the quality and/or quantity of merchandise to be deposited, that is not heeled in within the 5 (five) days from the notification that to such effect delivers the LENDER, will produce the automatic Default of the BORROWER without the need to interpretation, causing the expiration of all the terms with the effects stipulated in Section TEN of this Master Agreement.

**7.4.** The BORROWER declares and warrants the truth of all the data contained in the Warrants, and that the merchandise indicated in them does not recognize nor will recognize any encumbrance nor restriction. In case of bankruptcy of the depositing company (Warrantera) of the merchandise described in the Warrants, the BORROWER compels to communicate such circumstance to the LENDER in within the 48 hs. from its order. The un-fulfillment of such communication will cause the automatic Default of the BORROWER. In all the cases, the BORROWER must answer for the damages and harms that it un-fulfillment could cause to the LENDER.

**7.5.** In case of Default of the BORROWER for any cause whatsoever, the LENDER will be automatically entitled with the faculty to initiate the execution of the Warrants in the terms of Lay 9643, without prejudice of all the other remedies and/or legal actions that correspond. In case of auction of the merchandise described in the Warrants, the LENDER expressly reserves the faculty to designate the auctioneer to such effect.

**7.6.** It will be exclusive and excluding responsibility of the BORROWER the inscription of the endorsement of the Warrants in the books of the depositing company of the merchandise indicated in them, as well as the payment of all the expenses and fees that correspond to such storage company.

## SECTION EIGHT: SURETY.

The SURETY hereat becomes the joint and several surety, main payor and co-debtor of the debts and liabilities undertaken by the BORROWER in this Master Agreement, under the same terms and conditions set forth herein for the BORROWER, expressly waiving the right to: (1) the benefits of division and excussion and other applicable related commercial and civil rules, (2) demand the previous judicial or extra judicial foreclosure of the BORROWER or exercise any defense to be enforced by the BORROWER and in general to file any defense other than that of payment. The joint and several liability assumed by the SURETY comprises, additionally, the legal or conventional readjustment and accessory costs, such as currency updating, compensatory and penalty interest, due by the BORROWER. This surety shall be effective until full payment by the BORROWER of all liabilities of the BORROWER, covered by this guarantee. It will be considered as a non compliance with the rules of the present the case in which the SURETY starts negotiations with any creditor for a general payment arrangement or changes the its indebtedness schedule, becomes

acreedor con miras a un arreglo general de pagos o cambiar el cronograma de endeudamiento, o se transformen en insolventes o quebrados, o les. sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los (60) días hábiles de haber sido decretados. En dicho supuesto, en un plazo de treinta (60) días hábiles, el MUTUARIO deberá designar un nuevo garante a satisfacción del MUTUANTE. Vencido el plazo de treinta (30) días sin que el MUTUARIO haya designado un nuevo garante, el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO QUINTA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.

## CLAUSULA NOVENA: MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DEL MUTUARIO Y DEL FIADOR.

### 9.1.    Manifestaciones y Declaraciones del MUTUARIO.
A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la Línea de Crédito, el MUTUARIO y el FIADOR manifiestan y declaran, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**9.1.1.**    Que el MUTUARIO es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

**9.1.2.**    Que el MUTUARIO y el FIADOR no están obligados a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**9.1.3.**    Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO y el FIADOR están

insolvent, or bankrupt, or bankruptcy proceedings are instituted, or petitions for a composition with creditors, or an Out of Court Reorganization Plan, and the same are not withdrawn within 60 days from initiation thereof. In such event, the LENDER shall designate a new surety at satisfaction of the LENDER. At the expiration of the terms of thirty (30) days in the case that the BORROWER has not designated a new surety, the LENDER may, declare that the BORROWER's obligations are due and demand payment of all amounts due by the BORROWER as payable, plus all expenses incurred by the LENDER. The SURETY declares and warrants all the following, which will be maintaing during the term of this Master Agreement: (a) This warranty constitutes a valid and bonding obligation for me, executable in agreement with its respective terms; (b) There is not existence of statute, rule, regulation or contractual obligation that is bonding to me and that could be violated by the celebration, delivery or execution of this warranty. For purposes hereof, the SURETY establishes special domicile at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, United States of America, and accepts that notices served through a certified telegram or other authentic means are valid. For all legal purposes hereof, the SURETY irrevocably submits to the jurisdiction and applicable law set forth in section FIFTEEN hereof, expressly waiving any other forum or jurisdiction.

## SECTION NINE: REPRESENTATIONS, WARRANTIES AND COMMITMENTS OF THE BORROWER AND OF THE SURETY

### 9.1 Representations and Warranties of the BORROWER.
In order to persuade the LENDER to enter into the Master Agreement and grant the Credit Facility, the BORROWER and the SURETY represent and warrant the following as of the date hereof and until this Master Agreement is terminated the following:

**9.1.1** That the BORROWER is a cooperative association of first degree duly organized, registered and validly existing pursuant to the laws of the Argentine Republic, with all the necessary powers and authority to carry out the relevant operations and businesses currently developed; and

**9.1.2** That the BORROWER and the SURETY are not bound to apply for authorizations or approvals from any judicial or governmental authority or from any other public or private entity (including, without limitation, lessors, lenders, creditors, insurance companies and financial institutions) as a result from this Master Agreement and/or the Guaranties.

**9.1.3** That the Master Agreement and the Guaranties (i) are legal acts or businesses that the BORROWER and/or the SURETY are

legalmente autorizados y capacitados para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

9.1.4.    Que el MUTUARIO y/o el FIADOR y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

9.1.5.    Que el MUTUARIO y el FIADOR no tienen pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

9.1.6.    Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables  y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

9.1.7.    Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

9.1.8.    Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

9.1.9.    Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato/marco,

legally authorized and qualified to perform pursuant to the relevant legal and statutory provisions governing their activity; and (ii) that they are executed pursuant to all the required internal approvals of the BORROWER, without infringing any legal, statutory, stockholders' meeting or contractual provision, and that no further authorization is necessary; and

9.1.4 That the BORROWER and/or the SURETY and/or their Affiliates have not materially and significantly defaulted on: (i) any order, ruling, mandatory injunction, demand, decree or request from any court of justice or arbitral tribunal, or any government agency, whether national, provincial or municipal, of the country or foreign, and/or (ii) the payment of taxes, rates, liens, social security debts and/or levies, whether national, provincial or municipal, both within the country or abroad; and

9.1.5 That the BORROWER and/or the SURETY have no pending lawsuit, investigation or judicial, administrative or arbitral proceeding before any court of justice, arbitral tribunal or administrative authority, whether national, provincial or municipal, in the country or abroad; or any arbitration proceeding, that may (i) adversely and materially affect their capacity to fulfill their payment obligations under the Master Agreement; (ii) affect the validity, legality or enforceability of any of the Transaction Documents; and/or (iii) have a material adverse effect on the business, financial or any other condition, or the result of their operations; and

9.1.6 That the execution and delivery of, and/or compliance with the Transaction Documents do not infringe any provisions under the Applicable Rules and/or any law and/or decree and/or regulation and/or resolution applicable to the BORROWER and do not infringe any order issued by any court or relevant judicial, arbitral or administrative authority the BORROWER might be subject to, and/or any provision under the current by-laws of the BORROWER and/or under any mortgage, pledge, debt instrument, master agreement or other undertaking in which the BORROWER might be a party or be bound to; and

9.1.7 That there is no paramount title and/or lien and/or restriction and/or limitation and/or hindrance whatsoever that precludes and/or prohibits and/or limits and/or in any way restricts the powers and rights of the BORROWER to execute all the documentation of the Transaction Documents, as well as any other commitment assumed by the BORROWER to the LENDER under any of the Transaction Documents; and

9.1.8 That they are in compliance with the rules and regulations in force applicable to them in environmental, industrial safety and public health matters, and that they have secured all authorizations, permits and licenses required under such legislation; and

9.1.9 That they have given and provided the LENDER with all the information relating to or in connection with any other

acuerdo u operación, hecho y/o circunstancia vinculada al MUTUARIO y al FIADOR que de cualquier forma pudiere afectar adversa y sustancialmente la capacidad de cualquiera de ellos para hacer frente a sus obligaciones de pago bajo el Contrato Marco y las Garantías, y que toda la información que han proporcionado al MUTUANTE en relación con la preparación, negociación y ejecución de los Documentos de la Operación es correcta y verdadera y no contiene ninguna información errónea acerca de un hecho relevante, ni omite ningún hecho relevante que resulte necesario destacar para que los hechos consignados no resulten erróneos ni ambiguos; y

**9.1.10.** Que el balance del MUTUARIO al 30 de Junio de 2009, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivos autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2009 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y

**9.1.11.** Que las Garantías otorgadas por el MUTUARIO no se encuentran sujetas a prenda, o mejor derecho alguno; y

**9.1.12.** Que el MUTUARIO ha contratado y mantiene vigentes todos los seguros necesarios conforme con los estándares en la República Argentina, y para las actividades que desarrolla, los cuales han sido contratados con aseguradoras de solvencia y reconocido prestigio a nivel nacional; y

**9.1.13** Que conforme el conocimiento actual del MUTUARIO, los Deudores Cedidos no se encuentran en situación de cesación de pagos, insolvencia, en concurso preventivo o en quiebra, ni registra con el MUTUARIO, según el caso, mora alguna en el pago de sus respectivas deudas.

**9.1.14** Que los Documentos de la Operación y las obligaciones allí contenidas son y serán en todo momento obligaciones directas y generales del MUTUARIO y tendrán en todo momento el rango más preferencial del endeudamiento del MUTUARIO.

**9.1.15.** Los Documentos de la Operación están, o cuando sean debidamente ejecutados y entregados estarán, en la forma y sustancia legal apropiada bajo el derecho que resulte aplicable a los efectos de su cumplimiento y ejecución bajo el derecho que resulte aplicable. Todas las formalidades exigidas en Argentina para la validez y el cumplimiento de los Documentos de la Operación (incluyendo cualquier notificación, registración, inscripción, pago de tasas o tributos, protocolización, o presentación ante cualquier Autoridad Gubernamental) han sido cumplidas.

**9.1.16.** Que no ha ocurrido ni ocurrirá ningún Evento de Incumplimiento como consecuencia de o en relación a, el

master agreement, contract or transaction, fact and/or circumstance relating to the BORROWER and/or the SURETY that may in any way adversely and materially affect the capacity of any of them to comply with their payment obligations hereunder and under the Guarantees, and that all the information furnished to the LENDER relating to the preparation, negotiation and execution of the Transaction Documents is true and correct and does not contain any inaccurate information regarding any relevant fact, nor does it omit any relevant fact the mention of which might be necessary to prevent the stated facts from being inaccurate or misleading; and

**9.1.10** The annual balance sheet of the BORROWER as of June 30, 2009, the relevant statements of income and financial position, annexes and further information therein contained relating to the BORROWER, copies of which the BORROWER has delivered to the LENDER duly signed by their pertinent authorities, accurately represent the financial situation and result of operations of the BORROWER as of that date, and that from June 30, 2009 – no adverse change or event that may cause an adverse change in the business, operations, prospects or financial condition of the BORROWER has occurred; and

**9.1.11** That the Guaranties granted by the BORROWER are not subject to any pledge, or paramount title; and

**9.1.12** That the BORROWER has taken out and maintain duly in force all required insurance pursuant to the standards current in the Argentine Republic, and for the activities they develop with creditworthy insurance companies of national renown; and

**9.1.13** That pursuant to the BORROWER's present knowledge, the Assigned Debtors have not suspended payments, are not insolvent, are not subject to reorganization proceedings or bankrupt, and have not defaulted on any payment of its relevant debts.

**9.1.14.** That the Transaction Documents and the obligations included therein are and will be at all times direct and general obligations of the BORROWER and have and will have at all times the highest preferential rank of the BORROWER s' debt.

**9.1.15.** The Transaction Documents are, or when duly executed and delivered will be, in proper legal form and substance under the applicable law for purposes of performance thereof, pursuant to applicable law. All formalities required in Argentina for the validity and performance of the Transaction Documents (including any notice, registration, filing, payment of fees or taxes, notarization, or submittal to any Government Authority) have been complied with.

**9.1.16** That no Event of Default has occurred or will occur as a consequence of or in connection with the performance of the

cumplimiento de las operaciones previstas en los Documentos de la Operación;

**9.1.17.** Que no ha ocurrido ni ocurrirá ningún Cambio Material Adverso respecto del MUTUARIO y/o del FIADOR que razonablemente pudiera causar un Efecto Material Adverso en su capacidad para cumplir con sus obligaciones bajo los Documentos de la Operación.

**9.1.18.** Que cumplen y realizan todas las acciones razonables para mantener el cumplimiento de todas las leyes, regulaciones y convenciones internacionales correspondientes a los aspectos ambientales, laborales, de salubridad y seguridad social que le resulten aplicables.

**9.1.19.** Que los Bienes Fideicomitidos no reconocen gravamen ni restricción alguna a la fecha;

**9.1.20.** Que el Crédito Cedido contra PDVSA ascenderá como mínimo a una suma equivalente al veinte por ciento (20%) de la Línea de Crédito.

**9.1.21.** Que el Crédito Cedido contra Fonterra ascenderá como mínimo a una suma equivalente al cincuenta por ciento (50%) de la Línea de Crédito.

**9.1.21** Que el Crédito Cedido contra Arthur Schuman ascenderá como mínimo a una suma equivalente al treinta por ciento (30%) de la Línea de Crédito.

**9.1.22.** Que en todo momento durante la vigencia del presente Contrato Marco el MUTUANTE contará con Warrants por una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada.

**9.2** Compromisos y Obligaciones del MUTUARIO y del FIADOR.
Desde la firma del presente Contrato Marco y durante todo el tiempo en que cualquier suma debida bajo el Contrato Marco se encontrare pendiente de pago, por cualquier concepto y/o causa que fuere, el MUTUARIO y el FIADOR se comprometen firme, expresa, irrevocable e incondicionalmente, a realizar o no realizar, según el caso, la totalidad de los actos y/o actividades que a continuación se especifican:

**9.2.1.** A pagar debida y puntualmente las Sumas Adeudadas, así como los gastos referidos en la Cláusula DECIMO PRIMERA, de conformidad con los términos y condiciones que se establecen en el presente Contrato Marco, y

**9.2.2.** A mantener al día el pago de sus impuestos, gravámenes, tasas, y/o cargas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero, salvo para aquellos casos en que el MUTUARIO y/o el FIADOR según el caso, los disputase por las vías legales correspondientes, de manera fundada y de buena fe, con la mayor celeridad permitida por la legislación procesal aplicable, y sobre la

transactions contemplated in the Transaction Documents;

**9.1.17.** That no Material Adverse Change has occurred or will occur as regards the BORROWER and/or the SURETY that may reasonably cause a Material Adverse Effect in their capacity to comply with their obligations under the Transaction Documents;

**9.1.18.** That the comply with and every reasonable action is being followed and taken by them in order to remain compliant with all international laws, regulations and conventions relating to environmental, labor, health and social security issues applicable thereto.

**9.1.19.** That the Trusted Assets to not recognize lien and or restriction of any kind as of the date hereof,

**9.1.20** That the Assigned Credit against PDVSA shall amount as a minimum to an amount equivalent to twenty per cent (20%) of the Credit Facility.

**9.1.21.** That the Assigned Credit against Fonterra shall amount as a minimum to an amount equivalent to fifty__ per cent (50%) of the Credit Facility.

**9.1.22.** That the Assigned Credit against Arthur Schuman shall amount as a minimum to an amount equivalent to thirty per cent (30%) of the Credit Facility.

**9.1.23.** That at all time during the validity period of this Master Agreement the LENDER shall be provided with Warrants for an amount equivalent to fifteen per cent (15%) of the Indebted Credit Facility.

**9.2 Commitments and Obligations of the BORROWER and of the SURETY.**
Following the execution hereof and to the extent any amount due hereunder remains outstanding, on any account and/or due to any reason whatsoever, the BORROWER and the SURETY firmly, expressly, irrevocably and unconditionally undertake to perform or abstain from performing, as applicable, all the acts and/or activities specified below:

**9.2.1** To pay as and when due the Sums Due, as well as the expenses of Section ELEVEN, pursuant to the terms and conditions set forth herein; and

**9.2.2** To keep all payments of taxes, liens, rates, and/or social security obligations and/or levies, whether national, provincial or municipal, both in the country or abroad, up to date, except in such cases where the BORROWER and the SURETY may, as applicable, object in good faith to such payments through the relevant legal resources for good reasons, as hastily as permitted by the applicable procedural legislation and based on their

base de su inconstitucionalidad, inaplicabilidad y/o ilegalidad, y

**9.2.3.** A (i) mantener en vigencia sus personerías jurídicas y todas las inscripciones necesarias para mantener dichas personerías; (ii) realizar todo acto razonable para mantener vigentes todos los derechos, permisos, autorizaciones, contrato marcos, seguros, poderes, prerrogativas, franquicias, inscripciones, licencias y similares, necesarios o convenientes para la conducción normal de su actividad, negocios u operaciones y el cumplimiento de sus obligaciones; (iii) mantener todos sus bienes en buen estado y condiciones de funcionamiento, y (iv) no realizar acto alguno que pudiese afectar adversamente la validez y/o eficacia del Contrato Marco y las Garantías, y

**9.2.4.** A no realizar actos que constituyan o impliquen (i) una fusión, absorción o cualquier otro acto al que, conforme a cualquier ley o norma, pudieran oponerse los acreedores del MUTUARIO, ó (ii) la participación del MUTUARIO en otras sociedades o en otros proyectos o negocios distintos de los que desarrolla actualmente, ó (iii) la reducción, distribución o reintegro del capital social del MUTUARIO a sus cooperativistas, y a conducir y hacer todo lo necesario para que se conserven, preserven, renueven y mantengan plenamente en vigencia, su existencia legal y derechos, sus licencias, concesiones, permisos, privilegios y materiales de franquicia para la conducción y manejo de sus respectivos negocios, y

**9.2.5.** A mantener plena y diligentemente informado al MUTUANTE sobre cualquier Cambio Material Adverso y/o cualquier otro hecho que pudiera causar un Efecto Material Adverso y/o de cualquier forma afectar adversa y sustancialmente la capacidad de pago del MUTUARIO de las obligaciones asumidas bajo el presente Contrato Marco y/o las Garantías, y/o (ii) pudiere afectar adversamente la validez y/o eficacia de cualquiera de las Garantías, así como las acciones tomadas para subsanar el mismo, y

**9.2.6.** A poner a disposición del MUTUANTE, y además entregar inmediatamente cuando éste lo solicite, la siguiente documentación contable correspondiente al MUTUARIO: (i) estados contables anuales debidamente auditados por una firma de auditoria de primer nivel y prestigio internacional, (ii) estados contables trimestrales, y (iii) cualquier otra información que el MUTUANTE razonablemente le requiera en cualquier momento. Los estados contables referidos en (i) precedente deberán presentarse debidamente auditados dentro de los ciento veinte (120) días corridos del cierre del respectivo ejercicio; los estados contables referidos en (ii) deberán ser presentados dentro de los sesenta (60) días corridos de los respectivos trimestres; y la documentación referida en (iii) deberá presentarse dentro de los cinco (5) días corridos de requerida por el MUTUANTE, y

**9.2.7.** A no subrogar de cualquier manera a cualquier tercero acreedor con, y a no permitir que de cualquier manera cualquier tercero acreedor se subrogue en, cualquiera de los derechos y/o acciones consagrados a favor del MUTUANTE bajo el presente Contrato Marco y las Garantías, lo que implicará, entre otras cosas,

unconstitutionality, inapplicability and/or illegality; and

**9.2.3** To (i) maintain their legal capacity in force as well as all registrations necessary to maintain the same; (ii) take any reasonable steps to maintain all the rights, permits, authorizations, agreements, insurance, powers of attorney, privileges, franchises, registrations, licenses and the like in force, as are necessary or advisable for the regular conduct of their activity, businesses or operations and the performance of their obligations; (iii) maintain all their property in good state and working conditions; and (iv) abstain from performing any act that may adversely affect the validity and/or effect of the Master Agreement and the Guaranties; and

**9.2.4** To abstain from performing any acts implying (i) a consolidation, merger, demerger or any other act which, pursuant to any law or rule, may be opposed by the BORROWER's creditors; or (ii) the participation of the BORROWER in other companies or projects or businesses different to the ones currently performed by them, or (iii) the reduction, distribution or reimbursement of corporate capital of the BORROWER or its associates, and to conduct and make all acts necessary for the conservation, maintenance, renewal and effectiveness of their legal existence and rights, licenses, concessions, permits, privileges and franchise materials for the conduction and management of its respective businesses; and

**9.2.5** To maintain the LENDER fully and thoroughly informed of any Material Adverse Change and/or any other fact that may cause a Material Adverse Effect and/or otherwise adversely and significantly affect the payment capacity of the BORROWER of the obligations hereunder and/or under the Guaranties; and/or (ii) that may adversely affect the validity and/or effect of any of the Guaranties, as well as of the actions taken to remedy the same; and

**9.2.6** To make available to the LENDER, and further deliver forthwith - at the latter's request - the following accounting documentation corresponding to the BORROWER: (i) annual financial statements duly audited by a first-level auditing firm of international prestige; (ii) quarterly financial statements, (iii) any other information the LENDER might reasonable request at any time. The financial statements mentioned in (i) above must be submitted duly audited within one hundred and twenty (120) calendar days from the closing of the relevant fiscal year; the financial statements mentioned in (ii) shall be submitted within sixty (60) calendar days from the closing of the relevant quarters; the documentation mentioned in (iii) above must be submitted within five (5) calendar days following LENDER 's request; and

**9.2.7** Not to let in any manner whatsoever any third party creditor be subrogated to, and to preclude any third party creditor from becoming subrogated in any way to, any rights and/or actions granted to the LENDER hereunder and under the Guaranties, which will entail, inter alia, the obligation of the

la obligación del MUTUARIO de exigir la renuncia expresa de cualquier tercer pagador a la facultad de subrogarse en tales derechos y/o acciones mientras permanezca impaga cualquier suma bajo el Contrato Marco, y

**9.2.8.** A cumplir con las Normas Aplicables (incluyendo, sin limitación, toda ley, norma, reglamento, orden, directiva o resolución que le fuere aplicable en materia de protección del medio ambiente, residuos tóxicos o peligrosos, contaminación e higiene), y a mantener todas las autorizaciones, permisos o licencias que fueren necesarios bajo las Normas Aplicables, y

**9.2.9.** A cumplir en tiempo y forma con todas y cada una de las obligaciones a su cargo emergentes de los Documentos de la Operación, y

**9.2.10.** A notificar al MUTUANTE, en forma inmediata, (i) el acaecimiento de cualquier Evento de Incumplimiento, y (ii) cualquier incumplimiento en que el MUTUARIO y/o el FIADOR incurriere en relación con cualquier acuerdo o Contrato Marco del que sea parte o cualquier obligación a su cargo emergente de los mismos (hubiere o no sido declarada la caducidad y aceleración de plazos), y (iii) las acciones tomadas para subsanar los incumplimientos referidos en (i) y (ii) precedentes, y

**9.2.11.** A mantener los registros contables y demás registros en debida forma y a permitir el acceso del MUTUANTE a sus oficinas, instalaciones, libros, registros y archivos, permitiéndole la realización de auditorías contables, legales y de gestión, por sí mismo o por quien el MUTUANTE designe a tal efecto, en la medida que no interfiera sustancial y adversamente con las actividades habituales del MUTUARIO, y

**9.2.12.** A informar al MUTUANTE dentro de los 5 (cinco) Días Hábiles de producido, (i) cualquier pérdida o daño sufrido en los bienes de el MUTUARIO por montos superiores a Dólares Estadounidenses DOS MILLONES con 00/100 (US$ 2..000.000,00) en forma individual o acumulada durante cada ejercicio anual, y (ii) cualquier litigio, o reclamo en el cual el monto reclamado al MUTUARIO fuere igual o superior a Dólares Estadounidenses TRES MILLONES con 00/100 (US$ 3.000.000,00) en forma individual o acumulada durante cada ejercicio anual, y

**9.2.13.** A no reducir su capital, y

**9.2.14.** A no transferir ni de cualquier otra forma reducir, por cualquier causa o concepto, incluyendo mediante acuerdo de accionistas o acuerdo de sindicación de acciones con terceros, y a no prendar, gravar ni otorgar cualquier clase de garantía respecto de las tenencias accionarias actuales del MUTUARIO en otras sociedades.

**9.2.15.** A mantener en una situación no inferior, en cuanto a garantías y privilegios de cobro, respecto de cualquier otra obligación del MUTUARIO, todos los importes adeudados bajo el presente Contrato Marco, y

BORROWER to demand the express waiver by any third party obligor of the power to become subrogated to such rights and/or actions to the extent any sum hereunder remains outstanding; and

**9.2.8** To comply with the Applicable Rules (including, without limitation, any law, rule, regulation, order, instruction or resolution applicable to them as regards environmental protection, toxic or hazardous wastes, pollution and hygiene) and to maintain all authorizations, permits or licenses that are necessary under the Applicable Rules; and

**9.2.9** To comply in due time and manner each and every of their obligations arising from the Transaction Documents; and

**9.2.10** To forthwith immediately notify the LENDER (i) of the occurrence of any Event of Default; and (ii) of any default by the BORROWER and/or the SURETY in connection with any agreement or master agreement they might be a party to, or of any of their obligations thereunder (irrespective of whether or not the lapsing and acceleration of the terms has been declared); and (iii) of any actions taken to cure the defaults mentioned in (i) and (ii) above; and

**9.2.11** To keep the accounting records and other records in proper form and allow LENDER's access to their offices, facilities, books, records and files, allowing the performance of any accounting, legal, and management audits, by themselves or by the ones appointed by the LENDER to the extent such action does not materially and adversely interfere with the regular activities of the BORROWER, and

**9.2.12** To inform the LENDER within 5 (five) Business Days after occurrence thereof (i) of any loss or damage suffered by the BORROWER s' property in amounts higher than TWO MILLION United States Dollars and 00/100 (USD 2,000,000.00), individually or cumulatively during each fiscal year, and (ii) any action or claim where the amount claimed from the BORROWER is equal to or higher than THREE MILLION United States Dollars and 00/100 (USD 3,000,000.00) individually or cumulatively during each fiscal year, and

**9.2.13** To abstain from reducing its capital stock; and

**9.2.14** To abstain from transferring or otherwise reducing, for any cause or on any account, including by means of a shareholder s' agreement or voting trust with third parties, and from pledging, encumbering or granting, any kind of guaranty as regards the current shareholdings of the BORROWER in other companies, and

**9.2.15** To maintain all amounts due hereunder as to guaranties and privileges in collection not below any other obligation of the BORROWER;




**9.2.16.** A informar al MUTUANTE semestralmente (i) la deuda consolidada de todas las Afiliadas del MUTUARIO, abierta por cada una de dichas sociedades y por cada entidad financiera acreedora, y (ii) el volumen de ventas de cada una de las Afiliadas.

**9.2.17.** A no a adoptar cualquier decisión que pudiera afectar el negocio y/o el valor llave del MUTUARIO.

**9.2.18.** A cumplir con todos los requisitos y exigencias que imponga el Banco Central de la República Argentina y demás Normas Aplicables y acreditar tal cumplimiento en forma inmediata al MUTUANTE, a satisfacción de éste, incluyendo sin limitación: (i) a ingresar al mercado libre de cambios de la República Argentina todos los fondos depositados en la Cuenta del Mutuario desembolsados bajo el presente Contrato Marco, mediante el correspondiente cierre de cambio y acreditación de los Pesos Argentinos resultantes en una cuenta bancaria abierta en el sistema financiero argentino en concepto de conversión de divisas causadas en el presente Contrato Marco suscripto con un MUTUANTE del exterior y (ii) a informar al BCRA en forma periódica sobre (a) la existencia de los Documentos de la Operación y (b) su saldo de deuda con el exterior de conformidad con las Comunicaciones "A" 3602 y 3609 del BCRA y/o sus complementarias y modificatorias.

**9.2.19.** A satisfacer toda la información que el MUTUANTE pudiera requerirle relacionada con los Créditos Cedidos, y a cumplir con todas aquellas obligaciones que pudieran corresponderle para que los Créditos Cedidos sean abonados al MUTUANTE, obligándose a realizar todas las gestiones que resulten necesarias a efectos de que el MUTUANTE obtenga el reconocimiento pleno de los Créditos Cedidos, asumiendo el MUTUARIO todos los gastos y costos que resulten en consecuencia o inherentes a dicha cesión, incluyendo razonables gastos por honorarios o costos judiciales en que deba incurrir eventualmente el MUTUANTE para obtener el cobro de los Crédito Cedidos;

**9.2.20.** A realizar sus mejores esfuerzos para causar que los Deudores Cedidos depositen en la Cuenta del Mutuante en tiempo y forma todos los montos correspondientes a los Créditos Cedidos;

**9.2.21.** A reemplazar, a entera satisfacción del MUTUANTE, dentro de un plazo de cinco días corridos de requerido, el respectivo Pagaré por otro instrumento idóneo para otorgar a los mismos el acceso a la vía ejecutiva en caso que, como consecuencia de un cambio en la legislación, los mencionados instrumentos perdieran su eficacia como tales; y

**9.2.22.** A remitir al MUTUANTE copia de todo informe, documento, reporte, orden de compra, factura, y/o pronóstico de ventas que remita a cada Deudor Cedido y/o que reciba de cada Deudor Cedido.

**9.2.16** To inform the LENDER on a semiannual basis (i) the consolidated debt of the BORROWER's Affiliates, by each of the companies and per each of the financial entities as creditors, and (ii) the sales volume of each of the Affiliates,

**9.2.17** To abstain from making any decision that may affect the business and/or goodwill of the BORROWER;

**9.2.18** To comply with all the requirements and demands imposed by Banco Central de la República Argentina and other Applicable Rules, and evidence such compliance to the LENDER, to the latter's satisfaction, including without any restriction whatsoever: (i) to enter in the exchange market of the Republic of Argentina all the funds deposited in the BORROWER's Account disbursed hereunder, through the corresponding exchange closing and crediting of the resulting Pesos in a bank account opened in the Argentine financial system as conversion of currency caused under this Master Agreement executed with a foreign lender, and (ii) to periodically inform Banco Central de la República Argentina about: (a) the existence of the Transactions Documents and (b) the balance of its foreign debt according to Comunicaciones "A". 3602 and 3609 of the Banco Central de la República Argentina and/or its complementary rules and amendments.

**9.2.19** To provide all the information the LENDER may request from them relating to the Assigned Credits, and to comply with every obligation applicable to them for the Assigned Credits to be paid to the LENDER, binding themselves to follow any necessary steps for the LENDER to achieve full recognition of the Assigned Credits; the BORROWER will bear all the expenses and costs resulting from or inherent in said assignments, including the reasonable attorney's fees or court costs the LENDER might eventually incur to collect the Assigned Credits;

**9.2.20** To make their best efforts to cause the Assigned Debtors to deposit in the LENDER's Account as and when due all the amounts corresponding to the Assigned Credits;

**9.2.21** To replace, to the LENDER's full satisfaction, within a term of five calendar days following request therefore, the relevant Promissory Notes with another eligible instruments allowing for the enforced collection proceeding if, due to any change in the legislation, the aforementioned instruments lose their effect as such; and

**9.2.22.** To send to the LENDER a copy of all reports, documents, purchase orders, invoices and/or sale forecasts that were send to each Assigned Debtor and/or were received from each Assigned Debtor.

**CLÁUSULA DECIMA:   MORA.**

**10.1**    La Mora del MUTUARIO en el cumplimiento de las obligaciones de pago en tiempo y forma de cualquier Suma Adeudada se producirá en forma automática de pleno derecho y sin necesidad de interpelación alguna. Ocasionada la Mora, se producirá la caducidad de todos los plazos y el MUTUANTE tendrá derecho a considerar la totalidad de la Línea de Crédito Adeudada como una deuda de plazo vencido y exigir y demandar judicialmente el pago íntegro de la Línea de Crédito Adeudada, los intereses devengados y demás accesorios. Durante el tiempo que dure la Mora, el MUTUANTE tendrá derecho a percibir intereses compensatorios acumulativos pactados a una tasa de interés equivalente a la tasa implícita de cada Solicitud de fondos con más un interés punitorio equivalente al 50 % (cincuenta por ciento) de la tasa de los intereses compensatorios..

**10.2**    También se considerará la mora del MUTUARIO, si transcurridos quince (15) días contados a partir de que el MUTUANTE los haya intimado a subsanar los siguientes Eventos de Incumplimiento, los mismos no hubieren sido subsanados, en cuyo caso el MUTUANTE tendrá la facultad de considerar la Línea de Crédito Adeudada como de plazo vencido y solicitar al MUTUARIO el inmediato pago de todas las Sumas Adeudadas en los siguientes Eventos de Incumplimiento:

(a)    si un tercero pidiere la quiebra del MUTUARIO, del FIADOR, del Deudor Cedido y/o y no fuera rechazada dicha solicitud por el tribunal interviniente en la primera oportunidad procesal correspondiente;

(b)    si el MUTUARIO, el FIADOR y/o cada Deudor Cedido pidiesen su propia quiebra, promoviese su concurso de acreedores o iniciase los procedimientos tendientes a lograr un Acuerdo Preventivo Extrajudicial o una reestructuración de sus pasivos;

(c)    si el MUTUARIO y/o el FIADOR incurrieren en cesación de pagos, aún sin efectuarse los trámites antedichos;

(d)    Si se trabare embargo o se dictare cualquier otra medida cautelar sobre cualquiera de los bienes, activos o derechos del MUTUARIO y/o sus, o se decretare la inhibición general de bienes de cualquiera de el MUTUARIO, por un monto en exceso de Dólares Estadounidenses TRES MILLONES (US$ 3.000.000,00) o su equivalente en Pesos, sea en forma individual o conjunta durante toda la vigencia del Contrato Marco, y dichos embargos y/o medidas cautelares no fuesen levantados, por cualquier causa que fuere, dentro de los sesenta (60) días hábiles judiciales de solicitado el levantamiento del embargo y/o la medida cautelar, solicitud que deberá ser efectuada en la primera oportunidad procesal posible, o

**SECTION TEN: DEFAULT**

**10.1** The BORROWER's default to comply with the obligations agreed upon in this Master Agreement - including without limitation, payment in due time and manner of any Sum Due - shall occur automatically by law and without any judicial order. Upon the Default, the lapsing of all terms shall occur and the LENDER shall be entitled to consider the aggregate amount of the Indebted Credit Facility as past due debt and to request and legally demand full payment of the Indebted Credit Facility, interest accrued and other charges. During the time of the Default the LENDER shall be entitled to receive compensatory interest agreed equivalent to the interest rate implicit in each funds request, plus and interest for default equivalent to 50% (fifty per cent) of such interest rate.

**10.2**    The LENDER shall also be entitled to consider the automatic Default of the BORROWER, if after fifteen (15) calendar days as of the date in which the LENDER request the mitigation of the Event of Default, the same were not resolved, in which event the LENDER shall be entitled to consider the Indebted Credit Facility as past due, and request from the BORROWER the prompt payment of all the Sums Due, being the Events of Default the following:

(a)    if a third party requests the BORROWER, the SURETY, and/or the Assigned Debtors to be declared bankrupt and such request is not rejected by the court intervening in the pertinent first procedural step;

(b)    if the BORROWER, the SURETY, and/or the Assigned Debtor file for their own bankruptcy proceedings, file for their own reorganization, or initiate procedures for an out-of-court reorganization plan or any debt restructuring;

(c)    if the BORROWER, the SURETY incur suspension of payments, without such steps being taken;

(d)    in the event any attachment or any provisional remedy were granted over the property, assets or rights of the BORROWER, or a legal disqualification from disposing of any of the BORROWERs' property were ordered in an amount exceeding THREE Million United States Dollars and 00/100 (USD 3,000,000.00), or its equivalent in Pesos, whether individually or jointly throughout the effect of the Master Agreement, and such attachments and/or provisional remedies were not released or cancelled due to any reason whatsoever within sixty (60) judicial days following the request to release the attachment and/or cancel the provisional remedy, which request must be made at the first procedural opportunity possible; or

(e) si en cualquier momento durante la vigencia del presente Contrato Marco se comprobare la falta de veracidad, parcial o total, por parte del MUTUARIO, en las declaraciones contenidas en la Cláusula NOVENA del presente y/o el incumplimiento de los compromisos asumidos en dicha Cláusula y/o la falta de veracidad en cualquiera de las aplicaciones del presente Contrato Marco;

(f) si se produjere cualquier alteración que, a criterio del MUTUANTE, ocasione un cambio fundamental en las condiciones básicas que se han tenido en cuenta para el presente Contrato Marco;

(g) si el MUTUARIO y/o el FIADOR modificasen de cualquier forma su composición accionaria;

(h) si el MUTUARIO y/o el FIADOR incumpliere cualquiera de las obligaciones a su cargo establecidas en el presente Contrato Marco y/o en los Documentos de la Operación;

(i) si el MUTUARIO incumpliere con cualquiera de sus obligaciones contractuales con cada Deudor Cedido;

(j) si –con prescindencia de que hubiese o no incumplimiento por parte de el MUTUARIO en el pago de las Sumas Adeudadas- el MUTUARIO y/o cada Deudor Cedido terminan el contrato que causa los Créditos Cedidos ;

(k) si por cualquier causa que fuere las sumas adeudadas en virtud del presente Contrato Marco fueren abonadas en una moneda distinta del Dólar;

(l) Si se dictaren una o más sentencias judiciales o laudos arbitrales firmes en contra del MUTUARIO o se tomaran medidas para la ejecución de cualquier hipoteca, embargo u otro gravamen sobre los bienes de el MUTUARIO que, a criterio del MUTUANTE, pudieran (i) afectar adversa y sustancialmente la capacidad de el MUTUARIO para hacer frente al pago de sus obligaciones bajo el Contrato Marco, ó (ii) afectar adversa y sustancialmente cualquiera de las Garantías;

(m) Si ocurriere un Cambio Material Adverso y/o un Efecto Material Adverso

(n) si el MUTUARIO incumpliere cualquiera de sus obligaciones establecidas en el Fideicomiso y/o realizare cualquier acto que afecte negativamente o implique una disminución en el valor de los Bienes Fideicomitidos;

10.3  El MUTUARIO asume el cumplimiento de todas y cada una de las obligaciones bajo los Documentos de la Operación, por lo cual en caso de incurrir en un Evento de Incumplimiento, se

(e) if at any time during the term hereof the lack of veracity, whether partial or total, by the BORROWER is proven in the statements included in Section NINE hereof and/or the failure to comply with the undertakings assumed in such Section and/or the lack of veracity in any of the applications of this Master Agreement;

(f) if there were any change that in the LENDER's opinion, would cause a material change in the basic conditions which have been considered for this Master Agreement.

(g) if in any manner whatsoever the BORROWER and/or the SURETY's shareholdings changes,

(h) if the BORROWER and/or the SURETY fails to comply with any of their obligations set forth herein and/or in the Transaction Documents.

(i) if the BORROWER fails to comply with any of their contractual obligations with the Assigned Debtors,

(j) if – irrespective of the BORROWER' compliance or noncompliance with the payment of the Sums Due –, the BORROWER and/or the Assigned Debtor terminate the agreements originating the Assigned Credits;

(k) if for any reason whatsoever the Sums Due hereunder are paid in other currency than the Dollar.

(l) if one or more final judicial judgments or arbitration awards were issued against the BORROWER or measures were adopted to foreclose any mortgage, attachment or other lien over the property of the BORROWER which, at LENDER's criterion, may (i) adversely and materially affect the capacity of the BORROWER to afford payment of their obligations hereunder; or (ii) adversely and materially affect any of the Guaranties;

(m) if there occurs a Material Adverse Change and/or a Material Adverse Effect.

(n) If the BORROWER does not comply with any of the obligations set forth in the Trust and/or perform any act that have a negative effect or implies a reduction in the value of the Trust Assets.

10.3 The BORROWER binds itself to the performance of each and every one of the obligations under the Transaction Documents, and, therefore, the occurrence of an Event of Default by it will

producirá la Mora del MUTUARIO. Producida la Mora del MUTUARIO, el MUTUANTE podrá proceder sin más a la ejecución de las Garantías (entendiéndose que en el caso del Fideicomiso podrá instruir al Fiduciario a tal efecto) e imputar la totalidad de los Créditos Cedidos al pago de la Línea de Crédito Adeudada.

**10.4** En adición a lo dispuesto en la Sección 10.3 precedente, la Mora del MUTUARIO por el incumplimiento de cualquiera de las obligaciones pactadas en el presente producirá la caducidad de todos los plazos y la mora automática en todos los contratos suscriptos entre el MUTUARIO y el MUTUANTE. Del mismo modo, la mora en cualquiera de tales contratos provocará la Mora automática del presente Contrato Marco -en los términos establecidos en la Sección 10.1 precedente- y de cualquier otra obligación contractual entre el MUTUARIO y el MUTUANTE. En tal sentido, producida la Mora del MUTUARIO, ya sea por falta de pago de las Sumas Adeudadas por parte del MUTUARIO o por el acaecimiento de cualquiera de los Eventos de Incumplimiento detallados con anterioridad, el MUTUANTE a su exclusivo criterio, podrá proceder sin más a la ejecución de las Garantías y/o de otras garantías otorgadas en otros contratos suscriptos entre el MUTUARIO y el MUTUANTE. Asimismo, en tal supuesto el MUTUANTE quedará facultado a aplicar a la cancelación de las Sumas Adeudadas bajo este Contrato Marco los fondos del MUTUARIO depositados a ese momento -o los que se depositaren en el futuro- en la Cuenta del Mutuante por cualquier causa y/o relación contractual entre el MUTUARIO y el MUTUANTE.

## CLÁUSULA DECIMO PRIMERA:            GASTOS.

**11.1** Toda comisión, aranceles bancarios (incluyendo, sin limitación, los aranceles y comisiones bancarias derivadas de los depósitos y transferencias efectuados desde y hacia la Cuenta del Mutuante y/o Cuenta del Mutuario), tributos y/o gastos que las operaciones derivadas directa y/o indirectamente de este Contrato Marco pudieren generar, serán a cargo del MUTUARIO. El MUTUARIO se compromete a abonar al MUTUANTE en forma inmediata y a su solo requerimiento todas las comisiones y/o gastos a su cargo, circunstancia que deberá hacerse efectiva en un plazo no mayor a 48 horas de recibido tal requerimiento, el cual deberá ser debidamente documentado.

**11.2** Todos los pagos bajo el Contrato Marco deberán ser hechos por el MUTUARIO libres de deducciones, retenciones u otros cargos de cualquier naturaleza. En caso que el MUTUARIO sea requerido por ley o por cualquier autoridad competente a realizar cualquier deducción, retención o cargo, el MUTUARIO deberá realizar tantos pagos adicionales al MUTUANTE como sean necesarios para que, después de realizadas tales deducciones, retenciones o cargos, el MUTUANTE reciba un monto igual al monto debido al mismo bajo los términos de este Contrato Marco como si tales deducciones, retenciones o cargos no hubiesen sido realizados. El MUTUARIO deberá pagar en legal tiempo y forma a las autoridades impositivas que corresponda, el monto retenido, y

give rise to BORROWER 's Default. Upon the BORROWER's Default, the LENDER may forthwith proceed to enforce the Guarantees (being understood that in the case of the Trust it may instruct the trustee to proceed to that end) and allocate all the Assigned Credits to the payment of the Indebted Credit Facility.

**10.4** In addition to the provisions set forth in 10.3 above, the BORROWER 's Default due to the non-fulfillment of any of the obligations agreed herein shall give place to the lapsing of all terms and the automatic default of all the agreements executed between the BORROWER and the LENDER. Likewise, the default in any of such agreements shall give place to the automatic Default hereof – as per the terms set forth in 10.1 above – and of any other contractual obligation between the BORROWER and the LENDER. In such sense, upon the BORROWER 's, either due to the lack of payment by the Assigned Debtors or due to the occurrence of any of the Events of Default detailed hereinabove, the LENDER, at its own discretion, shall proceed to the execution of the Guarantees and/or other guaranties granted in other agreements executed between the BORROWER and the LENDER. Likewise, in such event, the LENDER shall be entitled to apply to the payment of the Sums Due, the BORROWER's funds deposited at such time – or those to be deposited in the future – in the LENDER's Account for any reason and/or contractual relationship between the LENDER and the BORROWER.

## SECTION ELEVEN: EXPENSES.

**11.1** All commissions, bank fees (including, without any restriction whatsoever, the bank fees and commissions resulting from the deposits and transfers made from and to LENDER's Account and/or BORROWER's Account) taxes and/or charges resulting from the transactions directly and/or indirectly derived from this Master Agreement, shall be borne by the BORROWER. The BORROWER undertakes to pay all commissions and/or expenses to be borne by it to the LENDER promptly and upon the latter's sole request and not later than 48 hours following such request, which shall be duly evidenced.

**11.2** All payments hereunder shall be made by the BORROWER free of any deduction, withholding and other charges of any nature whatsoever. If the BORROWER is requested by law or any other competent authority to make any deduction, withholding or charge, the BORROWER shall make such additional payments to the LENDER as necessary so that, after such deductions, withholdings or charges, the LENDER receives an amount equal to the amount due to it hereunder as if such deductions, withholdings or charges have not been made. The BORROWER shall pay in due time and manner to the pertinent tax authority, the amount withheld, and shall obtain and give to the LENDER a certified copy of the corresponding receipts in

deberán obtener y suministrar al MUTUANTE copia certificada de los comprobantes que correspondan respecto de dicho pago

**11.3** El MUTUARIO se obliga a cumplir en tiempo y forma – a su exclusivo costo y cargo- con la liquidación de divisas y el pago de todos los tributos correspondientes derivados directa e indirectamente del presente Contrato Marco y con las demás reglamentaciones de conformidad con la normativa dictada al respecto por el Banco Central de la República Argentina, desligando al MUTUANTE de cualquier obligación al respecto.

**11.4** El MUTUARIO se compromete a mantener indemne, defender y evitar que perjuicio alguno se ocasione al MUTUANTE, sus socios y empleados con relación a todas las obligaciones emergentes de las operaciones relacionadas con los. Créditos Cedidos, ingreso y liquidación de divisas y toda otra obligación impositiva, cambiaria, bancaria, aduanera o de cualquier otra índole que de ella pudiese surgir.

## CLÁUSULA DÉCIMO SEGUNDA:    CESIÓN    DEL CONTRATO MARCO.

El MUTUANTE podrá ceder el presente Contrato Marco en su totalidad a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común de este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente.

## CLÁUSULA DÉCIMO TERCERA: VIGENCIA. INDEMNIDAD

**13.1** El presente Contrato Marco así como todas las Garantías mantendrán su vigencia hasta que se cumplan en su totalidad los derechos y/u obligaciones de las Partes bajo el presente Contrato Marco. Asimismo, aún después de cumplidas con las obligaciones emergentes del Contrato Marco, las Cláusulas DECIMO PRIMERA, DECIMO TERCERA y DECIMO QUINTA sobrevivirán y se mantendrán plenamente vigentes hasta la expiración de las prescripciones que resulten aplicables según el caso.

**13.2** El MUTUARIO mantendrá indemne al MUTUANTE y a sus Afiliadas, directores, gerentes, funcionarios, empleados y asesores externos (la "Parte Indemnizada") de cualquier, pérdida, reclamo, demanda, responsabilidad y todos sus gastos relacionados (incluyendo honorarios razonables de abogados y asesores), incurridos por la Parte Indemnizada relacionado con, relativo a, derivado de y como consecuencia de: (i) la ejecución o entrega del Contrato Marco y las Garantías y del cumplimiento

connection with such payment.

**11.3** The BORROWER undertakes to comply in due time and manner, on its own account, with settlement of foreign currency and payment of all pertinent taxes directly or indirectly resulting from this Master Agreement and with other rules in accordance with the rules set forth by Banco Central de la República Argentina, releasing the LENDER from any obligation therefore.

**11.4** The BORROWER undertakes to hold the LENDER harmless, and to defend and prevent any damage to the LENDER, its shareholders and employees in connection with all obligations resulting from the transactions relating to the Assigned Credits, entry and liquidation of foreign exchange and any other taxable, exchange, banking, customs liability or of any other kind whatsoever resulting therefrom.

## SECTION TWELVE: MASTER AGREEMENT ASSIGNMENT.

The LENDER may assign the rights arising from the Master Agreement in full to any of its affiliates and/or subsidiaries (i.e. those holding or subsidiary corporations of the LENDER or property thereof), by any of the means provided by Law, the assignee acquiring the same benefits and/or rights and/or actions to which the LENDER is entitled under the above-mentioned Master Agreement. In such event, the LENDER shall give notice by true means of the assignment to the BORROWER, as well as of the new payment terms and conditions, using therefore any true means of notice. In such event, the BORROWER may file any defense against the assignee of the Master Agreement which it would have been entitled to file against the assigning LENDER.

## SECTION THIRTEEN: EFFECT – INDEMNITY.

**13.1** This Master Agreement as well as all the Guaranties resulting herefrom will remain in full force and effect until performance in full of the rights and/or obligations of the Parties hereunder. Furthermore, even after the obligations arising from the Master Agreement have been fulfilled, Sections ELEVEN, THIRTEEN and FIFTEEN will survive and will remain in full force and effect until the expiration of the limitations that might be applicable.

**13.2** The BORROWER will hold the LENDER and its Affiliates, directors, managers, officers, employees and independent advisors (the "Indemnitee") harmless against any loss, claim, complaint, liability and every expense relating thereto (including reasonable attorney's and advisor's fees) incurred by the Indemnitee in connection with, relating to, arising from and as a consequence of: (i) the execution or delivery of the Master Agreement and the Guaranties and the performance of the

de las obligaciones previstas en ellos, o de la celebración de las operaciones previstos en ellos; (ii) el Crédito Cédido adeudado con más sus intereses o el uso de los fondos desembolsados o (iii) cualquier demanda, litigio, investigación, sumario, o procedimiento, real o potencial, relacionado con cualquiera de las circunstancias previstas en esta Cláusula 13.2, fundada en razones contractuales, extra-contractuales o previstas en el derecho que resulte aplicable; en la medida que la indemnidad de tales pérdidas, demandas, responsabilidades o gastos no resulten de la culpa grave o dolo de la Parte Indemnizada.

## CLÁUSULA DÉCIMO CUARTA: AUTORIZACION

El MUTUARIO autoriza expresamente al MUTUANTE a inscribir y registrar el presente Contrato Marco y todos los documentos emanados en virtud del mismo en todos los Registros que el MUTUANTE considere pertinentes a efectos de afianzar las obligaciones del MUTUARIO.

En tal sentido, el MUTUARIO autoriza al MUTUANTE a presentar todo tipo de 'financing statements' en las oficinas de registro de cualquier jurisdicción de los Estados Unidos de América, de acuerdo a lo previsto en la Sección 5 del Artículo 9 del Uniform Commercial Code, incluyendo a los bienes del MUTUARIO entregados como garantía del cumplimiento de las obligaciones asumidas en el presente Contrato Marco.

## CLÁUSULA DÉCIMO QUINTA: JURISDICCIÓN Y LEY APLICABLE.

**15.1** El presente Contrato Marco es gobernado por y debe ser interpretado de acuerdo con la legislación del Estado de Nueva York, Estados Unidos de América.

**15.2** El MUTUARIO irrevocablemente se somete a la jurisdicción no exclusiva de los tribunales de los Estados Unidos de América sitos en el Distrito Sur de New York para cualquier acción, juicio o procedimiento que pueda ser iniciado por el MUTUANTE en relación con el presente Contrato Marco. La sentencia que se dicte contra el MUTUARIO en cualquiera de dichos juicios, acciones o procedimientos será considerada definitiva y podrá ser ejecutada en cualquier otra jurisdicción.

**15.3** Nada de lo dispuesto precedentemente en el presente Contrato Marco afectará el derecho del MUTUANTE a iniciar procedimientos legales o de cualquier otra forma demandar al MUTUARIO en cualquier otra jurisdicción que el MUTUANTE considere apropiada, incluyendo la facultad del MUTUANTE de iniciar la ejecución judicial y/o extrajudicial de los Pagarés y/o de los Warrants y/o del Fideicomiso en la República Argentina.

**15.4** El MUTUARIO por el presente designa y autoriza en forma irrevocable a Sancor Dairy Corporation, con domicilio en 80 SW 8th Street , Suite 2000 - Miami, FL 33130-3003, NY, USA, como su agente autorizado al solo efecto de recibir, en su nombre y representación, correspondencia y/o notificaciones dirigidas al MUTUARIO en cualquier acción, juicio o procedimiento que el MUTUANTE pudiera iniciar en el Estado

---

obligations thereunder, or the performance of the transactions contemplated therein; (ii) the Assigned Credits due plus any interest thereon or the use of the disbursed funds; or (iii) any actual complaint, lawsuit, preliminary investigation proceeding or procedure, current or potential, relating to any of the circumstances contemplated in this Section 13.2, based on contractual or extra-contractual reasons, or as provided in the applicable law; to the extent the indemnity against such losses, complaints, liabilities or expenses is not due to the gross negligence or willful misconduct of the Indemnitee.

## SECTION FOURTEEN: AUTHORIZATION

The BORROWER expressly authorizes the LENDER to register this Master Agreement and all documents thereunder in all Registries deemed relevant by the LENDER in order to secure the BORROWER's obligations.

Therefore, the BORROWER authorizes the LENDER to submit any kind of financing statements in the registry offices of any jurisdiction of the United States of America, as per the provisions set forth in Section 5 Article 9 of the Uniform Commercial Code, including all the BORROWER's goods delivered as security for the compliance with the obligations undertaken hereunder.

## SECTION FIFTEEN: JURISDICTION AND APPLICABLE LAW

**15.1** This Master Agreement is governed by and must be construed in accordance with the laws of the State of New York, United States of America.

**15.2** The BORROWER irrevocably accepts the non-exclusive jurisdiction of the United States Courts located at the South District of New York for any claim, trial or proceeding that might be initiated by the LENDER, and in connection with this Master Agreement. The ruling issued against the BORROWER at such trials, claims or proceeding, shall be considered final and may be executed in any other jurisdiction.

**15.3** Nothing of the aforesaid herein shall affect the LENDER's right to bring legal actions or to otherwise sue the BORROWER in any other jurisdiction deemed appropriate by the LENDER, including the LENDER's right to initiate the judicial and/or extrajudicial execution of the Promissory Notes and/or the Warrants and/or the Trust in the Argentine Republic.

**15.4** The BORROWER hereby irrevocably appoints and authorized Sancor Dairy Corporation, with domicile at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA, as its authorized agent for the sole purpose of receiving, in its name and stead, letters and/or notices addressed to the BORROWER in any action, lawsuit or proceedings filed by the LENDER in the estate of New York, being the BORROWER obliged to inform the

de New York, debiendo asimismo el MUTUARIO informar al MUTUANTE sobre la identidad y domicilio de cualquier nuevo agente que designe a tales efectos.

**15.5** Si por cualquier motivo su agente autorizado a los efectos de recibir notificaciones en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, NY, USA no estuviere presente, el MUTUARIO acepta y consiente que las notificaciones dispuestas en cualquier acción, juicio o procedimiento le sean efectuadas por correo registrado de los Estados Unidos de América, en el domicilio del MUTUARIO indicado en la Sección 15.8 de la presente Cláusula.

**15.6** Las notificaciones efectuadas de la manera establecida en la Sección 15.4 de la presente Cláusula serán consideradas personales, válidas, recibidas y obligatorias para el MUTUARIO.

**15.7** El MUTUARIO irrevocablemente renuncia, en la máxima medida permitida por las leyes, a oponer cualquier objeción que pueda tener ahora o en el futuro contra la jurisdicción de cualquiera de los tribunales mencionados en esta Cláusula que intervenga en cualquier juicio, acción o procedimiento iniciado por el MUTUANTE; y en especial, el MUTUARIO renuncia a oponer cualquier defensa o alegación de incompetencia, o 'inconvenient forum' respecto del tribunal que intervenga en tal acción, juicio o procedimiento. Asimismo el MUTUARIO renuncia expresamente a su derecho a recusar sin expresión de causa al Tribunal unipersonal o colegiado que interviniera en la contienda. El MUTUARIO sólo podrá oponer excepción de pago total y/o parcial comprobado por escrito, en documento emanado del MUTUANTE que haga referencia directa al Contrato Marco en ejecución o a la obligación afianzada, renunciando expresamente a las otras defensas de cualquier índole

**15.8** Cualquiera de las notificaciones precedentemente aludidas que deban ser efectuadas referidas al presente Contrato Marco deberán ser remitidas a los domicilios indicados a continuación:
MUTUARIO:        1) 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003 - USA
                 2) Tacuarí 202 - 3° Piso - Capital Federal, República Argentina
MUTUANTE:        Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE        Amsterdam,        The Netherlands

## CLÁUSULA DECIMO SEXTA:    FIRMAS Y RECEPCION DE INSTRUMENTOS.

Se firman 3 (tres) juegos de ejemplares iguales, de un mismo tenor y a un solo efecto, quedando 1 (un) juego en poder del MUTUANTE, 1 (un) juego en poder del MUTUARIO y 1 (un) juego en poder del FIADOR.

LENDER as of the identity and address of any new agent appointed to that end.

**15.5** If, for any reason, its authorized agent to receive notices at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA, fails to be present, the BORROWER agrees and consents to the notices to be served in any action, lawsuit or proceedings being served on it by US registered mail at the BORROWER's domicile stated in 15.8 hereof.

**15.6** Notices served as stated in 15.4 shall be considered personal, valid, received and mandatory for the BORROWER.

**15.7** The BORROWER irrevocably waives, to the maximum extent permitted by the laws, the right to file an objection now or in the future against the jurisdiction of any of the courts mentioned in this Section hearing in any lawsuit, action or proceedings filed by the LENDER, and, especially, the BORROWER waives the right to file any defense or to allege lack of jurisdiction, or inconvenient forum regarding the court hearing in such action, lawsuit or proceedings. The BORROWER also expressly waives its right to challenge the one-judge or more judges of the court hearing the case. The BORROWER may only file a defense for full and/or partial payment evidenced in writing, on a document sent by the LENDER directly related to the Master Agreement being executed or the guaranteed obligation, expressly waiving any other defenses of any kind whatsoever.

**15.8** Any of the aforementioned notices to be made in respect of this Master Agreement shall be sent to the domiciles stated below:
BORROWER:
1) 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3003, NY, USA.
2) Tacuarí 202 – 3rd Floor – City of Buenos Aires, Argentine Republic
LENDER:
Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands.

## SECTION SIXTEEN: SIGNATURES AND RECEIPT OF DOCUMENTS.

The parties hereto sign 3 (three) equal counterparts of the same tenor and to one sole purpose, 1 (one) counterpart for the LENDER, and 1 (one) counterpart for the BORROWER, and one counterpart for the SURETY.




**CLÁUSULA DECIMO SEPTIMA: LUGAR Y FECHA.**

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina y por el MUTUANTE en Amsterdam, a los 21 días del mes de Diciembre de 2009.

**SECTION SEVENTEEN: PLACE AND DATE.**

Executed by the BORROWER and the SURETY in the City of Buenos Aires, Argentine Republic, and by the LENDER in Amsterdam, on December 21, 2009.

By: SANCOR COOPERATIVAS UNIDAS LTDA.
Name: Mario Magdalena
Capacity: Attorney-in-fact

Firma/s certificada/s en Foja
N° E00132286 3
Bs. As. 21/12/09

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

By: SANCOR DO BRASIL Productos Alimenticios Ltda.
Name: Mario Magdalena – Gabriel Martinuzzi
Capacity: Attorney-in-fact

By: IIG TOF B.V.
Name: J. Heijmans / J. Heijmans
Capacity:





ACTA DE CERTIFICACION DE FIRMAS
LEY 404



## ANEXO

F 001322863

ARANA (h)
BANO
4370

1  Buenos Aires, 21 de Diciembre de 2009 . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s                                          que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 24                del LIBRO

6  número 128                    , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9  Gabriel Gustavo MARTINUZZI, DNI 18.264.987, quienes justifican sus i-

10  dentidades de acuerdo al inciso a del artículo 1002 del Código Civil y ac-

11  túan: el señor Magdalena en su carácter de apoderado de la sociedad

12  "SANCOR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sun-

13  chales, Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro

14  Nacional de Cooperativas, de la Provincia de Santa Fe, Departamento

15  Castellanos, conforme lo acredita con el poder de fecha 15 de diciembre

16  de 2009, pasado al folio 1400 del Registro 640 de la ciudad de Suncha-

17  les, Provincia de Santa Fe, a cargo de la escribana Analía Roch, asimis-

18  mo actúan: el señor Magdalena en su carácter de Apoderado Gerencia

19  Financiera y el señor Martinuzzi en su carácter de Administrador de la

20  sociedad "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que a-

21  creditan con el Contrato Social de fecha 4 de agosto de 2008 debidamen-

22  te Legalizado y Apostillado, la documentación relacionada tengo a la vista

23  y les confieren facultades suficientes para suscribir el documento adjunto,

24  doy fe.- El documento se encuentra parcialmente escrito en idioma ex-

25  tranjero.-



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

## Viviana Paruolo

**De:** Maria Noel Gullo [mgullo@grupobaf.com]
**Enviado el:** lunes, 01 de agosto de 2011 09:33 a.m.
**Para:** Ana Suhl; 'Diego Magnani'; Maria Baccarelli; 'Moira'; 'Romina'; 'Viviana Paruolo'; Alejandra Zupa; 'Dolores Perez Del Cerro'; 'Jose Lopez Mañan'; Juan Cruz Piccardo
**Asunto:** PEND EN CUENTA

| IIG | | | |
|---|---|---|---|
| AGROFERTIL | | | |
| ALMOND COAST | | | |
| TECNOMYL | | | |
| AASA | 1.859.854,25 | | |
| ENAV | 573.554,32 | | |
| FRIAR  ARG | 1.258.850,69 | | |
| FRIAR ROU | | | |
| FRIAR -  ANTICIPOS 2006 - | 20.648,15 | | |
| VICENTIN SUC URUGUAY | | | |
| CAGSA | | | |
| EMAISA | 217.187,39 | | |
| PROSAL | 900.192,49 | | |
| CIA.AZUCARERA CONCEPCION | | | |
| MASTELLONE | | | |
| MILKAUT | | | |
| MOHIÑO CAÑUELAS | | | |
| COPAGRAN | | | |
| CTJ | 9.899,46 | | |
| ATANOR | | | |
| MINETTI | | | |
| AZUCARERA TERAN | | | |
| SA SER | | | |
| RASIC | 603.280,21 | | |
| MSU - BRASIL | | | |
| MSU AGROPY | | | |
| MSU AGROUY | | | |
| SANCOR - giro Sancor u Otros | | | |
| SANCOR - Fonterra | | | |
| SANCOR - Schuman | | | |
| SANCOR - Bariven | | | |
| VIÑAS  IIG CAPITAL | | | |
| VIÑAS - IIG TOF BV | | | |
| VIÑAS - GIRO CLIENTE | | | |
| TIERRA ROJA | | | |
| CARTELLONE DO BRASIL | | | |
| SURINVEST | | | |
| ALIMENTOS MODERNOS | 402.353,57 | para la aplicación y retoma | |
| MASTELLONE | | | |
| SANCOR | | | |
| RASIC | 54.747,00 | debemos acumular aprox u$S 500.000 para luego transferir al cliente (cta Miam |
| TIERRA ROJA | | | |
| MOHIÑO CAÑUELAS | | | |
| TECNOMYL | | | |
| JUGOS DEL SUR | | | |

1





Maria Noel Gullo
B.A. Financial Factoring S.A.
Av. Leandro N Alem 855 Piso 30
C1001AAD - Buenos Aires - Argentina
Tel: +54 11 6347 6001
Fax: +54 11 6347 6000

**PRIMERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuari 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, cuyas copias se adjuntan a la presente como Anexo A (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Primera Enmienda.

(b) Que sobre la base del Contrato Marco, es intención del MUTUARIO requerir al MUTUANTE una línea de crédito tipo 'revolving' a fin de poder requerirle –en los términos y condiciones establecidos en el Contrato Marco- los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la Línea de Crédito Adeudada alcance el monto máximo de la Línea de Crédito, de modo que la Línea de Crédito en todo momento resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(c) Que el mecanismo antes descripto permitiría al MUTUARIO requerir periódicamente el flujo de fondos requeridos para financiar sus exportaciones, pudiendo cancelar las Sumas Adeudadas, solicitar nuevos desembolsos y así sucesivamente, siempre que el monto acumulado de toda la Línea de Crédito resulte inferior a Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00).

(d) Que es intención de las Partes modificar el Contrato Marco al solo efecto de extender el Plazo de Disponibilidad y el plazo máximo del cual no podrán extenderse las Fechas de Vencimiento previsto en la Cláusula PRIMERA.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente primera enmienda al Contrato Marco (la "Primera Enmienda"), de conformidad con las presentes Cláusulas:

1.    Modificase de la Cláusula PRIMERA del Contrato Marco las siguientes definiciones:

*"Fecha/s de Vencimiento"* significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán ser anteriores a los 24 (veinticuatro) meses calculadas desde la fecha de cada Solicitud de Desembolso e indefectiblemente anteriores al 31 de Diciembre de 2012 .

*"Línea de Crédito"* significa la única línea de crédito, modalidad "revolving" que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA MILLONES con 00/100 (US$ 50.000.000,00)

*"Plazo de Disponibilidad"* significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2012, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO"



2.      Con excepción de aquellos términos expresamente modificados por la presente Primera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 15 días del mes de Marzo de 2010.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: SANCOR DO BRASIL Produtos Alimenticios Ltda.
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderado - Administrador

Por: IIG TOF B.V.
Nombre:        Trust International Management (T.I.M.) B.V.
Carácter:              Managing Director
y. Hamer / W Riergolen
apoderados

Firma/s certificada/s en Foja
N°.
Bs. As. 15. 3. 2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370




 ACTA DE CERTIFICACION DE FIRMAS 

## ANEXO

F 001362069

1   Buenos Aires, 15 de **Marzo** de 2010 . En mi carácter de escribano

2   Titular del Registro Notarial Nº 841

3   CERTIFICO: Que la/s firma/s      que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número 48      del LIBRO

6   número 132     , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8   la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9   Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10   dades de acuerdo al inciso a del artículo 1002 del Código Civil y actúan:

11   el señor Magdalena en su carácter de apoderado de la sociedad "SAN-

12   COR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sunchales,

13   Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

14   cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

15   tellanos, conforme lo acredita con el poder de fecha 15 de diciembre de

16   2009, pasado al folio 1400 del Registro 640 de la ciudad de Sunchales,

17   Provincia de Santa Fe, a cargo de la escribana Analía Roch, asimismo

18   actúan: el señor Magdalena en su carácter de Apoderado Gerencia Fi-

19   nanciera y el señor Valicente en su carácter de Apoderado de la sociedad

20   "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que acreditan con

21   el Poder Especial de fecha 17 de diciembre de 2009, debidamente certi-

22   ficado con fecha 17 de diciembre de 2009 y debidamente Autorizado por

23   el Ministerio de Relaciones Exteriores con fecha 7 de enro de 2010 y tra-

24   ducido con fecha 18 de enero de 2010 y legalizado bajo el número 948 de

25   fecha 19 de enero de 2010, la documentación relacionada tengo a la vista







F 001362069

y les confieren facultades suficientes para suscribir el documento adjunto, doy fe.-



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50



## SEGUNDA A ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificada mediante Primera Enmienda de fecha 15 de Marzo de 2010, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Segunda Enmienda.

(b) Que, en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO frente al MUTUANTE bajo el Contrato Marco, el MUTUARIO se obligó a mantener durante toda la vigencia del Contrato Marco y hasta que el mismo se extinga, Warrants endosados a favor del MUTUANTE por un monto no inferior a una suma equivalente al 15% (quince por ciento) de la Línea de Crédito Adeudada (Sección 7.2 de la Cláusula SEPTIMA).

(c) Al momento de la presente, el MUTUANTE declara de conformidad, que la Línea de Crédito Adeudada, asciende a un total de US$ 14.910.992,92 (Dólares Estadounidenses CATORCE MILLONES NOVECIENTOS DIEZ MIL NOVECIENTOS NOVENTA Y DOS CON 92/100) y que el MUTUARIO entregó y endosó Warrants a su favor por la suma total de US$ 3.869.640,30 (Dólares Estadounidenses TRES MILLONES OCHOCIENTOS SESENTA Y NUEVE MIL SEISCIENTOS CUARENTA CON 30/100).

(d) Que el MUTUARIO ha requerido al MUTUANTE y el MUTUANTE –pese a no tener obligación alguna a ello- ha aceptado liberar algunos – no todos- de los Warrants endosados a su favor, siempre que no se vea afectada la ratio exigida por la Sección 7.2 de la Cláusula SEPTIMA y sin que ello implique novación alguna de la deuda instrumentada en el Contrato Marco ni en las Solicitudes de Desembolso.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente segunda enmienda al Contrato Marco (la "Segunda Enmienda"), de conformidad con las presentes Cláusulas:

**1.** Reintégrense al MUTUARIO los Warrants que se detallan a continuación dentro de las 48 hs de que el MUTUARIO haya suscripto la presente Segunda Enmienda:

| Nº WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2685 | Leche en Polvo | Sunchales | 148.800 | kgs | 03/Jun/2010 | 520.800,00 |

**2.** Conforme lo anteriormente detallado, como consecuencia de la liberación de los Warrants, a partir del día de la fecha, la garantía de Warrants del Contrato Marco queda conformada de la siguiente forma:

| Nº WARRANT | PRODUCTO | DEPOSITO | CANTIDAD | | VTO. | IMPORTE u$s |
|---|---|---|---|---|---|---|
| 2675 V | Queso Semi Duro | Balnearia | 148.937,00 | Kg | 03/Jun/2010 | 700.003,90 |
| 2676 V | Queso Semi Duro | Balnearia | 102.412,00 | Kg | 03/Jun/2010 | 481.336,40 |
| 2677 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |




| 2678 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |
|--------|-----------|-----------|------------|-----|-------------|------------|
| 2679 V | Leche UAT | Chivilcoy | 500.000,00 | Lt | 03/Jun/2010 | 285.000,00 |
| 2682 V | Queso Pasta Dura | La Carlota | 187.500,00 | Kg | 03/Jun/2010 | 1.312.500,00 |
| Total | | | | | | 3.348.840,30 |

3.   Con excepción de aquellos términos expresamente modificados por la presente Segunda Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 13 días del mes de Abril de 2010.

Por: **SANCOR COOPERATIVAS UNIDAS LTDA.**
Nombre: Mario Magdalena
Carácter: Apoderado

Por: **SANCOR DO BRASIL Produtos Alimenticios Ltda.**
Nombre: Mario Magdalena – Daniel Jorge Valicente
Carácter: Apoderados

Por: **IIG TOF B.V.**
Nombre: S. Smybosch / y Uuymans
Carácter: Apoderados

Firma/s certificada/s en Foja
Nº R007907330
Bs. As. 13-4-2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370



ARANA (h)
:RIBANO
.T. 4370

F 005962330

1  Buenos Aires, 13 de     Abril     de 2010   . En mi carácter de escribano

2  Titular del Registro Notarial Nº 841

3  CERTIFICO: Que la/s firma/s                          que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número 190              del LIBRO

6  número 133                , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9  Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10 dades de acuerdo al inciso a del artículo 1002 del Código Civil y actúan:

11 el señor Magdalena en su carácter de apoderado de la sociedad "SAN-

12 COR COOPERATIVAS UNIDAS LIMITADA" con domicilio en Sunchales,

13 Provincia de Santa Fe, e inscripta en la Matrícula 772 del Registro Na-

14 cional de Cooperativas, de la Provincia de Santa Fe, Departamento Cas-

15 tellanos, conforme lo acredita con el poder de fecha 15 de diciembre de

16 2009, pasado al folio 1400 del Registro 640 de la ciudad de Sunchales,

17 Provincia de Santa Fe, a cargo de la escribana Analía Roch, asimismo

18 actúan: el señor Magdalena en su carácter de Apoderado Gerencia Fi-

19 nanciera y el señor Valicente en su carácter de Apoderado de la sociedad

20 "SANCOR DO BRASIL Produtos Alimenticios LTDA." lo que acreditan con

21 el Poder Especial de fecha 17 de diciembre de 2009, debidamente certi-

22 ficado con fecha 17 de diciembre de 2009 y debidamente Autorizado por

23 el Ministerio de Relaciones Exteriores con fecha 7 de enro de 2010 y tra-

24 ducido con fecha 18 de enero de 2010 y legalizado bajo el número 948 de

25 fecha 19 de enero de 2010, la documentación relacionada tengo a la vista




F 005962330

y les confieren facultades suficientes para suscribir el documento adjunto,

doy fe.-



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50





**TERCERA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Productos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificada mediante Primera Enmienda de fecha 15 de Marzo de 2010, y Segunda Enmienda del 13 de Abril de 2010, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Tercera Enmienda.

(b) Que es intención de las Partes modificar el Contrato Marco al solo efecto de modificar la cláusula Décimo Segunda.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente tercera enmienda al Contrato Marco (la "Tercera Enmienda"), de conformidad con las presentes Cláusulas:

**1.** Modifícase la Cláusula DECIMO SEGUNDA del Contrato Marco, la cual quedará redactada del siguiente modo:

**CLÁUSULA DÉCIMO SEGUNDA: CESIÓN DEL CONTRATO MARCO.**

El MUTUANTE podrá ceder o transferir los derechos derivados el presente Contrato Marco a cualquiera de sus afiliadas y/o subsidiarias (entendiéndose por tales aquellas sociedades controlantes de o controladas por el MUTUANTE o sea propiedad común o relacionadas a este último), por cualquiera de los medios previstos en la Ley, adquiriendo el cesionario los mismos beneficios y/o derechos y/o acciones de que es titular el MUTUANTE en virtud de este Contrato Marco. En ese caso, el MUTUANTE deberá comunicar en forma fehaciente la cesión al MUTUARIO, como también la nueva forma de pago, utilizando para ello cualquier medio fehaciente de notificación, pudiendo en ese caso el MUTUARIO oponer al cesionario del Contrato Marco cualquier defensa que hubiera podido oponer al MUTUANTE cedente. Asimismo, el MUTUANTE podrá suscribir con cualquiera de sus afiliadas y/o subsidiarias, convenios de participación relacionados a los créditos derivados de este Contrato Marco.

**SECTION TWELVE: MASTER AGREEMENT ASSIGNMENT.**

The LENDER may assign or otherwise transfer the rights arising from the Master Agreement to any of its affiliates and/or subsidiaries (i.e. those holding, subsidiary corporations of the LENDER or other corporations related to them or property thereof), by any of the means provided by Law, an assignee acquiring the assigned benefits and/or rights and/or actions to which the LENDER is entitled under the above-mentioned Master Agreement. In such event, the LENDER shall give notice by true means of any new payment terms and conditions, using therefore any true means of notice. In such event, the BORROWER may file any defense against an assignee of the Master Agreement which it would have been entitled to file against the assigning LENDER. In addition to the aforementioned assignment rights, the LENDER may execute with any of its affiliates and/or subsidiaries, participation agreements related to the credits and receivables derived from this Master Agreement.

2. Las Partes acuerdan otorgar a esta Tercera Enmienda efectos retroactivos al 21 de Diciembre de 2009. Con excepción de aquellos términos expresamente modificados por la presente Tercera Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO y el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 29 días del mes de Noviembre de 2010.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: Mario Magdalena
Carácter: Apoderado

Por: SANCOR DO BRASIL Produtos Alimenticios Ltda.
Nombre: Mario Magdalena –Daniel Jorge Valicente
Carácter: Apoderados

Por: IIG TOF B.V.
Nombre: J. Hanens / G Becher
Carácter: apoderados.

Firma/s certificada/s en Foja
Nº F00.15.12.965
Bs. As. 29-11-2010

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

 **ACTA DE CERTIFICACION DE FIRMAS** 

# ANEXO

F 001516965

1　Buenos Aires, 29 de Noviembre de 2010 . En mi carácter de escribano

2　Titular del Registro Notarial Nº 841

3　CERTIFICO: Que la/s firma/s que obra/n en el

4　documento que adjunto a esta foja, cuyo requerimiento de certificación se

5　formaliza simultáneamente por ACTA número 184 del LIBRO

6　número 147 , es/son puesta/s en mi presencia por la/s persona/s

7　cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8　la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y

9　Daniel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identi-

10　dades de acuerdo al inciso a) del artículo 1002 del Código Civil y actúan:

11　el señor Magdalena en su carácter de Apoderado de la sociedad "SAN-

12　COR COOPERATIVAS UNIDAS LIMITADA", con domicilio en Sunchales,

13　Provincia de Santa Fe, inscripta en la Matrícula 772 del Registro Nacional

14　de Cooperativas, de la Provincia de Santa Fe, Departamento Castellanos,

15　conforme lo acredita con el poder de fecha 15 de diciembre de 2009, pa-

16　sado al folio 1400 del Registro 640 de la ciudad de Sunchales, Provincia

17　de Santa Fe, a cargo de la escribana Analía Roch, y el señor Valicente en

18　su carácter de Apoderado de la sociedad "SANCOR DO BRASIL Produtos

19　Alimenticios LTDA." lo que acredita con el Poder Especial de fecha 17 de

20　diciembre de 2009, debidamente certificado con fecha 17 de diciembre de

21　2009 y debidamente Autorizado por el Ministerio de Relaciones Exteriores

22　con fecha 7 de enero de 2010 y traducido con fecha 18 de enero de 2010

23　y legalizado bajo el número 948 de fecha 19 de enero de 2010, toda la

24　documentación relacionada tengo a la vista y les confiere facultades sufi-

25　cientes para suscribir el documento adjunto, doy fe.- El documento se






F 001516965

encuentra parcialmente escrito en idioma extranjero.-

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50



MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

**QUINTA ENMIENDA AL CONTRATO DE LÍNEA DE CRÉDITO
PARA LA PREFINANCIACIÓN DE EXPORTACIONES**

Entre:

**SANCOR COOPERATIVAS UNIDAS LIMITADA**, una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3° Piso - Capital Federal, República Argentina, representado en este acto por el Sr. Mario Magdalena, en su carácter de apoderado (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.**, una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Daniel Jorge Valicente, en su carácter de Apoderados, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.**, representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.**, representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que con fecha 21 de Diciembre de 2009, las Partes suscribieron un Contrato Marco de línea de crédito para pre-financiación de exportaciones, modificado mediante Primera Enmienda de fecha 15 de Marzo de 2010, Segunda Enmienda de 13 de Abril de 2010, Tercera Enmienda de fecha 29 de Noviembre de 2010 y Cuarta Enmienda de fecha 1 de Agosto de 2011, cuyas copias se adjuntan a la presente como **Anexo A** (el "Contrato Marco"), cuyas definiciones, términos y condiciones se mantienen vigentes, resultan aplicables a la presente y se tienen por reproducidas en la presente en la medida que no sean expresamente modificadas por la presente Quinta Enmienda.

(b) Que el MUTUARIO solicita al MUTUANTE una ampliación en el Plazo de Disponibilidad y de las Fechas de Vencimiento, así como la posibilidad a futuro de prorrogar las mismas.

(c) Que el MUTUANTE está dispuesto a aceptar la extensión del Plazo de Disponibilidad y de las Fechas de Vencimiento, sin que ello implique novación de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco y/o las Solicitudes de Desembolso derivadas del mismo y siempre que se mantengan plenamente vigentes todas y cada una de las Garantías. Asimismo, el MUTUANTE acepta la solicitud del MUTUARIO de contar con la posibilidad de prorrogar las Fechas de Vencimiento.

(d) Que es intención de las Partes modificar el Contrato Marco a fin de incluir lo expuesto precedentemente.

En mérito a las consideraciones precedentemente expuestas, las cuales forman parte integrante de la presente, las Partes suscriben la presente Quinta Enmienda al Contrato Marco (la "Quinta Enmienda"), de conformidad con las presentes Cláusulas:

1. Modificase de la **cláusula PRIMERA** del Contrato Marco las siguientes definiciones:

*"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán ser anteriores a los 18 (dieciocho) meses calculadas desde la fecha de cada Solicitud de Desembolso e indefectiblemente anteriores al 30 de Agosto de 2016.*

*"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 27 de Febrero de 2015, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO"*

*"Sumas Adeudadas": significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses y gastos administrativos que resulten aplicables, conforme el presente Contrato Marco.*

1

2.     Modifícase la **cláusula QUINTA** del Contrato Marco por la siguiente:

**_CLÁUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CRÉDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO._**

*5.1.     El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.*

*5.2 El MUTUARIO podrá optar por prorrogar la última de las Fechas de Vencimiento de cada Solicitud de Desembolso por un nuevo período de 18 (dieciocho) meses. Vencido este nuevo período podrá, nuevamente y por última vez, optar por una nueva prórroga de la última de las Fechas de Vencimiento de cada Solicitud de Desembolso_por un nuevo período de 18 meses. A los efectos de ejercer su derecho a prorrogar la última de las Fechas de Vencimiento de cada Solicitud de Desembolso por hasta un máximo de dos períodos consecutivos de 18 meses, el MUTUARIO deberá cumplir con los siguientes recaudos: (i) estar en cumplimiento de todas sus obligaciones bajo el presente Contrato Marco y que no haya acaecido un Evento de Incumplimiento, (ii) abonar la totalidad de las Sumas Adeudadas distintas a aquellas cuya Fecha de Vencimiento se pretende prorrogar, en relación a la Solicitud de Desembolso de que se trate (iii) notificar su decisión de prorrogar la última de las Fechas de Vencimiento conforme lo establecido en esta cláusula en forma fehaciente y por escrito al MUTUANTE y al FIADOR con una anticipación de al menos 45 días a la Fecha de Vencimiento, conforme modelo adjunto en **ANEXO V**, (iv) obtener del FIADOR su expreso consentimiento respecto de la prórroga de las Fechas de Vencimiento por medio del cuál el FIADOR asuma mantener la fianza aquí otorgada en toda su extensión y por el plazo prorrogado y entregar ese documento con las firmas debidamente certificadas por escribano al MUTUANTE, conforme modelo adjunto en **ANEXO V**, (v) deberá acordar con el MUTUANTE la Tasa de Descuento que será aplicable al nuevo período y los montos correspondientes a los gastos administrativos correspondientes a la misma, y (vi) deberá entregar al MUTUANTE nuevos Pagarés por las Sumas Adeudadas que incluyan el capital y todos los intereses más los gastos administrativos que resultarán aplicables durante período prorrogado, a satisfacción del MUTUANTE. Todos los recaudos antes previstos deberán estar cumplidos con anterioridad a la última Fecha de Vencimiento de cada Solicitud de Desembolso. La falta de cumplimiento de algunos de los recaudos mencionados y/o la falta de acuerdo entre el MUTUARIO y el MUTUANTE en alguna de las cuestiones que así lo requieran, incluido pero no limitado a la fijación de la Tasa de Descuento y/o los gastos administrativos a los efectos de la prórroga, no generará responsabilidad del MUTUANTE ni derecho de reclamo alguno por parte del MUTUARIO y se mantendrán los términos de las Solicitudes de Desembolso, incluido pero no limitado a las Fechas de Vencimiento originariamente previstas.*

*5.3     A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:*

*(a)     Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquellos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.*

*(b)     Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar las Sumas Adeudadas a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses excedan el monto de las Sumas Adeudadas, el excedente será transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de las Sumas Adeudadas, bajo apercibimiento de Mora.*

*(c)     Todos los fondos correspondientes a los Créditos Cedidos que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección.*

*5.4     En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.*

2



**5.5**     *Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.*

3.      En virtud de lo expuesto en la cláusula 2 precedente, las Partes acuerdan incorporar al Contrato Marco el **Anexo V.**

4.      Modifícase el apartado  9.1.10 de la **cláusula NOVENA** del Contrato Marco el cual quedará redactado de la siguiente forma:

*CLAUSULA NOVENA:   MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DEL MUTUARIO Y DEL FIADOR.*

*9.1.10.  Que el balance del MUTUARIO al 30 de Junio de 2011, los correspondientes estados de resultados y situación patrimonial, anexos y demás información allí contenida referente al MUTUARIO, de los cuales el MUTUARIO ha entregado copias al MUTUANTE debidamente firmadas por sus respectivas autoridades, representan en forma correcta la situación financiera y el resultado de las operaciones del MUTUARIO a dicha fecha, y que desde el 30 de Junio de 2009 no ha ocurrido ningún cambio adverso, ni ningún hecho que pudiera generar un cambio adverso en los negocios, operaciones, perspectivas o condición financiera del MUTUARIO; y*

5.      Las Partes acuerdan notificar la presente Quinta Enmienda al Banco de Servicios y Transacciones S.A. en su carácter de fiduciario -conforme se define en el Contrato Marco-, mediante el envío de una nota conforme el modelo que se adjunta a la presente como **Anexo B.** Dicha nota será enviada por el MUTUARIO dentro de las 48 hs de suscripta la presente y -como condición de validez de la presente Quinta Enmienda- deberá remitir al MUTUANTE una copia de dicha nota con la constancia de recepción por parte del fiduciario.

6.      En contraprestación por los costos irrogados al MUTUANTE por la aceptación de las modificaciones requeridas por el MUTUARIO y efectivamente introducidas al Contrato Marco mediante la presente enmienda, las Partes acuerdan que a partir de la presente, en cada Solicitud de Desembolso o prórroga de la última de las Fechas de Vencimiento de cada Solicitud de desembolso, se fijará un monto en concepto de gastos administrativos de 0,15% (quince centésimas por ciento) sobre el monto desembolsado o prorrogado.

7.      Con excepción de aquellos términos expresamente modificados por la presente Quinta Enmienda, todos los demás términos, condiciones y cláusulas del Contrato Marco y las Solicitudes de Desembolso remitidas y aceptadas hasta el día de la fecha permanecen inalterables, manteniendo los mismos plena vigencia.

Suscripto por el MUTUARIO en la Ciudad de Buenos Aires, República Argentina, por el FIADOR en la Ciudad de Buenos Aires, República Argentina, y por el MUTUANTE en la Ciudad de Amsterdam, a los 21 días del mes de Septiembre de 2011.

Por: SANCOR COOPERATIVAS UNIDAS LTDA.
Nombre: María Magdalena
Carácter: Apoderado

Por: IIG TOF B.V. Gawain Heijmans Ed Harzebcom
Nombre: Attorneys-in-fact
Carácter:

Por: SANCOR DO BRASIL Produtos Alimenticios Ltda.
Nombre: Mario Magdalena -Daniel Jorge Valicente
Carácter: Apoderados

Firma/s certificada/s en Foja
Nª.....................................
De. Ao...............................

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

3



# ANEXO

F 001708511

Buenos Aires, 21 de Septiembre de 2011 . En mi carácter de escribano
Titular del Registro Notarial Nº 841

CERTIFICO: Que la/s firma/s que obra/n en el
documento que adjunto a esta foja, cuyo requerimiento de certificación se
formaliza simultáneamente por ACTA número 43 del LIBRO
número 168 , es/son puesta/s en mi presencia por la/s persona/s
cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como
la justificación de su identidad. Mario César MAGDALENA, L.E. 8.106.144 y Da-
niel Jorge VALICENTE, DNI 21.050.725, quienes justifican sus identidades de
acuerdo al inciso a) del artículo 1002 del Código Civil y actúan: el señor Magda-
lena en su carácter de Apoderado de la sociedad "SANCOR COOPERATIVAS
UNIDAS LIMITADA", con domicilio en Sunchales, Provincia de Santa Fe, ins-
cripta en la Matrícula 772 del Registro Nacional de Cooperativas, de la Provincia
de Santa Fe, Departamento Castellanos, conforme lo acredita con el poder de
fecha 15 de diciembre de 2009, pasado al folio 1400 del Registro 640 de la ciu-
dad de Sunchales, Provincia de Santa Fe, a cargo de la escribana Analía Roch,
y el señor Valicente en su carácter de Apoderado de la sociedad "SANCOR DO
BRASIL Produtos Alimenticios LTDA." lo que acredita con el Poder Especial de
fecha 17 de diciembre de 2009, debidamente certificado con fecha 17 de di-
ciembre de 2009 y debidamente Autorizado por el Ministerio de Relaciones Ex-
teriores con fecha 7 de enero de 2010 y traducido con fecha 18 de enero de
2010 y legalizado bajo el número 948 de fecha 19 de enero de 2010, toda la
documentación relacionada tengo a la vista y les confiere facultades suficientes
para suscribir el documento adjunto, doy fe.-

MARTIN R. ARANA (h)
ESCRIBANO
MAT. 4370

**ANEXO A**

*Contrato Marco*



## CONTRATO DE LÍNEA DE CRÉDITO
## PARA LA PREFINANCIACIÓN DE EXPORTACIONES

Entre
**SANCOR COOPERATIVAS UNIDAS LIMITADA,** una cooperativa de primer grado, constituida y registrada bajo las leyes de la República Argentina, con domicilio en Tacuarí 202 - 3º Piso - Capital Federal, República Argentina, representada en este acto por el Sr. Mario Magdalena, en su carácter de apoderada (en adelante el "MUTUARIO"), por una parte;

**SANCOR DO BRASIL Produtos Alimenticios Ltda.,** una compañía organizada bajo las leyes de la República del Brasil, representada en este acto por los Sres. Mario Magdalena y Gabriel Gustavo Martinuzzi, en su carácter de Apoderado Gerencia Financiera y Administrador (Articulo 11º) respectivamente, domiciliada en Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República del Brasil, por otra parte, (en adelante el "FIADOR"), y

**IIG TOF B.V.,** representado por **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** representado en este acto por los Sres. _____, en su carácter de _____, domiciliado en Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (en adelante el "MUTUANTE"), por la otra parte; y

El MUTUANTE, el MUTUARIO y el FIADOR conjuntamente denominados las "Partes"; y

**CONSIDERANDO:**

(a) Que el MUTUARIO está interesado en obtener financiamiento de mediano plazo para destinarlo a la pre-financiación de sus exportaciones

(b) Que la satisfacción de la necesidad de contar con financiamiento para prefinanciar las exportaciones que el MUTUARIO tiene en la actualidad, redundará en su beneficio, permitiéndole continuar con el desarrollo y ampliación de sus mercados externos;

(c) Que el FIADOR mantiene fuertes relaciones comerciales con el MUTUARIO por lo cual está interesado en afianzar las obligaciones de éste último a fin de que pueda obtener la financiación antes referida,

(d) Que por las razones indicadas en el Considerando (b), y además, para facilitar el otorgamiento de un préstamo desde el punto de vista del riesgo crédito, el MUTUARIO está dispuesto a afectar bienes para garantizar el repago del crédito para prefinanciar sus exportaciones;

(e) Que el MUTUANTE está dispuesto a otorgar una línea de

## PRE EXPORT FINANCE CREDIT FACILITY AGREEMENT

Entered into by and between:
**SANCOR COOPERATIVAS UNIDAS LIMITADA,** a company store of first degree, constituted and registered under the laws of the Argentine Republic, with domicile at Tacuarí 202, 3º floor, Capital Federal, República Argentina, represented herein by Mr. Mario Magdalena, as representative (hereinafter referred to as the "BORROWER"), and

**SANCOR DO BRASIL Productos Alimenticios Ltda.,** a corporation registered under the laws of the Brazilian Republic, represented herein by Mr. Mario Magdalena and Gabriel Gustavo Martinuzzi, as Attorney-in-Fact, Financial Manager and Administrator (section 11º) respectively, with domicile at Barueri, Estado de Sao Paulo, na Alameda Araguaia, Nro. 933, Sala 91/92, Alphaville – CEP 06455-000, República de Brasil, (hereinafter referred to as the "SURETY"), and

**IIG TOF B.V.,** respresented by **TRUST INTERNATIONAL MANAGEMENT (T.I.M.) B.V.,** respresented herein by Mr. _____ and _____, as _____, with domicile at Telestone 8 – Teleport, Naritaweg 165, P.O. Box 7241, 1007 JE Amsterdam, The Netherlands, (hereinafter referred to as the "LENDER"), and

The BORROWER, the LENDER and the SURETY jointly named as the "Parties"; and

**WHEREAS:**

(a) That the BORROWER is interested in obtaining mid term financing in order to appoint it to pre-finance its exportations.

(b) That the satisfaction and the need to obtain a financing to pre-finance the export that the BORROWER currently has, will benefit him, granting him to continue with the development and extension of its external markets;

(c) That the SURETY maintains strong commercial relationships with the BORROWER, reason why is interested to guarantee the obligations of the last mentioned in order for it to obtain the financing previously referred to;

(d) That for the reasons indicated in (b) above, and algo, to facilitate the granting of the loan from the perspective of the credit risk, the BORROWER is willing to affect some assets/goods to warranty the repayment of the credit to pre-finance its exports;

(e) That The LENDER is willing to grant a credit facility

crédito de hasta Dólares Estadounidenses cincuenta millones con 00/100 (US$ 50.000.000,00) . para el MUTUARIO, sujeto a los términos y condiciones del presente Contrato, en la medida que y siempre y cuando: (i) el MUTUARIO y el FIADOR se obliguen solidariamente a su repago y al cumplimiento de todas las obligaciones asumidas bajo el Contrato Marco; (ii) que las Garantías (conforme se las define más adelante) se mantengan plenamente vigentes y exigibles hasta la expiración del Contrato, y (iii) se otorgue y perfeccione el Fideicomiso y la cesión de los Créditos Cedidos (tal como se los define más adelante).

En mérito a las consideraciones precedentemente establecidas, se celebra el presente contrato de línea de crédito, sujeto a las siguientes cláusulas y condiciones:

## PRIMERA:       DEFINICIONES.

"Afiliadas" significa las compañías controladas por y/o controlantes de y/o de propiedad común del MUTUARIO y/o del FIADOR.

"Arthur Schuman": significa ARTHUR SCHUMAN, INC., una firma organizada bajo las leyes del Estado de New Jersey, Estados Unidos de Norteamérica, con domicilio en 40 New Dutch Lane, Fairfield, NJ 07004 USA

"BARIVEN c/o PDVSA": significa Bariven S.A., c/o PDVSA Services, Inc., una firma organizada bajo las leyes del Estado de Texas, Estados Unidos de Norteamérica, con domicilio en 1293 Eldrige Parkway, Houston, Texas (77077), Estados Unidos de Norteamérica.

"Bien/es Fideicomitido/s" significa los "Créditos Cedidos" conforme este término está definido en el Fideicomiso.

"Cambio Material Adverso" significa cualquier cambio sustancial desfavorable en la situación económica, comercial, financiera, operativa, patrimonial o de cualquier otra índole del MUTUARIO y/o del FIADOR y/o sus Afiliadas y/o del MUTUANTE, o de sus proyecciones, considerados en conjunto, o en la política económico financiera y tributaria de la República Argentina o de los Estados Unidos de América, o que ocurriera cualquier hecho que, a criterio razonable del MUTUANTE, hiciera variar sustancialmente las condiciones de mercado imperantes a la fecha de celebración del presente Contrato Marco (incluyendo sin limitación cualquier suspensión, condonación o limitación al cumplimiento de las obligaciones dinerarias bajo facilidades financieras y/o de comercio exterior y/o de otro tipo, cualquier declaración de cesación de pagos en la República Argentina o en cualquier otro mercado financiero y de valores, el inicio de una guerra, de agresiones armadas, o de cualquier otro tipo de crisis nacional o internacional directa o indirectamente relacionada con la República Argentina); o que ocurriera un acontecimiento que en opinión del MUTUANTE diera motivo razonable para suponer que el MUTUARIO y/o el

of up to  Fifty Million United States Dollars and 00/100 (US$ 50,000,000.00) to the BORROWER, subject to the terms and conditions of this Master Agreement, to the extent and provided that: (i) the BORROWER and the SURETY become jointly and severally bound to repay the same and to comply with all the obligations undertaken under the Agreement; (ii) the Guarantees (as defined hereinbelow) are maintained in full force and effect and enforceable up to the termination of the Agreement; and (iii) the Parties grant and perfect the assignment of the Assigned Credits (as they are defined hereinafter).

By virtue of the aforesaid considerations, this credit facility agreement is executed pursuant to the following terms and conditions:

## SECTION ONE: DEFINITIONS.

"Affiliates" means the subsidiary corporations and/or holding corporations and/or companies commonly owned by the BORROWER and/or the SURETY.

"Artur Schuman" means ARTHUR SCHUMAN, INC., a corporation organized and registered under the laws of the Estate of New Jersey, United States, with domicile at 40 New Dutch Lane, Fairfield, NJ 07004 USA.

"BARIVEN c/o PDVSA" means Bariven S.A., c/o PDVSA Services Inc., a corporation organized and registered under the laws of the Estate of Texas, United States of America, with domicile at 1293 Eldrige Parkway, Huston, Texas (77077), United States of America.

"Trusted Asset/s" means the "Assigned Credits" as the term is defied in the Trust.

"Material Adverse Change" means any material unfavorable change in the economic, commercial, financial or operating situation or financial position or of any other kind of the BORROWER and/or the SURETY and/or their Affiliates and/or the LENDER, or their projections, taken as a whole, or in the economic, financial and tax policy of the Republic of Argentina or the United States of America, or the occurrence of any event that, at the LENDER 's reasonable criterion, materially changes the prevailing market conditions as of the date of execution hereof (including, without limitation, any suspension, release or limitation to the compliance with monetary obligations under financial facilities and/or foreign trade and/or of any other kind, any payment suspension declaration in the Republic of Argentina or in any other financial or exchange market, the commencement of war, armed assaults, or any other type of national or international crisis directly or indirectly related to the Argentine Republic); or the occurrence of any event which in the LENDER 's opinion gives reasonable grounds to presume that the BORROWER and/or the SURETY will not be able to regularly fulfill or comply with their obligations hereunder; or

FIADOR no podrán cumplir u observar normalmente sus obligaciones bajo el presente Contrato Marco; o cualquier variación en el tipo de cambio Peso Argentino/Dólar Estadounidense o cualquier suspensión en los mercados de cambio de la República Argentina y/o Estados Unidos de América.

"Condiciones Precedentes" significan las condiciones precedentes para la entrada en vigencia del Contrato Marco, previstas en la Cláusula SEGUNDA.

"Contrato Marco" significa el presente contrato de línea de crédito suscrito entre las Partes.

"Crédito/s Cedido/s" significa los siguientes créditos del MUTUARIO contra los Deudores Cedidos:

(i) todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Fonterra y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Fonterra.

(ii) todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a BARIVEN c/o PDVSA y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con BARIVEN c/o PDVSA.

(iii) todos los créditos actuales y futuros que le correspondan al MUTUARIO en virtud de las ventas de mercadería que el MUTUARIO realice a Arthur Schuman y/o sus Afiliadas y/o subsidiarias, entre el 21 de Diciembre de 2009 y hasta la cancelación total de la Línea de Crédito Adeudada, incluyendo todos los derechos crediticios derivados de los conocimientos de embarque, remitos, facturas y demás documentos emitidos en virtud de las operaciones de venta que el MUTUARIO celebre con Arthur Schuman.

"Cuenta del Mutuante" significa la cuenta bancaria de titularidad del MUTUANTE cuyos datos se detallan a continuación:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |

any significant variation in the Peso Argentino/United States Dollar exchange rate, or any suspension in the foreign exchange markets of the Republic of Argentina and/or the United States of America that produce a Material Adverse Effect.

"Conditions Precedent" means the conditions precedent for the effectiveness of the Master Agreement, set forth in Section TWO.

"Master Agreement" means this credit facility agreement executed between the Parties.

"Assigned Credit/s" means the following credits of the BORROWER against the Assigned Debtors:

(i) means all the actual and future credit rights corresponding to the BORROWER over the commercial transactions of sales of goods that the BORROWER executes to Fonterra and/or their Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Fonterra.

(ii) means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to BARIVEN c/o PDVSA and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with BARIVEN c/o PDVSA.

(iii) means all the actual and future credits rights corresponding to the BORROWER over the commercial transactions of sales god that the BORROWER executes to Arthur Schuman and/or its Affiliates and/or subsidiaries, in between December 21, 2009 and until the total cancellation of the Credit Line owed, including all credit rights resulting from the bills of lading, delivery notices, invoices and other documents issued under the sales transactions the BORROWER executes with Arthur Schuman.

"Lender's Account" means the LENDER's bank account, the data of which is detailed hereinafter:

| | |
|---|---|
| Bank: | State Street bank & Trust Boston, MA |
| ABA#: | 011-000-028 |
| SWIFT: | SBOSUS33 |
| Credit: | WMS Cash DDA |
| Account #: | 17039843 |
| Further Credit: | IIG TOF B.V – Sancor CUL |
| Account #: | 02030-8420148 |

"Cuenta del Mutuario" significa la cuenta bancaria de titularidad del MUTUARIO cuyos datos se detallan a continuación o la que el MUTUARIO indique al MUTUANTE en forma fehaciente:

"Borrower's Account" means the BORROWER's bank account, the data of which is detailed below or that that may be informed by the BORROWER in an evidencing way:

| | | | |
|---|---|---|---|
| BANCO: | Citibank N.A. | BANK: | Citibank N.A. |
| DIRECCIÓN: | New York, U.S.A. | ADDRESS: | New York, U.S.A. |
| ABA: | 021000089 | ABA: | 021000089 |
| SWIFT: | CITIUS33 | SWIFT: | CITIUS33 |
| Cuenta Nro.: | 36976697 | Account #: | 36976697 |
| A NOMBRE DE: | Banco Comafi S.A., Buenos Aires, Argentina | ON BEHALF OF: | Banco Comafi S.A., Buenos Aires, Argentina |
| SWIFT: | QUILARBA | SWIFT: | QUILARBA |
| CHIPS: | UID 320011 | CHIPS: | UID 320011 |
| A FAVOR DE: | SanCor Cooperativas Unidas Limitada | IN FAVOR OF: | SanCor Cooperativas Unidas Limitada |
| CUENTA Nº: | 000-0-129785 | ACCOUNT #.: | 000-0-129785 |
| REFERENCIA: | Prefinanciación de Exportación | REFERENCE: | Prefinanciación de Exportación |

"Deudor/es Cedido/s" significa Arthur Schuman y/o Fonterra y/o BARIVEN c/o PDVSA.

"Assigned Debtors" means Arthur Schuman and/or Fonterra and/or BARIVEN c/o PDVSA.

"Documentos de la Operación" significa el presente Contrato Marco, las Solicitudes de Desembolso derivadas del mismo, los Pagarés, el Fideicomiso, los Warrants y los contratos u órdenes de compra que causan los Créditos Cedidos.

"Transaction Documents" means this Master Agreement, the Requests for Disbursement resulting therefrom, the Promissory Notes, the Trust, the Warrants and the agreements or purchase orders that cause the Assigned Credits.

"Dólares" y "US$" significa Dólares Estadounidenses billete o transferencia.

"Dollars" and "USD" means United States Dollars, in cash or through a bank transfer.

"Efecto Material Adverso" significa un efecto material adverso en (i) el negocio, los activos, operaciones o condición (financiera o de cualquier otro tipo) del MUTUARIO y/o del FIADOR y/o sus Afiliadas o de las otras partes de los Documentos de la Operación (incluyendo el MUTUANTE), o (ii) la validez o cumplimiento de los Documentos de la Operación, o (iii) los derechos y beneficios conferidos al MUTUANTE en los Documentos de la Operación.

"Material Adverse Effect" means a material adverse effect in (i) the business, assets, transactions or condition (financial or of any other nature) of the BORROWER and/or the SURETY and/or its Affiliates or the other parties of the Transaction Documents (including the LENDER), or (ii) the validity or performance of the Transaction Documents, or (iii) the rights and benefits granted to the LENDER in the Transaction Documents.

"Evento de Incumplimiento" significa cualquiera de los eventos, condiciones o circunstancias enumeradas en la cláusula DECIMA, Sección 10.1 y 10.2 del Contrato Marco; y/o cualquier incumplimiento de las obligaciones establecidas en el Contrato Marco; y/o cualquier Evento de Incumplimiento conforme se define en el Fideicomiso.

"Event of Default" means any event, condition or circumstance mentioned in, Section Ten, 10.1 and 10.2 of the Master Agreement; and/or any non-compliance of the obligations set forth in the Master Agreement; and/or any Event of Default in agreement with what is foreseen in the Trust.

"Fecha/s de Vencimiento" significa las fechas de vencimiento para el pago de las Sumas Adeudadas indicadas en cada una de las Solicitudes de Desembolso. Las Fechas de Vencimiento deberán indefectiblemente ser anteriores a los 24 (veinticuatro) meses calculadas desde la fecha de cada Solicitud de Desembolso.

"Due Date/s" means the due date for the payment of the Due Sums indicated in each of the Requests for Disbursement. The Due Dates shall be previous to 24 (twenty four) months of the date of each Disbursement Request.

"FIADOR" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"SURETY" has the meaning indicated in the introduction of this Master Agreement.

"Fideicomiso" es la propuesta de cesión fiduciaria y fideicomiso con fines de garantía suscripta en el día de la fecha por el MUTUARIO en carácter de potencial fiduciante, a efectos de ser remitida al Banco de Servicios y Transacciones S.A. como potencial fiduciario y al MUTUANTE como potencial beneficiario, en virtud de la cual, el MUTUARIO –a efectos de garantizar el cumplimiento de las obligaciones del presente Contrato Marco- transfiere los Bienes Fideicomitidos para que el potencial fiduciario, una vez aceptada la propuesta, los administre de conformidad con lo allí dispuesto, cuyo modelo se adjunta como Anexo I al presente Contrato Marco.

"Fonterra": significa FONTERRA LIMITED, una firma organizada bajo las leyes de Nueva Zelanda, con domicilio en Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Garantías" significa los Pagarés, el Fideicomiso, los Warrants y la cesión de los Créditos Cedidos.

"Línea de Crédito" significa la única línea de crédito, que, sujeto a los términos y condiciones de los Documentos de la Operación, el MUTUANTE pondrá a disposición del MUTUARIO, por hasta el monto total y máximo de Dólares Estadounidenses CINCUENTA millones con 00/100 (US$ 50.000.000,00).

"Línea de Crédito Adeudada" significa la sumatoria de todas las Sumas Adeudadas por el MUTUARIO bajo la Línea de Crédito incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Mora" significa cualquier evento o condición que constituya un Evento de Incumplimiento, ocasionando los efectos establecidos en la cláusula DECIMA del presente Contrato Marco.

"MUTUANTE" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"MUTUARIO" tiene el significado indicado en el encabezamiento del presente Contrato Marco.

"Normas Aplicables" son todas las normas nacionales, provinciales o municipales, presentes y/o futuras, aplicables a la actividad y los negocios del MUTUARIO.

"Partes" significa conjuntamente el MUTUARIO, el FIADOR y el MUTUANTE.

"Pagaré/s" significa los pagarés librados por el MUTUARIO y avalados por el FIADOR, a favor del MUTUANTE, de conformidad con el formato adjunto al Contrato Marco como Anexo II, por un monto equivalente a la Suma Adeudada en cada Solicitud de Desembolso, conforme lo establecido en la Cláusula TERCERA del Contrato Marco.

"Pesos" moneda de curso legal en la República Argentina.

"Plazo de Acreditación" significa el plazo de tres (3) Días

"Trust" is the proposal for the fiduciary assignment and trust with a guaranty purpose executed on the date hereof by the BORROWER in its capacity of potential Trustor, so as to be sent to the Banco de Servicio y Transacciones S.A. as potential Trustee, and the LENDER as potential beneficiary, by virtue of which, the BORROWER – in order to grant the compliance with the obligations of this Master Agreement – shall transfer the Trust Assets so that the potential Trustee once the proposal is accepted can administer them in agreement with what is therein established, which model is attached herein as Annex I to this Master Agreement.

"Fonterra" means FONTERRA LIMITED, a company existing under the laws of New Zealand, with domicile at Fonterra Centre, 9 Princess Street, Auckland, New Zealand.

"Guarantees" means the Promissory Notes, the Trust, the Warrants and the assignment of the Assigned Credits.

"Credit Facility" means the unique Credit Facility, that, subject to the terms and conditions of the Transaction Documents, the LENDER shall make its best efforts so as to grant it to the BORROWER, for up to the total maximum amount of Fifty Million United States Dollars and 00/100 (U$S 50,000,000.00).

"Indebted Credit Facility" means the sum up of all the Sums Due by the BORROWER under the Credit Facility including all interests applicable in accordance with this Master Agreement.

"Default" means the any event or condition that constitute an Event of Default, causing the effects set forth in Section TEN hereof.

"LENDER" has the meaning given in the first paragraph hereof.

"BORROWER" has the meaning given in the first paragraph hereof.

"Applicable Rules" means all present and/or future, national, provincial or municipal rules applicable to the activities and the business of the BORROWER.

"Parties" means jointly the BORROWER, the SURETY and the LENDER.

"Promissory Note/s" means the promissory notes delivered by the BORROWER and guaranteed by the SURETY, in favor od the LENDER, in agreement with the format attached to this Master Agreement as Annex II, for an amount equivalent to the Due Amount in each Disbursement Request, in agreement with what is established in Section THIRD of the Master Agreement.

"Pesos" means the legal currency in the Argentine Republic.

"Crediting Term" means the term of three (3) Business Days as

Hábiles contados desde la fecha de recepción efectiva de la Solicitud de Desembolso.

"Plazo de Confirmación" significa el plazo de cinco (5) días hábiles contados a partir de la fecha de acreditación de los fondos requeridos en la Cuenta del Mutuario, conforme una Solicitud de Desembolso.

"Plazo de Disponibilidad" significa el plazo fijado exclusivamente en beneficio del MUTUANTE, que transcurre desde la fecha del Contrato Marco hasta el 31 de Diciembre de 2010, durante el cual el MUTUANTE se compromete a mantener disponible la Línea de Crédito a favor del MUTUARIO.

"Solicitud de Desembolso" significa el formulario sustancialmente idéntico al que se adjunta al presente en Anexo III, completo con todos los datos debidamente consignados, que el MUTUARIO deberá suscribir, con la firma de sus apoderados o representantes legales certificada ante escribano público.

"Suma/s Adeudada/s" significa los fondos que el MUTUARIO debe restituir en pago al MUTUANTE bajo cada Solicitud de Desembolso incluyendo todos los intereses que resulten aplicables, conforme el presente Contrato Marco.

"Tasa de Descuento" significa la tasa de interés anual de descuento a ser pactada por las Partes en cada Solicitud de Desembolso, que el MUTUANTE aplicará a cada desembolso de fondos que el MUTUARIO le solicite para calcular el monto de las Sumas Adeudadas.

Warrants: significa los warrants emitidos conforme la Ley 9643 de la República Argentina, correspondientes a certificados de depósito de mercadería de propiedad del MUTUARIO u otra mercadería a satisfacción del MUTUANTE, endosados por el MUTUARIO a favor del MUTUANTE por los montos y en las condiciones establecidos en la Cláusula SEPTIMA del presente Contrato Marco en garantía del cumplimiento de las obligaciones asumidas por el MUTUARIO bajo el Contrato Marco.

## CLAUSULA SEGUNDA: LA LINEA DE CREDITO.

### 2.1. Disponibilidad de la Línea de Crédito.

(a) Disponibilidad Condicionada. Sujeto al cumplimiento específico de cada una y todas las Condiciones Precedentes, o a que el MUTUANTE dispense expresamente y por escrito el cumplimiento de una o todas las Condiciones Precedentes, sin estar obligado a ello bajo ninguna circunstancia, el MUTUANTE se compromete durante el Plazo de Disponibilidad, a mantener disponible la Línea de Crédito a favor del MUTUARIO, la que podrá ser utilizada exclusivamente para la prefinanciación de exportaciones del MUTUARIO, en la medida de las respectivas Solicitudes de Desembolso, conforme las condiciones y el procedimiento que se establece en este Contrato Marco.

from the effective date of receipt of the Request for Disbursement.

"Confirmation Term" means the term of five (5) Business Days as from the date the required funds are credited in BORROWER's Account, pursuant to a Request for Disbursement.

"Availability Term" is the term fixed exclusively to the benefit of the LENDER, as from the date of the Master Agreement until December 31, 2010, during which period the LENDER undertakes to make their best efforts to maintain the Credit Facility available in favor of the BORROWER.

"Request for Disbursement /Disbursement Request" is the form substantially identical to the one attached hereto as Annex III, complete with all data duly stated, to be executed by the BORROWER with the signature of its attorneys-in-fact or legal representatives certified by a notary public.

"Sum/s Due" means the funds to be given by the BORROWER as payment to the LENDER under each Request for Disbursement including any applicable interest until the capital repayment, as per this Master Agreement.

"Discount Interest Rate" means the annual discount interest rate to be agreed between the Parties under each Request for Disbursement, that the LENDER will apply to each funds disbursement that the BORROWER requires to calculate the amount of the Sums Due.

"Warrants" means the warrants issued in agreement with Section 9643 of the Argentine Republic, corresponding to certificates of the deposit of merchandise property of the BORROWER or other merchandise at LENDER's satisfaction, endorsed by the BORROWER in favor of the LENDER for the amounts and in the conditions established n Section SEVEN of this Master Agreement in warranty of the fulfillment of obligations undertaken by the BORROWER under this Master Agreement.

## SECTION TWO: THE CREDIT FACILITY.

### 2.1 Availability of the Credit Facility.

(a) Conditional Availability. Subject to the punctual fulfillment of each and every of the Precedent Conditions, or to the fact that the LENDER expressly releases in writing the compliance with all and each of the Conditions Precedent, without being required to do so under no circumstance, the LENDER undertakes to make the Credit Facility available to the BORROWER during the Availability Term, which may be used to finance the BORROWER's exports, pursuant to the conditions and procedure set forth in this Master Agreement.

**(b) Vigencia.** Una vez expirado el Plazo de Disponibilidad, cesará automática e irrevocablemente –sin necesidad de notificación judicial o extrajudicial alguna- el derecho del MUTUARIO de remitir cualquier Solicitud de Desembolso al MUTUANTE, salvo que el Plazo de Disponibilidad sea prorrogado expresamente y por escrito por el MUTUANTE, a su exclusiva satisfacción, y tal decisión sea fehacientemente notificada al MUTUARIO en tiempo hábil.

**(b) Effectiveness.** Once the Availability Term has expired, the BORROWER's right to send to the LENDER any Request for Disbursement will automatically and irrevocably cease – without any prior judicial or extrajudicial notice - unless the Availability Term is expressly extended in writing by the LENDER, to its sole satisfaction, and such decision is sufficiently notified to the BORROWER in due time.

**(c) Monto de los Desembolsos.** El MUTUARIO podrá requerir los desembolsos que estime conveniente de acuerdo a sus necesidades hasta que la sumatoria total de los montos consignados en las respectivas Solicitudes de Desembolso alcancen el monto de la Línea de Crédito; en consecuencia, en ningún caso y bajo ningún supuesto, el MUTUANTE estará obligado, ni se podrá interpretar que esté obligado, a desembolsar una suma mayor a o por encima de la Línea de Crédito.

**(c) Amount of Disbursements.** The BORROWER may require the disbursements it deems appropriate according to its needs until the aggregate of the amounts stated in the relevant Requests for Disbursement reach the amount of the Credit Facility; consequently, in no case and event will the LENDER be bound, or may be interpreted to be bound, to disburse an amount higher than or exceeding the Credit Facility.

**2.2.** <u>Condiciones Precedentes al otorgamiento de la Línea de Crédito.</u>

**2.2** <u>Conditions Precedent to the Granting of the Credit Facility.</u>

La validez y vigencia de la Línea de Crédito otorgada por el MUTUANTE bajo el presente Contrato Marco está condicionada a que, a criterio razonable del MUTUANTE, (i) se cumplan y mantengan plenamente vigentes a la firma del presente Contrato Marco, todas y cada una de las siguientes Condiciones Precedentes, estipuladas en beneficio exclusivo del MUTUANTE y/o (ii) el MUTUANTE dispense en forma expresa y por escrito, una, algunas o todas las Condiciones Precedentes:

The validity and effectiveness of the Credit Facility granted by the LENDER under the Master Agreement is subject to the fact that, at the LENDER'S reasonable discretion, (i) all and each of the following Conditions Precedent, set forth for LENDER'S exclusive benefit, take place and remain fully effective as of the execution of this Master Agreement and until its termination, and/or (ii) the LENDER expressly excludes in writing one, any or all the Conditions Precedent:

**(a) Aprobaciones Societarias.** copia certificada por escribano público del poder general del MUTUARIO del cual surja que el/ los firmantes apoderados para la suscripción de los Documentos de la Operación se encuentran suficientemente facultados para dicho acto; y

**(a)** <u>Corporate Approvals.</u> a copy certified by a notary public of the general power of attorney of the BORROWER , evidencing that the persons authorized to sign the Transaction Documents are fully empowered therefore.

**(b)** <u>Vigencia de las Manifestaciones y Declaraciones del MUTUARIO.</u> Que se encuentren en plena vigencia y continúen siendo ciertas, correctas y verdaderas, todas y cada una de la manifestaciones y declaraciones efectuadas por el MUTUARIO en la Cláusula NOVENA del Contrato Marco, y

**(b)** <u>Effectiveness of the Representations and Statements by the BORROWER and the SURETY.</u> That all and each of the representations and statements made by the BORROWER and/or the SURETY in Section NINE of the Master Agreement are fully effective, remain being accurate, correct and true;

**(c)** <u>Inexistencia de Cambios Materiales Adversos, Efectos Materiales Adversos o Supuestos de Incumplimiento.</u> Que no hubiere ocurrido y/o no se encontrare vigente, ni hubiere elementos fundados para prever el acaecimiento de uno o más Cambios Materiales Adversos, Efectos Materiales Adversos y/o de los Eventos de Incumplimiento (hubiere o no sido declarada la caducidad y aceleración de plazos), y que no hubiere ocurrido en conocimiento del MUTUARIO ninguna circunstancia que de cualquier forma hiciere peligrar, menoscabare o debilitare la plena vigencia, validez, plenitud, alcance, ejecutabilidad y/u oponibilidad frente a terceros de los Documentos de la Operación y de las Garantías, y

**(c)** <u>Non-existence of Material Adverse Changes, Material Adverse Effects or Events of Default.</u> That no grounded elements have neither occurred and/or continue, or exist to foresee the occurrence of one or more Material Adverse Changes, Material Adverse Effects and/or Events of Default (should the lapse and acceleration of terms have been declared or not), and no circumstance known by the BORROWER has occurred that in any way may endanger, undermine or weaken the full effectiveness, validity, full force and effect, scope, enforcement and/or opposition against third parties of the Transaction Documents and Guarantees,

**(d)** <u>Notificación a los Deudores Cedidos.</u> Que el MUTUARIO

**(d)** <u>Notification to the Assigned Debtors:</u> That the BORROWER

haya notificado a los Deudores Cedidos las cesiones de los Créditos Cedidos en los términos establecidos en la Sección 4.6 del presente Contrato Marco; a cuyo efecto el MUTUARIO deberá entregar al MUTUANTE el original de tales notificaciones recibidas y aceptadas por los Deudores Cedidos.

(e) **Constitución del Fideicomiso.** Como condición previa e ineludible al otorgamiento de la Línea de Crédito, el MUTUARIO deberá haber constituido en legal forma el Fideicomiso de cesión de cobranzas, conforme lo establecido en el Fideicomiso, a favor del MUTUANTE.

**CLÁUSULA TERCERA: CONDICIONES PRECEDENTES PARA EL DESEMBOLSO.·**

**3.1. Solicitud de Desembolso.** A fin de solicitar al MUTUANTE un desembolso bajo la Línea de Crédito, el MUTUARIO deberá enviar por medio fehaciente y a satisfacción del MUTUANTE:

(i) el original de la Solicitud de Desembolso debidamente completada y firmada por el representante legal del MUTUARIO y del FIADOR o apoderados con facultades suficientes, con su firma certificada por escribano público argentino; cada Solicitud de Desembolso deberá indefectiblemente contener el monto del desembolso requerido, la/s Fecha/s de Vencimiento del mismo y las Sumas Adeudadas que deberá pagar al MUTUANTE en tal/es Fecha/s de Vencimiento;

(ii) un Pagaré por un monto equivalente a las Sumas Adeudadas, debidamente suscripto por el representante legal del MUTUARIO o apoderados con facultades suficientes y avalado por el FIADOR, a plena satisfacción del MUTUANTE, con las firmas debidamente certificadas por un escribano público argentino; y

(iii) los Warrants debidamente endosados por el MUTUARIO, de conformidad con lo establecido en la Cláusula SEPTIMA del presente Contrato Marco, con fecha de vencimiento anterior a la última Fecha de Vencimiento de las consignadas en la Solicitud de Desembolso, con firma certificada por escribano público argentino, a satisfacción del MUTUANTE, representativos de mercaderías a satisfacción del MUTUANTE y por un valor también a satisfacción del MUTUANTE;

**3.2. Falta de Responsabilidad por Desembolsar o No Desembolsar.** Sin perjuicio de lo dispuesto en la presente Cláusula, el MUTUANTE no tendrá responsabilidad de ningún tipo frente al MUTUARIO, por aceptar o rechazar cualquier Solicitud de Desembolso efectivamente recibida del MUTUARIO, -siempre que el rechazo sea con causa y por consiguiente, el MUTUARIO renuncia expresa e irrevocable a promover algún reclamo contra el MUTUANTE fundado en tal

has notified to the Assigned Debtors all the assignments of the Assigned Credits in the terms established in section 4.6 of this Master Agreement, to which effect the BORROWER shall deliver to the LENDER the original of such received and accepted notifications by the Assigned Debtors.

(e) **Trust Constitution:** As a previous and unavoidable condition for the granting of the Credit Line, the BORROWER must have constituted in legal war the Trust of assigns recover, in agreement with what is established in the Trust, in favor of the LENDER.

**SECTION THREE: CONDITIONS PRECEDENT FOR DISBURSEMENTS.**

**3.1 Request for Disbursement.** In order to request the LENDER a disbursement under the Credit Facility, the BORROWER must send by self-probatory means and to LENDER'S satisfaction:

(i) the original of the Request for Disbursement duly filled out and signed by the legal representatives or attorney's in fact of the BORROWER and the SURETY duly empowered therefore, with their signatures certified by an Argentine notary public; each Request for Disbursement shall invariable contain the requested disbursement amount, the Due Dates, and the Sums Due that the it will have to pay to the LENDER in such Due Dates;

(ii) a Promissory Note for the Sums Due, duly signed by the legal representatives or attorney-in-fact of the BORROWER and or representatives duly empowered therefore and by the SURETY, at LENDER's entire satisfaction, with the signatures duly certified by an Argentine notary public;

(iii) the Warrants duly endorsed by the BORROWER, in agreement with what is established in Section SEVEN of this Master Agreement, with due date previous to the last Due Date of the ones established in the Request for Disbursement, with their signatures certified by an Argentine notary public, at satisfaction of the LENDER, representative of merchandise at satisfaction of the LENDER and also for an amount at satisfaction of the LENDER.

**3.2 Lack of Liability for Making a Disbursement or Not.** Notwithstanding the provisions of this Section, the LENDER shall not have any liability whatsoever to the BORROWER for accepting or rejecting any Request for Disbursement effectively received from the BORROWER.- always that the rejection in with cause- and, therefore, the BORROWER expressly and irrevocably waives to file any claim against the LENDER based upon such circumstance or cause.

circunstancia o causa.

**3.3. Trámite posterior. Desembolso.** Una vez recibidos los documentos de la Solicitud de Desembolso por el MUTUANTE, el MUTUANTE procederá a verificar, a su exclusiva discreción, que toda la información y documentación en ellos contenida sea correcta y conforme al Contrato Marco. Ello no obstante, el MUTUANTE no está obligado a realizar una auditoría legal o *due diligence* de los documentos de la Solicitud de Desembolso y por consiguiente, no será responsable por la falsedad, inexactitud, omisión y/o falta de genuinidad de la misma. Sin perjuicio de ello, de estar éste de acuerdo, a su satisfacción, con los documentos de la Solicitud de Desembolso, el MUTUANTE procederá, a su exclusiva discreción y satisfacción y aún sin estar obligado a ello bajo los Documentos de la Operación, a desembolsar y depositar los fondos solicitados en la Cuenta del Mutuario dentro del Plazo de Acreditación. La aceptación por el MUTUANTE de una Solicitud de Desembolso no lo obliga a aceptar cualquier otra Solicitud de Desembolso –siempre que el rechazo sea con causa- que el MUTUARIO le pueda presentar en forma simultánea o ulteriormente a aquélla.

**3.4. Confirmación.** Dentro del Plazo de Confirmación, el MUTUARIO deberá indefectiblemente remitir por medio fehaciente al MUTUANTE una nota confirmando la recepción de tales fondos. Sin perjuicio de ello, aun en el supuesto de que el MUTUANTE no remitiese la nota de confirmación antes referida, la falta de reclamo fehaciente del MUTUARIO dentro del plazo de cinco (5) días corridos contados desde la finalización del Plazo de Acreditación implicará la conformidad del MUTUARIO con el desembolso depositado en la Cuenta del Mutuario.

**3.5. Facultad Exclusiva del MUTUANTE.** En el caso en que, a exclusivo criterio del MUTUANTE, durante el Plazo de Disponibilidad ocurriera cualquier Cambio Material Adverso o Efecto Material Adverso, el MUTUANTE podrá suspender inmediatamente la tramitación de cualquier Solicitud de Desembolso cursada de conformidad con el Contrato Marco, que esté siendo verificada y evaluada por aquél, así como cualquier desembolso de fondos correspondiente a una Solicitud de Desembolso aprobada por el MUTUANTE pero cuyos fondos no hayan sido efectivamente acreditados en la Cuenta del Mutuario, sin que tal decisión genere responsabilidad alguna al MUTUANTE, renunciando en consecuencia el MUTUARIO a promover cualquier acción por responsabilidad fundada en tal causa. Ello, sin perjuicio de la facultad del MUTUANTE de dar por terminado el Contrato en tal supuesto, de conformidad con lo establecido en la cláusula DECIMA del presente Contrato.

**3.6. Devolución al MUTUARIO de los Créditos Cedidos. Notificación a los Deudores Cedidos.** Una vez cancelada en su totalidad la Línea de Crédito Adeudada por el MUTUARIO y dentro de las 48 hs. de sucedido ello, el MUTUANTE se obliga a notificar a cada Deudor Cedido que ha quedado sin efecto la cesión del Crédito Cedido por lo que a partir de la recepción de

**3.3 Subsequent Proceeding. Disbursement.** Once the documents of the Request for Disbursement have been received by the LENDER, it will proceed to verify, that all the information and documents contained therein are, at its own criterion, accurate and in accordance with the Master Agreement. Notwithstanding that, the LENDER is not obliged to perform a legal audit or due diligence of the Documents of the Request for Disbursement and, therefore, it will be not responsible for any misrepresentation, inaccuracy, omission and/or lack of genuineness thereof. Notwithstanding the aforesaid, if the LENDER agrees, to its satisfaction, with the Documents of the Request for Disbursement, the LENDER shall, at its own discretion and to its own satisfaction, and even without being bound thereto under the Transaction Documents, to disburse the requested funds in the BORROWER's Account within the Crediting Term. The LENDER'S acceptance of a Request for Disbursement does not bind it to accept any other Request for Disbursement that the BORROWER may submit to it simultaneously or thereafter – always that the rejection is with cause.

**3.4 Confirmation.** Within the Confirmation Term, the BORROWER must necessarily send to the LENDER a note confirming the receipt of such funds by self-probatory means. Notwithstanding the aforesaid, even in the event that the BORROWER fails to send the confirmation note mentioned above, the lack of claim by the BORROWER by self-probatory means within a term of five (5) calendar days as from the completion of the Crediting Term shall imply the conformity of the BORROWER to the disbursement deposited in the BORROWER's Account.

**3.5 LENDER'S Exclusive Power.** Should, at the LENDER'S exclusive discretion, during the Availability Term any Material Adverse Change or Material Adverse Effect occur, the LENDER may immediately interrupt the proceedings of any Request for Disbursement filed according to the Master Agreement, which is being reviewed and evaluated by such LENDER, as well as any disbursement of funds corresponding to a Request for Disbursement approved by the LENDER but which funds have not been actually credited in BORROWER's Account, without giving rise to any responsibility for the LENDER. Consequently, the BORROWER waives to file any action for responsibility grounded on such reason. The aforesaid notwithstanding the authority of the LENDER to render the Master Agreement terminated, pursuant to the provisions of section TEN hereof.

**3.6 Refund to the BORROWER of the Assigned Credits. Notification to the Assigned Debtors:** Once the Credit Line Facility owed is completely canceled by the BORROWER and in within the 48 hs. From its occurrence, the LENDER compels to notify to each of the Assigned Debtors that the assignment of the Assigned Credit has no effect, reason why from the reception of

dicha notificación, cada Deudor Cedido deberá abonar al MUTUARIO el monto de los respectivos Créditos Cedidos.

such notification, each Assigned Debtor shall pay to the BORROWER the amount of the respective Assigned Credits.

## CLÁUSULA CUARTA: CESIÓN DE CRÉDITOS.

## SECTION FOUR: CREDIT ASSIGNMENT.

**4.1.** En garantía de pago de la Línea de Crédito Adeudada y del cumplimiento de todas y cada una de las obligaciones asumidas por el MUTUARIO bajo los Documentos de la Operación, y como medio de pago de las Sumas Adeudadas - conforme lo establecido en la Cláusula 5.2 del Contrato Marco- el MUTUARIO cede al MUTUANTE los Créditos Cedidos. La referida cesión comprende todos los derechos y acciones que posee el MUTUARIO y le corresponden respecto de los Créditos Cedidos y de las consecuencias precedentemente citadas, colocando al MUTUANTE en su mismo lugar y grado de privilegio con toda la extensión y amplitud pertinente, subrogándolo además en todos los derechos o acciones de cumplimiento de contrato y/o cobro que eventualmente existieran con respecto a dichos créditos, sin perjuicio de las obligaciones emergentes de las obligaciones contractuales con los Deudores Cedidos de las cuales surjan los Créditos Cedidos, que quedarán a cargo exclusivo del MUTUARIO.

**4.1** As security for the payment of all the obligaitons and the compliance of all the obligations assumed by the BORROWER under the Transaction Documents, and as means of payment of the Sums Due, - in agreement with what is established in Section 5.2 of the Master Agreement – the BORROWER assign to the LENDER the Assigned Credits. The assignment or assignments undertaken comprises all the rights and actions that the BORROWER has with regard to the Assigend Credits and of the consequences previously stated, placing the LENDER pari passu in priorities with the pertinent scope and to the relevant extent, the latter being also subrogated to all rights or agreement performance and/or collection actions likely to exist in the future in connection with such credits, notwithstanding the obligations deriving from the contractual obligations with the Assigned Debtor originating from the Assigned Credits, which shall be exclusively borne by the BORROWER.

**4.2.** El MUTUARIO se compromete a entregar al MUTUANTE, dentro de los 5 (cinco) días de su despacho, los conocimientos de embarque respecto de la mercadería comprendida en los Créditos Cedidos. Asimismo, se obliga a entregar al MUTUANTE, dentro de los 5 (cinco) días de recibidas por los Deudores Cedidos, copias o fotocopias de los remitos y facturas que el MUTUARIO emita como consecuencia de los Créditos Cedidos.

**4.2** The BORROWER undertakes to deliver to the LENDER, within 5 (FIVE) days from dispatch thereof, certified copies of the bills of lading regarding the merchandise included in the Assigned Credits. In such sense, it undertakes to deliber to the LENDER, in within 5 (FIVE) days from the reception by the Assigned Debtors, the delivery notices and the invoices issued by the BORROWER as a consequence of the Assigned Credits.

**4.3.** El MUTUARIO garantiza que todas las sumas correspondientes a los Créditos Cedidos serán depositadas por los Deudores Cedidos en la Cuenta del Mutuante. A tal efecto, en adición a las notificaciones previstas en la Sección 4.6 de la presente Cláusula CUARTA, el MUTUARIO se obliga a incluir en todas y cada una de las facturas emitidas en virtud de los Créditos Cedidos que sean remitidas a los Deudores Cedidos, una leyenda que indique expresamente que tales facturas deberán ser pagadas al MUTUANTE mediante transferencia de los fondos correspondientes a la Cuenta del Mutuante. En cada una de las facturas cedidas el MUTUARIO se compromete a incluir la siguiente leyenda (y su correspondiente traducción al idioma inglés):

**4.3** The BORROWER guarantees that all sums corresponding to the Assigned Credits shall be deposited by the Assigned Debtor in the LENDER's Account. For such purpose, in addition to the notices indicated in 4.6, the BORROWER and/or the SURETY undertakes to include in all and each of the invoices issued under the Assigned Credits to be sent to the Assigned Debtor, a legend expressly stating that such invoices shall be paid to the LENDER through a transfer of the pertinent funds to the LENDER's Account. In each of the assigned invoices assigned to the BORROWER and/or the SURETY, undertake to include the following legend:

*"El crédito representado y contenido en la presente factura, fue cedido en garantía a IIG TOF B.V., por contrato de Cesión de Créditos de fecha __/__/200__. Deberán Uds. abonar el mismo a su vencimiento mediante depósito en el Banco: _____., ABA _____, Beneficiario: IIG TOF B.V., Cuenta N°: _____ "*

*"The credit represented and included in this invoice, was assigned as security to IIG TOF B.V., through the Credit Assignment Agreement dated __/200__. You should pay the same on the due date through a deposit in the Bank: __ ABA___; Beneficiary: IIG TOF B.V.; Account No. __ )"*

**4.4.** Los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas de acuerdo a lo dispuesto en la Sección 5.2 del Contrato Marco.

**4.4** The funds of the Assigned Credits deposited in the LENDER's Account shall be applied to the payment of the Sums Due as per Section FIVE, 5.2 of the Master Agreement.

4.5.   La cesión de los Créditos Cedidos se efectúa con responsabilidad por parte del MUTUARIO hacia el MUTUANTE. En consecuencia, si por cualquier causa el importe de los Créditos Cedidos no fuere abonado al MUTUANTE conforme los términos establecidos en la presente Cláusula CUARTA y/o no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, el MUTUARIO deberá abonar al MUTUANTE el importe total saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

4.6.   Como condición indispensable para la entrada en vigencia del presente Contrato Marco, el MUTUARIO se obliga a notificar en forma fehaciente esta cesión a los Deudores Cedidos mediante la remisión de una notificación sustancialmente idéntica al modelo adjunto al presente como **Anexo IV** con lo cual la misma quedará perfeccionada frente a terceros, sin necesidad de aceptación alguna del Deudor Cedido para tales efectos. A tales fines dentro de las 48 hs. de suscripto el presente Contrato Marco, y como una de las Condiciones Precedentes, el MUTUARIO comunicará a todos los Deudores Cedidos, con intervención notarial, que los Créditos Cedidos han sido transmitidos al MUTUANTE, y que el depósito de las sumas correspondientes a los Créditos Cedidos deberá efectuarse en la Cuenta del Mutuante. Asimismo, y sin perjuicio del perfeccionamiento de la cesión del modo antes indicado, el MUTUARIO se obliga a obtener la aprobación expresa de los Deudores Cedidos respecto de la presente cesión, debiendo los Deudores Cedidos –mediante su apoderado o representante legal– firmar al pie de dicha notificación con constancia de aceptación de la misma. El MUTUARIO deberá entregar dicha notificación al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, como una de las Condiciones Precedentes.

El MUTUARIO deberá entregar dichas notificaciones al MUTUANTE, con la aceptación de los Deudores Cedidos en la forma antes indicada, conforme lo establecido en la condición previa a entrada en vigencia del presente Contrato Marco.

Asimismo el MUTUARIO remitirá conjuntamente vía fax una comunicación a cada Deudor Cedido, notificándole la cesión de los Créditos Cedidos, indicándole que el pago de los Créditos Cedidos deberá realizarse en la Cuenta del Mutuante, consignándose que se remite por correo el original de la comunicación.

Cumplido ello, el MUTUARIO requerirá a un escribano público la certificación del texto de la misma, su destinatario, domicilio y su despacho mediante correo internacional por un servicio que brinde constancia de su entrega y recepción.

4.7.   El presente Contrato no implica de forma alguna la transferencia por el MUTUARIO al MUTUANTE de las obligaciones emergentes de los contratos que causen los Créditos.

4.5   This assignment of the Assigned Credits is made under the BORROWER's liability to the LENDER. Therefore, if for any reason whatsoever the amount of the Assigned Credits is not paid to the LENDER as per the terms stated in this Section and/ or are not enough to cover the payment of the Due Amounts in the correspondent Due Dates, the BORROWER shall pay the LENDER the total amount or the balance due corresponding to each Sum Due, previously of or in each Due Date, under penalty of incurring in automatic Default.

4.6   As an essential condition for the validity of this Master Agreement, the BORROWER and the SURETY binds themselves to give notice of this assignment by a self-probatory means to the Assigned Debtors, through the remittance of a notice substantially identical to the form attached hereto as Annex IV with which it must be understood as effective towards third parties, without the need of any acceptance of the Assigned Debtor to such effects. For purposes thereof, within 48 hours after the execution of this Master Agreement, as as one of the Precedent Condition, the BORROWER shall notify the Assigned Debtor in writing and through self-probatory means with the intervention of a notary, that the credits have been assigned to the LENDER and that the deposit of the sums pertinent to the Assigned Credits shall be made to the LENDER's Account. In such sense, and without prejudice of the assignment perfection in the means previously mentioned, the BORROWER compels to obtain the express approval of the Assigned Debtors regarding this assignment, and the Assigned Debtors will have to sig – by means of a representative or a person empowered to – at the bottom of each notification with acceptance proof of it. The BORROWER shall deliver such notices to the LENDER, with the acceptance of the Assigned Debtors is the way previously outlined, as a Condition Precedent.

The BORROWER shall deliver such notifications to de LENDER, with the acceptance of the Assigned Debtors in the way that was previously indicated, in agreement with what is established in the previous condition to the starting date of this Master Agreement.

In such sense, the BORROWER will remit vía fax a communication to each of the Assigned Debtors, notifying the assignment of the Assigned Credits, indicating that the payment of the Assigned Credtis must be done in th LENDER's Account, establishing that the original of the communication is remitted by postage mail.

Fulfilled that, the LENDER will require to a notary public the certification of the text of it, its addressee, domicile and it deliver by means of international postage mail by a service that gives prove of its deliver and reception.

4.7   This Agreement does not imply in any manner whatsoever a transfer by the BORROWER to the LENDER of the obligations arising from the agreements originating the Assigned Credits,

Cedidos, las que permanecerán en cabeza del MUTUARIO. El MUTUARIO se compromete a cumplir con todas y cada una las obligaciones a su cargo emergentes de los contratos que causen los Créditos Cedidos, de modo que no se vea afectado el derecho del MUTUANTE al cobro de los Créditos Cedidos. La falta de cumplimiento en debido tiempo y forma de las obligaciones antedichas, producirá automáticamente de pleno derecho la Mora del MUTUARIO. De igual manera se producirá la Mora de pleno derecho con los efectos antes citados en el caso de que – con prescindencia de que hubiese o no incumplimiento por parte del MUTUARIO- los Deudores Cedidos rescindan o resuelvan los contratos de compraventa de mercadería que causen los Créditos Cedidos, o de cualquier forma discontinúen o terminen su relación comercial con el MUTUARIO, ya sea en forma unilateral o de común acuerdo entre el MUTUARIO y los Deudores Cedidos.

**4.8.**    El MUTUARIO declara y garantiza al MUTUANTE:

(a)    el cobro de los Créditos Cedidos.

(b)    la forma instrumental de los mismos.

(c)    la legitimidad de los Créditos Cedidos y que los mismos son de su libre disponibilidad, no encontrándose afectado por embargos, ni prohibiciones de cesión, o gravámenes de otra naturaleza al momento de la presente;

(d)    que no se encuentra inhibido para disponer de sus bienes;

(e)    que no adeuda suma alguna a ningún Deudor Cedido que pueda dar lugar a compensaciones o quitas de cualquier especie sobre los Créditos Cedidos, y que de darse tal supuesto abonará la diferencia conforme lo estipulado en la cláusula 5.4;

(f)    que no ha percibido suma alguna derivada de los Créditos Cedidos, y que los mismos no han sido cedidos total ni parcialmente a persona física o jurídica alguna con anterioridad;

(g)    la autenticidad de las firmas de todo documento que acredite la causa de los Créditos Cedidos.

(h)    que cumplirá con todas y cada una de las obligaciones a su cargo emergentes de los Créditos Cedidos, incluyendo –pero no limitado a- la entrega en tiempo y forma a los Deudores Cedidos de la mercadería objeto de los Créditos Cedidos.

(i)    que el monto de los Créditos Cedidos depositado en la Cuenta del Mutuante durante el Plazo de Disponibilidad será equivalente como mínimo al 110,00% del monto de la Línea de Crédito.

(j)    que todos los Créditos Cedidos serán facturados por el MUTUARIO directa y exclusivamente a cada Deudor Cedido.

**CLAUSULA QUINTA: CANCELACIÓN DE LAS SUMAS ADEUDADAS. APLICACIÓN DE LOS CREDITOS CEDIDOS AL PAGO DE LAS SUMAS ADEUDADAS. RECURSO DEL MUTUARIO.**

which shall be borne by the BORROWER. The BORROWER undertakes to comply with any and all of its obligations deriving from the agreements of the Assigned Credits so that the LENDER's right to collect the Assigned Credits shall not be affected. Non-compliance in due time and manner of the obligations mentioned above shall automatically give place by operation of law to the BORROWER's Default. The Default by operation of law shall occur all the same with the consequences already mentioned in the event that, irrespective of the BORROWER's default, the Assigned Debtor rescinds or terminates the merchandise purchase agreements originating the Assigned Credits, or ceases or ends its business relationship with the BORROWER, whether unilaterally or as agreed between the BORROWER and the Assigned Debtor.

4.8 [  ] The BORROWER states and guarantees the LENDER as follows:

(a)    the collection of the Assigned Credits;

(b)    the instrumental form thereof;

(c)    the legitimacy of the Assigned Credits and that the Assigned Credits are freely available to it, and that they are not subject to any attachment, assignment prohibition, or any lien whatsoever as of the date hereof;

(d)    that it is not subject to restraining orders to dispose of its property;

(e)    that it does not owe any sum of money which may give place to set off or discharges of debts of any kind whatsoever on the Assigned Credits; and that if such events take place it will pay the difference in agreement with what is established in section 5.4;

(f)    that it has not received any sum resulting from the Assigned Credits and that the same have not been assigned, either partially or totally, to any natural or artificial person before;

(g)    the authenticity of the signatures of any document evidencing the reason for the Assigned Credits;

(h)    that it shall comply with any and all of the obligations under its charge deriving from the Assigned Credits, including, but not limited to, delivery in due time and manner to the Assigned Debtors of the goods stated in the Assigned Credits.

(i)    that the amount of the Assigned Credits to be deposited at the LENDER's Account during the Availability Term shall be at least equal at a minimum to 110,00% of the amount of the Credit Facility.

(j)    that all the Assigned Credits will be invoices by the BORROWER directly and exclusively to each Assigned Debtor.

**SECTION FIVE: PAYMENT OF SUMS DUE. APPLICATION OF ASSIGNED CREDITS TO PAYMENT OF SUMS DUE. BORROWER'S REMEDY.**

**5.1.** El MUTUARIO se obliga irrevocable e incondicionalmente a pagar al MUTUANTE las Sumas Adeudadas en las Fechas de Vencimiento correspondientes, mediante depósito de las mismas en la Cuenta del Mutuante.

**5.2.** A los efectos mencionados en la Sección 5.1 antes referida, los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante serán aplicados al pago de las Sumas Adeudadas del siguiente modo:

(a) Durante los meses en que NO exista Fecha de Vencimiento (entendiéndose por tales aquéllos meses transcurridos entre la efectivización del desembolso requerido en cada Solicitud de Desembolso hasta el mes calendario inmediato anterior al de la Fecha de Vencimiento), el MUTUANTE transferirá los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante, dentro de las 48 hs. de recibidos, a la Cuenta del Mutuario.

(b) Durante los meses correspondientes a las Fechas de Vencimiento (entendiéndose por tal el período comprendido entre el día 1 y el día 30 de los meses correspondientes a las Fechas de Vencimiento), el MUTUANTE aplicará los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante a cancelar las Sumas Adeudadas a pagar en la Fecha de Vencimiento correspondiente a dicho mes. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses excedan el monto de las Sumas Adeudadas, el excedente será transferido al MUTUARIO de la forma indicada en el acápite (a) de la presente Sección 5.2. En el caso que los fondos de los Créditos Cedidos depositados durante tales meses no fuesen suficientes para cubrir el importe de las Sumas Adeudadas, el MUTUARIO será responsable de aportar la diferencia, y abonar así el importe total de las Sumas Adeudadas, bajo apercibimiento de Mora.

(c) Todos los fondos correspondientes a los Créditos Cedidos que sean depositados en la Cuenta del Mutuante con posterioridad a la cancelación total de la Línea de Crédito Adeudada y en exceso de la misma, serán reintegrados al MUTUARIO en la forma indicada en el acápite (a) de la presente Sección 5.2.

**5.3.** En caso de Mora, la totalidad de los fondos de los Créditos Cedidos depositados en la Cuenta del Mutuante se aplicarán a cancelar toda la Línea de Crédito Adeudada y cualquier otra suma adeudada por el MUTUARIO bajo los Documentos de la Operación.

**5.1.** The BORROWER irrevocably and unconditionally undertakes to pay the LENDER the Sums Due and the Performance Fee on the Due Dates corresponding to each of them through a deposit thereof in the LENDER's Account.

**5.2.** For purposes mentioned in Section 5.1 above, the funds of the Assigned Credits deposited at the LENDER's Account shall be applied to payment of Sums Due as follows:

(a) During the months in which there are NO Due Dates (being understand by such the months between the effective disbursement after a Disbursement Request and the following calendar month before the Due Date), the LENDER shall transfer the funds corresponding to the Assigned Credit that the Assigned Debtors deposit at the Lender's Account, during the 48 hours period since its reception, to the Borrower's Account.

(b) During the months corresponding to the Due Dates (being understand by such the period between the 1st and the 30th of each month corresponding to the Due Dates), the LENDER shall apply the amounts of the Assigned Credits deposited at the Lender's Account to cancel the Sums Due to be paid in the Due Dates corresponding to each month. In the event that the amount of the Assigned Credits deposited during said month exceeds the amount of the Sums Due, the exceeding amount shall be transfer, to the Borrower's Account as stated in Section 5.2 (a) If the sums deposited during said months were not enough to fulfill the amounts of the Sums Due, the BORROWER shall deposit the amount needed in order to comply with the total amounts of the Sums Due, under penalty of incurring in automatic Default.

(c) All the funds corresponding to the Assigned Credits that were deposited at the Lender's Account, after the total cancellation of the Credit Facility, and in excess of it, shall be re-delivered to the BORROWER and/or the SURETY as set forth in (a) herein of this Section 5.2.

**5.3** Upon Default, all the funds of the Assigned Credits deposited in the LENDER's Account shall be applied to pay the entire Credit Facility and any other amount due under the Transaction Documents.

5.4.    Habida cuenta del recurso del MUTUARIO en la cesión de los Créditos Cedidos al MUTUANTE, en caso que -por cualquier causa- el importe de los Créditos Cedidos depositados en la Cuenta del Mutuante no fuesen suficientes para cubrir el pago de las Sumas Adeudadas en las Fecha de Vencimiento correspondiente a un mes determinado, el MUTUARIO deberá abonar al MUTUANTE el importe total o el saldo adeudado correspondiente a cada Suma Adeudada, antes de o en cada Fecha de Vencimiento, bajo apercibimiento de incurrir en Mora automática.

5.4    Taking into account the resource of the BORROWER in the assignment of the Assigned Credits to the LENDER, in case that – for any reason whatsoever - the amount of the Assigned Credits deposited in the LENDER's Account are not sufficient to pay the Sums Due in the correspondent Due Date in a determined month, the BORROWER shall pat the LENDER the total amount or the adequate balance correspondent to each Sum Due, before of or in each Due Date, under penalty of incurring in automatic Default.

## CLAUSULA SEXTA:    MONEDA DE PAGO.

## SECTION SIX: PAYMENT CURRENCY.

6.1.    El MUTUARIO asume que el pago del importe total o el saldo que eventualmente adeude en virtud de los Documentos de la Operación –incluyendo el pago de la Línea de Crédito Adeudada- deberá ser necesariamente abonado en Dólares y no en otra moneda. En consecuencia, el MUTUARIO expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de la Línea de Crédito Adeudada así como los intereses compensatorios y punitorios, costos, costas y demás sumas a ser abonadas al MUTUANTE en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago. Asimismo el MUTUANTE asume que la transferencia que debe realizar a favor del MUTUARIO de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) deberán ser necesariamente abonados en Dólares y no en otra moneda. En consecuencia, el MUTUANTE expresamente reconoce y acepta que constituye condición esencial de este Contrato Marco que la devolución de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c), así como los intereses punitorios y demás sumas a ser transferidas al MUTUARIO en virtud del presente, se cancelen en Dólares, renunciando expresamente a invocar la teoría de la imprevisión o cualquier otra similar para alegar una mayor onerosidad sobreviviente en el pago.

6.1    The BORROWER undertakes that payment of the full amount or the balance eventually due under the Transaction Documents- including payment of the Indebted Credit Facility - shall be paid in Dollars and not in another currency. Consequently, the BORROWER expressly acknowledges and states that it is a material condition to this Master Agreement, that the payment of the Indebted Credit Facility, as well as compensatory and penalty interest, costs, court fees and further sums payable to the LENDER hereunder, be canceled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment. In addition to this the LENDER understands that the transfer to be made in favor of the BORROWER of the funds of the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c) shall be payable in Dollars and not in any other currency. As a consequence of the foregoing the LENDER acknowledges that it is an essential condition of this Master Agreement that the devolution of the funds corresponding to the Assigned Credits that the Assign Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), as well as punitive interests and other sums to be transferred to the BORROWER under this Agreement, are cancelled in Dollars, expressly waiving the doctrine of unforeseeability or any other similar law to allege a major consideration in payment.

6.2.    En atención a lo dispuesto en la Cláusula 6.1., en caso que en cualquier fecha de Vencimiento existiere cualquier restricción o prohibición para acceder al mercado libre de cambios. en la República Argentina, el MUTUARIO y en su caso el MUTUANTE deberán igualmente abonar las sumas comprometidas (la Línea de Crédito Adeudada y. cualquier otra suma pagaderas en virtud de los Documentos de la Operación en Dólares para el caso del MUTUARIO y la transferencia de los fondos de los Créditos Cedidos que los Deudores Cedidos depositen en la Cuenta del Mutuante conforme a lo previsto en la cláusula QUINTA acápite 5.2. a) y c) para el caso del MUTUANTE, obteniendo los mismos a través de cualquiera de los siguientes mecanismos, a opción del MUTUANTE o MUTUARIO, según el caso:

6.2    In accordance with the provisions set forth in Section 6.1., if on any Maturity Date there is any restriction or prohibition to access the exchange market in the Argentine Republic, the BORROWER and the LENDER shall nevertheless pay the indebted amounts (the Indebted Credit Facility and any other amount payable under the Transaction Documents) in Dollars, in the case of. the BORROWER, and transfer of the sums corresponding to the Assigned Credits that the Assigned Debtors deposit at the LENDER's Account as set forth in Section FIVE 5.2. a) and c), obtaining the same though any of the following mechanisms, to the LENDER's or BORROWER s' option depending on the case:

6.2.(a) Mediante la compra con Pesos (o la moneda que sea

6.2(a) Through the purchase with Pesos (or the then legal tender

en ese momento de curso legal en la República Argentina), de cualquier título en Dólares y la transferencia y venta de dichos instrumentos fuera de la República Argentina por Dólares Estadounidenses en una cantidad tal que, liquidados en un mercado del exterior, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares sea igual a la cantidad de dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(b).** Mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de cualquier título en Dólares, a satisfacción expresa del MUTUANTE (o del MUTUARIO en su caso) y con cotización en Dólares en el exterior, en una cantidad tal que, liquidados por el MUTUANTE (o el MUTUARIO en su caso) en un mercado del exterior, en precios y condiciones de plaza, y una vez deducidos los impuestos, costos, comisiones y gastos correspondientes, su producido en Dólares Estadounidenses sea igual a la cantidad total en dicha moneda adeudada bajo los Documentos de la Operación; o bien

**6.2.(c).** En el caso que existiera cualquier prohibición legal expresa en la República Argentina que impidiera al MUTUARIO (o al MUTUANTE en su caso) llevar a cabo las operaciones indicadas en los dos puntos anteriores, mediante la entrega al MUTUANTE (o al MUTUARIO en su caso) de Pesos (o la moneda que sea en ese momento de curso legal en la República Argentina), en una cantidad tal que, en la fecha de pago de que se trate dichos Pesos sean suficientes, una vez deducidos los impuestos, costos, comisiones y gastos que correspondieren, para adquirir la totalidad de los Dólares adeudados por el MUTUARIO (o el MUTUANTE en su· caso) bajo los Documentos de la Operación, según el tipo de cambio informado por Citibank, N.A., Nueva York, Estados Unidos de Norteamérica, para efectuar adquisiciones de Dólares con Pesos en la Ciudad de Nueva York, a las 12 (doce) horas (hora de la Ciudad de Nueva York) de la fecha de pago; o bien

**6.2.(d).** Mediante cualquier otro procedimiento existente en la República Argentina o en el exterior, en las Fechas de Vencimiento bajo el Contrato Marco, para la adquisición de Dólares.

**6.3.** Queda expresamente establecido que en cualquiera de las alternativas detalladas en 6.2.(a). a 6.2.(d)., las sumas adeudadas por el MUTUARIO (o el MUTUANTE en su caso) sólo se considerarán pagadas y dicho pago tendrá efectos liberatorios únicamente, una vez que se acredite efectivamente en la Cuenta del Mutuante (o en la Cuenta del Mutuario en su caso), la cantidad de Dólares adeudada bajo los Documentos de la Operación.

**6.4.** Todos los gastos, costos, comisiones, honorarios e impuestos pagaderos con relación a los procedimientos referidos en 6.2.(a). a 6.2.(d) precedentes serán pagados por el MUTUARIO

in the Argentine Republic), of any security·in Dollars and the transfer and sale of said instruments outside the Argentine Republic for Dollars in an amount which, sold in a foreign market, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the amount of said currency due under the Transaction Documents; or

**6.2(b)** Through delivery to the LENDER (or the BORROWER as the case may be) of any security in Dollars, to the LENDER's express satisfaction (or the BORROWER's as the case may be) and with Dollar quotation abroad, in an amount which, once sold by the LENDER (or the BORROWER) in a foreign market, at market prices and conditions, and once applicable taxes, costs, commissions and expenses are deducted, the proceeds thereof in Dollars are equal to the aggregate amount in such currency due under the Transaction Documents; or

**6.2(c)** If there is any express legal prohibition in the Argentine Republic, which would impede the BORROWER (or the LENDER) from making the transactions stated in the two foregoing paragraphs, through the delivery to the LENDER (or BORROWER) of Pesos (or the then legal tender in the Argentine Republic), in an amount which, on the payment date, such Pesos ·are enough, once applicable taxes, costs, commissions and expenses are deducted, to acquire the aggregate amount of Dollars due by the BORROWER (or the LENDER) under the Transaction Documents, as per the exchange rate informed by Citibank N.A., New York, United States of America, to make Dollar acquisitions with Pesos in the City of New York, at 12 (twelve) hours (New York City time) on the payment date; or

**6.2(d)** Through any other procedure existing in the Argentine Republic or abroad, on any Maturity Date under the Master Agreement, for the purchase of Dollars.

**6.3** It is hereby expressly stated that in any of the alternatives detailed in 6.2. (a) through 6.2.(d), the Sums Due by the ·BORROWER (or the LENDER) shall only be deemed paid and such payment shall have discharging effects only, once the amount of Dollars due under the Transaction Documents and this Master Agreement is actually credited at the Lender's Account (or at the Borrowers' Account as the case may be).

**6.4** All charges, costs, commissions, fees and taxes payable in connection with the procedures set forth in 6.2.(a) through 6.2.(d) above shall be paid by the BORROWER (or the LENDER as the

(o por el MUTUANTE en su caso).

case may be).

**6.5.** Si con el fin de obtener una sentencia judicial fuera necesario convertir los montos en Dólares adeudados bajo el presente a otra moneda, las Partes acuerdan que el tipo de cambio a ser usado será aquél al cual, de acuerdo con procedimientos bancarios normales, el MUTUANTE (o el MUTUARIO en su caso) pueda comprar con esa otra moneda Dólares en la ciudad de Nueva York, Estados Unidos de América, en el Día Hábil anterior a aquél en el cual la sentencia final es dictada. Asimismo, si alguna sentencia fuera dictada contra el MUTUARIO (o el MUTUANTE en su caso) en una moneda distinta de Dólares, la obligación de pago del MUTUARIO (o del MUTUANTE en su caso) de cualquier suma adeudada bajo los Documentos de la Operación sólo se considerará cancelada si en el Día Hábil siguiente a aquél en que el MUTANTE (o el MUTUARIO en su caso) haya recibido algún monto juzgado como adeudado bajo el presente en esa otra moneda, el MUTUANTE (o el MUTUARIO en su caso) pueda, de acuerdo con procedimientos bancarios normales, en la ciudad de Nueva York, Estados Unidos de América, comprar Dólares con esa otra moneda. Si dichos Dólares Estadounidenses así comprados fueran menos que la suma de Dólares adeudada bajo los Documentos de la Operación, el MUTUARIO (o el MUTUANTE en su caso) acuerda, como una obligación diferente e independientemente de tal sentencia, indemnizar al MUTUANTE (o al MUTUARIO en su caso) de esa pérdida.

6.5 If in order to obtain a judicial judgment it would be necessary to change the amounts in Dollars due hereunder to another currency, the Parties agree that the exchange rate to be used shall be such which, in accordance with normal banking procedures, the LENDER (or the BORROWER) shall be able to purchase with such other currency Dollars in New York City, United States of America, on the Business Day prior to that day in which final judgment is pronounced. Likewise, if a judgment is pronounced against the BORROWER (or the LENDER) in a currency other than Dollars, the BORROWER's payment obligation (or the LENDER's) of any amount due under the Transaction Documents shall only be deemed paid if on the Business Day following the date in which the LENDER (or BORROWER) has received any amount judged as due hereunder in such other currency, the LENDER (or the BORROWER) shall, under normal banking procedures, in the City of New York, United States of America, purchase Dollars with such other currency. If such amount of Dollars thus purchased is less than the amount due under the Transaction Documents, the BORROWER (or LENDER) agrees, as a different obligation and independently from such judgment, to compensate the LENDER (or BORROWER) for such loss.

## CLÁUSULA SEPTIMA:  WARRANTS

## SECTION SEVEN: WARRANTS

**7.1** En adición a toda otra garantía, junto con cada Solicitud de Desembolso, el MUTUARIO deberá suscribir y entregar al MUTUANTE, como garantía adicional de pago, Warrants de productos lácteos o sus derivados –debidamente endosados a favor del MUTUANTE- por una suma equivalente como mínimo al 15% (quince por ciento) de la Suma Adeudada correspondiente, expresada en Dólares Estadounidenses, con exclusión de toda otra moneda.

7.1. In addition to any other warranty, together with each Request for Disbursement, the BORROWER shall subscribe and deliver to the LENDER, as an additional warranty of payment, Warrants of milk products or its derivates – dully endorsed in favor of the LENDER – for an amount equivalent as minimum to 15% (fifteen per cent) of the correspondent Amount Due, determined in American Dollars, with exclusion of all other currency.

**7.2.** El MUTUARIO se obliga a qué durante toda la vigencia del Contrato Marco el MUTUANTE cuente en su poder con Warrants por un monto no inferior a una suma equivalente al quince por ciento (15%) de la Línea de Crédito Adeudada. Teniendo en cuenta el plazo máximo de vigencia de los warrants establecido en el art. 26 de la Ley 9643, el MUTUARIO se obliga a reemplazar periódicamente los Warrants antes del vencimiento de los 180 (ciento ochenta) días contados desde la fecha de emisión de los mismos, debiendo entregar al MUTUANTE nuevos Warrants por un monto igual o superior, en su caso, al de los Warrants originales.

7.2. The BORROWER compels that during the term of the Master Agreement the LENDER has in its power the Warrants for an amount not inferior to the amount equivalent to 15% (fifteen per cent) of the Credit Line Due. Taking into account the maximum in force term of the warrants as established in section 26 on Section 9643, the BORROWER undertakes to periodically replace the Warrants before the expiration of 180 (one hundred and eighty) days counted from the date in which they were issued, and must deliver to the LENDER new Warrants for an amount equal or superior, in its case, to that of the original Warrants.

**7.3.** A fin de determinar la cantidad de mercadería que el MUTUARIO deberá depositar para la emisión de los certificados de depósito correspondientes a los Warrants, se tomará en cuenta el precio de mercado de dicha mercadería, vigente al momento de dicho depósito. El mantenimiento de la garantía constituida por los Warrants, por los montos y en la forma precedentemente establecida, constituye una condición esencial

7.3. In order to determine the quantity of the merchandise that the BORROWER shall deposit for the issuance of the correspondent deposit certificates to the Warrants, it will be taken into account the market price of such merchandise, in force at the moment of such deposit.   The maintenance of the warranties constituted for the Warrants, for the amounts and in the way that was previously mentioned, constitutes an essential

para el mantenimiento del presente Contrato Marco. Consecuentemente, la falta de acuerdo –por cualquier motivo que fuere- en la calidad y/o cantidad de mercadería a ser depositada, que no fuere subsanada dentro de los 5 (cinco) días contados de la intimación que al efecto curse el MUTUANTE, producirá sin más la Mora automática del MUTUARIO sin necesidad de interpelación alguna, provocando la caducidad de todos los plazos con los efectos estipulados en la Cláusula DECIMA del presente Contrato.

7.4. El MUTUARIO declara y garantiza la veracidad de todos los datos consignados en los Warrants, y que la mercadería indicada en los mismos no reconoce ni reconocerá gravamen ni restricción alguna. En caso de quiebra de la empresa depositaria (Warrantera) de la mercadería descripta en los Warrants, el MUTUARIO se compromete a comunicar dicha circunstancia al MUTUANTE dentro de las 48hs. de decretada la misma. . El incumplimiento de dicha comunicación provocará la Mora automática del MUTUARIO. En todos los casos, el MUTUARIO deberá responder por los daños y perjuicios que su incumplimiento pudiere ocasionar al MUTUANTE.

7.5. En caso de Mora del MUTUARIO por cualquier causa que fuere, el MUTUANTE quedará automáticamente facultado para iniciar la ejecución de los Warrants en los términos de la Ley 9643, sin perjuicio de los otros remedios y/o acciones legales que le correspondan. En el supuesto de subasta de la mercadería descripta en los Warrants, el MUTUANTE se reserva expresamente la facultad de desinsacular martillero al efecto.

7.6. Será responsabilidad exclusiva y excluyente del MUTUARIO la inscripción del endoso de los Warrants en los libros de la empresa depositaria de la mercadería indicada en por los mismos, como así también el pago de todos los gastos y honorarios que correspondan a dicha empresa almacenadora.

## CLÁUSULA OCTAVA:   FIADOR.

Por este acto el FIADOR se constituye en fiador solidario, codeudor solidario, liso llano y principal pagador de las obligaciones y deudas asumidas por el MUTUARIO en el presente Contrato Marco, en los mismos términos y condiciones establecidas en el presente Contrato Marco para el MUTUARIO afianzado con renuncia expresa a: (1) los beneficios de división y excusión y demás normas comerciales y civiles concordantes aplicables. (2) a exigir la previa ejecución judicial o extrajudicial del MUTUARIO o ejercer cualquier defensa que pudiera hacer valer el MUTUARIO y en general a oponer toda excepción que no sea la de pago. La responsabilidad solidaria asumida por el FIADOR se extiende, asimismo, al reajuste legal o convencional y accesorios, tales como la actualización monetaria, intereses compensatorios y moratorios, debidos por el MUTUARIO. Esta fianza permanecerá vigente hasta la total cancelación por parte del MUTUARIO de todas las deudas que mantiene el MUTUARIO afianzado y cubiertas por esta garantía. Se considerará incumplimiento de las disposiciones de la presente el caso en que el FIADOR comience negociaciones con cualquier

condition for the maintenance of this Master Agreement. Consequently, the lack of agreement – for any reason whatsoever – in the quality and/or quantity of merchandise to be deposited, that is not heeled in within the 5 (five) days from the notification that to such effect delivers the LENDER, will produce the automatic Default of the BORROWER without the need to interpretation, causing the expiration of all the terms with the effects stipulated in Section TEN of this Master Agreement.

7.4. The BORROWER declares and warrants the truth of all the data contained in the Warrants, and that the merchandise indicated in them does not recognize nor will recognize any encumbrance nor restriction. In case of bankruptcy of the depositing company (Warrantera) of the merchandise described in the Warrants, the BORROWER compels to communicate such circumstance to the LENDER in within the 48 hs. from its order. The un-fulfillment of such communication will cause the automatic Default of the BORROWER. In all the cases, the BORROWER must answer for the damages and harms that it un-fulfillment could cause to the LENDER.

7.5. In case of Default of the BORROWER for any cause whatsoever, the LENDER will be automatically entitled with the faculty to initiate the execution of the Warrants in the terms of Lay 9643, without prejudice of all the other remedies and/or legal actions that correspond. In case of auction of the merchandise described in the Warrants, the LENDER expressly reserves the faculty to designate the auctioneer to such effect.

7.6. It will be exclusive and excluding responsibility of the BORROWER the inscription of the endorsement of the Warrants in the books of the depositing company of the merchandise indicated in them, as well as the payment of all the expenses and fees that correspond to such storage company.

## SECTION EIGHT: SURETY.

The SURETY hereat becomes the joint and several surety, main payor and co-debtor of the debts and liabilities undertaken by the BORROWER in this Master Agreement, under the same terms and conditions set forth herein for the BORROWER, expressly waiving the right to: (1) the benefits of division and excussion and other applicable related commercial and civil rules, (2) demand the previous judicial or extra judicial foreclosure of the BORROWER or exercise any defense to be enforced by the BORROWER and in general to file any defense other than that of payment. The joint and several liability assumed by the SURETY comprises, additionally, the legal or conventional readjustment and accessory costs, such as currency updating, compensatory and penalty interest, due by the BORROWER. This surety shall be effective until full payment by the BORROWER of all liabilities of the BORROWER, covered by this guarantee. It will be considered as a non compliance with the rules of the present the case in which the SURETY starts negotiations with any creditor for a general payment arrangement or changes the its indebtedness schedule, becomes

acreedor con miras a un arreglo general de pagos o cambiar el cronograma de endeudamiento, o se transformen en insolventes o quebrados, o les sea decretada la quiebra o se presente en concurso preventivo de acreedores o Acuerdo Preventivo Extrajudicial, y los mismos no sean levantados dentro de los (60) días hábiles de haber sido decretados. En dicho supuesto, en un plazo de treinta (60) días hábiles, el MUTUARIO deberá designar un nuevo garante a satisfacción del MUTUANTE. Vencido el plazo de treinta (30) días sin que el MUTUARIO haya designado un nuevo garante, el MUTUANTE puede mediante notificación al FIADOR declarar las obligaciones del MUTUARIO vencidas, y exigir el pago de todos los montos debidos por el MUTUARIO como vencidos, más todos los gastos en que hubiera incurrido el MUTUANTE. El FIADOR efectúa las siguientes declaraciones y garantías, todas las cuales deberán mantenerse durante la vigencia del presente Contrato Marco: (a) Esta garantía constituye una obligación válida y vinculante para mí, ejecutable de acuerdo con sus respectivos términos; (b) No existe estatuto, regla, regulación u obligación contractual vinculante para mí que pudiera ser violada por la celebración, entrega o ejecución de esta garantía. A los efectos del presente el FIADOR constituye domicilio especial en 80 SW 8th Street, Suite 2000 - Miami, FL 33130-3003, United States of America y acepta como válidas las notificaciones que se practiquen por telegrama colacionado u otro medio auténtico. A todos los efectos legales de la presente fianza el FIADOR se somete irrevocablemente a la jurisdicción y ley aplicable establecidos en la Cláusula DECIMO QUINTA del presente, renunciando expresamente a cualquier otro fuero o jurisdicción.

insolvent, or bankrupt, or bankruptcy proceedings are instituted, or petitions for a composition with creditors, or an Out of Court Reorganization Plan, and the same are not withdrawn within 60 days from initiation thereof. In such event, the LENDER shall designate a new surety at satisfaction of the LENDER. At the expiration of the terms of thirty (30) days in the case that the BORROWER has not designated a new surety, the LENDER may, declare that the BORROWER's obligations are due and demand payment of all amounts due by the BORROWER as payable, plus all expenses incurred by the LENDER. The SURETY declares and warrants all the following, which will be maintaing during the term of this Master Agreement: (a) This warranty constitutes a valid and bonding obligation for me, executable in agreement with its respective terms; (b) There is not existence of statute, rule, regulation or contractual obligation that is bonding to me and that could be violated by the celebration, delivery or execution of this warranty. For purposes hereof, the SURETY establishes special domicile at 80 SW 8th Street, Suite 2000 – Miami, FL 33130-3303, United States of America, and accepts that notices served through a certified telegram or other authentic means are valid. For all legal purposes hereof, the SURETY irrevocably submits to the jurisdiction and applicable law set forth in section FIFTEEN hereof, expressly waiving any other forum or jurisdiction.

## CLAUSULA NOVENA: MANIFESTACIONES, DECLARACIONES Y COMPROMISOS DEL MUTUARIO Y DEL FIADOR.

**9.1.      Manifestaciones y Declaraciones del MUTUARIO.**
A fin de inducir al MUTUANTE a celebrar el Contrato Marco y otorgarle la Línea de Crédito, el MUTUARIO y el FIADOR manifiestan y declaran, a la fecha del presente Contrato Marco y hasta que el mismo se extinga, lo siguiente:

**9.1.1.**      Que el MUTUARIO es una cooperativa de primer grado debidamente constituida, inscripta y existente conforme las leyes de la República Argentina, con todas las facultades necesarias para llevar a cabo sus respectivas operaciones y negocios en los que participa en la actualidad; y

**9.1.2.**      Que el MUTUARIO y el FIADOR no están obligados a solicitar autorizaciones o aprobaciones de cualquier autoridad judicial, gubernamental o de cualquier otra persona tanto de derecho público como privado (incluyendo, pero no limitado a locadores, prestamistas, acreedores, compañías aseguradoras e instituciones financieras) como resultado del presente Contrato Marco y/o de las Garantías; y

**9.1.3.**      Que el Contrato Marco y las Garantías (i) constituyen actos o negocios jurídicos que el MUTUARIO y el FIADOR están

## SECTION NINE: REPRESENTATIONS, WARRANTIES AND COMMITMENTS OF THE BORROWER AND OF THE SURETY

**9.1 Representations and Warranties of the BORROWER.**
In order to persuade the LENDER to enter into the Master Agreement and grant the Credit Facility, the BORROWER and the SURETY represent and warrant the following as of the date hereof and until this Master Agreement is terminated the following:

**9.1.1 That the BORROWER** is a cooperative association of first degree duly organized, registered and validly existing pursuant to the laws of the Argentine Republic, with all the necessary powers and authority to carry out the relevant operations and businesses currently developed; and

**9.1.2 That the BORROWER** and the SURETY are not bound to apply for authorizations or approvals from any judicial or governmental authority or from any other public or private entity (including, without limitation, lessors, lenders, creditors, insurance companies and financial institutions) as a result from this Master Agreement and/or the Guaranties.

**9.1.3 That the Master Agreement** and the Guaranties (i) are legal acts or businesses that the BORROWER and/or the SURETY are

legalmente autorizados y capacitados para realizar en mérito a las respectivas disposiciones legales y estatutarias que rigen su actividad, y (ii) se celebran contando con todas las aprobaciones internas necesarias del MUTUARIO, sin violación de disposición legal, estatutaria, asamblearia ni contractual alguna, no siendo necesaria ninguna autorización adicional; y

**9.1.4.**  Que el MUTUARIO y/o el FIADOR y/o sus Afiliadas no se hallan en situación de incumplimiento sustancial y relevante de (i) cualesquier orden, auto, requerimiento judicial, intimación, decreto o demanda de ninguna corte, tribunal judicial o arbitral u organismo gubernamental nacional, provincial o municipal del país o del extranjero, y/o (ii) el pago de impuestos, tasas, gravámenes, deudas previsionales y/o contribuciones de carácter nacional, provincial o municipal, tanto en el país como en el extranjero; y

**9.1.5.**  Que el MUTUARIO y el FIADOR no tienen pendiente litigio, investigación o procedimiento judicial o administrativo o arbitral alguno ante ningún tribunal judicial, arbitral o autoridad administrativa nacional, provincial o municipal, del país o del extranjero, ni tampoco proceso arbitral alguno, que pudiere (i) afectar adversa y sustancialmente sus posibilidades de cumplir con sus obligaciones de pago según lo previsto en el Contrato Marco, (ii) afectar la validez, legalidad o ejecutabilidad de cualquiera de los Documentos de la Operación, y/o (iii) tener un efecto adverso substancial en los negocios, condición financiera o de otro tipo o resultado en sus operaciones; y

**9.1.6.**  Que la celebración, ejecución y/o cumplimiento de los Documentos de la Operación no viola disposición alguna emanada de las Normas Aplicables y/o cualquier ley y/o decreto y/o reglamento y/o resolución aplicable al MUTUARIO ni tampoco viola ninguna orden de tribunal o autoridad judicial, arbitral o administrativo competente a que se hallare sometido el MUTUARIO y/o disposición alguna emanada de los estatutos vigentes del MUTUARIO y/o de ninguna hipoteca, prenda, instrumento de deuda, Contrato Marco u otro compromiso en que el MUTUARIO fuere parte o se encontrare obligado; y

**9.1.7.**  Que no existe mejor derecho y/o gravamen y/o restricción y/o limitación y/o impedimento de cualquier naturaleza, que impida y/o prohíba y/o limite y/o de cualquier manera restrinja las facultades y derechos del MUTUARIO de suscribir y firmar la totalidad de la documentación de los Documento de la Operación, así como también de cualquier otro compromiso asumido por el MUTUARIO frente al MUTUANTE a consecuencia de cualquiera de los Documentos de la Operación; y

**9.1.8.**  Que el MUTUARIO cumple con la normativa y regulación vigente que les resulta aplicable en materia ambiental, de seguridad industrial y de salud pública, y que ha obtenido todas las autorizaciones, permisos y licencias, que fueren necesarios bajo dicha normativa; y

**9.1.9.**  Que ha dado y facilitado al MUTUANTE toda la información relativa o relacionada con todo otro contrato marco,

legally authorized and qualified to perform pursuant to the relevant legal and statutory provisions governing their activity; and (ii) that they are executed pursuant to all the required internal approvals of the BORROWER, without infringing any legal, statutory, stockholders' meeting or contractual provision, and that no further authorization is necessary; and

**9.1.4** That the BORROWER and/or the SURETY and/or their Affiliates have not materially and significantly defaulted on: (i) any order, ruling, mandatory injunction, demand, decree or request from any court of justice or arbitral tribunal, or any government agency, whether national, provincial or municipal, of the country or foreign, and/or (ii) the payment of taxes, rates, liens, social security debts and/or levies, whether national, provincial or municipal, both within the country or abroad; and

**9.1.5** That the BORROWER and/or the SURETY have no pending lawsuit, investigation or judicial, administrative or arbitral proceeding before any court of justice, arbitral tribunal or administrative authority, whether national, provincial or municipal, in the country or abroad; or any arbitration proceeding, that may (i) adversely and materially affect their capacity to fulfill their payment obligations under the Master Agreement; (ii) affect the validity, legality or enforceability of any of the Transaction Documents; and/or (iii) have a material adverse effect on the business, financial or any other condition, or the result of their operations; and

**9.1.6** That the execution and delivery of, and/or compliance with the Transaction Documents do not infringe any provisions under the Applicable Rules and/or any law and/or decree and/or regulation and/or resolution applicable to the BORROWER and do not infringe any order issued by any court or relevant judicial, arbitral or administrative authority the BORROWER might be subject to, and/or any provision under the current by-laws of the BORROWER and/or under any mortgage, pledge, debt instrument, master agreement or other undertaking in which the BORROWER might be a party or be bound to; and

**9.1.7** That there is no paramount title and/or lien and/or restriction and/or limitation and/or hindrance whatsoever that precludes and/or prohibits and/or limits and/or in any way restricts the powers and rights of the BORROWER to execute all the documentation of the Transaction Documents, as well as any other commitment assumed by the BORROWER to the LENDER under any of the Transaction Documents; and

**9.1.8** That they are in compliance with the rules and regulations in force applicable to them in environmental, industrial safety and public health matters, and that they have secured all authorizations, permits and licenses required under such legislation; and

**9.1.9** That they have given and provided the LENDER with all the information relating to or in connection with any other