UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,

       v.

INTERNATIONAL INVESTMENT GROUP,
LLC,

                  Defendant.

Case No.: 1:19-cv-10796-DLC

## MEMORANDUM OF GTFF AND STFF IN FURTHER SUPPORT OF THE APPLICATION FOR THIS COURT TO DISTRIBUTE FUNDS

HERRICK, FEINSTEIN LLP

Stephen B. Selbst
Arthur G. Jakoby
2 Park Avenue
New York, New York 10016
(212) 592-1400
sselbst@herrick.com
ajakoby@herrick.com

*Attorneys for Non-Parties IIG Structured Trade Finance Fund, Ltd. and IIG Global Trade Finance Fund Ltd.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................................1

FACTS ........................................................................................................................................3

    I.      TFF Purchases Loan Participations ................................................................3

    II.     TFT Purchases Loan Portfolios from TFF...................................................6

    III.    TFT Uses Funds Provided by GTFF and STFF
          to Fund Its Purchases from TFF................................................................7

    IV.    Funding of GTFF and STFF by Investors...................................................10

    V.     GTFF and STFF Acquire Participation Interest in Loan Facilities............11

    VI.    Master Participation Agreements................................................................16

ARGUMENT ............................................................................................................................18

    I.      Girobank Lacks Jurisdiction to Oppose Eight of the
          Eleven Claims at Issue in the TFT Application ........................................18

    II.     The Court's Exercise of Ancillary Jurisdiction is Appropriate .................19

          1.     Legal Standard for Exercising Ancillary Jurisdiction................19

          2.     The Court's Exercise of Ancillary Jurisdiction Would Further the
                 Interests of Judicial Economy and Convenience of the Parties .................20

    III.    GTFF and STFF Have Demonstrated Their Right to the Funds ................22

          1.     Risk of Loss .................................................................................23

          2.     Opportunity for Gain....................................................................24

          3.     Intent of the Parties and Language and Form of the Transaction .............24

          4.     Degree of Control over the Transferred Assets .........................26

          5.     Purchase Price of the Transferred Assets....................................27

    IV.    Girobank Has Not Demonstrated any Ownership or Rights
          to the Funds at Issue in the TFT Application ...........................................28

          1.     Girobank has Admitted That its Participation Interests were Sold...........28

i

2.      Girobank's Claims are Time Barred ...........................................................29

3.      Girobank is Barred from Bringing Claims against GTFF
        and STFF under the New York Uniform Commercial Code ....................30

CONCLUSION.......................................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

Cases

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
   120 F.3d 351 (2d Cir. 1997).................................................................................29

*Advanced Magnetics, Inc. v. Bayfront Partners*,
   106 F.3d 11 (2d Cir. 1997)..................................................................................25

*Advanced Trading Corp. v. Nydegger & Co.*,
   127 N.Y.S.2d 800 (N.Y. Sup. Ct. 1953) ............................................................25

*Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.*,
   726 F. Supp. 1411 (S.D.N.Y. 1989)..............................................................25, 26

*Boaziz v. Torati*,
   No. 14-cv-8024 (RA) (RLE), 2016 WL 11483840 (S.D.N.Y. June 1, 2016).........19

*Caribe Carriers, Ltd. v. C.E. Health & Co.*,
   784 F. Supp. 1119 (S.D.N.Y. 1992).....................................................................26

*Chesley v. Union Carbide Corp.*,
   927 F.2d 60 (2d Cir. 1991)...................................................................................19

*City of Livonia Employees' Retirement System v. Wyeth*,
   No. 07-cv-10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013) ................18

*Cluett, Peabody & Co., Inc. v. CPC Acquisition Co., Inc.*,
   863 F.2d 251 (2d Cir. 1988)................................................................................20

*Colorado River Water Conservation Dist. v. U.S.*,
   424 U.S. 800 (1976)............................................................................................21

*Fox v. Peck Iron & Metal Co.*,
   25 B.R. 674 (Bankr. S.D. Cal. 1982) ..................................................................27

*Girobank N.V. et al. v. David Hu et al.*,
   Case No. 655968/2018 (Sup. Ct. N.Y. Cnty.)......................................................21

*Girobank N.V. v. IIG Capital, LLC, et al.*,
   Case No. 653605/2015 (Sup. Ct. N.Y. Cnty.)......................................................21

*Girobank, N.V. et al. v. IIG Trade Opportunities Fund, N.V. et al.*,
   Case No. 652135/2019 (Sup. Ct. N.Y. Cnty.)......................................................21

*Gutkowski v. Steinbrenner,*
  680 F. Supp. 2d 602 (S.D.N.Y. 2010) ...................................................................29

*Home Bond Co. v. McChesney,*
  239 U.S. 568 (1916).........................................................................................27

*In re Candy Lane Corp.,*
  38 B.R. 571 (Bankr. S.D.N.Y. 1984)..................................................................25

*King v. Tuxedo Enter.,*
  975 F. Supp. 448 (E.D.N.Y. 1997) ....................................................................26

*Kokkonen v. Guardian Life Ins. Co. of America,*
  511 U.S. 375 (1994).................................................................................19, 20

*Levitt v. Brooks,*
  669 F.3d 100 (2d Cir. 2012)..............................................................................20

*Miller v. Wells Fargo Bank Int'l Corp.,*
  540 F.2d 548 (2d Cir. 1976)..............................................................................26

*Rahanian v. Ahdout,*
  694 N.Y.S.2d 44 (1st Dept. 1999) ................................................................23, 24

*Red Pocket, Inc. v. Interactive Comms. Int'l, Inc.,*
  No. 17-cv-5670, 2020 WL 838279 (S.D.N.Y. Feb. 20, 2020) ........................23, 24

*Regions Bank v. Wieder & Mastroianni, P.C.,*
  170 F. Supp. 2d 436 (S.D.N.Y. 2001).................................................................21

*S.E.C. v. Credit Bancorp, Ltd.,*
  No. 99-cv-11395, 2000 WL 1752979 (S.D.N.Y. 2000) ......................................33

*Stamford Bd. of Educ. v. Stamford Educ. Ass'n,*
  697 F.2d 70 (2d Cir. 1982)................................................................................20

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,*
  549 F.3d 100 (2d Cir. 2008)..............................................................................18

## Statutes & Rules

N.Y. C.P.L.R. 213...............................................................................................29

N.Y. U.C.C. § 8-102 ..........................................................................2, 18, 30, 31

N.Y. U.C.C. § 8-501 ..........................................................................30, 31, 32, 33

N.Y. U.C.C. § 8-502 ..................................................................................30, 33

Non-parties IIG Structured Trade Finance Fund, Ltd. ("STFF") and IIG Global Trade Finance Fund Ltd. ("GTFF") respectfully submit this memorandum of law in further support of the application of STFF and GTFF, dated April 16, 2020 [Dkt. No. 113] (the "TFT Application"), requesting entry of an order directing Bank Leumi and defendant International Investment Group ("IIG") to make disbursements of funds held in eleven (11) collection accounts maintained by Bank Leumi (collectively, the "Collection Accounts") in New York by Trade Finance Trust ("TFT") to GTFF and STFF (the "Claims") and in response to the Memorandum of Girobank, N.V. and Girobank International, N.V. (together, "Girobank") in Opposition to Omnibus Application by STFF, GTFF, and TriLinc for this Court to Distribute Funds [Dkt. No. 127] (the "Opposition") and the letter dated April 24, 2020 from counsel for Bank Leumi USA ("Bank Leumi") to Hon. Denise L. Cote, U.S.D.J. [Dkt. No. 128] (the "Bank Leumi Letter").

## INTRODUCTION

In the Opposition, Girobank argues, *inter alia*, that (a) this Court should not exercise its ancillary jurisdiction to rule upon the relief requested by GTFF and STFF, (b) that GTFF and STFF have failed to demonstrate their rights to receipt of the funds requested, and (c) that it had or may have participation rights with respect to the loan facilities of three borrowers identified in the TFT Application as Compania, Sancor and Ivorfield. [Dkt. Nos. 125-127].

There is no merit to Girobank's contentions. As Girobank has admitted, the Compania and Sancor loan facilities in which it now claims to have continuing rights were sold in 2013 to Trade Finance Funding, I, B.V. ("TFF I BV"), an investment vehicle sponsored by IIG, and then participated into Trade Finance Funding I, Ltd. ("TFF"), a Cayman Islands limited company and the actual CLO vehicle sponsored by IIG. The Ivorfield position was also sold via a separate

agreement involving IIG TOF N.V., a limited liability company organized under Curacao law ("TOF NV") selling various positions directly to TFF.

Some of the loan facilities owned by TFF were subsequently sold to TFT in three transactions in 2017, shortly after GTFF and STFF were formed. As explained below, there are independent fatal defects to Girobank's claims. First, with respect to the loan participations acquired by GTFF and STFF from TFT in 2017, GTFF and STFF are purchasers of financial assets within the meaning of Section 8-102(9) of the Uniform Commercial Code, without any notice of any adverse claim to such assets, which means that no remedy, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may be asserted against GTFF or STFF in respect of those assets. In addition, based on Girobank's admissions that the sales of its claimed interests in the Compania, Sancor and Ivorfield facilities occurred in November 2013, any claims it had or may have had are now barred by the statute of limitations.

As to the other eight accounts listed in the TFT Application, Girobank has not – and cannot – assert any rights at all with respect to such transactions because it never had or even claimed an interest in those loan facilities. As to those transactions, Girobank has neither a substantive basis nor standing to object to the requests made by GTFF and STFF.

While GTFF and STFF believe that the TFT Application demonstrated their entitlements to the funds in the collection accounts maintained by TFT at Bank Leumi in New York, in this response (the "Response"), they provide additional documentary evidence that shows, *inter alia*: (1) the transfers of loan participations to TFF as sales, (2) the transfers by TFF to TFT of various loan participations, (3) how TFT paid for its purchases of loan participations from TFF with funds provided by GTFF and STFF, (4) the funding of GTFF and STFF by their respective investors, (5) further details regarding the loan participations that GTFF and STFF acquired that are the subject

of the TFT application, and (6) the rights of GTFF and STFF to the funds in the collection accounts under their participation agreements with TFT.

## FACTS

In his capacity as one of the Joint Official Liquidators of GTFF and STFF, Christopher Kennedy of Alvarez and Marsal Cayman Islands Limited and his staff have conducted investigations into the books and records of IIG.[1] That investigation has included, without limitation, personal interviews with Martin Silver and David Hu and their respective counsel, an examination of the computer server on which IIG stored records relating to GTFF and STFF, and in respect of its overall business, and examination of relevant bank records with respect to the transfers of funds among the parties described in the Response. The factual statements in the Response under the headings "TFF Purchases Loan Portfolios," "TFT Purchases Loan Portfolios From TFF," "TFT Uses Funds Provided by GTFF and STFF to Fund Its Purchases From TFF," "Funding of GTFF and STFF by Investors" and "GTFF and STFF Acquire Participation Interests in Loan Facilities" are the result of the factual investigations Mr. Kennedy has conducted with his staff.

## I.      TFF Purchases Loan Participations

TFF was formed in 2013 for the purposes (a) of acquiring portfolios of loans, originated by prior investment vehicles sponsored by IIG, specifically TOF NV, and IIG TOF B.V., a limited liability company organized under the laws of the Netherlands ("TOF BV"), and (b) issuing three series of notes backed by the cash flows generated by the Collateral Obligations acquired from

---

[1] Both GTFF and STFF are funds in liquidation in the Cayman Islands, pursuant to winding up orders dated October 23, 2019 and January 31, 2020 entered by the Grand Court of the Cayman Islands. Alex Lawson and Christopher Kennedy of the firm of Alvarez and Marsal Cayman Islands Limited have been appointed as Joint Official Liquidators (the "JOLs") of both funds. Copies of the orders appointing the JOLs were annexed as Exhibits A and B to the Selbst Dec. filed in connection with the TFT Application [Dkt. No. 114].

TOF BV and TOF NV.[2] A copy of the Offering Circular dated November 11, 2013 (the "Offering Circular") issued by TFF in connection with the issuance of the notes is annexed as Exhibit 1 to the Declaration of Christopher Kennedy which is being filed contemporaneously with this Memorandum of Law (the "Kennedy Dec.").

The Offering Circular clearly states that the acquisitions by TFF of the Collateral Obligations, which were consummated under agreements governed by New York law, were structured as sale transactions. As additional assurance to prospective investors in the notes to be issued by TFF, the Offering Circular advised that TFF had obtained legal opinions from New York counsel that the transactions would be recognized as "true sales" under New York law rather than a pledge or receivables and that the choice of New York law to govern the transaction agreements was enforceable. TFF also obtained an opinion of Curacao counsel that a Curacao court would uphold the choice of New York law as governing the Curacao sale agreement and the transfer of assets, and that a Curacao court would respect a determination by a New York court that that the Curacao sale transaction was a true sale. Finally, TFF obtained an opinion of Dutch counsel that a Dutch court would uphold the choice of New York law, and that a Dutch court would similarly respect a determination by a New York court that the Dutch sale transaction was a true sale. *See* Exhibit 1 at 42-43.

The agreement referred to in the Offering Circular as the Curacao Sale Agreement, a copy of which is annexed as Exhibit 2 to the Kennedy Dec., demonstrates the clear intent of the parties that the transaction was a sale. Section 2.1, titled "Transfer of the Conveyed Assets," provides in relevant part that: "Subject to and upon the conditions set forth herein, the Seller hereby sells,

---

[2] The Offering Circular refers to the portfolios of the loans and associated rights acquired by TFF as "Collateral Obligations." *See* Kennedy Dec. Exhibit 1 at 18-20, for a more detailed discussion of the rights embodied by the term "Collateral Obligations." Hereinafter, all references to the Exhibits will be to the Exhibit numbers in the Kennedy Dec.

conveys and transfers to the Issuer on the Closing Dates all of Seller's right, title, and interest in, to and under its Initial Collateral Obligations listed on Schedule I hereto." *See* Exhibit 2 at 5. Among the assets listed on Schedule I to Exhibit 2 are all of the interests in TOF NV (the seller under the agreement) in the facilities identified in the TFT Application as Ivorfield and Prosesamo. *See* Exhibit 2 at Schedule 1-1.

The agreement referred to in the Offering Circular as the Dutch Sale Agreement, a copy of which is annexed as Exhibit 3 to the Kennedy Dec., is virtually identical to the Curacao Sale Agreement. Section 2.1(a) of the Dutch Sale Agreement contains the same formulation of sale and conveyance and evidences the intention of the parties that the transaction was a sale. *See* Exhibit 3 at 5. Among the assets listed on Schedule I to Exhibit 3 are all of the interests in TOF BV (the seller under the agreement) in the facilities identified in the TFT Application as Compania and Sancor.  The assets at issue in the Dutch Sale Agreement were then participated into TFF. *See* Exhibit 4.

Moreover, Girobank has repeatedly admitted that the loan facilities in which it claims to have held participation interests were sold in 2013. For example, as recently as June 7, 2019, Girobank filed an amended complaint in an action in Supreme Court, New York County, Index Number 655968/2019 against IIG, Martin Silver and David Hu, the principals of IIG, and other parties, in which Girobank alleged that the loans in which it had participation interests had been sold in 2013.[3] Paragraph 89 of the amended complaint alleges that: "Defendants, with TOF and IIG Capital, arranged for and sold almost all of their trade finance loans as part of a complex securitization transaction that closed during November 2013." Exhibit 5 at ¶ 89.

---

[3] A copy of the amended complaint is annexed as Exhibit 5 to the Kennedy Dec.

## II.    TFT Purchases Loan Portfolios from TFF

In the summer of 2017, TFT entered into a series of transactions with TFF in which TFT acquired interests in certain loan portfolios then owned by TFF. The first purchase agreement between TFF and TFT dated June 6, 2017 was supplemented by two later agreements, referred to as "Subsequent Agreements," which were dated July 3, 2017 and August 1, 2017 (collectively, the "TFT Purchase Agreements"). Copies of these agreements are annexed as Exhibits 6, 7 and 8 to the Kennedy Dec.

Set forth below is a reconciliation that shows the total purchase price paid to TFT under the TFT Purchase Agreements:

| Date | Payment Made | Received by TFT | Received by TFF |
|---|---|---|---|
| **First Sale:** | **Purchase and Sale Agreement dated June 6, 2017 for $80,000,000 (assets valued at $79,228,449)** | | |
| June 1, 2017 | GTFF paid: | 66,680,646.78 | |
| June 1, 2017 | GTFF paid: | 3,020,666.67 | |
| June 1, 2017 | GTFF paid: | 9,503,295.72 | |
| June 1, 2017 | TFT paid: | | 66,680,646.78 |
| June 1, 2017 | TFT paid: | | 3,020,666.67 |
| June 1, 2017 | TFT paid: | | 9,503,295.72 |
| **Total:** | | **79,204,609.17** | **79,204,609.17** |
| | | | |
| **Second Sale:** | **Subsequent Transfer Agreement dated July 3, 2017 for $69,682,597** | | |
| July 3, 2017 | MaplesFS    Limited[4]    on behalf of STFF paid: | 62,999,950.00 | |
| July 3, 2017 | GTFF paid: | 7,668,094.32 | |
| July 3, 2017 | TFT paid: | | 54,673,142.88 |
| July 3, 2017 | TFT paid: | | 7,668,094.32 |
| July 3, 2017 | TFT paid: | | 7,306,750.62 |
| | | | |
| **Total:** | | **70,668,044.32** | **69,647,987.82** |
| | | | (Note: shortfall of 34,609.18) |

---

[4] MaplesFS Limited ("Maples") provides fiduciary services for investment funds and structured finance vehicles. https://maples.com/en/Services/Fiduciary-Services, accessed May 5, 2020.

| Third Sale:   Subsequent Transfer Agreement dated August 1, 2017 for $20,758,667 | | | |
|---|---|---|---|
| August 1, 2017 | STFF paid: | 27,588,916.64 | |
| August 1, 2017 | TFT paid: | | 20,758,666.64 |
| **Total:** | | **27,588,916.64** | **20,758,666.64** |
| **Total Received by TFF:** | | | **169,611,263.63** |

### III.   TFT Uses Funds Provided by GTFF and STFF to Fund Its Purchases from TFF

In connection with the investigation of IIG described above, Mr. Kennedy directed his staff to conduct a review of the bank statements for GTFF, STFF and TFT accounts to show: (i) investor monies coming into GTFF and STFF, then (ii) being paid to TFT, and then (iii) being paid into the bank account connected to the TFF. This section of the statement of facts is based upon the investigation conducted by Mr. Kennedy's staff.

| Fund/Account | Account # | Bank |
|---|---|---|
| IIG Global Trade Finance Fund Ltd | XX-XXX-053 | Deutsche Bank Trust Company Americas |
| IIG Structured Trade Finance Fund Ltd | XX-XXX-766 | Deutsche Bank Trust Company Americas |
| Trade Finance Trust Settlement Account | XX-XXX-733 | Deutsche Bank Trust Company Americas |

**June 1, 2017 Transaction**. In the transaction dated June 6, 2017, for which the purchase price was $79,204,609, the following payments were made, as shown on the excerpt below from the June 2017 statement for the TFT settlement account at Deutsche Bank:

- Between June 1-6, 2017 GTFF paid $79,204,609 to TFT. (*see ref 1.1, 1.2 & 1.3*)
- Between June 1-6, 2017 TFT paid $79,204,609 to TFF. (*see ref 1.4, 1.5 & 1.6*)

**Deutsche Bank Trust Company Americas**
P.O. Box 318. Church Street Station
New York, New York 10008-0318

CABLE: BANKTRUS
SWIFT: BKTRUS 33
TELEPHONE (212) 250-2500

STATEMENT OF ACCOUNT ACTIVITY FROM JUNE    01, 2017 TO JUNE    30, 2017
ACCOUNT NUMBER

21  TFT SETTLEMENT ACCOUNT
1500 BROADWAY, 26TH FLOOR
NEW YORK, NY 10036
ATTN : THOMAS LAVECCHIA

0

12  ITEMS

| BOOK BALANCE FORWARD: | $1.00 | COLLECTED BALANCE FORWARD: | $1.00 | |
| 6 CREDITS APPLIED: | $80,204,679.15 | | |
| 6 DEBITS APPLIED: | $80,204,674.90 | 0 CHKS  0 CHKITMS  6 DMS | |
| CLOSING BOOK BALANCE: | $5.25 | CLOSING COLLECTED BALANCE: | $5.25 | |

| POSTING DATE | FUNDS VALUE | VALUE DATE | TYPE/ SOURCE | YOUR REFERENCE/OUR REFERENCE NARRATIVE | DEBIT AMOUNT | CREDIT AMOUNT |
|---|---|---|---|---|---|---|
| 06-01 | 0 | | TRF/MT | SDP/01.06-11 45 //C910330BBK060117 IIG GLOBAL TRADE FINANCE FUND LTD | | 66,680,646.76  1.1 |
| 06-01 | 0 | | TRF/MT | SDP/01.06-11 50 //C910366BBK060117 DBTCA TTEE FOR TRADE FINANCE | 66,680,646.76  1.4 | |
| 06-01 | | | | **INTERIM BALANCE INFORMATION** BOOK    :    $1.00 COLLECTED:    $1.00 | | |
| 06-02 | 0 | | TRF/MT | SDP/02.06-14 42 //C913162BBK060217 IIG GLOBAL TRADE FINANCE FUND LTD | | 3,020,666.67  1.2 |
| 06-02 | 0 | | TRF/MT | SDP/02.06-14 44 //C913216BBK060217 DBTCA TTEE FOR TRADE FINANCE | 3,020,666.67  1.5 | |
| 06-02 | | | | **INTERIM BALANCE INFORMATION** BOOK    :    $1.00 COLLECTED:    $1.00 | | |
| 06-06 | 0 | | TRF/MT | SDP/05.06-16 40 //C918486BBK060617 IIG GLOBAL TRADE FINANCE FUND LTD | | 9,503,295.72  1.3 |
| 06-06 | 0 | | TRF/MT | SDP/05.06-16 40 //C918496BBK060617 DBTCA TTEE FOR TRADE FINANCE | 9,503,295.72  1.6 | |
| 06-06 | | | | **INTERIM BALANCE INFORMATION** BOOK    :    $1.00 COLLECTED:    $1.00 | | |

**July 3, 2017 Transaction**. In the transaction dated July 3, 2017, for which the purchase price was $69,647,987, the following payments were made, as shown on the excerpt below from the July 2017 statement for the TFT settlement account at Deutsche Bank:

- On July 3, 2017 Maples (on behalf of STFF), transferred $62,999,950. (*see ref 2.1*)
- On July 3, 2017 GTFF transferred $7,668,094 to TFT. (*see ref 2.2*)
- Between July 3-7, 2017 TFT paid $69,647,987 to TFF. (*see ref 2.3, 2.4 & 2.5*)



9

**August 1, 2017 Transaction**. In the transaction dated August 1, 2017, for which the purchase price was $20,758,666.64, the following payments were made, as shown on the excerpt below from the August 2017 statement for the TFT settlement account at Deutsche Bank:

- On 1 August 2017 STFF paid $27,588,916.64 to TFT. (*see ref 3.1*)
- On 1 August 2017 TFT paid $20,758,666.64 to TFF. (*see ref 3.2*)



## IV.   Funding of GTFF and STFF by Investors

The funds provided by GTFF and STFF that were used to pay the purchase price in the three transactions in which TFT acquired loan portfolios from TFF came from investments in GTFF and STFF by their respective investors. GTFF received $79,999,950 in investor funds on June 1, 2017 from Maples, of which $79,204,609.17 was used for the first purchase from TFF. GTFF received a further $22,149,650 over the following 14 months from Maples, of which $7,668,094.32 was used to fund the second purchase by TFT from TFF.

STFF effectively received $62,999,950 on July 3, 2017 from Maples, which was used for the second purchase from TFF dated July 3, 2017. This initial investment was paid directly to TFT because STFF did not have a bank account set up until the July 20, 2017. STFF received a further

$36,999,950 on August 1, 2017 from Maples, of which $20,758,666.64 used for the third purchase from TFF. STFF received an $19,999,950 on 2 October 2017 from Maple, but which was not used to purchase loan portfolios from TFF.

## V.   GTFF and STFF Acquire Participation Interest in Loan Facilities

As explained above, GTFF and STFF funded the acquisition by TFT of the loan participations that were transferred in the TFT Purchase Agreements. This section of the Response details the participation interest acquired by GTFF and STFF in the loan facilities that are the subject of the TFT Application. As noted below, some of these participation interests were acquired at or near in time to the dates of the TFT Purchase Agreements, while other participation interests were subsequently acquired. As set forth in the Kennedy Dec., all of the information regarding the participation interests acquired by GTFF and STFF is based upon an examination of IIG's books and records conducted by the staff of Alvarez and Marsal Cayman Islands Limited at Mr. Kennedy's direction.[5]

### A.   Compania De Granos International SA

| GTFF | | STFF | |
|------|------|------|------|
| Date | Amount ($) | Date | Amount ($) |
| 06/06/2017 | $2,000,000 | 07/03/2017 | $1,200,000 |
| 11/24/2017 | $2,000,000 | 08/01/2017 | $8,600,000 |
| 11/28/2017 | $1,500,000 | 11/01/2017 | $500,000 |
| | | 11/24/2017 | $1,000,000 |
| | | 11/28/2017 | $5,500,000 |
| **Total** | **$5,500,000** | **Total** | **$16,850,000** |

In the case of Compania De Granos International S.A., the purchases made on June 6, 2017, July 3, 2017 and August 1, 2017 were consummated in connection with the TFT Purchase Agreements, while the remaining transactions were completed subsequently.

---

[5] In the Bank Leumi Letter, Bank Leumi notes that, in several cases, the Collection Accounts contain less money than the amounts claimed in the TFT Application.  For the avoidance of doubt, GTFF and STFF are not asking the Court to order a disbursement of more money than exists in the Collection Accounts.

### B.  Conductores y Cables del Peru S.A.C.

| GTFF | | STFF | |
|------|--------|------------|------------|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| | | 07/03/2017 | $12,000,000 |
| | | **Total** | **$12,000,000** |

In the case of Conductores y Cables del Peru S.A.C., the single participation interest acquired was consummated in connection with the TFT Purchase Agreements.

### C.  Consorcio Ceper Internacional

| GTFF | | STFF | |
|------|--------|------------|------------|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 01/29/2018 | $494,700 | 01/29/2018 | $510,629 |
| 03/26/2018 | $393,170 | 03/26/2018 | $580,356 |
| 10/09/2018 | $624,537 | 10/09/2018 | $920,000 |
| **Total** | **$1,512,407** | **Total** | **$2,010,985** |

In the case of Consorcio Ceper Internacional, all of the participation interests were acquired after the TFT Purchase Agreements because this borrowing relationship began in December 2017.

### D.  Citricola Saltena S.A.

| GTFF | | STFF | |
|------|--------|------------|------------|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 12/26/2017 | $30,456 | 08/15/2017 | $80,560 |
| 01/28/2018 | $43,488 | 12/20/2017 | $53,856 |
| 03/19/2018 | $312,188 | 01/05/2018 | $65,664 |
| 07/10/2018 | $47,318 | 02/07/2018 | $83,609 |
| 07/20/2018 | $22,104 | 02/09/2018 | $29,088 |
| | | 06/07/2018 | $36,252 |
| | | 12/19/2018 | $130,824 |
| | | 01/02/2019 | $18,144 |
| **Total** | **$455,554** | **Total** | **$497,997** |

In the case of Citricola Saltena S.A., all of the participation interests were acquired after the TFT Purchase Agreements because this borrowing relationship (for GTFF, STFF and TFT) began subsequent to the date of those agreements.

### E. Imperio S.A.

| GTFF | | STFF | |
|---|---|---|---|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 01/29/2018 | $319,800 | 01/29/2018 | $330,200 |
| **Total** | **$319,800** | **Total** | **$330,200** |

In the case of Imperio S.A., all of the participation interests were acquired after the TFT Purchase Agreements because this borrowing relationship (for GTFF, STFF and TFT) began subsequent to the date of those agreements.

### F. Ivorfield Trading Corp.[6]

| GTFF | | STFF | |
|---|---|---|---|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 07/13/2017 | $95,000 | 08/03/2017 | $785,000 |
| 08/30/2017 | $178,000 | 08/29/2017 | $591,000 |
| 09/12/2017 | $158,000 | 08/30/2017 | $297,000 |
| 09/27/2017 | $650,000 | 09/12/2017 | $664,500 |
| 09/28/2017 | $80,000 | 09/15/2017 | $572,000 |
| 12/08/2017 | $298,000 | 09/18/2017 | $548,000 |
| 01/10/2018 | $875,000 | 09/27/2017 | $485,000 |
| 01/11/2018 | $100,000 | 09/28/2017 | $110,000 |
| 01/17/2018 | $322,000 | 10/24/2017 | $435,000 |
| 01/19/2018 | $66,000 | 12/08/2017 | $492,000 |
| 01/24/2018 | $446,000 | 12/29/2017 | $222,000 |
| 02/05/2018 | $186,000 | 01/10/2018 | $548,000 |
| 02/26/2018 | $114,000 | 01/11/2018 | $58,000 |
| | | 01/17/2018 | $317,000 |
| | | 01/19/2018 | $69,000 |
| | | 01/24/2018 | $252,000 |
| | | 02/05/2018 | $276,000 |
| | | 02/06/2018 | $609,000 |
| | | 02/07/2018 | $340,000 |
| | | 02/16/2018 | $245,000 |
| | | 02/26/2018 | $163,000 |
| | | 02/28/2018 | $545,000 |
| | | 06/04/2018 | $457,000 |
| **Total** | **$3,568,000** | **Total** | **$9,080,500** |

[6] Subsequent to the filing of the TFT Application, additional participation certificates were found related to the Ivorfield participation interests.  These additional Ivorfield participation certificates are attached to the Kennedy Dec. as Exhibit 11.

In the case of Ivorfield, all participation interests were acquired outside of the TFT Purchase Agreements.

### G.    Proexpo S.A.[7]

| GTFF | | STFF | |
|---|---|---|---|
| Date | Amount ($) | Date | Amount ($) |
| 09/08/2017 | $110,000 | 08/03/2017 | $730,000 |
| 12/08/2017 | $87,000 | 08/09/2017 | $400,000 |
| 01/08/2018 | $164,000 | 08/23/2017 | $500,000 |
| 01/09/2018 | $302,000 | 09/06/2017 | $319,000 |
| 01/11/2018 | $100,000 | 09/08/2017 | $327,000 |
| 01/17/2018 | $422,000 | 09/25/2017 | $366,000 |
| 01/18/2018 | $587,000 | 10/20/2017 | $909,000 |
| 07/17/2018 | $334,000 | 10/24/2017 | $80,000 |
| | | 12/05/2017 | $346,000 |
| | | 12/08/2017 | $143,000 |
| | | 12/29/2017 | $176,000 |
| | | 01/17/2018 | $414,000 |
| **Total** | **$2,106,000** | **Total** | **$4,710,000** |

In the case of Proexpo S.A., all participation interests were acquired after the TFT Purchase Agreements.

### H.    Prosesamo Holding Ltd.

| GTFF | | STFF | |
|---|---|---|---|
| Date | Amount ($) | Date | Amount ($) |
| 07/16/2018 | $470,000 | 07/16/2018 | $830,000 |
| 10/04/2018 | $40,000 | 10/04/2018 | $60,000 |
| **Total** | **$510,000** | **Total** | **$890,000** |

In the case of Prosesamo Holdings Ltd., all of the participation interests were acquired after the TFT Purchase Agreements because this borrowing relationship began subsequent to the date of those agreements.

---

[7] Subsequent to the filing of the TFT Application, additional participation certificates were found related to the Proexpo participation interests.  These additional Proexpo participation certificates are attached to the Kennedy Dec. as Exhibit 12.

I.    **Representaciones Saldana S.A.**[8]

| GTFF | | STFF | |
|------|------|------|------|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 12/22/2017 | $33,800 | 12/22/2017 | $68,200 |
| 12/27/2017 | $57,800 | 12/27/2017 | $120,896 |
| 12/29/2017 | $54,835 | 12/28/2017 | $45,319 |
| 04/12/2018 | $76,288 | 12/29/2017 | $112,998 |
| 05/03/2018 | $134,529 | 04/12/2018 | $115,008 |
| 05/24/2018 | $136,000 | 05/03/2018 | $294,047 |
| 06/04/2018 | $208,093 | 05/24/2018 | $214,000 |
| **Total** | **$701,345** | **Total** | **$970,468** |

In the case of Representaciones Saldana S.A., all of the participation interests were acquired after the TFT Purchase Agreements because this borrowing relationship began subsequent to the date of those agreements.

J.    **San Agustin Energy (Formerly known as Valle Energy Inc.)**[9]

| GTFF | | STFF | |
|------|------|------|------|
| **Date** | **Amount ($)** | **Date** | **Amount ($)** |
| 06/06/2017 | $3,900,000 | 07/03/2017 | $9,950,000 |
| | | 08/01/2017 | $4,000,000 |
| **Total** | **$3,900,000** | **Total** | **$13,950,000** |

In the case of San Augustin Energy, formerly known as Valle Energy Inc., the participation interests acquired on June 6, 2017 and July 3, 2017 were acquired in connection with the TFT Purchase Agreements, and the participation acquired by STFF on August 1, 2017 was acquired outside of the TFT Purchase Agreements.

---

[8] Subsequent to the filing of the TFT Application, additional participation certificates were found related to the Saldana participation interests.  These additional Saldana participation certificates are attached to the Kennedy Dec. as Exhibit 13.

[9] In the Bank Leumi Letter, Bank Leumi argues that the Valle Energy Inc. Collection Account has a zero balance. However, GTFF and STFF note that, as a result of Valle Energy Inc.'s name change to San Agustin Energy Corp., repayments from the borrower have been made into the San Agustin Energy Collection Account, Account No. XXXXXXX3901, which is the account from which GTFF and STFF sought disbursement from in the TFT Application.

K.      Sancor Corp.[10]

| STFF | |
|---|---|
| Date | Amount ($) |
| 07/03/2017 | $18,668,647 |
| **Total** | **$18,668,647** |

In the case of Sancor Corp. the participation interest was acquired by STFF in connection with the TFT Purchase Agreements.

## VI.    Master Participation Agreements

In connection with their acquisition of participation interests from TFT, GTFF and STFF each entered into a Master Participation Agreement (collectively, the "Participation Agreements") with TFT as seller and IIG Trade Finance LLC, as administrator.[11] The Participation Agreements are substantially identical and clearly demonstrate the intention of the parties to create rights of the participants in and to the underlying loan documents and the collateral securing such credit facilities. The definition of "Participation Interest" provides that "a participation interest, as detailed in an applicable Participation Certificate, in a particular Facility or Loan and includes, without limitation, all corresponding rights in payments thereunder and all Collateral and proceeds thereof." Kennedy Dec. Exhibits 9 and 10 at 3.

The Participation Agreements similarly make it clear that the participants are purchasing all of TFT's rights as seller with respect to the participation interests, and have no recourse to TFT as the seller of the participation interests, but must look solely to the underlying borrower for repayment. Section 7, titled "Status of Parties" provides:

---

[10] In the Opposition, Girobank notes that GTFF and STFF have submitted Spanish language documents to this court as exhibits to the Selbst Declaration related to Ivorfield and Sancor.  With the Court's indulgence, GTFF and STFF can provide certified translations of the relevant loan documents if the Court determines it needs such translations.

[11] Copies of the GTFF Participation Agreement, dated as of May 31, 2017, and the STFF Participation Agreement, dated as of June 30, 2017, are annexed as Exhibits 9 and 10 to the Kennedy Dec.

> In the case of any sale of a Participation Interest, (i) the seller thereof assigns to Purchaser, without recourse, such seller's entire right, title and interest in and to the respective Participation Interest (and does not retain or hold any right, title or interest therein)…In all cases, the relationship between a seller of a Participation Interest and the Purchaser thereof (be it Participant or Seller), is and shall be that of a purchaser and seller of a property interest and not a debtor-creditor relationship; and the seller of a Participation Interest does not assume and shall have no liability to any Purchaser thereof.

Exhibits 9 and 10 at 11.

Other provisions of the Participation Agreements are consistent and expressly disclaim any obligation of the seller of a participation interest to the purchaser. Section 2(f) of the Participation Agreements provides: The sale of a Participation Interest shall be made without recourse to, or representation or warranty by, the applicable seller[.]" Exhibits 9 and 10 at 3. Section 3 of the Participation Agreements similarly provides: "Purchaser (including Participant) acknowledges that in the event that Obligor fails to make any payment when due with respect to a Facility or Loan, Purchaser (including Participant) has no recourse to the seller of the Participation Interest, including Seller." Exhibits 9 and 10 at 5.

Section 4(c) of the Participation Agreement also identifies the rights of holders of participation interests to funds collected from borrowers and provides:

> All monies collected within a relevant collection account from or on behalf of an Obligor in respect of a Facility in which Participant holds a Participation Interest(s) shall be held within segregated collection accounts for such Facility, and to the extent allocable to a Participation Interest of Participant, be held in such collection account in trust for Participant for the purpose for which they were paid…Promptly following such time as monies received in a relevant collection account constitute good collected funds, with respect to a Participation Interest, Administrator shall remit to Participant the portion of such monies to which Participant is entitled[.]

Exhibits 9 and 10 at 6.

As explained below, these provisions of the Participation Agreements show that the funds collected in the collection accounts are "financial assets" within the meaning of Section 8-102(9) of the Uniform Commercial Code. These provisions further show the enforceable rights of GTFF and STFF to the funds in such collection accounts, to the extent of their participation interests therein.

## ARGUMENT

### I.   Girobank Lacks Jurisdiction to Oppose
### Eight of the Eleven Claims at Issue in the TFT Application

At the outset, STFF and GTFF note that in the Opposition, Girobank alleges claims to only three of the eleven funds at issue in the TFT Application: specifically, those related to Compania De Granos International S.A. ("Compania")[12], Ivorfield Trading Corp. ("Ivorfield"), and Sancor Coop Unidas Ltd. ("Sancor").[13] Thus, Girobank does not have standing to oppose the TFT Application to the extent it concerns Claims related to the other eight Collection Accounts, as Girobank has failed to demonstrate any "injury-in-fact" or "personal stake" in the outcome of the TFT Application with regard to such Claims. *See City of Livonia Employees' Retirement System v. Wyeth*, No. 07-cv-10329 (RJS), 2013 WL 4399015, at *7 (S.D.N.Y. Aug. 7, 2013) (noting the "basic requirements for constitutional standing under Article III of the U.S. Constitution, which requires an 'injury-in-fact' or 'personal stake in outcome of the controversy.'" (citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008))).

---

[12] Referred to in the Opposition as Compania Argentina de Granos, S.A. or CAGS.

[13] GTFF and STFF note that by setting forth its own claims to the Compania, Ivorfield, and Sancor funds in the Opposition, Girobank tacitly admits that the Court may appropriately retain ancillary jurisdiction over such claims and the subject matter of the TFT Application. Accordingly, Girobank's jurisdictional arguments should be disregarded.

Thus, the Court should disregard Girobank's Opposition to the TFT Application as it relates to (i) Conductores y Cables del Peru SAC, (ii) Consorcio Ceper Internacional, (iii) Citricola Saltena SA, (iv) Imperio S.A., (v) Proexpo S.A., (vi) Prosesamo Holding Ltd., (vii) Representaciones Saldana S.A., and (viii) Valle Energy Inc.

## II.     The Court's Exercise of Ancillary Jurisdiction is Appropriate

To the extent this Court determines that Girobank has standing to object to all 11 funds at issue in the TFT Application, Girobank's argument concerning the Court's exercise of ancillary jurisdiction over the Claims is wrong. As discussed herein, the Court's exercise of ancillary jurisdiction over the Claims fits within the framework under which courts may exercise ancillary jurisdiction and doing so would further the interests of judicial economy and convenience of the parties. Accordingly, this Court should exercise ancillary jurisdiction over the Claims raised in the TFT Application.

### 1.     Legal Standard for Exercising Ancillary Jurisdiction

Generally, federal courts are permitted to assert ancillary jurisdiction over a claim where doing so would "(1) to permit disposition by a single court of claims that are, *in varying respects and degrees*, factually interdependent, . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994) (emphasis added and citations omitted). It is well established that exercise of such ancillary jurisdiction is within the Court's discretion. *See Boaziz v. Torati*, No. 14-cv-8024 (RA) (RLE), 2016 WL 11483840 (S.D.N.Y. June 1, 2016) ("The decision to hear an ancillary claim is discretionary and 'turns upon whether the policies of judicial economy, convenience, and fairness to litigants are furthered by the assumption of jurisdiction.'" (citing *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 64 (2d Cir. 1991) and

*Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 72 (2d Cir. 1982))). In exercising this discretion, the Court should consider several factors, including, but not limited to, (1) judicial economy, (2) familiarity with the subject matter of the suit, and (3) the convenience of the parties. *Id.* (citing *Levitt v. Brooks*, 669 F.3d 100, 104 (2d Cir. 2012) and *Cluett, Peabody & Co., Inc. v. CPC Acquisition Co., Inc.*, 863 F.2d 251, 256 (2d Cir. 1988)).

Although STFF and GTFF do not agree with or adopt Girobank's purported facts, Girobank's Opposition makes abundantly clear that the Claims at issue in the TFT Application, and in particular any dispute related to the Claims to the Compania, Ivorfield, and Sancor funds, are directly related to and arise out of the underlying fraud claim against IIG. For Girobank to suggest otherwise would be disingenuous. Here, as a direct consequence of IIG's fraudulent conduct, STFF and GTFF are being forced to defend their Claims to these funds against purportedly competing claims of entities like Girobank. Thus, GTFF and STFF maintain that the Court's exercise of ancillary jurisdiction over the Claims would surely qualify under the first "prong" set forth in *Kokkonen*.

## 2. The Court's Exercise of Ancillary Jurisdiction Would Further the Interests of Judicial Economy and Convenience of the Parties

Upon consideration of all the circumstances at issue here, it is clear that this Court's exercise of ancillary jurisdiction over the Claims will further the interests of judicial economy and convenience of the parties, as this Court is familiar with the subject matter of the Claims and the relevant parties have already appeared before this Court.

First, as Girobank is aware, there are numerous other proceedings pending in a variety of domestic and foreign courts, all involving litigation over IIG-related assets. These include: (1) the liquidation proceedings of STFF pending in the Cayman Islands, (2) the liquidation proceedings of GTFF pending in the Cayman Islands, and its related Chapter 15 proceeding [Case No. 20-

10132 (MEW) (Bankr. S.D.N.Y.)]; (3) the Curacao insolvency of IIG Trade Opportunity Fund N.V., and its related Chapter 15 bankruptcy proceeding [Case No. 20-10666 (MEW) (Bankr. S.D.N.Y.)]; and (4) the several claims of Girobank, both pending and disposed of, in New York State Supreme Court, New York County [*See, e.g.*, *Girobank N.V. et al. v. David Hu et al.*, Case No. 655968/2018 (Sup. Ct. N.Y. Cnty.); *Girobank, N.V. et al. v. IIG Trade Opportunities Fund, N.V. et al.*, Case No. 652135/2019 (Sup. Ct. N.Y. Cnty.); *Girobank N.V. v. IIG Capital, LLC, et al.*, Case No. 653605/2015 (Sup. Ct. N.Y. Cnty.)].[14] As evidenced by these various proceedings before these various forums, this Court is clearly the only appropriate central forum for resolving these disputes.

For example, this Court is (i) the only forum with the power to adjudicate the Claims held by both GTFF and STFF, (ii) the only forum in which Girobank, TriLinc, STFF, and GTFF have all appeared, which is not true of any other forum cited by Girobank in the Opposition, and (iii) this Court is already familiar with the nature of the facts underlying the Claims, and so can resolve the Claims quickly and efficiently. Forcing GTFF, STFF, and any other parties with similar claims to litigate such claims piecemeal in the various forums in which related cases are pending would simply increase costs for all parties and create the risk of inconsistent results across the various forums. Such duplicative litigation does not further the interest of judicial economy and should be avoided. *C.f. Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F. Supp. 2d 436, 439 (S.D.N.Y. 2001) ("In order to promote judicial economy, if competing cases are filed in two federal courts, 'the general principle is to avoid duplicative litigation.'" (citing *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976))).

---

[14] Even though Girobank has asserted various claims in New York State Supreme Court, none of those claims name either GTFF or STFF as parties. Thus, Girobank cannot claim that the New York State Supreme Court is a preferred forum. Moreover, because neither GTFF nor STFF were ever named in those Supreme Court actions, they have had no notice of the claims asserted or the attachment remedy sought by Girobank therein.

In particular, Girobank suggests that GTFF's Chapter 15 proceeding is the proper place to litigate these Claims. *See* Opposition at pp. 9-11. However, bankruptcy courts are courts of limited jurisdiction. At most, GTFF could assert its claim to the funds via the GTFF Chapter 15 proceeding, but the bankruptcy court would have no jurisdiction over any other claims to the funds, such as those asserted by STFF, TriLinc, IIG Trade Opportunity Fund, or IIG Malta Bank Ltd. Accordingly, STFF and these other entities would be required to bring their various claims to the funds individually in some other forum or forums.

Thus, the approach Girobank advocates for in the Opposition appears to be designed not to decrease the number of litigations over these funds, but rather to multiply them. Accordingly, principles of judicial economy strongly favor the Court's exercise of ancillary jurisdiction over the Claims.

## III.    GTFF and STFF Have Demonstrated Their Right to the Funds

Assuming that this Court appropriately retains ancillary jurisdiction over the TFT Application, GTFF and STFF have made abundantly clear in the Facts section above that they have validly acquired the participation interests at issue in the TFT Application, and that TFT had, in turn, validly acquired such interests from TFF prior to the sale of such interests to GTFF and STFF.

Importantly, as noted above, TFF's 2013 acquisition of the portfolio of loans from TOF NV and TOF BV are "true sales" under New York law. When determining whether a transfer of an asset should be treated as true sale rather than the creation of a security interest, courts in most jurisdictions have emphasized the following factors: (1) the degree to which the risk of loss is transferred to an assignee; (2) the degree to which the opportunity for gain is transferred to the assignee; (3) the intent of the parties and the language and form of the transaction; (4) the degree

of control exercised by the assignor over the transferred assets; and (5) the purchase price for the transferred assets. When considering the transaction as a whole, the transfer of the loan portfolio from TOF NV and TOF BV to TFF plainly meets the requirements of a "true sale" under New York law.

### 1.      Risk of Loss

Under New York law, where a buyer assumes the credit risk related to an asset following the transfer of such asset, the transfer is generally deemed to be a true sale. *See, e.g.*, *Red Pocket, Inc. v. Interactive Comms. Int'l, Inc.*, No. 17-cv-5670, 2020 WL 838279, at *6 (S.D.N.Y. Feb. 20, 2020) ("in a sale, 'there is a true sale in which title and risk of loss passes to the buyer-retailer and the buyer is entitled to retain *all* proceeds of a subsequent sale, liable to the seller only for payment of the purchase price'" (citing *Rahanian v. Ahdout*, 694 N.Y.S.2d 44, 47 (1st Dept. 1999) (emphasis in original))).

Under the terms of the Dutch Sale Agreement and the Curacao Sale Agreement (together, the "Sale Agreements"), any credit risk related to the collection of the Conveyed assets is placed entirely on the purchaser.  Specifically, the Sale Agreements provide:

> The parties agree that the provisions of this Section 6.1 shall not be interpreted to provide recourse to the Seller against loss by reason of the bankruptcy, insolvency or lack of creditworthiness of an Obligor with respect to a Collateral Obligation. The Seller shall have no liability for making indemnification hereunder to the extent any such indemnification constitutes recourse for uncollectible or uncollected amounts payable under any Collateral Obligation conveyed by it hereunder.

Exhibits 2 and 3 at § 6.1.

Similarly, the Sale Agreements provide:

> Except as expressly set forth in this Agreement, the Seller assigns each Conveyed Assets "as is," "where-is" and makes no covenants, representations or warranties regarding the Conveyed Assets.

Exhibits 2 and 3 at § 2.1(d).

Accordingly, under the terms of the Sale Agreements, the credit risk related to the collection of the Conveyed Assets rests entirely with the purchaser, and the Sellers retain no such credit risk.  Thus, the "Risk of Loss" factor weighs in favor of the Sale Agreements being "true sales."

### 2.    Opportunity for Gain

Similarly, Courts have held that where a buyer is entitled to benefit from any gain or surplus associated with a transferred asset following the transfer of such asset, without the need to provide additional compensation to the seller, the transfer of such asset is considered to be a true sale. *See, e.g.*, *Red Pocket, Inc.*, 2020 WL 838279, at *6 ("in a sale, 'there is a true sale in which title and risk of loss passes to the buyer-retailer and the buyer is entitled to retain *all* proceeds of a subsequent sale, liable to the seller only for payment of the purchase price'" (citing *Rahanian*, 694 N.Y.S.2d at 47 (emphasis in original))).

Here, under the terms of the Sale Agreements, the Sellers have no right or obligation to repurchase or otherwise reacquire any of the Conveyed Assets, nor do the Sellers have any right to an additional incremental purchase price payment in the event that collections of the Conveyed Assets were to exceed their previous expectations.  Thus, because the Sellers are no longer entitled to any gain associated with the Conveyed Assets, the "Opportunity for Gain" factor weighs in favor of the Sale Agreements being considered true sales under New York law.

### 3.    Intent of the Parties and Language and Form of the Transaction

When considering whether a transaction constitutes a true sale, New York courts have focused on the parties' intent in determining whether a transaction constitutes a true sale.  Rather than imposing any specific language requirement, courts generally look for words or acts that

manifest the intent to assign a property interest. *See, e.g.*, *Advanced Magnetics, Inc. v. Bayfront Partners*, 106 F.3d 11, 18 (2d Cir. 1997); *Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.*, 726 F. Supp. 1411, 1417 (S.D.N.Y. 1989); *In re Candy Lane Corp.*, 38 B.R. 571, 575 (Bankr. S.D.N.Y. 1984); *Advanced Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (N.Y. Sup. Ct. 1953).

Per the express terms of the Sale Agreements, the parties to the Sale Agreements clearly intended that the transfer of the Conveyed Assets be considered a true sale, rather than a secured transaction, and the form of the transaction reflects the same. Specifically, the Sale Agreements provide:

> The Seller and the [Issuer/Purchaser] intend and agree that (i) the transfer of the Conveyed Assets by the Seller to the [Issuer/Purchaser] pursuant to this Agreement is, in each and every case, intended to be an absolute sale, conveyance and transfer of ownership of the applicable Conveyed Assets, free and clear of any Lien, security interest, charge or encumbrance other than Permitted Liens, providing the [Issuer/Purchaser] with the full risks and benefits of ownership of the Conveyed Assets, rather than the mere granting of a security interest to secure a financing and (ii) such Conveyed Assets shall not be part of the Seller's estate in the event of a filing of a bankruptcy petition or other action by or against such Person under any Insolvency Law.

Exhibits 2 and 3 at § 2.1(d). Similarly, the Sale Agreements provides:

> the Seller owns the Conveyed Assets being conveyed hereunder, free and clear of any lien, claim or encumbrance of any person (other than Permitted Liens), and, upon the transfer by the Seller to the [Issuer/Purchaser] of any Conveyed Assets pursuant to this Agreement and any other required transfer document, the [Issuer/Purchaser] will own such Conveyed Assets free and clear of any and all liens, claims or encumbrances created by, or attaching to property of, the Seller (other than Permitted Liens).

Exhibits 2 and 3 at § 3.1(j)(iv).

Accordingly, the language and form of the Sale Agreements make clear that the transfer is a true sale, and once the Conveyed Assets are sold pursuant to the Sale Agreements, the Sellers

retain no ownership rights to the Conveyed Assets, and the Sellers have no rights with respect to any further sale, transfer or disposition of the Conveyed Assets. Therefore, the Intent of the Parties/Form of the Transaction factor weighs in favor of ruling that the Sale Agreements were true sales.

### 4.   Degree of Control Over the Transferred Assets

The next factor to consider in determining whether a transfer is deemed to be a true sale is the degree of control over the transferred assets retained by the seller and obtained by the purchaser.  Under New York law, to constitute an absolute assignment, an assignor must relinquish its entire interest in the assigned rights, and may not retain control over such rights. *See Caribe Carriers, Ltd. v. C.E. Health & Co.*, 784 F. Supp. 1119, 1126 (S.D.N.Y. 1992); *King v. Tuxedo Enter.*, 975 F. Supp. 448, 452 (E.D.N.Y. 1997); *Banque Arabe*, 726 F. Supp. at 1417.  "An assignment cannot exist where an assignor retains control over the fund or any authority to collect or any power to revoke." *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558 (2d Cir. 1976).

Here, under the terms of the Sale Agreements, the Seller retains no ownership rights in the Conveyed Assets and therefore has no right to sell, transfer, assign or otherwise dispose of the Conveyed Assets.  Furthermore, the Seller may not take any action with respect to the Conveyed Assets following the transfer of the assets without the prior instruction of the Issuer/Purchaser. For example, Section 2.4 of the Sale Agreement provides:

> On and after the Transfer Date, the Seller (i) shall not take (or refrain from taking) any action with respect to its respective Conveyed Assets other than in accordance with the prior instructions of the Purchaser (or the Collateral Manager on behalf of the Purchaser) and (ii) shall take (or refrain from taking) any reasonable action with respect to its respective Conveyed Assets thereto in accordance with the prior instructions of the Purchaser (or the Collateral Manager on behalf of the Purchaser). In the event that any Conveyed Assets fails to fully vest in the sole ownership and control of the Purchaser, the Seller agrees that it shall take (or refrain from taking) all reasonable

26

> actions with respect to such respective failed Conveyed Assets as it shall be directed by the Purchaser (or the Collateral Manager on behalf of the Purchaser) and that the Seller shall hold such failed Conveyed Assets as agent solely for and on behalf of the Purchaser.

Exhibits 2 and 3 at § 2.4.

Similarly, in the event that a Seller receives a payment on or after a Transfer Date, the Seller is obligated to promptly remit to the Issuer/Purchaser any payment of principal, interest, fees or any other sums relating to or otherwise payable on account of the Conveyed assets, which property is the property of the Issuer/Purchaser under the terms of the Sale Agreements. *See* Exhibits 2 and 3 at § 5.1(g). Thus, it is clear under the terms of the Sale Agreements that the Sellers retain no control over the Conveyed Assets, which are to be controlled by the purchaser following the execution of the transfer. Accordingly, the Degree of Control factor weighs in favor of the transfer being deemed a true sale.

### 5.     Purchase Price for the Transferred Assets

The final factor to consider when determining whether a transfer is to be considered a true sale is the adequacy of the purchase price paid to the seller for the transferred assets. Generally, where the purchase price is much lower than the value of the assets sold, such is an indication that the transaction was not a true sale. *See Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 689 (Bankr. S.D. Cal. 1982). Similarly, if the purchase price is retroactively adjusted to reflect the actual collections on a transferred account, such is indicative that the transaction was not a true sale. *Home Bond Co. v. McChesney*, 239 U.S. 568, 573 (1916).

Here, the purchase price paid to the Sellers by the Issuer/Purchaser was not less than fair and reasonable and was the face value of the loan plus accrued interest, as evidenced by section 3.1(k) of the Sale Agreements which provides:

> The cash payments received by the Seller in respect of the purchase price of all Conveyed Assets conveyed hereunder by the Seller

> constitutes reasonably equivalent value in consideration for the transfer to the [Issuer/Purchaser] of such Conveyed Assets under this Agreement, such transfer was not made for or on account of any antecedent debt owed by the [Issuer/Purchaser] to the Seller, and such transfer was not and is not voidable or subject to avoidance under any Insolvency Law.

Exhibits 2 and 3 at § 3.1(k).

Accordingly, this fifth and final factor, in conjunction with the other factors discussed herein, weighs in favor of the transaction being deemed a true sale under New York law.

## IV. Girobank has not Demonstrated any Ownership or Rights to the Funds at Issue in the TFT Application

Unlike GTFF and STFF, Girobank has failed to demonstrate any legitimate ownership or rights to the funds held in the Collection Accounts, including those for Compania, Ivorfield, and Sancor.

### 1. Girobank has Admitted That its Participation Interests Were Sold

First, GTFF and STFF point out that Girobank has previously admitted that its participation interests in the Compania, Ivorfield, and Sancor have been sold, thus extinguishing their rights to any funds held in the such Collection Accounts. For example, in its amended complaint dated June 7, 2019 filed with the Supreme Court of the State of New York, County of New York in the matter of *Girobank, N.V., et al. v. Hu, et al.,* Index No. 655968/2018 (Sup. Ct. N.Y. Cnty.) (the "Amended Complaint"), Girobank alleges:

> Defendants, with TOF and IIG Capital, arranged for and sold almost all of their trade finance loans as part of a complex securitization transaction that closed during November 2013. Defendants never told Girobank about this transaction, and Girobank only learned about it after the fact through publicly available documents. Defendants, with TOF and IIG Capital, were paid approximately $187 million as a result of the transaction. Girobank received no money.

Exhibit 5 at ¶ 89.

Thus, Girobank has admitted in a separate court filing before the Supreme Court of the State of New York, New York County, that it no longer has an interest in the relevant participation agreements.  As a result, Girobank cannot now assert that it has any remaining right to these participation interests or to the funds at issue in the TFT Application. On this basis alone, Girobank's Opposition should be disregarded and the TFT Application should be granted.

### 2.    Girobank's Claims are Time Barred

To the extent that this Court deems that Girobank does somehow retain any claims related to the November 2013 sale of its participation interests, such claims would be properly characterized as breaches of contract related to any participation agreement Girobank entered into with regard to its claimed participation interests. As a result, any of Girobank's purported claims would be subject to the six-year statute of limitations for breach of contract under New York law. *See* N.Y. C.P.L.R. 213(2) ("The following actions must be commenced within six years: . . . 2. An action upon a contractual obligation or liability, express or implied . . ."); *see also Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 615 (S.D.N.Y. 2010) ("New York's statute of limitations for contract and quasi-contract claims is six years, and it accrues upon breach." (citing N.Y. C.P.L.R. 213(2) and *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 361 (2d Cir. 1997))).

Because any breach of Girobank's purported participation agreements would be tied to the sale of Girobank's participation interests that took place in November 2013, any claims related thereto must have been brought by November 2019, or six years after the date the breach occurred. Further to the point, because Girobank's loans were sold in 2013, Girobank has no contractual privity with either the borrowers or TFT and the funds were paid by the borrowers into the Collection Accounts in 2020, more than six years after the loans were sold. As a result, any claims related to Girobank's participation agreement have long expired, and Girobank cannot now assert claims against GTFF and STFF related to the participation interests at issue in this Application.

29

3.      **Girobank is Barred from Bringing Claims against GTFF and STFF under the New York Uniform Commercial Code**

Finally, even if Girobank's purported claims were somehow still alive despite the expiration of the six-year statute of limitations, any claims Girobank may have against GTFF and STFF with regard to such funds would fail under New York Uniform Commercial Code ("N.Y. U.C.C.") § 8-502. Under N.Y. U.C.C. § 8-502, "An action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8-501 *for value* and *without notice of the adverse claim*." (emphasis added). Here, GTFF and STFF's purchase and ownership of the participation interests at issue in the litigation clearly fit under the protections of N.Y. U.C.C. § 8-502.

First, the participation interests clearly constitute "financial assets" as defined in the N.Y. U.C.C. Under N.Y. U.C.C. § 8-102(9), a "financial asset" is defined as either:

(i)      a security;

(ii)     an obligation of a person or share, participation, or other interest in a person or in property or an enterprise of a person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or

(iii)    any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this Article.

N.Y. U.C.C. § 8-102(9). Here, GTFF and STFF's participation interests clearly fall under the definition of a financial asset pursuant to N.Y. U.C.C. § 8-102(9)(ii). Such interests are (i) "participation[s]" (ii) "in property or enterprise of a person," i.e.: the loans made by the originators to the borrowers, and (ii) are "of a type, . . . recognized . . . as a medium for investment." Thus,

GTFF and STFF's participation interests constitute "financial assets" under the definition set forth in N.Y. U.C.C. § 8-102(9).

Next, because the proceeds of GTFF and STFF's participation interests are held in the Collection Accounts, and because such Collection Accounts constitute "securities accounts" under N.Y. U.C.C. § 8-501(a), GTFF and STFF have acquired "security entitlements" to such participation interests pursuant to N.Y. U.C.C. § 8-501(b). The first step in this analysis is to consider the definition set forth under N.Y. U.C.C. § 8-501(a), which defines "securities account" to mean "an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset." Here, the GTFF and STFF's financial assets (i.e.: their participation interests) have been credited to the Collection Accounts pursuant to the Master Participation Agreements between TFT and STFF and between TFT and GTFF.  Under these agreements GTFF and STFF have explicit rights to such financial assets. This is clear under Sections 4(b) and (c) of the Master Participation Agreements, which provide:

> (b) Without limiting the foregoing, subject to the provisions of this Agreement . . . , it is the intent and purpose of the Parties that Administrator, on behalf of Seller and Participant with respect to a Facility in which Participant holds a Participation Interest(s), shall bill for, collect within relevant collection accounts and account for the periodic installments of principal and interest and other sums payable under the relevant Financing Documents and shall exercise all rights, powers and privileges of the lender or other provider of credit thereunder, and generally shall be responsible for the administration of such Financing Documents.

> (c) All monies collected within a relevant collection account from or on behalf of an Obligor in respect of a Facility in which Participant holds a Participation Interest(s) shall be held within segregated collection accounts for such Facility, **and to the extent allocable to a Participation Interest of Participant, be held in such**

31

> ***collection account in trust for Participant for the purpose for***
> ***which they were paid***, but need not be segregated in any manner
> from any other monies therein allocable to the interests of Seller or
> any other Person. Promptly following such time as monies received
> in a relevant collection account constitute good collected funds, with
> respect to a Participation Interest, Administrator shall remit to
> Participant the portion of such monies to which Participant is
> entitled in accordance with the terms hereof and the relevant
> Participation Certificate, by wire transfer of immediately available
> funds or such other means as is mutually agreed between Participant
> and Administrator (and, shall, correspondingly, remit to Seller the
> net portion of such monies in respect of its interests, e.g., net of
> participation interests of Participant or any other Person).

Exhibits 9 and 10 at §§ 4(b), (c) (emphasis added). Thus, the funds maintained in the Collection

Accounts were maintained by TFT in trust for GTFF and STFF, making the Collection Accounts

"securities accounts" under N.Y. U.C.C. § 8-501(a).

Next, because the Collection Accounts are securities accounts under N.Y. U.C.C. § 8-
501(a), GTFF and STFF have acquired security entitlements to the participation interests held in

such Collection Accounts pursuant to N.Y. U.C.C. § 8-501(b), which provides:

> a person [i.e., GTFF and STFF] acquires a security entitlement if a
> securities intermediary [i.e., TFT]:
>
> (1)    indicates by book entry that a financial asset has been
>         credited to the person's securities account;
>
> (2)    receives a financial asset from the person or acquires a
>         financial asset for the person and, in either case, accepts it
>         for credit to the person's securities account; or
>
> (3)    becomes obligated under other law, regulation, or rule to
>         credit a financial asset to the person's securities account.

Here, because TFT has received the participation interests from GTFF and STFF and has

accepted them for credit to GTFF and STFF's securities accounts in the form of the Collection

Accounts, GTFF and STFF have acquired security entitlements to the participation interests

pursuant to N.Y. U.C.C. § 8-501(b).

Finally, N.Y. U.C.C. § 8-502 provides that "[a]n action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8-501 for value and without notice of the adverse claim." *See also S.E.C. v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2000 WL 1752979, at \*25 (S.D.N.Y. 2000) (recognizing that "Section 8-502 precludes common law property claims from being brought against bona fide purchasers of securities entitlements, i.e., those who acquire an entitlement for value and without notice of an adverse claim."). As demonstrated above, (i) GTFF and STFF have acquired security entitlements under Section 8-501 with regard to the participation interests, (ii) GTFF and STFF have acquired such security entitlements for value, and (iii) GTFF and STFF have acquired such security entitlements without notice of Girobank's adverse claim. Taken together, Girobank may not assert any claims against GTFF and STFF with regard to the participation interests under N.Y. U.C.C. § 8-502.

Accordingly, for all the reasons set forth above, Girobank's Opposition should be overruled and the TFT Application should be granted.

## CONCLUSION

For the foregoing reasons, GTFF and STFF respectfully request that this Court exercise ancillary jurisdiction over the TFT Application and grant GTFF and STFF's request for the entry of an order directing Bank Leumi and IIG to make disbursements of funds held in the Collection Accounts to GTFF and STFF.

Dated: New York, New York
       May 8, 2020

HERRICK, FEINSTEIN LLP

By:   */s/ Stephen B. Selbst*
         Stephen B. Selbst
         Arthur G. Jakoby
2 Park Avenue
New York, New York 10016
(212) 592-1400
sselbst@herrick.com
ajakoby@herrick.com

*Attorneys for Non-Parties IIG
Structured Trade Finance Fund, Ltd.
and IIG Global Trade Finance Fund
Ltd.*